# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| **ROBIN ATWELL, an individual,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. CV-06-** |
| | ) | **1089-MEF** |
| **SMART ALABAMA, LLC, a legal entity,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT SMART ALABAMA, LLC'S MEMORANDUM BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

COMES NOW defendant SMART Alabama, LLC (hereinafter referred to as "Defendant" or "SMART") and submits this brief in support of its Motion for Summary Judgment:

## I. STATEMENT OF THE CASE

Plaintiff Robin Atwell ("Plaintiff" or "Atwell") alleges that SMART engaged in hostile work environment sex harassment and retaliation after she failed to return to work in February 2006. The undisputed facts revealed in discovery establish that Plaintiff's claims are without merit and are due to be dismissed because: (1) Plaintiff was not subjected to a hostile work environment; (2) Plaintiff was not subjected to a tangible employment action; (3) SMART is not directly or vicariously liable for the alleged conduct; and (4) SMART did not discharge

Plaintiff, either actually or constructively, in retaliation for any protected activities. For these reasons, SMART is entitled to summary judgment as a matter of law.

## II. <u>STATEMENT OF UNDISPUTED FACTS</u>

### A.    SMART ALABAMA, LLC

1.    SMART, located in Luverne, Alabama, is a stamping and welding facility for automotive parts provided to Hyundai Motor Manufacturing Alabama. Tab A (Plt. Depo. at 53:20-23, 67:5-18); Tab C (Sport Aff. ¶4); Tab E (Sport Depo. at 7:2-17).

2.    Until November 2005, Gary Sport ("Sport") served as Human Resources Manager.  Tab C (Sport Aff. ¶2); Tab E (Sport Depo. at 6:22-7:1).

3.    Sport became General Manager in November 2005 and is responsible for overseeing Human Resources, including Employee Relations, as well as General Affairs, Safety, and some indirect responsibility for Information Technology and Accounting.  Tab C (Sport Aff. ¶¶2,6); Tab E (Sport Depo. at 7:18-8:5).

4.    Ruth Ryan, Employee Relations Manager for SMART, reports to Gary Sport.  Tab B (Ryan Aff. ¶4); Tab D (Ryan Depo. at 6:3-6;7:4-5).

5.    At all times relevant to Plaintiff's allegations, Rance Maddox was the Safety Manager at SMART.  Tab A (Plt. Depo. at 69:22-72:20); Tab C (Sport Aff. ¶12); Tab E (Sport Depo. at 27:16-28:1); Tab K (Maddox Dec. ¶2).

6.     SMART is comprised of a production floor, in addition to production and administration offices located at the front of the plant.  Tab A (Plt. Depo. at 67:5-18); Tab E (Sport Aff. ¶5).

7.     SMART's Safety Office is located in the production office area of the plant.  Tab A (Plt. Depo. at 85:3-6); Tab E (Sport Aff. ¶5).

8.     The safety office has a door with a window in the door, and is passed by when SMART employees go to the breakroom and first aid room.  Tab A (Plt. Depo. at 85:3-86:19); Tab E (Sport Aff. ¶5); Tab F (Bodiford Dec. ¶3).

**B.     SMART'S ANTI-HARASSMENT POLICY**

9.     At all times relevant to this action, SMART's employee handbook includes a policy regarding "sexual and other unlawful harassment," which reads in pertinent part as follows:

> It is SMART ALABAMA, LLC's objective to provide a working environment free from discrimination and conduct commonly referred to as sexual harassment….
>
> Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when:
>
> > a.     submission to such conduct is made either explicitly or implicitly a term or condition of an individuals' employment,
> >
> > b.     submission to or rejection of such conduct by an individual is used as a basis for employment decisions affecting such individual, or

1614329 v1

      c.     such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment."

Sexual harassment refers to behavior inappropriate in the workplace because it is offensive, unwelcome behavior which would not occur but for the sex of the offended person. Both sexual harassment, and accusations of sexual harassment, are disrupting to the work environment.

If you or a co-worker experiences what you believe to be sexual harassment or accusations of sexual harassment, report it to your **immediate supervisor or the Human Resources Department.** SMART ALABAMA, LLC will investigate any employee, regardless of job position when such allegations are made. Based on available information, SMART ALABAMA, LLC will take appropriate action and communicate on a need-to-know basis.

Tab A (Plt. Depo. at 56:2-58:20 & DX3); Tab B (Ryan Aff. ¶6 & Att. A); Tab C (Sport Aff. ¶7 & Att. A); Tab O (Hughes Aff. ¶6 & Att. A)(emphasis supplied).

10.    Employees are provided a copy of the policy during their training and at the time of their hire by SMART. Tab A (Plt. Depo. at 56:2-58:20 & DX3); Tab B (Ryan Aff. ¶7); Tab C (Sport Aff. ¶8).

11.    SMART provides annual training to all of its managers, office personnel, and "salary individuals" regarding workplace harassment. Tab C (Sport Aff. ¶8); Tab E (Sport Depo. at 80:13-23).

12.    Rance Maddox received a copy of SMART's anti-harassment policy, and he understood that harassment would not be tolerated at SMART.  Tab C (Sport Aff. ¶14 & Att. E); Tab K (Maddox Aff. ¶3).

### C.    PLAINTIFF ROBIN ATWELL

13.    Plaintiff was hired by SMART on August 25, 2005 as an Assembly Technician, where she "ran a robot that made parts."  Tab A (Plt. Depo. at 54:8-55:21,67:5-18); Tab C (Sport Aff. ¶11); Tab E (Sport Depo. at 24:19-25:3).

14.    Plaintiff was provided her copy of the SMART employee handbook on "the very first night of [Alabama Industrial Development Training (hereinafter referred to as "AIDT")]."  Tab A (Plt. Depo. at 56:15-57:2 & DX3).

15.    Plaintiff knew that the anti-harassment policy was in the handbook and she read the policy shortly after beginning her employment at SMART.  Tab A (Plt. Depo. at 56:2-58:20 & DX 3).

16.    She understood that harassment would not be tolerated at SMART and that she should report harassment she experienced. Tab A (Plt. Depo. at 56:2-58:20 & DX 3).

17.    Plaintiff's training materials also addressed diversity and provided that sexual harassment was prohibited at SMART.  Tab A (Plt. Depo. at 59:3-60:9 & DX 4).

18.    Plaintiff discussed her breast implants at work.  Tab A (Plt. Depo. at 216:2-20); Tab F (Bodiford Dec. ¶5).

19.    Plaintiff also used the words "bitch" and "fuck" at work.  Tab A (Plt. Depo. at 244:11-18).

20.    At least two employees, Scott Kelley and Gary Smith, heard plaintiff when she told Kelley that she had had a sex dream about him and "it was hot." Tab A (Plt. Depo. at 221:12-222:4; 244:11-18); Tab J (Kelley Dec. ¶6); Tab N (Smith Dec. ¶3).

21.    When plaintiff went through AIDT training, she discussed a third shift safety position with Rance Maddox, as she had prior emergency medical service training.  Tab A (Plt. Depo. at 71:8-72:23).

22.    She experienced no problems with Maddox at that time.  Tab A (Plt. Depo. at 72:5-23).

23.    As an Assembly Technician, plaintiff worked third shift and was supervised by Tammy Green, her Team Leader, and Scott Kelley.  Tab A (Plt. Depo. at 67:5-22).

### D.    PLAINTIFF'S TRANSFER TO THE SAFETY OFFICE

24.    In November of 2005, Plaintiff transferred from her position as an Assembly Technician to a position in the Safety Office.  Tab A (Plt. Depo. at 68:11-72:23).

25.     Plaintiff had been "promised" such a position at the same pay rate anyway, but understood that she had been paid a premium for working third-shift assembly.  Tab A (Plt. Depo. at 71:8-10).

26.     Plaintiff would not have been eligible for a raise in her position in the Safety Office until expiration of 90 days.    Tab A (Plt. Depo. at 161:13-164:165:10).

27.     Rance Maddox served as her immediate supervisor.   Tab A (Plt. Depo. at 74:4-8); Tab K (Maddox Aff. ¶5).

28.     In addition to Plaintiff and Maddox, Lisa Bodiford, Wendy Burgans, Lakeisha Jessie and Colinda Porter worked in the Safety Office.  Tab A (Plt. Depo. at 76:11-78:10); Tab F (Bodiford Dec. ¶3); Tab G (Burgans Dec. ¶2); Tab H (Jessie Dec. ¶2); Tab M (Porter Dec. ¶2).

29.     At least one other employee, Colinda Porter, worked first shift with plaintiff, and other safety office employees' shifts overlapped.  Tab A (Plt. Depo. at 78:11-83:21); Tab F (Bodiford Dec. ¶3); Tab G (Burgans Dec. ¶3); Tab H (Jessie Dec. ¶3); Tab M (Porter Dec. ¶¶2,5).

30.     The Safety Office had a door, and the door had a window in it.  Tab A (Plt. Depo. at 86:1-3); Tab C (Sport Aff. ¶5); Tab F (Bodiford Dec. ¶3); Tab G (Burgans Dec. ¶2); Tab I (Jones Dec. ¶4); Tab M (Porter Dec. ¶3).

31.    At times, the door to the safety office remained open because the air conditioning did not properly work.  Tab A (Plt. Depo. at 86:4-19); Tab C (Sport Aff. ¶5); Tab F (Bodiford Dec. ¶3); Tab K (Maddox Aff. ¶4); Tab M (Porter Dec. ¶3).

32.    SMART employees came in and out of the safety office.  Tab A (Plt. Depo. at 86:20-88:3, 98:19-99:10); Tab C (Sport Aff. ¶5); Tab K (Maddox Aff. ¶4).

33.    The Safety Office consisted of two desks, one folding table, and three computers.  Tab A (Plt. Depo. at 93:11-19).

34.    When plaintiff started in the Safety Office, she was trained by Melissa McGough, another safety assistant.  Tab A (Plt. Depo. at 88:14-90:13).

35.    Maddox also assured her that he would show her how to perform her job tasks.  Tab A (Plt. Depo. at 90:9-13).

36.    Plaintiff's duties in the Safety Office included checking the First Aid room, starting a morning inventory, creating charts and graphs, answering the phones, handling issues regarding employees' receipt of workers' compensation benefits, scheduling employees' doctor visits, checking on employees' physical therapy progress, and filling out accident incident reports.  Tab A (Plt. Depo. at 93:23-95:21).

37.     Plaintiff was also responsible for the updating of SMART's OSHA 300 logs.  Tab A (Plt. Depo. at 97:14-18,99:11-100:2); Tab K (Maddox Aff. ¶5); Tab F (Bodiford Dec. ¶7); Tab M (Porter Dec. ¶6).

38.     When assembly technicians in the plant worked overtime, the Safety Office was expected to work overtime.  Tab A (Plt. Depo. at 107:2-20); Tab C (Sport Aff. ¶18).

39.     During plaintiff's employment, SMART employees were working 3 shifts per day, 7 days a week.  Tab A (Plt. Depo. at 107:2-20); Tab C (Sport Aff. ¶18).

40.     Each employee in the Safety Office was expected to work weekends. Tab A (Plt. Depo. at 107:21-108:1, 110:10-12 & DX8); Tab C (Sport Aff. ¶18); Tab F (Bodiford Dec. ¶9); Tab K (Maddox Aff. ¶8).

**E.     PLAINTIFF'S PERFORMANCE PROBLEMS**

41.     Plaintiff understood company policy to prohibit she and other office employees from wearing blue jeans on Fridays when visitors are at the plant.  Tab A (Plt. Depo. at 66:21-67:4); Tab C (Sport Aff. ¶19); Tab K (Maddox Aff. ¶7); Tab M (Porter Dec. ¶10).

42.     Maddox verbally counseled plaintiff about wearing jeans on Friday but did not issue her a written document.  Tab A (Plt. Depo. at 66:15-67:4, 150:12-151:11); Tab C (Sport Aff. ¶19); Tab K (Maddox Aff. ¶7).

43.    Maddox counseled other employees, including Lisa Bodiford, as to wearing of blue jeans and dressing professionally.  Tab A (Plt. Depo. at 151:3-11); Tab K (Maddox Aff. ¶7).

44.    Plaintiff understood that completing paperwork, including workers' compensation claims and OSHA logs, was very important.  Tab A (Plt. Depo. at 75:12-23, 96:1-3).

45.    She and Maddox discussed OSHA 300 logs daily.  Tab A (Plt. Depo. at 127:14-128:11).

46.    Maddox also discussed performance problems with the Safety employees as a group and individual roles during meetings in January 2006.  Tab A (Plt. Depo. at 122:19-123:5; 135:18-136:16 & DX14); Tab G (Burgans Dec. ¶5); Tab H (Jessie Dec. ¶6).

47.    Plaintiff experienced problems with obtaining workers' compensation information from those in the Safety Office working other shifts.  Tab A (Plt. Depo. at  156:7-157:1).

48.    Maddox issued plaintiff a memo on or about January 5, 2006, to remind her of her obligations within the Safety Office, including keeping him up to date as to what was occurring with workers' compensation claims and the OSHA 300 log.  Tab A (Plt. Depo. at 126:14-128:11 & DX10).

49.     Maddox and Sport discussed with plaintiff her performance problems in a conference room on or about January 13, 2006.  Tab A (Plt. Depo. at 123:6-126:8 & DX6); Tab C (Sport Aff. ¶17 & Att. C).

50.     Maddox communicated to her that he expected her to perform the job duties set forth in Exhibit 6.  Tab A (Plt. Depo. at 123:6-126:8); Tab C (Sport Aff. ¶17).

51.     Plaintiff understood that company policy prohibited employees from taking company documents without authorization.  Tab A (Plt. Depo. at 101:12-104:9).

52.     Plaintiff took home company documents, including injury reports of other employees, which SMART did not receive until discovery in this litigation.  Tab A (Plt. Depo. at 101:12-104:9); Tab C (Sport Aff. ¶ 21 & Att. E).

53.     Plaintiff completed paperwork for a raise for which she would not be eligible until February, gave it to Rance Maddox, but never followed up with Human Resources.  Tab A (Plt. Depo. at 162:5-165:10 & DX1).

## F.     ALLEGED HARASSMENT BY MADDOX

54.     On November 16, 2005, plaintiff's birthday, Maddox said "Happy birthday" to her and hugged her in the Safety Office for approximately 8-10 seconds.  Tab A (Plt. Depo. at 176:10-177:18).

55.    Plaintiff did not report the hug at that time, did not record it on her calendar, and continued working after he hugged her.  Tab A (Plt. Depo. at 177:16-178:19); Tab E (Sport Depo. at 58:17-59:14).

56.    Between November 2005 and January 2006, Maddox asked her to have drinks at Igor's 3 or 4 times and referenced that they would have a good time. Tab A (Plt. Depo. at 188:12-190:14).

57.    Plaintiff does not know if Maddox invited anyone else to go and did not ever go herself, and does not know who, if anyone, to whom she reported his invitations.  Tab A (Plt. Depo. at 188:12-190:14); Tab E (Sport Depo. at 58:17-59:14).

58.    Between December 2005 and January 2006, Maddox asked plaintiff on several occasions where she was eating lunch and if she wanted to eat lunch with him.  Tab A (Plt. Depo. at 166:21-169:1).

59.    Maddox also showed up at places plaintiff ate in Luverne, which did not have many places to eat.  Tab A (Plt. Depo. at 169:17-170:16).

60.    Plaintiff first considered this "innocent" conversation, and is not sure what exactly she told Sport about Maddox asking to her lunch when talking to him in SMART's cafeteria.  Tab A (Plt. Depo. at 169:3-172:14); Tab C (Sport Aff. ¶23).

61.    Between November 16, 2005, and December 1, 2005, while in the Safety Office, Maddox commented that it was impossible for men to be monogamous.  Tab A (Plt. Depo. at 190:15-191:191:23).

62.    Plaintiff did not record the comment on her calendar and did not report it to anyone at SMART because it was "just a comment…letting me know how he thought…" Tab A (Plt. Depo. at 192-93).

63.    Between November 16, 2005 and the end of January 2006, Maddox attempted to hold her hand while talking to her about 20 or 30 times.  Tab A (Plt. Depo. at 178:20-182:3).

64.    Plaintiff did not record the attempted hand-holding incidents on her calendar, contends that she reported it to Ryan in late January or early February 2006, but only told Sport that Maddox "turned into a grouch and that he was making it miserable for me."  Tab A (Plt. Depo. at 178:20-182:3).

65.    Maddox touched plaintiff on the arms and "invade [her] space by the way he held [her] arms to talk to [her]."  Tab A (Plt. Depo. at 182:4-183:18).

66.    Plaintiff did not report the arm-touching at the time it occurred, but left a complaint form dated February 2, 2006, for Fran Hughes, who worked in Administration and assisted  Human Resources with hiring functions.  Tab A (Plt. Depo. at 182:4-188:11 & DX 17); Tab C (Sport Aff. ¶ 26 & Att. H); Tab O (Hughes Aff. ¶¶3,5,7).

67.    She does not know what happened to the typed complaint, dated on or about February 2, 2006, which she no longer has, and whether Hughes or Gary Sport ever received it.  Tab A (Plt. Depo. at 186:15-188:11 & DX 17); Tab C (Sport Aff. ¶26 & Att. H); Tab E (Sport Depo. at 61 & PX1); Tab O  (Hughes Aff. ¶7).

68.    Between November 16, 2005 and the end of January 2006, Maddox rubbed his pelvis area up against plaintiff's buttocks in a sliding manner several times per week.  Tab A (Plt. Depo. at 193:12-196:1).

69.    Plaintiff reported this touching to Chairman Kwon on the same day she found her "termination" letter, sometime after January 30, 2006.  Tab A (Plt. Depo. at 196:15-197:12).

70.    She understood Kwon was not her supervisor or Human Resources. Tab A (Plt. Depo. at 197:15-21); Tab B (Ryan Aff. ¶19 ); Tab C (Sport Aff. ¶27).

71.    On January 18, 2006, while plaintiff was sitting at her desk in the Safety Office, Maddox came from behind her, rubbed her shoulders, and reached down and touched her breast.  Tab A (Plt. Depo. at 172:22-174:18 & DX 16).

72.    When plaintiff reported the incident to Ryan in late January or early February 2006 and to the EEOC under penalty of perjury, she reported the touching as having been on her shoulders.  Tab A (Plt. Depo. at 172:22-173:15 & DX16); Tab B (Ryan Aff. ¶15); Tab D (Ryan Depo. at 23-26).

73.    Upon    receiving    plaintiff's    complaint,    Ryan    conducted    an investigation.  Tab A (Plt. Depo. at 206:2-207:6); Tab B (Ryan Aff. ¶16).

74.    Ryan interviewed Colinda Porter, who described the incident as follows:

> One day, when she had successfully entered a case on the
> log, she was very excited.  Rance, who was already
> walking over from his desk, placed both hands on her
> shoulders and said, "Good job."  They laughed because
> Robin had finally entered a case, and I laughed, too.
> Robin did not appear to be offended, shocked or upset.
> Rance walked out of the office, and then Robin did.

Tab A (Plt. Depo. at 205:13-207:6); Tab D (Ryan Depo. at 32:6-33:5); Tab E (Sport Depo. at 73:2-15); Tab G (Burgans Dec. ¶4);  Tab M (Porter Dec. ¶6).

75.     Ryan concluded, based upon plaintiff and Porter's accounts that there had been no policy violation.  Tab A (Plt. Depo. at 206:2-207:6); Tab B (Ryan Aff. ¶17).

76.    Ryan attempted to meet with plaintiff to discuss the results of her investigation, but plaintiff left SMART shortly thereafter.  Tab A (Plt. Depo. at 206:2-207:6); Tab B (Ryan Aff. ¶17).

77.    Maddox touched her legs while during meetings with Kwon, but she did not report the touchings after the meetings because she was afraid he was going to fire her, but had no personal knowledge that he could do so without approval. Tab A (Plt. Depo. at 223:10-226:3); Tab B (Sport Aff. ¶20).

78.    Maddox asked plaintiff, who had discussed her breast implants at work, if her breasts were real and what they felt like.  Tab A (Plt. Depo. at 214:14-218:20); Tab F (Bodiford Dec. ¶5).

79.    Plaintiff walked out of the Safety Office, went outside to smoke, and came back and did her job.  Tab A (Plt. Depo. at 217:5-12).

80.    She did not report the comment to anyone at SMART, and, although she had some discussions with Sport concerning Maddox in the cafeteria, does not recall any details.  Tab A (Plt. Depo. at 218:3-218:20); Tab B (Sport Aff. ¶23).

81.    Maddox made the comment, "I've got a real man for you" approximately 5 or 6 times to plaintiff and other women, which plaintiff did not report at the time it occurred.  Tab A (Plt. Depo. at 218:21-220:7).

82.    Maddox called plaintiff "baby," "honey," and "sweetie" each day she worked with him, but plaintiff never reported this to Human Resources because they were "comments my daddy calls people."  Tab A (Plt. Depo. at 222:5-223:9).

83.    Maddox also said to plaintiff "You've got to work with me" and "I'll take care of you," after which plaintiff would walk out, go outside, or go to the bathroom, then continue working.  Tab A (Plt. Depo. at 228:23-233:15); Tab K (Maddox Dec. ¶10).

84.    Maddox told plaintiff his wife was a "fucking bitch" and that he was unhappy in his marriage.  Tab A (Plt. Depo. at 240:6-244:18).

85.    Maddox called plaintiff at home and on her cell phone to ask work-related questions and then what she was doing, but he made no comments during these conversations she considered inappropriate.    Tab A (Plt. Depo. at 207:7-213:21); Tab C (Sport Aff. ¶23).

86.    Besides the above, plaintiff does not contend that she experienced any further harassment from Rance Maddox.    Tab A (Plt. Depo. at 254:12-255:2).

87.    Other female employees in the Safety Office experienced no problems working with Maddox.    Tab F (Bodiford Dec. ¶6); Tab G (Burgans Dec. ¶6); Tab H (Jessie Dec. ¶5).

## G.    PLAINTIFF'S ALLEGED REPORTS, TRANSFER, AND JOB ABANDONMENT

88.    Plaintiff reported Maddox's conduct to no one at SMART until the end of January 2006 because she was afraid that he was going to fire her, though she does not know if he could do so himself.    Tab A (Plt. Depo. at 64:5-65:13; 225:8-226:3); Tab C (Sport Aff. ¶20); Tab K(Maddox Aff. ¶14).

89.    On or about January 18, 2006, Plaintiff spoke to Sport in SMART's cafeteria about Maddox, but does not recall what she told him, and Sport never learned that Maddox asked her about eating lunch, gave her a birthday hug, attempted to hold her hand, asked her out for drinks, rubbed his pelvis against her, told her that men could not be monogamous, or otherwise harassed her in any

manner.  Tab A (Plt. Depo. at 181:14-20; 218:15-20 & DX 14); Tab C (Sport Aff. ¶23); Tab E (Sport Depo. at 91:7-96:13).

90.     In response to employee complaints (including plaintiff's "grouch" complaint) solely as to how Maddox was running the Safety Office, Sport counseled Maddox to "Show respect at all times to your peers, your subordinates, and our Security Team.  Manage yourself professionally and calmly. Don't threaten or intimidate people."  Tab A (Plt. Depo. at 258:1-259:23 & DX18); Tab C (Sport Aff. ¶22 & Att. G); Tab E (Sport Depo. at 55:9-56:13); Tab K (Maddox Aff. ¶11).

91.     Plaintiff wrote a letter to Maddox on her computer, and, although plaintiff contends that she included jokes made about women and invading body space, the only comments on the letter were, "This letter is intended to express to some of the concerns that I have.  I have worked in the Safety Department Since November 14 of 2006.  As you know I have had a couple of hit and miss days on the daily operations.  I have learned a lot and I am still learning every day.  I " Tab A (Plt. Depo. at 128:20-132:2 & DX 11).

92.     Plaintiff met with Ruth Ryan and Joseph on or about February 1, 2006, told her only that Maddox had been "out of the way," but did not give Ryan specific details contained in her EEOC Charge.  Tab A (Plt. Depo. at 202:11-203:20); Tab B (Ryan Aff. ¶¶14-15, 20).

93.    She met with Ryan again on February 2, 2006 in the Washington Room for over an hour.  Tab A (Plt. Depo. at 203:21-204:3).

94.    Plaintiff  told Ryan only that Maddox had touched her inappropriately and had made comments making her uncomfortable.  Tab A (Plt. Depo. at 204:10-206:1); Tab B (Ryan Aff. ¶15).

95.    Ryan, in response to a request by plaintiff for a transfer, told her that she would be transferred back to production, at least two or three hundred feet from Maddox, where she would not have one-on-one contact with him and would not report to him.  Tab A (Plt. Depo. at 206:6-207:6; 274:11-275:14); Tab B (Ryan Aff. ¶20); Tab C (Sport Aff. ¶28); Tab E (Sport Depo. at 85:4-15)

96.    Plaintiff asked David McGough about transferring to his department, which would have placed her in closer proximity to Maddox's office than if she was moved out into the plant, but reported no harassment to him.  Tab A (Plt. Depo. at 263:4-21); Tab C (Sport Aff. ¶25); Tab P (McGough Aff. ¶¶4-5).

97.    Plaintiff refused the transfer offered by SMART because "[Maddox] has access to the plant" and could go through the plant "at any time."  Tab A (Plt. Depo. at 199:10-202:10); Tab C (Sport Aff. ¶¶24-25).

98.    Maddox, however, had been out on a medical leave during late January 2006 and resigned his employment with SMART within three weeks of

plaintiff's failure to return to work.  Tab A (Plt. Depo. at 159:5-160:6); Tab C (Sport Aff. ¶¶32-33 & Att. J); Tab K (Maddox Aff. ¶2).

99.    Plaintiff found an unsigned letter, dated January 30, 2006, from Maddox in a "community pile," in which Maddox stated that, due to her job performance, he had no choice "but to terminate you from within the Safety Department." Tab A (Plt. Depo. at 152:2-154:20 & DX 15); Tab C (Sport Aff. ¶20 & Att. D); Tab K (Maddox Aff. ¶14).

100.   The letter mentioned nothing about plaintiff's employment with SMART being terminated.  Tab A (Plt. Depo. at 226:13-228:22 & DX 15); Tab C (Sport Aff. ¶20 & Att. D).

101.   Plaintiff was never given the letter by Maddox, and Sport did not authorize the letter. Tab A (Plt. Depo. at 152:2-154:10 & DX 15); Tab C (Sport Aff. ¶20 & Att. D); Tab K (Maddox Aff. ¶14).

102.   No one at SMART ever told plaintiff she was terminated.   Tab A (Plt. Depo. at 62:23-65:16, 152:3-153:6;158:19-159:1); Tab C (Sport. Aff. ¶20); Tab K (Maddox Aff. ¶14).

103.   No one at SMART ever told plaintiff that she needed to resign.  Tab A (Plt. Depo. at 65:14-16); Tab C (Sport Aff. ¶20).

104.    Plaintiff reported to work on Monday, February 6, 2006 and Tuesday, February 7, 2006, but did not return to work after that day.  Tab A (Plt. Depo. at 62:8-19); Tab C (Sport Aff. ¶28 & Att. I).

## H.    PLAINTIFF'S CLAIMS

105.    Plaintiff filed a Charge of Discrimination with the EEOC alleging hostile work environment harassment and retaliation.  Tab A (Plt. Depo. at 165:4-20 & DX 16).

106.    Plaintiff told the EEOC under penalty of perjury that Maddox reached down and touched her shoulder, not her breast. Tab A (Plt. Depo. at 165:4-20; 172:22-173:15 & DX 16).

107.    The EEOC found no cause to conclude that any harassment or retaliation had occurred, as alleged in plaintiff's Charge.  Tab A (Plt. Depo. at 294:16-295:7 & DX 21).

108.    Plaintiff filed this action alleging hostile work environment sexual harassment on December 8, 2006. (Complaint, Doc. No. 1).

109.    She contends she was subjected to emotional distress as a result of Maddox's actions.  (Complaint, ¶13 , Doc. No. 1).

110.    She was hospitalized during the last week of January 2006 for a non-work related car accident.  Tab A (Plt. Depo. at 287:4-16).

111.   Plaintiff, who had previously been on Wellbutrin, later told Dr. Tompkins that her supervisor was "constantly fussing and nitpicking her" and that she had filed sexual harassment charges.  Tab A (Plt. Depo. at 281:13-284:12, 288:1-289:19 & DX 19).

112.   Plaintiff sought no counseling as a result of Maddox's alleged conduct.  Tab A (Plt. Depo. at 284:10-285:6).

113.   Plaintiff had been raped in 1997, for which she never received counseling, and contends that this event made the events occurring at SMART more difficult for her.  Tab A (Plt. Depo. at 291:9-293:3).

114.   Plaintiff heard that Cathy Caldwell, an employee of the security company contracting with SMART, left her employment because Maddox kissed her, but has no personal knowledge.  Tab A (Plt. Depo. at 263:22-267:18 & DX14); Tab B (Ryan Aff. ¶21); Tab C (Sport Aff. ¶31).

115.   As of the date of her deposition, plaintiff was not working and had not sought nor held any positions of employment since leaving SMART.  Tab A (Plt. Depo. at 50:10-23).

### III. <u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment is appropriate if the court finds there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249

(1986).  The movant's initial burden is to "show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  Clark v. Coates & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  When the burden of proof at trial belongs to the non-movant, the moving party may support its motion with "affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial."  Celotex Corp., 477 U.S. at 323.

"Mere general allegations which do not reveal detailed and precise facts" will not create a genuine issue of material fact.  Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 592 (11th Cir. 1995), cert. denied, 116 S.Ct. 74 (1995).  Conclusory statements also fail to create a genuine issue of material fact.  See Brown v. City of Clewiston, 848 F.2d 1534, 1537 (11th Cir. 1998).

While employment discrimination cases present fact-intensive issues, "[t]he long and short of it is that the summary judgment rule applies in job discrimination cases just as in other cases. No thumb is to be placed on either side of the scale."  Chapman v. A-1 Transport, 229 F.3d 1012, 1026 (11th Cir. 2000) (en banc)

## IV. ARGUMENT

### A.    SMART IS ENTITLED TO SUMMARY JUDGMENT AS TO PLAINTIFF'S SEXUAL HARASSMENT CLAIMS.

Plaintiff has failed to establish a genuine issue of material fact as to her harassment claims. She has failed to prove hostile work environment. She has

1614329 v1

failed to prove that she was subjected to a tangible employment action as a result of her refusal to respond to Maddox's alleged advances. She has failed to establish a genuine issue of material fact as to SMART's direct or vicarious liability.

      **1.    Plaintiff Has Failed to Establish a Genuine Issue of Material Fact as to Hostile Work Environment.**

      To prove hostile work environment, plaintiff must show: (1) she belongs to a protected group; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based upon her sex; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment; and (5) defendant is liable for such environment under a theory of vicarious or direct liability.  See Mendoza v. Borden, Inc., 195 F.3d 1238, 1246 (11th Cir. 1999); Harris v. Forklift Sys., Inc., 510 U.S. 17, 22-23 (1993).  At least some of the conduct about which plaintiff now complains was not based on sex.  Moreover, plaintiff cannot prove that the alleged conduct, in its totality, was sufficiently severe or pervasive to establish a hostile work environment.  Nor can she establish SMART's direct or vicarious liability, as discussed below.

      At least some of the harassment about which plaintiff now complains is not actionable because the conduct was not based on her sex.  See Oncale v. Sundowner Offshore Svcs., Inc., 523 U.S. 75, 80 (1998) ("The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not

exposed").  Plaintiff admits that Maddox's calls to her were not sexual in nature. (Facts, ¶86).  She admits not reporting Maddox's monogamy comment because he was letting her "know how he felt." (Facts, ¶62).  Maddox's reference to his wife as a "fucking bitch" was not based on plaintiff's gender.  (Facts, ¶85); see Baldwin v. Blue Cross/Blue Shield, 480 F.3d 1287, 1301 (11th Cir. 2007) (finding that use of profanity not based on sex).  As at least some of the alleged conduct was not based on plaintiff's sex, and could have been directed to male employees as well, it was not sex-based and is therefore not actionable under Title VII.  See Henson v. City of Dundee, 682 F.2d 897,904 (11th Cir. 1998).

The remaining conduct alleged by plaintiff is not sufficiently severe or pervasive to state a hostile work environment claim. Title VII does not impose a general civility code and will not allow for a claim based upon isolated events, teasing, or off-hand comments. Mendoza, 195 F.3d at 1246.  The Mendoza case is instructive as to what rises to the level of a hostile work environment.  A supervisor's: (1) telling plaintiff he was "getting fired up;" (2) rubbing his hip against the plaintiff's while touching her shoulder and smiling; (3) making sniffing sounds while staring at the plaintiff's groin; and (4) constantly following and staring at the plaintiff, in their totality, "[fell] well short of the level of either severe or pervasive conduct sufficient to alter [the plaintiff's] terms and conditions of employment." Id. at 1247-48.

Here, plaintiff offers even less. Maddox's alleged comments about monogamy, "I've got a real man for you," and inquiries about plaintiff's breasts are insufficient to establish a hostile environment. See Howard v. City of Roberstdale, 168 Fed. Appx. 883, 889-90 (11th Cir. Feb. 9, 2006) ("nooner" comment, discussing plaintiff's private parts and sex life, and touching did not defeat summary judgment); see Bussell v. Motorola, Inc., 141 Fed. Appx. 819, 823 (11th Cir. 2005 (strip club talk insufficient), vacated on other grounds, 127 S.Ct. 38 (2005). Even when combined with plaintiff's inconsistent accounts of Maddox touching her breasts, touching her hands, or giving her a birthday hug, plaintiff has not stated a hostile environment claim. See Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 585 (11th Cir. 2000) (no hostile environment where worker placed hand on knee and touched hem of dress, in addition to calling at home repeatedly); Bussell, 141 Fed. Appx. at 823 (lifting plaintiff's shirt and pulling down pants insufficient to show hostile environment); see Willets v. Interstate Hotels, LLC, 204 F.Supp.2d 1334 (M.D. Fla. 2002) (holding that hugging plaintiff in a sexualized manner, rubbing her hands and shoulders, frequently stating he loved plaintiff, kissing plaintiff on neck, and once playing a hand on plaintiff's inner thigh does not establish requisite severity or pervasiveness).

The conduct alleged by plaintiff was not frequent considering all the daily opportunities she had to interact with Maddox in the Safety Office. She specifically

identifies one breast touching, one birthday hug, one monogamy comment, 5 or 6 "I've got a real man for you" comments, and one inquiry about her breasts.  His alleged conduct was not nearly as severe as the lewd sniffing and stalking found insufficient in <u>Mendoza</u>, or the touching and discussion of plaintiff's private parts in <u>Howard</u>.  The conduct certainly did not interfere with plaintiff's performance of her Safety Office duties, as she continued working after Maddox's alleged comments and touchings.  (Facts, ¶¶55, 79); <u>Davis v. Potter</u>, 190 Fed. Appx. 874, 877 (11th Cir. 2006) (holding that individual who suffers no apparent effect upon her job cannot show hostile environment). Hence, Maddox's conduct did not rise to the level of a hostile work environment, and summary judgment is due to be granted.

**2.    Plaintiff Has Failed to Establish a Genuine Issue of Material Fact as to a Tangible Employment Action.**

Even assuming, *arguendo¸* that plaintiff could prove that Maddox's alleged conduct rose to the level of actionable harassment, she has failed to allege or prove that she suffered a tangible employment practice as a result thereof.  As an initial matter, plaintiff's EEOC Charge alleged harassment only under a hostile work environment theory.[1]   See <u>Minix v. Jeld-Wen, Inc.</u>, No. 06-16094, 2007 WL 1828259 (11th Cir. June 27, 2007) (holding that harassment allegation premised on

---

[1] Notably, plaintiff's Complaint does not specifically allege any tangible employment action was taken as a result of her refusal to submit to Maddox's alleged conduct.  (Doc. No. 1). In any event, there was no such action, as set forth by SMART above.

tangible employment action is not like or related to hostile environment theory).

She cannot now contend that her alleged refusals to Maddox's advances caused a

tangible employment action of hostile environment such allegations set forth in her

EEOC Charge.

Even assuming plaintiff could make such a claim at this stage, such claim

fails because she has failed to establish that she was subjected to a tangible

employment action, defined by the Eleventh Circuit as follows:

> The prima facie elements for…[a tangible employment
> practice] cause of action that the plaintiff must prove
> include: (1) the employee belongs to a protected group;
> (2) the employee was subjected to unwelcome sexual
> harassment; (3) the harassment complained of was based
> on sex; and (4) the employee's reaction to the unwelcome
> behavior affected tangible aspects of the employee's
> compensation, or terms, conditions or privileges of
> employment.

Johnson v. Booker T. Washington Broadcasting Svc., Inc., 234 F.3d 501,

508 (11th Cir. 2000).  Plaintiff must prove a "causal link between the tangible

employment action and the incident(s) of sexual harassment."  Burlington Indus.,

Inc. v. Ellerth, 524 U.S. 742, 761-62 (June 26, 1998); see Arnold v. Tuskegee

Univ., 212 Fed. Appx. 803 (11th Cir. 2006).  "If a claim involves only unfulfilled

threats, it should be categorized as a hostile work environment claim which

requires a showing of severe or pervasive conduct."  Ellerth, 524 U.S. at 754.

In the instant case, there is no evidence before the Court suggesting that plaintiff was subjected to a tangible employment action as a result of her refusal to submit to Maddox's alleged advances. In fact, plaintiff's allegations consist of no more than "unfulfilled threats." It is undisputed that plaintiff was never terminated nor told to resign. (Facts, ¶¶102-103). The "termination" memo she "found," which made no reference to her employment with SMART being terminated, was never issued to her. (Facts, ¶¶99-101). Plaintiff has set forth no evidence that the unsigned, undelivered memo was causally connected to any advances, as she does not know if Maddox actually had the authority to issue it on his own. (Facts, ¶101). Plaintiff's transfer to production, done in response to her request, never took place because she failed to return to work. (Facts, ¶¶95, 104).[2]

Plaintiff's remaining allegations come nowhere close to tangible employment actions. Maddox's verbal warning, which was issued to other employees, about wearing blue jeans resulted in no changes to her employment status. (Facts, ¶¶42-43); Johnson, 234 F.3d at 512 (defining "tangible employment practice" as "a significant change in employment status…which, in most cases, involves direct economic harm"). Nor did the memorandums issued to plaintiff

---

[2] Such transfer would not rise to the level of a tangible employment action anyway. "An offer to transfer an employee…is not an employment action; it is merely an offer. Providing an employee with a choice about where she works does not change the terms and conditions of her employment." Baldwin v. Blue Cross/Blue Shield, 480 F.3d 1287, 1292 (11th Cir. 2007). As set forth below, plaintiff was not constructively discharged.

about her performance.  (Facts, ¶¶49-50).  Plaintiff has offered no evidence that such actions by Maddox were causally connected to her rebuffing of any advances. Hence, even had plaintiff pled such a claim, she cannot proceed on a tangible employment action theory.

### 3.    SMART Is Not Liable.

Even assuming, *arguendo*, that plaintiff was subjected to actionable harassment based on sex, SMART is still entitled to summary judgment because it is not liable for such harassment.  SMART is not directly liable for such harassment.  SMART is not vicariously liable for such harassment.

### a.    SMART IS NOT DIRECTLY LIABLE.

Plaintiff cannot establish a genuine issue of material fact as to SMART's direct liability because she has failed to prove that SMART had actual knowledge of the alleged harassment and failed to take steps to remedy it.  See Minix, 2007 WL 12828259 at *2.  SMART could not take steps to remedy what it did not know.  Here, there is no evidence that, when SMART *actually* became aware of plaintiff's allegations in late January 2006, it failed to take steps to remedy the conduct alleged.  SMART had no knowledge, actual or constructive, of any sexual harassment concerns based on plaintiff's admittedly vague discussion with Gary Sport on or about January 18, 2006.  See Madray v. Publix Supermarkets, Inc., 208 F.3d 1290, 1300-01 (11th Cir. 2000) (no notice from general statements).  Even

still, when plaintiff, along with others, reported that Maddox was a "grouch," Sport issued him a counseling memorandum about his interactions with employees. (Facts, ¶90).

Plaintiff admits she does not know what happened to the February 2, 2006 document she allegedly gave Hughes *after* meeting with Ryan. (Facts, ¶¶66-67). Her reports to both Hughes and Kwon were not sufficient to put SMART on notice because they were not, as plaintiff admits, part of Human Resources, who were designated by the policy to receive sexual harassment complaints; nor were they her supervisor. Madray, 208 F.3d at 1301-02 (holding that reports to mid-level managers insufficient where not designated by policy. All that Ryan learned was that Maddox made plaintiff uncomfortable and had touched her inappropriately. (Facts, ¶94). Ryan acted immediately to investigate the one specific incident of which she had knowledge. (Facts, ¶73). In addition, plaintiff was offered transfer to a position where she would be further away from Maddox than even she requested. (Facts, ¶96). SMART took steps to resolve the concerns reported by plaintiff and, as such, is not directly liable for Maddox's alleged conduct. See Watson v. Blue Circle, Inc., 324 F.3d 1252, 1260 (11th Cir. 2003) ("If an employer has actual or constructive notice of harassment but takes immediate and appropriate corrective action, the employer is not liable for the harassment").

### B.    SMART IS NOT VICARIOUSLY LIABLE.

Even assuming, *arguendo*, that the events about which plaintiff now complains rose to the level of a hostile work environment, her claim still fails because Defendant is not responsible for the alleged conduct.  She cannot establish that Defendant is liable for any sexual harassment because the undisputed facts reflect: (a) that [Defendant] exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee failed to take advantage of any preventive or corrective opportunities provided by [Defendant] to avoid harm otherwise.  Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 765 (1998).

### i.    Defendant exercised reasonable care to prevent and correct any sexually harassing behavior.

Defendant exercised reasonable care to prevent gender harassment because SMART established an anti-harassment policy that provided avenues by which employees could complain.  (Facts, ¶9). SMART's policy was disseminated to employees at the time of hire, told employees that harassment should be reported to their supervisor or Human Resources.  (Facts, ¶¶9-10); Madray, 208 F.3d at 1298-99 ("[D]issemination of an employer's anti-harassment policy [is] fundamental to meeting the requirement for exercising reasonable care in preventing sexual harassment').  Managers were trained on the policy, and Maddox

received and understood the policy. (Facts, ¶¶11-12). SMART took steps to investigate reported violations of the policy. (Facts, ¶¶9, 114).

Plaintiff was undisputedly aware of the policy during her employment at SMART. She understood that she should report harassment she experienced. (Facts, ¶15-17). She knew this as early as her orientation. (Facts, ¶15).

> ii. **Plaintiff was aware of and unreasonably failed to take advantage of preventive or corrective opportunities and to avoid harm otherwise.**

Plaintiff unreasonably failed to take advantage of corrective opportunities available to her through SMART by failing to adequately notify SMART of the alleged harassment and by failing to take advantage of reasonable corrective measures offered by SMART. An employee's failure to take advantage of preventive or corrective measures can take one of two forms: (1) the employee does not use the procedures to *promptly* report harassment; and (2) the employee is not taking advantage of any reasonable corrective measures the employer offered after harassment was reported. Baldwin, 480 F.3d at 1306.

Plaintiff was undisputedly aware that harassment could and should be reported. (Facts, ¶15-17). Plaintiff made the conscious decision, however, not to promptly report Maddox's alleged conduct--which had begun in November 2005--

to anyone designated by the policy until the end of January 2006.[3] Her nearly two-and-a-half month delay establishes her failure to take advantage of SMART's corrective measures of which she was admittedly aware. See Walton v. Johnson & Johnson Svcs., Inc., 347 F.3d 1272, 1289 (holding that employee unreasonably failed to take advantage of anti-harassment policy when she waited 3 months to report harassment); Taylor v. CSX Transp., 418 F.Supp.2d 1284 (M.D. Ala. 2006) (holding that employee's failure to timely report established second element of affirmative defense).

What she did report was insufficient to put SMART on notice of any harassment; even still, prompt corrective action was taken. Her January 18, 2006 and February 2, 2006 generalized statements to Hughes and Sport, which she admittedly cannot recall and which did not contain all the allegations she now sets forth, were insufficient to put SMART on notice. See BE v. Columbia Palms West Hosp. Ltd. Partnership, 490 F.3d 1302, 1310 (11th Cir. 2007) (generalized report of problem with coworker insufficient to constitute report of harassment); see Madray, 208 F.3d 1300-01 (complaint failing to disclose nature and extent of alleged harassment insufficient to put employer on notice of need to take corrective

---

[3] Any contention by plaintiff that she was afraid to report the alleged harassment or that she did not want to "make waves" does not relieve her of the obligation to report the alleged harassment. Madray, 208 F.3d at 1296 (recognizing that "[t]o permit an employee to disregard a policy of which she was admittedly aware based on generalized fears would require an employer to become automatically liable for harassment committed by a supervisor").

action).[4]

Plaintiff's February 1, 2006 report to Ryan was the first SMART learned of any particular sexually harassing behavior by Maddox. Whether the report was limited to an isolated shoulder-touching incident, or was, as plaintiff now vaguely contends, a full-blown account of plaintiff's current allegations does not matter. SMART took immediate remedial action.   Ryan promptly investigated the touching incident and concluded no harassment occurred. (Facts, ¶¶74-76); see Baldwin, 480 F.3d at 1303-04 ("The employer is not required to credit the statements on the she-said side absent circumstances indicating it would not be unreasonable to do so…").   In addition, Ryan arranged for plaintiff to be transferred further away from Maddox than even plaintiff had requested.  (Facts, ¶96).

Plaintiff's abandonment of her position--before learning of the results of Ryan's investigation and before SMART could transfer her--precludes from her now contending that SMART failed to take appropriate remedial action.  See Watson v. Blue Circle, Inc., 324 F.3d 1252, 1260 (11th Cir. 2003) ("If an employer has actual or constructive notice of harassment but takes immediate and appropriate corrective action, the employer is not liable for harassment").  Plaintiff

---

[4] Her alleged report to Kwon was also insufficient, as it did not take place until sometime after she located the "termination" letter dated January 30, 2006, after she had been in the hospital that same week.  (Facts, ¶¶70-71).  Her contention that she had "already been" to Human Resources fails based on her own timeline as well.

concedes here that moving to production would place her out of the office with Maddox and, as such, was an effectively calculated to end any alleged harassment.[5] This is particularly evident due to Maddox's ongoing medical leave and the fact that he left SMART's employment shortly thereafter. The fact that plaintiff did not receive the transfer of her choice--to David McGough's area--does not render the steps taken by SMART as ineffective. See Farley v. American Cast Iron Pipe Co., 115 F.3d 1548 (11th Cir. 1997) (holding that employee does not get to choose her remedy). Because plaintiff inexplicably failed to take advantage of the preventive and corrective measures offered by SMART, she is now precluded from asserting her sexual harassment claim.  See Madray, 208 F.3d 1290 at 1302.

## C.    SMART IS ENTITLED TO SUMMARY JUDGMENT AS TO ANY CLAIM BY PLAINTIFF FOR RETALIATION.

To the extent that Plaintiff's Complaint alleges that SMART terminated her or caused her to resign in retaliation for reporting Maddox's alleged harassment,[6] SMART is entitled to summary judgment because Plaintiff cannot demonstrate that she suffered any adverse employment action or that there was a causal link

---

[5] "Title VII does not convey upon an employee the absolute right to demand that a workplace dispute be resolved in a way that is most attractive to her.  Title VII simply requires that remedial action taken be reasonably calculated to end the sexual harassment." Cooper v. Wyeth Ayerst Lederle, 106 F.Supp.2d 479 (S.D.N.Y. 2000); see also Nash v. Electrospace Svcs., Inc., 9 F.3d 401, 404 (5th Cir. 1993) (employer's response to complaint was sufficient where, although complaints could not be corroborated during investigation, employee was transferred to another position).

[6] Plaintiff's Complaint does not specifically allege retaliation; SMART addresses this claim in any event.

between her protected activity and the alleged adverse employment action.  To establish a prima facie case of retaliation under Title VII, a plaintiff must show: (1) participation in a protected activity; (2) a materially adverse action; and (3) a causal connection between the two.  See Cooper v. Southern Co., 390 F.3d 695, 740 (11th Cir. 2005).

There is no evidence which shows that Plaintiff suffered an adverse employment action which was caused by her protected activity.  Recently, in Burlington Northern & Santa Fe Railway Co. v. White, 126 S. Ct. 2405 (2006), the U.S. Supreme Court defined adverse employment actions in the context of a retaliation claim as an employer's actions that are "materially adverse to a reasonable employee or job applicant."  *Id.* at 2409.  In other words, the "actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination."  *Id.*

### 1.    Plaintiff Did Not Suffer An Adverse Employment Action.

Plaintiff alleges that she was "caus[ed]… to resign her employment with [SMART]," but the record evidences that it is Plaintiff who decided to cease working at SMART.  (Pl.'s Compl. at ¶ 12); (Facts, ¶¶97-101).[7]  Immediately after Plaintiff contends she complained of Maddox's alleged behavior, she was offered

---

[7]  Her verbal warning for wearing blue jeans and January 2006 performance memoranda do not rise the level of adverse employment actions.  Plaintiff offers no evidence linking such actions to any economic loss or change in employment status.

the opportunity to transfer out of the Safety Office to another part of the plant. (Facts, ¶92). Plaintiff refused the offer and failed to return to work.  As stated above, "[a]n offer to transfer an employee… is not an employment action; it is merely an offer.  Providing an employee with a choice about where she works does not change the terms or conditions of her employment."  <u>Baldwin</u>, 480 F.3d at 1300; <u>see</u> <u>also</u> <u>Sauvage v. Snow</u>, 413 F. Supp. 2d 1289, 1298 (M.D. Fla. 2005) (holding that a lateral transfer did not constitute adverse employment action).

### 2.    Plaintiff Was Not Constructively Discharged.

Nor may plaintiff prevail on a constructive discharge theory.  "A constructive discharge occurs when a discriminatory employer imposes working conditions that are 'so intolerable that a reasonable person in [the employee's] position would have been compelled to resign.'" <u>Fitz v. Pugmire Lincoln-Mercury, Inc.</u>, 348 F.3d 974, 977 (11th Cir. 2003) (quoting <u>Poole v. Country Club of Columbus, Inc.,</u> 129 F.3d 551, 553 (11th Cir. 1997)).  The "standard for proving constructive discharge is higher than the standard for proving a hostile work environment." <u>Walton v. Johnson & Johnson Services, Inc.,</u> 347 F.3d 1272, 1282 (11th Cir. 2003) (quoting <u>Hipp v. Liberty Nat'l Life Ins. Co.,</u> 252 F.3d 1208, 1231 (11th Cir. 2001)).  Moreover, while constructive discharge may constitute an adverse employment action, the plaintiff bears the burden of proving that a constructive discharge actually occurred.  <u>See</u> <u>Hipp v. Liberty Nat'l Life Ins. Co.,</u>

252 F.3d 1208, 1230 (11th Cir. 2001).  The undisputed facts of this case simply do not meet that standard.

As set forth above, Plaintiff has not adduced sufficient evidence in support of her hostile work environment claim.  Further, there is no evidence that Plaintiff ever actually resigned or that she did so because of any act or omission on the part of SMART.  Plaintiff reported to work on Monday, February 6, 2006, and she worked "some" on the 7th, but she did not return to work after February 7, 2006.  (Facts, ¶104).  She never received a letter of termination and that no one at SMART ever told her she was terminated.  (Facts, ¶¶99-101).  She also testified that no one at SMART told her that she needed to resign.  Id.  The "termination" letter found by plaintiff in the community pile was never issued to her.  (Facts, ¶¶99-101).

Plaintiff's allegations of harassment do not rise to the level of constructive discharge such that a reasonable person would be compelled to resign.  When an employee quit after propositions fondling, and two rapes by her immediate Supervisor, the Eleventh Circuit found no constructive discharge.  See Walton v. Johnson Svcs., Inc., 347 F. 3d 1272, 1282 (11th Cir. 2003).  The picture even plaintiff paints of her employment at SMART falls for short of the constructive discharge threshold.  Even after Maddox's alleged comments and touchings, plaintiff continued performing her job duties.  (Facts, ¶¶55, 79).

Plaintiff admits she unilaterally made the decision not to return to work after February 7, 2006.  No one had told her to resign or that she would be terminated. In fact, she had been told that she would be transferred, in accordance with her wishes.[8]  Therefore, SMART is entitled to summary judgment as to any claim arising as a result of Plaintiff's unilateral decision to stop reporting for work in February 2006.

### 3.    There is Nothing to "Causally Connect" to Any Protected Activity and Plaintiff Cannot Show Pretext.

Without an adverse employment action, there is nothing to link to Plaintiff's alleged protected activity.  Plaintiff offers no evidence connecting the January 2006 counseling memorandum to any protected activity.  In fact, plaintiff knew and understood her responsibilities as to the OSHA 300 log and workers' compensation.  She cannot causally connect the verbal warning to any protected activity where even she admits that she is not aware if Maddox counseled others, which, in fact, he had.  (Facts, ¶43). Temporal proximity between her generalized reports to HR in late January and her performance memorandum earlier that month and discovery of the "termination" memorandum are insufficient to establish causation. See Higdon v. Jackson, 393 F3d 1222 (11th Cir. 2004).

---

[8] See Landsgraf v. USI Film Prod's, 968 F.2d 427, 430-31 ("[a] reasonable employee would not have felt compelled to resign immediately following the institution of measures which [are]…reasonably calculated to stop the harassment").

Nor can plaintiff show any pretext. She has offered no admissible evidence that her reports caused any adverse employment action, much less a termination that never occurred. She has failed to identify other employees who engaged in the same conduct as she--wearing blue jeans on a non-designated day and struggling with paperwork and OSHA logs-who were treated more favorably. Hence, summary judgment on any retaliation claim pled by plaintiff is warranted.

## V. <u>CONCLUSION</u>

Based on the foregoing, and its Evidentiary Submission filed contemporaneously herewith, SMART respectfully requests that this Court grant its Motion for Summary Judgment, dismiss Plaintiff's Complaint with prejudice, and tax costs to Plaintiff.


*/s/Marcel L. Debruge*
Marcel L. Debruge (DEB006)
Kathryn Morris Willis (MOR130)

Attorneys for Defendant
SMART ALABAMA, LLC


OF COUNSEL:

**BURR & FORMAN LLP**
3400 SouthTrust Tower
420 North 20th Street
Birmingham, Alabama  35203
Telephone:  (205) 251-3000
Facsimile:  (205) 458-5100

1614329 v1

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served on the following by directing same to his office address through first-class, United States mail, postage prepaid, on this the 2nd day of November, 2007:

Richard F. Horsley, Esq.
Lindsey O. Hill, Esq.
Goozee, King & Horsley
1 Metroplex, Suite 280
Birmingham, Alabama 35209

Thomas F. Kelly, Jr., P.C.
17 Court Square
P.O. Box 605
Clayton, Alabama  36016


<u>/s/ Marcel L. Debruge</u> _____
OF COUNSEL

1614329 v1