# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| **ROBIN ATWELL, an individual,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. CV-06-** |
| | ) | **1089-MEF** |
| **SMART ALABAMA, LLC, a legal entity,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT SMART ALABAMA, LLC'S EVIDENTIARY SUBMISSION IN SUPPORT OF ITS MOTION FOR SUMMARYJUDGMENT

Defendant, SMART Alabama, LLC ("SMART") submits the following materials in support of its Motion for Summary Judgment filed simultaneously herewith:

**Tab A:**    Deposition of Robin Atwell with exhibits

**Tab B:**    Affidavit of Ruth Ryan with attachments

**Tab C:**    Affidavit of Gary Sport with attachments

**Tab D:**    Deposition of Ruth Ryan with exhibits

**Tab E:**    Deposition of Gary Sport with exhibits

**Tab F:**    Declaration of Lisa Bodiford

**Tab G:**    Declaration of Wendy Burgans

**Tab H:**    Declaration of Lakeisha Jessie

1612176 v1

1

**Tab I:**    Declaration of Cansia Jones

**Tab J:**    Declaration of Scott Kelley

**Tab K:**    Declaration of Rance Maddox

**Tab L:**    Declaration of Melissa McGough

**Tab M:**    Declaration of Colinda Porter

**Tab N:**    Declaration of Gary Smith

**Tab O:**    Affidavit of Fran Hughes with attachments

**Tab P**:    Affidavit of David McGough with attachments

**TAB Q:**    Affidavit of Rance Maddox with attachments


s/Kathryn  Morris Willis
Marcel L. Debruge (DEB006)
Kathryn Morris Willis (MOR130)

Attorneys for Defendant
SMART ALABAMA, LLC


OF COUNSEL:

**BURR & FORMAN LLP**
3400 SouthTrust Tower
420 North 20th Street
Birmingham, Alabama  35203
Telephone:  (205) 251-3000
Facsimile:  (205) 458-5100

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing has been served on the following by directing same to his office address through first-class, United States mail, postage prepaid, on this the 2nd day of November, 2007:

Richard F. Horsley, Esq.
Lindsey O. Hill, Esq.
Goozee, King & Horsley
1 Metroplex, Suite 280
Birmingham, Alabama 35209

Thomas F. Kelly, Jr., P.C.
17 Court Square
P.O. Box 605
Clayton, Alabama  36016


<u>s/Kathryn Morris Willis</u>
OF COUNSEL

# FREEDOM COURT REPORTING

| Page 1 | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| 2 | MIDDLE DISTRICT OF ALABAMA |
| 3 | NORTHERN DIVISION |
| 4 | |
| 5 | CASE NUMBER: CV 06-1089-MEF |
| 6 | ROBIN ATWELL, an individual, |
| 7 | Plaintiff, |
| 8 | v. |
| 9 | SMART ALABAMA, LLC, legal entity, |
| 10 | Defendant. |
| 11 | |
| 12 | DEPOSITION TESTIMONY OF: |
| 13 | ROBIN O. ATWELL |
| 14 | June 21, 2007 |
| 15 | 10:30 a.m. |
| 16 | |
| 17 | STIPULATION |
| 18 | IT IS STIPULATED AND AGREED by and |
| 19 | between the parties through their respective |
| 20 | counsel that the deposition of ROBIN O. ATWELL |
| 21 | may be taken before SHERI G. CONNELLY, |
| 22 | Commissioner, at the law offices of Burr & |
| 23 | Forman, Suite 1950, RSA Tower, 201 Monroe |

| Page 2 | |
|---|---|
| 1 | Street, Montgomery, Alabama 36104, on the 21st |
| 2 | day of June, 2007. |
| 3 | IT IS FURTHER STIPULATED AND AGREED |
| 4 | that the signature to and the reading of the |
| 5 | deposition by the witness is waived, the |
| 6 | deposition to have the same force and effect |
| 7 | as if full compliance had been had with all |
| 8 | laws and rules of Court relating to the taking |
| 9 | of depositions. |
| 10 | IT IS FURTHER STIPULATED AND AGREED |
| 11 | that it shall not be necessary for any |
| 12 | objections to be made by counsel to any |
| 13 | questions, except as to form or leading |
| 14 | questions, and that counsel for the parties |
| 15 | may make objections and assign grounds at the |
| 16 | time of the trial, or at the time said |
| 17 | deposition is offered in evidence, or prior |
| 18 | thereto. |
| 19 | IT IS FURTHER STIPULATED AND AGREED |
| 20 | that the notice of filing of the deposition by |
| 21 | the Commissioner is waived. |
| 22 | |
| 23 | |

| Page 3 | |
|---|---|
| 1 | INDEX |
| 2 | |
| 3 | EXAMINATION BY: PAGE NUMBER: |
| 4 | MS. WILLIS 6 |
| 5 | |
| 6 | EXHIBITS: PAGE NUMBER: |
| 7 | Plaintiff's Exhibits: |
| 8 | There were no Plaintiff's Exhibits |
| 9 | submitted to the deposition. |
| 10 | |
| 11 | Defendant's Exhibits: |
| 12 | Defendant's Exhibit 1    20 |
| 13 | Defendant's Exhibit 2    30 |
| 14 | Defendant's Exhibit 3    56 |
| 15 | Defendant's Exhibit 4    59 |
| 16 | Defendant's Exhibit 5    62 |
| 17 | Defendant's Exhibit 6    96 |
| 18 | Defendant's Exhibit 7    106 |
| 19 | Defendant's Exhibit 8    108 |
| 20 | Defendant's Exhibit 9    113 |
| 21 | Defendant's Exhibit 10   126 |
| 22 | Defendant's Exhibit 11   128 |
| 23 | Defendant's Exhibit 12   132 |

| Page 4 | |
|---|---|
| 1 | Defendant's Exhibit 13   136 |
| 2 | Defendant's Exhibit 14   137 |
| 3 | Defendant's Exhibit 15   151 |
| 4 | Defendant's Exhibit 16   165 |
| 5 | Defendant's Exhibit 17   186 |
| 6 | Defendant's Exhibit 18   258 |
| 7 | Defendant's Exhibit 19   281 |
| 8 | Defendant's Exhibit 20   286 |
| 9 | Defendant's Exhibit 21   294 |
| 10 | Defendant's Exhibit 22   295 |
| 11 | Defendant's Exhibit 23   310 |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 5

```
1           APPEARANCES
2
3    FOR THE PLAINTIFF:
4        Richard L. Horsley
5        King, Horsley & Lyons, LLP
6        Shades Brook Building, Suite 200
7        3300 Cahaba Road
8        Birmingham, Alabama 35223
9        205.871.1310
10
11   FOR THE DEFENDANT:
12       Kathryn M. Willis
13       Burr & Forman, LLP
14       Suite 3400
15       420 North 20th Street
16       Birmingham, Alabama 35203
17       205.251.3000
18
19   ALSO PRESENT:
20       Gary Sport
21
22
23
```

Page 6

```
1        I, SHERI G. CONNELLY, a Court
2    Reporter of Birmingham, Alabama, acting as
3    Commissioner, certify that on this date, as
4    provided by the Federal Rules of Civil
5    Procedure and the foregoing stipulation of
6    counsel, there came before me at the law
7    offices of Burr & Forman, Suite 1950, RSA
8    Tower, 201 Monroe Street, Montgomery, Alabama
9    36104, beginning at 10:30 a.m., ROBIN O.
10   ATWELL, witness in the above cause, for oral
11   examination, whereupon the following
12   proceedings were had:
13
14       ROBIN O. ATWELL,
15       being first duly sworn, was
16       examined and testified as follows:
17
18       COURT REPORTER:  Usual stipulations?
19   MS. WILLIS:  That's fine.
20   MR. HORSLEY:  Sure.
21
22   EXAMINATION BY MS. WILLIS:
23       Q.  Ms. Atwell, we met earlier.  I'm
```

Page 7

```
1    Katy Willis.  I'm an attorney representing
2    Smart Alabama in the lawsuit that you filed
3    against them.  I'm here today to ask you some
4    questions regarding the lawsuit you filed.
5    We're going to go over a few rules and it's
6    not to pick on you.  It's just we do this with
7    everybody but let me ask you this question
8    first:  Have you ever had your deposition taken
9    before?
10       A.  Yes, I have.
11       Q.  In what case?
12       A.  It was a divorce case between my
13   ex-husband and myself.
14       Q.  Okay.  And was this Mr. Davis?
15       A.  Right.
16       Q.  Okay.  Is that the only deposition
17   you've given?
18       A.  To my knowledge, that's the only
19   time.
20       Q.  Okay.  Let me go over -- so you're
21   probably a little bit of an old pro at this
22   but I'll go over this anyway.  You know our
23   court reporter is here taking down everything
```

Page 8

```
1    we say, so please be sure and answer verbally
2    so that I can hear you and the court reporter
3    can accurately record what you're saying.  Can
4    you try to remember to do that?
5        A.  Yes.
6        Q.  And please don't be offended if I or
7    your attorney jump in and say, speak out
8    because it's hard if you shrug your shoulders
9    or do uh-huh or huh-uh for her to get it down.
10       A.  Okay.
11       Q.  Just so you know, you can take a
12   break when you need it.  If you need a
13   bathroom, you know where those are, need some
14   water or soft drink, you know where those are.
15   If you'll just let me know ahead of time when
16   you need a break, I'll be happy to get to a
17   stopping point so long as there's not a
18   question out on the table.  Will you let me
19   know when you need a break?
20       A.  Yes, I will.
21       Q.  Okay.  And if you don't understand a
22   question I ask, can I count on you to let me
23   know and I'll try to rephrase it in a way that
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 9

1  you understand?
2      A.  Yes.
3      Q.  And I know there may be some
4  questions to which your attorney may object.
5  That's to get his objection on the record.
6  Let me ask you this question: Have you taken
7  any medication today?
8      A.  No, ma'am.
9      Q.  Are there any medical conditions or
10  treatment that you're currently under that I
11  may need to be aware of that may affect your
12  ability to testify?
13      A.  No, ma'am.
14      Q.  Anything else that would prevent you
15  from answering my questions truthfully today?
16      A.  No, ma'am.
17      Q.  Okay.  And I know you've had a
18  deposition taken before.  In getting ready for
19  this deposition, did you review any documents?
20      A.  I have reviewed the documents that I
21  had at my home.
22      Q.  Okay.  And some of those documents
23  as I understand Mr. Horsley has told me have

Page 10

1  been provided to me and we'll go over those
2  later.
3      A.  Okay.
4      MR. HORSLEY:  And she's asking you
5  about today with me too.
6      Q.  Today, yeah.
7      MR. HORSLEY:  What you reviewed with
8  me.
9      MS. WILLIS:  Thank you.
10      A.  Yeah, we had went over the --
11      Q.  And I don't know -- I don't want to
12  know what y'all talked about, okay.
13      A.  Right.  I reviewed the EEOC charges
14  as well as the -- I can't remember what the
15  other name of the other documents were, I'm
16  sorry.  It was the EEOC and I guess the
17  questions that you had as well as my
18  answers --
19      Q.  Okay.
20      A.  -- that I had.
21      Q.  So your interrogatory responses?
22      A.  Exactly, that's what it was.
23      Q.  That's fair enough.  That's fair

Page 11

1  enough.  Thank you.
2      Have you discussed this deposition
3  or the testimony you're giving today for
4  anybody other than your attorney, and keep in
5  mind I don't want you to tell me what you
6  talked about with your attorney.
7      A.  No.
8      Q.  Okay.  And you've mentioned your
9  divorce with Mr. Davis.  Besides the divorce
10  with Mr. Davis, have there been any other
11  lawsuits to which you have been a plaintiff or
12  a defendant?
13      A.  No, ma'am.
14      Q.  Not any kind of personal injury or
15  car wreck or anything like that?
16      A.  I was recently in an automobile
17  accident and no charges or anything has been
18  filed at this time or no lawsuits if that's
19  what you're trying to ask.
20      Q.  Okay.  And I guess the divorce with
21  Mr. Davis, what county was that in?
22      A.  Coffee.
23      Q.  And what year was that?

Page 12

1      A.  '97, 1997.
2      Q.  And I guess you and he were the only
3  parties to the case?
4      A.  Correct.
5      Q.  And did it go to court?
6      A.  Multiple times.
7      Q.  Multiple times.  What was the
8  ultimate outcome?
9      A.  We got a divorce.
10      Q.  Okay.  Okay.  Let me ask you this
11  question: Have you ever filed an EEOC charge
12  besides the one you filed against Smart
13  Alabama?
14      A.  No, ma'am.
15      Q.  Have you ever filed for workers'
16  compensation benefits?
17      A.  I believe once in my lifetime.
18      Q.  And when was that?
19      A.  Should have been in March of 1990 I
20  believe.
21      Q.  And what kind of injury did you have
22  then that prompted you to file for benefits?
23      A.  The employer I was working at

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 13

1  flooded. Elba is notorious for flooding and
2  it flooded then and so I was no longer able to
3  work there.
4      Q.  And was that workers' comp benefits
5  or was that unemployment?
6      A.  No, no, that was unemployment, I'm
7  sorry.
8      Q.  And that's fine.  So you filed for
9  unemployment compensation with which employer
10 in Elba?
11     A.  It was Nasco Equipment Company.
12 It's a forklift company.
13     Q.  And I guess they are no longer.  Do
14 they exist any longer?
15     A.  I'm not certain to be honest with
16 you.
17     Q.  Okay.  And let me move on to my
18 original question.
19     A.  Okay.
20     Q.  Have you ever filed for workers'
21 compensation benefits, meaning you were
22 seeking benefits because you were injured on a
23 job?

Page 14

1      A.  Not to my knowledge, no, other than
2  the Smart.
3      Q.  And was that for your left shoulder?
4  Was that a shoulder injury?
5      A.  It was -- I didn't seek benefits.  I
6  just -- they filed my medical bills through
7  the workmen's comp.
8      Q.  Okay.
9      A.  For the shoulder injury and the
10 other workmen's comp issue was to deal with me
11 being hospitalized by Dr. Tompkins for stress-
12 related problems.
13     Q.  And was that your hospitalization in
14 January 2006 that you're referencing?
15     A.  Correct, as well as some doctors'
16 visits.
17     Q.  But you didn't seek benefits for
18 those, did you?
19     A.  No, ma'am, they were denied.
20     Q.  Have you ever filed for bankruptcy?
21     A.  No, ma'am.
22     Q.  I guess I should have asked this the
23 first time but can you state your full name

Page 15

1  for the record?
2      A.  Robin O'Ree Atwell.
3      Q.  And have you ever gone by any other
4  name?
5      A.  Yes, ma'am.
6      Q.  Okay.
7      A.  Robin O'Ree Davis and Robin O'Ree
8  Kyle, K-Y-L-E, that's my maiden name.
9      Q.  Kyle is your maiden name?
10     A.  Uh-huh.  And Robin O'Ree Webster, my
11 stepfather adopted me so Kyle then became my
12 maiden name when I was three.
13     Q.  So Webster was the name you were
14 born with?
15     A.  Born with.
16     Q.  Okay.  Besides Robin Atwell, Robin
17 Davis, Robin Kyle, and Robin Webster, have
18 there been any other names that you've gone
19 by?
20     A.  When my ex-boyfriend and I were
21 dating, I went by his last name.  We filed
22 taxes together.  It would have been Robin -- I
23 think it was Robin O. Farmer.

Page 16

1      Q.  How long were you known by that
2  name?
3      A.  Four years approximately.
4      Q.  Okay.  And what's your current
5  address?
6      A.  Physical as well as mailing?
7      Q.  Yeah.
8      A.  Okay.  The physical is
9
10     Q.  And where is that address?
11     A.  Brantley, Alabama.
12     Q.  Okay.  And how long have you been
13 residing at that address, Ms. Atwell?
14     A.  It would be 14 months.
15     Q.  Okay.  And who all resides at the
16     address with you?
17     A.  My husband and myself.
18     Q.  And your husband is?
19     A.  Kevin Atwell.
20     Q.  And is Mr. Atwell employed?
21     A.  Yes, he is.
22     Q.  Who is he employed with?
23     A.  He works nuclear power plant

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 17

1  shutdowns so he works for various contractors
2  all over the United States.
3      Q.  Does he work through a particular
4  company?
5      A.  Several.
6      Q.  And how long have you all been
7  married, you and Mr. Kevin Atwell?
8      A.  January of this year was a year.
9      Q.  So since January 2006?
10     A.  Right.
11     Q.  Okay.  Prior to the
12 Avenue address that you moved to 14 months
13 ago, what was your address?
14     A.  It was
15     Q.  And was that also in Brantley?
16     A.  That was in Elba.
17     Q.  And how long did you live at that
18 address?
19     A.  I moved there after the '90 flood --
20 '98 flood, sorry.  Oh, gosh, I'm not really
21 certain.  Can I reference some notes?
22     Q.  Well, I'm going to get out your
23 interrogatory responses --

Page 18

1      MR. HORSLEY:  Just tell us what you
2  remember.
3      Q.  -- and we can look at them then.
4      A.  I'm saying maybe four or five years
5  max.
6      Q.  Who resided at that address with you
7  in Elba, the North Morrow Avenue?
8      A.  Myself and my four children.
9      Q.  And let me ask you this and one
10 reason I'm asking is because I think you've
11 asked for a jury trial in this case and I want
12 to make sure that -- I don't know that any of
13 your children are of jury age but can you tell
14 me your children's names and ages?
15     A.
16     Q.  Okay.
17
18
19     Q.  And where do your four sons reside?
20     A.  My two oldest sons now live with
21 their father, Mark Davis, and my two younger
22 children live with my mother.
23     Q.  Where does your mother reside?

Page 19

1      A.  In Elba.
2      Q.  And you don't have custody of the
3  children?
4      A.  I have joint custody of
5
6      Q.  But not of
7      A.  Correct.
8      Q.  So you were married to Mark Davis.
9  Where does Mark Davis live?
10     A.  He lives in Elba, Alabama.
11     Q.  Okay.  Do you know who he's employed
12 by?
13     A.  He's through civil service through
14 Fort Rucker.
15     Q.  And when were you all married?
16     A.  In '92, November of '92.
17     Q.  How long were you all married?
18     A.  Almost five years.
19     Q.  And then when were you married to
20 Mr. -- were you married another time I guess?
21     A.  I was married another time but it
22 was annulled.
23     Q.  Okay.  And who was that?

Page 20

1      A.  Shane Teal, T-E-A-L.
2      Q.  And when were you all married?
3      A.  In 1998 I believe.
4      Q.  Okay.  And obviously it was briefly?
5      A.  It was for a month.
6      Q.  Because it was annulled, okay.  Did
7  you ever go by the name of Robin Teal?
8      A.  Just very briefly, I took my name
9  back as soon as everything was settled.
10     Q.  And no children from that union?
11     A.  No.
12     Q.  Okay.  And so you've been married to
13 Mr. Davis, Mr. Teal, and Mr. Atwell?
14     A.  Correct.
15
16     (Whereupon, Defendant's Exhibit 1
17     was marked for identification and a
18     copy of same is attached hereto.)
19
20     Q.  Okay.  And I'm going to show you,
21 Ms. Atwell, and this may help you out.  I
22 wasn't trying to trick you, I was just trying
23 to get through that part, what I'm going to

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 21

1  mark as Defendant's Exhibit 1 which are your
2  interrogatory responses.
3      A.  Okay.
4      Q.  And I wanted to just go over the
5  list of your relatives.  I appreciate your
6  providing those but I want to make sure we've
7  covered all of those since you have asked for
8  a jury trial.
9      A.  Okay.
10     Q.  Let's just go over these briefly.
11 Your mother-in-law is Janice Eddison; is that
12 correct?
13     A.  That's correct.
14     Q.  And she's over the age of 18?
15     A.  Yes, she is.
16     Q.  Kevin Atwell, your husband, we've
17 spoken about?
18     A.  Right.
19     Q.  Okay.  Janice Stephens, that's your
20 sister-in-law?
21     A.  Yes.
22     Q.  It's your husband's --
23     A.  Sister.

Page 22

1      Q.  -- sister?  She's over the age of
2  18?
3      A.  Yes.
4      Q.  And Keith Stephens must be her
5  husband?
6      A.  Correct.
7      Q.  Earl Kyle is your stepfather who
8  adopted you; is that right?
9      A.  Right.
10     Q.  And he currently lives in Elba?
11     A.  Right.
12     Q.  Is he employed?
13     A.  He's retired.
14     Q.  And Avis Kyle, your mother, is she
15 employed?
16     A.  She is.
17     Q.  Okay.  Where is she employed?
18     A.  She's employed at the Coffee County
19 Courthouse.
20     Q.  Okay.  Is she a clerk there?
21     A.  She works for the revenue
22 commissioner.
23     Q.  And you listed is it --

Page 23

1      A.  Clydie.
2      Q.  I'm sorry, Flowers?
3      A.  Right.
4      Q.  And how is Clydie Flowers related to
5  you?
6      A.  That's my husband's grandmother.
7      Q.  Okay.  And she works at Crenshaw
8  County Courthouse?
9      A.  Yes, she does.
10     Q.  What does she do there?
11     A.  She is a receptionist.
12     Q.  For one of the judges or just in the
13 courthouse?
14     A.  In the main lobby.
15     Q.  And Kyle Flowers, who is that?
16     A.  That is Kevin, my husband's,
17 cousin -- uncle, I'm sorry.
18     Q.  And he's over the age of 18?
19     A.  Yes, he is.
20     Q.  And Kelly Flowers, is Kelly Flowers
21 over the age of 18?
22     A.  Yes, she is.
23     Q.  And where does she work?

Page 24

1      A.  Last I knew she was teaching.  We
2  don't have a whole lot of communication with
3  her so I'm not certain.
4      Q.  Okay.  Vickey White, how is Vickey
5  White related to you?
6      A.  That's my husband's aunt.
7      Q.  And is she over the age of 18?
8      A.  Yes, she is.
9      Q.  And where is she director of
10 nursing?
11     A.  Over an assisting living facility, I
12 believe it's in Covington County.
13     Q.  Marilyn Kennedy, how is Marilyn
14 related to you?
15     A.  My husband's aunt.
16     Q.  He's got a lot of family around.
17     A.  Yes, he does.
18     Q.  You did a good job of remembering.
19 And is she employed?
20     A.  She works at CCA, it's Crenshaw
21 Christian Academy, in the day-care facility.
22     Q.  Okay.  Clarence Kennedy, how is
23 Clarence related to you?

6  (Pages 21 to 24)

# FREEDOM COURT REPORTING

Page 25

1    A.   That's Marilyn's husband.
2    Q.   Okay.  And is Clarence employed?
3    A.   He is.  He works something to do
4  with the logging industry but I'm not sure
5  exactly what he does.
6    Q.   Okay.  Misty Frazier, how is Misty
7  related to you?
8    A.   That's my husband's cousin.
9    Q.   And all you know about her is she's
10  a student?
11    A.   She's a nursing student.
12    Q.   Is she over 18?
13    A.   Yes, she is.
14    Q.   Where does Misty live?
15    A.   She was living with her mother but
16  she's currently moved to Mobile because she is
17  now going to ultrasound school.
18    Q.   To do ultrasounds?
19    A.   Right.
20    Q.   Okay.  Dewants Owen?
21    A.   Yeah, it's actually supposed to be
22  Dewanis.  I didn't read that there's -- oh,
23  it's spelling not determined.  That's my

Page 26

1  husband's uncle.
2    Q.   And where does he live?
3    A.   He lives in Brantley.
4    Q.   And is he employed?
5    A.   No, ma'am, he's disabled.
6    Q.   Okay.  Over 18?
7    A.   Yes, he is.
8    Q.   Kenneth Owens, how are you related
9  to Kenneth Owens?
10    A.   My husband's cousin.
11    Q.   And is he employed?
12    A.   I've never met Kenneth.
13    Q.   Okay.  Vicki Billings, how are you
14  related to Vicki?
15    A.   That's my husband's sister -- half
16  sister.
17    Q.   Okay.  And she lives in Luverne?
18    A.   I think she may have a Luverne
19  address.
20    Q.   Where does she work?
21    A.   At Crenshaw Community Hospital.
22    Q.   Okay.  Any other -- and I know
23  you've listed here that you've got the Webster

Page 27

1  last name.  Any other relatives that you can
2  think of that reside in like Coffee County,
3  Crenshaw County, those areas, other than the
4  ones we've already talked about?
5    A.   No, ma'am, all of my relatives are
6  on my father's side and they live in the Lee
7  County area and all of my other relatives live
8  out of state in other states.
9    Q.   And what's your father's family
10  name?
11    A.   Webster.
12    Q.   Okay, all right.  And let me go back
13  up a little bit.  Mr. Teal, do you know where
14  he lives now?
15    A.   No, ma'am.
16    Q.   You can flip over with me if you
17  want to follow along, Ms. Atwell.  I think --
18  let's see, I'm looking on page eight if you're
19  looking at the top of the fax pages.
20    A.   Okay.
21    Q.   It's item number 12 about your
22  criminal record.
23    A.   Right.

Page 28

1    Q.   And you referenced a harassment
2  charge around 1997 and a husband.  Which
3  husband was that with?
4    A.   Mark Davis.
5    Q.   Okay.  And that was in what county?
6    A.   Coffee.
7    Q.   So when you were living in Elba and
8  I'm going to make sure I've got the right ones
9  covered.  I'm going to show you this and make
10  sure it matches up with what we've got.  I'm
11  going to mark as Exhibit -- it's just I guess
12  a printout but I want to make sure we're
13  talking about the right things.  Here you go.
14  You can take your time and flip through that
15  if you want to.  We can talk through all of
16  these.
17    A.   Okay.
18    Q.   I'm going to ask you about the
19  status of them.  Now I know in your
20  interrogatory responses that you told me that
21  you were charged with some form of harassment
22  but let's just kind of go through this.
23    A.   Okay.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 29

1    Q.  With your ex-husband in Coffee
2 county, Mr. Davis.
3    A.  Right.
4    Q.  What was the outcome as you recall
5 of that?
6    A.  At that point I was really, really
7 afraid of him because he did have such close
8 connections with the chief himself, they would
9 fish bass tournaments together, and so I
10 dropped my charges against him and in turn he
11 dropped his charges against me because he
12 pressed charges against me for cursing at him.
13    Q.  Okay.  And this was in 1997?
14    A.  Approximately.
15    Q.  Just about and I mean, we're going
16 to go through this very briefly?
17    A.  Right.
18    Q.  And then you had listed in your
19 interrogatory responses criminal conspiracy
20 misdemeanor in Crenshaw County and criminal
21 mischief.  What was that all about?
22    A.  My now husband had a pickup truck, I
23 think it was a 2005 model, I'm not certain.

Page 30

1 It was stolen and taken into another county
2 and caught on fire.  The police officer that
3 did the initial report claimed that I was on
4 the vehicle with another person who's known to
5 be in all type of bad things, been locked up
6 for all sorts of things.  The police officer
7 that set -- made these statements owes my
8 husband and his mother several thousand
9 dollars as well as money for damage to some
10 property that he had rented and never paid
11 for.
12    Q.  And who was the police officer?
13    A.  It's Robin Daniels.
14
15    (Whereupon, Defendant's Exhibit 2
16    was marked for identification and a
17    copy of same is attached hereto.)
18
19    Q.  Okay.  And so those are the ones
20 you've listed.  Let's go through the ones in
21 exhibit -- Defendant's Exhibit 2, that right
22 there, and I'll just reference it.  It looks
23 like the first on -- and I'm just reading off

Page 31

1 the first page, tell me if you don't see where
2 I am, but this looks like criminal conspiracy
3 in Crenshaw County.  Is that the truck
4 incident --
5    A.  The truck incident.
6    Q.  -- that you were referring to?
7    A.  Yes.
8    Q.  And it looks like -- it looks like
9 on the second page I'm looking at the
10 disposition paragraph.  Is that a guilty plea;
11 is that right?
12    A.  Yes, ma'am.
13    Q.  Okay.  So you pled guilty to that?
14    A.  Yes, ma'am.
15    Q.  Did you receive any form of I guess
16 probation?
17    A.  No, ma'am, paid no fines, paid no
18 court costs.
19    Q.  Okay.  Let's see, if you'll flip
20 over to the third page behind that, which is
21 that big long chart, and I'm looking down at
22 the bottom around 1/11/06.  It said probation
23 of one year.  Was probation along with that

Page 32

1 charge?
2    A.  If it was, I was not aware of it.
3    Q.  Okay.  And if you'll flip with me to
4 the next one, we can just move on from there.
5 It looks like -- the second one looks like
6 it's in Coffee County and that it says assault
7 third degree.  Is this referencing -- and this
8 is in 2004.  Was this regarding your ex-
9 husband or was this something else?
10    A.  No, ma'am, a gentleman that I was
11 dating at the time that I lived with at
12        his stepmother was trying to
13 evict us from the property.  They didn't get
14 along very well.  She came up to where we were
15 living and the property was in his father's
16 name, who she was married to.  And she was
17 showing out in front of the kids and
18 threatened to run her vehicle into the house
19 and I tried to stop her and she pressed
20 charges against me and I pressed charges
21 against her because I was trying to physically
22 restrain her and she hit me.
23    Q.  Okay.

8  (Pages 29 to 32)

# FREEDOM COURT REPORTING

Page 33

1    A.   So charges were pressed both ways
2  but they were all dropped.
3    Q.   And I think that second page, that
4  chart, it looks like it was -- I think what we
5  call legally it says non pros but it was
6  essentially dropped?
7    A.   Right.
8    Q.   Okay.  And then flipping to the next
9  one, this looks like this was in Elba in
10  Coffee County.  It's just -- I want to make
11  sure this is you driving with a suspended
12  license or something?
13    A.   Yes, ma'am.
14    Q.   And it looks like -- I'm looking at
15  the second page -- that you did a guilty plea
16  and paid a fine?
17    A.   Right.
18    Q.   Okay.  And then the next one in
19  Exhibit 2 looking -- driving with suspended
20  license, I want to make sure that's not a
21  duplication.  It looks like a different
22  number.  Was this a different driving with
23  suspended license?

Page 34

1    A.   Right, I think I was stopped in two
2  different areas.
3    Q.   Okay.  And you paid a fine for this
4  one too and I'm looking at the chart back
5  behind it?
6    A.   Yes, ma'am.
7    Q.   Oh, let me -- let me ask you because
8  I didn't ask you, what is your Social Security
9  number?
10    A.
11    Q.   And do you have a current Alabama
12  driver's license?
13    A.   No, ma'am.
14    Q.   You don't.  Is it suspended?
15    A.   Yes, ma'am.
16    Q.   Okay, all right.  And then I'm
17  looking at the next one, Ms. Atwell, and I
18  believe we've already talked about this.  It
19  says criminal mischief in 2005 in Crenshaw
20  County.  Is that related to the truck?
21    A.   It is.
22    Q.   Okay, and we know what happened with
23  that so if you'll just move on to the next

Page 35

1  one.  It looks like there is an expired
2  license somewhere in Elba?
3    A.   I think that was in conjunction with
4  the same or one of the tickets --
5    Q.   Okay.
6    A.   -- that was previously.
7    Q.   Okay.  And then it looks like one of
8  our last ones here was just a speeding ticket.
9  I don't even know why that pulled up on this
10  because we all have those, don't we?
11    A.   That's right.
12    Q.   And then the very last one I'm
13  looking at, Ms. Atwell, was harassment around
14  1996.  Was this related to -- in Coffee
15  County, was this related to Mr. Davis?
16    A.   That very well could be it, I'm --
17    Q.   The reason I'm thinking it might be
18  is I'm looking at the last page and it says
19  something about Mark William Davis.  If you
20  see where I'm referring to, it's the very last
21  page.
22    A.   I believe that was --
23    Q.   Was that the incident that you

Page 36

1  described in your interrogatory responses?
2    A.   I believe it is.
3    Q.   Okay, all right.  Just very briefly,
4  you graduated from high school; is that right?
5    A.   No, ma'am.
6    Q.   You didn't.  Where did you go to
7  high school?
8    A.   I went to high school in Elba,
9  Alabama.
10    Q.   Okay.  And it looks like you got
11  your GED though --
12    A.   Right.
13    Q.   -- from Enterprise State.  Did you
14  have any college or technical or vocational
15  training?
16    A.   The only vocational training that I
17  had was I decided to go into the emergency
18  medical field and I took some courses through
19  LBW, Enterprise State Junior College.  Auburn
20  University offered some courses and CEU's and
21  things of that nature.
22    Q.   Okay.  Have you ever had any
23  military service?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 37

1   A. No, ma'am.
2   Q. I usually just ask that question.
3   Most people haven't. I'm going to talk a
4   little bit about your employment history and I
5   know you've done us the favor of listing some
6   of those so hopefully this will make this a
7   lot quicker. When you got out of high school,
8   who were you employed with?
9   A. High school, my first employer would
10  have been a place called -- I think it was
11  Homefood Restaurants or Homestyle Restaurants.
12  Q. Were you a server?
13  A. I was.
14  Q. And was that in Elba?
15  A. It was.
16  Q. And how long did you work there, do
17  you remember?
18  A. A few months. It wasn't very long
19  because that's when I had gotten ill and no
20  longer could go to school or work.
21  Q. Okay. And what illness was it that
22  caused you to be unable to work or attend
23  school?

Page 38

1   A. I was pregnant and had spotting and
2   bleeding and they put me on bedrest.
3   Q. We talked a little bit about that
4   earlier.
5   A. Yeah.
6   Q. And do you remember how much you
7   were paid at Homestyle or that place?
8   A. No, ma'am.
9   Q. While you were working there, did
10  you receive any verbal or written discipline?
11  A. No, ma'am.
12  Q. When you worked there, did they have
13  a handbook?
14  A. No, ma'am.
15  Q. Did you have a way you could report
16  concerns you had?
17  A. Just directly to my supervisor.
18  Q. Did you ever complain about
19  discrimination while you worked there?
20  A. No, ma'am.
21  Q. And besides the problems with your
22  pregnancy while you were working at Homestyle,
23  were you ever injured or ill enough to seek

Page 39

1   treatment from a doctor or a health care
2   provider?
3   A. While I was employed there?
4   Q. Uh-huh, besides the pregnancy.
5   A. The pregnancy related, no, ma'am.
6   Q. And after you worked at Homestyle,
7   did you stay home and have your -- have your
8   child?
9   A. I did.
10  Q. And where was the next place you
11  worked?
12  A. My husband and I started a catering
13  business together.
14  Q. And that was Southern Elegance?
15  A. It was.
16  Q. And this was Mark Davis that you
17  started this business with?
18  A. Correct.
19  Q. And that operated out of Elba?
20  A. Elba, Alabama.
21  Q. And were you your own boss?
22  A. Actually we were in like partners I
23  guess you would say.

Page 40

1   Q. Okay. But you -- I mean, basically
2   y'all just reported to each other --
3   A. Right.
4   Q. -- about what was going on, you
5   didn't have a supervisor?
6   A. No.
7   Q. How much did you earn or how much
8   were you paid as a result of the catering
9   business?
10  A. It varied due to the number of
11  parties and events that we handled. To be
12  honest with you, I'm not sure exactly what the
13  total income would be over those years.
14  Q. Okay. And y'all divorced and the
15  business closed down?
16  A. Right.
17  Q. Does Mr. Davis still operate that
18  business?
19  A. No.
20  Q. And while you were working for
21  Southern Elegance as a caterer, were you ever
22  injured or ill enough to seek the treatment of
23  a doctor or a health care provider?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 41

1   A.  No, ma'am.
2   Q.  I'm looking back at your
3   interrogatories.  It was just trying -- I know
4   it's hard to remember this.  I want to make it
5   as quick as possible.  Coffee County EMS, did
6   you ever work for them?
7   A.  Yes, ma'am.
8   Q.  And it looks like maybe from '92 to
9   '96?
10  A.  I believe that's correct.
11  Q.  Would that have been before y'all
12  opened the catering business, you and
13  Mr. Davis?
14  A.  That would have been the Elba
15  Rescue.
16  Q.  Elba Rescue was before you opened
17  the catering business; is that right?
18  A.  It was actually during the same
19  time.  My husband was the captain of the
20  rescue squad.
21  Q.  So you worked on the rescue squad
22  too.
23  A.  As well.

Page 42

1   Q.  What did you do?
2   A.  I did some of the bookkeeping for
3   them.  I was the secretary.  I did the minutes
4   for the meetings.  I was an ambulance driver.
5   I was an emergency first responder, had
6   various tasks that were -- that everyone had
7   to do as far as stocking trucks and checking
8   trucks and that sort of thing.
9   Q.  Who did you report to?
10  A.  My husband.
11  Q.  Your husband.  And did you ever
12  complain about discrimination while you worked
13  for Elba Rescue or Coffee County EMS?
14  A.  No, ma'am.
15  Q.  And while you were working for Elba
16  Rescue or Coffee County EMS, were you ever
17  injured or ill enough to seek treatment from a
18  health care provider?
19  A.  While I was working for Elba Rescue,
20  I fell going to a run in the hallway and
21  injured my -- I think it was my left knee and
22  had to be taken by ambulance to the emergency
23  room.

Page 43

1   Q.  Let me ask you this: How much did
2   you make while you were working at Elba?
3   A.  Actually Elba Rescue at that point
4   was a volunteer service.
5   Q.  Okay.  So you were just putting in
6   time voluntarily because of your husband --
7   A.  Right.
8   Q.  -- and you do that.  Young World of
9   Learning?
10  A.  Yes, that's a day-care facility in
11  Elba.
12  Q.  In Elba, okay?  And you reported to
13  if Peggy Carpenter?
14  A.  I did.
15  Q.  And what were you paid there?
16  A.  Minimum wage, whatever minimum wage
17  was during that time.
18  Q.  Did you receive any raises or
19  bonuses while you worked there?
20  A.  Not to my knowledge, no.
21  Q.  Did you ever receive any discipline
22  while you worked there?
23  A.  No, ma'am.

Page 44

1   Q.  Did Young World of Learning have any
2   kind of handbook or procedure for you to
3   report concerns you had about your job?
4   A.  No, ma'am.
5   Q.  What was your reason for leaving
6   there?
7   A.  My youngest two children -- or my
8   oldest two children started school and my
9   youngest two, I moved into a church-based
10  facility, at Baptist church, they offered a
11  preschool and day-care program and I -- that
12  the only reason I left because by working
13  there I received a discount on my childcare
14  fees while working at Young World because all
15  four of my children attended that school.
16  Q.  Okay.  And while you were working at
17  Young World, did you complain about
18  discrimination?
19  A.  No, ma'am.
20  Q.  It looks like you also worked at
21  Kelly's Barbecue?
22  A.  Yes, ma'am.
23  Q.  Were you a server?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 45

1   A. Yes, ma'am.
2   **Q. And you reported to Fay Tindale?**
3   A. Yes, ma'am.
4   **Q. And this was in Elba?**
5   A. Yes.
6   **Q. And why did you leave that job?**
7   A. At that time I had separated and was
8   trying to get everything in my life straight
9   and I had to work during the day and then I
10  had the younger kids and I couldn't afford the
11  day care so I stayed home and actually saved
12  more money by doing my child support than I
13  was by driving back and forth to work and
14  paying day care.
15  **Q. And did you receive any discipline**
16  **while you worked there at Kelly's Barbecue**
17  **as a server?**
18  A. No, ma'am.
19  **Q. Okay. Did you have a way you could**
20  **report concerns or questions you had about**
21  **your job while you were working there?**
22  A. Straight to Ms. Fay.
23  **Q. And did you ever complain about**

Page 46

1   discrimination while you worked there?
2   A. No, I never had trouble with
3   discrimination.
4   **Q. And did you -- were you ever injured**
5   **or ill enough while you were working there at**
6   **Kelly's Barbecue to get treatment from a**
7   **health care provider besides childbirth?**
8   A. No, ma'am.
9   **Q. And it looks like you also worked at**
10  **Double Branch?**
11  A. Yes.
12  **Q. And you worked there from 2003 to**
13  **2004?**
14  A. I believe that's correct.
15  **Q. You were a bartender?**
16  A. Right, bartender and server.
17  **Q. And a server. And who did you**
18  **report to?**
19  A. Jimbo Ross, he was the -- he's not
20  the owner but he was the manager.
21  **Q. Okay. And did you receive any kind**
22  **of discipline, verbal or written --**
23  A. No.

Page 47

1   **Q. -- while you were there? And why**
2   **did you leave?**
3   A. I just didn't like the bar scene
4   anymore. I had met Kevin and we were trying
5   to establish a relationship and that's an okay
6   place for a person that's single maybe but if
7   you're trying to start a relationship, there's
8   too many people that come in and out that can
9   cause problems in a relationship. That's not
10  the best place to work.
11  **Q. Where did you work after you worked**
12  **at Double Branch?**
13  A. I worked for Allwood Construction
14  out of Troy.
15  **Q. And what did you do there at Allwood**
16  **Construction?**
17  A. Paperwork and general cleanup and
18  errand running, bookkeeping, just anything and
19  everything. He had very few employees and the
20  ones he did were on the construction site.
21  **Q. Okay. So you were more on the**
22  **clerical side?**
23  A. Right.

Page 48

1   **Q. So you were kind of responsible for**
2   **and understood the importance of keeping**
3   **accurate documents?**
4   A. Right.
5   **Q. And your supervisor was Allen Wood;**
6   **is that right?**
7   A. That's correct.
8   **Q. While you worked there, did you get**
9   **any kind of discipline, whether verbal or**
10  **written?**
11  A. No, ma'am.
12  **Q. Did you have a way you could express**
13  **concerns or problems or questions you had**
14  **about your employment while you were working**
15  **at Allwood Construction?**
16  A. Yes, ma'am.
17  **Q. How did you do that there?**
18  A. He's a very good friend of ours and
19  so I mean, he was over at our house quite
20  often, so anytime -- if I had any kind of
21  questions or concerns, I could always go to
22  him.
23  **Q. And while you were working there at**

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 49

1  Allwood Construction, were you ever injured or
2  ill enough to seek the care of a health care
3  provider or a doctor?
4      A.  No.
5      Q.  And why did you leave Allwood
6  Construction?
7      A.  He had just started out, it was a
8  new business, and the business wasn't working
9  out very well and it was just not a very good
10 situation.  It had got to the point to where
11 it was affecting our friendship but he had a
12 lifestyle that was completely different than
13 what me and my boyfriend and children were
14 accustomed to and we had to break ties as far
15 as the work relationship.
16     Q.  Were you making $12 an hour there --
17     A.  Correct.
18     Q.  -- full-time?  And when you said
19 business wasn't going well, what was going on?
20     A.  He didn't have very many contracts.
21 He would have to go out and give people bids
22 for different jobs and he was a social
23 butterfly and he would spend more time talking

Page 50

1  and going here and he was playing in a band in
2  the bars and it was just not very well
3  organized on his behalf.
4      Q.  Okay.  And what was the next place
5  you worked after you worked at Allwood?
6      A.  At Smart.
7      Q.  At Smart.  And I promise we're going
8  to go through Smart in detail but we're going
9  to get to that.
10         Let me ask you this question:  Are
11 you currently working?
12     A.  No, ma'am.
13     Q.  Why aren't you working at this point
14 in time?
15     A.  I don't feel comfortable working at
16 this point because of everything that has gone
17 on while I was working at Smart.
18     Q.  Have you applied for any jobs?
19     A.  No, ma'am.
20     Q.  No job since you left Smart?
21     A.  No, ma'am.
22     Q.  Have you interviewed anywhere?
23     A.  No, ma'am.

Page 51

1      Q.  Gone to any job fairs?
2      A.  No, ma'am.
3      Q.  I think you had said you may have
4  been doing some baby-sitting and some other
5  things through a relative?
6      A.  Right, for my sister-in-law and my
7  mother-in-law.
8      Q.  How often do you work for them?
9      A.  I clean their house as needed.  It
10 may be once a month.  It may be twice a month.
11 It may be every three or four months.  It just
12 usually depends on if they have some type of
13 event coming up that's going to be at their
14 home.
15     Q.  Okay.
16     A.  And I baby-sit for my sister-in-law
17 Janna also, and that's just an as-needed
18 basis.  I don't baby-sit every day for her to
19 work or anything.
20     Q.  How often do you baby-sit for Janna
21 on average?
22     A.  I haven't kept Walker in over three
23 months so it's not very often, it's just once

Page 52

1  in a while.
2      Q.  Do you get paid when you baby-sit
3  Walker?
4      A.  I have.
5      Q.  And how much does Janna pay you?
6      A.  $15, $20, it just really depends on
7  how long she's going to be gone and it's not
8  that I charge her, she just tries to give me
9  some extra spending money.
10     Q.  Okay.  But your husband is employed?
11     A.  Yes, he is.
12     Q.  Okay.  And how much does he earn?
13     A.  About 2,000 a week.
14     Q.  So you're just staying at home right
15 now?
16     A.  Right.
17     Q.  Do you have any plans to obtain a
18 job in the future?
19     A.  Not at this time, no, ma'am.
20     Q.  What I guess would need to change
21 for you to feel compelled to seek out a job?
22     A.  When I feel comfortable enough to be
23 able to go out and be around other people.

13  (Pages 49 to 52)

# FREEDOM COURT REPORTING

Page 53

1    Q.  Have you sought any counseling or
2  assistance with that since you left Smart?
3    A.  I tried to get counseling but the
4  workmen's comp refused to pay for me to see
5  the counselor and I couldn't afford to pay out
6  of my own pocket.
7    Q.  Does your husband have health
8  insurance now?
9    A.  No, ma'am.
10    Q.  Do you understand if you become
11  employed at some time while this lawsuit is
12  going on that you'll let Mr. Horsley know so
13  he can let me know?
14    A.  Yes, ma'am.
15    Q.  Okay.  Now, let's talk a little bit
16  about your employment with Smart because I
17  know that's why we're here today.  You worked
18  with Smart in Luverne?
19    A.  Correct.
20    Q.  And just so I understand, I want to
21  make sure we're talking about the same place,
22  Smart's plant is in Luverne on 331?
23    A.  Correct.

Page 54

1    Q.  And you go in the parking lot in the
2  security shack that's run by ADI Security?
3    A.  Correct.
4    Q.  And the security guards work out
5  there and let you in and out if you're an
6  employee?
7    A.  Correct.
8    Q.  And when were you hired by Smart?
9    A.  My hire date was August the 25th of
10  2005.
11    Q.  Okay.  Did you fill out an
12  application?
13    A.  Yes, ma'am, previous to that.
14    Q.  Okay.  And you went through I guess
15  training with AIDT?
16    A.  Correct.
17    Q.  And what kind of things did you
18  cover in your AIDT training?
19    A.  Basically very little.  Our class
20  consisted of I think three and a half months.
21  The plant was really short-handed and they had
22  to condense their training classes in order to
23  be able to fill the need for the employees.

Page 55

1    Q.  Who hired you?
2    A.  We were called in in a group
3  setting.  There was probably 50 or 60 people
4  in a conference room, so exactly who hired
5  who, I'm not certain other than that we were
6  the ones that were chosen out of the group
7  that had applied.
8    Q.  Did you have an interview of any
9  sort?
10    A.  I did on one of the nights during
11  our training class, our AIDT training class, I
12  was called in to Rance Maddox's office for an
13  interview for third shift, safety position.
14    Q.  Right.  But you didn't start in that
15  position, did you?
16    A.  No, ma'am.
17    Q.  You went to -- I guess out in the
18  production area?
19    A.  Correct.
20    Q.  As an assembly technician?
21    A.  Correct.
22    Q.  So you didn't report to Rance Maddox
23  at that time at all?

Page 56

1    A.  No, ma'am.
2    Q.  When you were hired at Smart, you
3  understood there was a policy that prohibited
4  harassment; right?
5    A.  Not initially but later on after
6  reading some more in the manual, it was
7  obvious there were a lot of different areas
8  that people where their rights and all were
9  protected.
10
11    (Whereupon, Defendant's Exhibit 3
12  was marked for identification and a
13  copy of same is attached hereto.)
14
15    Q.  And I'm going to show you what I'm
16  going to mark as Defendant's Exhibit 3 and is
17  this one of the manuals you're talking about?
18    A.  This is a copy of a larger version.
19    Q.  Okay.
20    A.  It's one of the little condensed
21  manuals that they hand out to their employees.
22    Q.  When do they hand them out to the
23  employees?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 57

1    A.  I believe I was issued mine the very
2  first night of AIDT training.
3    Q.  So you got a handbook.  If you'll
4  turn with me, I'm looking on the page number,
5  guys, that's the bottom of the page, little
6  seven.
7    A.  Okay.
8    Q.  Are you with me there?
9    A.  I am.
10    Q.  And you see there's a nonharassment
11  policy?
12    A.  Right.
13    Q.  And so you received this I guess on
14  the first night you were trained by AIDT?
15    A.  I believe.  It was one of the nights
16  that we were trained by AIDT.  There was only
17  three or four nights.
18    Q.  Did you read it at that time?
19    A.  No.
20    Q.  Okay.  I mean, a lot of times people
21  don't.  Did you eventually go back and read
22  it?
23    A.  Yes.

Page 58

1    Q.  When did you go back and read it?
2    A.  I'm not really certain exactly when
3  I read it but it was sometime after I started
4  working, I would say within the first few
5  weeks or whatever.
6    Q.  You took it home and took the time
7  and read through it?
8    A.  Right, because there was a lot of
9  information that you were issued when you were
10  first hired.
11    Q.  When you were first hired, yeah.
12  But you understood I guess going in even
13  before you read the manual that it was wrong
14  to harass somebody, whether it was on the
15  basis of their gender or race or anything
16  else?
17    A.  Right.
18    Q.  And you understand you could report
19  it if you were being harassed?
20    A.  Right.
21    Q.  You understood that at the outset of
22  when you -- you at least had some
23  understanding of that at the outset of your

Page 59

1  employment at Smart?
2    A.  Right.
3    Q.  And it looks like you also had maybe
4  some diversity training during AIDT.  Do you
5  remember that?
6    A.  Is that for the drug testing?
7
8    (Whereupon, Defendant's Exhibit 4
9    was marked for identification and a
10    copy of same is attached hereto.)
11
12    Q.  No, but I'll -- you've provided me
13  with these documents so I'll let you explain
14  them to me and it's just part of the AIDT
15  manual.  It was so thick I didn't copy the
16  whole thing to show you guys because we would
17  be pawing through it forever.  And I'm marking
18  as Defendant's Exhibit 4, it looks like your
19  AIDT completion certificate, and I'm looking
20  at what it is -- it looks like page 422 of the
21  manual.  I've got 422 down on the left-hand
22  corner.  Are you with me?
23    A.  Yes, ma'am.

Page 60

1    Q.  And it talks about sexual harassment
2  and that sexual harassment can be lots of
3  different things and that sex harassment is
4  against the law; right?
5    A.  Right.
6    Q.  So do you remember receiving this
7  during your training as well?
8    A.  The booklet that this was in yes,
9  ma'am, and this was also included.
10    Q.  Okay.  And let me ask you another
11  question about your handbook.  I know you said
12  you went back and I'm referring to Defendant's
13  Exhibit 3 now, you said you had gone back
14  through several weeks after you started
15  working at Smart and kind of thumbed through
16  it, pawed through it once you had time to go
17  through it.  You understood that certain
18  behaviors, you know, or certain behaviors like
19  attendance violations or certain things could
20  result in discipline for you; right?
21    A.  Correct.
22    Q.  And I guess there's a list of things
23  and I'm looking on page 34 of Defendant's

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 61

1  Exhibit 3. Just tell me when you're there.
2      A. Okay, I'm there.
3      Q. And I guess on pages 33 and 34,
4  there is a list of different things that could
5  result in disciplinary action for an employee;
6  right?
7      A. Right.
8      Q. They -- they may include reporting
9  to work late, fighting, horseplay,
10 insubordination, some of those things; right?
11     A. Correct.
12     Q. Turning with me to page 34, you
13 understood when you were employed with Smart
14 that theft or misuse or taking of company
15 property violated company policy too; right?
16     A. Correct.
17     Q. Okay. And let me -- you worked at
18 Smart from I guess August of 2005 until
19 February of 2007; is that right?
20     A. That's correct.
21     Q. And I think maybe your last day that
22 you worked there, and I think we're going to
23 look and be sure, was February 7th. Does that

Page 62

1  sound about right?
2      A. I believe that's right.
3
4      (Whereupon, Defendant's Exhibit 5
5      was marked for identification and a
6      copy of same is attached hereto.)
7
8      Q. And we're going to look at your
9  calendar a little bit later and I know that's
10 going to help. But I'm going to mark as
11 Defendant's Exhibit 5, it looks like your time
12 punch records, and you're at the bottom of the
13 page, and it looks like you -- I'm looking at
14 the bottom of Defendant's Exhibit 5. You
15 weren't scheduled on Sunday the 5th. You came
16 in and worked Monday the 6th and you worked
17 some on Tuesday the 7th but didn't come back
18 after that?
19     A. Correct.
20         MR. HORSLEY: Objection.
21     Q. Is that about right?
22     A. Yes.
23     Q. Okay, that's accurate, all right.

Page 63

1  And when you -- when you left your employment,
2  you weren't terminated, were you?
3      A. I have never received a letter of
4  termination.
5      Q. Huh?
6      A. I did not receive a letter of
7  termination.
8      Q. Did anybody ever tell you you were
9  being fired?
10     A. No, ma'am.
11     Q. Did anybody ever say anything
12 leading you to that conclusion?
13     A. On the day that I left, no, ma'am.
14 Prior to that, yes.
15     Q. Who had said what on what day?
16     A. I received a letter of termination
17 from Rance Maddox.
18     Q. How did you obtain that letter?
19     A. It was on my desk in my office.
20     Q. It was on your desk. Where was it
21 on your desk?
22     A. On the right-hand end. I had a
23 horseshoe-shaped desk and it was there amongst

Page 64

1  some papers on the top and they called it a
2  community pile. It has all sorts of things
3  that have to be filed by a person that works
4  usually on third shift.
5      Q. Do you know if Rance Maddox had the
6  authority independently to terminate your
7  employment with Smart?
8      A. He made it very clear very often
9  that he had such power.
10     Q. Would you have any reason to dispute
11 that he would have to have the -- no matter
12 what he said that he would have to have the
13 approval of human resources to do that?
14     A. It was not my understanding
15 according to him. He made the decisions on
16 who worked in his office and who did not work
17 in his office.
18     Q. Okay. But you don't have any facts
19 disputing that -- you don't have any facts to
20 dispute that it would have required the
21 approval of human resources other than what
22 Rance Maddox told you?
23     A. Well, actually we have minutes from

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 65

1  meetings that were taken by Colinda Porter
2  where he made such statements letting you know
3  that he was in control of his office.
4      **Q. Okay. But again, I guess I don't**
5  **want to reask the question but other than**
6  **those things, do you know of any facts that**
7  **would lead you to disagree with me that he**
8  **would ultimately have to have the approval of**
9  **Gary Sport or Ruth Ryan or somebody in human**
10 **resources before he went through with any kind**
11 **of termination?**
12     A.  I was unaware that he would have to
13 go through anyone else.
14     **Q. Did anybody ever tell you you needed**
15 **to resign?**
16     A.  Resign, no, ma'am.
17     **Q. Okay. Why did you leave that day?**
18     A.  I had moved my office -- my
19 necessary things out of my office into a
20 conference room across the hallway and Rance
21 came in with a girl named Wendy Burgin who I
22 believe works second shift. I think she was
23 light duty, she was not a regular safety

Page 66

1  employee, and demanded that I move back into
2  our office. She -- they walked in together
3  side by side, she stood there and I had told
4  him that I was not going back in the office.
5  And later on that day, I had went and talked
6  to Ruth again and let her know, you know, what
7  was going on and she said they would handle
8  it, there was an investigation pending, for me
9  to just keep quiet, do my job, stay away from
10 him, only answer questions if it was work
11 related and you know, that -- she promised me
12 and assured me that she would handle it. And
13 I believe that was the day that I was written
14 up for wearing blue jeans on a Friday.
15     **Q. But you never received a written**
16 **write-up for that, did you?**
17     A.  He showed me one but as far as me
18 receiving it in my hand, no, but he did
19 Colinda Porter to type up some type of paper
20 that -- for me wearing blue jeans.
21     **Q. The blue jeans were only supposed to**
22 **be worn on Fridays; right?**
23     A.  It wasn't in the handbook but in

Page 67

1  general the office people did wear jeans on
2  Friday unless there was a certain group of
3  people maybe coming in or visitors or somebody
4  special coming in.
5      **Q. Okay. And we're going to come back**
6  **to all of that. Let me ask you a little bit**
7  **about your job at Smart or your jobs at Smart.**
8  **When you first worked there, you worked in the**
9  **production area?**
10     A.  That's correct.
11     **Q. Were you actually out there**
12 **stamping?**
13     A.  The machines were.
14     **Q. The machines were and you were**
15 **operating --**
16     A.  Right.
17     **Q. -- as an assemble technician?**
18     A.  Right.
19     **Q. And who did you report to there?**
20     A.  My supervisor was a lady named Tammy
21 Green and over her was a gentleman named Scott
22 Kelly.
23     **Q. So Tammy Green, was she like your**

Page 68

1  team leader or group leader?
2      A.  She was. She was.
3      **Q. Okay. And Scott was over her?**
4      A.  Correct.
5      **Q. And what shift did you work when you**
6  **worked with Tammy Green and Scott Kelly out in**
7  **the production area?**
8      A.  Third shift.
9      **Q. Okay. So you were nighttime?**
10     A.  Right.
11     **Q. And you worked there and then you**
12 **became injured; is that correct?**
13     A.  While I was working, yes, ma'am.
14     **Q. At Smart, out in production, how did**
15 **you that happen?**
16     A.  I was working in the -- I want to
17 say it was the dash area, I'm not certain on
18 that. There was boards on the floors and they
19 were not all the time level where they would
20 meet up together and if you would walk -- step
21 on one, the other side would be higher than
22 that one and you could trip easily and I had
23 tripped one night while I had one of the big

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 69

1 dash things in my hand taking it from one
2 machine to another and fell and had hurt my
3 back and then went to the emergency room that
4 night but there was nothing wrong other than a
5 pulled muscle with that injury.
6     Q.  Did you injure yourself again?
7     A.  I did.
8     Q.  When was that?
9     A.  I was moved to a different area
10 working with some smaller pieces and actually
11 the way I was described to it is I had some
12 muscle damage and they thought that it was
13 like a partially torn rotator cuff in my left
14 shoulder.
15     Q.  Okay.  And so after you got the
16 partially torn -- the whatever was wrong with
17 the muscles in your shoulder?
18     A.  Right.
19     Q.  Is that when you moved to the safety
20 office?
21     A.  No, ma'am.
22     Q.  Okay.  Well, when did you move to
23 the safety office?

Page 70

1     A.  I went to the first aid room, that's
2 where injured employees go.  I had actually
3 been working in the safety office while
4 working in the plant.
5     Q.  How did you do that?
6     A.  It's a little confusing.  They did
7 not have a third shift safety person per se.
8 They had a young lady named Amanda Dempsey who
9 was third shift who was pregnant and put on
10 light duty.  To my knowledge, she had -- she
11 didn't have any medical training.  If she did,
12 it was limited, but from the conversations
13 that she and I had, I don't think she had
14 much.  But Scott Kelly is my husband's cousin
15 and he knew that I had some medical training,
16 so whenever anything would come up, they would
17 come and pull me from my job to let me treat
18 people and then even take people to the
19 hospital and that sort of thing.
20     Q.  But you didn't regularly work in
21 there, that wasn't actually your job duties at
22 that time?
23     A.  That was not my job duties, right.

Page 71

1     Q.  Okay.
2     A.  I just did that because they asked
3 that of me and because a third shift safety
4 position had been somewhat kind of promised to
5 me.  They were trying to work on convincing
6 some of the people in the office that they did
7 they need somebody on third shirt.
8     Q.  And who had kind of sort of promised
9 you a third shift safety position?
10     A.  Gary Sport.
11     Q.  And when was this that you talked to
12 him about it?
13     A.  I had actually talked to Rance when
14 he did the interview and Rance I'm assuming
15 had talked to Gary because Gary came to me
16 while I was working one night and told me to
17 hang in there, we're working on it but things
18 around there work kind of slow when it comes
19 to making decisions like that so they kind
20 of --
21     Q.  Do you -- I'm sorry, I didn't mean
22 to cut you off.  Please finish your answer.
23     A.  They have to take it one step at a

Page 72

1 time.  The Koreans want to save money, the
2 Americans want it done right and sometimes it
3 just doesn't pan out the way everybody wants
4 it to.
5     Q.  Let me back up a little bit.  You
6 said Rance interviewed you one of the nights
7 during AIDT training?
8     A.  He did.
9     Q.  What did you all discuss in that
10 interview?
11     A.  He wanted -- he told me what he was
12 looking for, wanted to know what my abilities
13 were, what my training was, what they lacked
14 in that department, what he wanted to see
15 become of that department, just things of that
16 nature.
17     Q.  Anything personal discussed?
18     A.  No, ma'am.
19     Q.  No problems during the interview?
20     A.  No, ma'am.
21     Q.  He was as professional and courteous
22 I guess --
23     A.  Right, he was not interviewed.

18  (Pages 69 to 72)

## FREEDOM COURT REPORTING

Page 73

1  There was a young lady in the office at the
2  time typing on the computer.
3      Q.  Who was in the office, do you
4  remember?
5      A.  I believe it was Lisa -- I'm trying
6  to remember what her -- Bodiford.
7      Q.  Okay.  So I'm going to kind of
8  fast-forward that to when you had talked to
9  Rance or talked to Gary about the safety
10  assistant position.  You eventually moved into
11  that position in November of 2005; is that
12  right?
13      A.  Yes, ma'am.
14      Q.  How did that come about?
15      A.  To the best of my knowledge, I was
16  just moved to that position because of the
17  girl that was actually in that office went to
18  another department to work for Gary Sport.
19  Her name was Melissa McGough.
20      Q.  Okay.  And when you started out
21  working -- was this some form of light duty
22  for you as far as your shoulder?
23      A.  I was actually still on light duty

Page 74

1  while I was working there in the office.  I
2  actually did my physical therapy with the
3  on-site physical therapist.
4      Q.  And when you worked in the safety
5  office, you reported to Rance Maddox?
6      A.  I did.
7      Q.  And he was the safety manager?
8      A.  He was.
9      Q.  Do you know all of his job duties?
10      A.  I know many of his job duties.
11      Q.  What did you understand those to
12  include?
13      A.  That he was to oversee people
14  working in his department, not only safety,
15  that included the security department.  He had
16  to meet with the team leaders.  He had to meet
17  with human resources.  He had to, you know,
18  just pretty much make sure that everything was
19  done properly in the plan and in the office
20  and scheduling was done correctly and
21  paperwork was filled out correctly and he -- I
22  mean, he had numerous things that he had to --
23  to have done but not all of those were done

Page 75

1  personally, he just made sure they were done.
2      Q.  He oversaw all of it I guess?
3      A.  He oversaw it.
4      Q.  And I guess one of the things you
5  mentioned like making sure things were safe in
6  the plant, walking through the plant; right?
7      A.  Right.
8      Q.  Making sure people had protective
9  equipment or earplugs or whatever it was
10  necessary?
11      A.  Right.
12      Q.  Making sure paperwork was filled
13  out.  That was very important; right?
14      A.  Right.
15      Q.  Because if you didn't fill that out,
16  workers' comp claims didn't get filed?
17      A.  That's right.
18      Q.  Or things didn't get recorded in the
19  OSHA log?
20      A.  Right.
21      Q.  Which could have gotten the company
22  and Rance probably in a whole lot of trouble?
23      A.  Correct.

Page 76

1      Q.  If they hadn't been filled out
2  correctly?
3      A.  That's correct.
4      Q.  And OSHA had come to look at them or
5  requested them.  Have you ever seen a job
6  description for Rance Maddox?
7      A.  Not to my knowledge.
8      Q.  Do you know to whom he reported?
9      A.  It was my understanding that he
10  reported to Gary Sport.
11      Q.  You told me you reported to Rance
12  Maddox.  Which other Smart employees was Rance
13  Maddox responsible for supervising or
14  overseeing?
15      A.  All of the employees that he was
16  responsible for, I'm not sure about all the
17  people that worked in the safety department --
18  I mean the security department.
19      Q.  Just tell me the names of the people
20  in the safety department.
21      A.  It was Amanda Dempsey, Colinda
22  Porter, Lisa Bodiford, Wendy Burgins, myself,
23  and then all the people that worked in the

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 77

1  security department.
2      **Q.  Rance oversaw them?**
3      A.  He did.
4      **Q.  But that was -- that was ADI; right?**
5      A.  Actually I'm not sure exactly how it
6  went but their payroll come through our office
7  and he met with them and they had to follow
8  his rules.  It was under -- listed under the
9  safety department.
10     **Q.  Do you know whether there's a**
11 **contract or anything for services between**
12 **Smart and ADI?**
13     A.  I'm pretty sure there is.
14     **Q.  Have you seen one?**
15     A.  Not to my knowledge, I have not seen
16 one.
17     **Q.  Do you know whether employees of ADI**
18 **or employees of Smart are under any kind of**
19 **agreement between the two of them?**
20     A.  I'm not certain but I'm sure -- you
21 know, that's what ADI does.  They contract
22 with large companies to provide security
23 services.

Page 78

1      **Q.  And they provide their employees to**
2  **provide security --**
3      A.  Right.
4      **Q.  -- for other companies, okay.  Let**
5  **me ask you about I guess some of the folks you**
6  **work with in the safety office because I know**
7  **you listed several and we'll go through those.**
8  **Some of these ladies were in there I guess on**
9  **light duty; right?**
10     A.  Some.
11     **Q.  You had named Amanda Dempsey --**
12     A.  Right.
13     **Q.  -- who was in because she was**
14 **pregnant I think you said?**
15     A.  Correct.
16     **Q.  What shift did she work?**
17     A.  Third.
18     **Q.  You had mentioned Wendy Burgins a**
19 **little bit earlier.**
20     A.  Right.
21     **Q.  Was Wendy on any form of light duty?**
22     A.  Yes, ma'am, she had a knee injury
23 and required surgery and so she was on light

Page 79

1  duty also.  I believe it required surgery.  I
2  may have her confused.  I think I'm having her
3  confused, I'm sorry, with another employee.
4      **Q.  That's fine.  That's fine.  What**
5  **shift did Wendy work?**
6      A.  Second shift.
7      **Q.  Did you get along with Wendy?**
8      A.  At times it was very hard for me to
9  count on her to get certain things done that I
10 left for her to have done because everything
11 that I had heard from the other team leaders
12 is that every time Lisa went in the plant to
13 do a plant inspection, Wendy went with her.
14 If Lisa went to the bathroom, Wendy went with
15 her.  I couldn't convince her or motivate her
16 enough to realize that she could do something
17 on her own without having to have somebody
18 with her all the time.
19     **Q.  Is Wendy a truthful person?**
20     A.  To be honest with you, I don't know.
21 I worked first shift, she worked second.
22     **Q.  All right.  You named a couple of**
23 **others.  We'll go through those.  Colinda**

Page 80

1  Porter?
2      A.  Yes, ma'am.
3      **Q.  What shift did Colinda work?**
4      A.  She came in on the first shift.
5      **Q.  So she worked -- you worked on first**
6  **shift; right?**
7      A.  Right.
8      **Q.  And so she worked with you?**
9      A.  On occasion.
10     **Q.  On occasion.  How did that work that**
11 **it was only on occasion?**
12     A.  People had to be taken to the
13 doctors, physical therapy, follow-up visits.
14 Sometimes I was on the road, sometimes she was
15 on the road.  Inventory had to be taken.
16 Plant inspections had to be made so it was
17 kind of hit and miss as to who all was in the
18 office at one particular time.
19     **Q.  Okay.  So sometimes she was there**
20 **and sometimes she wasn't?**
21     A.  Correct.
22     **Q.  And sometimes you were there and**
23 **sometimes you weren't?**

20   (Pages 77 to 80)

# FREEDOM COURT REPORTING

Page 81

1    A.  Correct.
2    Q.  And was Colinda there because of
3  light duty or do you know why?
4    A.  Yes.
5    Q.  Okay?
6    A.  Pregnancy related.
7    Q.  Okay.  And is Colinda a truthful
8  person?
9    A.  Other than working with her for the
10  short period of time that I worked there,
11  that's all I personally know about her.
12    Q.  Any reason to think she would lie
13  about you?
14    A.  No, ma'am.
15    Q.  Okay.  Lisa Bodiford, is that who
16  that is?
17    A.  Yes.
18    Q.  Lisa that you named?
19    A.  Right.
20    Q.  What shift did Lisa work?
21    A.  She was on second shift also.
22    Q.  So she worked second shift with
23  Wendy?

Page 82

1    A.  Correct.
2    Q.  That's who you were talking about
3  earlier?
4    A.  Correct.
5    Q.  Now, Lisa -- do you know Lisa was
6  working in the safety office?
7    A.  I believe that she was just a
8  general safety employee.  I don't -- to my
9  knowledge I don't know if she was there
10  because of an injury.  She was never treated
11  for an injury while I was working.
12    Q.  Okay.
13    A.  She was there prior to me coming to
14  the safety department.
15    Q.  So yeah, she was there to start
16  with?
17    A.  Right.
18    Q.  Before you came in, okay.  And is
19  Lisa a truthful person?
20    A.  Other than our work experience
21  together, I really don't personally know her.
22    Q.  Any reason to think she would lie
23  about you?

Page 83

1    A.  No, ma'am.
2    Q.  Did you say Carissa Jones?
3    A.  I don't --
4    Q.  Was there an employee there named
5  that -- I had that written down but?
6    A.  There was a Lakeisha Jessie.
7    Q.  Okay.  We'll talk about Lakeisha.
8  Does Lakeisha work in the safety office?
9    A.  If you want to call it that.  That
10  was -- I don't know what that was exactly
11  Lakeisha was there on light duty and we
12  couldn't get Lakeisha off of light duty.
13    Q.  What shift was Lakeisha supposed to
14  work in the safety office while she was on
15  light duty?
16    A.  I think she was on second if not
17  third.  She would come and overlap her
18  schedules so much that I would have to look
19  back through my notes to be able to tell you
20  if she was second or third because she was
21  there sometimes during both shifts.
22    Q.  And you couldn't get her off light
23  duty, what did you mean by that?

Page 84

1    A.  You have some people that want to --
2  come in the safety office and want to stay in
3  the safety office and the doctors say they're
4  okay and everybody says they're okay and they
5  don't want to go back to work and you kind of
6  have to be the bad guy and tell them, you've
7  got to go to work.
8    Q.  Because working in the safety office
9  was a little bit more cushy than working out
10  there --
11    A.  Right.
12    Q.  -- with machines; right?
13    A.  Air condition, restroom right across
14  the hall, right, you know, and they had
15  access, you know, to go back down the hall and
16  go out for a smoke break.  There's a safety
17  office and there's a first aid room.  They are
18  two totally different areas.
19    Q.  Okay.
20    A.  The light duty people generally work
21  out of the first aid room if they weren't put
22  in other areas of the plant.  If there were
23  other jobs assigned that we still in the plant

21 (Pages 81 to 84)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 85

1  but it was within their ability to do those
2  jobs with their injuries.
3      Q.  Well, the safety office was in the
4  production office side of the plant; is that
5  right?
6      A.  Correct.
7      Q.  You told me it was just down the
8  hall from the bathroom?
9      A.  The first aid room.
10      Q.  The first aid room?
11      A.  Was right across the hall from that
12  bathroom.
13      Q.  Right across the room to the
14  bathroom, but the safety office is right down
15  near by the break rooms, is it not, kind of on
16  the way to the --
17      A.  It's in a corridor by itself.
18      Q.  Right.  And it faces off to the
19  production offices though.
20      A.  Well, the production offices are
21  here.  The safety office is in a doorway in
22  the hallway.  There's no other doors in the
23  hallway.

Page 86

1      Q.  And wasn't there a window in the
2  door of the safety office?
3      A.  Yes, ma'am.
4      Q.  And from what I remember just --
5  that maybe there are some problems with air
6  conditioning in there when it got hot that you
7  had to leave the door open.
8      A.  Sometimes there was an odd smell and
9  sometimes the door was left open and sometimes
10  the door was left shut.  If we were having a
11  meeting or if I was trying to get some work
12  done, we would put a note on the door, if you
13  need attention, please see assistant in first
14  aid room, things of that -- there was a lot of
15  notes posted all over the door in the hallway
16  because we didn't have a central bulletin
17  board outside of our office to paste things so
18  a lot of things were just taped up on the
19  windows and doors.
20      Q.  Okay.  But employees came in and out
21  of that room if they needed earplugs or --
22      A.  No; no, ma'am.
23      Q.  -- come report something?

Page 87

1      A.  No, ma'am.
2      Q.  They never came in the safety
3  office?
4      A.  Occasionally but those things were
5  kept in the first aid room.
6      Q.  Did you work some in the first aid
7  room?
8      A.  I have.  I came in.  I've done
9  inventory of the first aid room and organized
10  the first aid room and made lists for the
11  people that are working the first aid room to
12  be able to issue out the team leaders all
13  their necessary equipment for their shift and
14  that sort of thing.
15      Q.  When an employee had an injury I
16  guess they would go where?
17      A.  To the first aid room.
18      Q.  How would you know to take them to
19  the doctor?
20      A.  Someone would come to the office and
21  let us know, hey, we've got somebody in
22  here -- if it's serious.  If it was just a
23  minor abrasion or something, a lot of times

Page 88

1  the people that were in the first aid room
2  that were on light duty would treat the injury
3  themselves.
4      Q.  Or would you ever help treat because
5  of your training and background with EMS?
6      A.  I would.  If it was something minor
7  and they wanted to handle it, I would let them
8  handle it.  There are some people that were
9  not comfortable with blood or handling that
10  kind of thing, so at that point, you know, I
11  would do that for him or whoever else was
12  working the safety office would do that for
13  them.
14      Q.  You told me about Lakeisha Jessie.
15  I think you named Melissa McGough earlier or
16  she had been working in there.  Did she work
17  in the safety office or first aid room while
18  you were doing that?
19      A.  Safety office, not while I was
20  there, she was working in the safety office
21  while I was in the plant.  They transferred
22  her on -- my understanding, don't hold me to
23  it -- but it was under Gary -- it was in the

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 89

1 human resources department and then her
2 position became open and I was placed in her
3 position.
4    Q.  Okay.  She train you in your
5 position or show you to what to do?
6    A.  The first few days that I was there,
7 she came in and worked off and on during the
8 day showing me different things and where
9 things went and how things were supposed to be
10 and phone numbers and --
11    Q.  What kind of things did she show
12 you, like how to do --
13    A.  She showed me where all the stuff
14 was in the first aid room, all the stuff was
15 in the office, how to use the extension, how
16 to use my voice mail.  How do I log onto the
17 computer, which programs we had in the
18 computer.  I'm trying to remember now.  It was
19 just a basic overview of everything that was
20 to be done because it was kind of a really
21 quick transition that took place.
22    Q.  Uh-huh.
23    A.  And so you know, everybody is like,

Page 90

1 well, we'll help you do this and we'll help
2 you do that and don't worry about this and
3 don't worry about that, because you know, it
4 was taking up time from where she was supposed
5 to be to come and try to train me so she had
6 handwritten out a bunch of notes and that kind
7 of thing and said if I had any questions, to
8 come to her.
9    Q.  Okay.
10    A.  And then Rance assured me that --
11 you know, that he knew how to do it all too so
12 that if there was anything that I didn't catch
13 the first go-around, that he would show me.
14    Q.  Is Melissa McGough a truthful
15 person?
16    A.  As far as -- I only worked with her
17 for a brief, you know, three days there in the
18 same office together.  Other than that, she
19 worked on the entire different end of the
20 plant from where I had worked at.
21    Q.  Any reason to think she would tell a
22 lie about you?
23    A.  Not to my knowledge.

Page 91

1    Q.  Anybody else that you can think of
2 that worked under Rance in the safety
3 department at Smart?
4    A.  Those are the only people that I can
5 think of other than they were -- that worked
6 for him in the safety department, that's all.
7    Q.  Okay.
8    A.  But light duty employees, there were
9 several that came in and out while I was there
10 but they're not considered safety employees.
11    Q.  Let me back up just a minute.  You
12 have -- you reported to Tammy Harper when you
13 were out on the -- not Tammy Harper, Tammy
14 Green -- I'm thinking of an entire other case,
15 I'm sorry, I just slipped -- Tammy Green, when
16 you were out and she was your team leader;
17 right?
18    A.  Correct.
19    Q.  Any problems with her?
20    A.  No, ma'am.
21    Q.  Any reason to think that she would
22 tell a lie about you?
23    A.  No, ma'am.

Page 92

1    Q.  What about Scott Kelly, how much
2 interaction did you have with him when you
3 worked out in the plant area?
4    A.  Just passing by and here and there
5 and actually made a record amount of parts on
6 my machine and they had a big party and Scott
7 come over and congratulated everybody and
8 Tammy bought her employees, the ones that made
9 records, that she bought them gifts themselves
10 because the team leaders receive watches when
11 their employees do good but employees receive
12 nothing, so she went and bought us some stuff.
13    Q.  Okay.  Is Scott Kelly a truthful
14 person?
15    A.  To my knowledge.
16    Q.  Okay.  Did you have any further
17 interaction with him when he was in the safety
18 office -- when you were in the safety office,
19 I'm sorry.
20    A.  Other than coming in and bringing
21 his employees in and out to get treated and
22 following up on different things and sometimes
23 they would have employees that would tell

# FREEDOM COURT REPORTING

Page 93

1  their team leader they were on light duty and
2  Scott would come or other team leaders would
3  come to find that they were really on light
4  duty and sometimes they weren't.
5      Q.  Uh-oh.
6      A.  They would be telling a fib about
7  where they were supposed to be.  So yeah, we
8  interacted some but it was usually always on
9  a -- whatever business as far as the safety
10 office is.
11     Q.  How many desks were there in the
12 safety office?
13     A.  There was two desks and one folding
14 table.
15     Q.  Okay.  Was that set up so that three
16 people could work in there at one time?
17     A.  It was.
18     Q.  How many computers were in there?
19     A.  Three.
20     Q.  Okay.  Did they all have the same
21 software on them?
22     A.  I'm not certain.
23     Q.  Okay.  Tell me just kind of

Page 94

1  generally -- you've told me a little bit about
2  what you did, that Melissa sort of walked you
3  through where some things were.  Tell me
4  generally what your duties were as being in
5  the safety -- working in the safety office at
6  Smart.
7      A.  Okay.  When I would first came in in
8  the mornings, I would go through the first aid
9  room and I would see if all my people were
10 there that were supposed to be there and if
11 they weren't, I would track them down and we
12 would go ahead and start a morning inventory
13 because we had to have an inventory done for
14 Jim and Antoine Kwan and he's a real stickler
15 on his inventories and charts and graphs and
16 all of that and Wendy did all of his charts
17 and graphs, so we just got all the figures up
18 and she would type them in and then get ready
19 for the following day.
20     I would go in and answer multiple
21 phone calls during the day, make multiple
22 phone calls during the day, workmen's comp,
23 doctor's visits, making people follow up,

Page 95

1  checking on their physical therapy to see if
2  things are going all right and they've got
3  their prescription like they need because they
4  have to have a prescription or a doctor's
5  order to be able to attend physical therapy
6  and some people would have them or misplace
7  them, so we fill out incident reports, file
8  incident reports, if they are recordables or
9  not recordables, if taking the information
10 from there if they were treated by a doctor in
11 the emergency room or in the office and
12 deciding whether or not they were a reported
13 injury as far as if it was a severe injury or
14 just a minor abrasion or something of that
15 nature.  You have to kind of read over each
16 incident report and look at -- attach the
17 medical information if there's any and decide
18 where to go from there.  You had to file -- I
19 had to fax things.  I had to copy things, a
20 lot of -- a lot of time is spent on the
21 telephone and copier and fax.
22     Q.  A lot of clerical things too?
23     A.  Right.

Page 96

1      Q.  Well, it was important that all that
2  paperwork got processed; right?
3      A.  Correct.
4
5      (Whereupon, Defendant's Exhibit 6
6  was marked for identification and a
7  copy of same is attached hereto.)
8
9      Q.  And I'm going to show you -- I think
10 you've provided this to me -- but what I have
11 marked as Defendant's Exhibit 6.  It looks
12 like a day shift, a safety assistant, position
13 responsibilities, and is this consistent with
14 what you've told me as far as what your duties
15 were?
16     A.  It is.  This was not exactly what
17 was explained in the beginning.  When I first
18 took over the position, this was something
19 that was -- not everything but there are some
20 things on here that were added later and then
21 some things are just -- you know you've got to
22 do it but they just type it out all nice and
23 neat where it looked really important but it's

24  (Pages 93 to 96)

# FREEDOM COURT REPORTING

Page 97

1  just like really anything.
2      Q.  What's an example, a teeny thing on
3  Defendant's Exhibit 6?
4      A.  Let me see, like "conduct lockout
5  tagout safety training for employees that
6  require a lockout device and perform
7  competency testing for lockout trained
8  employees." I can't teach lockout tagout
9  safety training, I'm not certified, but I was
10  required by Rance to teach these classes.
11  Other employees were required to teach these
12  classes.  So there's a lot of things on here
13  that look nice but they just don't work out.
14      Q.  Okay.  But you were one of the ones
15  responsible for maintaining the OSHA 300
16  medical records and workers' comp.  You had
17  already told me that?
18      A.  Right.
19      Q.  Okay.  And you worked on safety
20  inspections or safety topics?
21      A.  Right.
22      Q.  You did walk through because I think
23  you described you and other people in the

Page 98

1  office would go out in the plant and do
2  inspections; right?
3      A.  Right, safety glasses, ear plugs,
4  steel-toed shoes, sleeves, gloves.
5      Q.  Make sure people are wearing --
6      A.  Hard hats, correct.
7      Q.  Okay, absolutely.  Assist the safety
8  manager in responding to the employees' needs
9  and concerns for safety requirements.  Just
10  kind of -- did you kind of -- tell me what you
11  understood that to mean I guess.
12      A.  Which one are you on?
13      Q.  I'm on the front page, Ms. Atwell.
14  It's about the one, two, three, four, fifth
15  star down, the fifth asterisk down.
16      A.  Okay.
17      Q.  Do you see that?
18      A.  Okay.
19      Q.  And what did you understand that to
20  mean?
21      A.  "Assist the safety manager in
22  responding to the employees' needs and
23  concerns for safety requirements."  What I

Page 99

1  would gather by reading that is that I'm going
2  to help the safety manager by providing the
3  employees with the information they need on
4  safety issues as well as the materials they
5  need for safety related issues.
6      Q.  And just whatever else was needed --
7      A.  Right.
8      Q.  -- as far as when people walked in?
9      A.  Right, questions, comments,
10  concerns, right, safety training.
11      Q.  Let's see, looking at the second
12  page of this Defendant's Exhibit 6, anything
13  there that you didn't understand you were
14  supposed to perform?
15      A.  I never did an a.m. inspection and
16  check for the emergency evacuation system for
17  the plant.  I was hired to be in the office
18  doing the OSHA 300 log, the workmen's comp,
19  the organization of the first aid room, the
20  ordering of supplies.  I had to do all the
21  invoices and send all the stuff over to
22  accounting to make sure all the bills were
23  paid.  A lot of these things were put in here

Page 100

1  but they were actually the responsibility of
2  someone else.
3      Q.  Okay.  Who were they the
4  responsibility of?
5      A.  A lot of the things that were on
6  here were the responsibility of Rance Maddox.
7      Q.  Okay.  Looking at the third page,
8  I'm looking at the top of that, Ms. Atwell,
9  "All workers' comp cases will be managed and
10  report to day shift safety assistant."  Was
11  that you?
12      A.  Correct.
13      Q.  And so you were responsible for
14  entering those and getting them over to --
15  getting reports done on those; right?
16      A.  Well, I was the managing report.
17  Now if it happened on the second or third
18  shift, they were supposed to enter that
19  information, pass it on to me, that way I
20  would know what had happened.  That way when a
21  doctor's office calls and says, listen, I've
22  got so-and-so and so-and-so here, are they
23  here on a legitimate workmen's comp claim, so

25  (Pages 97 to 100)

# FREEDOM COURT REPORTING

Page 101

1  we need to know how to process this because if
2  you didn't have that communication, I would
3  say, well, no, I haven't -- I'm not aware of
4  them having an injury and then we would have
5  to come back later and find out yes, they did.
6  So we had to try to -- everybody try to work
7  together.
8      Q. Okay. And you signed off on this
9  description I guess which was written out in
10 January of 2006; is that right?
11     A. Correct.
12     Q. In your role as the day shift safety
13 assistant, you had access to company
14 documents; right?
15     A. In my office.
16     Q. Yeah.
17     A. Yeah.
18     Q. Like I'm talking about OSHA 300
19 logs, workers' comp first report of injury
20 forms. Those are company documents; right?
21     A. Correct.
22     Q. And you understood that taking
23 company property or company documents was

Page 102

1  really an offense that could lead up to
2  discipline and termination; right?
3      A. I actually took documents on a
4  regular basis and did a lot of work at home.
5      Q. Well, I'm just -- the reason I'm
6  asking is I'm just real curious. I can show
7  you -- I haven't been marked them as an
8  exhibit. I'm happy to do it if it would help
9  us be more clear that we've got a lot of
10 documents you -- your lawyer produced to us as
11 far as first reports of injuries --
12     A. Right.
13     Q. -- and OSHA 300 logs, and I'm just
14 not sure how you I guess continued to have
15 those after you no longer worked at Smart.
16     A. The only thing I can think of is
17 that I had those documents in my possession at
18 the time that everything went down on the 7th.
19     Q. And so you took them with you?
20     A. I already had material at home. I
21 worked -- I brought material home on a regular
22 basis.
23     Q. Why did you take it home?

Page 103

1      A. To be able to go proofread things
2  and make sure there weren't any corrections
3  that need to be made and that sort of thing.
4      Q. Were you paid for that time?
5      A. No.
6      Q. Did you ever report that time?
7      A. No, I would rather do my work at
8  home than to have to be there and work with
9  Rance.
10     Q. Okay. But you understood taking
11 documents from the company was an offense for
12 which you could have been disciplined; right?
13     A. No, ma'am, I was encouraged to do my
14 work at home.
15     Q. Well, I understand that. I don't --
16     A. Right.
17     Q. I'm encouraged to do work at home
18 too whenever I can.
19     A. Exactly.
20     Q. But my question is more of this: You
21 understood that if you took a document you
22 were not authorized to take or asked to take
23 that that would violate company policy; right?

Page 104

1      A. I was never aware that I took any
2  documents that were against company policy.
3      Q. And I'm not saying that we did --
4      A. Right.
5      Q. I'm just saying if you had taken
6  something that you had not been expressly
7  authorized to take to work on or to work at
8  home, that that would violate company policy?
9      A. Right.
10     Q. Now, when you worked at Smart, you
11 were paid I think you told me nine dollars an
12 hour initially. Is that about right?
13     A. Right, when I started in the
14 assembly.
15     Q. Okay. And did that ever go up?
16     A. When I was moved to the safety
17 department it went to I believe nine
18 dollars -- stayed at nine dollars but I was
19 supposed to have been going to 9.50.
20     Q. Did you ever go to 9.50 or can you
21 just not remember?
22     A. I've got some copies of some of my
23 pay stubs but I believe 9.50 is correct. I'm

26 (Pages 101 to 104)

## FREEDOM COURT REPORTING

Page 105

1  pretty sure that's correct.
2      Q.  That you ended up at 9.50 at the
3  time you left?
4      A.  I think -- I think that's correct.
5  I'll have to double-check with my pay stubs to
6  be sure.
7      Q.  Do you have those pay stubs with
8  you?
9      A.  There's a copy of one there.
10      Q.  Does that show -- are you looking at
11  Exhibit --
12          MR. HORSLEY:  5.
13      Q.  -- 5?
14      A.  I don't think it has the pay rate on
15  this particular one.
16      Q.  I think this has your time and not
17  your pay.
18      A.  Right.  There's a secondary page to
19  this that has your pay rate on it.
20          MS. WILLIS:  Off the record.
21
22      (Whereupon, a discussion was held
23      off the record.)

Page 106

1
2      (Whereupon, a brief recess was taken
3      from 12:03 p.m. to 12:14 p.m.)
4
5      (Whereupon, Defendant's Exhibit 7
6      was marked for identification and a
7      copy of same is attached hereto.)
8
9      Q.  (By Ms. Willis) Ms. Atwell, before
10  the break you had indicated you might have
11  some pay stubs and I have just marked the one
12  that you have given to us as Defendant's
13  Exhibit 7.  Is this a pay stub you received
14  while working at Smart Alabama?
15      A.  Yes, ma'am.
16      Q.  And is this for oh, goodness, it
17  looks like November 2005?
18      A.  It is.
19      Q.  And you were making nine dollars per
20  hour?
21      A.  That's right.
22      Q.  And overtime of time and half when
23  you worked overtime?

Page 107

1      A.  Right.
2      Q.  It looks like you had a lot of hours
3  of overtime --
4      A.  I did.
5      Q.  -- that month.  Was that pretty
6  common?
7      A.  That was usually pretty common.
8      Q.  You guys were working pretty hard;
9  right?
10      A.  Yes, ma'am.
11      Q.  And the plant was working weekends?
12      A.  Right, three shifts, seven days a
13  week.
14      Q.  Okay.  Wow, that is a lot.  So the
15  safety office had to be working then too;
16  right?
17      A.  Correct.
18      Q.  To accommodate who was out in the
19  plant working in production; right?
20      A.  Correct.
21      Q.  And everybody had to work --
22  everybody in the safety office was supposed to
23  work weekends; isn't that right?

Page 108

1      A.  Right.
2
3      (Whereupon, Defendant's Exhibit 8
4      was marked for identification and a
5      copy of same is attached hereto.)
6
7      Q.  Okay.  And I'm going to show you
8  what I'm going to mark as Exhibit 8 something
9  I think you provided to us and it was a
10  weekend work schedule --
11      A.  Correct.
12      Q.  -- for the safety office.  Let me
13  show you that.  Was this a typical -- and when
14  I say this, I mean Defendant's Exhibit 8, was
15  this a typical weekend work schedule?
16      A.  No, ma'am.
17      Q.  Why wasn't it typical?
18      A.  Due to the fact that I worked Monday
19  through Friday, when I was put on a schedule
20  to work on a Sunday on second shift or maybe
21  even on a third shift, which sometimes would
22  happen, that would mean that I would work a
23  third shift and then have to come back in and

27  (Pages 105 to 108)

# FREEDOM COURT REPORTING

Page 109

1  work a first shift back to back, two doubles.
2      **Q. Well, let's look here on -- it looks**
3  **like when you're scheduled for third shift**
4  **that you're scheduled for third shift on a**
5  **Saturday; right?**
6      A. Sometimes.
7      **Q. Okay.**
8      A. Some of these were revised because
9  there was a conflict in the schedule. I
10  discussed it with Rance. He was not in
11  agreement. I took it to Gary, explained to
12  Gary that I cannot work a third shift on
13  Sunday and be back at work at eight o'clock on
14  Monday morning.
15      **Q. And was that adjusted when you**
16  **reported that to Gary?**
17      A. It was being handled was -- was my
18  understanding.
19      **Q. Okay. But you didn't have to work**
20  **the back to back after you went to Gary about**
21  **it?**
22      A. I did not return back to work.
23      **Q. After that?**

Page 110

1      A. Right.
2      **Q. But it looks like, you know, it**
3  **looks like, for example -- I think you're**
4  **scheduled to work four days on this weekend**
5  **schedule and it looks like that Wendy's**
6  **working maybe three days and Lisa is working**
7  **several days as well. Lisa is working three**
8  **or four days; is that right?**
9      A. Yes, ma'am.
10      **Q. So everybody was expected to work on**
11  **the weekends?**
12      A. Right.
13      **Q. Regardless of whether --**
14      A. We have actually tried to do a
15  rotation schedule --
16      **Q. Uh-huh.**
17      A. -- where everyone would have a
18  weekend off and we had people that didn't show
19  up and people that you couldn't depend on and
20  the majority of those people were the people
21  that were on light duty that we would let work
22  the first aid room. So then we would get
23  called in, so there were a lot of weekends

Page 111

1  that aren't on the schedule that were actually
2  worked by myself or other safety department
3  employees because of them being shorthanded.
4      **Q. But everybody was supposed to work**
5  **regardless of what had been going on during**
6  **the week because y'all were all working seven**
7  **days a week three shifts; right?**
8      A. Well, this was put in after I
9  started to work in the safety department.
10      **Q. Okay. I understand that --**
11      A. Right, when I first --
12      **Q. -- because that February date --**
13      A. When I first got hired, I worked
14  Monday through Friday, 8:00 until 5:00.
15      **Q. When you first got hired at Smart?**
16      A. When I first went to the safety
17  department.
18      **Q. Okay. And then when did that**
19  **change?**
20      A. Shortly thereafter, I'm not sure
21  exactly when to be honest with you.
22      **Q. Bear with me just a second.**
23      A. For example -- can I show you

Page 112

1  something here?
2      **Q. Yes, ma'am, I'm listening.**
3      A. Here on Sunday, February 5, 2006, it
4  has Tabitha working first shift, which is 6:00
5  a.m. to 4:00 p.m. It has me working second
6  shift, which is 4:00 p.m. to 12:00 a.m., so I
7  get off at 12 midnight and be back at work at
8  eight o'clock in the morning on Monday
9  morning.
10      **Q. And that's what you went to Gary**
11  **about?**
12      A. Correct.
13      **Q. How many times did that happen**
14  **before you went to Gary about it?**
15      A. I believe -- the first time it
16  happened I went to Gary about it and then
17  Rance had it typed up that way -- actually
18  Colinda typed these but she typed these
19  according to the schedule that Rance gave her.
20      **Q. Colinda typed them up?**
21      A. The next time I told Gary, I said,
22  I'm not going -- I'm not working it, I'm not,
23  and I did not.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 113

1    Q. Okay. I'm going to show you -- I
2  don't have a copy of this if I need to make a
3  copy but if y'all can just look at it and we
4  can give it back to her. It's some time
5  records you guys produced.
6
7    (Whereupon, a discussion was held
8  off the record.)
9
10    (Whereupon, Defendant's Exhibit 9
11  was marked for identification and a
12  copy of same is attached hereto.)
13
14    Q. I'm going to mark as 9 some
15  documents you -- and if you don't mind, I'm
16  going to walk over there and look at them with
17  you because that's the easiest way,
18  Ms. Atwell.
19    A. Okay.
20    Q. I'm marking as Exhibit 9 to your
21  deposition some of your time records -- some
22  more of your time records that you produced to
23  us. Does this look like your time?

Page 114

1    A. It very well could be. Without me
2  being able to reference mine at home --
3  anything on here can be changed --
4    Q. Okay.
5    A. -- on the computer system because
6  that's how they would add and correct people's
7  hours.
8    Q. Okay. And I'm representing to you
9  and I understand you wanting to check that.
10  This is -- I think my office put that stamp on
11  it.
12    A. Okay.
13    Q. But I think this is what you gave
14  us --
15    A. Okay.
16    Q. -- as best I understand. With that
17  caveat, I guess, let's move forward.
18    A. Okay.
19    Q. And it looks like that -- like let's
20  look, for example, in January you didn't work
21  Saturday or Sunday, January 7th or 8th; right?
22  That's what it reflects.
23    A. No.

Page 115

1    Q. Okay. Then let's flip over. It
2  looks like in -- I'm going back to December
3  and you were working in the safety office in
4  December; right?
5    A. Correct.
6    Q. And you -- you didn't work Saturday
7  the 17th or Sunday the 18th; is that right?
8  That's what these documents reflect at least.
9    A. Now, some of these may or may not be
10  correct because sometimes when you would come
11  in in a hurry or somebody was hurt or
12  whatever, you didn't go by the time clock and
13  swipe your badge and make sure it beeped and
14  you were in the system. You went on in and
15  did your job. There's going to be some times
16  that aren't on here where I was actually
17  present and there's going to be some times on
18  here where I was not present.
19    Q. Okay.
20    A. Does that make any sense?
21    Q. Yeah. I guess I have the question
22  of when would there be some times that time is
23  on here and you weren't actually present if

Page 116

1  you had to swipe your card I guess?
2    A. Because not everyone swiped their
3  card in the offices when you were coming in
4  if -- if there was an emergency. Like for
5  example, one evening I was called in, there
6  was a gentleman around the press area that had
7  a seizure. They called me from home. I live
8  four miles from the plant. There was a safety
9  person there at the plant. They called me. I
10  came in, assisted them, took him to the
11  emergency room. I never clocked in. I never
12  clocked out.
13    Q. Okay. Okay, fair enough. And I
14  guess here's another weekend work schedule
15  where it looks like you worked a Sunday,
16  November 6th, but you didn't work Saturday the
17  5th, at least according to the time records?
18    A. Correct.
19    Q. Did you write these notes on what's
20  marked P26(A) 0032 of Defendant's Exhibit 9?
21    A. No, ma'am.
22    Q. Do you know who wrote that?
23    A. The lady that's in payroll. Her

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 117

1  name is not coming to me right this second.
2      Q.  Okay.  And these time records were
3  kept in a system; is that right?
4      A.  Correct.
5      Q.  And I guess it registered it by
6  you -- like you told me before, it swipes your
7  badge?
8      A.  Right, you swiped out.  Well,
9  sometimes when you would swipe it, it would
10 work and sometimes it wouldn't, you might have
11 to swipe it and then sometimes --
12     Q.  It would have to beep?
13     A.  Right.
14     Q.  Okay; okay.
15     A.  So.
16     Q.  And did you have access to your own
17 time cards through that system or did somebody
18 have to approve and review your time?
19     A.  The time went through payroll and
20 they were the only people that had access to
21 my knowledge of these time sheets.
22     Q.  Okay.  Can I ask -- let me ask you
23 the question because -- and if it's -- you

Page 118

1  know, if it's an error on my part, I'm sorry,
2  but these have been marked as something you
3  provided to us and I'm going to show you
4  another page.  How did you come in to
5  possession of these time records?
6      A.  You can go to them and request them
7  because that's the only way you can check your
8  time.
9      Q.  Like your check versus your time --
10 your paycheck versus your time?
11     A.  Right; exactly.
12     Q.  Okay.  And looking on 33, are these
13 your handwritten notes on P26(A)0033 of
14 Defendant's Exhibit 9?
15     A.  They are.
16     Q.  And triple shift, two employees were
17 out, is that what you were referencing earlier
18 that somebody didn't come to work?
19     A.  Correct.
20     Q.  And so you worked -- you attempted
21 to clock out and back in, I'm sorry; is that
22 right?
23     A.  Right, because if you don't clock

Page 119

1  out it won't -- they'll cut your time off at
2  whatever hours your general hours are supposed
3  to stop.
4      Q.  Okay.
5      A.  So in order to get credit for it,
6  you had to clock out, wait a few minutes, then
7  clock back in and then let payroll know, hey,
8  I worked overtime or I worked an extra shift
9  or whatever the situation was.
10     Q.  And P26(A)0036, are these your notes
11 as well?  Here I'm going to pull the staple
12 out --
13     A.  Okay.
14     Q.  -- and we'll staple it back for you,
15 I promise.  Are these your notes?
16     A.  Yes.
17     Q.  And the notes, if I'm correct, 12:43
18 Colinda left for lunch.  Is that in reference
19 to Colinda Porter who also worked in the
20 safety office?
21     A.  It is.
22     Q.  And 1:12 returned, I assume that's
23 when she returned?

Page 120

1      A.  Correct.
2      Q.  Why were you keeping up with that?
3      A.  Actually these notes were taken the
4  very last day I worked at Smart.
5      Q.  Okay, that's fine.  That makes
6  sense.  Why did you document when Colinda left
7  for lunch and when she came back?
8      A.  Earlier Rance and I had a
9  conversation where he was very rude to me
10 about me taking lunch later on in the day that
11 I was supposed to take it at a specific time.
12 A lot of times you could not take your lunch
13 at a specific time because of the fact that
14 things come up -- somebody gets hurt, I'm not
15 going to go eat lunch and make them sit there
16 for an hour.
17     Q.  Okay, fair enough.  Now, what is
18 this one o'clock, asked about what?
19     A.  Light duty status in assigned areas.
20     Q.  And what was that conversation
21 about?
22     A.  That's what the -- what Rance had
23 asked me about and I gave him -- that was

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 121

1  already posted in the office or the bulletin
2  thing inside our door where we put things. It
3  has the employee, their type of injury, their
4  light duty status, and if they're attending
5  physical therapy or not, and I showed him
6  where it was but he already knew where it was.
7  He has a copy put on his desk every day. Gary
8  had a copy on his desk. I believe Lloyd
9  Weathers had a copy on his desk. Every day
10  when somebody new was added, a new list was
11  issued to people in various departments.
12      Q. Okay. And was that 108, was that a
13  similar inquiry about the light duty release
14  dates?
15      A. Yes; uh-huh.
16      Q. You told me a little bit earlier,
17  Ms. Atwell, that different people had
18  different kind of shifts within the safety
19  office/first aid room; right?
20      A. Correct.
21      Q. How many safety assistants or
22  personnel were on each shift generally?
23      A. There were two safety assistants,

Page 122

1  myself and Lisa Bodiford.
2      Q. Okay.
3      A. Everyone else was light duty.
4      Q. But they worked with safety and/or
5  first aid?
6      A. Correct.
7      Q. So you're right in correcting me not
8  necessarily safety assistants. How many
9  people, regardless of whether they were a
10  safety assistant, were considered a light duty
11  team member worked per shift as far as safety
12  and first aid went?
13      A. It varied daily because some people
14  were released, some people were added. Some
15  days there may be no one added. Some days
16  there may be three added.
17      Q. Okay. So it just varied?
18      A. It varied.
19      Q. Okay. And now while you worked in
20  the safety office, and we've touched on this a
21  little bit, your performance was discussed
22  with you several times by -- with you by Rance
23  Maddox several times; right?

Page 123

1      A. My performance?
2      Q. Performance issues or job
3  performance.
4      A. The performance of the entire office
5  was discussed several times.
6      Q. Okay.
7      A. My performance issues, me in general
8  were discussed between Gary and Rance and
9  myself one day in the conference room.
10      Q. When was that meeting in the
11  conference room?
12      A. January the 13th.
13      Q. What happened during that
14  discussion, Ms. Atwell?
15      A. Rance presented the paper that we
16  had looked at earlier, Exhibit 6, and I'm not
17  certain who read or reviewed -- if it was read
18  or reviewed out loud or if it was just -- if I
19  read it myself because I really don't recall,
20  but Rance let me know prior to that he had
21  certain expectations and that if I couldn't
22  meet those expectations that he would find
23  somebody else, that that was his office,

Page 124

1  people in his office were going to do what he
2  wanted to do. If they didn't want to -- I'm
3  trying to think what his words were -- work
4  with him, then he would find someone that
5  would.
6      Q. Okay. What were his expectations he
7  told you about?
8      A. The reason I made nine dollars and
9  not 9.50 was because I filled out my request
10  for my 30-day raise and Rance had to do his
11  portion of it in order for me to get my 30-day
12  raise. I never got that turned in because I
13  would not work with him.
14      Q. You say work with him, what do you
15  mean by that?
16      A. He referred to himself, you know,
17  I'm the man and I'm this and I'm that and you
18  just have to know him.
19      Q. Well, unfortunately I don't --
20      A. I know. I know.
21      Q. -- so I'm going to have to rely on
22  your description today.
23      A. Rance let it be known that he

31 (Pages 121 to 124)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 125

1  thought he was this big, bad womanizer person,
2  ladies man, and he thought he could do
3  whatever he wanted to do and say whatever he
4  wanted to say and he didn't worry about -- he
5  said, I don't care what Gary says, I don't
6  care what anybody in human resources says,
7  this is my office and this is the way it's
8  going to work.  He didn't care if he made you
9  cry.  He didn't care if he made you upset.  He
10  didn't care if you threatened to go tell
11  somebody what was going on, he didn't care,
12  because he -- he actED like -- he showed no
13  fear at all.
14      Q.  Okay.  Fair enough.  Let me ask you
15  this question: What expectation specifically
16  did he communicate to you during this January
17  13th meeting with he and Gary Sport in the
18  conference room?
19      A.  Oh, he was a perfect gentleman in
20  front of Gary.
21      MR. HORSLEY:  Answer the question
22  she's asking you.
23      THE WITNESS:  Okay.

Page 126

1      MR. HORSLEY:  She asked you what
2  expectations did he describe for you in that
3  meeting.
4      THE WITNESS:  In front of Gary?
5      MR. HORSLEY:  Yeah.
6      A.  Everything listed here.
7      Q.  In the sheets?
8      A.  In the sheets.
9
10      (Whereupon, Defendant's Exhibit 10
11      was marked for identification and a
12      copy of same is attached hereto.)
13
14      Q.  Okay.  And I'm going to show you
15  what I'm marking as 10 and I believe you had a
16  copy of this but I don't know so I'm just
17  going to show it to you.
18      A.  Okay.
19      Q.  I mean, I know you've got it but I
20  think you may have provided the copy, how
21  about that.
22      A.  Oh.
23      Q.  Do you recognize Defendant's Exhibit

Page 127

1  10?
2      A.  I vaguely recall this.  I actually
3  didn't receive it on the 5th.  That's the day
4  that I got married.
5      Q.  Okay.
6      A.  I wasn't at work that day.
7      Q.  But have you seen Defendant's
8  Exhibit 10 before now?
9      A.  I'm not certain -- I can't say with
10  certainty that I've seen it before but I was
11  just looking at the date and it --
12      Q.  The date clicked?
13      A.  Yeah.
14      Q.  Now, had you in fact had some
15  discussions about the OSHA 300 log with Rance?
16      A.  We discussed it daily.  I gave him a
17  printout every day.
18      Q.  About cases entered in the OSHA 300
19  log?
20      A.  I guess he had to meet with certain
21  people and he would say, I need a current
22  copy, and I would give him a current copy and
23  I don't know what he did with them exactly

Page 128

1  but.
2      Q.  Okay.  Had you ever discussed
3  letting him know what's going on with workers'
4  comp and billing and injuries that occurred?
5      A.  From time to time it would be in
6  conversation but very little conversations
7  that he and I actually had had to do with
8  work-related issues unless he was inquiring
9  about, you know, where's so-and-so supposed to
10  be or where is this or just little small
11  things.
12      Q.  We're going to get to your
13  conversations, I promise.
14      A.  Okay.
15
16      (Whereupon, Defendant's Exhibit 11
17      was marked for identification and a
18      copy of same is attached hereto.)
19
20      Q.  I'm going to show you what I have
21  marked as -- I'm going to mark it as 11 and
22  you produce -- I think your lawyer produced
23  this to us.

32  (Pages 125 to 128)

# FREEDOM COURT REPORTING

Page 129

1    A.   Okay.
2    Q.   And I'm going to have to get your
3  help. I don't know what 11 is all about.
4    A.   Okay. This is a letter that I had
5  typed and saved in my computer.
6    Q.   Uh-huh.
7    A.   This is all that remains of the
8  letter. When I tried to print it off of the
9  computer, that was all that was left of it.
10  Someone apparently had deleted the remainder
11  of it. I had went to Gary and expressed to
12  him some concerns that I had with Rance and
13  some problems that I was having within the
14  office and Gary asked me to write Rance a
15  letter and I did.
16    Q.   Okay. And when did you print this
17  letter off?
18    A.   I'm not sure the exact date that it
19  was printed off.
20    Q.   Obviously before you left on
21  February 7th; right?
22    A.   Right.
23    Q.   Did you ever give a letter or a

Page 130

1  completed version of Defendant's Exhibit 11 to
2  Rance?
3    A.   Yes, I did.
4    Q.   You did?
5    A.   I did.
6    Q.   Did you give a copy to Gary?
7    A.   I believe I did.
8    Q.   Okay. And it says -- and I'm just
9  looking at the letter -- "It's intended to
10  express some of the concerns that I have. I
11  have worked in the safety department since
12  November 14. I had a couple of hit and miss
13  days of training on daily operation. I have
14  learned a lot and am still learning every
15  day." What else was contained in the letter?
16  Obviously you were concerned about training
17  and performing your job duties; right?
18    A.   Well, that was just the start of it.
19  I was trying to be able to get my raise. I
20  was trying to show, you know, in the letter,
21  you know, I'm not going to work for him, you
22  know, I'm not that type of person. He went on
23  and on and on various complaints, you know,

Page 131

1  that -- you know, this was my way to voice
2  what I felt, you know, how I felt.
3    Q.   What other complaints do you recall
4  being in the original document of Defendant's
5  Exhibit 11?
6    A.   The jokes that he made about women
7  and this and that and the other and the little
8  comments and the way that he would invade your
9  space and then, you know, try to be all nice
10  to you in an inappropriate way and then turn
11  around when you wouldn't go along with him and
12  snap at you. It's like Jekyll and Hyde,
13  either you play along or I'm not going to play
14  nice.
15    Q.   Okay. What was I guess the
16  conclusion or the outcome or the resolution
17  you were putting in Defendant's Exhibit 11?
18    A.   Gary wanted me to voice everything
19  that was going on, all my concerns, all my
20  questions, all my problems, that way once
21  Rance was notified by me by letter, Gary could
22  address him at that point.
23    Q.   Okay. Gary did eventually address

Page 132

1  Rance; right?
2    A.   I'm assuming so.
3    Q.   Okay. And we'll talk about that in
4  a bit too.
5    A.   Okay.
6    Q.   Do you know who -- what happened to
7  Defendant's Exhibit 11 or what happened to the
8  rest of it?
9    A.   Everybody that worked in that office
10  had access to that computer.
11    Q.   So you really have no idea what
12  happened to it?
13    A.   No idea.
14
15    (Whereupon, Defendant's Exhibit 12
16  was marked for identification and a
17  copy of same is attached hereto.)
18
19    Q.   Okay. I've got several I guess
20  memos I wanted to show you. Now, y'all
21  eventually did have a meeting I guess about --
22  let me show you this and ask you what this is
23  about before that because I think this came

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 133

1  before the meeting and I'm marking as 12 a
2  note that you signed dated and I think you
3  produced to us dated January 12 of '06 about a
4  meeting with a Diane Balkcom.
5      A.  Correct.
6      Q.  Did you type this?
7      A.  I did.
8      Q.  Is that your signature at the
9  bottom?
10     A.  It is.
11     Q.  And I guess you were Robin Davis
12 because your name hadn't changed over from
13 being married a week before?
14     A.  Right.
15     Q.  And what was this all about,
16 Ms. Atwell?
17     A.  We had an employee that was struck
18 by a forklift before I became a member of the
19 safety department.  She went through various
20 therapists, specialists, neurologists, just
21 about every doctor you can imagine, physical
22 therapy and everything.  She was released to
23 modified duty.  She came for all of about five

Page 134

1  minutes and sat in a padded rolling chair with
2  armrests and said she could not sit there any
3  longer and got up and walked out.
4      Q.  Okay.
5      A.  We had a lot of trouble trying to
6  work with her and a lot of it had to do with
7  her husband, he had a really sour attitude,
8  and so Gary had to have a meeting with her to
9  let her know that the doctors had released
10 her, she was expected to come back and work
11 out her modified duty program and that if she
12 didn't, that it could result in her
13 termination.
14     Q.  Okay.  And that's what this is
15 about?
16     A.  This is a letter to Gary.
17     Q.  From you?
18     A.  From me.
19     Q.  Summarizing?
20     A.  I had to summarize the meeting,
21 correct.
22     Q.  And did you just hold on to this
23 when you left Smart —

Page 135

1      A.  Correct.
2      Q.  -- on February 7?
3      A.  Correct.
4      Q.  Why did you hang on to this thing
5  because it really didn't have anything to do
6  with you and your employment; right?
7      A.  Well, she had threatened and had
8  obtained at least two lawyers that I know of
9  while I was there and I knew if it ever went
10 to court I would need some way to refresh
11 myself on anything that might come of that
12 particular case.
13     Q.  Okay.  So you held on to it for that
14 reason --
15     A.  I did.
16     Q.  -- and took it with you?
17     A.  I did.
18     Q.  Okay.  Now, eventually you guys in
19 the safety office had a meeting, right, kind
20 of about who's on first and who's supposed to
21 be doing what; right?
22     A.  Right.
23     Q.  And there's a little bit of

Page 136

1  confusion about whose responsibility was whose
2  maybe?
3      A.  Oh, yeah.
4      Q.  Yes, there was?
5      A.  No doubt.
6      Q.  Tell me a little bit about the
7  confusion.
8      A.  Certain people were assigned to do
9  certain things and they wouldn't do their
10 things and then I was required to do all of my
11 things plus some of their things and you'd
12 come in and paper would be stacked up and
13 piled up and nothing would be filed and it was
14 like trying to push a chain, I mean, trying to
15 get some people to do what was expected of
16 them.
17     Q.  How did this meeting come about, do
18 you have any idea?
19     A.  What was the date on that meeting,
20 do you have it?
21
22     (Whereupon, Defendant's Exhibit 13
23     was marked for identification and a

34  (Pages 133 to 136)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 137

1  copy of same is attached hereto.)
2
3     Q.  I'm going to show it to you.  It's
4  January 24th and I'll go ahead and mark 13.
5     A.  Okay.
6        MR. HORSLEY:  Off the record.
7
8     (Whereupon, a discussion was held
9     off the record.)
10
11     A.  I had went to Gary and to Ruth about
12  Rance and this meeting was held after that.
13  That's where the comments that "It was made
14  clear that if anyone has a problem or feel the
15  need to run to anyone in human resource
16  concerning how he operates the safety
17  department, can feel free to do so.  The fact
18  is, Mr. Maddox was hired to do this job and is
19  still in charge of the safety department."
20     Q.  Who typed Defendant's Exhibit 13?
21     A.  Colinda Porter.
22
23     (Whereupon, Defendant's Exhibit 14

Page 138

1  was marked for identification and a
2  copy of same is attached hereto.)
3
4     Q.  Okay.  I'm going to go ahead and
5  show you 14 because I'm just a little bit
6  confused --
7     A.  Okay.
8     Q.  -- kind of on the timing of some
9  things.
10     A.  Okay.
11     Q.  If you'll look with me, it's
12  P26(A)0002, it's the second page of the
13  exhibit.  I think you've got on January 18th
14  you met with Gary.  Do you see that?  Are you
15  with me?  I'm on January now.
16        MR. HORSLEY:  Right.
17     Q.  January 18th, do you see that
18  meeting with Gary?
19     A.  Correct.
20     Q.  And I don't see anything about Ruth
21  until the next page, February P26(A)0003, and
22  I think February 1st spoke with Ruth.
23     A.  That was the day I spoke with Ruth

Page 139

1  and Joseph.  I've actually spoken with Ruth in
2  private before and I've also actually spoken
3  with oh, gosh, she's in human resources.
4        MR. HORSLEY:  Just tell her as best
5  you remember.
6     A.  I can't remember her name and asked
7  for a complaint form to be able to fill out
8  against Rance if there was any type of
9  complaint form.  I was told there was no such
10  form itself, just to fill out something in
11  writing and submit that.
12     Q.  Well, let me ask you a little bit
13  about these calendars while we're on them and
14  we'll kind of have to flip-flop.  It looks
15  like -- and I'm flipping through the exhibit,
16  Ms. Atwell, that -- it looks like you've got
17  two Januaries and Februaries.  You've got --
18  there's the January and February at the
19  beginning with the Southeast Sportsman
20  calendar and then we get back to pages five
21  and six and it's January and February again.
22  Are these separate calendars?
23     A.  This was my calendar that was on my

Page 140

1  desk at work.
2     Q.  Uh-huh.
3     A.  Like a little small pocket calendar.
4        MR. HORSLEY:  Pointing to the second
5  one?
6        THE WITNESS:  The second one.
7     Q.  You mean P26(A) 5 and 6, that was
8  the one on your desk?
9     A.  Correct.
10     Q.  Is that right?
11     A.  As well as this one, I believe.
12     Q.  Okay.
13     A.  Yes, these were different -- two
14  separate calendars.
15     Q.  And the front two ones, P26(A) 2 and
16  3, where did you maintain these calendars?
17     A.  These were maintained in my
18  briefcase.
19     Q.  In your briefcase.  Did you take
20  that to and from work with you every day?
21     A.  On occasion, not every day.
22     Q.  So you left it at home at times?
23     A.  Sometimes.

35  (Pages 137 to 140)

# FREEDOM COURT REPORTING

Page 141

1    Q.  When would you fill in this
2  calendar?
3    A.  Usually at night, my husband worked
4  third shift at the same plant and I would fill
5  in my daily events.
6    Q.  Okay.  Do you have these for other
7  months of the year that year?
8    A.  Oh, yeah.
9    Q.  Okay.  Do you have them for other
10  months?
11    A.  Oh, yeah.
12    Q.  I think we're going to need the rest
13  of that.
14    A.  Okay.
15    Q.  I mean, I know you weren't employed
16  but I mean, if it's got anything --
17    A.  It's got church and baseball.
18    MR. HORSLEY:  Just give it to me and
19  then we'll --
20    THE WITNESS:  Okay.
21    Q.  (By Ms. Willis) And I guess why did
22  you decide to -- had you always been a
23  calendar keeper I guess is my question.

Page 142

1    A.  I have actually.  I always have.
2    Q.  And do you just write down things
3  that are important to you or events that are
4  important to you?
5    A.  Right.  I've never been really good
6  at keeping up with dates and times, so if I
7  don't write something down, then I may, you
8  know, get my days mixed up.
9    Q.  But you tried to record things that
10  were obviously important to you like the day,
11  I got married --
12    A.  Correct.
13    Q.  -- on January 5th on this calendar?
14    A.  Correct.
15    Q.  Or things that affected you like --
16  it looks like on the 24th when you go to
17  Crenshaw County Hospital I believe that's CCH.
18  I'm in January, I'm sorry.
19    A.  Okay.
20    Q.  Do you see where I'm looking, the
21  24th?
22    A.  Yes.
23    Q.  Because that was important to you;

Page 143

1  right?
2    A.  Correct.
3    Q.  So you wrote down the things that
4  were important to you.  Did you fill it in
5  every day or would you sometimes miss a day
6  and go back in and fill in things that had
7  happened?
8    A.  I probably had went back and filled
9  in things from the day before, I'm not going
10  to say that I haven't, because you know,
11  sometimes you get in a big hurry and don't
12  have time to write down -- I'm a journal
13  keeper also.
14    Q.  Okay.  Do you have a journal for the
15  time period during your employment with Smart
16  Alabama?
17    A.  No, actually I started a journal
18  afterwards --
19    Q.  Okay.
20    A.  -- as part of my self-therapy.
21    Q.  Your self-therapy, was that
22  prescribed by a physician or health care
23  provider?

Page 144

1    A.  No, I did some research on the
2  internet and that was one of the things that
3  they suggested, since I couldn't see a
4  therapist, I went through some of the steps to
5  try to see what could be done and that was one
6  of the things was to keep a journal of your
7  thoughts and your feelings and your concerns.
8    Q.  And did that journal contain
9  information about the events that had
10  transpired during your employment at Smart?
11    A.  The journal started after I left.
12    Q.  Right, and I'm saying did it
13  reference things that had happened to you or
14  occurred while you were working at Smart?
15    A.  Yes, it referenced feelings that I
16  was having because of things that happened.
17    Q.  Did it reference Rance Maddox?
18    A.  Oh, yeah.
19    MS. WILLIS:  We're going to have to
20  get that journal because it's -- it's clearly
21  responsive.  I think we've asked for any
22  journals or you know --
23    THE WITNESS:  I never -- I didn't

36  (Pages 141 to 144)

# FREEDOM COURT REPORTING

Page 145

1　think to say anything.
2　　　　MS. WILLIS: Oh, no, that's fine,
3　but we're going to need to get that and we may
4　need to -- I hope we won't have to do this
5　again based on that journal but we do need
6　to --
7　　**Q.　(By Ms. Willis) You don't happen to**
8　**have that with you today, do you?**
9　　A.　No; no.
10　　**Q.　If you'll just get that to your**
11　**lawyer.**
12　　A.　Okay.
13　　**Q.　And I don't want to know anything**
14　**that -- I don't want to know when you started**
15　**to talk to him and what y'all talked about.**
16　　A.　Right.
17　　**Q.　But if it relates to -- I think**
18　**you've alleged mental anguish in this action**
19　**so it's relevant -- I think it's relevant**
20　**to --**
21　　　　MR. HORSLEY: Can we take a break
22　for a minute and let me ask her some things
23　about that and then maybe we can put something

Page 146

1　on the record about the journal.
2　　　　MS. WILLIS: Yeah, that's fine.
3
4　　　　(Whereupon, a brief recess was taken
5　　　　from 12:50 p.m. to 12:57 p.m.)
6
7　　　　MR. HORSLEY: Well, what I'm
8　agreeing to do today as far as a journal about
9　which Ms. Atwell just testified is to have her
10　provide it to me. I'm going to look at it and
11　decide from my standpoint whether or not I
12　think it is discoverable, and if it is, I will
13　obviously produce it. If I don't think it's
14　discoverable, then I'm not going to produce it
15　and -- with the understanding that the
16　defendant can file a motion to compel to force
17　me to produce it. My understanding on the
18　record of what the journal contains does not
19　specifically reference the defendant or Rance
20　Maddox and contains other very personal things
21　that are completely unrelated to this lawsuit,
22　so I'm going to have to look at it before I
23　can agree to produce it.

Page 147

1　　　　MS. WILLIS: Okay. And I understood
2　that and I'll just say for the record, I take
3　the position at this point, and of course we
4　can agree to disagree later on down the road.
5　　　　MR. HORSLEY: Right.
6　　　　MS. WILLIS: That if it relates to
7　events or you know, she's claiming mental
8　anguish I believe as part of her damages in
9　this action, if it relates to that as a result
10　of any of the actions of Smart or Rance Maddox
11　then it is relevant. We may be able to
12　discuss the redaction of other unrelated
13　things as a possibility, you know, I'm within
14　a time limit but I'm going to probably reserve
15　the right to leave the depo or reopen the depo
16　if the journal -- if the journal is produced
17　or if the Court makes you produce the journal
18　if that's an issue.
19　　　　MR. HORSLEY: Okay.
20　　　　MS. WILLIS: If the journal so calls
21　for that.
22　　　　MR. HORSLEY: That's fine.
23　　　　MS. WILLIS: Okay.

Page 148

1　　　　MR. HORSLEY: That's fine.
2　　　　MS. WILLIS: Let's move forward.
3　Thank you for addressing that. I appreciate
4　that.
5　　**Q.　(By Ms. Willis) Ms. Atwell, will you**
6　**look back with me at Defendant's Exhibit 13,**
7　**which is this memo about the meeting?**
8　　A.　Okay.
9　　**Q.　And this meeting was addressed for**
10　**everybody, right, who was there?**
11　　A.　For Rance, myself, Lisa and Colinda
12　were the ones present. I'm not sure exactly
13　why Wendy wasn't there. She may have had a
14　doctor's visit or something.
15　　**Q.　Basically it sounds like the point**
16　**of the meeting was to reiterate**
17　**responsibilities and hey guys, let's stop any**
18　**kind of blame game that's going on here and**
19　**get some stuff done. Is that the way you**
20　**understood it?**
21　　A.　No.
22　　**Q.　Okay. Well, tell me how you**
23　**understood it because you were there.**

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 149

1    A.   Rance made it clear that -- like I
2  said, that he was the big boss.
3       Q.   Okay.
4       A.   That he did the hiring, he did the
5  firing, he controlled everything of everyone
6  in his office and he didn't answer to anyone,
7  and these notes actually aren't word for word,
8  they're just a brief summary of everything
9  that was said in that meeting and if you would
10 notice also --
11      Q.   Yes, ma'am.
12      A.   -- in this meeting the -- the only
13 person who had any changes made to their job
14 duties, which were just changed on the 14th I
15 believe of that month, was it the 13th or
16 14th, was myself.
17      Q.   I understand that but you know, you
18 had told me before I guess earlier on in your
19 testimony that when --
20      A.   Right.
21      Q.   -- you started in the office, you
22 were responsible for OSHA 300 and workers'
23 comp paperwork?

Page 150

1    A.   Right.
2       Q.   So that part hadn't changed; right?
3       A.   Right.
4       Q.   So this wasn't really a substantial
5  change to your duties, it was just a -- I
6  guess a -- I don't want to say a repeat or a
7  reiteration of what had already taken place --
8  what you had already been doing as well as
9  what had already taken place in the January
10 job description meeting?
11      A.   Correct.
12      Q.   Okay.  And we talked a little bit
13 about the blue jeans early on in the
14 deposition?
15      A.   Correct.
16      Q.   And it was your understanding blue
17 jeans were okay on Fridays if somebody wasn't
18 coming in or what not?
19      A.   Correct, if we weren't having plant
20 visitors or some type of special function or
21 something of that nature.
22      Q.   Did you ever receive any write-ups
23 from Rance Maddox about wearing blue jeans?

Page 151

1    A.   I had -- he told me he was writing
2  me up and he gave me a verbal warning.
3       Q.   Okay.  Are you aware as to whether
4  he counseled any other employees, whether they
5  be safety assistants or light duty people,
6  about wearing jeans on certain days?
7       A.   To my knowledge he hasn't -- jeans,
8  no.
9       Q.   But you don't know one way or the
10 other if he did or not?
11      A.   I don't know.
12
13      (Whereupon, Defendant's Exhibit 15
14 was marked for identification and
15 a copy of same is attached hereto.)
16
17      Q.   Okay.  I am going to show you what
18 I'm marking as now 15 and I believe you guys
19 made this available to us.  Are these your
20 notes on Defendant's Exhibit 15?
21      A.   They are.
22      Q.   And is this the termination letter
23 you saw?

Page 152

1    A.   Yes.
2       Q.   How did you come to have a copy of
3  this?
4       A.   It was in the community file where
5  Colinda keeps her things that everyone gives
6  her that's kind of centrally located where
7  everything gets filed.
8       Q.   Okay.  And so you took a -- you took
9  a copy from there?
10      A.   I made a copy from there.
11      Q.   Okay.  Why did you make a copy of
12 it?
13      A.   Because it was intended -- there was
14 one here on the desk and the way I know that
15 she's the one that had typed it is because it
16 was in her central folder.
17      Q.   But it was never handed to you and
18 said, Robin, you're terminated?
19      A.   When you walk in your office and
20 your name plaque is missing off of your desk
21 and this is the only thing sitting on your
22 desk, it's kind of obvious.
23      Q.   Yes, ma'am, but that wasn't my

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 153

1  question. Nobody ever handed this to you and
2  said you were terminated, did they?
3      A. They didn't have to.
4      MR. HORSLEY: Just answer that
5  question.
6      A. No; no.
7      Q. Okay. And it wasn't sitting out on
8  your desk, it was sitting in the community
9  file on your desk; right?
10     A. This was sitting on the desk in the
11  community file.
12     Q. Okay.
13     A. There was another copy -- there was
14  papers everywhere in this office. There was
15  another copy on the desk. When you walk in --
16  because I didn't have a calendar on my desk
17  right here, desk pad, everything was up.
18     Q. Okay. Well, let's look at 15. Do
19  you know if Gary Sport had authorized this
20  letter?
21     A. I have no idea.
22     Q. Do you know if Ruth Ryan or anybody
23  else in human resources authorized this

Page 154

1  letter?
2      A. I have no idea to be honest with
3  you.
4      Q. Do you know who typed it?
5      A. Looking at the words and the
6  spelling and the way things are aligned here,
7  I feel very strongly that Colinda Porter typed
8  that to be honest with you.
9      Q. But you don't know for sure?
10     A. I don't know for sure.
11     Q. It's just your thought?
12     A. I've seen a lot of things that she's
13  typed and I feel comfortable with saying that
14  I think she typed it.
15     Q. Fair enough. Fair enough. And
16  let's look at the contents of Defendant's
17  Exhibit 15. I'm looking at the second
18  paragraph of the first page of Defendant's
19  Exhibit 15.
20     A. Okay.
21     Q. "As you can remember, it is first
22  shift safety assistant responsibility to enter
23  in and complete the OSHA 300A log." "The last

Page 155

1  entry in the OSHA 300A log was on November 30,
2  2005, which was entered in by Melissa
3  McGough." "You have yet to enter in or
4  complete any recordables on the OSHA 300A
5  log." I mean, we've talked about you
6  understood OSHA logs going in the safety
7  office?
8      A. Correct.
9      Q. You didn't make any notes out beside
10  this part of the letter; right?
11     A. Correct.
12     Q. And so there hadn't been any
13  recordables put into the log as of January
14  30th?
15     A. There have been. There's actually
16  two different OSHA 300 logs.
17     Q. There's a 300 and a 300A?
18     A. Right.
19     Q. I understand that. But as far as
20  the 300A log, do you know if anything had
21  been -- any recordables were showing up in
22  that log as of this time, January 30th?
23     A. There had to have been because there

Page 156

1  was things recorded. We had to go back from
2  when the plant opened and go re-enter multiple
3  things in the OSHA 300 log that was -- way
4  before I was ever even hired, we had to go
5  through the entire file cabinet and play
6  catch-up.
7      Q. Okay. Now I'm looking at the third
8  paragraph. "Along with completing the OSHA
9  300A log, there has to be a first report of
10  injury claim from workers' compensation filled
11  out and emailed to Bill Hicks. This is also
12  very serious and must be done within 48 hours
13  of initial injury." You told me earlier you
14  understood about filling out workers'
15  compensation forms; right?
16     A. Correct.
17     Q. And that you had some problems with
18  other people in the office --
19     A. Correct.
20     Q. -- giving you information about what
21  had happened on their shifts?
22     A. Actually it was their responsibility
23  to fill out their report on the people that

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 157

1  were injured on their shift.
2     Q.  Uh-huh, okay.  What's the note
3  here -- is this your handwriting by paragraph
4  three on the first page of Exhibit 15?
5     A.  It is.
6     Q.  And it says, "Whatever I have copies
7  of all my stuff now and some of the old
8  stuff."  Was that some of the stuff you took
9  with you when you left Smart as far as the
10  first reports of injury?
11     A.  Some of the stuff that I had
12  accumulated over the period of time of working
13  there.
14     Q.  And taken home with you?
15     A.  Correct.
16     Q.  When did you handwrite these notes
17  on Defendant's Exhibit 15 by the way?
18     A.  Probably the day I got it.
19     Q.  The day you found it?
20     A.  Correct.
21     Q.  And were you at work then or were
22  you --
23     A.  Oh, I was at work.

Page 158

1     Q.  Okay, that you wrote this in?
2     A.  Because I went to Mr. Kwan
3  immediately.
4     Q.  You went to Mr. Kwan?
5     A.  I did.
6     Q.  With this letter?
7     A.  With this letter.
8     Q.  And what did you and Mr. Kwan
9  discuss?
10     A.  I made Mr. Kwan a copy of it.  I put
11  the copy that was left on the desk in my
12  pocket, discussed it with him.  He said he
13  would find out what was going on, he was very
14  upset about it.  I explained to him what all
15  had been going on and that he would find out
16  and get to the bottom of it.  That was not his
17  exact words but that was the gist of our
18  conversation.
19     Q.  He didn't tell you you were
20  terminated, did he?
21     A.  No, he did not.
22     Q.  Okay.  Did he ever get back to you
23  about it?

Page 159

1     A.  No, he did not.
2     Q.  But you left shortly thereafter, I
3  guess within a week of this?
4     A.  Correct.
5     Q.  Okay.  And then you've got notes
6  about what is this, never been instructed,
7  what is this, never been instructed, for daily
8  planner and reports of safety memos; is that
9  right?
10     A.  The daily planner for all three
11  shifts, I have no idea what exactly that was
12  other than the daily planner that we did was
13  for the light duty employees and it was what
14  their restrictions were and where they were
15  supposed to be.  That was done daily, so I
16  have no clue what he was trying to say that I
17  didn't do because it was -- the closest thing
18  that I knew that he was talking about was the
19  light duty planner that lets all the team
20  leaders know where everybody is supposed to
21  be.
22     Q.  But you didn't talk to Rance Maddox
23  directly about this Defendant's Exhibit 15,

Page 160

1  did you?
2     A.  No, he wasn't there.
3     Q.  Okay.  Was he out on medical leave
4  at that time?
5     A.  I'm not certain to be honest with
6  you.
7     Q.  Okay.  Then looking at the second
8  page, "Office organization, I know where my
9  stuff is and can't control what is done on
10  second or third shift.  This office is shared
11  by six people."
12     A.  Right.
13     Q.  Is that referring to the safety
14  assistants and the light duty people who work
15  in the safety office with you?
16     A.  Correct.
17     Q.  Okay.  "Safety committee/first
18  responders meeting, made list, posted list,
19  gave list to Lloyd," is that Lloyd Weathers?
20     A.  It is.
21     Q.  "And asked him to give me a date and
22  time when I could meet with the safety
23  committee people.  No response."  Had you

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 161

1  followed up on that since not getting a
2  response from Lloyd?
3      A.  It was followed up on and later on a
4  meeting was scheduled.
5      Q.  Okay.  Let me ask you this:  With
6  regard to I guess Defendant's Exhibit 15 and
7  14 and the January 6 or January 5th memo,
8  which was 10, that note -- none of these
9  memos, whether you received them or not, ever
10  resulted in you being demoted, did they?
11     A.  No, but I was never given my raise
12  that I was supposed to have.
13     Q.  I'm looking back at Defendant's
14  Exhibit 1, which is the interrogatory
15  responses, and I'm looking at page six and I
16  thought you had told me earlier in the
17  deposition but I may be wrong but it says here
18  I began working with Smart Alabama for nine
19  dollars an hour and ended at 9.50 so you
20  eventually did go to 9.50; right?
21     A.  I believe I may have.  I don't have
22  a current statement but the 9.50 was what I
23  was making on third shift.  When I transferred

Page 162

1  to first shift, they wanted to decrease my pay
2  to nine dollars because that's what a first
3  shift employee gets paid.  Third shift gets
4  paid more.
5      Q.  But you were truthful when you
6  signed your interrogatory responses just as
7  you're being truthful here right now; right?
8      A.  To the best of my knowledge, yes.
9      Q.  So you began working making nine
10  dollars an hour and ended at 9.50?
11     A.  Right.
12     Q.  But you moved from third shift to
13  first shift?
14     A.  Right.
15     Q.  So you understood there may have
16  been some kind of shift premium paid for
17  working that third shift?
18     A.  Right, but if I -- the whole reason
19  for taking that position was for more money.
20     Q.  Okay.  Did anybody ever promise you
21  you were going to make more money?
22     A.  I was told that I would stay the
23  same.

Page 163

1      Q.  Okay.  That -- who told you you
2  would stay the same?
3      A.  Gary and he had -- he eventually got
4  that straight.
5      Q.  Okay.  So you did get a raise?
6      A.  No, I stayed at my regular pay rate
7  that I was on third shift but I never got my
8  30-day raise.
9      Q.  What was the --
10     A.  Or 30- or 90-day, I'm not certain.
11  Anyway, there was a raise period that came in
12  there where I had to have an evaluation.
13  Rance told me to write it out and I wrote it
14  out.  He said, I'll sign it.  I took it to him
15  to sign it.  I felt like he wanted certain
16  favors in order to sign that.  I tore it up
17  and threw it in the garbage.  I never asked
18  for my raise.
19     Q.  So you didn't ask for it?
20     A.  I asked Rance to do my paperwork.
21     Q.  But you never went to Gary about
22  your raise?
23     A.  No.

Page 164

1      Q.  Never went to Ruth about your raise?
2      A.  No.
3      Q.  Never went to anybody else in HR
4  about your raise?
5      A.  No, because it has to go through
6  your supervisor.  They have to give you a good
7  report in order for you to get your raise.
8      Q.  Now, you started in the safety
9  office in the beginning of November; right?
10     A.  Correct.
11     Q.  So you would have worked November,
12  December, January before you would have ever
13  even been eligible for the 90-day raise;
14  right?
15     A.  Correct.
16     Q.  But that was -- that would have been
17  at the beginning of February that you would
18  have been eligible -- even eligible for a
19  90-day raise; right?
20     A.  Right, that's why I said it was 30
21  to 90 or 60, I don't -- I'll have to look in
22  the handbook.
23     Q.  But you -- you only worked until the

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 165

1  7th of January -- I mean February, I'm sorry,
2  and then left; right?
3      A.  Correct.
4      Q.  Okay, all right.  Now, obviously you
5  filed an EEOC charge after you left the
6  employment of Smart; right?
7      A.  Correct.
8      Q.  And you signed that under penalty of
9  perjury; right?
10     A.  Correct.
11
12     (Whereupon, Defendant's Exhibit 16
13     was marked for identification and a
14     copy of same is attached hereto.)
15
16     Q.  And I'm going to mark as Exhibit 16
17  your charge and you were as truthful and
18  accurate and complete with the EEOC as you
19  could have been; right?
20     A.  Correct.
21     Q.  I'm going to show you what I'm
22  marking as 16, which is your EEOC charge.
23  Tell me when you're done reviewing it.

Page 166

1      A.  I've reviewed it.
2      MR. HORSLEY:  We've looked at it.
3      Q.  Okay.  I just wanted to make sure.
4  And did you sign this charge on I guess the
5  third page -- oh, at the bottom of the third
6  page, is that your signature down in the left-
7  hand corner?
8      A.  Yes, it is.
9      Q.  And you understood you were signing
10  under the penalty of perjury?
11     A.  Yes.
12     Q.  And I don't want to know any
13  discussions about what you may have had with
14  your lawyer about what to put in there; okay?
15     A.  Okay.
16     Q.  Let's just go through the
17  contentions of your EEOC charge and I'm going
18  to ask you some specific questions about
19  those; okay?
20     A.  Okay.
21     Q.  Now, I'm looking at the first
22  asterisk.  "During her first week in
23  Mr. Maddox's office, and continuing through

Page 167

1  January 2006, Mr. Maddox asked Ms. Atwell on
2  numerous occasions where she was eating and if
3  she wanted to eat with him.  When she would
4  tell him she had other plans, on numerous
5  occasions, he would show up wherever she was
6  eating."  On what date did this occur?
7      A.  There were several dates actually.
8  I don't have the exact dates.
9      Q.  You didn't write them down on a
10  calendar?
11     A.  I don't -- I don't write every
12  single little thing down.  I write some very
13  important things down.  Would you like to give
14  me an example of how something like that would
15  occur?
16     MR. HORSLEY:  Just answer her
17  questions.
18     MS. WILLIS:  That's fine.
19     MR. HORSLEY:  She just wants to know
20  if you wrote it down or not and the answer is
21  no.
22     Q.  (By Ms. Willis) And that's fine.
23  Did he ask you to go eat at a specific place?

Page 168

1      A.  Yes, Ranch House, Chicken Shack.
2      Q.  Anywhere else that you can think of?
3      A.  He asked me to a place where you
4  don't eat.
5      Q.  What's that?
6      A.  It's a bar.
7      Q.  What's that?
8      A.  In Montgomery, Igor's or Iyor's or
9  something.
10     Q.  And I think that's later on down in
11  the charge and we'll get to that; okay?
12     A.  Okay.
13     Q.  Right now I'm just asking you about
14  lunch.  How many times did he ask you to have
15  lunch with him?
16     A.  It was almost on a daily basis.
17  Where are you eating lunch?  Where are you
18  going?  What are y'all going to have today?
19  Where are you going today?  Do you want to go
20  grab something?  No.
21     Q.  Okay.  Did that offend you?
22     A.  When it got to where it was -- the
23  other things going on, the other things that

42  (Pages 165 to 168)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 169

1  had been done, other things that had been
2  said, I was very uncomfortable.
3      Q.  But initially it didn't bother you?
4      A.  Well, initially it started out as
5  what I thought was just innocent conversation,
6  you know.  Would you like to go eat here or
7  where are you going and then when it got to
8  where me and the girls would go show up
9  somewhere to eat because he would overhear us
10 on the phone where we were going to go eat for
11 lunch and then you never know, you might see
12 him pull through the parking lot or he might
13 show up.  So I started getting my husband to
14 come eat lunch with me every day and he worked
15 third shift, so he would have to get up out of
16 bed to come eat lunch.
17     Q.  Now, there's not very many places to
18 eat in Luverne around the plant, are there?
19     A.  Right around the plant, no.
20     Q.  So it's not necessarily that Rance
21 was following you to lunch, it may be -- it
22 could have been at least limited possibilities
23 about where to eat?

Page 170

1      A.  Well, there's enough places that --
2  the random possibility of him showing up at
3  the same place very often was -- you know, I
4  just don't see it happening as a coincidence.
5      Q.  Did he ever show up where you were
6  eating and ask could he eat with you?
7      A.  Oh, he has come and sat down with
8  me, yes, ma'am.  He didn't ask.  He just sat.
9      Q.  You've been with others?
10     A.  No.
11     Q.  By yourself?
12     A.  It was by myself one day.
13     Q.  Where was that at?
14     A.  At the Chicken Shack in Luverne.
15     Q.  And that happened one time?
16     A.  Yes.
17     Q.  About when did that happen in your
18 employment at Smart?
19     A.  I'm saying it was maybe somewhere
20 before January -- between December and
21 January.  The reason I'm thinking is that's
22 when I started making reference to my husband
23 and then started making him come eat lunch

Page 171

1  with me.
2      Q.  Okay.  Did anybody else witness him
3  inviting you to lunch?
4      A.  Colinda may have, I'm not certain on
5  that.
6      Q.  Anybody else?
7      A.  No one that I can think of at this
8  time.
9      Q.  Did you ever report Rance asking you
10 to take you to lunch or go to lunch with you?
11     A.  That was the part of the whole gist
12 of the things when I went to human resources,
13 that was part of what was brought up.
14     Q.  Who did you report that to?
15     A.  It was brought up to Gary in the
16 cafeteria at Smart.
17     Q.  So you ran into him one day in the
18 cafeteria?
19     A.  No, I went to go talk directly with
20 Gary and we were actually speaking in the
21 cafeteria.  It was between lunch shifts.
22     Q.  Okay.  And what did you tell him
23 specifically about going to lunch?

Page 172

1      A.  I think -- it wasn't just about
2  lunch itself.  It was about numerous things.
3      Q.  Okay.  But just for now I'm
4  asking --
5      A.  Okay.
6      Q.  -- what specifically did you tell
7  Gary about Rance wanting you to go to lunch?
8      A.  I don't remember my exact words but
9  probably that, you know, that he had been
10 coming on to me and that I was uncomfortable
11 with it and he calls all the time and asks me
12 to go out to eat all the time and shows up,
13 you know, and just the same things that are
14 listed.
15     Q.  Did you ever tell Rance that you
16 felt uncomfortable with him doing that?
17     A.  Oh, yeah, I've cussed at him.
18     Q.  When did you cuss at him?
19     A.  The day that he reached over my
20 shoulders and grabbed my breast when I was at
21 my computer station at my desk.
22     Q.  That's not exactly what you told the
23 EEOC, was it, and I'm looking -- the third

43  (Pages 169 to 172)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 173

1  asterisk, "On January 18, 2006, while
2  Ms. Atwell was in the corner of the office
3  working on a computer, Mr. Maddox grabbed both
4  of her shoulders and squeezed them as if he
5  were giving her a massage. He moved his hands
6  over her shoulders where they were situated
7  just above her breast and rubbed her." He
8  didn't touch your breast, did he?
9      A.  Your breast is not just a small
10  area. It's -- it goes in other areas and yes,
11  the actual breast area was touched.
12      Q.  Why didn't you tell the EEOC that
13  instead of just above your breast?
14      A.  Because it wasn't under it, it was
15  above. It was in this area.
16      Q.  Okay. And I'll go ahead and ask you
17  about that incident. That happened when you
18  successfully entered something into the
19  computer; right?
20      A.  No.
21      Q.  Well, tell me how this came about
22  then.
23      A.  He was all the time rubbing and

Page 174

1  bumping up against you and hugging and holding
2  hands.
3      Q.  Yes, ma'am, that's not what I asked
4  though. I'm asking about this specific
5  incident which you're referring to. Tell me
6  how that came about.
7      A.  I was working on my computer. I
8  don't even know what I was doing or working on
9  at that particular time. My desk was in a
10  corner. My computer was in the very center.
11  My chair rolled up to the middle. He walked
12  up behind me. I could not roll backwards. He
13  reacher over and was rubbing my shoulders. As
14  I tried to get up, he reached down. He
15  laughed and thought it was funny.
16      Q.  Okay. But that happened that one
17  time?
18      A.  At the computer desk, yes.
19      Q.  At computer desk. Did he touch your
20  shoulder/breast at any other time?
21      A.  He was a very touchy, feely person.
22      Q.  Did he touch them at any other time?
23          MR. HORSLEY: She's asking you if he

Page 175

1  touched your breasts at any other time.
2      A.  He's rubbed his shoulders up against
3  my breasts.
4      Q.  When did that happen?
5      A.  I'm not sure exactly a date unless I
6  listed a date here.
7      Q.  Did you ever record it on your
8  calendar?
9      A.  Not unless it was on my calendar.
10      Q.  So that just wasn't important enough
11  to you to keep track of it I guess?
12          MR. HORSLEY: Object to the form,
13  argumentative.
14          MS. WILLIS: You can answer.
15      A.  It got to where it was something all
16  the time every day.
17      Q.  Okay.
18      A.  And so yes, he has.
19      Q.  Did anybody witness him when he came
20  and rubbed your shoulders/up above your breast
21  when you were sitting at the computer?
22      A.  To my knowledge, no.
23      Q.  When that happened I know -- and

Page 176

1  we're going to get into who you've talked to
2  at Smart a little bit later on.
3      A.  Okay.
4      Q.  Did you tell anybody in your family
5  or anybody else outside the workplace about
6  it?
7      A.  I told my sister-in-law.
8      Q.  Your sister-in-law, Janna?
9      A.  Uh-huh.
10      Q.  Let's look back at the second page.
11  "On November 16, 2005, Ms. Atwell's birthday,
12  Rance Maddox hugged her. Although it was a
13  birthday hug, the hug was inappropriately
14  tight and long." Where were you at Smart when
15  Rance hugged you?
16      A.  In our office.
17      Q.  In the safety office?
18      A.  Uh-huh.
19      Q.  Was anyone else present?
20      A.  Not to my knowledge.
21      Q.  Was the door open or closed?
22      A.  Closed.
23      Q.  Was any conversation had prior to

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 177

1  him hugging you?
2      A.  He came in and I had had flowers and
3  balloons -- two actually arrangements of
4  flowers and balloons sent to me, so that's how
5  he knew it was my birthday, and I was standing
6  up in passing walking by it was like, you
7  know, happy birthday but other than -- I
8  didn't actually come outright and tell him
9  it's my birthday.
10     Q.  And when you say inappropriately
11  tight and long, how long did the hug last?
12     A.  I'd say maybe eight to ten seconds.
13     Q.  Okay.  And you consider that too
14  long?
15     A.  Oh, yeah.
16     Q.  Did you report that to anybody when
17  it happened?
18     A.  No.
19     Q.  What did you do after he hugged you?
20     A.  I was on my way out the door and I
21  went on out and did -- wherever I was heading
22  to.
23     Q.  Kept on working or whatever you were

Page 178

1  doing prior to the hug?
2      A.  Yeah, I thought it was kind of
3  weird.
4      Q.  Okay.
5      A.  But --
6      Q.  Did you record it, and I'm looking
7  if y'all want to look on Defendant's Exhibit
8  14, did you record it anywhere on any
9  calendar?
10     A.  I'm not certain if it's on there or
11  not.
12     Q.  I don't see anything about it but --
13     A.  It's my birthday, I wouldn't forget.
14     Q.  I don't -- I don't see one of these
15  kinds of calendars for November.  I do see
16  your desk calendar, so if you have one of
17  those, you might want to give that to your
18  lawyer too for November 2005.
19     A.  Okay.  I have that.
20     Q.  Let's talk about this other
21  allegation from November 16 through the end of
22  January.  "Mr. Maddox repeatedly touched the
23  plaintiff on her arms and hands and attempted

Page 179

1  to hold hands with her while talking to her."
2  Where would you be when he would do this?
3      A.  It could be a variety of places.  He
4  could be at his desk and call me to his desk
5  and either I could stand on the side of his
6  desk and he'll say, come around here so I can
7  see.  And as I would stand beside him and try
8  to show him things or get him to show me
9  things, that's when all the touching and
10  rubbing would be while I was closer by or if I
11  was doing things filing or looking for
12  something, you know, he would come by or brush
13  by.  And when he would try to talk to you, he
14  would try to hold your hand or rub your hand.
15  And if he sat on the front side of his desk,
16  he would try to hold your hand and pull you in
17  towards where his legs were.
18     Q.  Did you ever see him doing that with
19  any other female employee?
20     A.  I did one other female employee.
21     Q.  Who?
22     A.  Melissa McGough.
23     Q.  When did that occur?

Page 180

1      A.  It was actually while I was in
2  training and he was that way with her.
3      Q.  What do you mean that way with her,
4  what exactly did you see?
5      A.  He was holding her hand while he was
6  standing there talking to her and he hugged
7  her but she was leaving the office to go to
8  another area and so I really didn't know what
9  to make of it.  It really didn't strike me as
10  odd at that particular time.
11     Q.  How many times did he try to hold
12  your hand?
13     A.  I'd say at least 20 or 30.
14     Q.  Did you ever record it on your
15  calendar?
16     A.  I'm not certain unless it's -- if
17  it's not on there, then I may not have written
18  that down.
19     Q.  Did anybody ever witness him trying
20  to hold your hand while he was talking to you?
21     A.  I'm not certain.
22     Q.  Did you ever report it that he was
23  trying to hold your hand when he was talking

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 181

1    to you?
2        A.   Yes.
3        Q.   To whom?
4        A.   To Gary and to Ruth.
5        Q.   To Gary when you talked to him
6    first?
7        A.   Uh-huh.
8        Q.   And then to Ruth later on?
9        A.   Right, and the second -- the first
10   and second meeting that I had with Ruth, it
11   was discussed in both of those meetings.
12       Q.   Okay.  What specifically did you
13   tell Gary?
14       A.   That he was out of the way, I don't
15   remember exactly what my words were.  I just
16   went over everything that was making me
17   uncomfortable and that when he didn't get his
18   way, he turned into a grouch and that he was
19   making it miserable for me because I wouldn't
20   play along with him.
21       Q.   Did you specifically reference him
22   holding your hand?
23       A.   I'm -- I'm not positive but I'm very

Page 182

1    sure that I did because --
2        Q.   But you're not absolutely certain?
3        A.   I know that I did with Ruth.
4        Q.   Okay.  The other allegation I guess
5    in this part is that he touched you -- touched
6    you on your arms.  Where would he touch you on
7    your arms?  What part of your arms?  Let me
8    make that question a little clearer.
9        A.   He may come up from behind and wrap
10   his arm around your arm or come up from behind
11   and rub your arms this way or come up from the
12   front and grab you on each side and just -- he
13   would invade your space by the way he held
14   your arms to talk to you, not like in a gruff
15   way but just like in a -- you know, this is my
16   space, this is your space, he would invade
17   your space while he held you and pulled you
18   towards him.
19       Q.   How many times did he do that?
20       A.   Probably 20 or more, I mean, it's
21   hard to keep up with it because it went on so
22   much.
23       Q.   I understand that and you know, I'm

Page 183

1    sorry, I have to kind of ask you because I do
2    need to get the specifics.  When was the first
3    time he touched your arms like you just
4    described for us?
5        A.   I'm not sure exactly which day would
6    be the first time.
7        Q.   How long had you been working in the
8    safety office with Rance when he touched you
9    on the arms for the first time?
10       A.   Two days.
11       Q.   Two days.  Did you report it to
12   anybody then?
13       A.   The birthday hug, no.
14       Q.   Well, did you -- okay.  Did you
15   report the touching on the arms to anyone at
16   Smart at the time it happened, the first time
17   it happened?
18       A.   No.
19       Q.   You waited to report it until
20   sometime mid-January when you met with Gary;
21   right?
22       A.   No, it had been reported before
23   then.  I had went to Fran Hughes and asked for

Page 184

1    a letter from her, a form to fill out,
2    something that I could fill out about Rance.
3    I had already written the letter -- no, that's
4    when I had written the letter to Rance but I
5    had went to Fran Hughes prior to asking for a
6    form to fill out for harassment.
7        Q.   Did you tell her specifically --
8        A.   Yes.
9        Q.   -- what you were putting in the
10   form?  Do you consider Fran Hughes a truthful
11   person?
12       A.   As far as I know.
13       Q.   Okay.  Did you ever turn in the
14   letter or the form about --
15       A.   The company doesn't have such a
16   form.  That's what she --
17       Q.   Did you ever write out anything?
18       A.   I did.
19       Q.   What?
20       A.   Everything that I felt that was
21   going on.
22       Q.   Well, was that in that January --
23       A.   You know, how uncomfortable --

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 185

1    MR. HORSLEY:  Make sure that she's
2  finished before you start talking.
3    MS. WILLIS:  And I'm sorry, I will
4  extend you the same courtesy.
5    **Q.  (By Ms. Willis) Did you write that**
6  **out in that January letter that was unfinished**
7  **or are you talking about some other document**
8  **when you say you wrote all that out?**
9    A.  There's two separate documents.
10  This is the one to Rance himself and there was
11  another letter that was given to Fran through
12  human resources.
13    **Q.  Where is that letter?**
14    A.  Human resources I'm assuming.
15    **Q.  What was the date of that letter?**
16    A.  Just one second and I'll --
17    MR. HORSLEY:  Hold on.  Is this the
18  handwritten letter?
19    THE WITNESS:  It may be.  Do you
20  have it?
21    MR. HORSLEY:  Do you not have this?
22    MS. WILLIS:  I have one but it's not
23  to -- I don't have anything with Fran Hughes'

Page 186

1  name on it.
2    THE WITNESS:  Does it say human
3  resources or --
4    MR. HORSLEY:  Hold on.
5    THE WITNESS:  This is the rough
6  draft.
7    MR. HORSLEY:  Is that what you're
8  talking about?  You've got this, don't you?
9    MS. WILLIS:  Uh-huh.
10
11    (Whereupon, Defendant's Exhibit 17
12    was marked for identification and a
13    copy of same is attached hereto.)
14
15    **Q.  (By Ms. Willis) I'll go ahead and**
16  **mark this.  I'm showing you Defendant's**
17  **Exhibit 17.  Is this addressed to Fran Hughes?**
18    A.  No.
19    **Q.  And this was a rough draft?**
20    A.  It is.
21    **Q.  So it wasn't ever given over?**
22    A.  Yeah, it was typed.
23    **Q.  Did you ever give it to anybody?**

Page 187

1    A.  Yes, it was given to Fran Hughes.
2    **Q.  When did you give it to Fran Hughes?**
3    A.  I'm assuming somewhere around the
4  2nd because that's the date on it.
5    **Q.  Did you not keep a typed copy of it?**
6    A.  I gave them everything that I had.
7    **Q.  Although you kept copies of OSHA**
8  **forms, you didn't keep a typed copy of your**
9  **complaint?**
10    A.  I don't have copies of my pay stubs
11  either but -- no, I don't keep copies of
12  everything.
13    **Q.  Do you know what if anything Fran**
14  **did with it?**
15    A.  No idea.
16    **Q.  Okay.  Do you know if Gary Sport,**
17  **who this was addressed to, ever got it?**
18    A.  I'm uncertain.  There was a copy for
19  Fran and there was a copy for Gary.
20    **Q.  Okay.  But Fran's name is not**
21  **anywhere on this?**
22    A.  Right, she's on -- all you have to
23  do is change the name.  She's human resources,

Page 188

1  Smart.
2    **Q.  She dealt more with insurance and**
3  **community relations; right?**
4    A.  Actually when she came to our AIDT
5  training meeting, she came in and introduced
6  herself and said that she had an open door
7  policy and that if anybody had any questions
8  or concerns, feel free to come to her.  She
9  did have other job responsibilities but she
10  was also there in case someone needed to speak
11  with her about problems or concerns.
12    **Q.  Okay.  Going back to your EEOC**
13  **charge, you reference going to Igor's in**
14  **Montgomery, going for drinks after work.  How**
15  **many times did Mr. Maddox ask you if he wanted**
16  **to go have -- if you wanted to go have drinks**
17  **after work?**
18    A.  Between the November and -- sometime
19  in November and around -- somewhere around the
20  New Year when I guess all the Christmas
21  parties and getting ready for New Year's and
22  all, it was around in that particular time.
23  I'm saying maybe three or four times.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 189

1    **Q. Did you ever go?**
2    A. No.
3    **Q. Did you ever -- let's look at**
4  **Defendant's Exhibit 14. Did you ever record**
5  **it on a calendar anywhere?**
6    A. No, ma'am.
7    **Q. Okay. Did he -- what would he say**
8  **when he asked you to have drinks with you --**
9  **with him, so sorry.**
10    A. That he was going to Igor's and
11  would I like to go with him and they're going
12  to have a good time and come on, you know,
13  we'll have a ball and I'll buy your drinks and
14  don't worry about driving, we'll just -- you
15  know, if we get too tore up, we'll get a room,
16  and that kind of stuff.
17    **Q. And he said we're going to have a**
18  **good time. Who else was going with him?**
19    A. He never referenced anyone else
20  going with him.
21    **Q. Do you know whether anybody else was**
22  **going to go or not?**
23    A. He never said if there was.

Page 190

1    **Q. Did anybody ever witness him asking**
2  **you to have drinks with him after work?**
3    A. Not to my knowledge.
4    **Q. Okay. Even though they worked there**
5  **in the safety office with you?**
6    A. Like I said, people were in and out.
7    **Q. Okay. Did you ever report**
8  **specifically that he was asking -- that he,**
9  **Mr. Maddox, was asking to have drinks with**
10  **you?**
11    A. I'm sure it was brought up at one of
12  the conversations that I had with somebody.
13    **Q. Do you -- but you don't know who?**
14    A. No.
15    **Q. Or when, okay. There's something**
16  **here in your EEOC charge about a comment**
17  **between November 16 and December 1st as to it**
18  **was impossible for men to be monogamous.**
19  MR. HORSLEY: Where are you?
20  MS. WILLIS: First page -- first
21  page of allegations I guess.
22  THE WITNESS: Right there.
23  MR. HORSLEY: Yeah.

Page 191

1    A. Yes.
2    **Q. Where were you when Rance made a**
3  **comment like this?**
4    A. In our office.
5    **Q. Who else was present?**
6    A. I think somebody had come in and --
7  or we were talking about somebody was upset
8  about something. There was a guy that worked
9  there named Dusty and he had come in and
10  talked to Rance because he was having trouble
11  with his girlfriend, and when Dusty left,
12  that's when Rance started up the conversation
13  about people being -- you know, he didn't
14  believe that men could be monogamous and
15  they're not designed that way -- we're not
16  built that way, we're not wired that way, you
17  know. He just let it be known that that's how
18  he felt.
19    **Q. Was anybody else in the office at**
20  **that time?**
21    A. No.
22    **Q. What did you say?**
23    A. I don't believe I made a comment.

Page 192

1    **Q. Okay. Did you record it on your**
2  **calendar anywhere?**
3    A. No, that's why the dates are as they
4  from --
5  MR. HORSLEY: Just answer what she's
6  asking you.
7    A. No.
8    **Q. Did you tell anybody in your family**
9  **about it?**
10    A. I told my sister-in-law, Janna.
11    **Q. Did you report it to anybody at that**
12  **time at Smart?**
13    A. No.
14    **Q. Why not?**
15    A. I just didn't.
16    **Q. Didn't think it was important enough**
17  **to tell anybody?**
18    A. That was just a comment.
19    **Q. Okay. So you weren't offended by**
20  **it?**
21    A. At that time, I mean, he was just
22  letting me know how he thought but you know, I
23  didn't want -- you know, I didn't go to human

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 193

1  resources with it.
2  **Q. Okay.**
3  A. I've been in their office every day.
4  **Q. Did you go to human resources ever**
5  **specifically about the comment about men being**
6  **monogamous in their relationships?**
7  A. No, but I'm sure it was mentioned in
8  some of the meetings that I had.
9  **Q. You don't know one way or another**
10 **though?**
11 A. No.
12 **Q. Okay. It says on numerous occasions**
13 **between November 16 and the end of January he**
14 **deliberately rubbed his pelvis area against**
15 **your buttocks.**
16 A. Yes.
17 **Q. Tell me the first time that**
18 **occurred.**
19 A. I'm not sure exactly the first time
20 that it occurred to be honest with you. I
21 don't know the exact date.
22 **Q. How long had you been working in the**
23 **safety office?**

Page 194

1  A. Probably less than a week.
2  **Q. You would agree with me rubbing your**
3  **pelvis up against somebody's behind, that's**
4  **pretty serious if it happens; right?**
5  A. Oh, yeah.
6  **Q. Why didn't it get recorded on your**
7  **calendar?**
8  A. Like I said, some things I write
9  down and some things I didn't. That's why
10 there's no specific date on there.
11 **Q. How many times did he rub his pelvis**
12 **against you?**
13 A. Against any part of my body?
14 **Q. Yeah.**
15 A. Probably off and on several times a
16 week at least.
17 **Q. What part of your body did he rub**
18 **his pelvis up against and how on the first**
19 **occasion?**
20 A. He's rubbed it up against my
21 buttocks. He's rubbed it up against my
22 shoulder. I guess that would be the two main
23 areas.

Page 195

1  **Q. Okay. And yes, ma'am, and I'm**
2  **asking the first time that it happened, what**
3  **part of your body did he rub his pelvis up**
4  **against?**
5  A. He had come behind me as I was
6  filing. He made it seem like he was just
7  trying to squeeze by but there was nothing
8  behind him to prevent him from getting by.
9  **Q. How long of contact did he have with**
10 **you at that point in time when you were**
11 **filing?**
12 A. It was not a brush, it was a slide
13 if that makes any sense.
14 **Q. About how long did the slide last?**
15 A. Maybe three seconds.
16 **Q. Did you say anything to him about**
17 **it?**
18 A. No, I stood up, leaned up from where
19 I was -- the position I was in.
20 **Q. Do you know if he meant to do it or**
21 **not?**
22 A. Well, I act startled and he laughed,
23 so he didn't apologize so I'm assuming it was

Page 196

1  intentional.
2  **Q. Did you report it to anybody outside**
3  **of Smart?**
4  A. No.
5  **Q. Did you report it to anybody at**
6  **Smart?**
7  A. I did.
8  **Q. Who?**
9  A. It was brought up in the
10 conversations.
11 **Q. Which conversation?**
12 A. The conversations that I had with
13 different people that work in human resources
14 as well as Mr. Kwan.
15 **Q. When did you tell Mr. Kwan about**
16 **this?**
17 A. The day that I found the termination
18 letter.
19 **Q. How long did you spend with Mr. Kwan**
20 **that day?**
21 A. About 30 minutes.
22 **Q. Okay. What specifically did you**
23 **tell him during that meeting?**

49 (Pages 193 to 196)

# FREEDOM COURT REPORTING

Page 197

1    A.  We went over the letter and I
2  explained to him everything that had gone on
3  over the period of time that I had worked
4  there, everything.
5    **Q.  Well, can you tell me more specifics**
6  **than everything?**
7    A.  About him calling all hours of the
8  day and night, about him showing up where I
9  eat, about him asking me out, about him
10 touching me inappropriately, about him telling
11 me to just work with him and you know,
12 everything, about how I'd cry, about how I'd
13 throw up, about how it's causing me problems
14 at home.
15   **Q.  Right.  But you understood from the**
16 **sex harassment policy that you're supposed to**
17 **report your concerns to human resources, that**
18 **that was where it was supposed to go?**
19   A.  And it did and it didn't do any
20 good, so I went to the person that's over
21 their head and that's Antoine Kwan.
22   **Q.  What did Mr. Kwan say in response to**
23 **you during the meeting?**

Page 198

1    A.  I remember him saying what, what
2  several times, and I explained to him and I
3  slowed down because I was really upset and you
4  know, didn't know, you know, if it was
5  factual, if I was really terminated, if I
6  wasn't terminated, you know, what was going
7  on.  We had just bought a house.  All this
8  mess was going on, you know.  All I could
9  think is I really need this job, I don't need
10 it this bad if I'm going to have to put up
11 with this kind of mess and I explained
12 everything to him, all my concerns, all my
13 feelings, everything that was done, everything
14 that was said.
15   **Q.  And you said you had done that**
16 **because meeting with human resources had done**
17 **no good?**
18   A.  Right, I had asked --
19   **Q.  What led you to conclude that?**
20   A.  I had asked to be transferred.  I
21 had asked for him to be transferred.  I had to
22 transfer myself.
23   **Q.  But weren't you in fact told that**

Page 199

1  **you were going to be transferred out to work**
2  **with Lloyd Weathers?**
3    A.  On the very last day I was at work,
4  my husband and I met with Ruth and Rance said
5  that they would move me out into the plant.
6  If I worked out in the plant, I would see
7  Rance every day.  He has access to the plant.
8  He has to go through the plant.  You have to
9  get your safety equipment through him.
10   **Q.  Right, but you wouldn't need to have**
11 **one-on-one interaction with him unless you**
12 **needed to go to the safety office?**
13   A.  No, he could come through the plant
14 at any given time.
15   **Q.  He could come through the plant but**
16 **there were obviously other people working out**
17 **there; right?**
18   A.  There were other people working in
19 the offices too.
20   **Q.  But none of them really witnessed**
21 **any of this according to you.  Let me -- let**
22 **me show you looking back at your calendar on**
23 **the 7th, it says requested transfer.  Is that**

Page 200

1  **when you met with Ruth?  I'm looking at your**
2  **calendar if you want to look along.**
3    A.  Okay.
4        MR. HORSLEY:  Ask the question
5  again.
6        MS. WILLIS:  Can you read it back?
7
8    (Whereupon, the desired portion of
9    the proceedings was read back.)
10
11   A.  That's one of the occasions that I
12 met with Ruth about getting transferred.
13   **Q.  But it didn't satisfy you to move to**
14 **the plant and out away from the safety office?**
15   A.  I would still have to deal with him
16 every day.
17   **Q.  Well, where in the plant did you**
18 **want to be moved if -- so you wouldn't have to**
19 **deal with him every day?**
20   A.  To another department that had
21 nothing to do with safety.  The people in the
22 front offices didn't have to deal with Rance.
23 They didn't have to have safety equipment.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 201

1    Q. Do you know if you were qualified to
2  perform any of the positions in the front
3  office?
4    A. Actually I was -- there was a
5  gentleman that worked there, I'm trying to
6  remember his name, who was -- he knew what was
7  going on and he said that he would try to get
8  me put into that department.
9    Q. Who was that?
10   A. I'm trying to find his name, David
11 McGough.
12   Q. What department was David McGough
13 in?
14   A. I'm not certain. I'll have to do
15 some research on that and let you know. I'm
16 really not sure.
17   Q. He worked out in the plant though,
18 didn't he?
19   A. No, he had an office.
20   Q. Do you know if anybody who worked
21 with him in the plant or not?
22   A. I'm not certain.
23   Q. Okay. What did you tell David

Page 202

1  McGough if anything?
2    A. I told him what was going on with
3  Rance. I'm not sure exactly what details I
4  went into. He knew that I was unhappy. He
5  had seen me crying. He knew that I was upset
6  and he said that he would try to get me a job
7  in his area.
8    Q. Okay. But David McGough doesn't
9  work in human resources, does he?
10   A. No, he doesn't.
11   Q. When you met with Ruth Ryan the
12 first time, the first time I reflect you met
13 with Ruth Ryan, February 1st, do you see that?
14   A. With Ruth and Joseph, yes.
15   Q. Who's Joseph?
16   A. He -- I'm not exactly sure what his
17 title was. I know he did some translation and
18 he helped Ruth with some of the new hires I'm
19 thinking but I'm not sure exactly what his
20 title was. He was like her assistant.
21   Q. In the meeting on February 1st, tell
22 me everything you told Ruth and Joseph.
23   A. That Rance had been out of the way,

Page 203

1  I wasn't totally -- I didn't lay everything
2  out on the table that day with Ruth because
3  Joseph was in there and Joseph ate lunch with
4  a girl that worked in our safety office on
5  almost a daily basis and I was afraid of
6  retaliation from Rance even further so I was
7  very vague with Ruth on that day because
8  Joseph was present at that meeting.
9    Q. But Joseph was part of human
10 resources in some way, wasn't he?
11   A. Like I said, I'm not -- he was her
12 assistant. I knew he helped do translations
13 for people that, you know, we couldn't
14 understand what they were saying and -- or he
15 would help do doctors' visits and that kind of
16 stuff but I'm really not sure exactly --
17   Q. So you didn't give Ruth all of the
18 specifics of what you listed in your EEOC
19 charge when you met with her on February 1st?
20   A. No.
21   Q. Did you ever follow up with her and
22 give her all the specifics?
23   A. Oh, yes.

Page 204

1    Q. When was that?
2    A. The next day, the very next day, we
3  met in the Washington room.
4    Q. And how long did you spend with Ruth
5  on that day?
6    A. It was well over an hour. It was
7  late in the evening, everybody was gone from
8  the office, and she and I sat in there alone
9  and spoke.
10   Q. Tell me everything you told Ruth
11 during that meeting in the Washington Room.
12   A. I told Ruth everything that was
13 going on with Rance as far as doing things
14 that made me feel uncomfortable and the
15 comments that he had made and the way he had
16 touched me inappropriately.
17   Q. What touchings did you tell her
18 about?
19   A. I don't know if I told her -- I
20 don't know which ones I told her other than
21 just in general, you know, him touching me
22 inappropriately and Ruth and I got into a deep
23 conversation about what she thought I should

51 (Pages 201 to 204)

# FREEDOM COURT REPORTING

Page 205

1  do.
2      Q.  What did Ruth say she thought you
3  should do?
4      A.  Apparently once before in her
5  history she had to seek an attorney and try to
6  get something done about one of her employers
7  that was causing her problems and that was her
8  advice to me.  We both were in the washing
9  room.  I explained to her what happened.  She
10  said the same thing had happened to her.  She
11  cried.  I cried and that was what our
12  conversation was about.
13      Q.  What specific comments did you
14  report to Ruth on the 2nd in the Washington
15  room.
16      A.  That the things he had said, the
17  touching inappropriately, you know, the fact
18  that it was causing me problems at home.  If
19  my husband found out, I was afraid of what he
20  would do.  He also worked at the plant.  It
21  was not a very good situation.  It was a
22  ticking time bomb.  You know, that's what was
23  said.  I'm not exactly sure which order or

Page 206

1  what extent but she knew what was going on.
2      Q.  Do you know if she ever interviewed
3  anybody about any of your allegations?
4      A.  I have no idea if she did or if she
5  didn't.  I left a few days after that.
6      Q.  Right.  And she had told you that you
7  were going to be transferred but you didn't
8  give her the opportunity to do that; right?
9      A.  I would still have to put up with
10  him every day.  It's their job to protect me
11  from him and other people from him and nobody
12  did.
13      Q.  Yes, but you were going to be
14  working out in the plant, not in the safety
15  office; right?
16      A.  He still works there.  That's
17  correct but he still works there.  He has
18  access to the entire plant.  You have to deal
19  with him.
20      Q.  But you would not be left in a one-
21  on-one situation with him?
22      A.  It doesn't matter.  I don't trust
23  him.

Page 207

1      Q.  But you wouldn't have been left in a
2  one-on-one situation with him though; right?
3      A.  They can't guarantee that.  You have
4  to go to the bathroom.  You have to go to the
5  break room.  I mean, that's -- I couldn't live
6  with that possibility.
7      Q.  Fair enough.  You said he called you
8  at home.  When did he call you at home?
9      A.  He called at home numerous times.  I
10  don't really know exactly which days.  I guess
11  we could pull the cell phone records and the
12  house phone records.
13      Q.  How many times did he call you at
14  home?
15      A.  On my cell phone or my home phone?
16      Q.  Your home phone.
17      MR. HORSLEY:  And don't guess.  Give
18  her a good estimate but don't guess at
19  anything.
20      THE WITNESS:  Okay.
21      A.  It was multiple times but I would
22  hate to say how many but it was -- it was
23  several on both but I don't know --

Page 208

1      Q.  Several, more than once?
2      A.  Oh, yes.
3      Q.  Several, more than three times?
4      A.  Yes.
5      Q.  Can you give me a ballpark, please,
6  and I'm realizing that's just an estimate.
7      A.  Probably on the home phone probably
8  15 or 20.
9      Q.  Okay.  What did you discuss in your
10  conversations with Rance Maddox when he called
11  you on the home phone?
12      A.  He would, you know, hey, what are
13  you doing, this, that, and the other, and you
14  know, he would try to make conversation about,
15  you know, what I was doing or this, that, or
16  the other or sometimes he would call and ask
17  little small things and then after he got that
18  answer, he would try to continue to make
19  conversation.
20      Q.  Okay.  So he would ask small work-
21  related issues?
22      A.  Sometimes or sometimes he would just
23  ask, what are you doing.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 209

1    **Q. Okay. How did you end these**
2 **conversations?**
3    A. I've got to go or the kids are
4 running wild or you know, it's late, I've got
5 to go to bed. It just varied dependent on
6 what -- where I was at, what I was doing and
7 what all, you know, was being said and
8 probably the mood I was in.
9    **Q. Did he ever say anything that you**
10 **considered to be inappropriate during these**
11 **conversations on your home phone?**
12    A. I consider it inappropriate to call
13 somebody late at night and ask them what they
14 are doing when you're married and you know
15 they're married and you just saw them at work
16 three hours ago.
17    **Q. That's fine. But did he make any**
18 **specific comments during the telephone**
19 **conversations with you at your home that you**
20 **considered inappropriate?**
21    A. No.
22    **Q. And in fact, Gary Sport had called**
23 **you at home before from the plant too; right?**

Page 210

1    A. He has.
2    **Q. To discuss work-related business?**
3    A. Always.
4    **Q. Did that offend you?**
5    A. No.
6    **Q. And on your cell phone, how many**
7 **times did he call you on your cell phone?**
8    A. I'm not sure exactly but it was
9 several.
10    **Q. Several. Can you please give me an**
11 **estimate of what you mean by several with**
12 **regard to your cell phone?**
13    A. It was a lot. I can't give you an
14 exact number.
15    **Q. Did you ever record any of those**
16 **calls, like tape-record them?**
17    A. No.
18    **Q. Did you ever record them on your**
19 **calendar?**
20    A. I'm not certain unless there's
21 things written on there. Like we said, the
22 other months aren't on here.
23    **Q. What would you discuss with**

Page 211

1 Mr. Maddox on the cell phone?
2    A. Sometimes he would ask piddly
3 work-related things and other times he would
4 just want to know what I was doing and where I
5 was at and what I was doing later on.
6 Sometimes when he called he seemed like he may
7 have been intoxicated. His speech wasn't very
8 clear.
9    **Q. Okay. Did he ever make any specific**
10 **comments during the conversations on your cell**
11 **phone that you considered to be inappropriate?**
12    A. I considered it inappropriate for
13 him to be calling the times that he called on
14 a cell phone the company didn't pay for.
15    **Q. Yes, ma'am, I understand that, but**
16 **during those conversations, did he make any**
17 **specific comments that you considered**
18 **offensive or inappropriate?**
19    A. Yeah, I think it's inappropriate to
20 call a married woman at night and ask her what
21 is she doing.
22    **Q. I understand that you do and I**
23 **understand that.**

Page 212

1    A. Yes, I found it very offensive.
2    **Q. You found the calls themselves**
3 **offensive. I'm asking about the specific**
4 **content of the calls. Was there ever anything**
5 **specifically said by Mr. Maddox in those calls**
6 **that was offensive or inappropriate to you?**
7    A. Yes.
8    **Q. What?**
9    A. I thought it was inappropriate to
10 call a married woman at home late at night.
11    MR. HORSLEY: She understands that.
12 What she's trying to get is a specific
13 comment, a sexual comment.
14    THE WITNESS: Okay.
15    MR. HORSLEY: Something else that he
16 said to you that you thought was offensive.
17    THE WITNESS: Right. I think the
18 answer is whatever it --
19    MR. HORSLEY: Tell her what the
20 answer is.
21    A. Yes, I found it offensive.
22    MR. HORSLEY: No, that's not --
23 she's asking -- we know that. We know that.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 213

1 She knows that. What she's asking about are
2 specific comments that he made that you found
3 offensive.
4 THE WITNESS: Right.
5 MR. HORSLEY: We know that it was
6 offensive for him to call you.
7 THE WITNESS: Right.
8 MR. HORSLEY: She's asking about
9 specific comments. No, she wants to know if
10 there were any specific comments he made that
11 were offensive.
12 A. Just what are you doing, that's --
13 Q. And that was offensive to you, what
14 are you doing?
15 A. Yeah.
16 Q. It made no reference to sex?
17 A. When you call me late at night and
18 you're obviously drunk, then that's offensive.
19 Q. Okay. But he made no reference to
20 sex during those telephone calls?
21 A. No.
22 Q. Okay. Did you ever report the cell
23 phone calls to anybody at Smart?

Page 214

1 A. Yes, that was brought up in the
2 conversations and brought up in the letter
3 that I had written to Rance.
4 Q. Let me ask you this question: You
5 wanted to be as truthful and accurate with the
6 EEOC as you could be; right?
7 A. Right.
8 Q. Why didn't you include in your
9 charge the fact that you had gone to Mr. Kwan?
10 A. I had discussed it and I guess I
11 thought this was just a gist of certain
12 things, I didn't realize it had to be every
13 single little detail.
14 Q. Okay. It says, "On several
15 occasions between December 2005 and January
16 2006, Mr. Maddox asked Ms. Atwell if her
17 breasts were real and what they felt like."
18 When did this first occur?
19 A. I'm assuming sometime between
20 December and January because I'm not really --
21 that's the only dates I know.
22 Q. And it's not recorded on your
23 January calendar anywhere, is it?

Page 215

1 A. No, ma'am.
2 Q. Okay. When was the first time
3 this -- you said the first time this happened
4 was between December 2005 and January 2006.
5 Where were you when he asked if your breasts
6 were real?
7 A. Our office.
8 Q. Okay. And who else was in the
9 office?
10 A. No one.
11 Q. Where were you sitting in the
12 office?
13 A. At my desk I believe.
14 Q. And how did the conversation come
15 about?
16 A. I had turned my chair around and I
17 was filing in the center file cabinet, which
18 actually there's two that face his direction,
19 and I guess by me facing in his direction he
20 could see in my blouse and that is what I feel
21 prompted the conversation.
22 Q. What did he say specifically?
23 A. Just wanted to know if they were

Page 216

1 real.
2 Q. And in fact, you had talked to other
3 employees before about having breast implants,
4 hadn't you?
5 A. Right, some of the girls at work
6 because some of the girls were interested in
7 actually having the surgery themselves.
8 Q. So you had talked about breast
9 implants at work?
10 A. With females.
11 Q. Which females did you discuss that
12 with?
13 A. Amanda Dempsey I know for sure and
14 there was a lady that worked on second or
15 third shift, I'm not certain what her name
16 was, but she had asked and I had told her I
17 guess she had had to have some type of surgery
18 done and was having to have reconstructive
19 stuff and was just curious about the
20 procedure.
21 Q. Okay. What did you say when
22 Mr. Maddox asked if your breasts were real?
23 A. I don't remember saying anything.

54 (Pages 213 to 216)

## FREEDOM COURT REPORTING

Page 217

1    Q.  Okay.  Did you report it to anybody
2  immediately?
3    A.  No, I believe I got up and walked
4  out.
5    Q.  What did you do after that?  Did you
6  continue performing your job duties?
7    A.  At that particular moment?
8    Q.  Uh-huh.
9    A.  I went outside and got -- I went and
10  got me a drink and went outside and went and
11  smoked and then got myself together and then
12  tried to go back in and do my job.
13    Q.  Okay.  Was that the only occasion on
14  which he asked if your breasts were real?
15    A.  I don't -- no, ma'am -- well, I
16  remember he asked -- no, that was the same day
17  he wanted to know what they felt like, you
18  know, do they feel real, you know, all of this
19  and on and on and you know, it's like he was
20  so adamant about it, that's why I got up and
21  walked out because you know, he wouldn't stop
22  the conversation.
23    Q.  But you didn't report it?

Page 218

1    A.  So I had to get out and -- you know,
2  leave to stop the conversation.
3    Q.  So you didn't report it to anybody
4  at Smart that day?
5    A.  That particular day, no.
6    Q.  Did you ever specifically report it
7  to anybody?
8    A.  I believe that was part of the
9  conversation that Gary and I had in the
10  cafeteria.
11    Q.  But you don't know for certain?
12    A.  I'm pretty certain that that was
13  part of our conversation that we had in the
14  cafeteria.
15    Q.  What specifically did you tell Gary
16  in the cafeteria?
17    A.  I don't remember specifically what I
18  said to Gary in the cafeteria other than what
19  had been going on with Rance, I don't know in
20  what details.
21    Q.  Okay.  The comment, I've got a real
22  man for you, when did he make this comment to
23  you?

Page 219

1    A.  He went around all the time saying
2  that particular comment.
3    Q.  To other people too?
4    A.  Oh, yeah, the girls in his office.
5    Q.  In what context would he say it?
6    A.  Like he was a stud.
7    Q.  Okay.  I understand.
8    A.  I mean --
9    Q.  I guess I need to rephrase that
10  question.
11    A.  Yeah.
12    Q.  How did it come about?
13    A.  Well, he was always real funny about
14  keeping his shoes real shiny and his shirt and
15  I mean, that's just -- that's just the way,
16  you know -- I don't remember, he had this
17  funny ringtone on his phone, I don't remember
18  exactly what it was.  It's just he thought he
19  was the man and he would let you know that,
20  you know.  I've got a real man for you, you
21  know.
22    Q.  How many times did he say, I've got
23  a real man for you, to you?

Page 220

1    A.  That in conjunction with if you'll
2  just work with me baby happened probably about
3  five or six times.
4    Q.  Five or six times.  At the time it
5  happened, did you ever go report it to human
6  resources?
7    A.  No.
8    Q.  Why not?
9    A.  Because I'm not sure exactly why I
10  didn't go at that particular point, I may have
11  been in the middle of doing something.  I
12  mean, I'm not really sure exactly when all
13  that transpired.  Like I said, we had just
14  bought a house, I was concerned for my job.
15  He made it very clear that if you didn't work
16  with him in the way that he talked about that
17  you wouldn't be in his office anymore, so it
18  was very important for me to try to keep my
19  job and keep my cool and let everybody else
20  handle their end of it.
21    Q.  Okay.  Did you ever report to
22  anybody when he said, you've got to work with
23  me?

### 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 221

1    A.   That was told to Ruth and I believe
2  it was told to Gary in a conversation that he
3  and I had.
4    Q.   Okay.
5    A.   I know for a fact it was told to
6  Ruth.
7    Q.   Now, you guys did -- and I mean you
8  guys, not just you and Mr. Maddox but other
9  people in the safety office did talk about
10 personal things sometimes; right?
11   A.   On occasion.
12   Q.   Yeah.  And do you recall the
13 occasion on which you told another employee
14 you had had a sex dream about him?
15   A.   I've never told another employee
16 about a sex dream about him.
17   Q.   So if they said that, they would be
18 lying?
19   A.   Yeah.
20   Q.   What about any comments about any
21 other employees being good looking or having a
22 cute butt, do you recall ever making those
23 comments?

Page 222

1    A.   Not to my knowledge.
2    Q.   So if other people witnessed you
3  doing that, they would be lying too?
4    A.   Probably, yes, ma'am.
5    Q.   Besides I've got a real man for you
6  or you've got to work with me, are there any
7  other comments that Mr. Maddox made to you
8  that you considered offensive while you worked
9  at Smart?
10   A.   It was always baby and honey and
11 sweetie when he wasn't ticked off if you
12 wouldn't let him rub up to you or rub your
13 leg.  If I pulled away or snatched away,
14 before then it would always be baby and honey
15 and sweetie.
16   Q.   How many times did he call you baby?
17   A.   Every day.
18   Q.   How many times did he call you
19 honey?
20   A.   Every day.
21   Q.   What about sweetie?
22   A.   Every day.
23   Q.   Did you ever go and report it to

Page 223

1  human resources as it was happening?
2    A.   No.
3    Q.   Why not?
4    A.   It was -- I mean, those were -- that
5  was comments that my daddy calls people.
6  That's comments that my daddy calls me.  That
7  can be taken several different ways but when
8  you put it together with everything else, then
9  you know exactly what he means.
10   Q.   Besides touching up on your
11 shoulders or rubbing up against you, were
12 there any other times Mr. Maddox touched you?
13   A.   Yes.
14   Q.   When?
15   A.   Every time he would have to go meet
16 with Mr. Kwan, he insisted that I go with him
17 to read him the charts and graphs and show him
18 everything because he had never seen them
19 before.  So he would sit in one chair and I
20 would sit in the other and while I'm sitting
21 here trying to explain to Mr. Kwan everything,
22 Rance is rubbing on my right leg the entire
23 time.  He's not rubbing with his hand.  He's

Page 224

1  got his leg moving his foot up and down to
2  make his leg rub against mine.
3    Q.   Kind of like playing footsie?
4    A.   Just like with his upper leg.
5    Q.   Okay.  How many times did this
6  occur?
7    A.   I don't recall.  I don't remember
8  exactly how many times it happened but it
9  was -- he tried to rub hisself on you and
10 touch you and have a lot of physical contact.
11   Q.   Well, I understand that, but did you
12 ever record anywhere that he had rubbed on
13 your leg in Mr. Kwan's office?
14   A.   Probably not specifically in
15 Mr. Kwan's office but that he had rubbed on
16 me, yes.
17   Q.   I don't -- well, I don't see it on
18 this one so --
19   A.   I don't remember the exact days.
20 Somewhere there was a schedule -- a calendar
21 at work that had the -- all the different
22 dates and times we had to meet with Mr. Kwan
23 because he would call and specify a time.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 225

1    Q. After meeting with Mr. Kwan when
2   Mr. Maddox would rub your leg, would you ever
3   go tell anybody?
4    A. The only people that I told was my
5   sister-in-law and Ruth and I'm not certain if
6   I told Gary about that or not. I may have, I
7   may not have. I tried to.
8    Q. Did you tell her when it happened --
9   her Ruth when it happened or later on?
10   A. Right, later on after it had
11  happened over a few times.
12   Q. I mean, I'm just going to ask this
13  kind of as a general question just because I'm
14  just kind of curious. If these things were
15  going on and they were occurring as frequently
16  as you're saying they were, why didn't you go
17  ahead and go to somebody instead of, you know,
18  until waiting towards the end of January and
19  the beginning of February to do so?
20   A. Because I was afraid he was going to
21  fire me.
22   Q. But you understood you could report
23  it, didn't you, ma'am?

Page 226

1    A. I had just bought a house. I had
2   just got married. I needed that job.
3    Q. Okay.
4        THE WITNESS: Can we take a break,
5   please?
6        MR. HORSLEY: Yeah. Is that all
7   right?
8        MS. WILLIS: Yeah.
9
10      (Whereupon, a brief recess was taken
11      from 2:12 p.m. to 2:26 p.m.)
12
13   Q. (By Ms. Willis) Ms. Atwell, before
14  we took a break, I was asking you and I'm not
15  going to try to summarize your testimony why
16  you hadn't reported some of these things and
17  you had said because you were worried about
18  your job?
19   A. Right.
20   Q. I'm going to direct your attention
21  again to Defendant's Exhibit 15.
22      MR. HORSLEY: Which one is it?
23      MS. WILLIS: This one.

Page 227

1    Q. (By Ms. Willis) And if you'll look
2   with me at the last paragraph of that memo on
3   the second page.
4    A. Okay.
5    Q. And it says, "Please be aware that
6   when you started a new job in the safety
7   office, you were on a ninety-day probationary
8   period. Because of the deficiencies in your
9   job performance, and with multiple attempts to
10  correct these problems, you have given me no
11  other choice but to terminate you from within
12  the safety department." And that paragraph
13  doesn't say anything -- does not say anything
14  about terminating your employment with Smart
15  Alabama, does it?
16      MR. HORSLEY: I'm going to object to
17  the form. You can answer.
18      MS. WILLIS: You can answer.
19   A. That's the way that I took that
20  statement.
21   Q. I understand how you would have
22  perceived it but this memo itself does not say
23  anything about you being terminated from Smart

Page 228

1   Alabama?
2        MR. HORSLEY: Same objection. You
3   can answer.
4        MS. WILLIS: You can answer.
5    A. I felt as if I was going to be
6   terminated from Smart.
7    Q. Yes, ma'am, and I understand and
8   appreciate the way you thought but my question
9   is this: Does anything in this paragraph and
10  your attorney is going to make the same
11  objection and it's fine.
12   A. Yeah.
13   Q. Does anything in this paragraph say,
14  you will be terminated from your employment
15  with Smart Alabama?
16      MR. HORSLEY: Same objection and
17  just answer the question she's asking
18  regardless of what you think about it.
19   A. Right.
20   Q. You've put on the record what you
21  think about it and that's fine.
22   A. No, it doesn't say Smart.
23   Q. Let's kind of go back to your

57 (Pages 225 to 228)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 229

1  allegations regarding Mr. Maddox.  Besides
2  saying, I've got a real man for you, besides
3  saying I'll take care of you or you've got to
4  work with me, were there any other comments
5  that he made -- and baby and honey and
6  sweetie, sorry, I don't mean to leave those
7  out, were there any other comments he made
8  while you worked in the safety office that you
9  considered to be inappropriate?
10     A.  As far as you've got to work with
11  me, when I was talking to him about getting my
12  raise, that's when he started, you've got to
13  work with me again and it -- I took it very
14  inappropriately because as he was rubbing on
15  me, he was telling me, you've got to work with
16  me and I'll get you what you want, I'll get
17  you what you need, and I took that as
18  inappropriate.
19     Q.  Okay.  I understand that.  Did he
20  make any references to sex while he said,
21  you've got to work with me?
22     A.  Physically he did.
23     Q.  Did he make any references to

Page 230

1  work-related things when he said, you've got
2  to work with me?
3     A.  As far as getting a raise, that's --
4  yeah.
5     Q.  I understand that part but did he
6  make any effort -- any reference to any,
7  you've got to work with me, I'm getting the
8  office together, you've got to work with me?
9     A.  No.
10     Q.  How many times did he tell you
11  you've got to work with me?
12     A.  Whenever he would try to rub or
13  touch or grab or hold my hands or whatever,
14  that's usually when that would come about and
15  then I would get ticked off and leave or he
16  would laugh if I got mad and walked out.
17     Q.  Okay.  How many times do you think
18  it happened though I guess if you could
19  estimate for us, please?
20     A.  The baby you've got to work with me
21  or you've got to work with me?
22     Q.  Yes, ma'am.
23     A.  Probably at least ten, 15 times that

Page 231

1  I can remember.
2     Q.  What would you do after he said,
3  baby, you've got to work with me, is that when
4  you would walk out and continue doing your
5  job?
6     A.  I would walk out.  Sometimes I would
7  go to the bathroom.  Sometimes I would go
8  outside, walk around the parking lot.  There
9  were a couple of employees that were in the
10  first aid room that saw that I was upset and
11  come to the bathroom to see what was wrong
12  with me.
13     Q.  Who were those employees, ma'am?
14     A.  I'm trying to remember what their
15  names was.  Gloria Thompson was one.  The
16  other names I -- they're not coming to me
17  right now.
18     Q.  And I'm going to ask you about
19  people you've listed as witnesses a little bit
20  later and maybe that will help jog your memory
21  on that.  That's fine.  What did you tell
22  Gloria Thompson and any other employees when
23  they checked on you, anything?

Page 232

1     A.  What had went on, whatever it was
2  that particular occasion, I don't remember
3  exactly what it was the day that she had come
4  in the bathroom, but whatever it was that he
5  had done or said that day, I had told her
6  about it.
7     Q.  Okay.  Besides -- let me ask you
8  this question:  When if anytime did Rance
9  Maddox say, I'll take care of you?
10     A.  It was -- it was said usually in
11  conjunction of if you'll work with me, I'll
12  take care of you as he rubbed on you or
13  invaded your space.
14     Q.  Did he ever say, I'll take care of
15  you outside of that context?
16     A.  That was usually the way he would
17  say it is usually in conjunction with the
18  other.
19     Q.  Did you ever report it to anybody
20  that he said, I'll take care of you?
21     A.  After everything come out, yes.
22     Q.  But not as it was happening?
23     A.  No.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 233

1    Q. Okay. Did you record it on your
2  calendar anywhere, I'll take care of you?
3  Because you said this happened like almost
4  daily, right, or several times?
5    A. It was often. The only thing I see
6  on the January calendar is when I was in the
7  hospital, Rance called me on my cell phone and
8  told me to take it easy.
9    Q. Take it easy because you were in the
10  hospital?
11    A. Uh-huh.
12    Q. Anything else said in that
13  conversation that you recall?
14    A. Not between he and I that I can
15  recall.
16    Q. Okay. But you didn't record, I'll
17  take care of you, anywhere on this calendar at
18  least?
19    A. Not on these two calendars, no,
20  ma'am.
21    Q. Okay. Did anybody witness him
22  saying to you, you know, if you'll work with
23  me, I'll take care of you?

Page 234

1    A. I'm not certain.
2    Q. You don't know one way or the other?
3    A. (Witness shakes head.)
4    Q. Yes or no?
5    A. No, I'm sorry.
6    Q. It's okay. We get tired and that's
7  when we start -- that's when we start doing
8  that. You'll see me start doing it too.
9    A. Okay.
10    Q. Besides I've got a real man for you,
11  I'll take care of you, you've got to work with
12  me, the comment about it's impossible for men
13  to be monogamous in their relationships, and
14  asking you to go to lunch or asking you to go
15  to drinks, were there any other -- and calling
16  you at home or on your cell phone, were there
17  any other verbal comments that Rance Maddox
18  made to you that you considered to be
19  offensive and inappropriate or harassing in
20  nature?
21    MR. HORSLEY: I think you forgot are
22  your breasts real too.
23    MS. WILLIS: Let me -- I'll restate

Page 235

1  it. Thank you because I'm trying to wrap that
2  up there and we'd have to come back. Let me
3  restate the question, okay.
4    Q. (By Ms. Willis) Besides him
5  asking -- besides Rance Maddox asking to eat
6  lunch with you, asking you about going to
7  drinks with him, making a comment about it was
8  impossible for men to be monogamous in their
9  sexual relationships, asking if your breasts
10  were real, saying I've got a real man for you,
11  or saying you've got to work -- if you'll work
12  with me, I'll take care of you or you've got
13  to work with me, I'll take care of you, were
14  there any other verbal comments that Rance
15  Maddox made that you consider to be
16  inappropriate, offensive, or harassing in
17  nature while you were at Smart?
18    A. I heard him make comments to another
19  girl while I was at work.
20    Q. Okay. And who was that girl?
21    A. It was a girl on second shift that
22  he apparently was having some type of affair
23  with and his wife found out about it and she

Page 236

1  come into the office one day and she and he
2  got into a confrontation about their
3  relationship and where his wife stood on it
4  and he asked me to leave the office.
5    Q. What was that employee's name?
6    A. I have it at home. I don't have it
7  with me at this time.
8    Q. Where is it at home? Is it in your
9  journal?
10    A. No.
11    Q. Is it written on some additional
12  notes?
13    A. I had talked with somebody the other
14  day and they had told me what her name was
15  because I had forgotten her name.
16    Q. Okay. Will you let your lawyer know
17  that --
18    A. I will.
19    Q. -- because we need to follow up on
20  that?
21    A. Okay.
22    Q. What comments did he make to her
23  specifically that you considered to be

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 237

1  inappropriate other than the fact that you've
2  told me that you thought they were having an
3  affair?
4      A.  He made comments about his wife,
5  about how he wasn't happy with her, their sex
6  life wasn't good anymore.  They didn't get
7  along.  All they did was fuss.  Their son or
8  her son or his son, I'm not sure exactly what
9  it was, caused him a lot of problems.  He let
10  me know that he was very unhappy in his
11  marriage.
12      Q.  He let you know or let her know?
13      A.  He let me know.  I don't think it
14  was a secret.  I think pretty much everybody
15  in the plant knew it.
16      Q.  I understand that but I'm a little
17  confused because I thought the conversation
18  was between -- I thought you were telling me
19  about the conversation between this other
20  employee on second shift and Mr. Maddox --
21      A.  Right.
22      Q.  -- about any kind of relationship
23  they had and I'm a little confused about why

Page 238

1  he said anything to you about that.
2      A.  Oh, he didn't say --
3      Q.  Or if he did.
4      A.  He didn't say anything to me about
5  her.
6      Q.  Uh-huh.
7      A.  She came in the office all the time.
8  They ate in the office together.  He would ask
9  me to go outside, go take a break, go do
10  whatever, he would stay in the office with
11  her.  It was kind of unusual because we were
12  first shift employees and she was a second
13  shift employee and she would come in and kind
14  of hang out with him and they would meet up in
15  the hallways and she would call.  I would
16  answer the phone several times during the day.
17  After a while, you began to recognize her
18  voice and then the day they had the
19  confrontation and all in the office.
20      Q.  What kind of confrontation did they
21  have I guess is what I'm asking.
22      A.  The gist of it -- the way I was
23  gathering it is she wanted him to leave his

Page 239

1  wife and he wasn't ready.  Even though he
2  wasn't happy, he wasn't ready.
3      Q.  He said that?
4      A.  Yeah, don't start this shit here.  I
5  don't want to hear it, not now, this isn't the
6  time.
7      Q.  Okay.  You were in the office at
8  this time?
9      A.  I was in the office.
10      Q.  He didn't ask you to leave for that
11  conversation?
12      A.  That's the conversation he asked me
13  to leave for.
14      Q.  Okay.
15      A.  Because she bust in -- she didn't
16  knock, she just busted in the office.
17      Q.  When if at any time did he talk
18  about being unhappy in his marriage then?  I'm
19  still a little fuzzy on that.
20      A.  His wife would call and she would
21  ask to speak to him.  I would transfer the
22  phone over to his desk.  He would pick up the
23  phone.  He would -- they would fuss and ya ya

Page 240

1  back and forth.  I was never really sure
2  exactly what everything was about because I
3  could only hear his end.  He would hang up,
4  she would call back.  This went on quite
5  often.
6      Q.  But did he ever expressly tell you,
7  I'm unhappy in my marriage?
8      A.  Oh, yeah.  He said that she was a --
9      THE WITNESS:  Can I say what he
10  said?
11      MR. HORSLEY:  Yeah, if she wants you
12  to.
13      Q.  (By Ms. Willis) Go ahead.  I mean --
14      A.  That she was a "fucking" bitch and
15  all she did was bitch and raise hell and he
16  was sick of it and he was sick of -- he named
17  the kid but I can't even think of what the
18  kid's name was, it was a teenage boy was what
19  I gathered from our conversations and that he
20  was really, really, really giving them a lot
21  of trouble.
22      Q.  He said this to you?
23      A.  He did.

60  (Pages 237 to 240)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 241

1    Q.  Was anybody else present when he
2    said this to you?
3        A.  Not that I can recall but I'm not
4    saying that there wasn't, I just can't recall.
5        Q.  When did he say this to you?
6        A.  This was some -- excuse me, this was
7    sometime around Christmas or New Year's.
8        Q.  Okay.  What if anything did you say
9    in response?
10       A.  I really don't recall what I said in
11   response.
12       Q.  Did you report it to anybody?
13       A.  Gary and I had had conversations
14   about problems with his wife because she had
15   also called Gary about Rance.
16       Q.  When did you have a conversation
17   with Gary about Rance's problems with his
18   wife?
19       A.  When his wife called my home one
20   night and spoke to me and my husband and
21   wanted to know why my number was in her
22   husband's cell phone and why he had been
23   calling it so much.

Page 242

1        Q.  When did his wife call your home and
2    ask why your number was in her husband's cell
3    phone?
4        A.  It was around -- I think it was in
5    December.  It was before Christmas I believe,
6    I'm not certain.  It was a Troy number, a 566
7    number.  That's the only reason I remember.
8        Q.  And so after that you talked to Gary
9    about --
10       A.  About his wife calling my home.
11       Q.  What did you -- what specifically
12   did you tell Gary in that conversation?
13       A.  It was pretty much common knowledge
14   by some of the office employees that they were
15   having trouble in their marriage.
16       Q.  That's what you told Gary.
17       A.  No, that's what the gist of our
18   conversation was.  I told him that his wife
19   had called and spoke to me, spoke to my
20   husband, wanted to know who I was and what
21   relation and how did I know her husband and he
22   explained that I worked for him and I guess
23   she was concerned with the number of calls and

Page 243

1    she was asking about some other people that
2    were also stored in his cell phone and who
3    they were and some of the people Kevin didn't
4    know and some of the people he did and he
5    explained to her who they were.
6        Q.  Okay.  Did Gary say anything back to
7    you when you talked about this with him?
8        A.  That she had called him also I guess
9    trying to inquire about some things.  I'm
10   really -- I don't remember exactly what the
11   conversation was about but that he was aware
12   that they were having trouble and that she had
13   contacted him also.
14       Q.  Okay.  Any other occasions that
15   Rance Maddox talked to you about his marriage?
16       A.  Other than when they would fuss and
17   she would call and he would hang up or she'd
18   call his cell phone and he would hang up and
19   he would make comments not directly to me but
20   in front of me about her, you know, that bitch
21   and slam the drawer and go out the door and
22   that kind of thing.  It wasn't directly at me
23   but it was said in front of me.

Page 244

1        Q.  Okay.  Were you offended by any of
2    that?
3        A.  Well, I mean, I tried to leave my
4    personal life at home no matter what was going
5    on and I think that if you were in a position
6    like that, then you should leave your personal
7    life at home.
8        Q.  I understand that but did it offend
9    you?
10       A.  The language that he used, yes.
11       Q.  Have you never used the word bitch?
12       A.  Oh, I have.
13       Q.  Have you ever used it at work?
14       A.  I may have.  It may have been
15   repeating or saying something.
16       Q.  Have you ever used the word "fuck"
17   at work or "fucking"?
18       A.  I probably have.
19       Q.  Okay.  Going back through, and I
20   hate to beat a dead horse on this, besides
21   Rance talking with this second shift employee
22   about their relationship, talking about his
23   relationship with his wife, saying if you work

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 245

1  with me, I'll take care of you, having
2  conversations with you on your home phone or
3  cell phone, saying I've got a real man for
4  you, asking if your breasts were real, making
5  the comment about it being impossible for men
6  to be monogamous, asking to eat with you or
7  asking you to go for drinks, are there any
8  other verbal comments that Rance Maddox made
9  to you during your employment at Smart that
10 you consider to be offensive, inappropriate,
11 or harassing in nature?
12     A.  Does it have to be sexually --
13 sexually harassing or just harassing or
14 either?
15     THE WITNESS:  Does that make any
16 sense?
17     MR. HORSLEY:  Well, this is a sexual
18 harassment case so I think.
19     Q.  (By Ms. Willis) Yeah, I think I'm
20 most interested in the sexual stuff.  If you
21 have something else you consider to be
22 offensive, you can tell me about that but was
23 there anything else of a sexual -- let me

Page 246

1  distinguish it anyway of that way besides and
2  if I need to repeat it I will -- all of the
3  things I just named in my last question, the
4  big long list, were there any other comments
5  or verbal comments that Mr. Maddox made during
6  your employment with Smart that you consider
7  to be sexually offensive or inappropriate?
8      A.  To my knowledge, that's all.
9      Q.  That's all.  Is there any other
10 document or -- document you could look at or
11 person you could talk to that would refresh
12 your memory or recollection about that?
13     A.  Some of the other employees more
14 than likely, yes.
15     Q.  You mean they may have witnessed
16 some of this?
17     A.  Right.
18     Q.  Okay.  But we've gone through and
19 talked about who witnessed what; right?
20     A.  That I could recall.
21     Q.  Okay.  And I'll just ask you this:
22 Besides what we've already talked about, were
23 there any other comments that you considered

Page 247

1  offensive or inappropriate for any other
2  reason other than sex or, you know, sexual
3  harassment from Rance Maddox?
4      A.  No, other than when I had moved to
5  the conference room and he came in there with
6  Wendy and demanded that I come move back into
7  his office.
8      Q.  Okay.
9      A.  I mean, I realize that wasn't sexual
10 but I felt like he was trying to put me back
11 in a place that I had left for a reason.
12     Q.  Your computer was in the office;
13 right?
14     A.  Right.
15     Q.  You had to use your computer to do
16 the OSHA 300 and 300A logs; right?
17     A.  Right, at the time I was going
18 through files one by one.
19     Q.  So you weren't able to enter those
20 being there in the conference room, were you?
21     A.  No, I was reviewing and making sure
22 the files had all their necessary information
23 in them.

Page 248

1      Q.  But you weren't able to enter them
2  in the computer as they came in?
3      A.  Right, and that's why I work --
4      Q.  How long did you -- I'm sorry.  Go
5  ahead, please.
6      A.  That's why I worked so much overtime
7  is because a lot of times when he would leave,
8  I would come back -- I would leave work --
9  bear in mind, I live four miles from the
10 plant.  I would come back and then finish up
11 entering what I needed to enter and then go
12 home.
13     Q.  Okay.  Let's talk about the
14 conference room.  When did you move yourself
15 to the conference room?
16     A.  I'm not sure exactly which day that
17 I had moved but somewhere between January the
18 18th and February the 7th.
19     Q.  Okay.  How many days did you work in
20 there -- the conference room?
21     A.  I don't recall.
22     Q.  Any document or person that would
23 refresh your recollection on that?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 249

1    A.  I could -- my husband would probably
2  be the only one because I remember telling him
3  the day that I moved in there.
4    Q.  Okay.
5    A.  Because that's the day that I
6  actually told him everything that was going on
7  and begged him not to do anything.
8    Q.  Okay.  And then was it after -- what
9  did you do after Rance told you to come back
10  to the office?
11    A.  I refused.
12    Q.  And what did you do after that?
13    A.  I stayed in there and finished
14  working on the folders that I was working on.
15    Q.  Did you keep working that day?
16    A.  The day that he came in and asked me
17  to?
18    Q.  Uh-huh.
19    A.  I think I stayed in there and
20  worked.  I'm pretty sure I did because I
21  remember taking some of the file folders with
22  me that afternoon because we were having to
23  pull out every single file in the plant from

Page 250

1  the time that it opened until current.
2    Q.  How long was it between the time
3  that he asked you to come back to the office
4  and the time you left on February 7 and didn't
5  come back to the plant?
6    A.  I'm not sure exactly which day.
7  It's some day between January the 18th and
8  February the 7th.
9    Q.  But you didn't write it down on the
10  calendar?
11    A.  No.
12    Q.  Besides giving you a birthday hug,
13  attempting to hold hands with you or touch
14  your arms, rubbing your shoulders, rubbing his
15  pelvis area against your buttocks -- actually
16  let me stop there.  I don't know that I
17  followed up with you.  You said -- I think you
18  mentioned something about he rubbed his pelvis
19  one time when he was passing and you were
20  doing filing; is that right?
21    A.  Right.
22    Q.  I don't want to misstate your prior
23  testimony.  Was there any other time that he

Page 251

1  rubbed his pelvis against you?
2    A.  If I were in a sitting position and
3  I was reviewing documents, he would come to
4  the side for me to show him something or ask
5  him about something or whatever, he would
6  stand really close to where he would be
7  touching you with his pelvis or hip or thigh,
8  whatever.  It varied.
9    Q.  When was -- when was the first time
10  that happened besides the filing cabinet thing
11  that you've already told me about?
12    A.  I'm not sure exactly when the first
13  occasion was.
14    Q.  Did you write it down on your
15  calendar?
16    A.  No.
17    Q.  How many times did he rub his pelvis
18  against you other than the cabinet -- the
19  filing cabinet time?
20    A.  I'm not sure exactly how many times
21  but it -- just depending on if I had to show
22  him something or ask him something or get him
23  to sign something and usually that's when he

Page 252

1  would -- would do that.  I'm not sure exactly
2  a time.
3    Q.  Can you give me a ballpark?
4    A.  Probably ten or more.
5    Q.  What would you do after he would rub
6  up against you?
7    A.  I would usually try to lean in to be
8  able to finish whatever I was doing unless it
9  was like really, really obvious what he was
10  doing and not just he was trying to review the
11  paperwork and wasn't paying attention to where
12  he was standing, so I would lean and sometimes
13  he would lean further and at that point I
14  would just get up.
15    Q.  Did you continue doing your work?
16    A.  No, I would go outside.
17    Q.  And then you would come back and do
18  your work?
19    A.  Yes.
20    Q.  Go outside and smoke a cigarette --
21    A.  Yeah.
22    Q.  -- or take a break?
23    A.  Yeah, and usually he would be ticked

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 253

1  off and he wouldn't be in there when I came
2  back so.
3      Q.  Okay.  Any other specific occasions
4  you can recall him rubbing his pelvis against
5  you?
6      A.  Not at this time, no.
7      Q.  Any -- any document or witness that
8  would help you recall?
9      A.  Not at this time, not without
10 getting up with some people.
11     Q.  Okay.  And we'll talk about those
12 people in just a little bit.
13     A.  Okay.
14     Q.  Let me go through -- did you ever go
15 after he rubbed his pelvis against you and
16 report it to anybody at Smart, like as it was
17 happening or right after it happened?
18     A.  No.
19     Q.  Why not?
20     A.  Because I feared what he would do
21 and I figured I would lose my job.
22     Q.  Okay.  Besides giving you a birthday
23 hug, trying to hold your hand, rubbing your

Page 254

1  arms, rubbing on your shoulder/upper chest
2  area, rubbing his pelvis against you, or
3  touching your shoulders, were there any
4  other -- did Rance Maddox at any time ever
5  touch you in a way that you believe to be
6  sexually inappropriate or offensive or
7  harassing?
8      MR. HORSLEY:  Did you include
9  rubbing the legs when meeting with Mr. Kwan?
10     MS. WILLIS:  No, let me go back
11 again.  Thank you.
12     Q.  (By Ms. Willis) Okay.  Let me start
13 that again.  Besides — besides giving you a
14 birthday hug, trying to hold hands with you or
15 rubbing your arms, rubbing your leg when you
16 met with Mr. Kwan, putting his arm around you
17 or rubbing his pelvis against you or rubbing
18 your shoulders, are there any other instances
19 when you claim Mr. Maddox touched you in a way
20 that was sexually inappropriate or offensive?
21     A.  To the best of my knowledge, that's
22 all.
23     Q.  Okay.  Any document or witness that

Page 255

1  would help you recall?
2      A.  Not at this time.
3      Q.  Okay.  Let me ask you -- I'm going
4  to ask you a couple of more specific questions
5  about your calendar, just some entries on
6  there.
7      A.  Okay.
8      Q.  If you want to get that out in front
9  of you.  I'm referring to Defendant's Exhibit
10 14 and I'm looking at January 18, 2006.
11     A.  Okay.
12     Q.  Meeting with Gary about Rance,
13 requested transfer.
14     A.  Right.
15     Q.  Tell me everything you told Gary
16 Sport in that meeting.
17     A.  I don't recall every single thing
18 that was said in that meeting.
19     Q.  Well, can you tell me what you do
20 recall, please?
21     A.  I gave him a gist of everything that
22 was going on with Rance up until or as far as
23 what had happened up until that point.

Page 256

1      Q.  Specifically what did you tell him?
2      A.  I'm not certain specifically what I
3  told him other than I'm sure I told him about
4  how he had been acting and what he had been
5  doing and what he had been saying and how he
6  had been treating me and that sort of thing.
7      Q.  Let's look -- and did you ever
8  follow up with Gary after this meeting,
9  January 18th?
10     A.  I'm sure we did.
11     Q.  Well, do you know of an occasion you
12 did?
13     A.  I know I spoke with him on the day
14 that the weekend schedule was released and I
15 know I spoke to him the day about the
16 situation with his wife calling but I don't
17 know exactly which.
18     Q.  What did you tell him about the day
19 the weekend schedule got released, is that
20 what you had testified to earlier about not
21 working on Sunday night and then getting up
22 and working again Monday morning?
23     A.  Right.

64  (Pages 253 to 256)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 257

1   Q.  Was that all you told him during
2  that conversation was about the weekend shift
3  schedule?
4      A.  I didn't understand why he was doing
5  me that way and that -- I probably said this
6  is BS and I can't work that and he said, I'll
7  handle it, I'll handle it, I don't know what
8  the hell he's thinking.  He's not thinking.
9      Q.  Okay.  Have you now told me
10  everything you told Gary on the 18th that you
11  can remember?
12     A.  As far as I can remember.
13     Q.  Any document or witness that would
14  help you recall?
15     A.  Not that I can remember.
16     Q.  I'm looking now at January 23.  It
17  says, "Rance got letter from Gary."  What were
18  you referring to there?
19     A.  Apparently Rance had gotten a letter
20  from Gary about how unhappy he was about how
21  he was handling things going on in his office
22  and the employees in his office and something
23  of that nature.

Page 258

1      Q.  How did you know about the letter?
2      A.  I don't remember if it was that day
3  or the next -- I believe it was the next day
4  Rance had talked to me about things going on
5  in the office.  That was the day that we had
6  that meeting the very next morning about
7  everybody's job performances and running to
8  human resources and all that sort of thing and
9  so I believe that's when it was mentioned was
10  when he called the meeting that that's what
11  referenced the letter that he had gotten.
12     Q.  Did you ever see the letter while
13  you were working at Smart?
14     A.  I did.
15     Q.  How did you come to see it?
16     A.  I saw it, Rance showed it to me.
17     Q.  When did he show it to you?
18     A.  I believe it was on the 24th.
19
20     (Whereupon, Defendant's Exhibit 18
21     was marked for identification and a
22     copy of same is attached hereto.)
23

Page 259

1      Q.  Okay.  I'm showing you Defendant's
2  Exhibit 18.  Is this the letter that you're
3  referring to in your calendar?
4      A.  I believe this is it.  That's right.
5      Q.  And if you'll see the second to last
6  paragraph, "Show respect at all times to your
7  peers, your subordinates, and our Security
8  Team.  Manage yourself professionally and
9  calmly.  Don't threaten or intimidate people."
10  Do you see that?
11     A.  Where is that -- okay, yes.
12     Q.  That's what Defendant's Exhibit 18
13  says.
14     A.  Right.
15     Q.  Do you know if Gary was referring to
16  what you had talked to him about on the 18th?
17     MR. HORSLEY:  Object to the form.
18  You can answer.
19     A.  I wasn't certain if that's what that
20  was referring to or not but I assume so
21  because of the stern lecture that we got about
22  anything going on in our office about people
23  running to human resources.

Page 260

1      Q.  But you knew you could go to human
2  resources because you had?
3      A.  Right.
4      Q.  Looking back at your calendar,
5  Ms. Atwell, I'm looking at January 24th, and I
6  know you noted the safety meeting and that you
7  went to the hospital and we're going to
8  address that a little bit later.
9      A.  Right.
10     Q.  At the bottom I say -- I see being
11  replaced.  Do you see that on January 24,
12  2006?
13     A.  Right.
14     Q.  What did that mean?
15     A.  During the safety meeting, that's
16  when Rance had made reference that, you know,
17  people would be replaced if they didn't work
18  with him like if they started running to human
19  resources, that he was tired of everybody
20  running behind his back, if they had a problem
21  with him, they needed to come to him.
22     Q.  Did he ever -- I'm so sorry, please
23  go ahead.

65 (Pages 257 to 260)

# FREEDOM COURT REPORTING

Page 261

1  A. That was the gist that I can recall.
2  Q. Did he ever specifically tell you
3  you were being replaced during that meeting on
4  January 24th?
5  A. He told me prior to that meeting
6  when he discussed the letter that he got from
7  Gary with me.
8  Q. What specifically did he say to you
9  during that meeting or when he showed you the
10  letter?
11  A. Yeah, he had -- was upset and I
12  guess he was saying that he didn't want
13  anybody to go behind his back, if they had a
14  problem, they needed to come to him. What I
15  couldn't get him to understand was that he was
16  the problem and he let it be known that if
17  anybody butted heads against him that it was
18  not going to be pretty, that's not exact words
19  but.
20  Q. What were his exact words as best
21  you can recall?
22  A. I mean, I really can't remember his
23  exact words. I mean, he had -- that's why I

Page 262

1  left to go to the doctor right after the
2  meeting was held. He had a meeting with me
3  and then he had a meeting with everybody and
4  then I left and went to the doctor.
5  Q. Was anybody else present when he met
6  with you?
7  A. No.
8  Q. Was the door to the safety office
9  open or closed?
10  A. Closed.
11  Q. Okay. Oh, let me ask you this
12  question: Where is David McGough's office?
13  A. It is on the front left -- no, it
14  would be the front right of the main entrance
15  to the building.
16  Q. So on the production side -- the
17  production office side?
18  A. I'm assuming that's production, I'm
19  not for certain.
20  Q. When you walked in the building and
21  you walked to the right?
22  A. Into the offices, right.
23  Q. And the safety office when you

Page 263

1  walked into the building and walked to the
2  right was down that corridor?
3  A. Farther down, correct.
4  Q. But really working with David
5  McGough would have meant you were closer to
6  working with Rance than having worked out in
7  the plant, right, if you worked with David
8  McGough?
9  A. It would depend on which proximity
10  of the plant that I would be put in but I
11  would be over there and David told me he
12  wouldn't let anybody mess with me.
13  Q. Okay.
14  A. And I felt like I would be protected
15  if I worked by him.
16  Q. Okay. Did you ever specifically
17  request to anybody in human resources that you
18  work with David McGough?
19  A. I think Ruth and I had talked about
20  that and she said they were working on it and
21  then I guess that never panned out.
22  Q. Okay. The 28th of January you've
23  got, Kathy quit, question mark. Who's Kathy?

Page 264

1  A. That's Kathy Caldwell.
2  Q. Oh, Kathy Caldwell that worked with
3  security with ADI?
4  A. Right.
5  Q. And why -- why do you have that on
6  your calendar?
7  A. I have that out there and I have a
8  question mark beside it because I put various
9  things on our calendars. Kevin picked me up.
10  MR. HORSLEY: Just answer that
11  question.
12  A. Okay. I just wrote it on there
13  because I was curious.
14  Q. How do you know she quit her job
15  with ADI?
16  A. That's what I had been told.
17  Q. Who told you that?
18  A. I'm not even certain. I'm sure it
19  was somebody that worked there but I'm not --
20  I can't say specifically who told what.
21  Q. Did Kathy tell you that directly?
22  A. No, ma'am.
23  Q. Why was that significant to put down

66 (Pages 261 to 264)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 265

1  on your calendar, Ms. Atwell?
2      A.  Because she was a member of the
3  security department and we have to take their
4  badges from them when they no longer work for
5  the company.
6      Q.  Did she give you your -- did she
7  give you her ADI security badge?
8      A.  Not me, no.
9      Q.  Who did she give it to?
10     A.  I have no clue.
11     Q.  Do you know why she quit?
12     A.  I've heard rumors since then.
13     Q.  Do you have personal knowledge of
14 why she quit?
15         MR. HORSLEY:  Don't talk about
16 anything you and I have discussed.
17     Q.  No, that you heard with your own
18 ears or saw with your own eyes know of any
19 fact as to why Kathy Caldwell quit her
20 employment with ADI.
21     A.  From her directly?
22     Q.  Uh-huh.
23         MR. HORSLEY:  Yeah, you can answer

Page 266

1  that, yeah.
2      Q.  Just don't talk about what you've
3  talked about with him.
4      A.  Oh, okay.  That's the same thing.
5         MR. HORSLEY:  You can tell her
6  anything that either Kathy Caldwell or anybody
7  else has told you about why she quit or
8  anything else as long as you're not discussing
9  something that you -- that I told you or you
10 told me.
11     A.  Okay.  Kathy told me that she quit
12 because Rance kissed her on the mouth.
13     Q.  When did Kathy tell you that?
14     A.  I'm not sure a date.  I know it was
15 after February the 8th, 9th, somewhere around
16 in there.
17     Q.  How did you come to talk to her
18 around February 8th or the 9th?
19     A.  I had heard rumors that's what
20 had happened through a friend of ours that
21 worked at the Smart plant, a neighbor of mine.
22     Q.  Who was that?
23     A.  Chris -- I've got to think of his

Page 267

1  last name.  I can't think of Chris' name.  His
2  girlfriend's name is Vonda.
3      Q.  And what did Chris tell you,
4  Ms. Atwell?
5      A.  That he had heard that Kathy quit --
6  well, he -- I had talked to his girlfriend
7  Vonda about what had happened with me and she
8  said, well, you need to talk to Chris and find
9  out about what's going on because Kathy quit
10 too.  And I said, well, what are you talking
11 about, and so I called Cliff, the -- their
12 supervisor, the security department
13 supervisor, and he called Kathy and gave her
14 my number and Kathy called me and she and I
15 had a conversation and that's when she told me
16 that's what had happened to her.
17     Q.  Had you met her before then?
18     A.  No.
19     Q.  Does Vonda work at Smart?
20     A.  She did.
21     Q.  She no longer works there?
22     A.  No.
23     Q.  What about Chris?

Page 268

1      A.  No.
2      Q.  Where do they live?
3      A.  On Sasser Street in Brantley,
4  Alabama.
5      Q.  Okay.  Turning your attention to
6  February in your calendar, ma'am.
7      A.  Okay.
8      Q.  I'm looking at February 8.
9      A.  Okay.
10     Q.  Spoke with John Kelly.  Who's John
11 Kelly and if it's a lawyer, I don't want to
12 know about your conversations but I do need to
13 know who he is.
14         MR. HORSLEY:  Tom Kelly.
15     A.  His card says John.
16         MR. HORSLEY:  That is a lawyer.
17     Q.  You contacted a lawyer?
18     A.  I did.
19     Q.  And I don't want to know what you
20 said to him or what he said to you but you
21 called him on the 8th?
22     A.  I did.
23     Q.  Okay.

67  (Pages 265 to 268)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 269

1    A. Well, actually my husband spoke with
2  him.
3    Q. Your husband, Kevin Atwell?
4    A. He did.
5    Q. But at some point you linked up with
6  Mr. Horsley so okay, and I don't want to know,
7  you know, that. Let's see, I'm showing you
8  looking at Defendant's Exhibit 17 again. I
9  know that you said this was a draft of
10 something that you had done but you don't know
11 if it ever got to Gary Sport one way or
12 another, do you?
13   MR. HORSLEY: She asked you if you
14 know if that ever got to him.
15   A. I know it was left on his desk in a
16 sealed envelope.
17   Q. Who put it there?
18   A. I did.
19   Q. I thought you told me earlier you
20 gave it to Fran Hughes.
21   A. I made one for each. Gary had one
22 and Fran had one. The names were changed at
23 the top of the letters. The letters were

Page 270

1  identical.
2    Q. Okay. But you don't have those
3  letters?
4    A. No, ma'am, I just have the rough
5  draft.
6    Q. And what's the phone number at the
7  top of Exhibit 17? Do you see that about the
8  date?
9    A. 3503 -- I believe that's
10 Dr. Tompkins' number in Luverne.
11   Q. Okay.
12   A. It was just used for scratch
13 purposes after that.
14   Q. Okay. When you spoke with Gary, did
15 he tell you that he would transfer you?
16   A. No, he was going to handle it.
17   Q. Okay. And he did in fact give Rance
18 a memo about the way he talked to employees,
19 didn't he?
20   A. He did.
21   Q. Okay. When was the -- and I want to
22 get this straight. I know we've talked about
23 it all along. When was the first time you

Page 271

1  talked to Ruth Ryan?
2    A. I don't remember. My brain is not
3  working -- February the -- no, January 2006.
4    Q. Is that of your infinite
5  recollection or just what your attorney wrote
6  in your EEOC charge?
7    A. It's not written down the exact date
8  so it's estimation and --
9    Q. What did you -- go ahead, I'm sorry.
10   A. I'm sure he put that because that's
11 probably what I told him.
12   Q. The first time you met with Ruth,
13 what did you tell her specifically?
14   A. I asked her if I could speak to her
15 confidentially. I remember she said, yeah, it
16 won't go any further than here. I told her
17 that I had spoke with Gary about Rance and
18 that I felt betrayed because when I got back
19 to work, Rance was even worse than what he had
20 ever been before.
21      It went from being sexual harassment
22 to hostile work environment. He was throwing
23 stuff. He was kicking doors shut. He would

Page 272

1  slam the phones down. He would ask you for
2  something and he would snatch it out of your
3  hand and I felt that it wasn't fair that I did
4  what I was supposed to do and I trusted him to
5  handle it and instead it back-fired on me. It
6  made it worse on me.
7    Q. What did Ruth say?
8    A. She asked me, you know, to talk to
9  her and so we went in the room and shut the
10 door and I was telling everything that was
11 going on and that's when, you know, she
12 assured me that they would handle it but I
13 needed to do my job and I needed to keep quiet
14 and only speak when spoken to and only answer
15 his questions directly and try not to stay
16 around him and to avoid contact with him and
17 that she promised me they were working on it,
18 that they would do something.
19   Q. And she followed up on that promise
20 when she told you she would transfer you to
21 Lloyd Weathers' area; right?
22      MR. HORSLEY: Object to form. You
23 can answer.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 273

1    MS. WILLIS: You can answer.
2    A. She never mentioned moving me to
3 Lloyd Weathers' area.
4    Q. No, ma'am, that's not what you told
5 me. You told me on the last day you went to
6 see her that -- she told you she was -- you
7 told me earlier in this deposition that she
8 said something about going to Lloyd Weathers
9 and you were concerned about that because you
10 thought that you were still going to see
11 Rance. Do you remember that testimony?
12    A. Yeah, it wasn't Lloyd Weathers. It
13 was David McGough. She was trying to get me a
14 job in his area.
15    Q. Yes, ma'am, but you've told me
16 earlier in this deposition that she was going
17 to have you out somewhere in the production
18 area that you and Kevin I believe -- and I'm
19 not going to summarize your testimony but that
20 you went to her on that -- one of those last
21 days she told you that they were working
22 on getting you out there with Lloyd Weathers
23 and you were upset because you thought you

Page 274

1 would still have to be around Rance. Do you
2 remember that testimony?
3    A. If I said Lloyd Weathers, it was
4 mistaken.
5    Q. Are you telling me the truth now or
6 were you telling me the truth then because
7 that's not what you testified to earlier?
8    A. If I said Lloyd Weathers, it was
9 accidentally. I have no idea who she wanted
10 me to work under in the plant.
11    Q. But she did tell you that she was
12 getting you a transfer?
13    A. Right, but it would be in the plant.
14    Q. Okay.
15    A. Which means I would have to see him
16 every day.
17    Q. But you wouldn't be in the safety
18 office any longer; correct? You wouldn't be
19 working in the safety office any longer;
20 correct?
21    A. I don't want to work around him.
22    Q. Yes, ma'am, that's not my question.
23    A. Right.

Page 275

1    Q. My question was: Working in the
2 plant would have meant you were not working in
3 the safety office any longer, wouldn't it?
4    A. Right.
5    Q. So you had this conversation with
6 Ruth in January. She told you -- late January
7 or something, she told you to go do your job
8 and that she would work on it. When is the
9 next time you talked to her?
10    A. I'm not sure if this was the very
11 next time but I do remember an occasion on the
12 30th where I spoke with her.
13    Q. January 30th?
14    A. Yes.
15    Q. Why didn't you report it on your
16 calendar?
17    A. There's a whole lot on the 30th.
18 Where it says Rance requested medical
19 records --
20    Q. Uh-huh.
21    A. -- I went to her because I was upset
22 because he had requested my medical records
23 and he already knew too much and the position

Page 276

1 he was in the office, he had access to
2 those records because Dr. Tompkins wrote it up
3 as workmen's comp and I didn't think he needed
4 to have those records, that if anybody else in
5 the plant wanted those records in the office,
6 you know, human resources, they could have
7 them but it really upset me that -- he was
8 adamant enough that the nurse from
9 Dr. Tompkins' office called me to let me know
10 that he was very ugly to her as he tried to
11 obtain my medical records.
12    Q. Who was that nurse?
13    A. B.G.
14    Q. But as your supervisor, Rance Maddox
15 probably needed a medical excuse to know why
16 you were absent the week prior; correct?
17    A. He didn't ask for an excuse. He
18 asked for medical records. He said, I want to
19 know what she told y'all.
20    Q. Did he ever say that directly to
21 you?
22    A. No, he told that to B.G.
23    Q. And how did you learn that he told

69 (Pages 273 to 276)

# FREEDOM COURT REPORTING

Page 277

1  that to B.G.
2      A.  B.G. called me and told me.
3      Q.  Where did B.G. call you?
4      A.  On my cell phone.
5      Q.  When did she call you?
6      A.  On the 26th or 27th I believe of
7  January.
8      Q.  Okay.  So that's what you spoke to
9  Ruth Ryan about on the 30th was the records?
10     A.  When I came back to work.
11     Q.  After that you spoke with her and
12 Joseph?
13     A.  On another occasion.
14     Q.  And what did you talk to she and
15 Joseph about?  You told me earlier you didn't
16 tell her everything.
17     A.  It was very limiting, right.
18     Q.  Did you speak with her again after
19 that?
20     A.  I know I did.  I know I spoke with
21 her and Joseph on February 1st and I spoke
22 with her on February 2nd and I spoke with her
23 February 3rd.

Page 278

1      Q.  When was the last time you spoke to
2  Ruth?
3      A.  February the 7th.
4      Q.  And during that conversation was
5  when you discussed the transfer?
6      A.  My husband was present for that
7  conversation.
8      Q.  But you were there as well?
9      A.  Yes.
10     Q.  Anything else said during that
11 conversation?
12     A.  My husband was there and he was
13 trying to ask what was going on and what they
14 were going to do about the situation and she
15 told him that that was none of his concern,
16 that that was between she and I.
17     Q.  But she did mention a transfer at
18 some point?
19     A.  Not in front of him, no.
20     Q.  But to you?
21     A.  Yes.
22     Q.  Okay.  And what did she say in that
23 conversation?

Page 279

1      A.  That they were going to transfer me
2  to -- in the plant and you know, I told her
3  that, you know, that wasn't working.  Shortly
4  after that conversation I went down the
5  hallway and that's when Rance -- I went into
6  the office to grab something off the desk.
7  Kevin stood there and held the door open for
8  me, my husband, and that's when he went in to
9  saying to the effect of taking too much
10 overtime and it wasn't authorized and he was
11 going to write me up and something about some
12 other things, I don't remember exactly what it
13 was, but I told him, you know, write it up.
14 Write it up.  I want to see it, write it up.
15 I mean, I had had it.  I was at the point
16 where I had had it.
17     Q.  And so you left after that?
18     A.  I did.  And Ruth come outside and
19 she said, calm down, calm down, and she
20 said -- I told her, I said, my nerves are bad.
21 I said, I need to just sit down.  And she
22 said, why don't you go on to the doctor and so
23 I went to Dr. Tompkins' office.

Page 280

1      Q.  On the 7th?
2      A.  I did.
3      Q.  We're going to get to that too.  You
4  didn't go back to work after that?
5      A.  No.
6      Q.  Did you ever call anybody there --
7      A.  No.
8      Q.  -- and say I'm not coming back?
9      A.  No.
10     Q.  You just didn't go back?
11     A.  Right.
12     Q.  And you haven't worked there since?
13     A.  No.
14         MR. HORSLEY:  Do you need to go eat
15 something?
16
17     (Whereupon, a brief recess was taken
18     from 3:19 p.m. to 3:31 p.m.)
19
20     (Whereupon, the desired portion of
21     the proceedings was read back.)
22
23     Q.  (By Ms. Willis) And so you went to

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 281

1  **Dr. Tompkins' office?**
2      A.  I did.
3      **Q.  And you had been treated by**
4  **Dr. Tompkins before for your shoulder --**
5      A.  I have.
6      **Q.  -- as workers' compensation?**
7      A.  I had.
8
9      (Whereupon, Defendant's Exhibit 19
10     was marked for identification and a
11     copy of same is attached hereto.)
12
13     **Q.  Okay.  And so you went there on the**
14 **7th.  I show you Exhibit 19 which are the**
15 **records that we got from his office and I'm**
16 **calling your attention to -- let's go to**
17 **page -- it's Bates stamped on the side,**
18 **Richard.  It's Family Practice Associates**
19 **00025.**
20     A.  Okay.
21     MS. WILLIS:  Are you with me?
22     MR. HORSLEY:  Yeah.
23     **Q.  (By Ms. Willis) And Ms. Atwell, you**

Page 282

1  **went to her -- the office on February 7, 2006;**
2  **is that correct?**
3      A.  I did.
4      **Q.  And you wanted to be as truthful and**
5  **accurate as possible to give your information**
6  **to the doctor?**
7      A.  Right.
8      **Q.  Do you know who made the notes on**
9  **the upper part of page 00025 of Defendant's**
10 **Exhibit 19?**
11     A.  That would be the nurse --
12     **Q.  Who is the nurse?**
13     A.  -- or the doctor, I'm not sure
14 exactly who.
15     **Q.  You don't know which one?**
16     A.  No.
17     **Q.  And you had been on Wellbutrin**
18 **before because of your hospitalization and for**
19 **smoking?**
20     A.  It was for -- right, to try to get
21 me to quit smoking.
22     **Q.  And they -- all the doctor's office**
23 **had to rely on was what you were telling them;**

Page 283

1  **right?**
2      A.  Right, and I guess what he had in
3  his records already.
4      **Q.  Okay.  He is constantly fussing and**
5  **nitpicking her.  And are you referring to**
6  **asking you about your job duties and slamming**
7  **things around like you've described earlier in**
8  **this deposition?**
9      A.  Right, that was -- actually it
10 starts up further than that.
11     **Q.  Yeah, I know it does, that she's**
12 **filed sexual harassment charges.  I'm not**
13 **denying that that's there.**
14     A.  Okay.
15     **Q.  I'm just asking you about that**
16 **particular part.**
17     A.  Right.
18     **Q.  That's what you're referring to?**
19     A.  Because that's what he had done
20 immediately before I had left the plant was
21 fussing about the overtime and saying he was
22 going to write me up and all of that.
23     **Q.  And do you see this note down here**

Page 284

1  **on the left-hand side where it says, seems**
2  **fairly calm --**
3      A.  Right.
4      **Q.  -- husband in office?**
5      A.  Right; uh-huh.
6      **Q.  And I think he said your anxiety was**
7  **situational.  Do you see that over to the**
8  **right?**
9      A.  Right.
10     **Q.  You were going to start Lexapro and**
11 **appointment with a counselor; right?**
12     A.  Right.
13     **Q.  Okay.  How long did you take the**
14 **Lexapro?**
15     A.  For two months and then when I went
16 back to refill it, the workmen's comp wouldn't
17 refill it any longer.  They said that the case
18 had been closed.
19     **Q.  Okay.  And you didn't make an**
20 **appointment -- you didn't have an appointment**
21 **with a counselor?**
22     A.  I called the counselor.  They
23 actually -- I think they had scheduled me an

71  (Pages 281 to 284)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 285

1  appointment, I'm pretty sure they did, and
2  when I called him and explained to him that it
3  was workmen's comp, they called workmen's comp
4  to verify and workmen's comp denied that it
5  would be covered because there was not an
6  actual physical injury.
7      Q.  Okay.  Did you -- but this wasn't
8  the first time that you had gone to
9  Dr. Tompkins complaining about nausea, you see
10  I'm looking on 25 about nausea, do you see
11  that, up at the top of the page, Ms. Atwell?
12      A.  Right.
13      Q.  Because if you'll flip with me to
14  00035, do you see that?
15      A.  Okay.
16      Q.  Okay.  That you had gone on October
17  20, 2005, and that was before you started
18  working in the safety office; right?
19      A.  Correct.
20      Q.  And you felt -- you had had heart
21  racing and felt nauseated and light-headed, so
22  it wasn't the first time you had gone to
23  Dr. Tompkins and reported this; right?

Page 286

1      A.  Actually this was an allergic
2  reaction to some medication.
3      Q.  Okay.  But it certainly wasn't the
4  first time that you had reported nausea to
5  Dr. Thompson, was it?
6      A.  Tompkins, no, ma'am.
7      Q.  Tompkins, I'm so sorry.  I'm going
8  to show you -- because I know you had talked
9  about your hospitalization.  Did you have any
10  other follow-up appointments -- let me ask you
11  this -- with Dr. Tompkins about any anxiety
12  after February 7?
13      A.  I don't believe I went back after
14  that other than for my refills.
15      Q.  And you may have gone back I know
16  you've had a car wreck that's separate --
17      A.  Right.
18      Q.  -- and apart from this treatment for
19  your car wreck but that's not related to this
20  case.  Am I right about that?
21      A.  Correct.
22
23      (Whereupon, Defendant's Exhibit 20

Page 287

1  was marked for identification and a
2  copy of same is attached hereto.)
3
4      Q.  Okay.  I'm showing you what I am
5  marking as 20.  I will show you that these are
6  the records that we got from Crenshaw
7  Hospital.  Is that where you were hospitalized
8  during the last week of January 2006?
9      A.  No, this is the car wreck.
10      MR. HORSLEY:  '07.
11      A.  In March.
12      Q.  I understand that but was Crenshaw
13  Hospital where you were hospitalized when you
14  were hospitalized during the last week of
15  January 2006?
16      A.  Yes.
17      Q.  Okay.  And if you'll turn with me to
18  page -- it's another Bates number, 00057, and
19  57 through 60 appear to be notes from when you
20  went to the hospital on or about January 26;
21  is that right?
22      MR. HORSLEY:  Say that again, I'm
23  sorry.

Page 288

1      Q.  It appears that 57 through 60 appear
2  to be notes from -- admission notes from when
3  you went into the hospital on or around
4  January 26, 2006.  Take your time and flip
5  through there.  Twenty-six is I think on page
6  59.
7      MR. HORSLEY:  It's just not dated.
8      MS. WILLIS:  Fifty-nine is.
9      MR. HORSLEY:  Okay.
10      Q.  (By Ms. Willis) Are you with me,
11  okay.  And you've gone into the hospital,
12  right, with -- and I'm looking at 57 with some
13  chest pain?
14      A.  Right.
15      Q.  Is that right and some shortness of
16  breath I guess?
17      A.  Right.
18      Q.  And some nausea, which you had had
19  before?
20      A.  Uh-huh.
21      Q.  Is there anything in these notes
22  about your -- that you see in these notes
23  about when you were admitted at the hospital

72 (Pages 285 to 288)

## FREEDOM COURT REPORTING

Page 289

1 about being harassed at work?
2    A. Yes, ma'am.
3    Q. Where?
4    A. "She relates a lot of stress at work
5 and certainly we have had a long discussion
6 with her about all the implications of that."
7    Q. What specific discussions did you
8 have with Dr. Tompkins and/or his staff about
9 stress at work?
10    A. At this point all Dr. Tompkins knew
11 is I told him there was a lot of stuff going
12 on at work and that I was having a lot of
13 problems dealing with everything. I don't
14 know exactly what my words were on it but just
15 letting him know that I was having a lot of
16 stress issues that were related to work.
17    Q. Okay. But there's no mention of
18 specific harassment?
19    A. Correct.
20    Q. And you had had a history of I guess
21 mitral valve prolapse in the past?
22    A. I have.
23    Q. Okay. Did they ever really diagnose

Page 290

1 you and figure out what was wrong?
2    A. Here?
3    Q. Yes, ma'am.
4    A. They diagnosed me with having a
5 panic attack or a panic disorder or something
6 I believe of that nature.
7    Q. But you were released?
8    A. Right.
9    Q. You were released from the hospital
10 and were able to go back to work; is that
11 right?
12    A. Correct.
13    Q. Have you had any anxiety attacks
14 since you left the employment of Smart in
15 February --
16    A. Yes, ma'am.
17    Q. -- of 2006?
18    A. Yes, ma'am.
19    Q. When?
20    A. It was not long ago -- actually I've
21 had them several different times. A friend of
22 mine came up to me from behind and grabbed me
23 and it startled me and I kind of got upset

Page 291

1 then. When my husband and I fuss about the
2 bills because I'm not working and when he
3 first found out everything that happened with
4 Rance and I sat down in detail and told him
5 everything that happened, then. Situations
6 similar to that.
7    Q. They make you anxious?
8    A. Right.
9    Q. Okay. But you -- you don't have any
10 treatment for that right now other than
11 journaling or doing for yourself?
12    A. Other -- I never had this problem
13 until I was raped and then after I was raped I
14 had this problem but it had gotten so much
15 better. I could socialize in public. I could
16 function. I didn't take five showers a day.
17 I didn't carry a weapon with me everywhere I
18 went. I didn't check the door locks five
19 times. I mean, I had gotten myself out of a
20 pattern that created a comfort zone for me and
21 I was able to go on and have a normal life.
22    Q. I don't want to delve into too
23 painful of a subject --

Page 292

1    A. Okay.
2    Q. -- but how long before you worked at
3 Smart were you raped?
4    A. That was in 1997.
5    Q. And did you press charges on that?
6    A. No, ma'am.
7    Q. I'm sorry. I'm not getting far into
8 that. Were you able to seek counseling for
9 that, ma'am?
10    A. No, ma'am.
11    Q. You didn't at the time? No?
12    A. No.
13    Q. I'm sorry, I'm not going to speak
14 out for you, I'm sorry. Did you take any
15 medication at that time?
16    A. I didn't tell anybody.
17    Q. I'm so sorry. I mean, I can't tell
18 you how sorry I am. Have you sought treatment
19 since?
20    A. No. I just talked to, you know, my
21 pastor. They know and my family knows. I
22 actually have a child, Logan, the eight-
23 year-old. He was the baby that I got pregnant

73 (Pages 289 to 292)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 293

1  with right after I got raped.
2      Q.  Was Mr. Davis the father?
3      A.  No.
4      Q.  Have you ever been on
5  antidepressants besides the Wellbutrin and the
6  Lexapro that we've talked about here?
7      A.  After my divorce I got put on
8  something, I don't even recall what it was.
9  It's so common now for everybody to be on it.
10  It's kind of like eating, chewing gum, or
11  something.  It's been so long ago, I'm not
12  really certain.
13      Q.  Do you feel like the rape made what
14  was going on at Smart harder for you?
15      A.  Yeah.
16      Q.  Okay.  Now, I know in your
17  interrogatory responses you had said about
18  being treated by a counselor as a child
19  because of some issues with maybe your father
20  or stepfather?
21      A.  Yeah, my real father got killed when
22  I was three.
23      Q.  I'm sorry to hear that.  I'm sorry.

Page 294

1  Did you go to counseling?
2      A.  I did.
3      Q.  As a child?
4      A.  I did.
5      Q.  Do you know how long you did that?
6      A.  My mom drove me to Dothan like -- I
7  think it started out like twice a month and
8  then it got down to where it was once a month
9  and then it got fewer and fewer.
10      Q.  Okay.
11      A.  That was so many years ago but I
12  remember it wasn't like all the time.
13      Q.  Right; right.  You filed your
14  claim -- you filed your EEOC charge; right?
15      A.  Uh-huh.
16      Q.  And we've talked about your EEOC
17  charge, haven't we?
18      A.  Yes, ma'am.
19      Q.  And the EEOC investigated; right?
20      A.  Uh-huh.
21
22      (Whereupon, Defendant's Exhibit 21
23  was marked for identification and a

Page 295

1  copy of same is attached hereto.)
2
3      Q.  They did an investigation and I'm
4  showing you Exhibit 21 where they concluded
5  their investigation and were unable to
6  determine that any discrimination occurred.
7      A.  Right.
8
9      (Whereupon, Defendant's Exhibit 22
10  was marked for identification and a
11  copy of same is attached hereto.)
12
13      Q.  Okay.  And then after that is when
14  you filed your lawsuit or your complaint
15  actually.  I'm going to show you that --
16  knowing that lawyers draft complaints and
17  unfortunately I don't get to question
18  Mr. Horsley about what he was thinking or what
19  was going through his mind at that time -- is
20  this the complaint you filed in this action
21  against Smart Alabama?
22      A.  Yes, ma'am.
23      Q.  And if you'll look with me on I

Page 296

1  guess the second and third page, ma'am, when
2  you talk about in paragraph six, "She was
3  sexually harassed by her supervisor, Rance
4  Maddox.  During this time, the plaintiff made
5  complaints to management of unwelcomed sexual
6  harassment."  Have you told me every way or
7  manner that you were sexually harassed by
8  Rance Maddox while you worked at Smart Alabama
9  during this deposition?
10      A.  To the best of my knowledge, I have.
11      Q.  Is there any document or witness
12  that would help you recall any more
13  specifically?
14      A.  Not at this time.
15      Q.  Okay.  Have you told me every way --
16  every time that you complained or raised a
17  concern to anybody at Smart Alabama about
18  Rance Maddox's actions during this deposition?
19      A.  To the best of my knowledge.
20      Q.  Is there any document or witness
21  that would help you I guess refresh your
22  recollection on that?
23      A.  To the best of my knowledge, I've

74  (Pages 293 to 296)

# FREEDOM COURT REPORTING

Page 297

1  given you everything I know of.
2      Q. Okay. And I know we asked for —
3  we — your attorney asked for damages during
4  this. I'm looking on page five specifically
5  if you want to reference that that you've been
6  deprived of economic benefits. Are you
7  talking about your wages there?
8      A. Yes, ma'am.
9      Q. And you've done emotional distress
10 and mental anguish. Can you tell me — other
11 than what you've already told me I guess, are
12 there any other facts that you contend support
13 your allegation that Smart's actions caused
14 you mental anguish or distress?
15     A. Can you be a little more specific?
16     Q. Yeah, I'll rephrase that. That was
17 a little bit confusing. Besides what you've
18 already told me, the facts you've told me in
19 this deposition, are there any other facts
20 that you have or that you know of supporting
21 your allegation that Smart is responsible for
22 you having mental distress or mental anguish?
23     A. Medical records, talking to family

Page 298

1  and friends, the fact that we had to sell our
2  house.
3      MR. HORSLEY: She's just asking if
4  there's anything that y'all haven't talked
5  about today.
6      THE WITNESS: I don't think so.
7      Q. (By Ms. Willis) Okay. Let me ask
8  you: You had said in your interrogatory
9  responses you provided us with names of some
10 witnesses that may know things and I'm going
11 to go through these real quickly and we've got
12 to take a short break and then we'll be done,
13 but I want to get from you what they know.
14     MS. WILLIS: It's Number 14,
15 Richard.
16     MR. HORSLEY: All right.
17     Q. (By Ms. willis) Ruth Ryan in human
18 resources at Smart Alabama, have you told me
19 everything during this deposition that you
20 think Ruth Ryan knows about your allegations
21 in this case?
22     A. To the best of my knowledge, I've
23 told you everything.

Page 299

1      Q. Okay. When's the last time you
2  talked to Ruth Ryan?
3      A. The 7th of February.
4      Q. Okay. Fran Hughes in human
5  resources, have you told me during this
6  deposition everything that you contend
7  Ms. Hughes knows about the facts of this case?
8      A. Yes, ma'am.
9      Q. Okay. When's the last time you've
10 talked to her?
11     A. Sometime in December of last year.
12     Q. Okay. What did y'all talk about at
13 that time?
14     A. She just had spoken to me. She was
15 at my cousin's wedding in Brantley.
16     Q. Okay. And have you told me
17 everything in this deposition that you contend
18 Gary Sport knows about your allegations in
19 this case?
20     A. To the best of my knowledge, yes,
21 ma'am.
22     Q. Misty Dicks, who is Misty Dicks?
23     A. She's a security guard that also

Page 300

1  works for the contractor through Smart.
2      Q. Okay. And what does she — I
3  haven't heard her name come up. What does she
4  know about the facts of this case?
5      A. Apparently he had asked her out
6  repeatedly and had caused her some issues and
7  she shared those with me.
8      Q. When did you speak with Ms. Dicks
9  about those issues?
10     A. I'm thinking somewhere between
11 February the 8th and maybe the 15th.
12     Q. How did you get in touch with
13 Ms. Dicks?
14     A. I called her father's restaurant in
15 Luverne.
16     Q. What restaurant is that?
17     A. It's — gosh, it's the Ranch House.
18     Q. Besides telling you that Rance asked
19 her out, is there any other knowledge that you
20 know of that Misty Dicks has about the facts
21 of this case?
22     A. She said that he had asked her out
23 repeatedly and that she had went to human

75 (Pages 297 to 300)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 301

1  resources and that nothing was done and that
2  her dad had said that if they don't do
3  something that he would.
4  **Q. Okay. And when's the last time you**
5  **talked to Misty?**
6  A.  I talked to her dad a couple of
7  months ago. I'm not sure exactly what the
8  date was. It was just in general, we had went
9  in to eat.
10  **Q. Okay.**
11  A.  But I haven't spoken with her in
12  quite a while.
13  **Q. Kathy Caldwell, have you told me**
14  **everything in this deposition that she knows**
15  **about the facts of your case?**
16  A.  Yes, ma'am, other than I didn't
17  mention that Kathy told me that when he kissed
18  her or attempted to kiss her, I can't
19  remember -- I'm pretty sure that he did kiss
20  her that she slapped him and there was a
21  witness involved in that.
22  **Q. And who was the witness?**
23  A.  She may have called a name or may

Page 302

1  not have, I don't remember.
2  **Q. Okay.**
3  A.  I gave her my attorney's phone
4  number and asked her to contact them and give
5  them their information and in turn I called my
6  attorney and gave him her information.
7  **Q. And I don't want to talk about what**
8  **you and your attorney talked about but that's**
9  **fine. When was the last time you talked to**
10  **Ms. Caldwell other than if you had a meeting**
11  **with him and her and I don't know if you have.**
12  A.  It's been quite some time. I'm not
13  sure exactly the date but it's been a while
14  back.
15  **Q. Six months, longer than that maybe?**
16  A.  I'm really not certain to be honest
17  with you. It hasn't been this year.
18  **Q. Okay. Gloria Thompson, other than**
19  **seeing you in the bathroom, are there any**
20  **other facts that Ms. Thompson has about this**
21  **case?**
22  A.  I'm not -- I haven't talked to her
23  directly but -- since all this has went on but

Page 303

1  she did speak to me before all this went on
2  and she may have some information, I'm not
3  sure.
4  **Q. Bill Bailey, what does Bill Bailey**
5  **know about the facts of this case?**
6  A.  As far as he wanted -- I had talked
7  to him and he said that he wanted to come and
8  testify as far as me working and doing what I
9  was supposed to do and tell about, you know,
10  just like a character reference or something
11  and that he had made -- I believe it was him,
12  let me think who the other guy was, is her
13  name on the list, is it continued -- yeah,
14  okay, no, I'm thinking of somebody else, but
15  yeah, that's all Bill wanted to do.
16  **Q. When was the last time you talked to**
17  **Bill?**
18  A.  Probably February or March.
19  **Q. Of this year?**
20  A.  I'm thinking.
21  **Q. Okay. Janna Stephens is --**
22  A.  Saw him in town. Oh, I'm sorry.
23  **Q. Janna Stephens, your sister-in-law,**

Page 304

1  **have you told me everything that you know of**
2  **that Janna knows?**
3  A.  I have.
4  **Q. Amanda Dempsey, who was light duty,**
5  **have you told me everything in this deposition**
6  **that she may know about the facts of this**
7  **case?**
8  A.  To the best of my knowledge.
9  **Q. When was the last time you talked to**
10  **Amanda Dempsey?**
11  A.  Right after her baby was born and
12  that's been last year I know.
13  **Q. Colinda Porter, have you told me**
14  **everything that you believe Ms. Porter knows**
15  **about the facts of this case?**
16  A.  To the best of my knowledge, I'm not
17  sure exactly what all she's seen and heard but
18  I don't know.
19  **Q. Okay. When is the last time you**
20  **talked to Ms. Porter?**
21  A.  When I left Smart.
22  **Q. Lakeisha Jessie, have you told me**
23  **everything in this deposition that Ms. Jessie**

76 (Pages 301 to 304)

# FREEDOM COURT REPORTING

Page 305

1  may know?
2      A.  To the best of my knowledge.
3      Q.  When was the last time you talked to
4  Ms. Jessie?
5      A.  When I left Smart.
6      Q.  Teresa Brothers, was Teresa Brothers
7  employed at Smart?
8      A.  She was.  She's been terminated.
9      Q.  What does Ms. Brothers know about
10 the facts of this case?
11     A.  She also wanted to testify about I
12 guess like a character reference or whatever
13 and I guess she had some issues with Rance.
14 I'm not certain what the extent was.  She
15 didn't go into it.
16     Q.  When was the last time you talked to
17 Ms. Brothers?
18     A.  About two months ago when I saw her
19 in town.
20     Q.  Did you discuss this case then?
21     A.  Huh?
22     Q.  Did you discuss this case then?
23     A.  I gave her my attorney's phone

Page 306

1  number and told her that she might want to
2  give him a call.
3      Q.  Okay.  Wendy, is that Wendy Burgins
4  that we were talking about?
5      A.  It is.
6      Q.  Have you told me everything in this
7  deposition that you know of that she knows
8  about your case?
9      A.  I haven't spoken with her since
10 the -- since I left but my husband, one of his
11 friends, I cannot tell you who it was, came to
12 him and told him that Wendy said that she was
13 right, that she would get your job, and so I
14 took it as if Wendy was trying to get my
15 position in the safety office.
16     Q.  But Wendy never said that to you
17 directly?
18     A.  No.
19     Q.  When is the last time you talked to
20 Wendy?
21     A.  The day I left.
22     Q.  Lisa Bodiford, anything else other
23 than what you have already told me that Lisa

Page 307

1  would know in this deposition?
2      A.  To the best of my knowledge.
3      Q.  What -- when's the last time you
4  talked to Lisa?
5      A.  When I left.
6      Q.  Mark Sissy?
7      A.  It's actually Mark and Sissy, it's
8  physical therapy contractors for Smart.
9      Q.  Okay.  And what do they know about
10 the facts of this case?
11     A.  When I was in -- when I was in the
12 physical therapy group for my shoulder, they
13 actually had a lot of problems with Rance
14 coming in while I was doing my physical
15 therapy and kind of sitting around and hanging
16 out, and due to it being a shoulder injury,
17 you had to put on a paper gown and they had to
18 do electro -- it's like an ultrasound kind of
19 heat therapy thing and he would just come in
20 there and he would inquire about people's
21 cases and you know, try to strike up a
22 conversation, and it was in a closed room and
23 it was supposed to be a private setting and he

Page 308

1  made himself seen quite often during my
2  physical therapy treatments to the point where
3  the therapist said, what's up with this guy,
4  and he had told me that he had talked to Mark
5  and Sissy about how he would just come in and
6  sit down in my physical therapy sessions.
7      Q.  When is the last time you talked to
8  Mark or Sissy?
9      A.  It was after I left Smart.
10     Q.  How long after you left Smart?
11     A.  I think it was within a couple of
12 days.
13     Q.  Tammy Green, who was your supervisor
14 out on the floor; is that right?
15     A.  Right.
16     Q.  Anything other than what you've
17 already told me that Tammy knows about this
18 action?
19     A.  To the best of my knowledge, I've
20 shared everything.
21     Q.  What about Tommy Hancock, who is
22 Tommy Hancock?
23     A.  He was an employee at Smart and I

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 309

1  talked to him -- I saw him in town one day and
2  he and Kevin know each other from way back and
3  he was showing Kevin his new motorcycle and
4  they got off on the subject, I heard you
5  wasn't at Smart no more and all this kind of
6  stuff, and he said that he wanted to testify
7  that he had knowledge of him making sexual
8  gestures and comments toward other women. He
9  never listed names.
10  Q. Tabitha, who's Tabitha?
11  A. I can't recall Tabitha's last name
12  right now. She's a girl that was in the first
13  aid room and she had a broken foot I believe
14  and she had seen me on several occasions
15  crying and tried to console me and she asked
16  what was wrong and I just told her, you know,
17  that it was Rance and she said, you know, he's
18  a jerk and he's this and he's that because you
19  know, I didn't want to get all into it and
20  that's the extent of what she knows and that
21  was the last time that I talked to her was
22  around the last few days of my employment.
23  Q. Okay.

Page 310

1      MS. WILLIS: Let us take about a
2  three-minute break, I'm going to look through
3  these, and we'll be done.
4
5      (Whereupon, a brief recess was taken
6      from 3:59 p.m. to 4:06 p.m.)
7
8      (Whereupon, Defendant's Exhibit 23
9      was marked for identification and a
10      copy of same is attached hereto.)
11
12  Q. (By Ms. Willis) I'm going to mark as
13  Composite Exhibit 23 and it's some documents
14  that you all made available to me this morning
15  and it's the only copy that I have. These
16  medical bills, what are they -- are they for
17  treatment with Dr. Tompkins?
18  A. They are.
19  Q. And this is for I guess bills that
20  occurred between January 24 and February 23 of
21  2006?
22  A. Right.
23  Q. Is that right?

Page 311

1  A. Right.
2  Q. Okay. And then you provided some
3  medical certifications. Is this your training
4  as a responder?
5  A. That's all that I had with me.
6  Q. Okay. And then you had referenced
7  some -- it looks like another criminal matter
8  that you had been involved in --
9  A. Right.
10  Q. -- but not that you perpetrated
11  yourself or anything?
12  A. Right.
13  Q. And this was some domestic violence
14  with regard to an individual named Scotty
15  Farmer?
16  A. Right.
17  Q. And this was when? When did this
18  take place, in 2005?
19  A. I believe that's right, uh-huh.
20  Q. And he was abusive to you?
21  A. Right.
22  Q. And when -- when's the last time --
23  A. Well, actually we were broken up at

Page 312

1  this point.
2  Q. Okay.
3  A. He was just harassing me.
4  Q. He was still bugging you?
5  A. Right.
6  Q. And he had unfortunately been
7  verbally and physically abusive to you prior
8  to that time --
9  A. Right.
10  Q. -- prior to when you filled this
11  out? And he was harassing you how when you
12  filled this out?
13  A. He was riding by the driveway and
14  cutting doughnuts in front of the house.
15  Q. And when did you all part ways prior
16  to that time?
17  A. Oh God, it was months before that.
18  This was all over the six-year-old who he is
19  not the father of.
20  Q. Okay.
21  A. But the six-year-old calls him dad
22  because we started dating when we was two. He
23  saw me in town one day and he wanted to take

78  (Pages 309 to 312)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 313

1  him with him and I said, no, we had plans, and
2  he showed out and this is what escalated.
3       Q.  Escalated as a result and I know
4  that his treatment of you caused you some
5  distress as well?
6       A.  Oh, yeah.
7       Q.  And that's why you filed this.  What
8  was the outcome of this?
9       A.  We all -- he went to church and got
10 baptized.
11      Q.  Okay.  Well, I guess that's a good
12 outcome.
13      A.  Yeah, and three of the kids got
14 baptized and we all actually get along now and
15 he comes to my house and me and my husband can
16 go to his house and it's a pretty unique
17 relationship.
18      Q.  Who is Mike Mitchell?
19      A.  He was a coworker that I worked with
20 at Elba Rescue -- Coffee County EMS.
21      Q.  That dates way back?
22      A.  Oh, yeah, it must have just been
23 stuck in there because of the medical

Page 314

1  certification.
2       Q.  That's fine.  And then you provided
3  us your Cobra paperwork for you and your
4  husband Kevin from Smart Alabama?
5       A.  Correct.
6       Q.  Okay, thank you.  And it looks like
7  you had filled out an incident report for
8  stress from pressure from tense situation with
9  supervisor?
10      A.  Right.
11      Q.  Did you ever turn this in?
12      A.  Yeah, there's a copy of it, should
13 be in the incident report binder.
14      Q.  Okay.  And this just was office
15 employees' phone numbers --
16      A.  Right.
17      Q.  -- that you had with Smart?
18      A.  Right.
19      Q.  And then we -- it looks like we had
20 your income tax return for 2006 --
21      A.  Correct.
22      Q.  -- that you filed this year.  Did
23 you marry file jointly?

Page 315

1       A.  I believe it was married.
2       Q.  Okay.
3       A.  I'm trying to remember how he filed.
4  I'm not certain, I guess I sign.
5       Q.  And there's a reference on this page
6  about unemployment compensation.  Did you file
7  for unemployment compensation or Mr. Atwell?
8       A.  No, Mr. Atwell.
9       Q.  Okay.
10      A.  In between jobs because of the type
11 of work he does, he draws unemployment because
12 he can draw -- if you work out of more than so
13 many states, you can draw from so many places
14 or something.  I'm not -- I let him handle all
15 of that.
16      Q.  Okay.  But this -- this return as
17 best you know accurately reflects the
18 income --
19      A.  Right.
20      Q.  -- that you had for 2006?
21      A.  Right.
22      Q.  Including what income you earned --
23      A.  Right.

Page 316

1       Q.  -- from Smart?  I thought there was
2  something on Smart on the back of this but it
3  may be -- there's Kevin Atwell Smart and then
4  I think there's Robin Atwell or Robin Davis
5  Smart, okay, and that was just -- I was just
6  wanting to go through those and I will give
7  you that.  If we can just finish up here.
8  Have you told me every fact supporting your
9  claim you were sexually harassed while you
10 were at Smart?
11      A.  To the best of my knowledge, yes, I
12 have.
13      Q.  Have you told me every fact
14 supporting your contention that you felt like
15 you had to leave Smart?
16      A.  Yes, I have.
17      Q.  Okay.  Have you answered all my
18 questions truthfully today?
19      A.  Yes, I have.
20      Q.  You understand you've given all your
21 answers under oath and under penalty of
22 perjury?
23      A.  Yes, I do.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 317

1    Q.  And you agree if you think of
2    something else that's responsive to my
3    questions, whether it's a witness' name or a
4    document, that you will let your attorney know
5    so that he can let me know?
6        A.  I will.
7            MS. WILLIS:  That's all I have other
8    than pending, you know, maybe reserving for us
9    to discuss leaving it open as far as the
10   journal and perhaps if there are other pages
11   of the calendar.
12           MR. HORSLEY:  Okay.
13           MS. WILLIS:  Okay.  Thank you.
14           MR. HORSLEY:  Very good.
15
16   (Whereupon, the deposition was
17   concluded at 4:11 p.m.)
18
19           FURTHER DEPONENT SAITH NOT
20
21
22
23

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

| A | | | |
|---|---|---|---|
| **abilities** 72:12 | **action** 61:5 | **age** 18:13 21:14 | 227:15 228:1 |

**A**

**abilities** 72:12
**ability** 9:12 85:1
**able** 13:2 52:23
  54:23 83:19
  87:12 95:5
  103:1 114:2
  130:19 139:7
  147:11 247:19
  248:1 252:8
  290:10 291:21
  292:8
**abrasion** 87:23
  95:14
**absent** 276:16
**absolutely** 98:7
  182:2
**abusive** 311:20
  312:7
**Academy** 24:21
**access** 84:15
  101:13 117:16
  117:20 132:10
  199:7 206:18
  276:1
**accident** 11:17
**accidentally**
  274:9
**accommodate**
  107:18
**accounting**
  99:22
**accumulated**
  157:12
**accurate** 48:3
  62:23 165:18
  214:5 282:5
**accurately** 8:3
  315:17
**accustomed**
  49:14
**act** 195:22
**actED** 125:12
**acting** 6:2 256:4

**action** 61:5
  145:18 147:9
  295:20 308:18
**actions** 147:10
  296:18 297:13
**actual** 173:11
  285:6
**adamant** 217:20
  276:8
**add** 114:6
**added** 96:20
  121:10 122:14
  122:15,16
**additional**
  236:11
**address** 16:5,10
  16:13,16 17:12
  17:13,18 18:6
  26:19 131:22
  131:23 260:8
**addressed** 148:9
  186:17 187:17
**addressing**
  148:3
**ADI** 54:2 77:4
  77:12,17,21
  264:3,15 265:7
  265:20
**adjusted** 109:15
**admission** 288:2
**admitted** 288:23
**adopted** 15:11
  22:8
**advice** 205:8
**affair** 235:22
  237:3
**affect** 9:11
**afford** 45:10
  53:5
**afraid** 29:7
  203:5 205:19
  225:20
**afternoon**
  249:22

**age** 18:13 21:14
  22:1 23:18,21
  24:7
**ages** 18:14
**ago** 17:13
  209:16 290:20
  293:11 294:11
  301:7 305:18
**agree** 146:23
  147:4 194:2
  317:1
**AGREED** 1:18
  2:3,10,19
**agreeing** 146:8
**agreement**
  77:19 109:11
**ahead** 8:15
  94:12 137:4
  138:4 173:16
  186:15 225:17
  240:13 248:5
  260:23 271:9
**aid** 70:1 84:17
  84:21 85:9,10
  86:14 87:5,6,9
  87:10,11,17
  88:1,17 89:14
  94:8 99:19
  110:22 121:19
  122:5,12
  231:10 309:13
**AIDT** 54:15,18
  55:11 57:2,14
  57:16 59:4,14
  59:19 72:7
  188:4
**air** 84:13 86:5
**Alabama** 1:2,9
  2:1 5:8,16 6:2
  6:8 7:2 12:13
  16:11 19:10
  34:11 36:9
  39:20 106:14
  143:16 161:18

227:15 228:1
  228:15 268:4
  295:21 296:8
  296:17 298:18
  314:4
**aligned** 154:6
**allegation**
  178:21 182:4
  297:13,21
**allegations**
  190:21 206:3
  229:1 298:20
  299:18
**alleged** 145:18
**Allen** 48:5
**allergic** 286:1
**Allwood** 47:13
  47:15 48:15
  49:1,5 50:5
**Amanda** 70:8
  76:21 78:11
  216:13 304:4
  304:10
**ambulance** 42:4
  42:22
**Americans** 72:2
**amount** 92:5
**and/or** 122:4
  289:8
**anguish** 145:18
  147:8 297:10
  297:14,22
**annulled** 19:22
  20:6
**answer** 8:1
  66:10 71:22
  94:20 125:21
  149:6 153:4
  167:16,20
  175:14 192:5
  208:18 212:18
  212:20 227:17
  227:18 228:3,4
  228:17 238:16

259:18 264:10
  265:23 272:14
  272:23 273:1
**answered**
  316:17
**answering** 9:15
**answers** 10:18
  316:21
**antidepressants**
  293:5
**Antoine** 94:14
  197:21
**anxiety** 284:6
  286:11 290:13
**anxious** 291:7
**anybody** 11:4
  63:8,11 65:14
  91:1 125:6
  153:22 162:20
  164:3 171:2,6
  175:19 176:4,5
  177:16 180:19
  183:12 186:23
  188:7 189:21
  190:1 191:19
  192:8,11,17
  196:2,5 201:20
  206:3 213:23
  217:1 218:3,7
  220:22 225:3
  232:19 233:21
  241:1,12
  253:16 261:13
  261:17 262:5
  263:12,17
  266:6 276:4
  280:6 292:16
  296:17
**anymore** 47:4
  220:17 237:6
**anytime** 48:20
  232:8
**anyway** 7:22
  163:11 246:1

# FREEDOM COURT REPORTING

**apart** 286:18
**apologize** 195:23
**apparently** 129:10 205:4 235:22 257:19 300:5
**appear** 287:19 288:1
**APPEARAN...** 5:1
**appears** 288:1
**application** 54:12
**applied** 50:18 55:7
**appointment** 284:11,20,20 285:1
**appointments** 286:10
**appreciate** 21:5 148:3 228:8
**approval** 64:13 64:21 65:8
**approve** 117:18
**approximately** 16:3 29:14
**area** 27:7 55:18 67:9 68:7,17 69:9 92:3 116:6 173:10 173:11,15 180:8 193:14 202:7 250:15 254:2 272:21 273:3,14,18
**areas** 27:3 34:2 56:7 84:18,22 120:19 173:10 194:23
**argumentative** 175:13
**arm** 182:10,10

254:16
**armrests** 134:2
**arms** 178:23 182:6,7,7,11 182:14 183:3,9 183:15 250:14 254:1,15
**arrangements** 177:3
**Ashton** 18:15 19:4
**asked** 14:22 18:11 21:7 71:2 103:22 120:18,23 126:1 129:14 139:6 144:21 160:21 163:17 163:20 167:1 168:3 174:3 183:23 189:8 198:18,20,21 214:16 215:5 216:16,22 217:14,16 236:4 239:12 249:16 250:3 269:13 271:14 272:8 276:18 297:2,3 300:5 300:18,22 302:4 309:15
**asking** 10:4 18:10 102:6 125:22 168:13 171:9 172:4 174:4,23 184:5 190:1,8,9 192:6 195:2 197:9 212:3,23 213:1,8 226:14 228:17 234:14 234:14 235:5,5 235:6,9 238:21

243:1 245:4,6 245:7 283:6,15 298:3
**asks** 172:11
**assault** 32:6
**assemble** 67:17
**assembly** 55:20 104:14
**assign** 2:15
**assigned** 84:23 120:19 136:8
**Assist** 98:7,21
**assistance** 53:2
**assistant** 73:10 86:13 96:12 100:10 101:13 122:10 154:22 202:20 203:12
**assistants** 121:21,23 122:8 151:5 160:14
**assisted** 116:10
**assisting** 24:11
**Associates** 281:18
**assume** 119:22 259:20
**assuming** 71:14 132:2 185:14 187:3 195:23 214:19 262:18
**assured** 66:12 90:10 272:12
**asterisk** 98:15 166:22 173:1
**as-needed** 51:17
**ate** 203:3 238:8
**attach** 95:16
**attached** 20:18 30:17 56:13 59:10 62:6 96:7 106:7 108:5 113:12

126:12 128:18 132:17 137:1 138:2 151:15 165:14 186:13 258:22 281:11 287:2 295:1,11 310:10
**attack** 290:5
**attacks** 290:13
**attempted** 118:20 178:23 301:18
**attempting** 250:13
**attempts** 227:9
**attend** 37:22 95:5
**attendance** 60:19
**attended** 44:15
**attending** 121:4
**attention** 86:13 226:20 252:11 268:5 281:16
**attitude** 134:7
**attorney** 7:1 8:7 9:4 11:4,6 205:5 228:10 271:5 297:3 302:6,8 317:4
**attorney's** 302:3 305:23
**Atwell** 1:6,13,20 6:10,14,23 15:2,16 16:13 16:19,20 17:7 20:13,21 21:16 27:17 34:17 35:13 98:13 100:8 106:9 113:18 121:17 123:14 133:16 139:16 146:9 148:5 167:1

173:2 214:16
226:13 260:5
265:1 267:4
269:3 281:23
285:11 315:7,8
316:3,4
**Atwell's** 176:11
**Auburn** 36:19
**August** 54:9
61:18
**aunt** 24:6,15
**authority** 64:6
**authorized** 103:22 104:7 153:19,23 279:10
**automobile** 11:16
**available** 151:19 310:14
**Avenue** 16:9,16 17:12,14 18:7
**average** 51:21
**Avis** 22:14
**avoid** 272:16
**aware** 9:11 32:2 101:3 104:1 151:3 227:5 243:11
**a.m** 1:15 6:9 99:15 112:5,6

_____

**B**
**baby** 220:2 222:10,14,16 229:5 230:20 231:3 292:23 304:11
**baby-sit** 51:16 51:18,20 52:2
**baby-sitting** 51:4
**back** 20:9 27:12 34:4 41:2

# FREEDOM COURT REPORTING

| | | | | |
|---|---|---|---|---|
| 45:13 57:21 | **Bailey** 303:4,4 | **begged** 249:7 | 307:2 308:19 | **board** 86:17 |
| 58:1 60:12,13 | **Balkcom** 133:4 | **beginning** 6:9 | 315:17 316:11 | **boards** 68:18 |
| 62:17 66:1,4 | **ball** 189:13 | 96:17 139:19 | **betrayed** 271:18 | **Bodiford** 73:6 |
| 67:5 69:3 72:5 | **balloons** 177:3,4 | 164:9,17 | **better** 291:15 | 76:22 81:15 |
| 83:19 84:5,15 | **ballpark** 208:5 | 225:19 | **bids** 49:21 | 122:1 306:22 |
| 91:11 101:5 | 252:3 | **behalf** 50:3 | **big** 31:21 68:23 | **body** 194:13,17 |
| 108:23 109:1,1 | **band** 50:1 | **behaviors** 60:18 | 92:6 125:1 | 195:3 |
| 109:13,20,20 | **bankruptcy** | 60:18 | 143:11 149:2 | **bomb** 205:22 |
| 109:22 112:7 | 14:20 | **believe** 12:17,20 | 246:4 | **bonuses** 43:19 |
| 113:4 115:2 | **Baptist** 44:10 | 20:3 24:12 | **Bill** 156:11 | **bookkeeping** |
| 118:21 119:7 | **baptized** 313:10 | 34:18 35:22 | 303:4,4,15,17 | 42:2 47:18 |
| 119:14 120:7 | 313:14 | 36:2 41:10 | **billing** 128:4 | **booklet** 60:8 |
| 134:10 139:20 | **bar** 47:3 168:6 | 46:14 57:1,15 | **Billings** 26:13 | **born** 15:14,15 |
| 143:6,8 148:6 | **Barbecue** 44:21 | 62:2 65:22 | **bills** 14:6 99:22 | 304:11 |
| 156:1 158:22 | 45:16 46:6 | 66:13 73:5 | 291:2 310:16 | **boss** 39:21 149:2 |
| 161:13 176:10 | **bars** 50:2 | 79:1 82:7 | 310:19 | **bother** 169:3 |
| 188:12 199:22 | **bartender** 46:15 | 104:17,23 | **binder** 314:13 | **bottom** 31:22 |
| 200:6,9 217:12 | 46:16 | 112:15 121:8 | **Birmingham** 5:8 | 57:5 62:12,14 |
| 228:23 235:2 | **baseball** 141:17 | 126:15 130:7 | 5:16 6:2 | 133:9 158:16 |
| 240:1,4 243:6 | **based** 145:5 | 140:11 142:17 | **birthday** 176:11 | 166:5 260:10 |
| 244:19 247:6 | **basic** 89:19 | 147:8 149:15 | 176:13 177:5,7 | **bought** 92:8,9 |
| 247:10 248:8 | **basically** 40:1 | 151:18 161:21 | 177:9 178:13 | 92:12 198:7 |
| 248:10 249:9 | 54:19 148:15 | 191:14,23 | 183:13 250:12 | 220:14 226:1 |
| 250:3,5 252:17 | **basis** 51:18 | 215:13 217:3 | 253:22 254:14 | **boy** 240:18 |
| 253:2 254:10 | 58:15 102:4,22 | 218:8 221:1 | **bit** 7:21 27:13 | **boyfriend** 49:13 |
| 260:4,20 | 168:16 203:5 | 242:5 254:5 | 37:4 38:3 | **brain** 271:2 |
| 261:13 271:18 | **bass** 29:9 | 258:3,9,18 | 53:15 62:9 | **Branch** 46:10 |
| 277:10 280:4,8 | **Bates** 281:17 | 259:4 270:9 | 67:6 72:5 | 47:12 |
| 280:10,21 | 287:18 | 273:18 277:6 | 78:19 84:9 | **Brantley** 16:11 |
| 284:16 286:13 | **bathroom** 8:13 | 286:13 290:6 | 94:1 121:16 | 17:15 26:3 |
| 286:15 290:10 | 79:14 85:8,12 | 303:11 304:14 | 122:21 132:4 | 268:3 299:15 |
| 302:14 309:2 | 85:14 207:4 | 309:13 311:19 | 135:23 136:6 | **break** 8:12,16 |
| 313:21 316:2 | 231:7,11 232:4 | 315:1 | 138:5 139:12 | 8:19 49:14 |
| **background** | 302:19 | **benefits** 12:16 | 150:12 176:2 | 84:16 85:15 |
| 88:5 | **bear** 111:22 | 12:22 13:4,21 | 231:19 253:12 | 106:10 145:21 |
| **backwards** | 248:9 | 13:22 14:5,17 | 260:8 297:17 | 207:5 226:4,14 |
| 174:12 | **beat** 244:20 | 297:6 | **bitch** 240:14,15 | 238:9 252:22 |
| **back-fired** 272:5 | **bed** 169:16 | **best** 47:10 73:15 | 243:20 244:11 | 298:12 310:2 |
| **bad** 30:5 84:6 | 209:5 | 114:16 139:4 | **blame** 148:18 | **breast** 172:20 |
| 125:1 198:10 | **bedrest** 38:2 | 162:8 254:21 | **bleeding** 38:2 | 173:7,8,9,11 |
| 279:20 | **beep** 117:12 | 261:20 296:10 | **blood** 88:9 | 173:13 175:20 |
| **badge** 115:13 | **beeped** 115:13 | 296:19,23 | **blouse** 215:20 | 216:3,8 |
| 117:7 265:7 | **began** 161:18 | 298:22 299:20 | **blue** 66:14,20,21 | **breasts** 175:1,3 |
| **badges** 265:4 | 162:9 238:17 | 304:8,16 305:2 | 150:13,16,23 | 214:17 215:5 |

216:22 217:14
234:22 235:9
245:4
**breath** 288:16
**brief** 90:17
106:2 146:4
149:8 226:10
280:17 310:5
**briefcase** 140:18
140:19
**briefly** 20:4,8
21:10 29:16
36:3
**bringing** 92:20
**broken** 309:13
311:23
**Brook** 5:6
**Brothers** 305:6
305:6,9,17
**brought** 102:21
171:13,15
190:11 196:9
214:1,2
**brush** 179:12
195:12
**BS** 257:6
**bugging** 312:4
**building** 5:6
262:15,20
263:1
**built** 191:16
**bulletin** 86:16
121:1
**bumping** 174:1
**bunch** 90:6
**Burgin** 65:21
**Burgins** 76:22
78:18 306:3
**Burr** 1:22 5:13
6:7
**business** 39:13
39:17 40:9,15
40:18 41:12,17
49:8,8,19 93:9

210:2
**bust** 239:15
**busted** 239:16
**butt** 221:22
**butted** 261:17
**butterfly** 49:23
**buttocks** 193:15
194:21 250:15
**buy** 189:13
**B.G** 276:13,22
277:1,2,3

_____

**C**

**cabinet** 156:5
215:17 251:10
251:18,19
**cafeteria** 171:16
171:18,21
218:10,14,16
218:18
**Cahaba** 5:7
**Caldwell** 264:1
264:2 265:19
266:6 301:13
302:10
**calendar** 62:9
139:20,23
140:3 141:2,23
142:13 153:16
167:10 175:8,9
178:9,16
180:15 189:5
192:2 194:7
199:22 200:2
210:19 214:23
224:20 233:2,6
233:17 250:10
251:15 255:5
259:3 260:4
264:6 265:1
268:6 275:16
317:11
**calendars**
139:13,22

140:14,16
178:15 233:19
264:9
**call** 33:5 83:9
179:4 207:8,13
208:16 209:12
210:7 211:20
212:10 213:6
213:17 222:16
222:18 224:23
238:15 239:20
240:4 242:1
243:17,18
277:3,5 280:6
306:2
**called** 37:10
55:2,12 64:1
110:23 116:5,7
116:9 207:7,9
208:10 209:22
211:6,13 233:7
241:15,19
242:19 243:8
258:10 267:11
267:13,14
268:21 276:9
277:2 284:22
285:2,3 300:14
301:23 302:5
**calling** 197:7
211:13 234:15
241:23 242:10
256:16 281:16
**calls** 94:21,22
100:21 147:20
172:11 210:16
212:2,4,5
213:20,23
223:5,6 242:23
312:21
**calm** 279:19,19
284:2
**calmly** 259:9
**captain** 41:19

**car** 11:15 286:16
286:19 287:9
**card** 116:1,3
268:15
**cards** 117:17
**care** 39:1 40:23
42:18 45:11,14
46:7 49:2,2
125:5,6,8,9,10
125:11 143:22
229:3 232:9,12
232:14,20
233:2,17,23
234:11 235:12
235:13 245:1
**Carissa** 83:2
**Caroline** 32:12
**Carpenter** 43:13
**carry** 291:17
**case** 1:5 7:11,12
12:3 18:11
91:14 135:12
188:10 245:18
284:17 286:20
298:21 299:7
299:19 300:4
300:21 301:15
302:21 303:5
304:7,15
305:10,20,22
306:8 307:10
**cases** 100:9
127:18 307:21
**catch** 90:12
**catch-up** 156:6
**caterer** 40:21
**catering** 39:12
40:8 41:12,17
**caught** 30:2
**cause** 6:10 47:9
**caused** 37:22
237:9 297:13
300:6 313:4
**causing** 197:13

205:7,18
**caveat** 114:17
**CCA** 24:20
**CCH** 142:17
**cell** 207:11,15
210:6,7,12
211:1,10,14
213:22 233:7
234:16 241:22
242:2 243:2,18
245:3 277:4
**center** 174:10
215:17
**central** 86:16
152:16
**centrally** 152:6
**certain** 13:15
17:21 24:3
29:23 55:5
58:2 60:17,18
60:19 67:2
68:17 77:20
79:9 93:22
123:17,21
127:9,20 136:8
136:9 151:6
160:5 163:10
163:15 171:4
178:10 180:16
180:21 182:2
201:14,22
210:20 214:11
216:15 218:11
218:12 225:5
234:1 242:6
256:2 259:19
262:19 264:18
293:12 302:16
305:14 315:4
**certainly** 286:3
289:5
**certainty** 127:10
**certificate** 59:19
**certification**

314:1
certifications
311:3
certified 97:9
certify 6:3
CEU's 36:20
chain 136:14
chair 134:1
174:11 215:16
223:19
change 52:20
111:19 150:5
187:23
changed 114:3
133:12 149:14
150:2 269:22
changes 149:13
character
303:10 305:12
charge 12:11
28:2 32:1 52:8
137:19 165:5
165:17,22
166:4,17
168:11 188:13
190:16 203:19
214:9 271:6
294:14,17
charged 28:21
charges 10:13
11:17 29:10,11
29:12 32:20,20
33:1 283:12
292:5
chart 31:21 33:4
34:4
charts 94:15,16
223:17
check 99:16
114:9 118:7,9
291:18
checked 231:23
checking 42:7
95:1

chest 254:1
288:13
chewing 293:10
Chicken 168:1
170:14
chief 29:8
child 39:8 45:12
292:22 293:18
294:3
childbirth 46:7
childcare 44:13
children 18:8,13
18:22 19:3
20:1 44:7,8
44:15 49:13
children's 18:14
choice 227:11
chosen 55:6
Chris 266:23
267:1,3,8,23
Christian 24:21
Christmas
188:20 241:7
242:5
church 44:10
141:17 313:9
church-based
44:9
cigarette 252:20
civil 6:4 19:13
claim 100:23
156:10 254:19
294:14 316:9
claimed 30:3
claiming 147:7
claims 75:16
Clarence 24:22
24:23 25:2
class 54:19
55:11,11
classes 54:22
97:10,12
clean 51:9
cleanup 47:17

clear 64:8 102:9
137:14 149:1
211:8 220:15
clearer 182:8
clearly 144:20
clerical 47:22
95:22
clerk 22:20
clicked 127:12
Cliff 267:11
clock 115:12
118:21,23
119:6,7
clocked 116:11
116:12
close 29:7 251:6
closed 40:15
176:21,22
262:9,10
284:18 307:22
closer 179:10
263:5
closest 159:17
clue 159:16
265:10
Clydie 23:1,4
Cobra 314:3
Coffee 11:22
22:18 27:2
28:6 29:1 32:6
33:10 35:14
41:5 42:13,16
313:20
coincidence
170:4
Colinda 65:1
66:19 76:21
79:23 80:3
81:2,7 112:18
112:20 119:18
119:19 120:6
137:21 148:11
152:5 154:7
171:4 304:13

college 36:14,19
come 47:8 62:17
67:5 70:16,17
73:14 76:4
77:6 83:17
84:2 86:23
87:20 90:5,8
92:7 93:2,3
101:5 108:23
115:10 118:4
118:18 120:14
134:10 135:11
136:12,17
152:2 169:14
169:16 170:7
170:23 177:8
179:6,12 182:9
182:10,11
188:8 189:12
191:6,9 195:5
199:13,15
215:14 219:12
230:14 231:11
232:3,21 235:2
236:1 238:13
247:6 248:8,10
249:9 250:3,5
251:3 252:17
258:15 260:21
261:14 266:17
279:18 300:3
303:7 307:19
308:5
comes 71:18
313:15
comfort 291:20
comfortable
50:15 52:22
88:9 154:13
coming 51:13
67:3,4 82:13
92:20 116:3
117:1 150:18
172:10 231:16

280:8 307:14
comment 190:16
191:3,23
192:18 193:5
212:13,13
218:21,22
219:2 234:12
235:7 245:5
comments 99:9
131:8 137:13
204:15 205:13
209:18 211:10
211:17 213:2,9
213:10 221:20
221:23 222:7
223:5,6 229:4
229:7 234:17
235:14,18
236:22 237:4
243:19 245:8
246:4,5,23
309:8
commissioner
1:22 2:21 6:3
22:22
committee
160:23
committee/first
160:17
common 107:6,7
242:13 293:9
communicate
125:16
communication
24:2 101:2
community
26:21 64:2
152:4 153:8,11
188:3
comp 13:4 14:7
14:10 53:4
75:16 94:22
97:16 99:18
100:9,23

# FREEDOM COURT REPORTING

149:23 276:3
284:16 285:3,3
285:4
**companies**
77:22 78:4
**company** 13:11
13:12 17:4
61:14,15 75:21
101:13,20,23
101:23 103:11
103:23 104:2,8
184:15 211:14
265:5
**compel** 146:16
**compelled** 52:21
**compensation**
12:16 13:9,21
156:10,15
281:6 315:6,7
**competency**
97:7
**complain** 38:18
42:12 44:17
45:23
**complained**
296:16
**complaining**
285:9
**complaint** 139:7
139:9 187:9
295:14,20
**complaints**
130:23 131:3
295:16 296:5
**complete** 154:23
155:4 165:18
**completed** 130:1
**completely**
49:12 146:21
**completing**
156:8
**completion**
59:19
**compliance** 2:7

**Composite**
310:13
**computer** 73:2
89:17,18 114:5
129:5,9 132:10
172:21 173:3
173:19 174:7
174:10,18,19
175:21 247:12
247:15 248:2
**computers**
93:18
**concern** 278:15
296:17
**concerned**
130:16 220:14
242:23 273:9
**concerning**
137:16
**concerns** 38:16
44:3 45:20
48:13,21 98:9
98:23 99:10
129:12 130:10
131:19 144:7
188:8,11
197:17 198:12
**conclude** 198:19
**concluded** 295:4
317:17
**conclusion**
63:12 131:16
**condense** 54:22
**condensed** 56:20
**condition** 84:13
**conditioning**
86:6
**conditions** 9:9
**conduct** 97:4
**conference** 55:4
65:20 123:9,11
125:18 247:5
247:20 248:14
248:15,20

**confidentially**
271:15
**conflict** 109:9
**confrontation**
236:2 238:19
238:20
**confused** 79:2,3
138:6 237:17
237:23
**confusing** 70:6
297:17
**confusion** 136:1
136:7
**congratulated**
92:7
**conjunction**
35:3 220:1
232:11,17
**connections**
29:8
**CONNELLY**
1:21 6:1
**consider** 177:13
184:10 209:12
235:15 245:10
245:21 246:6
**considered**
91:10 122:10
209:10,20
211:11,12,17
222:8 229:9
234:18 236:23
246:23
**consisted** 54:20
**consistent** 96:13
**console** 309:15
**conspiracy**
29:19 31:2
**constantly** 283:4
**construction**
47:13,16,20
48:15 49:1,6
**contact** 195:9
224:10 272:16

302:4
**contacted**
243:13 268:17
**contain** 144:8
**contained**
130:15
**contains** 146:18
146:20
**contend** 297:12
299:6,17
**content** 212:4
**contention**
316:14
**contentions**
166:17
**contents** 154:16
**context** 219:5
232:15
**continue** 208:18
217:6 231:4
252:15
**continued**
102:14 303:13
**continuing**
166:23
**contract** 77:11
77:21
**contractor**
300:1
**contractors** 17:1
307:8
**contracts** 49:20
**control** 65:3
160:9
**controlled** 149:5
**conversation**
120:9,20 128:6
158:18 169:5
176:23 191:12
196:11 204:23
205:12 208:14
208:19 215:14
215:21 217:22
218:2,9,13

221:2 233:13
237:17,19
239:11,12
241:16 242:12
242:18 243:11
257:2 267:15
275:5 278:4,7
278:11,23
279:4 307:22
**conversations**
70:12 128:6,13
190:12 196:10
196:12 208:10
209:2,11,19
211:10,16
214:2 240:19
241:13 245:2
268:12
**convince** 79:15
**convincing** 71:5
**cool** 220:19
**copier** 95:21
**copies** 104:22
157:6 187:7,10
187:11
**copy** 20:18
30:17 56:13,18
59:10,15 62:6
95:19 96:7
105:9 106:7
108:5 113:2,3
113:12 121:7,8
121:9 126:12
126:16,20
127:22,22
128:18 130:6
132:17 137:1
138:2 151:15
152:2,9,10,11
153:13,15
158:10,11
165:14 186:13
187:5,8,18,19
258:22 281:11

287:2 295:1,11
310:10,15
314:12
**corner** 59:22
166:7 173:2
174:10
**correct** 12:4
14:15 19:7
20:14 21:12,13
22:6 39:18
41:10 46:14
48:7 49:17
53:19,23 54:3
54:7,16 55:19
55:21 60:21
61:11,16,20
62:19 67:10
68:4,12 75:23
76:3 78:15
80:21 81:1
82:1,4 85:6
91:18 96:3
98:6 100:12
101:11,21
104:23 105:1,4
107:17,20
108:11 112:12
114:6 115:5,10
116:18 117:4
118:19 119:17
120:1 121:20
122:6 133:5
134:21 135:1,3
138:19 140:9
142:12,14
143:2 150:11
150:15,19
155:8,11
156:16,19
157:15,20
159:4 160:16
164:10,15
165:3,7,10,20
206:17 227:10

263:3 274:18
274:20 276:16
282:2 285:19
286:21 289:19
290:12 314:5
314:21
**correcting** 122:7
**corrections**
103:2
**correctly** 74:20
74:21 76:2
**corridor** 85:17
263:2
**costs** 31:18
**counsel** 1:20
2:12,14 6:6
**counseled** 151:4
**counseling** 53:1
53:3 292:8
294:1
**counselor** 53:5
284:11,21,22
293:18
**count** 8:22 79:9
**county** 11:21
22:18 23:8
24:12 27:2,3,7
28:5 29:2,20
30:1 31:3 32:6
33:10 34:20
35:15 41:5
42:13,16
142:17 313:20
**couple** 79:22
130:12 231:9
255:4 301:6
308:11
**course** 147:3
**courses** 36:18,20
**court** 1:1 2:8 6:1
6:18 7:23 8:2
12:5 31:18
135:10 147:17
**courteous** 72:21

**courtesy** 185:4
**courthouse**
22:19 23:8,13
**cousin** 23:17
25:8 26:10
70:14
**cousin's** 299:15
**cover** 54:18
**covered** 21:7
28:9 285:5
**Covington** 24:12
**coworker**
313:19
**created** 291:20
**credit** 119:5
**Crenshaw** 23:7
24:20 26:21
27:3 29:20
31:3 34:19
142:17 287:6
287:12
**cried** 205:11,11
**criminal** 27:22
29:19,20 31:2
34:19 311:7
**cry** 125:9 197:12
**crying** 202:5
309:15
**cuff** 69:13
**curious** 102:6
216:19 225:14
264:13
**current** 16:4
34:11 127:21
127:22 161:22
250:1
**currently** 9:10
22:10 25:16
50:11
**cursing** 29:12
**cushy** 84:9
**cuss** 172:18
**cussed** 172:17
**custody** 19:2,4

**cut** 71:22 119:1
**cute** 221:22
**cutting** 312:14
**CV** 1:5

———————

**D**

**dad** 301:2,6
312:21
**daddy** 223:5,6
**daily** 122:13
127:16 130:13
141:5 159:7,10
159:12,15
168:16 203:5
233:4
**damage** 30:9
69:12
**damages** 147:8
297:3
**Daniels** 30:13
**dash** 68:17 69:1
**date** 6:3 54:9
111:12 127:11
127:12 129:18
136:19 160:21
167:6 175:5,6
185:15 187:4
193:21 194:10
266:14 270:8
271:7 301:8
302:13
**dated** 133:2,3
288:7
**dates** 121:14
142:6 167:7,8
192:3 214:21
224:22 313:21
**dating** 15:21
32:11 312:22
**David** 201:10,12
201:23 202:8
262:12 263:4,7
263:11,18
273:13

**Davis** 7:14 11:9
11:10,21 15:7
15:17 18:15,17
18:17,21 19:8
19:9 20:13
28:4 29:2
35:15,19 39:16
40:17 41:13
133:11 293:2
316:4
**day** 2:2 45:9,11
45:14 51:18
61:21 63:13,15
65:17 66:5,13
89:8 94:19,21
94:22 96:12
100:10 101:12
120:4,10 121:7
121:9 123:9
127:3,6,17
130:15 138:23
140:20,21
142:10 143:5,5
143:9 157:18
157:19 169:14
170:12 171:17
172:19 175:16
183:5 193:3
196:17,20
197:8 199:3,7
200:16,19
203:2,7 204:2
204:2,5 206:10
217:16 218:4,5
222:17,20,22
232:3,5 236:1
236:14 238:16
238:18 248:16
249:3,5,15,16
250:6,7 256:13
256:15,18
258:2,3,5
273:5 274:16
291:16 306:21

# FREEDOM COURT REPORTING

309:1 312:23
**days** 89:6 90:17
107:12 110:4,6
110:7,8 111:7
122:15,15
130:13 142:8
151:6 183:10
183:11 206:5
207:10 224:19
248:19 273:21
308:12 309:22
**day-care** 24:21
43:10 44:11
**dead** 244:20
**deal** 14:10
200:15,19,22
206:18
**dealing** 289:13
**dealt** 188:2
**December** 115:2
115:4 164:12
170:20 190:17
214:15,20
215:4 242:5
299:11
**decide** 95:17
141:22 146:11
**decided** 36:17
**deciding** 95:12
**decisions** 64:15
71:19
**decrease** 162:1
**deep** 204:22
**defendant** 1:10
5:11 11:12
146:16,19
**Defendant's**
3:11,12,13,14
3:15,16,17,18
3:19,20,21,22
3:23 4:1,2,3,4
4:5,6,7,8,9,10
4:11 20:16
21:1 30:15,21

56:11,16 59:8
59:18 60:12,23
62:4,11,14
96:5,11 97:3
99:12 106:5,12
108:3,14
113:10 116:20
118:14 126:10
126:23 127:7
128:16 130:1
131:4,17 132:7
132:15 136:22
137:20,23
148:6 151:13
151:20 154:16
154:18 157:17
159:23 161:6
161:13 165:12
178:7 186:11
186:16 189:4
226:21 255:9
258:20 259:1
259:12 269:8
281:9 282:9
286:23 294:22
295:9 310:8
**deficiencies**
227:8
**degree** 32:7
**deleted** 129:10
**deliberately**
193:14
**delve** 291:22
**demanded** 66:1
247:6
**demoted** 161:10
**Dempsey** 70:8
76:21 78:11
216:13 304:4
304:10
**denied** 14:19
285:4
**denying** 283:13
**department**

72:14,15 73:18
74:14,15 76:17
76:18,20 77:1
77:9 82:14
89:1 91:3,6
104:17 111:2,9
111:17 130:11
133:19 137:17
137:19 200:20
201:8,12
227:12 265:3
267:12
**departments**
121:11
**depend** 110:19
263:9
**dependent** 209:5
**depending**
251:21
**depends** 51:12
52:6
**depo** 147:15,15
**DEPONENT**
317:19
**deposition** 1:12
1:20 2:5,6,17
2:20 3:9 7:8,16
9:18,19 11:2
113:21 150:14
161:17 273:7
273:16 283:8
296:9,18
297:19 298:19
299:6,17
301:14 304:5
304:23 306:7
307:1 317:16
**depositions** 2:9
**deprived** 297:6
**describe** 126:2
**described** 36:1
69:11 97:23
183:4 283:7
**description** 76:6

101:9 124:22
150:10
**designed** 191:15
**desired** 200:8
280:20
**desk** 63:19,20,21
63:23 121:7,8
121:9 140:1,8
152:14,20,22
153:8,9,10,15
153:16,17
158:11 172:21
174:9,18,19
178:16 179:4,6
179:6,15
215:13 239:22
269:15 279:6
**desks** 93:11,13
**detail** 50:8
214:13 291:4
**details** 202:3
218:20
**determine** 295:6
**determined**
25:23
**device** 97:6
**Dewanis** 25:22
**Dewants** 25:20
**diagnose** 289:23
**diagnosed** 290:4
**Diane** 133:4
**Dicks** 299:22,22
300:8,13,20
**different** 33:21
33:22 34:2
49:12,22 56:7
60:3 61:4 69:9
84:18 89:8
90:19 92:22
121:17,18
140:13 155:16
196:13 223:7
224:21 290:21
**direct** 226:20

**direction** 215:18
215:19
**directly** 38:17
159:23 171:19
243:19,22
264:21 265:21
272:15 276:20
302:23 306:17
**director** 24:9
**disabled** 26:5
**disagree** 65:7
147:4
**disciplinary**
61:5
**discipline** 38:10
43:21 45:15
46:22 48:9
60:20 102:2
**disciplined**
103:12
**discount** 44:13
**discoverable**
146:12,14
**discrimination**
38:19 42:12
44:18 46:1,3
295:6
**discuss** 72:9
147:12 158:9
208:9 210:2,23
216:11 305:20
305:22 317:9
**discussed** 11:2
72:17 109:10
122:21 123:5,8
127:16 128:2
158:12 181:11
214:10 261:6
265:16 278:5
**discussing** 266:8
**discussion**
105:22 113:7
123:14 137:8
289:5

# FREEDOM COURT REPORTING

discussions 127:15 166:13 289:7
disorder 290:5
disposition 31:10
dispute 64:10,20
disputing 64:19
distinguish 246:1
distress 297:9 297:14,22 313:5
DISTRICT 1:1 1:2
diversity 59:4
DIVISION 1:3
divorce 7:12 11:9,9,20 12:9 293:7
divorced 40:14
doctor 39:1 40:23 49:3 87:19 95:10 133:21 262:1,4 279:22 282:6 282:13
doctors 14:15 80:13 84:3 134:9 203:15
doctor's 94:23 95:4 100:21 148:14 282:22
document 103:21 120:6 131:4 185:7 246:10,10 248:22 253:7 254:23 257:13 296:11,20 317:4
documents 9:19 9:20,22 10:15 48:3 59:13

101:14,20,23 102:3,10,17 103:11 104:2 113:15 115:8 185:9 251:3 310:13
doing 45:12 51:4 88:18 99:18 135:21 150:8 172:16 174:8 178:1 179:11 179:18 204:13 208:13,15,23 209:6,14 211:4 211:5,21 213:12,14 220:11 222:3 231:4 234:7,8 250:20 252:8 252:10,15 256:5 257:4 291:11 303:8 307:14
dollars 30:9 104:11,18,18 106:19 124:8 161:19 162:2 162:10
domestic 311:13
door 86:2,7,9,10 86:12,15 121:2 176:21 177:20 188:6 243:21 262:8 272:10 279:7 291:18
doors 85:22 86:19 271:23
doorway 85:21
Dothan 294:6
Double 46:10 47:12
doubles 109:1
double-check 105:5

doubt 136:5
doughnuts 312:14
Dr 14:11 270:10 276:2,9 279:23 281:1,4 285:9 285:23 286:5 286:11 289:8 289:10 310:17
draft 186:6,19 269:9 270:5 295:16
draw 315:12,13
drawer 243:21
draws 315:11
dream 221:14 221:16
drink 8:14 217:10
drinks 188:14 188:16 189:8 189:13 190:2,9 234:15 235:7 245:7
driver 42:4
driver's 34:12
driveway 312:13
driving 33:11,19 33:22 45:13 189:14
dropped 29:10 29:11 33:2,6
drove 294:6
drug 59:6
drunk 213:18
due 40:10 108:18 307:16
duly 6:15
duplication 33:21
Dusty 191:9,11
duties 70:21,23 74:9,10 94:4 96:14 130:17

149:14 150:5 217:6 283:6
duty 65:23 70:10 73:21,23 78:9,21 79:1 81:3 83:11,12 83:15,23 84:20 88:2 91:8 93:1 93:4 110:21 120:19 121:4 121:13 122:3 122:10 133:23 134:11 151:5 159:13,19 160:14 304:4

--- E ---

ear 98:3
Earl 22:7
earlier 6:23 38:4 78:19 82:3 88:15 118:17 120:8 121:16 123:16 149:18 156:13 161:16 256:20 269:19 273:7,16 274:7 277:15 283:7
early 150:13
earn 40:7 52:12
earned 315:22
earplugs 75:9 86:21
ears 265:18
easiest 113:17
easily 68:22
easy 233:8,9
eat 120:15 167:3 167:23 168:4 169:6,9,10,14 169:16,18,23 170:6,23 172:12 197:9 235:5 245:6

280:14 301:9
eating 167:2,6 168:17 170:6 293:10
economic 297:6
Eddison 21:11
EEOC 10:13,16 12:11 165:5,18 165:22 166:17 172:23 173:12 188:12 190:16 203:18 214:6 271:6 294:14 294:16,19
effect 2:6 279:9
effort 230:6
eight 18:18 27:18 109:13 112:8 177:12 292:22
either 131:13 179:5 187:11 245:14 266:6
Elba 13:1,10 17:16 18:7 19:1,10 22:10 28:7 33:9 35:2 36:8 37:14 39:19,20 41:14 41:16 42:13,15 42:19 43:2,3 43:11,12 45:4 313:20
electro 307:18
Elegance 39:14 40:21
eligible 164:13 164:18,18
emailed 156:11
emergency 36:17 42:5,22 69:3 95:11 99:16 116:4,11
Emmett 16:9,16

# FREEDOM COURT REPORTING

17:11
emotional 297:9
employed 16:20
  16:22 19:11
  22:12,15,17,18
  24:19 25:2
  26:4,11 37:8
  39:3 52:10
  53:11 61:13
  141:15 305:7
employee 54:6
  61:5 66:1 79:3
  82:8 83:4
  87:15 121:3
  133:17 162:3
  179:19,20
  221:13,15
  237:20 238:13
  244:21 308:23
employees 47:19
  54:23 56:21,23
  70:2 76:12,15
  77:17,18 78:1
  86:20 91:8,10
  92:8,11,11,21
  92:23 97:5,8
  97:11 98:8,22
  99:3 111:3
  118:16 151:4
  159:13 216:3
  221:21 231:9
  231:13,22
  238:12 242:14
  246:13 257:22
  270:18 314:15
employee's
  236:5
employer 12:23
  13:9 37:9
employers 205:6
employment
  37:4 48:14
  53:16 59:1
  63:1 64:7

135:6 143:15
144:10 165:6
170:18 227:14
228:14 245:9
246:6 265:20
290:14 309:22
EMS 41:5 42:13
  42:16 88:5
  313:20
encouraged
  103:13,17
ended 105:2
  161:19 162:10
enter 100:18
  154:22 155:3
  247:19 248:1
  248:11
entered 127:18
  155:2 173:18
entering 100:14
  248:11
Enterprise
  36:13,19
entire 90:19
  91:14 123:4
  156:5 206:18
  223:22
entity 1:9
entrance 262:14
entries 255:5
entry 155:1
envelope 269:16
environment
  271:22
equipment
  13:11 75:9
  87:13 199:9
  200:23
errand 47:18
error 118:1
escalated 313:2
  313:3
essentially 33:6
establish 47:5

estimate 207:18
  208:6 210:11
  230:19
estimation 271:8
evacuation
  99:16
evaluation
  163:12
evening 116:5
  204:7
event 51:13
events 40:11
  141:5 142:3
  144:9 147:7
eventually 57:21
  73:10 131:23
  132:21 135:18
  161:20 163:3
everybody 7:7
  72:3 84:4
  89:23 92:7
  101:6 107:21
  107:22 110:10
  111:4 132:9
  148:10 159:20
  204:7 220:19
  237:14 260:19
  262:3 293:9
everybody's
  258:7
evict 32:13
evidence 2:17
ex 32:8
exact 129:18
  158:17 167:8
  172:8 193:21
  210:14 224:19
  261:18,20,23
  271:7
exactly 10:22
  25:5 40:12
  55:4 58:2 77:5
  83:10 96:16
  103:19 111:21

118:11 127:23
148:12 159:11
172:22 175:5
180:4 181:15
183:5 193:19
202:3,16,19
203:16 205:23
207:10 210:8
219:18 220:9
220:12 223:9
224:8 232:3
237:8 240:2
243:10 248:16
250:6 251:12
251:20 252:1
256:17 279:12
282:14 289:14
301:7 302:13
304:17
examination 3:3
  6:11,22
examined 6:16
example 97:2
  110:3 111:23
  114:20 116:5
  167:14
excuse 241:6
  276:15,17
exhibit 3:12,13
  3:14,15,16,17
  3:18,19,20,21
  3:22,23 4:1,2,3
  4:4,5,6,7,8,9
  4:10,11 20:16
  21:1 28:11
  30:15,21,21
  33:19 56:11,16
  59:8,18 60:13
  61:1 62:4,11
  62:14 96:5,11
  97:3 99:12
  102:8 105:11
  106:5,13 108:3
  108:8,14

113:10,20
116:20 118:14
123:16 126:10
126:23 127:8
128:16 130:1
131:5,17 132:7
132:15 136:22
137:20,23
138:13 139:15
148:6 151:13
151:20 154:17
154:19 157:4
157:17 159:23
161:6,14
165:12,16
178:7 186:11
186:17 189:4
226:21 255:9
258:20 259:2
259:12 269:8
270:7 281:9,14
282:10 286:23
294:22 295:4,9
310:8,13
Exhibits 3:6,7,8
  3:11
exist 13:14
expectation
  125:15
expectations
  123:21,22
  124:6 126:2
expected 110:10
  134:10 136:15
experience
  82:20
expired 35:1
explain 59:13
  223:21
explained 96:17
  109:11 158:14
  197:2 198:2,11
  205:9 242:22
  243:5 285:2

# FREEDOM COURT REPORTING

| | | | | |
|---|---|---|---|---|
| express 48:12 130:10 | fairly 284:2 | 202:21 203:19 | 95:18 146:16 | 209:17 228:11 |
| expressed 129:11 | fairs 51:1 | 225:19 248:18 | 152:4 153:9,11 | 228:21 231:21 |
| expressly 104:6 240:6 | family 24:16 | 250:4,8 266:15 | 156:5 215:17 | 302:9 314:2 |
| extend 185:4 | 27:9 176:4 | 266:18 268:6,8 | 249:21,23 | fines 31:17 |
| extension 89:15 | 192:8 281:18 | 271:3 277:21 | 314:23 315:6 | finish 71:22 |
| extent 206:1 | 292:21 297:23 | 277:22,23 | filed 7:2,4 11:18 | 248:10 252:8 |
| 305:14 309:20 | far 42:7 49:14 | 278:3 282:1 | 12:11,12,15 | 316:7 |
| extra 52:9 119:8 | 66:17 73:22 | 286:12 290:15 | 13:8,20 14:6 | finished 185:2 |
| ex-boyfriend 15:20 | 90:16 93:9 | 299:3 300:11 | 14:20 15:21 | 249:13 |
| ex-husband | 95:13 96:14 | 303:18 310:20 | 64:3 75:16 | fire 30:2 225:21 |
| 7:13 29:1 | 99:8 102:11 | Federal 6:4 | 136:13 152:7 | fired 63:9 |
| eyes 265:18 | 122:11 146:8 | feel 50:15 52:21 | 165:5 283:12 | firing 149:5 |
| | 155:19 157:9 | 52:22 137:14 | 294:13,14 | first 6:15 7:8 |
| _____ | 184:12 204:13 | 137:17 154:7 | 295:14,20 | 14:23 30:23 |
| **F** | 229:10 230:3 | 154:13 188:8 | 313:7 314:22 | 31:1 37:9 42:5 |
| face 215:18 | 255:22 257:12 | 204:14 215:20 | 315:3 | 57:2,14 58:4 |
| faces 85:18 | 292:7 303:6,8 | 217:18 293:13 | files 247:18,22 | 58:10,11 67:8 |
| facility 24:11,21 | 317:9 | feelings 144:7 | filing 2:20 | 70:1 79:21 |
| 43:10 44:10 | Farmer 15:23 | 144:15 198:13 | 179:11 195:6 | 80:4,5 84:17 |
| facing 215:19 | 311:15 | feely 174:21 | 195:11 215:17 | 84:21 85:9,10 |
| fact 108:18 | Farther 263:3 | fees 44:14 | 250:20 251:10 | 86:13 87:5,6,9 |
| 120:13 127:14 | fast-forward | fell 42:20 69:2 | 251:19 | 87:10,11,17 |
| 137:17 198:23 | 73:8 | felt 131:2,2 | fill 54:11,23 | 88:1,17 89:6 |
| 205:17 209:22 | father 18:21 | 163:15 172:16 | 75:15 95:7 | 89:14 90:13 |
| 214:9 216:2 | 293:2,19,21 | 184:20 191:18 | 139:7,10 141:1 | 94:7,8 96:17 |
| 221:5 237:1 | 312:19 | 214:17 217:17 | 141:4 143:4,6 | 99:19 101:19 |
| 265:19 270:17 | father's 27:6,9 | 228:5 247:10 | 156:23 184:1,2 | 102:11 109:1 |
| 298:1 316:8,13 | 32:15 300:14 | 263:14 271:18 | 184:6 | 110:22 111:11 |
| facts 64:18,19 | favor 37:5 | 272:3 285:20 | filled 74:21 | 111:13,15,16 |
| 65:6 297:12,18 | favors 163:16 | 285:21 316:14 | 75:12 76:1 | 112:4,15 122:5 |
| 297:19 299:7 | fax 27:19 95:19 | female 179:19 | 124:9 143:8 | 122:12 135:20 |
| 300:4,20 | 95:21 | 179:20 | 156:10 312:10 | 154:18,21 |
| 301:15 302:20 | Fay 45:2,22 | females 216:10 | 312:12 314:7 | 156:9 157:4,10 |
| 303:5 304:6,15 | fear 125:13 | 216:11 | filling 156:14 | 162:1,2,13 |
| 305:10 307:10 | feared 253:20 | fewer 294:9,9 | find 93:3 101:5 | 166:21,22 |
| factual 198:5 | Februaries | fib 93:6 | 123:22 124:4 | 181:6,9 183:2 |
| fair 10:23,23 | 139:17 | field 36:18 | 158:13,15 | 183:6,9,16 |
| 116:13 120:17 | February 61:19 | fifth 98:14,15 | 201:10 267:8 | 190:20,20 |
| 125:14 154:15 | 61:23 111:12 | Fifty-nine 288:8 | fine 6:19 13:8 | 193:17,19 |
| 154:15 207:7 | 112:3 129:21 | fighting 61:9 | 33:16 34:3 | 194:18 195:2 |
| 272:3 | 135:2 138:21 | figure 290:1 | 79:4,4 120:5 | 202:12,12 |
| | 138:22 139:18 | figured 253:21 | 145:2 146:2 | 214:18 215:2,3 |
| | 139:21 164:17 | figures 94:17 | 147:22 148:1 | 231:10 238:12 |
| | 165:1 202:13 | file 12:22 95:7 | 167:18,22 | 251:9,12 |

270:23 271:12
285:8,22 286:4
291:3 309:12
**fish** 29:9
**five** 18:4 19:18
133:23 139:20
220:3,4 291:16
291:18 297:4
**flip** 27:16 28:14
31:19 32:3
115:1 285:13
288:4
**flipping** 33:8
139:15
**flip-flop** 139:14
**flood** 17:19,20
**flooded** 13:1,2
**flooding** 13:1
**floor** 308:14
**floors** 68:18
**flowers** 23:2,4
23:15,20,20
177:2,4
**folder** 152:16
**folders** 249:14
249:21
**folding** 93:13
**folks** 78:5
**follow** 27:17
77:7 94:23
203:21 236:19
256:8
**followed** 161:1,3
250:17 272:19
**following** 6:11
92:22 94:19
169:21
**follows** 6:16
**follow-up** 80:13
286:10
**foot** 224:1
309:13
**footsie** 224:3
**force** 2:6 146:16

**foregoing** 6:5
**forever** 59:17
**forget** 178:13
**forgot** 234:21
**forgotten** 236:15
**forklift** 13:12
133:18
**form** 2:13 28:21
31:15 73:21
78:21 139:7,9
139:10 175:12
184:1,6,10,14
184:16 227:17
259:17 272:22
**Forman** 1:23
5:13 6:7
**forms** 101:20
156:15 187:8
**Fort** 19:14
**forth** 45:13
240:1
**forward** 114:17
148:2
**found** 157:19
196:17 205:19
212:1,2,21
213:2 235:23
291:3
**four** 16:3 18:4,8
18:19 44:15
51:11 57:17
98:14 110:4,8
116:8 188:23
248:9
**Fran** 183:23
184:5,10
185:11,23
186:17 187:1,2
187:13,19
269:20,22
299:4
**Fran's** 187:20
**Frazier** 25:6
**free** 137:17

188:8
**frequently**
225:15
**Friday** 66:14
67:2 108:19
111:14
**Fridays** 66:22
150:17
**friend** 48:18
266:20 290:21
**friends** 298:1
306:11
**friendship** 49:11
**front** 32:17
98:13 125:20
126:4 140:15
179:15 182:12
200:22 201:2
243:20,23
255:8 262:13
262:14 278:19
312:14
**fuck** 244:16
**fucking** 240:14
244:17
**full** 2:7 14:23
**full-time** 49:18
**function** 150:20
291:16
**funny** 174:15
219:13,17
**further** 2:3,10
2:19 92:16
203:6 252:13
271:16 283:10
317:19
**fuss** 237:7
239:23 243:16
291:1
**fussing** 283:4,21
**future** 52:18
**fuzzy** 239:19

_____

**G**

_____

**G** 1:21 6:1
**game** 148:18
**garbage** 163:17
**Gary** 5:20 65:9
71:10,15,15
73:9,18 76:10
88:23 109:11
109:12,16,20
112:10,14,16
112:21 121:7
123:8 125:5,17
125:20 126:4
129:11,14
130:6 131:18
131:21,23
134:8,16
137:11 138:14
138:18 153:19
163:3,21
171:15,20
172:7 181:4,5
181:13 183:20
187:16,19
209:22 218:9
218:15,18
221:2 225:6
241:13,15,17
242:8,12,16
243:6 255:12
255:15 256:8
257:10,17,20
259:15 261:7
269:11,21
270:14 271:17
299:18
**gather** 99:1
**gathered** 240:19
**gathering**
238:23
**GED** 36:11
**gender** 58:15
**general** 47:17
67:1 82:8
119:2 123:7

204:21 225:13
301:8
**generally** 84:20
94:1,4 121:22
**gentleman** 32:10
67:21 116:6
125:19 201:5
**gestures** 309:8
**getting** 9:18
100:14,15
161:1 169:13
188:21 195:8
200:12 229:11
230:3,7 253:10
256:21 273:22
274:12 292:7
**gifts** 92:9
**girl** 65:21 73:17
203:4 235:19
235:20,21
309:12
**girlfriend**
191:11 267:6
**girlfriend's**
267:2
**girls** 169:8 216:5
216:6 219:4
**gist** 158:17
171:11 214:11
238:22 242:17
255:21 261:1
**give** 49:21 52:8
113:4 127:22
129:23 130:6
141:18 160:21
164:6 167:13
178:17 186:23
187:2 203:17
203:22 206:8
207:17 208:5
210:10,13
252:3 265:6,7
265:9 270:17
282:5 302:4

# FREEDOM COURT REPORTING

306:2 316:6
given 7:17
  106:12 161:11
  185:11 186:21
  187:1 199:14
  227:10 297:1
  316:20
gives 152:5
giving 11:3
  156:20 173:5
  240:20 250:12
  253:22 254:13
glasses 98:3
Gloria 231:15
  231:22 302:18
gloves 98:4
go 7:5,20,22
  10:1 12:5 20:7
  21:4,10 27:12
  28:13,22 29:16
  30:20 36:6,17
  37:20 48:21
  49:21 50:8
  52:23 54:1
  57:21 58:1
  60:16 65:13
  70:2 78:7
  79:23 84:5,7
  84:15,16 87:16
  94:8,12,20
  95:18 98:1
  103:1 104:15
  104:20 115:12
  118:6 120:15
  125:10 131:11
  137:4 138:4
  142:16 143:6
  156:1,2,4
  161:20 164:5
  166:16 167:23
  168:19 169:6,8
  169:10 171:10
  171:19 172:7
  172:12 173:16

180:7 186:15
188:16,16
189:1,11,22
192:23 193:4
197:18 199:8
199:12 207:4,4
209:3,5 217:12
220:5,10
222:23 223:15
223:16 225:3
225:16,17
228:23 231:7,7
234:14,14
238:9,9,9
240:13 243:21
245:7 248:4,11
252:16,20
253:14,14
254:10 260:1
260:23 261:13
262:1 271:9,16
275:7 279:22
280:4,10,14
281:16 290:10
291:21 294:1
298:11 305:15
313:16 316:6
God 312:17
goes 173:10
going 7:5 17:22
  20:20,23 25:17
  28:8,9,11,18
  29:15 37:3
  40:4 42:20
  49:19,19 50:1
  50:7,8 51:13
  52:7 53:12
  56:15,16 58:12
  61:22 62:8,10
  62:10 66:4,7
  67:5 73:7 95:2
  96:9 99:1
  104:19 108:7,8
  111:5 112:22

113:1,14,16
115:2,15,17
118:3 119:11
120:15 124:1
124:21 125:8
125:11 126:14
126:17 128:3
128:12,20,21
129:2 130:21
131:13,19
137:3 138:4
141:12 143:9
144:19 145:3
146:10,14,22
147:14 148:18
151:17 155:6
158:13,15
162:21 165:16
165:21 166:17
168:18,18,19
168:23 169:7
169:10 171:23
176:1 184:21
188:12,13,14
189:10,11,17
189:18,20,22
198:6,8,10
199:1 201:7
202:2 204:13
206:1,7,13
218:19 225:12
225:15,20
226:15,20
227:16 228:5
228:10 231:18
235:6 244:4,19
247:17 249:6
255:3,22
257:21 258:4
259:22 260:7
261:18 267:9
270:16 272:11
273:8,10,16,19
278:13,14

279:1,11 280:3
283:22 284:10
286:7 289:11
292:13 293:14
295:15,19
298:10 310:2
310:12
good 24:18
  48:18 49:9
  92:11 142:5
  164:6 189:12
  189:18 197:20
  198:17 205:21
  207:18 221:21
  237:6 313:11
  317:11
goodness 106:16
gosh 17:20
  139:3 300:17
gotten 37:19
  75:21 257:19
  258:11 291:14
  291:19
gown 307:17
go-around 90:13
grab 168:20
  182:12 230:13
  279:6
grabbed 172:20
  173:3 290:22
graduated 36:4
grandmother
  23:6
graphs 94:15,17
  223:17
Green 67:21,23
  68:6 91:14,15
  308:13
grouch 181:18
grounds 2:15
group 55:2,6
  67:2 68:1
  307:12
gruff 182:14

guarantee 207:3
guard 299:23
guards 54:4
guess 10:16
  11:20 12:2
  13:13 14:22
  19:20 28:11
  31:15 39:23
  52:20 54:14
  55:17 57:13
  58:12 60:22
  61:3,18 65:4
  72:22 75:2,4
  78:5,8 87:16
  98:11 101:9
  102:14 114:17
  115:21 116:1
  116:14 117:5
  127:20 131:15
  132:19,21
  133:11 141:21
  141:23 149:18
  150:6 159:3
  161:6 166:4
  175:11 182:4
  188:20 190:21
  194:22 207:10
  207:17,18
  214:10 215:19
  216:17 219:9
  230:18 238:21
  242:22 243:8
  261:12 263:21
  283:2 288:16
  289:20 296:1
  296:21 297:11
  305:12,13
  310:19 313:11
guilty 31:10,13
  33:15
gum 293:10
guy 84:6 191:8
  303:12 308:3
guys 57:5 59:16

# FREEDOM COURT REPORTING

107:8 113:5
135:18 148:17
151:18 221:7,8

_____

**H**

**half** 26:15 54:20
106:22
**hall** 84:14,15
85:8,11
**hallway** 42:20
65:20 85:22,23
86:15 279:5
**hallways** 238:15
**Hancock** 308:21
308:22
**hand** 56:21,22
66:18 69:1
166:7 179:14
179:14,16
180:5,12,20,23
181:22 223:23
253:23 272:3
**handbook** 38:13
44:2 57:3
60:11 66:23
164:22
**handed** 152:17
153:1
**handle** 66:7,12
88:7,8 220:20
257:7,7 270:16
272:5,12
315:14
**handled** 40:11
109:17
**handling** 88:9
257:21
**hands** 173:5
174:2 178:23
179:1 230:13
250:13 254:14
**handwrite**
157:16
**handwriting**

157:3
**handwritten**
90:6 118:13
185:18
**hang** 71:17
135:4 238:14
240:3 243:17
243:18
**hanging** 307:15
**happen** 68:15
108:22 112:13
145:7 170:17
175:4
**happened** 34:22
100:17,20
112:16 123:13
132:6,7,12
143:7 144:13
144:16 156:21
170:15 173:17
174:16 175:23
177:17 183:16
183:17 195:2
205:9,10 215:3
220:2,5 224:8
225:8,9,11
230:18 233:3
251:10 253:17
255:23 266:20
267:7,16 291:3
291:5
**happening**
170:4 223:1
232:22 253:17
**happens** 194:4
**happy** 8:16
102:8 177:7
237:5 239:2
**harass** 58:14
**harassed** 58:19
289:1 296:3,7
316:9
**harassing**
234:19 235:16

245:11,13,13
254:7 312:3,11
**harassment** 28:1
28:21 35:13
56:4 60:1,2,3
184:6 197:16
245:18 247:3
271:21 283:12
289:18 296:6
**hard** 8:8 41:4
79:8 98:6
107:8 182:21
**harder** 293:14
**Harper** 91:12,13
**hate** 207:22
244:20
**hats** 98:6
**head** 197:21
234:3
**heading** 177:21
**heads** 261:17
**health** 39:1
40:23 42:18
46:7 49:2 53:7
143:22
**hear** 8:2 239:5
240:3 293:23
**heard** 79:11
235:18 265:12
265:17 266:19
267:5 300:3
304:17 309:4
**heart** 285:20
**heat** 307:19
**held** 105:22
113:7 135:13
137:8,12
182:13,17
262:2 279:7
**hell** 240:15
257:8
**help** 20:21 62:10
88:4 90:1,1
99:2 102:8

129:3 203:15
231:20 253:8
255:1 257:14
296:12,21
**helped** 202:18
203:12
**hereto** 20:18
30:17 56:13
59:10 62:6
96:7 106:7
108:5 113:12
126:12 128:18
132:17 137:1
138:2 151:15
165:14 186:13
258:22 281:11
287:2 295:1,11
310:10
**hey** 87:21 119:7
148:17 208:12
**he'll** 179:6
**Hicks** 156:11
**high** 36:4,7,8
37:7,9
**higher** 68:21
**hip** 251:7
**hire** 54:9
**hired** 54:8 55:1
55:4 56:2
58:10,11 99:17
111:13,15
137:18 156:4
**hires** 202:18
**hiring** 149:4
**hisself** 224:9
**history** 37:4
205:5 289:20
**hit** 32:22 80:17
130:12
**hold** 88:22
134:22 179:1
179:14,16
180:11,20,23
185:17 186:4

230:13 250:13
253:23 254:14
**holding** 174:1
180:5 181:22
**home** 9:21 39:7
45:11 51:14
52:14 58:6
102:4,20,21,23
103:8,14,17
104:8 114:2
116:7 140:22
157:14 197:14
205:18 207:8,8
207:9,14,15,16
208:7,11
209:11,19,23
212:10 234:16
236:6,8 241:19
242:1,10 244:4
244:7 245:2
248:12
**Homefood** 37:11
**Homestyle**
37:11 38:7,22
39:6
**honest** 13:15
40:12 79:20
111:21 154:2,8
160:5 193:20
302:16
**honey** 222:10,14
222:19 229:5
**hope** 145:4
**hopefully** 37:6
**horse** 244:20
**horseplay** 61:9
**horseshoe-sha...**
63:23
**Horsley** 5:4,5
6:20 9:23 10:4
10:7 18:1
53:12 62:20
105:12 125:21
126:1,5 137:6

# FREEDOM COURT REPORTING

138:16 139:4
140:4 141:18
145:21 146:7
147:5,19,22
148:1 153:4
166:2 167:16
167:19 174:23
175:12 185:1
185:17,21
186:4,7 190:19
190:23 192:5
200:4 207:17
212:11,15,19
212:22 213:5,8
226:6,22
227:16 228:2
228:16 234:21
240:11 245:17
254:8 259:17
264:10 265:15
265:23 266:5
268:14,16
269:6,13
272:22 280:14
281:22 287:10
287:22 288:7,9
295:18 298:3
298:16 317:12
317:14
**hospital** 26:21
70:19 142:17
233:7,10 260:7
287:7,13,20
288:3,11,23
290:9
**hospitalization**
14:13 282:18
286:9
**hospitalized**
14:11 287:7,13
287:14
**hostile** 271:22
**hot** 86:6
**hour** 49:16

104:12 106:20
120:16 161:19
162:10 204:6
**hours** 107:2
114:7 119:2,2
156:12 197:7
209:16
**house** 32:18
48:19 51:9
168:1 198:7
207:12 220:14
226:1 298:2
300:17 312:14
313:15,16
**HR** 164:3
**hug** 176:13,13
177:11 178:1
183:13 250:12
253:23 254:14
**hugged** 176:12
176:15 177:19
180:6
**hugging** 174:1
177:1
**Hughes** 183:23
184:5,10
185:23 186:17
187:1,2 269:20
299:4,7
**Huh** 63:5 305:21
**huh-uh** 8:9
**human** 64:13,21
65:9 74:17
89:1 125:6
137:15 139:3
153:23 171:12
185:12,14
186:2 187:23
192:23 193:4
196:13 197:17
198:16 202:9
203:9 220:5
223:1 258:8
259:23 260:1

260:18 263:17
276:6 298:17
299:4 300:23
**hurry** 115:11
143:11
**hurt** 69:2 115:11
120:14
**husband** 16:17
16:18 21:16
22:5 25:1 28:2
28:3 29:22
30:8 32:9
39:12 41:19
42:10,11 43:6
52:10 53:7
134:7 141:3
169:13 170:22
199:4 205:19
241:20 242:20
242:21 249:1
269:1,3 278:6
278:12 279:8
284:4 291:1
306:10 313:15
314:4
**husband's** 21:22
23:6,16 24:6
24:15 25:8
26:1,10,15
70:14 241:22
242:2
**Hyde** 131:12

————————
## I
**idea** 132:11,13
136:18 153:21
154:2 159:11
187:15 206:4
274:9
**identical** 270:1
**identification**
20:17 30:16
56:12 59:9
62:5 96:6

106:6 108:4
113:11 126:11
128:17 132:16
136:23 138:1
151:14 165:13
186:12 258:21
281:10 287:1
294:23 295:10
310:9
**Igor's** 168:8
188:13 189:10
**ill** 37:19 38:23
40:22 42:17
46:5 49:2
**illness** 37:21
**imagine** 133:21
**immediately**
158:3 217:2
283:20
**implants** 216:3
216:9
**implications**
289:6
**importance** 48:2
**important** 75:13
96:1,23 142:3
142:4,10,23
143:4 167:13
175:10 192:16
220:18
**impossible**
190:18 234:12
235:8 245:5
**inappropriate**
131:10 209:10
209:12,20
211:11,12,18
211:19 212:6,9
229:9,18
234:19 235:16
237:1 245:10
246:7 247:1
254:6,20
**inappropriately**

176:13 177:10
197:10 204:16
204:22 205:17
229:14
**incident** 31:4,5
35:23 95:7,8
95:16 173:17
174:5 314:7,13
**include** 61:8
74:12 214:8
254:8
**included** 60:9
74:15
**Including**
315:22
**income** 40:13
314:20 315:18
315:22
**independently**
64:6
**INDEX** 3:1
**indicated** 106:10
**individual** 1:6
311:14
**industry** 25:4
**infinite** 271:4
**information**
58:9 95:9,17
99:3 100:19
144:9 156:20
247:22 282:5
302:5,6 303:2
**initial** 30:3
156:13
**initially** 56:5
104:12 169:3,4
**injure** 69:6
**injured** 13:22
38:23 40:22
42:17,21 46:4
49:1 68:12
70:2 157:1
**injuries** 85:2
102:11 128:4

injury 11:14
12:21 14:4,9
69:5 78:22
82:10,11 87:15
88:2 95:13,13
101:4,19 121:3
156:10,13
157:10 285:6
307:16
innocent 169:5
inquire 243:9
307:20
inquiring 128:8
inquiry 121:13
inside 121:2
insisted 223:16
inspection 79:13
99:15
inspections
80:16 97:20
98:2
instances 254:18
instructed 159:6
159:7
insubordination
61:10
insurance 53:8
188:2
intended 130:9
152:13
intentional
196:1
interacted 93:8
interaction 92:2
92:17 199:11
interested 216:6
245:20
internet 144:2
interrogatories
41:3
interrogatory
10:21 17:23
21:2 28:20
29:19 36:1

161:14 162:6
293:17 298:8
interview 55:8
55:13 71:14
72:10,19
interviewed
50:22 72:6,23
206:2
intimidate 259:9
intoxicated
211:7
introduced
188:5
invade 131:8
182:13,16
invaded 232:13
inventories
94:15
inventory 80:15
87:9 94:12,13
investigated
294:19
investigation
66:8 295:3,5
inviting 171:3
invoices 99:21
involved 301:21
311:8
issue 14:10
87:12 147:18
issued 57:1 58:9
121:11
issues 99:4,5
123:2,7 128:8
208:21 289:16
293:19 300:6,9
305:13
item 27:21
Iyor's 168:8

_____

**J**

Jakan 18:18
19:6
Janice 21:11,19

Janna 51:17,20
52:5 176:8
192:10 303:21
303:23 304:2
Januaries
139:17
January 14:14
17:8,9 101:10
114:20,21
123:12 125:16
133:3 137:4
138:13,15,17
139:18,21
142:13,18
150:9 155:13
155:22 161:7,7
164:12 165:1
167:1 170:20
170:21 173:1
178:22 184:22
185:6 193:13
214:15,20,23
215:4 225:18
233:6 248:17
250:7 255:10
256:9 257:16
260:5,11 261:4
263:22 271:3
275:6,6,13
277:7 287:8,15
287:20 288:4
310:20
jeans 66:14,20
66:21 67:1
150:13,17,23
151:6,7
Jekyll 131:12
jerk 309:18
Jessie 83:6
88:14 304:22
304:23 305:4
Jim 94:14
Jimbo 46:19
job 13:23 24:18

44:3 45:6,21
50:20 51:1
52:18,21 66:9
67:7 70:17,21
70:23 74:9,10
76:5 115:15
123:2 130:17
137:18 149:13
150:10 188:9
198:9 202:6
206:10 217:6
217:12 220:14
220:19 226:2
226:18 227:6,9
231:5 253:21
258:7 264:14
272:13 273:14
275:7 283:6
306:13
jobs 49:22 50:18
67:7 84:23
85:2 315:10
jog 231:20
John 268:10,10
268:15
joint 19:4
jointly 314:23
jokes 131:6
Jones 83:2
Joseph 139:1
202:14,15,22
203:3,3,8,9
277:12,15,21
journal 143:12
143:14,17
144:6,8,11,20
145:5 146:1,8
146:18 147:16
147:16,17,20
236:9 317:10
journaling
291:11
journals 144:22
judges 23:12

jump 8:7
June 1:14 2:2
Junior 36:19
jury 18:11,13
21:8

_____

**K**

Kathryn 5:12
Kathy 263:23,23
264:1,2,21
265:19 266:6
266:11,13
267:5,9,13,14
301:13,17
Katy 7:1
keep 11:4 66:9
144:6 175:11
182:21 187:5,8
187:11 220:18
220:19 249:15
272:13
keeper 141:23
143:13
keeping 48:2
120:2 142:6
219:14
keeps 152:5
Keith 22:4
Kelly 23:20,20
67:22 68:6
70:14 92:1,13
268:10,11,14
Kelly's 44:21
45:16 46:6
Kennedy 24:13
24:22
Kenneth 26:8,9
26:12
kept 51:22 87:5
117:3 177:23
187:7
Kevin 16:19
17:7 21:16
23:16 47:4

# FREEDOM COURT REPORTING

| | | | | |
|---|---|---|---|---|
| 243:3 264:9 | 135:9 159:18 | 147:13 149:17 | 243:20 247:2 | 296:10,19,23 |
| 269:3 273:18 | 177:5 201:6 | 151:9,11 | 250:16 256:11 | 298:22 299:20 |
| 279:7 309:2,3 | 202:4,5 203:12 | 152:14 153:19 | 256:13,15,17 | 300:19 304:8 |
| 314:4 316:3 | 206:1 237:15 | 153:22 154:4,9 | 257:7 258:1 | 304:16 305:2 |
| **kicking** 271:23 | 260:1 275:23 | 154:10 155:20 | 259:15 260:6 | 307:2 308:19 |
| **kid** 240:17 | 289:10 | 159:20 160:8 | 260:16 264:14 | 309:7 316:11 |
| **kids** 32:17 45:10 | **knock** 239:16 | 166:12 167:19 | 265:11,18 | **known** 16:1 30:4 |
| 209:3 313:13 | **know** 7:22 8:11 | 169:6,11 170:3 | 266:14 268:12 | 124:23 191:17 |
| **kid's** 240:18 | 8:13,14,15,19 | 172:9,13 174:8 | 268:13,19 | 261:16 |
| **killed** 293:21 | 8:23 9:3,17 | 175:23 177:7 | 269:6,7,9,10 | **knows** 213:1 |
| **kind** 11:14 | 10:11,12 18:12 | 179:12 180:8 | 269:14,15 | 292:21 298:20 |
| 12:21 28:22 | 19:11 25:9 | 182:3,15,23 | 270:22 272:8 | 299:7,18 |
| 44:2 46:21 | 26:22 27:13 | 184:12,23 | 272:11 276:6,9 | 301:14 304:2 |
| 48:1,9,20 | 28:19 34:22 | 187:13,16 | 276:15,19 | 304:14 306:7 |
| 54:17 60:15 | 35:9 37:5 41:3 | 189:12,15,21 | 277:20,20 | 308:17 309:20 |
| 65:10 71:4,8 | 53:12,13,17 | 190:13 191:13 | 279:2,3,13 | **Koreans** 72:1 |
| 71:18,19 73:7 | 60:11,18 62:9 | 191:17 192:22 | 282:8,15 | **Kwan** 94:14 |
| 77:18 80:17 | 64:5 65:2,6 | 192:22,23 | 283:11 286:8 | 158:2,4,8,10 |
| 84:5 85:15 | 66:6,6,11 | 193:9,21 | 286:15 289:14 | 196:14,15,19 |
| 88:10 89:11,20 | 72:12 74:9,10 | 195:20 197:11 | 289:15 292:20 | 197:21,22 |
| 90:6 93:23 | 74:17 76:8 | 198:4,4,4,6,8 | 292:21 293:16 | 214:9 223:16 |
| 95:15 98:10,10 | 77:10,17,21 | 201:1,15,20 | 294:5 297:1,2 | 223:21 224:22 |
| 121:18 135:19 | 78:6 79:20 | 202:17 203:13 | 297:20 298:10 | 225:1 254:9,16 |
| 138:8 139:14 | 81:3,11 82:5,9 | 204:19,20,21 | 298:13 300:4 | **Kwan's** 224:13 |
| 148:18 152:6 | 82:21 83:10 | 205:17,22 | 300:20 302:11 | 224:15 |
| 152:22 162:16 | 84:14,15 87:18 | 206:2 207:10 | 303:5,9 304:1 | **Kyle** 15:8,9,11 |
| 178:2 183:1 | 87:21 88:10 | 207:23 208:12 | 304:6,12,18 | 15:17 18:18 |
| 189:16 198:11 | 89:23 90:3,11 | 208:14,15 | 305:1,9 306:7 | 22:7,14 23:15 |
| 203:15 224:3 | 90:17 96:21 | 209:4,7,14 | 307:1,9,21 | **K-Y-L-E** 15:8 |
| 225:13,14 | 100:20 101:1 | 211:4 212:23 | 309:2,16,17,19 | |
| 228:23 237:22 | 110:2 116:22 | 212:23 213:5,9 | 313:3 315:17 | **L** |
| 238:11,13,20 | 118:1 119:7 | 214:21 215:23 | 317:4,5,8 | |
| 243:22 290:23 | 123:20 124:16 | 216:13 217:17 | **knowing** 295:16 | **L** 5:4 |
| 293:10 307:15 | 124:18,20,20 | 217:18,18,19 | **knowledge** 7:18 | **lacked** 72:13 |
| 307:18 309:5 | 126:16,19 | 217:21 218:1 | 14:1 43:20 | **ladies** 78:8 |
| **kinds** 178:15 | 127:23 128:3,9 | 218:11,19 | 70:10 73:15 | 125:2 |
| **King** 5:5 | 129:3 130:20 | 219:16,19,20 | 76:7 77:15 | **lady** 67:20 70:8 |
| **kiss** 301:18,19 | 130:21,22,23 | 219:21 221:5 | 82:9 90:23 | 73:1 116:23 |
| **kissed** 266:12 | 131:1,2,9 | 223:9 225:17 | 92:15 117:21 | 216:14 |
| 301:17 | 132:6 134:9 | 233:22 234:2 | 151:7 162:8 | **Lakeisha** 83:6,7 |
| **knee** 42:21 | 135:8 141:15 | 236:16 237:10 | 175:22 176:20 | 83:8,11,12,13 |
| 78:22 | 142:8 143:10 | 237:12,12,13 | 190:3 222:1 | 88:14 304:22 |
| **knew** 24:1 70:15 | 144:22 145:13 | 241:21 242:20 | 242:13 246:8 | **language** 244:10 |
| 90:11 121:6 | 145:14 147:7 | 242:21 243:4 | 254:21 265:13 | **large** 77:22 |
| | | | | **larger** 56:18 |

# FREEDOM COURT REPORTING

**late** 61:9 204:7
209:4,13
212:10 213:17
275:6
**laugh** 230:16
**laughed** 174:15
195:22
**law** 1:22 6:6
60:4
**laws** 2:8
**lawsuit** 7:2,4
53:11 146:21
295:14
**lawsuits** 11:11
11:18
**lawyer** 102:10
128:22 145:11
166:14 178:18
236:16 268:11
268:16,17
**lawyers** 135:8
295:16
**lay** 203:1
**LBW** 36:19
**lead** 65:7 102:1
**leader** 68:1,1
91:16 93:1
**leaders** 74:16
79:11 87:12
92:10 93:2
159:20
**leading** 2:13
63:12
**lean** 252:7,12,13
**leaned** 195:18
**learn** 276:23
**learned** 130:14
**learning** 43:9
44:1 130:14
**leave** 45:6 47:2
49:5 65:17
86:7 147:15
160:3 218:2
229:6 230:15

236:4 238:23
239:10,13
244:3,6 248:7
248:8 316:15
**leaving** 44:5
180:7 317:9
**lecture** 259:21
**led** 198:19
**Lee** 27:6
**left** 14:3 42:21
44:12 50:20
53:2 63:1,13
69:13 79:10
86:9,10 105:3
119:18 120:6
129:9,20
134:23 140:22
144:11 157:9
158:11 159:2
165:2,5 166:6
191:11 206:5
206:20 207:1
247:11 250:4
262:1,4,13
269:15 279:17
283:20 290:14
304:21 305:5
306:10,21
307:5 308:9,10
**left-hand** 59:21
284:1
**leg** 222:13
223:22 224:1,2
224:4,13 225:2
254:15
**legal** 1:9
**legally** 33:5
**legitimate**
100:23
**legs** 179:17
254:9
**letter** 63:3,6,16
63:18 129:4,8
129:15,17,23

130:9,15,20
131:21 134:16
151:22 153:20
154:1 155:10
158:6,7 184:1
184:3,4,14
185:6,11,13,15
185:18 196:18
197:1 214:2
257:17,19
258:1,11,12
259:2 261:6,10
**letters** 269:23,23
270:3
**letting** 65:2
128:3 192:22
289:15
**let's** 21:10 27:18
28:22 30:20
31:19 53:15
99:11 109:2
114:17,19
115:1 148:2,17
153:18 154:16
166:16 176:10
178:20 189:3
228:23 248:13
256:7 269:7
281:16
**level** 68:19
**Lexapro** 284:10
284:14 293:6
**license** 33:12,20
33:23 34:12
35:2
**lie** 81:12 82:22
90:22 91:22
**life** 45:8 237:6
244:4,7 291:21
**lifestyle** 49:12
**lifetime** 12:17
**light** 65:23
70:10 73:21,23
78:9,21,23

81:3 83:11,12
83:15,22 84:20
88:2 91:8 93:1
93:3 110:21
120:19 121:4
121:13 122:3
122:10 151:5
159:13,19
160:14 304:4
**light-headed**
285:21
**limit** 147:14
**limited** 70:12
169:22
**limiting** 277:17
**linked** 269:5
**Lisa** 73:5 76:22
79:12,14 81:15
81:18,20 82:5
82:5,19 110:6
110:7 122:1
148:11 306:22
306:23 307:4
**list** 21:5 60:22
61:4 121:10
160:18,18,19
246:4 303:13
**listed** 22:23
26:23 29:18
30:20 77:8
78:7 126:6
172:14 175:6
203:18 231:19
309:9
**listen** 100:21
**listening** 112:2
**listing** 37:5
**lists** 87:10
**little** 7:21 27:13
37:4 38:3
53:15 54:19
56:20 57:5
62:9 67:6 70:6
72:5 78:19

84:9 94:1
121:16 122:21
128:6,10 131:7
135:23 136:6
138:5 139:12
140:3 150:12
167:12 176:2
182:8 208:17
214:13 231:19
237:16,23
239:19 253:12
260:8 297:15
297:17
**live** 17:17 18:20
18:22 19:9
25:14 26:2
27:6,7 116:7
207:5 248:9
268:2
**lived** 32:11
**lives** 19:10 22:10
26:3,17 27:14
**living** 24:11
25:15 28:7
32:15
**LLC** 1:9
**Lloyd** 121:8
160:19,19
161:2 199:2
272:21 273:3,8
273:12,22
274:3,8
**LLP** 5:5,13
**lobby** 23:14
**located** 152:6
**locked** 30:5
**lockout** 97:4,6,7
97:8
**locks** 291:18
**log** 75:19 89:16
99:18 127:15
127:19 154:23
155:1,5,13,20
155:22 156:3,9

# FREEDOM COURT REPORTING

**Logan** 18:17
  19:6 292:22
**logging** 25:4
**logs** 101:19
  102:13 155:6
  155:16 247:16
**long** 8:17 16:1
  16:12 17:6,17
  19:17 31:21
  37:16,18 52:7
  176:14 177:11
  177:11,14
  183:7 193:22
  195:9,14
  196:19 200:4
  246:4 248:4
  250:2 266:8
  284:13 289:5
  290:20 292:2
  293:11 294:5
  308:10
**longer** 13:2,13
  13:14 37:20
  102:15 134:3
  265:4 267:21
  274:18,19
  275:3 284:17
  302:15
**look** 18:3 61:23
  62:8 76:4
  83:18 95:16
  97:13 109:2
  113:3,16,23
  114:20 138:11
  146:10,22
  148:6 153:18
  154:16 164:21
  176:10 178:7
  189:3 200:2
  227:1 246:10
  256:7 295:23
  310:2
**looked** 96:23
  123:16 166:2

**looking** 27:18,19
  31:9,21 33:14
  33:19 34:4,17
  35:13,18 41:2
  57:4 59:19
  60:23 62:13
  72:12 99:11
  100:7,8 105:10
  118:12 127:11
  130:9 142:20
  154:5,17 156:7
  160:7 161:13
  161:15 166:21
  172:23 178:6
  179:11 199:22
  200:1 221:21
  255:10 257:16
  260:4,5 268:8
  269:8 285:10
  288:12 297:4
**looks** 30:22 31:2
  31:8,8 32:5,5
  33:4,9,14,21
  35:1,7 36:10
  41:8 44:20
  46:9 59:3,18
  59:20 62:11,13
  96:11 106:17
  107:2 109:2
  110:2,3,5
  114:19 115:2
  116:15 139:14
  139:16 142:16
  311:7 314:6,19
**lose** 253:21
**lot** 24:2,16 37:7
  54:1 56:7
  57:20 58:8
  75:22 86:14,18
  87:23 95:20,20
  95:22 97:12
  99:23 100:5
  102:4,9 107:2
  107:14 110:23

120:12 130:14
  134:5,6 154:12
  169:12 210:13
  224:10 231:8
  237:9 240:20
  248:7 275:17
  289:4,11,12,15
  307:13
**lots** 60:2
**loud** 123:18
**lunch** 119:18
  120:7,10,12,15
  168:14,15,17
  169:11,14,16
  169:21 170:23
  171:3,10,10,21
  171:23 172:2,7
  203:3 234:14
  235:6
**Luverne** 26:17
  26:18 53:18,22
  169:18 170:14
  270:10 300:15
**lying** 221:18
  222:3
**Lyons** 5:5

———————
         **M**
———————
**M** 5:12
**machine** 69:2
  92:6
**machines** 67:13
  67:14 84:12
**mad** 230:16
**Maddox** 55:22
  63:17 64:5,22
  74:5 76:6,12
  76:13 100:6
  122:23 137:18
  144:17 146:20
  147:10 150:23
  159:22 167:1
  173:3 176:12
  178:22 188:15

190:9 208:10
  211:1 212:5
  214:16 216:22
  221:8 222:7
  223:12 225:2
  229:1 232:9
  234:17 235:5
  235:15 237:20
  243:15 245:8
  246:5 247:3
  254:4,19
  276:14 296:4,8
**Maddox's** 55:12
  166:23 296:18
**maiden** 15:8,9
  15:12
**mail** 89:16
**mailing** 16:6
**main** 23:14
  194:22 262:14
**maintain** 140:16
**maintained**
  140:17
**maintaining**
  97:15
**majority** 110:20
**making** 49:16
  71:19 75:5,8
  75:12 94:23
  106:19 161:23
  162:9 170:22
  170:23 181:16
  181:19 221:22
  235:7 245:4
  247:21 309:7
**man** 124:17
  125:2 218:22
  219:19,20,23
  222:5 229:2
  234:10 235:10
  245:3
**Manage** 259:8
**managed** 100:9
**management**

296:5
**manager** 46:20
  74:7 98:8,21
  99:2
**managing**
  100:16
**manner** 296:7
**manual** 56:6
  58:13 59:15,21
**manuals** 56:17
  56:21
**March** 12:19
  287:11 303:18
**Marilyn** 24:13
  24:13
**Marilyn's** 25:1
**mark** 18:21 19:8
  19:9 21:1 28:4
  28:11 35:19
  39:16 56:16
  62:10 108:8
  113:14 128:21
  137:4 165:16
  186:16 263:23
  264:8 307:6,7
  308:4,8 310:12
**marked** 20:17
  30:16 56:12
  59:9 62:5 96:6
  96:11 102:7
  106:6,11 108:4
  113:11 116:20
  118:2 126:11
  128:17,21
  132:16 136:23
  138:1 151:14
  165:13 186:12
  258:21 281:10
  287:1 294:23
  295:10 310:9
**marking** 59:17
  113:20 126:15
  133:1 151:18
  165:22 287:5

# FREEDOM COURT REPORTING

Page 337

| | | | | |
|---|---|---|---|---|
| **marriage** 237:11 | 68:13 69:21 | 155:5 165:1 | 197:23 198:16 | 202:11,12 |
| 239:18 240:7 | 72:18,20 73:13 | 180:3 182:20 | 202:21 203:8 | 203:19 204:3 |
| 242:15 243:15 | 78:22 80:2 | 192:21 207:5 | 204:11 225:1 | 254:16 262:5 |
| **married** 17:7 | 81:14 83:1 | 210:11 219:8 | 254:9 255:12 | 267:17 271:12 |
| 19:8,15,17,19 | 86:3,22 87:1 | 219:15 220:12 | 255:16,18 | **middle** 1:2 |
| 19:20,21 20:2 | 91:20,23 | 221:7 223:4 | 256:8 258:6,10 | 174:11 220:11 |
| 20:12 32:16 | 103:13 106:15 | 225:12 229:6 | 260:6,15 261:3 | **midnight** 112:7 |
| 127:4 133:13 | 107:10 108:16 | 240:13 244:3 | 261:5,9 262:2 | **mid-January** |
| 142:11 209:14 | 110:9 112:2 | 246:15 247:9 | 262:2,3 302:10 | 183:20 |
| 209:15 211:20 | 116:21 149:11 | 260:14 261:22 | **meetings** 42:4 | **Mike** 313:18 |
| 212:10 226:2 | 152:23 170:8 | 261:23 279:15 | 65:1 181:11 | **miles** 116:8 |
| 315:1 | 174:3 189:6 | 291:19 292:17 | 193:8 | 248:9 |
| **marry** 314:23 | 195:1 211:15 | **meaning** 13:21 | **Melissa** 73:19 | **military** 36:23 |
| **Mason** 18:17 | 215:1 217:15 | **means** 223:9 | 88:15 90:14 | **mind** 11:5 |
| 19:5 | 222:4 225:23 | 274:15 | 94:2 155:2 | 113:15 248:9 |
| **massage** 173:5 | 228:7 230:22 | **meant** 195:20 | 179:22 | 295:19 |
| **matches** 28:10 | 231:13 233:20 | 263:5 275:2 | **member** 122:11 | **mine** 57:1 114:2 |
| **material** 102:20 | 264:22 268:6 | **medical** 9:9 14:6 | 133:18 265:2 | 224:2 266:21 |
| 102:21 | 270:4 273:4,15 | 36:18 70:11,15 | **memo** 148:7 | 290:22 |
| **materials** 99:4 | 274:22 286:6 | 95:17 97:16 | 161:7 227:2,22 | **minimum** 43:16 |
| **matter** 64:11 | 289:2 290:3,16 | 160:3 275:18 | 270:18 | 43:16 |
| 206:22 244:4 | 290:18 292:6,9 | 275:22 276:11 | **memory** 231:20 | **minor** 87:23 |
| 311:7 | 292:10 294:18 | 276:15,18 | 246:12 | 88:6 95:14 |
| **max** 18:5 | 295:22 296:1 | 297:23 310:16 | **memos** 132:20 | **minute** 91:11 |
| **ma'am** 9:8,13,16 | 297:8 299:8,21 | 311:3 313:23 | 159:8 161:9 | 145:22 |
| 11:13 12:14 | 301:16 | **medication** 9:7 | **men** 190:18 | **minutes** 42:3 |
| 14:19,21 15:5 | **McGough** 73:19 | 286:2 292:15 | 191:14 193:5 | 64:23 119:6 |
| 26:5 27:5,15 | 88:15 90:14 | **meet** 68:20 | 234:12 235:8 | 134:1 196:21 |
| 31:12,14,17 | 155:3 179:22 | 74:16,16 | 245:5 | **mischief** 29:21 |
| 32:10 33:13 | 201:11,12 | 123:22 127:20 | **mental** 145:18 | 34:19 |
| 34:6,13,15 | 202:1,8 263:5 | 160:22 223:15 | 147:7 297:10 | **misdemeanor** |
| 36:5 37:1 38:8 | 263:8,18 | 224:22 238:14 | 297:14,22,22 | 29:20 |
| 38:11,14,20 | 273:13 | **meeting** 86:11 | **mention** 278:17 | **miserable** |
| 39:5 41:1,7 | **McGough's** | 123:10 125:17 | 289:17 301:17 | 181:19 |
| 42:14 43:23 | 262:12 | 126:3 132:21 | **mentioned** 11:8 | **misplace** 95:6 |
| 44:4,19,22 | **mean** 29:15 40:1 | 133:1,4 134:8 | 75:5 78:18 | **missing** 152:20 |
| 45:1,3,18 46:8 | 48:19 57:20 | 134:20 135:19 | 193:7 250:18 | **misstate** 250:22 |
| 48:11,16 50:12 | 71:21 74:22 | 136:17,19 | 258:9 273:2 | **mistaken** 274:4 |
| 50:19,21,23 | 76:18 83:23 | 137:12 138:18 | **mess** 198:8,11 | **Misty** 25:6,6,14 |
| 51:2 52:19 | 98:11,20 | 148:7,9,16 | 263:12 | 299:22,22 |
| 53:9,14 54:13 | 108:14,22 | 149:9,12 | **met** 6:23 26:12 | 300:20 301:5 |
| 55:16 56:1 | 124:15 126:19 | 150:10 160:18 | 47:4 77:7 | **misuse** 61:14 |
| 59:23 60:9 | 136:14 140:7 | 161:4 181:10 | 138:14 183:20 | **Mitchell** 313:18 |
| 63:10,13 65:16 | 141:15,16 | 188:5 196:23 | 199:4 200:1,12 | **mitral** 289:21 |

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

mixed 142:8
Mobile 25:16
model 29:23
modified 133:23
134:11
mom 294:6
moment 217:7
Monday 62:16
108:18 109:14
111:14 112:8
256:22
money 30:9
45:12 52:9
72:1 162:19,21
monogamous
190:18 191:14
193:6 234:13
235:8 245:6
Monroe 1:23 6:8
Montgomery
2:1 6:8 168:8
188:14
month 20:5
51:10,10 107:5
149:15 294:7,8
months 16:14
17:12 37:18
51:11,23 54:20
141:7,10
210:22 284:15
301:7 302:15
305:18 312:17
mood 209:8
morning 94:12
109:14 112:8,9
256:22 258:6
310:14
mornings 94:8
Morrow 17:14
18:7
mother 18:22,23
22:14 25:15
30:8
mother-in-law

21:11 51:7
motion 146:16
motivate 79:15
motorcycle
309:3
mouth 266:12
move 13:17 32:4
34:23 66:1
69:22 114:17
148:2 199:5
200:13 247:6
248:14
moved 17:12,19
25:16 44:9
65:18 69:9,19
73:10,16
104:16 162:12
173:5 200:18
247:4 248:17
249:3
moving 224:1
273:2
multiple 12:6,7
94:20,21 156:2
207:21 227:9
muscle 69:5,12
muscles 69:17

_____
        N
_____
name 10:15
14:23 15:4,8,9
15:12,13,21
16:2 20:7,8
27:1,10 32:16
73:19 117:1
133:12 139:6
152:20 186:1
187:20,23
201:6,10
216:15 236:5
236:14,15
240:18 267:1,1
267:2 300:3
301:23 303:13

309:11 317:3
named 65:21
67:20,21 70:8
78:11 79:22
81:18 83:4
88:15 191:9
240:16 246:3
311:14
names 15:18
18:14 76:19
231:15,16
269:22 298:9
309:9
Nasco 13:11
nature 36:21
72:16 95:15
150:21 234:20
235:17 245:11
257:23 290:6
nausea 285:9,10
286:4 288:18
nauseated
285:21
near 85:15
neat 96:23
necessarily
122:8 169:20
necessary 2:11
65:19 75:10
87:13 247:22
need 8:12,12,13
8:16,19 9:11
52:20 54:23
71:7 86:13
95:3 99:3,5
101:1 103:3
113:2 127:21
135:10 137:15
141:12 145:3,4
145:5 183:2
198:9,9 199:10
219:9 229:17
236:19 246:2
267:8 268:12

279:21 280:14
needed 51:9
65:14 86:21
99:6 188:10
199:12 226:2
248:11 260:21
261:14 272:13
272:13 276:3
276:15
needs 98:8,22
neighbor 266:21
nerves 279:20
neurologists
133:20
never 26:12
30:10 46:2
63:3 66:15
82:10 87:2
99:15 104:1
116:11,11
124:12 142:5
144:23 152:17
159:6,7 161:11
163:7,17,21
164:1,3 169:11
189:19,23
221:15 223:18
240:1 244:11
263:21 273:2
291:12 306:16
309:9
new 49:8 121:10
121:10 188:20
188:21 202:18
227:6 241:7
309:3
nice 96:22 97:13
131:9,14
night 57:2,14
68:23 69:4
71:16 141:3
197:8 209:13
211:20 212:10
213:17 241:20

256:21
nights 55:10
57:15,17 72:6
nighttime 68:9
nine 104:11,17
104:18 106:19
124:8 161:18
162:2,9
ninety-day
227:7
nitpicking 283:5
non 33:5
nonharassment
57:10
normal 291:21
North 5:15
17:14 18:7
NORTHERN
1:3
note 86:12 133:2
157:2 161:8
283:23
noted 260:6
notes 17:21
83:19 86:15
90:6 116:19
118:13 119:10
119:15,17
120:3 149:7
151:20 155:9
157:16 159:5
236:12 282:8
287:19 288:2,2
288:21,22
notice 2:20
149:10
notified 131:21
notorious 13:1
November 19:16
73:11 106:17
116:16 130:12
155:1 164:9,11
176:11 178:15
178:18,21

# FREEDOM COURT REPORTING

188:18,19
190:17 193:13
**nuclear** 16:23
**number** 1:5 3:3
3:6 27:21
33:22 34:9
40:10 57:4
210:14 241:21
242:2,6,7,23
267:14 270:6
270:10 287:18
298:14 302:4
306:1
**numbers** 89:10
314:15
**numerous** 74:22
167:2,4 172:2
193:12 207:9
**nurse** 276:8,12
282:11,12
**nursing** 24:10
25:11

—————————
**O**
**O** 1:13,20 6:9,14
15:23
**oath** 316:21
**object** 9:4
175:12 227:16
259:17 272:22
**objection** 9:5
62:20 228:2,11
228:16
**objections** 2:12
2:15
**obtain** 52:17
63:18 276:11
**obtained** 135:8
**obvious** 56:7
152:22 252:9
**obviously** 20:4
129:20 130:16
142:10 146:13
165:4 199:16

213:18
**occasion** 80:9,10
80:11 140:21
194:19 217:13
221:11,13
232:2 251:13
256:11 275:11
277:13
**Occasionally**
87:4
**occasions** 167:2
167:5 193:12
200:11 214:15
243:14 253:3
309:14
**occur** 167:6,15
179:23 214:18
224:6
**occurred** 128:4
144:14 193:18
193:20 295:6
310:20
**occurring**
225:15
**October** 285:16
**odd** 86:8 180:10
**offend** 168:21
210:4 244:8
**offended** 8:6
192:19 244:1
**offense** 102:1
103:11
**offensive** 211:18
212:1,3,6,16
212:21 213:3,6
213:11,13,18
222:8 234:19
235:16 245:10
245:22 246:7
247:1 254:6,20
**offered** 2:17
36:20 44:10
**office** 55:12
63:19 64:16,17

65:3,18,19
66:2,4 67:1
69:20,23 70:3
71:6 73:1,3,17
74:1,5,19 77:6
78:6 80:18
82:6 83:8,14
84:2,3,8,17
85:3,4,14,21
86:2,17 87:3
87:20 88:12,17
88:19,20 89:15
90:18 92:18,18
93:10,12 94:5
95:11 98:1
99:17 100:21
101:15 107:15
107:22 108:12
114:10 115:3
119:20 121:1
122:20 123:4
123:23 124:1
125:7 129:14
132:9 135:19
149:6,21
152:19 153:14
155:7 156:18
160:8,10,15
164:9 166:23
173:2 176:16
176:17 180:7
183:8 190:5
191:4,19 193:3
193:23 199:12
200:14 201:3
201:19 203:4
204:8 206:15
215:7,9,12
219:4 220:17
221:9 224:13
224:15 227:7
229:8 230:8
236:1,4 238:7
238:8,10,19

239:7,9,16
242:14 247:7
247:12 249:10
250:3 257:21
257:22 258:5
259:22 262:8
262:12,17,23
274:18,19
275:3 276:1,5
276:9 279:6,23
281:1,15 282:1
282:22 284:4
285:18 306:15
314:14
**officer** 30:2,6,12
**offices** 1:22 6:7
85:19,20 116:3
199:19 200:22
262:22
**office/first**
121:19
**oh** 17:20 25:22
34:7 106:16
125:19 126:22
136:3 139:3
141:8,11
144:18 145:2
157:23 166:5
170:7 172:17
177:15 194:5
203:23 208:2
219:4 238:2
240:8 244:12
262:11 264:2
266:4 303:22
312:17 313:6
313:22
**okay** 7:14,16,20
8:10,21 9:17
9:22 10:3,12
10:19 11:8,20
12:10,10 13:17
13:19 14:8
15:6,16 16:4,8

16:12,15 17:11
18:16 19:11,23
20:4,6,12,20
21:3,9,19
22:17,20 23:7
24:4,22 25:2,6
25:20 26:6,13
26:17,22 27:12
27:20 28:5,17
28:23 29:13
30:19 31:13,19
32:3,23 33:8
33:18 34:3,16
34:22 35:5,7
36:3,10,22
37:21 40:1,14
43:5,12 44:16
45:19 46:21
47:5,21 50:4
51:15 52:10,12
53:15 54:11,14
56:19 57:7,20
60:10 61:2,17
62:23 64:18
65:4,17 67:5
68:3,9 69:15
69:22 71:1
73:7,20 78:4
80:19 81:5,7
81:15 82:12,18
83:7 84:4,4,19
86:20 89:4
90:9 91:7
92:13,16 93:15
93:20,23 94:7
97:14,19 98:7
98:16,18 100:3
100:7 101:8
103:10 104:15
107:14 108:7
109:7,19
111:10,18
113:1,19 114:4
114:8,12,15,18

# FREEDOM COURT REPORTING

Page 340

| | | | | |
|---|---|---|---|---|
| 115:1,19 | 188:12 189:7 | 288:9,11 | operates 137:16 | 76:14 |
| 116:13,13 | 190:4,7,15 | 289:17,23 | operating 67:15 | overtime 106:22 |
| 117:2,14,14,22 | 192:1,19 193:2 | 291:9 292:1 | operation | 106:23 107:3 |
| 118:12 119:4 | 193:12 195:1 | 293:16 294:10 | 130:13 | 119:8 248:6 |
| 119:13 120:5 | 196:22 200:3 | 295:13 296:15 | opportunity | 279:10 283:21 |
| 120:17 121:12 | 201:23 202:8 | 297:2 298:7 | 206:8 | overview 89:19 |
| 122:2,17,19 | 207:20 208:9 | 299:1,4,9,12 | oral 6:10 | Owen 25:20 |
| 123:6 124:6 | 208:20 209:1 | 299:16 300:2 | order 54:22 95:5 | Owens 26:8,9 |
| 125:14,23 | 211:9 212:14 | 301:4,10 302:2 | 119:5 124:11 | owes 30:7 |
| 126:14,18 | 213:19,22 | 302:18 303:14 | 163:16 164:7 | owner 46:20 |
| 127:5 128:2,14 | 214:14 215:2,8 | 303:21 304:19 | 205:23 | o'clock 109:13 |
| 129:1,4,16 | 216:21 217:1 | 306:3 307:9 | ordering 99:20 | 112:8 120:18 |
| 130:8 131:15 | 217:13 218:21 | 309:23 311:2,6 | organization | O'Ree 15:2,7,7 |
| 131:23 132:3,5 | 219:7 220:21 | 312:2,20 | 99:19 160:8 | 15:10 |
| 132:19 134:4 | 221:4 224:5 | 313:11 314:6 | organized 50:3 | |
| 134:14 135:13 | 226:3 227:4 | 314:14 315:2,9 | 87:9 | ——————— |
| 135:18 137:5 | 229:19 230:17 | 315:16 316:5 | original 13:18 | P |
| 138:4,7,10 | 232:7 233:1,16 | 316:17 317:12 | 131:4 | pad 153:17 |
| 140:12 141:6,9 | 233:21 234:6,9 | 317:13 | OSHA 75:19 | padded 134:1 |
| 141:14,20 | 235:3,20 | old 7:21 157:7 | 76:4 97:15 | page 3:3,6 27:18 |
| 142:19 143:14 | 236:16,21 | oldest 18:20 | 99:18 101:18 | 31:1,9,20 33:3 |
| 143:19 145:12 | 239:7,14 241:8 | 44:8 | 102:13 127:15 | 33:15 35:18,21 |
| 147:1,19,23 | 243:6,14 244:1 | once 12:17 | 127:18 149:22 | 57:4,5 59:20 |
| 148:8,22 149:3 | 244:19 246:18 | 51:10,23 60:16 | 154:23 155:1,4 | 60:23 61:12 |
| 150:12,17 | 246:21 247:8 | 131:20 205:4 | 155:6,16 156:3 | 62:13 98:13 |
| 151:3,17 152:8 | 248:13,19 | 208:1 294:8 | 156:8 187:7 | 99:12 100:7 |
| 152:11 153:7 | 249:4,8 253:3 | ones 27:4 28:8 | 247:16 | 105:18 118:4 |
| 153:12,18 | 253:11,13,22 | 30:19,20 35:8 | outcome 12:8 | 138:12,21 |
| 154:20 156:7 | 254:12,23 | 47:20 55:6 | 29:4 131:16 | 154:18 157:4 |
| 157:2 158:1,22 | 255:3,7,11 | 92:8 97:14 | 313:8,12 | 160:8 161:15 |
| 159:5 160:3,7 | 257:9 259:1,11 | 140:15 148:12 | outright 177:8 | 166:5,6 176:10 |
| 160:17 161:5 | 262:11 263:13 | 204:20 | outset 58:21,23 | 190:20,21 |
| 162:20 163:1,5 | 263:16,22 | one-on-one | outside 86:17 | 227:3 281:17 |
| 165:4 166:3,14 | 264:12 266:4 | 199:11 207:2 | 176:5 196:2 | 282:9 285:11 |
| 166:15,19,20 | 266:11 268:5,7 | on-one 206:21 | 217:9,10 231:8 | 287:18 288:5 |
| 168:11,12,21 | 268:9,23 269:6 | on-site 74:3 | 232:15 238:9 | 296:1 297:4 |
| 171:2,22 172:3 | 270:2,11,14,17 | open 86:7,9 89:2 | 252:16,20 | 315:5 |
| 172:5 173:16 | 270:21 274:14 | 176:21 188:6 | 279:18 | pages 27:19 61:3 |
| 174:16 175:17 | 277:8 278:22 | 262:9 279:7 | overhear 169:9 | 139:20 317:10 |
| 176:3 177:13 | 281:13,20 | 317:9 | overlap 83:17 | paid 30:10 31:17 |
| 178:4,19 | 283:4,14 | opened 41:12,16 | oversaw 75:2,3 | 31:17 33:16 |
| 181:12 182:4 | 284:13,19 | 156:2 250:1 | 77:2 | 34:3 38:7 40:8 |
| 183:14 184:13 | 285:7,15,16 | operate 40:17 | oversee 74:13 | 43:15 52:2 |
| 187:16,20 | 286:3 287:4,17 | operated 39:19 | overseeing | 99:23 103:4 |
| | | | | 104:11 162:3,4 |

# FREEDOM COURT REPORTING

Page 341

| | | | | |
|---|---|---|---|---|
| 162:16<br>**pain** 288:13<br>**painful** 291:23<br>**pan** 72:3<br>**panic** 290:5,5<br>**panned** 263:21<br>**paper** 66:19<br>123:15 136:12<br>307:17<br>**papers** 64:1<br>153:14<br>**paperwork**<br>47:17 74:21<br>75:12 96:2<br>149:23 163:20<br>252:11 314:3<br>**paragraph**<br>31:10 154:18<br>156:8 157:3<br>227:2,12 228:9<br>228:13 259:6<br>296:2<br>**parking** 54:1<br>169:12 231:8<br>**part** 20:23 59:14<br>118:1 143:20<br>147:8 150:2<br>155:10 171:11<br>171:13 182:5,7<br>194:13,17<br>195:3 203:9<br>218:8,13 230:5<br>282:9 283:16<br>312:15<br>**partially** 69:13<br>69:16<br>**particular** 17:3<br>80:18 105:15<br>135:12 174:9<br>180:10 188:22<br>217:7 218:5<br>219:2 220:10<br>232:2 283:16<br>**parties** 1:19 | 2:14 12:3<br>40:11 188:21<br>**partners** 39:22<br>**parts** 92:5<br>**party** 92:6<br>**pass** 100:19<br>**passing** 92:4<br>177:6 250:19<br>**paste** 86:17<br>**pastor** 292:21<br>**pattern** 291:20<br>**pawed** 60:16<br>**pawing** 59:17<br>**pay** 52:5 53:4,5<br>104:23 105:5,7<br>105:14,17,19<br>106:11,13<br>162:1 163:6<br>187:10 211:14<br>**paycheck**<br>118:10<br>**paying** 45:14<br>252:11<br>**payroll** 77:6<br>116:23 117:19<br>119:7<br>**peers** 259:7<br>**Peggy** 43:13<br>**pelvis** 193:14<br>194:3,11,18<br>195:3 250:15<br>250:18 251:1,7<br>251:17 253:4<br>253:15 254:2<br>254:17<br>**penalty** 165:8<br>166:10 316:21<br>**pending** 66:8<br>317:8<br>**people** 37:3 47:8<br>49:21 52:23<br>55:3 56:8<br>57:20 67:1,3<br>70:18,18 71:6 | 74:13 75:8<br>76:17,19,23<br>80:12 84:1,20<br>87:11 88:1,8<br>91:4 93:16<br>94:9,23 95:6<br>97:23 98:5<br>99:8 110:18,19<br>110:20,20<br>117:20 121:11<br>121:17 122:9<br>122:13,14<br>124:1 127:21<br>136:8,15 151:5<br>156:18,23<br>160:11,14,23<br>190:6 191:13<br>196:13 199:16<br>199:18 200:21<br>203:13 206:11<br>219:3 221:9<br>222:2 223:5<br>225:4 231:19<br>243:1,3,4<br>253:10,12<br>259:9,22<br>260:17<br>**people's** 114:6<br>307:20<br>**perceived**<br>227:22<br>**perfect** 125:19<br>**perform** 97:6<br>99:14 201:2<br>**performance**<br>122:21 123:1,2<br>123:3,4,7<br>227:9<br>**performances**<br>258:7<br>**performing**<br>130:17 217:6<br>**period** 81:10<br>143:15 157:12 | 163:11 197:3<br>227:8<br>**perjury** 165:9<br>166:10 316:22<br>**perpetrated**<br>311:10<br>**person** 30:4 47:6<br>64:3 70:7<br>79:19 81:8<br>82:19 90:15<br>92:14 116:9<br>125:1 130:22<br>149:13 174:21<br>184:11 197:20<br>246:11 248:22<br>**personal** 11:14<br>72:17 146:20<br>221:10 244:4,6<br>265:13<br>**personally** 75:1<br>81:11 82:21<br>**personnel**<br>121:22<br>**phone** 89:10<br>94:21,22<br>169:10 207:11<br>207:12,15,15<br>207:16 208:7<br>208:11 209:11<br>210:6,7,12<br>211:1,11,14<br>213:23 219:17<br>233:7 234:16<br>238:16 239:22<br>239:23 241:22<br>242:3 243:2,18<br>245:2,3 270:6<br>277:4 302:3<br>305:23 314:15<br>**phones** 272:1<br>**physical** 16:6,8<br>74:2,3 80:13<br>95:1,5 121:5<br>133:21 224:10 | 285:6 307:8,12<br>307:14 308:2,6<br>**physically** 32:21<br>229:22 312:7<br>**physician**<br>143:22<br>**pick** 7:6 239:22<br>**picked** 264:9<br>**pickup** 29:22<br>**piddly** 211:2<br>**pieces** 69:10<br>**pile** 64:2<br>**piled** 136:13<br>**place** 37:10 38:7<br>39:10 47:6,10<br>50:4 53:21<br>89:21 150:7,9<br>167:23 168:3<br>170:3 247:11<br>311:18<br>**placed** 89:2<br>**places** 169:17<br>170:1 179:3<br>315:13<br>**plaintiff** 1:7 5:3<br>11:11 178:23<br>296:4<br>**Plaintiff's** 3:7,8<br>**plan** 74:19<br>**planner** 159:8<br>159:10,12,19<br>**plans** 52:17<br>167:4 313:1<br>**plant** 16:23<br>53:22 54:21<br>70:4 75:6,6<br>79:12,13 80:16<br>84:22,23 85:4<br>88:21 90:20<br>92:3 98:1<br>99:17 107:11<br>107:19 116:8,9<br>141:4 150:19<br>156:2 169:18 |

# FREEDOM COURT REPORTING

169:19 199:5,6
199:7,8,13,15
200:14,17
201:17,21
205:20 206:14
206:18 209:23
237:15 248:10
249:23 250:5
263:7,10
266:21 274:10
274:13 275:2
276:5 279:2
283:20
**plaque** 152:20
**play** 131:13,13
156:5 181:20
**playing** 50:1
224:3
**plea** 31:10 33:15
**please** 8:1,6
71:22 86:13
208:5 210:10
226:5 227:5
230:19 248:5
255:20 260:22
**pled** 31:13
**plugs** 98:3
**plus** 136:11
**pocket** 53:6
140:3 158:12
**point** 8:17 29:6
43:3 49:10
50:13,16 88:10
131:22 147:3
148:15 195:10
220:10 252:13
255:23 269:5
278:18 279:15
289:10 308:2
312:1
**Pointing** 140:4
**police** 30:2,6,12
**policy** 56:3
57:11 61:15

103:23 104:2,8
188:7 197:16
**Porter** 65:1
66:19 76:22
80:1 119:19
137:21 154:7
304:13,14,20
**portion** 124:11
200:8 280:20
**position** 55:13
55:15 71:4,9
73:10,11,16
89:2,3,5 96:12
96:18 147:3
162:19 195:19
244:5 251:2
275:23 306:15
**positions** 201:2
**positive** 181:23
**possession**
102:17 118:5
**possibilities**
169:22
**possibility**
147:13 170:2
207:6
**possible** 41:5
282:5
**posted** 86:15
121:1 160:18
**power** 16:23
64:9
**Practice** 281:18
**pregnancy**
38:22 39:4,5
81:6
**pregnant** 38:1
70:9 78:14
292:23
**premium** 162:16
**preschool** 44:11
**prescribed**
143:22
**prescription**

95:3,4
**present** 5:19
115:17,18,23
148:12 176:19
191:5 203:8
241:1 262:5
278:6
**presented**
123:15
**press** 116:6
292:5
**pressed** 29:12
32:19,20 33:1
**pressure** 314:8
**pretty** 74:18
77:13 105:1
107:5,7,8
194:4 218:12
237:14 242:13
249:20 261:18
285:1 301:19
313:16
**prevent** 9:14
195:8
**previous** 54:13
**previously** 35:6
**print** 129:8,16
**printed** 129:19
**printout** 28:12
127:17
**prior** 2:17 17:11
63:14 82:13
123:20 176:23
178:1 184:5
250:22 261:5
276:16 312:7
312:10,15
**private** 139:2
307:23
**pro** 7:21
**probably** 7:21
55:3 75:22
143:8 147:14
157:18 172:9

182:20 194:1
194:15 208:7,7
209:8 220:2
222:4 224:14
230:23 244:18
249:1 252:4
257:5 271:11
276:15 303:18
**probation** 31:16
31:22,23
**probationary**
227:7
**problem** 137:14
260:20 261:14
261:16 291:12
291:14
**problems** 14:12
38:21 47:9
48:13 72:19
86:5 91:19
129:13 131:20
156:17 188:11
197:13 205:7
205:18 227:10
237:9 241:14
241:17 289:13
307:13
**procedure** 6:5
44:2 216:20
**proceedings**
6:12 200:9
280:21
**process** 101:1
**processed** 96:2
**produce** 128:22
146:13,14,17
146:23 147:17
**produced**
102:10 113:5
113:22 128:22
133:3 147:16
**production**
55:18 67:9
68:7,14 85:4

85:19,20
107:19 262:16
262:17,18
273:17
**professional**
72:21
**professionally**
259:8
**program** 44:11
134:11
**programs** 89:17
**prohibited** 56:3
**prolapse** 289:21
**promise** 50:7
119:15 128:13
162:20 272:19
**promised** 66:11
71:4,8 272:17
**prompted** 12:22
215:21
**proofread** 103:1
**properly** 74:19
**property** 30:10
32:13,15 61:12
101:23
**pros** 33:5
**protect** 206:10
**protected** 56:9
263:14
**protective** 75:8
**provide** 77:22
78:1,2 146:10
**provided** 6:4
10:1 59:12
96:10 108:9
118:3 126:20
298:9 311:2
314:2
**provider** 39:2
40:23 42:18
46:7 49:3
143:23
**providing** 21:6
99:2

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 343

**proximity** 263:9
**public** 291:15
**pull** 70:17
　119:11 169:12
　179:16 207:11
　249:23
**pulled** 35:9 69:5
　182:17 222:13
**punch** 62:12
**purposes** 270:13
**push** 136:14
**put** 38:2 70:9
　84:21 86:12
　99:23 108:19
　111:8 114:10
　121:2,7 145:23
　155:13 158:10
　166:14 198:10
　201:8 206:9
　223:8 228:20
　247:10 263:10
　264:8,23
　269:17 271:10
　293:7 307:17
**putting** 43:5
　131:17 184:9
　254:16
**p.m** 106:3,3
　112:5,6 146:5
　146:5 226:11
　226:11 280:18
　280:18 310:6,6
　317:17
**P26(A)** 116:20
　140:7,15
**P26(A)0002**
　138:12
**P26(A)0003**
　138:21
**P26(A)0033**
　118:13
**P26(A)0036**
　119:10

**Q**
**qualified** 201:1
**question** 7:7
　8:18,22 9:6
　12:11 13:18
　37:2 50:10
　60:11 65:5
　103:20 115:21
　117:23 125:15
　125:21 141:23
　153:1,5 182:8
　200:4 214:4
　219:10 225:13
　228:8,17 232:8
　235:3 246:3
　262:12 263:23
　264:8,11
　274:22 275:1
　295:17
**questions** 2:13
　2:14 7:4 9:4,15
　10:17 45:20
　48:13,21 66:10
　90:7 99:9
　131:20 166:18
　167:17 188:7
　255:4 272:15
　316:18 317:3
**quick** 41:5 89:21
**quicker** 37:7
**quickly** 298:11
**quiet** 66:9
　272:13
**quit** 263:23
　264:14 265:11
　265:14,19
　266:7,11 267:5
　267:9 282:21
**quite** 48:19
　240:4 301:12
　302:12 308:1

**R**
**race** 58:15

**racing** 285:21
**raise** 124:10,12
　130:19 161:11
　163:5,8,11,18
　163:22 164:1,4
　164:7,13,19
　229:12 230:3
　240:15
**raised** 296:16
**raises** 43:18
**ran** 171:17
**Rance** 55:12,22
　63:17 64:5,22
　65:20 71:13,14
　72:6 73:9 74:5
　75:22 76:6,11
　76:12 77:2
　90:10 91:2
　97:10 100:6
　103:9 109:10
　112:17,19
　120:8,22
　122:22 123:8
　123:15,20
　124:10,23
　127:15 129:12
　129:14 130:2
　131:21 132:1
　137:12 139:8
　144:17 146:19
　147:10 148:11
　149:1 150:23
　159:22 163:13
　163:20 169:20
　171:9 172:7,15
　176:12,15
　183:8 184:2,4
　185:10 191:2
　191:10,12
　199:7 200:22
　202:3,23 203:6
　204:13 208:10
　214:3 218:19
　223:22 232:8

　233:7 234:17
　235:5,14
　241:15 243:15
　244:21 245:8
　247:3 249:9
　254:4 255:12
　255:22 257:17
　257:19 258:4
　258:16 260:16
　263:6 266:12
　270:17 271:17
　271:19 273:11
　274:1 275:18
　276:14 279:5
　291:4 296:3,8
　296:18 300:18
　305:13 307:13
　309:17
**Rance's** 241:17
**Ranch** 168:1
　300:17
**random** 170:2
**rape** 293:13
**raped** 291:13,13
　292:3 293:1
**rate** 105:14,19
　163:6
**reached** 172:19
　174:14
**reacher** 174:13
**reaction** 286:2
**read** 25:22
　57:18,21 58:1
　58:3,7,13
　95:15 123:17
　123:17,19
　200:6,9 223:17
　280:21
**reading** 2:4
　30:23 56:6
　99:1
**ready** 9:18
　94:18 188:21
　239:1,2

**real** 94:14 102:6
　214:17 215:6
　216:1,22
　217:14,18
　218:21 219:13
　219:14,20,23
　222:5 229:2
　234:10,22
　235:10,10
　245:3,4 293:21
　298:11
**realize** 79:16
　214:12 247:9
**realizing** 208:6
**really** 17:20
　29:6,6 52:6
　54:21 58:2
　82:21 89:20
　93:3 96:23
　97:1 102:1
　123:19 132:11
　134:7 135:5
　142:5 150:4
　180:8,9 198:3
　198:5,9 199:20
　201:16 203:16
　207:10 214:20
　220:12 240:1
　240:20,20,20
　241:10 243:10
　251:6 252:9,9
　261:22 263:4
　276:7 289:23
　293:12 302:16
**reask** 65:5
**reason** 18:10
　35:17 44:5,12
　64:10 81:12
　82:22 90:21
　91:21 102:5
　124:8 135:14
　162:18 170:21
　242:7 247:2,11
**recall** 29:4

# FREEDOM COURT REPORTING

123:19 127:2
131:3 221:12
221:22 224:7
233:13,15
241:3,4,10
246:20 248:21
253:4,8 255:1
255:17,20
257:14 261:1
261:21 293:8
296:12 309:11
**receive** 31:15
38:10 43:18,21
45:15 46:21
63:6 92:10,11
127:3 150:22
**received** 44:13
57:13 63:3,16
66:15 106:13
161:9
**receiving** 60:6
66:18
**receptionist**
23:11
**recess** 106:2
146:4 226:10
280:17 310:5
**recognize**
126:23 238:17
**recollection**
246:12 248:23
271:5 296:22
**reconstructive**
216:18
**record** 8:3 9:5
15:1 27:22
92:5 105:20,23
113:8 137:6,9
142:9 146:1,18
147:2 175:7
178:6,8 180:14
189:4 192:1
210:15,18
224:12 228:20

233:1,16
**recordables**
95:8,9 155:4
155:13,21
**recorded** 75:18
156:1 194:6
214:22
**records** 62:12
92:9 97:16
113:5,21,22
116:17 117:2
118:5 207:11
207:12 275:19
275:22 276:2,4
276:5,11,18
277:9 281:15
283:3 287:6
297:23
**redaction**
147:12
**reference** 17:21
30:22 114:2
119:18 144:13
144:17 146:19
170:22 181:21
188:13 213:16
213:19 230:6
260:16 297:5
303:10 305:12
315:5
**referenced** 28:1
144:15 189:19
258:11 311:6
**references**
229:20,23
**referencing**
14:14 32:7
118:17
**referred** 124:16
**referring** 31:6
35:20 60:12
160:13 174:5
255:9 257:18
259:3,15,20

283:5,18
**refill** 284:16,17
**refills** 286:14
**reflect** 115:8
202:12
**reflects** 114:22
315:17
**refresh** 135:10
246:11 248:23
296:21
**refused** 53:4
249:11
**regard** 161:6
210:12 311:14
**regarding** 7:4
32:8 229:1
**regardless**
110:13 111:5
122:9 228:18
**registered** 117:5
**regular** 65:23
102:4,21 163:6
**regularly** 70:20
**reiterate** 148:16
**reiteration**
150:7
**related** 14:12
23:4 24:5,14
24:23 25:7
26:8,14 34:20
35:14,15 39:5
66:11 81:6
99:5 208:21
286:19 289:16
**relates** 145:17
147:6,9 289:4
**relating** 2:8
**relation** 242:21
**relations** 188:3
**relationship**
47:5,7,9 49:15
236:3 237:22
244:22,23
313:17

**relationships**
193:6 234:13
235:9
**relative** 51:5
**relatives** 21:5
27:1,5,7
**release** 121:13
**released** 122:14
133:22 134:9
256:14,19
290:7,9
**relevant** 145:19
145:19 147:11
**rely** 124:21
282:23
**remainder**
129:10
**remains** 129:7
**remember** 8:4
10:14 18:2
37:17 38:6
41:4 59:5 60:6
73:4,6 86:4
89:18 104:21
139:5,6 154:21
172:8 181:15
198:1 201:6
216:23 217:16
218:17 219:16
219:17 224:7
224:19 231:1
231:14 232:2
242:7 243:10
249:2,21
257:11,12,15
258:2 261:22
271:2,15
273:11 274:2
275:11 279:12
294:12 301:19
302:1 315:3
**remembering**
24:18
**rented** 30:10

**reopen** 147:15
**repeat** 150:6
246:2
**repeatedly**
178:22 300:6
300:23
**repeating**
244:15
**rephrase** 8:23
219:9 297:16
**replaced** 260:11
260:17 261:3
**report** 30:3
38:15 42:9
44:3 45:20
46:18 55:22
58:18 67:19
86:23 95:16
100:10,16
101:19 103:6
156:9,23 164:7
171:9,14
177:16 180:22
183:11,15,19
190:7 192:11
196:2,5 197:17
205:14 213:22
217:1,23 218:3
218:6 220:5,21
222:23 225:22
232:19 241:12
253:16 275:15
314:7,13
**reported** 40:2
43:12 45:2
74:5 76:8,10
76:11 91:12
95:12 109:16
183:22 226:16
285:23 286:4
**reporter** 6:2,18
7:23 8:2
**reporting** 61:8
**reports** 95:7,8

# FREEDOM COURT REPORTING

Page 345

100:15 102:11
157:10 159:8
**representing** 7:1
114:8
**request** 118:6
124:9 263:17
**requested** 76:5
199:23 255:13
275:18,22
**require** 97:6
**required** 64:20
78:23 79:1
97:10,11
136:10
**requirements**
98:9,23
**rescue** 41:15,16
41:20,21 42:13
42:16,19 43:3
313:20
**research** 144:1
201:15
**reserve** 147:14
**reserving** 317:8
**reside** 18:19,23
27:2
**resided** 18:6
**resides** 16:15
**residing** 16:13
**resign** 65:15,16
**resolution**
131:16
**resource** 137:15
**resources** 64:13
64:21 65:10
74:17 89:1
125:6 139:3
153:23 171:12
185:12,14
186:3 187:23
193:1,4 196:13
197:17 198:16
202:9 203:10
220:6 223:1

258:8 259:23
260:2,19
263:17 276:6
298:18 299:5
301:1
**respect** 259:6
**respective** 1:19
**responder** 42:5
311:4
**responders**
160:18
**responding** 98:8
98:22
**response** 160:23
161:2 197:22
241:9,11
**responses** 10:21
17:23 21:2
28:20 29:19
36:1 161:15
162:6 293:17
298:9
**responsibilities**
96:13 148:17
188:9
**responsibility**
100:1,4,6
136:1 154:22
156:22
**responsible** 48:1
76:13,16 97:15
100:13 149:22
297:21
**responsive**
144:21 317:2
**rest** 132:8
141:12
**restate** 234:23
235:3
**restaurant**
300:14,16
**Restaurants**
37:11,11
**restrain** 32:22

**restrictions**
159:14
**restroom** 84:13
**result** 40:8
60:20 61:5
134:12 147:9
313:3
**resulted** 161:10
**retaliation** 203:6
**retired** 22:13
**return** 109:22
314:20 315:16
**returned** 119:22
119:23
**revenue** 22:21
**review** 9:19
117:18 252:10
**reviewed** 9:20
10:7,13 123:17
123:18 166:1
**reviewing**
165:23 247:21
251:3
**revised** 109:8
**re-enter** 156:2
**Richard** 5:4
281:18 298:15
**riding** 312:13
**right** 7:15 10:13
17:10 21:18
22:8,9,11 23:3
25:19 27:12,23
28:8,13 29:3
29:17 30:21
31:11 33:7,17
34:1,16 35:11
36:3,4,12 40:3
40:16 41:17
43:7 46:16
47:23 48:4,6
51:6 52:14,16
55:14 56:4
57:12 58:8,17
58:20 59:2

60:4,5,20 61:6
61:7,10,15,19
62:1,2,21,23
66:22 67:16,18
68:10 69:18
70:23 72:2,23
73:12 75:6,7
75:11,13,14,17
75:20 77:4
78:3,9,12,20
79:22 80:6,7
81:19 82:17
84:11,12,13,14
85:5,11,13,14
85:18 91:17
95:2,23 96:2
97:18,21 98:2
98:3 99:7,9,10
100:15 101:10
101:14,20
102:2,12
103:12,16,23
104:4,9,12,13
105:18 106:21
107:1,9,12,16
107:19,23
108:1 109:5
110:1,8,12
111:7,11
114:21 115:4,7
117:1,3,8,13
118:11,22,23
121:19 122:7
122:23 129:21
129:22 130:17
132:1 133:14
135:6,19,21,22
138:16 140:10
142:5 143:1
144:12 145:16
147:5,15
148:10 149:20
150:1,2,3
153:9,17

155:10,18
156:15 159:9
160:12 161:20
162:7,7,11,14
162:18 164:9
164:14,19,20
165:2,4,6,9,19
168:13 169:19
173:19 181:9
183:21 187:22
188:3 190:22
194:4 197:15
198:18 199:10
199:17 206:6,8
206:15 207:2
209:23 212:17
213:4,7 214:6
214:7 216:5
221:10 223:22
225:10 226:7
226:19 228:19
231:17 233:4
237:21 246:17
246:19 247:13
247:14,16,17
248:3 250:20
250:21 253:17
255:14 256:23
259:4,14 260:3
260:9,13 262:1
262:14,21,22
263:2,7 264:4
272:21 274:13
274:23 275:4
277:17 280:11
282:7,20 283:1
283:2,9,17
284:3,5,8,9,11
284:12 285:12
285:18,23
286:17,20
287:21 288:12
288:14,15,17
290:8,11 291:8

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

291:10 293:1
294:13,13,14
294:19 295:7
298:16 304:11
306:13 308:14
308:15 309:12
310:22,23
311:1,9,12,16
311:19,21
312:5,9 314:10
314:16,18
315:19,21,23
**rights** 56:8
**right-hand**
63:22
**ringtone** 219:17
**road** 5:7 80:14
80:15 147:4
**Robin** 1:6,13,20
6:9,14 15:2,7,7
15:10,16,16,17
15:17,22,23
20:7 30:13
133:11 152:18
316:4,4
**role** 101:12
**roll** 174:12
**rolled** 174:11
**rolling** 134:1
**room** 42:23 55:4
65:20 69:3
70:1 84:17,21
85:9,10,13
86:14,21 87:5
87:7,9,10,11
87:17 88:1,17
89:14 94:9
95:11 99:19
110:22 116:11
121:19 123:9
123:11 125:18
189:15 204:3
204:11 205:9
205:15 207:5

231:10 247:5
247:20 248:14
248:15,20
272:9 307:22
309:13
**rooms** 85:15
**Ross** 46:19
**rotation** 110:15
**rotator** 69:13
**rough** 186:5,19
270:4
**RSA** 1:23 6:7
**rub** 179:14
182:11 194:11
194:17 195:3
222:12,12
224:2,9 225:2
230:12 251:17
252:5
**rubbed** 173:7
175:2,20
193:14 194:20
194:21 224:12
224:15 232:12
250:18 251:1
253:15
**rubbing** 173:23
174:13 179:10
194:2 223:11
223:22,23
229:14 250:14
250:14 253:4
253:23 254:1,2
254:9,15,15,17
254:17
**Rucker** 19:14
**rude** 120:9
**rules** 2:8 6:4 7:5
77:8
**rumors** 265:12
266:19
**run** 32:18 42:20
54:2 137:15
**running** 47:18

209:4 258:7
259:23 260:18
260:20
**Ruth** 65:9 66:6
137:11 138:20
138:22,23
139:1 153:22
164:1 181:4,8
181:10 182:3
199:4,4 200:1
200:12 202:11
202:13,14,18
202:22 203:2,7
203:17 204:4
204:10,12,22
205:2,14 221:1
221:6 225:5,9
263:19 271:1
271:12 272:7
275:6 277:9
278:2 279:18
298:17,20
299:2
**Ryan** 65:9
153:22 202:11
202:13 271:1
277:9 298:17
298:20 299:2

_____
**S**
_____
**safe** 75:5
**safety** 55:13
65:23 69:19,23
70:3,7 71:3,9
73:9 74:4,7,14
76:17,20 77:9
78:6 82:6,8,14
83:8,14 84:2,3
84:8,16 85:3
85:14,21 86:2
87:2 88:12,17
88:19,20 91:2
91:6,10 92:17
92:18 93:9,12

94:5,5 96:12
97:5,9,19,20
98:3,7,9,21,23
99:2,4,5,10
100:10 101:12
104:16 107:15
107:22 108:12
111:2,9,16
115:3 116:8
119:20 121:18
121:21,23
122:4,8,10,11
122:20 130:11
133:19 135:19
137:16,19
151:5 154:22
155:6 159:8
160:13,15,17
160:22 164:8
176:17 183:8
190:5 193:23
199:9,12
200:14,21,23
203:4 206:14
221:9 227:6,12
229:8 260:6,15
262:8,23
274:17,19
275:3 285:18
306:15
**SAITH** 317:19
**Sasser** 268:3
**sat** 134:1 170:7
170:8 179:15
204:8 291:4
**satisfy** 200:13
**Saturday** 109:5
114:21 115:6
116:16
**save** 72:1
**saved** 45:11
129:5
**saw** 151:23
209:15 231:10

258:16 265:18
303:22 305:18
309:1 312:23
**saying** 8:3 18:4
104:3,5 144:12
154:13 170:19
188:23 198:1
203:14 216:23
219:1 225:16
229:2,3 233:22
235:10,11
241:4 244:15
244:23 245:3
256:5 261:12
279:9 283:21
**says** 32:6 33:5
34:19 35:18
84:4 100:21
125:5,6 130:8
157:6 161:17
193:12 199:23
214:14 227:5
257:17 259:13
268:15 275:18
284:1
**scene** 47:3
**schedule** 108:10
108:15,19
109:9 110:5,15
111:1 112:19
116:14 224:20
256:14,19
257:3
**scheduled** 62:15
109:3,4 110:4
161:4 284:23
**schedules** 83:18
**scheduling**
74:20
**school** 25:17
36:4,7,8 37:7,9
37:20,23 44:8
44:15
**Scott** 67:21 68:3

| | | | | |
|---|---|---|---|---|
| 68:6 70:14 | 179:7,18 180:4 | 36:23 43:4 | 96:12 100:10 | 223:11 250:14 |
| 92:1,6,13 93:2 | 199:6 202:13 | services 77:11 | 100:18 101:12 | 254:3,18 |
| **Scotty** 311:14 | 215:20 224:17 | 77:23 | 108:20,21,23 | **shoulders/up** |
| **scratch** 270:12 | 231:11 233:5 | **sessions** 308:6 | 109:1,3,4,12 | 175:20 |
| **se** 70:7 | 234:8 258:12 | **set** 30:7 93:15 | 112:4,6 118:16 | **shoulder/breast** |
| **sealed** 269:16 | 258:15 259:5 | **setting** 55:3 | 119:8 121:22 | 174:20 |
| **second** 31:9 32:5 | 259:10 260:10 | 307:23 | 122:11 141:4 | **shoulder/upper** |
| 33:3,15 65:22 | 260:11 269:7 | **settled** 20:9 | 154:22 157:1 | 254:1 |
| 79:6,21 81:21 | 270:7 273:6,10 | **seven** 57:6 | 160:10 161:23 | **show** 20:20 28:9 |
| 81:22 83:16,20 | 274:15 279:14 | 107:12 111:6 | 162:1,3,3,12 | 56:15 59:16 |
| 99:11 100:17 | 283:23 284:7 | **severe** 95:13 | 162:13,16,17 | 89:5,11 90:13 |
| 108:20 111:22 | 285:9,10,14 | **sex** 60:3 197:16 | 163:7 169:15 | 96:9 102:6 |
| 112:5 117:1 | 288:22 | 213:16,20 | 216:15 235:21 | 105:10 108:7 |
| 138:12 140:4,6 | **seeing** 302:19 | 221:14,16 | 237:20 238:12 | 108:13 110:18 |
| 154:17 160:7 | **seek** 14:5,17 | 229:20 237:5 | 238:13 244:21 | 111:23 113:1 |
| 160:10 176:10 | 38:23 40:22 | 247:2 | 257:2 | 118:3 126:14 |
| 181:9,10 | 42:17 49:2 | **sexual** 60:1,2 | **shifts** 83:21 | 126:17 128:20 |
| 185:16 216:14 | 52:21 205:5 | 212:13 235:9 | 107:12 111:7 | 130:20 132:20 |
| 227:3 235:21 | 292:8 | 245:17,20,23 | 121:18 156:21 | 132:22 137:3 |
| 237:20 238:12 | **seeking** 13:22 | 247:2,9 271:21 | 159:11 171:21 | 138:5 151:17 |
| 244:21 259:5 | **seen** 76:5 77:14 | 283:12 296:5 | **shiny** 219:14 | 165:21 167:5 |
| 296:1 | 77:15 127:7,10 | 309:7 | **shirt** 71:7 | 169:8,13 170:5 |
| **secondary** | 154:12 202:5 | **sexually** 245:12 | 219:14 | 179:8,8 199:22 |
| 105:18 | 223:18 304:17 | 245:13 246:7 | **shit** 239:4 | 223:17 251:4 |
| **seconds** 177:12 | 308:1 309:14 | 254:6,20 296:3 | **shoes** 98:4 | 251:21 258:17 |
| 195:15 | **seizure** 116:7 | 296:7 316:9 | 219:14 | 259:6 281:14 |
| **secret** 237:14 | **self-therapy** | **shack** 54:2 | **short** 81:10 | 286:8 287:5 |
| **secretary** 42:3 | 143:20,21 | 168:1 170:14 | 298:12 | 295:15 |
| **security** 34:8 | **sell** 298:1 | **Shades** 5:6 | **shorthanded** | **showed** 66:17 |
| 54:2,2,4 74:15 | **send** 99:21 | **shakes** 234:3 | 111:3 | 89:13 121:5 |
| 76:18 77:1,22 | **sense** 115:20 | **Shane** 20:1 | **shortly** 111:20 | 125:12 258:16 |
| 78:2 259:7 | 120:6 195:13 | **shared** 160:10 | 159:2 279:3 | 261:9 313:2 |
| 264:3 265:3,7 | 245:16 | 300:7 308:20 | **shortness** | **showers** 291:16 |
| 267:12 299:23 | **sent** 177:4 | **sheets** 117:21 | 288:15 | **showing** 32:17 |
| **see** 27:18 31:1 | **separate** 139:22 | 126:7,8 | **short-handed** | 89:8 155:21 |
| 31:19 35:20 | 140:14 185:9 | **SHERI** 1:21 6:1 | 54:21 | 170:2 186:16 |
| 53:4 57:10 | 286:16 | **she'd** 243:17 | **shoulder** 14:3,4 | 197:8 259:1 |
| 72:14 86:13 | **separated** 45:7 | **shift** 55:13 64:4 | 14:9 69:14,17 | 269:7 287:4 |
| 94:9 95:1 97:4 | **serious** 87:22 | 65:22 68:5,8 | 73:22 194:22 | 295:4 309:3 |
| 98:17 99:11 | 156:12 194:4 | 70:7,9 71:3,9 | 281:4 307:12 | **shows** 172:12 |
| 138:14,17,20 | **server** 37:12 | 78:16 79:5,6 | 307:16 | **shrug** 8:8 |
| 142:20 144:3,5 | 44:23 45:17 | 79:21 80:3,4,6 | **shoulders** 8:8 | **shut** 86:10 |
| 169:11 170:4 | 46:16,17 | 81:20,21,22 | 172:20 173:4,6 | 271:23 272:9 |
| 178:12,14,15 | **service** 19:13 | 83:13 87:13 | 174:13 175:2 | **shutdowns** 17:1 |

# FREEDOM COURT REPORTING

sick 240:16,16
side 27:6 47:22
  66:3,3 68:21
  85:4 179:5,15
  182:12 251:4
  262:16,17
  281:17 284:1
sign 163:14,15
  163:16 166:4
  251:23 315:4
signature 2:4
  133:8 166:6
signed 101:8
  133:2 162:6
  165:8
significant
  264:23
signing 166:9
similar 121:13
  291:6
single 47:6
  167:12 214:13
  249:23 255:17
Sissy 307:6,7
  308:5,8
sister 21:23 22:1
  26:15,16
sister-in-law
  21:20 51:6,16
  176:7,8 192:10
  225:5 303:23
sit 120:15 134:2
  223:19,20
  279:21 308:6
site 47:20
sitting 152:21
  153:7,8,10
  175:21 215:11
  223:20 251:2
  307:15
situated 173:6
situation 49:10
  119:9 205:21
  206:21 207:2

256:16 278:14
  314:8
situational
  284:7
Situations 291:5
six 18:18 139:21
  160:11 161:15
  220:3,4 296:2
  302:15
six-year-old
  312:18,21
slam 243:21
  272:1
slamming 283:6
slapped 301:20
sleeves 98:4
slide 195:12,14
slipped 91:15
slow 71:18
slowed 198:3
small 128:10
  140:3 173:9
  208:17,20
smaller 69:10
Smart 1:9 7:2
  12:12 14:2
  50:6,7,8,17,20
  53:2,16,18
  54:8 56:2 59:1
  60:15 61:13,18
  64:7 67:7,7
  68:14 76:12
  77:12,18 91:3
  94:6 102:15
  104:10 106:14
  111:15 120:4
  134:23 143:15
  144:10,14
  147:10 157:9
  161:18 165:6
  170:18 171:16
  176:2,14
  183:16 188:1
  192:12 196:3,6

213:23 218:4
  222:9 227:14
  227:23 228:6
  228:15,22
  235:17 245:9
  246:6 253:16
  258:13 266:21
  267:19 290:14
  292:3 293:14
  295:21 296:8
  296:17 297:21
  298:18 300:1
  304:21 305:5,7
  307:8 308:9,10
  308:23 309:5
  314:4,17 316:1
  316:2,3,5,10
  316:15
Smart's 53:22
  297:13
smell 86:8
smoke 84:16
  252:20
smoked 217:11
smoking 282:19
  282:21
snap 131:12
snatch 272:2
snatched 222:13
social 34:8 49:22
socialize 291:15
soft 8:14
software 93:21
somebody 58:14
  65:9 67:3 71:7
  79:17 87:21
  115:11 117:17
  118:18 120:14
  121:10 123:23
  125:11 150:17
  190:12 191:6,7
  209:13 225:17
  236:13 264:19
  303:14

somebody's
  194:3
somewhat 71:4
son 237:7,8,8
sons 18:19,20
soon 20:9
sorry 10:16 13:7
  17:20 23:2,17
  71:21 79:3
  91:15 92:19
  118:1,21
  142:18 165:1
  183:1 185:3
  189:9 229:6
  234:5 248:4
  260:22 271:9
  286:7 287:23
  292:7,13,14,17
  292:18 293:23
  293:23 303:22
sort 42:8 55:9
  70:19 71:8
  87:14 94:2
  103:3 256:6
  258:8
sorts 30:6 64:2
sought 53:1
  292:18
sound 62:1
sounds 148:15
sour 134:7
Southeast
  139:19
Southern 39:14
  40:21
so-and-so
  100:22,22
  128:9
space 131:9
  182:13,16,16
  182:17 232:13
speak 8:7
  188:10 239:21
  271:14 272:14

277:18 292:13
  300:8 303:1
speaking 171:20
special 67:4
  150:20
specialists
  133:20
specific 120:11
  120:13 166:18
  167:23 174:4
  194:10 205:13
  209:18 211:9
  211:17 212:3
  212:12 213:2,9
  213:10 253:3
  255:4 289:7,18
  297:15
specifically
  125:15 146:19
  171:23 172:6
  181:12,21
  184:7 190:8
  193:5 196:22
  212:5 215:22
  218:6,15,17
  224:14 236:23
  242:11 256:1,2
  261:2,8 263:16
  264:20 271:13
  296:13 297:4
specifics 183:2
  197:5 203:18
  203:22
specify 224:23
speech 211:7
speeding 35:8
spelling 25:23
  154:6
spend 49:23
  196:19 204:4
spending 52:9
spent 95:20
spoke 138:22,23
  204:9 241:20

| | | | | |
|---|---|---|---|---|
| 242:19,19 | 60:14 73:20 | 1:18 2:3,10,19 | 309:4 | 119:2 120:11 |
| 256:13,15 | 104:13 111:9 | **stipulation** 1:17 | **submit** 139:11 | 128:9 135:20 |
| 268:10 269:1 | 143:17 144:11 | 6:5 | **submitted** 3:9 | 159:15,20 |
| 270:14 271:17 | 145:14 149:21 | **stipulations** | **subordinates** | 161:12 197:16 |
| 275:12 277:8 | 164:8 169:4,13 | 6:18 | 259:7 | 197:18 272:4 |
| 277:11,20,21 | 170:22,23 | **stocking** 42:7 | **substantial** | 303:9 307:23 |
| 277:22 278:1 | 191:12 227:6 | **stolen** 30:1 | 150:4 | **sure** 6:20 8:1 |
| **spoken** 21:17 | 229:12 260:18 | **stood** 66:3 | **successfully** | 18:12 21:6 |
| 139:1,2 272:14 | 285:17 294:7 | 195:18 236:3 | 173:18 | 25:4 28:8,10 |
| 299:14 301:11 | 312:22 | 279:7 | **suggested** 144:3 | 28:12 33:11,20 |
| 306:9 | **startled** 195:22 | **stop** 32:19 119:3 | **Suite** 1:23 5:6,14 | 40:12 53:21 |
| **Sport** 5:20 65:9 | 290:23 | 148:17 217:21 | 6:7 | 61:23 74:18 |
| 71:10 73:18 | **starts** 283:10 | 218:2 250:16 | **summarize** | 75:1,5,8,12 |
| 76:10 125:17 | **state** 14:23 27:8 | **stopped** 34:1 | 134:20 226:15 | 76:16 77:5,13 |
| 153:19 187:16 | 36:13,19 | **stopping** 8:17 | 273:19 | 77:20 98:5 |
| 209:22 255:16 | **statement** | **stored** 243:2 | **Summarizing** | 99:22 102:14 |
| 269:11 299:18 | 161:22 227:20 | **straight** 45:8,22 | 134:19 | 103:2 105:1,6 |
| **Sportsman** | **statements** 30:7 | 163:4 270:22 | **summary** 149:8 | 111:20 115:13 |
| 139:19 | 65:2 | **Street** 2:1 5:15 | **Sunday** 62:15 | 129:18 148:12 |
| **spotting** 38:1 | **states** 1:1 17:2 | 6:8 32:12 | 108:20 109:13 | 154:9,10 166:3 |
| **squad** 41:20,21 | 27:8 315:13 | 268:3 | 112:3 114:21 | 175:5 182:1 |
| **squeeze** 195:7 | **station** 172:21 | **stress** 14:11 | 115:7 116:15 | 183:5 185:1 |
| **squeezed** 173:4 | **status** 28:19 | 289:4,9,16 | 256:21 | 190:11 193:7 |
| **stacked** 136:12 | 120:19 121:4 | 314:8 | **supervising** | 193:19 201:16 |
| **staff** 289:8 | **stay** 39:7 66:9 | **strike** 180:9 | 76:13 | 202:3,16,19 |
| **stamp** 114:10 | 84:2 162:22 | 307:21 | **supervisor** | 203:16 205:23 |
| **stamped** 281:17 | 163:2 238:10 | **strongly** 154:7 | 38:17 40:5 | 210:8 216:13 |
| **stamping** 67:12 | 272:15 | **struck** 133:17 | 48:5 67:20 | 220:9,12 237:8 |
| **stand** 179:5,7 | **stayed** 45:11 | **stub** 106:13 | 164:6 267:12 | 240:1 247:21 |
| 251:6 | 104:18 163:6 | **stubs** 104:23 | 267:13 276:14 | 248:16 249:20 |
| **standing** 177:5 | 249:13,19 | 105:5,7 106:11 | 296:3 308:13 | 250:6 251:12 |
| 180:6 252:12 | **staying** 52:14 | 187:10 | 314:9 | 251:20 252:1 |
| **standpoint** | **steel-toed** 98:4 | **stuck** 313:23 | **supplies** 99:20 | 256:3,10 |
| 146:11 | **step** 68:20 71:23 | **stud** 219:6 | **support** 45:12 | 264:18 266:14 |
| **staple** 119:11,14 | **stepfather** 15:11 | **student** 25:10,11 | 297:12 | 271:10 275:10 |
| **star** 98:15 | 22:7 293:20 | **stuff** 89:13,14 | **supporting** | 282:13 285:1 |
| **start** 47:7 55:14 | **Stephens** 21:19 | 92:12 99:21 | 297:20 316:8 | 301:7,19 |
| 82:15 94:12 | 22:4 303:21,23 | 148:19 157:7,8 | 316:14 | 302:13 303:3 |
| 130:18 185:2 | **stepmother** | 157:8,11 160:9 | **supposed** 25:21 | 304:17 |
| 234:7,7,8 | 32:12 | 189:16 203:16 | 66:21 83:13 | **surgery** 78:23 |
| 239:4 254:12 | **steps** 144:4 | 216:19 245:20 | 89:9 90:4 93:7 | 79:1 216:7,17 |
| 284:10 | **stern** 259:21 | 271:23 289:11 | 94:10 99:14 | **suspended** |
| **started** 39:12,17 | **stickler** 94:14 | 309:6 | 100:18 104:19 | 33:11,19,23 |
| 44:8 49:7 58:3 | **STIPULATED** | **subject** 291:23 | 107:22 111:4 | 34:14 |

# FREEDOM COURT REPORTING

sweetie 222:11
222:15,21
229:6
swipe 115:13
116:1 117:9,11
swiped 116:2
117:8
swipes 117:6
sworn 6:15
system 99:16
114:5 115:14
117:3,17

**T**

Tabitha 112:4
309:10,10
Tabitha's
309:11
table 8:18 93:14
203:2
tagout 97:5,8
take 8:11 28:14
70:18 71:23
87:18 102:23
103:22,22
104:7 120:11
120:12 140:19
145:21 147:2
171:10 226:4
229:3 232:9,12
232:14,20
233:2,8,9,17
233:23 234:11
235:12,13
238:9 245:1
252:22 265:3
284:13 288:4
291:16 292:14
298:12 310:1
311:18 312:23
taken 1:21 7:8
9:6,18 30:1
42:22 65:1
80:12,15 104:5

106:2 120:3
146:4 150:7,9
157:14 223:7
226:10 280:17
310:5
talk 28:15 37:3
53:15 83:7
132:3 145:15
159:22 171:19
178:20 179:13
182:14 221:9
239:17 246:11
248:13 253:11
265:15 266:2
266:17 267:8
272:8 277:14
296:2 299:12
302:7
talked 10:12
11:6 27:4
34:18 38:3
66:5 71:11,13
71:15 73:8,9
145:15 150:12
155:5 176:1
181:5 191:10
216:2,8 220:16
236:13 242:8
243:7,15
246:19,22
258:4 259:16
263:19 266:3
267:6 270:18
270:22 271:1
275:9 286:8
292:20 293:6
294:16 298:4
299:2,10 301:5
301:6 302:8,9
302:22 303:6
303:16 304:9
304:20 305:3
305:16 306:19
307:4 308:4,7

309:1,21
talking 28:13
49:23 53:21
56:17 82:2
101:18 159:18
179:1 180:6,20
180:23 185:2,7
186:8 191:7
229:11 244:21
244:22 267:10
297:7,23 306:4
talks 60:1
Tammy 67:20
67:23 68:6
91:12,13,13,15
92:8 308:13,17
taped 86:18
tape-record
210:16
tasks 42:6
tax 314:20
taxes 15:22
teach 8:7,10,11
teaching 24:1
Teal 20:1,7,13
27:13
team 68:1 74:16
79:11 87:12
91:16 92:10
93:1,2 122:11
159:19 259:8
technical 36:14
technician 55:20
67:17
teenage 240:18
teeny 97:2
telephone 95:21
209:18 213:20
tell 11:5 18:1,13
31:1 61:1 63:8
65:14 76:19
83:19 84:6
90:21 91:22
92:23 93:23

94:3 98:10
125:10 136:6
139:4 148:22
158:19 165:23
167:4 171:22
172:6,15
173:12,21
174:5 176:4
177:8 181:13
184:7 192:8,17
193:17 196:15
196:23 197:5
201:23 202:21
204:10,17
212:19 218:15
225:3,8 230:10
231:21 240:6
242:12 245:22
255:15,19
256:1,18 261:2
264:21 266:5
266:13 267:3
270:15 271:13
274:11 277:16
292:16,17
297:10 303:9
306:11
telling 93:6
197:10 229:15
237:18 249:2
272:10 274:5,6
282:23 300:18
ten 177:12
230:23 252:4
tense 314:8
Teresa 305:6,6
terminate 64:6
227:11
terminated 63:2
152:18 153:2
158:20 198:5,6
227:23 228:6
228:14 305:8
terminating

227:14
termination
63:4,7,16
65:11 102:2
134:13 151:22
196:17
testified 6:16
146:9 256:20
274:7
testify 9:12
303:8 305:11
309:6
testimony 1:12
11:3 149:19
226:15 250:23
273:11,19
274:2
testing 59:6 97:7
thank 10:9 11:1
148:3 235:1
254:11 314:6
317:13
theft 61:14
therapist 74:3
144:4 308:3
therapists
133:20
therapy 74:2
80:13 95:1,5
121:5 133:22
307:8,12,15,19
308:2,6
thereto 2:18
thick 59:15
thigh 251:7
thing 42:8 59:16
70:19 87:14
88:10 90:7
97:2 102:16
103:3 121:2
135:4 152:21
159:17 167:12
205:10 233:5
243:22 251:10

# FREEDOM COURT REPORTING

| | | | | |
|---|---|---|---|---|
| 255:17 256:6 | **think** 15:23 | 91:14 170:21 | 111:7 122:16 | 120:11,13 |
| 258:8 266:4 | 18:10 26:18 | 202:19 257:8,8 | 157:4 159:10 | 128:5,5 143:12 |
| 307:19 | 27:2,17 29:23 | 295:18 300:10 | 188:23 195:15 | 143:15 147:14 |
| **things** 28:13 | 33:3,4 34:1 | 303:14,20 | 208:3 209:16 | 155:22 157:12 |
| 30:5,6 36:21 | 35:3 37:10 | **third** 31:20 32:7 | 293:22 313:13 | 160:4,22 |
| 51:5 54:17 | 42:21 51:3 | 55:13 64:4 | **three-minute** | 170:15 171:8 |
| 60:3,19,22 | 54:20 61:21,22 | 68:8 70:7,9 | 310:2 | 172:11,12 |
| 61:4,10 64:2 | 65:22 70:13 | 71:3,7,9 78:17 | **threw** 163:17 | 173:23 174:9 |
| 65:6,19 69:1 | 78:14 79:2 | 83:17,20 100:7 | **throw** 197:13 | 174:17,20,22 |
| 71:17 72:15 | 81:12 82:22 | 100:17 108:21 | **throwing** 271:22 | 175:1,16 |
| 74:22 75:4,5 | 83:16 88:15 | 108:23 109:3,4 | **thumbed** 60:15 | 180:10 183:3,6 |
| 75:18 79:9 | 90:21 91:1,5 | 109:12 141:4 | **ticked** 222:11 | 183:9,16,16 |
| 86:14,17,18 | 91:21 96:9 | 156:7 160:10 | 230:15 252:23 | 188:22 189:12 |
| 87:4 89:8,9,9 | 97:22 102:16 | 161:23 162:3 | **ticket** 35:8 | 189:18 191:20 |
| 89:11 92:22 | 104:11 105:4,4 | 162:12,17 | **tickets** 35:4 | 192:12,21 |
| 94:3 95:2,19 | 105:14,16 | 163:7 166:5,5 | **ticking** 205:22 | 193:17,19 |
| 95:19,22 96:20 | 108:9 110:3 | 169:15 172:23 | **ties** 49:14 | 195:2,10 197:3 |
| 96:21 97:12 | 114:10,13 | 216:15 296:1 | **tight** 176:14 | 199:14 202:12 |
| 99:23 100:5 | 124:3 126:20 | **Thompson** | 177:11 | 202:12 205:22 |
| 103:1 120:14 | 128:22 132:23 | 231:15,22 | **time** 2:16,16 | 215:2,3 219:1 |
| 121:2 128:11 | 133:2 138:13 | 286:5 302:18 | 7:19 8:15 | 220:4 223:15 |
| 136:9,10,11,11 | 138:22 141:12 | 302:20 | 11:18 14:23 | 223:23 224:23 |
| 138:9 142:2,9 | 144:21 145:1 | **thought** 69:12 | 19:20,21 28:14 | 236:7 238:7 |
| 142:15 143:3,6 | 145:17,19 | 125:1,2 154:11 | 32:11 41:19 | 239:6,8,17 |
| 143:9 144:2,6 | 146:12,13 | 161:16 169:5 | 43:6,17 45:7 | 247:17 250:1,2 |
| 144:13,16 | 154:14 168:2 | 174:15 178:2 | 49:23 50:14 | 250:4,19,23 |
| 145:22 146:20 | 168:10 171:7 | 192:22 204:23 | 52:19 53:11 | 251:9,19 252:2 |
| 147:13 152:5 | 172:1 191:6 | 205:2 212:9,16 | 55:23 57:18 | 253:6,9 254:4 |
| 154:6,12 156:1 | 192:16 198:9 | 214:11 219:18 | 58:6 60:16 | 255:2 270:23 |
| 156:3 167:13 | 211:19 212:17 | 228:8 237:2,17 | 62:11 68:19 | 271:12 275:9 |
| 168:23,23 | 228:18,21 | 237:18 269:19 | 70:22 72:1 | 275:11 278:1 |
| 169:1 171:12 | 230:17 234:21 | 273:10,23 | 73:2 79:12,18 | 285:8,22 286:4 |
| 172:2,13 179:8 | 237:13,14 | 316:1 | 80:18 81:10 | 288:4 292:11 |
| 179:9,11 194:8 | 240:17 242:4 | **thoughts** 144:7 | 90:4 93:16 | 292:15 294:12 |
| 194:9 204:13 | 244:5 245:18 | **thousand** 30:8 | 95:20 102:18 | 295:19 296:4 |
| 205:16 208:17 | 245:19 249:19 | **threaten** 259:9 | 103:4,6 105:3 | 296:14,16 |
| 210:21 211:3 | 250:17 263:19 | **threatened** | 105:16 106:22 | 299:1,9,13 |
| 214:12 221:10 | 266:23 267:1 | 32:18 125:10 | 112:15,21 | 301:4 302:9,12 |
| 225:14 226:16 | 276:3 284:6,23 | 135:7 | 113:4,21,22,23 | 303:16 304:9 |
| 230:1 243:9 | 288:5 294:7 | **three** 15:12 | 115:12,22 | 304:19 305:3 |
| 246:3 257:21 | 298:6,20 | 51:11,22 54:20 | 116:17 117:2 | 305:16 306:19 |
| 258:4 264:9 | 303:12 308:11 | 57:17 90:17 | 117:17,18,19 | 307:3 308:7 |
| 279:12 283:7 | 316:4 317:1 | 93:15,19 98:14 | 117:21 118:5,8 | 309:21 311:22 |
| 298:10 | **thinking** 35:17 | 107:12 110:6,7 | 118:9,10 119:1 | 312:8,16 |

# FREEDOM COURT REPORTING

**times** 12:6,7
57:20 79:8
87:23 112:13
115:15,17,22
120:12 122:22
122:23 123:5
140:22 142:6
168:14 180:11
182:19 188:15
188:23 194:11
194:15 198:2
207:9,13,21
208:3 210:7
211:3,13
219:22 220:3,4
222:16,18
223:12 224:5,8
224:22 225:11
230:10,17,23
233:4 238:16
248:7 251:17
251:20 259:6
290:21 291:19
**timing** 138:8
**Tindale** 45:2
**tired** 234:6
260:19
**title** 202:17,20
**today** 7:3 9:7,15
10:5,6 11:3
53:17 124:22
145:8 146:8
168:18,19
298:5 316:18
**told** 9:23 28:20
64:22 66:3
71:16 72:11
76:11 85:7
88:14 94:1
96:14 97:17
104:11 112:21
117:6 121:16
124:7 139:9
149:18 151:1

156:13 161:16
162:22 163:1
163:13 172:22
176:7 192:10
198:23 202:2
202:22 204:10
204:12,19,20
206:6 216:16
221:1,2,5,13
221:15 225:4,6
232:5 233:8
236:14 237:2
242:16,18
249:6,9 251:11
255:15 256:3,3
257:1,9,10
261:5 263:11
264:16,17,20
266:7,9,10,11
267:15 269:19
271:11,16
272:20 273:4,5
273:6,7,15,21
275:6,7 276:19
276:22,23
277:2,15
278:15 279:2
279:13,20
289:11 291:4
296:6,15
297:11,18,18
298:18,23
299:5,16
301:13,17
304:1,5,13,22
306:1,6,12,23
308:4,17
309:16 316:8
316:13
**Tom** 268:14
**Tommy** 308:21
308:22
**Tompkins** 14:11
270:10 276:2,9

279:23 281:1,4
285:9,23 286:6
286:7,11 289:8
289:10 310:17
**top** 27:19 64:1
100:8 269:23
270:7 285:11
**topics** 97:20
**tore** 163:16
189:15
**torn** 69:13,16
**total** 40:13
**totally** 84:18
203:1
**touch** 173:8
174:19,22
182:6 224:10
230:13 250:13
254:5 300:12
**touched** 122:20
173:11 175:1
178:22 182:5,5
183:3,8 204:16
223:12 254:19
**touching** 179:9
183:15 197:10
204:21 205:17
223:10 251:7
254:3
**touchings**
204:17
**touchy** 174:21
**tournaments**
29:9
**Tower** 1:23 6:8
**town** 303:22
305:19 309:1
312:23
**track** 94:11
175:11
**train** 89:4 90:5
**trained** 57:14,16
97:7
**training** 36:15

36:16 54:15,18
54:22 55:11,11
57:2 59:4 60:7
70:11,15 72:7
72:13 88:5
97:5,9 99:10
130:13,16
180:2 188:5
311:3
**transfer** 198:22
199:23 239:21
255:13 270:15
272:20 274:12
278:5,17 279:1
**transferred**
88:21 161:23
198:20,21
199:1 200:12
206:7
**transition** 89:21
**translation**
202:17
**translations**
203:12
**transpired**
144:10 220:13
**treat** 70:17 88:2
88:4
**treated** 82:10
92:21 95:10
281:3 293:18
**treating** 256:6
**treatment** 9:10
39:1 40:22
42:17 46:6
286:18 291:10
292:18 310:17
313:4
**treatments**
308:2
**trial** 2:16 18:11
21:8
**trick** 20:22
**tried** 32:19 53:3

110:14 129:8
142:9 174:14
217:12 224:9
225:7 244:3
276:10 309:15
**tries** 52:8
**trip** 68:22
**triple** 118:16
**tripped** 68:23
**trouble** 46:2
75:22 134:5
191:10 240:21
242:15 243:12
**Troy** 47:14
242:6
**truck** 29:22 31:3
31:5 34:20
**trucks** 42:7,8
**trust** 206:22
**trusted** 272:4
**truth** 274:5,6
**truthful** 79:19
81:7 82:19
90:14 92:13
162:5,7 165:17
184:10 214:5
282:4
**truthfully** 9:15
316:18
**try** 8:4,23 90:5
101:6,6 131:9
144:5 179:7,13
179:14,16
180:11 201:7
202:6 205:5
208:14,18
220:18 226:15
230:12 252:7
272:15 282:20
307:21
**trying** 11:19
20:22,22 32:12
32:21 41:3
45:8 47:4,7

# FREEDOM COURT REPORTING

| | | | | |
|---|---|---|---|---|
| 71:5 73:5 | 130:22 133:6 | 172:16 181:17 | 237:10 239:18 | 32:18 |
| 86:11 89:18 | 139:8 150:20 | 184:23 204:14 | 240:7 257:20 | **verbal** 38:10 |
| 124:3 130:19 | 216:17 235:22 | **understand** 8:21 | **union** 20:10 | 46:22 48:9 |
| 130:20 134:5 | 315:10 | 9:1,23 53:10 | **unique** 313:16 | 151:2 234:17 |
| 136:14,14 | **typed** 112:17,18 | 53:20 58:18 | **United** 1:1 17:2 | 235:14 245:8 |
| 159:16 180:19 | 112:18,20 | 74:11 98:19 | **University** 36:20 | 246:5 |
| 180:23 195:7 | 129:5 137:20 | 99:13 103:15 | **unrelated** | **verbally** 8:1 |
| 201:5,10 | 152:15 154:4,7 | 111:10 114:9 | 146:21 147:12 | 312:7 |
| 212:12 223:21 | 154:13,14 | 114:16 149:17 | **unusual** 238:11 | **verify** 285:4 |
| 231:14 235:1 | 186:22 187:5,8 | 155:19 182:23 | **unwelcomed** | **version** 56:18 |
| 243:9 247:10 | **typical** 108:13 | 203:14 211:15 | 296:5 | 130:1 |
| 252:10 253:23 | 108:15,17 | 211:22,23 | **upper** 224:4 | **versus** 118:9,10 |
| 254:14 273:13 | **typing** 73:2 | 219:7 224:11 | 282:9 | **Vickey** 24:4,4 |
| 278:13 306:14 | **T-E-A-L** 20:1 | 227:21 228:7 | **upset** 125:9 | **Vicki** 26:13,14 |
| 315:3 | _____ | 229:19 230:5 | 158:14 191:7 | **violate** 103:23 |
| **Tuesday** 62:17 | **U** | 237:16 244:8 | 198:3 202:5 | 104:8 |
| **turn** 29:10 57:4 | **ugly** 276:10 | 257:4 261:15 | 231:10 261:11 | **violated** 61:15 |
| 131:10 184:13 | **uh-huh** 8:9 | 287:12 316:20 | 273:23 275:21 | **violations** 60:19 |
| 287:17 302:5 | 15:10 39:4 | **understanding** | 276:7 290:23 | **violence** 311:13 |
| 314:11 | 89:22 110:16 | 58:23 64:14 | **use** 89:15,16 | **visit** 148:14 |
| **turned** 124:12 | 121:15 129:6 | 76:9 88:22 | 247:15 | **visitors** 67:3 |
| 181:18 215:16 | 140:2 157:2 | 109:18 146:15 | **Usual** 6:18 | 150:20 |
| **Turning** 61:12 | 176:9,18 181:7 | 146:17 150:16 | **usually** 37:2 | **visits** 14:16 |
| 268:5 | 186:9 217:8 | **understands** | 51:12 64:4 | 80:13 94:23 |
| **Twenty-six** | 233:11 238:6 | 212:11 | 93:8 107:7 | 203:15 |
| 288:5 | 249:18 265:22 | **understood** 48:2 | 141:3 230:14 | **vocational** 36:14 |
| **twice** 51:10 | 275:20 284:5 | 56:3 58:12,21 | 232:10,16,17 | 36:16 |
| 294:7 | 288:20 294:15 | 60:17 61:13 | 251:23 252:7 | **voice** 89:16 |
| **two** 18:20,21 | 294:20 311:19 | 98:11 101:22 | 252:23 | 131:1,18 |
| 34:1 44:7,8,9 | **Uh-oh** 93:5 | 103:10,21 | _____ | 238:18 |
| 77:19 84:18 | **ultimate** 12:8 | 147:1 148:20 | **V** | **voluntarily** 43:6 |
| 93:13 98:14 | **ultimately** 65:8 | 148:23 155:6 | **v** 1:8 | **volunteer** 43:4 |
| 109:1 118:16 | **ultrasound** | 156:14 162:15 | **vague** 203:7 | **Vonda** 267:2,7 |
| 121:23 135:8 | 25:17 307:18 | 166:9 197:15 | **vaguely** 127:2 | 267:19 |
| 139:17 140:13 | **ultrasounds** | 225:22 | **valve** 289:21 | _____ |
| 140:15 155:16 | 25:18 | **unemployment** | **varied** 40:10 | **W** |
| 177:3 183:10 | **unable** 37:22 | 13:5,6,9 315:6 | 122:13,17,18 | **wage** 43:16,16 |
| 183:11 185:9 | 295:5 | 315:7,11 | 209:5 251:8 | **wages** 297:7 |
| 194:22 215:18 | **unaware** 65:12 | **unfinished** | **variety** 179:3 | **wait** 119:6 |
| 233:19 284:15 | **uncertain** | 185:6 | **various** 17:1 | **waited** 183:19 |
| 305:18 312:22 | 187:18 | **unfortunately** | 42:6 121:11 | **waiting** 225:18 |
| **type** 30:5 51:12 | **uncle** 23:17 26:1 | 124:19 295:17 | 130:23 133:19 | **waived** 2:5,21 |
| 66:19,19 94:18 | **uncomfortable** | 312:6 | 264:8 | **walk** 68:20 |
| 96:22 121:3 | 169:2 172:10 | **unhappy** 202:4 | **vehicle** 30:4 | 97:22 113:16 |

# FREEDOM COURT REPORTING

152:19 153:15
231:4,6,8
**walked** 66:2
94:2 99:8
134:3 174:11
217:3,21
230:16 262:20
262:21 263:1,1
**Walker** 51:22
52:3
**walking** 75:6
177:6
**want** 10:11 11:5
18:11 21:6
27:17 28:12,15
33:10,20 41:4
53:20 65:5
68:16 72:1,2
83:9 84:1,2,5
124:2 145:13
145:14 150:6
166:12 168:19
178:7,17
192:23 200:2
200:18 211:4
229:16 239:5
250:22 255:8
261:12 268:11
268:19 269:6
270:21 274:21
276:18 279:14
291:22 297:5
298:13 302:7
306:1 309:19
**wanted** 21:4
72:11,12,14
88:7 124:2
125:3,4 131:18
132:20 162:1
163:15 166:3
167:3 188:15
188:16 214:5
215:23 217:17
238:23 241:21

242:20 274:9
276:5 282:4
303:6,7,15
305:11 309:6
312:23
**wanting** 114:9
172:7 316:6
**wants** 72:3
167:19 213:9
240:11
**warning** 151:2
**washing** 205:8
**Washington**
204:3,11
205:14
**wasn't** 20:22
37:18 49:8,19
66:23 70:21
80:20 86:1
108:17 127:6
148:13 150:4
150:17 152:23
153:7 160:2
172:1 173:14
175:10 186:21
198:6 203:1,10
211:7 222:11
237:5,6 239:1
239:2,2 241:4
243:22 247:9
252:11 259:19
272:3 273:12
279:3,10 285:7
285:22 286:3
294:12 309:5
**watches** 92:10
**water** 8:14
**way** 8:23 38:15
45:19 48:12
69:11 72:3
85:16 100:19
100:20 112:17
113:17 118:7
125:7 131:1,8

131:10,20
135:10 148:19
151:9 152:14
154:6 156:3
157:17 177:20
180:2,3 181:14
181:18 182:11
182:13,15
191:15,16,16
193:9 202:23
203:10 204:15
219:15 220:16
227:19 228:8
232:16 234:2
238:22 246:1
254:5,19 257:5
269:11 270:18
296:6,15 309:2
313:21
**ways** 33:1 223:7
312:15
**weapon** 291:17
**wear** 67:1
**wearing** 66:14
66:20 98:5
150:23 151:6
**Weathers** 121:9
160:19 199:2
272:21 273:3,8
273:12,22
274:3,8
**Webster** 15:10
15:13,17 26:23
27:11
**wedding** 299:15
**week** 52:13
107:13 111:6,7
133:13 159:3
166:22 194:1
194:16 276:16
287:8,14
**weekend** 108:10
108:15 110:4
110:18 116:14

256:14,19
257:2
**weekends**
107:11,23
110:11,23
**weeks** 58:5
60:14
**weird** 178:3
**Wellbutrin**
282:17 293:5
**Wendy** 65:21
76:22 78:18,21
79:5,7,13,14
79:19 81:23
94:16 148:13
247:6 306:3,3
306:12,14,16
306:20
**Wendy's** 110:5
**went** 10:10
15:21 36:8
54:14 55:17
60:12 65:10
66:5 69:3 70:1
73:17 77:6
79:12,13,14,14
89:9 92:12
102:18 104:17
109:20 111:16
112:10,14,16
115:14 117:19
122:12 129:11
130:22 133:19
135:9 137:11
143:8 144:4
158:2,4 163:21
164:1,3 171:12
171:19 177:21
181:16 182:21
183:23 184:5
197:1,20 202:4
217:9,9,10,10
219:1 232:1
240:4 260:7

262:4 271:21
272:9 273:5,20
275:21 279:4,5
279:8,23
280:23 281:13
282:1 284:15
286:13 287:20
288:3 291:18
300:23 301:8
302:23 303:1
313:9
**weren't** 62:15
63:2 80:23
84:21 93:4
94:11 103:2
115:23 141:15
150:19 192:19
198:23 247:19
248:1
**West** 16:8,16
17:11
**we'll** 10:1 78:7
79:23 83:7
90:1,1 119:14
132:3 139:14
141:19 168:11
189:13,14,15
253:11 298:12
310:3
**we're** 7:5 28:12
29:15 50:7,8
53:17,21 61:22
62:8 67:5
71:17 128:12
139:13 141:12
141:19 145:3
176:1 189:17
191:15,16
260:7 280:3
**we've** 21:6,16
27:4 28:10
34:18 87:21
102:9 122:20
144:21 155:5

# FREEDOM COURT REPORTING

166:2 246:18
246:22 270:22
293:6 294:16
298:11
**when's** 299:1,9
301:4 307:3
311:22
**White** 24:4,5
**wife** 235:23
236:3 237:4
239:1,20
241:14,18,19
242:1,10,18
244:23 256:16
**wild** 209:4
**William** 35:19
**willis** 3:4 5:12
6:19,22 7:1
10:9 105:20
106:9 141:21
144:19 145:2,7
146:2 147:1,6
147:20,23
148:2,5 167:18
167:22 175:14
185:3,5,22
186:9,15
190:20 200:6
226:8,13,23
227:1,18 228:4
234:23 235:4
240:13 245:19
254:10,12
273:1 280:23
281:21,23
288:8,10 298:7
298:14,17
310:1,12 317:7
317:13
**window** 86:1
**windows** 86:19
**wired** 191:16
**witness** 2:5 6:10
125:23 126:4

140:6 141:20
144:23 171:2
175:19 180:19
185:19 186:2,5
190:1,22
207:20 212:14
212:17 213:4,7
226:4 233:21
234:3 240:9
245:15 253:7
254:23 257:13
296:11,20
298:6 301:21
301:22 317:3
**witnessed**
199:20 222:2
246:15,19
**witnesses** 231:19
298:10
**woman** 211:20
212:10
**womanizer**
125:1
**women** 131:6
309:8
**Wood** 48:5
**word** 149:7,7
244:11,16
**words** 124:3
154:5 158:17
172:8 181:15
261:18,20,23
289:14
**work** 13:3 17:3
23:23 26:20
37:16,20,22
41:6 45:9,13
47:10,11 49:15
51:8,19 54:4
61:9 64:16
66:10 68:5
70:20 71:5,18
73:18 78:6,16
79:5 80:3,10

81:20 82:20
83:8,14 84:5,7
84:20 86:11
87:6 88:16
93:16 97:13
101:6 102:4
103:7,8,14,17
104:7,7 107:21
107:23 108:10
108:15,20,22
109:1,12,13,19
109:22 110:4
110:10,21
111:4,9 112:7
114:20 115:6
116:14,16
117:10 118:18
124:3,13,14
125:8 127:6
130:21 134:6
134:10 140:1
140:20 157:21
157:23 160:14
188:14,17
190:2 196:13
197:11 199:1,3
202:9 208:20
209:15 216:5,9
220:2,15,22
222:6 224:21
229:4,10,13,15
229:21 230:2,7
230:8,11,20,21
231:3 232:11
233:22 234:11
235:11,11,13
235:19 244:13
244:17,23
248:3,8,19
252:15,18
257:6 260:17
263:18 265:4
267:19 271:19
271:22 274:10

274:21 275:8
277:10 280:4
289:1,4,9,12
289:16 290:10
315:11,12
**worked** 38:12
38:19 39:6,11
41:21 42:12
43:19,22 44:20
45:16 46:1,9
46:12 47:11,13
48:8 50:5,5
53:17 61:17,22
62:16,16 64:16
67:8,8 68:6,11
74:4 76:17,23
79:21,21 80:5
80:5,8 81:10
81:22 89:7
90:16,19,20
91:2,5 92:3
97:19 102:15
102:21 104:10
106:23 108:18
111:2,13
116:15 118:20
119:8,8,19
120:4 122:4,11
122:19 130:11
132:9 141:3
164:11,23
169:14 190:4
191:8 197:3
199:6 201:5,17
201:20,21
203:4 205:20
216:14 222:8
229:8 242:22
248:6 249:20
263:6,7,15
264:2,19
266:21 280:12
292:2 296:8
313:19

**workers** 12:15
13:4,20 75:16
97:16 100:9
101:19 128:3
149:22 156:10
156:14 281:6
**working** 12:23
38:9,22 40:20
42:15,19 43:2
44:12,14,16
45:21 46:5
48:14,23 49:8
50:11,13,15,17
58:4 60:15
68:13,16 69:10
70:3,4 71:16
71:17 73:21
74:1,14 81:9
82:6,11 84:8,9
87:11 88:12,16
88:20 94:5
106:14 107:8
107:11,15,19
110:6,6,7
111:6 112:4,5
112:22 115:3
144:14 157:12
161:18 162:9
162:17 173:3
174:7,8 177:23
183:7 193:22
199:16,18
206:14 249:14
249:14,15
256:21,22
258:13 263:4,6
263:20 271:3
272:17 273:21
274:19 275:1,2
279:3 285:18
291:2 303:8
**workmen's** 14:7
14:10 53:4
94:22 99:18

100:23 276:3
284:16 285:3,3
285:4
**workplace** 176:5
**works** 16:23
17:1 22:21
23:7 24:20
25:3 64:3
65:22 206:16
206:17 267:21
300:1
**work-related**
128:8 210:2
211:3 230:1
**World** 43:8 44:1
44:14,17
**worn** 66:22
**worried** 226:17
**worry** 90:2,3
125:4 189:14
**worse** 271:19
272:6
**wouldn't** 117:10
131:11 136:9
178:13 181:19
199:10 200:18
207:1 217:21
220:17 222:12
253:1 263:12
274:17,18
275:3 284:16
**Wow** 107:14
**wrap** 182:9
235:1
**wreck** 11:15
286:16,19
287:9
**write** 116:19
129:14 142:2,7
143:12 163:13
167:9,11,12
184:17 185:5
194:8 250:9
251:14 279:11

279:13,14,14
283:22
**write-up** 66:16
**write-ups**
150:22
**writing** 139:11
151:1
**written** 38:10
46:22 48:10
66:13,15 83:5
101:9 180:17
184:3,4 210:21
214:3 236:11
271:7
**wrong** 58:13
69:4,16 161:17
231:11 290:1
309:16
**wrote** 116:22
143:3 158:1
163:13 167:20
185:8 264:12
271:5 276:2

_____ **Y** _____
**ya** 239:23,23
**yeah** 10:6,10
16:7 25:21
38:5 58:11
82:15 93:7
101:16,17
115:21 126:5
127:13 136:3
141:8,11
144:18 146:2
172:17 177:15
178:2 186:22
190:23 194:5
194:14 211:19
213:15 219:4
219:11 221:12
221:19 226:6,8
228:12 230:4
239:4 240:8,11

245:19 252:21
252:23 261:11
265:23 266:1
271:15 273:12
281:22 283:11
293:15,21
297:16 303:13
303:15 313:6
313:13,22
314:12
**year** 11:23 17:8
17:8 31:23
141:7,7 188:20
299:11 302:17
303:19 304:12
314:22
**years** 16:3 18:4
19:18 40:13
294:11
**Year's** 188:21
241:7
**year-old** 292:23
**young** 43:8 44:1
44:14,17 70:8
73:1
**younger** 18:21
45:10
**youngest** 44:7,9
**y'all** 10:12 40:2
40:14 41:11
111:6 113:3
132:20 145:15
168:18 178:7
276:19 298:4
299:12

_____ **Z** _____
**zone** 291:20

_____ **$** _____
**$12** 49:16
**$15** 52:6
**$20** 52:6

_____ **0** _____

**00025** 281:19
282:9
**00035** 285:14
**00057** 287:18
**0032** 116:20
**06** 133:3
**06-1089-MEF**
1:5
**07** 287:10

_____ **1** _____
**1** 3:12 20:16
21:1 161:14
**1st** 138:22
190:17 202:13
202:21 203:19
277:21
**1/11/06** 31:22
**1:12** 119:22
**10** 3:21 126:10
126:15 127:1,8
161:8
**10:30** 1:15 6:9
**106** 3:18
**108** 3:19 121:12
**11** 3:22 128:16
128:21 129:3
130:1 131:5,17
132:7
**1125** 17:14
**113** 3:20
**12** 3:23 18:17
27:21 112:7
132:15 133:1,3
**12:00** 112:6
**12:03** 106:3
**12:14** 106:3
**12:43** 119:17
**12:50** 146:5
**12:57** 146:5
**1216** 32:11
**126** 3:21
**128** 3:22
**13** 4:1 136:22

137:4,20 148:6
**13th** 123:12
125:17 149:15
**132** 3:23
**136** 4:1
**137** 4:2
**14** 4:2 16:14
17:12 18:15
130:12 137:23
138:5 161:7
178:8 189:4
255:10 298:14
**14th** 149:14,16
**15** 4:3 151:13,18
151:20 153:18
154:17,19
157:4,17
159:23 161:6
208:8 226:21
230:23
**15th** 300:11
**151** 4:3
**16** 4:4 165:12,16
165:22 176:11
178:21 190:17
193:13
**165** 4:4
**17** 4:5 186:11,17
269:8 270:7
**17th** 115:7
**18** 4:6 21:14
22:2 23:18,21
24:7 25:12
26:6 173:1
255:10 258:20
259:2,12
**18th** 115:7
138:13,17
248:18 250:7
256:9 257:10
259:16
**186** 4:5
**19** 4:7 281:9,14
282:10

# FREEDOM COURT REPORTING

**1950** 1:23 6:7
**1990** 12:19
**1996** 35:14
**1997** 12:1 28:2
29:13 292:4
**1998** 20:3

---
**2**

**2** 3:13 30:15,21
33:19 140:15
**2nd** 187:4
205:14 277:22
**2,000** 52:13
**2:12** 226:11
**2:26** 226:11
**20** 3:12 4:8
180:13 182:20
208:8 285:17
286:23 287:5
**20th** 5:15
**200** 5:6
**2003** 46:12
**2004** 32:8 46:13
**2005** 29:23
34:19 54:10
61:18 73:11
106:17 155:2
176:11 178:18
214:15 215:4
285:17 311:18
**2006** 14:14 17:9
101:10 112:3
167:1 173:1
214:16 215:4
255:10 260:12
271:3 282:1
287:8,15 288:4
290:17 310:21
314:20 315:20
**2007** 1:14 2:2
61:19
**201** 1:23 6:8
**205.251.3000**
5:17

**205.871.1310**
5:9
**21** 1:14 4:9
294:22 295:4
**21st** 2:1
**22** 4:10 295:9
**23** 4:11 257:16
310:8,13,20
**24** 260:11
310:20
**24th** 137:4
142:16,21
258:18 260:5
261:4
**25** 285:10
**25th** 54:9
**258** 4:6
**26** 287:20 288:4
**26th** 277:6
**27th** 277:6
**28th** 263:22
**281** 4:7
**286** 4:8
**294** 4:9
**295** 4:10

---
**3**

**3** 3:14 56:11,16
60:13 61:1
140:16
**3rd** 277:23
**3:19** 280:18
**3:31** 280:18
**3:59** 310:6
**30** 3:13 155:1
163:10 164:20
180:13 196:21
**30th** 155:14,22
275:12,13,17
277:9
**30-day** 124:10
124:11 163:8
**300** 97:15 99:18
101:18 102:13

**127**:15,18
**149**:22 155:16
**155**:17 156:3
247:16
**300A** 154:23
155:1,4,17,20
156:9 247:16
**310** 4:11
**33** 61:3 118:12
**3300** 5:7
**331** 53:22
**34** 60:23 61:3,12
**3400** 5:14
**3503** 270:9
**35203** 5:16
**35223** 5:8
**36104** 2:1 6:9

---
**4**

**4** 3:15 59:8,18
**4:00** 112:5,6
**4:06** 310:6
**4:11** 317:17
**420** 5:15
**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**
34:10
**422** 59:20,21
**48** 156:12

---
**5**

**5** 3:16 62:4,11
62:14 105:12
105:13 112:3
140:7
**5th** 62:15 116:17
127:3 142:13
161:7
**5:00** 111:14
**50** 55:3
**56** 3:14
**566** 242:6
**57** 287:19 288:1
288:12
**59** 3:15 288:6

---
**6**

**6** 3:4,17 96:5,11
97:3 99:12
123:16 140:7
161:7
**6th** 62:16 116:16
**6:00** 112:4
**60** 55:3 164:21
287:19 288:1
**62** 3:16

---
**7**

**7** 3:18 106:5,13
135:2 250:4
282:1 286:12
**7th** 61:23 62:17
102:18 114:21
129:21 165:1
199:23 248:18
250:8 278:3
280:1 281:14
299:3

---
**8**

**8** 3:19 108:3,8
108:14 268:8
**8th** 114:21
266:15,18
268:21 300:11
**8:00** 111:14

---
**9**

**9** 3:20 113:10,14
113:20 116:20
118:14
**9th** 266:15,18
**9.50** 104:19,20
104:23 105:2
124:9 161:19
161:20,22
162:10
**90** 17:19 164:21
**90-day** 163:10
164:13,19

**9133** 16:8,16
17:11
**92** 19:16,16 41:8
**96** 3:17 41:9
**97** 12:1
**98** 17:20

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| ROBIN ATWELL, an individual, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. CV-06-1089-MEF |
| | ) |
| SMART ALABAMA, LLC, a legal entity, | ) |
| | ) |
| Defendant. | ) |

## PLAINTIFF'S RESPONSE TO DEFENDANT SMART ALABAMA, LLC'S FIRST INTERROGATORIES

COMES NOW the Plaintiff, **Robin Atwell**, by and through the counsel of record and

responds to the Defendant Smart Alabama, LLC's First Interrogatories as follows:

1.    My relatives that live in the middle district of Alabama include the following:

| | |
|---|---|
| Mother-In-Law: | Janice Eddison (Maiden Name: Flowers) |
| Address: | ⋯ |
| | |
| Employer: | Crenshaw Community Hospital |
| Address: | 101 Hospital Circle |
| | Luverne, Alabama 36049 |
| | |
| Husband: | Kevin Atwell |
| Address: | 9133 W Emmett Avenue |
| | Brantley, Alabama 36009 |
| DOB: | |
| Employer: | He works for nuclear power plants across the US. |
| | |
| Sister-In-Law: | Janna Stephens (Maiden Name: Eddison) |
| Address: | |
| | |
| DOB: | |


EXHIBIT
R. Atwell 6-21-07

Brother-In-Law
(through marriage):    Keith Stephens
Address:

Employer:    Stephens Service Center

Step-father:    Earl Ray Kyle
Address:

Phone:
DOB:

Mother:    Avis Faye Kyle (Maiden Name: Pitchford)
Address:

Phone:
DOB:

Cyldie Flowers
Address:

Phone:
Employer:    Crenshaw County Courthouse
Address:    301 South Glenwood Avenue
Luverne, Alabama 36049

Kyle Flowers
Address:

Phone:
Employer:    Alabama Department of Environmental Management

Kelly Flowers
Address:

Phone:

Vickey White
Employer:    Director of Nursing

Marilyn Kennedy
Address:

Phone:

Clarence Kennedy
Address:

Phone:

Misty Frazier (All of the information I have regarding Misty is that she is a student.)

Dewants Owen (Spelling not determined.)

Kenneth Owens
Address:

Phone:

Vicki Billings
Address:

Phone:

I also have family that live in Lee County that I am related to through my late father. I do

not have any information on them but a common last name would be "Webster."

2.     My residences for the previous ten (10) years include the following:


January / February 2006 - Present


February 2005 - February 2006

... -




3

1998/1999 - February 2005

1998

1992 - 1997

1992

The dates listed above are approximate and I do not recall all of the time frames that I lived at these addresses.

3.    Since my employment ended with Smart Alabama, I have cleaned houses for my mother-in-law and sister-in-law. I have also babysat for my sister-in-law's child.

4.    Healthcare providers I have seen as a result of this incident include the following:

Brantley Rescue
Brantley, Alabama
January 26, 2006

I was transported to Crenshaw Community Hospital.

Crenshaw Community Hospital
Dr. Charles Tompkins
101 Hospital Circle
Luverne, Alabama 36049
January 26, 2006 - January 29, 2006

I was given an IV, put on oxygen, and given Lopressor for my blood pressure because my heart rate was extremely elevated. After that my blood pressure bottomed out and I was given another medication to get my blood pressure to increase a little. I was also given Atenolol for my heart and blood pressure and Prevacid because it was thought that I might have ulcers due to the fact that I had been throwing up every morning and during the day. I was diagnosed with having

an anxiety attack and I was admitted to the Crenshaw County Hospital Emergency Room.

Dr. Charles S. Tompkins
1704 South Forest Avenue
Luverne, Alabama 36049
February 7, 2006

I was prescribed with Lexapro and Vistaril for anxiety. I was also referred to a counselor,

Dr. Williams. However, workers' comp refused to pay for this treatment and the defendant

cancelled my health insurance with Blue Cross Blue Shield.

5.      I have filed a Charge of Discrimination with the Equal Employment Opportunity

Commission against Smart Alabama, LLC. This was filed in the Birmingham EEOC District

Office. The charge number is 420-2006-02661.

6.      My employers for the past ten (10) years include the following:

Smart Alabama
121 Shin Young Drive
Luverne, Alabama 36049
August 2005 to February 7, 2006

I began working with Smart Alabama for $9.00 an hour and ended at $9.50 an hour. I

began working in the plant on the third shift and my supervisor was Scott Kelly. Later I went to

work on the first shift safety and my supervisor was Rance Maddox. I left this job due to

overwhelming sexual harassment by my supervisor, Rance Maddox.

Allwood Construction
Troy, Alabama
Mid 2005 ( approximately 6 months)

My rate of pay was $12.00 an hour. My supervisor was Allen Wood. I worked there

doing clerical work for the company and I left because the business itself was getting bad.

Double Branch Lounge
Highway 231 Bypass
Troy, Alabama 36081
2003 - 2004 (about 1 year)

My rate of pay was at or about $3.00 an hour plus tips. I believe that my supervisor's

name was Jimbo Ross. I worked there as a bartender and I left because didn't want to work in a

bar anymore.

Kelly's Bar-B-Que
853 Troy Highway
Elba, Alabama 36323
Late 1990's (about 1 year)

My rate of pay was at or about $3.50 an hour plus tips. My supervisor was Faye Tindell. I

worked there as a server. I left because my husband at that time and I divorced and I needed a

job where I could be at home during the day for my children.

Southern Elegance Catering Co.
Elba, Alabama
1996 - 1999 (or about 3 years)

This was a catering company that my ex-husband and I owned. The business ended when

we divorced.

Coffee County EMS (formerly Elba Rescue)
325 Yelverton Avenue
Elba, Alabama 36323
1992 - 1996

My rate of pay was about $6.00 an hour plus a zero sleep pay bonus. My supervisor was

Pat Crosby. I worked there as an Emergency First Responder / Driver. I left because we got a

new supervisor that was very bad as far as running the business and also drastically cut employee

pay.

Young World of Learning
1340 Alabama Highway 203
Elba, Alabama 36323
1995 - 1997 (or about 2 years)

I was paid minimum wage at that time. I was employed as a child care provider. My

supervisor was Peggy Carpenter. I left after my two oldest children went into school and I

transferred my younger children to another daycare.

7.      I was seen by a general counselor when I was about 12 or 13 years old. I do not recall the

name of the counselor. My mother sent me to this counselor because I did not get along well

with my stepfather and it was thought that it might be because my father was killed when I was 3

years old.

8.      This information is still being gathered and will be supplemented in accordance with the

Federal Rules of Civil Procedure.

9.      I am not aware of any such statements.

10.     It has not been determined whether an expert will be utilized in this case but such

information will be supplemented in accordance with the Federal Rules of Civil Procedure

and/or the court's pretrial order.

11.     I have never been a party to any other lawsuit.

12.     I was charged with harassment around 1997. My ex-husband broke into my house while I

was in the shower. He slammed the door to the bathroom open and ripped the shower curtain

down while I was in there. I yelled and cussed at him and tried to get him to leave. I called

police and my ex-husband was taken to the police station. However, the police chief was a friend

of my ex-husband's and I was charged with harassment. My ex-husband was eventually

arrested and the charges against me were dropped. This took place in Elba, Coffee County,

Alabama.

I was charged with criminal conspiracy misdemeanor in 2005 in Crenshaw County,

Alabama. At that time I was also charged with criminal mischief but those charges were

dismissed.

13.    My educational background includes the following:

Elba High School
371 Tiger Drive
Elba, Alabama 36323
I completed the 11th grade and dropped out during my senior year in 1992 due to a

medical illness.

Enterprise State Junior College
I took an exam and received my GED in 1994.

Auburn University
I took an environmental safety training class around 1995.

I have also taken classes for my rescue AED Certification, C.P.R., and EVOC when I

worked for the rescue service and the AIDT training through Smart Alabama.

I am also state and federally certified for urine collection and drug testing.

Other training includes:
Haz-mat
OSHA
Blood Borne Pathogens

14.    Persons with knowledge of the acts committed by Rance Maddox include the following:

Ruth Ryan
Human Resources
(334) 296-5644

Fran Hughes
Human Resources

Gary Sport
Director of Human Resources

Misty Dicks
Security Guard

Cathy Caldwell
Security Guard

Gloria Thompson
General Employee
(334) 672-1516

Bill Bailey
Plant Employee
(334) 335-3764
(334) 429-1453

Janna Stephens
1575 Pond Creek Road
Luverne, Alabama 36049

Amanda Dempsey
3rd Shift Light Duty
(334) 429-1980

Colinda Porder
1st Shift Light Duty
(334) 672-7264

Lakeshia Jessie
2nd Shift Light Duty
(334) 804-1343

Teresa Brothers
Employee
(334) 220-2471

Wendy (last name unknown)
2nd Shift Light Duty
(334) 239-1354

Lisa Bodiford
2nd Shift Safety
(334) 429-0129

Mark Sissy
Physical Therapy Contractors
(334) 701-9705
(334) 798-1084

Tammy Green
3rd Shift Supervisor
(334) 328-8599

Tommy Hancock
(334) 488-6297

Tabatha (last name unknown)
(334) 268-1016

Robin Atwell

*Sworn to and subscribed before me a notary public, on this the 13th day of June, 2007.*

NOTARY PUBLIC
Comm. Exp.: 9/20/09

Richard F. Horsley

OF COUNSEL:
Gooze, King & Horsley, LLP
1 Metroplex Drive
Suite 280
Birmingham, Alabama 35209
(205) 871-1310
(205) 871-1370 (fax)

Case 2:06-cv-01089-MEF-WC    Document 18-3    Filed 11/02/2007    Page 12 of 110
JUN-13-2007 WED 02:59 PM GOODE KING HORSLEY LLP    FAX NO. 20F~711370    P. 13

06/12/2007  23:11    527340J    PAGE  82



**Department of the Treasury**
**Internal Revenue Service**
MEMPHIS, TN 37501-1498

Transcript Delivery System Correspondence

Tracking ID:
Date of Issue: 06-05-2007

002530,391645,000E.001 1 MB C.360 530
Iıllıllıllıllıllıllıllıllııllıllılılıllıllıllıllıllılıllıllılıllılıllıllılı

KEVIN J & JENNIFER L ATWELL
PO BOX 442
BRANTLEY, AL 36009



Tax Period: December, 2001

102530

### Information about the Request We Received

In this letter, we'll report the status of the request we received.

We've enclosed the transcript or transcripts that you requested on June 5, 2007.

A transcript of account shows a summary of your tax return and subsequent actions taken. These actions could include payments, amended returns, and corrections we made to the original return due to math mistakes.

We have different types of information that we can give you about your account:

* A return transcript will show you certain line items as reported on your tax return.
* An account transcript summarizes your return and shows subsequent changes that you or we may have made.
* A record of account has detailed information on both the line items from your return and on subsequent changes.

In addition, information for current tax years is available immediately on our computer systems.

Delivery time to you depends on how you submit your request and the delivery method you select to receive the information.

We're attempting to develop a new way to allow you to access your own tax account information on-line, but we have to make sure that unauthorized individuals won't get access to on-line accounts. While we currently don't have an on-line account system, you can get account information by calling your local IRS office (listed in your telephone directory), or our national toll free number 1-800-829-0922. You can also send us a completed Form 4506, Request for Copy or Transcript of Tax Form.

If you have any questions about information contained in the transcripts or other enclosed information, please call us at the IRS telephone number listed in your local directory or at 1-800-829-0922.

JUN-13-2007 WED 02:59 PM GOODE KING HORSLEY LLP    FAX NO. 205 711370    P. 14

06/12/2007  23:11   5273455                                                 PAGE 03

This Product Contains Sensitive Taxpayer Data

Request Date: 06-05-2007
Response Date: 06-05-2007

Tracking Number:

Account Transcript

FORM NUMBER: 1040             TAX PERIOD: Dec. 31, 2001

TAXPAYER IDENTIFICATION NUMBER:
SPOUSE TAXPAYER IDENTIFICATION NUMBER:

KEVIN J & JENNIFER L ATWELL

Any minus sign shown below signifies a credit amount.

```
ACCOUNT BALANCE:          0.00
ACCRUED INTEREST:         0.00        AS OF: Jan. 03, 2005
ACCRUED PENALTY:          0.00        AS OF: Jan. 03, 2005

ACCOUNT BALANCE
PLUS ACCRUALS:            0.00

** EXEMPTIONS:              02         ** FILING STATUS: Married Filing Joint
** ADJUSTED GROSS
   INCOME:
** TAXABLE INCOME:
   TAX PER RETURN:
** SE TAXABLE INCOME
   TAXPAYER:             920.00
** SE TAXABLE INCOME
   SPOUSE:                0.00
** TOTAL SELF
   EMPLOYMENT TAX:       141.00
```

** PER RETURN OR AS ADJUSTED

RETURN DUE DATE OR RETURN RECEIVED DATE (WHICHEVER IS LATER): Oct. 21, 2002

PROCESSING DATE: Dec. 02, 2002

TRANSACTIONS

| CODE | EXPLANATION OF TRANSACTION | CYCLE | DATE | AMOUNT |
|------|---------------------------|-------|------|--------|
| 150 | RETURN FILED AND TAX ASSESSED | 20024708 | 12-02-2002 | |
| 806 | WITHHOLDING CREDIT | | 04-15-2002 | |
| 460 | EXTENSION OF TIME TO FILE EXT. DATE 08-15-2002 | | 04-15-2002 | $0.00 |
| 610 | PAYMENT WITH RETURN | | 10-21-2002 | |
| 166 | LATE FILING PENALTY | 20024708 | 12-02-2002 | $100.00 |
| 276 | FAILURE TO PAY TAX PENALTY | 20024708 | 12-02-2002 | $4.06 |
| 196 | INTEREST ASSESSED | 20024708 | 12-02-2002 | $5.50 |
| 670 | SUBSEQUENT PAYMENT | | 12-18-2002 | |

This Product Contains Sensitive Taxpayer Data

 Department of the Treasury
Internal Revenue Service
MEMPHIS, TN 37501-1498

 Transcript Delivery System Correspondence

Tracking ID:
Date of Issue: 06-05-2007

002529.391695.0006.001 1 NO 0.360 530

KEVIN J & JENNIFER L ATWELL
PO BOX 442
BRANTLEY, AL 36009

Tax Period: December, 2002

102529

### Information about the Request We Received

In this letter, we'll report the status of the request we received.

We've enclosed the transcript or transcripts that you requested on June 5, 2007.

A transcript of account shows a summary of your tax return and subsequent actions taken. These actions could include payments, amended returns, and corrections we made to the original return due to math mistakes.

We have different types of information that we can give you about your account:

* A return transcript will show you certain line items as reported on your tax return.
* An account transcript summarizes your return and shows subsequent changes that you or we may have made.
* A record of account has detailed information on both the line items from your return and on subsequent changes.

In addition, information for current tax years is available immediately on our computer systems.

Delivery time to you depends on how you submit your request and the delivery method you select to receive the information.

We're attempting to develop a new way to allow you to access your own tax account information on-line, but we have to make sure that unauthorized individuals won't get access to on-line accounts. While we currently don't have an on-line account system, you can get account information by calling your local IRS office (listed in your telephone directory), or our national toll free number 1-800-829-0922. You can also send us a completed Form 4506, Request for Copy or Transcript of Tax Form.

If you have any questions about information contained in the transcripts or other enclosed information, please call us at the IRS telephone number listed in your local directory or at 1-800-829-0922.

JUN-13-2007 WED 03:00 PM GO^7E KING HORSLEY LLP    FAX NO. 20F^711370    P. 16

06/12/2007  23:11   527345၁                                                    PAGE 05

This Product Contains Sensitive Taxpayer Data

Request Date: 06-05-2007
Response Date: 06-05-2007

Tracking Number:

Account Transcript

FORM NUMBER: 1040          TAX PERIOD: Dec. 31, 2002

TAXPAYER IDENTIFICATION NUMBER:
SPOUSE TAXPAYER IDENTIFICATION NUMBER:

KEVIN J & JENNIFER L ATWELL

Any minus sign shown below signifies a credit amount.

| ACCOUNT BALANCE: | 0.00 | |
| ACCRUED INTEREST: | 0.00 | AS OF: Jan. 03, 2005 |
| ACCRUED PENALTY: | 0.00 | AS OF: Jan. 03, 2005 |

ACCOUNT BALANCE
PLUS ACCRUALS:        0.00

** EXEMPTIONS:         02          ** FILING STATUS: Married Filing Joint
** ADJUSTED GROSS
   INCOME:
** TAXABLE INCOME:
   TAX PER RETURN:
** SE TAXABLE INCOME
   TAXPAYER:           0.00
** SE TAXABLE INCOME
   SPOUSE:             0.00
** TOTAL SELF
   EMPLOYMENT TAX:     0.00

** PER RETURN OR AS ADJUSTED

RETURN DUE DATE OR RETURN RECEIVED DATE (WHICHEVER IS LATER): Aug. 25, 2003

PROCESSING DATE: Sep. 29, 2003

TRANSACTIONS

| CODE | EXPLANATION OF TRANSACTION | CYCLE | DATE | AMOUNT |
|------|----------------------------|-------|------|--------|
| 150 | RETURN FILED AND TAX ASSESSED | 20035808 | 09-29-2003 | |
| 806 | WITHHOLDING CREDIT | | 04-15-2003 | |
| 460 | EXTENSION OF TIME TO FILE EXT. DATE 08-15-2003 | | 04-15-2003 | $0.00 |
| 846 | REFUND | | 09-29-2003 | |

This Product Contains Sensitive Taxpayer Data

 Department of the Treasury
Internal Revenue Service
MEMPHIS, TN 37501-1498

Transcript Delivery System Correspondence

Tracking ID:
Date of Issue: 06-05-2007

003528.291666.0006.001 1 MB 0.360 530
IdhdIdlldddddlddIldddddlddlddddddllldI

KEVIN J ATWELL
PO BOX 442
BRANTLEY, AL 36009



Tax Period: December, 2003

J02528

### Information about the Request We Received

In this letter, we'll report the status of the request we received.

We've enclosed the transcript or transcripts that you requested on June 5,
2007.

A transcript of account shows a summary of your tax return and subsequent
actions taken. These actions could include payments, amended returns, and
corrections we made to the original return due to math mistakes.

We have different types of information that we can give you about your account:

*   A return transcript will show you certain line items as reported on your
    tax return.
*   An account transcript summarizes your return and shows subsequent changes
    that you or we may have made.
*   A record of account has detailed information on both the line items from
    your return and on subsequent changes.

In addition, information for current tax years is available immediately on our
computer systems.

Delivery time to you depends on how you submit your request and the delivery
method you select to receive the information.

We're attempting to develop a new way to allow you to access your own tax
account information on-line, but we have to make sure that unauthorized
individuals won't get access to on-line accounts. While we currently don't
have an on-line account system, you can get account information by calling
your local IRS office (listed in your telephone directory), or our national
toll free number 1-800-829-0922. You can also send us a completed Form 4506,
Request for Copy or Transcript of Tax Form.

If you have any questions about information contained in the transcripts or
other enclosed information, please call us at the IRS telephone number listed
in your local directory or at 1-800-829-0922.

This Product Contains Sensitive Taxpayer Data

Request Date: 06-05-2007
Response Date: 06-05-2007

Tracking Number:

Account Transcript

FORM NUMBER: 1040    TAX PERIOD: Dec. 31, 2003

TAXPAYER IDENTIFICATION NUMBER:
SPOUSE TAXPAYER IDENTIFICATION NUMBER:

KEVIN J ATWELL

Any minus sign shown below signifies a credit amount.

02528
ACCOUNT BALANCE:           0.00
ACCRUED INTEREST:          0.00      AS OF: Jan. 03, 2005
ACCRUED PENALTY:           0.00      AS OF: Jan. 03, 2005

ACCOUNT BALANCE
PLUS ACCRUALS:             0.00

** EXEMPTIONS:             01       ** FILING STATUS: Married Filing Separate
** ADJUSTED GROSS
   INCOME:
** TAXABLE INCOME:
   TAX PER RETURN:
** SE TAXABLE INCOME
   TAXPAYER:              0.00
** SE TAXABLE INCOME
   SPOUSE:                0.00
** TOTAL SELF
   EMPLOYMENT TAX:        0.00

** PER RETURN OR AS ADJUSTED

RETURN DUE DATE OR RETURN RECEIVED DATE (WHICHEVER IS LATER): Oct. 15, 2004

PROCESSING DATE: Nov. 22, 2004

TRANSACTIONS

| CODE | EXPLANATION OF TRANSACTION | CYCLE | DATE | AMOUNT |
|------|----------------------------|-------|------|--------|
| 150 | RETURN FILED AND TAX ASSESSED | 20044508 | 11-22-2004 | |
| 806 | WITHHOLDING CREDIT | | 04-15-2004 | |
| 460 | EXTENSION OF TIME TO FILE EXT. DATE 08-15-2004 | | 04-15-2004 | $0.00 |
| 846 | REFUND | | 11-22-2004 | |

This Product Contains Sensitive Taxpayer Data

JUN-13-2007 WED 03:00 PM GOODE KING HORSLEY LLP    FAX NO. 2050711370    P. 19

06/12/2007 23:11    5273435    PAGE 08

 **Department of the Treasury**
**Internal Revenue Service**
**MEMPHIS, TN 37501-1498**

Transcript Delivery System Correspondence

Tracking ID:
Date of Issue: 06-05-2007

002527.391588.0006.001 1 MB 0.340 590

KEVIN J ATWELL
PO BOX 442
BRANTLEY, AL 36009

Tax Period: December, 2004

702527

### Information about the Request We Received

In this letter, we'll report the status of the request we received.

We've enclosed the transcript or transcripts that you requested on June 5, 2007.

A transcript of account shows a summary of your tax return and subsequent actions taken. These actions could include payments, amended returns, and corrections we made to the original return due to math mistakes.

We have different types of information that we can give you about your account:

* A return transcript will show you certain line items as reported on your tax return.
* An account transcript summarizes your return and shows subsequent changes that you or we may have made.
* A record of account has detailed information on both the line items from your return and on subsequent changes.

In addition, information for current tax years is available immediately on our computer systems.

Delivery time to you depends on how you submit your request and the delivery method you select to receive the information.

We're attempting to develop a new way to allow you to access your own tax account information on-line, but we have to make sure that unauthorized individuals won't get access to on-line accounts. While we currently don't have an on-line account system, you can get account information by calling your local IRS office (listed in your telephone directory), or our national toll free number 1-800-829-0922. You can also send us a completed Form 4506, Request for Copy or Transcript of Tax Form.

If you have any questions about information contained in the transcripts or other enclosed information, please call us at the IRS telephone number listed in your local directory or at 1-800-829-0922.

JUN-13-2007 WED 03:01 PM GOOZE KING HORSLEY LLP      FAX NO. 205711370              P. 20

06/12/2007  23:11      52734                                                   PAGE 89

This Product Contains Sensitive Taxpayer Data

Request Date: 06-05-2007
Response Date: 06-05-2007

Tracking Number:

Account Transcript

FORM NUMBER: 1040          TAX PERIOD: Dec. 31, 2004

TAXPAYER IDENTIFICATION NUMBER:
SPOUSE TAXPAYER IDENTIFICATION NUMBER:

KEVIN J ATWELL

Any minus sign shown below signifies a credit amount.

ACCOUNT BALANCE:          0.00
ACCRUED INTEREST:         0.00          AS OF: Apr. 30, 2007
ACCRUED PENALTY:          0.00          AS OF: Apr. 30, 2007

ACCOUNT BALANCE
PLUS ACCRUALS:            0.00

** EXEMPTIONS:            00             ** FILING STATUS: Married Filing Separate
** ADJUSTED GROSS
   INCOME:
** TAXABLE INCOME:
   TAX PER RETURN:
** SE TAXABLE INCOME
   TAXPAYER:
** SE TAXABLE INCOME
   SPOUSE:
** TOTAL SELF
   EMPLOYMENT TAX:

** PER RETURN OR AS ADJUSTED

                              TRANSACTIONS
CODE EXPLANATION OF TRANSACTION         CYCLE    DATE          AMOUNT
460  EXTENSION OF TIME TO FILE                   04-15-2005    $0.00
     EXT. DATE 08-15-2005

This Product Contains Sensitive Taxpayer Data

JUN-13-2007 WED 03:01 PM GOOZE KING HORSLEY LLP    FAX NO. 2059711370    P. 21

06/12/2807  23:11    52734⌐⌐    PAGE 18



**Department of the Treasury**
**Internal Revenue Service**
**MEMPHIS, TN 37501-1498**

Transcript Delivery System Correspondence

Tracking ID:
Date of Issue: 06-05-2007

002526.391685.0006.001 1 MB 0.360 536



KEVIN J ATWELL & ROBIN K DAVIS
PO BOX 442
BRANTLEY, AL 36009

002526

Tax Period: December, 2005

### Information about the Request We Received

In this letter, we'll report the status of the request we received.

We've enclosed the transcript or transcripts that you requested on June 5, 2007.

A transcript of account shows a summary of your tax return and subsequent actions taken. These actions could include payments, amended returns, and corrections we made to the original return due to math mistakes.

We have different types of information that we can give you about your account:

* A return transcript will show you certain line items as reported on your tax return.
* An account transcript summarizes your return and shows subsequent changes that you or we may have made.
* A record of account has detailed information on both the line items from your return and on subsequent changes.

In addition, information for current tax years is available immediately on our computer systems.

Delivery time to you depends on how you submit your request and the delivery method you select to receive the information.

We're attempting to develop a new way to allow you to access your own tax account information on-line, but we have to make sure that unauthorized individuals won't get access to on-line accounts. While we currently don't have an on-line account system, you can get account information by calling your local IRS office (listed in your telephone directory), or our national toll free number 1-800-829-0922. You can also send us a completed Form 4506, Request for Copy or Transcript of Tax Form.

If you have any questions about information contained in the transcripts or other enclosed information, please call us at the IRS telephone number listed in your local directory or at 1-800-829-0922.

This Product Contains Sensitive Taxpayer Data

Request Date: 06-05-2007
Response Date: 06-05-2007

Tracking Number:

Account Transcript

FORM NUMBER: 1040          TAX PERIOD: Dec. 31, 2005

TAXPAYER IDENTIFICATION NUMBER:
SPOUSE TAXPAYER IDENTIFICATION NUMBER:

KEVIN J ATWELL & ROBIN K DAVIS

Any minus sign shown below signifies a credit amount.

02525    ACCOUNT BALANCE:          0.00
         ACCRUED INTEREST:         0.00        AS OF: May  08, 2006
         ACCRUED PENALTY:          0.00        AS OF: May  08, 2006

         ACCOUNT BALANCE
         PLUS ACCRUALS:            0.00

         ** EXEMPTIONS:            02          ** FILING STATUS: Married Filing Joint
         ** ADJUSTED GROSS
            INCOME:
         ** TAXABLE INCOME:
            TAX PER RETURN:
         ** SE TAXABLE INCOME
            TAXPAYER:              0.00
         ** SE TAXABLE INCOME
            SPOUSE:                0.00
         ** TOTAL SELF
            EMPLOYMENT TAX:        0.00

         ** PER RETURN OR AS ADJUSTED

         RETURN DUE DATE OR RETURN RECEIVED DATE (WHICHEVER IS LATER): Apr. 15, 2006

                                        PROCESSING DATE: May 08, 2006

                              TRANSACTIONS
CODE EXPLANATION OF TRANSACTION        CYCLE     DATE              AMOUNT
150  RETURN FILED AND TAX ASSESSED     20061708  05-08-2006

806  WITHHOLDING CREDIT                          04-15-2006

846  REFUND                                      05-08-2006

This Product Contains Sensitive Taxpayer Data

JUN-13-2007 WED 03:01 PM GOOZE KING HORSLEY LLP     FAX NO. 2059711370     P. 23

06/12/2007  23:11    52734__                                    PAGE  12



**Department of the Treasury**
**Internal Revenue Service**
**MEMPHIS, TN 37501-1498**

Transcript Delivery System Correspondence

Tracking ID: 1
Date of Issue: 06-05-2007

002525.391685.0006.001 1 MB 0.360 530
[barcode text]

**KEVIN ATWELL & ROBIN DAVIS**
**PO BOX 442**
**BRANTLEY, AL 36009**

Tax Period: December, 2006

307525

### Information about the Request We Received

In this letter, we'll report the status of the request we received.

We've enclosed the transcript or transcripts that you requested on June 5, 2007.

A transcript of account shows a summary of your tax return and subsequent actions taken. These actions could include payments, amended returns, and corrections We made to the original return due to math mistakes.

We have different types of information that we can give you about your account:

* A return transcript will show you certain line items as reported on your tax return.
* An account transcript summarizes your return and shows subsequent changes that you or We may have made.
* A record of account has detailed information on both the line items from your return and on subsequent changes.

In addition, information for current tax years is available immediately on our computer systems.

Delivery time to you depends on how you submit your request and the delivery method you select to receive the information.

We're attempting to develop a new way to allow you to access your own tax account information on-line, but we have to make sure that unauthorized individuals won't get access to on-line accounts. While we currently don't have an on-line account system, you can get account information by calling your local IRS office (listed in your telephone directory), or our national toll free number 1-800-829-0922. You can also send us a completed Form 4506, Request for Copy or Transcript of Tax Form.

If you have any questions about information contained in the transcripts or other enclosed information, please call us at the IRS telephone number listed in your local directory or at 1-800-829-0922.



02525

KEVIN A'...LL & ROBIN DAVIS
PO BOX 442
BRANTLEY, AL 36009-0442-426

Any minus sign shown below signifies a credit amount.

ACCOUNT BALANCE:            0.00
ACCRUED INTEREST:           0.00        AS OF: Apr. 30, 2007
ACCRUED PENALTY:            0.00        AS OF: Apr. 30, 2007

ACCOUNT BALANCE
PLUS ACCRUALS:              0.00

** EXEMPTIONS:              02          ** FILING STATUS: Married Filing Joint
** ADJUSTED GROSS
   INCOME:
** TAXABLE INCOME:          0.00
   TAX PER RETURN:          0.00
** SE TAXABLE INCOME
   TAXPAYER:                0.00
** SE TAXABLE INCOME
   SPOUSE:                  0.00
** TOTAL SELF
   EMPLOYMENT TAX:          0.00

** PER RETURN OR AS ADJUSTED

RETURN DUE DATE OR RETURN RECEIVED DATE (WHICHEVER IS LATER): Apr. 15, 2007

PROCESSING DATE: Apr. 23, 2007

TRANSACTIONS

| CODE | EXPLANATION OF TRANSACTION | CYCLE | DATE | AMOUNT |
|------|----------------------------|-------|------|--------|
| 150  | RETURN FILED AND TAX ASSESSED 76207-089-06985-7 | 20071508 | 04-23-2007 | $0.00 |
| 806  | WITHHOLDING CREDIT |  | 04-15-2007 | .. |
| 766  | REFUNDABLE CREDIT |  | 04-15-2007 |  |
| 776  | INTEREST DUE TAXPAYER |  | 04-15-2007 | ...43 |
| 846  | REFUND |  | 04-23-2007 |  |
| 898  | TREASURY OFFSET REFUND TO ANOTHER AGENCY REFUND REDUCED BY: $181.24 |  | 04-23-2007 |  |

This Product Contains Sensitive Taxpayer Data

AS TO RESPONSES TO INTERROGATORIES:

SMART ALABAMA, LLC

By: _____

Its: _GENERAL MANAGER ADMINISTRATION_

**VERIFICATION**

STATE OF ALABAMA           )

COUNTY OF _CRENSHAW_       )

Before me this day personally appeared _GARY SPORT_ and after being first duly sworn on oath, deposes and says that he is the _GENERAL MANAGER ADMIN._ for SMART ALABAMA, LLC, that he has read the foregoing responses to interrogatories on behalf of SMART ALABAMA, LLC; that he subscribes to the same on behalf of SMART ALABAMA, LLC and is duly authorized to do so; that the foregoing answers are based upon information supplied by persons who he believes to be knowledgeable regarding said information and from the books and records of the organization; and that he believes the foregoing answers to be true and correct to the best of his information, knowledge and belief.

Given under my hand and seal, this _14_ day of June, 2007.

_Staci Mount_
NOTARY PUBLIC
[SEAL]

My Commission
Expires: _9-15-2010_

1568829 v1

23



**ALABAMA SJIS CC/DC CASE DETAIL**



Company Name: BURR & FORMAN LLP        PREPARED FOR: VICKIE JACKSON

County: **24**    Case Number: DC-2005-000534.00    Charge    **CCNS**
Name: **DAVIS ROBIN**

# Case

## Case Information

| | | | | |
|---|---|---|---|---|
| County: | 24 - CRENSHAW | Case Number: | DC-2005-000534.00 | JID: TES THOMAS E SPORT   DEF status: B Bond |
| Filed: | 07/01/2005 | AAGCY: | S State | Muni N°: 00    City: |
| Arrest date: 07/01/2005 | | Offe date: | 06/29/2005 | ORI: 0031400    Officer: HARDEN |
| Indict date: | | Grand Jury: | | Atty 1: COO063A    Ticket N°: |
| Tracking N°s: | WR200500054000/0/0 | | | |
| Date: | | Que: | Time: | Desc: |

## Defendant Information

| | | | | |
|---|---|---|---|---|
| Name: | DAVIS ROBIN | Alias 1: | | Alias 2: |
| DOB: | | SSN: | | Driv License N°: AL5858299 |
| Height : | 5'07" | Weight: 135 | Race/Sex: White /F | Eyes/Hair: BRO/BRO |
| SID: | AL0 | YDate: | AIS: | PR: 0 |
| Address 1: | | | Address 2: | |
| Zip: | 36049 | City: LUVERNE | State: AL | Country: US |

## Prosecutor & Atty Info

| | | |
|---|---|---|
| Prosecutor: NIC008 | Attorney 1: COO063 A | Attorney 2: |
| Prosecutor Flag: N | Attorney 1 Flag: N | Attorney 2 Flag: |

## Warrant Information

| | | |
|---|---|---|
| Warrant Date: -- | WARAC — | WARLOC: — |
| BP ISS: | BP RTN: | |

## Charges

| | | | |
|---|---|---|---|
| 1. Crime co: CCNS | Statute: CRIMINAL CONSPRCY(FELONY) | Stat Name: 13A-004-003 | Class/Categ: F JU   Counts: 1 |
| 2. Crime co: | Statute: | Stat Name: | Class/Categ:   Counts: |
| 3. Crime co: | Statute: | Stat Name: | Class/Categ:   Counts: |
| More: N | | Dom Viol: N | Case Type: F   Case Categ: JU |
| Comment: | | | |

## Bonding Information

| | | |
|---|---|---|
| Bond amt: 5000.00 | Bond type: | Bond co: |
| Rel Date: 07/01/2005 | Surety: S 001 | CWIT: W 001 |
| Jury Demand: | | Appeal Date: |

# Settings

## Setting Dates

| | Date: | Que: | Time: | Description: |
|---|---|---|---|---|
| 1: | | | | |
| 2: | 01/05/2006 | 001 | 09:00 AM | PLMH - PREL HEARING |
| 3: | | | - | |
| 4: | | | - | |



EXHIBIT
R. Atwell 6-21-07

## Disposition

### Disposition

| | | | |
|---|---|---|---|
| CRT ACT: G Guilty ples | CA date: 01/05/2006 | Jury: | More: N |
| Charge 1: CCO2 CRIM CONSPIRACY - MISD/A | 13A-004-003    M A | Counts: 001 | CA: G 01/05/2006 |
| Charge 2: | | Counts: | CA: |
| Charge 3: | | Counts: | CA: |
| Admin: | Why: | TBNV1: | TBNV2: |
| Appeal: | CAPP: | Type: | GJCA: |
| Cont Dt: | Why: | Cont N° : 0 | Dom Viol: N |
| Comment: | | | |
| Case Compl: N | Sent Prov: Y | Due: | |
| Warr: 0 | SUBP: X SUBP: | Updated: 01/11/2006 | |

## Sentence - 24DC200500053400

### Sentence

| | | | |
|---|---|---|---|
| Sent: 01/05/2006 | Begin: 01/05/2006 | End 0 | PRB Beg: |
| IMP CONF: 00 00 000 | SUSP CONF: 00 00 000 | Total Conf: 00 00 000 | Jail Cred: 00 00 000 |
| LICN Susp: 00 00 000 | Probation: 01 00 000 | PRB Rev: | |

### Monetary

| | | | | |
|---|---|---|---|---|
| X Cost: | Fine Imp: 0.00 | Fine Susp: 0.00 | CVCC: | HIS: |
| WCCS: | MCOS: | JFEE: 0.00 | DRGF: 0 | ASU: |
| PREL: | DRUG: | RCUP: 0.00 | | |
| RES1: 0.00 | | RES2: 0.00 | | RES3: 0.00 |
| RES4: 0.00 | | RES5: 0.00 | | RES6: 0.00 |

### Confine

| | | | | | | |
|---|---|---|---|---|---|---|
| PENT: | LIFE: | LWOP: | DEATH: | SPLIT: | BOOT: 0 | EMON: 0 |
| JAIL: | CCUR: | CSEC: | CTERM: | RVSPL: | GANG: 0 | |

### Programs

| | | | | | | |
|---|---|---|---|---|---|---|
| JDVR: | JPROB: | AASCH: | DUI: | DDC: | CSV: 0 | SAPP: |
| PTRL: | BCSCH: | MNTL: | CRO: | ASCH: | ANGER: | DRUGCT: |

### Enhanced

| | | | | |
|---|---|---|---|---|
| PROJ: | CNOT: | SCH: | VDOB: | HOOF: |
| DRUGCODE: | MEAS: | VOL: 0.00 | | |

| | | | | |
|---|---|---|---|---|
| SEC/CUR: | | | | |
| Comment: | | | | |
| Bal Due: | Due: | CRO: | Updated: | Cost: 01/11/2006 |

© Alacourt.com  5/24/2007      3

## Case Action Summary - 24DC200500053400

| Date: | Time | Code | Comments | Operator |
|-------|------|------|----------|----------|
| 07/15/2005 | 9:21:14 | JUDG | ASSIGNED TO: (TES) THOMAS E SPORT     (AR01) | SHS |
| 07/15/2005 | 9:21:16 | STAT | INITIAL STATUS SET TO: "B" - BOND     (AR01) | SHS |
| 07/15/2005 | 9:21:16 | FILE | FILED ON: 07/01/2005     (AR01) | SHS |
| 07/15/2005 | 9:21:17 | ARRS | DEFENDANT ARRESTED ON: 07/01/2005     (AR01) | SHS |
| 07/15/2005 | 9:21:18 | BOND | BOND SET AT: $5000.00     (AR01) | SHS |
| 07/15/2005 | 9:21:19 | REDT | DEFENDANT RELEASED FROM JAIL: 07/01/2005   (AR01) | SHS |
| 07/15/2005 | 9:21:20 | DAT2 | SET FOR: APPOINTMENT OF COU ON 08/05/2005 AT (AR01) | SHS |
| 07/15/2005 | 9:21:21 | FILE | CHARGE 01: CRIMINAL CONSPRCY(FE/#CNTS: 001 (AR01) | SHS |
| 07/15/2005 | 9:21:39 | PRTY | PARTY ADDED: S001: JANICE M EDISON     (AW21) | SHS |
| 07/22/2005 | 12:00:00 | DOCK | NOTICE SENT: 07/22/2005 DAVIS ROBIN | SHS |
| 07/22/2005 | 1:00:00 | DOCK | NOTICE SENT: 07/22/2005 JANICE M EDISON | SHS |
| 08/10/2005 | 2:08:10 | ATY1 | ATTORNEY FOR DEFENDANT: CARTER WAYNE     (AR10) | SHS |
| 08/10/2005 | 2:08:19 | DAT2 | SET FOR: PREL HEARING ON 09/08/2005 AT 0900A(AR10) | SHS |
| 08/10/2005 | 2:08:43 | TEXT | COPY OF FILE TO CARTER | SHS |
| 08/25/2005 | 10:08:19 | SUBP | WITNESS SUBPOENA ISSUED: 08/25/2005     (AR08) | SHS |
| 08/30/2005 | 9:27:32 | SERV | PARTY W002 SERVED DATE:     (AW21) | JUS |
| 08/30/2005 | 9:27:46 | SERV | PARTY W003 SERVED DATE: 08292005 TYPE:     (AW21) | JUS |
| 09/07/2005 | 10:24:00 | TEXT | MOTION TO CONTINUE FILED | SHS |
| 09/07/2005 | 10:24:01 | TEXT | ORDER FILED, CASE CONTINUED TO 10/6/05 | SHS |
| 09/12/2005 | 10:35:11 | DAT2 | SET FOR: PREL HEARING ON 10/06/2005 AT 0900A(AR10) | SHS |
| 09/12/2005 | 10:36:00 | TEXT | COPY OF ORDER TO CARTER | SHS |
| 09/16/2005 | 1:25:53 | CASU | CASE ACTION SUMMARY PRINTED     (AR08) | SHS |
| 09/20/2005 | 11:39:00 | DOCK | NOTICE SENT: 09/20/2005 DAVIS ROBIN | SHS |
| 09/20/2005 | 11:50:23 | SUBP | WITNESS SUBPOENA ISSUED: 09/20/2005     (AR08) | SHS |
| 09/23/2005 | 9:07:13 | SERV | PARTY W003 SERVED DATE: 09212005 TYPE:     (AW21) | JUS |
| 09/23/2005 | 9:07:24 | SERV | PARTY W002 SERVED DATE: 09212005 TYPE:     (AW21) | JUS |
| 09/29/2005 | 10:05:48 | SERV | PARTY W001 SERVED DATE: 09222005 TYPE:     (AW21) | JUS |
| 10/06/2005 | 10:26:24 | TEXT | WAYNER CARTER REMOVED AS ATTORNEY DUE TO CONFLICT | SHS |
| 10/06/2005 | 4:08:59 | DAT2 | SET FOR: PREL HEARING ON 01/05/2006 AT 0900A(AR10) | SHS |
| 10/12/2005 | 10:26:24 | TEXT | BRANDON COOTS APPOINTED TO REPRESENT DEFT | SHS |
| 10/14/2005 | 10:26:24 | TEXT | COPY OF ORDER TO CARTER AND COOTS | SHS |
| 10/14/2005 | 10:26:25 | TEXT | COPY OF FILE TO COOTS | SHS |
| 10/14/2005 | 10:26:59 | ATY1 | ATTORNEY FOR DEFENDANT: COOTS BRANDON SHANE (AR10) | SHS |
| 10/14/2005 | 10:27:18 | DOC2 | DOCKET DATE NOTICE   SENT TO DEF ATTY 1 (AR09) | SHS |
| 12/21/2005 | 10:07:23 | SUBP | WITNESS SUBPOENA ISSUED: 12/21/2005     (AR08) | SHS |
| 12/30/2005 | 10:42:13 | SERV | PARTY W002 SERVED DATE: 12282005 TYPE: SERVED PER | JUS |
| 12/30/2005 | 10:42:30 | SERV | PARTY W003 SERVED DATE: 12282005 TYPE: SERVED PER | JUS |
| 01/11/2006 | 10:23:40 | DJID | DISPOSITION JUDGE ID CHANGED FROM:   TO: TES | OLG |
| 01/11/2006 | 10:23:41 | DISP | CHARGE 01: CRIM CONSPIRACY-F/#CNTS:001 (AR10) | OLG |
| 01/11/2006 | 10:23:42 | DISP | CHARGE 01 DISPOSED BY: GUILTY PLEA ON: 01/05/2006 | OLG |
| 01/11/2006 | 10:23:56 | DISP | CHARGE 01: CRIM CONSPIRACY - M/#CNTS: 001 (AR10) | OLG |
| 01/11/2006 | 10:23:57 | DISP | CHARGE 01 DISPOSED BY: on 01/05/2006 | OLG |
| 01/11/2006 | 10:24:25 | CH01 | DEFENDANT SENTENCED ON: 01/05/2006     (AR05) | OLG |
| 01/11/2006 | 10:24:26 | CH01 | SENTENCE TO BEGIN ON: 01/05/2006     (AR05) | OLG |
| 01/11/2006 | 10:24:27 | CH01 | PROBATION OF: 01 YEARS     (AR05) | OLG |
| 01/11/2006 | 10:24:28 | CH01 | COST PROVISION ORDERED BY THE COURT     (AR05) | OLG |
| 01/11/2006 | 10:24:29 | CH01 | CVCC PROVISION ORDERED BY THE COURT     (AR05) | OLG |
| 01/11/2006 | 10:24:30 | CH01 | SUBPOENA FEE PROVISION ORDERED BY THE COURT (AR05) | OLG |

© Alacourt.com  5/24/2007     4

| 01/11/2006 | 10:24:31 | CH01 | HISTORY FEE PROVISION ORDERED BY THE COURT. (AR05) | OLG |
| 01/31/2006 | 11:15:11 | SERV | PARTY W001 SERVED DATE: 01312006  TYPE: NO SERVICE | SHS |

END OF THE REPORT



**ALABAMA SJIS CC/DC CASE DETAIL**

Company Name: BURR & FORMAN LLP                    PREPARED FOR: VICKIE JACKSON



County:  19     Case Number: DC-2004-000543.00    Charge    ASS3
Name: **DAVIS ROBIN**

# Case

## Case Information

| | | | | | |
|---|---|---|---|---|---|
| County: | 19 - COFFEE - ELBA | Case Number: | DC-2004-000543.00 | JID: BPS B PAUL SHERLING | DEF status: B Bond |
| Filed: | 11/15/2004 | AAGCY: | M Municipal | Muni N°: 01 | City: ELBA |
| Arrest date: 11/08/2004 | | Offe date: | 11/03/2004 | ORI: 0190100 | Officer: TRUMAN |
| Indict date: | | Grand Jury: | | Atty 1: | Ticket N°: |
| Tracking N°'s: | WR200400041000/0/0 | | | | |
| Date: | 03/17/2005 | Que: 001 | Time: 02:30 PM | Desc: BTRL BENCH TRIAL | |

## Defendant Information

| | | | | | |
|---|---|---|---|---|---|
| Name: | DAVIS ROBIN | | Alias 1: | | Alias 2: |
| DOB: | | SSN: | XXX-XX-XXXX | Driv License N°: AL | |
| Height: | 5'06" | Weight: 140 | Race/Sex: White /F | Eyes/Hair: BRO/BRO |
| SID: | AL0 | YDate: | AIS: | PR: 0 |
| Address 1: | | | Address 2: | |
| Zip: | 36323 | City: ELBA | State: AL | Country: US |

## Prosecutor & Atty Info

| | | |
|---|---|---|
| Prosecutor: KEL023 | Attorney 1: | Attorney 2: |
| Prosecutor Flag: N | Attorney 1 Flag: Y | Attorney 2 Flag: |

## Warrant Information

Warrant date: 03/22/2005-A- Alias Warrant      WARAC  –       WARLOC: –
BP ISS:                                         BP RTN:

## Charges

| | | | |
|---|---|---|---|
| 1. Crime co: ASS3 | Statute: ASSAULT 3RD DEGREE | Stat Name: 13A-006-022 | Class/Categ: M PE  Counts: 1 |
| 2. Crime co: | Statute: | Stat Name: | Class/Categ:  Counts: |
| 3. Crime co: | Statute: | Stat Name: | Class/Categ:  Counts: |
| More: N | | Dom Viol: N | Case Type: M  Case Categ: PE |
| Comment: | | | |

## Bonding Information

| | | |
|---|---|---|
| Bond amt: 0.00 | Bond type: R Recognizance | Bond co: |
| Rel Date: 11/08/2004 | Surety: | CWIT: |
| Jury Demand: | | Appeal Date: |

# Settings

## Setting Dates

| | Date: | Que: | Time: | Description: |
|---|---|---|---|---|
| 1: | 03/17/2005 | 001 | 02:30 PM | BTRL - BENCH TRIAL |
| 2: | | | - | |
| 3: | | | - | |
| 4: | | | - | |

## Disposition

### Disposition

| | | | |
|---|---|---|---|
| CRT ACT: N Nol pross | CA date: 03/24/2005 | Jury: | Moro: N |
| Charge 1: ASS3 ASSAULT 3RD DEGREE | 13A-006-022 M A | Counts: 001 | CA: N 03/24/2005 |
| Charge 2: | | Counts: | CA: |
| Charge 3: | | Counts: | CA: |
| Admin: | Why: | TBNV1: | TBNV2: |
| Appeal: | CAPP: | Type: | GJCA: |
| Cont Dt: | Why: | Cont N° : 0 | Dom Viol: N |
| Comment: | | | |
| Case Compl: N | Sent Prov: N | Due: | |
| Warr: 2 | SUBP: M SUBP: | Updated: 03/25/2005 | |

## Sentence - 19DC200400054300

### Sentence

| | | | |
|---|---|---|---|
| Sent: 03/24/2005 | Begin: | End 0 | PRB Beg: |
| IMP CONF: 00 00 000 | SUSP CONF: 00 00 000 | Total Conf: 00 00 000 | Jail Cred: 00 00 000 |
| LICN Susp: 00 00 000 | Probation: 00 00 000 | PRB Rev: | |

### Monetary

| | | | |
|---|---|---|---|
| M Cost: | Fine Imp: 0.00 | Fine Susp: 0.00 | CVCC: | HIS: |
| WCCS: | MCOS: | JFEE: 0.00 | DRGF: 0 | ASU: |
| PREL: | DRUG: | RCUP: 0.00 | | |
| RES1: 0.00 | | RES2: 0.00 | | RES3: 0.00 |
| RES4: 0.00 | | RES5: 0.00 | | RES6: 0.00 |

### Confine

| | | | | | | |
|---|---|---|---|---|---|---|
| PENT: | LIFE: | LWOP: | DEATH: | SPLIT: | BOOT: 0 | EMON: 0 |
| JAIL: | CCUR: | CSEC: | CTERM: | RVSPL: | GANG: 0 | |

### Programs

| | | | | | | |
|---|---|---|---|---|---|---|
| JDVR: | IPROB: | AASCH: | DUI: | DDC: | CSV: 0 | SAPP: |
| PTRL: | BCSCH: | MNTL: | CRO: | ASCH: | ANGER: | DRUGCT: |

### Enhanced

| | | | | |
|---|---|---|---|---|
| PROJ: | CNOT: | SCH: | VDOB: N | HOOF: |
| DRUGCODE: | MEAS: | VOL: 0.00 | | |

| | | | |
|---|---|---|---|
| SEC/CUR: | | | |
| Comment: | | | |
| Bal Due: | Due: | CRO: | Updated: Cost: 03/25/2005 |



© Alacourt.com   5/24/2007    3

## Case Action Summary - 19DC200400054300

| Date: | Time | Code | Comments | Operator |
|---|---|---|---|---|
| 11/15/2004 | 9:07:32 | JUDG | ASSIGNED TO: (JCD) JOHN C DOWLING  (AR01) | JEL |
| 11/15/2004 | 9:07:33 | DAT1 | SET FOR: APPEARANCE DOCKET  ON 12/16/2004 AT (AR01) | JEL |
| 11/15/2004 | 9:07:34 | REDT | DEFENDANT RELEASED FROM JAIL : 11/08/2004 (AR01) | JEL |
| 11/15/2004 | 9:07:35 | BOND | BOND SET AT: $1000.00      (AR01) | JEL |
| 11/15/2004 | 9:07:36 | FILE | FILED ON: 11/15/2004      (AR01) | JEL |
| 11/15/2004 | 9:07:37 | FILE | CHARGE 01: ASSAULT 3RD DEGREE/#CNTS: 001   (AR01) | JEL |
| 11/15/2004 | 9:07:38 | ARRS | DEFENDANT ARRESTED ON: 11/08/2004     (AR01) | JEL |
| 11/15/2004 | 9:07:39 | STAT | INITIAL STATUS SET TO: "B": BOND      (AR01) | JEL |
| 11/15/2004 | 9:07:40 | CASP | CASE ACTION SUMMARY PRINTED       (AR01) | JEL |
| 01/24/2005 | 8:00:39 | DAT1 | SET FOR: APPEARANCE DOCKET  ON 03/17/2005 AT (AR04) | JEL |
| 01/24/2005 | 8:00:40 | SUBP | WITNESS SUBPOENA ISSUED 01/24/2005    (AR08) | JEL |
| 03/04/2005 | 1:21:45 | SERC | SERVICE OF NO SERVICE   ON 02192005 FOR W001 (A | JEL |
| 03/22/2005 | 3:00:57 | AWAR | ALIAS WARRANT ISSUED 03/22/2005     (AR08) | PSH |
| 03/25/2005 | 3:47:50 | DJID | DISPOSITION JUDGE ID CHANGED FROM:   TO: BPS | JEL |
| 03/25/2005 | 3:47:51 | DISP | CHARGE 01 DISPOSED BY: NOLPRS/DA ON: 03/24/2005 | JEL |
| 03/25/2005 | 3:47:52 | DISP | CHARGE 01: ASSAULT 3RD DEGREE /#CNTS: 001   (AR10) | JEL |
| 03/25/2005 | 3:47:53 | D001 | ENFORCEMENT STATUS SET TO: "N"      (AR10) | JEL |
| 03/25/2005 | 3:48:00 | CH00 | DEFENDANT SENTENCED ON: 03/24/2005      (AR05) | JEL |
| 03/25/2005 | 3:48:01 | CH00 | COURT ORDERED REMITTANCE OF COST     (AR05) | JEL |
| 03/25/2005 | 3:48:02 | CH00 | COURT ORDERED REMITTANCE OF HISTORY FEE   (AR05) | JEL |
| 03/25/2005 | 3:48:03 | CH00 | COURT ORDERED REMITTANCE OF WARRANT FEE   (AR05) | JEL |
| 03/25/2005 | 3:48:04 | CH00 | COURT ORDERED REMITTANCE OF CVCC      (AR05) | JEL |
| 03/25/2005 | 3:48:05 | CH00 | COURT ORDERED REMITTANCE OF SUBPOENA FEE   (AR05) | JEL |

 END OF THE REPORT



ALABAMA SJIS TR CASE DETAIL

PREPARED FOR: VICKIE JACKSON

alacourt.com

County: 19    Case Number: TR-2004-001438.00    Charge    DED
Name: DAVIS ROBIN KYLE

## Case

### Case Information

| | |
|---|---|
| County: | 19 - COFFEE - ELBA |
| Case Number: | TR-2004-001438.00 |
| JID: | BPS |
| DEF status: | F |
| UTC N°: | DMS916593 |
| Flag: | N |
| ENF STS: | C |

### Vehicle Information

| | |
|---|---|
| VEH DESC: | |
| VEH STATE: | AL |
| VEH YEAR: | 0 |
| VEH NUM: | |
| CLS: | DM |
| HAZ: | N |
| COMM: | N |

### Defendant Information

| | | | |
|---|---|---|---|
| Name: | DAVIS ROBIN KYLE | Phone: | |
| DOB: | | SSN: 420060538 | Driv License N°: AL5858299 |
| Height: | 5'07" | Weight: 135 | Race/Sex: W/F | Eyes/Hair: BRO/BRO |
| Address 1: | | Address 2: | |
| Zip: | 36323 | City: ELBA | State: AL | Country: US |

### Warrant Information

Warrant Date: 11/19/2004-A- Alias Warrant    WARAC: 03/04/2005-R- Warrant    WARLOC: --
BP ISS:    Recalled
BP RTN:

## Charge

### Charge

| | | | | | |
|---|---|---|---|---|---|
| Arrest date: | 06/08/2004 | Filed: | 08/16/2004 | Officer: | JETER |
| Agency: | 0190100 | Agency Type: M | Muni N°: | 01 | City: |
| Atty 1: | | Atty Type: | | Atty Flag: | Y |
| Date: | 10/21/2004 | Que: | 001 | Desc: | APPD APPEARANCE DOCKET |
| Charge: | T008 | Desc: DRIVE W/SUSPENDED | | Cite: | Rule 20: T |
| Speed: | 0 | Limit: | 0 | BAC: | 0.000 |
| Bond amt: | 0.00 | Bondco: | | Surety: | |
| FTA date: | | Released: | | Admin Date: | |

## Court Action

### Court Action

| | | | | | | |
|---|---|---|---|---|---|---|
| CRT ACT: | | CA date: 03/04/2005 | FS built: Y | | Complete: 03/04/2005 | |
| Charge: | T008 | Desc: DRIVE W/SUSPENDED | Cite: | | Bal due: | |
| Fine: | FINE: X | LSUS: X | CVCC: | HIST: | REST: | RECOUP: |
| Cost: | 141.00 | COST: X | Other due: 22.00 | JFEE: | HEAD: | |
| Comment: | | | | | | |
| SNTPRO: | N | | | | | |

## Case Action Summary - 19TR200400143800

| Date: | Time: | Code: | Comments | Operator |
|---|---|---|---|---|
| 08/17/2004 | 8:43:15 | NOTE | NOTICE FLAG SET TO: "N" (TR01) | COK |
| 08/17/2004 | 8:43:15 | STAT | INITIAL STATUS SET TO: "B" FOR BOND    (TR01) | COK |

© Alacourt.com  5/24/2007                                                1

| 08/17/2004 | 8:43:16 | FILE: | FILED ON: 08/16/2004 CHARGE: DRIVE W/SUSPENDED | COK |
|---|---|---|---|---|
| 08/17/2004 | 8:43:17 | ESTS | ENF STATUS SET TO: "A"          (TR01) | COK |
| 08/17/2004 | 8:43:18 | ARRS | DEFENDANT ARRESTED ON: 08/08/2004          (TR01) | COK |
| 08/17/2004 | 8:43:19 | DATE | SET FOR: APPEARANCE DOCKET ON 09/23/2004 @ 0900A | COK |
| 08/17/2004 | 8:43:20 | COST | DEFENDANT COST: $141.00          (TR01) | COK |
| 08/17/2004 | 8:43:21 | RU20 | RULE 20 STATUS OF: TRIAL          (TR01) | COK |
| 08/23/2004 | 3:00:00 | PTRL | PRE-TRIAL NOTICE MAILED 08/24/2004 | AOC |
| 08/23/2004 | 3:12:00 | PTRL | PRE-TRIAL NOTICE MAILED 08/24/2004 | AOC |
| 09/24/2004 | 9:31:35 | DATE | SET FOR: APPEARANCE DOCKET ON 10/21/2004 @ 0900A | JEL |
| 09/24/2004 | 9:39:33 | SNGT | SINGLE TRIAL NOTICE ISSUED          (TR03) | JEL |
| 11/19/2004 | 3:20:28 | AWAR | ALIAS WARRANT ISSUED: ($3500.00)  (TR03) | JEL |
| 11/19/2004 | 3:20:29 | SUSN | SUSPENSION NOTICE ISSUED          (TR03) | JEL |
| 03/04/2005 | 3:38:25 | CADA | CASE DISPOSED BY: GUILTY PLEA ON 03/04/2005 | JEL |
| 03/04/2005 | 3:38:26 | COST | COST PROVISION ORDERED BY THE COURT          (TR01) | JEL |
| 03/04/2005 | 3:38:27 | FINE | DEFENDANT SCHEDULED FINE: $100.00          (TR01) | JEL |
| 03/04/2005 | 3:38:28 | CADP | DEFENDANT CONVICTED OF: DRIVE W/SUSPENDED  (TR01) | JEL |
| 03/04/2005 | 3:38:29 | LSUS | SUSPENSION FEE PROVISION ORDERED BY THE COURT | JEL |
| 03/04/2005 | 3:38:58 | D001 | PAYMENT FREQUENCY SET TO: "L"          (FES1) | JEL |
| 03/04/2005 | 3:38:59 | D001 | PAYMENT DUE DATE SET TO: 03/25/2004          (FES1) | JEL |
| 03/04/2005 | 3:39:30 | WARR | "R" WARRANT SERVICE ON: 03/04/2005          (TR06) | JEL |
| 03/04/2005 | 3:39:55 | CLRN | CLEARANCE NOTICE ISSUED          (TR03) | JEL |

☺  *END OF THE REPORT*



**ALABAMA SJIS TR CASE DETAIL**

PREPARED FOR: VICKIE JACKSON


alacourt.com

County: 71    Case Number: TR-2004-001346.00    Charge    DED
Name: DAVIS ROBIN KYLE

## Case

### Case Information

| | |
|---|---|
| County: | 71 - COFFEE - ENTERPRISE |
| Case Number: | TR-2004-001346.00 |
| JID: | JCD |
| DEF status: | B |
| UTC N°: | NM4532705 |
| Flag: | N |
| ENF STS: | |

### Vehicle Information

| | |
|---|---|
| VEH DESC: | |
| VEH STATE: | AL |
| VEH YEAR: | 0 |
| VEH NUM: | |
| CLS: | DM |
| HAZ: | N |
| COMM: | U |

### Defendant Information

| | | | |
|---|---|---|---|
| Name: | DAVIS ROBIN KYLE | | Phone: |
| DOB: | | SSN: 420060038 | Driv License N°: AL5858299 |
| Height: | 5'07" | Weight: 135 | Race/Sex: W/F | Eyes/Hair: BRO/BRO |
| Address 1: | | Address 2: | |
| Zip: | 36323 | City: ELBA | State: AL | Country: US |

### Warrant Information

| | | | |
|---|---|---|---|
| Warrant Date: – | | WARAC – | WARLOC: – |
| BP ISS: | | BP RTN: | |

## Charge

### Charge

| | | | | |
|---|---|---|---|---|
| Arrest date: | 07/25/2004 | Filed: 07/27/2004 | Officer: 302 | |
| Agency: | 0190300 | Agency Type: M | Muni N°: 02 | City: |
| Atty 1: | | Atty Type: | Atty Flag: Y | |
| Date: | 09/24/2004 | Que: 001 | Desc: APPD APPEARANCE DOCKET | |
| Charge: | TODE | Desc: DRIVE W SUSPENDED | Cite: | Rule 20: T |
| Speed: | 0 | Limit: 0 | BAC: 0.000 | |
| Bond amt: | 0.00 | Bond co: | Surety: | |
| FTA date: | | Released: | Admin Date: | |

## Court Action

### Court Action

| | | | | | |
|---|---|---|---|---|---|
| CRT ACT: | | CA date: 08/20/2004 | FS built: Y | | Complete: 10/07/2004 |
| Charge: | TODE | Desc: DRIVE W SUSPENDED | Cite: | | Bal due: |
| Fine: | FINE: X | LSUS: X | CVCC: | HIST: | REST: | RECOUP: |
| Cost: | 141.00 | COST: X | Other due: 0.00 | JFEE: | HEAD: |
| Comment: | | | | | |
| SNTPRO: | N | | | | |

## Case Action Summary - 71TR200400134600

| Date: | Time | Code | Comments | Operator |
|---|---|---|---|---|
| 07/28/2004 | 8:06:17 | NOTE-TK | NOTICE FLAG SET ON ARREST (TR01) | SHH |
| 07/28/2004 | 8:06:13 | RU20 | RULE 20 STATUS OF: TRIAL      (TR01) | SHH |

| 07/28/2004 | 8:06:14 | COST | DEFENDANT COST: $141.00 (TR01) | SHH |
| 07/28/2004 | 8:06:15 | ARRS | DEFENDANT ARRESTED ON: 07/25/2004 (TR01) | SHH |
| 07/28/2004 | 8:06:16 | STAT. | INITIAL STATUS SET TO: "B" FOR BOND (TR01) | SHH |
| 07/28/2004 | 8:06:17 | FILE | FILED ON; 07/27/2004 CHARGE: DRIVE W/SUSPENDED | SHH |
| 07/28/2004 | 8:06:18 | ESTS | ENF STATUS SET TO: "A" (TR01) | SHH |
| 07/28/2004 | 8:06:19 | DATE | SET FOR: APPEARANCE DOCKET ON 08/20/2004 @ 0900A | SHH |
| 08/20/2004 | 11:35:26 | CADA | CASE DISPOSED BY: "GUILTY PLEA" ON 08/20/2004 (TR01) | SHH |
| 08/20/2004 | 11:35:27 | COST | COST PROVISION ORDERED BY THE COURT (TR01) | SHH |
| 08/20/2004 | 11:35:28 | FINE | DEFENDANT SCHEDULED FINE: $100.00 (TR01) | SHH |
| 08/20/2004 | 11:35:29 | CADP | DEFENDANT CONVICTED OF: DRIVE W/SUSPENDED (TR01) | SHH |
| 08/20/2004 | 11:35:30 | LSUS | SUSPENSION FEE PROVISION ORDERED BY THE COURT (TR01) | SHH |
| 08/20/2004 | 11:35:41 | D001 | PAYMENT FREQUENCY SET TO: "O" (FE51) | SHH |
| 08/20/2004 | 11:35:42 | D001 | PAYMENT DUE DATE SET TO: 08/24/2004 (FE51) | SHH |
| 08/20/2004 | 11:37:18 | DATE | SET FOR: APPEARANCE DOCKET ON 09/24/2004 @ 0900A | SHH |

 *END OF THE REPORT*



**ALABAMA SJIS/CC/DC CASE DETAIL**

Company Name: BURR & FORMAN LLP          PREPARED FOR: VICKIE JACKSON



County: 24    Case Number: DC-2005-000535.00    Charge    CRM1
Name: DAVIS ROBIN

## Case

### Case Information

| | | | |
|---|---|---|---|
| County: | 24 - CRENSHAW | Case Number: DC2005000535.00 | JID: TES THOMAS E SPORT | DEF status: B Bond |
| Filed: | 07/01/2005 | AAGCY: S. State | Muni N°: 00 | City: |
| Arrest date: 07/01/2005 | | Offe.date: 06/28/2005 | ORI: 0031400 | Officer: HARDEN |
| Indict date: | | Grand jury: | Atty 1: COO063A | Ticket N°: |
| Tracking N°'s: WR2005000053900/0/0 | | | | |
| Date: | | Que: | Time: | Dise: |

### Defendant Information

| | | | |
|---|---|---|---|
| Name: | DAVIS ROBIN | Alias 1: | Alias 2: |
| DOB: | | SSN: XXX-XX-0030 | Driv License N°: AL5858299 |
| Height : | 5'07" | Weight: 135 | Race/Sex: White /F | Eyes/Hair: BRO/BRO |
| SID: | AL0 | YDate: | AIS: | PR: 0 |
| Address 1: | | | Address 2: | |
| Zip: | 35049 | City: LUVERNE | State: AL | Country: US |

### Prosecutor & Atty Info

| | | |
|---|---|---|
| Prosecutor: NIC008 | Attorney 1: COO063 A | Attorney 2: |
| Prosecutor Flag: N | Attorney 1 Flag: N | Attorney 2 Flag: N |

### Warrant Information

| | | |
|---|---|---|
| Warrant Date: – | WARAC – | WARLOC: – |
| BP ISS: | BP RTN: | |

### Charges

| | | | | |
|---|---|---|---|---|
| 1. Crime co: CRM1 | Statute: CRIM MISCHIEF 1ST | Stat Name: 13A-007-021 | Class/Categ: F PR | Counts: 1 |
| 2. Crime co: | Statute: | Stat Name: | Class/Categ: | Counts: |
| 3. Crime co: | Statute: | Stat Name: | Class/Categ: | Counts: |
| More: N | | Dom Viol: N | Case Type: F | Case Categ: PR |
| Comment: | | | | |

### Bonding Information

| | | |
|---|---|---|
| Bond amt: 5000.00 | Bond type: | Bond co: |
| Rel Date: 07/01/2005 | Surety: | CWIT: W 001 |
| Jury Demand: | | Appeal Date: |

## Settings

### Setting Dates

| | Date: | Que: | Time: | Description: |
|---|---|---|---|---|
| 1: | | | | |
| 2: | 01/05/2006 | 001 | 09:00.AM | PLMH - PREL HEARING |
| 3: | | | | |
| 4: | | | | |



## Disposition

### Disposition

| | | |
|---|---|---|
| CRT ACT: D Dismissed | CA date: 01/05/2006 | Jury: | More: N |
| Charge 1: CRM1 CRIM MISCHIEF 1ST | 13A-007-021   F C | Counts: 001 | CA: D 01/05/2006 |
| Charge 2: | | Counts: | CA: |
| Charge 3: | | Counts: | CA: |
| Admin: | Why: | TBNV1: | TBNV2: |
| Appeal: | CAPP: | Type: | GJCA: |
| Cont Dt: | Why: | Cont N°: 0 | Dom Viol: N |
| Comment: | | | |
| Case Compl: N | Sent Prov: N | Due: | |
| Warr: 0 | SUBP:   SUBP: | Updated: 01/06/2006 | |

## Sentence - 24DC200500053500

### Sentence

| | | | |
|---|---|---|---|
| Sent: | Begin: | End 0 | PRB Beg: |
| IMP CONF: 00 00 000 | SUSP CONF: 00 00 000 | Total Conf: 00 00 000 | Jail Cred: 00 00 000 |
| LICN Susp: 00 00 000 | Probation: 00 00 000 | PRB Rev: | |

### Monetary

| | | | | |
|---|---|---|---|---|
| Cost: | Fine Imp: 0.00 | Fine Susp: 0.00 | CVCC: | HIS: |
| WCCS: | MCOS: | JFEE: 0.00 | DRGF: 0 | ASU: |
| PREL: | DRUG: | RCUP: 0.00 | | |
| RES1: 0.00 | | RES2: 0.00 | | RES3: 0.00 |
| RES4: 0.00 | | RES5: 0.00 | | RES6: 0.00 |

### Confine

| | | | | | | |
|---|---|---|---|---|---|---|
| PENT: | LIFE: | LWOP: | DEATH: | SPLIT: | BOOT: 0 | EMON: 0 |
| JAIL: | CCUR: | CSEC: | CTERM: | RVSPL: | GANG: 0 | |

### Programs

| | | | | | | |
|---|---|---|---|---|---|---|
| JDVR: | IPROB: | AASCH: | DUI: | DDC: | CSV: 0 | SAPP: |
| PYRL: | BCSCH: | MNTL: | CRO: | ASCH: | ANGER: | DRUGCT: |

### Enhanced

| | | | | |
|---|---|---|---|---|
| PROJ: | CNOT: | SCH: | VDOB: | HOOF: |
| DRUGCODE: | MEAS: | VOL: 0.00 | | |

| | | | |
|---|---|---|---|
| SEC/CUR: | | | |
| Comment: | | | |
| Bal Due: | Due: | CRO: | Updated:   Cost: 01/06/2006 |

© Alacourt.com   5/24/2007     3

## Case Action Summary - 24DC200500053500

| Date | Time | Code | Comments | Operator |
|------|------|------|----------|----------|
| 07/15/2005 | 9:24:07 | JUDG | ASSIGNED TO: (TES) THOMAS E SPORT   (AR01) | SHS |
| 07/15/2005 | 9:24:08 | BOND | BOND SET AT: $5000.00   (AR01) | SHS |
| 07/15/2005 | 9:24:09 | STAT | INITIAL STATUS SET TO: "B" - BOND   (AR01) | SHS |
| 07/15/2005 | 9:24:10 | REDT | DEFENDANT RELEASED FROM JAIL: 07/01/2005   (AR01) | SHS |
| 07/15/2005 | 9:24:11 | FILE | FILED ON: 07/01/2005   (AR01) | SHS |
| 07/15/2005 | 9:24:12 | DAT2 | SET FOR: APPOINTMENT OF COU ON 08/05/2005 AT (AR01) | SHS |
| 07/15/2005 | 9:24:13 | ARRS | DEFENDANT ARRESTED ON 07/01/2005   (AR01) | SHS |
| 07/15/2005 | 9:24:14 | FILE | CHARGE 01: CRIM MISCHIEF 1ST/#CNTS: 001   (AR01) | SHS |
| 07/22/2005 | 12:00:00 | DOCK | NOTICE SENT: 07/22/2005 DAVIS ROBIN | SHS |
| 08/10/2005 | 2:08:00 | TEXT | COPY OF FILE TO CARTER | SHS |
| 08/10/2005 | 2:08:25 | ATY1 | ATTORNEY FOR DEFENDANT: CARTER WAYNE   (AR10) | SHS |
| 08/10/2005 | 2:08:26 | DAT2 | SET FOR: PREL HEARING ON 09/08/2005 AT 0900A(AR10) | SHS |
| 09/07/2005 | 10:24:00 | TEXT | MOTION TO CONTINUE FILED | SHS |
| 09/07/2005 | 10:24:01 | TEXT | ORDER FILED: CASE CONTINUED TO 10/6/05 | SHS |
| 09/12/2005 | 10:35:23 | DAT2 | SET FOR: PREL HEARING ON 10/06/2005 AT 0900A(AR10) | SHS |
| 09/12/2005 | 10:35:01 | TEXT | COPY OF ORDER TO CARTER | SHS |
| 09/12/2005 | 10:36:12 | CASU | CASE ACTION SUMMARY PRINTED:   (AR08) | SHS |
| 09/20/2005 | 1:39:00 | DOCK | NOTICE SENT: 09/20/2005 DAVIS ROBIN | SHS |
| 10/05/2005 | 10:26:00 | TEXT | WAYNE CARTER REMOVED AS ATTORNEY DUE TO CONFLICT | SHS |
| 10/05/2005 | 4:00:00 | DAT2 | SET FOR: PREL HEARING ON 01/05/2006 AT 0900A(AR10) | SHS |
| 10/05/2005 | 4:00:00 | DAT2 | SET FOR: PREL HEARING ON 01/05/2006 AT 0900A(AR10) | SHS |
| 10/12/2005 | 10:26:00 | TEXT | BRANDON COOTS APOINTED TO REPRESENT DEFT | SHS |
| 10/14/2005 | 10:26:00 | TEXT | COPY OF ORDER TO CARTER AND COOTS | SHS |
| 10/14/2005 | 10:26:01 | TEXT | COPY OF FILE TO COOTS | SHS |
| 10/14/2005 | 10:26:03 | ATY1 | ATTORNEY FOR DEFENDANT: COOTS BRANDON SHANE (AR10) | SHS |
| 10/14/2005 | 10:27:12 | DOC2 | DOCKET DATE NOTICE   SENT TO DEF ATTY 1 (AR09) | SHS |
| 01/06/2006 | 10:20:14 | JFEL | JUROR FELONY FLAG SET ON FOR: INDIVIDUAL   (AR10) | JUS |
| 01/06/2006 | 10:20:15 | DJID | DISPOSITION JUDGE ID CHANGED FROM:   TO: TES | JUS |
| 01/06/2006 | 10:20:16 | DISP | CHARGE 01: CRIM MISCHIEF 1ST/#CNTS: 001 X (AR10) | JUS |
| 01/06/2006 | 10:20:17 | DISP | CHARGE 01 DISPOSED BY: DISMISSED ON: 01/05/2006 | JUS |
| 01/06/2006 | 10:20:18 | DOCK | ENFORCEMENT STATUS SET TO: (   )   (AR10) | JUS |

END OF THE REPORT

ALABAMA SJIS TR CASE DETAIL

PREPARED FOR: VICKIE JACKSON

**alacourt.com** County: 19  Case Number: TR-2002-000680.00  Charge  LICENSE

Name: DAVIS ROBIN KYLE

## Case

### Case Information

| | |
|---|---|
| County: | 19 - COFFEE - ELBA |
| Case Number: | TR-2002-000680.00 |
| JID: | SEB |
| DEF status: | B |
| UTC N°: | 8N5056813 |
| Flag: | N |
| ENF STS: | |

### Vehicle Information

| | |
|---|---|
| VEH DESC: | GEO |
| VEH STATE: | AL |
| VEH YEAR: | 0 |
| VEH NUM: | |
| CLS: | DM |
| HAZ: | N |
| COMM: | N |

### Defendant Information

| | | | |
|---|---|---|---|
| Name: | DAVIS ROBIN KYLE | | Phone: |
| DOB: | | SSN: 420060638692 | Driv License N°: AL5858299 |
| Height: | 5'07" | Weight: 120 | Race/Sex: W/F   Eyes/Hair: BRO/BRO |
| Address 1: | | | Address 2: |
| Zip: | 36323 | City: ELBA | State: AL   Country: US |

### Warrant Information

| | | | |
|---|---|---|---|
| Warrant Date: – | | WARAC  – | WARLOC: – |
| BP ISS: | | BP RTN: | |

## Charge

### Charge

| | | | | | |
|---|---|---|---|---|---|
| Arrest date: | 03/20/2002 | Filed: | 03/21/2002 | Officer: | BALDWIN |
| Agency: | 0190100 | Agency Type: M | | Muni N°: 01 | City: |
| Atty 1: | | Atty Type: | | Atty Flag: Y | |
| Date: | 04/18/2002 | Que: | 001 | Desc: | PLEA-PLEA DOCKET |
| Charge: | TS07 | Desc: | EXPIRED LICENSE | Cite: | Rule 20: G |
| Speed: | 0 | Limit: | 0 | BAC: | 0.000 |
| Bond amt: | 0.00 | Bond co: | | Surety: | |
| FTA date: | | Released: | | Admin Date: | |

## Court Action

### Court Action

| | | | | | |
|---|---|---|---|---|---|
| CRT ACT: | | CA date: 04/02/2002 | FS built: N | | Complete: |
| Charge: | TS07 | Desc: EXPIRED LICENSE | Cite: | | Bal due: |
| Fine: | FINE | LSUS: | CVCC: | HIST: | REST:   RECOUP: |
| Cost: | 0.00 | COST: | Other due: 0.00 | JFEE: | HEAD: |
| Comment: | | | | | |
| SNTPRO: | N | | | | |

## Case Action Summary - 19TR200200068000

| Date: | Time | Code | Comments | Operator |
|---|---|---|---|---|
| 03/26/2002 | 1:02:46 | NOTF | NOTICE FLAG SET (TR01)   (TR01) | JEP |
| 03/26/2002 | 1:02:47 | RU20 | RULE 20 STATUS OF: GUILTY PLEA ASSIGNED   (TR01) | JEP |

| 03/26/2002 | 1:02:49 | FILE | FILED ON: 03/21/2002 CHARGE: EXPIRED LICENSE(TR01) | JEP |
| 03/26/2002 | 1:02:49 | FINE | DEFENDANT SCHEDULED FINE:    $75.00    (TR01) | JEP |
| 03/26/2002 | 1:02:50 | COST | DEFENDANT COST:    $141.00    (TR01) | JEP |
| 03/26/2002 | 1:02:51 | STAT | INITIAL STATUS SET TO: "B" FOR BOND    (TR01) | JEP |
| 03/26/2002 | 1:02:52 | DATE | SET FOR: PLEA DOCKET ON 04/18/2002 @ 0900A (TR01) | JEP |
| 03/26/2002 | 1:02:53 | ESTS | ENF STATUS SET TO: "A"    (TR01) | JEP |
| 03/26/2002 | 1:02:54 | ARRS | DEFENDANT ARRESTED ON: 03/20/2002    (TR01) | JEP |
| 04/01/2002 | 2:34:00 | PTRL | PRE-TRIAL NOTICE MAILED 04/02/2002 | AOC |
| 04/04/2002 | 1:59:24 | ESTS | ENF STATUS CHANGED FROM "A" TO "N" (TR01). | JEP |
| 04/04/2002 | 1:59:25 | CADA | CASE DISPOSED BY: "NOL PROSSE" ON: 04/02/2002 | JEP |

🐝  *END OF THE REPORT*

ALABAMA SJIS TR CASE DETAIL



County: **19**    Case Number: TR-2001-001910.00    Charge    SPEED
Name: **DAVIS ROBIN**

## Case

| Case Information | |
|---|---|
| County: | 19 - COFFEE - ELBA |
| Case Number: | TR-2001-001910.00 |
| JID: | SEB |
| DEF status: | B |
| UTC N°: | 0M3314344 |
| Flag: | N |
| ENF STS: | |

| Vehicle Information | |
|---|---|
| VEH DESC: | CHEV |
| VEH STATE: | AL |
| VEH YEAR: | 0 |
| VEH NUM: | |
| CLS: | |
| HAZ: | N |
| COMM: | N |



### Defendant Information

| | | | |
|---|---|---|---|
| Name: | DAVIS ROBIN | | Phone: |
| DOB: | | SSN: 420060838 | Driv License N°: AL5858299 |
| Height: 5'07" | Weight: 120 | Race/Sex: W/F | Eyes/Hair: BRO/BRO |
| Address 1: | | Address 2: | |
| Zip: 36323 | City: ELBA | State: AL | Country: US |

### Warrant Information

| | | |
|---|---|---|
| Warrant Date: – | WARRAC: – | WARLOC: – |
| BP ISS: | BP RTN: | |

## Charge

| Charge | | | |
|---|---|---|---|
| Arrest date: 06/13/2001 | Filed: 06/15/2001 | Officer: BALDWIN | |
| Agency: 0190100 | Agency Type: M | Muni N°: 01 | City: |
| Atty 1: | Atty Type: | Atty Flag: Y | |
| Date: 09/18/2001 | Que: 001 | Desc: PLEA PLEA DOCKET | |
| Charge: 7001 | Desc: SPEED | Cite: | Rule 20: G |
| Speed: 68 | Limit: 45 | BAC: 0.000 | |
| Bond amt: 0.00 | Bond co: | Surety: | |
| FTA date: | Released: | Admin Date: | |

## Court Action

| Court Action | | | | | |
|---|---|---|---|---|---|
| CRT ACT: | CA date: 08/28/2001 | FS Built: N | | Complete: | |
| Charge: 7001 | Desc: SPEED | Cite: | | Bal due: | |
| Fine: | FINE: | LSOS: | CVCC: | HIST: | REST: | RECOUP: |
| Cost: 0.00 | COST: | Other due: 0.00 | JFEE: | HEAD: | |
| Comment: | | | | | |
| SNTPRO: N | | | | | |

## Case Action Summary - 19TR200100191000

| Date: | Time | Code | Comments | Operator |
|---|---|---|---|---|
| 06/15/2001 | 3:14:27 | NOTC | NOTICE FLAG SET TO: "N" (TR01) | JEP |
| 06/15/2001 | 3:14:28 | ESTS | ENF STATUS SET TO: "A" (TR01) | JEP |

© Alacourt.com  5/24/2007                                                    1

| 06/15/2001 | 3:14:29 | STAT | INITIAL STATUS SET TO: "B" FOR BOND (TR01) | JEP |
|---|---|---|---|---|
| 06/15/2001 | 3:14:30 | FILE | FILED ON: 06/15/2001 CHARGE: SPEED (TR01) | JEP |
| 06/15/2001 | 3:14:31 | COST | DEFENDANT COST: $141.00 (TR01) | JEP |
| 06/15/2001 | 3:14:32 | DATE | SET FOR: PLEA DOCKET ON 07/19/2001 @ 0900A (TR01) | JEP |
| 06/15/2001 | 3:14:33 | ARRS | DEFENDANT ARRESTED ON: 06/13/2001 (TR01) | JEP |
| 06/15/2001 | 3:14:34 | FINE | DEFENDANT SCHEDULED FINE: $20.00 (TR01) | JEP |
| 06/15/2001 | 3:14:35 | SPED | DEFENDANT CHARGED W/TRAVELING 068 IN 45 (TR01) | JEP |
| 06/15/2001 | 3:14:36 | RU20 | RULE 20 STATUS OF: GUILTY PLEA ASSIGNED (TR01) | JEP |
| 06/19/2001 | 2:10:00 | PTRL | PRE-TRIAL NOTICE MAILED 06/20/2001 (TR01) | AOC |
| 08/01/2001 | 2:11:46 | DATE | SET FOR: PLEA DOCKET ON 09/18/2001 @ 0900A (TR01) | JEP |
| 08/01/2001 | 2:11:47 | COMM | DRIVING SCHOOL (TR01) | JEP |
| 08/28/2001 | 3:08:15 | ESTS | ENF STATUS CHANGED FROM: "A" TO: "N" (TR01) | JEP |
| 08/28/2001 | 3:08:16 | CADA | CASE DISPOSED BY: NOL PROSS ON: 08/28/2001 | JEP |
| 08/28/2001 | 3:08:17 | COMM | DRIVING CERTIFICATE (TR01) | JEP |

 **END OF THE REPORT**



## ALABAMA SJIS(GC/DC CASE DETAIL)

**Company Name: BURR & FORMAN LLP**     **PREPARED FOR: VICKIE JACKSON**

County: **19**    Case Number: **DC-1996-000458.00**    Charge    **HARA**
Name: **DAVIS ROBIN O**

## Case

### Case Information

| | | |
|---|---|---|
| County: **19 - COFFEE - ELBA** | Case Number: **DC-1996-000458.00** | JID: **SEB STEVEN E BLAIR** | DEF status: **B Bond** |
| Filed: **12/12/1996** | AAGCY: **M Municipal** | Muni N°: **01** | City: |
| Arrest date: **12/11/1996** | Offe date: **11/05/1996** | ORI: **0190100** | Officer: **JACKSON** |
| Indict date: | Grand Jury: | Atty 1: | Ticket N°: |
| Tracking N°'s: **0/0/0** | | | |
| Date: **04/17/1997** | Que: **001** | Time: **10:00 AM**    Desc: **BTRL TRIAL** | |

### Defendant Information

| | | | |
|---|---|---|---|
| Name: **DAVIS ROBIN O** | | Alias 1: | Alias 2: |
| DOB: | SSN: **XXX-XX-0930** | | Driv License N°: |
| Height : **0"** | Weight: **0** | Race/Sex: **White /F** | Eyes/Hair: **/** |
| SID: **0** | YDate: | AIS: | PR: **0** |
| Address 1: | | Address 2: | |
| Zip: **36323** | City: **ELBA** | State: **AL** | Country: **US** |

### Prosecutor & Atty Info

| | | |
|---|---|---|
| Prosecutor: **KEL023** | Attorney 1: | Attorney 2: |
| Prosecutor Flag: **N** | Attorney 1 Flag: **Y** | Attorney 2 Flag: **Y** |

### Warrant Information

| | | |
|---|---|---|
| Warrant Date: **--** | WARAC **--** | WARLOC: **--** |
| BP ISS: | BP RTN: | |

### Charges

| | | | | |
|---|---|---|---|---|
| 1. Crime co: **HARA** | Statute: **HARASSMENT** | Stat Name: **13A-011-008(A)** | Class/Categ: **M PE** | Counts: **1** |
| 2. Crime co: | Statute: | Stat Name: | Class/Categ: | Counts: |
| 3. Crime co: | Statute: | Stat Name: | Class/Categ: | Counts: |
| More: | Dom.Viol: | Case Type: **M** | Case Categ: **PE** | |
| Comment: | | | | |

### Bonding Information

| | | | |
|---|---|---|---|
| Bond amt: **100.00** | Bond type: | Bond co: | |
| Rel Date: **12/11/1996** | Surety: | CWIT: **W 001** | |
| Jury Demand: | | Appeal Date: | |

## Settings

### Setting Dates

| | Date: | Que: | Time: | Description: |
|---|---|---|---|---|
| 1: | 04/17/1997 | 001 | 10:00 AM | BTRL - TRIAL |
| 2: | | 001 | | - |
| 3: | | | | - |
| 4: | | | | - |

## Disposition

### Disposition

| | | | |
|---|---|---|---|
| CRT ACT: D Dismissed | CA date: 04/17/1997 | Jury: | More: |
| Charge 1: HARA HARASSMENT | 13A-011-008(A)    M C | Counts:    001 | CA:    D 04/17/1997 |
| Charge 2: | | Counts: | CA: |
| Charge 3: | | Counts: | CA: |
| Admin: | Why: | TBNV1: | TBNV2: |
| Appeal: | CAPP: | Type: | GJCA: |
| Cont Dt: | Why: | Cont N° :    0 | Dom Viol: |
| Comment: | | | |
| Case Compl: Y | Sent Prov: U | Due: | |
| Warr:    0 | SUBP:    X SUBP: | Updated:    04/17/1997 | |

## Sentence - 19DC199600045800

### Sentence

| | | | |
|---|---|---|---|
| Sent: | Begin: | End    0 | PRB Beg: |
| IMP CONF:    00 00 000 | SUSP CONF: 00 00 000 | Total Conf:    00 00 000 | Jail Cred:    00 00 000 |
| LICN Susp:    00 00 000 | Probation:    00 00 000 | PRB Rev: | |

#### Monetary

| | | | | |
|---|---|---|---|---|
| Cost: | Fine Imp: 0.00 | Fine Susp: 0.00 | CVCC: | HIS: |
| WCCS: | MCOS: | JFEE: 0.00 | DRGF: 0 | ASU: |
| PREL: | DRUG: | RCUP: 0.00 | | |
| RES1: 0.00 | | RES2: 0.00 | | RES3: 0.00 |
| RES4: 0.00 | | RES5: 0.00 | | RES6: 0.00 |

#### Confine

| | | | | | | |
|---|---|---|---|---|---|---|
| PENT: | LIFE: | LWOP: | DEATH: | SPLIT: | BOOT: 0 | EMON: 0 |
| JAIL: | CCUR: | CSEC: | CTERM: | RVSPL: | GANG: 0 | |

#### Programs

| | | | | | | |
|---|---|---|---|---|---|---|
| JDVR: | IPROB: | AASCH: | DUI: | DDC: | CSV: 0 | SAPP: |
| PTRL: | BCSCH: | MNTL: | CRO: | ASCH: | ANGER: | DRUGCT: |

#### Enhanced

| | | | | |
|---|---|---|---|---|
| PROJ: | CNOT: | SCH: | VDOB: | HOOF: |
| DRUGCODE: | MEAS: | VOL: 0.00 | | |

| | | | |
|---|---|---|---|
| SEC/CUR: | | | |
| Comment: | | | |
| Bal Due: | Due: | CRO: | Updated:    Cost: 04/17/1997 |

© Alacourt.com   5/24/2007     3

## Case Action Summary - 19DC199600045800

| Date: | Time | Code | Comments | Operator |
|-------|------|------|----------|----------|
| 12/12/1996 | 4:04:21 | FILE | FILED THIS DATE 12/12/96 | CAW |
| 12/12/1996 | 4:04:22 | CHG1 | CHARGE AT FILING OF: HARASSMENT | CAW |
| 12/12/1996 | 4:04:23 | BOND | BOND SET FOR: $100.00 | CAW |
| 12/12/1996 | 4:04:24 | ARRS | DEFENDANT ARRESTED ON: 12/11/96 | CAW |
| 12/12/1996 | 4:04:25 | RELE | DEFENDANT RELEASED ON: 12/11/96 | CAW |
| 12/12/1996 | 4:04:26 | OFDT | OFFENSE DATE OF: 11/05/96 | CAW |
| 12/12/1996 | 4:04:27 | DAT1 | SET FOR: ON 01/07/97 AT 0830A | CAW |
| 12/12/1996 | 4:04:51 | PRTY | PARTY ADDED W001 MARK WILLIAM DAVIS | CAW |
| 12/17/1996 | 12:17:00 | PTRL | PRE-TRIAL NOTICE MAILED 12/18/96 | AOC |
| 01/08/1997 | 10:21:55 | DAT1 | SET FOR: TRIAL ON 02/20/97 AT 1100A | CAW |
| 01/08/1997 | 10:22:05 | SUBP | WITNESS SUBPOENA ISSUED 01/03/97 | CAW |
| 02/20/1997 | 4:12:08 | DAT1 | SET FOR: TRIAL ON 03/20/97 AT 1100A | CAW |
| 02/20/1997 | 4:12:16 | SUBP | WITNESS SUBPOENA ISSUED 02/20/97 | CAW |
| 02/24/1997 | 10:51:10 | TEXT | MOTION TO CONTINUE | CAW |
| 02/25/1997 | 3:47:17 | DAT1 | SET FOR: TRIAL ON 04/17/97 AT 1000A | CAW |
| 02/25/1997 | 3:49:13 | SUBP | WITNESS SUBPOENA ISSUED 02/25/97 | CAW |
| 04/17/1997 | 1:12:02 | DISP | DISPOSED ON 04/17/97 BY: DISMISS | CAW |
| 04/17/1997 | 1:12:03 | CHG1 | CHARGE AT DISPOSITION: HARASSMENT | CAW |

*END OF THE REPORT*

12/10/2004



# S M A R T
Stamped Metal American Research Technology, Alabama LLC

# EMPLOYEE
# HANDBOOK



Issue Number: 2
Revised: December 10, 2004
Effective: January 1, 2005



SMART ALABAMA, LLC Employee Handbook          12/10/2004

## *Table of Contents*

### Section I

Title Page..................................................................1
Welcome to SMART ALABAMA, LLC............................ 5
    Disclaimer .............................................................5

### Section II

Introduction.............................................................. 6
    Welcoming Message ...............................................6
    Equal Employment Opportunity............................. 7
    Non-Harassment Policy........................................... 7
    Open Door Policy.................................................. 8
    Problem Solving.................................................... 8
    Company Philosophy.............................................. 9
    Employment Philosophy..........................................9

### Section III

Non-Union Workplace.............................................10
    Code of Conduct.................................................10

### Section IV

Employment ........................................................ 11
    Employment at Will.............................................. 11
    Your Supervisor.................................................. 11
    Eligibility for Employment.....................................11
    Employee Classifications...................................... 11
    Family Employment ............................................ 12
    Criminal Convictions........................................... 12
    Violence............................................................ 12
    Weapons ........................................................... 13
    Alcohol, Drugs & Illegal Substance Abuse..............13
    Sexual and Other Unlawful Harassment................. 13
    Domestic Violence Statement.............................. 14

### Section VI

Introductory Period.............................................. 14

2

SMART ALABAMA, LLC Employee Handbook          12/10/2004

Personnel File..................................................................14
Meal & Break Periods........................................................15
Time Cards......................................................................15
Time Reporting System......................................................15
Hours of Work/Shifts.........................................................16
Pay Day..........................................................................16
Attendance & Reporting Absences.........................................16

## Section VII

Policies & Procedures.........................................................17
  Attendance....................................................................19
  Work Schedule Requirements..............................................19
  Overtime.......................................................................19
  Unscheduled Overtime.....................................................19
  Solicitation and Distribution..............................................20
  Safety and Health Guidelines.............................................20
  Parking.........................................................................21
  Bulletin Boards..............................................................21
  Suggestion Box..............................................................22
  Workplace Dress Code......................................................22
  Payroll Deductions for Federal Tax, State Tax,
    FICA and Medicare.......................................................22
  Performance & Evaluation Reviews......................................22
  Reporting Personal Information Changes................................23
  Visitors........................................................................23
  Personal Property...........................................................23
  Food & Beverage............................................................23
  Non-Tobacco.................................................................23

## Section VIII

Company Property..............................................................24
  Confidential Information Security.........................................24
  Facilities Security...........................................................24
  Company Equipment.........................................................24
  Phone Systems, Voice Mail and Personal Calls........................24
  Conservation and Recycling...............................................25

## Section IX

Computer Related...............................................................25
  Computers and Related Equipment.......................................25

3

SMART ALABAMA, LLC Employee Handbook          12/10/2004

Internet...................................................................... 26
Electronic Devices...................................................... 26

## Section X

Policies for Leave of Absence.................................... 26
    Eligibility................................................................ 26
    Unpaid Family & Medical Leave............................... 27
    Funeral Leave......................................................... 28
    Jury Duty................................................................ 28
    Military Duty........................................................... 29
    Severe Weather Closings......................................... 29

## Section XI

Benefits.................................................................... 29
    Overview................................................................ 29
    Group Medical Insurance ....................................... 29
    Group Dental Insurance.......................................... 30
    401K Plan .............................................................. 30
    Worker's Compensation.......................................... 30
    Holidays................................................................. 30
    Vacations............................................................... 31
    Vacations Schedule................................................ 32
    COBRA................................................................... 32
    Standards of Conduct............................................. 33

## Section XII

Discipline Policies..................................................... 34
    Associate Peer Review/Discipline Committee............. 34
    Disciplinary Procedures........................................... 35

## Section XIII

Termination of Employment........................................ 36
    Termination............................................................ 36

## Section XIV

Acknowledgement...................................................... 37
    Notice................................................................... 37

*Welcome to SMART ALABAMA, LLC*

4

SMART ALABAMA, LLC Employee Handbook          12/10/2004

The following pages contain information regarding many of the policies and procedures of SMART ALABAMA, LLC. These policies are a condition of employment. Labor relation laws require that all employees maintain a written policy that is applied non-discriminately to all employees.

If you have questions or need assistance reviewing this document please contact the Human Resources Department.

Office hours are:

   Monday through Friday:  8 am to 5 pm.

   Saturday and Sunday: Closed

Our main phone number is 334-335-5800.

For life threatening emergencies call 911.

## Disclaimer

This handbook is intended only to outline the employment policies, procedures and benefits of SMART ALABAMA, LLC. This manual is not intended to be all-inclusive and should not be considered to be an employment contract. SMART ALABAMA, LLC reserves the right to change employment policies, procedures, benefits or this manual at any time. Employees will be notified of any policy changes, additions or deletions. Said changes will immediately become a part of this manual.

*Introduction*

5

SMART ALABAMA, LLC Employee Handbook          12/10/2004

## WELCOMING MESSAGE

It is our pleasure to welcome you to the SMART ALABAMA, LLC family. We desire that our plant be a good place to work, a place where you will be treated with respect, and a place where you can further your own personal development and contribute to the growth and security of our company. We strive to recognize and appreciate good work.

It is our hope that by working together, we will be able to supply our customers with quality products at competitive prices when the customers want them. The past success of Shin Young, a parent company of SMART ALABAMA, LLC, has been the result of efforts by dedicated employees working together as a team. As a contributing member of the SMART ALABAMA, LLC family, you will share in the success of personal satisfaction, competitive wages, and an excellent benefit package.

Our goal is to grow together by providing a safe place to work and establishing our position as a recognized technological and quality leader of industry in the United States.

Best Regards,

President
Jong Cheol Kim

6

SMART ALABAMA, LLC Employee Handbook          12/10/2004

EQUAL EMPLOYMENT OPPORTUNITY GUIDELINES

SMART ALABAMA, LLC is an Equal Opportunity Employer. We pledge to
provide equal employment opportunities for all individuals who are qualified for
and meet all established job requirements, without regard to sex, race, color,
national origin, veteran status, religion, age, citizenship status, marital status,
height, weight, disability or any other characteristic protected by federal, state,
or local law. This pledge also applies to applicants for employment and their
placement. It applies to upgrading, transfer, change of positions, rates of pay
or other forms of compensation, selection for training, layoff or termination and
all other terms and conditions of employment.

If any Associate feels that he or she has been the subject of discrimination in
any way, they should report the matter to their Department Manager, Human
Resources Manager, or Administration Director.

NON-HARASSMENT POLICY

It is the policy of SMART Alabama, LLC to prohibit all forms of discrimination,
including harassment from supervisors, co-workers, suppliers, or customers of
SMART Alabama, LLC. The purpose of this policy is not to regulate our
Associates' personal morality. Rather, it is to ensure that, in our workplace,
no one harasses another.

Harassment is prohibited on any basis, including but not limited to, an
Associate's age, race, sex, color, national origin, veteran status, religion,
citizenship status, marital status, height, weight, disability, or any other
characteristic protected by federal, state, or local law. While it is not easy to
define precisely what harassment is, it certainly includes, but is not limited to,
any unwelcome deliberate, or repeated, unsolicited verbal, physical, visual or
sexual contact, or solicitations of favors which are offensive, abusive,
intimidating, hostile or demeaning. This includes racial, sexual, and other
harassing slurs, jokes, symbols, graffiti, etc.

All members of SMART Alabama, LLC will be held accountable for the
effective administration of this policy. Any Associate who feels that he or she
has been subjected to sexual or other harassment, or any Associate who
becomes aware of possible harassment, should immediately report the matter
to your Department Manager, Human Resources Manager, or Administration
Director. Every report of actual or perceived harassment will be promptly
investigated and corrective action will be taken where appropriate. No one will
be retaliated against for making any report under this policy.

Violations of this policy will not be permitted and will result in disciplinary
action up to and including the possibility of immediate discharge. False
accusations, providing false information, or not cooperating during an
investigation is prohibited and is grounds for discipline, up to and including
dismissal.

7


SMART ALABAMA, LLC Employee Handbook          12/10/2004

## OPEN DOOR PHILOSOPHY

Should you wish to discuss something with any member of management at any time, simply contact your Supervisor who will arrange for an appointment. If the topic is of a personal or confidential nature, please feel free to make the initial contact personally, request assistance from the Human Resources Department, or complete a confidential discussion request form concerning a private matter.

Your concerns will remain confidential while being addressed promptly and with respect.

## PROBLEM SOLVING

In any business organization where people must work together toward a common goal, differences of opinion may arise because someone believes that they have not been treated fairly or believes that a mistake has been made in the administration of a plan or condition of employment. The management of SMART ALABAMA, LLC recognizes your right to discuss items that are important to you, and receive consideration of your concern. If there is something about your job that is concerning you, let's get it out in the open and talk about it. We need to discuss it frankly so that you can obtain help with your concerns.

It is your right and privilege to keep right on going -- "to the top" if you wish. The Human Resources Department will be available to help you understand and follow each step of this procedure. Here are the four steps you may take.

1. Discuss the issue that is bothering you with your immediate Supervisor. He/she works with you every day and is personally interested in your welfare. He/she knows you and your job better than anyone else and can help address your concerns promptly and fairly.

2. If your concern has not been satisfactorily resolved, or if there is some reason you do not wish to bring the problem to your Supervisor, you may take the problem to your Department Manager or Assistant Department Manger. Talk openly and frankly with him or her. He or she will make every reasonable effort to resolve your problem at this level.

3. In the event your problem has not been satisfactorily resolved, you may contact a Human Resources Representative. He or she will listen to your concerns, and discuss possible solutions with you.

4. If all other attempts at solving your concern have been unsuccessful, you may make advance arrangements to meet with any member of staff, management team, or the Company President as a final step. Their door is open to you.

8

SMART ALABAMA, LLC Employee Handbook          12/10/2004

At each step of the procedure, someone will listen to your problem, investigate all of the surrounding facts, and discuss with you a recommended solution for your problem.

We cannot guarantee that all problems will be resolved to the individual Associate's satisfaction, but we can guarantee that each decision will be based upon the facts as well as the particular circumstances affecting that issue.

## COMPANY PHILOSOPHY

SMART ALABAMA, LLC's basic philosophy is three parts.  SMART believes in HARMONY, in CREATIVITY, and in PROSPERITY.

1. HARMONY through loyalty to our customers, through integration into the community around us, through respect for our company, our employees, and their families.

2. CREATIVITY by being flexible to meet the ever-changing needs of our customers in the marketplace and by taking the lead in technological innovation.

3. PROSPERITY, growing together by providing a safe place to work and being a leader in quality, customer services, and technological advance.

## EMPLOYMENT PHILOSOPHY

At SMART Alabama, LLC, every member of the management team is committed to the Company's philosophy of fair and impartial treatment of our Associates at all times. Associates are always free to speak to their Supervisor, or any member of the management team, to raise and get answers to any questions that may be on their minds. Every Associate is treated as an individual and as an important participant in the operation of our Company. We hope to maintain this open and long-standing relationship.

SMART Alabama, LLC strongly believes that individual consideration in Associate-Supervisory relationships provides the best climate for maximum development of teamwork and the attainment of our goal. We do not believe union representation of our Associates would be in the best interest of our Associates, the Company, or our customers.

We have enthusiastically accepted our responsibility to provide you with good working conditions, good wages and benefits, fair treatment and the personal respect, which is rightfully yours.  This is our commitment to each other. The dues, initiation fees, possible fines, assessments and costs imposed by unions on their members are unnecessary burdens.  Threats of strike and conflict create an antagonistic environment.

9

SMART ALABAMA, LLC Employee Handbook          12/10/2004

At our Company, you have the opportunity to express your problems, suggestions, and comments to us directly so we can understand each other better. We can continue this longstanding policy without a union. We will continue to listen and do our best to be responsive to your needs.

The Company strongly endorses the philosophy that individual consideration provides the best climate for maximum development and the attainment of your goals and those of the company.

## Non-Union Workplace

SMART Alabama, LLC. is a non-union work place. It is the desire of this company to remain that way. Our policies and procedures are put into place to assure you are treated fairly in every instance and never require the need for third party intervention. It is our position that our management team is accessible and well trained so as to posses the knowledge to handle any needs or situations that arise in a fair and equitable manner.

We realize that our employees are our most valuable asset and want your time with us to remain open and honest. We want you to have a work experience with the Company that is rewarding and helps you meet your own personal goals. We are proud of our team and our family and sincerely hope that everyone will do their part to keep the Company profitable and located in Luverne for many, many years to come.

### CODE OF CONDUCT

Employees of SMART ALABAMA, LLC are to conduct themselves in a responsible, professional and ethical manner. We expect your character exemplify proper behavior both at work and away from work. While you are away from work you still represent our company to those in the community. Engaging in activities that are damaging to the reputation of the Company and your fellow associates through company association is unwarranted and can lead to unrewarded employment by the Company.

Report unethical or dishonest behavior to your immediate supervisor.

Reported activities will be investigated by appropriate SMART ALABAMA, LLC management team members. The management team will determine appropriate means for proper resolution. Employees found to be conducting themselves in an unethical or dishonest manner may be subject to appropriate disciplinary action, up to and including termination.

10

SMART-ALABAMA, LLC *Employee Handbook*              12/10/2004

## *Employment*

### EMPLOYMENT AT WILL

You or SMART ALABAMA, LLC, without cause or notice, may terminate employment for any or no reason, with or without cause or notice, at any time. Nothing in this handbook or in any oral statement shall limit the right to terminate employment at-will. This handbook and policies contained herein do not in anyway constitute, and should not be construed as a contract of employment between the employee and the Company, or a promise of employment.

### YOUR SUPERVISOR

Your Supervisor is a vital part of the management team and will have more to do with your welfare and progress than any other person. He or she has the responsibility for planning your work schedule, insuring the quality and quantity of your work, and providing you with whatever assistance you may need. Your Supervisor was selected for the job because of his/her demonstrated commitment to the well being of the Company and of your and your fellow Associates.

Your Supervisor will arrange for your instruction, introduce you to fellow Associates, show you where things are, and give you feedback on your work performance. Supervisors are well aware of the difficulties connected with starting a new job and will do everything possible to help. Feel free to ask them questions. If they do not know the answer, they will get it for you. In addition, Supervisors meet periodically with other members of the management team to discuss your questions and suggestions.

Give your Supervisor your best cooperation. Our experience has shown that all of our Associates, working together as a team, make a "Win-Win combination."

### ELIGIBILITY FOR EMPLOYMENT

Federal law requires both new employees and re-hires to provide documentation of eligibility to work in the United States plus proper identity. A properly submitted form I-9 is required for employment.

### EMPLOYEE CLASSIFICATIONS

SMART employs a number of different types of employees including:

- Full-time: Position with workloads requiring 40+ hours a week.
- Part-time: Positions with workload requiring less than 30 hours a week.

11

SMART ALABAMA, LLC Employee Handbook          12/10/2004

· Temporary: Positions of limited duration.
· Co-op: Temporary positions available to local high school students through a
  co-op program administered by the local high school.
· Interns: Temporary position for college students to gain work experience in
  the field in which they are majoring.

Additionally, all classifications are determined to be either Exempt or Non-
exempt.

Exempt Employees are employees whose work duties exempt them from the
overtime compensation provisions of the Federal Fair Labor Standards Act
and any applicable state wage/hour law.

Non-exempt Employees are covered by the overtime compensation
provisions of the Federal Fair Labor Standards Act and any applicable state
wage/hour laws.

SMART makes the determination of the employee classifications in
accordance with all local, state, and federal laws.

## FAMILY EMPLOYMENT

SMART ALABAMA, LLC does allow family members and relatives of
employees to be considered for employment, provided they are qualified for
the position and no other conflict of interest exist. It is a policy of this
company that no one will directly supervise their family members. Hiring
decisions will be the exclusive responsibility of the Human Resources
department.

## CRIMINAL CONVICTIONS

Criminal convictions are taken seriously at SMART ALABAMA, LLC. We
reserve the right to disqualify any applicant for employment that has been
convicted of a criminal offense.

Furthermore, conviction of a crime may result in an automatic termination.
SMART ALABAMA, LLC will make every effort to evaluate the nature and
circumstances of the conviction. With the safety and well being of co-workers
at stake, convicted employees may be subject to appropriate disciplinary
action, up to and including termination.

## VIOLENCE

Threats of violence and acts of violence are strictly prohibited. Employees
threatening or committing acts of violence will be subject to appropriate
disciplinary action, up to and including termination. Report any such activity to
your immediate supervisor or the Human Resources Department.

12

SMART ALABAMA, LLC Employee Handbook          12/10/2004

## WEAPONS

Weapons are generally defined as guns, knives and other objects universally considered a weapon by the vast majority of society. A "weapon" can also be any object which would do harm to another when used as such. SMART ALABAMA, LLC shall deem any such object a "weapon" for the purpose of enforcing of this policy.

Possession of weapons is prohibited on company property and while on duty performing company business at any location. Any employee on duty or on company premises in possession of a weapon will be subject to appropriate disciplinary action, up to and including termination. Report any weapon possession to your immediate supervisor or the Human Resources Department.

## ALCOHOL, DRUGS & ILLEGAL SUBSTANCE ABUSE

Possession of alcohol, illegal drugs or other illegal substances is not permitted on company property, or while on duty in the employment of SMART ALABAMA, LLC. Furthermore, employees are not permitted to report for duty while under the influence of alcohol, illegal drugs or other illegal substances. Employees failing to adhere strictly to this policy will be subject to disciplinary action, up to and including termination. Report any suspicious activity to your immediate supervisor or the Human Resources Department.

## SEXUAL AND OTHER UNLAWFUL HARASSMENT

It is SMART ALABAMA, LLC's objective to provide a working environment free from discrimination and conduct commonly referred to as sexual harassment. The E.E.O.C. (Equal Employment Opportunity Commission) has provided a broad definition of sexual harassment. It is general in nature and may not always be clear when evaluating everyday situations.

"Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when:

1. submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment,

2. submission to or rejection of such conduct by an individual is used as a basis for employment decisions affecting such individual, or

3. such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment."

Sexual harassment refers to behavior inappropriate in the workplace because it is offensive, unwelcome behavior which would not occur but for the sex of

13

SMART ALABAMA, LLC Employee Handbook          12/10/2004

the offended person.  Both sexual harassment, and accusations of sexual harassment, are disrupting to the work environment.

If you or a co-worker experiences what you believe to be sexual harassment or accusations of sexual harassment, report it promptly to your immediate supervisor or the Human Recourses Department. SMART ALABAMA, LLC will investigate any employee, regardless of job position when such allegations are made.  Based on available information, SMART ALABAMA, LLC will take appropriate action and communicate on a need-to-know basis.

Appropriate disciplinary action, up to and including termination will be taken against any individual for sexual harassment charges determined to be valid.

## DOMESTIC VIOLENCE STATEMENT

SMART ALABAMA, LLC recognizes that domestic violence can have an adverse impact on employee job performances and may also impact co-worker's performance.

SMART ALABAMA, LLC will assist employees affected by domestic violence, both the victim and the abuser within reasonable guidelines. Information will remain confidential as long as the safety of others is not at risk.

### Your Introductory Period

The first ninety (90) days of your active employment is considered your introductory period.  This will give both you and your Supervisor an opportunity to determine if your job placement and individual satisfaction has been achieved.  During this period, your performance on the job, your attendance, and your potential abilities are carefully evaluated in determining whether your qualifications are best suited to your work assignments.  Any Associate missing 3 days of scheduled work during the introductory period will be subject to dismissal.  At the end of this period, your Supervisor will also conduct a formal review to discuss your performance to date and to answer any outstanding questions you may have.  At the end of the evaluation period, you may be invited to become a full time employee which may entitle you to additional benefits. In the event your evaluation information indicates you do not qualify, your employment will be terminated.

## PERSONNEL FILE

SMART ALABAMA, LLC maintains a confidential personnel file for each employee. Files are controlled by the Human Resources Department. Employees must acquire permission to view his or her personnel file from the

14

SMART ALABAMA, LLC Employee Handbook          12/10/2004

Human Resources Department. These files are the property of SMART ALABAMA, LLC, no documents may be altered or removed by the employee. Every reasonable effort is made to keep the information confidential, access is limited to staff members who require access to perform their job functions. Copies will not be distributed to any third party unless mandated to do so by a court of law.

## MEAL & BREAK PERIODS

The meal period is 1 hour long and there are two 10-minute break periods. One break is before your meal and one break is after your meal period. Associates who are scheduled to work a shift of 10 hours or more will receive a 10-minute break at the end of their 8-hour shift. Associates who are scheduled to work a shift of 13 hours or more will receive an additional 30-minute meal period. Your Supervisor will advise you when to take your breaks. If you leave Company property during these times, you must scan out when you leave and scan in when you return. In order to maintain good housekeeping, all food must be eaten in the cafeteria or in one of the break areas.

## TIME CARDS

All employees will be issued electronic time cards with photo identification. It is the employee's responsibility to keep this card for clocking in and out of the workday. It is the employee's responsibility to notify the Human Resource Department should a card become defective, lost, or stolen. A charge to replace a lost or stolen card may apply.

## TIME REPORTING SYSTEM

Your work time, as reported, is the basis for your pay at SMART Alabama, LLC. Each non-exempt SMART Associate will have a coded card that must be used when you return to work and when you leave. (This includes leaving the plant premises at lunch.) In addition to the scan card, each non-exempt Associate's Supervisor is responsible for ensuring the correctness of his/her Associate's attendance/work hour report.

At the end of every pay period, you and your Supervisor will have the opportunity to verify your work hours before the payroll is processed. If this review is not completed in a timely manner, any corrections necessary will be made in the next payroll period.

Your scan card report represents your bill to the Company for your work. Make sure it is correct. If it is not correct, please speak with your Supervisor. To protect your interest, we must be very strict in insisting that each Associate use only his or her scan card to scan in/out. Doing so for other Associates may lead to disciplinary action up to and including immediate discharge.

15

SMART ALABAMA, LLC Employee Handbook                    12/10/2004

Please advise your Supervisor of any questions you may have regarding this time reporting system.

## HOURS OF WORK/SHIFTS

SMART Alabama, LLC, depends on our working together. In order to assure SMART'S efficient operation, your hours of work and/or shift may be changed. If your hours of work are changed; your Supervisor will notify you. We appreciate your cooperation in this regard. It is mandatory that no associate clock in prior to the required shift start time and or remain on the clock past the day's ending time. Only with prior approval of your Supervisor may an individual report to work early or remain late while "on the clock". Abuse of this clocking policy will result in disciplinary action up to and including dismissal from the company.

## PAY DAY

All Associates are paid every other Friday. The pay period is Monday through Sunday, inclusive. When a recognized holiday falls on Friday, checks will be distributed on Thursday. SMART will not release your paycheck to anyone else without your written consent.

For the convenience of second and third shift, Associates checks will be distributed on Thursday during your shift.

The amount of your check is determined by your rate of pay, premiums, and/or overtime that you may have worked during a particular pay period. If you have any questions about your pay, please contact your Supervisor promptly.

## ATTENDANCE & REPORTING ABSENCES

SMART Alabama, LLC does not hire more Associates than needed to meet our customer's production schedules. We are proud of our Associate's commitment to the organization and customers needs. We also recognize that occasionally an absence, tardy or early leave is unavoidable. We have established a program, which accepts a few unavoidable absences while rewarding regular attendance. If you must miss, be late or leave early, it is very important that you let us know as soon as possible. Any deviations from normal attendance result in changes in our schedule production, different work assignments, customer shut down, or additional overtime assignments. If Associates cannot maintain an excellent attendance record, it puts undo strain on our Associates and the Company may be forced to hire more Associates than it can afford to maintain if customer demands decline.

It is very important that you report your absence as soon as possible. This allows us to adjust to your absence wherever possible and for as long as necessary. Unreported absences, or absences reported without stating the reason for the absence, will not be considered for FMLA Leave eligibility. If

16

SMART ALABAMA, LLC Employee Handbook          12/10/2004

you do not report your absence for three consecutive days, we will consider
that you have terminated your employment with SMART ALABAMA, LLC.
In case of extended absence, you may be excused from calling in to your
Supervisor. If you are on a pre-approved leave for a definite period of time
(such as bereavement, jury duty, vacation, family medical leave, short term
disability, military or personal leave) you may be exempt from the three day
consecutive day (termination) rule. Additionally, we do understand that there
are very rare circumstances that leave you in a position where you cannot
notify us of your absence for three consecutive days or more. We will try to
take these very unusual circumstances into account.

## Policies & Procedures

### ATTENDANCE PROGRAM

We have instituted a system to monitor attendance. We expect that all
Associates will be here every day for which they are scheduled. Because of
this we will reward good attendance with additional incentives. Our schedules,
staffing and employment security mandates it. We all encounter
circumstances that force us to miss some time we are scheduled to work. We
recognize that these rare circumstances happen to all of us and we do not
want to negatively impact our most diligent Associates. We have established
a system that we feel meets the needs of our customers, allows you to take
care of those rare demands in life that prevent your ability to be at work and
will not put undue strain on your fellow Associates.

Our attendance policy is based on a point system with an absence allowance
program to protect the possible attendance bonus for those who are diligent in
their attempts to attend.
The key to our attendance system is your responsibility for your own career at
SMART. We will not determine if your reason for being tardy, absent or
leaving early is acceptable. We all have different demands in life. Clearly,
there is a level of attendance which is excellent and also that which is
unacceptable to our customer's needs and your fellow Associates.
Associates who consistently help us met our customer needs and ensure our
job security through their regular attendance demonstrate their personal
commitment to their career and to our customers.

Points – You may receive points on your attendance record for all absences,
late arrivals and early leaves if they are not pre-approved leave.
(Bereavement, FMLA, Jury duty, Military, etc.) contact your Supervisor if you
have any questions about pre-approved leaves. Please find below the
SMART Alabama, LLC. attendance point system details.

17

SMART ALABAMA, LLC Employee Handbook                12/10/2004

12 POINTS ALLOWED
   EXCEPTION *3 POINTS DURING FIRST 90 DAYS TERMINATION*
   AFTER 12 POINTS TERMINATION
ORAL WARNING WITH 8 POINTS
WRITTEN WARNING AFTER 10 POINTS
FINAL WRITTEN WARNING WITH 12 POINTS
TERMINATION AFTER 12 POINTS

- 0 – 1 HOUR = ¼ PT.
- 1 – 4 HOURS = ½ PT.
- OVER 4 HOURS = 1 PT.

FOR EVERY MONTH OF PERFECT ATTENDANCE ONE POINT WILL BE EARNED.   POINTS  CANNOT  ACRUED  THROUGH  PERFECT ATTENDANCE, ONLY EARNED BACK TO A ZERO TOTAL.

### EXCLUSIONS ARE AS FOLLOWS

- VACATION DAYS WITH PRIOR APPROVAL
- LEAVE OF ABSENCE (DOCTOR APPROVED)
- PERSONAL LEAVE (APPROVED BY COMPANY)
- FMLA (AFTER 12 MONTHS OF SERVICE)

### EXCEPTIONS
   ABSENCES  ACCOMPANIED  BY  A  DOCTORS  EXCUSE  WILL  BE ASSESED POINTS BASED ON EACH SINGLE OCCURRENCE.
   EXAMPLE:  MISSING 3 DAYS FOR SICKNESS ACCOMPANIED BY A DOCTORS EXCUSE WILL COUNT 1 POINT FOR THE FIRST DAY AND NO POINTS THEREAFTER.
A ¼ DAY APPOINTMENT WILL COUNT ¼ POINT.

**Personal Illness or Injury** – If you must be absent due to a personal illness or injury, please seek medical care and notify your Supervisor as soon as you possibly can.  If you are absent on multiple consecutive days due to a personal injury or illness, we will convert your consecutive absences to one point if you supply physician's documentation, on your date of return, which indicates that you were unable to work and the date you may return to work. For your protection, the documentation must also state any restriction, or that there are no restrictions regarding your return to work.  This documentation must be dated on one of the days of your absence.  Additionally, the documentation must be received the day you return to work or on the 5th day of absence if your illness or injury is 5 days or longer.

**Employment Injuries** – Work time missed due to on-the-job injury will not result in points if the injury is reported by you in a timely manner and the absences are supported by documentation by our treating physician.

18

SMART ALABAMA, LLC Employee Handbook          12/10/2004

**Missed Time Card Punches**

One missed punch in any given six-month period is excused, additional missed punches result in one-half point being assessed if the Supervisor cannot verify that the Associate was in their work area on time

Any Associate who accumulates 12 or more points on their active attendance record is subject to discharge. For each 30 days worked without an occurrence a point will be dropped from your total. We do not wish any Associate to be discharged. Attendance is YOUR responsibility as a SMART Associate.

Together we will meet our customer's demands and help ensure our future careers.

## WORK SCHEDULE REQUIREMENTS

With variations in workload based on demand from our customers, it is our responsibility to meet critical deadlines, sometimes with little notice. As a result, you may be required to work overtime be it pre-planned or spontaneous. Overtime is mandatory when required; it is a condition of employment.

## OVERTIME

Production schedules, special projects, or other requirements sometimes make it necessary that we work overtime. In order to meet our customers' requirements, it may be necessary that the company schedule you to work overtime, including Saturdays, Sundays, or Holidays. Whenever possible, you will be provided 24 hours advance notice. At times it may be necessary to work overtime on very short notice. At these times you will be made to notify you by 3:00 p.m. on the day of overtime. SMART Alabama, LLC. will make every effort to make these time an exception and not the rule to work by.

Overtime pay accrues after you work more than 40 hours in one Monday through Sunday workweek. For non-exempt Associates, the rate of pay for overtime is one and one-half times your regular rate of pay.

Please remember that you are not allowed to work overtime unless it has been authorized in advance by your Supervisor.

## UNSCHEDULED OVERTIME

From time to time, unanticipated overtime work will be available. Unscheduled overtime work will be offered to Associates in the department in the position, which requires overtime based on department length of services. SMART ALABAMA, LLC will try to give as much advance notice of overtime as possible. Your cooperation will be appreciated.

19

SMART ALABAMA, LLC Employee Handbook          12/10/2004

## SOLICITATION AND DISTRIBUTION

SMART Alabama, LLC. strictly prohibits employees and non employees to participate in solicitation and distribution of any literature, sales items, fund raising, advertising, postings, passing out by hand / leaving in visible areas, or bringing into working areas or onto company property during, before, or after work hours, any of the above. Any company associate found in violation of this policy will be subject to disciplinary actions. Non-employees will be subject to prosecution under local laws governing these issues.

*This includes but is not limited to school, church, or other civic and/or non-profit or for profit organizations or club fundraisers, advertising of upcoming events or political activities, promoting charitable organizations, or individual charity drives.

- "Working area" is an area usually inside the facility; however, it also includes other areas such as loading docks, security gates, service entrances, and lobby area entrances where work is regularly performed. It includes such areas as aisle ways in the facility used for material movement and common use areas such as copy machine locations. Only in company-sponsored events can this policy be revoked.

## SAFETY AND HEALTH GUIDELINES

SAFETY is a matter of major concern to all of us at SMART ALABAMA, LLC. Our strong commitment to safety is evident by communications from our Plant Manager, our employee involvement through our Plant Safety Staff, our on-going safety training conducted by our coordinators, and various other safety communications on bulletin boards.

Every reasonable precaution will be taken to provide each of us with a safe place to work. Safety devices are installed throughout the plant, and safety rules are strictly enforced. However, without the full cooperation of all safety rules alone are of little value in preventing accidents. Accident prevention is largely the responsibility of each individual.

Together, we shall strive to eliminate hazards by constant inspection and the continuing safety education of all of us. But it is up to each of us to learn how to think safely and how to work safely.

We want everyone to be safety conscious. If we notice an unsafe practice or condition, we should immediately inform the person concerned. If not corrected immediately, then notify your safety coordinator. Our suggestion may prevent a future injury to ourselves or to another co-worker.

20

SMART ALABAMA, LLC Employee Handbook          12/10/2004

We will be off to a good start by familiarizing ourselves with the general safety regulations listed in this handbook as followings:

1) To protect our hearing, we are required to wear earplugs and /or other hearing protection in the plant.

2) Safety glasses with side shields are also required in the plant.

3) Other safety equipment should be worn as specifically required on a particular job.

4) All employees who work in the manufacturing area, or spend any time in the manufacturing area, are required to wear approved safety shoes.

5) Good housekeeping is a condition of employment. It must be a part of our manufacturing process that is continuous. It not only improves the appearance of our plant, but also helps prevent fires, accidents, personal injuries, and is essential to the overall quality of our operation.

6) For everyone's safety, do not leave tools, scrap or materials on the floor where someone may stumble over them, or overhead where there is danger of their falling.

7) Keep fire exits clear.

8) If operating machines, give the machine the best possible care and be alert for signs of wear or faulty operation. When working on the machine, be sure to follow all safety procedures so the machine cannot inadvertently begin operating. Running on plant property, particularly in aisles, is dangerous and strictly prohibited.

9) For obvious safety reasons, it is a plant policy not to allow unauthorized visitors in our plant.

10) For everyone's safety, it is prohibited to use electronic devices within the production areas. This includes headsets, cellular telephones, and any other electronic device not issued for use by the company.

**PARKING**

SMART ALABAMA, LLC employees are required to park in the employee parking area. All other parking is reserved for customers and visitors.

21

SMART ALABAMA, LLC Employee Handbook                    12/10/2004

## BULLETIN BOARDS

Bulletin boards placed in designated areas throughout the facility display notices and announcements for employees to review. It is the responsibility of each employee to review the bulletin boards several times per week to be aware of information posted.

## SUGGESTION BOX

SMART ALABAMA, LLC always encourages employees to submit suggestions, comments, or new ideas, which may benefit the company or working conditions. If you wish to remain anonymous every precaution will be made to preserve your privacy. Management will check the suggestion box on a regular basis for new submissions.

## WORKPLACE DRESS CODE

SMART ALABAMA, LLC encourages employees to dress comfortable, with consideration given to maintaining a professional appearance. Appropriate attire should be worn at all times in keeping with commonly recognized standards. No tank tops or loose fitting or baggy clothes are to be worn at any time on company property. Jewelry in the form of long or dangling necklaces or bracelets are not allowed. If you interface with clients or are scheduled to meet with clients on an occasional basis, be prepared and dress appropriately. Be considerate of the company's image as well as your image with customers and your co-workers. If you work in an area where uniforms or other company appointed apparel is required you must adhere to the required dress policy at all times. Approved company work wear will include caps and only approved caps may be worn. Defacing or placing slogans, stickers, or other remarks on company approved apparel or hardhats is strictly prohibited. The company will supply you with one pair of steel-toed work shoes annually. These are required to be worn at all times by all associates assigned to work in production areas. Any associate whose attire is deemed inappropriate may be asked to leave the premises and return with appropriate attire.

## PAYROLL DEDUCTIONS FOR FEDERAL TAX, STATE TAX, FICA AND MEDICARE

As required by law, SMART ALABAMA, LLC withholds taxes from employee earnings, as well as social security (FICA) and Medicare. SMART ALABAMA, LLC also participates in matching programs as required.

22

SMART ALABAMA, LLC Employee Handbook          12/10/2004

## PERFORMANCE & EVALUATION REVIEWS

Annual performance and evaluation reviews will outline the competencies you need to perform your job functions successfully. Your contributions to your department and SMART ALABAMA, LLC are also reviewed and documented. Your supervisor will discuss job requirements for your duties and identify your specific skills. Together you will establish plans for your growth and development. All performance reviews will become a permanent part of your personnel file.

All compensation increases will go into effect the first pay period following the increase date.

## REPORTING PERSONAL INFORMATION CHANGES

Employees must notify the Human Resources department whenever there is a change in their personal information on file with SMART ALABAMA, LLC. This includes address, phone number, income tax withholding information, emergency contacts and if applicable, any information which may impact your insurance coverage's.

## VISITORS

Due to the nature of our business, security clearances and non-disclose agreements with our clients, visitors are not allowed in production or restricted areas. All visitors who are not visiting for business purposes will be restricted to the regular lobby area. All business visitors must have authorization to enter production areas. See your immediate supervisor for authorization. Notify a supervisor immediately if you become aware of any unauthorized visitors.

## PERSONAL PROPERTY

SMART ALABAMA, LLC is not responsible for personal property of employees in facilities, vehicles or parking areas. Any personal items brought on premises deemed inappropriate by SMART ALABAMA, LLC, will be removed without notice. As always, be considerate of the company's image as well as your image with customers and co-workers.

## FOOD & BEVERAGE

Without exception, food and beverage is strictly prohibited within the production areas. Break rooms and other designated break areas will be provided. In all other areas, employees should be mindful of potential business visitors within the work area. Meals should be eaten in the specified lunch area.

23

SMART ALABAMA, LLC Employee Handbook                    12/10/2004

## NON-TOBACCO

The use of tobacco products in any form is strictly forbidden in SMART
ALABAMA, LLC facilities. Smokeless tobacco use and smoking is allowed
only in designated areas outdoors. While using tobacco please be considerate
of others. Use only approved receptacles for disposal of properly extinguished
tobacco products. Do not discard cigarette butts on company property or spit
on flooring in any areas, inside or outside the facility.

## Company Property

### CONFIDENTAL INFORMATION SECURITY

As a matter of course, employees of SMART ALABAMA, LLC will have access
to confidential and proprietary information. This information includes, but is not
limited to, personnel information, pricing, client lists, contractual agreements,
intellectual property, and marketing/sales strategies. It is a condition of
employment that you not disclose this information to third parties during or
after employment. Disclosure of SMART ALABAMA, LLC confidential
information without express written approval is prohibited.

### FACILITIES SECURITY

It is the responsibility of all employees to make sure the facilities and work
areas are secure. Any employee entrusted with facility keys shall make certain
the facility is secure when that employee is the last to leave. See your
immediate supervisor if this will be one of your responsibilities. This includes,

but is not limited to, turning off appropriate lights, and closing and locking all
doors and windows.

Report any potential security risks to your immediate supervisor.

### COMPANY EQUIPMENT

Company property, such as laser printers, copiers, computers, and all
production tools, are to be used for SMART ALABAMA, LLC business
purposes only. Use of unauthorized equipment may result in appropriate
disciplinary action, up to, and including termination.

24

SMART ALABAMA, LLC Employee Handbook                12/10/2004

Your designated work area, desks, and cabinets are not to be locked with personal locks. If you need assistance securing company property see your immediate supervisor.

## PHONE SYSTEMS, VOICE MAIL AND PERSONAL CALLS

Telephone systems, equipment, and operators are in place to provide business services of the company. Employees are to limit the personal use of these items. Lengthy calls should be made during breaks.

Long distance calls for personal use are prohibited.

## CONSERVATION AND RECYCLING

Conserving energy and resources is a priority at SMART ALABAMA, LLC. Employees are required to conserve power and water in all reasonable ways. Recycling containers are provided throughout the facility for collection. Containers are marked for various materials. Please be certain to separate all recyclables and put them into the appropriate containers.

## *Computer Related*

## COMPUTERS AND RELATED EQUIPMENT

SMART ALABAMA, LLC provides employees access to computers, printers, and other equipment on an as-needed basis, to perform their job requirements. This equipment is to be used exclusively for the business activities of SMART ALABAMA, LLC. Employees found to be using company

computer equipment for personal use may be subject to appropriate disciplinary action, up to, and including termination.

Employees are required to maintain their computers and related equipment in good working order. If any of your equipment needs service, repair, or maintenance, notify your immediate supervisor.

Employees shall not use company systems to knowingly violate any city, state, or federal laws.

Computer games and personal software may not be installed on company equipment.

Company equipment shall not be used to create or store personal information or projects.

25

SMART ALABAMA, LLC Employee Handbook          12/10/2004

Company equipment shall not be used to store or display images depicting violence, sexually explicit material, or racially offensive material.

Software installed on company computers must be properly licensed and installed at the direction of the computer systems supervisor.

Employees are not permitted to download any software (free or otherwise) without express permission from the computer systems supervisor.

### INTERNET

Company computer systems connected to the Internet are connected for business purpose only. Accessing the Internet for personal use is prohibited. Employees are expressly prohibited from allowing any third party to use company provided computers or Internet services.

Conducting company business on the Internet must be done following all guidelines and policies for conducting business in conventional settings. Do not expect privacy on company computers. Our software and systems have the capability of tracking each visit, each email, each chat, and each file transfer, by every computer on the system.

SMART ALABAMA, LLC maintains the right to limit Internet access.

SMART ALABAMA, LLC will comply with any reasonable requests from law enforcement to review Internet activities of any employee.

While accessing the Internet, employees should be fully aware of the global reach of the media. Employees are required to maintain a high level of dignity and be mindful that they represent SMART ALABAMA, LLC to the world at large while online.

For protection of SMART ALABAMA, LLC's network and proprietary information, security measures have been installed on the system. No employee shall, under any circumstances, attempt to disable or circumvent these security measures.

### ELECTRONIC DEVICES

The use of cellular phones, headsets, or any other electronic devices inside the production areas is strictly forbidden.  Cellular phone use should be limited to lunch and break times.  Only company approved electronic devices may be used in production areas.

26

SMART ALABAMA, LLC Employee Handbook          12/10/2004

## Policies for Leave of Absence

### ELIGIBILITY

Paid and non-paid leave of absence is a benefit of working at SMART ALABAMA, LLC. To qualify for these leave of absence benefits the employee must be a full time employee and have completed a minimum of ninety (90) days continuous employment with SMART ALABAMA, LLC. Full time employees are employees who have been assigned a regular 40 hours per week work shift. Employees scheduled for less than 40 hours weekly are not eligible. SMART ALABAMA, LLC reserves the right to, without notice, revise these leave of absence policies.

If you have questions contact the Human Resources Department.

### UNPAID FAMILY & MEDICAL LEAVE

SMART ALABAMA, LLC employees are eligible to take up to 12 weeks of unpaid family/medical leave within any 12-month period and be restored to the same or equivalent position upon your return from leave provided:

(1) You have worked for SMART ALABAMA, LLC for at least 12 months, and

(2) You have worked at least 1250 hours in the last 12-month period, from the date the leave is effective to the same date the previous year

Reasons for Leave

Employees may take family/medical leave for any of the following reasons:

(1) The birth of a son or daughter and on order to bond with said son or daughter;

(2) The placement of a son or daughter with you for adoption or foster care and on order to bond with the newly placed son or daughter;

(3) To care for a spouse, son, daughter, or parent ("covered relation") with a serious health condition; or

(4) Because of your own serious health condition which renders you unable to perform an essential function of your position.

Leave because of reasons "(1)" or "(2)" must be completed within the 12 month period beginning on the date of birth or replacement. In addition,

27

SMART ALABAMA, LLC Employee Handbook          12/10/2004

spouses who are both employed by SMART ALABAMA, LLC who request because of reasons "(1)" or "(2)" may only take a combined total of 12 weeks leave during any 12 month period.

### Notice of Leave

If you need for family/medical leave is foreseeable, you must give your immediate supervisor at least 30 days prior written notice. If this is not possible, you must at least give notice as soon as possible (within 1 to 2 business days after learning of your need for leave). Failure to provide such notice may delay the approval of leave.

SMART ALABAMA, LLC has request for Family/ Medical Leave forms available from the Human Resources Department. You should use these forms when requesting leave.

### Medical Certification

If you are requesting leave because of your own or a covered relation's serious health condition, you and the appropriate health care provider must apply appropriate medical certification. You may obtain Medical Certification Forms from the Human Resources Department.

### * 4-Week Paid Pregnancy Leave

SMART ALABAMA, LLC will provide 4 week paid pregnancy leave to the person who gives birth. This leave will be considered FMLA. After four weeks, an unpaid FMLA leave for up to 8 extra weeks may be taken if requested.

## FUNERAL LEAVE

SMART ALABAMA, LLC will provide reasonable time off for employees to attend funerals of friends and loved ones. In the event of a death in the immediate family of the employee, up to five days paid time off may be

granted to attend to family matters and funeral arrangements. In the event of the death of other family members, up to three days paid time off may be granted. Employees must provide Human Resources Department with a death certificate after he/she uses Funeral Leave. Contact the Human Resources Department concerning your specific needs.

<Funeral Leave Schedule>

| Leave Days | In the event of the death of... |
|---|---|
| Up to 5 days | Parent, stepparent, spouse, child or stepchild |
| Up to 3 days | Parents in law, sister, brother, grandparent, grandchildren, Stepsister/brother, grandparents-in-law, half-sister/brother, Great grandparents, son/daughter-in-law |
| Up to 1 day | Other relatives: aunts, uncles, nephews, nieces |

28

SMART ALABAMA, LLC Employee Handbook          12/10/2004

## JURY DUTY

Notify your immediate supervisor if you are summoned for jury duty. Time off from work will be granted as necessary in compliance with applicable law. SMART ALABAMA, LLC will pay the difference between jury duty pay and regular day's pay for the time spent on jury day up to maximum 5 days.

## MILITARY DUTY

In accordance with requirements of law, SMART ALABAMA, LLC will provide military leave of absence and reinstatement for qualifying employees. SMART ALABAMA, LLC will provide eligible employees up to one month for military leave of absence. SMART Alabama, LLC will pay the difference between regular work wages at SMART and military pay if the later is less. This will be based on a typical 40 hour week. Military pay verification in the form of a check stub or pay voucher must be presented to payroll in order to be paid accordingly.

## SEVERE WEATHER CLOSINGS

In the event the company must close for the day due to severe weather or emergencies, the company will make every reasonable effort to notify you. Employees will be paid for the day up to a maximum of three days.

If weather conditions are so severe that you are unable to travel to work, contact your immediate supervisor. Employees will be paid for the day when these instances arise and travel restrictions can be independently confirmed.

## *Benefits*

## OVERVIEW

Benefits provided to employees are provided at the will of SMART ALABAMA, LLC and SMART reserves the right to modify or eliminate benefits without notice under conditions of law. The benefits listed herein are intended to be a general description only. Details of specific benefits are outlined in the documentation for the benefit program.

29

SMART ALABAMA, LLC Employee Handbook          12/10/2004

### GROUP MEDICAL INSURANCE

SMART ALABAMA, LLC pays the substantial portion (70%) of premium costs for coverage of eligible employees. Coverage is available through the current plan for dependents. Any additional premium cost for the employee and all premiums for dependent coverage are the responsibility of the employee. Employee portion (30%) of premiums must be paid through payroll deduction. Details of the plan are available through the Human Resources Department.

Notice: Plan details may change without notice.

Additional Group and Life Benefits will be added.

### GROUP DENTAL INSURANCE

SMART ALABAMA, LLC pays the substantial portion (40%) of premium costs for coverage of eligible employees. Coverage is available through the current plan for dependents. Any additional premium cost for the employee and all premiums for dependent coverage are the responsibility of the employee. Employee portion (60%) of premiums must be paid through payroll deduction. Details of the plan are available through the Human Resources Department.

Notice: Plan details may change without notice.

### 401K PLAN

SMART ALABAMA, LLC may offer a 401K plan to eligible employees wishing to participate. Contact the Human Resources department for details.

### WORKER'S COMPENSATION

State and federal law governs eligibility requirements.  All premium costs are paid by SMART ALABAMA, LLC. Claims are paid directly to employees.  All employees are expected to return to work immediately upon release by their physician.

Employees are required to report job-related injuries immediately. Failure to comply could result in difficulty with the employee's claim.

Report all accidents or injuries to your immediate supervisor.

### HOLIDAYS

SMART ALABAMA, LLC provides the following holiday schedule for all employees. Eligible employees qualify for paid days. Non-qualifying employees are required to take the days off without pay unless otherwise approved in writing by your immediate supervisor.
Holiday Schedule:

30

SMART ALABAMA, LLC Employee Handbook                    12/10/2004

| | |
|---|---|
| New Year's Day | Paid |
| Martin Luther King Day | Paid |
| Good Friday | Paid |
| Memorial Day | Paid |
| Independence Day | Paid |
| Labor Day | Paid |
| Thanksgiving Day | Paid |
| Thanksgiving Friday | Non Paid |
| Christmas Eve | Non Paid |
| Christmas Day | Paid |
| Christmas Holiday Period | Non Paid |

Holidays falling on Sunday will be observed on the following Monday, those falling on Saturday will be observed the preceding Friday. For these days if an employee is required to work on the designated Friday or Monday, holiday pay plus regular wages will be paid, if an employee is required to work the actual holiday falling on a Saturday or Sunday double time wages will be paid.

## VACATIONS

SMART ALABAMA, LLC provides paid vacation time for all eligible employees. To qualify for vacation benefits a full time employee must have completed a minimum of ninety (90) days continuous employment with SMART ALABAMA, LLC. Employees are encouraged to take a vacation every year. Employees required to work through their vacation may carry vacation time over to the following year, this must be directed and approved by your immediate supervisor and the Human Resources department. A maximum number of days carried forward are 10 days in total regardless of years of services. Unused vacation plus any carried vacation days are paid in half upon termination. The following rules apply to vacation schedules:

1. All Vacation Requests must be submitted in writing and only complete days requested. There will be no half day vacations.

2. Definition of a year's vacation: An individual's vacation is applied from anniversary date to anniversary date.

3. An individual may carry only up to 10 days of unused vacation past their anniversary date each year.

4. Requests are handled on a first come, first serve basis (seniority will prevail when two or more requests are received on the same day by 5:00pm).

5. Requests for a "Full Weak" (5 consecutive business days) will take precedence over a request for single day(s), regardless of seniority, when two (2) or more request forms are submitted on the same day.

6. In order to be fair to all employees, the following holidays, Memorial Day and Labor Day, Independence Day and Thanksgiving, Christmas and New Years,

31

SMART ALABAMA, LLC Employee Handbook                    12/10/2004

will be considered "paired holidays." If you are granted a set of days
surrounding one of these holidays, you are prohibited from doing the same
around another holiday, regardless of seniority status or how far in advance it
is requested. This will not be decided based on seniority or convenience.

7.  During the months of November & December all employees are limited to a
    maximum of five (5) vacation days per month. There will be no exceptions to
    this policy.

8.  The company policy is "in an area where only a limited number of employees
    work, only one individual may be off at any given time."

9.  Vacation requests still must be approved! Please do not make any plans
    or commit your self in any way (i.e., deposit to a travel agent for a trip)
    until you are sure your request has been granted. Do not assume that
    because no member of your work group is off, that you are automatically
    granted the day(s) requested. Work-schedules and other requests' factor into
    the decision making process.

If a request for vacation is denied, and coincidently, you do not show up for work on
that day (i.e. sick) you will not be paid for that day regardless of time remaining.


VACATION SCHEDULE:

Vacation starts w/ 5 days after probationary period for the first year. Employee
will earn 7 days paid vacation after the first year anniversary and additional
vacation time per the schedule below.

Ex.)

| Years of Service   | Paid Vacation Days               |
|--------------------|----------------------------------|
| Year 1             | 5 days after probationary period |
| Year 2-3           | 7days                            |
| Year 4-5           | 10 days                          |
| Year 6-14          | 15 days                          |
| Year 15 and above  | 20 days.                         |

Paid company holidays, which occur during your vacation, are not counted as
vacation days.

COBRA

SMART ALABAMA, LLC, in accordance with federal law offers continued
medical benefits to employees who lose eligibility for coverage via termination
or other circumstances. COBRA (Consolidated Omnibus Budget
Reconciliation Act) provides employees and their qualified beneficiaries the
opportunity to continue health coverage under the company's health plan. The

32

SMART ALABAMA, LLC Employee Handbook          12/10/2004

employee pays full cost for coverage at our group rate, plus an administration fee.

The Human Resources department will provide details of COBRA coverage and procedures for applying at the time an employee loses eligibility.

## STANDARDS OF CONDUCT

Certain guidelines for personal behavior are necessary in any company for orderly and safe operations. Our primary rule at SMART ALABAMA, LLC is to use common sense and standards of honesty and decency accepted by all good citizens.

It is SMART ALABAMA, LLC policy to have certain rules and regulations regarding employee conduct to protect the efficient operation of the Company and well being of SMART employees, visitors and customers. It is also policy of the Company that all employees should be made aware of these rules.

The following, but not limited to, are examples of conduct infractions which may result in disciplinary action up to and including immediate discharge, depending on the circumstances in each case :

- Reporting to work late or not being ready to work at the assigned starting time;

- Knowingly scanning the time card of another Associate or having your time card scanned by another Associate for purposes of falsifying time records

- Fighting and/or horseplay on the job or threat of bodily injury to co-workers or customers.

- Insubordination or willful disobedience of directions and instructions of immediate supervisory personnel.

- Failure to notify the immediate supervisor when an associate will be absent from work, unable to report for work on time, or leave the work area or facility before the determined ending time;

- Overstaying breaks;

- Excessive use of the telephone for personal business;

- Failure to perform assigned tasks efficiently;

- Failure to comply with Company safety and health rules and regulations;

- Failure to follow Company or departmental quality standards;

33

SMART ALABAMA, LLC Employee Handbook                12/10/2004

- Participation in discrimination, harassment, or intimidation;

- Theft or misuse of Company property, customer property, or of another associate's property;

- Failure to report accurately the use of Company funds for business purposes;

- Disclosure or discussion of wages paid

- Falsifying, mutilating, or unauthorized removal of a Company record or report, such as an application for employment, a production record, a timecard, an expense report, etc;

- Sleeping on Company premises while clocked in or on company time;

- Deliberate interference with operations, sabotage, or work slowdowns;

- Violation of the Company policy on solicitation, distribution, or posting of unauthorized material;

- Excessive and/or unexecuted absenteeism (three consecutive work days absent without notification will be considered job abandonment);

- Aggressive behavior toward any individual while on company property.

Obviously not every instance of misconduct can be listed. Certainly, there are others. The Company reserves the right to impose discipline where the Company deems it appropriate and necessary to do so. If you have successfully completed your initial introductory period and believe that an adverse personnel action is unfair, you can ask to have it reviewed through our Problem Solving Procedure, the Associate Peer Review Procedure, or the Discipline Committee Procedure if applicable.


## DISCIPLINE POLICIES


### ASSOCIATE PEER REVIEW/DISCIPLINE COMMITTEE

SMART ALABAMA, LLC is committed to providing a harmonious work environment for our Associates. The solution to most problems is often found through communication. We will make every reasonable effort to assist in solving problems or disputes among employees.

34

SMART ALABAMA, LLC Employee Handbook          12/10/2004

However, there are times when corrective action discipline is necessary. There are also times when an Associate may wish to "appeal" the discipline action received.

There are two avenues the Associate may utilize to appeal their disciplinary action. The Associate Peer Review consisting of a panel of three (3) non-management Associates and two (2) Management Associates or the Discipline Committee consisting only of upper level management.

Some issues are not subject to the Peer Review or Discipline Committee procedures. These include, but are not limited to, disciplinary action relating to rules of conduct regarding termination unrelated to disciplinary action (such as position elimination or reductions in work force), changes to the Company's policies, performance evaluations, job descriptions, job classifications (grades), pay rates, changes to quality and quantity of work standards, benefit plans subject to ERISA and other items not specifically listed concerning these items may be resolved directly through the "Problem Solving", and/or "Open Door" procedures contained in this Handbook.

No Associate will be reprimanded, disciplined, or otherwise harassed by anyone as a result of using this procedure, any attempt to improperly influence a panelist or witness is prohibited.

The Human Resource Department is responsible for administration of this procedure, proper and timely handling of discipline complaints, training of Associate Peer Review/Discipline Committee panelists, and maintenance of the list of eligible panelists. In addition, all Associates involved in the

Associate Peer Review/Discipline Committee procedure are responsible for maintaining confidentiality of information obtained in the course of processing a complaint.

If you have any questions regarding the Associate Peer Review or Discipline Committee Procedure, please contact your Supervisor or a representative of the Human Resources Department.

## DISCIPLINARY PROCEDURES

It is SMART ALABAMA, LLC policy to have a procedure for discipline which will govern any violations of the Company's standards of conduct and which will ensure that the circumstances concerning a violation are given proper consideration before action is taken.

The following three-step progressive disciplinary procedure may be utilized whenever an employee violates the Company's standard of conduct unless the seriousness of the infraction justifies omitting any or all of the first three steps,

  1) Verbal Counseling
  2) Written Warning
  3) Termination

35

SMART ALABAMA, LLC Employee Handbook                    12/10/2004

In certain situations involving of the work rules or Company policies, it may become necessary for a manager, supervisor or business unit leader to temporarily remove an employee from the job pending an investigation. The associate may be suspended without pay from the job during the course of the investigation.

In most cases, employees who disagree with the disciplinary action taken against them are entitled to have the matter reviewed under the Company's Fair Treatment Procedure.

## *Termination of Employment*

### TERMINATION

Employees of SMART ALABAMA, LLC are not given tenure. The employee of SMART ALABAMA, LLC may choose to terminate employment at any time. Employees choosing to terminate their employment with SMART ALABAMA, LLC are required to return all company property to their immediate supervisor before leaving the premises on their final day of employment. Upon receipt of

all company owned property, the employee will receive their final paycheck including any earned vacation pay, if applicable.

SMART ALABAMA, LLC may terminate employment at any time for any reason. If an employee is terminated for a severe violation of policy they will be escorted from the premises immediately. Any personal property, plus their final paycheck including any earned vacation pay, if applicable, will be given to the employee upon receipt of all company owned property.

The Human Resources department will provide opportunity to all employees leaving SMART ALABAMA, LLC to have an exit interview. Request for exit interviews must be made with reasonable time for the Human Resources department to schedule the interview.

SMART ALABAMA, LLC considers personnel files confidential. Any request for employment confirmation will be provided only with employment dates and positions held.



# ∩AIDT

## CERTIFICATE OF ACHIEVEMENT

awarded to

*Robin O. Davis*

in recognition for successful completion of training

*SMART*



ATWELL V. SMART
P 26(A) 0081



**Men**

1. Men feel they have to be too cautious as to what they say or how they behave.
2. Men feel cross-gender communication is not as great a problem as women feel it is.
3. Men feel women do not think men are trying.
4. Men feel that women have more advantages in the workplace.
5. Men feel that they are not allowed to make mistakes.
6. Men feel women want both to be provided for and to have equality.
7. Men feel that women dress and act in a way that draws attention to their sexuality.

## 8. Sexual Harassment

Sexual harassment is a gender issue requiring special attention. This common form of discrimination is one of the most pressing and costly problems facing organizations today. Sexual harassment is unwelcome behavior that happens to you because of your sex that creates an intimidating, hostile, or offensive work environment. Many instances involve a man sexually harassing a woman, however, sexual harassment can also be:

- A woman harassing a man.
- A woman harassing a woman.
- A man harassing a man.

Some types of behavior that can be considered sexual harassment are:

- Unwelcome sexual advances.
- Request for sexual favors, or
- Verbal or physical conduct of a sexual nature.

Two types of sexual harassment are:

- "Quid Pro Quo" Harassment
- Hostile Environment

0002-S69(M)-AIDT 3/04

ATWELL V. SMART
P 26(A) 0515

Ⓢ S M A R T

## "Quid Pro Quo"

"This for that," such as, where an employee's submission to unwelcome sexual conduct is an expressed or implied condition of receiving job benefits or the employee's refusal to submit to sexual conduct would result in tangible job detriment.

## Hostile Environment

Verbal or physical conduct of a sexual nature that has the purpose or effect of unreasonably interfering with an individual's employment creating an intimidating, hostile, or offensive work environment.

## What are the Potential Liabilities?

- Back pay
- Reinstatement
- Damages for emotional harm
- Punitive damages

## Sexual Harassment and the Law

Although many federal and state laws do not specifically define sexual harassment or make it illegal, courts have found that sexual harassment is a form of sex discrimination which violates the laws against sex discrimination in the workplace.

**Title VII or the Civil Rights Act of 1964** is a federal law that protects individuals from discrimination based upon sex. This law makes it illegal for an employer to discriminate against individuals because of their sex in hiring, firing, and other terms and conditions of employment, such as promotions, raises, and other job opportunities.

The laws of most states also make it illegal to discriminate on the basis of sex, and some states specifically make sexual harassment against the law.

ATWELL V. SMART
P 26(A) 0516

 **S M A R T**

## Conduct Considered to be Sexual Harassment

Many different kinds of conduct that are of a sexual nature may be sexual harassment, if the behavior is unwelcome and if it is severe or pervasive. However, courts have resisted adopting what they consider a workplace "code of conduct" or list of behavior that is automatically considered to be sexual harassment. As a result, if the conduct is not unwelcome or not severe or pervasive, courts will not necessarily consider each type of conduct listed below to be sexual harassment.

Some examples of conduct that may be sexual harassment:

- **Verbal or written conduct:**
  Comments about clothing, personal behavior, or your body; sexual or sex-based jokes; requesting sexual favors or repeatedly asking you out; sexual innuendoes; telling rumors about your personal or sexual life; threatening you.

- **Physical conduct:**
  Rape or assault; impeding or blocking your movement; inappropriate touching of your body or clothing; kissing, hugging, patting, stroking

- **Nonverbal conduct:**
  Looking up and down your body; derogatory gestures or facial expression of a sexual nature; following or stalking you.

- **Visual displays:**
  Posters, drawings, pictures, screensavers or e-mails of a sexual nature.

## 9. Sexual Orientation Issues

Today's workplace is characterized by a mix of values and lifestyles. As gays and lesbians increasingly make their presence known in the workplace, a variety of issues develop. Some people believe that homosexuality is immoral and others just don't understand it. Although someone's sexual orientation has nothing to do with an

ATWELL V. SMART
P 26(A) 0517

**S M A R T**

individual's ability to perform a job, it can create conflict in the workplace. Gays and lesbians often feel compelled to hide their orientation because they fear isolation, discrimination, and even termination. Sexual orientation is different from sexual behavior because it refers to feelings and self-concept. Persons may or may not express their sexual orientation in their behaviors.

Several studies suggest that gays and lesbians make up 10%-15% of the workforce. Of all workplace issues, sexual orientation may be the most sensitive, volatile, and challenging. The whole issue of sexuality and its variations from heterosexuality is controversial, steeped in ignorance, and demanding of skills and resources to deal with it. Organizations, like most people, tend to avoid controversy and situations they are ignorant about, or are unable to manage effectively.

Points to ponder:

- 6% of the population is gay or lesbian.

- Compared to the general population, gays and lesbians are one of the most educated, affluent segments of society.

- Employees need to be sensitive to the fact that they may be working with individuals who may be gay/lesbian and have chosen not to reveal it.

- Religious/moral beliefs cannot supersede the rights of people not to be discriminated against.

- Sharing information about non-work related activities in a similar manner to heterosexual employees is not flaunting the gay/lesbian lifestyle.

ATWELL V. SMART
P 26(A) 0518



SMART ALABAMA LLC
Punch Detail Report
Previous pay period
All accounts, all pay rules, all Timeclock groups

                                                                                        Page
                                                                                    02/13/2006

Thu 02/02  630a*U                  530p                              11.00   82.65
Fri 02/03  1207p*U                 329p                               3.37   86.02
Sat 02/04  Unscheduled
Sun 02/05  917a*U                  356p                               6.65   92.67
Mon 02/06  Unscheduled
Tue 02/07  534a*U                   *7                                0.00   92.67

  Acct:000007,802
                REGULAR:    64.92  OVERTIME:    13.33  DOUBLE:    14.42


WALDEN,RICHARD         0001990176000007,802
                                    MATERIAL CONTROL,CMA-2    8 hour shift    25778    B9R
           ID IN  DEPT   SHIFT ACTIVITY    OUT  ID IN  DEPT   SHIFT ACTIVITY   OUT    TOTALS
Wed 01/25  Unscheduled
Thu 01/26  Unscheduled
Fri 01/27  550a*U                  200p                               8.17    8.17
Sat 01/28  550a*U                  200p                               8.17   16.33
Sun 01/29  Unscheduled
Mon 01/30  550a*U                  225p                               8.58   24.92
Tue 01/31  555a*U                  203p                               8.13   33.05
Wed 02/01  623a*U                  207p                               7.73   40.78
Thu 02/02  559a*U                  203p                               8.07   48.85
Fri 02/03  532a*U                  204p                               8.53   57.38
Sat 02/04  554a*U                  1213p                              6.32   63.70
Sun 02/05  Unscheduled
Mon 02/06  555a*U                  203p                               8.13   71.83
Tue 02/07  552a*U                  203p                               8.18   80.02
Add Punch        666 01/27  550a
Add Punch        666 01/27  200p
Add Punch        666 01/28  550a
Add Punch        666 01/28  200p
Add Punch        666 01/30  550a


  Acct:000007,802
                REGULAR:    73.05  OVERTIME:    6.97


BODIFORD,LISA H.       0001989346000010,1015
                                    HUMAN RESOURCES,SAFETY    8 hour shift    589    B9R
           ID IN  DEPT   SHIFT ACTIVITY    OUT  ID IN  DEPT   SHIFT ACTIVITY   OUT    TOTALS
Wed 01/25  946p                    727a*L                              9.45    9.45
Thu 01/26  945p                    738a*L                              9.63   19.08
Fri 01/27  941p                    624a*L                              8.40   27.48
Sat 01/28  948p                    617a                                8.00   35.48
Sun 01/29  ABSENT                                                     (8.00)
Mon 01/30  949p                    626a*L                              8.43   43.92
Tue 01/31  949p                    710a*L                              9.30   53.22
Wed 02/01  954p                    709a*L                              9.15   62.37
Thu 02/02  941p                    809a*L                             10.15   72.52
Fri 02/03  950p                    626a*L                              8.43   80.95
Sat 02/04  ABSENT                                                     (8.00)
Sun 02/05  ABSENT                                                     (8.00)
Mon 02/06  1001p*L                 736a*L                              9.58   90.53
Tue 02/07  947p                    624a*L                              8.40   98.93

  Acct:000010,1015
                REGULAR:    80.00  OVERTIME:    18.93


DAVIS,ROBIN            0001989870000010,1015
                                    HUMAN RESOURCES,SAFETY   Office    1445    B9R
           ID IN  DEPT   SHIFT ACTIVITY    OUT  ID IN  DEPT   SHIFT ACTIVITY   OUT    TOTALS
Wed 01/25  ABSENT                                                     (8.00)
Thu 01/26  ABSENT                                                     (8.00)
Fri 01/27  ABSENT                                                     (8.00)
Sat 01/28  Unscheduled
Sun 01/29  Unscheduled
Mon 01/30  747a                    1216p  M 1250p*L              500p  8.43    8.43
Tue 01/31  749a                    543p*L                              8.72   17.15
Wed 02/01  745a                    524p*L                              9.40   25.55
Thu 02/02  721a*E                  1230p  M 137p*L           526p-L    8.97   34.52
Fri 02/03  740a                    1153a  M 1235p*L              500p  8.30   42.82
Sat 02/04  700a*U                  1021a                               3.35   46.17
Sun 02/05  Unscheduled

```
SMART ALABAMA LLC                                                                    Page
Punch Detail Report                                                             02/13/2006
Previous pay period
All accounts, all pay rules, all Timeclock groups

Mon 02/06  736a                        515p                                8.40   54.57
Tue 02/07  735a                        1108a     M 1158a*L      1238p*E    4.22   58.78
  Add Punch         900 01/30  500p
  Add Punch         900 02/03  500p
  Remove Punch      666 02/05  910a


   Acct:000010,1015
             REGULAR:     57.15  OVERTIME:        1.63



EILAND,JO ANN           0001990205000010,1015
                                         HUMAN RESOURCES,SAFETY    8 hour shift   25768   B9R
                   ID IN   DEPT   SHIFT ACTIVITY    OUT    ID IN   DEPT   SHIFT ACTIVITY  OUT   TOTALS
Wed 01/25  Unscheduled
Thu 01/26  Unscheduled
Fri 01/27  Unscheduled
Sat 01/28  Unscheduled
Sun 01/29  Unscheduled
Mon 01/30  Unscheduled
Tue 01/31  Unscheduled
Wed 02/01  Unscheduled
Thu 02/02  Unscheduled
Fri 02/03  Unscheduled
Sat 02/04  Unscheduled
Sun 02/05  Unscheduled
Mon 02/06  750a*U                      1205p                                4.25   4.25
Tue 02/07  747a*U                      1137a                                3.83   8.08
  Add Punch         855 02/06  750a


   Acct:000010,1015
             REGULAR:      8.08



MCGOUGH,MARY M          0001290993000010,1015
                                         HUMAN RESOURCES,SAFETY    8 hour shift   385    B9R
                   ID IN   DEPT   SHIFT ACTIVITY    OUT    ID IN   DEPT   SHIFT ACTIVITY  OUT   TOTALS
Wed 01/25  750a                        509p                                9.00   9.00
Thu 01/26  757a                        512p                                9.00  18.00
Fri 01/27  757a                        505p                                9.00  27.00
Sat 01/28  Unscheduled
Sun 01/29  Unscheduled
Mon 01/30  756a                        1202p    H  111p*L       515p       7.85  34.85
Tue 01/31  755a                        713p*L                             11.22  46.07
Wed 02/01  800a                        1200p    H  100p*L       513p       8.00  54.07
Thu 02/02  759a                        513p                                9.00  63.07
Fri 02/03  757a                        1044a*E                             2.73  65.80
Sat 02/04  Unscheduled
Sun 02/05  Unscheduled
Mon 02/06  759a                        1202p    H  100p*L       503p       8.03  73.83
Tue 02/07  757a                        1103a    M 1250p*L       500p       7.22  81.05
  Remove Punch      666 01/30  333p
  Add Punch         666 01/30  515p
  Add Punch         666 01/31  755a
  Add Punch         666 02/01  100p
  Remove Punch      666 02/02  1205p
  Add Punch         666 02/06  100p


   Acct:000010,1015
             REGULAR:     74.98  OVERTIME:        6.07



TEAGUE,DEREK            0001990135000010,1025
                                         HUMAN RESOURCES,BUILDING SERVICES
                                                                  8 hour shift   1948   B9R
                   ID IN   DEPT   SHIFT ACTIVITY    OUT    ID IN   DEPT   SHIFT ACTIVITY  OUT   TOTALS
Wed 01/25  758a                        500p                                9.00   9.00
Thu 01/26  747a                        1206p    M 1245p*L       503p       8.35  17.35
Fri 01/27  735a                        500p                                9.42  26.77
Sat 01/28  Unscheduled
Sun 01/29  Unscheduled
Mon 01/30  744a                        1138a    M 1200p         503p       8.62  35.40
Tue 01/31  756a                        512p                                9.00  44.40
Wed 02/01  755a                        522p*L                              9.37  53.77
```

## Day Shift Safety Assistant Position Responsibilities

The following is a summary of specific job responsibilities that
a Safety Assistant will be required to perform on a day to day
basis.

* Start time 8:00 a.m. till 5:00 p.m.
  Normal break time is 10 minutes
  Lunch is one hour

* Maintain OSHA 300 Log, medical records, and all
  doctors and workers compensation issue daily.

* Review and track Safety Representatives and
  Supervisors, Safety Inspections and Monthly
  Safety Topics

* Conduct frequent safety walk–throughs of all departments
  to ensure that all employees are wearing all Personal
  Protection Equipment and are following all safety requirements

* Assit the Safety Manager in responding to the employees
  needs and concerns for safety requirements

* Train new Safety Representatives on proper Safety Inspections
   Procedures and Safety Responsibilities

* Conduct Lockout/Tagout Safety Training for employees that
  require a lockout device and perform competency testing for
  lockout trained employees

* * Review and file Safety Inspection, Crane Inspection, Safety
  Committees Inspections, Accident Reports, etc. that may come to
  Safety office

* Assist the Safety Manager in New Hire Safety Orientation



EXHIBIT
U
R. Atwell 69:07

Atwell v. Smart
0078
Pltf's RFP

* Assist the Safety Manager in taking notes and conducting the meeting for the day shift Safety/Ergonomic Committees

* Prepare Safety Orientation Handouts, Sign Off Sheets, and Manuals

* Assist with washing the gloves and inventory of the Personal Protection Equipment and also issuing PPE to team leaders for their department

MONTHLY RESPONSIBILITIES

* Conduct Department Ergonomic Rotation Audits for correct rotation schedule

* Audit new employees ramp in documention to ensure correct ramp in process

* Conduct A.M. inspection and check the Emergency Evacuation System for plant

* As a part of the Egronomic Rotation Audit, conduct employee interviews to ensure that rotation is done

* Audit new employees training documentation to ensure standard operating procedure for equipment safety training is completed and documented

* Update SOP'S for each piece of equipment to ensure accuracy and usefulness

* Revise and update Evacuation Route Maps to make them easier to read and understand

* Other duties as deemed necessary by the Safety Manager

Atwell v. Smart
0079
Pltf's RFP

\*     All worker's compensation cases will be managed and reported to
      Day shift safety assistant.

\*     All light duty team members will be assigned and monitored and
\*     Managed, a list of all light duty members will be developed and
      placed on the safety managers desk for review each morning, also a
      copy will be emailed to department manager, plant manager, and a
      hard copy will be given to each team leader with restrictions if any.

\*     Inventory all PPE daily and fill out correct reporting procedure.

I confirm that I am able to perform the function and requirements of
this position as described herein and explain to me

_____  01/13/06

Safety Assistant

I Confirm that I have explained the major requirement and
responsibilities of the position to the individual named above and
have witnessed his/her signature

Safety Manager

Atwell v. Smart
0080
Pltf's RFP

CO.   FILE   DEPT.   CLOCK  NUMBER   000
B9R   989878  000010          0002012131   1

SMART ALABAMA LLC
121 SHIN YOUNG DRIVE
LUVERNE, AL 36049
334 335 5800

Taxable Marital Status: Single
Exemptions/Allowances:
    Federal: 2
    State:

# Earnings Statement

Period Ending:     11/19/2005
Pay Date:          11/23/2005

**ROBIN DAVIS**

Social Security Number:

| Earnings | rate | hours | this period | year to date |
|---|---|---|---|---|
| Regular | | | 49.12 | 4,546.99 |
| Regular | 9.0000 | 80.00 | 720.00 | |
| Overtime | 13.5000 | 29.63 | 400.01 | 1,092.22 |
| Bonus | 9.0000 | 7.76 | 69.84 | 228.78 |
| Gross Pay | | | $1,238.97 | 5,867.99 |

| Deductions | Statutory | | |
|---|---|---|---|
| | Federal Income Tax | -119.88 | 451.64 |
| | Social Security Tax | -76.82 | 363.82 |
| | Medicare Tax | -17.97 | 85.09 |
| | AL State Income Tax | -50.58 | 234.85 |
| | Net Pay | $973.72 | |

Your federal taxable wages this period are
$1,238.97



# FEBRUARY SAFETY DEPARTMENT
## WEEKEND WORK SCHEDULE

### SATURDAY

#### February 4, 2006

Tabatha    1st Shift
Amelia     2nd Shift
Deborah    3rd Shift

#### February 11, 2006

Colinda    1st Shift
Lisa       2nd Shift
Robin      3rd Shift

#### February 18, 2006

Colinda    1st Shift
Wendy      2nd Shift
Robin      3rd Shift

#### February 25, 2006

Wendy      1st Shift
Lisa       2nd Shift
Robin      3rd Shift

### SUNDAY

#### February 5, 2006

Tabatha 1st Shift 6-4
Robin   2nd Shift 4-12

#### February 12, 2006

Wendy 2nd Shift

#### February 19, 2006

Lisa 3rd Shift

#### February 26, 2006

Colinda 1st Shift

Atwell v. Smart
0064
Pltf's RFP



EXHIBIT
8
R. Atwell 6-21-07



EXHIBIT

DAVIS,ROBIN                    0001989878000010,1015    HUMAN RESOURCES,SAFETY

| | ID IN | DEPT | SHIFT ACTIVITY | | OUT | ID IN | DEPT | Office SHIFT ACTIVITY | OUT | BSR TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|
| Wed 12/28 | 533a | VACATION | | | | | | | | 8.00 |
| Thu 12/29 | 533a | VACATION | | | | | | | | 8.00 |
| Fri 12/30 | 533a | VACATION | | | | | | | | 8.00 |
| Sat 12/31 | 533a | VACATION | | | | | | | | 8.00 |
| Sun 01/01 | ABSENT | | | | | | | | | (7.37) |
| Mon 01/02 | 1029p*L | | 1147p*E | | | | | | | 1.37 |
| Mon 01/02 | 1029p | HOLIDAY | | | | | | | | 8.00 |
| Tue 01/03 | 744a*U | | 451p | | | | | | | 9.38 |
| Wed 01/04 | 752a*U | | 910p | | | | | | | 12.00 |
| Wed 01/05 | 730a*U | | 607p | | | | | | | 9.62 |
| Fri 01/06 | 745a*U | | 509p | | | | | | | 8.15 |
| Fri 01/06 | ABSENT | | | | | | | | | 41.52 |
| Sat 01/07 | ABSENT | | | | | | | | | |
| Sun 01/08 | ABSENT | | | | | | | | | |
| Mon 01/09 | 759a*U | | | | | | | | | (7.37) |
| Tue 01/10 | 738a*U | | | | | | | | | 7.88 |
| Add Hours | 666 | 12/28 | 533a | VACATION | (Excused) | [None] | [None] | 8.00 | | 9.50 |
| Add Hours | 666 | 12/29 | 533a | VACATION | (Excused) | [None] | [None] | 8.00 | | |
| Add Hours | 666 | 12/30 | 533a | VACATION | (Excused) | [None] | [None] | 8.00 | | 49.40 |
| Add Hours | 666 | 12/31 | 533a | VACATION | (Excused) | [None] | [None] | 8.00 | | 58.90 |
| Add Hours | 666 | 01/02 | 1029p | HOLIDAY | (Excused) | [None] | [None] | 8.00 | | |

Acct:000010,1015        REGULAR:    OVERTIME:    HOLIDAY:
                        VACATION:
                        50.75       8.15         8.00
                        32.00

ATWELL V. SMART
P 26(A) 0030

SMART ALABAMA LLC
Punch Detail Report
Previous pay period

Page
01/03/2006

DAVIS,ROBIN                0001989878000010,1015

| | ID IN | DEPT | SHIFT | ACTIVITY | HUMAN RESOURCES,SAFETY OUT | ID IN | DEPT | Office SHIFT | ACTIVITY | 1445 OUT | B9R TOTALS | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Wed 12/14 | 744a*U | | | | 1208a | | | | | | 15.40 | 15.40 |
| Thu 12/15 | 752a*U | | | | 815p | | | | | | 11.38 | 26.78 |
| Fri 12/16 | 755a*U | | | | 500p | | | | | | 8.08 | 34.87 |
| Sat 12/17 | ABSENT | | | | | | | | | | (7.17) | |
| Sun 12/18 | ABSENT | | | | | | | | | | (7.17) | |
| Mon 12/19 | 757a*U | | | | 500p | | | | | | 8.05 | 42.92 |
| Tue 12/20 | ABSENT | | | | | | | | | | (7.17) | |
| Wed 12/21 | ABSENT | | | | | | | | | | (7.17) | |
| Thu 12/22 | 749a*U | | | | 749p | | | | | | 10.98 | 53.90 |
| Fri 12/23 | 750a*U | | | | 500p | | | | | | 8.27 | 62.07 |
| Sat 12/24 | ABSENT | | | | | | | | | | (7.17) | |
| Sun 12/25 | ABSENT | | | | | | | | | | (7.17) | |
| Mon 12/26 | 950p HOLIDAY | | | | | | | | | | 8.00 | |
| Tue 12/27 | 500p VACATION | | | | | | | | | | 8.00 | |
| Add Punch | | 666 12/16 | 500p | | | | | | | | | |
| Add Punch | | 666 12/19 | 500p | | | | | | | | | |
| Add Punch | | 666 12/23 | 500p | | | | | | | | | |
| Add Hours | | 666 12/26 | 950p | HOLIDAY (Excused) | | [Home] | [Home] | 8.00 | | | | |
| Add Hours | | 666 12/27 | 500p | VACATION (Excused) | | [Home] | [Home] | 8.00 | | | | |

Acct:000010,1015

| | REGULAR: | 59.15 | OVERTIME: | 2.92 | HOLIDAY: | 8.00 |
|---|---|---|---|---|---|---|
| | VACATION: | 8.00 | | | | |

ATWELL V. SMART
P 26(A) 0031



U = UNSchedued    L = LATE    E = EARly

**DAVIS,ROBIN**

000198987800010.1015    HUMAN RESOURCES,SAFETY    8 hour shift

|  | ID IN | DEPT | SHIFT ACTIVITY | OUT | ID IN DEPT | SHIFT ACTIVITY | OUT | B9R TOTALS |
|---|---|---|---|---|---|---|---|---|
| Wed 11/02 | 756a·U |  |  | 535p |  |  |  | 9.62 |
| Thu 11/03 | 753a·U |  |  | 553p |  |  |  | 10.00 |
| Fri 11/04 | 751a·U |  |  | 535p |  |  |  | 9.73 |
| Sat 11/05 | ABSENT |  |  |  |  |  |  | (8.17) |
| Sun 11/06 | 123p·U |  |  | 415p |  | Temp Set Check |  | (8.17) |
| Mon 11/07 | ABSENT |  |  |  |  | No Safety person |  | (3.72) |
| Tue 11/08 | 738a·U |  |  | 728p | H 919p·L | here. |  | 17.37 |
| Wed 11/09 | 752a·U |  |  | 505p |  |  | 250a | 9.22 |
| Thu 11/10 | 803a·U |  |  | 517p |  |  |  | 9.23 |
| Fri 11/11 | 806a·U |  |  | 318p |  |  |  | 7.10 |
| Sat 11/12 | 736a·U |  |  | 318p |  |  |  | 7.88 |
| Sun 11/13 | 442p·U |  |  | 452p |  |  |  | 0.17 |
| Mon 11/14 | 144a·U |  |  | 501p |  |  |  | 9.28 |
| Tue 11/15 | 555p·L |  |  | 900a·L |  |  |  | 95.03 |

Add Punch 666 11/11 803a

Acct:000010.1015    REGULAR: 80.00    OVERTIME: 29.63    DOUBLE: 3.80

---

**DAVIS,ROBIN**

000198987800010.1015    HUMAN RESOURCES,SAFETY    8 hour shift

|  | ID IN | DEPT | SHIFT ACTIVITY | OUT | ID IN DEPT | SHIFT ACTIVITY | OUT | B9R TOTALS |
|---|---|---|---|---|---|---|---|---|
| Wed 11/16 | ABSENT |  |  |  |  |  |  | (8.17) |
| Thu 11/17 | 723a·U |  |  | 505p |  |  |  | 9.73 |
| Fri 11/18 | 736a·U |  |  | 615p |  |  |  | 10.58 |
| Sat 11/19 | 1101a·U |  |  | 366p |  |  |  | 0.00 |
| Sun 11/20 | 641a·U |  |  | 1255a |  |  |  | 20.32 |
| Mon 11/21 | 742·U |  |  | 749p |  |  |  | 28.73 |
| Tue 11/22 | 744·U |  |  | 844p |  |  |  | 95.88 |
| Wed 11/23 | 715a·U |  |  |  |  |  |  | 57.00 |
| Thu 11/24 | ABSENT |  |  |  |  |  |  | 11.48 |
| Fri 11/25 | ABSENT |  |  |  |  |  |  | (8.17) |
| Sat 11/26 | ABSENT |  |  |  |  |  |  | (8.17) |
| Sun 11/27 | ABSENT |  |  |  |  |  |  | 14.08 |
| Tue 11/28 | 742a·U |  |  | 515p |  |  |  | 9.55 |
| Wed 11/29 | 733a·U |  |  | 109a |  |  |  | 17.60 |

Remove Punch 666 11/20 536a
Remove Punch 666 11/20 639a

Acct:000010.1015    REGULAR: 80.00    OVERTIME: 10.02    DOUBLE: 8.42

Handwritten notes: "Holiday", "SAT - SUN 3 loop", "7:25 A", "5:30 P", "Sunday", "8:00 AM IS NOT EARLy", "Sunday  No Safety person here", "Temp Set Check", "GOT OFF - 2:50 pm 21:50 pm", "5:30 Sunday pm", "5:30 - out  Need to clock out", "end up at lunchtime", "Please fill in time"

Triple Shift  2 employee's were out.

SAT  11/19  11:01 AM — Sunday  3:06 pm

6:36, 6:39, 6:41

Attempted to clock out & Back in. For
the  thirt ~~⊗⊗⊗~~ Shift IN a

row.

ATWELL V. SMART
P 26(A) 0033

SMART ALABAMA LLC
Punch Detail Report
Previous pay period
Selected accounts, all pay rules, all timeclock groups

Pag
11/30/2005

**BODIFORD, LISA M.**    0001989346000010,1015

| | ID IN | DEPT | SHIFT | ACTIVITY | OUT | ID IN | DEPT | SHIFT | ACTIVITY | OUT | B9R TOTALS | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | HUMAN RESOURCES,SAFETY | | | 8 hour shift | | 589 | | |
| Wed 11/16 | 252p | | | | 1108p | | | | | | 8.00 | 8.00 |
| Thu 11/17 | 256p | | | | 1112p | | | | | | 8.00 | 16.00 |
| Fri 11/18 | 255p | | | | 1116p | | | | | | 8.00 | 24.00 |
| Sat 11/19 | 250p | | | | 1100p | | | | | | 8.00 | 32.00 |
| Sun 11/20 | 241p | | | | 1004p*E | | | | | | 7.07 | 39.07 |
| Mon 11/21 | 248p | | | | 1127p*L | | | | | | 8.45 | 47.52 |
| Tue 11/22 | 250p | | | | 1100p | | | | | | 8.00 | 55.52 |
| Wed 11/23 | 257p | | | | 1000p*E | | | | | | 7.00 | 62.52 |
| Thu 11/24 | 800a HOLIDAY | | | | | | | | | | 8.00 | |
| Fri 11/25 | ABSENT | | | | | | | | | | (8.00) | |
| Sat 11/26 | Unscheduled | | | | | | | | | | | |
| Sun 11/27 | Unscheduled | | | | | | | | | | | |
| Mon 11/28 | 251p*U | | | | 1119p | | | | | | 8.47 | 70.98 |
| Tue 11/29 | 257p*U | | | | 1114p | | | | | | 8.28 | 79.27 |
| Add Punch | 666 11/19 | 250p | | | | | | | | | | |
| Add Hours | 666 11/24 | 800a HOLIDAY (Excused) | [Nome] | [Nome] | 9.00 | | | | | | | |

Acct:000010,1015

REGULAR:    63.75   OVERTIME:    8.45   HOLIDAY:    8.00
DOUBLE:    7.07


**DAVIS, ROBIN**    0001989878000010,1015

| | ID IN | DEPT | SHIFT | ACTIVITY | OUT | ID IN | DEPT | SHIFT | ACTIVITY | OUT | B9R TOTALS | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | HUMAN RESOURCES,SAFETY | | | 8 hour shift | | 1445 | | |
| Wed 11/16 | ABSENT | | | | | | | | | | (8.17) | |
| Thu 11/17 | 723a*U | | | | 507p | | | | | | 9.73 | 9.73 |
| Fri 11/18 | 736a*U | | | | 611p | | | | | | 10.58 | 20.32 |
| Sat 11/19 | 1101a*U | | | | *? | | | | | | 0.00 | 20.32 |
| Sun 11/20 | 641a*U | | | | 306p | | | | | | 8.42 | 28.73 |
| Mon 11/21 | 743a*U | | | | 1252a | | | | | | 17.15 | 45.88 |
| Tue 11/22 | 748a*U | | | | 743p | | | | | | 11.92 | 57.80 |
| Wed 11/23 | 715a*U | | | | 844p | | | | | | 13.48 | 71.28 |
| Thu 11/24 | ABSENT | | | | | | | | | | (8.17) | |
| Fri 11/25 | ABSENT | | | | | | | | | | (8.17) | |
| Sat 11/26 | ABSENT | | | | | | | | | | (9.17) | |
| Sun 11/27 | ABSENT | | | | | | | | | | (9.17) | |
| Mon 11/28 | 742a*U | | | | 515p | | | | | | 9.55 | 80.83 |
| Tue 11/29 | 733a*U | | | | 109a | | | | | | 17.60 | 98.43 |
| Remove Punch | 666 11/20 | 636a | | | | | | | | | | |
| Remove Punch | 666 11/20 | 639a | | | | | | | | | | |

*[handwritten annotation]* Need OT. sheet  
Need to clock out lunch time  
and in at lunch time  
Please fill in lunch  
time

Acct:000010,1015

REGULAR:    80.00   OVERTIME:    10.02   DOUBLE:    8.42


**MCGOUGH, MARY M**    0001290993000010,1015

| | ID IN | DEPT | SHIFT | ACTIVITY | OUT | ID IN | DEPT | SHIFT | ACTIVITY | OUT | B9R TOTALS | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | HUMAN RESOURCES,SAFETY | | | 8 hour shift | | 385 | | |
| Wed 11/16 | 757a*U | | | | 1206p | M 104p*L | | | | 502p | 8.12 | 8.12 |
| Thu 11/17 | 756a*U | | | | 1206p | M 100p*L | | | | 509p | 8.32 | 16.43 |
| Fri 11/18 | 753a*U | | | | 1157a | M 1255p*L | | | | 505p | 8.23 | 24.67 |
| Sat 11/19 | Unscheduled | | | | | | | | | | | |
| Sun 11/20 | Unscheduled | | | | | | | | | | | |
| Mon 11/21 | 758a*U | | | | 1204p | M 105p*L | | | | 500p | 8.02 | 32.68 |
| Tue 11/22 | 758a*U | | | | 1204p | M 1258p*L | | | | 506p | 8.23 | 40.92 |
| Wed 11/23 | 803a*U | | | | 524p | | | | | | 9.35 | 50.27 |
| Thu 11/24 | 530a HOLIDAY | | | | | | | | | | 8.00 | |
| Fri 11/25 | Unscheduled | | | | | | | | | | | |
| Sat 11/26 | Unscheduled | | | | | | | | | | | |
| Sun 11/27 | Unscheduled | | | | | | | | | | | |
| Mon 11/28 | 917a*U | | | | | | | | | | 0.00 | 50.27 |
| Tue 11/29 | 1208p*U | | | | 511p | | | | | | 5.05 | 55.32 |
| Add Hours | 666 11/24 | 530a HOLIDAY (Excused) | [Nome] | [Nome] | 8.00 | | | | | | | |

Acct:000010,1015

REGULAR:    54.40   OVERTIME:    0.92   HOLIDAY:    8.00

**ATWELL V. SMART**
**P 26(A) 0034**

SMART ALABAMA LLC
Punch Detail Report
Previous pay period

Page
12/15/2005

DAVIS,ROBIN            0001989870000010,1015

| | ID IN | DEPT | SHIFT | ACTIVITY | HUMAN RESOURCES,SAFETY | | | | 8 hour shift | 1445 | H9R | |
| | | | | | OUT | ID IN | DEPT | SHIFT | ACTIVITY | OUT | TOTALS | |
| Wed 11/30 | 740a*U | | | | 1200p | M | 100p*L | | | 519p | 8.65 | 8.65 |
| Thu 12/01 | 742a*U | | | | 1200p | M | 100p*L | | | 538p | 8.93 | 17.58 |
| Fri 12/02 | ABSENT | | | | | | | | | | (8.17) | |
| Sat 12/03 | ABSENT | | *unscheduled* | | | | | | | | (8.17) | |
| Sun 12/04 | ABSENT | | | | | | | | | | (8.17) | |
| Mon 12/05 | 735a*U | | | | 1200p | M | 100p*L | | | 643p | | |
| | M | 839p*L | | | 1224a | | | | | | 13.88 | 31.47 |
| Tue 12/06 | 747a*U | | | | 1200p | M | 100p*L | | | 613p | 9.43 | 40.90 |
| Wed 12/07 | 731a*U | | | | 1200p | M | 100p*L | | | 1003p | | |
| | M | 1042p*L | | | *7 | | | | | | 13.53 | 40.90 |
| Thu 12/08 | 742a*U | | | | 1200p | M | 100p*L | | | 926p | 12.73 | 53.63 |
| Fri 12/09 | 744a*U | | | | 1200p | M | 100p*L | | | 522p | 8.63 | 62.27 |
| Sat 12/10 | ABSENT | | *unscheduled* | | | | | | | | (8.17) | |
| Sun 12/11 | ABSENT | | | | | | | | | | (8.17) | |
| Mon 12/12 | 745a*U | | | | 1200p | M | 100p*L | | | 520p | | |
| | M | 845p*L | | | 1128p | | | | | | 11.30 | 73.57 |
| Tue 12/13 | 743a*U | | | | 525p | | | | | | 9.70 | 83.27 |
| Add Punch | | 855 | 11/30 | 1200p | | | | | | | | |
| Add Punch | | 666 | 11/30 | 100p | | | | | | | | |
| Add Punch | | 666 | 12/01 | 1200p | | | | | | | | |
| Add Punch | | 666 | 12/01 | 100p | | | | | | | | |
| Add Punch | | 666 | 12/05 | 1200p | | | | | | | | |
| Add Punch | | 666 | 12/05 | 100p | | | | | | | | |
| Add Punch | | 666 | 12/06 | 1200p | | | | | | | | |
| Add Punch | | 666 | 12/06 | 100p | | | | | | | | |
| Add Punch | | 666 | 12/07 | 1200p | | | | | | | | |
| Add Punch | | 666 | 12/07 | 100p | | | | | | | | |
| Add Punch | | 666 | 12/08 | 1200p | | | | | | | | |
| Add Punch | | 666 | 12/08 | 100p | | | | | | | | |
| Add Punch | | 666 | 12/09 | 1200p | | | | | | | | |
| Add Punch | | 666 | 12/09 | 100p | | | | | | | | |
| Add Punch | | 666 | 12/12 | 1200p | | | | | | | | |
| Add Punch | | 666 | 12/12 | 100p | | | | | | | | |

Acct:000010,1015

REGULAR:    80.00   OVERTIME:    16.80

*8 hrs*
*For Lunch Taken*

*She do take lunch*
*off site.*

12:43 Colinda left for Lunch
1:12 Returned

1:00 Asked about C/d status / assigned areas.
1:08 Asked about C/d release date



January 5, 2006

Attention:  Robin Davis
Reference:  Job Performance Evaluation
From:        Safety Manager

This memo is to inform you of your current work status in the Safety Department. It is important that you are aware of the things that are being done within the office.

First, the statement made concerning Diane Balkcom previous workman's compensation claims at SMART, is not true. After reviewing Diane's file, the only claim she has had is the one that is currently under investigation.

Also, you need to be aware that your title in the Safety Department is not Safety Supervisor but Safety Assistant.

I am to be informed of all decisions made concerning Worker's Comp, Billing, and of any injury that occur. These things are to be ran through me. I also need to know what is currently happening with Physical Therapy. OSHA 300 Log must be completed and updated on a daily basis. The daily planner for the Safety Department has yet to be done. This would help get things organized and make things run a lot smoother in the office.

This is my 3rd request with you concerning these matters. If it continues to be a problem, other issues will be discussed on a more serious note.

I appreciate your prompt attention to these matters. Also, here's a list of things that need your immediate attention.



Rance Maddox, CSM, CECD, CMA

ATWELL v. SMART
D 26(A) 00002

1. OSHA 300 Log
2. Expense Reports
3. Workman's Comp Claims
4. Office Supplies
5. Daily Planner For All 3 Shifts
6. Safety Committee /First Response Meeting
7. Reports of Safety Memos
8. First Aid Supplies
9. P.P.E. Inventory 3 Shifts (Daily)
10. Filing

ATWELL v. SMART
D 26(A) 00003

01-18-06

Dear Rance,

This letter is intended to express to some of the concerns that I have. I have worked in the Safety Department Since November 14 of 2005. As you know I had a couple of hit and miss days of training on the daily operations. I have learned a lot and I am still learning every day. I

Atwell v. Smart
0057
Plff's RFP



01-12-06

To: Human Resources
Re: Meeting with Diane Balkcom
From: Robin Davis
       Safety Dept.

Gary Sport , Diane Balkcom and myself, Robin Davis met today. The purpose of this meeting, was to be sure that Diane understood that we as a company were concerned about her recovery any rehabilitation and to discuss her modified duty release from her Dr. on 01-04-06. Gary informed Diane that we had received the documentation from her latest Dr. visit and that her Dr. note stated that she could return to work for modified duties. Gary expressed to Diane how important is that we all abide by what her physician directs her to do. Gary assured Diane, that this company has a modified duty program and that he would find a position that best suits her restrictions / limitations per her Dr.s instructions.

  Diane behavior was very hostile towards Gary. Sitting upright she raised her voice at Gary as he explained to her that everyone has to abide by the company policies.
Gary explained to Diane that she had not been to work one single time since her last Dr. visit. He also explained to her that she is expected to be in attendance. Diane's repeated failure to comply with her Dr. orders and the company policy will result permanent separation from the company.

*Robin Davis*

Robin Davis
Safety Assistant
Safety Department
Smart Alabama L.L.C.

Atwell v. Smart
0056
Pltf's RFP



Safety Meeting
Safety Office
Conducted by Rance Maddox
Date: 01-24-06 --- Tuesday 8:00 a.m.
Present:  Rance Maddox
          Robin Davis
          Lisa Bodiford
          Colinda Porter

The Safety Meeting held Tuesday morning, January 24, 2006 was
authorized and conducted by Rance Maddox, Safety Manager.

Mr. Maddox explained that he had met with Gary Sport and Mr. Kwon
the previous day regarding job performances in the Safety Office.

Rance Maddox is the Safety Manager and is in charge of the Safety
Office.  All Safety Assistants and Safety Personal work under Mr.
Maddox.  It was made clear that if anyone has a problem or feel the
need to run to anyone in Human Resource concerning how he operates
the Safety Department, can feel free to do so. The fact is, Mr. Maddox
was hired to do this job and is still in charge of the Safety Department.

Job Performance Evaluations on everyone in the Safety Office will be
performed today by Mr. Maddox.

Mr. Maddox is also responsible for making sure that all Bills that come
through the Safety Department come through him first in order to
make sure these bills get paid. He is also responsible for making out the
Safety Department weekend work schedule.  He made it clear that it is
unfair for some not to work on weekends when others have to.
Therefore, everyone will work a rotated schedule, which is already in
effect.

Also during the meeting, Mr. Maddox specified job duties for:

Robin Davis --- Worker's Compensation --- Filing, Processing
               OSHA 300 Log
               Make Doctors Appointments
               If Injury Occurs, Get:

EXHIBIT
13

Atwell v. Smart
0062
Plff's RFP

1. Team Leaders Name
2. Department
3. What Type of Injury
4. Light Duty Area Placed In

Lisa Bodiford --- No Change in Job Duties already in effect.

Each shift is responsible for taking a daily count on all P.P.E on their shift. Also, each shift is responsible for keeping up the washing of gloves and sleeves on their shift in order to keep them stocked. Daily P.P.E. Paperwork will be placed on Colinda's desk in order for Wendy to log everything in on 2nd Shift. If there is a need for any P.P.E. Supplies please make a list of what is needed so that it can be purchased.

Mr. Maddox will meet with Light Duty Personal who work in the First Aid Room and go over the correct P.P.E. Exchange Policy. Also, he will look over the list of Modified Job Duties and see if their should be any changes made concerning Light Duty Personal and their job duties.

Starting February 1st, JoAnn from the Luverne Fire and Rescue Squad will begin working in the Safety Department. She will be in charge of Instructing the First Responders and CPR classes. She will also be in charge of Medical Supplies.

Mr. Maddox feels this meeting was productive and explanatory. Please be aware that if you can not meet your daily job requirements, you can and will be replaced.

*Rance Maddox, LSA, CECD, CMA*

Rance Maddox, CSM, CECD, CMA

Atwell v. Smart
0063
Pltf's RFP

# PLAINTIFF'S CALENDARS



ATWELL V. SMART
P 26(A) 0001

# JANUARY 2006
## SOUTHEAST SPORTSMAN

All of the requests were for Immediate Action

The ring-necked pheasant is one of the most popular game birds and has been the subject of countless stamps and wildlife portraits. The male of the species is particularly easy to identify because of its signature coloring and white neck ring. The ring-necked pheasant is

### RING-NECKED PHEASANT   X  SOP Changes

a ground-dwelling species that can be found in tall prairie grasses or marshland. Pheasants bear precocial young, meaning that hatchling are able to walk immediately after hatching. Young pheasants depend greatly on insects to supply high levels of protein for growth.

**GUIDE TO BEST FISHING DAYS**
BEST ⬤   GOOD ◗   FAIR ◖   POOR ○

Dates shown on this calendar are approximations based on traditional season openings, events in nature, etc. Please consult your local hunting or fishing regulations for exact season data.

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| **1** New Year's Day — *PA & SE Spinning Season Opens; OH Small Game Chukar/Sage & Partridge Opens* | **2** | **3** | **4** Dry Firing / Testing / Training | **5** H Cat Mungafied | **6** | **7** Off |
| **8** Off | **9** New Year's Day Observed | **10** | **11** | **12** | **13** 1st Shift / Safety Resp *Epiphany* | **14** AK CANADA GOOSE; AL DEER STALK HUNTING ONLY; TN YOUNG SPORTSMAN'S DEER HUNT (ONLY) |
| **15** Off | **16** *Martin Luther King, Jr. Birthday Observed (USA)* | **17** | **18** 1st meeting w/ Gary about ... | **19** | **20** | **21** Off |
| **22** Off | **23** got Gf letter from Gary. | **24** safety meeting TD T running to Ergy Labs / CCH meeting Barrel being replaced | **25** Bldg Call X-Rays Echo Labs X (discharge) Ramos + Transfer Gary about | **26** Labs EKG CCH Barrel failed said to Very Easy | **27** Off XX | **28** Lanky F Quit ? X |
| **29** O Gf letter Received 11:30 am / DLE INV Plaid Inv | **30** Lunch meeting Released 11:30 w/ Barrel Repaired / Ramos Record meeting will X | **31** X | | | | |

DECEMBER
| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |

FEBRUARY
| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | | | | |

First Quarter 6
Full Moon 14
Last Quarter 22
New Moon 29

REPORT KY VIOLATIONS 1-800-5-ALERT
KY SNOW
MO DEER PRIMITIVE WEAPON (EITHER SEX) OPENS
AL HAZELL & QUITIN DEER OPENS

ATWELL V. SMART
P 26(A) 0002

# FEBRUARY 2006

## SOUTHEAST SPORTSMAN

**BIG HORN SHEEP**

Big horn sheep are best known for their bone-crunching dominance rituals and curly horns. These elusive creatures can survive in a variety of habitats including tundra, coniferous forest and desert. When living in the desert, the color of the sheep's fur coat will change to blend with its surroundings. The signature horns are composed of a fingernail-type material that becomes hardened and is nourished by a blood-supplied bony core. Some ram horns have been known to exceed 40 inches in length.

BEST ➤ GOOD ➤ FAIR ➤

GUIDE TO BEST FISHING DAYS

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | | | | |

ATWELL V. SMART
P 26(A) 0003



ATWELL V. SMART
P 26(A) 0004

# 2006

## January

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| 1 | 2 New Year | 3 Weekly Reports / Anne Ballroom left that with Cathy / Peace, Ruth | 4 Drug testing Training Federally Certified | 5 | 6 | 7 |
| 8 | 9 | 10 Amanda absent | 11 | 12 | 13 Out | 14 Out |
| 15 | 16 Martin Luther King Jr. Day | 17 AO | 18 AO 10-7 | 19 AO 10-7 | 20 Out | 21 Out |
| 22 | 23 | 24 10-6 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 Evaluation | | | | |

WHAT A FAMILY! Charles Addams did what many would like to do: He created his own family. The Addams Family and their friends have been entertaining people with their ghoulish humor since 1932. The classic house, site of many a howl, was modeled on the one in Westfield, NJ, where Addams was born on January 7, 1912.

# 2006

# February



LET MY PEOPLE GO! Frederick Douglass might be likened to a modern-day Moses. A former slave, his passion and gift of eloquence led him to become a powerful advocate for the abolitionist movement. An advisor to Presidents Lincoln and Johnson, he was a spokesman for his cause until his death, February 20, 1895, in Washington, D.C.

2006

March



January 30, 2006

Attention:   Robin Davis
Reference:   Job Performance Evaluation (4th Attempt)
From:        Rance Maddox

Earlier this month on January 24, 2006, in our last Safety Office
meeting, I discussed with you that I would be performing Job
Performance Evaluations on that same day. This memo is to inform
you of your Job Performance within the Safety Department.

In my last attempt on January 5, 2006, I informed you once again of
your Job Description. As you can remember, it is First Shift Safety
Assistant responsibility to enter in and complete the OSHA 300A Log.
This is a serious matter that you have taken lightly.  The last entry in
the OSHA 300A Log was on November 30, 2005, which was entered in
by Melissa McGough. As of this date, January 30, 2006, you have yet to
enter in or complete any Recordables on the OSHA 300A Log. This
highly unacceptable and can no longer be tolerated.  From your hire
date within the Safety Department, November 14, 2005, you have had
ample time to have completed this task or to have asked questions if you
did not understand how to perform this task.

Along with completing the OSHA 300A Log, there has to be a First
Report of Injury claim from Worker's Compensation filed out and
emailed to Bill Hicks. This is also very serious and must be done within
48 hours of initial injury. This is also one of your job performances you
have yet to complete. There are several employees who were injured on
the job and have had to wait over a month to see a doctor or is still
waiting on Workman's Comp approval, because they haven't gotten the
First Report of Injury Form. *what ever I have copies of all my
stuff now & some of the old stuff*
The following is a list of other Job Descriptions you have yet to
perform:

1.  Daily Planner for all Three Shifts *what is this? (Never Been Instructed.)*
2.  Reports of Safety Memos *what is this? (Never Been Instructed.)*

Atwell v. Smart
0090
Pltf's RFP

4. Office Organization *I know where my stuff is and can't control what is done on second or third shift. This office is shared by 6 people*

5. Safety Committee/First Responders Meeting *Made list posted list gave list to Cloyd and asked him to give me a date & time When I could meet with the Safety Comm. people - No Response.* Also, it has become a problem with you working weekends. It has been a month since you last worked a weekend. As a Safety Assistant it is your job as well as the other Safety Assistants to work weekends.

Please be aware that when you started a new job in the Safety Office you were on a ninety day probationary period. Because of the deficiencies in your job performance, and with multiple attempts to correct these problems, you have given me no other choice but to terminate you from within the Safety Department. I wish you the best luck in the future.

Rance Maddox, CMA, CECD, CMS

Atwell v. Smart
0091
Pltf's RFP

EEOC FORM 131 (5/01)

## U. S. Equal Employment Opportunity Commission

| | PERSON FILING CHARGE |
|---|---|
| ?epartment of Human Resources<br>_MART ALABAMA LLC<br>121 Shin Young Drive<br>Luverne, AL 36049 | **Robin  Atwell** |
| | THIS PERSON (check one or both)<br>[X] Claims To Be Aggrieved<br>[ ] Is Filing on Behalf of Other(s) |
| | EEOC CHARGE NO.<br>**420-2006-02661** |

### NOTICE OF CHARGE OF DISCRIMINATION
(See the enclosed for additional information)

This is notice that a charge of employment discrimination has been filed against your organization under:

[X] Title VII of the Civil Rights Act    [ ] The Americans with Disabilities Act

[ ] The Age Discrimination in Employment Act    [ ] The Equal Pay Act

The boxes checked below apply to our handling of this charge:

1. [ ] No action is required by you at this time.

2. [ ] Please call the EEOC Representative listed below concerning the further handling of this charge.

3. [X] Please provide by    **26-JUN-06**    a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation

4. [ ] Please respond fully by    to the enclosed request for information and send your response to the EEOC 'epresentative listed below. Your response will be placed in the file and considered as we investigate the charge   A prompt response to this .quest will make it easier to conclude our investigation.

5. [X] EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources. If you would like to participate, please say so on the enclosed form and respond by    **08-JUN-06** to    **Debra B. Léo, ADR Coordinator, at  (205) 212-2033** If you **DO NOT** wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

**Deidre J. Rivers,**
**ADR Assistant**

*EEOC Representative*

Telephone:    **(205) 212-2146**

**Birmingham District Office - 420**
**Ridge Park Place**
**1130 22nd Street, South**
**Birmingham, AL 35205**

Enclosure(s): [X] Copy of Charge

CIRCUMSTANCES OF ALLEGED DISCRIMINATION

[ ] RACE  [ ] COLOR  [X] SEX  [ ] RELIGION  [ ] NATIONAL ORIGIN  [ ] AGE  [ ] DISABILITY  [X] RETALIATION  [ ] OTHER

See enclosed copy of charge of discrimination.


EXHIBIT
???
?????? R. Atwell

| Date | Name / Title of Authorized Official | Signature |
|---|---|---|
| May 24, 2006 | Bernice Williams-Kimbrough,<br>District Director | *Bernice Kimbrough* |

## INFORMATION ON CHARGES OF DISCRIMINATION

### EEOC RULES AND REGULATIONS

Section 1601.15 of EEOC's regulations provides that persons or organizations charged with employment discrimination may submit a statement of position or evidence regarding the issues covered by this charge.

EEOC's recordkeeping and reporting requirements are found at Title 29, Code of Federal Regulations (29 CFR): 29 CFR Part 1602 (see particularly Sec. 1602.14 below) for Title VII and the ADA; 29 CFR Part 1620 for the EPA; and 29 CFR Part 1627, for the ADEA. These regulations generally require respondents to preserve payroll and personnel records relevant to a charge of discrimination until disposition of the charge or litigation relating to the charge. (For ADEA charges, this notice is the written requirement described in Part 1627, Sec. 1627.3(b)(3), .4(a)(2) or .5(c), for respondents to preserve records relevant to the charge – the records to be retained, and for how long, are as described in Sec. 1602.14, as set out below). Parts 1602, 1620 and 1627 also prescribe record retention periods – generally, three years for basic payroll records and one year for personnel records. Questions about retention periods and the types of records to be retained should be resolved by referring to the regulations.

**Section 1602.14  Preservation of records made or kept.** . . . . Where a charge ... has been filed, or an action brought by the Commission or the Attorney General, against an employer under Title VII or the ADA, the respondent ... shall preserve all personnel records relevant to the charge or the action until final disposition of the charge or action. The term *personnel records relevant to the charge*, for example, would include personnel or employment records relating to the aggrieved person and to all other aggrieved employees holding positions similar to that held or sought by the aggrieved person and application forms or test papers completed by an unsuccessful applicant and by all other candidates or the same position as that for which the aggrieved person applied and was rejected. The date of *final disposition of the charge or the action* means the date of expiration of the statutory period within which the aggrieved person may bring [a law     or, where an action is brought against an employer either by the aggrieved person, the Commission, or the Attorney General, the date on which such litigation is terminated.

### NOTICE OF NON-RETALIATION REQUIREMENTS

Section 704(a) of Title VII, Section 4(d) of the ADEA, and Section 503(a) of the ADA provide that it is an unlawful employment practice for an employer to discriminate against present or former employees or job applicants, for an employment agency to discriminate against any individual, or for a union to discriminate against its members or applicants for membership, because they have opposed any practice made an unlawful employment practice by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the statutes. The Equal Pay Act contains similar provisions. Additionally, Section 503(b) of the ADA prohibits coercion, intimidation, threats, or interference with anyone because they have exercised or enjoyed, or aided or encouraged others in their exercise or enjoyment, of rights under the Act.

Persons filing charges of discrimination are advised of these Non-Retaliation Requirements and are instructed to notify EEOC if any attempt at retaliation is made. Please note that the Civil Rights Act of 1991 provides substantial additional monetary provisions to remedy instances of retaliation or other discrimination, including, for example, to remedy the emotional harm caused by on-the-job harassment.

### NOTICE REGARDING REPRESENTATION BY ATTORNEYS

Although you do not have to be represented by an attorney while we handle this charge, you have a right, and may wish to retain an attorney to represent you. If you do retain an attorney, please give us your attorney's name, address and phone number, and ask your attorney to write us confirming such representation.

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

☐ FEPA
☒ EEOC

420-2006-02661

_____ and EEOC
State or local Agency, if any

| NAME (Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Mrs. Robin Atwell | (334) 527-3503 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| | 9 | |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| Smart Alabama LLC | | (334) 335-5800 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 121 Shin Young Drive | Luverne  Alabama 36049 | Crenshaw |

| NAME | | TELEPHONE NUMBER (Include Area Code) |
|---|---|---|
| | | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

☐ RACE    ☐ COLOR    ☒ SEX    ☐ RELIGION    ☐ NATIONAL ORIGIN
☒ RETALIATION    ☐ AGE    ☐ DISABILITY    ☐ OTHER (Specify)

DATE DISCRIMINATION TOOK PLACE
EARLIEST          LATEST
11/16/2005    2/17/2006
☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional space is needed, attach extra sheet(s)):

See Attachment

RECEIVED
EEOC

MAY 16 2006

BIRMINGHAM DISTRICT OFFICE

☐ I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the foregoing is true and correct.

_Robin Atwell_

Date          Charging Party (Signature)

NOTARY - When necessary for State and Local Requirements
_Michel Johnson_ Comm. Exp. 6-21-08

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT
_Robin Atwell_

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(Day, month, and year)

Robin Atwell began her employment with Smart Alabama LLC on approximately August 25, 2005. She was trained during the first week and served as an assembly tech for the remainder of August until November 14, 2005.

On or about November 14, 2005, Robin Atwell became a safety assistant which required her to transfer to a different part of the plant. Her new office was actually located in the office of the safety director, Rance Maddox. From approximately November 16, 2005 through February 7, 2006, Robin Atwell was the subject of sexual harassment by Rance Maddox. The particulars are as follows:

   * During her first week in Mr. Maddox's office, and continuing through January 2006, Mr. Maddox asked Mrs. Atwell on numerous occasions where she was eating and if she wanted to eat with him. When she would tell him she had other plans, on numerous occasions, he would show up wherever she was eating and ask if he could eat with her.

   * On November 16, 2005, Mrs. Atwell's birthday, Rance Maddox hugged her. Although it was a birthday hug, the hug was inappropriately tight and long.

   * From November 16, 2005 through the end of January 2006, Mr. Maddox repeatedly touched the Plaintiff on her arms and hands and attempted to hold hands with her while talking to her. This occurred on a daily basis.

   * From November 16, 2005 through the end of January 2006, Mr. Maddox repeatedly put his arm around Mrs. Atwell and inappropriately rubbed her back.

   * In December 2005, and continuing through January 2006, Mr. Maddox began asking Mrs. Atwell if she wanted to have drinks with him after work. At each request, she informed him that she would check with Kevin, her fiancé, and husband beginning on January 5, 2006. Regardless of her response, Mr. Maddox continued to ask her out for drinks knowing that she had a fiancé and a husband as of January 5, 2006.

   * At some time between November 16, 2005 and December 1, 2005, Mr. Maddox made the comment to Mrs. Atwell that it was impossible for men to be monogamous in their sexual relations.

   * On several occasions from the end of November 2005 through January 2006, Mr. Maddox asked Mrs. Atwell to travel to Montgomery, Alabama to meet him for drinks at Egor's, a local bar.

   * On numerous occasions between November 16, 2005 and the end of January 2006, Mr. Maddox deliberately rubbed his pelvis area against Mrs. Atwell's buttocks.

   * From November 16, 2005 through the end of January 2006, on numerous occasions, Mr. Maddox called the Plaintiff at her home, sometimes late at night. On each occasion, he would ask her what she was doing.

\*       On several occasions between December 2005 and January 2006, Mr. Maddox asked Mrs. Atwell if her breast were real and asked her what they felt like. She felt as though he was inviting her to ask him to touch her breast.

\*       On several occasions between December 1, 2005 and the end of January 2006, Mr. Maddox made the comment "I've got a real man for you" to Mrs. Atwell.

\*       On January 18, 2006, while Mrs. Atwell was in the corner of the office working on a computer, Mr. Maddox grabbed both of her shoulders and squeezed them as if he were giving her a massage. He moved his hands over her shoulders where they were situated just above her breast and rubbed her.

\*       On numerous occasions between November 16, 2005 and the end of January 2006, Mr. Maddox touched the Plaintiff on her legs.

\*       Beginning in December 2005 and continuing through December 2006, Mr. Maddox hugged Mrs. Atwell inappropriately and stated "baby, I'll take care of you"...."we'll be a team"..."you've got to work with me". Mrs. Atwell perceived the clear meaning of these statements that Mr. Maddox would help her with working conditions and raises if she would engage in sexual activities with him. On one occasion during that same period of time, Mr. Maddox asked Mrs. Atwell to spend the night in Montgomery for a training session.

On or about January 18, 2006, Mrs. Atwell reported Mr. Maddox's conduct to Gary Sport, a managerial employee. Previously, during casual conversations, she had informed Mr. Sport that she was uncomfortable working around Mr. Maddox. Despite these discussions, Mr. Maddox had not been reprimanded or counseled in any way.

As a result of her reporting Mr. Maddox, Mr. Maddox began placing more job duties on Mrs. Atwell. Furthermore, as a result of her reporting her, Mr. Maddox began to make Mrs. Atwell's working environment intolerable and hostile. At some point toward the end of January 2006, Mrs. Atwell reported Mr. Maddox to Ruth Ryan in the human resources department. Ms. Ryan told Mrs. Atwell to simply be short with Rance and just do her job. She assured Mrs. Atwell that they were investigating her complaints as of February 1, 2006. As a result of this meeting, Mr. Maddox created a weekend work schedule and put Mrs. Atwell on the schedules during hours that he knew she could not work. Still, during this time, Mr. Maddox continued to touch Mrs. Atwell inappropriately.

Mr. Maddox began to fabricate complaints about Mrs. Atwell and on a couple of occasions wrote her up for excessive overtime, which had been previously approved by Gary Sport. She was also written up for wearing blue jeans.

On February 7, 2006, Mrs. Atwell again met with Ruth Ryan. She reported to Ms. Ryan that reporting Rance had simply increased the hostility of her work environment. Ms. Ryan informed Mrs. Atwell that they would place her on another line; however, she would still have to

see Mr. Maddox everyday. Mrs. Atwell has been unable to return to work since that time due to severe emotional distress, depression and fear associated with the harassment and retaliation by Rance Maddox.

Smart Alabama LLC was made aware by Mrs. Atwell on numerous occasions about Mr. Maddox's sexual harassment toward her; however, they either did nothing or took measures that did not help or cure the problem. Smart Alabama LLC either was or should have been aware of previous and subsequent similar conduct by Mr. Maddox; however, he remained an employee.

S27-3503
02/02/06

Gary Spont
Human Res
Smart

RE: Department transfer

~~Gary Per my conversation with you.~~
In Regards to the Sexual
Harrasment Situation with Rance
Maddox. I Have requested a
departmental transfer. I have
been ~~asked~~ told to be patient. ~~and~~ By H.R. personel
I do not feel comfortable
being in a ~~closed office area~~
~~with any~~ confined work area
with Rance maddox. After I
talked to you about what events
have taken place, Rance maddox
has made my work environment
be a hostile one And I feel
that he was advised about my
complaint and that he is ~~going taking~~ using
~~misuse~~ his position to intimidate
others of By means of threats
~~of being~~ both direct & indirect.
So therefore at this point until
some permanent changes have been made in

Atwell v. Smart
0058
Pltf's RFP


EXHIBIT
17
B. Atwell  6·21·07

regards to my position at Smart or Rance maddox's position at Smart, I am requesting that one of the following actions be taken in a timely manor.

Robin Davis Atwell leave of Absence paid. (pending investigation)
Robin Davis Atwell leave of Absence unpaid (pending investigation)
Rance maddox leave of Absence paid (pending investigation)
Rance maddox leave of Absence unpaid (pending investigation)

Please inform me as soon as a decision has been made in Reference to what actions are going to be taken.

Sincerely,

Robi Davis Atwell

Atwell v. Smart
0059
Pltf's RFP

# SMART
### Stamped Metal American Research Technology, Alabama.LLC

Human Resource Department
321 Shin Young Drive     Laverne, Alabama 36049     334-335-5800

January 23, 2006

Rance,

This letter is to express my concerns about our Safety Management at SMART.   As we have discussed before, there are some things in the Safety arena that need to be completed.   Also, I am somewhat concerned about your approach to the job, the people, and the management of the job.

By copy of this letter to you I am documenting that we are discussing these issues on January 23, 2006.

These are the key areas we need to succeed in with dates for completion

Safety Plan
1.  Prepare a schedule to cover weekend works and post on Safety office door.  Someone should be in the safety area any time the production facility is working several lines.  *(handwritten: ro Gray will be give Schedule)* January 27 *(handwritten: Sun 1st Temp 2nd Shift)*
2.  Set up the workers' comp comp coordinator.  The safety person on each shift will be responsible for following up with and documenting the activities of each injured worker on their shift. I will assist you in putting this together. *(handwritten: light duty/Team Leader)* February 3
3.  Assign Robin the coordinator of the comp cases.  She should maintain the OSHA 300 log and assure that each file contains proper documentation and records. I want you to be the person speaking with our work comp carrier on work related injuries and issues from this point forward involving me when you feel or see it necessary. *(handwritten: RANCE will be in-charge w/c Coordinator)* January 24
4.  A list of modified duty jobs should be identified in the productions areas and given to each Supervisor and Team Leader. Ex: Fender Pads, Sweeping, Dusting of Welding Slag, Separating Nuts and Bolts, etc.
    January 31
.5.  Joanne will begin on Feb. 1.  At this time everyone is to be transitioned from the safety office and placed on modified duty in the plant production area.
    February 1-10
6.  Begin training through Joanne immediately on First Aid Responders.  We should have 4 per shift from a cross section of the plant.  Prepare a job description for these individuals.  February
7.  Dailey PPE inventories for each shift should be done, compiled, and put on mine and Mr. Kwon's desks each morning. Purchase requisitions with assigned P.O. and a copy of inventory shortage or explanation for need should be attached to all purchase requests.  No verbal orders are to be made; no orders are to be made unless you have a signed purchase request. Robin knows where the P.O. list is on the public server, make sure whomever initiates an order logs the P.O. electronically so I can verify as needed.
    Immediately-Daily
8.  Shawn should have the cage for PPE completed within a week.  Plans to relocate all PPE to that area should be made.
    TBD
9.  Each shift Safety person will be responsible for having the next shift's PPE washed and prepared. Implement a strict one for one exchange policy on PPE.  We can have a sign made to place on the door of the cage to indicate this.
    Daily

For your personal concern, I want you to maintain a positive attitude toward your job and co-workers.  Show respect at all times to your peers, your subordinates, and our Security Team.  Manage yourself professionally and calmly.  Don't threaten or intimidate people.  Your actions as a manager are always under review by those around us and they do not hesitate to point out faults.  Be aware of these things at all times.  As a manager you must maintain a calm posture when things annoy you.  It is good to question things but be aware of your presentation.  Calmness goes much further in soliciting support for your ideas than anger and shortness with people. Be at work during the assigned hours.  Keep me informed of issues and changes around you.

Rance, we can make this work and the responsibility for that falls on you.  As I review your job performance over the next few weeks I hope to see a dramatic improvement in these areas.  It is not our desire to make a change.  Let's work together to further secure your position with this company.

Gary

*(signature)*

**CONFIDENTIAL**

EXHIBIT
18
R. Atwell (6-21-07)

DFRP'S
00752
ATWELL V. SMART

 

## Patient Information Form: Please Print

**Patient:** Last Name  Atwell
First Name  Robin                    MI  O
Address  PO Box 442
City  Brantly            State  Al
Zip _____ Sex  F
Employed? Y ✓  N _____
Employer/School  SMART

Home Phone #  334-527-8503
Work Phone #  334 335 5800 ext235
Date of Birth  _____
Social Security #  _____
Marital Status  married

**Guarantor:** (Person Responsible for Bill)
Last Name  SMART
First Name  _____  MI ___
Address  121 Shin young Dr
City  Luverne          State  Al
Zip  36049  Sex _____
Employed? Y _____  N _____
Employer/School  _____

Home Phone #  _____
Work Phone #  _____
Date of Birth  _____
Social Security #  _____
Marital Status  _____

**Spouse:** Last Name  _____
First Name  _____  MI ___
Employed? Y _____  N _____
Employer/School  _____

Work Phone #  _____
Date of Birth  _____
Social Security #  _____

**Please list children in family that are patients of this practice:** _____

_____

_____

**Nearest Relative/Friend NOT Living With You:**
Name  Janice Edis  Relationship  mother in law    Phone #  527-8853

**Insurance Information:**
Primary Coverage  Alabama Self Insured    Secondary Coverage  _____
Claim Address  Employers Claim Mangement    Claim Address  _____
City/State/Zip  mont  AL    City/State/Zip  _____
Policyholder: Self ___ Spouse ___ Other ___    Policyholder: Self ___ Spouse ___ Other ___
ID #  _____    ID #  _____
Group# _____ Plan# _____    Group# _____ Plan# _____
Is Plan Through Work: Yes ___ No ___    Is Plan Through Work: Yes ___ No ___

I authorize Dr. Charles S. Tompkins and Family Practice Associates to provide any medical care deemed necessary according to their professional opinions. I understand that I am financially responsible for any balance not covered by my insurance.

I authorize my insurance benefits to be paid directly to Charles S. Tompkins, M.D. I authorize the release of any information by Dr. Tompkins and Family Practice Associates to my insurance carrier pertinent to my health insurance claims.

Agreement to pay: the undersigned accepts the fee charged as a lawful debt and promises to pay said fee including cost of collection, attorney fees, and court costs if such be necessary; waving now and forever the right to claim exemption under the constitution and laws of the state of Alabama, or any other state.

Legal Signature  Rob, Atwell              Date  02/07/06

Family Practice Asso.
00001
Atwell v. Smart

# MEDICATION RECORD

**Name:** Roan Davis

**Pharmacy:** _____    **Phone #** _____

**Patient Assistance Program:** _____

| ALLERGIES | REACTION |
|---|---|
| 1. aminophyline | |
| 2. Compazine | |
| 3. Shelaxin | |
| 4. | |

| Medication Name | Dosage | How Taken |
|---|---|---|
| Wellbutrin | 150 | QD |
| tenormin | 25 | 1/2 QD PRN |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**DATE:** 2-7-06

**NURSE:** _____

Family Practice Asso.
00002
Atwell v. Smart

# MEDICATION RECORD

**Name:** Robin Davis

**Pharmacy:** Crenshaw Drugs                    **Phone #** _____

**Patient Assistance Program:** _____

| ALLERGIES | REACTION |
|---|---|
| 1. Compazine | |
| 2. Skelaxin | |
| 3. ? Aminophylline | |
| 4. | |

| Medication Name | Dosage | How Taken |
|---|---|---|
| Ibuprofen | 800mg | PRN |
| Flexeril | 10mg | TID PRN |
| Orudis | 25mg | TID |
| | | |
| | | |
| 10/20   Mesni D'Parks  Witam | | |
| | | |
| | | |
| 12/29/05 (MP)   None taken | | |
| | | |
| P 01/24/06   MVI c̄ IRON | | ī QD |
| | | |
| | | |
| | | |
| | | |

**DATE:** 10/18/05                 **NURSE:** M. Parks, LPN

# MEDICATION RECORD

Name: Robin Darris

Pharmacy: Crenshaw                    Phone # _____

Patient Assistance Program: _____

| ALLERGIES | REACTION |
|-----------|----------|
| 1. Skelaxin | |
| 2. Compazine | |
| 3. ? Aminophylline | |
| 4. | |

| Medication Name | Dosage | How Taken |
|-----------------|--------|-----------|
| Motrin | 800 mg | QD |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

DATE: 9/08/05                    NURSE: Adreman LPN

# MEDICATION RECORD

**Name:** _Robin Davis_

**Pharmacy:** _____    **Phone #** _____

**Patient Assistance Program:** _____

| ALLERGIES | REACTION |
|---|---|
| 1. S Kelafin | |
| 2. | |
| 3. | |
| 4. | |

| Medication Name | Dosage | How Taken |
|---|---|---|
| Cyclobenzaprine | 10 mg | TID pRN |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**DATE:** _____    **NURSE:** _____

**Family Practice Associates**
1740 South Forest Avenue
Luverne, AL 36049
(334) 335-3383

Date: 3/21/2007

PATIENT: ATWELL, ROBIN  DOB:              Gender: F  MRN: 106303


CARDIOVASCULAR: HRRR without Murmur;

DERMATOLOGIC: Temperature: Warm Dry;

NEUROLOGIC: No Focal Deficit;

PSYCHIATRIC: Alert and Oriented x3; Memory Intact;

**ASSESSMENT:**
> 847.0 - SPRAIN NECK
> 850.9 - CONCUSSION UNSPEC


**PLAN:**
> Flexeril 5 mg Tab
> Refills: 0  Qty: 30 Tablet(s)
> Instructions:  TAKE 1 TABLET (5MG) BY ORAL ROUTE 3 TIMES PER DAY
>
> Ibuprofen 800 mg Tab
> Refills: 0  Qty: 30 Tablet(s)
> Instructions:  1 TAB PO TID PRN PAIN WITH FOOD
>
> Cervical Soft Collar Misc
> Refills: 0  Qty: 1 Unit(s)
> Instructions: 1
>
> Referral: Crenshaw Community Hospital (Hospital)
> Instructions: PT Evaluation & Heat u/s +/- Tens
>
>
> Follow-up prn if SX worsen or no improvement


_____

Susan Tompkins, CRN

Family Practice Asso.
00006
Atwell v. Smart

**Family Practice Associates**
1740 South Forest Avenue
Luverne, AL 36049
(334) 335-3383

Date: 3/21/2007

PATIENT: ATWELL, ROBIN  DOB:            Gender: F  MRN: 106303

**CHIEF COMPLAINT:** Follow. Up from MVA on Saturday

     Symptoms: Pain: Blurred vision; irregular depth preception. Neck hurts
     Location: Neck; Head; Shoulder; 3 fingers of Right hand
     Quality: Aching, Constant, Irregular, Sore, Painful
     Severity: Severe
     Duration: Since Saturday
     Timing: Soreness it worse instead of better
     Mod Fact: Can't get any relief from pain since the wreck
     Other: Reviewed Meds

**VITALS:** BP: 122/60 **Site:** Right Arm **Position:** Sitting **Pulse:** 68; **Resp:** 18; **Ht:** 6777 in.; **Wt:** 165 lbs.; **BMI:** 25.8

**ALLERGIES:** Aminophylline (nausea); Compazine (SEIZURE); Morphine (Chest Pain); Skelaxin (Jittery)

**MEDICATION:** Atenolol 25 mg Tab (1 tab po Q Day)
     Meprozine 50 mg-25 mg Cap (2 tabs po Q 4 hrs prn pain)
     Bupap 650 mg-50 mg Tab (1 tab po PRN Headache)
     Vistaril 50 mg Cap (1 tab po Q Day @ HS)

**PMH:** Anxiety;Hypoglycemia; Mitral Valve Prolapsed, Hemoctmmatosis; Fibromyalgia; Migraine Headaches;

**SH:** Consumes alcohol; Occasionally ; Pt smokes __1_ ppd for 7 yrs. Denies recreational drug use; Pt's occupation is:Housewife

**PSH:** Cholecystectomy; Appendectomy; Tonsillectomy; Adenoidectomy; Open BTL;4 Ovarian Cyst Surgeries; foreign Body Removed from foot.

**PFH:** Asthma: Parent; Child; Breast Cancer: Grandparent;Aunt; Cousin Colon Cancer: Aunt; Diabetes: Grandparent; Parent; Children;Great- Grandmother Hypertension: Parents;All Grandparents; Lung Cancer: Grandparent; Melanoma Cancer: Parents; Mental Disorder:Bi Polar; Prostate Cancer: Parent; Seizure: Child; Thyroid Disease: Aunts

### PHYSICAL EXAMINATION

GENERAL: NAD; able to move head/neck but with much guarding

HEENT: Normocephalic; PERRLA; EOMI; Sclera White; Visual Fields Normal; Nasal mucosa moist and pink; TM's intact and reflect NCL; Motion Restricted d/t pain;

RESPIRATORY: Lungs CTA; No rhonchi wheeze or rales;

Family Practice Asso.
00007

**Main Street Medical**
P.O. Box 407
Brantley, AL 36009
(334) 527-0101

Date: 5/7/2007

PATIENT: ATWELL, ROBIN  DOB:          ,  Gender: F  MRN: 106303

Referral: CRENSHAW COMM HOSP (Radiology)
Instructions: Ultrasound Abdomen / Cardiac Echo

Referral: CRENSHAW COMM HOSP (Radiology)
Instructions: Chest x-ray

Follow-up 1 week – Incident to visit she ask for all her routine meds be refilled

Atenolol 25 mg Tab
Refills: 5  Qty: 30 Tablet(s)
Instructions: 1 TAB PO  Q DAY

Prevacid 15 mg Cap
Refills: 5  Qty: 30 Tablet(s)
Instructions: 1 TAB PO Q DAY

Vistaril 25 mg Cap
Refills: 5  Qty: 30 Tablet(s)
Instructions: 1 TAB PO Q DAY

Lexapro 20 mg Tab
Refills: 5  Qty: 30 Tablet(s)
Instructions: 1 TAB PO Q

Susan Tompkins, CRN

Family Practice Asso.
00008

**Main Street Medical**
P.O. Box 407
Brantley, AL 36009
(334) 527-0101

Date: 5/7/2007

PATIENT: ATWELL, ROBIN   DOB:              ander: F   MRN: 106303

RESPIRATORY: SOB

GASTROINTESTINAL: Patient denies Abdominal Pain, Nausea/Vomiting, Blood in stool, Heartburn.

MUSCULOSKELETAL: Breast Mass

### PHYSICAL EXAMINATION

GENERAL: Well developed, well nourished; No acute distress here in the office today;

HEENT: Normocephalic; Conjunctivae unremarkable; Sclera White;

NECK: Supple; Full ROM of neck

CHEST: Chest clear; No rhonchi, crackles or wheezes;

BREAST: Has slight irregularity of left breast augmentation "pooched" out feeling but saline implant still intact

CARDIOVASCULAR: Regular rate and rhythm without murmurs, gallops or rubs. PMI normally placed; No edema to her extremities whatsoever; Pulses equal;

GASTROINTESTINAL: Abdomen Soft Flat Nondistended; Abdomen Nontender; No Organomegaly; Bowel Sounds Symmetric x4;

MUSCULOSKELETAL: Full Range of Motion; Gait Normal; No Joint or Bony Abnormalities; No Muscle Tenderness;

DERMATOLOGIC: Skin warm and dry to touch; No Jaundice;

NEUROLOGIC: No Focal Deficit;

**ORDERS:**
CMP (comprehensive metabolic panel) (1 ): SDL
CBC (1 ): SDL
TSH (1 ): SDL

**ASSESSMENT:**
728.87 - MUSCLE WEAKNESS (GENERAL)
729.81 - SWELLING LIMB
782.4 - JAUNDICE UNSPEC
786.05 - SHORTNESS BREATH
424.0 - MITRAL VALVE DISORDER

**PLAN:**

Family Practice Asso.
00009

**Main Street Medical**
P.O. Box 407
Brantley, AL 36009
(334) 527-0101

Date: 5/7/2007

PATIENT: ATWELL, ROBIN  DOB. . . . . . . . _ender: F  MRN: 106303

**CHIEF COMPLAINT:** Post MVA Problems
Wreck was 3-17-07

> Symptoms: Swelling; SOB
> Location: "All Over"
> Quality: Aching, Sore, Dull, Irregular
> Severity: Mild to Moderate
> Duration: Injured in MVA 3/17/07; Has had a problem with swelling since.
> Timing: Has to sleep in a chair d/t SOB
> Mod Fact: Presently Participating in Physical Therapy
> Other: Reviewed Meds

**COMPLAINT 2:** Reports being jaundiced about 1 week after accident

> Symptoms: Jaundice after car accident but states sx have improved now
> Location: Eyes and skin

**VITALS: BP:** 136/62 **Site:** Left Arm **Position:** Sitting **Pulse:** 74; **Resp:** 18; **Ht:** 66 in.; **Wt:** 167 lbs.; **BMI:** 27

**ALLERGIES:** Compazine (Seizure); Morphine (Chest Pain); Skelaxin (Jittery)

**MEDICATION:** Ibuprofen 800 mg Tab (1 tab po Q 6 hrs PRN)
Atenolol 25 mg Tab (1 TAB PO Q DAY)
Prevacid 15 mg Cap (1 TAB PO Q DAY)
Vistaril 25 mg Cap (1 TAB PO Q DAY)
Lexapro 20 mg Tab (1 TAB PO Q DAY)

**PMH:** Anxiety; Hypoglycemia; Mitral Valve Prolapse; Hemochromatosis; Fibromyalgia; Migraine Headaches;

**SH:** Consumes alcohol: Occasionally; Pt smokes 1 ppd for 7 yrs. Denies recreational drug use; Pt's occupation is: Housewife

**PSH:** Cholecystectomy; Appendectomy; Tonsillectomy; Adenoidectomy; Open  BTL; 4 Ovarian Cyst Surgeries; Foreign Body Removed from foot; Implants: Breast

**PFH:** Asthma: Parent, Children; Breast Cancer: Grandparent, Aunt;  Colon Cancer: Aunt; Diabetes: Grandparent, Parent, Child; Hypertension: Parents,  All Grandparents; Lung Cancer: Grandparent; Skin Cancer: Parents;  Prostate Cancer: Parent; Seizure: Child; Thyroid Disease: Aunts

**REVIEW OF SYSTEMS:**

> CARDIOLOGIC: Edema,  SOB when lying flat
> Patient denies Chest pain,  Palpitations.

Family Practice Asso.
00010

## Family Practice Associates, LLC
1704 South Forest Ave.
Luverne, AL 36049
(334) 335-3383

## Laboratory Results

**Patient Name:** ROBIN ATWELL

**Order Date:** 05/09/2007

**MRN:** 106303    **DOB:**    **SSN:**    **Phone:** 334-527-8853

**Specimen:**   106303

**Test Number:**   1004

**Specimen Date:** 05/07/2007

**Physician:**    TOMPKINSSUSAN

**Result Date:** 05/10/2007

**Physician ID:**   P65117

**Result:**

**Patient Fasting:**

### COMPREHENSIVE METABOLIC PANEL

| Test Name | Abnormal | Result Value | Unit of Measure | Ref Range | Status | Producer ID |
|---|---|---|---|---|---|---|
| SODIUM | | 136 | mmol/L | 135^145 | F | BHAM |
| CHLORIDE | | 107 | mmol/L | 98^109 | F | BHAM |
| POTASSIUM | | 4.3 | mmol/L | 3.5^5.5 | F | BHAM |
| CO2 | L | 20 | mEq/L | 21^31 | F | BHAM |
| BUN | L | 6 | mg/dL | 7^25 | F | BHAM |
| CALCIUM | | 9.1 | mg/dL | 8.4^10.2 | F | BHAM |
| CREATININE | | 0.7 | mg/dL | 0.6^1.3 | F | BHAM |
| GLUCOSE | | 91 | mg/dL | 70^105 | F | BHAM |
| PROTEIN,TOTAL | | 6.8 | g/dL | 6.0^8.3 | F | BHAM |
| AST(SGOT) | | 16 | U/L | 13^39 | F | BHAM |
| ALT(SGPT) | | 12 | U/L | 7^52 | F | BHAM |
| ALBUMIN | | 4.3 | g/dL | 3.7^5.3 | F | BHAM |
| ALKALINE PHOSPHATASE | | 98 | U/L | 40^120 | F | BHAM |
| BILIRUBIN, TOTAL | | 0.9 | mg/dL | 0.1^1.2 | F | BHAM |
| ANION GAP | | 13.3 | mmol/L | | F | BHAM |
| OSMOLALITY | L | 279 | mOsm/kg | 285^295 | F | BHAM |
| BUN/CREATININE RATIO | | 8.6 | | 6^20 | F | BHAM |
| GLOBULIN | | 2.5 | g/dL | 1.5^4.5 | F | BHAM |
| A/G RATIO | | 1.7 | | 1.1^2.4 | F | BHAM |

**Lab:**   SOUTHERN DIAGNOSTIC LABORATORI
2732 7TH AVENUE SOUTH    BIRMINGHAM, AL 35233
(205) 313-1240
**Director:**   LOUIS E.

## Confidential

Family Practice Asso.
00011

## Family Practice Associates, LLC
1704 South Forest Ave.
Luverne, AL 36049
(334) 335-3383

## Laboratory Results

Patient Name: ROBIN ATWELL                          Order Date: 05/09/2007

MRN: 106303        DOB:              SSN:            Phone: 334-527-8853

---

Specimen:    106303                    Test Number:   4003
Specimen Date:  05/07/2007             Physician:     TOMPKINSSUSAN
Result Date:  05/10/2007               Physician ID:  P65117
Result:                                Patient Fasting:

---

**TSH (THIRD GENERATION)**

| Test Name | Abnormal | Result Value | Unit of Measure | Ref Range | Status | Producer ID |
|-----------|----------|--------------|-----------------|-----------|--------|-------------|
| TSH (THIRD GENERATION) | | 1.022 | uIU/mL | 0.35^5.50 | F | BHAM |

Lab:   SOUTHERN DIAGNOSTIC LABORATORI
       2732 7TH AVENUE SOUTH    BIRMINGHAM, AL 35233
       (205) 313-1240
Director:   LOUIS E.

**Confidential**                                    1 of 1

## Family Practice Associates, LLC
1704 South Forest Ave.
Luverne, AL 36049
(334) 335-3383

## Laboratory Results

**Patient Name:** ROBIN ATWELL

**MRN:** 106303    **DOB:**    **SSN:**

**Order Date:** 05/09/2007

**Phone:** 334-527-8853

| | |
|---|---|
| **Specimen:** 106303 | **Test Number:** 9001 |
| **Specimen Date:** 05/07/2007 | **Physician:** TOMPKINSSUSAN |
| **Result Date:** 05/10/2007 | **Physician ID:** P65117 |
| **Result:** | **Patient Fasting:** |

**CLIENT NOTIFICATION**

| Test Name | Abnormal | Result Value | Unit of Measure | Ref Range | Status | Producer ID |
|---|---|---|---|---|---|---|
| COLLECTION DATE | | 05/07/2007 | | | F | BHAM |
| TEST ORDERED | | CBC | | | F | BHAM |
| NOTIFIED | | LYNN NORMAN | | | F | BHAM |
| COMMENTS | | | | | F | BHAM |

THE SPECIMEN FOR THE TEST LISTED ABOVE WAS RECEIVED CLOTTED AND WE ARE

UNABLE TO PERFORM THE TEST. RECOLLECTION IS RECOMMENDED.

**Lab:** SOUTHERN DIAGNOSTIC LABORATORI
2732 7TH AVENUE SOUTH    BIRMINGHAM, AL 35233
(205) 313-1240
**Director:** LOUIS E.

**Confidential**

1 of 1

Family Practice Asso.
00013

**Montgomery Cardiovascular Associates, P.C.**
2119 East South Blvd. Montgomery, AL 36116
(334)280-1500 Fax: (334)280-1500

10位303

May 14, 2007
Page 1
Chart Document

| Robin O Atwell | | Home: (334)335-3501 |
|---|---|---|
| Female DOB: | 62683 | Ins: B/C OF A (1) Grp: 62397 |

05/08/2007 - Office Visit: Echo ONLY (Crenshaw)
Provider: ERIC CRUM MD
Location of Care: Montgomery Cardiovascular Associates, P.C.
Status: ON HOLD DOCUMENT. Contents are preliminary

### TWO-DIMENSIONAL/M-MODE/DOPPLER ECHOCARDIOGRAM REPORT

| | |
|---|---|
| **NAME:** | Atwell, Robin O |
| **MCA CHART NO.:** | 62683 |
| **D.O.B.:** | |
| **DATE:** | 05/08/2007 7:03 AM |
| **ORDERING M.D.:** | Charles Tompkins |
| **INTERPRETING M.D.:** | Eric Crum |
| **REFERRING M.D.:** | Charles Tompkins |
| **PERFORMED AT:** | Crenshaw Community Hospital |

**REASON FOR STUDY:**

1.    Shortness of breath.

**QUALITY OF STUDY:** Fair.

**M-MODE MEASUREMENTS:**

| LV End diastolic | 45 | mm |
|---|---|---|
| LV End systolic | 27 | mm |
| Posterior Wall | 9 | mm |
| Septum | 8 | mm |
| EF | 70 | % |
| Aorta | 29 | mm |
| Valve Opening | 19 | mm |
| Left Atrium | 30 | mm |

**TWO-DIMENSIONAL/DOPPLER STUDY:** Echocardiogram demonstrates normal left ventricular chamber size and wall thicknesses with overall normal left ventricular systolic performance and a calculated ejection fraction of 70%. There are no segmental wall motion abnormalities identified. The left atrium appears normal in size. The right heart appears normal in size. The interventricular septum appears intact. The aortic, mitral, and tricuspid valves appear to be pliable. Doppler pattern of left ventricular inflow suggests slightly reduced left ventricular relaxation or compliance. No intracardiac masses or thrombi are seen. There is no significant pericardial effusion.

**CONCLUSIONS:**

1.    Essentially normal study with normal left ventricular chamber size and wall thicknesses with overall    normal left ventricular systolic performance. Ejection fraction is 70% with no segmental wall motion    abnormalities.
2.    No significant valvular abnormalities.
3.    No intracardiac masses or thrombi are seen.

Family Practice Asso.
00014

**Montgomery Cardiovascular Associates, P.C.**
2119 East South Blvd. Montgomery, AL 36116
(334)260-1600  Fax: (334)260-1600

*May 14, 2007*
*Page 2*
*Chart Document*

| Robin O Atwell | | Home: (334)335-3501 |
|---|---|---|
| Female  DOB: | 62683 | Ins: B/C OF A (1) Grp: 52397 |

4.   There is no significant pericardial effusion.
5.   Doppler suggests perhaps mildly reduced left ventricular relaxation or compliance with a variable slightly reduced E:A ratio of the Doppler pattern of left ventricular inflow.

R. Eric Crum, M.D.

REC/lw
Job ID: 276037
DD:     05/11/2007
DT:     05/14/2007

Fax to:

Crenshaw Community Hospital
101 Hospital Circle
Luverne, Alabama 36049
Phone: 334-335-3374
Fax: 334-335-1169

Dr. Charles Tompkins
Rt. 3 Box 9-E
Luverne, Alabama 36049-9405
Phone: 334-335-3383
Fax: 334-335-3078

Family Practice Asso.
00015

# Crenshaw Community Hospital

101 Hospital Circle
Luverne AL36049
334-335-3374 FAX: 334-335-1140

PATIENT NAME: ATWELL, ROBIN

DATE OF BIRTH:

MRN:          41327

ACCOUNT NUMBER:

EXAM DATE:     5-08-2007

ORDERING PHYSICIAN: TOMPKINS, CHARLES

PRIMARY CARE PHYSICIAN:

ACCESSION NUMBER:   A189552

PATIENT LOCATION:   OUTPATIENT

FLOOR/ROOM:

EXAM DESCRIPTION: US ABDOMEN COMPLETE

---

HISTORY: Abdomen pain, automobile accident January 2007.

TECHNIQUE: Multiplanar sonographic imaging of the abdomen was performed.

FINDINGS:  Evaluation of the liver demonstrates normal homogenous echogenicity.
No focal hepatic lesions are identified.  No intrahepatic ductal dilatation is
seen.

The gallbladder surgically absent. The common bile duct measures approximately
3.1 mm and is within normal limits.

Evaluation of the kidneys demonstrates the right renal size at  11.4 x 4.1 x 6.0
cm . The left kidney measures 11.7 x 4.7 x 6.0 cm in size. No evidence for
hydronephrosis. No renal masses or renal calculi are seen.  Both kidneys
demonstrate normal cortical echogenicity and cortical thickness.

The spleen measures 10.4 x 4.8 cm and is within normal limits. The pancreas is
within normal limits.  No focal splenic or pancreatic mass is seen.

Evaluation of the abdominal aorta demonstrates no evidence for abdominal aortic
aneurysm.


IMPRESSION:
CHOLECYSTECTOMY. OTHERWISE UNREMARKABLE ABDOMINAL ULTRASOUND.


Dictated and Electronically Signed: Raja P. Reddy, MD  RSI Staff Radiologist
 5-08-2007   4:18 pm       Turnaround: 0 Hrs 12 Minutes


Family Practice Asso.
00016
Atwell v. Smart

Professional interpretation by RSI (Reddy Solutions, Inc.)      *Innovative Radiology Solutions*

# Crenshaw Community Hospital
101 Hospital Circle
Luverne AL36049
334-335-3374  FAX: 334-335-1140

PATIENT NAME: ATWELL, ROBIN

DATE OF BIRTH:

MRN:          41327

ACCOUNT NUMBER:

EXAM DATE:    5-08-2007

ORDERING PHYSICIAN: TOMPKINS, CHARLES

PRIMARY CARE PHYSICIAN:

ACCESSION NUMBER:  A189402

PATIENT LOCATION:   OUTPATIENT

FLOOR/ROOM:

EXAM DESCRIPTION: XR CHEST (2 VIEWS)

---

HISTORY:   Chest pain.

CHEST X-RAY

TECHNIQUE: PA and lateral views of the chest are submitted for evaluation. No priors for comparison.

FINDINGS: Evaluation of the chest demonstrates a normal cardiomediastinal silhouette. The trachea is midline. Bilateral breast augmentations are demonstrated. The lungs are clear without evidence for an infiltrate.  No pleural effusion or pneumothorax is identified.  No acute bony abnormality is seen.

IMPRESSION:
NEGATIVE CHEST X-RAY.

Dictated and Electronically Signed:  Raja P. Reddy, MD  RSI Staff Radiologist
   5-08-2007   4:46 pm       Turnaround: 2 Hrs 33 Minutes

Family Practice Asso.
00017
Atwell v. Smart

Professional interpretation by RSI (Reddy Solutions, Inc.)     *"Innovative Radiology Solutions"*

106303

CRENSHAW COMMUNITY HOSPITAL

PHYSICAL THERAPY EVALUATION

PATIENT NAME: Attwell, Robin ___ DOB: ___ EX: M/F

OCCUPATION: homemaker ___ PHYSICIAN: Dr. Tompkins

DIAGNOSIS: cervical sprain s/p MVA ___ ONSET: 3/17/07

PHYSICIAN'S ORDERS: evaluate / tx
other injuries in MVA: liver contusion,
PAST MEDICAL HISTORY: ® RC tear; ® breast implant rupture, ® knee contusion

PRIOR FUNCTIONAL LEVEL: ①

SUBJECTIVE: was hit on driver's side of vehicle (was driving)

PAIN: Location ① cervical → mid thoracic, ® dittoid

    Type aches ___ Intensity (0-10) ___

    Factors influence pain neck movements, prolonged sitting

    Current pain management rest, meds (was on flexeril but stopped
    taking it)

OBJECTIVE:

    Mental Status A & O x 3

    V/S: BP (L/R) supine ___ Sit ___ Stand ___

    Pulse ___ (Regular) Respirations ___ (labored/unlabored)

    Neurological Tone WNL ___ DTR intact

    Sensation intact

    Bowel/Bladder intact

    Other ___

Family Practice Asso.
00018

Skin integrity intact ✓  Wounds _____ (See wound report) incor. good

Edema pitting/non-pitting  Location ® knee _____ Degree mild

Vascular Doppler ABI ___ N/A

Peripheral pulses palpable N/T   ®)  N/T   (L) non palpable _____ ®) _____
(L)

Varicosities ___ N/T

Rubor ___ ⊖ _____ Claudications ⊖

## RANGE OF MOTION:

RUE: WNL ___ ✓ _____ WFL _____ Limitations _____

LUE: WNL ___ ✓ _____ WFL _____ Limitations _____

RLE: WNL ___ ✓ _____ WFL _____ Limitations _____

LLE: WNL ___ ✓ _____ WFL _____ Limitations _____

Cervical WNL rotation ® ___ WFL _____ Limitations Anterior ® 68° (A) 72° (P)
lat, tilt, flex, ext

Trunk WNL ✓ _____ WFL _____ Limitations _____

Comments: C/O ® mid/lower cervical pain ⊖ and range of rotation to ®.
combination movements of cervical flex in, lat tilt to ® cause ↑ as
Sx on ® cervical.

Posture: Sitting  forward head position _____

Standing WNL _____

Comments _____

_____

_____

STRENGTH:

RUE: WNL ____✓____ WFL _____ Limitations _____

LUE: WNL ____✓____ WFL _____ Limitations _____

RLE: WNL __NT__ WFL _____ Limitations _____

LLE: WNL __NT__ WFL _____ Limitations _____

Cervical WNL _____ WFL ✓ (4-/5) _____ Limitations _____

Trunk WNL __NT__ WFL _____ Limitations _____

Comments: c/o ↑ ⊕ mid/lower cervical pain on resisted rotation, lat.
tilt to ⊕ _____

_____

Balance Sitting Good ✓ Fair ____ Poor ____ Comments _____

Standing Good ✓ Fair ____ Poor ____ Comments _____

Functional assessment (I) independent (SBA) stand by assist (CGA) contact guard assist (MN) minimal assist (MO) moderate assist (MX) maximal assist (UN) unable

Bed Mobility: Turning ___I___ Bridging ___I___ Supine to sit ___I___

Sit to supine ___I___

Transfers: weight bearing status ___PWB___ (R/L) assistive device ___Ø___

Slide _____ Stand/pivot ___I___

Ambulation: weight bearing status ___PWB___ (R/L) ___ØAD___

Assistance required ___I___ Endurance ___1000___ Ft

Gait pattern ___PD BLUNG___

ADLS: Feeding ___I___ Grooming ___I___ Toileting ___I___ Bathing ___I___

Dressing ___I___ Comments _____

Special Tests: cervical distraction ⊕ for Ⓛ cervical paraspinal pain). Cervical rotation is also ⊕ c less intensity. Cervical compression is ⊕ for SX. There is Ø SX on palpation of paraspinal area.

Assessment ↓ ROM, strength; poor postural habits s/p MVA c cervical sprain

Plan: Therapeutic exercise (✓) Transfer/bed mobility ( ) Balance exercise ( ) Gait training ( )

Family/patient education ( ) modalities (✓) U.S.

Other ( )

Frequency/duration ___2x/wk x 1; 3x/wk x 3___

GOALS: Short Term 1) reduce pain  2) cervical rotation to (R) 75° (A) 80° (L)

3) 4/5 cerv. strength               (2wks)

Long Term 1) est HEP  2) cervical AROM WNL 3) 5/5 cerv. strength

4) resume full activities  5) pt demonstrates proper posture / body mechanics
                                                    (4wk)

Rehabilitative potential: Good (✓) Fair ( ) Poor ( )

_____         _____
Therapist                                          Date   5/4/07

## PROGRESS NOTE

| HPI | | | |
|---|---|---|---|
| Location, quality, severity, duration, timing, context, modifying factors, associated signs and symptoms. | | | |

NAME: Robin Davis    DATE: 3-7-06

D.O.B.: _____ H: ____ W: ____ T: ____ P: ____ B.P. ____ R: ____

C.C. / NURSES NOTE: _____

# no show. MF

| ROS | WNL | SEE NOTE |
|---|---|---|
| CONST | ☐ | ☐ |
| EYES | ☐ | ☐ |
| ENT/MOUTH | ☐ | ☐ |
| CV | ☐ | ☐ |
| RESP | ☐ | ☑ |
| GI | ☐ | ☐ |
| GU | ☐ | ☐ |
| MUSC | ☐ | ☐ |
| SKIN/BREASTS | ☐ | ☐ |
| NEURO | ☐ | ☐ |
| PSYCH | ☐ | ☐ |
| ENDO | ☐ | ☐ |
| HEM/LYMPH | ☐ | ☐ |
| ALLERG/IMMUN | ☐ | ☐ |

NO NOTEWORTHY CHANGES SINCE LAST VISIT.    SEE NOTE DATED:

| PFSH | NO CHG | SEE NOTE |
|---|---|---|
| PAST | ☐ | ☐ |
| FAMILY | ☐ | ☐ |
| SOCIAL | ☐ | ☐ |

NO NOTEWORTHY CHANGES SINCE LAST VISIT.    SEE NOTE DATED:

| EXAM | WNL | SEE NOTE |
|---|---|---|
| CONST | ☐ | ☐ |
| EYES | ☐ | ☐ |
| ENT/MOUTH | ☐ | ☐ |
| NECK | ☐ | ☐ |
| RESP | ☐ | ☐ |
| CV | ☐ | ☐ |
| CHEST (BREASTS) | ☐ | ☐ |
| GI (ABDOMEN) | ☐ | ☐ |
| LYMPH | ☐ | ☐ |
| GU | ☐ | ☐ |
| MUSC | ☐ | ☐ |
| SKIN | ☐ | ☐ |
| NEURO | ☐ | ☐ |
| PSYCH | ☐ | ☐ |

NO ✓: NO REVIEW / EXAM

☐ Medication List Reviewed

HPI:

Couns/coord greater than 50%☐

Total Time: _____ min.

Physician Signature: _____    Couns/coord time: _____ min.



## PROGRESS NOTE

| | HPI |
|---|---|

Location, quality, severity, duration, timing, context, modifying factors, associated signs and symptoms.

NAME: Robin Davis

DATE: 2-8-06

D.O.B.: _____ H: _____ W: _____ T: _____ P: _____ B.P. _____ R: _____

C.C. / NURSES NOTE: _____

Came Yesterday     NP

| | ROS | WNL | SEE NOTE |
|---|---|---|---|
| CONST | | ☐ | ☐ |
| EYES | | ☐ | ☐ |
| ENT/MOUTH | | ☐ | ☐ |
| CV | | ☐ | ☐ |
| RESP | | ☐ | ☑ |
| GI | | ☐ | ☐ |
| GU | | ☐ | ☐ |
| MUSC | | ☐ | ☐ |
| SKIN/BREASTS | | ☐ | ☐ |
| NEURO | | ☐ | ☐ |
| PSYCH | | ☐ | ☐ |
| ENDO | | ☐ | ☐ |
| HEM/LYMPH | | ☐ | ☐ |
| ALLERG/IMMUN | | ☐ | ☐ |

NO NOTEWORTHY CHANGES SINCE LAST VISIT.     SEE NOTE DATED:

☐ Medication List Reviewed

HPI:

| | PFSH | NO CHG | SEE NOTE |
|---|---|---|---|
| PAST | | ☐ | ☐ |
| FAMILY | | ☐ | ☐ |
| SOCIAL | | ☐ | ☐ |

NO NOTEWORTHY CHANGES SINCE LAST VISIT.     SEE NOTE DATED:

| | EXAM | WNL | SEE NOTE |
|---|---|---|---|
| CONST | | ☐ | ☐ |
| EYES | | ☐ | ☐ |
| ENT/MOUTH | | ☐ | ☐ |
| NECK | | ☐ | ☐ |
| RESP | | ☐ | ☐ |
| CV | | ☐ | ☐ |
| CHEST (BREASTS) | | ☐ | ☐ |
| GI (ABDOMEN) | | ☐ | ☐ |
| LYMPH | | ☐ | ☐ |
| GU | | ☐ | ☐ |
| MUSC | | ☐ | ☐ |
| SKIN | | ☐ | ☐ |
| NEURO | | ☐ | ☐ |
| PSYCH | | ☐ | ☐ |

NO ✓: NO REVIEW / EXAM

Couns/coord greater than 50% ☐

Total Time: _____ min.

Physician Signature: _____     Couns/coord time: _____ min.

## PROGRESS NOTE

| HPI |
| --- |
| Location, quality, severity, duration, timing, context, modifying factors, associated signs and symptoms. |

| ROS | WNL | SEE NOTE |
| --- | --- | --- |
| CONST | ☐ | ☐ |
| EYES | ☐ | ☐ |
| ENT/MOUTH | ☐ | ☐ |
| CV | ☐ | ☐ |
| RESP | ☐ | ☑ |
| GI | ☐ | ☐ |
| GU | ☐ | ☐ |
| MUSC | ☐ | ☐ |
| SKIN/BREASTS | ☐ | ☐ |
| NEURO | ☐ | ☐ |
| PSYCH | ☐ | ☐ |
| ENDO | ☐ | ☐ |
| HEM/LYMPH | ☐ | ☐ |
| ALLERG/IMMUN | ☐ | ☐ |

NO NOTEWORTHY CHANGES SINCE LAST VISIT.    SEE NOTE DATED:

| PFSH | NO CHG | SEE NOTE |
| --- | --- | --- |
| PAST | ☐ | ☐ |
| FAMILY | ☐ | ☐ |
| SOCIAL | ☐ | ☐ |

NO NOTEWORTHY CHANGES SINCE LAST VISIT.    SEE NOTE DATED:

| EXAM | WNL | SEE NOTE |
| --- | --- | --- |
| CONST | ☐ | ☐ |
| EYES | ☐ | ☐ |
| ENT/MOUTH | ☐ | ☐ |
| NECK | ☐ | ☐ |
| RESP | ☐ | ☐ |
| CV | ☐ | ☐ |
| CHEST (BREASTS) | ☐ | ☐ |
| GI (ABDOMEN) | ☐ | ☐ |
| LYMPH | ☐ | ☐ |
| GU | ☐ | ☐ |
| MUSC | ☐ | ☐ |
| SKIN | ☐ | ☐ |
| NEURO | ☐ | ☐ |
| PSYCH | ☐ | ☐ |

NO ✓: NO REVIEW / EXAM

NAME: Robin Davis    DATE: 2-7-06

H: ___ W: 150 T: ___ P: 80 B.P. 118/70 R: ___

C.C. / NURSES NOTE: - here today for w/c claim . pt asked for something for her nerves, still on Wellbutrin, states she has filed sexual

☐ Medication List Reviewed    herrasments charges on her boss
HPI: @work. She shares office with her boss - he is constantly fussing and "nit picking" her PT c/o ↑ anxiety, stays nervous, ↑ nausea. every day when she goes to work.

A3 above . NO recent chest pain - since D/C from Hospital Echo → TV MR, 1+ Pulm R + NO MVP

See D/C summary → no organic etiology for chest pain established

Anxiety - apparently situational

NAD - screen fairly calm c husband in office    Begin Lexapro ? Amt PRN Vistaril

CTA    Appt c Dr. Williamson Dr. Crowder

RRR S/M    Recheck 3-4 wks

NO CVE    Stop Wellbutrin

Counsel/coord greater than 50%
Total Time: ___ min.

Physician Signature ___    Couns/coord time: ___ min.

W/C Drug Screen / done PR

Copy of pertinent records c̄ patient

Appt Dr. Williamson 2-13-06 @ 800P

Family Practice Asso.
00025
Atwell v. Smart

Rx Date/Time    FEB-02-2006(THU) 11:49                                      P. 001
FEB-02-2006  11:20                                                          P.01/02
**Montgomery Cardiovascular Associates, P.C.**              February 2, 2006
2119 East South Blvd.  Montgomery, AL 36116                              Page 1
(334)280-1600  Fax: (334)280-1600                                Chart Document

| **ROBIN O DAVIS** | Home: 3343353501 Office: 3345278853 |
|---|---|
| Female  DOB:              111209-1-mc | Ins: B/C OF A (1) Grp: 52397 |

01/25/2006 - Office Visit: Echo  ONLY (Crenshaw)
Provider: ERIC CRUM MD
Location of Care: Montgomery Cardiovascular Associates, P.C.
Status: ON HOLD DOCUMENT.  Contents are preliminary

## TWO-DIMENSIONAL/M-MODE/DOPPLER ECHOCARDIOGRAM REPORT

| | |
|---|---|
| NAME: | DAVIS, ROBIN O |
| MCA CHART NO.: | 111209-1-mc |
| D.O.B.: | |
| DATE: | 01/25/2006 8:30 AM |
| ORDERING M.D.: | CHARLES TOMPKINS |
| INTERPRETING M.D.: | ERIC CRUM |
| REFERRING M.D.: | CHARLES TOMPKINS |
| PERFORMED AT: | CRENSHAW COMMUNITY HOSPITAL |

**REASON FOR STUDY:**

1. Chest pain.
2. Shortness of breath.
3. History of mitral valve prolapse.

**M-MODE MEASUREMENTS:**

| | |
|---|---|
| Left ventricular end diastolic diameter: | 46 mm |
| Left ventricular end systolic diameter: | 28 mm |
| Aortic root diameter: | 30 mm |
| Valve opening: | 16 mm |
| Left atrium: | 28 mm |
| Posterior wall thickness: | 9 mm |
| Septal wall thickness: | 14 mm |
| Ejection fraction: | 60% |

**TWO-DIMENSIONAL/COLOR DOPPLER STUDY:**  Echocardiogram demonstrates normal left ventricular chamber size and wall thicknesses with overall normal left ventricular systolic performance with ejection fraction 60%.  There are no segmental wall motion abnormalities.  The left atrium appears normal in size. The right heart appears normal in size.  The interventricular septum appears intact.  The aortic valve is pliable.  Mitral valve is pliable with trace mitral regurgitation by Doppler.  There is no definite prolapse. Tricuspid valve is pliable with mild (1+) tricuspid regurgitation by Doppler.  No intracardiac masses or thrombi seen.  No significant pericardial effusion.

**CONCLUSIONS:**

1. Normal left ventricular chamber size and wall thicknesses with overall normal left ventricular systolic performance with ejection fraction 60%.
2. The left atrium is normal in size.
3. The right heart is normal in size.

Family Practice Asso.
00026
Atwell v. Smart

**Montgomery Cardiovascular Associates, P.C.**
2119 East South Blvd. Montgomery, AL 36116
(334)280-1500 Fax: (334)280-1600

February 2, 2006
Page 2
Chart Document

| ROBIN O DAVIS | | Home: 3343353501 Office: 3345278853 |
|---|---|---|
| Female  DOB: | 111209-1-mc | Ins: B/C OF A (1) Grp: 52397 |

4.    The valves are pliable with trace mitral regurgitation and mild (1+) tricuspid regurgitation by
       Doppler. No evidence of significant mitral valve prolapse.
5.    No intracardiac masses or thrombi seen.
6.    No significant pericardial effusion.


R. Eric Crum, M.D.

REC/lw

Fax to:

Dr. Charles Tompkins
Rt. 3 Box 9-E
Luverne, Alabama 36049-9405
Phone: 334-335-3383
Fax: 334-335-3078

Crenshaw Community Hospital
101 Hospital Circle
Luverne, Alabama 36049
Phone: 334-335-3374
Fax: 334-335-1159

Job ID: 234140
DD:    02/01/2006
DT:    02/02/2006

Family Practice Asso.
00027
Atwell v. Smart

## PROGRESS NOTE

| HPI |
| --- |
| Location, quality, severity, duration, timing, context, modifying factors, associated signs and symptoms. |

NAME: Robin Davis    DATE: 1-25-06

D.O.B.: _____  H: _____  W: _____  T: _____  P: _____  B.P. _____  R: _____

C.C. / NURSES NOTE: _____

no show - Hater. NP

☐ Medication List Reviewed    Was in hospital / CPR

HPI:

| | ROS | WNL | SEE NOTE |
| --- | --- | --- | --- |
| | CONST | ☐ | ☐ |
| | EYES | ☐ | ☐ |
| | ENT/MOUTH | ☐ | ☐ |
| | CV | ☐ | ☐ |
| | RESP | ☐ | ☑ |
| | GI | ☐ | ☐ |
| | GU | ☐ | ☐ |
| | MUSC | ☐ | ☐ |
| | SKIN/BREASTS | ☐ | ☐ |
| | NEURO | ☐ | ☐ |
| | PSYCH | ☐ | ☐ |
| | ENDO | ☐ | ☐ |
| | HEM/LYMPH | ☐ | ☐ |
| | ALLERG/IMMUN | ☐ | ☐ |

NO NOTEWORTHY CHANGES SINCE LAST VISIT.    SEE NOTE DATED:

| | FFSH | NO CHG | SEE NOTE |
| --- | --- | --- | --- |
| | PAST | ☐ | ☐ |
| | FAMILY | ☐ | ☐ |
| | SOCIAL | ☐ | ☐ |

NO NOTEWORTHY CHANGES SINCE LAST VISIT.    SEE NOTE DATED:

| | EXAM | WNL | SEE NOTE |
| --- | --- | --- | --- |
| | CONST | ☐ | ☐ |
| | EYES | ☐ | ☐ |
| | ENT/MOUTH | ☐ | ☐ |
| | NECK | ☐ | ☐ |
| | RESP | ☐ | ☐ |
| | CV | ☐ | ☐ |
| | CHEST (BREASTS) | ☐ | ☐ |
| | GI (ABDOMEN) | ☐ | ☐ |
| | LYMPH | ☐ | ☐ |
| | GU | ☐ | ☐ |
| | MUSC | ☐ | ☐ |
| | SKIN | ☐ | ☐ |
| | NEURO | ☐ | ☐ |
| | PSYCH | ☐ | ☐ |

NO ✓: NO REVIEW / EXAM

☐ Couns/coord greater than 50%

Total Time: _____ min.

Physician Signature: _____    Couns/coord time: _____ min.

Family Practice Asso.
00028
Atwell v. Smart

Name: ROBIN DAVIS
ID: 106303
Sex: Female
BP: 112/68 mmHg
Weight: 149.0 lbs
Height: Inches
Age: Years
Comments: Unconfirmed Report

Family Practice Associates
Req. Physician:
Technician: MICHELLE
History:
Medication:
Date of Report: 01/24/06
Reviewed By:
Review Date:

10:37:08

Rate: 88 BPM
PR: 140 msec
QT/QTc: 358/407 msec
QRSD: 90 msec
P Axis: 59
QRS Axis: 81
T Axis: 50

Interpretation:
Sinus Rhythm
P-QRS - 1:1, Normal P axis, H Rate 88
WITHIN NORMAL LIMITS

Speed:25 mm/sec   Limb:10 mm/mv   Chest:10 mm/mv   MYOCON AICON IRUFIXON   Midmark Diagnostics Group   Page 1 of 1   Version 6.3.0   ECG Analysis Ver. 6.3.0   Print Date 01/24/06   10:37:51

Family Practice Asso.
00029

## PROGRESS NOTE

| HPI | |
|---|---|
| Location, quality, severity, duration, timing, context, modifying factors, associated signs and symptoms. | |

| ROS | WNL | SEE NOTE |
|---|---|---|
| CONST | ☐ | ☐ |
| EYES | ☐ | ☐ |
| ENT/MOUTH | ☐ | ☐ |
| CV | ☐ | ☐ |
| RESP | ☐ | ☑ |
| GI | ☐ | ☐ |
| GU | ☐ | ☐ |
| MUSC | ☐ | ☐ |
| SKIN/BREASTS | ☐ | ☐ |
| NEURO | ☐ | ☐ |
| PSYCH | ☐ | ☐ |
| ENDO | ☐ | ☐ |
| HEM/LYMPH | ☐ | ☐ |
| ALLERG/IMMUN | ☐ | ☐ |

NO NOTEWORTHY CHANGES SINCE LAST VISIT.    SEE NOTE DATED:

| PFSH· | NO CHG | SEE NOTE |
|---|---|---|
| PAST | ☐ | ☐ |
| FAMILY | ☐ | ☐ |
| SOCIAL | ☐ | ☐ |

NO NOTEWORTHY CHANGES SINCE LAST VISIT.    SEE NOTE DATED:

| EXAM | WNL | SEE NOTE |
|---|---|---|
| CONST | ☑ | ☐ |
| EYES | ☐ | ☐ |
| ENT/MOUTH | ☑ | ☐ |
| NECK | ☐ | ☐ |
| RESP | ☑ | ☐ |
| CV | ☑ | ☐ |
| CHEST (BREASTS) | ☐ | ☐ |
| GI (ABDOMEN) | ☑ | ☐ |
| LYMPH | ☐ | ☐ |
| GU | ☐ | ☐ |
| MUSC | ☑ | ☐ |
| SKIN | ☐ | ☐ |
| NEURO | ☐ | ☐ |
| PSYCH | ☐ | ☐ |

NO ✓: NO REVIEW / EXAM

NAME: Robin Davis    DATE: 1-24-06

H: ___  W: 149  T: ___  P: 100  BP: 112/68

C.C. / NURSES NOTE: "SOB, heart racing away; sleeps well @ night but still tired all the time; also c/o chest tightening (no chest pains)"

☑ Medication List Reviewed    took Nexium ā d ¡ 3 weeks, ā help 5/5

HPI
- B/P 140/89  Pulse 109 @ work this a.m.
- has these episodes about twice a week
- hx fibromyalgia + MVP
- was taking tenormin - stopped 5yrs ago
- working 8-5 now -

palpitations, fatigue, chest pain,
fibromyalgia, MVP

wa~

Cmp, CBC, TSH

EKG - SR

2DEcho - 1-25-06  10:00

24° Holter Moniter

Physician Signature: DBurns CRNP    Couns/coord time: ___ min.

F/U tomorrow for Holter

| Couns/coord greater than 50% | ☐ |
|---|---|
| Total Time: | ___ min. |

Family Practice Asso.
00030

## PROGRESS NOTE

| HPI |
|---|
| **Location, quality, severity, duration, timing, context, modifying factors, associated signs and symptoms.** |

| ROS | WNL | SEE NOTE |
|---|---|---|
| CONST | ☐ | ☐ |
| EYES | ☐ | ☐ |
| ENT/MOUTH | ☐ | ☐ |
| CV | ☐ | ☐ |
| RESP | ☐ | ☐ |
| GI | ☐ | ☐ |
| GU | ☐ | ☐ |
| MUSC | ☐ | ☐ |
| SKIN/BREASTS | ☐ | ☐ |
| NEURO | ☐ | ☐ |
| PSYCH | ☐ | ☐ |
| ENDO | ☐ | ☐ |
| HEM/LYMPH | ☐ | ☐ |
| ALLERG/IMMUN | ☐ | ☐ |

**NO NOTEWORTHY CHANGES SINCE LAST VISIT.     SEE NOTE DATED:**

| PFSH | NO CHG | SEE NOTE |
|---|---|---|
| PAST | ☐ | ☐ |
| FAMILY | ☐ | ☐ |
| SOCIAL | ☐ | ☐ |

**NO NOTEWORTHY CHANGES SINCE LAST VISIT.     SEE NOTE DATED:**

| EXAM | WNL | SEE NOTE |
|---|---|---|
| CONST | ☑ | ☐ |
| EYES | ☐ | ☐ |
| ENT/MOUTH | ☐ | ☐ |
| NECK | ☐ | ☐ |
| RESP | ☐ | ☑ |
| CV | ☑ | ☐ |
| CHEST (BREASTS) | ☐ | ☐ |
| GI (ABDOMEN) | ☐ | ☐ |
| LYMPH | ☐ | ☐ |
| GU | ☐ | ☐ |
| MUSC | ☐ | ☐ |
| SKIN | ☐ | ☐ |
| NEURO | ☐ | ☐ |
| PSYCH | ☐ | ☐ |

**NO ✓: NO REVIEW / EXAM**

NAME: Robin Davis     DATE: 12-29-05

D:          H:       W:       T: 97⁴/₆ ×P:       B.P. 114/70 R:

O₂ Sat 98-99

C.C. / NURSES NOTE: Congested, coughing

Using albuterol inhaler & neb txs q 3-4 hrs x 3-4 da @ home c̄ No relief

☑ Medication List Reviewed

**HPI:**
- productive cough (green phlegm) ; runny nose (clear)
- Ø headaches / Ø sinus pressure
- c/o sore throat
- taking Atuss, NyQuil along c̄ albuterol - Ø relief

ē BBS c̄ mild coarse rhonchi - clearing p̄ neb try, croupy cough -

Bronchitis

Decadron 3 IV
Rocephin 1 gm , Vibratabs 100 y BID
Prednisone 40·30·20·10
Phenergan DM 1-2 tsp q 6° prn

☐ Couns/coord greater than 50%

Total Time: _____ min.

Physician Signature: D Brown NP       Couns/coord time: _____ min.

RU prn



# The Therapy & WELLness Group

*"Solutions for living well"*
*3160 West Main Street, Suite 1*
Dothan, Alabama 36303

## PHYSICAL THERAPY INITIAL EVALUATION

**Patient:** Robin Davis
**Date of Birth:**
**Physician:** Charles Tompkins, M.D.
**Physical Therapist:** Mark A. Mashburn, P.T., O.C.S.
**Diagnosis:** Left Shoulder Strain
**Date:** November 1, 2005

Dear Dr. Tompkins:

Thank you for your referral of Robin for outpatient physical therapy for her left shoulder condition. She relates a date of injury of approximately 10/14/05, with handling blank parts from floor to bench height at SMART. She is right hand dominant. She states her regular job is that of Hood Outers, loading a jig. She states the day of the injury while lifting parts from floor and "slinging" these, she had a sudden onset of pain in the left shoulder. She describes that she felt her shoulder "came out of place" and describes the Emergency Room Physician, Dr. Smith, as performing what can be interpreted as a manipulation type maneuver to "put the shoulder back in place", by patient's description; however, with the mechanism of injury she describes, this evaluator, without medical records from that physician, did not feel that it would be typical to have a true subluxation or dislocation of the shoulder.

Medical records will be sought from the ER visit as well.

The patient describes being active in sports and softball, slow pitch and fast pitch, primarily left dominant throwing history but with no reported history of subluxation or rotator cuff tear injury in sports questioning today.

She has been using an immobilizer, and review of records of Dr. Tompkins indicates a working history and clinical signs/symptom pattern of subluxing/subluxation/shoulder instability with mild impingement.

Patient states she has discontinued use of her sling recently.

She complains of 2/10+ pain and decreased active motion tolerance at or over shoulder level. She states she has no home exercise program. She uses heat.

**OBJECTIVE:** Objectively, she shows about 50% decreased active motion for flexion, abduction, and external rotation. She has a positive impingement sign with combined internal rotation at shoulder abduction testing today. This is mild. She has no gross instability signs, though she may have a hypermobile joint and periods of subluxation. She is guarded, however, with this type of movement and manual testing, and this will need to be rechecked.

She shows weakness with her scapular stabilizers, graded at 3+/5 for the lower trapezius and 4-/5 for external rotation, internal rotation. Flexion and abduction planes are graded at 3+/5 and guarded/painful.

She has no contracture, though she is apprehensive and guarded about full overhead motion.

Neurological exam is negative. Cervical spine motion is full, though she has some upper trapezius scapular elevation related to guarding – still no loss of motion and negative for foraminal encroachment signs.

Palpation in the shoulder girdle area does show soft tissue adaptive shortening/guarding and tenderness in the upper trapezius and levator scapulae typical of a shoulder strain patient who is guarding with scapular elevation and protraction. She has slight adaptive shortening and guarding pattern of the pectoralis muscles. She has decreased firing and activation/hold ability with the lower trapezius. Supraspinatus with isolated testing is weak and tender and graded at 3 to 3+/5.

Family Practice Asso.
00032

**Patient: Robin Davis**          **Date: November 1, 2005**          **Page 2**

**TREATMENT:** Treatment today includes manual therapy with training the patient in neutral scapular position, avoidance of impingement, how to use heat and ice, tendon massage. She is assisted with exercise, including shoulder pendulum, isometrics focusing on extension and lower trapezius firing. She is instructed in external rotation in side lying for rotator cuff strengthening, protected. She will be assisted on each subsequent visit with progressive strengthening with Theraband and weighted activities, open and closed chain, ultrasound to the tendons involved, and ice post-activity, electrical stimulation if needed.

**ASSESSMENT:** Patient is an appropriate candidate for outpatient physical therapy to restore full active range of motion, restore functional shoulder biomechanical movement pattern for activities of daily living and work, and then restore functional open and closed chain strength, material handling ability, etc. Ongoing assessment of shoulder stability will be included in her care and any new findings or worrisome findings communicated to Dr. Tompkins.

**PATIENT UNDERSTANDS AND AGREES TO THE FOLLOWING GOALS:**

**SHORT-TERM GOALS:**          Time Frame – Two Weeks
1.     Patient's active range of motion within normal limits all planes.
2.     Patient's manual muscle test increased all planes to at least 4- to 4/5.
3.     Patient with self-exercise ability demonstrated on at least two consecutive visits of therapy with strengthening, stabilizer firing and strengthening, open and closed chain components.

**LONG-TERM GOALS:**          Time Frame – Four to Six Weeks -- Per Healing Time Frame of Dr. Tompkins
1.     Patient with 4+ to 5/5 muscle testing for shoulder and scapular musculature.
2.     Patient with no loss of motion.
3.     Patient with repeated motion ability overhead and forward without limitation relative to work demands.
4.     Patient tolerating full closed chain material handling, etc.
5.     No permanent impairment or work restrictions.

**PLAN OF TREATMENT:** See patient two to three times per week to achieve goals as above, including modalities, exercise, manual therapy, ultrasound/electrical stimulation, patient training and progressive work duty within healing guidelines of Dr. Tompkins.

Thank you for this referral.

Sincerely,


_____
Mark A. Mashburn, P.T., O.C.S.          Date

MAM/mt

DD: 11/03/05
DT: 11/03/05

I agree with the above physical therapy plan of treatment and certify as medically necessary.


_____
Charles Tompkins, M.D.          Date

co: Worker's Comp., Employer's Claim Management



Family Practice Asso.
00034
Atwell v. Smart

## PROGRESS NOTE

| HPI | |
| --- | --- |
| Location, quality, severity, duration, timing, context, modifying factors, associated signs and symptoms. | |

| | ROS | WNL | SEE NOTE |
| --- | --- | --- | --- |
| CONST | | ☐ | ☐ |
| EYES | | ☐ | ☐ |
| ENT/MOUTH | | ☐ | ☐ |
| CV | | ☐ | ☐ |
| RESP | | ☐ | ☐ |
| GI | | ☐ | ☐ |
| GU | | ☐ | ☐ |
| MUSC | | ☐ | ☐ |
| SKIN/BREASTS | | ☐ | ☐ |
| NEURO | | ☐ | ☐ |
| PSYCH | | ☐ | ☐ |
| ENDO | | ☐ | ☐ |
| HEM/LYMPH | | ☐ | ☐ |
| ALLERG/IMMUN | | ☐ | ☐ |

NO NOTEWORTHY CHANGES SINCE LAST VISIT.     SEE NOTE DATED:

| PFSH | NO CHG | SEE NOTE |
| --- | --- | --- |
| PAST | ☐ | ☐ |
| FAMILY | ☐ | ☐ |
| SOCIAL | ☐ | ☐ |

NO NOTEWORTHY CHANGES SINCE LAST VISIT.     SEE NOTE DATED:

| | EXAM | WNL | SEE NOTE |
| --- | --- | --- | --- |
| CONST | | ☐ | ☐ |
| EYES | | ☐ | ☐ |
| ENT/MOUTH | | ☐ | ☐ |
| NECK | | ☐ | ☐ |
| RESP | | ☐ | ☐ |
| CV | | ☐ | ☐ |
| CHEST (BREASTS) | | ☐ | ☐ |
| GI (ABDOMEN) | | ☐ | ☐ |
| LYMPH | | ☐ | ☐ |
| GU | | ☐ | ☐ |
| MUSC | | ☐ | ☒ |
| SKIN | | ☐ | ☐ |
| NEURO | | ☐ | ☐ |
| PSYCH | | ☐ | ☐ |

NO ✓: NO REVIEW / EXAM

NAME: Robin Davis     DATE: 10-20-05

H: ___  W: 146  T: ___  P: 104/ 117  B.P. 98/76  R: ___

C.C. / NURSES NOTE: Pt WC follow-up from Smart C (L) shoulder injury. Pt. is c/o heart racing and is now throwing up. Came in from outside

☐ Medication List Reviewed    feeling nauseated + light headed.

HPI: Seems to think the meds. she is taking may be causing this.

Injury at work 6 nights ago — descrbes bendig over & picking up light object — but awkwardly lifting off the ground in "swinging motion" — ests wt ± "40 lbs"

Esp active hx of ↑
fast pitch softball in past —
pitched c Left hand

A/P) My guess is that her shoulder prob' chronically subluxes — although the patient will not confirm

(L) shoulder pain

TTP bicipital groove

↑ guarding                    • Stop Motrin! Dose perz
Unable to crossover, etc —      bed of passive instructive row
but pt easily actively          • Resume Ketoprofen
Subluxes her (L) G-H joint      • use Ultram PRN
                                • Appt c PT for such
                                  @ Smart

Couns/coord greater than 50% ☐

Appt Time: ___ min.

Physician Signature: ___     Couns/coord time: ___ min.

# PROGRESS NOTE

| HPI | | |
|---|---|---|
| Location, quality, severity, duration, timing, context, modifying factors, associated signs and symptoms. | | |

| ROS | WNL | SEE NOTE |
|---|---|---|
| CONST | ☐ | ☐ |
| EYES | ☐ | ☐ |
| ENT/MOUTH | ☐ | ☐ |
| CV | ☐ | ☐ |
| RESP | ☐ | ☐ |
| GI | ☐ | ☐ |
| GU | ☐ | ☐ |
| MUSC | ☐ | ☐ |
| SKIN/BREASTS | ☐ | ☐ |
| NEURO | ☐ | ☐ |
| PSYCH | ☐ | ☐ |
| ENDO | ☐ | ☐ |
| HEM/LYMPH | ☐ | ☐ |
| ALLERG/IMMUN | ☐ | ☐ |

NO NOTEWORTHY CHANGES SINCE LAST VISIT.          SEE NOTE DATED:

| PFSH | NO CHG | SEE NOTE |
|---|---|---|
| PAST | ☐ | ☐ |
| FAMILY | ☐ | ☐ |
| SOCIAL | ☐ | ☐ |

NO NOTEWORTHY CHANGES SINCE LAST VISIT.          SEE NOTE DATED:

| EXAM | WNL | SEE NOTE |
|---|---|---|
| CONST | ☑ | ☐ |
| EYES | ☐ | ☐ |
| ENT/MOUTH | ☐ | ☐ |
| NECK | ☐ | ☐ |
| RESP | ☑ | ☐ |
| CV | ☑ | ☐ |
| CHEST (BREASTS) | ☐ | ☐ |
| GI (ABDOMEN) | ☐ | ☐ |
| LYMPH | ☐ | ☐ |
| GU | ☐ | ☐ |
| MUSC | ☐ | ☑ |
| SKIN | ☐ | ☐ |
| NEURO | ☐ | ☐ |
| PSYCH | ☐ | ☐ |

NO ✓: NO REVIEW / EXAM

NAME: Robin Davis          DATE: 10-18-05

H: ___ W: 152 T: 97.8 P: 84 B.P: 132/70 R: ___

C.C. / NURSES NOTE: WC followed-up. Injured (L) shoulder @ WORK (SMART). Was seen in ER @ CCH on 10/15/05

☑ Medication List Reviewed

HPI: — c/o (L) shoulder making "audible click" upon moving
— arm sling intact @ present

limited AROM, tnd to palpation over deltoid

tendinitis   vs   ? Rotator Cuff tear

Medrol dose pk, + xray (L) shoulder
ultram 50g 1-2 q6°pn
? MRI

Cont light duty for now   RTD Thursday afternoon

Physician Signature: _____ CRNP   Couns/coord time: _____ min.

Couns/coord greater than 50% ☐   Total Time: _____ min.

Family Practice Asso.
00036

## PROGRESS NOTE

| HPI | |
|---|---|
| Location, quality, severity, duration, timing, context, modifying factors, associated signs and symptoms. | |

NAME: Robin Davis    DATE: 9-28-05

H: ___ W: 150 T: ___ P: 92 B.P. 124/70

C.C. / NURSES NOTE: W/c follow-up — injury on 9-13-05 — c/o tingling in (R) 4th, 5th fingers up arm —

☐ Medication List Reviewed

HPI:

| ROS | WNL | SEE NOTE |
|---|---|---|
| CONST | ☐ | ☐ |
| EYES | ☐ | ☐ |
| ENT/MOUTH | ☐ | ☐ |
| CV | ☐ | ☐ |
| RESP | ☐ | ☐ |
| GI | ☐ | ☐ |
| GU | ☐ | ☐ |
| MUSC | ☐ | ☐ |
| SKIN/BREASTS | ☐ | ☐ |
| NEURO | ☐ | ☐ |
| PSYCH | ☐ | ☐ |
| ENDO | ☐ | ☐ |
| HEM/LYMPH | ☐ | ☐ |
| ALLERG/IMMUN | ☐ | ☐ |

NO NOTEWORTHY CHANGES SINCE LAST VISIT. SEE NOTE DATED:

| PFSH | NO CHG | SEE NOTE! |
|---|---|---|
| PAST | ☐ | ☐ |
| FAMILY | ☐ | ☐ |
| SOCIAL | ☐ | ☐ |

NO NOTEWORTHY CHANGES SINCE LAST VISIT. SEE NOTE DATED:

| EXAM | WNL | SEE NOTE! |
|---|---|---|
| CONST | ☐ | ☐ |
| EYES | ☐ | ☐ |
| ENT/MOUTH | ☐ | ☐ |
| NECK | ☐ | ☐ |
| RESP | ☐ | ☐ |
| CV | ☐ | ☐ |
| CHEST (BREASTS) | ☐ | ☐ |
| GI (ABDOMEN) | ☐ | ☐ |
| LYMPH | ☐ | ☐ |
| GU | ☐ | ☐ |
| MUSC | ☐ | ☐ |
| SKIN | ☐ | ☐ |
| NEURO | ☐ | ☐ |
| PSYCH | ☐ | ☐ |

NO ✓: NO REVIEW / EXAM

NL ROM c NL strength

Subjective ↓ sensation — paresthesis _____

Right hand / forearm

Basically expect resolution c time

no further testing regd. _____

Symptoms worsen

Total Time: ___ min.

Physician Signature: _____    Couns/coord time: ___ min.

Rev PR

Family Practice Asso.
00037
Atwell v. Smart

## PROGRESS NOTE

| HPI | | |
|---|---|---|
| Location, quality, severity, duration, timing, context, modifying factors, associated signs and symptoms. | | |

| ROS | WNL | SEE NOTE |
|---|---|---|
| CONST | ☐ | ☑ |
| EYES | ☐ | ☐ |
| ENT/MOUTH | ☐ | ☐ |
| CV | ☐ | ☐ |
| RESP | ☐ | ☐ |
| GI | ☐ | ☐ |
| GU | ☐ | ☐ |
| MUSC | ☐ | ☐ |
| SKIN/BREASTS | ☐ | ☐ |
| NEURO | ☐ | ☐ |
| PSYCH | ☐ | ☐ |
| ENDO | ☐ | ☐ |
| HEM/LYMPH | ☐ | ☐ |
| ALLERG/IMMUN | ☐ | ☐ |

NO NOTEWORTHY CHANGES SINCE LAST VISIT.     SEE NOTE DATED:

| PFSH | NO CHG | SEE NOTE |
|---|---|---|
| PAST | ☐ | ☐ |
| FAMILY | ☐ | ☐ |
| SOCIAL | ☐ | ☐ |

NO NOTEWORTHY CHANGES SINCE LAST VISIT.     SEE NOTE DATED:

| EXAM | WNL | SEE NOTE |
|---|---|---|
| CONST | ☐ | ☐ |
| EYES | ☐ | ☐ |
| ENT/MOUTH | ☐ | ☐ |
| NECK | ☐ | ☐ |
| RESP | ☐ | ☐ |
| CV | ☐ | ☐ |
| CHEST (BREASTS) | ☐ | ☐ |
| GI (ABDOMEN) | ☐ | ☐ |
| LYMPH | ☐ | ☐ |
| GU | ☐ | ☐ |
| MUSC | ☐ | ☐ |
| SKIN | ☐ | ☐ |
| NEURO | ☐ | ☐ |
| PSYCH | ☐ | ☐ |

NO ✓: NO REVIEW / EXAM

NAME: Robin Davis     DATE: 9-13-05

H:_____ W: 154 T:_____ P: 68 B.P. 100/60 R:_____

C.C. / NURSES NOTE: _fell @ work- jarring back & neck —_
_R fingers tingling._

☑ Medication List Reviewed

HPI:

Describe when atravel fall & ⊗ — (cancel n

Some CWF meds

_Correction_
(P) Still 9/20

Sec ER note

(Tp)

Thoracic / Neur pm

R=O Radiculopathy

Sl TTP paravertebral     Cont' Flexeril Tm
region bilat     +

New inject     Short tzper of prednisone
3mg → 2mg → 1mg

Counts/coord greater than 50%

for N 10 days     Total Time:_____ min.

Physician Signature:_____     ✓ _____ fm 10:00     min.

# CRENSHAW COMMUNITY HOSPITAL
## MEDICAL LABORATORY SERVICES
### 101 Hospital Circle    Luverne, AL 36009
### Phone 334-335-1168

## URINE SCREEN REPORT  (UDS5)

NAME _Robin Dawis_____    SS# _____

SPECIMEN ID# _015533_____    SECURITY SEAL INTACT? _yes_ TECH _RN_

DATE/TIME COLLECTED _9/10/05_ _0210_ COLLECTED BY _CO_

EMPLOYER _Smart  Alabama  UC_____

| **DRUG** | **RESULT** | **ANALYTICAL CUT-OFF** |
|----------|-----------|------------------------|
| Cocaine | negative | 300ng/ml |
| Amphetamine | negative | 1,000ng/ml |
| Methamphetamine | negative | 1,000ng/ml |
| Marijuana(THC) | negative | 50ng/ml |
| Opiates | negative | 300ng/ml |

TECH _RN_ _9/10/05_____    DATE/TIME _9/10/05 /200_

This assay provides only a preliminary analytical test result.  Specimens with positive results will be sent to a reference laboratory and a more specific alternate chemical method will be used to obtain a confirmed analytical result.

Interfering substances in the urine specimen may cause erroneous results.  Adulterants, such as bleach and/or alum, in urine specimens may produce erroneous results regardless of the analytical method used.  A positive result by be obtained from certain foods or food supplements.

A Positive result does not indicate level of intoxication, administration route or concentration in urine.  A positive test does not distinguish between drugs of abuse and certain medications.

A Negative result may not necessarily indicate drug-free urine.  Negative results can be obtained when drug is present below the cut-off level of the test.

Family Practice Asso.
00039
Atwell v. Smart

 

# Spirometry Report

Family Practice Associates
1704 South Forest Avenue
Luverne, AL 36049

| | | | | |
|---|---|---|---|---|
| Name: | ROBIN DAVIS | Age: | | Race: Caucasian |
| ID: | SMART | Height: | 66 inches | Weight: 154.0 lbs. |
| Sex: | Female | Indication: | SMOKER | |
| Smoker: | Yes, 30 cigs./day for 11 years. | Medications: | | |
| COPD Risk: | Low | Lung Age: | < 31 years | |

| | | | |
|---|---|---|---|
| Requested By: | Susan Tompkins, CRNP | Performed By: | Adriana |
| Test Date: | 08/23/05  10:19:49 | Sensor S/N: | 521205 |
| Press./Temp. | 760  mmHg./69 degrees F | Sensor Calibrated: | 08/16/05 11:05:37 |
| Bronchodilator: | | Normals/Interp.: | Crapo/ATS (1991) |



| Measurement | Units | Predicted | Best Pre-BD Actual | Best Pre-BD % Pred. |
|---|---|---|---|---|
| FVC | L | 3.972 | 7.736 | 195% |
| FEV1 | L | 3.365 | 4.323 | 128% |
| FEV1/FVC | % | 85 % | 56 % | 66 % |
| FEF25-75% | L/S | 3.839 | 4.034 | 105% |
| PEF | L/S | 6.704 | 4.590 | 68 % |
| Exp. Time | Sec. | | 3.750 | |
| Best FVC | L | 3.972 | 7.736 | 195% |
| Best FEV1 | L | 3.365 | 4.555 | 135% |
| FIVC | L | 3.972 | | |

Test Quality:     Pre-BD FVC:     5 attempted, 4 accepted, 0 matches.

Interpretation:     Obstruction may be a physiological variant.

Unconfirmed Report

Name:    **ROBIN DAVIS** ●
ID:      **SMART**
Test Date:  08/23/05  10:19:49

All Pr ● onchodilator FVC Tests



Vol (L)

Time (S)

Pred. FEV1
Pred. FEV3
Pred. FEV
Pred. FVC

F (L/S)

———— Test #1
———— Test #2 (Best)
———— Test #3
———— Test #4

Pred. FEF25
Pred. FEF50
Pred. FEF75
Pred. FVC
Pred. PEF

Vol (L)

Pre-BD FVC:    5 attempted, 4 accepted, 0 matches.

Family Practice Asso.
00041
Atwell v. Smart

Midmark Diagnostics Group          Software Version: 6.3.0          Printed: 08/23/05  10:21:40          Page 2 of 3

Name:      ROBIN DAVIS
ID:        SMART
Test Date: 08/23/05  10:19:49

Best P   st Bronchodilator FVC Tests



Vol (L)

Time (S)

F (L/S)

——— Best Pre-Bronchodilator
——— Best Post Bronchodilator

Vol (L)

Pre-BD FVC:    5 attempted, 4 accepted, 0 matches.

Family Practice Asso.
00042
Atwell v. Smart

Midmark Diagnostics Group          Software Version: 6.3.0          Printed: 08/23/05  10:21:40          Page 3 of :



R 403-0787
K 403-0798
Dx: 11-350l

08/23/2005  21:17:55

| | | |
|---|---|---|
| Rate | 89 | |
| PR | 149 | |
| QRSD | 76 | |
| QT | 344 | |
| QTc | 418 | |
| | | |
| --AXIS-- | | |
| P | 68 | |
| QRS | 92 | |
| T | 3b | |

. AGE NOT ENTERED, ASSUMED TO BE 50 YEARS FOR PURPOSE OF ECG INTERPRETATION
. NORMAL SINUS RHYTHM, RATE  89............................normal P axis, PR, rate & rhythm
. RIGHT AXIS DEVIATION...................................................Age-specific ranges

- OTHERWISE NORMAL ECG -

Davis, Robin O
8-23-05
DE
Domingo OP EKr

Family Practice Asso.
00043
Atwell v. Smart                    Crenshaw Comm. Hospital

PRELIMINARY-MD MUST REVIEW

**Family Practice Associates**

Charles S. Tompkins, MD
Susan P. Tompkins, CRNP
Djuana Burns, CRNP

# History and Physical

Name: Robin O Davis    S:    Date 09/13/05

Address: _____    Occupation Assembly tech

Phone (home) 334-335-3501   (work) _____   Date of Birth _____

Chief complaint: Back pain arm (R) & 2½ finger numb

**Drug Allergies:** Amoxophyllin Compazine, Skelaxin 800mg

**Family History:**

| | Father | Mother | Father's Parents | Mother's Parents | Siblings | Children |
|---|---|---|---|---|---|---|
| Heart Disease | ☐ | ☐ | ☑ | ☑ | ☐ | ☐ |
| High Blood Pressure | ☑ | ☑ | ☑ | ☑ | ☐ | ☐ |
| Stroke | ☐ | ☐ | ☑ | ☑ | ☐ | ☐ |
| Cancer | ☐ | ☐ | ☑ | ☑ | ☐ | ☐ |
| Glaucoma | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Diabetes | ☑ | ☐ | ☑ | ☑ | ☐ | ☐ |
| Epilepsy / Convulsions | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Bleeding Disorder | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Kidney Disease | ☐ | ☐ | ☐ | ☐ | ☑ | ☐ |
| Thyroid Disease | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Mental Illness | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Osteoporosis | ☐ | ☐ | ☐ | ☐ | ☑ | ☐ |

**Current Medications:**
Cyclobenzaprine 10mg
½ to 1 tablet 3x Day
800 mg Ibuprofin 2x Day

**Hospitalization or Surgery:** 1975?

| Reason | Date | Reason | | Date |
|---|---|---|---|---|
| Tonsils | | | | |
| Tand Feb 90 | 1990 | Ovarian Cyst | | |
| GALL Bladder 1998 | 1998 | | | |
| apendex | 2005 | | | |
| C-Section | 2000 1990 | | | |
| Foot Surgery | | | | |

**Women Only:**   Pregnant? ☐ Yes ☑ No    Planning pregnancy? ☐ Yes ☑ No

**Medical History:**

- ☑ Headache
- ☑ Shortness of breath
- ☑ Heart palpitations M.V.P.
- ☑ Heart murmur
- ☑ Chest pain
- ☑ Dizziness/Fainting
- ☐ Peripheral vascular disease
- ☑ Allergies/Hay fever
- ☐ Asthma
- ☑ Bronchitis
- ☑ Pneumonia
- ☑ Ulcer
- ☐ GI disorder

- ☐ Lactose Intolerance
- ☑ Gallbladder disease
- ☐ Prostate disease
- ☑ Bowel irregularity I.B.S.
- ☐ Incontinence
- ☑ Sexual/menstrual dysfunction
- ☐ Venereal disease
- ☐ Frequent infections
- ☐ Hepatitis
- ☑ Anemia
- ☑ Arthritis fibro mialgia
- ☐ Osteoporosis
- ☐ Nervousness

- ☐ Depression
- ☐ Gout
- ☐ Scarlet fever
- ☐ Chronic rashes
- ☐ Rheumatic fever
- ☐ Mumps
- ☐ Measles
- ☐ Rubella
- ☐ Polio
- ☐ Diphtheria
- ☐ Tetanus
- ☑ Other Hemocromotosis
- ☐ Other

**Habits:**

- ☐ Smoke: Packs daily 1½
  How long 8 + years
  Interested in stopping? yes
- ☐ Excersise routine: limited
- ☐ Contact with blood/bodily fluid at work? No

- ☐ Coffee: Cups daily 0
  Other caffine 2-3 mt. dews
- ☐ Alcohol: Type _____
  Amount _____
- ☐ Diet: Salt intake _____
  Fat intake _____

- ☐ Sleep: Difficulty falling asleep ☑
  Continuity disturbances _____
  Snoring _____
  Early morning awakening _____
  Daytime drowsiness _____
  Other _____

# NON D.O.T. CUSTODY AND CONTROL FORM
(Do Not Use This Form For D.O.T. Collections)

LabCorp OTS RTP
1904 Alexander Drive
RTP          NC 27709
919-572-4900          SPECIMEN ID NO.     **0567593596**     LAB ACCESSION NO.

## STEP 1: COMPLETED BY COLLECTOR OR EMPLOYER REPRESENTATIVE

| A. Employer Name, Address and I.D. No. | B. MRO Name, Address, Phone and Fax No. |
|---|---|
| Industrial Care Management | DR DONALD PROBST |
| 6502 Emp:Smart Alabama LLC | 1696 MAIN ST STE A |
| 303 West 4th St | PRATTVILLE     AL 36044 |
| Luverne     AL 36049 | PH: 334-358-3070 FX: 334-358-3080 |
| 334-358-3070    ALB | |

C. Donor SSN or Employee I.D. No.

D. Reason for Test:   ☐ Pre-employment   ☐ Random   ☐ Reasonable Suspicion/Cause   ☒ Post Accident
☐ Return to Duty   ☐ Follow-up   ☒ Other (specify) _Post injury_

E. Drug Tests to be Performed (1) 789100 789100 5-Ext-Bund

F. Collection Site Address:
Family Practice Asoc      Collector Phone No. _334-335-3383_
1704 SE Forest Ave
Luverne   AL   36049      Collector Fax No. _334-335-3083_

## STEP 2: COMPLETED BY COLLECTOR

| Read specimen temperature within 4 minutes. Is temperature between 90° and 100°F? ☒Yes ☐No, Enter Remark | Specimen Collection: ☒Split ☐Single ☐None Provided (Enter Remark) | ☐Observed (Enter Remark) |
|---|---|---|

REMARKS:

## STEP 3: Collector affixes bottle seal(s) to bottle(s). Collector dates seal(s). Donor initials seal(s). Donor completes STEP 5 on Copy 2 (MRO Copy)

## STEP 4: CHAIN OF CUSTODY - INITIATED BY COLLECTOR AND COMPLETED BY LABORATORY

I certify that the specimen given to me by the donor identified in the certification section on Copy 2 of this form was collected, labeled, sealed, and released to the Delivery Service noted in accordance with applicable requirements.

X _Lynn Norman_     Time of Collection _1400_ AM/PM     SPECIMEN BOTTLE(S) RELEASED TO:
Signature of Collector

_Lynn Norman_     _Labcorp_     _Courier_
(PRINT) Collector's Name (First, MI, Last)   Date (Mo/Day/Yr.)     Name of Delivery Service Transferring Specimen to Lab

RECEIVED AT LAB:

X _____     Primary Specimen Bottle Seal Intact     SPECIMEN BOTTLE(S) RELEASED TO:
Signature of Accessioner
☐ Yes
_____     ☐ No, Enter Remark Below
(PRINT) Accessioner's Name (First, MI, Last)   Date (Mo/Day/Yr.)

## STEP 5: COMPLETED BY DONOR

I certify that I provided my urine specimen to the collector; that I have not adulterated it in any manner; each specimen bottle used was sealed with a tamper-evident seal in my presence; and that the information provided on this form and on the label affixed to each specimen bottle is correct.

X _Robin Davis_     _Robin Davis_     _02.07.06_
Signature of Donor     (PRINT) Donor's Name (First, MI, Last)

Daytime Phone No. _334,527-3503_     Evening Phone No. _334,527-3503_     Date of Birth ___ Mo. ___ Day ___ Yr.

Should the results of the laboratory tests for the specimen identified by this form be confirmed positive, the Medical Review Officer will contact you to ask about prescriptions and over-the-counter medications you may have taken. Therefore, you may want to make a list of those medications for your own records. THIS LIST IS NOT NECESSARY. If you choose to make a list, do so either on a separate piece of paper or on the back of your copy (COPY 5). –DO NOT PROVIDE THIS INFORMATION ON THE BACK OF ANY OTHER COPY OF THE FORM. TAKE COPY 5 WITH YOU.

## STEP 6: COMPLETED BY MEDICAL REVIEW OFFICER - PRIMARY SPECIMEN

In accordance with applicable requirements, my determination/verification is:

☐ NEGATIVE   ☐ POSITIVE   ☐ TEST CANCELLED   ☐ REFUSAL TO TEST BECAUSE:
☐ DILUTE     ☐ ADULTERATED   ☐ SUBSTITUTED

Family Practice Asso.
00045
Atwell v. Smart

REMARKS

X _____     X _____     ___/___/___
Signature of Medical Review Officer     (PRINT) Medical Review Officer's Name (First, MI, Last)     Date (Mo/Day/Yr.)

## STEP 7: COMPLETED BY MEDICAL REVIEW OFFICER - SPLIT SPECIMEN

In accordance with applicable requirements, my determination/verification for the split specimen (if tested) is:

☐ RECONFIRMED     ☐ FAILED TO RECONFIRM – REASON _____

X _____     X _____     ___/___/___
Signature of Medical Review Officer     (PRINT) Medical Review Officer's Name (First, MI, Last)     Date (Mo/Day/Yr.)

FORM 650 BC (REVISED 3/01)

LabCo





SOUTHERN DIAGNOSTIC LABORATORIES
2732 7TH AVENUE SOUTH
BIRMINGHAM, AL  35233

2732 7th Ave South
Birmingham, AL 35233
Phone: 205-313-1240
Fax: 205-313-1250



Patient Name: DAVIS ROBIN

Sex/Species: FEMALE
Date of Birth:
Age:
Patient Phone:
Patient ID #:
Med. Rec. #:

Requesting Physician: TOMPKINS M.D.
Accession: A243727
Requisition #:
Collected: 01/24/2006 10:46
Reported: 01/25/2006 07:01

| REQUEST | RESULT | | UNITS | NORMALS | TEST LOC. |
|---|---|---|---|---|---|
| ***Comprehensive Metabolic Panel*** | | | | | |
| SODIUM | 141 | | mmol/L | 135-145 | |
| CHLORIDE | 108 | | mmol/L | 98-109 | |
| POTASSIUM | 4.1 | | mmol/L | 3.5-5.5 | |
| CO2 | 23 | | mEq/L | 21-31 | |
| BUN | 4 | L | mg/dL | 7-25 | |
| CALCIUM | 8.9 | | mg/dL | 8.2-10.0 | |
| CREATININE | 0.6 | | mg/dL | 0.6-1.3 | |
| GLUCOSE | 81 | | mg/dL | 70-105 | |
| PROTEIN,TOTAL | 7.0 | | g/dL | 6.0-8.3 | |
| AST[SGOT] | 20 | | U/L | 13-39 | |
| ALT[SGPT] | 13 | | U/L | 7-52 | |
| ALBUMIN | 4.9 | | g/dL | 3.7-5.3 | |
| ALKALINE PHOSPHATASE | 81 | | U/L | 40-120 | |
| BILIRUBIN, TOTAL | 0.6 | | mg/dL | 0.1-1.2 | |
| ANION GAP | 14.1 | | mmol/L | | |
| OSMOLALITY | 288 | | mOsm/kg | 285-295 | |
| BUN/CREATININE RATIO | 6.7 | | | 6-20 | |
| GLOBULIN | 2.1 | | g/dL | 1.5-4.5 | |
| A/G RATIO | 2.3 | | | 1.1-2.4 | |
| ***TSH*** | | | | | |
| TSH [THIRD GENERATION] | 0.756 | | uIU/mL | 0.4-4.0 | |

_____ ABNORMAL SUMMARY _____

| ***Comprehensive Metabolic Panel*** | | | | | |
|---|---|---|---|---|---|
| BUN | 4 | L | mg/dL | 7-25 | |

PLEASE NOTE: The abnormal summary is supplied as a tool for identifying abnormal results.
All results must still be reviewed as some abnormal results will not be included
due to their interpretive or textual nature.

*** FINAL REPORT ***

Family Practice Asso.
00046
Atwell v. Smart

DAVIS ROBIN



FAMILY PRACTICE ASSOCIATES
1704 SOUTH FOREST AVE
LUVERNE, AL
334-335-3383

```
ID: 000036957                    01-24-06
WB                                 11:28
                                Patient
                                Limits 1
WBC     7.2    x10^3/uL     4.5   10.5
LY     30.8    %           20.5   51.1
MO      4.0    %            1.7    9.3
GR     65.2    %           42.2   75.2
LY#     2.2    x10^3/uL     1.2    3.4
MO#     0.3    x10^3/uL     0.1    0.6
GR#     4.7    x10^3/uL     1.4    6.5
RBC     4.50   x10^6/uL     4.00   6.00
Hgb    13.8    g/dL        11.0   18.0
Hct    42.9    %           35.0   60.0
MCV    95.4    fL          80.0   99.9
MCH    30.8    pg          27.0   31.0
MCHC   32.2 L  g/dL        33.0   37.0
RDW    12.0    %           11.6   13.7
Plt   333.     x10^3/uL    150.   450.
MPV     7.4 L  fL           7.8   11.0
```

Davis, Robin
(Atwell)



WBC HISTOGRAM



RBC HISTOGRAM



PLT HISTOGRAM

Family Practice Asso.
00047
Atwell v. Smart

Charles S. Tompkins, MD
Susan P. Tompkins, CRNP
Djuana L. Burns, CRNP

Family Practice Assoc
1704 South Forest Av
Luverne, AL 36049
Phone 334-335-3383        Fax 334-335-

Urinalysis

ID: Davis, Robin
(Atwell)
022    01-24-06 10:54AM

CLARITY: Clear
COLOR: LT. YELLOW

MULTISTIX 10 SG

GLU   NEGATIVE
BIL   NEGATIVE
KET   NEGATIVE
SG    <=1.005
BLO*  TRACE-INTACT
PH    5.5
PRO   NEGATIVE
URO   0.2 E.U./dL
NIT   NEGATIVE
LEU   NEGATIVE

Family Practice Asso.
00048
Atwell v. Smart



**CRENSHAW COMMUNITY HOSPITAL**
**101 HOSPITAL CIRCLE**
**LUVERNE, AL 36049**
Telephone (334) 335-3374

| PATIENT: | DAVIS, ROBIN O | DOB: | | ROOM#: | 120B |
|---|---|---|---|---|---|
| ACCT#: | 43634 | EXAM: | CHEST | | |
| PHYSICIAN: | TOMPKINS | DATE: | 1-25-06 | X-RAY#: | 41327 |

**CLINICAL HISTORY:   CHEST PAIN**

**EPA AND LATERAL VIEWS OF CHEST:** The heart is normal in size and shape.  No pulmonary infiltration is seen. There is mild scoliosis and there are very mild osteoarthritic changes within the thoracic spine.  No other significant findings are seen.

**T. L. EAKES, M.D.**
**ROENTGENOLOGIST**

TLE/nrh
D:  1-26-06
T:  1-26-06

**RADIOLOGY DEPARTMENT REPORT**
**Page 1 of 1**

Family Practice Asso.
00049
Atwell v. Smart



## CRENSHAW COMMUNITY HOSPITAL
### 101 HOSPITAL CIRCLE
### LUVERNE, AL 36049
#### Telephone (334) 335-3374

| PATIENT: | DAVIS, ROBIN O | DOB: | ROOM#: OP |
| ACCT#: | 40002 | EXAM: LT SHOULDER | |
| PHYSICIAN: | TOMPKINS | DATE: 10-18-05 | X-RAY#: 41327 |

CLINICAL HISTORY: INJURY

SINGLE AP VIEW OF LEFT SHOULDER: No fracture or dislocation involving the left shoulder is evident on this quite abbreviated study. There is an apparent calcified lymph node in the axilla. There is a vague increase in opacity over the left mid to lower lung which could represent some infiltration. No other significant findings are noted.

T. L. EAKES, M.D.
ROENTGENOLOGIST

TLE/nrh
D: 10-18-05
T: 10-18-05

### RADIOLOGY DEPARTMENT REPORT
#### Page 1 of 1

**CRENSHAW COMMUNITY HOSPITAL**
**101 HOSPITAL CIRCLE**
**LUVERNE, AL 36049**
Telephone (334) 335-3374

| PATIENT: | DAVIS, ROBIN O | | | ROOM#: ER |
|---|---|---|---|---|
| ACCT#: | 38368 | EXAM: | T SPINE | |
| PHYSICIAN: | R. SMITH/TOMPKINS | DATE: | 9-10-05 | X-RAY#: 41327 |

CLINICAL HISTORY:  TRAUMA, PAIN

AP, LATERAL AND SWIMMER'S VIEWS OF THORACIC SPINE:  There is mild kyphosis and there are mild osteoarthritic changes within the thoracic spine.  No definite compression fracture or subluxation within the thoracic spine is seen.  There are degenerative changes within the cervical area including interspace narrowing at least at one level.  There is a 1.5 cm in diameter area of calcification overlying the low neck region possibly related to the thyroid gland or a lymph node.  No other significant findings are noted.

T. L. EAKES, M.D.
ROENTGENOLOGIST

TLE/nrh
D: 9-12-05
T: 9-12-05

RADIOLOGY DEPARTMENT REPORT
Page 1 of 1

Family Practice Asso.
00051
Atwell v. Smart

# Family Practice Associates

Name _Robin Davis_      Date of birth _11-16-73_

| CHRONIC ILLNESSES | SURGERY |
|---|---|
| Mitral Valve | |
| Hypo Ancemia | |
| Fibro Mialgia | |
| Iron Overload | |
| ~~Bi Polar~~ | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

ALLERGIES: _Skelafin - (legs stinging)_
_Compazine_
_? Aminophylline_

SMOKER: YES/NO _____ PACK-YEARS     ETOH: YES/NO _____ AMT

FAMILY HISTORY: _____

| STUDIES | PREVENTION | |
|---|---|---|
| | FLU | |
| | PNEUMO | |
| | TETANUS | |
| | COLON | |
| | BONE DENSITY | |
| | BREAST EXAM/MAMMO | |
| | PAP | |
| | | |
| | | |

Family Practice Asso.
00052
Atwell v. Smart

CRENSHAW COMMUNITY HOSPITAL

PHYSICAL THERAPY EVALUATION

PATIENT NAME: Atwell, Robin    DOB    AGE:    SEX- M/F

OCCUPATION: homemaker    PHYSICIAN: Dr Tompkins

DIAGNOSIS: cervical sprain S/P MVA    ONSET: 3/17/07

PHYSICIANS ORDERS: evaluate/tx

PAST MEDICAL HISTORY: ®RC tear; ®chest implant rupture, ®knee contusion, other injuries in MVA: liver contusion,

PRIOR FUNCTIONAL LEVEL: Ⓘ

SUBJECTIVE: was hit on driver's side of vehicle (was driving)

PAIN: Location ①cervical → mid thoracic, ②deltoid

   Type aches    Intensity (0-10)

   Factors influence pain neck movements, prolonged sitting

   Current pain management rest, meds (was on flexeril but stopped taking it).

OBJECTIVE:

   Mental Status A & O x3

   V/S: BP (L/R) supine —    Sit —    Stand —

   Pulse —  (Reg/Irreg) Respirations —    (labored/unlabored)

   Neurological: Tone WNL    DTR intact

   Sensation intact

   Bowel/Bladder intact

   Other



EXHIBIT
26

Skin integrity: intact ✓  Wounds _____ (See wound report) turgor _good_

Edema: pitting/non-pitting  Location ®knee _____ Degree _mild_

Vascular Doppler ABI  N/A _____

Peripheral pulses palpable N/T  ®)  N/T    (L) non palpable  ®) _____
(L)

Varicosities  N/T _____

Rubor  ⊖ _____  Claudications  ⊖ _____

RANGE OF MOTION:

RUE: WNL ✓ _____ WFL _____ Limitations _____

LUE: WNL ✓ _____ WFL _____ Limitations _____

RLE: WNL ✓ _____ WFL _____ Limitations _____

LLE: WNL ✓ _____ WFL _____ Limitations _____

Cervical: WNL rotation ® _____ WFL _____ Limitations rotation ® 65° (A) 72°(P)
lat. tilt, flex, ext

Trunk: WNL ✓ _____ WFL _____ Limitations _____

Comments: c/o ® mid/lower cervical pain c and ↓ range of rotation to ®. combination movements of cervical flex in, lat tilt to ® cause ↑ in Sx on ®cervical.

Posture: Sitting  forward head position

Standing  WNL

Comments _____

_____

_____

STRENGTH:

RUE: WNL _____ ✔ _____ WFL _____ Limitations _____

LUE: WNL _____ ✔ _____ WFL _____ Limitations _____

RLE: WNL _ NT _ WFL _____ Limitations _____

LLE: WNL _ NT _ WFL _____ Limitations _____

Cervical WNL _____ WFL ✔ (4-5) _____ Limitations _____

Trunk WNL _ NT _ WFL _____ Limitations _____

Comments: c/o ↑ ⓇL mid/lower cervical pain on ipsilateral rotation, lat. tilt to Ⓡ _____

_____

Balance: Sitting Good ✔ Fair _____ Poor _____ Comments _____

Standing Good ✔ Fair _____ Poor _____ Comments _____

Crenshaw Community Hospital
00004
Atwell v. Smart

Functional assessment (I) independent (SBA) stand-by assist (CGA) contact guard assist (MN) minimal assist (MO) moderate assist (MX) maximal assist (UN) unable

Bed Mobility: Turning ___I___     Bridging ___I___     Supine to sit ___I___

Sit to supine ___I___

Transfers: weight bearing status ___FWB___     (R/L) assistive device ___∅___

Slide _____     Stand/pivot ___I___

Ambulation: weight bearing status ___FWB___     (R/L) ___∅ AD___

Assistance required ___I___     Endurance ___1000___ Ft

Gait pattern ___RLWG___ (FD)

ADLS: Feeding ___I___     Grooming ___I___     Toileting ___I___     Bathing ___I___

Dressing ___I___     Comments _____

Special Tests: cervical flexion ⊕ for (R) cervical paraspinal pain. cervical rotation is also ⊕ č less intensity. Cervical compression is ⊕ for ↑. There is ∅ SX on palpation of paraspinal area.

Assessment: ↓ ROM, strength; poor postural habits S/P MVA č cervical sprain

Plan: Therapeutic exercise ( ✓ ) Transfer/bed mobility ( ) Balance exercise ( ) Gait training ( )

Family/patient education ( ) modalities ( ✓ ) U.S.

Other ( ) _____

Frequency/duration ~~3/wk x 3~~ (FD) 3x/wk x 3

Crenshaw Community Hospital
00005
Atwell v. Smart

GOALS: Short Term 1) reduce pain  2) cervical rotation to ® 75° (R) 50°(L)
3) 4/5 cerv. strength                (2 wks)

Long Term 1) rest HEP  2) cervical AROM WNL  3) 5/5 cerv. strength

4) assume full activities  5) pt demonstrates proper posture/body mechanics
(4 wk)

Rehabilitative potential: Good (✓)  Fair ( )  Poor ( )

_____          _____
Therapist                                       Date  8/9/07

Crenshaw Community Hospit
00006
Atwell v. Smart

CRENSHAW COMMUNITY HOSPITAL
Luverne, Alabama

PHYSICAL-OCCUPATIONAL THERAPY
Progress Notes

| Date | |
|---|---|
| 5/10/07 | Atwell Robin<br>S: "My neck & knee are bothering me some this morning!"<br>O: Pt receives US x 8 mins @ 1.0 w/cm² to cervical & paraspinal region(s) while seated. Pt to ther excs per flow sheet x 10 mins<br>A: HEP is established & pt instructed to perform excs daily<br>P: Cont tx per POC    Monica Shirley, LPTA |
| 5/11/07 | S: Pt reports persistant ® cervical pain on prolnged sitting.<br>O: pt is instructed in proper sitting posture c lumbar roll. She receives US @ 1.2 w/cm² x 8 min to ® cervical & upper thoracic paraspinal areas seated c lumbar roll in position. Pt then performs therex per flow sheet x 24 min.<br>A: tolerates tx well<br>P: cont per POC |
| 5/14/07 | Pt called & cancelled p.m. appt & R/S for 5/15/07    Monica Shirley, LPTA |
| 5/15/07 | Pt called & cancelled p.m. appt 2° sickness    Monica Shirley, LPTA |

Physical-Occupational Therapy Progress Notes

Crenshaw Community Hospital
00007
Atwell v. Smart

61987

TREATMENT

| DATE: | 5/9 | 5/10 | 5/11 | 5/14 | 5/16 | | | | | | | | |
|-------|-----|------|------|------|------|--|--|--|--|--|--|--|--|
| **MODALITIES** | | | | | | | | | | | | | |
| Evaluation | ✓ | ✓ | | ✓ | | | | | | | | | |
| US | ✓ | ✓ | | | | | | | | | | | |
| TE | ✓ | | ✓ | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |

ENT: Atwell, Robin

**EXERCISES:**

| | | | | | | | | | | | | | |
|--|--|--|--|--|--|--|--|--|--|--|--|--|--|
| Sidelying lat flt 3x a | | 2# X10 | | | | | | | | | | | |
| Supine chin tucks 7# | | X10 | | | | | | | | | | | |
| lat flt stress X5 | | X10 | | | | | | | | | | | |
| Levator scular | | X10 | | | | | | | | | | | |
| Supine chin Tuck c̄ ✓ | | 2# | | | | | | | | | | | |
| prone chin tuck c̄ / | | X10 | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| Scap retraction | | quff X10 | | | | | | | | | | | |

Crenshaw Community Hospit:
00008
Atwell v. Smart

Crenshaw Community Hospital
00009
Atwell v. Smart

4/327  US/xray

| CRENSHAW COMMUNITY HOSPITAL | 101 HOSPITAL CIRCLE | LUVERNE | AL 36049 | |
|---|---|---|---|---|

EMERGENCY ROOM • OUTPATIENT RECORD

| SUB TYPE | SERVICE | EFFECT DATE | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | ULTRASOU | 5/08/07 | 159 | | | | | | | |

| PATIENT NUMBER | TYPE | PATIENT NAME | | AGE | BIRTHDATE | SEX | R/S | DATE OF SERVICE | TIME | CLERK INIT. |
|---|---|---|---|---|---|---|---|---|---|---|
| 061961 | 2 | ATWELL ROBIN O | | | | F | S1 | 5/08/07 | 13:01 | SLA |

| ADDRESS - LINE 1 | ADDRESS - LINE 2 | CITY | STATE | ZIP CODE | TELEPHONE |
|---|---|---|---|---|---|
| | | | AL | | 335-3501 |

| PATIENT SSAN | NOTIFY IN CASE OF EMERGENCY - NAME | RELATIONSHIP | ADDRESS | TELEPHONE |
|---|---|---|---|---|
| | EDISON JANICE | 5278853 | | 527-8853 |

| INSURANCE COMPANY | | CONTRACT OR GROUP NUMBER | DATE | PLACE |
|---|---|---|---|---|
| | | | TIME | EVENT |

| GUARANTOR NAME | GUARANTOR ADDRESS | CITY | STATE | ZIP CODE | GUAR. TELEPHONE |
|---|---|---|---|---|---|
| ATWELL ROBIN O | 9133 W EMMETT AVE | BRANTLEY | AL | 36009 | 335-3501 |

| GUARANTOR EMPLOYER | GUARANTOR OCCUPATION | GUAR. EMPLOYER ADDRESS | GUA. EMP. TELEPHONE |
|---|---|---|---|
| NONE | | | |

| PREV. SERVICE | PREV. SERV. DATE | IF MINOR - PARENT NAME | MED. REC. # | ADMITTING/2ND PHYSICIAN |
|---|---|---|---|---|
| 059493 | 3/05/07 | | 41327 | THOMPKINSS/TOMPKINS C |

| CHARGES | X-RAY | LAB | RESP. TH. | PHY. TH. | EKG | I.V. | DRUGS | SUPPLIES | OTHER | M.D. | E.R. RM | TOTAL DUE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | |

AUTHORIZATION FOR TREATMENT, GUARANTEE OF PAYMENT, ASSIGNMENT OF INSURANCE BENEFITS

1. the undersigned has been informed of the emergency treatment considered necessary for the above named patient, and that treatment and procedures will be performed by physicians, members of house staff and employees of the hospital. Authorization is hereby granted for such treatment and procedures. The undersigned has read the above authorization and understands the same and certifies that no guarantee or assurance has been made as to the results that may be obtained.
2. The undersigned agrees to pay for services rendered by hospital upon release of patient.
3. I/we hereby assign any hospital benefits, sick benefits, injury benefits due to a liability of a third party, payable by any party, for the above patient, to hospital unless I pay the account in full upon release of patient. I/we hereby authorize the Administrator of Hospital to furnish from its records any information requested by the below realized insurance companies in connection with the above assignment. I do hereby appoint the "Controller" of Hospital as my lawful attorney to endorse for me any checks made payable to me for benefits or claims collected under the above assignment and to apply any credit balance to any other account I may owe said hospital.

| DATE | TIME | SIGNED PATIENT | SIGNED GUARANTOR |
|---|---|---|---|

CHIEF COMPLAINT (If Accident State How, When, and Where)          ADVANCED DIRECTIVE  U

| TEMP. | PULSE | RESP. | B/P | ALLERGIES | MEDICATIONS - NONE | E.R. PHYSICIAN | PHY. TOX. |
|---|---|---|---|---|---|---|---|

NURSES NOTES:

NURSE'S SIGNATURE (RN OR LPN)

LAB DATA (Including X-Rays, EKGs, etc.)

PHYSICIAN'S REPORT

# DIAGNOSIS:

TREATMENT:

| | CONDITION ON DISC |
|---|---|
| | IMP  STABLE  EXPIRED |

INSTRUCTIONS TO PATIENT:

Crenshaw Community Hospital
00010
Atwell v. Smart

FOLLOW-UP WITH

M.D

M.D

PATIENT'S SIGNATURE ON DISCHARGE
BY SIGNING HERE I CERTIFY THAT I UNDERSTAND THE FOLLOW-UP
INSTRUCTIONS RECEIVED BY ME IN WRITING, WHICH HAVE BEEN EXPLAINED TO ME.

DATE - TIME OF DISC.

PHYSICIAN'S SIGNATURE

ATWELL ROBIN O
DOB - 
MR# 41327
AR# 061961
ADMIT DATE: 5/08/07

**CRENSHAW COMMUNITY HOSPITAL**
**101 Hospital Circle**
**Luverne, Alabama 36049**
**Telephone: (334) 335-3374**
**Fax: (334) 335-5636** _____ HOSPITAL

## AUTHORIZATION FOR EMERGENCY TREATMENT

1. The undersigned has been informed of the emergency treatment considered necessary for the patient whose name appears on the reverse hereof and that the treatment and procedures will be performed by physicians, members of the house staff and employees of the hospital. Authorization is hereby granted for such treatment and procedures.

2. MEDICARE - MEDICAID PATIENT'S CERTIFICATION: Authorization to release information and payment request. I certify that the information given by me in applying for payment under Titles XVIII and XIX of the Social Security Act is correct. I authorize release of all records required to act on this request. I request that payment of authorized benefits be made on my behalf.

3. ASSIGNMENT OF INSURANCE BENEFITS: I hereby authorize payment directly to _____ Hospital of hospital benefits otherwise payable to me including major medical insurance and payment of surgical or medical benefits, including major medical, directly to the attending physician but not to exceed regular charges for these services. I understand that I am financially responsible to the hospital and physician for charges not covered by this assignment.

4. AUTHORIZATION FOR RELEASE OF MEDICAL INFORMATION: The hospital and attending physician are authorized to furnish any medical information requested by insurance companies with whom I have coverage or any public agency which may be assisting in payment for my care.

5. REFUND OF INSURANCE BENEFITS: I authorize the refund of overpaid insurance benefits in accordance with my insurance policy conditions where my coverages are subject to a coordination of benefits clause.

6. I understand that health care services paid under Medicare, Medicaid, and maternal and child health programs are subject to review by the Professional Standards Review Organization.

_5/8/07_____   ___SM___   x _Rob O Atwell_____
Date            Witness           Patient

_____   _____   _____   _____
Date            Witness           Responsible Party      Relationship to Patient

Crenshaw Community Hospital
00011
Atwell v. Smart

## Family Practice Associates, LLC

1704 South Forest Ave.
Luverne, AL 36049

Work Phone: (334) 335-3383
Fax: (334) 335-3078

Date: 05/07/2007

### Referral Letter

From: Susan Tompkins, CRNP

To: CRENSHAW COMM HOSP
101 HOSPITAL CIRCLE
LUVERNE, 36049

Phone: 334-335-3374

Patient: ATWELL, ROBIN

MRN: 106303

Insurance Information:

Physician Assessments:
782.4    JAUNDICE UNSPEC
786.05   SHORTNESS OF BREATH

Appointment Date:   May 8 2007 1:00PM
Ins Referral Num.:
No of Visits:

Comments:   Ultrasound Abdomen /
Cardiac Echo

_Susan P. Ipki CRNP_

Susan Tompkins, CRNP

1 of 1

Crenshaw Community Hospital
00012
Atwell v. Smart

# Family Practice Associates, LLC

1704 South Forest Ave.
Luverne, AL 36049

Work Phone:  (334) 335-3383
Fax:  (334) 335-3076

Date: 05/07/2007

## Referral Letter

From:  Susan Tompkins, CRNP

To:  CRENSHAW COMM HOSP
101 HOSPITAL CIRCLE
LUVERNE, 36049

Phone: 334-335-3374

Patient:  ATWELL, ROBIN

MRN: 106303

Insurance Information:

Physician Assessments:
786.05   SHORTNESS OF BREATH

Appointment Date:  May 8 2007  1:00PM
Ins Referral Num.:
No of Visits:

Comments:  Chest x-ray

Susan P. Zpki CRP

_____

Susan Tompkins, CRNP

1 of 1

Crenshaw Community Hospital
00013
Atwell v. Smart

02/18/2005 18:08 FTP RSI                                    @008/008

Crenshaw Community - OP-Routine

# ABDOMINAL ULTRASOUND

**EXAM DATE:** 5-8-07

**PATIENT NAME:** Atwell, Robin        **MR #:** 41327

**DOB:** _____        **AGE:** _____        **MALE /** (FEMALE) (circle one)

**REFERRING MD:** Tompkins        **PHONE:** (334) 335-3383

**CLINICAL HISTORY:** Automobile accident January 2007

**LIVER**                                      **SPLEEN**

(NORMAL)        ABNORMAL              (NORMAL)        ABNORMAL

MASSES: SINGLE    MULTI            SAG: 103.5 mm

COMMENTS: _____                    TRV: 47.9    AP: 46.0 mm

_____                              COMMENTS: _____

**GALLBLADDER**                               **PANCREAS**

(NORMAL)        ABNORMAL              (NORMAL)        NON-VISIBLE

WALL N/A mm    CHD: 3.1 mm          MASSES: SINGLE    MULTI

CALCULI: SINGLE    MULTI            COMMENTS: _____

COMMENTS: Removed                   _____

**RIGHT KIDNEY**                              **LEFT KIDNEY**

(NORMAL)        ABNORMAL              (NORMAL)        ABNORMAL

SAG: 114.3 mm                        SAG: 116.5 mm

AP: 41.0 mm                          AP: 46.9 mm

TRV: 60.0 mm                         TRV: 59.8 mm

**VASCULAR**

**PROX AORTA**            **MID AORTA**            **DISTAL AORTA**

AP 14.5 mm            AP 12.9 mm            AP 11.5 mm

TRV: \ mm            TRV: \ mm            TRV: \ mm

Crenshaw Community Hospital
00014
Atwell v. Smart

# Crenshaw Community Hospital

101 Hospital Circle
Luverne AL36049
334-335-3374 FAX: 334-335-1140

PATIENT NAME: ATWELL, ROBIN

DATE OF BIRTH:

MRN:            41327

ACCOUNT NUMBER: 61961

EXAM DATE:     5-08-2007

ORDERING PHYSICIAN: TOMPKINS, CHARLES

PRIMARY CARE PHYSICIAN:

ACCESSION NUMBER: A189552

PATIENT LOCATION:  OUTPATIENT

FLOOR/ROOM:

EXAM DESCRIPTION: US ABDOMEN COMPLETE

---

**HISTORY:** Abdomen pain, automobile accident January 2007.

**TECHNIQUE:** Multiplanar sonographic imaging of the abdomen was performed.

**FINDINGS:** Evaluation of the liver demonstrates normal homogenous echogenicity. No focal hepatic lesions are identified. No intrahepatic ductal dilatation is seen.

The gallbladder surgically absent. The common bile duct measures approximately 3.1 mm and is within normal limits.

Evaluation of the kidneys demonstrates the right renal size at  11.4 x 4.1 x 6.0 cm . The left kidney measures 11.7 x 4.7 x 6.0 cm in size. No evidence for hydronephrosis. No renal masses or renal calculi are seen.  Both kidneys demonstrate normal cortical echogenicity and cortical thickness.

The spleen measures 10.4 x 4.8 cm and is within normal limits. The pancreas is within normal limits.  No focal splenic or pancreatic mass is seen.

Evaluation of the abdominal aorta demonstrates no evidence for abdominal aortic aneurysm.


**IMPRESSION:**
CHOLECYSTECTOMY. OTHERWISE UNREMARKABLE ABDOMINAL ULTRASOUND.



Dictated and Electronically Signed:  Raja P. Reddy, MD  RSI Staff Radiologist
  5-08-2007   4:18 pm      Turnaround: 0 Hrs 12 Minutes




Professional interpretation by RSI (Reddy Solutions, Inc.)    *Innovative Radiology Solutions*

621 North Ave., Suite C-30 o Atlanta, GA  30308 o Phone (678) 904-6820 o (888) 906-3304 o Fax (678) 904-6824

Crenshaw Community Hospital
00015
Atwell v. Smart

**Crenshaw Community Hospital**
101 Hospital Circle
Luverne AL 36049
334-335-3374  FAX: 334-335-1140

PATIENT NAME: ATWELL, ROBIN

DATE OF BIRTH:

MRN:             41327

ACCOUNT NUMBER: 61961

EXAM DATE:     5-08-2007

ORDERING PHYSICIAN: TOMPKINS, CHARLES

PRIMARY CARE PHYSICIAN:

ACCESSION NUMBER: A189402

PATIENT LOCATION:  OUTPATIENT

FLOOR/ROOM:

EXAM DESCRIPTION: XR CHEST (2 VIEWS)

---

HISTORY:  Chest pain.

CHEST X-RAY

TECHNIQUE: PA and lateral views of the chest are submitted for evaluation. No priors for comparison.

FINDINGS: Evaluation of the chest demonstrates a normal cardiomediastinal silhouette. The trachea is midline. Bilateral breast augmentations are demonstrated. The lungs are clear without evidence for an infiltrate.  No pleural effusion or pneumothorax is identified.  No acute bony abnormality is seen.

IMPRESSION:
NEGATIVE CHEST X-RAY.

Raja P. Reddy, MD  RSI Staff Radiologist
Thank you for allowing us to participate in the care of your patient.
This report e-signed, verified and authenticated by physician on:
 5-08-2007   4:46 pm     Turnaround: 2 Hrs 33 Minutes

Crenshaw Community Hospital
00016
Atwell v. Smart

Professional interpretation by RSI (Reddy Solutions, Inc.)   *"Innovative Radiology Solutions"*

621 North Ave., Suite C-30 o Atlanta, GA  30308 o Phone (678) 904-6820 o (888) 906-3304 o Fax (678) 904-6824

410860

CRENSHAW COMMUNITY HOSPITAL     101 HOSPITAL CIRCLE     LUVERNE     AL 36049

| BOX TYPE | SERVICE LAB | EFFECT DATE 3/05/07 | 306 | | | | EMERGENCY ROOM • OUTPATIENT RECORD |
|---|---|---|---|---|---|---|---|

| PATIENT NUMBER 059493 | TYPE 2 | PATIENT NAME ATWELL ROBIN O | | AGE | BIRTHDATE | SEX F | H/S 81 | DATE OF SERVICE 3/05/07 | TIME 15:38 | CLERK INIT. SM |
|---|---|---|---|---|---|---|---|---|---|---|

ADDRESS - LINE 1     ADDRESS - LINE 2     CITY     STATE AL   ZIP CODE     TELEPHONE 335-3501

PATIENT SSAN    NOTIFY IN CASE OF EMERGENCY - NAME EDISON JANICE    RELATIONSHIP 5278853    ADDRESS    TELEPHONE 527-8853

INSURANCE COMPANY Private Pay

CONTRACT OR GROUP NUMBER    DATE    PLACE

GUARANTOR NAME ATWELL ROBIN O    GUARANTOR ADDRESS    CITY    STATE AL   ZIP CODE    GUAR. TELEPHONE 335-3501

GUARANTOR EMPLOYER NONE    GUARANTOR OCCUPATION    GUAR. EMPLOYER ADDRESS    GUAR. EMPL. TELEPHONE

PREV. SERVICE 050266    PREV. SERV. DATE 7/08/06    IF MINOR - PARENT NAME    MED. REC. # 41327    ADMITTING/2ND PHYSICIAN KING E /KING E

| CHARGES | X-RAY | LAB | RESP. TH. | PHY. TH. | EKG | I.V. | MEDS | SUPPLIES | OTHER | M.D. | E.R. RM | TOTAL DUE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

DATE    TIME    SIGNED PATIENT    SIGNED GUARANTOR

CHIEF COMPLAINT (If accident State How, When, and Where)    ADVANCED DIRECTIVE U

| TEMP. | PULSE | RESP. | B/P | ALLERGIES | MEDICATIONS - NONE | M.R. PHYSICIAN | EXT. TO |
|---|---|---|---|---|---|---|---|

NURSES NOTES:

NURSE'S SIGNATURE (RN OR LVN)

LAB DATA (Including X-Rays, EKGs, etc.)    Wet prep DNA probe

PHYSICIAN'S REPORT

61610

# DIAGNOSIS:

TREATMENT:

INSTRUCTIONS TO PATIENT:    CONDITION ON DISC. IMP STABLE EXP

FOLLOW-UP WITH

PATIENT'S SIGNATURE ON DISCHARGE    DATE - TIME OF DISC.    PHYSICIAN'S SIGNATURE

Crenshaw Community Hospital
00017

**CRENSHAW COMMUNITY HOSPITAL**
101 Hospital Circle
Luverne, Alabama 36049
Telephone: (334) 335-3374    HOSPITAL
Fax: (334) 335-5636

ATWELL ROBIN O
DOB -
MR# 41327
AR# 059493
ADMIT DATE: 3/05/07

## AUTHORIZATION FOR EMERGENCY TREATMENT

1. The undersigned has been informed of the emergency treatment considered necessary for the patient whose name appears on the reverse hereof and that the treatment and procedures will be performed by physicians, members of the house staff and employees of the hospital. Authorization is hereby granted for such treatment and procedures.

2. MEDICARE - MEDICAID PATIENT'S CERTIFICATION: Authorization to release information and payment request. I certify that the information given by me in applying for payment under Titles XVIII and XIX of the Social Security Act is correct. I authorize release of all records required to act on this request. I request that payment of authorized benefits be made on my behalf.

3. ASSIGNMENT OF INSURANCE BENEFITS: I hereby authorize payment directly to _____
Hospital of hospital benefits otherwise payable to me including major medical insurance and payment of surgical or medical benefits, including major medical, directly to the attending physician but not to exceed regular charges for these services. I understand that I am financially responsible to the hospital and physician for charges not covered by this assignment.

4. AUTHORIZATION FOR RELEASE OF MEDICAL INFORMATION: The hospital and attending physician are authorized to furnish any medical information requested by insurance companies with whom I have coverage or any public agency which may be assisting in payment for my care.

5. REFUND OF INSURANCE BENEFITS: I authorize the refund of overpaid insurance benefits in accordance with my insurance policy conditions where my coverages are subject to a coordination of benefits clause.

6. I understand that health care services paid under Medicare, Medicaid, and maternal and child health programs are subject to review by the Professional Standards Review Organization.

3/5/07        _____        *Specimen Only*
Date               Witness                Patient

_____     _____     _____     _____
Date               Witness         Responsible Party        Relationship to Patient

Patient Information for Account: 002019

Page 1

```
  Patient Demographics ————————      Guarantor Demographics
 1 Name...:  ATWELL ROBIN            20 Guarantor:   ATWELL ROBIN
 2 Sec Nam:                          21 Address1.:
 3 Sex....:  F                       22 Address2.:
 4 Birth..:                          23 City.....:
 5 Doctor.:  002 KING ELIZA          24 State....:
 6 Marital:                          25 Zip......:
 7 Race...:                          26 Employer.:
 8 Soc Sec:                          27 Guar SSN.:
 9 Home Ph:   3344030787            —  Billing Information ————————
10 Busi Ph:                          30 Cycle Code...:      33 Sig on File.:   Y
11 Addr1..:                          31 Bill Type....:      34 Collect Code:
12 Addr2..:                          32 Credit Switch:
13 City...:                         —  Service Information ————————
15 Zip....:                          41 Patient Type.:     PP
16 M/R Num:                          42 Referring Phy:
17 Priv Dt:  061606                  43    Diagnosis:
                                    44 Referring Phy:
     Account Setup  6/16/06          45    Diagnosis:

18 Email..:
  Enter:     (   0-Next    PgDn    "ALL"    "DEL"    S-Pat Funct    "T"ran Entry    )-
```

Crenshaw Community Hospital
00019
Atwell v. Smart

3/5/07

## Crenshaw Community Hospital

### OUTPATIENT PROCEDURE REQUEST FORM

**Patient Name:** Robin Atwell          **SSN No.** _____

**Date of Birth:** _____          **Phone Number:** _____

**Insurance:** _____          **Physician Sig.** _____

## LABORATORY

[ ]CBC
____789.00 Abdominal Pain
____285.9 Anemia
____780.6 Fever
____780.79 Fatigue/Malaise
____783.21 Weight Loss
____716.90 Arthritis
____v58.69 Long term medication use

[ ]Protime/PTT
____427.31 Atrial Fibrillation
____428.0 CHF
____v58.61 Anti-Coagulant use
____414.00 ASHD
____784.7 Epistaxis
____414.9 CAD

[ ]Thyroid Profile
____780.79 Fatigue
____242.90 Hyperthyroidism
____244.9 Hypothyroidism
____ Other
____799.2 Nervous
____783.21 Weight Loss
____783.1 Weight Gain

[ ]Basic Metabolic Panel
____401.9 Hypertension
____584.9 Acute Renal Failure
____585 Chronic Renal Failure
____780.39 Seizure Disorder
____780.4 Vertigo
____782.3 Edema
____v58.69 Long term medication use

[ ]Hepatic Panel
____789.01 RUQ Abd Pain
____789.06 Epigastric Pain
____789.05 Periumbilical Pain
____571.5 Cirrhosis
____v58.69 Long term medication use
____782.4 Jaundice

[ ]Lipid Panel
____401.9 Hypertension
____272.0 Hypercholesterolemia
____250.00 NIDDM
____250.01 IDDM
____428.0 CHF
____786.50 Chest Pain

[ ]Digoxin Level
____427.31 A. Fib
____429.3 Cardiomegaly
____428.0 CHF
____v58.69 Long term med use

[ ]PSA
____790.93 Elevated PSA
____239.5 Prostate CA
____596.0 Bladder Neck
      Obstruction
____v10.46 Personal Hx
      Prostate CA

[ ] Comp Met Profile
____ Other

[ ]Urinalysis
____250.00 NIDDM
____599.0 UTI
____599.7 Hematuria
____595.9 Cystitis
____788.1 Pain/Urin
____789.00 Abd pain

wet prep          616.10
DNA probe

Crenshaw Community Hospital
00020

## Radiology/Other

[  ]Chest X-Ray
__786.50 Chest Pain
__486 Pneumonia
__780.6 Fever
__786.2 Cough
__786.05 SOB
__401.9 HTN
__414.00 ASHD
__427.31 A.Fib
__493.90 Asthma
__466.0Acute Bronchitis
__786.07 Wheezing
__496 COPD

[  ]EKG
__786.50 Chest Pain
__428.0 CHF
__401.9 HTN
__780.2 Syncope
__786.09 Dyspnea

[  ]Mammogram
__v76.12 Routine
__610.1 Fibrocystic Breast Ds
__611.72 Breast Mass

[  ]CT Scan
__435.9 TIA
__780.2 Syncope
__784.0 Headache
__780.39 Convulsions
__436 CVA
__789.00 Abd Pain
__298.9 Psychosis
__295.90 Schizophrenia
__295.70 Schizo-affective

[  ]Other X-Ray
_____
_____Diagnosis_____

[  ]Ultrasound
_____
_____Diagnosis_____

[  ]Nuclear Medicine
_____
_____Diagnosis_____

Atwell Robin

NAME:       ATWELL ROBIN O    41327
ROOM #      058493
HOSP #      DOE          F   03/05/07
DOB:        KING/KING                    FCC
PHYSICIAN:

LAB #
SPECIMEN TYPE            Pt Dr'd

DATE/TIME DESIRED      PRIORITY   ☐ ROUTINE   ☐ ASAP
                                  ☐ STAT      ☐ PRE-OP

COLLECTION DATE   COLLECTION TIME      INITIALS OR COLLECTOR
3/5/07            1515                 F King

☐ CULTURE & SENSITIVITY      ☐ MONO TEST
☐ GRAM STAIN                 ☐ OTHER
☐ WET PREP
☐ KOH PREP
☐ GC/CHLMYDIA ANTIGEN

Small bacteria          1-4 clue cells

15-30 RBC's             No UTICH

0-2 WBC's               No yeast

CRENSHAW COMMUNITY HOSPITAL
LUVERNE, AL 36049

TECH  F Commander

DATE/TIME REPORTED
3/5/07   1530

MISCELLANEOUS

[Paste 1st report 3½"]

To this sheet are attached the various analysis slips which come from
the laboratory. In the laboratory the analysis slips are made out in
triplicate, duplicate or single. The original is gummed along the
five-inch side and when received at the nurses' station is attached to
this chart laboratory sheet by the gummed margin. The first report
received is attached at the bottom line of this sheet and others above
this, leaving 3/8 inch of earlier report exposed in each case.

Name - Last              First              Middle              Hospital No.

Location of Hospital              Clin or Service     Attending Physician

Crenshaw Community Hospital
00032
Atwell v. Smart

# CLINICAL LABORATORY REPORTS



2732 7th Ave South
Birmingham, AL 35233
Phone: 205-313-1240
Fax: 205-313-1250

SOUTHERN DIAGNOSTIC LABORATORIES
2732 7TH AVENUE SOUTH
BIRMINGHAM, AL 35233

| Patient Name | | |
|---|---|---|
| ATWELL, ROBIN O | | |

| Sex/Species: | Date of Birth: | Age: |
|---|---|---|
| FEMALE | | -- |

| Patient Phone: | Patient ID #: | Med. Rec. #: |
|---|---|---|
| | | 059493 |

Requesting Physician: DOCTOR
Accession: A497011
Requisition #: 105743
Collected: 03/05/2007 15:10
Reported: 03/07/2007 16:54

| REQUEST | RESULT | UNITS | NORMALS | TEST LOC. |
|---|---|---|---|---|
| CHLAMYDIA TRACHOMATIS, DNA PROBE | NEGATIVE | | | BHAM |
| NEISSERIA GONORRHOEAE, DNA PROBE | NEGATIVE | | | BHAM |

Test Site Codes:
BHAM SOUTHERN DIAGNOSTIC LABORATORIES - 2732 7TH AVENUE SOUTH     BIRMINGHAM, AL 35233 205-313-1240 CLIA# 01D1015388
*** FINAL REPORT ***

| ATWELL, ROBIN O | | Page 1     (LAST) |
|---|---|---|

Crenshaw Community Hospital
00023
Atwell v. Smart

CRENSHAW COMMUNITY HOSPITAL    101 HOSPITAL CIRCLE    LUVERNE    AL 3604_

**EMERGENCY ROOM • OUTPATIENT RECO_**

| PATIENT NUMBER | TYPE | PATIENT NAME | AGE | BIRTHDATE | SEX | M/S | DATE OF SERVICE | TIME | CLERK INT. |
|---|---|---|---|---|---|---|---|---|---|
| 050266 | 3 | DAVIS ROBIN O | | | F | S1 | 7/08/06 | 03:43 | GW |

| PATIENT ADDR | ADDRESS - LINE 2 | CITY | STATE | ZIP CODE | TELEPHONE |
|---|---|---|---|---|---|
| | | | AL | | |

| NOTIFY IN CASE OF EMERGENCY – NAME | RELATIONSHIP | ADDRESS | TELEPHONE |
|---|---|---|---|
| EDISON JANICE | 5278853 | | 527-885_ |

| INSURANCE COMPANY | CONTRACT OR GROUP NUMBER | DATE 7/08/06 | PLACE OTHER ACCIDENT |
|---|---|---|---|
| | | TIME 03:30 | EVENT FELL |

| GUARANTOR NAME | GUARANTOR ADDRESS | CITY | STATE | ZIP CODE | GUAR. TELEPHONE |
|---|---|---|---|---|---|
| DAVIS ROBIN O | PO BOX 443 | BRANTLEY | AL | 36009 | 335-3501 |

| GUARANTOR EMPLOYER | GUARANTOR OCCUPATION | GUAR. EMPLOYER ADDRESS | GUAR. EM. TELEPHONE |
|---|---|---|---|
| NONE | | | |

| EMV. SERVICE | PREV. SERV. DATE | IF MINOR – PARENT NAME | MED. REC. # | FAMILY PHYSICIAN |
|---|---|---|---|---|
| 049371 | 6/13/06 | | 41327 | OZAIR SADA/TOMPKINS |

**CHARGES** | X-RAY | LAB | RESP. TH. | PHY. TH. | EKG | O2 | DRUGS | SUPPLIES | M.D. | E.R. RM | TOTAL DU

AUTHORIZATION FOR TREATMENT, GUARANTEE OF PAYMENT, ASSIGNMENT OF INSURANCE BENEFITS

CHIEF COMPLAINT (If Accident State How, When, and Where)

**NURSES NOTES:** Fell 3 ft off door steps — pain (R) & back & hip — not moving legs — Doesn't feel anything to feet & legs.

LAB DATA (Including X-Rays, EKGs, etc.)

C-spine, CXR, Pelvis, L-S spine.

PHYSICIAN'S REPORT:

DIAGNOSIS: Fall
— Back Sprain 2° to Fall

TREATMENT:
— OTC pain meds.

INSTRUCTIONS TO PATIENT:

Crenshaw Community Hospital
00024
Atwell v. Smart

7/8/06    0610

_____ HOSPITAL
_____

## AUTHORIZATION FOR EMERGENCY TREATMENT

1.  The undersigned has been informed of the emergency treatment considered necessary for the patient whose name appears on the reverse hereof and that the treatment and procedures will be performed by physicians, members of the house staff and employees of the hospital. Authorization is hereby granted for such treatment and procedures.

2.  **MEDICARE - MEDICAID PATIENT'S CERTIFICATION:** Authorization to release information and payment request. I certify that the information given by me in applying for payment under Titles XVIII and XIX of the Social Security Act is correct. I authorize release of all records required to act on this request. I request that payment of authorized benefits be made on my behalf.

3.  **ASSIGNMENT OF INSURANCE BENEFITS:** I hereby authorize payment directly to _____ Hospital of hospital benefits otherwise payable to me including major medical insurance and payment of surgical or medical benefits, including major medical, directly to the attending physician but not to exceed regular charges for these services. I understand that I am financially responsible to the hospital and physician for charges not covered by this assignment.

4.  **AUTHORIZATION FOR RELEASE OF MEDICAL INFORMATION:** The hospital and attending physician are authorized to furnish any medical information requested by insurance companies with whom I have coverage or any public agency which may be assisting in payment for my care.

5.  **REFUND OF INSURANCE BENEFITS:** I authorize the refund of overpaid insurance benefits in accordance with my insurance policy conditions where my coverages are subject to a coordination of benefits clause.

6.  I understand that health care services paid under Medicare, Medicaid, and maternal and child health programs are subject to review by the Professional Standards Review Organization.

| Date | Witness | Patient |
|------|---------|---------|

| Date | Witness | Responsible Party | Relationship to Patient |
|------|---------|-------------------|-------------------------|

CRENSHAW COMMUNITY HOSPITAL
101 HOSPITAL CIRCLE.. 334-335-3374
LUVERNE, ALABAMA 36049
*Where Caring Counts*

## CONDITIONS OF ADMISSIONS AND TREATMENT

**AUTHORIZATION AND CONSENT FOR SERVICES:** I am presenting myself for medical services at Crenshaw Community Hospital. I consent to such care as my physician orders and all other persons caring for me deem necessary and beneficial. I understand that this care may include examinations, test, medical and/or surgical treatment. I also understand that such treatment may involve risk and that no guarantees have been made to me about the outcome of this care. I understand that the physicians on the staff are independent contractors, and not the employees or agents of Crenshaw Community Hospital. I authorize observers to be present during procedures for the purpose of medical training and education. I understand that I have the right to understand my rights and responsibilities as a patient.

**PERSONAL VALUABLES:** Crenshaw Community Hospital is not responsible for valuables, including money, jewelry, and watches, not properly deposited in our care. I accept responsibility for personal items kept in my possession.

**RELEASE OF MEDICAL INFORMATION:** The undersigned consents to the release of general information regarding admission and condition unless designated in writing. The undersigned also authorizes Crenshaw Community Hospital and physician(s) rendering service to release medical or other information about the patient which may be necessary for the completion of insurance claims, review of services, or receipt of benefits including current medical records. Such information may be released to third-party payers, including the third-party payer's agent and/or representative, governmental agencies, or anyone responsible for payment of hospital and/or physician charges.

**MEDICARE AUTHORIZATION:** I certify that the information given by me in applying for payment under Title XVIII of the Social Security Administration or its intermediaries or carriers for this or related Medicare claim. I request payment for the authorized benefits are made on my behalf to Crenshaw Community Hospital, and any organizations and physician(s) rendering service during my treatment.

**ASSIGNMENT OF BENEFITS AND FINANCIAL RESPONSIBILITY:** I authorize payment of all insurance benefits, basic and major medical, for this period of medical, emergency, and/or diagnostic treatment to be made directly to Crenshaw Community Hospital. I understand that I am financially responsible for all charges not covered by insurance payments, including private room differentials, and that all efforts for collection of those benefits are for my convenience and do not represent a guarantee for collection or a credit to my account until such time as payment is received by Crenshaw Community Hospital and the contracted entities. I also assign the benefits payable for physicians' services to the physician(s) furnishing the services, including Montgomery Radiology Associates, or authorize such physicians or physician group to submit a claim to my insurance company(s), Medicare, and/or Medicaid. I will be responsible for any collection fees, court cost, and/or attorney fees incurred while collecting on my account(s). Copies of this authorization are as valid as the original.

Witness _____     Patient or Responsible Party _____

Date: __7 / 8 / 06__     Legal Guardian/Proxy: _____

ATWELL ROBIN O    41327
05C266    Crenshaw Community Hospital
DOB    Luverne, AL 36049
OZAIR/TOMPKINS    ER

ATWELL ROBIN O
05C266
DOB    F C7/C6/C6
OZAIR/TCMPKINS    ER
*Addressograph*

## EMERGENCY NURSING TRIAGE FORM

Date: 7/8/06    Time: 0343    Pvt. M.D. _____
Allergies: Aminophyllin – Compazine – Skelaxin
Age: ___ Weight: ___ Temperature: 98.9 Pulse: 96 Respiration: 18 Blood Pressure: 115/55
Chief Complaint: Fell 3 ft off door steps – pain R & back R
Data Source (Informant): hip – not moving legs – no feeling in legs –

| ARRIVAL: | NOTIFIED: | GLASGOW COMA SCALE |
|---|---|---|
| ☐Walk | ☐Police | Adult/Pediatric |
| ☐Carried | ☐Family/friend | |
| ☐Ambulance | ☐Med. Examiner | A. EYE OPENING |
| ☐Police | ☐Animal Control | Spontaneous 4 |
| ☐Rescue Squad | ☐Clergy | To Voice 3 |
| ☐Wheelchair | ☐Family Serv. | To Pain 2 |
| ☐Stretcher | Time called: | None 1 |

**ARE IMMUNIZATIONS CURRENT?**    ☐ Yes    ☐ No

| PMH | YES | NO | | YES | NO | | YES | NO |
|---|---|---|---|---|---|---|---|---|
| Arthritis | ☐ | ☑ | CVA | ☐ | ☑ | Migraines | ☐ | ☑ |
| Asthma | ☐ | ☑ | Diabetes | ☐ | ☑ | Psyc | ☐ | ☑ |
| By-pass | ☐ | ☑ | Dialysis | ☐ | ☑ | Pulmonary | ☐ | ☑ |
| Cardiac | MVP | ☑ | GI | ☐ | ☑ | Renal | ☐ | ☑ |
| CHF | ☐ | ☑ | GU | ☐ | ☑ | Seizure | ☐ | ☑ |
| COPD | ☐ | ☑ | HTN | ☐ | ☑ | Sickle Cell | ☐ | ☑ |

B. VERBAL
Oriented/Smile 5
Confused 4
Screams 3
Grunts 2
None 1

**CURRENT MEDICATIONS**    ☐ None    ☐ Unknown

| Name | Dose | Freq | Name | Dose | Freq |
|---|---|---|---|---|---|
| Atenolol | | | | | |
| Atarax | | | | | |

C. MOTOR
Obeys Spontaneous 6
Localizes to pain 5
Flexor withdraw l 4
Abnormal Flexion 3
Extensor Posturing 2
None 1

Score total: 15

ACCOMP. BY:
☐Self
☐Family/friend
☐Police
☐Other

L.O.C.
☐Alert
☐Lethargic
☐Unresponsive
☐Disoriented
☐Shock

VALUABLES
☐Patient
☐Family/friend
☐Med. Examiner
☐Save__ Env. #

### NURSING OBSERVATIONS

PAIN ☑YES ☐ NO (Circle one)    0 2 4 6 8 10
Location: R back    Description: _____

EMESIS ☑No ☐ Yes    Pt. description: _____

STOOL ☑N/A ☐ Normal    Last BM: _____

URINATION ☑N/A ☐ Normal ☐ Frequency ☐ Dysuria

DISCHARGE ☑N/A ☐ No ☐ Yes
☐ Vaginal _____ ☐ Urethral _____ ☐ Other _____

BLEEDING ☑No ☐ Yes ☐LMP: July 06
Location: _____
☑None ☐ Minimal ☐ Moderate ☐ Severe ☐ Bright ☐ Dark ☐ Clots
☐ Other: _____

RESPIRATORY ☐ N/A
☑Regular ☐ Shallow ☐ Irreg ☐ Hypervent ☐ Cough ☐ Dyspneic
☐ Absent ☐ Rapid ☐ Other _____

CIRCULATION/CARDIAC/PULSES    BREATH SOUNDS
☑Regular ☐Absent ☐Palpable    ☐N/A ☐Unequal ☐Diminished
☐Irreg ☐Weak    ☐Rales ☑Equal ☐Rhonch
☐Cardiac Rhythm: _____    ☐Wheezes

SAFETY    ☐Side rails up ☑Attendant with patient
☐Nurses in attendance ☐Other

NEUROLOGICAL ☑Alert ☐Confused ☐Oriented
☐Unresponsive ☐Lethargic ☐Seizures
PUPILS ☑Equal ☐Unequal size in mm: R ___ L ___
RESPONDS TO STIMULI ☐No ☑Yes ☑Verbal ☐Painful
VISUAL ACUITY N/A ___
GI ☑N/A ☐Vomiting ☐Diarrhea ☐Nausea
ABD ☑N/A ☐Soft ☐Distended ☐Rigidity ☐Bowel Sounds
SKIN ☐Warm ☐Pale ☐Dusty ☐Cyanotic ☐Dry ☐Moist
☐Cool ☐Clammy ☐Other _____

TRAUMA: (location & appearance) ☑N/A    COMMENTS
Abrasion _____
Avulsion _____
Contusion _____
Deformity _____ Crenshaw Community Hospital
Edema _____    00027
Laceration _____    Atwell v. Smart
Puncture Wound _____

| DISCH. COND. | EXIT VIA | DISPOSITION |
|---|---|---|
| ☑Improved | ☐Walk ☐Carried | ☐Home |
| ☐Critical | ☐Wheelchair | ☐Other facility |
| ☐Unchanged | ☐Stretcher | ☐AMA ☐Expired |
| ☐Expired | ☐Ambulance | ☐DOE ☐Admit |

| MEDICATION/DOSE/TREATMENT/I.V. | ROUTE / SITE | SIGNATURE | RESPONSE |
|---|---|---|---|
| | N/A | | |

## ADDITIONAL VITAL SIGNS

| TIME | TEMP | PULSE | RESP | B/P | O₂SAT |
|---|---|---|---|---|---|
| | | N/A | | | |

## PROCEDURE / TREATMENT

| | | TIME | Nurse Initials |
|---|---|---|---|
| Cardiac Monitor | ) | | |
| Splint (Type: | ) | | |
| (Location: | ) | | |
| Central Line (Type: | ) | | |
| Chest Tub (Am't Drained: ) (Size: | ) | | |
| Dressing (Type: | N/A | | |
| Foley Cath. (Am't Drained: ) (Size: | ) | | |
| N/G Tube (Am't Drained: ) (Size: | ) | | |
| O₂ per | | | |
| Patient Teaching (Type: | ) | | |

| PHYSICIAN | EXAM TIME | PROCEDURE DONE |
|---|---|---|
| | | |

| PHYSICIAN | TIME NOTIFIED | PLACE NOTIFIED | TIME RESPOND | NURSE INITIALS |
|---|---|---|---|---|
| Ozair | in ER | | | |

## IV FLUIDS / TIMES / RATES

| Time Started | IV Fldd | Rate | IV Cath & Site | Nurse Initials | Time D/C | Amt. Infused |
|---|---|---|---|---|---|---|
| | | | | | | |

Comments

## ADDITIONAL NURSES NOTES

| TIME | |
|---|---|
| 0343 | /02 Trent |
| 0500 | To X Ray per stretcher — S Edison RN |
| 0510 | Back to ER — non moving both ⊙ legs & feet — responds easily to tactile stimuli to feet & legs — S Edison R.N. |

| DISCHARGE TO: | ADMITTED TO: | REPORT GIVEN TO: |
|---|---|---|
| Home — Stable @ 0610 c husband | | |

Transferred By:

Discharge Nurse Signature: S Edison R.N.

# CRENSHAW COMMUNITY HOSPITAL
## 101 Hospital Circle
## Luverne AL 36049
## PHONE: (334) 335-3374

*ER*

| | |
|---|---|
| PATIENT: ATWELL, ROBIN | REFERRING PHYSICIAN: OZAIR, MD, SADAT |
| DATE OF BIRTH: | PHONE: 3343351192 |
| MRN: CCH41327 | ACCESSION NUMBER: 00081224 |
| EXAM DATE: 07/08/2006 | *502660* |

**EXAM: XR PORTABLE CHEST**

HISTORY: Fall

PORTABLE CHEST

FINDINGS: Portable examination shows clear lung fields. Study is limited by trauma board artifact. There is no consolidation, atelectasia, or pleural effusion present. Cardiomediastinal silhouette appears within normal limits.

IMPRESSION:
1. NO POSTTRAUMATIC FINDING SEEN.


STEVEN EPSTEIN MD

07/08/2006 07:00 AM

Crenshaw Community Hospital
00029
Atwell v. Smart

# CRENSHAW COMMUNITY HOSPITAL
### 101 Hospital Circle
### Luverne AL 36049
### PHONE: (334) 335-3374



| PATIENT: ATWELL, ROBIN | REFERRING PHYSICIAN: OZAIR, MD, SADAT |
|---|---|
| DATE OF BIRTH: | PHONE: 3343351192 |
| MRN: CCH41327 | ACCESSION NUMBER: 00081223 |
| EXAM DATE: 07/08/2006 | 502*ele* |

## EXAM: XR AP PELVIS

HISTORY: Fall

PELVIS X-RAY

FINDINGS: AP view of the pelvis is limited by trauma board artifact. Bony pelvis is grossly intact. There is bowel gas obscuring small portion of the sacrum and adjacent iliac bone. There is no diastases of the pubic symphysis or sacroiliac joints.

IMPRESSION:
1. NO FRACTURE SEEN.

STEVEN EPSTEIN MD

07/08/2006 07:03 AM

Crenshaw Community Hospital
00030
Atwell v. Smart

# CRENSHAW COMMUNITY HOSPITAL
### 101 Hospital Circle
### Luverne AL 36049
### PHONE: (334) 335-3374

*ER*

| | |
|---|---|
| PATIENT: ATWELL, ROBIN | REFERRING PHYSICIAN: OZAIR, MD, SADAT |
| DATE OF BIRTH: | PHONE: 3343351192 |
| MRN: CCH41327 | ACCESSION NUMBER: 00081222 |
| EXAM DATE: 07/08/2006 | *50266* |

**EXAM:  XR LUMBAR SPINE (COMPLETE)**

HISTORY: Fall. Unable to feel both legs

LUMBAR SPINE COMPLETE

FINDINGS: AP, lateral and cone-down views are obtained of the lumbosacral spine. Lumbar alignment is maintained without fracture or subluxation. Disc spaces are fairly well-preserved. There is spondylosis at the thoracolumbar junction. Pedicles appear intact.

IMPRESSION:
1. NO FRACTURE OR SUBLUXATION SEEN.

STEVEN EPSTEIN MD

07/08/2006 07:03 AM

Professional interpretation by RSI (Reddy Solutions, Inc.) "Innovative Radiology Solutions"

621 North Ave., Suite C-30 • Atlanta, GA 30308 • Phone (678) 904-6820 • (888) 906-3304 • Fax (678) 904-6824

Crenshaw Community Hospital
00031
Atwell v. Smart

From: Fax number    To: CCH-ALL DEPTS    Page: 2/2    Date: 7/8/2006 7:07:48 AM

# CRENSHAW COMMUNITY HOSPITAL

101 Hospital Circle
Luverne AL 36049
PHONE: (334) 335-3374

*ER*

| | |
|---|---|
| PATIENT: ATWELL, ROBIN | REFERRING PHYSICIAN: OZAIR, MD, SADAT |
| DATE OF BIRTH: | PHONE: 3343351192 |
| MRN: CCH41327 | ACCESSION NUMBER: 00081221 |
| EXAM DATE: 07/08/2006 | 50260 |

**EXAM: XR CERVICAL SPINE COMPLETE**

HISTORY: Fall with unable to feel both legs.

CERVICAL SPINE COMPLETE

FINDINGS: AP, lateral, swimmer's, and open-mouth odontoid views are obtained. The lateral film shows a straightened cervical lordosis which may be secondary to positioning or muscle spasm. There is no fracture or subluxation seen to C6-C7. C7-T1 appears normal on the swimmers view. The dens also appears normal. There is spondylosis at C5-C6.

IMPRESSION:
1. SLIGHT STRAIGHTENING OF THE CERVICAL CURVATURE BUT NO FRACTURE OR SUBLUXATION SEEN.

STEVEN EPSTEIN MD

07/08/2006 07:06 AM

Crenshaw Community Hospital
00032
Atwell v. Smart

## · CRENSHAW COMMUNITY HOSPITAL · LUVERNE, ALABAMA 36049 · PHONE: 334-335-3374

**THIS EVALUATION WAS EMERGENCY CARE ONLY AND NOT INTENDED TO BE COMPLETE MEDICAL CARE. PLEASE FOLLOW THE INSTRUCTIONS BELOW AND FOLLOW-UP WITH YOUR ASSIGNED PHYSICIAN OR OTHER PHYSICIAN AS NEEDED.**

### ☐ HEAD INJURY

AWAKEN EVERY ____ HOUR(S) FOR ____ HOUR(S)
CALL IMMEDIATELY OR BE RECHECKED IMMEDIATELY IF:
1. Severe headache.
2. Persistent vomiting.
3. Unusual behavior or drowsiness.
4. Weakness, confusion.
5. Convulsions (dial 911).
6. Drainage of fluid from nose or ear(s).

### ☐ SPRAINS / STRAINS / BRUISES

1. Elevate and ice pack first 24-48 hrs. Then apply heat, after 24-48 hrs.
2. Rest injured area.
3. Call if numbness, weakness, increased pain, increased swelling.
4. Rewrap elastic bandage if too tight or too loose.
5. Remove splint in ____ days; ____ when comfortable; when follow-up physician instructs you to.
6. Stop using crutches in ____ days; ____ when comfortable; when follow-up physician instructs you to.
7. Aspirin/Tylenol/Advil/Nuprin for pain.

### ☐ CAST - SPLINT

1. Elevate and place ice pack over cast.
2. Do not put weight on cast for ____ hour(s).
3. Keep dry.
4. Call if increased pain, numbness, or if extremity turns blue or cold, or if elastic bandage or cast is too tight or too loose.
5. Remove splint when pain-free or when physician instructs you to.

### ☐ ABDOMINAL PAIN

1. Rest.
2. Clear liquids only for ____ hour(s).
3. Return if pain localizes, increases or is associated with fever, bloody vomitus/stools or abdominal distension.
4. Return for repeat exam in ____ hour(s) or sooner, if symptoms in #3 exist.

### ☐ YOU HAVE BEEN GIVEN A MEDICATION THAT WARRANTS OBSERVATION FOR AN ALLERGIC REACTION. PLEASE REMAIN IN THE WAITING AREA FOR 20 MINUTES.

### ☐ WOUND CARE / BURNS

1. Keep clean and dry until sutures are out, except daily soap and water and dressing change.
2. Elevate injured part to decrease swelling.
3. Ice intermittently for one to two days.
4. Return visit ____ day(s).
5. Sutures out in ____ day(s). (Suture removal/ wound check between 8:00 a.m. & 8:00 p.m.)
6. Return immediately if increased redness, pain, swelling, drainage, red streaks. Any wound can get infected.
7. No swimming/water immersion until sutures out.
8. Use antibiotic ointment, especially on facial lacerations.

☐ Check your tetanus immunization status follow-up within 48 hours if last booster was greater than 5 years ago.

### ☐ FLU, VOMITING, DIARRHEA - ADULTS

1. If vomiting, push clear fluids (things you can see through).
2. No milk products for 24 hours if diarrhea.
3. Tylenol for fever if not vomiting.
4. Return if you develop bloody stools/vomitus, become thirsty, or increased abdominal pain.
5. No Aspirin for persons under 16 years of age with flu-like symptoms.

### ☐ FLU, VOMITING, DIARRHEA - INFANTS/CHILDREN

1. Clear liquids as much as child wants
   - Pedialyte, Lytren, Infalyte
   - Jello-water (half strength), Gatorade
   - Defizzed room temperature soda
   - Liquids you can see through
   - Give slowly if vomiting and try again
2. After 24 hours, advance diet as tolerated to applesauce, bananas, strained carrots, and then to regular diet.
3. If prolonged diarrhea, advance to soy formula (Isomil, Soy-Alac) for one to two weeks.
4. No milk products for several days.
5. Call or return if increased diarrhea, vomiting, bloody stools/vomitus, signs of dehydration (decreased urination, dry mouth, lethargy, irritable, weight loss, no tears), or no improvement in 24 hours.

### ☐ BACK OR SPINE INJURY

1. Bedrest for ____ day(s) or until comfortable.
2. No lifting or straining until pain-free or follow-up physician advises. Apply heat as needed.
3. Return immediately if numbness or weakness in arms or legs, or bowel/bladder problems.
4. See follow-up physician in ____ to ____ days if pain is not better.

### ☐ EYE CARE

1. Wear patch for ____ hour(s).
2. Rest both eyes.
3. Return for check in ____ hour(s).
4. Don't drive or operate machinery when eye is patched.

### ☐ FEVER CONTROL - ADULTS

1. Aspirin and/or Tylenol or Advil/Nuprin.
2. Push fluids.
3. Return if new symptoms such as increased cough, diarrhea, pain, vomiting, shortness of breath.

### ☐ FEVER CONTROL - CHILDREN

1. Keep clothes off.
2. Tylenol dosage ____mg/lb. body weight every 4-6 hours, or ____ mg every 4-6 hours for your child.
3. Push fluids.
4. Return if new symptoms, such as increased cough, diarrhea, pain, vomiting, shortness of breath.
5. No aspirin for person under 16 years of age with flu-like symptoms.
6. To control shivering, cover child with light blankets.

### ☐ UPPER RESPIRATORY INFECTIONS

1. Fever Control.
2. Push fluids.
3. Vaporizer, as needed for cough.
4. Cough medicine, decongestant as needed.
5. Return if ear pain, lethargy, rash, shortness of breath, productive cough.

### ☐ PICK UP PRESCRIBED MEDICATION(S) AT OUT-PATIENT PHARMACY.

---

**NO DRIVING** ☐ FOR - ____ HRS   - OR -   ☐ UNTIL SEEN BY REFERRAL PHYSICIAN

OTHER INSTRUCTIONS: *Return to the E.R. if symptoms worsen.*

**THE EMERGENCY/CONVENIENT CARE DEPARTMENT HAS NOT CONTACTED YOUR REFERRAL PHYSICIAN. YOU ARE RESPONSIBLE FOR OBTAINING FOLLOW-UP CARE AS ADVISED.**

**IF YOUR CONDITION BECOMES WORSE OR NEW SYMPTOMS DEVELOP AND YOU ARE UNABLE TO CONTACT YOUR PHYSICIAN RETURN TO THE EMERGENCY DEPARTMENT IMMEDIATELY!**

IF YOU HAD X-RAYS TAKEN THERE WILL BE A FINAL READING BY THE RADIOLOGY SPECIALIST. IF THERE IS ANY DISCREPANCY IN THE READING, YOU WILL BE NOTIFIED.

YOUR EMERGENCY/PRIVATE PHYSICIAN WAS DR. _____

IF YOU DO NOT HAVE A PRIVATE MEDICAL DOCTOR YOU MAY SEE THE REFERRAL PHYSICIAN BELOW FOR FOLLOW-UP CARE RELATED TO THIS VISIT. WHEN YOU CALL FOR AN APPOINTMENT BE SURE TO STATE THAT YOU WERE TREATED IN THE EMERGENCY DEPARTMENT.

I AUTHORIZE COPIES OF ALL MEDICAL RECORDS/REPORTS RELATING TO THIS VISIT TO BE SENT TO THE REFERRAL DOCTOR/AGENCY BELOW.
SIGNATURE: _____
YOUR REFERRAL PHYSICIAN IS: DR. _____
PHONE: _____
ADDRESS: _____

☐ CALL FOR CULTURE RESULTS IN ____ DAY(S) AT 495-8000
☐ DISABILITY DAYS _____

ATWELL ROBIN O     41327
CDC 25
DOB ____     F 07/06/06
BLAIR/TOMPKINS     ER
Crenshaw Community Hospital
00033
Atwell v. Smart
MEDICAL RECORDS

☐ SEE IN ____ DAYS   ☐ SEE IN ____ DAYS IF NOT IMPROVED
I HEREBY ACKNOWLEDGE RECEIPT OF AND UNDERSTAND THE ABOVE INSTRUCTIONS.
SIGNATURE: _____     DATE: 7/8/06
WITNESS: _____ R.N.

*EMERGENCY / CONVENIENT CARE/AFTER-CARE INSTRUCTIONS*

ATWELL ROBIN O   41327
05C266
DOB            F C7/C8/C6
OZAIR/TOMPKINS   ER

Crenshaw Community Hospital
101 Hospital Circle
Luverne, Al 36049

ATWELL ROBIN O   41327
05C266
DOB            F C7/C8/C6
OZAIR/TOMPKINS   ER

## Emergency Department LEVEL OF CARE

| | CRITICAL CARE : SEE ** below |
|---|---|
| CC | CPR |
| CC | Stroke/Cerebral Hemorrage - all Types |
| CC | Trauma, Trauma Alert/ Multiple Trauma |
| CC | Shock of all types- Septic, Cardiogenic, Spinalm Hypovolemic, Anaphylactic |
| CC | Other- See *** below |
| | See also Procedures Listing |
| | |
| 16 | PROTOCOLS: Asthma, Chest pain, Psych |
| | |
| | ADMISSIONS / TRANSPORT |
| 0 | Triage |
| 0 | Simple Recheck |
| 1 | Ambulatory visit / Complex recheck |
| 10 | DOA, Death (no code) |
| 5 | Hospital Admission |
| 3 | Transfer in ED by ambulance |
| 1 | Transfer out of ED by ambulance |
| 5 | Transport with nurse to other facility |
| | ASSISTING MONITORING |
| 15 | Conscious Sedation (inc. routine monitoring) |
| 5 | Monitoring / Multi VIS  neuro check, cardiac) |
| 2 | Nasal packing |
| 1 | Pulse Ox check (Routine) |
| 2 | Resporatory Therapy Tx (O2, updraft, etc.) |
| 2 | Simple Assist (steri strip, eye exam) |
| 10 | Ventilator / CPAP mask |
| | WOUND CARE |
| 5 | Complex wound cleansing |
| 2 | Dressing (small / moderate) |
| 3 | Dressing (large / complex / simple burn) |
| 2 | Suture Removal |
| 2 | Wound cleaning / eye treatment / eye patch) |
| | SPECIAL NEEDS |
| 2 | Bath |
| 1 | Bedpan / Urinal (ea placement theron) |
| 1 | Bed linen changed |
| 3 | Comatose, disoriented |
| 5 | Combative, confused, incontinent, psychiatric |
| 2 | Pediatric patient |
| 1 | Isolation |

| | PROCEDURES |
|---|---|
| CC | Cardioversion |
| CC | Chest tube insertion |
| CC | Emergency Delivery |
| CC | Intraosseous Infusion |
| CC | Intubation |
| CC | Pacemaker assist |
| CC | TPA administration |
| CC | Tracheostomy assist / replace |
| 10 | Blood administration |
| 10 | Bronchoscopy |
| 5 | Casting |
| 10 | Central line / cutdown insertion |
| 10 | Debridement of burns, complex |
| 5 | Debridement of burns, simple |
| 5 | Foreign Body removal, EAR |
| 5 | Foreign Body removal, OTHER |
| 10 | Gastric lavage |
| 5 | Gastrostomy tube change |
| 3 | I & D abcess |
| 10 | K wire / Steinman pin |
| 10 | Laceration / wound repair, simple |
| 10 | Laceration / wound repair, intermediate |
| 15 | Laceration / wound repair, complex |
| 10 | Lumbar puncture |
| 5 | Nasal Hemorrhage control |
| 5 | Peritoneal tap assist |
| 10 | Pre-op preparation |
| 10 | Reduction of Fx / DISLOCATION |
| 5 | Removal of impacted ear wax |
| 10 | Splint (leg, arm, shoulder, etc.) |
| 2 | Therapeutic phlebotomy |
| 15 | Thoracentesis / Paracentesis |

** If a diagnostic, surgical or therapeutic
procedure was done, you must use
ER level or Critical Care level with
procedure charge.

Crenshaw Community Hospital
00034
Atwell v. Smart

## EMERGENCY DEPARTMENT LEVEL OF CARE (continued)

| | EDUCATION / DISCHARGE INSTR. |
|---|---|
| 2 | AMA |
| 2 | Crutch Training by the ER staff |
| 0 | Discharge instructions – simple |
| 2 | Discharge instructions – complex |
| 2 | Social Services consult |
| | MEDS / Ivs |
| 5 | Infusaport access |
| 3 | IV - simple (INT, KVO) |
| 5 | IV - w/pump, drip, rapid > 2 hours |
| 1 | MED-PO, supp, topical |
| 5 | Multiple lines, complex IV's |
| 3 | Rabies vaccine |
| | OB / GYN |
| 2 | Fetal heart tones |
| 2 | Newborn Care |
| 3 | Pelvic exam - simple |
| 5 | Pelvic exam - complex, hemorrhage, difficult |
| 10 | Rape exam |
| | TREATMENT |
| 3 | Ace wrap, collar, sling, immobilizer |
| 15 | Decontamination – Hazardous Materials |
| 2 | Enema administration |
| 5 | Impaction removal |
| 2 | Suction / Irrigation |
| 2 | Traction assist |
| 3 | Urinary cauth / NG insertion |
| | TESTS |
| 2 | Arterial Blood Gases (ABG) |
| 2 | C-arm |
| 2 | EKG 12 lead |
| 1 | Glucose via device (routine) |
| 1 | Hemocult |
| 1 | Lab |
| 2 | Specimen collect (urine, sputum, etc) |
| 1 | Visual acuity |
| 2 | X-ray (simple) per trip |
| 3 | X-ray (complex - CT, MRI, US, IVP ) per trip including patient monitoring |

** Any time a Critical Care item is marked, you do not have to mark anything more on the left side, simply mark any procedure that was performed, and indicate "CC" in the box below.

Total points determines level of service:

| | | |
|---|---|---|
| 0 | ER Level 1 | |
| 1-5 | ER Level 2 | 4 |
| 6-10 | ER Level 3 | |
| 11-15 | ER Level 4 | |
| 16 and up | ER Level 5 | |

**TOTAL POINTS
or CC for Critical Care**

*** For Critical Care  - Other: See below for examples, refer to Policy for Definition

**Potential Symptoms:**
New onset paralysis
Head injury with loss of consciousness
Acute myocardial Infarction
Drug overdoses impairing vital functions
Coma of all etyiologies (except hypoglycemic)
**Acute Failure:**
Renal, hepatic, respiratory, pulmonary edema, major
    pulmonary embolis
Emboli of fat or amniotic fluid
Non-hemorrhagic Strokes with vital function impairment
**Aneurysms, Thoracic or Abdominal**
Leaking or ruptured          Cardia Tamponade
Aortic dissection           Lactic Acidosis
Diabetic Ketoacidosis        Envenomation
Tension Pneumothorax
Thyroid storm or Addisonian Crisis
Life-threatening hyper/hypo thermia
DIC or other bleeding diathesis - Hemophilia, ITP, TTP, Leukemia
Aplasti

**Potential Interventions**
Multiple parenteral medications requiring constant monitoring
CVP line insertion          Ventilator
Pericardiocentesis         Cricothyrotomy
Control of major hemorrhage  Emergent Cath Lab Pro
Administration of blood transfusions / blood products
Major burn care / transfer to burn unit
Major Trauma care / multiple surgical consults

41327

CRENSHAW COMMUNITY HOSPITAL        101 HOSPITAL CIRCLE        LUVERNE        AL 36049

**EMERGENCY ROOM • OUTPATIENT RECORD**

| PATIENT NUMBER | TYPE | PATIENT NAME | AGE | BIRTHDATE | SEX | M/S | DATE OF SERVICE | TIME | CLERK INT. |
|---|---|---|---|---|---|---|---|---|---|
| 29371 | 3 | DAVIS ROBIN D | | | F | S1 | 6/13/06 | 21:05 | CDH |

| ADDRESS - LINE 1 | | ADDRESS - LINE 2 | CITY | STATE | ZIP CODE | TELEPHONE |
|---|---|---|---|---|---|---|
| PO BOX 442 | | | | AL | | 335-3501 |

| PATIENT SSAN | NOTIFY IN CASE OF EMERGENCY - NAME | | RELATIONSHIP | ADDRESS | | TELEPHONE |
|---|---|---|---|---|---|---|
| 20060838 | EDISON JANICE | | 5278853 | | | 527-8853 |

| INSURANCE COMPANY | CONTRACT OR GROUP NUMBER | DATE | PLACE |
|---|---|---|---|
| | | TIME | EVENT |

| GUARANTOR NAME | GUARANTOR ADDRESS | CITY | STATE | ZIP CODE | GUAR. TELEPHONE |
|---|---|---|---|---|---|
| DAVIS ROBIN D | PO BOX 443 | BRANTLEY | AL | 36009 | 335-3501 |

| GUARANTOR EMPLOYER | GUARANTOR OCCUPATION | GUAR. EMPLOYER ADDRESS | | GUAR. EM. TELEPHONE |
|---|---|---|---|---|
| NONE | | | | |

| PREV. SERVICE | PREV. SERV. DATE | IF MINOR - PARENT NAME | MED. REC. # | FAMILY PHYSICIAN | M.D. | S.A. RM | TOTAL CHG |
|---|---|---|---|---|---|---|---|
| 043634 | 1/25/06 | | 41327 | SIDDIQ TAH/TOMPKINS C | | | |

| CHARGES | X-RAY | LAB | RESP. TH. | PHY. TH. | EKG | I.V. | DRUGS | SUPPLIES | OTHER | M.D. | S.A. RM | TOTAL CHG |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

**AUTHORIZATION FOR TREATMENT, GUARANTEE OF PAYMENT, ASSIGNMENT OF INSURANCE BENEFITS**

1. The undersigned has been informed of the emergency treatment considered necessary for the above named patient, and that treatments and procedures will be performed by physicians, members of house staff and employees of the hospital. Authorization is hereby granted for each treatment and procedure. The undersigned has read the above authorization and understands the same and certifies that no guarantee or assurance has been made as to the results that may be obtained.
2. The undersigned agrees to pay for services rendered by Hospital upon release of patient.
3. I/we hereby assign any hospital benefits, sick benefits, injury benefits due to a liability of a Third party, payable by any party, for the above patient, to Hospital unless I pay the account in full upon release of patient.
4. I/we hereby authorize the "Administrator of Hospital" to furnish from its records any information requested by the before mentioned insurance companies in connection with the above assignment. I do hereby appoint the "Controller" of Hospital as my lawful attorney to endorse for me any checks made payable to me for benefits or claims collected under the above assignment and to apply any credit balance to any other account I may owe said hospital.

| DATE | TIME | SIGNED PATIENT | |
|---|---|---|---|
| | | SIGNED GUARANTOR | |

**CHIEF COMPLAINT (If Accident State How, When, and Where)**

511.0

| TEMP | PULSE | RESP. | B/P | ALLERGIES | MEDICATIONS - HOME | ER PHYSICIAN | TET. TOX. |
|---|---|---|---|---|---|---|---|
| 98.6 | 94 | 24 | 120/09 | Compazine Aminophyllin | see triage | Siddiq | |

NURSES NOTES:
Pain B chest, worse = deep breath — S.O.B. edema in finger
& feet — more S.O.B. after eating — symptoms off & on
X 5-6 weeks

NURSE'S SIGNATURE (RN OR LPN)
Edison R

LAB DATA (Including X-Rays, EKGs, etc.)
Chest X Ray   CBC — Chem 7 — EKG

**PHYSICIAN'S REPORT:**

32 yoc ft sddq cp
upon consup + breathing
100 & 2 sat
&wt pn
&cm

**DIAGNOSIS:**

Crenshaw Community Hospital
00036
Atwell v. Smart

**TREATMENT:**

Pain Relief

**INSTRUCTIONS TO PATIENT:**

2 Peds
Adil R
6   2215

_____ **HOSPITAL**

#### AUTHORIZATION FOR EMERGENCY TREATMENT

1. The undersigned has been informed of the emergency treatment considered necessary for the patient whose name appears on the reverse hereof and that the treatment and procedures will be performed by physicians, members of the house staff and employees of the hospital. Authorization is hereby granted for such treatment and procedures.

2. **MEDICARE - MEDICAID PATIENT'S CERTIFICATION:** Authorization to release information and payment request. I certify that the information given by me in applying for payment under Titles XVIII and XIX of the Social Security Act is correct. I authorize release of all records required to act on this request. I request that payment of authorized benefits be made on my behalf.

3. **ASSIGNMENT OF INSURANCE BENEFITS:** I hereby authorize payment directly to _____ Hospital of hospital benefits otherwise payable to me including major medical insurance and payment of surgical or medical benefits, including major medical, directly to the attending physician but not to exceed regular charges for these services. I understand that I am financially responsible to the hospital and physician for charges not covered by this assignment.

4. **AUTHORIZATION FOR RELEASE OF MEDICAL INFORMATION:** The hospital and attending physician are authorized to furnish any medical information requested by insurance companies with whom I have coverage or any public agency which may be assisting in payment for my care.

5. **REFUND OF INSURANCE BENEFITS:** I authorize the refund of overpaid insurance benefits in accordance with my insurance policy conditions where my coverages are subject to a coordination of benefits clause.

6. I understand that health care services paid under Medicare, Medicaid, and maternal and child health programs are subject to review by the Professional Standards Review Organization.

_____     _____     _____
Date                          Witness                        Patient

_____     _____     _____     _____
Date                          Witness             Responsible Party              Relationship to Patient

Crenshaw Community Hospital
00037
Atwell v. Smart

CRENSHAW COMMUNITY HOSPITAL
101 HOSPITAL CIRCLE.. 334-335-3374
LUVERNE, ALABAMA 36049
*Where Caring Counts*

# CONDITIONS OF ADMISSIONS AND TREATMENT

**AUTHORIZATION AND CONSENT FOR SERVICES:** I am presenting myself for medical services at Crenshaw Community Hospital. I consent to such care as my physician orders and all other persons caring for me deem necessary and beneficial. I understand that this care may include examinations, test, medical and/or surgical treatment. I also understand that such treatment may involve risk and that no guarantees have been made to me about the outcome of this care. I understand that the physicians on the staff are independent contractors, and not the employees or agents of Crenshaw Community Hospital. I authorize observers to be present during procedures for the purpose of medical training and education. I understand that I have the right to understand my rights and responsibilities as a patient.

**PERSONAL VALUABLES:** Crenshaw Community Hospital is not responsible for valuables, including money, jewelry, and watches, not properly deposited in our care. I accept responsibility for personal items kept in my possession.

**RELEASE OF MEDICAL INFORMATION:** The undersigned consents to the release of general information regarding admission and condition unless designated in writing. The undersigned also authorizes Crenshaw Community Hospital and physician(s) rendering service to release medical or other information about the patient which may be necessary for the completion of insurance claims, review of services, or receipt of benefits including current medical records. Such information may be released to third-party payers, including the third-party payer's agent and/or representative, governmental agencies or anyone responsible for payment of hospital and/or physician charges.

**MEDICARE AUTHORIZATION:** I certify that the information given by me in applying for payment under Title XVIII of the Social Security Administration or its intermediaries or carriers for this or related Medicare claim. I request payment for the authorized benefits are made on my behalf to Crenshaw Community Hospital, and any organizations and physician(s) rendering service during my treatment.

**ASSIGNMENT OF BENEFITS AND FINANCIAL RESPONSIBILITY:** I authorize payment of all insurance benefits, basic and major medical, for this period of medical, emergency, and/or diagnostic treatment to be made directly to Crenshaw Community Hospital. I understand that I am financially responsible for all charges not covered by insurance payments, including private room differentials, and that all efforts for collection of those benefits are for my convenience and do not represent a guarantee for collection or a credit to my account until such time as payment is received by Crenshaw Community Hospital and the contracted entities. I also assign the benefits payable for physicians' services to the physician(s) furnishing the services, including Montgomery Radiology Associates, or authorize such physicians or physician group to submit a claim to my insurance company(s), Medicare, and/or Medicaid. I will be responsible for any collection fees, court cost, and/or attorney fees incurred while collecting on my account(s). Copies of this authorization are as valid as the original.

Witness _____     Patient or Responsible Party ✗ *Robi Atwell*

Date: _____     Legal Guardian/Proxy: _____

Crenshaw Community Hospital
00038
Atwell v. Smart

DAVIS ROBIN C #1327
049371
DOB          F 06/23/06
DR SIDDIQ/TCHPOKINS ER
Addressograph

**Crenshaw Community Hospital**
Luverne, AL 36049

**EMERGENCY NURSING TRIAGE FORM**

Date: 6/13/06   Time: 2105   Pvt. M.D. ___   SAO₂ 100%

Allergies: Compazine — Aminophylline —

Age: ___  Weight: ___  Temperature: 98.6  Pulse: 94  Respiration: 24  Blood Pressure: 120/69

Chief Complaint: Pain (R) chest — worse ē deep breath — S.O.B

Data Source (Informant): Has had symptoms off ē on 5-6 weeks. Also (R)

| ARRIVAL: | NOTIFIED: | GLASGOW COMA SCALE | ARE IMMUNIZATIONS CURRENT? | | ☐ Yes  ☑ No |
|---|---|---|---|---|---|

**ARRIVAL:**
☑ Walk
☐ Carried
☐ Ambulance
☐ Police
☐ Rescue Squad
☐ Wheelchair
☐ Stretcher

**ACCOMP. BY:**
☐ Self
☑ Family/friend
☐ Police
☐ Other

**L.O.C.**
☑ Alert
☐ Lethargic
☐ Unresponsive
☐ Disoriented
☐ Shock

**VALUABLES**
☐ Patient
☐ Family/friend
☐ Med. Examiner
☐ Save__ Env. #

**NOTIFIED:**
☐ Police
☐ Family/friend
☐ Med. Examiner
☐ Animal Control
☐ Clergy
☐ Family Serv.
Time called:

**GLASGOW COMA SCALE**
Adult/Pediatric

**A. EYE OPENING**
Spontaneous — 4
To Voice — 3
To Pain — 2
None — 1

**B. VERBAL**
Oriented/Smile — 5
Confused — 4
Screams — 3
Grunts — 2
None — 1

**C. MOTOR**
Obeys Spontaneous — 6
Localizes to pain — 5
Flexor withdraw l — 4
Abnormal Flexion — 3
Extensor Posturing — 2
None — 1

Score total __15__

**PMH**   YES  NO
Arthritis  ☐  ☐
Asthma  ☐  ☐
By-pass  ☐  ☐
Cardiac  ☑  ☐
CHF  ☐  ☐
COPD  ☐  ☐

CVA  ☐  ☐
Diabetes  ☐  ☐
Dialysis  ☐  ☐
GI  ☐  ☐
GU  ☐  ☐
HTN  ☐  ☐

Migraines  ☐  ☐
Psyc  ☐  ☐
Pulmonary  ☐  ☐
Renal  ☐  ☐
Seizure  ☐  ☐
Sickle Cell  ☐  ☐

**CURRENT MEDICATIONS**   ☐ None  ☐ Unknown

| Name | Dose | Freq | Name | Dose | Freq |
|---|---|---|---|---|---|
| Albuterol Inhaler | | | | | |
| Xopenex Neb | | | | | |
| Atenolol | 25 mg | QD | | | |
| Atarax | 25 mg | HS | | | |

**NURSING OBSERVATIONS**

**PAIN** ☑ YES  ☐ NO (Circle one)   0 2 4 6 8 10
Location: (R) chest  Description:

**EMESIS** ☑ No  ☐ Yes   Pt. description: ___

**STOOL** ☑ N/A  ☐ Normal   Last BM: ___

**URINATION** ☑ N/A  ☐ Normal  ☐ Frequency  ☐ Dysuria

**DISCHARGE** ☑ N/A  ☐ No  ☐ Yes
☐ Vaginal  ☐ Urethral  ☐ Other ___

**BLEEDING** ☑ No  ☐ Yes  ☑ LMP: ___/___/06
Location: ___
☑ None  ☐ Minimal  ☐ Moderate  ☐ Severe  ☐ Bright  ☐ Dark  ☐ Clots
☐ Other: ___

**RESPIRATORY** ☐ N/A
☐ Regular  ☐ Shallow  ☐ Irreg  ☐ Hypervent  ☐ Cough  ☐ Dyspneic
☐ Absent  ☐ Rapid  ☑ Other: S.O.B

**CIRCULATION/CARDIAC/PULSES**
☑ Regular  ☐ Absent  ☐ Palpable
☐ Irreg  ☐ Weak  ☐ Diminished
☐ Cardiac Rhythm: ___

**BREATH SOUNDS**
☐ N/A  ☐ Unequal  ☐ Diminished
☐ Rales  ☑ Equal  ☐ Rhonch
☐ Wheezes

**SAFETY**   ☐ Side rails up  ☐ Attendant with patient
☑ Nurses in attendance  ☐ Other

**NEUROLOGICAL** ☑ Alert  ☐ Confused  ☑ Oriented
☐ Unresponsive  ☐ Lethargic  ☐ Seizures

**PUPILS** ☑ Equal  ☐ Unequal size in mm: R__ L__

**RESPONDS TO STIMULI** ☐ No  ☑ Yes  ☑ Verbal  ☐ Painful

**VISUAL ACUITY** N/A ☑

**GI** ☑ N/A  ☐ Vomiting  ☐ Diarrhea  ☐ Nausea

**ABD** ☑ N/A  ☐ Soft  ☐ Distended  ☐ Rigidity  ☐ Bowel Sounds

**SKIN** ☑ Warm  ☐ Pale  ☐ Dusty  ☐ Cyanotic  ☐ Dry  ☐ Moist
☐ Cool  ☐ Clammy  ☐ Other ___

**TRAUMA: (location & appearance)** ☑ N/A  **COMMENTS**
Abrasion ___
Avulsion ___
Contusion ___
Deformity ___
Edema ___
Laceration ___
Puncture Wound ___

Crenshaw Community Hospital
00039
Atwell v. Smart

**DISCH. COND.**
☐ Improved
☐ Critical
☐ Unchanged
☐ Expired

**EXIT VIA**
☐ Walk  ☐ Carried
☐ Wheelchair
☐ Stretcher
☐ Ambulance

**DISPOSITION**
☐ Home
☐ Other facility
☐ AMA  ☐ Expired
☐ DOE  ☐ Admit

| MEDICATION/DOSE/TREATMENT/I.V. | ROUTE / SITE | SIGNATURE | RESPONSE |
|---|---|---|---|
| | | | |

## ADDITIONAL VITAL SIGNS

| TIME | TEMP | PULSE | RESP | B/P | O$_2$SAT |
|---|---|---|---|---|---|
| | | | | | |

### PROCEDURE / TREATMENT

| | TIME | Nurse Initials |
|---|---|---|
| Cardiac Monitor ) | | |
| Splint (Type: ) | | |
| (Location: ) | | |
| Central Line (Type: ) | | |
| Chest Tub (Am't Drained: ) (Size: ) | | |
| Dressing (Type: ) | | |
| Foley Cath. (Am't Drained: ) (Size: ) | | |
| N/G Tube (Am't Drained: ) (Size: ) | | |
| O$_2$ per | | |
| Patient Teaching (Type: ) | | |

| PHYSICIAN | EXAM TIME | PROCEDURE DONE |
|---|---|---|
| | | |

| PHYSICIAN | TIME NOTIFIED | PLACE NOTIFIED | TIME RESPOND | NURSES INITIALS |
|---|---|---|---|---|
| Siddig in ER | | | | |

### IV FLUIDS / TIMES / RATES

| Time Started | IV Fluid | Rate | IV Cath & Size | Nurse Initials | Time D/C | Amt. Infused |
|---|---|---|---|---|---|---|
| | | | | | | |

Comments

| TIME | ADDITIONAL NURSES NOTES |
|---|---|
| | See Front |

DISCHARGE TO: Home Stable @ 2215

ADMITTED TO:

REPORT GIVEN TO:

Transferred By:

Discharge Nurse Signature: Edison R.N.

Crenshaw Community Hospital
00040
Atwell v. Smart

Crenshaw Community Hospital
101 Hospital Cir. Luverne, AL 36049
Reported:    22:11 Jun 13 2006

Patient Name: DAVIS Debra 049371
Patient ID:
Sample Number: 0615000210

Location: ER/DC                    Sample Fluid: PLASMA
Priority: ROUTINE                  Entered:    22:04 Jun 13 2006

Segment: A  Position: 6

| TEST NAME | | RESULT | REF. INTERVAL | UNITS |
|---|---|---|---|---|
| CA | Calcium | 9.1 | 8.5-10.1 | mg/dL |
| GLU | Glucose | 91 | 78-110 | mg/dL |
| BUN | Blood Urea Nitrogen | 10 | 7-18 | mg/dL |
| CREA | Creatinine | 0.8 | 0.6-1.3 | mg/dL |
| Na | Sodium | 141 | 136-145 | mmol/L |
| K | Potassium | 3.7 | 3.5-5.1 | mmol/L |
| Cl | Chloride | 101 | 98-107 | mmol/L |
| ECO2 | Enzymatic Carbonate | 29.5 | 21.0-32.0 | mmol/L |

CRENSHAW COMMUNITY HOSP                    101 HOSPITAL CIRCLE                              LUVERNE, AL 36049
S P WALKER, MO/MED. DIREC                   PH:(334)335-1168                              FAX:(334)335-1159

Sample ID:     061306029          Patient Name: DAVIS ROBIN
Run Date/Time: 06/13/2006 10:08:56 PM Patient ID:   049371          Collect Date/Time: 06/13/2006 09:40:00 PM
Seq#:          1057              Gender:    Female      DOB:         Physician:   SIDDIQ/TOMPKINS
OPR:           BCI                                       Age:         Location:    ER
Flagging Set:  Woman
Comments:      COLLECTED BY DKC

| | | Range | | | | | Range | |
|---|---|---|---|---|---|---|---|---|
| WBC | 9.5 | * | 10^3/µL | 4.0 / 11.0 | NE | 54.1 | * | % | 45.0 / 70.0 |

| | | | | | LY | 35.8 | * | % | 20.0 / 40.0 |
| RBC | 4.43 | | 10^6/µL | 3.80 / 5.80 | MO | 6.6 | * | % | 3.0 / 10.0 |
| HGB | 13.8 | | g/dL | 11.5 / 16.5 | EO | 2.9 | * | % | 1.0 / 5.0 |
| HCT | 40.8 | | % | 37.0 / 47.0 | BA | 0.6 | * | % | 0.0 / 1.05 |
| MCV | 92 | | fL | 76 / 96 |
| MCH | 31.1 | | pg | 27.0 / 32.0 |
| MCHC | 33.9 | | g/dL | 31.0 / 35.0 |
| RDW | 12.7 | | % | 11.0 / 16.0 | NE# | 5.16 | * | 10^3/µL | 2.00 / 7.50 |
| | | | | | LY# | 3.41 | * | 10^3/µL | 1.50 / 4.00 |
| | | | | | MO# | 0.63 | * | 10^3/µL | 0.20 / 0.80 |
| PLT | 285 | | 10^3/µL | 150 / 500 | EO# | 0.28 | * | 10^3/µL | 0.04 / 0.40 |
| MPV | 7.8 | | fL | 6.0 / 10.0 | BA# | 0.06 | * | 10^3/µL | 0.02 / 0.10 |

Flags and Messages

Analytical Alarms
DIFF-

Interpretive Messages
WBC Interpretation Not Possible





RBC



PLT



WBC/BASO

Microscopic Examination

| Neutrophils | _____ | Metamyelocytes | _____ | Anisocytosis | _____ | Retics | _____ |
|---|---|---|---|---|---|---|---|
| Bands | _____ | Myelocytes | _____ | Hypochromia | _____ | Sed. Rate | _____ |
| Lymphocytes | _____ | Promyelocytes | _____ | Polychromasia | _____ | | |
| Monocytes | _____ | Blast | _____ | Poikilocytosis | _____ | | |
| Eosinophils | _____ | Atyp. Lymph | _____ | Microcytosis | _____ | | |
| Basophils | _____ | NRBC s | _____ | Macrocytosis | _____ | | |

Comment : _____

Requested by : _____
Reviewed by : _____



Out of Action Range  XXX      Out of Patient Range  XXX

Printed 06/13/2006 10:08:59 PM



06/13/2006  21:43:35    ---   ·· ·    ·· ----    Crenshaw Comm. Hospital

Dr:

| | | |
|---|---|---|
| Rate | 86 | . AGE NOT ENTERED, ASSUMED TO BE 50 YEARS FOR PURPOSE OF ECG INTERPRETATION |
| PR | 151 | . NORMAL SINUS RHYTHM, RATE 86........................................normal P axis, PR, rate & rhythm |
| QRSD | 74 | . BORDERLINE RIGHT AXIS DEVIATION.................................................... |
| QT | 349 | ........................................................age-specific ranges |
| QTc | 417 | |

--AXIS--

| | | |
|---|---|---|
| P | 64 | DAVIS  ROBIN  C  41327 |
| QRS | 87 | 049571        F 06/23/C6 |
| T | 39 | DOB              FR |
| | | DR SIDDIQ/TCHPOKINS OTHERWISE NORMAL ECG - |

PRELIMINARY-MD MUST REVIEW

Crenshaw Community Hospital
00043
Atwell v. Smart

# CRENSHAW COMMUNITY HOSPITAL
### 101 Hospital Circle
### Luverne AL 36049
### PHONE: (334) 335-3374

| PATIENT: DAVIS, ROBIN | REFERRING PHYSICIAN: SIDDIQ, MD, DR |
|---|---|
| DATE OF BIRTH | PHONE: |
| MRN: CCH41327 | ACCESSION NUMBER: 00070249 |
| EXAM DATE: 06/13/2006 | |

## EXAM: XR CHEST (TWO VIEWS)

HISTORY: Shortness of breath and cough.

CHEST X-RAY, PA AND LATERAL.

COMPARISON STUDY: None.

FINDINGS: There is minimal density in the left mid lung zone which is likely due to technique. Otherwise the lung fields are clear. There is no pleural effusion nor pneumothorax. The cardiomediastinal silhouette is normal size. The trachea is midline. No acute osseous abnormality is noted.

IMPRESSION:
WITHIN NORMAL LIMITS TWO-VIEW CHEST X-RAY. PLEASE SEE COMMENT ABOVE.

SARA RUPP, MD

Professional interpretation by RSI (Reddy Solutions, Inc.) *"Innovative Radiology Solutions"*

621 North Ave., Suite C-30 • Atlanta, GA 30308 • Phone (678) 904-6820 • (888) 906-3304 • Fax (678) 904-6824

Crenshaw Community Hospital
00044
Atwell v. Smart

**CRENSHAW COMMUNITY HOSPITAL • LUVERNE, ALABAMA 36049 • PHONE: 334-335-3374**

THIS EVALUATION WAS EMERGENCY CARE ONLY AND NOT INTENDED TO BE COMPLETE MEDICAL CARE. PLEASE FOLLOW THE
INSTRUCTIONS BELOW AND FOLLOW-UP WITH YOUR ASSIGNED PHYSICIAN OR OTHER PHYSICIAN AS NEEDED.

### ☐ HEAD INJURY

AWAKEN EVERY ____ HOUR(S) FOR ____ HOUR(S)
CALL IMMEDIATELY OR BE RECHECKED IMMEDIATELY IF:
1. Severe headache.
2. Persistent vomiting.
3. Unusual behavior or drowsiness.
4. Weakness, confusion.
5. Convulsions (dial 911).
6. Drainage of fluid from nose or ear(s).

### ☐ SPRAINS / STRAINS / BRUISES

1. Elevate and ice pack first 24-48 hrs.
   Then apply heat, after 24-48 hrs.
2. Rest injured area.
3. Call if numbness, weakness, increased pain, increased swelling.
4. Rewrap elastic bandage if too tight or too loose.
5. Remove splint in ____ days; ____ when comfortable;
   ____ when follow-up physician instructs you to.
6. Stop using crutches in ____ days; ____ when comfortable;
   ____ when follow-up physician instructs you to.
7. Aspirin/Tylenol/Advil/Nuprin for pain.

### ☐ CAST - SPLINT

1. Elevate and place ice pack over cast.
2. Do not put weight on cast for ____ hour(s).
3. Keep dry.
4. Call if increased pain, numbness, or if extremity turns blue or cold, or if elastic bandage or cast is too tight or too loose.
5. Remove splint when pain-free or when physician instructs you to.

### ☐ ABDOMINAL PAIN

1. Rest.
2. Clear liquids only for ____ hour(s).
3. Return if pain localizes, increases or is associated with fever, bloody vomitus/stools or abdominal distension.
4. Return for repeat exam in ____ hour(s) or sooner, if symptoms in #3 exist.

### ☐    YOU HAVE BEEN GIVEN A MEDICATION THAT
WARRANTS OBSERVATION FOR AN ALLERGIC REACTION.
PLEASE REMAIN IN THE WAITING AREA FOR 20 MINUTES.

### ☐ WOUND CARE / BURNS

1. Keep clean and dry until sutures are out, except daily soap and water and dressing change.
2. Elevate injured part to decrease swelling.
3. Ice intermittently for one to two days.
4. Return visit ____ day(s).
5. Sutures out in ____ day(s).
   (Suture removal/wound check between 8:00 a.m. & 8:00 p.m.)
6. Return immediately if increased redness, pain, swelling, drainage, red streaks. Any wound can get infected.
7. No swimming/water immersion until sutures out.
8. Use antibiotic ointment, especially on facial lacerations.

☐ Check your tetanus immunization status follow-up within 48 hours if last booster was greater than 5 years ago.

### ☐ FLU, VOMITING, DIARRHEA - ADULTS

1. If vomiting, push clear fluids (things you can see through).
2. No milk products for 24 hours if diarrhea.
3. Tylenol for fever if not vomiting.
4. Return if you develop bloody stools/vomitus, become thirsty, or increased abdominal pain.
5. No Aspirin for persons under 16 years of age with flu-like symptoms.

### ☐ FLU, VOMITING, DIARRHEA - INFANTS/CHILDREN

1. Clear liquids as much as child wants
   -Pedialyte, Lytren, Infalyte
   -Jello-water (half strength), Gatorade
   -Defizzed room temperature soda
   -Liquids you can see through
   -Give slowly if vomiting and try again
2. After 24 hours, advance diet as tolerated to applesauce, bananas, strained carrots, and than to regular diet.
3. If prolonged diarrhea, advance to soy formula (Isomil, Soy-Alac) for one to two weeks.
4. No milk products for several days.
5. Call or return if increased diarrhea, vomiting, bloody stools/vomiting, signs of dehydration (decreased urination, dry mouth, lethargy, irritable, weight loss, no tears), or no improvement in 24 hours.

### ☐ BACK OR SPINE INJURY

1. Bedrest for ____ day(s) or until comfortable.
2. No lifting or straining until pain-free or follow-up physician advises. Apply heat as needed.
3. Return immediately if numbness or weakness in arms or legs, or bowel/bladder problems.
4. See follow-up physician in ____ to ____ days if pain is not better.

### ☐ EYE CARE

1. Wear patch for ____ hour(s).
2. Rest both eyes.
3. Return for check in ____ hour(s).
4. Don't drive or operate machinery when eye is patched.

### ☐ FEVER CONTROL - ADULTS

1. Aspirin and/or Tylenol or Advil/Nuprin.
2. Push fluids.
3. Return if new symptoms such as increased cough, diarrhea, pain, vomiting, shortness of breath.

### ☐ FEVER CONTROL - CHILDREN

1. Keep clothes off.
2. Tylenol dosage 8mg/lb. body weight every 4-6 hours, or ____ mg every 4-6 hours for your child.
3. Push fluids.
4. Return if new symptoms, such as increased cough, diarrhea, pain, vomiting, shortness of breath.
5. No aspirin for person under 16 years of age with flu-like symptoms.
6. To control shivering, cover child with light blankets.

### ☐ UPPER RESPIRATORY INFECTIONS

1. Fever Control.
2. Push fluids.
3. Vaporizer, as needed for cough.
4. Cough medicine, decongestant as needed.
5. Return if ear pain, lethargy, rash, shortness of breath, productive cough.

### ☐    PICK UP PRESCRIBED MEDICATION(S) AT
OUT-PATIENT PHARMACY.

---

**NO DRIVING** >    ☐ FOR - ____ HRS    - OR -    ☐    UNTIL SEEN BY REFERRAL PHYSICIAN

OTHER INSTRUCTIONS: Fill prescriptions & take as directed. Force fluids
Follow-up with Dr. Tompkins if no better

THE EMERGENCY/CONVENIENT CARE DEPARTMENT HAS NOT
CONTACTED YOUR REFERRAL PHYSICIAN. YOU ARE RESPONSIBLE
FOR OBTAINING FOLLOW-UP CARE AS ADVISED.

IF YOUR CONDITION BECOMES WORSE OR NEW SYMPTOMS
DEVELOP AND YOU ARE UNABLE TO CONTACT YOUR PHYSICIAN
RETURN TO THE EMERGENCY DEPARTMENT IMMEDIATELY!

IF YOU HAD X-RAYS TAKEN THERE WILL BE A FINAL READING BY THE RADIOLOGY SPECIALIST. IF THERE IS ANY DISCREPANCY IN THE READING, YOU WILL BE NOTIFIED.

YOUR EMERGENCY/PRIVATE PHYSICIAN WAS DR. Siddiq

IF YOU DO NOT HAVE A PRIVATE MEDICAL DOCTOR YOU MAY SEE THE REFERRAL    PHYSICIAN
BELOW FOR FOLLOW-UP CARE RELATED TO THIS VISIT. WHEN YOU CALL FOR AN APPOINTMENT
BE SURE TO STATE THAT YOU WERE TREATED IN THE EMERGENCY DEPARTMENT.

I AUTHORIZE COPIES OF ALL MEDICAL RECORDS/REPORTS RELATING TO THIS VISIT TO BE SENT
TO THE REFERRAL DOCTOR/AGENCY BELOW.

SIGNATURE:
YOUR REFERRAL PHYSICIAN IS: DR. Tompkins
PHONE:
ADDRESS:

☐ SEE IN ____ DAYS    ☐ SEE IN ____ DAYS IF NOT IMPROVED
I HEREBY ACKNOWLEDGE RECEIPT OF AND UNDERSTAND THE ABOVE INSTRUCTIONS.
SIGNATURE: ____    DATE: 6-13-06
WITNESS: JE Edison R.N.

EMERGENCY / CONVENIENT CARE/AFTER-CARE INSTRUCTIONS

☐ CALL FOR CULTURE RESULTS IN ____ DAY(S) AT 495-6000
☐ DISABILITY DAYS ____

Crenshaw Community Hospital
00045
Atwell v. Smart

C MIC    B. C  41327
049371
009    F 06/23/06
DR SIDDIQ/TOMPKINS ER
MEDICAL RECORDS

Crenshaw Community Hospital
101 Hospital Circle
Luverne, Al 36049

DAVIS ROBIN C C1327
049371
DOB              F 06/13/06
DR SIDDIQ/TCMPOKINS    ER

## Emergency Department LEVEL OF CARE

| | | CRITICAL CARE : SEE ** below |
|---|---|---|
| | CC | CPR |
| | CC | Stroke/Cerebral Hemorrage – all Types |
| | CC | Trauma, Trauma Alert/ Multiple Trauma |
| | CC | Shock of all types- Septic, Cardiogenic, |
| | | Spinalm Hypovolemic, Anaphylactic |
| | CC | Other- See *** below |
| | | See also Procedures Listing |
| | | |
| | 16 | PROTOCOLS: Asthma, Chest pain, Psych |
| | | |
| | | ADMISSIONS / TRANSPORT |
| | 0 | Triage |
| | 0 | Simple Recheck |
| ✓ | 1 | Ambulatory visit / Complex recheck |
| | 10 | DOA, Death (no code) |
| | 5 | Hospital Admission |
| | 3 | Transfer in ED by ambulance |
| | 1 | Transfer out of ED by ambulance |
| | 5 | Transport with nurse to other facility |
| | | ASSISTING MONITORING |
| | 15 | Conscious Sedation (inc. routine monitoring) |
| | 5 | Monitoring (Multi V/S, neuro check, cardiac) |
| | 2 | Nasal packing |
| ✓ | 1 | Pulse Ox check (Routine) |
| | 2 | Resporatory Therapy Tx (O2, updraft, etc.) |
| | 2 | Simple Assist (steri strip, eye exam) |
| | 10 | Ventilator / CPAP mask |
| | | WOUND CARE |
| | 5 | Complex wound cleansing |
| | 2 | Dressing (small / moderate) |
| | 3 | Dressing (large / complex / simple burn) |
| | 2 | Suture Removal |
| | 2 | Wound cleaning / eye treatment / eye patch) |
| | | SPECIAL NEEDS |
| | 2 | Bath |
| | 1 | Bedpan / Urinal (ea placement theron) |
| ✓ | 1 | Bed linen changed |
| | 3 | Comatose, disoriented |
| | 5 | Combative, confused, incontinent, psychiatric |
| | 2 | Pediatric patient |
| | 1 | Isolation |

| | PROCEDURES |
|---|---|
| CC | Cardioversion |
| CC | Chest tube insertion |
| CC | Emergency Delivery |
| CC | Intraosseous Infusion |
| CC | Intubation |
| CC | Pacemaker assist |
| CC | TPA administration |
| CC | Tracheostomy assist / replace |
| 10 | Blood administration |
| 10 | Bronchoscopy |
| 5 | Casting |
| 10 | Central line / cutdown insertion |
| 10 | Debridement of burns, complex |
| 5 | Debridement of burns, simple |
| 2 | Foreign Body removal, EAR |
| 5 | Foreign Body removal, OTHER |
| 10 | Gastric lavage |
| 5 | Gastrostomy tube change |
| 3 | I & D abcess |
| 10 | K wire / Steinman pin |
| 5 | Laceration / wound repair, simple |
| 10 | Laceration / wound repair, intermediate |
| 15 | Laceration / wound repair, complex |
| 10 | Lumbar puncture |
| 5 | Nasal Hemorrhage control |
| 5 | Peritoneal tap assist |
| 10 | Pre-op preparation |
| 10 | Reduction of Fx / DISLOCATION |
| 5 | Removal of impacted ear wax |
| 10 | Splint (leg, arm, shoulder, etc.) |
| 2 | Therapeutic phlebotomy |
| 15 | Thoracentesis / Paracentesis |

** If a diagnostic, surgical or therapeutic
procedure was done, you must use
ER level or Critical Care level with
procedure charge.

Crenshaw Community Hospital
00046
Atwell v. Smart

## EMERGENCY DEPARTMENT LEVEL OF CARE (continued)

| | EDUCATION / DISCHARGE INSTR. |
|---|---|
| 2 | AMA |
| 2 | Crutch Training by the ER staff |
| 0 | Discharge Instructions - simple |
| 2 | Discharge Instructions - complex |
| 2 | Social Services consult |
| | MEDS / Ivs |
| 5 | Infusaport access |
| 3 | IV - simple (INT, KVO) |
| 5 | IV - w/pump, drip, rapid > 2 hours |
| 1 | MED-PO, supp, topical |
| 5 | Multiple lines, complex IV's |
| 3 | Rabies vaccine |
| | OB / GYN |
| 2 | Fetal heart tones |
| 2 | Newborn Care |
| 3 | Pelvic exam - simple |
| 5 | Pelvic exam - complex, hemorrhage, difficult |
| 10 | Rape exam |
| | TREATMENT |
| 3 | Ace wrap, collar, sling, immobilizer |
| 15 | Decontamination - Hazardous Materials |
| 2 | Enema administration |
| 5 | Impaction removal |
| 2 | Suction / Irrigation |
| 2 | Traction assist |
| 3 | Urinary Cath / NG insertion |
| | TESTS |
| 2 | Arterial Blood Gases (ABG) |
| 2 | C-arm |
| 2 | EKG 12 lead |
| 1 | Glucose via device (routine) |
| 1 | Hemocult |
| 1 | Lab |
| 1 | Specimen collect (urine, sputum, etc) |
| 1 | Visual acuity |
| 2 | X-ray (simple) per trip |
| 3 | X-ray (complex - CT, MRI, US, IVP ) per trip including patient monitoring |

** Any time a Critical Care item is marked, you do not have to mark anything more on the left side, simply mark any procedure that was performed, and indicate "CC" in the box below.

Total points determines level of service:

| | |
|---|---|
| 0 | ER Level 1 |
| 1-5 | ER Level 2 |
| 5-10 | ER Level 3 |
| 11-15 | ER Level 4 |
| 16 and up | ER Level 5 |

TOTAL POINTS
or CC for Critical Care

*** For Critical Care - Other: See below for examples, refer to Policy for Definition

#### Potential Symptoms:
New onset paralysis
Head Injury with loss of consciousness
Acute myocardial Infarction
Drug overdoses Impairing vital functions
Coma of all etylologies (except hypoglycemic)

#### Acute Failure:
Renal, hepatic, respiratory, pulmonary edema, major pulmonary embolis
Emboli of fat or amniotic fluid
Non-hemorrhagic Strokes with vital function impairment

#### Aneurysms, Thoracic or Abdominal

| | |
|---|---|
| Leaking or ruptured | Cardia Tamponade |
| Aortic dissection | Lactic Acidosis |
| Diabetic Ketoacidosis | Envenomation |

Tension Pneumothorax
Thyroid storm or Addisonian Crisis
Life-threatening hyper/hypo thermia
DIC or other bleeding diathesis - Hemophilia, ITP, TTP, Leukemia
Aplastl

#### Potential Interventions
Multiple parenteral medications requiring constant monitoring

| | |
|---|---|
| CVP line insertion | Ventilator |
| Periocardiocentesis | Cricothyrotomy |
| Control of major hemorrhage | Emergent Cath Lab Pro |

Administration of blood transfusions / blood products
Major burn care / transfer to burn unit
Major Trauma care / multiple surgical consults

 

CRENSHAW COMMUNITY HOSPITAL    101 HOSPITAL CIRCLE    LUVERNE    AL 36049

**RECORD OF ADMISSION**

| PATIENT NAME | ROOM NO. | HOSP. NO. | | ADDRESS LINE - 1 | | ADDRESS LINE - 2 |
|---|---|---|---|---|---|---|
| DAVIS ROBIN O | 120-2 | 043634 | | | | |

| AGE | BIRTHDATE | SEX | BIRTHPLACE | | CITY | | STATE | ZIP CODE | COUNTY CODE |
|---|---|---|---|---|---|---|---|---|---|
| 32 | | F | CRENSHAW | | | | AL | | 041 |

| SSAN | NATIONALITY | CIVIL ST. | MILITARY | RELIGION | | CHURCH | | PATIENT TELEPHONE |
|---|---|---|---|---|---|---|---|---|
| | WHITE | S | N | | | | | 335-3501 |

| SPOUSE INFORMATION | NAME OF HUSBAND OR MAIDEN NAME OF WIFE | | SPOUSE BIRTHPLACE | | SPOUSE EMPLOYER NAME |
|---|---|---|---|---|---|
| U | | | | | |

| | SPOUSE ADDRESS | | | SPOUSE EMPLOYER ADDRESS |
|---|---|---|---|---|

| NAME OF FATHER | BIRTHPLACE | MAIDEN NAME OF MOTHER | BIRTHPLACE |
|---|---|---|---|

| NOTIFY IN CASE OF EMERGENCY | NAME | RELATIONSHIP | ADDRESS | TELEPHONE |
|---|---|---|---|---|
| | EDISON JANICE | 5278853 | | 527-8853 |

| EMPLOYER NAME | EMPLOYER ADDRESS | EMPLOYER TELEPHONE | OCCUPATION |
|---|---|---|---|
| SMART ALABAMA LLC | 121 SHIN YOUNG DRIVE | 334-335-5800 | |

| GUARANTOR NAME | GUARANTOR TELEPHONE | CITY | HOSPITALIZATION INSURANCE |
|---|---|---|---|
| DAVIS ROBIN O | 335-3501 | | BLUE CROSS-I/P PPA852463626 52397 |

| GUARANTOR ADDRESS - 1 | | | | | |
|---|---|---|---|---|---|

| GUARANTOR ADDRESS - 2 | STATE | ZIP CODE | DATE | TIME | PLACE | EVENT |
|---|---|---|---|---|---|---|
| | AL | 36009 | | | | |

| ADMITTING PHYSICIAN | CONSULTING PHYSICIAN | ADMITTING SERVICE | SMOKER | ADMITTING DIAGNOSIS |
|---|---|---|---|---|
| TOMPKINS C | TOMPKINS C | MEDICAL | | |

| ALLERGIES | DATE LAST ADM. | PREV. ADM. NO. | ADMISSION DATE | TIME OF ADMISSION | INITIALS | DISCHARGE DATE |
|---|---|---|---|---|---|---|
| | 10/18/05 040002 | | 1/25/06 | 1:15 AM | JHE | 1-26-06 |

| FINANCIAL CLASS | MEDICAL RECORDS NUMBER | ADMISSION CODE | HOME 1 | SHORT TERM HOSPITAL 2 | SKILLED NURSING FACILITY 3 | INTERMEDIATE CARE FACILITY 4 | OTHER 5 | HOME HEALTH AGENCY 6 | LEFT AMA 7 | EXPIRED 20 | TIME |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 41327 | 17/EMER | | | | | | | | | 1400 |

**PRINCIPAL DIAGNOSIS:**

ADVANCE DIRECTIVE = U

**CODE**

78659

**SECONDARY DIAGNOSIS:**

28605

4240

**PRINCIPAL OPERATION / DATE:**

**SECONDARY OPERATIONS:**

Consultation With _____

Results:  ☐ Recovered  ☐ Improved  ☐ Not Improved  ☐ Not Treated  ☐ Diagnosis Only  ☐ Died  ☐ Released Against Advice

Cause of Death _____  Autopsy:  ☐ Yes  ☐ No

I have examined and approved this complete medical record on _____ 20 ___

Crenshaw Community Hospital
00048
Atwell v. Smart

Signed _____

Attending Physician

**ADMISSION — SUMMARY SHEET (over)**

CHART COPY                                    ATTENDING PHYSICIAN



## CONDITIONS OF ADMISSION

TO

_____ HOSPITAL

1. **Release of Information:** The undersigned is consideration for the treatment to be given by _____ Hospital to patient hereby agrees and expressly waives his/her privilege (and the privilege of the patient being treated if other than the undersigned) to the confidentiality of medical records relating to this admission and any and all such medical treatment received relative to such admission including, without limitation, any psychiatric treatment, for the time period of this admission and agrees, understands and consents that all records generated by his/her treatment and/or admission to the hospital (or treatment of one for whom the undersigned has legal responsibility or authority to execute this consent form) can be reviewed by any person or organization authorized by law or by a third party payor who may provide insurance payments to the hospital for the charges incurred for the services rendered to the patient and also expressly authorizes the hospital to release such records to such payor or to any person or organization authorized by law to review these records for any lawful purpose.

2. **Consent to Hospital Care:** I am presenting myself for admission to the hospital and I voluntarily consent to the rendering of such care including diagnostic procedures and medical treatment, by authorized agents and employees of the hospital, and by its medical staff, or their designees, as may in their professional judgment be deemed necessary or beneficial. I acknowledge that no guarantees have been made to me as to the effect of such examination or treatment on my condition. I realize that during the course of my care, at the _____ Hospital, or for follow-up care, it may be necessary for the _____ Hospital or my attending physicians to make available to other health care providers, copies of my medical records for information relating to my care, and I consent to such releases.

3. **Personal Valuables:** It is understood and agreed that the hospital maintains a safe for the safekeeping of money and valuables and the hospital shall not be liable for the loss or damage to any money, jewelry, glasses, dentures, furs, fur coats, and fur garments or other articles of unusual value and small compass, unless placed therein, and shall not be liable for loss or damage to any other personal property, unless deposited with the hospital for safekeeping.

4. **Assignment of Insurance Benefits:** In the event the undersigned is entitled to hospital benefits of any type whatsoever arising out of any policy of insurance insuring patient or any other party liable to patient, said benefits are hereby assigned to Hospital for application on patient's bill, and it is agreed that the hospital may receipt for any such payment and such payment shall discharge the said insurance company of any and all obligations under the policy to the extent of such payment, the undersigned and/or patient being responsible for charges not covered by this assignment.

5. **Financial Agreement and Payment Guarantee:** Both undersigned patient and the guarantor(s) agree that in consideration of the services to be rendered to the patient, they hereby individually obligate themselves to pay the charges of the hospital in accordance with the regular rates and terms of the Hospital. Should the account be referred to an attorney for collection, the undersigned shall pay reasonable attorney's fees and collection expenses. All delinquent accounts bear interest at the legal rate.

6. **For Medicare/Medicaid Beneficiaries Only:** I certify that the information given by me in applying for payment under Titles XVIII & XIX under the Social Security Act is correct. I request that payment of authorized benefits be made on my behalf for any services furnished me by, or in, _____ Hospital, including physicians services. I authorize any holder of medical or other information about me to release to the health care financing administration and agents any information necessary to determine these benefits or related services.

The undersigned certifies that he has read the foregoing, and is the patient, or is duly authorized by the patient as patient's general agent to execute the above and accept its terms. All guarantors certify that they have read the foregoing and accept its terms.

_____
Patient

_____
Witness

_____
Guarantors

_____
Date

_____
Relationship to Patient

Crenshaw Community Hospital
00049
Atwell v. Smart

*Lft 61149*

**CRENSHAW COMMUNITY HOSPITAL**
**101 Hospital Circle**
**Luverne, Alabama 36049**

DAVIS ROBIN        41327
043634
DOB              F  01/28/06
DR. TOMKINS   RM 1206

**DISCHARGE PLAN**

DATE: __1/26/06__

PATIENT NAME: __Davis, Robin__        PHYSICIAN __Tompkins__

DIET AND DIETARY INSTRUCTIONS: __Diet as tolerated but Caffein__
__free drinks, tea + coffee. Limit chocolate and__
__No smoking__

MEDICATIONS: __Take home medications as at home. Plus take__
__① Atendol 12.5mg 1 tab. as directed__
__② Wellbutrin XL 150mg 1 tab. every morning.__
__③ Prevacid 15mg 1 tab. every morning__

RETURN CLINIC APPOINTMENT: __Return to office 2/9/06 at 2pm__

SPECIAL INSTRUCTIONS: __May take Motrin over the counter for pain__

REFERRALS: Public Health, Social Services, Mental Health, Other Facilities, etc.

DISCHARGE NURSE: __L. Tompkins RN__

I UNDERSTAND THE ABOVE INSTRUCTIONS:

PATIENT / FAMILY SIGNATURE: __X Robin Davis__

Crenshaw Community Hospital
00050
Atwell v. Smart

DAVIS ROBIN O    41327
043634
DOB              F  01/25/06
U. TOMPKINS      RM 120B

## DISCHARGE PLANNING ASSESSMENT

PATIENT'S ADDRESSOGRAPH

ADMISSION DATE 1-25-06 _____ DISCHARGE DATE _____

ADMITTING DIAGNOSIS _Chest Pain R 10 mI_ _____ AGE _____

INSURANCE COVERAGE: MEDICARE _____ MEDICAID _____ VA _____ PRIVATE PAY _____
TRICARE _____ BCBS ✓ OTHER INSURANCE _____

MENTAL STATUS: DISORIENTED _____ CONFUSED _____ AGITATED _____ ALERT ✓
COMATOSE _____ LETHARGIC _____ OTHER _____

IMPAIRMENTS WHICH MIGHT AFFECT CARE: NONE ✓ SPEECH _____ SIGHT _____
PHYSICAL IMPAIRMENT _____ HEARING _____ OTHER _____
Elaborate if needed on Impairments _____

HOME ENVIRONMENT: LIVES ALONE _____ LIVES WITH RELATIVES ✓
ASSISTED LIVING _____ SKILLED NURSING FACILITY _____
OTHER _____
ACTIVITIES OF DAILY LIVING: SELF ✓ NEEDS ASSISTANCE _____ DEPENDENT _____

SPECIAL NEEDS: NONE ✓ SPECIFY _____

OTHER DEPARTMENT NEEDS: NONE ✓ SPECIFY _____

CURRENTLY USING: HOME HEALTH AGENCY ✓ NAME OF AGENCY _____
HOME PHYSICAL THERAPY _____ HOME HEALTH AIDE _____
HOSPICE _____ NAME OF AGENCY _____

EQUIPMENT CURRENTLY BEING USED AT HOME: NONE ✓ WALKER _____ BED _____
WHEELCHAIR _____ BEDSIDE COMMODE _____ OXYGEN _____ AER NEBS _____
OTHER _____
NAME OF DURABLE MEDICAL EQUIPMENT COMPANY USED: _____

CURRENT TEACHING NEEDS: DIET _N/A_ TREATMENTS _____ MEDICATIONS _____
OTHER _____

Crenshaw Community Hospital
00051
Atwell v. Smart

**FAMILY/PATIENT REPRESENTATIVE AVAILABLE TO PROVIDE SUPPORT/CARE:**

NAME _Janice E dson_        RELATIONSHIP _____

ADDRESS _____

PHONE _____ 522-8853 _____

POTENTIAL NEED FOR ALTERNATE PLACEMENT    YES    (NO)
FURTHER DISCHARGE PLANNING NEEDED    YES    (NO)

NOTES: _Patient Cares for own Needs. Will monitor future_
_discharge Needs._

Discharge Planner's Signature/Date/Time   _1-25-06 Kathryn..._

| Date/Time | Follow up Notes |
|-----------|-----------------|
| 6/26/06 | D/c to home. M McLinly |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |



DAVIS ROBIN C    41327
043634
DOB              F  01/25/00
                 RM 120B

**Crenshaw Community Hospital**
**Luverne, AL**

**NURSING ADMISSION**
**ASSESSMENT**

Date: 1-25-06  Time: 0215  Phone Numbers: _____
Educational needs: _____
Information obtained from: ☑Patient ☐Family ☐Significant Other (name) _Aminophylline_
ALLERGIES (food, drugs, other) _Ampicillan Medrol Compound_  Allergy Bracelet ☐Yes  ☐No
Admit via: ☐Ambulatory ☑Wheelchair ☐Stretcher from: _ER_
**HEALTH PERCEPTION - HEALTH MANAGEMENT**
Chief complaint: (patient's statement) _"Pain in the middle of my chest_
_going straight through to my back"_

MEDICATION - Circle those taken today
_none_

Disposition of drugs: ☐With patient ☐Sent Home ☐Pharmacy ☐Not brought
Pertinent Hx (Previous Hx: Surgeries, Medical problems) _Tonsillectomy  Ovaries/cyst removed  foot surgery_

**PROSTHETIC DEVICES** ☐None
Dentures    ☐Lower    ☐Upper    ☐Partial
            ☐Bridge             ☐Capped
            ☑Eyeglasses         ☐Contacts
            ☐Hearing Aid        ☐Pacemaker

**SAFETY NEEDS**
☑Call button      ☐Siderails        ☐Siderails/HS only
☐Restraints       ☐Vest restraint
☐Significant other/family member to remain with patient
☐Other: _____

**ROLE RELATIONSHIP**
☑Married  ☐Single  ☐Widowed  ☐Divorced
Children: _4 - boys_

Occupation: _Smart_

Educational level: _12th_

**DISCHARGE PLANNING**
Living arrangements (check one): ☐Alone  ☑With Spouse
☐Family ☐Friend ☐Other: _____
Is Significant Other capable of assisting post discharge? ☐Yes ☐No
If not, what support services are available? _____

**PRESENT A.D.** (check appropriate box)
☐Self-Care  ☐Requires assistance
☐Requires total care  ☐Other: _____
Did patient require help with any of the following at home?
(check appropriate box)
☐Cooking    ☐Feeding      ☐Toilet Needs
☐Medications ☐Special diet ☐Transportation ☐No help
☐Other (specify): _____

**DISCHARGE DESTINATION:**
☐If unknown, refer to Social Worker  ☐Currently using Home Health
Agency Name: _____

**PERSONAL FAMILY HISTORY**
Alcohol        ☐Yes ☐No  Amount: _father alcoholic_
Smoking:       ☐Yes ☐No  Amount: _____
Drugs:         ☐Yes ☑No  Amount: _____
Exposure to Infectious Disease: _____

| | YES | NO | RELATION |
|---|---|---|---|
| Kidney Disease | ✓ | | _aunt_ |
| Asthma | ✓ | | _children_ |
| Cancer | ✓ | | _aunts all/grandparent_ |
| Diabetes | | ✓ | _Mothers side_ |
| Epilepsy/Seizures | | ✓ | |
| High Blood Pressure | ✓ | | _grandparents parents_ |
| Heart Disease | ✓ | | _grandparents x4_ |
| Vascular Disease | | ✓ | |
| Sickle Cell Disease | | ✓ | |

**VALUE BELIEF**
Religious affiliation: _Baptist_
Important to your family life? ☐Yes  ☐No

**INSTRUCTIONS TO PATIENT**
Call light:  ☑Yes ☐No    Emergency light  ☐Yes ☐No
Meal times:  ☑Yes ☐No    Bed Control      ☑Yes ☐No
Bathroom:    ☑Yes ☐No    Television       ☑Yes ☐No

**VALUABLES** (describe) _Glasses - cell phone_

                                          ☐None
☐To hospital safe
Disposition: ☑With patient  ☐Sent home with: _____

**DO YOU HAVE AN ADVANCE DIRECTIVE?** ☐Yes ☑No
If yes, explain that we need a copy for our records.  If no, ask the
patient if he/she would like additional information and instructions
concerning Advance Directives.
                            Patients answer: ☐Yes ☐No

Crenshaw Community Hospital
00053
Atwell v Smart

**VITAL SIGNS:**
B/P 136/84  R or L Pulse 113  Resp. 22  Temp 98.7
Height 5'4"  Weight 150

**HEENT:**
| | | |
|---|---|---|
| Vision problems  *glasses* | ☐Yes | ☑No |
| Hearing problems | ☐Yes | ☑No |
| Sinus trouble | ☑Yes | ☐No |
| Speech problems | ☐Yes | ☑No |
| Primary language, if not English _____ | | |
| Frequent sore throat/hoarseness | ☐Yes | ☑No |
| Epistaxis | ☐Yes | ☑No |

**RESPIRATORY:**
Cough ☐Yes ☑No  ☐Productive ☐Non-productive
Character of Sputum _____
SOB: ☑Yes ☐No  Asthma ☐Yes ☑No

**CARDIOVASCULAR:**
| | | |
|---|---|---|
| Chest pain | ☑Yes | ☐No |
| Palpitations | ☑Yes | ☐No |
| Edema  *hands* | ☑Yes | ☐No |
| SOB at rest  *c̄ chest pain* | ☑Yes | ☐No |
| Phlebitis | ☐Yes | ☑No |

**GASTROINTESTINAL:**
| | | |
|---|---|---|
| Heartburn | ☐Yes | ☑No |
| Difficulty Swallowing/eating | ☐Yes | ☑No |
| Nausea & Vomiting *c̄ chest pain* | ☑Yes | ☐No |
| Hemorrhoids | ☐Yes | ☑No |
| Abdominal pain | ☐Yes | ☑No |
| Last bowel movement *1-24-06* | | |
| Bowel patter ☐Natural ☐Induced (explain) | | |

**SKIN:**
| | | |
|---|---|---|
| Rashes | ☐Yes | ☑No |
| Allergies | ☐Yes | ☑No |
| Lesions  *Bruises* | ☐Yes | ☑No |
| Lacerations and pressure sores | ☐Yes | ☑No |

**NEUROLOGICAL:**
| | | |
|---|---|---|
| Headaches | ☑Yes | ☐No |
| Dizziness | ☐Yes | ☑No |
| Seizures | ☐Yes | ☑No |
| Responds to ☑Verbal ☐Pain | | |

**GENITOURINARY:**
| | | |
|---|---|---|
| Hematuria | ☐Yes | ☑No |
| Hx of Kidney/bladder Infection | ☑Yes | ☐No |
| Prostate trouble | ☐Yes | ☐No |
| Genital Itching, discharge, lesions | ☐Yes | ☑No |

**REPRODUCTIVE - FEMALE (if applicable):**
| | | |
|---|---|---|
| Do you perform breast self-exam monthly? | ☐Yes | ☐No |
| Type of birth control: _____ | | |
| LMP _____ Are you pregnant? | ☐Yes | ☐No |
| Menses regularity | ☐Yes | ☐No |

**MUSCULOSKELETAL:**
| | | |
|---|---|---|
| Joint pain  *Knees wrist* | ☑Yes | ☐No |
| Swollen joints  *+ hands* | ☐Yes | ☐No |
| Back pain | ☐Yes | ☐No |
| Neck pain  *Arthritis* | ☐Yes | ☐No |
| Arm pain | ☐Yes | ☐No |
| Leg pain | ☐Yes | ☐No |
| Limited movement (if any) *Fibromyalgia* | | |

Completed by _____ *A Burgans LPN*   R.N.

---

IMMUNIZATION HISTORY
HISTORY OF
FLU SHOT W/I LAST YEAR YES  NO
PNEUMOVAX          YES  NO
DATE GIVEN

RATE & DESCRIPTION _____

Apical Rate:  ☐ Regular  ☐Irregular _____

APPETITE  ☑Good ☐Fair ☐Poor
MEAL SNACK PATTER AT HOME:

Texture: *Smooth*      Turgor: *good*
Temperature: *Warm*

| | | |
|---|---|---|
| Alert | ☐Yes | ☐No |
| Oriented | ☐Yes | ☐No |
| Changes in memory | ☐Yes | ☑No |
| Agitation | ☐Yes | ☑No |
| Comatose | ☐Yes | ☐No |

BLADDER PROBLEMS/PATTERNS:  ☑None
☐Dysuria      ☐Anuria      ☐Nocturia

ACTIVITY/EXERCISE:  ☐Ambulatory  ☐Athletic
☐Ambulatory with assist  ☐Sedentary  ☐Bedfast

☐Nursing Care Plan Completed

Date *1-25-06*   Time *0230*

Crenshaw Community Hospital
00054

DAVIS ROBIN O   41327
O43634
O,8                          F  01/25/06
U   ...  ...  ...            RM 120B

NSHAW COMMUNITY HOSPITAL
HOSPITAL CIRCLE.. 334-335-3374
LUVERNE, ALABAMA 36049
*"Where Caring Counts"*

NURSING CARE PLAN
IV'S / REPLOCKS

| DATE/ INITIAL | NURSING DIAGNOSES | GOAL/EXPECTED OUTCOME | NURSING ORDERS | DATE RESOLVED INITIAL |
|---|---|---|---|---|
| | 1.  Potential for infection R/T invasive procedure (ie., insertion of venous catheter) | 1.  Pt will have no S/S of infection AEB: -will experience no fever or chills -insertion site will remain free of drainage, erythema, edem or tenderness. | 1.  Inspect insertion site of catheter for erythema, edema, drainage, and tenderness q 2.  Monitor Pt's temperature q 3.  Keep insertion site covered and secure at all times. 4.  Change insertion site and tubing q 72 hours. | |
| 1/25 DB | | | | |

Crenshaw Community Hospital
00055
Atwell v. Smart

CRENSHAW COMMUNITY
HOSPITAL

1-25-06

Pain

DAVIS ROBIN O    41327
043634
DOB          F  01/25/06
D_ T_PKINS   RM 1208

| 1 | Nursing Diagnosis | Goal/Expected Outcome | Nursing Orders | Date Resolve Initial |
|---|---|---|---|---|
| 1 25 | 1. Alteration in comfort/ pain. | 1. Patient will express minimal discomfort or absence of pain. | 1. Assess and record all c/o pain – type, location, severity, duration. 2. Medicate as ordered. Assess effects of medication within _____ Report absence of pain relief. 3. Position for comfort. 4. Encourage patient to engage in distraction techniques. | |

Crenshaw Community Hospital
00056
Atwell v. Smart

**CRENSHAW COMMUNITY HOSPITAL**
**·101 Hospital Circle**
**Luverne, AL 36049**
**Telephone (334) 335-3374**

| | | |
|---|---|---|
| **PATIENT:** | DAVIS, Robin | **DOB:** |
| **ACCT #:** | 043634 | **PATIENT #:** 41327 |
| **PHYSICIAN:** | Dr. Charles S. Tompkins | **ADM. DATE:** |

**HISTORY OF PRESENT ILLNESS:** 32 year-old white female comes to the emergency room after being awakened just after midnight with substernal chest pain radiating through to her back. She had some nausea and some shortness of breath. She had a similar episode the day before. She was seen in the office by Dejuana a couple of days ago with the same sort of thing. I do not know the details of that visit.

**PAST MEDICAL HISTORY:** She is a heavy smoker, two packs a day. She says she has had some abnormal PFTs in the past when she started at Smart. She seems to have a lot of work-related stress. She has had a previous tubal. She had her tonsils out. She had an ovarian cyst removed in the past, apparently 2004. She had her gallbladder out in 1998. She has had some foot surgery, and she has breast implants. She had a prior c-section in 2000.

**CURRENT MEDICATIONS:** No routine medicines.

**SOCIAL HISTORY:** Married with four boys. She works at Smart. She has a 12th-grade education.

**FAMILY HISTORY:** Positive for heart problems, hemochromotosis, hypoglycemia, high blood pressure, and malignancy in her aunts and grandparents. We probably need to obtain a more detailed family history.

**PHYSICAL EXAM:** On exam, she arrived here with heart rate in the 113 range.
**HEENT/Neck:** Negative.
**HEART:** Regular tachycardia.
**LUNGS:** Clear.
**ABDOMEN:** Benign.
**EXTREMITIES:** Normal.
**NEURO:** Intact.

(continued)

**HISTORY & PHYSICAL**

**Page 1 of 2**

Crenshaw Community Hospital
00057
Atwell v. Smart

**CRENSHAW COMMUNITY HOSPITAL**
**·101 Hospital Circle**
**Luverne, AL 36049**
**Telephone (334) 335-3374**

| | | | |
|---|---|---|---|
| **PATIENT:** | DAVIS, Robin | **DOB:** | |
| **ACCT #:** | 043634 | **PATIENT #:** 41327 | |
| **PHYSICIAN:** Dr. Charles S. Tompkins | | **ADM. DATE:** | |

(continued)

IMPRESSION/PLAN:  She was started on Lopressor and aspirin in the emergency room. Nothing particularly remarkable on EKG or vital signs.  Labs were fine to start with.  This just looked like a sinus tachy.  Certainly with her mitral valve prolapse it could be she is having some rhythm problems there.  She is a real heavy smoker and has a lot of family history of heart disease, so this will need to be handled carefully.


_____

Dr. Charles S. Tompkins, MD

CST/jrj
D: 01/26/06
T: 01/26/06


**HISTORY & PHYSICAL**

**Page 2 of 2**

Crenshaw Community Hospital
00058

**CRENSHAW COMMUNITY HOSPITAL**
**101 Hospital Circle**
**Luverne, AL 36049**
**Telephone (334) 335-3374**

| | |
|---|---|
| **PATIENT:** DAVIS, Robin | **PATIENT #:** 41327 |
| **ACCT #:** 043634 | **ADM. DATE:** |
| **PHYSICIAN:** Dr. Charles S. Tompkins | **DIS. DATE:** 01/26/06 |

**DISCHARGE DIAGNOSIS:** Chest pain. Shortness of breath. Smoker and reportedly has history of abnormal PFTs. Echocardiographic evidence of mild mitral valve prolapse and trace mitral regurgitation. Heavy smoker, up to two packs per day. History of "hemochromotosis", details unclear. Family history of hemochromotosis. History of bilateral tubal ligation in the past. SAID TO BE ALLERGIC TO AMINOPHYLLINE, MEDROL, AND COMPAZENE. Heavy caffeine consumer.

**DISPOSITION:** The patient will likely go home today. We are checking a set of gases. I do not think her PO2 is going to be low enough to make us worried about a pulmonary embolus. Should it be, then I think we will send her and get a spiral CT or VQ scan. She certainly does have some mitral valve prolapse. She could have some periodic rhythm disturbance. We have not documented that here, but that certainly could be the case. She is a very heavy caffeine consumer. She previously was on stimulants such as stackers in the past. She smokes up to two packs a day. She relates a lot of stress at work, and certainly we have had a long discussion with her about all of the implications of that.

When I see her back in the office I think I might ought to give some consideration to a product such as Provigil to help her with her alertness at work and maybe get off some of this other stuff. I am going to recommend Wellbutrin XL 150 mg to help with smoking. We talked about caffeine reduction. I am going to give her Atenolol 12.5 mg one daily p.r.n. heart racing. She does have a relative low blood pressure and will not be able to tolerate much. I am also going to empirically put her on Prevacid. She may need some GI workup later as well. I suppose we might consider abdominal ultrasound and/or EGD outpatient if symptoms seem to warrant that.

**HOSPITAL COURSE:** This young lady, 32 years old, came in with chest pain. She sort of had episodic chest pain recently. It feels like her heart races. It is very intense pain at times. She is known to have mitral valve prolapse as noted above. We did an ultrasound of her heart, and we do find she has some component of mitral valve. She said she has had hemochromotosis when I talked to her. It sounds more like she has had the genetic testing because of some other male family members with hemochromotosis, and that the mutation did show up with her. She seems to also describe that she has had phlebotomies in the past.

Hematocrit is 35.7 with MCV of 91 now. Remainder of her labs are fine. She has a TSH pending from the office because she had seen Dejuana a few days before she came in here.

(continued)

**DISCHARGE SUMMARY**

**Page 1 of 2**

Crenshaw Community Hospital
00059
Atwell v. Smart

**CRENSHAW COMMUNITY HOSPITAL**
**'101 Hospital Circle**
**Luverne, AL 36049**
**Telephone (334) 335-3374**

| | |
|---|---|
| **PATIENT:** DAVIS, Robin | **PATIENT #:** 41327 |
| **ACCT #:** 043634 | **ADM. DATE:** |
| **PHYSICIAN:** Dr. Charles S. Tompkins | **DIS. DATE:** 01/26/06 |

(continued)

All in all, her physical exam is unremarkable. I do not appreciate a murmur or a click. Her lungs are clear. She has a lot of shortness of breath with exertion. We are going to get a set of gases. She tells me when she started at Smart she had PFTs that were abnormal. I do not know the details on that. We may need to repeat PFTs if we do not have them in our office. I think we also need to confirm the results of previous testing for the genetic mutations associated with hemochromotosis.

_____
Dr. Charles S. Tompkins, MD

CST/jrj
D: 01/26/06
T: 01/26/06

**DISCHARGE SUMMARY**

**Page 2 of 2**

Crenshaw Community Hospital
00060




**CRENSHAW COMMUNITY HOSP**                    **101 HOSPITAL CIRCLE**                              **LUVERNE, AL 36049**
**S P WALKER, MD/MED. DIREC**                       **PH:(334)335-1168**                                 **FAX:(334)335-1159**

| | | | | |
|---|---|---|---|---|
| Sample ID: | 012506001 | Patient Name: DAVIS ROBIN | | |
| Run Date/Time: | 01/25/2006 01:39:02 AM | Patient ID: | 043834 | Collect Date/Time: 01/25/2006 01:30:00 AM |
| Seq#: | 1380 | Gender: | Female    DOB | Physician: OZAIR/TOMPKINS |
| OPR: | BCI | | Age: | Location: ER |
| Flagging Set: | Woman | | | |
| Comments: | collected by wm | | | |

| | | | Range |
|---|---|---|---|
| WBC | 8.1 | 10^3/µL | 4.0 / 11.0 |
| | | | |
| RBC | 3.93 | 10^6/µL | 3.80 / 5.80 |
| HGB | 12.7 | g/dL | 11.5 / 16.5 |
| HCT | 35.7 | % | 37.0 / 47.0 |
| MCV | 91 | fL | 76 / 96 |
| MCH | 32.4 | pg | 27.0 / 32.0 |
| MCHC | 35.6 | g/dL | 31.0 / 35.0 |
| RDW | 12.5 | % | 11.0 / 16.0 |
| | | | |
| PLT | 293 | 10^3/µL | 150 / 500 |
| MPV | 7.6 | fL | 6.0 / 10.0 |

| | | | Range |
|---|---|---|---|
| NE | 57.1 | % | 45.0 / 70.0 |
| LY | 32.4 | % | 20.0 / 40.0 |
| MO | 7.3 | % | 3.0 / 10.0 |
| EO | 2.6 | % | 1.0 / 5.0 |
| BA | 0.6 | % | 0.0 / 0.0 |
| | | | |
| NE# | 4.61 | 10^3/µL | 2.00 / 7.50 |
| LY# | 2.62 | 10^3/µL | 1.50 / 4.00 |
| MO# | 0.59 | 10^3/µL | 0.20 / 0.80 |
| EO# | 0.21 | 10^3/µL | 0.04 / 0.40 |
| BA# | 0.05 | 10^3/µL | 0.02 / 0.10 |

**Flags and Messages**





Vol



Abs





RBC

PLT

WBC/BASO

**Microscopic Examination**

| | | | |
|---|---|---|---|
| Neutrophils | _____ | Metamyelocytes | _____ | Anisocytosis | _____ | Retics | _____ |
| Bands | _____ | Myelocytes | _____ | Hypochromia | _____ | Sed. Rate | _____ |
| Lymphocytes | _____ | Promyelocytes | _____ | Polychromasia | _____ | | |
| Monocytes | _____ | Blast | _____ | Poikilocytosis | _____ | | |
| Eosinophils | _____ | Atyp. Lymph | _____ | Microcytosis | _____ | | |
| Basophils | _____ | NRBC s | _____ | Macrocytosis | _____ | | |

Comment : _____

Requested by : _____

Reviewed by : _____

Out of Action Range  **XXX**      Out of Patient Range  **XXX**

```
++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++
+                                                                        +
+                   Crenshaw Community Hospital                          +
+                   101 Hospital Cir. Luverne, AL  36049                 +
+                   Reported:      01:53 Jan 25 2006                     +
+                                                                        +
+                                                                        +
+                                                                        +
+                                                                        +
+ Patient Name:  DAVIS ROBIN 043634                                      +
+ Patient ID:    OZAIR/TOMP                                              +
+ Sample Number: 012506@0130                                            +
+                                                                        +
+ Location:    ER/WM              Sample Fluid:  PLASMA                  +
+ Priority:    ROUTINE            Entered:       01:32 Jan 25 2006       +
+                                                                        +
+ Segment: A  Position: 5                                                +
+                                                                        +
+                                                                        +
+                                                                        +
+                                                                        +
+                                                                        +
+                                                                        +
+                                                                        +
+                                                                        +
+           TEST NAME                    RESULT    REF. INTERVAL   UNITS +
+ ==============================         ========  =============  ====== +
+ AST   Aspartate Aminotransferase       16         15-37         U/L    +
+ ALT   Alanine Aminotransferase         29   LO    30-65         U/L    +
+ ALP   Alkaline Phosphatase             94         50-136        U/L    +
+ tbil  Total Bilirubin                  0.27       0.00-1.00     mg/dL  +
+ TP    Total Protein                    6.4        6.4-8.2       g/dL   +
+ ALB   Albumin                          3.9        3.4-5.0       g/dL   +
+ CA    Calcium                          8.3   LO    8.5-10.1      mg/dL  +
+ GLU   Glucose                          78         70-110        mg/dL  +
+ BUN   Blood Urea Nitrogen              4    LO    7-18          mg/dL  +
+ CREA  Creatinine                       0.7        0.6-1.3       mg/dL  +
+ Na    Sodium                           144        136-145       mmol/L +
+ k     Potassium                        3.2   LO    3.5-5.1       mmol/L +
+ cl    Chloride                         108  HI    98-107        mmol/L +
+ ECO2  Enzymatic Carbonate              28.0       21.0-32.0     mmol/L +
+ CK    Total CK                         130        21-232        U/L    +
+ LDH   Lactic Dehydrogenase             140        100-190       U/L    +
+ LMMB  mass Creatine Kinase-MB          0.6        0.0-3.6       ng/mL  +
+ MYO   Myoglobin                        26         10-92         ng/mL  +
+ LTNI  Troponin I                       0.04       0.00-0.05     ng/mL  +
+                                                                        +
++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++
```

Crenshaw Community Hospital
00062
Atwell v. Smart

Crenshaw Community Hospital
101 Hospital Cir. Luverne, AL 36049
Reported:       19:08 Jan 25 2006

Patient Name:  DAVIS ROBIN  043634
Patient ID:  TOMPKINS
Sample Number: 0125060I025

Location:  120/DC                    Sample Fluid:  PLASMA
Priority:  ROUTINE                   Entered:       18:35 Jan 25 2006

Segment A Position 5

| TEST NAME | RESULT | REF INTERVAL | UNITS |
|-----------|--------|--------------|-------|
| AST  Aspartate Aminotransferase | 21 | 15-37 | U/L |
| CK   Total CK | 110 | 21-232 | U/L |
| LDH  Lactic Dehydrogenase | 144 | 100-190 | U/L |
| LMMB mass Creatine Kinase MB | 0.7 | 0.0-3.6 | ng/mL |
| MYO  Myoglobin | 23 | 10-92 | ng/mL |
| LTNI Troponin I | 0.00  01 | 0.00-0.05 | ng/mL |



Crenshaw Community Hospital
101 Hospital Cir. Luverne, AL 36049
Reported:        11:28 Jan 25 2006

Patient Name: DAVIS ROBIN 041634
Patient ID:     TOMPKINS
Sample Number: 012506H1040

Location:  120/CH                    Sample Fluid: PLASMA
Priority:  ROUTINE                   Entered:      10:58 Jan 25 2006

Segment: A  Position: 9

| TEST NAME | | RESULT | REF. INTERVAL | UNITS |
|-----------|---|--------|---------------|-------|
| AST  | Aspartate Aminotransferase | 24 | 15-37 | U/L |
| CK   | Total CK | 113 | 21-232 | U/L |
| LDH  | Lactic Dehydrogenase | 144 | 100-190 | U/L |
| CKMB | Mass Creatine Kinase-MB | 0.4 | <0-3.6 | ng/mL |
| MYO  | Myoglobin | 30 | 10-92 | ng/ml |
| LTNI | Troponin I | 9.00 | 0.00-0.05 | ng/ml |

Crenshaw Community Hospital
00064
Atwell v. Smart

### INSTRUMENTATION LABORATORY
### PATIENT SAMPLE REPORT

CRENSHAW HOSPITAL
LUVERNE, AL
LAB

*Room Air*

*Dr. Tompkins    Rm 120*

Status: ACCEPTED
01/26/2006  11:47:17
Sample Type: Arterial
Sample No.: 10
Operator:  BF
Patient ID: 043634. Patient Name: DAVIS, ROBIN.
Comment: ALLEN TEST OK
Instrument:  Model: GEM 3000,  S/N:

| Measured (37.0C) | | | Reference Ranges | | Critical Limits | |
|---|---|---|---|---|---|---|
| | | | Low | High | Low | High |
| pH | 7.42 | | 7.35 | 7.45 | 7.21 | 7.59 |
| pCO2 | 35 | mmHg | 34 | 45 | 19 | 67 |
| pO2 | 107 | mmHg | 75 | 85 | 43 | ---- |

| Derived Parameters | | | Reference Ranges | | Critical Limits | |
|---|---|---|---|---|---|---|
| | | | Low | High | Low | High |
| HCO3- | 22.7 | mmol/L | 22.0 | 26.0 | ---- | ---- |
| TCO2 | 23.8 | mmol/L | 23.0 | 27.0 | ---- | ---- |
| BE (B) | -1.3 | mmol/L | 0.0 | 2.0 | ---- | ---- |
| SO2c | 98 | % | 96 | 100 | ---- | ---- |

!=Outside ref. range



# CRENSHAW COMMUNITY HOSPITAL

## Cardiac Ultrasound

Date **1/25/06**
Name **Davis, Robin**    Age    Sex **F**    Race **W**
Height    Weight    B.S.A.
Clinical Data **CP/SOB/hx of MVP**
Requested DR **Tomp**    Primary Dr
Master tape# **96**    Start    End

**M-mode**

**Left Ventricle**
End diastolic **46** (35-56mm)
End systolic **28** (23-40mm)
LVPW **9** (7-12mm)
IVS **10** (7-12mm)
FS (25-50%)
EF **60%** (53-67%)

**Doppler**
LVOT **9** (0.7-1.1m/s)
Mitral Inflow **9** (0.5-1.1m/s)
Tricuspid Inflow (0.3-0.7m/s)
Aortic Flow (1.0-1.7m/s)
Pul. Artery Flow (0.6-0.9m/s)

**Mitral Valve**
Epoint-septal separation
Right ventricle (7-23mm)

**Aorta**
End diastolic diameter **30** (20-38mm)
Valve Opening **16** (16-26mm)

**Left Atrium**
End diastolic diameter **28** (19-40mm)

Tech's observation **Mild MVP c̄ trace MR mild-mod TR**

doppler / m-mode /        Tech: **Tracey**

Crenshaw Community Hospital
00066
Atwell v. Smart



**CRENSHAW COMMUNITY HOSPITAL**
**101 HOSPITAL CIRCLE**
**LUVERNE, AL 36049**
Telephone (334) 335-3374

| | | | |
|---|---|---|---|
| PATIENT: | DAVIS, ROBIN O | DOB: 11-16-73 | ROOM#: 120B |
| ACCT#: | 43634 | EXAM: CHEST | |
| PHYSICIAN: | TOMPKINS | DATE: 1-25-06 | X-RAY#: 41327 |

CLINICAL HISTORY:   CHEST PAIN

EPA AND LATERAL VIEWS OF CHEST:  The heart is normal in size and shape.  No pulmonary infiltration is seen. There is mild scoliosis and there are very mild osteoarthritic changes within the thoracic spine.  No other significant findings are seen.


**T. L. EAKES, M.D.**
**ROENTGENOLOGIST**

TLE/nrh
D: 1-26-06
T: 1-26-06

**RADIOLOGY DEPARTMENT REPORT**
**Page 1 of 1**

Crenshaw Community Hospital
00067



FEB. 6. 2006 1:33PM                                                      No.8016    P. 1/2

**Montgomery Cardiovascular Associates, P.C.**                    February 6, 2006
2119 East South Blvd. Montgomery, AL 36116                                    Page 1
(334)280-1600 Fax: (334)280-1600                                      Chart Document

| **ROBIN O DAVIS** | | Home: 3343353501 Office: 3345278853 |
|---|---|---|
| Female  DOB:11/16/1973 | 111209-1-mc | Ins: B/C OF A (1) Grp: 52397 |

01/25/2006 – Office Visit: Echo ONLY (Crenshaw)
Provider: ERIC CRUM MD
Location of Care: Montgomery Cardiovascular Associates, P.C.

### TWO-DIMENSIONAL/M-MODE/DOPPLER ECHOCARDIOGRAM REPORT

| | |
|---|---|
| **NAME:** | DAVIS, ROBIN O |
| **MCA CHART NO.:** | 111209-1-mc |
| **D.O.B.:** | |
| **DATE:** | 01/25/2006 8:30 AM |
| **ORDERING M.D.:** | CHARLES TOMPKINS |
| **INTERPRETING M.D.:** | ERIC CRUM |
| **REFERRING M.D.:** | CHARLES TOMPKINS |
| **PERFORMED AT:** | CRENSHAW COMMUNITY HOSPITAL |

**REASON FOR STUDY:**

1.      Chest pain.
2.      Shortness of breath.
3.      History of mitral valve prolapse.

**M-MODE MEASUREMENTS:**

| | |
|---|---|
| Left ventricular end diastolic diameter: | 46 mm |
| Left ventricular end systolic diameter: | 28 mm |
| Aortic root diameter: | 30 mm |
| Valve opening: | 16 mm |
| Left atrium: | 28 mm |
| Posterior wall thickness: | 9 mm |
| Septal wall thickness: | 14 mm |
| Ejection fraction: | 60% |

**TWO-DIMENSIONAL/COLOR DOPPLER STUDY:** Echocardiogram demonstrates normal left ventricular chamber size and wall thicknesses with overall normal left ventricular systolic performance with ejection fraction 60%. There are no segmental wall motion abnormalities. The left atrium appears normal in size. The right heart appears normal in size. The interventricular septum appears intact. The aortic valve is pliable. Mitral valve is pliable with trace mitral regurgitation by Doppler. There is no definite prolapse. Tricuspid valve is pliable with mild (1+) tricuspid regurgitation by Doppler. No intracardiac masses or thrombi seen. No significant pericardial effusion.

**CONCLUSIONS:**

1.      Normal left ventricular chamber size and wall thicknesses with overall normal left ventricular systolic performance with ejection fraction 60%.
2.      The left atrium is normal in size.
3.      The right heart is normal in size.
4.      The valves are pliable with trace mitral regurgitation and mild (1+) tricuspid regurgitation by Doppler. No evidence of significant mitral valve prolapse.

FEB-06-2006  1:34PM                                                    No.8016   P. 2/2

**Montgomery Cardiovascular Associates, P.C.**
2119 East South Blvd. Montgomery, AL 36116
(334)280-1500  Fax: (334)280-1600

February 6, 2006
Page 2
Chart Document

| ROBIN O DAVIS | | Home: 3343363501 Office: 3345278853 |
|---|---|---|
| Female  DOB: | 111209-1-mc | Ins: B/C OF A (1) Grp: 52397 |

5.    No intracardiac masses or thrombi seen.
6.    No significant pericardial effusion.


R. Eric Crum, M.D.

REC/tw

Fax to:

Dr. Charles Tompkins
Rt. 3 Box 9-E
Luverne, Alabama 36049-9405
Phone: 334-335-3383
Fax: 334-335-3078

Crenshaw Community Hospital
101 Hospital Circle
Luverne, Alabama 36049
Phone: 334-335-3374
Fax: 334-335-1159

Job ID: 234140
DD:    02/01/2006
DT:    02/02/2006

**Signed by ERIC CRUM MD on 02/03/2006 at 8:45 AM**

Crenshaw Comm. Hospital

Crenshaw Community Hospital
00070
Atwell v. Smart

01/25/2006 01:46:16

043654                    F  C1/24/06
DOB
DR. OZAIR/TOMPKINS

Dx:

| | |
|---|---|
| Rate | 105 |
| PR | 143 |
| QRSD | 75 |
| QT | 298 |
| QTc | 394 |

--AXIS--
P    67
QRS  76
T   -20

· AGB NOT ENTERED, ASSUMED TO BE 50 YEARS FOR PURPOSE OF ECG INTERPRETATION
· SINUS TACHYCARDIA, RATE 105..............................normal P axis, rate>=100
· BORDERLINE LEFT ATRIAL ABNORMALITY.............................P>30mS, <-10mV V1

- BORDERLINE ECG -

PRELIMINARY-MD MUST REVIEW

01/25/2005  16:43:04

Crenshaw Comm. Hospital

Dx:

| | Rate | 53 |
| --- | --- | --- |
| P | PR | 153 |
| QRS | QRSD | 66 |
| T | QT | 380 |
| | QTc | 357 |

--AXIS--
P    7
QRS  -20
T    -4

. AGE NOT ENTERED, ASSUMED TO BE 50 YEARS FOR PURPOSE OF ECG INTERPRETATION
. NORMAL SINUS RHYTHM, RATE 53.......normal P axis, PR, rate & rhythm
. LVH BY VOLTAGE..................................Rl-1.2mV aVL

- BORDERLINE ECG -

DAVIS ROBIN O
043654
038

04. I. PERKINS

F 01/25/06
Rm 1208

PRELIMINARY-MD MUST REVIEW

Crenshaw Community Hospital
00071
Atwell v. Smart

DAVIS ROBIN C    41327
04
0
F  01/25/06
RM 1208

6:05    00:25 25JAN06



CHART NO. 604700

00:25 25JAN06  LEAD II  X1.0  HR=115



(Paste 2nd report on this line)

(Paste 1st report on this line)

To this sheet are attached the various analysis slips which come from the laboratory. In the laboratory the analysis slips are made out in triplicate, duplicate or single. The original is gummed along the five-inch side and when received at the nurses' station is attached to this chart laboratory sheet by the gummed margin. The first report received is attached at the bottom line of this sheet and others above this, leaving 3/8 inch of earlier report exposed in each case.

| Name - Last | First | Middle | Hospital No. |

| Location of Hospital | Clinic or Service | Attending Physician |

# CLINICAL LABORATORY REPORTS

Crenshaw Community Hospital
00072
Atwell v. Smart



**CLINICAL LABORATORY REPORTS**

Crenshaw Community Hospital
00073
Atwell v. Smart



CH 4 DAVIS ROBIN 120B   HR=76 08:00:59 PM  1/25/06 ALL REC

CH 4 DAVIS ROBIN 120B   HR=79 10:01:00 PM  1/25/06 ALL REC

CH 4 DAVIS ROBIN 120B   HR=61 12:01:00 AM  1/26/06 ALL REC

CH 4 DAVIS ROBIN 120B   HR=58 02:01:00 AM  1/26/06 ALL REC

CH 4 DAVIS ROBIN 120B   HR=52 04:01:00 AM  1/26/06 ALL REC

| Name - Last | First | Middle | Hospital No. |
|---|---|---|---|
| Location of Hospital | Clinic or Service | Attending Physician | |

## CLINICAL LABORATORY REPORTS

Crenshaw Community Hospital
00074
Atwell v Smart

Crenshaw Community Hospital
Luverne, AL

DAVIS ROBIN S    /1397
043634
DR.                  F  01/25/06
                       RM 1208
**Addressograph**

# PROGRESS NOTES

| Date | Notes Should Be Signed by the Physician |
|------|------------------------------------------|
| 1/25 | Adm late last night c̄ chest pain ▽ tachycardia |
|      | Saw today on F/U  CP in ac  PE ⊖ |
|      | Ac  mvp |
|      | echo |
|      | ✓ TropI |
|      | EKG/GFs  ___ |
|      | Holding ___ |
|      | VO Dictated |
| 1/26 | VO  no cp  EKGs/CFs ⊖  Echo → mvp c̄ mr |
|      | D/C |

# CRENSHAW COMMUNITY HOSPITAL
## PHYSICIAN'S ORDERS

| Drug Sensitivities & Allergies | ☐ NKDA | | | | |
|---|---|---|---|---|---|
| **Drug** | Anaphylaxis | N/V | Rash | Other (specify) | |
| 1. Aminophylline | | | | | |
| 2. Medad | | | | | |
| 3. Compazine | | | | | |
| 4. | | | | | |
| 5. | | | | | |
| 6. | | | | | |

NAME  Robin Davis
ROOM NO. (ADDRESS)
HOSP. NO.
PHYSICIAN

| Date & Time | Another brand or drug identical in form and content may be dispensed unless checked ☐ | USE BALL POINT PEN ONLY | Nurse's Initials |
|---|---|---|---|

Please admit under C/O Dr. Templemein to tele

Diagnosis — chest pain r/o M.I.

Condition — stable.

Vitals — routine.

Diet — regular.

IV fluids — hep lock.

Activity — as tolerated.

Medication —

— aspirin 81 mg PO daily

— Lopressor 25 mg 12.5 mg PO BID.

Labs

cardiac enzg. x3, First set to be done in ER.

— CXR PA + lat. view in AM, patient can go for x-ray off tele

— ECHO / cardiogram in AM

O2 @ 2L NC

V.O. Dr.Oman / Ida Burgess LPN

# CRENSHAW COMMUNITY HOSPITAL
## PHYSICIAN'S ORDERS

| Drug Sensitivities & Allergies | ☐ NKDA | | | | |
|---|---|---|---|---|---|
| Drug | Anaphylaxis | N/V | Rash | Other (specify) | |
| 1. | | | | | |
| 2. Aminophylline | | | | | |
| 3. | | | | | |
| 4. Compazine | | | | | |
| 5. Medrol | | | | | |
| 6. | | | | | |

NAME DAVIS, DONITA    11327
ROOM NO.
(ADDRESS)    F 01/25/06
HOSP. NO.    RX 1239
PHYSICIAN

| Date & Time | Another brand or drug identical in form and content may be dispensed unless checked ☐ | USE BALL POINT PEN ONLY | Nurse's Initials |
|---|---|---|---|

1/25

Hold Lopressor if BP < 110 Systolic t/w
HR < 70

Prevacid 30mg IV qday

EKG this Am

No caffeine
No nicotine

[signature] 1/25/06 11 30

24 hr chart check completed 012606 @ 0020 J. Lawson

1/26/06    D/C O₂

ABGs 30 minutes ~ 1hour p̄ D/C O₂

Call me p̄ ABGs for consideration of D/C
Rx Wellbutrin XL 150 + financial on chart

DO NOT USE THIS SHEET
UNLESS A RED NUMBER SHOWS ➤

PHYSICIAN'S ORDERS
Crenshaw Community Hospital
00077
Atwell v. Smart

# CRENSHAW COMMUNITY HOSPITAL
## PHYSICIAN'S ORDERS

| Drug Sensitivities & Allergies | ☐ NKDA | | | | |
|---|---|---|---|---|---|
| Drug | Anaphylaxis | N/V | Rash | Other (specify) | |
| 1. *Aminophylline* | | | | | |
| 2. *Compazine* | | | | | |
| 3. *Medrol* | | | | | |
| 4. | | | | | |
| 5. | | | | | |
| 6. | | | | | |

NAME
ROOM NO. DAVIS ROBIN C    41327
(ADDRESS) 843634
HOSP. NO. 000                    F  01/25/06
PHYSICIAN                       RM 1208

| Date & Time | Another brand or drug identical in form and content may be dispensed unless checked ☐ | USE BALL POINT PEN ONLY | Nurse's Initials |
|---|---|---|---|
| 1/26/06 | ① Motrin 800mg Now | | |
| | ② Discharge home c̄ Motrin over the counter for pain ③ Wellbutrin XL 150m | | |
| | ⑤ Prevacid , ④ Atenolol | | |
| | V.O. Dr Tomlins (L Tomlins RN | | |
| | L Tomlins RN | | |
| | 1/26/06 @ 1300 | | |

DO NOT USE THIS SHEET
UNLESS A RED NUMBER SHOWS  →  

PHYSICIAN'S ORDERS
Crenshaw Community Hospital
00078
Atwell v. Smart

DAVIS ROBIN O    41327
043634
0          01/25/06
RM 1209

**Crenshaw Community Hospital**
**Luverne, AL**



**TEMP/PULSE/RESPIRATION**
**GRAPHIC CHART**

| Name: | | Room # | Bed # |
|---|---|---|---|
| Hospital # | Physician: | | |

| Date | 1/25 | 1/25 | 1/26 | 1/26 | 1/27 | 1/27 |
|---|---|---|---|---|---|---|
| Day in Hosp | | | | | | |
| | AM | PM | AM | PM | AM | PM |

| | HOUR | 2 4 6 8 10 12 | 2 4 6 8 10 12 | 2 4 6 8 10 12 | 2 4 6 8 10 12 | 2 4 6 8 10 12 | 2 4 6 8 10 12 |
|---|---|---|---|---|---|---|---|
| **TEMPERATURE** | 106 | | | | | | |
| | 105 | | | | | | |
| | 104 | | | | | | |
| | 103 | | | | | | |
| | 102 | | | | | | |
| | 101 | | | | | | |
| | 100 | | | | | | |
| | 99 | | | | | | |
| | 98.6 | | | | | | |
| | 98 | | | | | | |
| | 97 | | | | | | |
| | 96/ | | | | | | |
| **PULSE** | 150 | | | | | | |
| | 140 | | | | | | |
| | 130 | | | | | | |
| | 120 | | | | | | |
| | 110 | | | | | | |
| | 90 | | | | | | |
| | 80 | | | | | | |
| | 70 | | | | | | |
| | 60 | | | | | | |
| **RESPIRATION** | 50 | | | | | | |
| | 40 | | | | | | |
| | 30 | | | | | | |
| | 20 | | | | | | |
| | 10 | | | | | | |

| SEP | 135 | 93 | 180 | 115/79 | | 101 | |
|---|---|---|---|---|---|---|---|
| DEP | 84 | 38 | 45 | | | 52 | |
| URINE OUTPUT | | 99% | | | 54 100% | | |

Crenshaw Community Hospital
00079

# INTAKE OUTPUT FLOWSHEET

Date: _____    Date: _012606____    Date: _012706____

| INTAKE | 7p - 7a | 7a - 7p | 7p - 7a | 7a - 7p | 7p - 7a | 7a - 7p |
|---|---|---|---|---|---|---|
| ORAL | | | 600 | | | |
| | | | | | | |
| NG TUBE | | | | | | |
| | | | | | | |
| | | | | | | |
| PARENTERAL | | | | | | |
| | | | | | | |
| | | | | | | |
| TOTAL | | | 600 | | | |
| **OUTPUT** | **7p - 7a** | **7a - 7p** | **7p - 7a** | **7a - 7p** | **7p - 7a** | **7a - 7p** |
| ASPIRATION | | | | | | |
| DRAINAGE | | | | | | |
| EMESIS | | | | | | |
| NG DRAIN | | | | | | |
| | | | | | | |
| URINE | | | ʃʃʃʃ | | | |
| BM | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| TOTAL | | | Ø | | | |
| 24 hr INTAKE | | CC | 24 hr IN | CC | 24 hr IN | CC |
| 24 hr OUTPUT | | CC | 24 hr OUT | CC | 24 hr OUT | CC |
| WEIGHT | | | | | | |

Crenshaw Community Hospital
00080
Atwell v. Smart

Crenshaw Community Hospital
Luverne, AL

**PATIENT ASSESSMENT**

DAVIS ROBIN C    41327
043634
030              F  01/25/06
                 RM 1208

2. Addressograph.

1. Date: 1-25-06

| INITIAL ASSESSMENT | 7P - 7A | 7A - 7P |
|---|---|---|
| **3. NUTRITION/METABOLIC PATTERN** | SKIN: NP  Other: _____ | SKIN: ⊙NP Other: _____ |
| **4. RESPIRATORY/ CIRCULATION PATTERN** | Breath Sound: ❑Normal  ❑Abnormal<br>Cough: -  ❑Yes ❑No<br>        ❑Productive ❑Non-productive<br>Pulse:  ❑Regular  ❑Irregular<br>Calf Tenderness        + -<br>Peripheral Pulses      + -<br>Edema                  + - | Breath Sound: ❑Normal  →❑Abnormal<br>Cough:   ❑Yes ❑No<br>        ❑Productive ❑Non-productive<br>Pulse:  ❑Regular  ❑Irregular<br>Calf Tenderness        + -<br>Peripheral Pulses      + -<br>Edema                  + - |
| **5. ELIMINATION PATTERN** | Nausea:   ❑Vomiting  ❑NP<br>Abdomen:  ❑Distended  ❑Non-distended<br>Bowel Sounds: + | Nausea:   ❑Vomiting  ❑NP<br>Abdomen:  ❑Distended  ❑Non-distended<br>Bowel Sounds: + - |
| **6. ACTIVITY/EXERCISE PATTERN** | ROM:  ❑Full  ❑Impaired | ROM:  ❑Full  ❑Impaired |
| **7. COGNITIVE/PERCEPTUAL PATTERN** | LOC: ❑Person  ❑Place  ❑Time<br>Follows Command    + -<br>Thought Process: ❑Logical ❑Illogical<br>Mood: ❑Sad ❑Angry ❑Calm ❑Withdrawn<br>        Other: _____<br>Discomfort    + -<br>Type: _____<br>Location: _____ | LOC: ❑Person  ❑Place  ❑Time<br>Follows Command    + -<br>Thought Process: ❑Logical ❑Illogical<br>Mood: ❑Sad ❑Angry ❑Calm ❑Withdrawn<br>        Other: _____<br>Discomfort    + ⊖<br>Type: _____<br>Location: _____ |

| ONGOING ASSESSMENT | 7P - 7A | 7A - 7P |
|---|---|---|
| **8. HEALTH PERCEPTION/ HEALTH MANAGEMENT PATTERN** | Safety:      Siderails x ___<br>             Restraints equipment<br>Special Precautions: _____ | Safety:      Siderails x 2 ___<br>             Restraints equipment<br>Special Precautions: Bed locked |
| **9. NUTRITION/METABOLIC PATTERN** | Diet:<br>Other: _____ % feed pump | Diet: Reg<br>Other: _____ % feed pump |
| **10. ELIMINATION PATTERN** | Void: x ____ Incontinent _____<br>❑Constipated  ❑Diarrhea<br>Incontinent stool: x _____<br>Devices _____ Care _____ | Void: x ___ Incontinent _____<br>❑Constipated  ❑Diarrhea<br>Incontinent stool: x _____<br>Devices _____ Care _____ |
| **11. ACTIVITY/EXERCISE PATTERN** | Hygiene: ❑Shower ❑Self ❑Assisted ❑Complete<br>Ambulate x ___ Chair x ___<br>Bedrest positioned x ___<br>TCBD x ___ Oral Care x ___ | Hygiene: ❑Shower ❑Self ❑Assisted ❑Complete<br>Ambulate x ___ Chair x ___<br>Bedrest positioned x ___<br>TCBD x ___ Oral Care x ___ |
| **12. SLEEP/REST PATTERN** | ❑Restless  ❑Sleeping  ❑NA<br>❑Other: _____ | ❑Restless  ❑Sleeping  ❑NA<br>❑Other: awake<br>meds |
| **13. COGNITIVE/PERCEPTIVE** | Patient Teaching<br>Knowledge Def.: + -<br>Instruction Given:  + -<br>Type: _____ | Patient Teaching<br>Knowledge Def.: + -<br>Instruction Given: _____<br>Type: _____ |

| CODES: | LOC = Level of Consciousness, | ROM = Range of Motion, | NA = Not Applicable, | NP = No Problems |
|---|---|---|---|---|
| | + = Positive, | - = Negative, | x = Times | |

*NOTE: (*) ON THIS SHEET INDICATES FURTHER NOTES ON THE NURSING PROGRESS NOTES.*          *(Over)*

Crenshaw Community Hospital
00081
Atwell v. Smart

| INITIAL ASSESSMENT | 7P - 7A continued | 7A - 7P continued |
|---|---|---|
| 13. b | Discomfort  + -<br>Type:<br>Location:<br>Relieved:  + -<br>Method: | Discomfort  + -<br>Type:<br>Location:<br>Relieved:  + -<br>Method: |
| 14. ROLE/RELATIONSHIP | Visitors: ☐Yes  ☐No<br>Communication Pattern: ☐Effective ☐Ineffective | Visitors: ☐Yes  ☐No<br>Communication Pattern: ☐Effective ☐Ineffective |

| PROCEDURE/TREATMENT | 7P - 7A | 7A - 7P |
|---|---|---|
| 15. TELEMETRY | | SR 70's |
| 16. WOUND ASSESSMENT | Color:  ☐Red  ☐Pink<br>Other:<br>Drainage: ☐Yes  ☐No<br>Drainage Color: ☐Serous  ☐Dark Red<br>☐Bright Red ☐Purulent ☐None ☐Other: _____ | Color:  ☐Red  ☐Pink<br>Other:<br>Drainage: ☐Yes  ☐No<br>Drainage Color: ☐Serous  ☐Dark Red<br>☐Bright Red ☐Purulent ☐None ☐Other: _____ |
| 17. TUBES | Type: _____ Drainage: ☐Yes  ☐No<br>Apprearance: _____<br>Irrigation: _____<br>Type: _____<br>Apprearance: _____<br>Irrigation: _____ | Type: _____ Drainage: ☐Yes  ☐No<br>Apprearance: _____<br>Irrigation: _____<br>Type: _____<br>Apprearance: _____<br>Irrigation: _____ |
| 18. SPECIMENS | Urine: ☐Routine ☐C&S ☐24hr<br>Stool: ☐O&P ☐C&S ☐OB<br>Sputum: ☐C&S ☐GmStain ☐AFB<br>☐Cytology ☐1,2,3<br>Other: | Urine: ☐Routine ☐C&S ☐24hr<br>Stool: ☐O&P ☐C&S ☐OB<br>Sputum: ☐C&S ☐GmStain ☐AFB<br>☐Cytology ☐1,2,3<br>Other: |
| 19. EQUIPMENT | ☐K-Pad  ☐Walker  ☐Cane<br>☐Other: _____<br>Suction:  ☐Gomco  ☐Portable<br>☐Emberson ☐Intermittent<br>Traction: _____<br>Oxygen @ _____ | ☐K-Pad  ☐Walker  ☐Cane<br>☐Other: _____<br>Suction:  ☐Gomco  ☐Portable<br>☐Emberson ☐Intermittent<br>Traction: _____<br>Oxygen @ _____ |
| 20. SPECIAL PROCEDURE | | Replwd |
| 21. PATIENT'S CONDITION | | Stable |
| 22. PHYSICIAN VISIT | | |
| 23. SIGNATURE/TITLE | | |

Crenshaw Community Hospital<br>00082<br>Atwell v. Smart

Crenshaw Community Hospital
Luverne, AL

DAVIS ROBIN O    41327
043634
000              F   01/25/06
                 RM 120B

**SUPPLEMENTAL
NURSES' NOTES**

| DATE | TIME | TREATMENT PROBLEM, NEED | NARRATIVE |
|------|------|------------------------|-----------|
| 1/25 | 0215 | | 32 yowf admitted to services |
| | | | of Dr. Tompkins c̄ 40 CP telemetry |
| | | | c̄ chest wall. HR 78 NSR 82 |
| | | | @ 2L NC oriented to room |
| | | | voiced understanding outside |
| | | | to smoke and back to room |
| | | | c̄ CP pain @ present. Burgess RN |
| | 0400 | | Resting quietly resp̄ ease |
| | | | Burgess RN |
| | 0600 | | Tel HR #74 NS 40 CP no discomfort |
| | | | resp̄ ease          RN |
| | 0800 | | awake & alert SR — WB |
| | | | c̄ resp̄ ease — O₂ on @ 2LM NC |
| | | | bed lock present — Tele Tele |
| | | | RN |
| | 1130 | | Dr. Tompkins here — orders N  RN |
| | 1330 | | eyes closed resp̄ ease |
| | 1600 | | awake c̄ complaints — Rec |
| | | | at ease — VSS. Tele Tele RN |
| | 1730 | | family c̄ pt. here — denies |
| | | | discomforts or needs —    RN |

Signature: _____    Signature: _Lola Burgess RN_

Signature: _____    Signature: _____

Signature: _____    Signature: _____

Signature: _____    Signature: _____

DAVIS ROBIN O    41327
043634              F  01/25/06
DOB                 RM 1208
2. Addressograph

Crenshaw Community Hospital
Luverne, AL

# PATIENT ASSESSMENT

1. Date: _012606_

| INITIAL ASSESSMENT | 7P - 7A | 7A - 7P |
|---|---|---|
| **3. NUTRITION/METABOLIC PATTERN** | SKIN: NP Other: _cool dry intact_ | SKIN: ☑NP Other: _____ |
| **4. RESPIRATORY/ CIRCULATION PATTERN** | Breath Sound: ☑Normal ☐Abnormal<br>Cough: ☐Yes ☑No<br>☐Productive ☐Non-productive<br>Pulse: ☑Regular ☐Irregular<br>Calf Tenderness + ⊖<br>Peripheral Pulses ⊕ ⊖<br>Edema + ⊖ | Breath Sound: ☑Normal ☐Abnormal<br>Cough: ☐Yes ☑No<br>☐Productive ☐Non-productive<br>Pulse: ☑Regular ☐Irregular<br>Calf Tenderness + ⊖<br>Peripheral Pulses + ⊕<br>Edema + ⊖ |
| **5. ELIMINATION PATTERN** | Nausea: ☐Vomiting ☑NP<br>Abdomen: ☐Distended ☑Non-distended<br>Bowel Sounds: ⊕ _x 4 quads_ | Nausea: ☐Vomiting ☑NP<br>Abdomen: ☐Distended ☑Non-distended<br>Bowel Sounds: ⊕ _-X4_ |
| **6. ACTIVITY/EXERCISE PATTERN** | ROM: ☑Full ☐Impaired | ROM: ☑Full ☐Impaired |
| **7. COGNITIVE/PERCEPTUAL PATTERN** | LOC: ☑Person ☑Place ☑Time<br>Follows Command ⊕ -<br>Thought Process: ☑Logical ☐Illogical<br>Mood: ☐Sad ☐Angry ☑Calm ☐Withdrawn<br>Other: _euphoria_<br>Discomfort + ⊖<br>Type: _____<br>Location: _____ | LOC: ☑Person ☑Place ☑Time<br>Follows Command ⊕ -<br>Thought Process: ☑Logical ☐Illogical<br>Mood: ☐Sad ☐Angry ☑Calm ☐Withdrawn<br>Other: _____<br>Discomfort + ⊖<br>Type: _____<br>Location: _____ |

| ONGOING ASSESSMENT | 7P - 7A | 7A - 7P |
|---|---|---|
| **8. HEALTH PERCEPTION/ HEALTH MANAGEMENT PATTERN** | Safety: Siderails x _1 X 2_<br>Restraints equipment<br>Special Precautions: _Bed lowest position, locked_ | Safety: Siderails x _1 x 2_<br>Restraints equipment<br>Special Precautions: _Bed ↓ & locked_ |
| **9. NUTRITION/METABOLIC PATTERN** | Diet: _Regular_ _no caffeine_<br>Other: _____ % feed pump | Diet: _Reg No caff._<br>Other: _____ % feed pump |
| **10. ELIMINATION PATTERN** | Void: x _11_ Incontinent _____<br>☐Constipated ☐Diarrhea<br>Incontinent stool: x _____<br>Devices _____ Care _____ | Void: x _____ Incontinent _____<br>☐Constipated ☐Diarrhea<br>Incontinent stool: x _BRP_<br>Devices _____ Care _____ |
| **11. ACTIVITY/EXERCISE PATTERN** | Hygiene: ☐Shower ☑Self ☐Assisted ☐Complete<br>Ambulate x _ADLB_ Chair x _PRN_<br>Bedrest positioned x _self_<br>TCBD x _self_ Oral Care x _self PRN_ | Hygiene: ☐Shower ☑Self ☐Assisted ☐Complete<br>Ambulate x _√5_ Chair x _5_<br>Bedrest positioned x _5_<br>TCBD x _5_ Oral Care x _5_ |
| **12. SLEEP/REST PATTERN** | ☐Restless ☑Sleeping ☐NA<br>☐Other: _____ | ☐Restless ☐Sleeping ☐NA<br>☑Other: _awake_ |
| **13. COGNITIVE/PERCEPTIVE** | Patient Teaching<br>Knowledge Def.: + ⊖<br>Instruction Given: ⊕ -<br>Type: _No caffeine, Nicotine_ | Patient Teaching _meds/procedures_<br>Knowledge Def.: + ⊖<br>Instruction Given: ⊕ -<br>Type: _Verbal_ |

| CODES: | LOC = Level of Consciousness, | ROM = Range of Motion, | NA = Not Applicable, | NP = No Problems |
|---|---|---|---|---|
| | + = Positive, | - = Negative, | x = Times | |

*NOTE: (*) ON THIS SHEET INDICATES FURTHER NOTES ON THE NURSING PROGRESS NOTES.*    (Over)

Crenshaw Community Hospital
00084
Atwell v. Smart

| INITIAL ASSESSMENT | 7P - 7A continued | 7A - 7P continued |
|---|---|---|
| 13. b | Discomfort    + ⊘<br>Type:<br>Location:<br>Relieved:    + -<br>Method: | Discomfort    + ⊘<br>Type:<br>Location:<br>Relieved:    + -<br>Method: |
| 14. ROLE/RELATIONSHIP | Visitors: ☑Yes    ☐No<br>Communication Pattern: ☑Effective ☐Ineffective | Visitors: ☑Yes    ☐No<br>Communication Pattern: ☑Effective ☐Ineffective |

| PROCEDURE/TREATMENT | 7P - 7A | 7A - 7P |
|---|---|---|
| 15. TELEMETRY | Similar Rhythm    Rate 60's-70's | Sinus   60-70's |
| 16. WOUND ASSESSMENT | Color: ☐Red    ☐Pink<br>Other: ____ N/A<br>Drainage: ☐Yes    ☐No<br>Drainage Color: ☐Serous    ☐Dark Red<br>☐Bright Red ☐Purulent ☐None ☐Other: ___ | Color: ☐Red    ☐Pink<br>Other: ____<br>Drainage: ☐Yes    ☐No<br>Drainage Color: ☐Serous    ☐Dark Red<br>☐Bright Red ☐Purulent ☐None ☐Other: ___ |
| 17. TUBES | Type: Hep lock  Drainage: ☐Yes  ☐No<br>Apprearance: 3-5 s injection,infiltration<br>Irrigation: Right Hand<br>Type: ____<br>Apprearance: ____<br>Irrigation: ____ | Type: ____  Drainage: ☐Yes  ☐No<br>Apprearance: ____<br>Irrigation: ____<br>Type: ____<br>Apprearance: ____<br>Irrigation: ____ |
| 18. SPECIMENS | Urine: ☐Routine ☐C&S ☐24hr<br>Stool: ☐O&P ☐C&S ☐OB<br>Sputum: ☐C&S ☐GmStain ☐AFB N/A<br>☐Cytology ☐1,2,3<br>Other: ____ | Urine: ☐Routine ☐C&S ☐24hr<br>Stool: ☐O&P ☐C&S ☐OB<br>Sputum: ☐C&S ☐GmStain ☐AFB<br>☐Cytology ☐1,2,3<br>Other: ____ |
| 19. EQUIPMENT | ☐K-Pad    ☐Walker    ☐Cane<br>☑Other: IV Pump<br>Suction: ☐Gomco    ☐Portable<br>☐Emberson ☐Intermittent<br>Traction: ____<br>Oxygen @ 2 LPm    Nasal Cannula | ☐K-Pad    ☐Walker    ☐Cane<br>☑Other: IV Pump<br>Suction: ☐Gomco    ☐Portable<br>☐Emberson ☐Intermittent<br>Traction: ____<br>Oxygen @ 2L/m |
| 20. SPECIAL PROCEDURE | N/A | HL |
| 21. PATIENT'S CONDITION | Fair | Fair |
| 22. PHYSICIAN VISIT | N/A | |
| 23. SIGNATURE/TITLE | Jeannie C Dawson | D Tompkins RN |

Crenshaw Community Hospital
00085

DAVIS ROBIN D
043634
DOB
F 01/25/06
RM 1208



**Crenshaw Community Hospital**
Luverne, AL

## SUPPLEMENTAL NURSES' NOTES

| DATE | TIME | TREATMENT PROBLEM, NEED | NARRATIVE |
|------|------|-------------------------|-----------|
| 012506 | 1915 | | Room dark. eyes closed lying in bed. rouses easily when spoken to. Denies SOB or chest pain @ present. Reports mild dizziness, SOB + ache mid sternum when walks to BR. Very anxious. Re: dx. Husband @ BS. Lungs clear EBBS. No peripheral edema. O₂ sat 99%. Oxygen 2LPM/NC. ___ J Dawson |
| | 2100 | | Hep lock in Rt hand intact. No S+S of infection, infiltration. Telemetry series. Rhythm HR 59-64. Pt has not smoked + noted nervousness. J Dawson |
| | 2212 | | Lights off. eyes closed. Resp even unlabored. O₂ on 2LPM N/C. Husband @ B.S. Left undisturbed. BP 115/91 to per protocol. J Dawson |
| 012606 | 0015 | | Continues to rest well. Telemetry monitored AP 64 Sinus Rhythm. Jeanie C Dawson |
| | 0200 | | Resting comfortable. Resp. 20 unlabored. Telemetry AP low as 54 then back to low 60's. Sat 99%. ___ Jeanie C Davis RN |
| | 0342 | | Awakened to change batteries to telemetry box. O₂ off on floor. Told her if she felt comfortable. Could leave off, but pt says thinks she breathes + rests better with it on. Reports both parents c hx sleep apnea. O₂ replaced NC 2LPM. Denies chest pain, SOB etc. J Dawson |
| | 0505 | | Lying on Lt side. HoB flat. oxygen on 2LPM. Telemetry NSR HR 56. J Davis RN |
| | 0630 | | Rested well. telemetry monitored AP 53-72. O₂ sat 97-98%. When up moving around c/o SOB slight dizziness + occasional ache mid sternum. Lungs clear PBBS. Hep lock intact, patent, heparin held due to low AP + low diastolic BP. No acute distress this shift. Jeanie C Davis RN |

Signature: Jeanie C Davis RN

Signature: _____

Signature: _____

Signature: _____

Signature: _____

Signature: _____

Signature: _____

Signature: _____

**Crenshaw Community Hospital**
Luverne, AL

# SUPPLEMENTAL
# NURSES' NOTES

| DATE | TIME | TREATMENT PROBLEM, NEED | NARRATIVE |
|------|------|------|------|
| 1/24/06 | 08⁰⁰ | | Laughing & talking ō visitors. No distress noted. VSS. |
| | | | Ht patient SRS noted. See initial assessment. ___ L. Tompkins RN |
| | 10⁰⁰ | | Off telemetry getting shower. No distress ___ L. Tompkins RN |
| | 12⁰⁰ | | Talking ō Dr. Tompkins. No distress noted. ___ L. Tompkins RN |
| | 14⁰⁰ | | ABG's WNL. No abnormalities on telemetry. Called to |
| | | | report ABG's to Dr. Tompkins & order for Discharge. Pt. |
| | | | heplock removed ō cannula intact. Telemetry removed. |
| | | | Discharge instructions & prescriptions given & verbalized |
| | | | understanding. ___ Leaving Ambulatory, ō staff member |
| | | | do put vehicle ō sister in law. L. Tompkins RN |
| | | | |

Signature: _____    Signature: _____

Signature: _L. Tompkins RN_____    Signature: _____

Signature: _____    Signature: _____

Signature: ● _____    ●gnature: _____    ●

Crenshaw Community Hospital
00087
Atwell v. Smart

# MEDICATION ADMINISTRATION RECORD

PATIENT

ROOM | PHYSICIAN

DAVIS ROBIN O 41327
043634
F 01/25/06
RM 1208

ALLERGIES Medrol Ampicillan & Compazine | DIET

DIAGNOSIS Aminophylline AMPICILLAN | AGE | WEIGHT | SEX | NUMBER OF FORMS IN USE

| ORDER DATE | DC DATE | MEDICATION - DOSE - ROUTE - FREQUENCY | MEDICATION SCHEDULE | SHIFT | DATE 1/25 Time/Init. | DATE 1/26 Time/Init. | DATE 1/27 Time/Init. | DATE 1/28 Time/Init. |
|---|---|---|---|---|---|---|---|---|
| 1/25 | | Hep Lock c NS Flush q 8° | 0600 1400 2200 | 11-7 | | 0600 JT | | |
| | | | | 7-3 | 1400 | 1425 | | |
| | | | | 3-11 | 2200 JD | | | |
| ↓ | | ASA 81mg qd | 0800 | 11-7 | 02 in ER | 0830 LT | | |
| | | | | 7-3 | | | | |
| | | | | 3-11 | | | | |
| ↓ | | Lopressor 12.5mg po BID | 0800 2000 | 11-7 | 02 in ER | 0830 LT | | |
| | | | | 7-3 | | | | |
| | | | | 3-11 | 2000 JD | | | |
| 1/28 | | Prevacid 30mg IV qd | 1200 | 11-7 | | | | |
| | | | | 7-3 | 1200 BL | | | |
| | | | | 3-11 | | | | |
| | | | | 11-7 | | | | |
| | | | | 7-3 | | | | |
| | | | | 3-11 | | | | |
| | | | | 11-7 | | | | |
| | | | | 7-3 | | | | |
| | | | | 3-11 | | | | |
| | | | | 11-7 | | | | |
| | | | | 7-3 | | | | |
| | | | | 3-11 | | | | |
| | | | | 11-7 | | | | |
| | | | | 7-3 | | | | |
| | | | | 3-11 | | | | |
| | | | | 11-7 | | | | |
| | | | | 7-3 | | | | |
| | | | | 3-11 | | | | |
| | | | | 11-7 | | | | |
| | | | | 7-3 | | | | |
| | | | | 3-11 | | | | |
| | | | | 11-7 | | | | |
| | | | | 7-3 | | | | |
| | | | | 3-11 | | | | |
| | | | | 11-7 | | | | |
| | | | | 7-3 | | | | |
| | | | | 3-11 | | | | |
| | | | | 11-7 | | | | |
| | | | | 7-3 | | | | |
| | | | | 3-11 | | | | |
| | | Crenshaw Community Hospital 00088 Atwell v. Smart | | 11-7 | | | | |
| | | | | 7-3 | | | | |
| | | | | 3-11 | | | | |

SPECIAL NOTES:
2000 1/25 Lopressor held due to BP 115/49 J Dawson
0 - 1/26/06 Lopressor held due to B/P 101/52 - L Tomplins LPN

SITE CODES
OD - Right Eye
OS - Left Eye
OU - Both Eyes
AD - Right Ear
AS - Left Ear
ABD - Abdomen
FOR THE FOLLOWING SITES INDICATE:
L - LEFT R - RIGHT
G - Gluteus (Buttocks)
LT - Lateral Thigh
AT - Anterior Thigh
D - Deltoid
F - Forearm

| INIT. | NURSE SIGNATURE | INIT. | NURSE SIGNATURE |
|---|---|---|---|
| BL | B. L. Barzan LPN | | [signature] |
| JD | Jennie Dawson | | |
| LT | L Tomplins LPN | | |
| | | | |
| | | | |

RENSHAW COMMUNITY HOSPITAL    101 HOSPITAL CIRCLE    LUVERNE    AL 36049

**EMERGENCY ROOM • OUTPATIENT RECORD**

| ACCT NUMBER 43634 | TYPE 3 | PATIENT NAME DAVIS ROBIN O | AGE | BIRTHDATE | SEX F | R/W SW | DATE OF SERVICE 1/25/06 | TIME 00:21 | CLERK INT JHE |

| ADDRESS - LINE 1 | | ADDRESS - LINE 2 | | CITY BRANTLEY AL | STATE AL | ZIP CODE 36009 | TELEPHONE 135-0389 |

| EMPLOYER | | NATURE IN CASE OF EMERGENCY - NAME EDISON JANICE | RELATIONSHIP 5278853 | ADDRESS | | TELEPHONE 527-8853 |

| INSURANCE COMPANY BLUE CROSS-O/P | | CONTRACT OR GROUP NUMBER PPAB52463626 | DATE | PLACE | TIME | EVENT |

| GUARANTOR NAME DAVIS ROBIN O | GUARANTOR ADDRESS 1098 SIMS RD | LUVERNE | AL | STATE ZIP CODE 36049 | GUAR. TELEPHONE 335-3501 |

| GUARANTOR EMPLOYER MART ALABAMA LLC | GUARANTOR OCCUPATION | GUAR. EMPLOYER ADDRESS 121 SHIN YOUNG DRIVE | GUAR. BUS TELEPHONE 335-5800 |

| MR NUMBER 40002 | PREV SERV DATE 10/18/05 | IF MINOR - PARENT NAME | MED REC 41327 | FAMILY PHYSICIAN OZAIR SADA/TOMPKINS C |

| CHARGES | X-RAY | LAB | RESP. TH. | PHY. TH. | EKG | I.V. | DRUGS | SUPPLIES | OTHER | M.D. | E.R. RM | TOTAL OU |

**AUTHORIZATION FOR TREATMENT, GUARANTEE OF PAYMENT, ASSIGNMENT OF INSURANCE BENEFITS**

1. The undersigned has been informed of the emergency treatment considered necessary for the above named patient, and that treatment and procedures will be performed by physicians, members of house staff and employees of the hospital. Authorization is hereby granted for such treatment and procedures. The undersigned has read the above authorization and understands the same and certifies that no guarantee or assurance has been made as to the results that may be obtained.
2. The undersigned agrees to pay for services rendered by Hospital upon release of patient.
3. I/we hereby assign any hospital benefits, sick benefits, injury benefits due to a liability of a Third party, payable by any party, for the above patient, to Hospital unless I pay the account in full upon release of patient. I/we hereby authorize the "Administrator of Hospital" to furnish from its records any information requested by the below mentioned insurance companies in connection with the above assignment. I do hereby appoint the "Controller" of Hospital as my lawful attorney to endorse for me any checks made payable to me for benefits or claims collected under the above assignment and to apply any credit balance to any other account I may owe said hospital.

| DATE | TIME | SIGNED PATIENT | SIGNED GUARANTOR SAO...9J.. |

**CHIEF COMPLAINT (If Accident State How, When, and Where)**

| TEMP 98.7 | PULSE 113 | RESP 22 | B/P 135/84 | ALLERGIES Amoxycillin Medrol - Compazine | MEDICATIONS - HOME N/A | RN PHYSICIAN (Ozair) | VET. TOX. |

**NURSES NOTES:** Awakened c̄ pain in mid-chest through to back — nausea & S.O.B. — had similar episode yesterday & was seen @ Dr. Tompkins office.    J. Edison R

**LAB DATA (Including X-Rays, EKGs, etc.):** CBC, Chem 18, Cardiac Enzyme

**PHYSICIAN'S REPORT:** 32 y/o ... with hx of mitral valve prolapse, ...

**DIAGNOSIS:** chest pain r/o M.I.

**TREATMENT:** ASA 81
— Lopressor 25 mg.

**INSTRUCTIONS TO PATIENT:**

Crenshaw Community Hospital
00089
Atwell v. Smart

FOLLOW-UP WITH

| PATIENT'S SIGNATURE ON DISCHARGE | DATE - TIME OF DISC. | PHYSICIAN'S SIGNATURE |

0205

HOSPITAL

## AUTHORIZATION FOR EMERGENCY TREATMENT

1. The undersigned has been informed of the emergency treatment considered necessary for the patient whose name appears on the reverse hereof and that the treatment and procedures will be performed by physicians, members of the house staff and employees of the hospital. Authorization is hereby granted for such treatment and procedures.

2. **MEDICARE - MEDICAID PATIENT'S CERTIFICATION:** Authorization to release information and payment request. I certify that the information given by me in applying for payment under Titles XVIII and XIX of the Social Security Act is correct. I authorize release of all records required to act on this request. I request that payment of authorized benefits be made on my behalf.

3. **ASSIGNMENT OF INSURANCE BENEFITS:** I hereby authorize payment directly to _____ Hospital of hospital benefits otherwise payable to me including major medical insurance and payment of surgical or medical benefits, including major medical, directly to the attending physician but not to exceed regular charges for these services. I understand that I am financially responsible to the hospital and physician for charges not covered by this assignment.

4. **AUTHORIZATION FOR RELEASE OF MEDICAL INFORMATION:** The hospital and attending physician are authorized to furnish any medical information requested by insurance companies with whom I have coverage or any public agency which may be assisting in payment for my care.

5. **REFUND OF INSURANCE BENEFITS:** I authorize the refund of overpaid insurance benefits in accordance with my insurance policy conditions where my coverages are subject to a coordination of benefits clause.

6. I understand that health care services paid under Medicare, Medicaid, and maternal and child health programs are subject to review by the Professional Standards Review Organization.

| Date | Witness | Patient | |
|------|---------|---------|--|

| Date | Witness | Responsible Party | Relationship to Patient |
|------|---------|-------------------|-------------------------|

CRENSHAW COMMUNITY HOSPITAL
101 HOSPITAL CIRCLE., 334-335-3374
LUVERNE, ALABAMA 36049
*"Where Caring Counts"*

# CONDITIONS OF ADMISSIONS AND TREATMENT

**AUTHORIZATION AND CONSENT FOR SERVICES:** I am presenting myself for medical services at Crenshaw Community Hospital. I consent to such care as my physician orders and all other persons caring for me deem necessary and beneficial. I understand that this care may include examinations, test, medical and/or surgical treatment. I also understand that such treatment may involve risk and that no guarantees have been made to me about the outcome of this care. I understand that the physicians on the staff are independent contractors, and not the employees or agents of Crenshaw Community Hospital. I authorize observers to be present during procedures for the purpose of medical training and education. I understand that I have the right to understand my rights and responsibilities as a patient.

**PERSONAL VALUABLES:** Crenshaw Community Hospital is not responsible for valuables, including money, jewelry, and watches, not properly deposited in our care. I accept responsibility for personal items kept in my possession.

**RELEASE OF MEDICAL INFORMATION:** The undersigned consents to the release of general information regarding admission and condition unless designated in writing. The undersigned also authorizes Crenshaw Community Hospital and physician(s) rendering service to release medical or other information about the patient which may be necessary for the completion of insurance claims, review of services, or receipt of benefits including current medical records. Such information may be released to third-party payers, including the third-party payer's agent and/or representative, governmental agencies or anyone responsible for payment of hospital and/or physician charges.

**MEDICARE AUTHORIZATION:** I certify that the information given by me in applying for payment under Title XVIII of the Social Security Administration or its intermediaries or carriers for this or related Medicare claim. I request payment for the authorized benefits are made on my behalf to Crenshaw Community Hospital, and any organizations and physician(s) rendering service during my treatment.

**ASSIGNMENT OF BENEFITS AND FINANCIAL RESPONSIBILITY:** I authorize payment of all insurance benefits, basic and major medical, for this period of medical, emergency, and/or diagnostic treatment to be made directly to Crenshaw Community Hospital. I understand that I am financially responsible for all charges not covered by insurance payments, including private room differentials, and that all efforts for collection of those benefits are for my convenience and do not represent a guarantee for collection or a credit to my account until such time as payment is received by Crenshaw Community Hospital and the contracted entities. I also assign the benefits payable for physicians' services to the physician(s) furnishing the services, including Montgomery Radiology Associates, or authorize such physicians or physician group to submit a claim to my insurance company(s), Medicare, and/or Medicaid. I will be responsible for any collection fees, court cost, and/or attorney fees incurred while collecting on my account(s). Copies of this authorization are as valid as the original.

Witness _____

Date: 1/24/06

Patient or Responsible Party _____

Legal Guardian/Proxy: _____

Crenshaw Community Hospital
00091
Atwell v. Smart



Crenshaw Community Hospital
101 Hospital Circle
Luverne, Al 36049

DAVIS ROBIN O    41327
043634
DOB           F  C1/24/06
DR. OZAIR/TOMPKINS

## Emergency Department LEVEL OF CARE

| | CRITICAL CARE : SEE ** below |
|---|---|
| CC | CPR |
| CC | Stroke/Cerebral Hemorrage - all Types |
| CC | Trauma, Trauma Alert/ Multiple Trauma |
| CC | Shock of all types- Septic, Cardogenic, Spinalm Hypovolemic, Anaphylactic |
| CC | Other- See *** below |
| | See also Procedures Listing |
| | |
| 16 | PROTOCOLS: Asthma, Chest pain, Psych |
| | |
| | ADMISSIONS / TRANSPORT |
| 0 | Triage |
| 0 | Simple Recheck |
| 1 | Ambulatory visit / Complex recheck |
| 10 | DOA, Death (no code) |
| 5 | Hospital Admission |
| 3 | Transfer in ED by ambulance |
| 1 | Transfer out of ED by ambulance |
| 5 | Transport with nurse to other facility |
| | ASSISTING MONITORING |
| 15 | Conscious Sedation (Inc. routine monitoring) |
| 5 | Monitoring (Multi V/S, neuro check, cardiac) |
| 2 | Nasal packing |
| 1 | Pulse Ox check (Routine) |
| 2 | Resporatory Therapy Tx (O2, updraft, etc.) |
| 2 | Simple Assist (steri strip, eye exam) |
| 10 | Ventilator / CPAP mask |
| | WOUND CARE |
| 5 | Complex wound cleansing |
| 2 | Dressing (small / moderate) |
| 3 | Dressing (large / complex / simple burn) |
| 2 | Suture Removal |
| 2 | Wound cleaning / eye treatment / eye patch) |
| | SPECIAL NEEDS |
| 2 | Bath |
| 1 | Bedpan / Urinal (ea placement theron) |
| 1 | Bed linen changed |
| 3 | Comatose, disoriented |
| 5 | Combative, confused, incontinent, psychiatric |
| 2 | Pediatric patient |
| 1 | Isolation |

| | PROCEDURES |
|---|---|
| CC | Cardioversion |
| CC | Chest tube insertion |
| CC | Emergency Delivery |
| CC | Intraosseous Infusion |
| CC | Intubation |
| CC | Pacemaker assist |
| CC | TPA administration |
| CC | Tracheostomy assist / replace |
| 10 | Blood administration |
| 10 | Bronchoscopy |
| 5 | Casting |
| 10 | Central line / cutdown insertion |
| 10 | Debridement of burns, complex |
| 5 | Debridement of burns, simple |
| 2 | Foreign Body removal, EAR |
| 5 | Foreign Body removal, OTHER |
| 10 | Gastric lavage |
| 5 | Gastrostomy tube change |
| 3 | I & D abcess |
| 10 | K wire / Steinman pin |
| 5 | Laceration / wound repair, simple |
| 10 | Laceration / wound repair, Intermediate |
| 15 | Laceration / wound repair, complex |
| 10 | Lumbar puncture |
| 5 | Nasal Hemorrhage control |
| 5 | Peritoneal tap assist |
| 10 | Pre-op preparation |
| 10 | Reduction of Fx / DISLOCATION |
| 5 | Removal of impacted ear wax |
| 10 | Splint (leg, arm, shoulder, etc.) |
| 2 | Therapeutic phlebotomy |
| 15 | Thoracentesis / Paracentesis |

** If a diagnostic, surgical or therapeutic
   procedure was done, you must use
   ER level or Critical Care level with
   procedure charge.

## EMERGENCY DEPARTMENT LEVEL OF CARE (continued)

| | | |
|---|---|---|
| | **EDUCATION / DISCHARGE INSTR.** | |
| | 2 | AMA |
| | 2 | Crutch Training by the ER staff |
| | 0 | Discharge instructions - simple |
| | 2 | Discharge instructions - complex |
| | 2 | Social Services consult |
| | **MEDS / IVs** | |
| | 5 | Infusaport access |
| | 3 | IV - simple (INT, KVO) |
| | 5 | IV - w/pump, drip, rapid > 2 hours |
| | 1 | MED-PO, supp, topical |
| | 5 | Multiple lines, complex IV's |
| | 3 | Rabies vaccine |
| | **OB / GYN** | |
| | 2 | Fetal heart tones |
| | 2 | Newborn Care |
| | 3 | Pelvic exam - simple |
| | 5 | Pelvic exam - complex, hemorrhage, difficult |
| | 10 | Rape exam |
| | **TREATMENT** | |
| | 3 | Ace wrap, collar, sling, immobilizer |
| | 15 | Decontamination - Hazardous Materials |
| | 2 | Enema administration |
| | 5 | Impaction removal |
| | 2 | Suction / Irrigation |
| | 2 | Traction assist |
| | 3 | Urinary Cath / NG insertion |
| | **TESTS** | |
| | 2 | Arterial Blood Gases (ABG) |
| | 2 | C-arm |
| | 2 | EKG 12 lead |
| | 1 | Glucose via device (routine) |
| | 1 | Hemocult |
| | 1 | Lab |
| | 1 | Specimen collect (urine, sputum, etc) |
| | 1 | Visual acuity |
| | 2 | X-ray (simple) per trip |
| | 3 | X-ray (complex - CT, MRI, US, IVP.) per trip including patient monitoring |

** Any time a Critical Care item is marked, you do not have to mark anything more on the left side, simply mark any procedure that was performed, and indicate "CC" in the box below.

**Total points determines level of service:**

| 0 ER Level 1 |
| 1-5 ER Level 2 |
| 6-10 ER Level 3 |
| 11-15 ER Level 4 |
| 16 and up ER Level 5 |

*18*

**TOTAL POINTS**
or CC for Critical Care

*** For Critical Care - Other: See below for examples, refer to Policy for Definition

**Potential Symptoms:**

New onset paralysis
Head injury with loss of consciousness
Acute myocardial infarction
Drug overdoses impairing vital functions
Coma of all etyiologies (except hypoglycemic)

**Acute Failure:**

Renal, hepatic, respiratory, pulmonary edema, major pulmonary embolis
Emboli of fat or amniotic fluid
Non-hemorrhagic Strokes with vital function impairment

**Aneurysms, Thoracic or Abdominal**

| Leaking or ruptured | Cardia Tamponade |
| Aortic dissection | Lactic Acidosis |
| Diabetic Ketoacidosis | Envenomation |
| Tension Pneumothorax | |

Thyroid storm or Addisonian Crisis
Life-threatening hyper/hypo thermia
DIC or other bleeding diathesis - Hemophilia, ITP, TTP, Leukemia
Aplasti

**Potential Interventions**

Multiple parenteral medications requiring constant monitoring

| CVP line insertion | Ventilator |
| Periocardiocentesis | Cricothyrotomy |
| Control of major hemorrhage | Emergent Cath Lab Pro |

Administration of blood transfusions / blood products
Major burn care / transfer to burn unit
Major Trauma care / multiple surgical consults

Crenshaw Community Hospital
00093
Atwell v. Smart

DAV...ROBIN O  <1327
043634
DOB        F  C1/24/06
DR. OZAIR/TOMPKINS
Addressograph

**Crenshaw Community Hospital**
Luverne, AL 36049

**EMERGENCY NURSING
TRIAGE FORM**

Date: 01/25/06  Time: 001  Pvt. M.D. _____  SAD 972

Allergies: Medrol — Compazine — Aminophylline

Age: ____  Weight: ____  Temperature: 98.9  Pulse: 113  Respiration: 22  Blood Pressure: 135/84

Chief Complaint: Awakened — pain in mid chest → to back R — nausea —

Data Source (Informant): Hx of MVP — Fibromyalgia — Hemochromotosis —

| ARRIVAL: | NOTIFIED: | GLASGOW COMA SCALE | | | |
|---|---|---|---|---|---|
| ☐Walk | ☐Police | *Adult/Pediatric* | | | |

**GLASGOW COMA SCALE** *Adult/Pediatric*

| | |
|---|---|
| A. EYE OPENING | |
| Spontaneous | 4 |
| To Voice | 3 |
| To Pain | 2 |
| None | 1 |
| B. VERBAL | |
| Oriented/Smile | 5 |
| Confused | 4 |
| Screams | 3 |
| Grunts | 2 |
| None | 1 |
| C. MOTOR | |
| Obeys Spontaneous | 6 |
| Localizes to pain | 5 |
| Flexor withdraw l | 4 |
| Abnormal Flexion | 3 |
| Extensor Posturing | 2 |
| None | 1 |
| Score total | 15 |

**ARRIVAL:**
☐Walk
☐Carried
☐Ambulance
☐Police
☑Rescue Squad
☐Wheelchair
☐Stretcher

**ACCOMP. BY:**
☐Self
☐Family/friend
☐Police
☑Other

**L.O.C.**
☑Alert
☐Lethargic
☐Unresponsive
☐Disoriented
☐Shock

**VALUABLES**
☐Patient
☐Family/friend
☐Med. Examiner
☐Save _ Env. #

**NOTIFIED:**
☐Police
☐Family/friend
☐Med. Examiner
☐Animal Control
☐Clergy
☐Family Serv.
Time called:

**ARE IMMUNIZATIONS CURRENT?**  ☐ Yes  ☐ No

| PMH | YES NO | | YES NO | | YES NO |
|---|---|---|---|---|---|
| Arthritis | ☐ ☑ | CVA | ☐ ☑ | Migraines | ☐ ☑ |
| Asthma | ☐ ☑ | Diabetes | ☐ ☑ | Psyc | ☐ ☑ |
| By-pass | ☐ ☑ | Dialysis | ☐ ☑ | Pulmonary | ☐ ☑ |
| Cardiac | ☐ ☑ | GI | ☐ ☑ | Renal | ☐ ☑ |
| CHF | ☐ ☑ | GU | ☐ ☑ | Seizure | ☐ ☑ |
| COPD | ☐ ☑ | HTN | ☐ ☑ | Sickle Cell | ☐ ☑ |

**CURRENT MEDICATIONS**  ☑ None  ☐ Unknown

| Name | Dose | Freq | Name | Dose | Freq |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**NURSING OBSERVATIONS**

**PAIN** ☑YES ☐ NO (Circle one)  😊 😐 😣 😖 😫 😭  0 2 4 6 8 10
Location: mid chest & back  Description: _____

**NEUROLOGICAL** ☑Alert ☐Confused ☐Oriented
☐Unresponsive ☐Lethargic ☐Seizures

**EMESIS** ☑No ☐ Yes  Pt. description: _____

**PUPILS** ☑Equal ☐Unequal size in mm: R__ L__

**STOOL** ☑N/A ☐ Normal  Last BM: ____

**RESPONDS TO STIMULI** ☐No ☑Yes ☑Verbal ☐Painful

**URINATION** ☑N/A ☐ Normal ☐ Frequency ☐ Dysuria

**VISUAL ACUITY N/A** ☐

**DISCHARGE** ☑N/A ☐ No ☐ Yes
☐ Vaginal _____ ☐ Urethral _____ ☐ Other ____

**GI** ☐N/A ☐Vomiting ☐Diarrhea ☑Nausea

**ABD** ☐N/A ☑Soft ☐Distended ☐Rigidity ☐Bowel Sounds

**BLEEDING** ☑No ☐ Yes  LMP: __ Days
Location: _____

**SKIN** ☑Warm ☐Pale ☐Dusty ☐Cyanotic ☑Dry ☐Moist
☐Cool ☐Clammy ☐Other ____

☑None ☐ Minimal ☐ Moderate ☐ Severe ☐ Bright ☐ Dark ☐ Clots
☐ Other: _____

**TRAUMA: (location & appearance)** ☑N/A  **COMMENTS**
Abrasion _____
Avulsion _____
Contusion _____
Deformity _____
Edema _____
Laceration _____
Puncture Wound _____

N/A

**RESPIRATORY** ☐ N/A
☑Regular ☐ Shallow ☐ Irreg ☐ Hypervent ☐ Cough ☐ Dyspnek
☐ Absent ☐ Rapid ☐ Other: ____

**CIRCULATION/CARDIAC/PULSES**
☑Regular ☐Absent ☐Palpable
☐Irreg ☐Weak
☐Cardiac Rhythm: ____

**BREATH SOUNDS**
☐N/A ☐Unequal ☐Diminished
☐Rales ☑Equal ☐Rhonch
☐Wheezes

**SAFETY** ☐Side rails up ☑Attendant with patient
☐Nurses in attendance ☐Other ____

**DISCH. COND.**
☐Improved
☐Critical
☐Unchanged
☐Expired

**EXIT VIA**
☐Walk ☐Carried
☐Wheelchair
☐Stretcher
☐Ambulance

**DISPOSITION**
☐Home
☐Other facility
☐AMA ☐Expired
☐DOE ☑Admit

Crenshaw Community Hospital
00094
Atwell v. Smart

| MEDICATION/DOSE | TREATMENT/I.V. | ROUTE / SITE | SIGNATURE | RESPONSE |
|---|---|---|---|---|
| Lopressor 25 mg | | P.O. | J Edison RN | |
| ASA 81 mg | | P.O. | | |

## ADDITIONAL VITAL SIGNS

| TIME | TEMP | PULSE | RESP | B/P | O₂ SAT |
|---|---|---|---|---|---|
| | | | | 102/72 | |

### PROCEDURE / TREATMENT

Cardiac Monitor    0020

| | TIME | Nurse Initials |
|---|---|---|
| Splint (Type: ) | | |
| (Location: ) | | |
| Central Line (Type: ) | | |
| Chest Tub (Am't Drained: ) (Size: ) | | |
| Dressing (Type: ) | | |
| Foley Cath. (Am't Drained: ) (Size: ) | | |
| N/G Tube (Am't Drained: ) (Size: ) | | |
| O₂ per | | |
| Patient Teaching (Type: ) | | |

| PHYSICIAN | EXAM TIME | PROCEDURE DONE |
|---|---|---|
| | | |

| PHYSICIAN | TIME NOTIFIED | PLACE NOTIFIED | TIME RESPOND | NURSE INITIALS |
|---|---|---|---|---|
| O₂ air | 0030 | rm | 0035 | JME |

### IV FLUIDS / TIMES / RATES

| Time Started | IV Fluid | Rate | IV Cath & Size | Nurse Initials | Time D/C | Am't. Infused |
|---|---|---|---|---|---|---|
| 0145 | Aepbar | | #20 (R) Wrist | JME | | |

**Comments**

| TIME | ADDITIONAL NURSES NOTES |
|---|---|
| See Front | |

| DISCHARGE TO: | ADMITTED TO: | REPORT GIVEN TO: |
|---|---|---|
| | 120 B per Wheelchair @ 0205 | |

Transferred By:

Discharge Nurse Signature: J Edison R.N.

Crenshaw Community Hospital
00095

**Montgomery Cardiovascular Associates, P.C.**
2119 East South Blvd. Montgomery, AL 36116
(334)280-1500 Fax: (334)280-1600

*February 7, 2006*
*Page 1*
Chart Document

| **ROBIN O DAVIS** | | Home: 3343353501 Office: 3345278853 |
|---|---|---|
| Female DOB: | 111209-1-mc | Ins: B/C OF A (1) Grp: 52397 |

**01/25/2006 - Office Visit: Echo ONLY (Crenshaw)**
**Provider: ERIC CRUM MD**
**Location of Care: Montgomery Cardiovascular Associates, P.C.**

*MB# 41327*
*acct# 43634*

### TWO-DIMENSIONAL/M-MODE/DOPPLER ECHOCARDIOGRAM REPORT

| | |
|---|---|
| **NAME:** | DAVIS, ROBIN O |
| **MCA CHART NO.:** | 111209-1-mc |
| **D.O.B.:** | |
| **DATE:** | 01/25/2006 8:30 AM |
| **ORDERING M.D.:** | CHARLES TOMPKINS |
| **INTERPRETING M.D.:** | ERIC CRUM |
| **REFERRING M.D.:** | CHARLES TOMPKINS |
| **PERFORMED AT:** | CRENSHAW COMMUNITY HOSPITAL |

**REASON FOR STUDY:**

1.    Chest pain.
2.    Shortness of breath.
3.    History of mitral valve prolapse.

**M-MODE MEASUREMENTS:**

| | |
|---|---|
| Left ventricular end diastolic diameter: | 46 mm |
| Left ventricular end systolic diameter: | 28 mm |
| Aortic root diameter: | 30 mm |
| Valve opening: | 16 mm |
| Left atrium: | 28 mm |
| Posterior wall thickness: | 9 mm |
| Septal wall thickness: | 14 mm |
| Ejection fraction: | 60% |

**TWO-DIMENSIONAL/COLOR DOPPLER STUDY:** Echocardiogram demonstrates normal left ventricular chamber size and wall thicknesses with overall normal left ventricular systolic performance with ejection fraction 60%. There are no segmental wall motion abnormalities. The left atrium appears normal in size. The right heart appears normal in size. The interventricular septum appears intact. The aortic valve is pliable. Mitral valve is pliable with trace mitral regurgitation by Doppler. There is no definite prolapse. Tricuspid valve is pliable with mild (1+) tricuspid regurgitation by Doppler. No intracardiac masses or thrombi seen. No significant pericardial effusion.

**CONCLUSIONS:**

1.    Normal left ventricular chamber size and wall thicknesses with overall normal left ventricular systolic performance with ejection fraction 60%.
2.    The left atrium is normal in size.
3.    The right heart is normal in size.
4.    The valves are pliable with trace mitral regurgitation and mild (1+) tricuspid regurgitation by Doppler. No evidence of significant mitral valve prolapse.

Crenshaw Community Hospital
00096
Atwell v. Smart

**Montgomery Cardiovascular Associates, P.C.**
2119 East South Blvd. Montgomery, AL 36116
(334)280-1500 Fax: (334)280-1600

February 7, 2006
Page 2
Chart Document

| ROBIN O DAVIS | Home: 3343353501 Office: 3345278853 |
|---|---|
| Female  DOB                                  111209-1-mc | Ins: B/C OF A (1) Grp: 52397 |

5.      No intracardiac masses or thrombi seen.
6.      No significant pericardial effusion.


R. Eric Crum, M.D.

REC/iw

Fax to:

Dr. Charles Tompkins
Rt. 3 Box 9-E
Luverne, Alabama 36049-9405
Phone: 334-335-3383
Fax: 334-335-3078

Crenshaw Community Hospital
101 Hospital Circle
Luverne, Alabama 36049
Phone: 334-335-3374
Fax: 334-335-1159

Job ID: 234140
DD:     02/01/2006
DT:     02/02/2006

**Signed by ERIC CRUM MD on 02/03/2006 at 8:45 AM**

Crenshaw Community Hospital
00097
Atwell v. Smart



# CRENSHAW COMMUNITY HOSPITAL

## Cardiac Ultrasound

Date 1/25/06
Name Davis, Robin  Age ___  Sex F  Race W
Height ___  Weight ___  B.S.A. ___
Clinical Data CP / SOB / hx of MVP
Requested DR Jomp  Primary Dr ___
Master tape# 96  Start ___  End ___

**M-mode**

Left Ventricle
End diastolic 46 (35-56mm)
End stystolic 28 (23-40mm)
LVPW 9 (7-12mm)
IVS 9 (7-12mm)
FS ___ (25-50%)
EF 60% (53-67%)

**Doppler**

LVOT 9 (0.7-1.1m/s)
Mitral Inflow 9 (0.6-1.1m/s)
Tricuspid Inflow ___ (0.3-0.7m/s)
Aortic Flow ___ (1.0-1.7m/s)
Pul. Artery Flow ___ (0.6-0.9m/s)

Mitral Valve
Epoint-septal seperation ___
Right ventricle ___ (7-23mm)

Aorta
End diastolic diameter 30 (20-38mm)
Valve Opening 16 (16-26mm)

Left Atrium
End diastolic diameter 28 (19-40mm)

Tech's observation mild MVP c trace sie / mild-mod TR

doppler ___ m-mode ___  Tech Tracy

41327

CRENSHAW COMMUNITY HOSPITAL    101 HOSPITAL CIRCLE    LUVERNE    AL 36049

10-19

**EMERGENCY ROOM • OUTPATIENT RECORD**

| PATIENT NUMBER 040002 | TYPE 2 | PATIENT NAME DAVIS ROBIN O | AGE 31 | BIRTHDATE | SEX F | RACE SW | ADMIT 07/19/05 | TIME 09:47 | CLERK INT. |

| EMPLOYER - LINE 1 | ADDRESS - LINE 2 | LUVERNE | STATE AL 36049 | TELEPHONE 335-3501 |

| GUARANTOR / SSAN EDISON JANICE | RESPONSIBLE PARTY - NAME 3278853 | ADDRESS | TELEPHONE 327-8853 |

SMART ALABAMA LLC
121 Shin Young Dr.    Atten:
Luverne, AL 36049    Rance Maddox

| 4200607853 | DATE | PLACE |
| | TIME | EVENT |

| DAVIS ROBIN O | 1095 SIMS RD | LUVERNE | STATE ZIP CODE 36049 | 995-5501 |

| SMART ALABAMA LLC | GUARANTOR OCCUPATION | 121 SHIN YOUNG DRIVE | 995-5500 |

| 539915 | 10/19/05 | IF MINOR - PARENT NAME | 41327 | FAMILY TOMPKINS C/TOMPKINS C |

| **CHARGES** | X-RAY | LAB | RESP. TH. | PHY. TH. | EKG | I.V. | DRUGS | SUPPLIES | OTHER | M.D. | E.R. RM | TOTAL DUE |

**AUTHORIZATION FOR TREATMENT, GUARANTEE OF PAYMENT, ASSIGNMENT OF INSURANCE BENEFITS**

1. The undersigned has been informed of the emergency treatment considered necessary for the above named patient, and that treatment and procedures will be performed by physicians, members of house staff and employees of the hospital. Authorization is hereby granted for such treatment and procedures. The undersigned has read the above authorization and understands the same and certifies that no guarantee of assurance has been made as to the results that may be obtained.
2. The undersigned agrees to pay for services rendered by Hospital upon release of patient.
   I/we hereby assign any hospital benefits, sick benefits, injury benefits due to a liability of a Third party, payable by any party, for the above patient, to Hospital unless I pay the account in full upon release of patient. I/we hereby authorize the Administrator of Hospital to furnish from its records any information requested by the before mentioned insurance companies in connection with the above assignment. I do hereby appoint the "Controller" of Hospital as my lawful attorney to endorse for me any checks made payable to me for benefits or claims collected under the above assignment and to apply any credit balance to any other account I may owe said Hospital.

| DATE | TIME | SIGNED PATIENT | SIGNED GUARANTOR 8409 |

**CHIEF COMPLAINT (If Accident State How, When, and Where)**

E 927

| TEMP. | PULSE | RESP. | B/P | ALLERGIES | MEDICATIONS - HOME | E.R. PHYSICIAN | TXT. TOX. |

**NURSES NOTES:**

**NURSE'S SIGNATURE (RN OR LPN)**

**LAB DATA (including X-Rays, EKGs, etc.)**

**PHYSICIAN'S REPORT:**

# DIAGNOSIS:

**TREATMENT:**

| | CONDITION ON DISC STABLE EXPIRED |

**INSTRUCTIONS TO PATIENT:**

| | FOLLOW-UP WITH | M. |

Crenshaw Community Hospital
00099
Atwell v. Smart

| PATIENT'S SIGNATURE ON DISCHARGE | DATE - TIME OF DISC. | PHYSICIAN'S SIGNATURE | M. |

_____ HOSPITAL

_____

## AUTHORIZATION FOR EMERGENCY TREATMENT

1. The undersigned has been informed of the emergency treatment considered necessary for the patient whose name appears on the reverse hereof and that the treatment and procedures will be performed by physicians, members of the house staff and employees of the hospital. Authorization is hereby granted for such treatment and procedures.

2. **MEDICARE - MEDICAID PATIENT'S CERTIFICATION:** Authorization to release information and payment request. I certify that the information given by me in applying for payment under Titles XVIII and XIX of the Social Security Act is correct. I authorize release of all records required to act on this request. I request that payment of authorized benefits be made on my behalf.

3. **ASSIGNMENT OF INSURANCE BENEFITS:** I hereby authorize payment directly to _____ Hospital of hospital benefits otherwise payable to me including major medical insurance and payment of surgical or medical benefits, including major medical, directly to the attending physician but not to exceed regular charges for these services. I understand that I am financially responsible to the hospital and physician for charges not covered by this assignment.

4. **AUTHORIZATION FOR RELEASE OF MEDICAL INFORMATION:** The hospital and attending physician are authorized to furnish any medical information requested by insurance companies with whom I have coverage or any public agency which may be assisting in payment for my care.

5. **REFUND OF INSURANCE BENEFITS:** I authorize the refund of overpaid insurance benefits in accordance with my insurance policy conditions where my coverages are subject to a coordination of benefits clause.

6. I understand that health care services paid under Medicare, Medicaid, and maternal and child health programs are subject to review by the Professional Standards Review Organization.

_____    _____    _____
Date         Witness              Patient

_____    _____    _____    _____
Date         Witness              Responsible Party       Relationship to Patient

Crenshaw Community Hospital
00100

CRENSHAW COMMUNITY HOSPITAL
101 HOSPITAL CIRCLE.. 334-335-3374
LUVERNE, ALABAMA 36049
*Where Caring Counts*

# CONDITIONS OF ADMISSIONS AND TREATMENT

**AUTHORIZATION AND CONSENT FOR SERVICES:** I am presenting myself for medical services at Crenshaw Community Hospital. I consent to such care as my physician orders and all other persons caring for me deem necessary and beneficial. I understand that this care may include examinations, test, medical and/or surgical treatment. I also understand that such treatment may involve risk and that no guarantees have been made to me about the outcome of this care. I understand that the physicians on the staff are independent contractors, and not the employees or agents of Crenshaw Community Hospital. I authorize observers to be present during procedures for the purpose of medical training and education. I understand that I have the right to understand my rights and responsibilities as a patient.

**PERSONAL VALUABLES:** Crenshaw Community Hospital is not responsible for valuables, including money, jewelry, and watches, not properly deposited in our care. I accept responsibility for personal items kept in my possession.

**RELEASE OF MEDICAL INFORMATION:** The undersigned consents to the release of general information regarding admission and condition unless designated in writing. The undersigned also authorizes Crenshaw Community Hospital and physician(s) rendering service to release medical or other information about the patient which may be necessary for the completion of insurance claims, review of services, or receipt of benefits including current medical records. Such information may be released to third-party payers, including the third-party payer's agent and/or representative, governmental agencies or anyone responsible for payment of hospital and/or physician charges.

**MEDICARE AUTHORIZATION:** I certify that the information given by me in applying for payment under Title XVIII of the Social Security Administration or its intermediaries or carriers for this or related Medicare claim. I request payment for the authorized benefits are made on my behalf to Crenshaw Community Hospital, and any organizations and physician(s) rendering service during my treatment.

**ASSIGNMENT OF BENEFITS AND FINANCIAL RESPONSIBILITY:** I authorize payment of all insurance benefits, basic and major medical, for this period of medical, emergency, and/or diagnostic treatment to be made directly to Crenshaw Community Hospital. I understand that I am financially responsible for all charges not covered by insurance payments, including private room differentials, and that all efforts for collection of those benefits are for my convenience and do not represent a guarantee for collection or a credit to my account until such time as payment is received by Crenshaw Community Hospital and the contracted entities. I also assign the benefits payable for physicians' services to the physician(s) furnishing the services, including Montgomery Radiology Associates, or authorize such physicians or physician group to submit a claim to my insurance company(s), Medicare, and/or Medicaid. I will be responsible for any collection fees, court cost, and/or attorney fees incurred while collecting on my account(s). Copies of this authorization are as valid as the original.

Witness _____     Patient or Responsible Party _____

Date: __10-18-06__     Legal Guardian/Proxy: _____

Robin Davis
pt 40002 mr 41327

Crenshaw Community Hospital
00101

# CRENSHAW COMMUNITY HOSPITAL

101 Hospital Drive
Luverne, AL 36049
phone: 335-3374 - Fax: 335-(159?)

## Outpatient Radiology Physician Order Form

Patient Name: _Robin Davis_

Appointment Date/Time: _10/18/05_ 2:05p

Ordering Physician: _Choi 055_ MD
(signature required)

Reason Br Exam: _(will continued)_
_pain Rt shoulder & left_

Special Instructions/Information: _____

☐ FAX REPORT—FAX #
☐ SEND FILMS WITH PATIENT

### Diagnostic Radiology

ICD-9 Code | Exam

- Upper GI Series*
- Upper GI Series w/ Small Bowel Series*
- Small Bowel Series*
- Barium Swallow
- Barium Enema-single contrast***
- Barium Enema-air contrast***
- IVP(Intravenous Pyelogram)**
- Chest PA/Lateral
- Ribs RIGHT and/or LEFT
- Acute Abdomen Series
- KUB
- Pelvis AP
- Hip RIGHT and/or LEFT ✓
- Other Extremities _left shoulder_
- Cervical Spine Series
- Thoracic Spine Series
- Lumbar Spine Series
- Sacrum/Coccyx
- Skull
- Sinuses
- Facial Bones
- Other

### CT (Computerized Tomography)

ICD-9 Code | Exam

- CT Brain w/o contrast
- CT Brain w/o and w/ contrast*
- CT Neck soft tissue w/o and w/ contrast*
- CT Chest w/ contrast
- CT Abdomen w/o and w/ contrast ****
- CT Pelvis w/ contrast ****
- CT Abdomen w/o contrast
- CT Pelvis w/o contrast
- CT Cervical spine w/o contrast
- CT Thoracic spine w/o contrast
- CT Lumbar spine w/o contrast
- CT Sinuses
- Other

\* Nothing to eat or drink past midnight the night before

\*\* Requires full bladder-drink 40 oz. 1 hr. prior to exam

\*\*\* Follow E-Z-EM or Fleets 1 ? hour prep kit the day before

\*\*\*\* Follow Baro-Cat prep instructions

If the patient is having a contrast exam please note:

1. Diabetic patients may not resume Glucophage or Metformin until 48 hours after the exam.

2. A BUN and Creatinine is required prior to exam on all patients over the age of 60.

3. Document if the patient has known Renal or Heart Disease.

### Ultrasound

ICD-9 Code | Exam

- RUQ Abd (GB, Liver, Pancreas)*
- Complete Abdomen*
- Abdominal Aorta*
- Renal/Urinary Bladder
- Retroperitoneum
- Pelvis***
- Pregnancy / OB***
- Thyroid
- Carotid Doppler
- Various Doppler, RIGHT and/or LEFT
- Arterial Duplex,Lower Extremities
- Other

_Robin Davis_
_Pt 40002    MR 41827_

Crenshaw Community Hospital
00102
Atwell v. Smart



### CRENSHAW COMMUNITY HOSPITAL
### 101 HOSPITAL CIRCLE
### LUVERNE, AL 36049
Telephone (334) 335-3374

| PATIENT: | DAVIS, ROBIN O | DOB: | | ROOM#: OP |
| ACCT#: | 40002 | EXAM: LT SHOULDER | | |
| PHYSICIAN: | TOMPKINS | DATE: 10-18-05 | X-RAY#: 41327 |

CLINICAL HISTORY: INJURY

SINGLE AP VIEW OF LEFT SHOULDER: No fracture or dislocation involving the left shoulder is evident on this quite abbreviated study. There is an apparent calcified lymph node in the axilla. There is a vague increase in opacity over the left mid to lower lung which could represent some infiltration. No other significant findings are noted.

T. L. EAKES, M.D.
ROENTGENOLOGIST

TLE/nrh
D: 10-18-05
T: 10-18-05

### RADIOLOGY DEPARTMENT REPORT
### Page 1 of 1

Crenshaw Community Hospital
00103
Atwell v. Smart

CRENSHAW COMMUNITY HOSPITAL    101 HOSPITAL CIRCLE    LUVERNE    AL 36049

10-17

EMERGENCY ROOM • OUTPATIENT RECORD

| PATIENT NUMBER | TYPE | PATIENT NAME | AGE | BIRTHDATE | SEX | M/S | DATE OF SERVICE | TIME | CLERK INIT. |
|---|---|---|---|---|---|---|---|---|---|
| 039915 | 3 | DAVIS ROBIN D | | | F | SW | 10/15/05 | 02:42 | GW |

| ADDRESS - LINE 1 | ADDRESS - LINE 2 | CITY | STATE | ZIP CODE | TELEPHONE |
|---|---|---|---|---|---|
| | | | AL | | 335-3501 |

| NEXT OF KIN | NOTIFY IN CASE OF EMERGENCY - NAME | RELATIONSHIP | ADDRESS | TELEPHONE |
|---|---|---|---|---|
| | EDISON JANICE | 5278853 | | 527-8853 |

| INSURANCE COMPANY | CONTRACT OR GROUP NUMBER | DATE | PLACE |
|---|---|---|---|
| SMART ALABAMA LLC | 420060838 | | |
| | | TIME | EVENT |

| GUARANTOR NAME | GUARANTOR ADDRESS | | STATE | ZIP CODE | GUAR. TELEPHONE |
|---|---|---|---|---|---|
| DAVIS ROBIN D | | LUVERNE | AL | 36049 | 335-3501 |

| GUARANTOR EMPLOYER | GUARANTOR OCCUPATION | GUAR. EMPLOYER ADDRESS | GUAR. EMP. TELEPHONE |
|---|---|---|---|
| SMART ALABAMA LLC | | 121 SMIN YOUNG DRIVE | 335-5800 |

| BCX SERVICE | PREV. SERV. DATE | IF MINOR - PARENT NAME | MED. REC. NO. | FAMILY PHYSICIAN |
|---|---|---|---|---|
| 058368 | 9/10/05 | | 41327 | SMITH R / TOMPKINS C |

## CHARGES

| X-RAY | LAB | PROR. TR. | PHY. TR. | EKG | I.V. | DRUGS | SUPPLIES | OTHER | M.D. | E.R. RM | TOTAL DUE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | |

### AUTHORIZATION FOR TREATMENT, GUARANTEE OF PAYMENT, ASSIGNMENT OF INSURANCE BENEFITS

1. The undersigned has been informed of the emergency treatment considered necessary for the above named patient, and that treatment and procedure will be performed by physicians, members of house staff and employees of the hospital. Authorization is hereby granted for such treatment and procedure. The undersigned has read the above authorization and understands the same and certifies that no guarantee or assurance has been made as to the results that may be obtained.
2. The undersigned agrees to pay for services rendered by Hospital upon release of patient.
3. I/we hereby assign any hospital benefits, sick benefits, injury benefits due to a liability of a Third party, payable by any party, for the above patient, to Hospital unless I pay the amount in full upon release of patient.
4. I/we hereby authorize the "Administrator of Hospital" to furnish from its records any information requested by the below mentioned insurance companies in connection with the above assignment. I do hereby appoint the "Controller" of Hospital as my lawful attorney to endorse for me any checks made payable to me for benefits or claims collected under the above assignment and to apply any credit balance to any other account I may owe said hospital.

| DATE | TIME | SIGNED GUARANTOR | 71941 |
|---|---|---|---|

CHIEF COMPLAINT (If Accident State How, When, and Where)
LEFT SHOULDER INJURY                                                    E927

| TEMP | PULSE | RESP | B/P | ALLERGIES | MEDICATIONS - HOME | ER PHYSICIAN | TET. TOX. |
|---|---|---|---|---|---|---|---|
| 99 | 94 | 18 | 123 | Compazine, Skelaxin, Aminophylline | N/A | Smith | |

NURSES NOTES: Was picking up heavy metal parts & (L) shoulder
popped - now has pain & shoulder pops & some
movement

NURSES SIGNATURE (RN or LPN)
Edison R

LAB DATA (including X-Rays, EKGs, etc.) Drug Screen ✓

PHYSICIAN'S REPORT: _(illegible handwritten notes)_

DIAGNOSIS: shoulder pain

TREATMENT: _(illegible handwritten notes)_

INSTRUCTIONS TO PATIENT:

Crenshaw Community Hospital
00104
Atwell v. Smart

| | DATE - TIME OF DISC. | FOLLOW-UP WITH |
|---|---|---|
| PATIENT'S SIGNATURE ON DISCHARGE | 10/15/05    D34C | PHYSICIAN SIGNATURE |

_____ **HOSPITAL**
_____

### AUTHORIZATION FOR EMERGENCY TREATMENT

1. The undersigned has been informed of the emergency treatment considered necessary for the patient whose name appears on the reverse hereof and that the treatment and procedures will be performed by physicians, members of the house staff, and employees of the hospital. Authorization is hereby granted for such treatment and procedures.

2. **MEDICARE - MEDICAID PATIENT'S CERTIFICATION:** Authorization to release information and payment request. I certify that the information given by me in applying for payment under Titles XVIII and XIX of the Social Security Act is correct. I authorize release of all records required to act on this request. I request that payment of authorized benefits be made on my behalf.

3. **ASSIGNMENT OF INSURANCE BENEFITS:** I hereby authorize payment directly to _____ Hospital of hospital benefits otherwise payable to me including major medical insurance and payment of surgical or medical benefits, including major medical, directly to the attending physician but not to exceed regular charges for these services. I understand that I am financially responsible to the hospital and physician for charges not covered by this assignment.

4. **AUTHORIZATION FOR RELEASE OF MEDICAL INFORMATION:** The hospital and attending physician are authorized to furnish any medical information requested by insurance companies with whom I have coverage, any public agency which may be assisting in payment for my care.

5. **REFUND OF INSURANCE BENEFITS:** I authorize the refund of overpaid insurance benefits in accordance with my insurance policy conditions where my coverages are subject to a coordination of benefits clause.

6. I understand that health care services paid under Medicare, Medicaid, and maternal and child health programs are subject to review by the Professional Standards Review Organization.

_____ _____ _____
Date                 Witness              Patient

_____ _____ _____ _____
Date                 Witness              Responsible Party    Relationship to Patient

CRENSHAW COMMUNITY HOSPITAL
101 HOSPITAL CIRCLE.. 334-335-3374
LUVERNE, ALABAMA 36049
*"Where Caring Counts"*

# CONDITIONS OF ADMISSIONS AND TREATMENT

**AUTHORIZATION AND CONSENT FOR SERVICES:** I am presenting myself for medical services at Crenshaw Community Hospital. I consent to such care as my physician orders and all other persons caring for me deem necessary and beneficial. I understand that this care may include examinations, test, medical and/or surgical treatment. I also understand that such treatment may involve risk and that no guarantees have been made to me about the outcome of this care. I understand that the physicians on the staff are independent contractors, and not the employees or agents of Crenshaw Community Hospital. I authorize observers to be present during procedures for the purpose of medical training and education. I understand that I have the right to understand my rights and responsibilities as a patient.

**PERSONAL VALUABLES:** Crenshaw Community Hospital is not responsible for valuables, including money, jewelry, and watches, not properly deposited in our care. I accept responsibility for personal items kept in my possession.

**RELEASE OF MEDICAL INFORMATION:** The undersigned consents to the release of general information regarding admission and condition unless designated in writing. The undersigned also authorizes Crenshaw Community Hospital and physician(s) rendering service to release medical or other information about the patient which may be necessary for the completion of insurance claims, review of services, or receipt of benefits including current medical records. Such information may be released to third-party payers, including the third-party payer's agent and/or representative, governmental agencies or anyone responsible for payment of hospital and/or physician charges.

**MEDICARE AUTHORIZATION:** I certify that the information given by me in applying for payment under Title XVIII of the Social Security Administration or its intermediaries or carriers for this or related Medicare claim. I request payment for the authorized benefits are made on my behalf to Crenshaw Community Hospital, and any organizations and physician(s) rendering service during my treatment.

**ASSIGNMENT OF BENEFITS AND FINANCIAL RESPONSIBILITY:** I authorize payment of all insurance benefits, basic and major medical, for this period of medical, emergency, and/or diagnostic treatment to be made directly to Crenshaw Community Hospital. I understand that I am financially responsible for all charges not covered by insurance payments, including private room differentials, and that all efforts for collection of those benefits are for my convenience and do not represent a guarantee for collection or a credit to my account until such time as payment is received by Crenshaw Community Hospital and the contracted entities. I also assign the benefits payable for physicians' services to the physician(s) furnishing the services, including Montgomery Radiology Associates, or authorize such physicians or physician group to submit a claim to my insurance company(s), Medicare, and/or Medicaid. I will be responsible for any collection fees, court cost, and/or attorney fees incurred while collecting on my account(s). Copies of this authorization are as valid as the original.

Witness _GW_

Date: _10/15/05_

Patient or Responsible Party X _Robin Davis_

Legal Guardian/Proxy: _____

Robin Davis
pt 39915   mr 41327

Crenshaw Community Hospital
00106
Atwell v. Smart

DAVIS ROBIN   41327
039915
DOB        F  10/15/05
SMITH R/TCMEKINS  ER

**Crenshaw Community Hospital**
Luverne, AL 36049

**EMERGENCY NURSING TRIAGE FORM**

Date: 10/15/05  Time: 0242  Pvt. M.D.: _____

Allergies: Aminophyllin – S Delaxin – Compagine

Age: 31  Weight: _____  Temperature: 99  Pulse: 94  Respiration: 18  Blood Pressure: 122/72

Chief Complaint: Was picking up heavy metal parts & R shoulder popped

Data Source (Informant): now has pain & shoulder pops = some movement

| ARRIVAL: | NOTIFIED: | GLASGOW COMA SCALE |
|---|---|---|
| ☑Walk | ☐Police | Adult/Pediatric |
| ☐Carried | ☐Family/friend | |
| ☐Ambulance | ☐Med. Examiner | **A. EYE OPENING** |
| ☐Police | ☐Animal Control | Spontaneous ........ 4 |
| ☐Rescue Squad | ☐Clergy | To Voice ............. 3 |
| ☐Wheelchair | ☐Family Serv. | To Pain .............. 2 |
| ☐Stretcher | Time called: | None ................. 1 |

**ACCOMP. BY:**
☐Self
☑Family/friend
☐Police
☐Other

**L.O.C.**
☑Alert
☐Lethargic
☐Unresponsive
☐Disoriented
☐Shock

**VALUABLES**
☐Patient
☐Family/friend
☐Med. Examiner
☐Save__Env. #

**B. VERBAL**
Oriented/Smile ...... 5
Confused ........... 4
Screams ............ 3
Grunts ............. 2
None ............... 1

**C. MOTOR**
Obeys Spontaneous .. 6
Localizes to pain ... 5
Flexor withdraw l ... 4
Abnormal Flexion ... 3
Extensor Posturing .. 2
None ............... 1

Score total _____

**ARE IMMUNIZATIONS CURRENT?**  ☐ Yes  ☐ No

| PMH | YES | NO | | YES | NO | | YES | NO |
|---|---|---|---|---|---|---|---|---|
| Arthritis | ☐ | ☐ | CVA | ☐ | ☐ | Migraines | ☐ | ☐ |
| Asthma | ☐ | ☐ | Diabetes | ☐ | ☐ | Psyc | ☐ | ☐ |
| By-pass | ☐ | ☐ | Dialysis | ☐ | ☐ | Pulmonary | ☐ | ☐ |
| Cardiac | ☐ | ☐ | GI | ☐ | ☐ | Renal | ☐ | ☐ |
| CHF | ☐ | ☐ | GU | ☐ | ☐ | Seizure | ☐ | ☐ |
| COPD | ☐ | ☐ | HTN | ☐ | ☐ | Sickle Cell | ☐ | ☐ |

**CURRENT MEDICATIONS**  ☐ None  ☐ Unknown

| Name | Dose | Freq | Name | Dose | Freq |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**NURSING OBSERVATIONS**

**PAIN** ☑YES ☐ NO (Circle one)  0 2 4 6 8 10
Location: R shoulder  Description: _____

**EMESIS** ☑No ☐ Yes  Pt. description: _____

**STOOL** ☑N/A ☐ Normal  Last BM: _____

**URINATION** ☑N/A ☐ Normal ☐ Frequency ☐ Dysuria

**DISCHARGE** ☑N/A ☐ No ☐ Yes
☐ Vaginal _____ ☐ Urethral _____ ☐ Other ____

**BLEEDING** ☑No ☐ Yes ☐ LMP: Sept 05
Location: _____
☑None ☐ Minimal ☐ Moderate ☐ Severe ☐ Bright ☐ Dark ☐ Clots
☐ Other: _____

**RESPIRATORY** ☐ N/A
☑Regular ☐ Shallow ☐ Irreg ☐ Hypervent ☐ Cough ☐ Dyspneic
☐ Absent ☐ Rapid ☐ Other: _____

**CIRCULATION/CARDIAC/PULSES**    **BREATH SOUNDS**
☑Regular ☐Absent ☐Palpable    ☑N/A ☐Unequal ☐Diminished
☐Irreg ☐Weak    ☐Rales ☐Equal ☐Rhonch
☐Cardiac Rhythm: ____    ☐Wheezes

**SAFETY** ☐Side rails up ☐Attendant with patient
☑Nurses in attendance ☐Other _____

**NEUROLOGICAL** ☑Alert ☐Confused ☐Oriented
☐Unresponsive ☐Lethargic ☐Seizures
**PUPILS** ☑Equal ☐Unequal size in mm: R ___ L ___

**RESPONDS TO STIMULI** ☐No ☑Yes ☐Verbal ☐Painful

**VISUAL ACUITY N/A** ☐

**GI** ☑N/A ☐Vomiting ☐Diarrhea ☐Nausea

**ABD** ☑N/A ☐Soft ☐Distended ☐Rigidity ☐Bowel Sounds

**SKIN** ☐Warm ☐Pale ☐Dusty ☐Cyanotic ☐Dry ☐Moist
☐Cool ☐Clammy ☐Other _____

**TRAUMA: (location & appearance)** ☑N/A   **COMMENTS**
Abrasion _____
Avulsion _____
Contusion _____
Deformity _____    Crenshaw Community Hospital
Edema _____    00107
Laceration _____    Atwell v. Smart
Puncture Wound _____

| DISCH. COND. | EXIT VIA | DISPOSITION |
|---|---|---|
| ☐Improved | ☐Walk ☐Carried | ☐Home |
| ☐Critical | ☐Wheelchair | ☐Other facility |
| ☐Unchanged | ☐Stretcher | ☐AMA ☐Expired |
| ☐Expired | ☐Ambulance | ☐DOE ☐Admit |

| MEDICATION/DOSE/TREATMENT/I.V. | ROUTE / SITE | SIGNATURE | RESPONSE |
|---|---|---|---|
| | N/A | | |

## ADDITIONAL VITAL SIGNS

| TIME | TEMP | PULSE | RESP | B/P | O₂SAT |
|---|---|---|---|---|---|
| | | | N/A | | |

## PROCEDURE / TREATMENT

| | | TIME | Nurse Initials |
|---|---|---|---|
| Cardiac Monitor | ) | | |
| Splint (Type: | ) | | |
| (Location: | ) | | |
| Central Line (Type: | ) | | |
| Chest Tub (Am't Drained: | ) (Size: ) | N/A | |
| Dressing (Type: | ) | | |
| Foley Cath. (Am't Drained: | ) (Size: ) | | |
| N/G Tube (Am't Drained: | ) (Size: ) | | |
| O₂ per | | | |
| Patient Teaching (Type: | ) | | |

| PHYSICIAN | EXAM TIME | PROCEDURE DONE |
|---|---|---|
| | | |

| PHYSICIAN | TIME NOTIFIED | PLACE NOTIFIED | TIME RESPOND | NURSE DETAILS |
|---|---|---|---|---|
| Smith | | | | |

## IV FLUIDS / TIMES / RATES

| Time Started | IV Fluid | Rate | IV Cath & Site | Nurse Initials | Time D/C | Amt. Infused |
|---|---|---|---|---|---|---|
| | | | | | | |

**Comments**

| TIME | ADDITIONAL NURSES NOTES |
|---|---|
| See Front | |

**DISCHARGE TO:** Home — Stable @ 0340

**ADMITTED TO:**

**REPORT GIVEN TO:**

**Transferred By:**

**Discharge Nurse Signature:** F Edison R.N.

Crenshaw Community Hospital
00108
Atwell v. Smart

**CRENSHAW COMMUNITY HOSPITAL • LUVERNE, ALABAMA 36049 • PHONE: 334-335-3374**

*THIS EVALUATION WAS EMERGENCY CARE ONLY AND NOT INTENDED TO BE COMPLETE MEDICAL CARE. PLEASE FOLLOW THE INSTRUCTIONS BELOW AND FOLLOW-UP WITH YOUR ASSIGNED PHYSICIAN OR OTHER PHYSICIAN AS NEEDED.*

## ☐ HEAD INJURY
AWAKEN EVERY ____ HOUR(S) FOR ____ HOUR(S)
CALL IMMEDIATELY OR BE RECHECKED IMMEDIATELY IF:
1. Severe headache.
2. Persistent vomiting.
3. Unusual behavior or drowsiness.
4. Weakness, confusion.
5. Convulsions (dial 911).
6. Drainage of fluid from nose or ear(s).

## ☐ SPRAINS / STRAINS / BRUISES
1. Elevate and ice pack first 24-48 hrs. Then apply heat, after 24-48 hrs.
2. Rest injured area.
3. Call if numbness, weakness, increased pain, increased swelling.
4. Rewrap elastic bandage if too tight or too loose.
5. Remove splint in ____ days; ____ when comfortable; ____ when follow-up physician instructs you to.
6. Stop using crutches in ____ days; ____ when comfortable; ____ when follow-up physician instructs you to.
7. Aspirin/Tylenol/Advil/Nuprin for pain.

## ☐ CAST - SPLINT
1. Elevate and place ice pack over cast.
2. Do not put weight on cast for ____ hour(s).
3. Keep dry.
4. Call if increased pain, numbness, or if extremity turns blue or cold, or if elastic bandage or cast is too tight or too loose.
5. Remove splint when pain-free or when physician instructs you to.

## ☐ ABDOMINAL PAIN
1. Rest.
2. Clear liquids only for ____ hour(s).
3. Return if pain localizes, increases or is associated with fever, bloody vomitus/stools or abdominal distension.
4. Return for repeat exam in ____ hour(s) or sooner, if symptoms in #3 exist.

## ☐ YOU HAVE BEEN GIVEN A MEDICATION THAT WARRANTS OBSERVATION FOR AN ALLERGIC REACTION. PLEASE REMAIN IN THE WAITING AREA FOR 20 MINUTES.

## ☐ WOUND CARE / BURNS
1. Keep clean and dry until sutures are out, except daily soap and water and dressing change.
2. Elevate injured part to decrease swelling.
3. Ice intermittently for one to two days.
4. Return visit ____ day(s).
5. Sutures out in ____ day(s). (Suture removal/wound check between 8:00 a.m. & 8:00 p.m.)
6. Return immediately if increased redness, pain, swelling, drainage, red streaks. Any wound can get infected.
7. No swimming/water immersion until sutures out.
8. Use antibiotic ointment, especially on facial lacerations.

☐ Check your tetanus immunization status follow-up within 48 hours if last booster was greater than 5 years ago.

## ☐ FLU, VOMITING, DIARRHEA - ADULTS
1. If vomiting, push clear fluids (things you can see through).
2. No milk products for 24 hours if diarrhea.
3. Tylenol for fever if not vomiting.
4. Return if you develop bloody stools/vomitus, become thirsty, or increased abdominal pain.
5. No Aspirin for persons under 16 years of age with flu-like symptoms.

## ☐ FLU, VOMITING, DIARRHEA-INFANTS/CHILDREN
1. Clear liquids as much as child wants
   -Pedialyte, Lytren, Infalyte
   -Jell-o water (half strength), Gatorade
   -Defizzed room temperature soda
   -Liquids you can see through
   -Give slowly if vomiting and try again
2. After 24 hours, advance diet as tolerated to applesauce, bananas, strained carrots, and then to regular diet.
3. If prolonged diarrhea, advance to soy formula (Isomil, Soy-Alac) for one to two weeks.
4. No milk products for several days.
5. Call or return if increased diarrhea, vomiting, bloody stools/vomitus, signs of dehydration (decreased urination, dry mouth, lethargy, irritable, weight loss, no tears), or no improvement in 24 hours.

## ☐ BACK OR SPINE INJURY
1. Bedrest for ____ day(s) or until comfortable.
2. No lifting or straining until pain-free or follow-up physician advises. Apply heat as needed.
3. Return immediately if numbness or weakness in arms or legs, or bowel/bladder problems.
4. See follow-up physician in ____ to ____ days if pain is not better.

## ☐ EYE CARE
1. Wear patch for ____ hour(s).
2. Rest both eyes.
3. Return for check in ____ hour(s).
4. Don't drive or operate machinery when eye is patched.

## ☐ FEVER CONTROL - ADULTS
1. Aspirin and/or Tylenol or Advil/Nuprin.
2. Push fluids.
3. Return if new symptoms such as increased cough, diarrhea, pain, vomiting, shortness of breath.

## ☐ FEVER CONTROL - CHILDREN
1. Keep clothes off.
2. Tylenol dosage 5mg/lb. body weight every 4-6 hours, or ____ mg every 4-6 hours for your child.
3. Push fluids.
4. Return if new symptoms, such as increased cough, diarrhea, pain, vomiting, shortness of breath.
5. No aspirin for person under 16 years of age with flu-like symptoms.
6. To control shivering, cover child with light blankets.

## ☐ UPPER RESPIRATORY INFECTIONS
1. Fever Control.
2. Push fluids.
3. Vaporizer, as needed for cough.
4. Cough medicine, decongestant as needed.
5. Return if ear pain, lethargy, rash, shortness of breath, productive cough.

## ☐ PICK UP PRESCRIBED MEDICATION(S) AT OUT-PATIENT PHARMACY.

---

**NO DRIVING** ☐ FOR ____ HRS — OR — ☐ UNTIL SEEN BY REFERRAL PHYSICIAN

OTHER INSTRUCTIONS: *Orudis as prescribed — Follow up with Dr. Tompkins monday for poss. MRI.*

THE EMERGENCY/CONVENIENT CARE DEPARTMENT HAS NOT CONTACTED YOUR REFERRAL PHYSICIAN. YOU ARE RESPONSIBLE FOR OBTAINING FOLLOW-UP CARE AS ADVISED.

*IF YOUR CONDITION BECOMES WORSE OR NEW SYMPTOMS DEVELOP AND YOU ARE UNABLE TO CONTACT YOUR PHYSICIAN RETURN TO THE EMERGENCY DEPARTMENT IMMEDIATELY!*

IF YOU HAD X-RAYS TAKEN THERE WILL BE A FINAL READING BY THE RADIOLOGY SPECIALIST. IF THERE IS ANY DISCREPANCY IN THE READING, YOU WILL BE NOTIFIED.

YOUR EMERGENCY/PRIVATE PHYSICIAN WAS DR. _____

IF YOU DO NOT HAVE A PRIVATE MEDICAL DOCTOR YOU MAY SEE THE REFERRAL PHYSICIAN BELOW FOR FOLLOW-UP CARE RELATED TO THIS VISIT. WHEN YOU CALL FOR AN APPOINTMENT BE SURE TO STATE THAT YOU WERE TREATED IN THE EMERGENCY DEPARTMENT.

I AUTHORIZE COPIES OF ALL MEDICAL RECORDS/REPORTS RELATING TO THIS VISIT TO BE SENT TO THE REFERRAL DOCTOR/AGENCY BELOW.
SIGNATURE: _____
YOUR REFERRAL PHYSICIAN IS: DR. _____
PHONE: _____
ADDRESS: _____

☐ CALL FOR CULTURE RESULTS IN ____ DAY(S) AT 495-8000
☐ DISABILITY DAYS _____

DAVIS ROBIN  41327
C30015
DOB                    F  10/15/05
SMITH R/TOMPKINS    ER

☐ SEE IN ____ DAYS   ☐ SEE IN ____ DAYS IF NOT IMPROVED
I HEREBY ACKNOWLEDGE RECEIPT OF AND UNDERSTAND THE ABOVE INSTRUCTIONS.
SIGNATURE: _____ DATE: 10/15/05
WITNESS: _____ R.N.
*EMERGENCY / CONVENIENT CARE/AFTER-CARE INSTRUCTIONS*

Crenshaw Community Hospital
00109
Atwell v. Smart

*MEDICAL RECORDS*

# CRENSHAW COMMUNITY HOSPITAL
## MEDICAL LABORATORY SERVICES
### 101 Hospital Circle    Luverne, AL 36009
### Phone 334-335-1168



### URINE SCREEN REPORT  (UDS5)

NAME *Davis, Robin O* SS _____

SPECIMEN ID#_____ SECURITY SEAL INTACT? *yes* TECH_____

DATE/TIME COLLECTED *10-15-05 0220* COLLECTED BY *JEdison RN*

EMPLOYER *SMART PLANT — identified by Amanda Dempsey Q.C. technical*

| DRUG | RESULT | ANALYTICAL CUT-OFF |
|------|--------|--------------------|
| Cocaine | *Negative* | 300ng/ml |
| Amphetamine | *Negative* | 1,000ng/ml |
| Methamphetamine | *Negative* | 1,000ng/ml |
| Marijuana(THC) | *Negative* | 50ng/ml |
| Opiates | *Negative* | 300ng/ml |

TECH *10-15-05    10 20    BJFarmer MT (ASCP)* DATE/TIME *10-15-05    1020*

This assay provides only a preliminary analytical test result.  Specimens with positive results will be sent to a reference laboratory and a more specific alternate chemical method will be used to obtain a confirmed analytical result.

Interfering substances in the urine specimen may cause erroneous results.  Adulterants, such as bleach and/or alum, in urine specimens may produce erroneous results regardless of the analytical method used. A positive result by be obtained from certain foods or food supplements.

A Positive result does not indicate level of intoxication, administration route or concentration in urine.  A positive test does not distinguish between drugs of abuse and certain medications.

A Negative result may not necessarily indicate drug-free urine.  Negative results can be obtained when drug is present below the cut-off level of the test.

Crenshaw Community Hospital
101 Hospital Circle
Luverne, AL 36049                Hospital

DAVIS ROBIN  41327
039915
SMITH R/TOMPKINS  ER

# EMERGENCY DEPARTMENT LEVEL OF CARE

| | CRITICAL CARE:  See ** below |
|---|---|
| CC | CPR |
| CC | Stroke / Cerebral Hemorrhage - all types |
| CC | Trauma, Trauma Alert / Multiple Trauma |
| CC | Shock of all types - Septic, Cardiogenic, Spinal, Hypovolemic, Anaphylactic |
| CC | Other - See *** below |
| | See also Procedures Listing |
| 16 | PROTOCOLS: Asthma, Chest pain, (Psych) |
| | ADMISSIONS / TRANSPORT |
| 0 | Triage |
| 0 | Simple recheck |
| 1 | Ambulatory visit / Complex recheck |
| 10 | DOA, Death (no code) |
| 5 | Hospital Admission |
| 3 | Transfer in ED by ambulance |
| 1 | Transfer out ED by ambulance |
| 5 | Transport with nurse to other facility |
| | ASSISTING MONITORING |
| 15 | Conscious Sedation (Include Routine Monitoring) |
| 5 | Monitoring (Mult V/S, neuro check, cardiac) |
| 2 | Nasal packing |
| 1 | Pulse Ox check (Routine) |
| 2 | Respiratory Therapy Tx (O₂, updraft, etc.) |
| 2 | Simple assist (steri strip, eye exam) |
| 10 | Ventilator / CPAP mask |
| | WOUND CARE |
| 5 | Complex wound cleansing |
| 2 | Dressing (small/ moderate |
| 3 | Dressing (large / complex / simple burn |
| 2 | Suture removal |
| 2 | Wound cleaning / eye treatment / eye patch |
| | SPECIAL NEEDS |
| 2 | Bath |
| 1 | Bedpan / Urinal  (ea placement therap) |
| 1 | Bed linen changed |
| 3 | Comatose, disoriented |
| 5 | Combative, confused, incontinent, psychiatric |
| 2 | Pediatric patient |
| 1 | Isolation |

| | PROCEDURES | CHARGE CODE |
|---|---|---|
| CC | Cardioversion | 2038 |
| CC | Chest tube insertion | 2039 |
| CC | Emergency Delivery | 2040 |
| CC | Intraosseous infusion | 2031 |
| CC | Intubation | 2032 |
| CC | Pacemaker assist | 2021 |
| CC | TPA administration | 2029 |
| CC | Tracheostomy assist / replace | 2026 |
| 10 | Blood administration | 1201 |
| 10 | Bronchoscopy | 2000 |
| 5 | Casting | 2033 |
| 10 | Central line / cutdown insertion | 2003 |
| 10 | Debridement of burns, complex | 2034 |
| 5 | Debridement of burns, simple | 2028 |
| 5 | Foreign body removal, ear | 2008 |
| 5 | Foreign body removal, other | 2035 |
| 10 | Gastric lavage | 2010 |
| 5 | Gastrostomy tube change | 2009 |
| 3 | I & D abcess | 2036 |
| | | 1202 |
| | | 1203 |
| | | 1204 |
| | | 1205 |
| | | 2012 |
| 10 | K wire / Steinman pin | 2037 |
| 5 | Laceration / wound repair, simple | 2016 |
| 10 | Laceration / wound repair, intermediate | 2017 |
| 15 | Laceration / wound repair, complex | 2018 |
| 10 | Lumbar puncture | 2019 |
| 5 | Nasal hemorrhage control | 2020 |
| 5 | Peritoneal tap assist | 2022 |
| 10 | Pre-op preparation | N/A |
| 10 | Reduction of Fx / dislocation | 2023 |
| 5 | Removal of impacted ear wax | 2024 |
| 10 | Splint (leg, arm, shoulder, etc.) | 2025 |
| 2 | Therapeutic phlebotomy | 2030 |
| 15 | Thoracentesis / Paracentesis | 2027 |

**If a diagnostic, surgical or therapeutic procedure was done, you must use ER level or Critical Care level with procedure charge.

Crenshaw Community Hospital
00111

# EMERGENCY DEPARTMENT LEVEL OF CARE  (continued)

| | EDUCATION / DISCHARGE INSTR. |
|---|---|
| 2 | AMA |
| 2 | Crutch training by the ER staff |
| | Discharge instructions-simple |
| 2 | Discharge instructions-complex |
| 2 | Social Services consult |
| | MEDS / IVs |
| 5 | Infusaport access |
| 3 | IV - simple (INT, KVO) |
| 5 | IV w/pump, drip, rapid > 2 hours |
| 1 | MED-PO, supp, topical |
| 5 | Multiple lines, complex IV's |
| 3 | Rabies vaccine |
| | OB/GYN: |
| 2 | Fetal heart tones |
| 2 | Newborn care |
| 3 | Pelvic exam - simple |
| 5 | Pelvic exam - complex, hemorrhage, difficult |
| 10 | Rape exam |
| | TREATMENT |
| 3 | Ace wrap, collar, sling, Immobilizer |
| 15 | Decontamination - Hazardous Materials |
| 2 | Enema administration |
| 5 | Impaction removal |
| 2 | Suction / Irrigation |
| 2 | Traction assist |
| 3 | Urinary Cath / NG insertion |
| | TESTS: |
| 2 | Arterial blood gases (ABG) |
| 2 | C-arm |
| 2 | EKG, 12 lead |
| 1 | Glucose via device (routine) |
| 1 | Hemocult |
| 1 | Lab |
| 1 | Specimen collect (urine, sputum, etc) |
| 1 | Visual acuity |
| 2 | X-ray, (simple) per trip |
| 3 | X-ray (complex - CT/MRI/US/IVP) per trip including pat monitoring |

** Any time a Critical Care item is marked, you do not have to mark anything more on the left side; simply mark any procedure that was performed, and indicate "CC" in the box below.

Total points determines level of service:

0   ER Level 1
1 - 5   ER Level 2
6 - 10   ER Level 3
11 - 15   ER Level 4
16 and up ER Level 5

TOTAL POINTS
or CC for Critical Care

*** For Critical Care - Other: See below for examples, refer to Policy for Definition.

POTENTIAL SYMPTOMS:

New onset paralysis

Head injury with loss of consciousness

Acute myocardial infarction

Drug overdoses impairing vital functions

Coma of all etiologies (except hypoglycemic)

ACUTE FAILURE –

Renal, hepatic, respiratory, pulmonary edema, major pulmonary embolis

Emboli of fat or amniotic fluid

Non-hemorrhagic Strokes with vital function impairment

ANEURYSMS, THORACIC OR ABDOMINAL –
Leaking or ruptured

Aortic dissection                          Cardic Tamponade
Diabetic Ketoacidosis                      Lactic Acidosis
Tension Pneumothorax                       Envenomation
Thyroid storm or Addisonian Crisis
Life-threatening hyper/hypo thermia
DIC or other bleeding diathesis - Hemophilia, ITP, TTP, Leukemia
Aplasti

POTENTIAL INTERVENTIONS:

Multiple parenteral medications requiring constant monitoring
CVP line insertion                         Ventilator
Pericardiocentesis                         Cricothyrotomy
Control of major hemorrhage                Emergent Cath Lab Pro
Administration of blood transfusions / blood products
Major burn care / transfer to burn unit
Major trauma care / multiple surgical consultants.

41327

CRENSHAW COMMUNITY HOSPITAL      101 HOSPITAL CIRCLE       LUVERNE       AL 36049

**EMERGENCY ROOM • OUTPATIENT RECORD**

| PATIENT NUMBER | TYPE | PATIENT NAME | AGE | BIRTHDATE | SEX M/S | DATE OF SERVICE | TIME | CLERK INIT. |
|---|---|---|---|---|---|---|---|---|
| 038368 | 3 | DAVIS ROBIN O | | | SW | 9/10/05 | 01:27 | TA |

| ADDRESS - LINE 1 | ADDRESS - LINE 2 | CITY LUVERNE | STATE AL | ZIP CODE 36049 | TELEPHONE 334-335-5800 |

| PATIENT GUAR. | NOTIFY IN CASE OF EMERGENCY - NAME SMART OF ALABAMA LLC | RELATIONSHIP | ADDRESS | TELEPHONE |

| INSURANCE COMPANY WC Smart | CONTRACT OR GROUP NUMBER | DATE 9/10/05 | PLACE JOB |
| | | TIME 12:30 | INJURY HURT BACK |

| GUARANTOR NAME SMART OF ALABAMA LLC | GUARANTOR ADDRESS 121 SHIN YOUNG DRIVE | CITY LUVERNE | STATE AL | ZIP CODE 36049 | GUAR. TELEPHONE 335-5800 |

| GUARANTOR EMPLOYER SMART ALABAMA LLC | GUARANTOR OCCUPATION | GUAR. EMPLOYER ADDRESS 121 SHIN YOUNG DRIVE | GUAR. EMPLOYER PHONE 335-5800 |

| PREV. SERVICE 037584 | PREV. SERV. DATE 8/23/05 | IF MINOR - PARENT NAME | MED. REC. # 41327 | FAMILY PHYSICIAN SMITH R /TOMPKINS C |

| CHARGES | X-RAY | LAB | RESP. TH. | PHY. TH. | EKG | I.V. | DRUGS | SUPPLIES | OTHER | M.D. | E.R. RM | TOTAL |

**AUTHORIZATION FOR TREATMENT, GUARANTEE OF PAYMENT, ASSIGNMENT OF INSURANCE BENEFITS**

1. The undersigned has been informed of the emergency treatment considered necessary for the above named patient, and that treatment and procedures will be performed by physicians, members of house staff and employees of the hospital. Authorization is hereby granted for such treatment and procedures. The undersigned has read the above authorization and understands the same and certifies that no guarantee or assurance has been made as to the results that may be obtained.
2. The undersigned agrees to pay for services rendered by Hospital upon release of patient.
3. I/we hereby assign any hospital benefits, sick benefits, injury benefits due to a liability of a Third party, payable by any party, for the above patient, to Hospital unless I pay the account in full upon release of patient.
4. I/we hereby authorize the "Administrator of Hospital" to furnish from its records any information requested by the before mentioned insurance companies in connection with the above assignment. I do hereby appoint the "Controller" of Hospital as my lawful attorney to endorse for me any checks made payable to me for benefits of claims collected under the above assignment and to apply any credit balance to any other account I may owe said Hospital.

| DATE | TIME | SIGNED GUARANTOR | 2471 |

| CHIEF COMPLAINT (If Accident State How, When, and Where) |
Back Pain - fell @ work                      58889

| T.P.R. | PULSE | RESP. | B/P | ALLERGIES Compazine | MEDICATIONS - HOME | FAM. PHYSICIAN |
| 97.9 | 95 | 20 | 139/84 | Amitriptyline | none | Dr. Smith |

**NURSES NOTES:**

T-spine

**LAB DATA (Including X-Rays, EKGs, etc.)**

NURSE'S SIGNATURE (RN OR LPN)

**PHYSICIAN'S REPORT:**

**DIAGNOSIS:**

Crenshaw Community Hospital
00113
Atwell v. Smart

**TREATMENT:**

**INSTRUCTIONS TO PATIENT:**

| FOLLOW-UP WITH |

9/10/05   0345

| DATE - TIME OF DISC. | PHYSICIAN'S SIGNATURE |

PATIENT'S SIGNATURE ON DISCHARGE

_____ **HOSPITAL**
_____

### AUTHORIZATION FOR EMERGENCY TREATMENT

1. The undersigned has been informed of the emergency treatment considered necessary for the patient whose name appears on the reverse hereof and that the treatment and procedures will be performed by physicians, members of the house staff and employees of the hospital. Authorization is hereby granted for such treatment and procedures.

2. **MEDICARE - MEDICAID PATIENT'S CERTIFICATION:** Authorization to release information and payment request. I certify that the information given by me in applying for payment under Titles XVIII and XIX of the Social Security Act is correct. I authorize release of all records required to act on this request. I request that payment of authorized benefits be made on my behalf.

3. **ASSIGNMENT OF INSURANCE BENEFITS:** I hereby authorize payment directly to _____ Hospital of hospital benefits otherwise payable to me including major medical insurance and payment of surgical or medical benefits, including major medical, directly to the attending physician but not to exceed regular charges for these services. I understand that I am financially responsible to the hospital and physician for charges not covered by this assignment.

4. **AUTHORIZATION FOR RELEASE OF MEDICAL INFORMATION:** The hospital and attending physician are authorized to furnish any medical information requested by insurance companies with whom I have coverage or any public agency which may be assisting in payment for my care.

5. **REFUND OF INSURANCE BENEFITS:** I authorize the refund of overpaid insurance benefits in accordance with my insurance policy conditions where my coverages are subject to a coordination of benefits clause.

6. I understand that health care services paid under Medicare, Medicaid, and maternal and child health programs are subject to review by the Professional Standards Review Organization.

_____
Date                          Witness                          Patient

_____
Date                          Witness                Responsible Party        Relationship to Patient

Crenshaw Community Hospital
00114
Atwell v. Smart

**CRENSHAW COMMUNITY HOSPITAL • LUVERNE, ALABAMA 36049 • PHONE: 334-335-3374**

*THIS EVALUATION WAS EMERGENCY CARE ONLY AND NOT INTENDED TO BE COMPLETE MEDICAL CARE. PLEASE FOLLOW THE INSTRUCTIONS BELOW AND FOLLOW-UP WITH YOUR ASSIGNED PHYSICIAN OR OTHER PHYSICIAN AS NEEDED.*

### ☐ HEAD INJURY

AWAKEN EVERY ____ HOUR(S) FOR ____ HOUR(S)
CALL IMMEDIATELY OR BE RECHECKED IMMEDIATELY IF:
1. Severe headache.
2. Persistant vomiting.
3. Unusual behavior or drowsiness.
4. Weakness, confusion.
5. Convulsions (dial 911).
6. Drainage of fluid from nose or ear(s).

### ☐ SPRAINS / STRAINS / BRUISES

1. Elevate and ice pack first 24-48 hrs.
   Then apply heat, after 24-48 hrs.
2. Rest injured area.
3. Call if numbness, weakness, increased pain, increased swelling.
4. Rewrap elastic bandage if too tight or too loose.
5. Remove splint in ____ days; ____ when comfortable; when follow-up physician instructs you to.
6. Stop using crutches in ____ days; ____ when comfortable; when follow-up physician instructs you to.
7. Aspirin/Tylenol/Advil/Nuprin for pain.

### ☐ CAST - SPLINT

1. Elevate and place ice pack over cast
2. Do not put weight on cast for ____ hour(s).
3. Keep dry.
4. Call if increased pain, numbness, or if extremity turns blue or cold, or if elastic bandage or cast is too tight or too loose.
5. Remove splint when pain-free or when physician instructs you to.

### ☐ ABDOMINAL PAIN

1. Rest
2. Clear liquids only for ____ hour(s).
3. Return if pain localizes, increases or is associated with fever, bloody vomitus/stools or abdominal distension.
4. Return for repeat exam in ____ hour(s) or sooner, if symptoms in #3 exist.

☐ YOU HAVE BEEN GIVEN A MEDICATION THAT WARRANTS OBSERVATION FOR AN ALLERGIC REACTION. PLEASE REMAIN IN THE WAITING AREA FOR 20 MINUTES.

### ☐ WOUND CARE / BURNS

1. Keep clean and dry until sutures are out, except daily soap and water and dressing change.
2. Elevate injured part to decrease swelling.
3. Ice intermittently for one to two days.
4. Return visit ____ day(s).
5. Sutures out in ____ day(s).
   (Suture removal/wound check between 8:00 a.m. & 8:00 p.m.)
6. Return immediately if increased redness, pain, swelling, drainage, red streaks. Any wound can get infected.
7. No swimming/water immersion until sutures out.
8. Use antibiotic ointment, especially on facial lacerations.

☐ Check your tetanus immunization status follow-up within 48 hours if last booster was greater than 5 years ago.

### ☐ FLU, VOMITING, DIARRHEA - ADULTS

1. If vomiting, push clear fluids (things you can see through).
2. No milk products for 24 hours if diarrhea.
3. Tylenol for fever if not vomiting.
4. Return if you develop bloody stools/vomitus, become thirsty, or decreased abdominal pain.
5. No Aspirin for persons under 16 years of age with flu-like symptoms.

### ☐ FLU, VOMITING, DIARRHEA-INFANTS/CHILDREN

1. Clear liquids as much as child wants
   -Pedialyte, Lytren, Infalyte
   -Jello-water (half strength), Gatorade
   -Defizzed room temperature soda
   -Liquids you can see through
   -Give slowly if vomiting and try again
2. After 24 hours, advance diet as tolerated to applesauce, bananas, strained carrots, and then to regular diet.
3. If prolonged diarrhea, advance to soy formula (Isomil, Soy-Alac) for one to two weeks.
4. No milk products for several days.
5. Call or return if increased diarrhea, vomiting, bloody stools/vomitus, signs of dehydration (decreased urination, dry mouth, lethargy, irritable, weight loss, no tears), or no improvement in 24 hours.

### ☐ BACK OR SPINE INJURY

1. Bedrest for ____ day(s) or until comfortable.
2. No lifting or straining until pain-free or follow-up physician advises. Apply heat as needed.
3. Return immediately if numbness or weakness in arms or legs, or bowel/bladder problems.
4. See follow-up physician in ____ to ____ days if pain is not better.

### ☐ EYE CARE

1. Wear patch for ____ hour(s).
2. Rest both eyes.
3. Return for check in ____ hour(s).
4. Don't drive or operate machinery when eye is patched.

### ☐ FEVER CONTROL - ADULTS

1. Aspirin and/or Tylenol or Advil/Nuprin.
2. Push fluids.
3. Return if new symptoms such as increased cough, diarrhea, pain, vomiting, shortness of breath.

### ☐ FEVER CONTROL - CHILDREN

1. Keep clothes off.
2. Tylenol dosage 8mg/lb. body weight every 4-6 hours, or ____ mg every 4-6 hours for your child.
3. Push fluids.
4. Return if new symptoms, such as increased cough, diarrhea, pain, vomiting, shortness of breath.
5. No aspirin for person under 16 years of age with flu-like symptoms.
6. To control shivering, cover child with light blankets.

### ☐ UPPER RESPIRATORY INFECTIONS

1. Fever Control.
2. Push fluids.
3. Vaporizer, as needed for cough.
4. Cough medicine, decongestant as needed.
5. Return if ear pain, lethargy, rash, shortness of breath, productive cough.

☐ PICK UP PRESCRIBED MEDICATION(S) AT OUT-PATIENT PHARMACY.

---

**NO DRIVING** ➤ ☐ FOR - ____ HRS  - OR -  ☐ UNTIL SEEN BY REFERRAL PHYSICIAN

OTHER INSTRUCTIONS: _Take medication as prescribed - follow up with Dr._
_Tompkins as needed. Light duty_

---

**THE EMERGENCY/CONVENIENT CARE DEPARTMENT HAS NOT CONTACTED YOUR REFERRAL PHYSICIAN. YOU ARE RESPONSIBLE FOR OBTAINING FOLLOW-UP CARE AS ADVISED.**

*IF YOUR CONDITION BECOMES WORSE OR NEW SYMPTOMS DEVELOP AND YOU ARE UNABLE TO CONTACT YOUR PHYSICIAN RETURN TO THE EMERGENCY DEPARTMENT IMMEDIATELY!*

IF YOU HAD X-RAYS TAKEN THERE WILL BE A FINAL READING BY THE RADIOLOGY SPECIALIST. IF THERE IS ANY DISCREPANCY IN THE READING, YOU WILL BE NOTIFIED.

YOUR EMERGENCY/PRIVATE PHYSICIAN WAS DR. _Smith_     ☐ CALL FOR CULTURE RESULTS IN ____ DAY(S) AT 465-8000

IF YOU DO NOT HAVE A PRIVATE MEDICAL DOCTOR YOU MAY SEE THE REFERRAL PHYSICIAN BELOW FOR FOLLOW-UP CARE RELATED TO THIS VISIT. WHEN YOU CALL FOR AN APPOINTMENT BE SURE TO STATE THAT YOU WERE TREATED IN THE EMERGENCY DEPARTMENT.

☐ DISABILITY DAYS ____

I AUTHORIZE COPIES OF ALL MEDICAL RECORDS/REPORTS RELATING TO THIS VISIT TO BE SENT TO THE REFERRAL DOCTOR/AGENCY BELOW.
SIGNATURE: ____
YOUR REFERRAL PHYSICIAN IS: DR. ____
PHONE: ____
ADDRESS: ____

Crenshaw Community Hospital
00115
Atwell v. Smart

DAVIS RODIN Q.     41327
C38368
DOB          F 09/10/05
DR R SMITH/TOMPKINS     ER

☐ SEE IN ____ DAYS     ☐ SEE IN ____ DAYS IF NOT IMPROVED
I HEREBY ACKNOWLEDGE RECEIPT OF AND UNDERSTAND THE ABOVE INSTRUCTIONS.
SIGNATURE: X _Rodin Davis_     DATE: 9/10/05
WITNESS: _____

*EMERGENCY / CONVENIENT CARE/AFTER-CARE INSTRUCTIONS*     MEDICAL RECORDS

CRENSHAW COMMUNITY HOSPITAL
101 HOSPITAL CIRCLE.. 334-335-3374
LUVERNE, ALABAMA 36049
*Where Caring Counts*

# CONDITIONS OF ADMISSIONS AND TREATMENT

**AUTHORIZATION AND CONSENT FOR SERVICES:** I am presenting myself for medical services at Crenshaw Community Hospital. I consent to such care as my physician orders and all other persons caring for me deem necessary and beneficial. I understand that this care may include examinations, test, medical and/or surgical treatment. I also understand that such treatment may involve risk and that no guarantees have been made to me about the outcome of this care. I understand that the physicians on the staff are independent contractors, and not the employees or agents of Crenshaw Community Hospital. I authorize observers to be present during procedures for the purpose of medical training and education. I understand that I have the right to understand my rights and responsibilities as a patient.

**PERSONAL VALUABLES:** Crenshaw Community Hospital is not responsible for valuables, including money, jewelry, and watches, not properly deposited in our care. I accept responsibility for personal items kept in my possession.

**RELEASE OF MEDICAL INFORMATION:** The undersigned consents to the release of general information regarding admission and condition unless designated in writing. The undersigned also authorizes Crenshaw Community Hospital and physician(s) rendering service to release medical or other information about the patient which may be necessary for the completion of insurance claims, review of services, or receipt of benefits including current medical records. Such information may be released to third-party payers, including the third-party payer's agent and/or representative, governmental agencies or anyone responsible for payment of hospital and/or physician charges.

**MEDICARE AUTHORIZATION:** I certify that the information given by me in applying for payment under Title XVIII of the Social Security Administration or its intermediaries or carriers for this or related Medicare claim. I request payment for the authorized benefits are made on my behalf to Crenshaw Community Hospital, and any organizations and physician(s) rendering service during my treatment.

**ASSIGNMENT OF BENEFITS AND FINANCIAL RESPONSIBILITY:** I authorize payment of all insurance benefits, basic and major medical, for this period of medical, emergency, and/or diagnostic treatment to be made directly to Crenshaw Community Hospital. I understand that I am financially responsible for all charges not covered by insurance payments, including private room differentials, and that all efforts for collection of those benefits are for my convenience and do not represent a guarantee for collection or a credit to my account until such time as payment is received by Crenshaw Community Hospital and the contracted entities. I also assign the benefits payable for physicians' services to the physician(s) furnishing the services, including Montgomery Radiology Associates, or authorize such physicians or physician group to submit a claim to my insurance company(s), Medicare, and/or Medicaid. I will be responsible for any collection fees, court cost, and/or attorney fees incurred while collecting on my account(s). Copies of this authorization are as valid as the original.

Witness _____         Patient or Responsible Party X _____

Date: _____         Legal Guardian/Proxy: _____

# CRENSHAW COMMUNITY HOSPITAL
## MEDICAL LABORATORY SERVICES
### 101 Hospital Circle    Luverne, AL 36009
### Phone 334-335-1168

## URINE SCREEN REPORT   (UDS5)

NAME _Robin Dewis_    SS# _____

SPECIMEN ID# _015533_    SECURITY SEAL INTACT? _yes_ TECH _Rd_

DATE/TIME COLLECTED _9/10/05  0240_ COLLECTED BY _CO_

EMPLOYER _Smart Alabama LL_

| DRUG | RESULT | ANALYTICAL CUT-OFF |
|------|--------|--------------------|
| **Cocaine** | _Negative_ | **300ng/ml** |
| **Amphetamine** | _Negative_ | **1,000ng/ml** |
| **Methamphetamine** | _Negative_ | **1,000ng/ml** |
| **Marijuana(THC)** | _Negative_ | **50ng/ml** |
| **Opiates** | _Negative_ | **300ng/ml** |

TECH _RN_ _9/10/05_        DATE/TIME _9/10/05  1200_

This assay provides only a preliminary analytical test result. Specimens with positive results will be sent to a reference laboratory and a more specific alternate chemical method will be used to obtain a confirmed analytical result.

Interfering substances in the urine specimen may cause erroneous results. Adulterants, such as bleach and/or alum, in urine specimens may produce erroneous results regardless of the analytical method used. A positive result by be obtained from certain foods or food supplements.

A Positive result does not indicate level of intoxication, administration route or concentration in urine. A positive test does not distinguish between drugs of abuse and certain medications.

A Negative result may not necessarily indicate drug-free urine. Negative results can be obtained when drug is present below the cut-off level of the test.

Crenshaw Community Hospital
00117
Atwell v. Smart

**CRENSHAW COMMUNITY HOSPITAL**
**101 HOSPITAL CIRCLE**
**LUVERNE, AL 36049**
Telephone (334) 335-3374

| PATIENT: | DAVIS, ROBIN O | DOB: | | ROOM#: | ER |
|---|---|---|---|---|---|
| ACCT#: | 38368 | EXAM: | T SPINE | | |
| PHYSICIAN: | R. SMITH/TOMPKINS | DATE: | 9-10-05 | X-RAY#: | 41327 |

CLINICAL HISTORY: TRAUMA, PAIN

**AP, LATERAL AND SWIMMER'S VIEWS OF THORACIC SPINE:** There is mild kyphosis and there are mild osteoarthritic changes within the thoracic spine. No definite compression fracture or subluxation within the thoracic spine is seen. There are degenerative changes within the cervical area including interspace narrowing at least at one level. There is a 1.5 cm in diameter area of calcification overlying the low neck region possibly related to the thyroid gland or a lymph node. No other significant findings are noted.

T. L. EAKES, M.D.
ROENTGENOLOGIST

TLE/nrh
D: 9-12-05
T: 9-12-05

**RADIOLOGY DEPARTMENT REPORT**
**Page 1 of 1**

Crenshaw Community Hospital
00118



Crenshaw Community Hospital
101 Hospital Circle
Luverne, AL 36049                    Hospital

DAVIS ROBIN O        41327
038368
DR R SMITH/TOMPKINS        ER

# EMERGENCY DEPARTMENT LEVEL 100F        F 09/10/05

| | CRITICAL CARE:  See ** below | |
|---|---|---|
| CC | CPR | 2038 |
| CC | Stroke / Cerebral Hemorrhage - all types | |
| CC | Trauma, Trauma Alert / Multiple Trauma | |
| CC | Shock of all types - Septic, Cardiogenic, Spinal, Hypovolemic, Anaphylactic | |
| CC | Other - See *** below | |
| | See also Procedures Listing | |
| 16 | PROTOCOLS: Asthma, Chest pain, (Psych) | |
| | ADMISSIONS / TRANSPORT | |
| 9 | Triage | |
| 6 | Simple recheck | |
| 1 | Ambulatory visit / Complex recheck | |
| 10 | DOA, Death (no code) | |
| 5 | Hospital Admission | |
| 3 | Transfer in ED by ambulance | |
| 1 | Transfer out of ED by ambulance | |
| 5 | Transport with nurse to other facility | |
| | ASSISTING MONITORING | |
| 18 | Conscious Sedation (include Routine Monitoring) | |
| 6 | Monitoring (Mult W/S, more check codes) | |
| 2 | Nasal packing | |
| 1 | Pulse Ox check (Routine) | |
| 2 | Respiratory Therapy Tx (O2, updraft, etc.) | |
| 2 | Simple assist (start strip, eye exam) | |
| 10 | Ventilator / CPAP mask | |
| | WOUND CARE | |
| 5 | Complex wound cleansing | |
| 2 | Dressing (small) / moderate | |
| 3 | Dressing (large) / complex / simple burn | |
| 2 | Suture removal | |
| 2 | Wound cleaning / eye treatment / eye patch | |
| | SPECIAL NEEDS | |
| 2 | Bath | |
| 1 | Bedpan / Urinal (ea placement / item) | |
| 3 | Bed linen changed | |
| 3 | Comatose, disoriented | |
| 5 | Combative, Confused, incontinent, psychiatric | |
| 2 | Pediatric patient | |
| 1 | Isolation | |

| | PROCEDURES | CHARGE CODE |
|---|---|---|
| CC | Cardioversion | 2038 |
| CC | Chest tube insertion | 2039 |
| CC | Emergency Delivery | 2040 |
| CC | Intraosseous infusion | 2031 |
| CC | Intubation | 2032 |
| CC | Pacemaker assist | 2021 |
| CC | TPA administration | 2029 |
| CC | Tracheostomy assist / replace | 2026 |
| 10 | Blood administration | 1201 |
| 10 | Bronchoscopy | 2000 |
| 5 | Casting | 2033 |
| 10 | Central line / cutdown insertion | 2003 |
| 10 | Debridement of burns, complex | 2034 |
| 5 | Debridement of burns, simple | 2028 |
| 5 | Foreign body removal, ear | 2008 |
| 5 | Foreign body removal, other | 2035 |
| 10 | Gastric lavage | 2010 |
| 5 | Gastrostomy tube change | 2009 |
| 3 | I & D abscess | 2036 |
| 2 | Infusion therapy (IV fluids) | 1202 |
| 3 | Injection (therapeutic) IM / SC | 1203 |
| 3 | Injection (therapeutic) IV | 1204 |
| 3 | Injection (antibiotic) IM | 1205 |
| 5 | Injection for nerve block | 2012 |
| 10 | K wire / Steinmann pin | 2027 |
| 5 | Laceration / wound repair, simple | 2016 |
| 10 | Laceration / wound repair, intermediate | 2017 |
| 15 | Laceration / wound repair, complex | 2018 |
| 10 | Lumbar puncture | 2019 |
| 5 | Nasal hemorrhage control | 2020 |
| 5 | Peritoneal tap assist | 2022 |
| 10 | Pre-op preparation | N/A |
| 10 | Reduction of / dislocation | 2023 |
| 5 | Removal of impacted ear wax | 2024 |
| 10 | Splint (leg, arm, shoulder, etc.) | 2025 |
| 2 | Therapeutic phlebotomy | 2030 |
| 2 | Thoracentesis / paracentesis | 2022 |

*** If a diagnostic, surgical or therapeutic procedure was done, you must use ED level or Critical Care level with procedure charge.

Crenshaw Community Hospital
00119

# EMERGENCY DEPARTMENT LEVEL OF CARE (continued)

| | EDUCATION / DISCHARGE INSTR. |
|---|---|
| 2 | AMA |
| 2 | Crutch training by the ER staff |
| | Discharge instructions-simple |
| 2 | Discharge instructions-complex |
| 2 | Social Services consult |
| | MEDS / IVs |
| 5 | Infusaport access |
| 3 | IV - simple (INT, KVO) |
| 5 | IV w/pump, drip, rapid > 2 hours |
| 1 | MED PO, supp, topical |
| 5 | Multiple lines, complex IV's |
| 3 | Rabies vaccine |
| | OB/GYN: |
| 2 | Fetal heart tones |
| | Newborn care |
| 3 | Pelvic exam - simple |
| 5 | Pelvic exam - complex, hemorrhage, difficult |
| 10 | Rape exam |
| | TREATMENT |
| 3 | Ace wrap, collar, sling, immobilizer |
| 15 | Decontamination - Hazardous Materials |
| 2 | Enema administration |
| 5 | Impaction removal |
| 2 | Suction / Irrigation |
| 2 | Traction assist |
| 3 | Urinary Cath / NG insertion |
| | TESTS: |
| 2 | Arterial blood gases (ABG) |
| 2 | C-arm |
| 2 | EKG 12 lead |
| 1 | Glucose via device (routine) |
| 1 | Hemocult |
| 1 | Lab |
| 1 | Specimen collect (urine, sputum, etc) |
| 1 | Visual acuity |
| 1 | X-ray (simple) per trip |
| 3 | X-ray (complex - CT/MRI/US/IVP) per trip including pt monitoring |

\* Any time a Critical Care item is marked, you do not have to mark anything more on the left side; simply mark any procedure that was performed, and indicate "CC" in the box below.

Total points determines level of service:

| 0 | ER Level 1 |
|---|---|
| 5 | ER Level 2 |
| 6 - 10 | ER Level 3 |
| 11 - 15 | ER Level 4 |
| 16 and up | ER Level 5 |

6

TOTAL POINTS or CC for Critical Care

\*\* For Critical Care - Other: See below for examples, refer to Policy for Definition.

POTENTIAL SYMPTOMS:

New onset paralysis

Head injury with loss of consciousness

Acute myocardial infarction

Drug overdoses impairing vital functions

Coma of all etiologies (except hypoglycemic)

ACUTE FAILURE -

Renal, hepatic, respiratory, pulmonary edema, major pulmonary emboli

Emboli of fat or amniotic fluid

Non-hemorrhagic Strokes with vital function impairment

ANEURYSMS, THORACIC OR ABDOMINAL -

Leaking or ruptured

Aortic dissection                    Cardiac Tamponade

Diabetic Ketoacidosis            Lactic Acidosis

Tension Pneumothorax           Envenomation

Thyroid storm or Addisonian Crisis

Life-threatening hyper/hypo thermia

DIC or other bleeding diethesis - Hemophilia, ITP, TTP, Leukemia

Aplasic

POTENTIAL INTERVENTIONS:

Multiple parenteral medications requiring constant monitoring

CVP line insertion                   Ventilator

Pericardiocentesis                  Cricothyrotomy

Control of major hemorrhage    Emergent Cath Lab Pro

Administration of blood transfusions /blood products

Major burn care / transfer to burn unit

Major trauma care / multiple surgical consultants

DAVIS ROBIN O    41327
038368
DOB        F 09/10/C5
DR R SMITH/TOMPKINS    ER

Crenshaw Community Hospital
Luverne, AL 36049

**EMERGENCY NURSING TRIAGE FORM**

Addressograph

Date: 9/10/05   Time: 0127   Pvt. M.D.: Tompkins

Allergies: Aminophylline, Compazine

Age: _____   Weight: _____   Temperature: 97.7   Pulse: 95   Respiration: 20   Blood Pressure: 133/64

Chief Complaint: back pain — fell @ work

Data Source (Informant): Pt

| ARRIVAL: | NOTIFIED: | GLASGOW COMA SCALE |
|---|---|---|
| ☐Walk | ☐Police | Adult/Pediatric |
| ☐Carried | ☐Family/friend | |
| ☐Ambulance | ☐Med. Examiner | A. EYE OPENING |
| ☐Police | ☐Animal Control | Spontaneous ____4 |
| ☐Rescue Squad | ☐Clergy | To Voice ____3 |
| ☐Wheelchair | ☐Family Serv. | To Pain ____2 |
| ☐Stretcher | Time called: | None ____1 |

**ARE IMMUNIZATIONS CURRENT?**   ☐ Yes   ☐ No

| PMH | YES | NO | | YES | NO | | YES | NO |
|---|---|---|---|---|---|---|---|---|
| Arthritis | ☐ | ☑ | CVA | ☐ | ☑ | Migraines | ☐ | ☑ |
| Asthma | ☐ | ☑ | Diabetes | ☐ | ☑ | Psyc | ☐ | ☑ |
| By-pass | ☐ | ☑ | Dialysis | ☐ | ☑ | Pulmonary | ☐ | ☑ |
| Cardiac | ☐ | ☑ | GI | ☐ | ☑ | Renal | ☐ | ☑ |
| CHF | ☐ | ☑ | GU | ☐ | ☑ | Seizure | ☐ | ☑ |
| COPD | ☐ | ☑ | HTN | ☐ | ☑ | Sickle Cell | ☐ | ☑ |

ACCOMP. BY:
☐Self
☑Family/friend
☐Police
☐Other

B. VERBAL
Oriented/Smile ____5
Confused ____4
Screams ____3
Grunts ____2
None ____1

**CURRENT MEDICATIONS**   ☐ None   ☐ Unknown

| Name | Dose | Freq | Name | Dose | Freq |
|---|---|---|---|---|---|
| none | | | | | |

L.O.C.
☑Alert
☐Lethargic
☐Unresponsive
☐Disoriented
☐Shock

C. MOTOR
Obeys Spontaneous ____6
Localizes to pain ____5
Flexor withdraw l ____4
Abnormal Flexion ____3
Extensor Posturing ____2
None ____1

Score total _____

VALUABLES
☐Patient
☐Family/friend
☐Med. Examiner
☐Save___ Env. #

**NURSING OBSERVATIONS**

PAIN  ☑YES  ☐NO (Circle one)  😊😊😊😊😊😊  0 2 4 6 8 10

Location: back   Description: _____

**NEUROLOGICAL** ☑Alert ☐Confused ☐Oriented
☐Unresponsive ☐Lethargic ☐Seizures

EMESIS ☑No ☐Yes   Pt. description: _____

PUPILS ☐Equal ☐Unequal size in mm: R___ L___

STOOL ☐N/A ☑Normal Last BM: _____

RESPONDS TO STIMULI ☐No ☑Yes ☐Verbal ☐Painful

URINATION ☐N/A ☑Normal ☐Frequency ☐Dysuria

VISUAL ACUITY N/A ☐

DISCHARGE ☐N/A ☑No ☐Yes
☐Vaginal ☐Urethral ☐Other

GI ☑N/A ☐Vomiting ☐Diarrhea ☐Nausea

ABD ☐N/A ☑Soft ☐Distended ☐Rigidity ☐Bowel Sounds

BLEEDING ☑No ☐Yes ☐LMP: _____
Location: _____

SKIN ☐Warm ☐Pale ☐Dusty ☐Cyanotic ☑Dry ☐Moist
☐Cool ☐Clammy ☐Other

☐ None ☐ Minimal ☐ Moderate ☐ Severe ☐ Bright ☐ Dark ☐ Clots
☐ Other: _____

**TRAUMA: (location & appearance)** ☐N/A   **COMMENTS**
Abrasion _____
Avulsion _____
Contusion _____
Deformity _____
Edema _____
Laceration _____
Puncture Wound _____

RESPIRATORY ☐N/A
☑Regular ☐Shallow ☐Irreg ☐Hypervent ☐Cough ☐Dyspneic
☐Absent ☐Rapid ☐Other: _____

Crenshaw Community Hospital
00121
Axwell v. Smart

CIRCULATION/CARDIAC/PULSES
☑Regular ☐Absent ☐Palpable
☐Irreg ☐Weak
☐Cardiac Rhythm: _____

BREATH SOUNDS
☐N/A ☐Unequal ☐Diminished
☐Rales ☐Equal ☐Rhonch
☐Wheezes

| DISCH. COND. | EXIT VIA | DISPOSITION |
|---|---|---|
| ☐Improved | ☑Walk ☐Carried | ☑Home |
| ☐Critical | ☐Wheelchair | ☐Other facility |
| ☐Unchanged | ☐Stretcher | ☐AMA ☐Expired |

SAFETY   ☐Side rails up ☐Attendant with patient

| MEDICATION/DOSE/TREATMENT | ROUTE / SITE | SIGNATURE | RESPONSE |
|---|---|---|---|
| 16 April 10mg 2 p.o @ 0340 | | C Odom p | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

## ADDITIONAL VITAL SIGNS

| TIME | TEMP | PULSE | RESP | B/P | O₂SAT |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

## PROCEDURE / TREATMENT

| | | TIME | Nurse |
|---|---|---|---|
| Cardiac Monitor | ) | | |
| Splint (Type: | ) | | |
| (Location: | ) | | |
| Central Line (Type: | ) | | |
| Chest Tub (Am't Drained: ) (Size: | ) | | |
| Dressing (Type: | ) | | |
| Foley Cath. (Am't Drained: ) (Size: | ) | | |
| N/G Tube (Am't Drained: ) (Size: | ) | | |
| O₂ per | | | |
| Patient Teaching (Type: | ) | | |

| PHYSICIAN | EXAM TIME | PROCEDURE DONE |
|---|---|---|
| | | |
| | | |

| PHYSICIAN | TIME NOTIFIED | PLACE NOTIFIED | TIME RESPOND | NURSE INITIALS |
|---|---|---|---|---|
| Dr. Smith | | | ER | CO |
| | | | | |
| | | | | |

## IV FLUIDS / TIMES / RATES

| Time Started | IV Fluid | Rate | IV Cath & Size | Nurse Initials | Time D/C | In |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |

Comments:

| TIME | ADDITIONAL NURSES NOTES |
|---|---|
| 0210 | Urine for drug screen collected + sent to lab,    C Odom p |
| 0315 | TO Xray per ambulatory    (C Odom R) |
| 0345 | Instructions given. D/C home. Stable.    C Odom p |
| | |
| | |
| | |
| | |
| | |

| DISCHARGE TO: | ADMITTED TO: | REPORT GIVEN TO: |
|---|---|---|
| home @ 0345 | | |
| Transferred By: | | Crenshaw Community Hospital |
| | | 00122 |

Mar. 25. 2005  3:38PM    EHC

41327  Admit 32

CRENSHAW COMMUNITY HOSPITAL    101 HOSPITAL CIRCLE    LUVERNE    AL 36049

23/766

**EMERGENCY ROOM • OUTPATIENT RECORD**

| PT NUMBER | TYPE | PATIENT NAME | AGE | BIRTHDATE | SEX | M/S | DATE OF SERVICE | TIME | CLERK INIT. |
|---|---|---|---|---|---|---|---|---|---|
| | | DOUG ROBIN C | | | | | 3/19/05 | 23:01 | |

ADDRESS - LINE 1
CITY LUVERNE    STATE AL  ZIP CODE 36049    TELEPHONE 335-3001

NOTIFY IN CASE OF EMERGENCY - NAME  TARA MCLANEY
RELATIONSHIP FRIEND    TELEPHONE 578-0424

GUARANTOR NAME  DOUG ROBIN D
GUARANTOR ADDRESS  1096 SIMMS RD
CITY LUVERNE    STATE AL  ZIP CODE 36049    GUAR. TELEPHONE 335-3901

MED. REC. # 041327
FAMILY PHYSICIAN  TOMPKINS C/VICTORIA E

**CHARGES**

| X-RAY | LAB | REG'N TM | PAT. TM | EKG | I.V. | DRUGS | SUPPLIES | OTHER | M.D. | E.R. RM | TOTAL DUE |
|---|---|---|---|---|---|---|---|---|---|---|---|

**PHYSICIAN'S REPORT**

3/19    6142    5419

4709

**DIAGNOSIS:**

**TREATMENT:**

**INSTRUCTIONS TO PATIENT:**

    Admit 32

CRENSHAW COMMUNITY HOSPITAL     101 HOSPITAL CIRCLE     LUVERNE     AL 36049

**EMERGENCY ROOM • OUTPATIENT RECORD**

| PATIENT NUMBER | TYPE | PATIENT NAME | | AGE | BIRTHDATE | SEX | M/S | DATE OF SERVICE | TIME | CLERK INT. |
|---|---|---|---|---|---|---|---|---|---|---|
| 121766 | 1 | DAVIS ROBIN O | | | | F | DIV | 3/19/05 | 23:01 | TB |
| ORDER - LINE 1 | | ADDRESS - LINE 1 | | | | CITY | | STATE | ZIP CODE | TELEPHONE |
| | | | | | | LUVERNE | | AL | 36049 | 335-3501 |
| NEXT OF KIN | | NOTIFY IN CASE OF EMERGENCY - NAME | RELATIONSHIP | | ADDRESS | | | | | TELEPHONE |
| | | TARA MCLANEY | FRIEND | | | | | | | 372-0424 |
| INSURANCE COMPANY | | | | CONTRACT OR GROUP NUMBER | | | DATE | | PLACE | |
| | | | | | | | TIME | | EVENT | |
| GUARANTOR NAME | | GUARANTOR ADDRESS | | CITY | | | STATE | ZIP CODE | GUAR. TELEPHONE | |
| DAVIS ROBIN O | | 1096 SIMMS RD | | LUVERNE | | | AL | 36049 | 335-3501 | |
| GUARANTOR EMPLOYER | | GUARANTOR OCCUPATION | | GUAR. EMPLOYER ADDRESS | | | | | GUAR. EMP. TELEPHONE | |
| DIV. SERVICE | PREV. SERV. DATE | IF MINOR - PARENT NAME | | | MED. REC. # 041327 | | FAMILY PHYSICIAN TOMPKINS C/VICTORIA E | | | |

| CHARGES | X-RAY | LAB | RESP. TH. | PHY. TH. | EKG | I.V. | DRUGS | SUPPLIES | OTHER | M.D. | E.R. RM | TOTAL DUE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | |

**AUTHORIZATION FOR TREATMENT, GUARANTEE OF PAYMENT, ASSIGNMENT OF INSURANCE BENEFITS**

1. The undersigned has been informed of the emergency treatment considered necessary for the above named patient, and that treatment and procedures will be performed by physicians, members of house staff and employees of the hospital. Authorization is hereby granted for such treatment and procedures. The undersigned has read the above authorization and understands the same and certifies that no guarantee or assurance has been made as to the results that may be obtained.
2. The undersigned agrees to pay for services rendered by Hospital upon release of patient.
3. I/we hereby assign any hospital benefits, sick benefits, injury benefits due to a liability of a Third party, payable by any party, for the above patient, to Hospital unless I pay the account in full upon release of patient.
4. I/we hereby authorize the "Administrator of Hospital" to furnish from its records any information requested by the before mentioned insurance companies in connection with the above assignment. I do hereby appoint the "Controller of Hospital as my lawful attorney to endorse for me any checks made payable to me for benefits or claims collected under the above assignment and to apply my credit balance to any other account I may owe said hospital.

| DATE | TIME | SIGNED PATIENT | | SIGNED GUARANTOR |
|---|---|---|---|---|

**CHIEF COMPLAINT (If Accident State How, When, and Where)**

| TEMP. | PULSE | RESP. | B/P | ALLERGIES | | MEDICATIONS - HOME | | E.R. PHYSICIAN | | TET. TOX. |
|---|---|---|---|---|---|---|---|---|---|---|

**NURSES NOTES:**

| | | | | | | NURSE'S SIGNATURE (RN OR LPN |
|---|---|---|---|---|---|---|

**LAB DATA (Including X-Rays, EKGs, etc.)**

6142     5419

**PHYSICIAN'S REPORT:**     4709

3/19

**DIAGNOSIS:**

**TREATMENT:**

| | | CONDITION ON DISC. |
|---|---|---|
| | | DISP | STABLE | EXPIR |

**INSTRUCTIONS TO PATIENT:**

Crenshaw Community Hospital
00124
Atwell v. Smart

FOLLOW-UP WITH

| PATIENT'S SIGNATURE ON DISCHARGE | DATE - TIME OF DISC. | PHYSICIAN'S SIGNATURE |
|---|---|---|
| | MEDICAL RECORDS | |

_____ HOSPITAL

_____

### AUTHORIZATION FOR EMERGENCY TREATMENT

1.  The undersigned has been informed of the emergency treatment considered necessary for the patient whose name appears on the reverse hereof and that the treatment and procedures will be performed by physicians, members of the house staff and employees of the hospital. Authorization is hereby granted for such treatment and procedures.

2.  **MEDICARE - MEDICAID PATIENT'S CERTIFICATION:** Authorization to release information and payment request. I certify that the information given by me in applying for payment under Titles XVIII and XIX of the Social Security Act is correct. I authorize release of all records required to act on this request. I request that payment of authorized benefits be made on my behalf.

3.  **ASSIGNMENT OF INSURANCE BENEFITS:** I hereby authorize payment directly to _____ Hospital of hospital benefits otherwise payable to me including major medical insurance and payment of surgical or medical benefits, including major medical, directly to the attending physician but not to exceed regular charges for these services. I understand that I am financially responsible to the hospital and physician for charges not covered by this assignment.

4.  **AUTHORIZATION FOR RELEASE OF MEDICAL INFORMATION:** The hospital and attending physician are authorized to furnish any medical information requested by insurance companies with whom I have coverage or any public agency which may be assisting in payment for my care.

5.  **REFUND OF INSURANCE BENEFITS:** I authorize the refund of overpaid insurance benefits in accordance with my insurance policy conditions where my coverages are subject to a coordination of benefits clause.

6.  I understand that health care services paid under Medicare, Medicaid, and maternal and child health programs are subject to review by the Professional Standards Review Organization.

_____        _____        _____
Date                         Witness                      Patient

_____        _____        _____        _____
Date                         Witness                      Responsible Party            Relationship to Patient

Crenshaw Community Hospital
00125
Atwell v. Smart

DAVIS ROBIN C  41327
021256 SSN #[illegible]
028        F  03/19/05
DR VICTORIA/TOMPKINS  132

## REPORT OF CONSULTATION

| Family Name | First Name | Middle Name | Room No. | Hosp. No. |
|---|---|---|---|---|
| Davis | Robin | | | |

From: Attending Physician _Dr. C. Tompkins – Dr. Kenneth_   To: Consulting Physician _Dr. E. Victor_   Date: _3-19-05 2020_

Report requested regarding _Severe right lower abdominal pain_

Signature of attending physician _____

## REPORT

Findings _31 y.o. multigravida healthy female with over a 24 hour history of increasing right lower abdominal pain accompanied by fever. Pain is aggravated on walking or straining. No accompanying diarrhea, vaginal discharge or vomiting first symptoms_

P.E.   T₂ 99.5   BP₂ 126/74   HR 120 reg
RR₂ 20

c/o severe right lower abdominal pain aggravated on movement, coughing, walking etc.

Chest clear   Heart RRR

Abdomen c old C-section and laparoscopic cholecystectomy scar. Tenderness with 3+/4 rebound and Rovsing's - 1° gastric

Diagnosis _[illegible]_

Recommendations _Pelvic exam / ultrasound → per Dr. Kenney_

cross gyn 3+/p

_[illegible] 15,000 c shift_
_[illegible], UA_
and amylase –

Date of consultation: _3-19-05 2030_   Dr. _____   Signature of Consultant

REPORT OF CONSULTATION

Crenshaw Community Hospital
00126
Atwell v. Smart

DAVIS Robin J 41527
C1266  SSN 4200000000
009        F  03/19/65
Dr VICTORIA/TOMKINS  132

## REPORT OF CONSULTATION

| Family Name | First Name | Middle Name | Room No. | Hosp. No. |
|---|---|---|---|---|
| Davis | Robin | | | |

From: Attending Physician — *D. C. Tomplins — Dr. Kennedy*  To: Consulting Physician — *Dr. E. Vachon*  Date: 3-19-0?  20 20

Report requested regarding _____

*Severe RLQ abdominal pain*

Signature of attending physician _____

### REPORT

**Findings** _____

*Impression — Severe RLQ abdominal pain — Strong suspicion for appendicitis Or Ruptured Ovarian cyst*

*Recommendations:*

*Advised immediate laparotomy appendectomy, possible ovarian cystectomy and/or salpingo-oophorectomy under general anesthesia — Nature of the procedure and anesthesia with their associated benefits, risks possible complications and post op sequelae explained in full detail to patient. She is fully agreeable. Informed consent obtained.*

*Thank you for the opportunity of this consult !!!*

Crenshaw Community Hospital
00127
Atwell v. Smart

Date of consultation: 3-19-0?  20 20    Dr. _____

Signature of Consultant _____

REPORT OF CONSULTATION



Crenshaw Community Hospital
Luverne, AL

**PROGRESS NOTES**

Addressograph

| Date | Notes Should Be Signed by the Physician |
|------|------------------------------------------|

3/19/05  Op Note
0075

Laparotomy + appendectom

Dx: Abdominal pain.
? PID.

Finding: Seropurulent exudate
left of Fallopian tube. Both
Fallopian tubes inflammation
and for bou — Previous
BTL — Appendix normal
removing no distention post op good

01/15  P/F/P Check
up stable
Heart lungs, Abdomen OK
burning crodia post op good

**CRENSHAW COMMUNITY HOSPITAL**
**101 Hospital Drive**
**Luverne, AL 36049**
**Telephone (334) 335-3374**

**PATIENT:** DAVIS, ROBIN                **ROOM #:**
**ACCT #:** 031766                      **PATIENT #:**
**PHYSICIAN:** Dr. Edgar Victoria       **DATE OF SURGERY:** 03/19/05

**PREOPERATIVE DIAGNOSIS:**    Abdominal pain, suspicion for appendicitis, rule out pelvic pathology.

**POSTOPERATIVE DIAGNOSIS:**    Abdominal pain secondary to acute salpingitis (pelvic inflammatory disease).

**PROCEDURE PERFORMED:** Laparotomy, appendectomy.

**SURGEON:** Dr. Edgar Victoria

**ANESTHESIA:** Endotracheal general.

**ESTIMATED BLOOD LOSS:** Negligible.

**FINDINGS:**               , multi gravida, post BTL female who presented with a 24-hour history of increasing right lower quadrant abdominal pain and fever. There has been no accompanying nausea, vomiting, diarrhea, or urinary tract symptoms.

Her preoperative WBC count was 15,000 with a shift. She was noted to be markedly tender to McBurney's point with 3+/4 rebound, 3+/4 ___ sign, and 3+/4 psoas sign.

At the operation, there are some adhesions noted in the right upper abdomen from her previous laparoscopic cholecystectomy. The gallbladder is missing. Palpation of both kidneys, the cecum, and terminal ileum is normal. The appendix is grossly normal. The uterus is somewhat boggy. Both fallopian tubes have been previously ligated and appear to be bulbous with seropurulent exudate noted, especially in the left fallopian tube. Both fallopian tubes are moderately congested. A swab from the left fallopian tube was taken for C&S studies.

**DESCRIPTION OF PROCEDURE:** Following positive patient identification, endotracheal general anesthesia was carried out. A Foley catheter was inserted in the bladder. The abdomen was then prepped with Betadine and draped in the usual sterile manner. The old suprapubic C-section scar was excised. Incision was deepened cutting through subcutaneous tissue and fascia transversely. The superior and inferior fascial flaps were developed. The peritoneum was incised vertically. The above findings were noted at exploration. With adequate traction and exposure, a swab from the left fallopian tube was taken for C&S studies.

The appendix was then exposed gradually with Walcott clamps. Mesoappendix clamped, divided, and ligated with 0-chromic catgut. Double ligature of 0-chromic catgut was applied to the appendiceal base.

(continued)

**OPERATIVE REPORT**

**Page 1 of 2**

Crenshaw Community Hospital
00129
Atwell v. Smart

**CRENSHAW COMMUNITY HOSPITAL**
**101 Hospital Drive**
**Luverne, AL 36049**
**Telephone (334) 335-3374**

| | | | |
|---|---|---|---|
| **PATIENT:** | DAVIS, ROBIN | **ROOM #:** | |
| **ACCT #:** | 031766 | **PATIENT #:** | |
| **PHYSICIAN:** | Dr. Edgar Victoria | **DATE OF SURGERY:** 03/19/05 | |

(continued)

The pelvic cavity irrigated with warm saline solution until clear. The appendix was then divided between a Kelly clamp and the ligature. The stump was cauterized with _____ and neutralized with alcohol and cleansed with Betadine and further cauterized with monopolar cautery at the _____.

The cecum was then replaced in its normal anatomical locations. The omentum was placed over the bowel.

Good meticulous hemostasis was accomplished. Sponge, instrument, and needle counts were reported as correct. The incision was closed in layers: The peritoneum with a continued suture of #1 Vicryl. The fascia with continuous interlocking hemostatic suture of #1 Vicryl x 2. The wound was irrigated with warm saline solution. Subcutaneous tissue layers were approximated with a continuous suture of 3-0 Vicryl and the skin with staples. A total of 30 cc of 0.5% Marcaine was injected around the incisions to alleviate pain in the immediate postop period. Sterile dressings were applied. The patient tolerated the operative procedure well and left the operating room in a satisfactory condition.

Dr. Edgar Victoria

EV/db
D: 03/20/05
T: 03/21/05

cc:     Charles S. Tompkins, M.D.

**OPERATIVE REPORT**

**Page 2 of 2**

1750

**CRENSHAW COMMUNITY HOSPITAL**
**101 Hospital Circle**
Luverne, Alabama 36049

**DISCHARGE PLAN**

DATE: 03/20/05

PATIENT NAME: Robin Davis     PHYSICIAN: Tompkins

DIET AND DIETARY INSTRUCTIONS: Regular (as tolerated)

MEDICATIONS: Levaquin 500mg — take 1 tablet daily
Vibra tabs 100mg — take 1 tablet two times a day
Diflucan 150mg — take 1 tablet (only 1 pill)

*Extra Strength Tylenol / Motrin for pain

(335-6666)

RETURN CLINIC APPOINTMENT: Follow-up with Dr. Victoria next Monday (03/28/0
for staple removal

SPECIAL INSTRUCTIONS: No heavy lifting/straining. Clean incision daily with
warm water & mild anti-bacterial soap. May cover with clean dressin
daily. Let incision air out whenever possible. Call Dr. Victoria
office Monday (03/21/05) to schedule appointment for next Mond

REFERRALS: Public Health, Social Services, Mental Health, Other Facilities, etc.

None

DISCHARGE NURSE: Michelle Smith, LPN

**I UNDERSTAND THE ABOVE INSTRUCTIONS:**

PATIENT / FAMILY SIGNATURE: Robi O'Davis

Crenshaw Community Hospital
00131
Atwell v. Smart

*Darlis, Kalun    041327*
*031766*
*132*
*Dr. Tompkins / Victoria*

## DISCHARGE PLANNING ASSESSMENT

PATIENT'S ADDRESSOGRAPH

ADMISSION DATE *3/19/05* _____ DISCHARGE DATE _____

ADMITTING DIAGNOSIS *RLQ pain* _____ AGE _____

INSURANCE COVERAGE: MEDICARE _____ MEDICAID _____ VA _____ PRIVATE PAY ___✓___

  TRICARE _____ BCBS _____ OTHER INSURANCE _____

MENTAL STATUS: DISORIENTED _____ CONFUSED _____ AGITATED _____ ALERT ___✓___

  COMATOSE _____ LETHARGIC _____ OTHER _____

IMPAIRMENTS WHICH MIGHT AFFECT CARE: NONE ___✓___ SPEECH _____ SIGHT _____

  PHYSICAL IMPAIRMENT _____ HEARING _____ OTHER _____

    Elaborate if needed on impairments _____

HOME ENVIRONMENT: LIVES ALONE _____ LIVES WITH RELATIVES ___✓___

  ASSISTED LIVING _____ SKILLED NURSING FACILITY _____

  OTHER _____

ACTIVITIES OF DAILY LIVING: SELF ___✓___ NEEDS ASSISTANCE _____ DEPENDENT _____

SPECIAL NEEDS: NONE ___✓___ SPECIFY _____

OTHER DEPARTMENT NEEDS: NONE _____ SPECIFY _____

CURRENTLY USING: HOME HEALTH AGENCY __N/A__ NAME OF AGENCY _____

  HOME PHYSICAL THERAPY _____ HOME HEALTH AIDE _____

  HOSPICE _____ NAME OF AGENCY _____

EQUIPMENT CURRENTLY BEING USED AT HOME: NONE ___✓___ WALKER _____ BED _____

  WHEELCHAIR _____ BEDSIDE COMMODE _____ OXYGEN _____ AER NEBS _____

  OTHER _____

  NAME OF DURABLE MEDICAL EQUIPMENT COMPANY USED: _____

CURRENT TEACHING NEEDS: DIET __N/A__ TREATMENTS _____ MEDICATIONS _____

  OTHER _____

**FAMILY/PATIENT REPRESENTATIVE AVAILABLE TO PROVIDE SUPPORT/CARE:**

NAME _Tara McStaney_     RELATIONSHIP _friend_

ADDRESS _____

PHONE _372-0424_

POTENTIAL NEED FOR ALTERNATE PLACEMENT     YES   (NO)

FURTHER DISCHARGE PLANNING NEEDED     YES   (NO)

NOTES _Pt not currently homebound & tends own_
_ADL will monitor hosp stay for poss needs_

Discharge Planner's Signature/Date/Time _3/20/05 M McSorley_

| Date/Time | Follow up Notes |
|-----------|-----------------|
| 3/20/05 | D/c to home M McSorley |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

Crenshaw Community Hospital
00133
Atwell v. Smart

DAVIS ROBIN J 41327
C31766 SSN 48C06C828
DOB          F C3/19/C5
DR VICTORIA/TOMPKINS 132

**Crenshaw Community Hospital**
Luverne, AL

**NURSING ADMISSION ASSESSMENT**

Date: 3/20/05  Time: 0045  Phone Numbers: 335 - 4461 - 527-8853
Educational needs: Explain all procedures & meds
Information obtained from: ☑Patient ☐Family ☐Significant Other (name) ____
**ALLERGIES** (food, drugs, other) Compazine — Aminophyllin   Allergy Bracelet ☐Yes · ☐No
Admit via: ☐Ambulatory ☐Wheelchair ☐Stretcher from: OR

**HEALTH PERCEPTION - HEALTH MANAGEMENT**
Chief complaint: (patient's statement) ____

**MEDICATION - Circle those taken today**
N/A

Disposition of drugs: ☐With patient ☐Sent Home ☐Pharmacy ☐Not brought
Pertinent Hx (Previous Hx: Surgeries, Medical problems) Ovarian Cyst removal — Lap Chole

**PROSTHETIC DEVICES** ☐None
Dentures    ☐Lower    ☐Upper    ☐Partial
            ☐Bridge            ☐Capped
            ☑Eyeglasses        ☐Contacts
            ☐Hearing Aid       ☐Pacemaker

**SAFETY NEEDS**
☑Call button    ☐Siderails    ☐Siderails/HS only
☐Restraints    ☐Vest restraint
☐Significant other/family member to remain with patient
☐Other: ____

**ROLE RELATIONSHIP**
☐Married ☐Single ☐Widowed ☑Divorced
Children: 4 boys
Occupation: Payroll Clerk - Wood's Construction
Educational level: 12th grade

**DISCHARGE PLANNING**
Living arrangements (check one): ☐Alone ☐With Spouse
☐Family ☐Friend ☐Other: ____
Is Significant Other capable of assisting post discharge? ☐Yes ☐No
If not, what support services are available? ____

**PRESENT A.D.** (check appropriate box)
☐Self-Care ☐Requires assistance
☐Requires total care ☐Other: ____
Did patient require help with any of the following at home?
(check appropriate box)
☐Cooking ☐Feeding ☐Toilet Needs
☐Medications ☐Special diet ☐Transportation ☐No help
☐Other (specify): ____

**DISCHARGE DESTINATION:**
☐If unknown, refer to Social Worker ☐Currently using Home Health
Agency Name: ____

**PERSONAL FAMILY HISTORY**
Alcohol       ☑Yes ☐No   Amount: occ. — social
Smoking:      ☑Yes ☐No   Amount: 1 pk/day
Drugs:        ☐Yes ☐No   Amount: ____
Exposure to Infectious Disease: ____

| | YES | NO | RELATION |
|---|---|---|---|
| Kidney Disease | | ✓ | |
| Asthma | | ✓ | |
| Cancer | | ✓ | |
| Diabetes | | ✓ | |
| Epilepsy/Seizures | | ✓ | |
| High Blood Pressure | | ✓ | |
| Heart Disease MVP | ✓ | | self |
| Vascular Disease | | ✓ | |
| Sickle Cell Disease | | ✓ | |

**VALUE BELIEF**
Religious affiliation: Protestant
Important to your family life? ☐Yes ☑No

**INSTRUCTIONS TO PATIENT**
Call light: ☑Yes ☐No    Emergency light ☐Yes ☐No
Meal times: ☑Yes ☐No    Bed Control    ☑Yes ☐No
Bathroom: ☑Yes ☐No      Television     ☑Yes ☐No

**VALUABLES** (describe) ____
☐To hospital safe ____    ☑None
Disposition: ☐With patient ☐Sent home with: ____

**DO YOU HAVE AN ADVANCE DIRECTIVE?** ☐Yes ☑No
If yes, explain that we need a copy for our records. If no, ask the patient if he/she would like additional information and instructions concerning Advance Directives.
Patients answer: ☐Yes ☑No

Crenshaw Community Hospital
0034
Atwell v. Smart

CRENSHAW COMMUNITY
HOSPITAL

DAVIS ROBIN O 41327
021766  SSN 42COECR28
DOB          F  03/19/05
DR VICTORIA/TOMPKINS 132

Pain

| e/ial | Nursing Diagnosis | Goal/Expected Outcome | Nursing Orders | Date Resolve initial |
|---|---|---|---|---|
| 3-05 | 1. Alteration in comfort/ pain. | 1. Patient will express minimal discomfort or absence of pain. | 1. Assess and record all c/o pain - type, location, severity, duration. 2. Medicate as ordered. Assess effects of medication within _1 hr_ . Report absence of pain relief. 3. Position for comfort. 4. Encourage patient to engage in distraction techniques: _____ | |

Crenshaw Community Hospital
00135
Atwell v. Smart

**COMPONENT / PROCEDURE REQUESTED**

- ☐ Red Blood Cells        ☐ Therapeutic Phlebotomy
- ☐ Fresh Frozen Plasma    ☐ WBC Removal Filter
- ☐ Cryoprecipitate        Other
- ☐ Platelet, Single
- ☐ Platelet, Pheresed
- ☐ Rhig
- ☐ Antibody ID
- ☐ Antigen Screen
- ☐ Fetal H2B Screen

**CRENSHAW COMMUNITY HOSPITAL**
**TRANSFUSION SERVICE**
LUVERNE, ALABAMA 36049

**BLOOD COMPONENT REQUEST / COMPATIBILITY TESTING REPORT / IMMUNOHEMATOLOGY REQUEST**

| | UNIT NO. | DATE DESIRED 3/19/05 | ☐ STAT ☐ ROUTINE ☐ SURGERY | COLLECTED BY WM | DATE 3/19 | TIME 1845 |
|---|---|---|---|---|---|---|

CELLS VS. / SERUM VS.

| | ANTI-A | ANTI-B | ANTI-AB | ANTI-D | DU | RH CONT | A₁ CELLS | A₂ CELLS | B CELLS | INTERP |
|---|---|---|---|---|---|---|---|---|---|---|
| PATIENT | + | 0 | + | + | | 0 | 0 | | + | A-pos |
| DONOR | | | | | | | | | | |

**COMPATIBILITY TESTING KEY**
O - ABSENCE OF AGGLUTINATION OR HEMOLYSIS
+ - PRESENCE OF AGGLUTINATION
H - PRESENCE OF HEMOLYSIS

| Compatibility Testing Report | | 37°C/LISS | AHG | INTER | UNIT TRANSFUSED / RELEASED |
|---|---|---|---|---|---|
| | | | | | DATE:        TIME: |
| CELL I | 0 | 0 | 0 | neg | REMARKS: |
| CELL II | 0 | 0 | 0 | neg | |
| CELL III | 0 | 0 | 0 | neg | |
| Auto Control | 0 | 0 | 0 | neg | |

☐ DIRECT ANTIGLOBULIN TEST

Date / Time  3/19/05  2112  WM

CHART COPY

---

**URINALYSIS / FECES / FLUID / PREG TEST**

| LAB NO. 19-18 | DATE DESIRED | ☐ ROUTINE ☐ STAT | ☐ PRE-OP | COLLECTED BY WM | DATE 3-19-05 | TIME 1910 |
|---|---|---|---|---|---|---|

REMARKS:

| ☐ URINE, MICROSCOPIC | RESULT | ☐ | | RESULT |
|---|---|---|---|---|
| WBCS / HPF | 3-4 | | | |
| BACTERIA | | ☐ GLUCOSE (FINGERSTICK) | | mg / dl |
| RBCS / HPF | 2-3 | | | |
| EP. CELLS / HPF | occ | | | |
| CRYSTALS | | ☐ MICROHEMATOCRIT | | % |
| MUCOUS | | | | |
| CASTS / LPF | | ☐ FLUID EXAM | | RESULT |
| TYPE: | | SOURCE: | | |
| OTHER | | APPEARANCE: | | |

| ☐ | RESULT | ☐ CELL COUNT | RBC / CUMM. |
|---|---|---|---|
| ☐ OCCULT BLOOD (FECES) | | | WBC / CUMM. |
| ☐ OCCULT BLOOD (GASTRIC) | | | POLYS% |
| ☐ STREP A ANTIGEN | | ☐ DIFFERENTIAL | LYMPHS |
| ☐ SERUM PREGNANCY TEST | | ☐ PROTEIN | |
| ☑ URINE PREGNANCY TEST | Negative | ☐ GLUCOSE | |
| | | ☐ OTHER | |

**URINE URINALYSIS**

| COLOR | Yellow |
|---|---|
| APPEARANCE | Clear |
| GLUCOSE | O |
| BILIRUBIN | O |
| KETONES | O |
| SPECIFIC GRAVITY | <1.005 |
| pH | 6.0 |
| PROTEIN | |
| NITRITE | |
| BLOOD | Small |
| LEUCOCYTE ESTERASE | trace |

**CRENSHAW COMMUNITY HOSPITAL**
LUVERNE, AL 36049

DATE 3-19-05   TIME 1910   TECH WM

Crenshaw Community Hospital
00136
Atwell v. Smart

LAB NO. :

SPECIMEN TYPE *Vaginal*

☐ ROUTINE
☐ PRE-OP
☐ ASAP
☐ STAT

DATE 3/19/05
TIME 2030
TECH 441G

PATIENT NO.
PATIENT NAME
ADDRESS
DOCTOR

ROOM NO.
AGE

IF IMPRINT PLATE NOT USED
PRINT HERE

*Numerous WBC's ↑ Clue cells seen*

*No trichomonads or yeast seen*

CRENSHAW COMMUNITY HOSPITAL
LUVERNE, AL 36049

MISCELLANEOUS

TECH: *W*

DATE: 3/19/05 2040

White Copy = CHART    Yellow copy = BILLING    Pink copy = LAB

Crenshaw Community Hospital
00137
Atwell v. Smart



**CRENSHAW COMMUNITY HOSP**
PH: (334) 335-1168

101 HOSPITAL CIRCLE
LUVERNE AL 38049

**SP WALKER,MD/ MED. DIR.**
FAX: (334) 335-1159

| | | |
|---|---|---|
| Sample ID: | 031905018 | Patient Name: DAVIS ROBIN |
| Run Date/Time: | 03/19/2005 06:58:30 PM | Patient ID: 031766 |
| Seq#: | 522 | Gender: Female |
| OPR: | BCI | |
| Flagging Set: | Woman | |
| Comments: | COLLECTED BY WM | |

Collect Date/Time: 03/19/2005 06:45:00 PM
Physician: KIRACOFE
Location: ER
DOB.
Age:

### Range

| | | | Range |
|---|---|---|---|
| WBC | 15.9 | HH 10^3/µL | 4.0 / 11.0 |
| RBC | 4.73 | 10^6/µL | 3.80 / 5.80 |
| HGB | 14.9 | g/dL | 11.5 / 16.5 |
| HCT | 43.6 | % | 37.0 / 47.0 |
| MCV | 92 | fL | 76 / 96 |
| MCH | 31.6 | pg | 27.0 / 32.0 |
| MCHC | 34.3 | g/dL | 31.0 / 35.0 |
| RDW | 12.8 | % | 11.0 / 16.0 |
| PLT | 256 | 10^3/µL | 150 / 500 |
| MPV | 7.3 | fL | 6.0 / 10.0 |



| | | | Range |
|---|---|---|---|
| NE | 74.8 | H % | 45.0 / 70.0 |
| LY | 16.7 | L % | 20.0 / 40.0 |
| MO | 6.2 | % | 3.0 / 10.0 |
| EO | 1.3 | % | 1.0 / 8.0 |
| BA | 1.0 | H % | 0.0 / 0.5 |
| NE# | 11.92 | HH 10^3/µL | 2.00 / 7.50 |
| LY# | 2.66 | 10^3/µL | 1.50 / 4.00 |
| MO# | 0.99 | H 10^3/µL | 0.20 / 0.80 |
| EO# | 0.21 | 10^3/µL | 0.04 / 0.40 |
| BA# | 0.15 | H 10^3/µL | 0.02 / 0.10 |

**Flags and Messages**

Dotplot and Histogram Flags
IMM

Interpretive Messages
Leukocytosis
Neutrophilia



Vol



Abs



RBC



PLT

WBC/BASO

### Microscopic Examination

| | | | | | |
|---|---|---|---|---|---|
| Neutrophils | _____ | Metamyelocytes | _____ | Anisocytosis | _____ | Retics | _____ |
| Bands | _____ | Myelocytes | _____ | Hypochromia | _____ | Sed. Rate | _____ |
| Lymphocytes | _____ | Promyelocytes | _____ | Polychromasia | _____ | | |
| Monocytes | _____ | Blast | _____ | Poikilocytosis | _____ | | |
| Eosinophils | _____ | Atyp. Lymph | _____ | Microcytosis | _____ | | |
| Basophils | _____ | NRBC s | _____ | Macrocytosis | _____ | | |

Comment : _____

_____

Requested by : _____

Reviewed by : _____

Out of Action Range  XXX    Out of Patient Range  XXX

Printed 03/19/2005 06:58:34 PM

Crenshaw Community Hospital
00138

  

```
+++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++
+                                                                           +
+               Crenshaw Community Hospital                                 +
+               101 Hospital Cir. Luverne, AL  36049                        +
+               Reported:      19:08 Mar 19 2005                            +
+                                                                           +
+                                                                           +
+                                                                           +
+                                                                           +
+ Patient Name:  DAVIS ROBIN 031766                                         +
+ Patient ID:    KIRACOPE                                                   +
+ Sample Number: 031905@1845                                                +
+                                                                           +
+ Location:    ER/WM             Sample Fluid:  PLASMA                      +
+ Priority:    ROUTINE           Entered:       18:55 Mar 19 2005           +
+                                                                           +
+ Segment: B  Position: 9                                                   +
+                                                                           +
+                                                                           +
+                                                                           +
+                                                                           +
+                                                                           +
+                                                                           +
+                                                                           +
+                                                                           +
+        TEST NAME                   RESULT     REF. INTERVAL     UNITS      +
+ =============================     ==========  =============    ========    +
+ AST    Aspartate Aminotransferase    19        15-37           U/L        +
+ ALT    Alanine Aminotransferase      33        30-65           U/L        +
+ ALP    Alkaline Phosphatase         112        50-136          U/L        +
+ tbil   Total Bilirubin             0.74       0.00-1.00        mg/dL       +
+ TP     Total Protein                7.2        6.4-8.2         g/dL        +
+ ALB    Albumin                      4.2        3.4-5.0         g/dL        +
+ CA     Calcium                      8.8        8.5-10.1        mg/dL       +
+ GLU    Glucose                       95        70-110          mg/dL       +
+ BUN    Blood Urea Nitrogen           3    LO   7-18            mg/dL       +
+ CREA   Creatinine                   0.8        0.6-1.3         mg/dL       +
+ Na     Sodium                       139        136-145         mmol/L      +
+ k      Potassium                    3.1   LO   3.5-5.1         mmol/L      +
+ cl     Chloride                     102        98-107          mmol/L      +
+ ECO2   Enzymatic Carbonate         26.6       21.0-32.0        mmol/L      +
+ AMY    Amylase                       35        25-115          U/L         +
+                                                                           +
+++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++
```

Crenshaw Community Hospital
00139
Atwell v. Smart

PRINTED: 03/19/05 20:56                                          PAGE 1

CRENSHAW COMMUNITY HOSPITAL
101 HOSPITAL CIRCLE
LUVERNE, AL 36049
(334) 335-3160  FAX (334) 335-1159
S. G. WALKER MD, MEDICAL DIRECTOR

PATIENT REQUISITION REPORT

LAST NAME: DAVIS              DOB:          DOCTOR: KIRACOFE/KING
FIRST NAME: ROBIN            AGE:          LOCATION: ER
PATIENT ID: 031766          SEX: M         COMMENT:

D/T DRAWN: 03/18/05 18:46 BY: SM      D/T ENTERED: 03/19/05 20:56
ACCESSION: 31805018                   COMMENT:

| TEST | RESULT | NORMAL RANGE | LLT | NORMAL | 3HH | UNITS |
|------|--------|--------------|-----|--------|-----|-------|
| PT   | 12.3   | 11.0 - 15.0  | [   | *      | ]   | sec   |
| PTT  | 25.5   | 20.0 - 38.0  | [   | *      | ]   | sec   |

RESULTS REVIEWED AND APPROVED BY  _____

Crenshaw Community Hospital
00140
Atwell v. Smart

 

**CRENSHAW COMMUNITY HOSP**
PH: (334) 335-1168

**101 HOSPITAL CIRCLE**
**LUVERNE AL 36049**

SP WALKER, MD/ MED. DIR.
FAX: (334) 335-1159

| | | | |
|---|---|---|---|
| Sample ID: | 032005001 | Patient Name: DAVIS  ROBIN | |
| Run Date/Time: | 03/20/2005 08:10:35 AM | Patient ID: 031766 | Collect Date/Time: 03/20/2005 07:20:00 AM |
| Seq#: | 528 | Gender: Female    DOB: | Physician: VICTORIA/TOMPKINS |
| OPR: | BCI | Age: | Location: 132 |
| Flagging Set: | Woman | | |
| Comments: | c ollected by gb | | |

### Range

| WBC | 12.3 | H | 10^3/μL | 4.0 / 11.0 |
|---|---|---|---|---|
| RBC | 4.42 | | 10^6/μL | 3.80 / 5.80 |
| HGB | 13.8 | | g/dL | 11.5 / 16.5 |
| HCT | 40.6 | | % | 37.0 / 47.0 |
| MCV | 92 | | fL | 76 / 96 |
| MCH | 31.3 | | pg | 27.0 / 32.0 |
| MCHC | 34.1 | | g/dL | 31.0 / 35.0 |
| RDW | 13.0 | | % | 11.0 / 16.0 |

| PLT | 272 | | 10^3/μL | 150 / 500 |
|---|---|---|---|---|
| MPV | 8.3 | | fL | 6.0 / 10.0 |

### Range

| NE | 77.1 | H | % | 45.0 / 70.0 |
|---|---|---|---|---|
| LY | 15.0 | | % | 20.0 / 40.0 |
| MO | 6.1 | | % | 3.0 / 10.0 |
| EO | 1.1 | | % | 1.0 / 5.0 |
| BA | 0.6 | H | % | 0.0 / 0.5 |

| NE# | 9.51 | H | 10^3/μL | 2.00 / 7.50 |
|---|---|---|---|---|
| LY# | 1.85 | | 10^3/μL | 1.50 / 4.00 |
| MO# | 0.75 | | 10^3/μL | 0.20 / 0.80 |
| EO# | 0.14 | | 10^3/μL | 0.04 / 0.40 |
| BA# | 0.07 | | 10^3/μL | 0.02 / 0.10 |

### Flags and Messages

**Interpretive Messages**
Neutrophilia









### Microscopic Examination

| | | | | | | |
|---|---|---|---|---|---|---|
| Neutrophils | _____ | Metamyelocytes | _____ | Anisocytosis | _____ | Retics | _____ |
| Bands | _____ | Myelocytes | _____ | Hypochromia | _____ | Sed. Rate | _____ |
| Lymphocytes | _____ | Promyelocytes | _____ | Polychromasia | _____ | | |
| Monocytes | _____ | Blast | _____ | Poikilocytosis | _____ | | |
| Eosinophils | _____ | Atyp. Lymph | _____ | Microcytosis | _____ | | |
| Basophils | _____ | NRBC s | _____ | Macrocytosis | _____ | | |

Comment : _____

Requested by : _____
Reviewed by : _____

Out of Action Range  XXX      Out of Patient Range  XXX

Printed 03/20/2005 08:10:38 AM

Crenshaw Community Hospital
00141
Atwell y. Smart

Crenshaw Community Hospital
Luverne, AL

Form 640    BRIGGS Des Moines, Iowa 50305    Printed in USA    Approved by the American Hospital Association

DAVIS ROBIN C    41327
031765  SSN 426066838
    B  03/12/65

ElectroTrace 9677

Davis Roba    3/14/05
intra-op

Davis Robin
031765

| Name - Last | First | Middle | Hospital No. |
|---|---|---|---|
| DAVIS | Robin | | 031765 |
| Location of Hospital | Clinic or Service | Attending Physician | |
| | CCH | V. Chance | |

## CLINICAL LABORATORY REPORTS

Crenshaw Community Hospital
00142
Atwell v. Smart



enshaw Community Hospital
l Hospital Circle
erne, AL 36049

# INFORMED CONSENT FOR SURGICAL
## PROCEDURES and/or DIAGNOSTIC TESTS
### Dr. Edgar T. Victoria
Brantley Highway, PO Drawer 510
Luverne, AL 36049

Tel: 335-6666 or
335-6223

Informed Consent For: _Laparotomy_ , _Appendectomy_ , _possible_
_salpingo-oophrectomy_ , _or ovarian cystectomy_
(Medical Terminology)

***DO NOT SIGN THIS FORM UNTIL YOU HAVE READ IT AND FULLY UNDERSTAND ITS CONTENTS.***

Patient Name: _Robin Davis_          Date: _3-19-0__

The following has been explained to me in general terms and I understand that:

1. The diagnosis requiring this procedure is: _Severe abdominal pain_
_strong suspicion for appendicitis_
_? Ruptured or twisted ovarian cyst_
(diagnosis described in layman's terms)

2. The nature of this procedure is: _To make an incision on_
_abdomen, remove the appendix, possibly_
_remove a tube and ovary or a cyst_
_and correct an immediate life threatening_
(procedure described in layman's terms)

3. The purpose of this procedure is: _problem in the abdomen_
_to improve symptoms, remove an_
_inflamed appendix, prevent rupture and_
_severe infections_
(specific for this patient)

4. **MATERIAL RISKS OF THIS PROCEDURE:**

   As a result of this procedure being performed, there may be material risks of: *INFECTION, ALLERGIC REACTION, DISFIGURING SCAR, SEVERE LOSS OF BLOOD, LOSS OR LOSS OF FUNCTION OF ANY LIMB OR ORGAN, PARALYSIS, PARAPLEGIA OR QUADRIPLEGIA, BRAIN DAMAGE, CARDIAC ARREST OR DEATH.*

5. In addition to these material risks, there may be other possible risks involved in this procedure including but not limited to POSSIBLE: blood loss necessitating transfusions which carry the risks of exposure to AIDS, hepatitis or other infectious diseases; formation of blood clots; emboli (clots of blood and other material) that might travel to other parts of the body; need for immediate surgery or other additional surgery; need for hormones or other drug therapy; formation of adhesions and/or scar tissue; hernia at the incision site; fistula (an abnormal opening) formation.

Patient Initial: _RSD_                                    Physician Initial: _____

Crenshaw Community Hospital
00143
Atwell v. Smart                    Page 1 of 4

**OTHER POSSIBLE RISKS:** _Injury to Bladder, Bowel, severe infection and or bleeding_

6. I have been informed of the risks of anesthesia which may include, in addition to the above listed in MATERIAL RISKS: broken teeth, pneumonia, phlebitis (inflammation and infection of the veins), nerve injury, damage to or failure of the heart, liver, and kidneys.

7. The likelihood of success of the above procedure is: ( ✓ ) Good   ( ) Fair   ( ) Poor.

8. Practical alternatives to this procedure include: _None that is appropriate in the treatment of the underlying problem_

9. If the patient chooses not to have the above procedure, the prognosis (predicted future medical condition) is: _Uncertain and may be poor especially if the appendix ruptures, peritonitis and severe infection occur - Also (unreadable)_
(to be filled in during informed consent process)

I understand that the physician, medical personnel and other assistants will rely on statements about the patient, the patient's medical history and other information in determining whether to perform the procedure or the course of treatment for the patient's condition in recommending the above procedure.

I understand that the practice of medicine is not an exact science and that _NO GUARANTEES OR ASSURANCES HAVE BEEN MADE TO ME_ concerning the results of this procedure.

I understand that during the course of the procedure described above, it may be necessary or appropriate to perform additional procedures which are unforeseen or not known to be needed at the time this consent is given. I consent to and authorize the persons described herein to make the decisions concerning such procedures. I also consent to and authorize the performance of such additional procedures as they deem necessary or appropriate.

I also consent to diagnostic studies, tests, x-ray examinations and other treatment or courses of treatment relating to the diagnosis or procedures described herein.

I also consent that any tissues, specimens, organs or limbs removed from my (the patient's) body in the course of any procedure may be tested or retained for scientific or teaching purposes and then disposed of within the discretion of the physician, facility or other health care provider.

I consent to the presence of observers in the operating room for medical, scientific or educational purposes approved the ny (the patient's) physician.

I consent to the taking and publication of any photographs or video tapes taken during my (the patient's) procedure.

Crenshaw Community Hospital
00144
Atwell v. Smart

2 of 4

ANESTHESIA STATEMENT OF REQUEST, AUTHORIZATION AND CONSENT

1. I hereby request, authorize and consent to the administration of anesthesia and the use of such anesthetics and techniques as may be deemed advisable for the surgical procedure to be done.

2. The risks and dangers of the use of anesthesia have been carefully and fully explained to me by: _Robert James Royals_ Date: _3/19/05_ Time: _2253_

3. I understand that there are some serious complications that can result from the use of anesthesia.

4. I acknowledge that no warrantee or guarantee has been made concerning the results that may be obtained from such anesthesia and techniques.

5. I request, authorize and consent to the administration of such anesthesia as may be considered necessary or advisable in the judgement of the anesthesiologist, anesthetist or physician/surgeon.

Patient's Signature: _Robi Oldan_ Date: _3/19/05_ Time: _2255_

Witness: _G Edison R.N._ Date: _3/19/05_ Time: _2255_

• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •

BY SIGNING THIS FORM, I ACKNOWLEDGE THAT I HAVE READ OR HAD THIS FORM READ AND/OR EXPLAINED TO ME. I FURTHER ACKNOWLEDGE THAT I FULLY UNDERSTAND ITS CONTENT, AND THAT I HAVE BEEN GIVEN AMPLE OPPORTUNITY TO ASK QUESTIONS AND THAT ANY QUESTIONS HAVE BEEN ANSWERED SATISFACTORILY. ALL BLANKS OR STATEMENTS REQUIRING COMPLETION WERE FILLED IN AND ALL STATEMENTS I DO NOT APPROVE OF WERE STRICKEN BEFORE I SIGNED THIS FORM

I ALSO HAVE RECEIVED ADDITIONAL INFORMATION INCLUDING BUT NOT LIMITED TO THE MATERIALS LISTED BELOW RELATING TO THE PROCEDURES DESCRIBED HEREIN.

OTHER POSSIBLE RISKS: _See paragraph 3 and 5_

_____

_____

_____

_____

_____

Patient's Initials: _ROO_                    Physician's Initials: _____

I voluntarily consent to allow Doctor _____ or any such physician designated or selected by him/her and all medical personnel under the direct supervision and control of such physician and all other personnel who may otherwise be involved in performing such procedures described or otherwise referred to herein.

_____ M.D.    _____
                                   (person giving consent)

_____ RN/LPPN  _____
                                   (Relationship, if not the patient)

                                   _____
                                   (Patient unable to sign because of)

Crenshaw Community Hospital
00146
Atwell v. Smart

Page 4 of 4

# PATIENT SURGERY ADMISSION

| Patient No. | Surgery Date | O.R. Time | Age | Date of Birth | Sex | Marital Status | Race | Surgeon |
|---|---|---|---|---|---|---|---|---|
| 31766 | 3/19/05 | 2305 | | | F | D | W | V. Oteri |

Admitting Diagnosis: PL Q ABD pain

Proposed Operation: Exploratory Laparotomy

Possible Salphingo-oophorectomy
or Ovarian cystectomy

- Consent form signed / witnessed ☑
- NPO
- Special consent releases signed
- -/dated / witnessed ☑

4. History, physical complete ☐
5. I.D. Band ☑
6. LAB ☐ X-ray ☐ RHO GAM ☐
7. Bobby pins ☐ Contact lens ☐
   Dentures ☐ REM ☐

8. Make-up ☐ False eyelashes ☐
   Nail polish ☐
9. Jewelry, valuables to cashier ☐ family ☐
10. Allergies Aminophylline (Terpezine)

| MEDICATION GIVEN | | | IV Therapy: | Solution R L C 125 cc/hr | Catheter | Guage |
|---|---|---|---|---|---|---|
| Drug & Dose | Time | Method | | | | |
| See Triage | | | IV ☐ In OR ☐ In Unit | | | |

| Urinary Output: | Type | Size | Amount | Color | Character | Inserted by: |
|---|---|---|---|---|---|---|

Mental Status: Calm ☑ Excited ☐ Depressed ☐ Apprehensive ☐ Other:

| Pre-OP Ordered | U/A | HGB 14.9 | HCT 43.6 | EKG | K 3.1 | LUNGS | AGE 31 | B/P 107/65 | TEMP 98.0 | PULSE 96 | RESP 20 | HEIGHT 5'7" | WEIGHT 105 kg |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| OR Room No | Surgeon V. Oteri | Circulating Nurse J. Maruya | Position on Table |
|---|---|---|---|
| Disinfectant Prep | Assistant Ø | Extra Scrub Nurse | ☐ Prone  On wood plate |
| Area to ABD | Scrub Nurse N. Dunn Rev | Culture to lab  Specimens to lab | ☐ Supine to B thigh |
| | | | ☐ Lithotomy |
| Betadine Scrub | Anesthesiologist/CRNA J. Reyals | ☐ Anesthesia Method Agent ☐ LTA | ☐ Lateral |
| Betadine Sol | ☐ General ☐ Caudal | ☐ Muscle Relaxant | ☐ Jackknife |
| Alcohol | ☐ Local infiltrate ☐ Spinal ☐ Epidural | ☐ Block Regional ☐ Narcotic | ☐ Power |
| Zephran Tinct | ☐ Other | | ☐ Sitting |
| Merth | ☐ Intubation ☐ Nitrous ☐ Fluothane | Anesthesia Began 2305 | Anesthesia Ended 0030 | ☐ Headpins |
| None ☐ Dry | ☐ Mask ☐ O2 ☐ Ethrane | | | ☐ Other |
| Other ☐ Wet | ☐ Nasal O2 ☐ Forane | Surgery Began 2335 | Surgery Ended 0030 | SAFETY STRAP ON |
| | Leads by: J. Reyals | | | |
| Seat to: ☐ Stretcher ☐ Bed ☐ W/C | | ☐ Cautery ☐ Ground Coag ☐ Blend ☐ Bipolar | To O.R. by ☐ Amb ☐ W/C |
| TRR ☐ OR ☐ FR | | Used  Plate  Out ☐ Unipolar | ☐ Stretcher |
| Operation Performed: | | ☐ Tourniquet Time up | Location | Prosthesis & Service No's |
| | | Time down ☐ Rt ☐ Lt ☐ Arm ☐ Leg | | |

COUNTS  Sponge ☑Correct ☐ Unresolved ☐ N/A
Sharps ☑Correct ☐ Unresolved ☐ N/A

| POST OP Diagnosis: | TIME | ALDRETE SCORE - MODIFIED | 0-2 | PRE | IMMEDIATE POST PROCEDURE | UPON DISCHARGE |
|---|---|---|---|---|---|---|
| | TEMP | ACTIVITY | | | | |
| | O2 SAT | Able to move on command | 2 | 2 | 2 | 2 |
| | | Impaired movement | 1 | | | |
| | | Not moving | 0 | | | |
| R. Medications given: | BP 200 | RESPIRATION | | | | |
| Drug & Dose | Time | Method | 180 | Able to deep breath freely | 2 | 2 | 2 | SaO2:___% Resp:___ |
| See Anesthesia Records | | 160 | Dyspnea of limited breathing | 1 | | | |
| | 140 | Apneic | 0 | | | |
| | 120 | CONSCIOUSNESS | | | | |
| PAR Time in 0030 | 100 | Fully awake | 2 | 2 | 2 | 2 |
| Time out 0100 | 80 | Arousable on calling | 1 | | | |
| | 60 | Not responding | 0 | | | |
| Oxygen  O2 Route | 40 | CIRCULATION | | | | |
| Time | 20 | BP poles within normal range for pt | 2 | 2 | 2 | 2 Pulse:___ B/P:___ |
| Airway | | Impaired circulation | 1 | | | |
| PO/ORAL | | Unstable | 0 | | | |
| | | NAUSEA AND/OR VOMITING | | | | |
| | | Minimal | 2 | 2 | 1 | |
| | | Moderate, having required treatment | 1 | | | |
| | | Severe, receiving treatment | 0 | | | |
| | | TOTALS | | 10 | 9 | 10 |

| PAR Medications given: | | | | Packing — | Drains | Catheters |
|---|---|---|---|---|---|---|
| Drug & Dose | Time | Method | Initial | Dressing: 4×4 | | Type/Size: 16 F Foley |
| Demerol 50mg | 0030 | IVP | | Location: to ABD inc | | Location: to bladder |
| Ativan 4mg | 0030 | IVP | | | | Type IV: RL |

| FLUIDS INTAKE | | | FLUIDS OUTPUT — | |
|---|---|---|---|---|
| IR: 1000 | Total: 1050 | | Preop: 25 | PAR: 25 |
| PAR: 50 | | | OR: 400 | Total: 425 |

Nurse's Notes: 2330 Pt to OR via Stretcher. Resp ease. Wincing(?) nasal. No concerns voiced — J. Maruya
0030: Pt to PP via Stretcher. Resp ease. IV infusing 8 RL. Dressing to ABD D.I. Foley Cath with clear
excreted. Pt to resure Demerol 50mg IVP given. VSS No distress noted. — J. Maruya

Crenshaw Community Hospital
00147

Nurse's Signature: Frances M. Reyals, CRNA

## SURGERY CHECK LIST

## SPONGE COUNT

X-rays (4x4) _____ CK3

4x18 E-tapes _____ CK3

18" X 18" laps _____ CK3

Peanuts _____ Ø

Tonsil _____ Ø

3 count taken ( )

Sharps _____ CK3

3 count taken ( )

| Addressograph plate ▲ | Floor | O.R. |
|---|---|---|
| I.D. Band on | ✓ | |
| Surgical Permit Signed | ✓ | |
| History & Physical | | |
| Allergies  *Pancreatin flex. Compazine* | | |
| Pre-op Enema (if ordered) | | |
| NPO after midnight | ✓ | |
| Blood Work Done | | |
| Urinalysis | | |
| Lab work ordered, but results not yet known | | |
| BP and TPR taken | ✓ | |
| Voided or catheter | ✓ | |
| Consultation | | |
| Jewelry removed and secured | | |
| Hairpins, make up and nail polish removed | | |
| Contact lenses and glasses removed | | |
| Dentures removed | | |
| Head cap and gown | ✓ | |
| Name Plate | ✓ | |
| Procedure scheduled | ✓ | |
| | | |
| | | |
| Premedication of: - | | |
| | | |
| Time given: | | |
| Date:    Floor Nurse: | | |
| Surgery Nurse:  *Mary* | | |

## DRAINS

Type: _____
Site: _____
By: _____
Gauze in [ ]
Pin secure [ ]
Sutured [ ]

Type: _____
Site: _____
By: _____
Gauze in [ ]
Pin secure [ ]
Sutured [ ]

Type: _____
Site: _____
By: _____
Gauze in [ ]
Pin secure [ ]
Sutured [ ]

## RECOVERY ROOM NOTES

0050 - Resp ease. sleeping c̄ diff. No c/o pain. Pt c/o nausea Zofran 8mg IV given - Mary

100 - sleeping c̄ diff. ABD dressing. Pt. no c/o pain / discomfort. Foley cath intact & patent. VSS. Pt back to Room 132 via stretcher — Mary

Crenshaw Community Hospital
00148
Atwell v. Smart



# PREOPERATIVE EVALUATION

Crenshaw Community Hospital
00150

NAME PLATE

Systems Review: Review each system, use the corresponding number to expand, explain or alert.
(List drugs and allergies on front of chart.)

Signature(s) of Interviewer(s) James Rayfield, CRNA

DATE: 3-19-05 TIME: 2300

DIAGNOSIS:

| | yes | no | | yes | no | | yes |
|---|---|---|---|---|---|---|---|
| 1 NEUROLOGICAL seizures or loss of consciousness | | ✓ | 13 CARDIOVASCULAR history of myocardial infarction | | ✓ | 25 ORTHOPEDIC restricted range of motion | |
| 2 cerebral vascular accident trans ischemic attack | | ✓ | 14 history of heart disease ⊕ MVP | ✓ | | 26 arthritis/bursitis | |
| 3 numbness/tingling of extremities | | ✓ | 15 hypertension (meds: yes no) | | ✓ | 27 joint prosthesis | |
| 4 mental status AAO x3 | ✓ | | 16 peripheral vascular disease | | ✓ | 28 | |
| 5 | | | 17 cardiovascular surgery | | ✓ | 29 RENAL—G.U. | |
| 6 EENT contact lenses glasses | ✓ | | 18 irregular pulse | | ✓ | 30 | |
| 7 dental prosthesis: loose teeth | | ✓ | 19 | | | 31 ENDOCRINE (etc) thyroid (surgery) (meds) | |
| 8 restricted R O M (jaw) (neck) | | ✓ | 20 GASTROINTESTINAL hepatic jaundice(hx) | | ✓ | 32 diabetes mellitus Diet controlled | |
| 9 PULMONARY asthma (active) (past/history) | | ✓ | 21 hiatal hernia (regurg) (esoph's) | | ✓ | 33 | |
| 10 bronchitis emphysema | | ✓ | 22 intestinal obstruction | | ✓ | 34 ANESTHESIA HISTORY patient None | ✓ |
| 11 shortness of breath | | ✓ | 23 ulcers—colitis | | ✓ | 35 family | |
| 12 smoking history ⊕ ī ppd/pancakes | ✓ | | 24 ⊕ Abd. pain | ✓ | | 36 SURGICAL HISTORY see below | ✓ |

#36 - TJA Age 3
Laparoscopy x2
Cholecystectomy
C/S BTL
Ovarian cystectomy
GEN
None

ANESTHESIA PLAN: GEN Anesthesia plan discussed with: patient

## POST ANESTHESIA VISIT

| Date | Time | |
|---|---|---|
| [illegible] | 1330 | POD #1 - S/p Exp. lap ē Appy. via GETA - VSS - None — James Rayfield, CRNA |
| [illegible] | 0800 | NO APPARENT ANESTHESIA COMPLICATIONS: [signature] |

DAVIS ROBIN O  41327
031766  SSN 2SCO6CA28
DOB
DR. VICTORIA/TOMPKINS  132
F  03/19/65

Addressograph

Crenshaw Community Hospital
Luverne, AL

# PROGRESS NOTES

| Date | Notes Should Be Signed by the Physician |
|------|------------------------------------------|
| 3/20/0 | Doing remarkably well — little/no pain |
|  | VSS |
|  | Resume & MTP Bewy Dr |
|  | DC |

Crenshaw Community Hospital
00151
Atwell v. Smart

# CRENSHAW COMMUNITY HOSPITAL
## PHYSICIAN'S ORDERS

| Drug Sensitivities & Allergies | ☐ NKDA | | | | |
|---|---|---|---|---|---|
| Drug | | Anaphylaxis | N/V | Rash | Other (specify) |
| 1. | | | | | |
| 2. | | | | | |
| 3. | | | | | |
| 4. | | | | | |
| 5. | | | | | |
| 6. | | | | | |

NAME *Davis, Roslyn*
ROOM NO.
(ADDRESS)
HOSP. NO.
PHYSICIAN *C. Tompkins – E. Vickn*

| Date & Time | Another brand or drug identical in form and content may be dispensed unless checked ☐ | USE BALL POINT PEN ONLY | Nurse's Initials |
|---|---|---|---|

3-14-0X · NPO

'040 • Informed consent (Laparotomy, appendect
possible salphingo-oophorectomy or
ovarian cystectomy

• IV 1000 ml Lactated Ringers at 125 ml/hr

• Pre-op visit by CRNA

DO NOT USE THIS SHEET
UNLESS A RED NUMBER SHOWS



# CRENSHAW COMMUNITY HOSPITAL
## PHYSICIAN'S ORDERS

| Drug Sensitivities & Allergies | ☐ NKDA | | | | |
|---|---|---|---|---|---|
| Drug | Anaphylaxis | N/V | Rash | Other (specify) | |
| 1. | | | | | |
| 2. Compazine | | | | | |
| 3. | | | | | |
| 4. Aminophyllin | | | | | |
| 5. | | | | | |
| 6. | | | | | |

NAME
ROOM NO.
(ADDRESS)
HOSP. NO.
PHYSICIAN

| Date & Time | Another brand or drug identical in form and content may be dispensed unless checked ☐ | USE BALL POINT PEN ONLY | Nurse's Initials |
|---|---|---|---|

3/9/05 = Post-Op Orders
0025 = liquids to regular diet in the AM ✓
2. Routine UA
- Hourly urine output first — D/c Foley
  in 6-8 hours if void and if not remains in
- Admit to Dr. C. Templin service
- Please inform Dr. Templin of
  admission in the AM
2. CBC in the AM
= Renu present IVF at 125 ml/hour
= D/c IVF if tolerating liquids well
= Demerol 50 mg IM q4h
  prn pain
= May have Lortab 7.5 mg 1 tab
  prn pain if preferred
Zofran 4 mg IV q3h prn nausea

Grantler RN  0220
24° chart check Grantler RN  0220

DO NOT USE THIS SHEET
UNLESS A RED NUMBER SHOWS →

**PHYSICIAN'S ORDERS**
Crenshaw Community Hospital
00153
Atwell v. Smart

# CRENSHAW COMMUNITY HOSPITAL
## PHYSICIAN'S ORDERS

| Drug Sensitivities & Allergies | ☐ NKDA | | | | |
|---|---|---|---|---|---|
| Drug | Anaphylaxis | N/V | Rash | Other (specify) | |
| 1. | | | | | |
| 2. Compazine | | | | | |
| 3. | | | | | |
| 4. Aminophyllin | | | | | |
| 5. | | | | | |
| 6. | | | | | |

NAME
ROOM NO.
(ADDRESS)
DAVIS
HOSP. NO.
PHYSICIAN

| Date & Time | Another brand or drug identical in form and content may be dispensed unless checked ☐ | USE BALL POINT PEN ONLY | Nurse's Initials |
|---|---|---|---|
| 3/20/05 @ 1035 | Rocephine 1 gram IV daily p.o. Dr. Victoria   M. Smith, LPN | | |
| | M. Smith, LPN 03/20/05 @ 1050 | | |
| 3/20 1. D/C | 2. Rx's Levaquin 500m PO & Vicodin PO & Diflucan 3. Usual post op io's         + use SS Tylenol/Motrin for pain 5. Rx c Dr Victoria c Funk for stye please | | |
| | change & obsv status | | |
| | M. Smith, LPN 03/20/05 @ 1740 | | |

**DO NOT USE THIS SHEET UNLESS A RED NUMBER SHOWS**

PHYSICIAN'S ORDERS

Crenshaw Community Hospital
00154
Atwell v. Smart





**TEMP/PULSE/RESPIRATION GRAPHIC CHART**

Name: _____ Room # _____ Bed# _____

Hospital # _____ Physician: _____

| Date | 3-20-05 | | 3-20 | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Day in Hosp | admit 0115 | | | | | | | | | | | | | | | | | | | | | | | | | |
| Day P.O. or P.P. | Am | | Pm | | | | | | | | | | | | | | | | | | | | | | | |
| HOUR | 2 4 6 8 10 12 | | 2 4 6 8 10 12 | | | 2 4 6 8 10 12 | | | 2 4 6 8 10 12 | | | 2 4 6 8 10 12 | | | 2 4 6 8 10 12 | | |

TEMPERATURE: 106 105 104 103 102 101 100 99 98.6 98 97 96

PULSE: 150 140 130 120 110 100 90 80 70 60

RESPIRATION: 50 40 30 20 10

| SEP | 111 | 116 | | 109 | | | | | | | | | | | | | | | | | | | | | |
| DEP | 41 | 53 | | 46 | | | | | | | | | | | | | | | | | | | | | |
| URINE OUTPUT | | | | | | | | | | | | | | | | | | | | | | | | | | |

Crenshaw Community Hospital
00155
Atwell v. Smart

 **Baptist** HEALTH

# INTAKE OUTPUT FLOWSHEET

Date: 3-20-05     Date: _____     Date: _____

| INTAKE | 7p - 7a | 7a - 7p | 7p - 7a | 7a - 7p | 7p - 7a | 7a - 7p |
|---|---|---|---|---|---|---|
| ORAL | 237 | | | | | |
| NG TUBE | | | | | | |
| | | | | | | |
| PARENTERAL | 1000 | | | | | |
| | | | | | | |
| | | | | | | |
| TOTAL | | | | | | |
| **OUTPUT** | **7p - 7a** | **7a - 7p** | **7p - 7a** | **7a - 7p** | **7p - 7a** | **7a - 7p** |
| ASPIRATION | | | | | | |
| DRAINAGE | | | | | | |
| EMESIS | | | | | | |
| NG DRAIN | | | | | | |
| | | | | | | |
| URINE | 330 | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| TOTAL | | | | | | |
| 24 hr INTAKE | | CC | 24 hr IN | CC | 24 hr IN | CC |
| 24 hr OUTPUT | | CC | 24 hr OUT | CC | 24 hr OUT | CC |
| WEIGHT | | | | | | |

Crenshaw Community Hospital
00156
Atwell v. Smart

Crenshaw Community Hospital
101 Hospital Circle
Luverne, AL 36049

DAVIS ROBERT O  41317
031766  SSN 4&COEDREP
DOB          F  03/19/05
Dr. VICTORIA TOMPKINS  132
ADDRESSOGRAPH

**GRAPH CHART**

| DATE | 3-20-05 | | | | | | | | | | | | | | | | | |
|------|------|------|------|------|------|------|------|------|------|---|---|---|---|---|---|---|---|---|
| **TIME** | | 0115 | 0130 | 0145 | 0200 | 0300 | 0400 | 0500 | 0600 | 0700 | | | | | | | | |
| 300 | 0115 | 114/47 | 116/63 | 117/67 | 123/73 | 114/66 | 107/61 | 113/68 | 104/52 | | | | | | | | | |
| 290 | 0130 | | | | | | | | | | | | | | | | | |
| 280 | 0145 | | | | | | | | | | | | | | | | | |
| 270 | 0200 | | | | | | | | | | | | | | | | | |
| 260 | 0300 | | | | | | | | | | | | | | | | | |
| 250 | 0400 | | | | | | | | | | | | | | | | | |
| 240 | 0500 | | | | | | | | | | | | | | | | | |
| 230 | 0600 | | | | | | | | | | | | | | | | | |
| 220 | 0700 | | | | | | | | | | | | | | | | | |
| 210 | 0800 | | | | | | | | | | | | | | | | | |
| 200 | | | | | | | | | | | | | | | | | | |
| 190 | | | | | | | | | | | | | | | | | | |
| 180 | | | | | | | | | | | | | | | | | | |
| 170 | | | | | | | | | | | | | | | | | | |
| 160 | | | | | | | | | | | | | | | | | | |
| 150 | | | | | | | | | | | | | | | | | | |
| 140 | | | | | | | | | | | | | | | | | | |
| 130 | | | | | | | | | | | | | | | | | | |
| 120 | | | | | | | | | | | | | | | | | | |
| 110 | | | | | | | | | | | | | | | | | | |
| 100 | | | | | | | | | | | | | | | | | | |
| 90 | | | | | | | | | | | | | | | | | | |
| 80 | | | | | | | | | | | | | | | | | | |
| 70 | | | | | | | | | | | | | | | | | | |
| 60 | | | | | | | | | | | | | | | | | | |
| 50 | | | | | | | | | | | | | | | | | | |
| 40 | | | | | | | | | | | | | | | | | | |
| 30 | | | | | | | | | | | | | | | | | | |
| 20 | | | | | | | | | | | | | | | | | | |
| 10 | | | | | | | | | | | | | | | | | | |
| 0 | | | | | | | | | | | | | | | | | | |
| **Temperature** | | 95.6 | 97.4 | 96.3 | 96.8 | 96.8 | 97.2 | 97.1 | 95.2 | | | | | | | | | |
| **Pulse** | | 101 | 91 | 83 | 79 | 90 | 76 | 74 | 76 | | | | | | | | | |
| **Respiration** | | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | | | | | | | | | |
| **Oxygen Saturation** | | | | | | | | | | | | | | | | | | |
| **Urine Output** | | | | | 50 | 30 | 100 | 50 | 100 | | | | | | | | | |

Crenshaw Community Hospital
00157
Atwell v. Smart

DAVIS ROOM 2 41327
031766  SSN 420000020
DOE           F  03/19/05
DR VICTORIA TOMPKINS  132

Crenshaw Community Hospital
Luverne, AL

# PATIENT ASSESSMENT

2. Addressograph

1. Date: 3-20-05

| INITIAL ASSESSMENT | 7P - 7A | 7A - 7P |
|---|---|---|
| **3. NUTRITION/METABOLIC PATTERN** | SKIN: NP Other: incision lower abd | SKIN: NP Other: abd dressing dry & intact |
| **4. RESPIRATORY/ CIRCULATION PATTERN** | Breath Sound: ☑Normal ☐Abnormal<br>Cough: ☐Yes ☐No<br>☐Productive ☐Non-productive<br>Pulse: ☐Regular ☐Irregular<br>Calf Tenderness        + ☺<br>Peripheral Pulses      + ☺<br>Edema                  + ☺ | Breath Sound: ☑Normal ☐Abnormal<br>Cough: ☐Yes ☐No<br>☐Productive ☐Non-productive<br>☐Regular ☐Irregular<br>Pulse:<br>Calf Tenderness        + ☺<br>Peripheral Pulses      + ☺<br>Edema                  + ☺ |
| **5. ELIMINATION PATTERN** | Nausea: ☐Vomiting ☑NP<br>Abdomen: ☐Distended ☑Non-distended<br>Bowel Sounds: + | Nausea: ☐Vomiting ☑NP<br>Abdomen: ☐Distended ☑Non-distended<br>Bowel Sounds: ☑ + |
| **6. ACTIVITY/EXERCISE PATTERN** | ROM: ☑Full ☐Impaired | ROM: ☑Full ☐Impaired |
| **7. COGNITIVE/PERCEPTUAL PATTERN** | LOC: ☑Person ☐Place ☐Time<br>Follows Command        ☺<br>Thought Process: ☑Logical ☐Illogical<br>Mood: ☐Sad ☐Angry ☑Calm ☐Withdrawn<br>Other:<br>Discomfort             ☺<br>Type: incisional area on lower abd<br>Location: | LOC: ☑Person ☐Place ☐Time<br>Follows Command        ☑<br>Thought Process: ☑Logical ☐Illogical<br>Mood: ☐Sad ☐Angry ☑Calm ☐Withdrawn<br>Other:<br>Discomfort  ☺<br>Type: c/o pain<br>Location: lower abd |

| ONGOING ASSESSMENT | 7P - 7A | 7A - 7P |
|---|---|---|
| **8. HEALTH PERCEPTION/ HEALTH MANAGEMENT PATTERN** | Safety: Siderails x 2<br>Restraints equipment<br>Special Precautions: | Safety: Siderails x 2 x 2<br>Restraints equipment<br>Special Precautions: bed ↓ & locked |
| **9. NUTRITION/METABOLIC PATTERN** | Diet: reg as tolerated<br>Other: _____ % feed pump | Diet: Regular<br>Other: _____ % feed pump |
| **10. ELIMINATION PATTERN** | Void: x ____ Incontinent foley<br>☐Constipated ☐Diarrhea<br>Incontinent stool: x<br>Devices ____ Care | Void: x BRP Incontinent<br>☐Constipated ☐Diarrhea<br>Incontinent stool: x<br>Devices ____ Care |
| **11. ACTIVITY/EXERCISE PATTERN** | Hygiene: ☐Shower ☐Self ☐Assisted ☐Complete<br>Ambulate x self      Chair x<br>Bedrest positioned x self<br>TCBD x ____ Oral Care x | Hygiene: ☐Shower ☑Self ☐Assisted ☐Complete<br>Ambulate x 3      Chair x 3<br>Bedrest positioned x 3<br>TCBD x 3 ____ Oral Care x 3 |
| **12. SLEEP/REST PATTERN** | ☐Restless ☑Sleeping ☐NA<br>☐Other: | ☐Restless ☐Sleeping ☐NA<br>☑Other: Awake |
| **13. COGNITIVE/PERCEPTIVE** | Patient Teaching<br>Knowledge Def: +<br>Instruction Given: +<br>Type: | Patient Teaching medical procedures<br>Knowledge Def: ☺<br>Instruction Given: ☑<br>Type: verbal |

**CODES:** LOC = Level of Consciousness,  ROM = Range of Motion, NA = Not Applicable,  NP = No Problems
+ = Positive,  - = Negative,  x = Times

**NOTE:** (*) ON THIS SHEET INDICATES FURTHER NOTES ON THE NURSING PROGRESS NOTES.                (Over)

Crenshaw Community Hospital
00158
Atwell v. Smart

| INITIAL ASSESSMENT | 7P - 7A continued | 7A - 7P continued |
|---|---|---|
| 13. b | Discomfort ① Type: _visuous pain_ Location: _lower abd_ Relieved: Method: | Discomfort ② Type: _Jb pain_ Location: _lower abd_ Relieved: ⊕ Method: Demerol 35mg IV per RN @ 08 |
| 14. ROLE/RELATIONSHIP | Visitors: ☐Yes  ☐No Communication Pattern: ☐Effective ☐Ineffective | Visitors: ☐Yes  ☐No Communication Pattern: ☐Effective ☐Ineffective |
| **PROCEDURE/TREATMENT** | **7P - 7A** | **7A - 7P** |
| 15. TELEMETRY | NA | |
| 16. WOUND ASSESSMENT | Color: ☐Red  ☐Pink Other: Drainage: ☐Yes  ☐No Drainage Color: ☐Serous  ☐Dark Red ☐Bright Red ☐Purulent ☐None ☐Other: | Color: ☐Red  ☐Pink Other: Drainage: ☐Yes  ☐No Drainage Color: ☐Serous  ☐Dark Red ☐Bright Red ☐Purulent ☐None ☐Other: _Abd dsg dry & intact_ |
| 17. TUBES | Type: _____ Drainage: ☐Yes  ☐No Apprearance: Irrigation: Type: Appearance: NA Irrigation: | Type: _____ Drainage: ☐Yes  ☐No Apprearance: Irrigation: Type: Appearance: Irrigation: |
| 18. SPECIMENS | Urine: ☐Routine ☐C&S ☐24hr Stool: ☐O&P ☐C&S ☐OB      NA Sputum: ☐C&S ☐GmStain ☐AFB ☐Cytology ☐1,2,3 Other: | Urine: ☐Routine ☐C&S ☐24hr Stool: ☐O&P ☐C&S ☐OB Sputum: ☐C&S ☐GmStain ☐AFB ☐Cytology ☐1,2,3 Other: |
| 19. EQUIPMENT | ☐K-Pad      ☐Walker      ☐Cane ☐Other: _IV pump_ Suction: ☐Gomco    ☐Portable ☐Emberson ☐Intermittent Traction: Oxygen @ | ☐K-Pad      ☐Walker      ☐Cane ☐Other: Suction: ☐Gomco    ☐Portable ☐Emberson ☐Intermittent Traction: Oxygen @ |
| 20. SPECIAL PROCEDURE | NA | IV ~ Hep lock |
| 21. PATIENT'S CONDITION | | Stable |
| 22. PHYSICIAN VISIT | | |
| 23. SIGNATURE/TITLE | _J. Butler RN_ | _Michelle Smith, LPN_ |

Crenshaw Community Hospital
00159
Atwell v. Smart

DAVIS ROBIN D  41327
021766  SSN 4ECOEC828
DOB          F  C3/19/C5
DR VICTCRIA/TCMPKINS  132

Crenshaw Community Hospital
Luverne, AL

**SUPPLEMENTAL NURSES' NOTES**

| DATE | TIME | TREATMENT PROBLEM, NEED | NARRATIVE |
|------|------|------|-----------|
| 3-20-05 | 0115 | | Pt to room 132 from Surgery - appendectomy. Pt brought via stretcher. LR @ 125 in @arm infusing. Ø sts injection or infiltrations. Foley cath. patent urine amber and clear. Dsg. on lower abd. dry & intact. No further needs noted. J.Butler RN |
| | 0130 | | Pt in bed. Side rails ↑ x 2. Friend @ bedside. Ø c/o void @ this time. J.Butler RN |
| | 0145 | | Pt in bed. C/o pain. Informed that next dose of med not due for another 3 hours. Pt verbalized understanding and said she'd try to handle the pain. J.Butler RN |
| | 0200 | | Pt in bed. VS taken. Ø needs voiced. Foley emptied. 50ml amber urine. J.Butler RN |
| | 0300 | | Pt in bed resting c̄ eyes closed. 30 ml amber clear urine emptied from foley cath. Ø needs voiced @ this time. J.Butler RN |
| | 0400 | | Pt c/o pain. Demerol 50 mg IV given by M. McLendon RN. 100 ml amber clear urine emptied from foley cath. Instructed that foley could possibly be removed by 0700 am. Pt stated that the earliest it could be taken out please do. J.Butler RN |
| | 0420 | | Pt requests gatoraide. Pt drinking c̄ difficulty. Ø c/o nausea. J.Butler RN |
| | 0635 | | Pt in bed. IV flds complete. HL. Discontinued Foley cath. 16F cath. Bulb deflated c̄ 10ml water, removed. 100 ml amber clear urine emptied from cath bag. Pt tolerated s̄ c/o. Pt ↑ walking in room. Pt states ready for breakfast. Reg tray brought in room. Ø c/o pain or nausea @ this time. J.Butler RN |
| 03/40/05 | 0800 | | Lying in bed watching TV. Ambulatory in room & hallway PRN. Alert & oriented x 3. Resp @ ease. Lungs clear bilaterally. IV ~ Heplock intact (L) inner arm. Site clear. Flushing well. Abd soft. BS ⦵ x 4. Abd dsg dry & intact. 600 cc yellow urine voided & emptied. Instructed on incentive spirometer. Demonstrated correct use. Friend @ bedside. No distress noted. Will continue to monitor. — M. Smith, LPN |

Signature: J.Butler RN

Signature: Michelle Smith LPN

Signature: _____

Signature: _____

Signature: _____

Signature: _____

00160
Atwell v. Smart

DAVIS RON...S  41327
...  ...  ...
008
...VICTORIA...PKINS  132



**Crenshaw Community Hospital**
Luverne, AL

## SUPPLEMENTAL NURSES' NOTES

| DATE | TIME | TREATMENT PROBLEM, NEED | NARRATIVE |
|------|------|------------------------|-----------|
| 03/20/03 | 0850 | | C/o abd pain. Only. Wanted 1/2 strength of pain med. Medicated c̄ Demerol 25mg IV (instead of 50mg) per C. Dillon, RN. — M. Smith, LPN |
| | 1000 | | States pain relieved. Friend @ bedside. Will continue to monitor. — M. Smith, LPN |
| | 1025 | | Received call from Dr. Victoria. New orders received. Rocephine 1gm IV daily. — M. Smith, LPN |
| | 1300 | | Ambulatory in hallway & outside. No problems noted. No needs voiced. — M. Smith, LPN |
| | 1400 | | Requesting 1/2 of pain med for abd pain. Medicated @ this time per C. Dillon, RN. Demerol 25mg IV — M. Smith, LPN |
| | 1600 | | No changes noted. Waiting on MD to make rounds. States "I want to go home." — M. Smith, LPN |
| | 1700 | | MD made rounds. D/C orders received. — M. Smith, LPN |
| | 1715 | | Heplock D/C'd. Tolerated well. Cannula intact. |
| | 1750 | | D/C instructions reviewed. Understanding verbalized. Rx's & copy of D/C instructions given. D/C home ambulatory to PMV. Friend present. Condition stable — M. Smith, LPN |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Signature: _Michelle Smith, LPN_

Signature: _____

Signature: _____

Signature: _____

Signature: _____

Signature: _____

Signature: _____

Signature: _____

Crenshaw Community Hospital
00161
Atwell v. Smart

# MEDICATION ADMINISTRATION RECORD

| PATIENT | | | | | |
|---|---|---|---|---|---|
| ROOM | PHYSICIAN | | | | |
| ALLERGIES | | DIET | | | NUMBER OF FORMS IN USE |
| DIAGNOSIS | | | AGE | WEIGHT | SEX |

| ORDER DATE | DC DATE | MEDICATION - DOSE - ROUTE - FREQUENCY | MEDICATION SCHEDULE | S H I F T | DATE 3/20/05 Time/Int. | DATE 3/21/05 Time/Int. | DATE 3/22/05 Time/Int. | DATE 3/23/05 Time/Int. |
|---|---|---|---|---|---|---|---|---|
| -20-05 | | HL Flush td | 0800 1400 2000 | 11-7 7-3 3-11 | MS 0840 | | | |
| 20-05 | | Demerol 50mg IV q4h prn pain | PRN | 11-7 7-3 3-11 | 0440 1820-CD | | | |
| 20-05 | | Lortab 7.5 mg p.o. q 3 h prn pain | PRN | 11-7 7-3 3-11 | | | | |
| 20-05 | | Zofran 4 mg IV q 3 h prn nausea | PRN | 11-7 7-3 3-11 | | | | |
| | | | | 11-7 7-3 3-11 | | | | |
| 3/20 | | Rocephine 1gram IV daily | 1200 | 11-7 7-3 3-11 | MS 1130 | | | |
| | | | | 11-7 7-3 3-11 | | | | |
| | | | | 11-7 7-3 3-11 | | | | |
| | | | | 11-7 7-3 3-11 | | | | |
| | | | | 11-7 7-3 3-11 | | | | |
| | | | | 11-7 7-3 3-11 | | | | |
| | | | | 11-7 7-3 3-11 | | | | |
| | | | | 11-7 7-3 3-11 | | | | |

PECIAL NOTES:

SITE CODES
OD-Right Eye
OS - Left Eye
OU - Both Eyes
AD - Right Ear
AS - Left Ear
ABD - Abdomen
FOR THE FOLLOWING SITES INDICATE:
L - LEFT    R - RIGHT
G-Gluteus (Buttocks)
LT - Lateral Thigh
AT - Anterior Thigh
D - Deltoid
F - Forearm

| INT. | NURSE SIGNATURE | INT. | NURSE SIGNATURE |
|---|---|---|---|
| | Crowther RN | MS | M. Smith, LPN |
| | M. McFarland RN | | |

Crenshaw Community Hospital
00162


Crenshaw Community Hospital
101 Hospital Circle
Luverne, AL 36049


Hospital



# EMERGENCY DEPARTMENT LEVEL OF CARE

| | CRITICAL CARE:  See ** below |
|---|---|
| CC | CPR |
| CC | Stroke / Cerebral Hemorrhage - all types |
| CC | Trauma, Trauma Alert / Multiple Trauma |
| CC | Shock of all types - Septic, Cardiogenic, Spinal, Hypovolemic, Anaphylactic |
| CC | Other - See *** below |
| | See also Procedures Listing |
| | |
| 16 | PROTOCOLS: Asthma, Chest pain, (Psych) |
| | |
| | ADMISSIONS / TRANSPORT |
| 0 | Triage |
| 0 | Simple recheck |
| 1 | Ambulatory visit / Complex recheck |
| 10 | DOA, Death (no code) |
| 5 | Hospital Admission |
| 3 | Transfer in ED by ambulance |
| 1 | Transfer out of ED by ambulance |
| 3 | Transport with nurse to other facility |
| | ASSISTING MONITORING |
| 15 | Conscious Sedation (include Routine Monitoring) |
| 5 | Monitoring (Mult V/S, neuro check, cardiac) |
| 2 | Nasal packing |
| | |
| 2 | Respiratory Therapy Tx (O₂, updraft, etc.) |
| 2 | Simple assist (steri strip, eye exam) |
| 10 | Ventilator / CPAP mask |
| | WOUND CARE |
| 5 | Complex wound cleansing |
| 2 | Dressing (small/ moderate |
| 3 | Dressing (large / complex / simple burn |
| 2 | Suture removal |
| 2 | Wound cleaning / eye treatment / eye patch |
| | SPECIAL NEEDS |
| 2 | Bath |
| 1 | Bedpan / Urinal  (ea placement thereon) |
| 1 | Bed linen changed |
| 3 | Comatose, disoriented |
| 5 | Combative, confused, incontinent, psychiatric |
| 2 | Pediatric patient |
| 1 | Isolation |

| | PROCEDURES | CHARGE CODE |
|---|---|---|
| CC | Cardioversion | 2038 |
| CC | Chest tube insertion | 2039 |
| CC | Emergency Delivery | 2040 |
| CC | Intraosseous Infusion | 2031 |
| CC | Intubation | 2032 |
| CC | Pacemaker assist | 2021 |
| CC | TPA administration | 2029 |
| CC | Tracheostomy assist / replace | 2026 |
| 10 | Blood administration | 1201 |
| 10 | Bronchoscopy | 2000 |
| 5 | Casting | 2033 |
| 10 | Central line / cutdown insertion | 2003 |
| 10 | Debridement of burns, complex | 2034 |
| 5 | Debridement of burns, simple | 2028 |
| 2 | Foreign body removal, ear | 2008 |
| 5 | Foreign body removal, other | 2035 |
| 10 | Gastric lavage | 2010 |
| 5 | Gastrostomy tube change | 2009 |
| 3 | I & D abcess | 2036 |
| 2 | Infusion therapy (IV fluids) | 1202 |
| 3 | Injection (therapeutic) IM / SC | 1203 |
| 3 | Injection (therapeutic) IV | 1204 |
| 3 | Injection (antibiotic) IM | 1205 |
| 5 | Injection for nerve block | 2012 |
| 10 | K wire / Steinman pin | 2037 |
| 5 | Laceration / wound repair, simple | 2016 |
| 10 | Laceration / wound repair, intermediate | 2017 |
| 15 | Laceration / wound repair, complex | 2018 |
| 10 | Lumbar puncture | 2019 |
| 5 | Nasal hemorrhage control | 2020 |
| 5 | Peritoneal tap assist | 2022 |
| 10 | Pre-op preparation | N/A |
| 10 | Reduction of Fx / dislocation | 2023 |
| 5 | Removal of impacted ear wax | 2024 |
| 10 | Splint (leg, arm, shoulder, etc.) | 2025 |
| 2 | Therapeutic phlebotomy | 2030 |
| 15 | Thoracentesis / Paracentesis | 2027 |

**\*\*If a diagnostic, surgical or therapeutic procedure was done, you must use ER level or Critical Care level with procedure charge.**

Crenshaw Community Hospital
00163
Atwell v. Smart

# EMERGENCY DEPARTMENT LEVEL OF CARE  (continued)

| | EDUCATION / DISCHARGE INSTR. |
|---|---|
| 2 | AMA |
| 2 | Crutch training by the ER staff |
| | Discharge Instructions-simple |
| 2 | Discharge Instructions-complex |
| 2 | Social Services consult |
| | MEDS / IVs |
| 5 | Infuseport access |
| 3 | IV - simple (INT, KVO) |
| 5 | IV w/pump, drip, rapid > 2 hours |
| 1 | MED-PO, supp, topical |
| 5 | Multiple lines, complex IV's |
| 3 | Rabies vaccine |
| | OB/GYN: |
| 2 | Fetal heart tones |
| 2 | Newborn care |
| 3 | Pelvic exam - simple |
| 5 | Pelvic exam - complex, hemorrhage, difficult |
| 10 | Rape exam |
| | TREATMENT |
| 3 | Ace wrap, collar, sling, immobilizer |
| 15 | Decontamination - Hazardous Materials |
| 2 | Enema administration |
| 5 | Impaction removal |
| 2 | Suction / Irrigation |
| 2 | Traction assist |
| 3 | Urinary Cath / NG insertion |
| | TESTS: |
| 2 | Arterial blood gases (ABG) |
| 2 | C-arm |
| 2 | EKG  12 lead |
| 1 | Glucose via device (routine) |
| 1 | Hemocult |
| 1 | Lab |
| 1 | Specimen collect (urine, sputum, etc) |
| 1 | Visual acuity |
| 2 | X-ray, (simple) per trip |
| 3 | X-ray (complex - CT/MRI/US/IVP) per trip including pat monitoring |

** Any time a Critical Care item is marked, you do not have to mark anything more on the left side, simply mark any procedure that was performed, and indicate "CC" in the box below.

Total points determines level of service:

0 ER Level 1
1 - 5 ER Level 2
6 - 10 ER Level 3
11 - 15 ER Level 4
16 and up ER Level 5

**23**

TOTAL POINTS
or CC for Critical Care

*** For Critical Care - Other:  See below for examples, refer to Policy for Definition.

**POTENTIAL SYMPTOMS:**

New onset paralysis

Head injury with loss of consciousness

Acute myocardial infarction

Drug overdoses impairing vital functions

Coma of all etiologies (except hypoglycemic)

**ACUTE FAILURE -**

Renal, hepatic, respiratory, pulmonary edema, major pulmonary embolis

Emboli of fat or amniotic fluid

Non-hemorrhagic Strokes with vital function impairment

**ANEURYSMS, THORACIC OR ABDOMINAL**

Leaking or ruptured -

| | |
|---|---|
| Aortic dissection | Cardia Tamponade |
| Diabetic Ketoacidosis | Lactic Acidosis |
| Tension Pneumothorax | Envenomation |

Thyroid storm or Addisonian Crisis

Life-threatening hyper/hypo thermia

DIC or other bleeding diathesis - Hemophilia, ITP, TTP, Leukemia

Aplasti

**POTENTIAL INTERVENTIONS:**

Multiple parenteral medications requiring constant monitoring

| | |
|---|---|
| CVP line insertion | Ventilator |
| Periocardiocentesis | Cricothyrotomy |
| Control of major hemorrhage | Emergent Cath Lab Pro |

Administration of blood transfusions / blood products

Major burn care / transfer to burn unit

Major trauma care / multiple surgical consultants.



Crenshaw Community Hospital
00164
Atwell v. Smart

**Crenshaw Community Hospital**
Luverne, AL 36049

Addressograph

## EMERGENCY NURSING TRIAGE FORM

Date: 3/19/05    Time: 1830    Pvt. M.D. _____

Allergies: Aminophylline — Compazine

Age: 31    Weight: ____    Temperature: 99.5    Pulse: 130    Respiration: 20    Blood Pressure: 126/34

Chief Complaint: RLQ pain — fever >24 hrs

Data Source (Informant): _____    Hx of Hemochromatosis

---

**ARRIVAL:**
- ☑ Walk
- ☐ Carried
- ☐ Ambulance
- ☐ Police
- ☐ Rescue Squad
- ☐ Wheelchair
- ☐ Stretcher

**ACCOMP. BY:**
- ☐ Self
- ☑ Family/friend
- ☐ Police
- ☐ Other

**L.O.C.**
- ☑ Alert
- ☐ Lethargic
- ☐ Unresponsive
- ☐ Disoriented
- ☐ Shock

**VALUABLES**
- ☐ Patient
- ☐ Family/friend
- ☐ Med. Examiner
- ☐ Save__ Env. #

**NOTIFIED:**
- ☐ Police
- ☐ Family/friend
- ☐ Med. Examiner
- ☐ Animal Control
- ☐ Clergy
- ☐ Family Serv.
  Time called: _____

**GLASGOW COMA SCALE**
*Adult/Pediatric*

**A. EYE OPENING**
- Spontaneous — 4
- To Voice — 3
- To Pain — 2
- None — 1

**B. VERBAL**
- Oriented/Smile — 5
- Confused — 4
- Screams — 3
- Grunts — 2
- None — 1

**C. MOTOR**
- Obeys Spontaneous — 6
- Localizes to pain — 5
- Flexor withdrawl — 4
- Abnormal Flexion — 3
- Extensor Posturing — 2
- None — 1

Score total: 15

**ARE IMMUNIZATIONS CURRENT?**    ☐ Yes    ☐ No

| PMH | YES | NO | | YES | NO | | YES | NO |
|---|---|---|---|---|---|---|---|---|
| Arthritis | ☐ | ☐ | CVA | ☐ | ☐ | Migraines | ☐ | ☐ |
| Asthma | ☐ | ☐ | Diabetes | ☐ | ☐ | Psyc | ☐ | ☐ |
| By-pass | ☐ | ☐ | Dialysis | ☐ | ☐ | Pulmonary | ☐ | ☐ |
| Cardiac | ☑ | ☐ | GI | ☐ | ☐ | Renal | ☐ | ☐ |
| CHF | ☐ | ☐ | GU | ☐ | ☐ | Seizure | ☐ | ☐ |
| COPD | ☐ | ☐ | HTN | ☐ | ☐ | Sickle Cell | ☐ | ☐ |

**CURRENT MEDICATIONS**    ☑ None    ☐ Unknown

| Name | Dose | Freq | Name | Dose | Freq |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

---

## NURSING OBSERVATIONS

**PAIN** ☑ YES  ☐ NO (Circle one)    😊😊😊😠😠😠  0 2 4 6 8 10
Location: RLQ    Description: _____

**EMESIS**    ☐ No    ☑ Yes    Pt. description: _____

**STOOL**    ☑ N/A    ☐ Normal    Last BM: _____

**URINATION**    ☑ N/A    ☐ Normal    ☐ Frequency    ☐ Dysuria

**DISCHARGE**    ☑ N/A    ☐ No    ☐ Yes
☐ Vaginal    ☐ Urethral    ☐ Other _____

**BLEEDING**    ☑ No    ☐ Yes    LMP: March 05
Location: _____
☑ None ☐ Minimal ☐ Moderate ☐ Severe ☐ Bright ☐ Dark ☐ Clots
☐ Other: _____

**RESPIRATORY** ☐ N/A
☑ Regular ☐ Shallow ☐ Irreg ☐ Hypervent ☐ Cough ☐ Dyspneic
☐ Absent ☐ Rapid ☐ Other: _____

**CIRCULATION/CARDIAC/PULSES**    **BREATH SOUNDS**
☐ Regular ☐ Absent ☐ Palpable    ☐ N/A ☐ Unequal ☐ Diminished
☐ Irreg    ☐ Weak    ☐ Rales ☐ Equal ☐ Rhonch
☐ Cardiac Rhythm: _____    ☐ Wheezes>

**SAFETY**    ☐ Side rails up ☐ Attendant with patient
☐ Nurses in attendance    ☐ Other _____

**NEUROLOGICAL** ☐ Alert    ☐ Confused    ☐ Oriented
☐ Unresponsive    ☐ Lethargic    ☐ Seizures

**PUPILS**    ☐ Equal    ☐ Unequal size in mm: R__ L__

**RESPONDS TO STIMULI**    ☐ No    ☑ Yes ☐ Verbal ☐ Painful

**VISUAL ACUITY** N/A ☐ _____

**GI**    ☐ N/A ☐ Vomiting    ☐ Diarrhea    ☑ Nausea

**ABD** ☑ N/A ☐ Soft ☐ Distended ☐ Rigidity ☐ Bowel Sounds

**SKIN** ☑ Warm ☐ Pale ☐ Dusty ☐ Cyanotic ☐ Dry ☐ Moist
☐ Cool ☐ Clammy ☐ Other _____

**TRAUMA: (location & appearance)** ☑ N/A    COMMENTS
Abrasion _____
Avulsion _____    Crenshaw Community Hospital
Contusion _____    00165
Deformity _____    Atwell v. Smart
Edema _____
Laceration _____
Puncture Wound _____

| **DISCH. COND.** | **EXIT VIA** | **DISPOSITION** |
|---|---|---|
| ☐ Improved | ☐ Walk ☐ Carried | ☐ Home |
| ☐ Critical | ☐ Wheelchair | ☐ Other facility |
| ☐ Unchanged | ☐ Stretcher | ☐ AMA ☐ Expired |
| ☐ Expired | ☐ Ambulance | ☐ DOE ☐ Admit |

## CRENSHAW COMMUNITY HOSPITAL
### 101 HOSPITAL CIRCLE
### LUVERNE, AL 36049
### Telephone (334) 335-3374

| | | | |
|---|---|---|---|
| PATIENT: | DAVIS, ROBIN O | DOB: | ROOM#: ER |
| ACCT#: | 31766 | EXAM: ABD | |
| PHYSICIAN: | KIERACOFE | DATE: 3-19-05 | X-RAY#: 41327 |

CLINICAL HISTORY: ABDOMINAL PAIN

EPA VIEW OF CHEST: The heart is normal in size and shape. No pulmonary infiltration is seen. No other significant findings are noted.

SUPINE AND ERECT VIEWS OF ABDOMEN: There are surgical clips in the right upper abdomen. There is mild scoliosis of the lumbosacral spine. There is some vascular calcification in the right side of the pelvis. There is mild prominence of gas and feces within the intestine at least primarily colon with no free intra-abdominal air being noted the pattern being nonspecific radiographically. There is soft tissue fullness within the pelvic area which could be due to the urinary bladder but could be of other nature. No other significant findings are noted.

T. L. EAKES, M.D.
ROENTGENOLOGIST

TLE/nrh
D: 3-20-05
T: 3-20-05

### RADIOLOGY DEPARTMENT REPORT
### Page 1 of 1

Crenshaw Community Hospital
00166
Atwell v. Smart

CRENSHAW COMMUNITY HOSPITAL    101 HOSPITAL CIRCLE    LUVERNE    AL 36049

**EMERGENCY ROOM • OUTPATIENT RECORD**

| TIENT NUMBER | TYPE | PATIENT NAME | | AGE | BIRTHDATE | SEX | M/S | DATE OF SERVICE | | CLERK INITE |
|---|---|---|---|---|---|---|---|---|---|---|
| 021755 | 3 | DAVIS ROBIN O | | | | F | DW | 3/19/05 | 18:30 | TB |

| DRESS - LINE 1 | | ADDRESS - LINE 2 | | | CITY LUVERNE | | STATE AL | ZIP CODE 36049 | TELEPHONE 335-3501 |
|---|---|---|---|---|---|---|---|---|---|

| TIENT SSAN | | NOTIFY IN CASE OF EMERGENCY - NAME TARA MCLANEY | RELATIONSHIP FRIEND | ADDRESS | | | | TELEPHONE 372-0424 |
|---|---|---|---|---|---|---|---|---|

| SURANCE COMPANY | | | CONTRACT OR GROUP NUMBER | | | DATE | PLACE |
|---|---|---|---|---|---|---|---|
| | | | | | | TIME | EVENT |

| UARANTOR NAME DAVIS ROBIN O | | GUARANTOR ADDRESS | | CITY LUVERNE | STATE AL | ZIP CODE 36049 | GUAR. TELEPHONE 335-3501 |
|---|---|---|---|---|---|---|---|
| GARANTOR EMPLOYER | | GUARANTOR OCCUPATION | GUAR. EMPLOYER ADDRESS | | | | GUAR. DIR. TELEPHONE |

| EV. SERVICE | | PREV. SERV. DATE | IF MINOR - PARENT NAME | | MED. REC. # 041327 | FAMILY PHYSICIAN KIRACOFE G/UNASSIGNED |
|---|---|---|---|---|---|---|

| **CHARGES** | X-RAY | LAB | RGWP. TH. | PHY. TH. | EKG | I.V. | DRUGS | SUPPLIES | OTHER | M.D. | E.R. RM | TOTAL DUE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

**AUTHORIZATION FOR TREATMENT, GUARANTEE OF PAYMENT, ASSIGNMENT OF INSURANCE BENEFITS**

1. The undersigned has been informed of the emergency treatment considered necessary for the above named patient, and that treatment and procedures will be performed by physicians, members of house staff and employees of the hospital. Authorization is hereby granted for such treatment and procedures.
2. The undersigned agrees to pay for services rendered by Hospital upon release of patient.
3. I/we hereby assign any hospital benefits, sick benefits, injury benefits due to a liability of a Third party, payable by any party, for the above patient, to Hospital unless I pay the account in full upon release of patient.
4. I/we hereby authorize the Administrator of Hospital to furnish from its records any information requested by the before mentioned insurance companies in connection with the above assignment. I do hereby appoint the "Controller" of Hospital as my lawful attorney to endorse for me any checks made payable to me for benefits or claims collected under the above assignment and to apply any credit balance to any other account I may owe said hospital.

| DATE | TIME | SIGNED PATIENT | SIGNED GUARANTOR |
|---|---|---|---|

**CHIEF COMPLAINT (If Accident State How, When, and Where)**

---

| TEMP | PULSE | RESP | B/P | ALLERGIES Aminophyllin - Confirm | MEDICATIONS - HOME None | ER PHYSICIAN Kiracofe | TEL. TOX. |
|---|---|---|---|---|---|---|---|

NURSES NOTES:

RLQ pain — fever — pain > 24 hrs.

*(illegible handwritten notes)*

**LAB DATA (Including X-Rays, EKGs, etc.)**

*(illegible handwritten notes)*

**PHYSICIAN'S REPORT:**

*(illegible handwritten notes)*

**DIAGNOSIS:** *(illegible handwritten)* pain

**TREATMENT:**

**INSTRUCTIONS TO PATIENT:**

*(illegible handwritten prescriptions)*

Crenshaw Community Hospital
00167
Atwell v. Smart

| | CONDITION ON DISC. | | |
|---|---|---|---|
| | IMP | STABLE | EXPIRED |

FOLLOW-UP WITH

| PATIENT'S SIGNATURE ON DISCHARGE | DATE - TIME OF DISC. | PHYSICIAN'S SIGNATURE |
|---|---|---|

_____ **HOSPITAL**
_____

### AUTHORIZATION FOR EMERGENCY TREATMENT

1. The undersigned has been informed of the emergency treatment considered necessary for the patient whose name appears on the reverse hereof and that the treatment and procedures will be performed by physicians, members of the house staff and employees of the hospital. Authorization is hereby granted for such treatment and procedures.

2. **MEDICARE - MEDICAID PATIENT'S CERTIFICATION:** Authorization to release information and payment request. I certify that the information given by me in applying for payment under Titles XVIII and XIX of the Social Security Act is correct. I authorize release of all records required to act on this request. I request that payment of authorized benefits be made on my behalf.

3. **ASSIGNMENT OF INSURANCE BENEFITS:** I hereby authorize payment directly to _____ Hospital of hospital benefits otherwise payable to me including major medical insurance and payment of surgical or medical benefits, including major medical, directly to the attending physician but not to exceed regular charges for these services. I understand that I am financially responsible to the hospital and physician for charges not covered by this assignment.

4. **AUTHORIZATION FOR RELEASE OF MEDICAL INFORMATION:** The hospital and attending physician are authorized to furnish any medical information requested by insurance companies with whom I have coverage or any public agency which may be assisting in payment for my care.

5. **REFUND OF INSURANCE BENEFITS:** I authorize the refund of overpaid insurance benefits in accordance with my insurance policy conditions where my coverages are subject to a coordination of benefits clause.

6. I understand that health care services paid under Medicare, Medicaid, and maternal and child health programs are subject to review by the Professional Standards Review Organization.

| Date | Witness | Patient |
|------|---------|---------|

| Date | Witness | Responsible Party | Relationship to Patient |
|------|---------|-------------------|-------------------------|

CRENSHAW COMMUNITY HOSPITAL
101 HOSPITAL CIRCLE - 334-335-3374
LUVERNE, ALABAMA 36049
*Where Caring Counts*

# CONDITIONS OF ADMISSIONS AND TREATMENT

**AUTHORIZATION AND CONSENT FOR SERVICES:** I am presenting myself for medical services at Crenshaw Community Hospital. I consent to such care as my physician orders and all other persons caring for me deem necessary and beneficial. I understand that this care may include examinations, test, medical and/or surgical treatment. I also understand that such treatment may involve risk and that no guarantees have been made to me about the outcome of this care. I understand that the physicians on the staff are independent contractors, and not the employees or agents of Crenshaw Community Hospital. I authorize observers to be present during procedures for the purpose of medical training and education. I understand that I have the right to understand my rights and responsibilities as a patient.

**PERSONAL VALUABLES:** Crenshaw Community Hospital is not responsible for valuables, including money, jewelry, and watches, not properly deposited in our care. I accept responsibility for personal items kept in my possession.

**RELEASE OF MEDICAL INFORMATION:** The undersigned consents to the release of general information regarding admission and condition unless designated in writing. The undersigned also authorizes Crenshaw Community Hospital and physician(s) rendering service to release medical or other information about the patient which may be necessary for the completion of insurance claims, review of services, or receipt of benefits including current medical records. Such information may be released to third-party payers, including the third-party payer's agent and/or representative, governmental agencies or anyone responsible for payment of hospital and/or physician charges.

**MEDICARE AUTHORIZATION:** I certify that the information given by me in applying for payment under Title XVIII of the Social Security Administration or its intermediaries or carriers for this or related Medicare claim. I request payment for the authorized benefits are made on my behalf to Crenshaw Community Hospital, and any organizations and physician(s) rendering service during my treatment.

**ASSIGNMENT OF BENEFITS AND FINANCIAL RESPONSIBILITY:** I authorize payment of all insurance benefits, basic and major medical, for this period of medical, emergency, and/or diagnostic treatment to be made directly to Crenshaw Community Hospital. I understand that I am financially responsible for all charges not covered by insurance payments, including private room differentials, and that all efforts for collection of those benefits are for my convenience and do not represent a guarantee for collection or a credit to my account until such time as payment is received by Crenshaw Community Hospital and the contracted entities. I also assign the benefits payable for physicians' services to the physician(s) furnishing the services, including Montgomery Radiology Associates, or authorize such physicians or physician group to submit a claim to my insurance company(s), Medicare, and/or Medicaid. I will be responsible for any collection fees, court cost, and/or attorney fees incurred while collecting on my account(s). Copies of this authorization are as valid as the original.

Witness _____ *JB* _____     Patient or Responsible Party X _*Robso Davis*_ _____

Date: _*3/19/05*_ _____     Legal Guardian/Proxy: _____

Crenshaw Community Hospital
00169
Atwell v. Smart



# Bridger Pathology Laboratories, PA
2055 Normandie Drive
Montgomery, Alabama 36111
(334) 288-4963

## SURGICAL PATHOLOGY REPORT

| | |
|---|---|
| Date Entered: 03/22/05 | SP #: S-05-02421 |
| File #: 174061 | Biopsy Date: 03/19/05 |
| Patient: DAVIS, ROBIN | Age: |
| Address: | Sex: f |
| External ID: | Ex. Order #: 031766 |
| Doctor: VICTORIA, DR. EDGAR CRENSHAW COMMUNITY HOSPITAL | |

**Clinical History**
RLQ ABD PAIN

**Tissue Removed**
APPENDIX

**Diagnosis**

### Appendix – subacute appendicitis with periappendicitis

**Gross Description**

The appendix is approximately 7.8 cm in length and averages 3 ½ to 4 mm in diameter. There is no exudate present. The lumen is not dilated. It is serially sectioned and submitted in two cassettes.

WMB:pw
03-22-05

**Comment**

The slides show fibrous obliteration of the distal lumen. There is mild inflammation of the serosal surface with a mixed inflammation. The muscularis shows an increase in eosinophils. In one area of the serosa there is fibrosis with mixed inflammation with some acute inflammation associated with congestion and early hemorrhage.

JDR:pw
03-23-05

*[signature]*

William M. Bridger, M.D                                                James D. Reinhardt, M.D.

Crenshaw Community Hospital
00170
Atwell v. Smart



2732 7th Ave South
Birmingham, AL 35233
Phone: 205-313-1240
Fax: 205-313-1250

SOUTHERN DIAGNOSTIC LABORATORIES
2732 7TH AVENUE SOUTH
BIRMINGHAM, AL  35233

| Patient Name | |
|---|---|
| DAVIS,ROBIN | |

| Sex/Species: | Date of Birth: | Age: |
|---|---|---|
| FEMALE | | |

| Patient Phone: | Patient ID # : | Med. Rec. # : |
|---|---|---|
| | | 031766 |

Requesting Physician: **VICTORIA**
Accession: **A110454**
Requisition #:
Collected: **03/19/2005 20:30**
Reported: **03/25/2005 08:00**

| REQUEST | RESULT | UNITS | NORMALS | TEST LOC. |
|---|---|---|---|---|
| CHLAMYDIA TRACHOMATIS rRNA | NOT DETECTED | | | |
| NEISSERIA GONORRHOEAE rRNA | NOT DETECTED | | | |
| | *** FINAL REPORT *** | | | |

Crenshaw Community Hospital
00171
Atwell v. Smart

| DAVIS,ROBIN | Page 1    (LAST) |
|---|---|

EEOC Form 161 (3/98)

U. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: | From: |
|---|---|
| Robin Atwell<br>9133 Emmett Avenue<br>Brantley, Alabama 36009 | Birmingham District Office<br>Ridge Park Place<br>1130 22nd Street South<br>Suite 2000<br>Birmingham, Alabama 35205 |

☐ On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR § 1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 420-2006-02661 | Kevan J. Jackson, Investigator | (205) 212-2128 |

THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans with Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge.

☐ Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

☐ While reasonable efforts were made to locate you, we were not able to do so.

☐ You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

☒ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other (briefly state)

## - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed **WITHIN 90 DAYS** of your receipt of this Notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

Bernice Williams-Kimbrough, District Director

10/16/06
(Date Mailed)

Enclosure(s)

cc:
Richard Horsley
Goozee, King & Horsley
Attorneys At Law
Shades Brooks Bldg, Suite 200
3300 Cahaba Road
Birmingham, Alabama 35223

Kathryn Morris Willis
Burr & Forman LLP
Attorneys and Counselors
3100 Wachovia Tower
420 North 20th Street
Birmingham, Alabama 35203

EXHIBIT

ATWELL V. SMART
FOIA 003

,,Enclosure with EEOC
Form 161-B (3/98)

# INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.
If you also plan to sue claiming violations of State law, please be aware that time limits and other
provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS --**    **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA),
or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge __within
90 days__ of the date you *receive* this Notice. Therefore, you should keep a record of this date. Once this 90-day
period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an
attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her
the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is
prudent that your suit be filed within 90 days of the date this Notice was *mailed* to you (as indicated where the
Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate
State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide
after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short
statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter
alleged in the charge, or, to the extent permitted by court decisions, matters like or related to the matters alleged in
the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some
cases can be brought where relevant employment records are kept, where the employment would have been, or
where the respondent has its main office. If you have simple questions, you usually can get answers from the office
of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make
legal strategy decisions for you.

**PRIVATE SUIT RIGHTS -- Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment:
backpay due for violations that occurred more than 2 years (3 years) before you file suit may not be collectible.
For example, if you were underpaid under the EPA for work performed from 7/1/00 to 12/1/00, you should file suit
before 7/1/02 -- *not* 12/1/02 -- in order to recover unpaid wages due for July 2000. This time limit for filing an EPA
suit is separate from the 90-day filing period under Title VII, the ADA or the ADEA referred to above. Therefore, if
you also plan to sue under Title VII, the ADA or the ADEA, in addition to suing on the EPA claim, suit must be filed
within 90 days of this Notice __and__ within the 2- or 3-year EPA backpay recovery period.

**ATTORNEY REPRESENTATION -- Title VII and the ADA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having
jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such
assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to
explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day
period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE -- All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have
any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need
to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and
provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all
charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to
review the charge file, please make your review request __within 6 months__ of this Notice. (Before filing suit, any
request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

ATWELL V. SMART
FOIA 004

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

RECEIVED

2006 DEC -8 A 10: 12

ROBIN ATWELL, an individual, )
)
    Plaintiff,                )
)
v.                            )    Civil Action No.: 2:06CV1089 —MEF
)
SMART ALABAMA, LLC, a legal   )       *JURY DEMAND*
entity,                       )
)
    Defendant.                )

DEBRA P. HACKETT, CL.
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA.

## COMPLAINT

1.  This is an action at law pursuant to 42 U.S.C. § 2000e *et seq.*, to redress unlawful
    employment practices. The jurisdiction of this court is invoked under 28 U.S.C. §
    1331 and 28 U.S.C. § 1343(a)(4), as this matter in controversy involves a federal
    question and is an action by Federal law to redress civil rights secured to the
    plaintiff.

2.  On May 16, 2006, the plaintiff filed a Charge of Discrimination with the Equal
    Employment Opportunity Commission (hereinafter referred to as "EEOC"). The
    plaintiff filed her Charge of Discrimination within 180 days of the most recent
    discriminatory act. On October 16, 2006, the plaintiff received from the EEOC a
    Notice of Right to Sue. The plaintiff has filed her lawsuit within 90 days of the
    receipt of the Notice of Rigth to Sue and therefore has met all administrative
    prerequisites to the filing of this action.

## PARTIES

3.  The plaintiff, Robin Atwell, is over the age of 21 years, and is a citizen of the



United States and is a resident of the State of Alabama.

4.   The defendant, Smart Alabama, LLC, at all times pertinent to the allegations
     contained in this complaint, was doing business in Crenshaw County, Alabama.
     At all times relevant hereto, the defendant was plaintiff's employer, and is an
     employer within the meaning of 42 U.S.C. § 2000e-9(b).

## FACTS

5.   On or about August 25, 2005, the Plaintiff was hired as an assembly technician by
     the defendant, Smart Alabama, LLC. On or about November 14, 2005, she
     became a safety assistant, which required her to transfer to a different part of the
     plant.

6.   From November 16, 2005 through February 7, 2006, she was sexually harassed by
     her supervisor, Rance Maddox. During this time, the Plaintiff made complaints to
     management of unwelcomed sexual harassment. The Plaintiff complained that
     she was being subjected to unwelcomed and uninvited sexual harassment by
     Rance Maddox who, at that time, was an employee of the defendant (please see
     the description of the sexual harassment, attached as Exhibit A).

7.   The defendant did not take reasonable and sufficient corrective action in response
     to the Plaintiff's complaints and the sexual harassment continued unabated.

8.   Instead of taking necessary and reasonable corrective action in response to the
     Plaintiff's complaints, the defendant ratified and condoned the unlawful acts and
     did so despite having actual and legal knowledge and notice of those unlawful and
     discriminatory acts; or, if the defendant did take corrective action then such action
     was inadequate and did not end the unlawful acts or correct the adverse effects of

the unlawful acts.

9.    The unlawful acts complained of were malicious and were perpetrated again the
      Plaintiff with a reckless indifference to the Plaintiff's protected civil rights.

10.   Following the Plaintiff's complaints and notice to the defendant as described
      hereinabove, and the defendant's ratification of the harassment, the Plaintiff was
      forced to resign from her employment in February 2006 with the defendant due to
      the hostile environment and the defendant's refusal to address the sexual
      harassment.

## COUNT I

11.   Plaintiff realleges and readopts paragraphs 1 through 10 above as if fully set forth
      herein.

12.   The plaintiff was subjected to unlawful discrimination and harassment in violation
      of 42 U.S.C. § 2000(e) *et seq.*, in that plaintiff was subjected to an unwelcomed
      and uninvited sexual harassment and when plaintiff brought this to the attention of
      her supervisors, nothing was done to remedy the situation; or, if steps were taken
      in attempt to remedy the situation, then such steps were inadequate, causing the
      plaintiff to resign from her employment with the defendant.

13.   As a direct and proximate result of the defendant's discriminatory and harassing
      actions, the plaintiff has been deprived of economic and non-economic benefits,
      including, but not limited to lost wages, mental anguish, emotional distress,
      humiliation, embarrassment and loss of training and job education.

WHEREFORE, PREMISES CONSIDERED, plaintiff prays that this Honorable Court
will grant the following relief:

(i)     Declare the defendant's conduct to constitute a violation of Title VII of the Civil
        Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.*;

(ii)    Order the defendant to pay compensatory and punitive damages to the plaintiff in
        such an amount to be determined by a jury of the plaintiff's peers;

(iii)   Order the defendant to pay plaintiff's attorney's fees and costs relative to this
        action pursuant to U.S.C. § 2000e-5(k) and other lawful authority;

(iv)    Order the defendant to pay to the plaintiff all the pay and benefits she has lost as a
        result of the discriminatory and unlawful acts complained herein;

(v)     Order the defendant to cease and desist from the discriminatory and unlawful acts
        complained of herein;

(vi)    Order and award such other and further relief to which plaintiff is entitled and
        which this Honorable Court deems just and proper.

## COUNT II

14.     Plaintiff adopts and realleges paragraphs 1 through 13 above as if fully set forth
        herein.

15.     The Plaintiff was subjected to a hostile environment and sexually charged
        environment in violation 42 U.S.C. § 2000(e) *et seq.*, in that the defendant had
        actual and legal knowledge and notice that unlawful and discriminatory and
        sexually harassing practices were being perpetrated toward the Plaintiff in the
        workplace, yet the defendants failed to prevent or stop the unlawful and
        discriminatory practices.

16.     The Plaintiff was subjected to sexual harassment in the workplace so severe and
        pervasive as to alter the terms and conditions of the Plaintiff's employment and to

create an abusive and hostile working environment.

17.    As a direct and proximate result of the sexual harassment and the sexually charged
workplace and the hostile working environment as described above, the Plaintiff
has been deprived of economic and non-economic benefits, including but not
limited to lost wages, emotional distress, mental anguish, humiliation,
embarrassment and loss of training and job education.

WHEREFORE, PREMISES CONSIDERED, plaintiff prays that this Honorable Court
will grant the following relief:

(i)     Declare the defendant's conduct to constitute a violation of Title VII of the Civil
Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.*;

(ii)    Order the defendant to pay compensatory and punitive damages to the plaintiff in
such an amount to be determined by a jury of the plaintiff's peers;

(iii)   Order the defendant to pay plaintiff's attorney's fees and costs relative to this
action pursuant to U.S.C. § 2000e-5(k) and other lawful authority;

(iv)    Order the defendant to pay to the plaintiff all the pay and benefits she has lost as a
result of the discriminatory and unlawful acts complained herein;

(v)     Order the defendant to cease and desist from the discriminatory and unlawful acts
complained of herein;

(vi)    Order and award such other and further relief to which plaintiff is entitled and
which this Honorable Court deems just and proper.

Richard F. Horsley  (HOR023)
Lindsey O. Hill (HIL055)
Attorneys for Plaintiff

OF COUNSEL:

**GOOZEE, KING & HORSLEY**
Shades Brook Bldg., Suite 200
3300 Cahaba Road
Birmingham, Alabama 35223
(205) 871-1310

**Plaintiff hereby demands a trial by struck jury on all issues of this case.**

Of Counsel

SERVE DEFENDANT AS FOLLOWS:

Smart Alabama, LLC                    *        BY CERTIFIED MAIL
c/o George B. Harris
401 Adams Ave., Ste. 780
Montgomery, Alabama 36104

FROM :Southland Haulers L          FAX NO. :3345270482              ..t. 20 2006 02:08PM  P5



Robin Atwell began her employment with Smart Alabama LLC on approximately August 25, 2005. She was trained during the first week and served as an assembly tech for the remainder of August until November 14, 2005.

On or about November 14, 2005, Robin Atwell became a safety assistant which required her to transfer to a different part of the plant. Her new office was actually located in the office of the safety director, Rance Maddox. From approximately November 16, 2005 through February 7, 2006, Robin Atwell was the subject of sexual harassment by Rance Maddox. The particulars are as follows:

* During her first week in Mr. Maddox's office, and continuing through January 2006, Mr. Maddox asked Mrs. Atwell on numerous occasions where she was eating and if she wanted to eat with him. When she would tell him she had other plans, on numerous occasions, he would show up wherever she was eating and ask if he could eat with her.

* On November 16, 2005, Mrs. Atwell's birthday, Rance Maddox hugged her. Although it was a birthday hug, the hug was inappropriately tight and long.

* From November 16, 2005 through the end of January 2006, Mr. Maddox repeatedly touched the Plaintiff on her arms and hands and attempted to hold hands with her while talking to her. This occurred on a daily basis.

* From November 16, 2005 through the end of January 2006, Mr. Maddox repeatedly put his arm around Mrs. Atwell and inappropriately rubbed her back.

* In December 2005, and continuing through January 2006, Mr. Maddox began asking Mrs. Atwell if she wanted to have drinks with him after work. At each request, she informed him that she would check with Kevin, her fiancé, and husband beginning on January 5, 2006. Regardless of her response, Mr. Maddox continued to ask her out for drinks knowing that she had a fiancé and a husband as of January 5, 2006.

* At some time between November 16, 2005 and December 1, 2005, Mr. Maddox made the comment to Mrs. Atwell that it was impossible for men to be monogamous in their sexual relations.

* On several occasions from the end of November 2005 through January 2006, Mr. Maddox asked Mrs. Atwell to travel to Montgomery, Alabama to meet him for drinks at Egor's, a local bar.

* On numerous occasions between November 16, 2005 and the end of January 2006, Mr. Maddox deliberately rubbed his pelvis area against Mrs. Atwell's buttocks.

* From November 16, 2005 through the end of January 2006, on numerous occasions, Mr. Maddox called the Plaintiff at her home, sometimes late at night. On each occasion, he would ask her what she was doing.



FROM :Southland  Haulers L               FAX NO. :3345270402               t. 20 2006 02:08PM  P6

On several occasions between December 2005 and January 2006, Mr. Maddox asked Mrs. Atwell if her breast were real and asked her what they felt like. She felt as though he was inviting her to ask him to touch her breast.

On several occasions between December 1, 2005 and the end of January 2006, Mr. Maddox made the comment "I've got a real man for you" to Mrs. Atwell.

On January 18, 2006, while Mrs. Atwell was in the corner of the office working on a computer, Mr. Maddox grabbed both of her shoulders and squeezed them as if he were giving her a massage. He moved his hands over her shoulders where they were situated just above her breast and rubbed her.

On numerous occasions between November 16, 2005 and the end of January 2006, Mr. Maddox touched the Plaintiff on her legs.

Beginning in December 2005 and continuing through December 2006, Mr. Maddox hugged Mrs. Atwell inappropriately and stated "baby, I'll take care of you"...."we'll be a team"..."you've got to work with me". Mrs. Atwell perceived the clear meaning of these statements that Mr. Maddox would help her with working conditions and raises if she would engage in sexual activities with him. On one occasion during that same period of time, Mr. Maddox asked Mrs. Atwell to spend the night in Montgomery for a training session.

On or about January 18, 2006, Mrs. Atwell reported Mr. Maddox's conduct to Gary Sport, a managerial employee. Previously, during casual conversations, she had informed Mr. Sport that she was uncomfortable working around Mr. Maddox. Despite these discussions, Mr. Maddox had not been reprimanded or counseled in any way.

As a result of her reporting Mr. Maddox, Mr. Maddox began placing more job duties on Mrs. Atwell. Furthermore, as a result of her reporting her, Mr. Maddox began to make Mrs. Atwell's working environment intolerable and hostile. At some point toward the end of January 2006, Mrs. Atwell reported Mr. Maddox to Ruth Ryan in the human resources department. Ms. Ryan told Mrs. Atwell to simply be short with Rance and just do her job. She assured Mrs. Atwell that they were investigating her complaints as of February 1, 2006. As a result of this meeting, Mr. Maddox created a weekend work schedule and put Mrs. Atwell on the schedules during hours that he knew she could not work. Still, during this time, Mr. Maddox continued to touch Mrs. Atwell inappropriately.

Mr. Maddox began to fabricate complaints about Mrs. Atwell and on a couple of occasions wrote her up for excessive overtime, which had been previously approved by Gary Sport. She was also written up for wearing blue jeans.

On February 7, 2006, Mrs. Atwell again met with Ruth Ryan. She reported to Ms. Ryan that reporting Rance had simply increased the hostility of her work environment. Ms. Ryan informed Mrs. Atwell that they would place her on another line; however, she would still have to

FROM :Southland Haulers          FAX NO. :3345270402          ct. 20 2006 02:09PM  P7

see Mr. Maddox everyday. Mrs. Atwell has been unable to return to work since that time due to severe emotional distress, depression and fear associated with the harassment and retaliation by Rance Maddox.

Smart Alabama LLC was made aware by Mrs. Atwell on numerous occasions about Mr. Maddox's sexual harassment toward her; however, they either did nothing or took measures that did not help or cure the problem. Smart Alabama LLC either was or should have been aware of previous and subsequent similar conduct by Mr. Maddox; however, he remained an employee.



EXHIBIT
23
P. Haskell 5-31-02

Medical Bills

Crenshaw Comm. Hospital

01/05/2006  22:03:12

Dx:

. AGE NOT ENTERED, ASSUMED TO BE 50 YEARS FOR PURPOSE OF ECG INTERPRETATION
. NORMAL SINUS RHYTHM, RATE 97.............normal P axis, PR, rate & rhythm
. RSR' IN V1 OR V2.......................................small R' only

| Rate | 97 |
| PR | 152 |
| QRSD | 87 |
| QT | 351 |
| QTc | 446 |

--AXIS--
| P | 2 |
| QRS | 33 |
| T | -12 |

PRELIMINARY-MD MUST REVIEW

- OTHERWISE NORMAL ECG -



148/92 - 93 - 22 - 98.6


Diovan / HCT    80 / 12.5
Nexium
Paxil

02/28/2006                        Financial Statement                    Page:  1
                                  Account #: 106303

                    CHARLES S TOMPKINS MD
                    1704 S FOREST AVE
                    LUVERNE
                    AL                        36049
                    334-335-3283

                    GIVE THANKS TO THE LORD, FOR HE IS GOOD, HIS LOVE
                    ENDURES FOREVER. PSALM 118:1

        ROBIN DAVIS

        AL                    36009

        Fold Here                 Fold Here                        Fold Here

| Patient | | Account SS# | | | | |
|---------|--|-------------|--|----|--------|---------|
| Serv Date | Inv# | Description Of Services | | Dr | Amount | Balance |
| DAVIS,ROBIN | | 106303 | | | | |
| 01/24/06 | 0012 | ESTABLISHED EXTENDED OFFI | | DB | 88.00 | 88.00 |
| 02/23/06 | 0012 | BCBS PAYMENT | 060202 | DB | -23.00 | 65.00 |
| 02/23/06 | 0012 | BCBS ADJUSTMENT | | DB | -40.00 | 25.00 |
| 01/24/06 | 0013 | CBC WITH PARTIAL DIFF | | DB | 15.00 | 40.00 |
| 02/23/06 | 0013 | BCBS PAYMENT | 060202 | DB | -13.00 | 27.00 |
| 02/23/06 | 0013 | BCBS ADJUSTMENT | | DB | -2.00 | 25.00 |
| 01/24/06 | 0014 | EKG W/INTERPRETATION AND | | CST | 50.00 | 75.00 |
| 02/23/06 | 0014 | BCBS PAYMENT | 060202 | CST | -43.00 | 32.00 |
| 02/23/06 | 0014 | BCBS ADJUSTMENT | | CST | -7.00 | 25.00 |
| 01/24/06 | 0015 | HOLTER EKG MONITORING 24 | | CST | 185.00 | 210.00 |
| 02/23/06 | 0015 | BCBS PAYMENT | 060202 | CST | -185.00 | 25.00 |

| Current | 31-60 Days | 61-90 Days | 91-120 Days | 120+ Days | Total Ins | Total Due |
|---------|-----------|-----------|-------------|-----------|-----------|-----------|
| 25.00 | .00 | .00 | .00 | .00 | 346.00 | 25.00 |

04/03/2006                    Financial Statement                Page:  1
                              Account #: 106303

                    CHARLES S TOMPKINS MD
                    1704 S FOREST AVE
                    LUVERNE
                    AL                    36049
                    334-335-3383

            GIVE THANKS TO THE LORD, FOR HE IS GOOD, HIS LOVE
            ENDURES FOREVER. PSALM 118:1




        ROBIN DAVIS
              .

        AL                    36009


    Fold Here              Fold Here                    Fold Here
----------------------------------------------------------------------
Patient                Account SS#
    Serv Date Inv# Description Of Services        Dr    Amount   Balance
----------------------------------------------------------------------
                    Balance As Of 02/28/06                      25.00
DAVIS, ROBIN              106303
    02/07/06  0016 ESTABLISHED INTERMEDIATE           CST    60.00    85.00
    03/30/06  0016 BCBS PAYMENT             060316    CST   -22.00    63.00
    03/30/06  0016 BCBS ADJUSTMENT                    CST   -13.00    50.00
    02/07/06  0017 COLLECTION OF DRUG SCREEN          CST    15.00    65.00
    03/08/06  0017 SMART SAY NOT W/C, BC WILL NOT COVER
    01/25/06  0018 HOSPITAL CARE - INITIAL L          CST   169.00   234.00
    03/30/06  0018 BCBS PAYMENT             060223    CST  -135.00    99.00
    03/30/06  0018 BCBS ADJUSTMENT                    CST   -34.00    65.00
    01/25/06  0019 EKG INTERP AND REPORT              CST    15.00    80.00
    03/30/06  0019 BCBS PAYMENT             060223    CST   -13.00    67.00
    03/30/06  0019 BCBS ADJUSTMENT                    CST    -2.00    65.00
    01/26/06  0020 HOSPITAL - DISCHARGE               CST    87.00   152.00
    03/30/06  0020 BCBS PAYMENT             060223    CST   -63.00    89.00
    03/30/06  0020 BCBS ADJUSTMENT                    CST   -24.00    65.00


    Current 31-60 Days 61-90 Days 91-120 Days  120+ Days  Total Ins  Total Due
      40.00    25.00      .00        .00         .00        .00       65.00

Medical training

Certifications

ÉE, KING & HORSLEY LLP
Y E R S
PLEX DRIVE, SUITE 280
JGHAM, ALABAMA 35209

Robin O. Davis                                          2/16/01
Payroll                    Ending 02/16/01                              54.01

Coffee Co. EMS        Payroll                                          54.01

EMS-MEDICAL, INC.   d/b/a COFFEE COUNTY EMS

6303

Robin O. Davis                                      8/24/2001
Payroll            Ending 08/24-01 Salary advance for payroll 08-3      190.14

Coffee Co. EMS      Salary Advance                                    190.14

EMS-MEDICAL, INC.   d/b/a COFFEE COUNTY EMS
   Robin O. Davis
Payroll

Coffee Co. EMS      Payroll

Ending 07/20/01

7/20/2001

6206
214.38

214.38

---

EMS-MEDICAL, INC.   d/b/a COFFEE COUNTY EMS
   Robin O. Davis
Payroll

Coffee Co. EMS      Payroll

Ending 07/20/01

7/20/2001

6206
214.38

214.38

FOLD AT (4) TO FIT COMPANION SELF DUO-VUE ENVELOPE     PRINTED IN U.S.A.

ROBIN O DAVIS            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    [# 11]            1168  05/21/2001

| | | | | | | |
|---|---|---|---|---|---|---|
| Gross Pay | 87.25 | 349.74 | 2224.74 | Social Security | 21.68 | 137.91 |
| | | | | Medicare Tax | 5.07 | 32.27 |
| | 63.25 hrs reg. | | | Federal Tax | 45.00 | 252.00 |
| | 24 hrs standby | | | State Tax | 13.03 | 75.07 |
| | | | | Uniforms | 18.75 | 18.75 |
| | | | | Other | 10.00 | 205.33 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 5.15 | 349.74 | 113.53 | 236.21 | 2224.74 | 721.33 | 1503.41 |

Two Hundred Thirty Six and 21/100 Dollars

05/21/2001    $***236.21

ROBIN O DAVIS
1125 N MORROW AVE
ELBA            AL   36323

ROBIN O DAVIS            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    [# 11]            1168  05/21/2001

| | Hours | Current | YTD | Deductions | Current | YTD |
|---|---|---|---|---|---|---|
| Gross Pay | 87.25 | 349.74 | 2224.74 | Social Security | 21.68 | 137.91 |
| | | | | Medicare Tax | 5.07 | 32.27 |
| | | | | Federal Tax | 45.00 | 252.00 |
| | | | | State Tax | 13.03 | 75.07 |
| | | | | Uniforms | 18.75 | 18.75 |
| | | | | Other | 10.00 | 205.33 |

| Pay Rate | Curr.Earn. | Curr.Ded. | Net Pay | YTD Earn. | YTD Ded. | YTD Net |
|---|---|---|---|---|---|---|
| 5.15 | 349.74 | 113.53 | 236.21 | 2224.74 | 721.33 | 1503.41 |

ROBIN O DAVIS              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    [# 15]              1223    07/20/2001

| Gross Pay | 76.5 | 279.85 | 3757.19 | Social Security | 17.35 | 232.93 |
|-----------|------|--------|---------|-----------------|-------|--------|
|           |      |        |         | Medicare Tax    | 4.06  | 54.50  |
|           |      |        |         | Federal Tax     | 34.00 | 451.00 |
|           |      |        |         | State Tax       | 10.06 | 132.87 |
|           |      |        |         | Uniforms        | 0.00  | 18.75  |
|           |      |        |         | Other           | 0.00  | 205.33 |

*49 hrs reg* *27.5 standby* (handwritten)

| 5.15 | 279.85 | 65.47 | 214.38 | 3757.19 | 1095.38 | 2661.81 |

Two Hundred Fourteen and 38/100 Dollars

07/20/2001    $***214.38

ROBIN O DAVIS
1125 N MORROW AVE
ELBA              AL   36323

ROBIN O DAVIS              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    [# 15]              1223    07/20/2001

|           | Hours | Current | YTD     | Deductions      | Current | YTD    |
|-----------|-------|---------|---------|-----------------|---------|--------|
| Gross Pay | 76.5  | 279.85  | 3757.19 | Social Security | 17.35   | 232.93 |
|           |       |         |         | Medicare Tax    | 4.06    | 54.50  |
|           |       |         |         | Federal Tax     | 34.00   | 451.00 |
|           |       |         |         | State Tax       | 10.06   | 132.87 |
|           |       |         |         | Uniforms        | 0.00    | 18.75  |
|           |       |         |         | Other           | 0.00    | 205.33 |

| Pay Rate | Curr.Earn. | Curr.Ded. | Net Pay | YTD Earn. | YTD Ded. | YTD Net |
|----------|------------|-----------|---------|-----------|----------|---------|
| 5.15     | 279.85     | 65.47     | 214.38  | 3757.19   | 1095.38  | 2661.81 |



*A System Saving Lives*

# SOUTHEAST ALABAMA EMERGENCY MEDICAL SERVICES COUNCIL, INC.

Certifies that

*ROBIN DAVIS*

has successfully completed examinations in accordance with the standards of the U.S. Department of Transporation, Highway Safety for

# FIRST RESPONDER

Awarded this the __5__ day of __MAY__ , 19 __94__

_____
Executive Director

_____
Instructor



**AMERICAN HEART ASSOCIATION**
Alabama Affiliate
**CARDIOPULMONARY RESUSCITATION**
AND
**EMERGENCY CARDIAC CARE**
RECOGNIZES THAT

Robin W. Kyle

has successfully completed the national cognitive and performance examinations in accordance with the Standards of the American Heart Association for

Course "B" Adult & Ped. Heartsaver

May 21, 1991
Date Issued

Instructor
2475871

# Enterprise State Junior College

### Enterprise                    Alabama

ROBIN KYLE DAVIS

## has successfully completed a course in

### EMERGENCY VEHICLE OPERATORS COURSE

## offered as part of the Academic Program
## of Enterprise State Junior College
## and has been awarded          quarter hours credit

INSTRUCTOR

Emergency Medical Training
DEPARTMENT

DEAN OF THE COLLEGE

November 16, 1993
DATE

PRESIDENT



# Alabama State Board of Health

THIS IS TO CERTIFY that a license is granted by the STATE BOARD OF HEALTH

To

**DAVIS, ROBIN K**

THIS license Shall Expire    02/28/199    and is subject to the provisions of Act 1590, Regular Sessions 1971 Legislature. This license shall not be Assignable or Transferable and shall be subject to revocation as specified in Part I of the License, Section D of the STATE BOARD OF HEALTH, RULES, REGULATIONS, STANDARDS, EMERGENCY MEDICAL SERVICES.

IN WITNESS WHEREOF, I have hereunto set my hand this    02/07/1994

License No:    9400178

License Level: Ambulance Driver

58862

_State Health Officer_

ADPH-F-EMS-34/1-93









**STATE OF ALABAMA**

**TEACHERS' RETIREMENT SYSTEM**
135 SOUTH UNION STREET
POST OFFICE BOX 302150
MONTGOMERY, AL 36130-2150

U.S. POSTAGE

ROBIN O DAVIS
987 JOHNSON ST
ELBA AL 36323 3209

36323-3209    05

TEACHERS' RETIREMENT SYSTEM
P.O. Box 302150
135 South Union Street    COFFEE COUNTY BOARD OF EDUCATION
Montgomery, Alabama 36130-2150    400 REDDOCK HILL ROAD
ELBA, ALABAMA 36323

RETURN SERVICE REQUESTED

SEP 21'98    ALA

**IMPORTANT BENEFIT INFORMATION ENCLOSED**

*FIRST CLASS MAIL*    48168400492167600122266

C0F90060
DAVIS, ROBIN O.
510 SIMMONS ST
ELBA

DAVIS,ROBIN O.
RETURN TO SENDER
DAVIS
502.A APH59N3-5T.R09
R.R.A 36323-5914 1396 07 09/23/98

**CURRENT RECORDS AS OF 6/30/98**

OUR RECORDS CONTAIN THE FOLLOWING DATA CONCERNING YOUR ACCOUNT AS OF THE DATE SHOWN ABOVE. IF YOU NOTE ANY OMISSIONS OR DISCREPANCIES, PLEASE WRITE TO: P.O. BOX 302150, MONTGOMERY AL, 36130-2150. IF YOU WRITE, PLEASE BE SPECIFIC IN YOUR QUESTIONS AND INCLUDE YOUR SOCIAL SECURITY NUMBER AND RETURN ADDRESS.

**PERSONAL**

MEMBER NAME **DAVIS ROBIN O**

ACCOUNT NUMBER **481684**    BENEFICIARY NAME **KYLE AVIS F**

SOCIAL SECURITY NUMBER    BIRTHDATE **01/08/55**

BIRTHDATE    SEX

SEX **FEMALE**

ENTRY DATE **12/01/96**

IF YOU HAVE NAMED MORE THAN ONE BENEFICIARY, "MULTIPLE" WILL BE INDICATED ABOVE. BENEFICIARY CHANGES MAY BE MADE ON A MEMBER INFORMATION RECORD FORM OR FORM MB. DESIGNATION OF BENEFICIARY PRIOR TO RETIREMENT. THE FORMS MAY BE OBTAINED FROM EITHER YOUR EMPLOYER OR THE RETIREMENT SYSTEM.

**MEMBER CONTRIBUTIONS**

| | PRE-TAXED CONTRIBUTIONS | NON-TAXED CONTRIBUTIONS | INTEREST | BALANCE |
|---|---|---|---|---|
| CURRENT YEAR CONTRIBUTIONS (JULY 1 - JUNE 30) | .00 | .00 | 9.64 | |
| ACCOUNT BALANCE | .00 | 236.20 | 14.36 | 250.56 |

**CREDITABLE SERVICE BY CATEGORY**
(YEARS AND MONTHS)

| MEMBERSHIP | PRIOR | RESTORED | MILITARY | TRANSFERRED | OTHER | TOTAL | VESTED |
|---|---|---|---|---|---|---|---|
| 00-08 | | | | | | 00-08 | |

**LAST TEN YEAR SERVICE HISTORY**

| SCHOOL YEAR | CALCULATED EARNINGS | CONTRIBUTIONS | SERVICE CREDIT |
|---|---|---|---|
| 96-97 | 4,724 | 236.20 | 00-08 |

IF ADDRESS IS INCORRECT PLEASE RETURN AN ADDRESS CHANGE FORM AVAILABLE FROM YOUR PAYROLL CLERK.

FOR AN EXCELLENT WAY TO REDUCE YOUR FEDERAL INCOME TAXES CONSIDER RSA-1, THE RSA DEFERRED COMPENSATION PLAN. CALL 832-4140 FOR ADDITIONAL INFORMATION.

Subject to audit *(see Ten Year Service History)*.

After 10 or more years of creditable service a member is eligible for deferred benefits. Prior to making a career decision to work for a non-covered agency, it is strongly recommended that a member request an audit to confirm attainment of vested status.

The calculated earnings are based on actual contributions received for the period beginning July 1 and ending June 30 and will not necessarily agree with your contract salary or the salary reported on your W-2 Form.

# WARNING

1. Your pistol license is valid for the State of Alabama only!
2. This license does not permit you to carry a gun openly.
3. Your license does not allow you to carry a pistol in any place that serves alcohol or if you are arrested on any drug related charge.
4. Your license is also void in any air terminal or in any Court House or other public building whether City, County, State, or Federal.
5. If you carry a pistol under any of the above conditions where it is void you will be subject to ARREST for carring a concealed weapon.

ROBIN GREE   DAVIS

Charles G. West, Sheriff
Crenshaw County

## ALABAMA UNIFORM INCIDENT/OFFENSE REPORT

| | | | | | | |
|---|---|---|---|---|---|---|
| VICTIM SSN | COMPLAINANT SSN | 7 (1) INCIDENT (2) OFFENSE SUPPLEMENT | 2 CASE # | 3 SFX | | |
| 4 ORI # 0 2 4 0 0 0 0 | 5 DATE AND TIME OF THIS REPORT 0 3 1 6 0 5 1 39 AM PM MIL | 6 AGENCY NAME Crenshaw County Sheriff | | 0 5 0 3 0 5 2 | | |
| 8 REPORTED BY Robin O Davis | 9 VICTIM OR ADDRESS (STREET, CITY, STATE, ZIP) | | 8 ORIGINAL OFFENSE DATE | 10 PHONE 334 335-3501 | | |

| 12 VICTIM (LAST, FIRST, MIDDLE NAME) | 1P 2B 3S | 13 ADDRESS (STREET, CITY, STATE, ZIP) | 14 PHONE ( ) |
|---|---|---|---|
| 16 EMPLOYER/SCHOOL | 16 OCCUPATION | 17 ADDRESS (STREET, CITY, STATE, ZIP) | 18 PHONE ( ) |

| 19 RESIDENT NON-RESIDENT | 20 INJURY Y N | 21 RACE W B | 22 SEX MALE FEMALE | 23 HGT 59 | 24 WGT 140 | 25 DOB 14 19 6775 | 26 AGE | 27 WAS OFFENDER KNOWN TO VICTIM? Y N | 28 VICTIM WAS (EXPLAIN RELATIONSHIP) Ex-Boyfriend | 29 CODE |
|---|---|---|---|---|---|---|---|---|---|---|

| 30 TYPE INCIDENT OR OFFENSE Domestic Violence | FEL MISD | 31 DEGREE (CIRCLE) 1 2 3 | 32 UCR CODE | 33 STATE CODE/LOCAL ORDINANCE 13A-6-132 |
|---|---|---|---|---|
| 34 TYPE INCIDENT OR OFFENSE Harassment | FEL MISD | 35 DEGREE (CIRCLE) 1 2 3 | 36 UCR CODE | 37 STATE CODE/LOCAL ORDINANCE |

| 38 PLACE OF OCCURRENCE Patsburg | | | | | 39 SECTOR County |
|---|---|---|---|---|---|

| 40 POINT OF ENTRY | DOOR WINDOW | ROOF OTHER | 41 METHOD OF ENTRY | FORCIBLE NO FORCE | ATT. FORCIBLE | 42 ASSAULT SIMPLE AGGR. | 43 TREATMENT FOR ASSAULT INJURY Y N |
|---|---|---|---|---|---|---|---|

| OCCURRED ON OR BETWEEN | 45 TIME | | 46 | 47 LIGHTING | 48 WEATHER | 49 PREMISE | | 50 CODE |
|---|---|---|---|---|---|---|---|---|
| 02 03 05 | 52 TIME | AM PM MIL | S M T W T F S | NATURAL MOON ART. EXT. ART. INT. UNK. | CLEAR CLOUDY RAIN FOG SNOW HAIL UNK. | HWY.—ST.—ALLEY RAILROAD RESIDENCE CHURCH SCHOOL CONVENIENCE INDUSTRIAL SERVICE STA. | BANK DRUG STORE APT./TWN. HSE. SHOPPING CENTER PARKING LOT OTHER COMMER. OTHER | |
| 03 16 05 | 1:59 | AM PM MIL | S M T W T F S | | | | | |

| 54 VERIFY FOR Y N | 55 TREAT. FOR Y N | 56 CIRCUMSTANCES HOMICIDE & ASSAULT | 57 CODE | | HANDGUN | RIFLE | SHOTGUN | UNKNOWN |
|---|---|---|---|---|---|---|---|---|
| RAPE EXAM Y N | RAPE INJURY Y N | LOCATION: RAPE | | | | | | |

| 58 WEAPON USED FIREARM KNIFE | HANDS, FISTS, VOICE, ETC. OTHER DANGEROUS | 59 DESCRIPTION OF WEAPONS/FIREARMS/TOOLS USED IN OFFENSE DESCRIBE: |
|---|---|---|

| 60 QUANTITY | 61 STOLEN, RECOVERED, LOST, FOUND OR DESTROYED (INCLUDE MAKE, MODEL, SIZE, TYPE, SERIAL NUMBER, COLOR, ETC.) | 62 DOLLAR VALUE STOLEN | 63 RECOVERED DAMAGED | DATE | VALUE |
|---|---|---|---|---|---|
| | | | | | |

☐ CONTINUED IN NARRATIVE

**PROPERTY DESCRIPTION**

| 64 MOTOR VEHICLE | S R O C | 65 CURRENCY, NOTES | S R O C | 66 JEWELRY | S R O C | 67 CLOTHING/FURS | S R O C | 68 FIREARMS | S R O C | 69 OFFICE EQUIPMENT | S R O C |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 70 ELECTRONICS | S R D C | 71 HOUSEHOLD | S R D C | 72 CONSUMABLE GOODS | S R D C | 73 LIVESTOCK | S R D C | 74 MISCELLANEOUS | S R D C | | |

**DOLLAR VALUE**

| 75 CHECK CATEGORIES | STOLEN | RECOVERED | SUSPECTS VEH. | VICTIMS VEH. | UNAUTH. USE | ABANDONED |
|---|---|---|---|---|---|---|

| 76 # STOLEN | 77 LIC. | 78 LIS. | 79 LIY. | 80 TAG COLOR | 81 VIN |
|---|---|---|---|---|---|
| 82 YTR | 83 VMA | 84 VMO | 85 VST | 86 VCO: TOP: BOTTOM: | 87 ADDITIONAL DESCRIPTION |
| STOLEN MTR. VEH ONLY | 88 AREA STOLEN BUS. RES. RUR. | | 89 OWNERSHIP VERIFIED BY: | TAG RECEIPT BILL OF SALE TITLE OTHER | 90 WARRANT SIGNED Y N # |
| 91 AUTO INSURER NAME (COMPANY) ADDRESS (STREET, CITY, STATE, ZIP) | | | | | 92 PHONE ( ) |
| MOTOR VEH. RECOVERY ONLY REQUIRED FOR 840 UCR CODE | 93 STOLEN IN YOUR JURISDICTION? Y WHERE? | | 94 RECOVERED IN YOUR JURISDICTION? Y WHERE? | | |

**VEHICLES**

## TYPE OR PRINT IN BLACK INK

ACJIC—32 REV 8-96

OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATION

| INCIDENT/OFFENSE REPORT CONTINUED | 95 DATE AND TIME OF REPORT 09/31/06/05 | 7:39 | [ ] AM [X] PM [ ] MIL. | 96 CASE # | | 97 8FX | 98 [X] OFFENDER [X] SUSPECT [ ] MISSING PERSON | [ ] CHECK IF MULTIPLE |

**99 NAME (LAST, FIRST, MIDDLE)** LARMER SCOTTY
**100 NICKNAME/ALIAS**
**101 RACE** [X] W [ ] B [ ] A [ ] I   **102 SEX** [X] M [ ] F   **102 DOB** 11/26/62   **104 AGE** 42

**105 ADDRESS (STREET, CITY, STATE, ZIP)** 1216 CAROLYN St. ELBA, AL.
**106 HGT** 5'7"   **107 WGT** 185   **108 EYE** GRN   **109 HAIR** LT BRO   **110 COMPLEXION**

**111 PROBABLE DESTINATION** 77   0211
**112 ARMED?** [ ] Y [ ] N [X] UNK   **113 WEAPON** Rifle or Shotgun   **115 [ ] ARRESTED [X] WANTED**

**114 CLOTHING**     [ ] SCARS  [ ] MARKS  [ ] TATOOS

**116 NAME (LAST, FIRST, MIDDLE)**
**117 NICKNAME/ALIAS**
**118 RACE** [ ] W [ ] B [ ] A [ ] I   **119 SEX** [ ] M [ ] F   **120 DOB**   **121 AGE**

**122 ADDRESS (STREET, CITY, STATE, ZIP)**
**123 HGT**   **124 WGT**   **125 EYE**   **126 HAIR**   **127 COMPLEXION**

**128 PROBABLE DESTINATION**
**129 ARMED?** [ ] Y [ ] N [ ] UNK.   **130 WEAPON**

**131 CLOTHING**     [ ] SCARS  [ ] MARKS  [ ] TATOOS   **132 [ ] ARRESTED [ ] WANTED**

**WITNESSES**

| 133 NAME (LAST, FIRST, MIDDLE) SEX, RACE, DOB | | 134 ADDRESS (STREET, CITY, STATE, ZIP) | 135 RES. PHONE | 136 BUS. PHONE |
| #1 | SEX [ ]M [ ]F  RACE [ ]W [ ]A [ ]B [ ]I  M D Y | | ( ) | ( ) |
| #2 | SEX [ ]M [ ]F  RACE [ ]W [ ]A [ ]B [ ]I  M D Y | | ( ) | ( ) |
| #3 | SEX [ ]M [ ]F  RACE [ ]W [ ]A [ ]B [ ]I  M D Y | | ( ) | ( ) |
| #4 | SEX [ ]M [ ]F  RACE [ ]W [ ]A [ ]B [ ]I  M D Y | | ( ) | ( ) |

WITNESS #1 SSN __-__-__   WITNESS #2 SSN __-__-__   WITNESS #3 SSN __-__-__   WITNESS #4 SSN __-__-__

**NARRATIVE**

137 Scotty & I lived together for 3 years. He was verbally & physically abusive for over a year and a half. He has cursed, pushed, shoved, punched, threw items, kicked items, screamed, drove crazy, (Petracy) threatened to kill me as well as himself. He approached me in the last few weeks at the convience store. He forced my door open and would not let me close it. He then threw iced drink all over the truck. All of my children were in the vehicle. He calls the House alot and I hang up. He calls back. He says mean things and makes threats towards me and my new boyfriend. I have seen him come on the Road in front of my new house and cut donuts at the end of the driveway.

CONTINUED ON SUPPLEMENT [ ] 8FX

| ASSISTING AGENCY ORI | ASSISTING AGENCY CASE # | 8FX |

I hereby affirm that I have read this report and that all information given by me is correct to the best of my knowledge. I will assume full responsibility for notifying this agency if any stolen property or missing person hereby reported is returned.

SIGNATURE _(signature)_   **138 LOCAL USE**   **139 STATE USE**

**ADMINISTRATION**

| MULTIPLE CASES CLOSED | 140 CASE # | 141 8FX | 142 CASE # | 143 8FX | 144 CASE # | 145 8FX | 146 ADDITIONAL CASES CLOSED NARRATIVE [ ] Y [ ] N |

| 147 CASE STATUS [ ] PENDING [ ] INACTIVE [ ] CLOSED | 148 CASE DISPOSITION: [ ] CLEARED BY ARREST (JUV.) [ ] CLEARED BY ARREST (ADULT) [ ] UNFOUNDED [ ] ADM. CLEARED | 149 EXCEPTIONAL CLEARANCE: [A] SUSPECT/OFFENDER DEAD [B] OTHER PROSECUTION [C] EXTRADITION DENIED [D] LACK OF PROSECUTION [E] JUVENILE, NO REFERRAL [F] DEATH OF VICTIM | 149 REPORTING OFFICER Paul Asteel   ID # 2414 |
| ENTERED ACIC/NCIC [ ] DATE | | | 150 ASSISTING OFFICER   ID # |
| | | | 151 SUPERVISOR APPROVAL   ID #   152 WATCH CMDR.   ID # |

Robin,

    I just wanted you to know that you will be missed by me and thank you for your friendship that we have developed, over the pasted 10 months you have became like my sister and your leaving hurts, but however, I do understand why you are leaving.

    Thank you for all the laughter you have brought me when I've needed it and being there when I've needed to talk and you input in different things we have encountered over the past months that has made the job easier to deal with.

    Robin, If I could leave you with a few thoughts is would be:

1) You can be anything in life you want to be if you just want it bad enough to pay the Price for it.
2) You are very smart with a good level head on your shoulder if you will just use it.
3) Believe in your self, because the way you perceive yourself is the way others will perceive you to be.
4) The sky is the limit and you are the only thing that holds you back.
5) Nothing in life come easy or cheep, you will have to work and pay the price for what you want out of life.

    Robin, You are very smart and I know how for you can go because I do believe in and I know that there is nothing in this world you can't do if you do a little planing, dreaming, thing about what it will cost you mentally, physically, and spiritually.

    I know a little about your past and I feel I can truly say this, if you live in the past your past will become you future, you have two ways of dealing with the past: (1) is look at the past and learn from it. (2) Use your past to your advantage and turn it into experience and go forward.

    I know you have seen a lot, done a lot, and been accused of a lot but no matter where you've been or where you go, your past is always going to be there but use it to your advantage and go forward.

    I wish you all the luck, hope, and love that you will ever need to do what ever it is that your going to do in your life.

    I want you to know that Tim loves you and I feel he would be good to you, I know that we have talked and I know how much he loves you and I wish you all the best in life.

    Well, I've got a lot to do today so remember I'm always around if you need me and I love you like a sister and always will !!!!!!!!!!!!!!!!!!!!!!!

Your loving friend,

Mike Mitchell

P.S.:

Please stay in touch:

Home: 334-493-1490, Cell no. 334-726-1700, EMS beeper: 719-1550

Statewide beeper: 1-800-406-0152 pin (334-726-1700) "dial the 800 no. enter the pin no. 334-726-1700 press # then enter your phone no. and press #.

# Certificate of Attendance

This is to certify that

## Children's Environmental Health Conference

*attended the*

Sponsored by

Environmental Protection Agency, United States Department of Agriculture, Alabama Cooperative Extension System, Southeast Alabama Medical Center, Family Guidance Center, Houston County Department of Human Resources, Houston County Department of Public Health, Alfred Saliba Family Service and Center at Southeast Alabama Medical Center/Dothan, Alabama for six clock hours credit.

**April 7, 2001**



Phillip A. Carter
Phillip Carter
County Extension Agent



Laura Booth
Extension Specialist - Environmental Education

© 1995 +40

Published by the Alabama Cooperative Extension System, Alabama A&M and Auburn Universities, in cooperation with the U.S. Department of Agriculture. An Equal Opportunity Employer.

LITHO IN U.S.A.

# Coffee County EMS Phone List
## *Do Not Release Phone Numbers To Anyone Outside CCEMS*     25 Sep 01

CCEMS Personal

| Name | | | |
|---|---|---|---|
| Stephanie Pierce | 897-1830 | cell: 308-6683 | pager :719-8730 |
| Pat Crosby | 347-0450/6905 | cell: 464-2477 | pager: 719-0760 |
| Tina Hanchey | 897-0253 | cell 313-6725 | |
| Sean Conley | 393-7326 | cell 303-9373 | work 255-7032 |
| Joe McCollough | 897-5675 | cell 763-0355 | work 897-5711 |
| Michael Hughes | 588-2550 | cell 406-6682 | pager 713-5716 |
| Tammy Dodson | 684-0376 | work 684-2586 | pager 713-5714 |
| Sherry Daniels | 897-2343 | cell 406-6917 | pager 670-9040 |
| Karl Williams | 684-0376 | | |
| Danny Jordan | 897-6896 | cell 235-2901 | pager 719-0650 |
| Robin Davis | 897-0088/1171 | cell 406-1712 | pager 719-1650 |
| Michael Mitchell | 493-1490 | fax 493-1491 | pager 719-1550 |
| Trey Glass | 983-7971 | | pager 713-0619 |
| Kenneth Moss | 393-4700 | | pager 598-7784 |
| Wendy Green | 348-2461 | | |
| Regina Logioatos | 493-8858 | | pager 719-3824 |
| Tim Deloach | 393-8556 | | pager 598-7787 |
| Harvey Henderson | 222-7833 | | pager 719-5581 |
| Terry Harrison | 897-3352 | | |

Police Departments

| | |
|---|---|
| Elba | 897-2555 / 3881 |
| New Brockton | 894-5559 |
| | Fax 894-5686 |
| Enterprise | 347-1211 |
| | fax 308-2851 |
| Level Plains | 347-0422 |
| Daleville | 598-4442 / 4443 |
| Hartford | 588-2222 |
| Ozark | 744-511 |
| Geneva | 684-277 |
| Brantley | 527-3244 / 3245 |
| CC Sheriff | 894-6200 |
| Florala | 858-3244 |
| Sheriff Off. | 894-5535 |

Hospitals

| | |
|---|---|
| Elba | 897-2257( ER)X 255 (Floor) X 260 |
| MCE | 393-3856 |
| | fax 347-1643 |
| Flowers | 793-9694 |
| SEAMC | 793-2794 |
| | 1-800-428-7044 |
| DMC | 774-7784 |
| Andalusia | 222-6956 |
| Edge | 670-5420 |
| Mont. Bapt. | 286-2843 |
| Opp | 493-9129 / 9130 |
| Cren. Bapt. | 335-3374 ext. 250 |
| Jackson | 293-8000 |
| Wiregrass | 684-1905 |
| Va- Mont | 272-4670 ext 4361 |

Ambulances

| | |
|---|---|
| Enterprise | 393-0333 |
| Care | 671-2273 |
| Pilchers | 792-4118 |
| Brantley | 527-3244 |
| Emergestat | 445-1306 |
| Union Springs | 738-4980 |
| Lyster | 255-7032 |
| Opp | 493-6969 fax 493-4126 |
| Luverne | 335-3345 |
| Opportunity | 493-0911 |
| Geneva | 684-2586 fax 684-6902 |
| Florala | 858-6095 |

Towing

Coffee Auto Repair
888-399-0362
Mon - Fri 894-5406
Nights & weekends 894-6430

Medical Control Numbers

| | | | |
|---|---|---|---|
| L. Dyess | 1128 | Chandler | 0196 |
| Barnes | 0035 | K. Williams | 0829 |
| Jenkins | 0178 | | |
| Rodgers | 0038 | | |
| A. Kirk | 0037 | | |
| Drew | 0099 | | |
| Seay | 0203 | | |
| Glover | 1166 | | |
| Durkish | 0207 | | |

Cell Phones

308-6684
308-6685

Unit# 102-308-5167
103-308-6687
104-308-6688



# Alabama State Board of Health

THIS IS TO CERTIFY that a license is granted by the STATE BOARD OF HEALTH
To

## DAVIS, ROBIN K

This license Shall Expire ............ and is subject to the provisions
of The Code of Alabama, 1975, 22-18-1, et seq. This license shall not be Assignable
or Transferable, and the licensee may be subject to disciplinary action, up to and
including license suspension or revocation, for any pertinent violation of the current
ALABAMA STATE BOARD OF HEALTH EMERGENCY MEDICAL SERVICES RULES.

IN WITNESS WHEREOF I have unto set my hand this, 04/04/2001

License No: 9400178

License Level: Ambulance Driver

**100087**

State Health Officer

ADPH-F-EMS-31 / 8-2000(BS)



Alabama State Board of Health

This Certifies DAVIS, ROBIN K
as a licensed Ambulance Driver

License No.: 9400178

Expires: 03/31/2003

State Health Officer

Alabama State
Board of Health

PHOTO

DAVIS, ROBIN K
Ambulance Driver
9400178
Exp: 03/31/2003

DAVIS, ROBIN K
1125 N MARROW AVE
ELBA      AL
36323

# C O B R A

## CONTINUATION OF COVERAGE APPLICATION



**BlueCross BlueShield**
**of Alabama**

An Independent Licensee of the Blue Cross and Blue Shield Association.



**BlueCross BlueShield
of Alabama**

# Certificate of Creditable Coverage

Blue Cross and Blue Shield of Alabama is an Independent Licensee of the
Blue Cross and Blue Shield Association

**\*IMPORTANT** - This certificate provides evidence of your prior health coverage. Please refer to
the Statement of HIPAA Portability Rights enclosed in this envelope for a detailed explanation of
the importance of this certificate.

1) Date of this Certificate:  03/20/2006

2) Name, Address, of Issuer responsible for providing this Certificate:

Blue Cross and Blue Shield of Alabama
450 Riverchase Parkway East, P.O. Box 995
Birmingham, Al. 35298

3) For further information call: Blue Cross Customer Service at 205-988-2200 or 800-292-8868

4) Name of Contract Holder:  Robin O Davis

5) Group Plan(s) covered by this Certificate:
   Plan Number(s):  52397

6) Contract Number under most recent plan:  PPA852463626

7) Name of Member to whom this Certificate applies:

Name Robin O Davis                     Date of Birth

8) If the individual identified in line 7 has at least 18 months of creditable coverage (disregarding
   periods of coverage before a 63 day break), check here and skip lines 9 and 10 _____

9) Date Waiting Period (if any) began:  08/01/2005

10) Date Coverage Began:  12/01/2005

11) Date Coverage Ended:  03/01/2006
    (or check if coverage is continuing as of the date of this Certificate:____ )

(Note: Separate certificates will be furnished for the Contract Holder and each Member.)

Robin O Davis
1096 Sims Rd
Luverne, AL. 36049-4927

# COBRA

## COBRA Continuation Coverage Election Letter

Date of Notice: _____
                        MM/DD/YYYY

To: _____
            NAME OF EMPLOYEE, SPOUSE, DEPENDENT CHILDREN, AS APPROPRIATE

Address:_____
                     ADDRESS TO WHICH NOTICE IS BEING SENT

**This notice contains important information about your right to continue your health care coverage with your group health plan(s). Please read the information contained in this notice very carefully.**

To elect COBRA continuation coverage, follow the instructions to complete the Election Form (MKT-365) and submit it to the Plan Administrator at the address below. This Election Form should be included in your COBRA Election Packet (MKT-171).

If you do not elect COBRA continuation coverage, your coverage under the plan will end on _____.
                                                                                            MM/DD/YYYY

Please check the reason below:
☐ End of employment        ☐ Reduction in hours of employment    ☐ Death of employee
☐ Divorce                  ☐ Enrollment in Medicare             ☐ Loss of dependent child status

Each person ("qualified beneficiary") in the category(ies) checked below is entitled to elect COBRA continuation coverage, which will continue group health care coverage under the plan for up to _____ months.

Please check the appropriate box or boxes below and give the name:

☐ Covered employee or covered former employee _____

☐ Covered spouse or covered former spouse _____

☐ Dependent child(ren) covered under the plan on the day before the event that caused the loss of coverage _____

_____

☐ Child who is losing coverage under the plan because he or she is no longer a dependent under the plan _____

_____

If any of the persons listed above do not reside at the address to which this notice was sent, please notify the Plan Administrator of the new address for these persons so that we may give them a copy of this notice.

If elected, COBRA continuation coverage will begin on _____ and can last until _____.
                                                            DATE                                        DATE
You may elect either family coverage or single coverage for COBRA continuation coverage.

COBRA continuation coverage cost — Family: _____ Single: _____
Your cost for COBRA coverage may change over time, as the cost of benefits under the plan changes. You do not have to send any payment with the Election Form. Important additional information about payment for COBRA continuation coverage is included in "Important Information about your COBRA Conntinuation Coverage Rights" (MKT-54).

If you have any questions about this notice or your rights to COBRA continuation coverage, you should contact:

Plan Administrator:

Name/Position:

Address:                                          Phone Number:

MKT-53 (10-2004)

PLEASE DETACH AND RETAIN THIS PAGE



**BlueCross BlueShield of Alabama**

An Independent Licensee of the
Blue Cross and Blue Shield Association.
450 Riverchase Parkway East
P.O. Box 995
Birmingham, Alabama 35298-0001
(205) 988-2200

# COBRA

### CONTINUATION OF COVERAGE APPLICATION
Under the provisions of the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA) as amended

## TO BE COMPLETED BY APPLICANT

**Employee Information:**

| | |
|---|---|
| Name Shown On The Present Coverage **Kevin Atwell** | ☐ Male ☐ Female |
| Health Contract Number | Dental Contract Number (If Any) |
| Group Number/Division | My Date of Birth MM/DD/YYYY |
| Street Address | |
| City | State    ZIP |
| Telephone Number:   Home | Work |
| Date COBRA Coverage Should Start MM/DD/YYYY | Date of Termination/Layoff MM/DD/YYYY |

**COBRA Applicant Information:**

| | |
|---|---|
| Name To Be Shown On Continuation Coverage | ☐ Male ☐ Female |
| Social Security Number | Date of Birth (MM/DD/YYYY) |
| Billing Address (Street) | |
| City | State    ZIP |

Reason I Can Continue Coverage *(Check one)*
☐ Death  ☐ Divorce  ☐ Legal Separation  ☐ Dependent Married
☐ No Longer An Eligible Dependent  ☐ Termination/Reduction in Hours
☐ Employee is entitled to Medicare
Date the above event occurred

### List eligible dependents to be shown on the Continuation Coverage:

| LAST NAME | FIRST NAME | INITIAL | SOCIAL SECURITY NUMBER | RELATIONSHIP | DATE OF BIRTH |
|---|---|---|---|---|---|
| | | | | ☐ Husband ☐ Wife | MM  DD  YYYY |
| | | | | ☐ Son ☐ Daughter | MM  DD  YYYY |
| | | | | ☐ Son ☐ Daughter | MM  DD  YYYY |
| | | | | ☐ Son ☐ Daughter | MM  DD  YYYY |

**COORDINATION OF BENEFITS INFORMATION** — If you, your spouse, or your dependents are covered by any other group health insurance, please give the following information.

| NAME OF CONTRACT HOLDER | POLICY, ID, CONTRACT OR CERTIFICATE NUMBER | TYPE COVERAGE ☐ INDIVIDUAL ☐ FAMILY | NAME OF INSURANCE COMPANY |
|---|---|---|---|
| EMPLOYER'S NAME | CITY | GROUP NUMBER | STREET ADDRESS |
| NAME OF MEMBER ENTITLED TO MEDICARE BENEFITS  ☐ Part A  ☐ Part B | MEDICARE NUMBER | CITY, STATE, ZIP | |

**OTHER BLUE CROSS COVERAGE** — If you or your spouse are currently covered by another Blue Cross and Blue Shield contract, please complete below:

CURRENT BLUE CROSS AND BLUE SHIELD CONTRACT NUMBER _____

CITY AND STATE OF BLUE CROSS PLAN ENROLLED _____

I acknowledge that I have received and read a COBRA notice informing me of my COBRA rights.

I understand and acknowledge that it is the Employer's obligation (and not Blue Cross') to provide me with any and all continuation coverage to which I might be entitled under COBRA or under the provisions of the Employer's group health plan implementing COBRA. I further understand and acknowledge that my COBRA benefits are provided to me under and in accordance with the provisions of Part 6 of Title 1 of the Employee Retirement Income Security Act of 1974. In the event of a dispute between me and Blue Cross regarding my benefits under COBRA or under this application, I understand that any administrative remedies available under the Employer's group plan must be used and exhausted by me before bringing any action against Blue Cross, notwithstanding cancellation of the Employer's coverage.

By signing below, I agree to pay to Blue Cross and Blue Shield of Alabama the monthly premium to continue the group benefits for me and my eligible dependents,

if any, who are listed above. I can continue COBRA coverage for 18 months following my termination of employment or reduction in hours or 36 months if my coverage was terminated for any other event listed above. Under certain circumstances explained in the COBRA notice, if I or a member of my family is or becomes disabled during the first 60 days of COBRA coverage, the 18-month period may be extended to 29 months.

I understand that the first payment is due by 45 days after I first elected COBRA. The first payment must include all premiums retroactive to the effective date of COBRA coverage. All other payments are due within 30 days of the due date. If I fail to pay the amount due on time or if I request that my coverage be cancelled, my coverage will end and not be reinstated under any circumstances.

I understand that coverage will end for me or any of my dependents who become covered by Medicare or any other group health coverage which does not have limitations or exclusions for pre-existing conditions or which has them but

they do not apply. I will notify you in writing if I become covered by another group plan or Medicare. If I or any of my qualified dependents become disabled according to the Social Security Administration (SSA), I will notify you in writing before the end of the 18 month period and within 60 days after the date of my initial qualifying date, the date on which my coverage is lost under my group health plan because of such event, or the date of the SSA disability determination.

While I continue the benefits provided by this group, these benefits are subject to all terms and conditions of the Employer's group health plan and any agreement between the Employer and Blue Cross and Blue Shield of Alabama. My benefits and/or rates will change when this Employer's benefits change, and will end if the Employer's coverage is cancelled at the same time benefits for active employees of the Employer end, regardless of whether I have continued to pay for my coverage.

| I wish to continue the following coverage: | ☐ HEALTH ONLY  ☐ DENTAL ONLY | ☐ HEALTH AND DENTAL | ☐ I enclose with this application a check or money order for the premium payment to cover the period from the effective date of my COBRA coverage through the current coverage period. |
|---|---|---|---|

SIGNATURE OF APPLICANT _____   Date: _____

## TO BE COMPLETED BY EMPLOYER

I am authorized by the Employer named below to certify that the person named above is eligible under COBRA to continue group health plan coverage to be effective for a maximum of __18X__ (18 or 36) months. The monthly rate for the continuation coverage will be $ __561.00__ per month until notified by Blue Cross and Blue Shield of Alabama under the conditions noted above.          $0.00 Dental

Employer: **Smart Alabama LLC**          Telephone Numbers: **334-335-5800**

COBRA EFFECTIVE DATE: **3-1-06**

Signature of Authorized Representative: **Melissa McGough**          Date: **3-1-06**

Type or Print Name Below Signature: **Melissa McGough**

ENR-270 (Rev. 10-2004)          Original: To Blue Cross and Blue Shield of Alabama, P.O. Box 995, Birmingham, AL 35298-0001   Pink Copy: To Employer   Yellow Copy: To Subscriber

# Important Information
# About Your COBRA Premiums

Blue Cross and Blue Shield of Alabama administers benefits for COBRA subscribers so long as their former employer maintains coverage by our company. This information is provided to inform you of important information as it relates to the administration of your COBRA coverage. The information is general because the COBRA law and regulations are complex. If you have a question about your eligibility for COBRA coverage, please call your group. If you have a question about payment for COBRA coverage after you are enrolled in COBRA, please call our Customer Service Department at 1 800 292-8868.

## BILLING

1. Please send your payment to Blue Cross promptly. Under COBRA regulations, Blue Cross will cancel your coverage when payment is not received within 30 days of the due date which appears on your bill. The only exception to the 30 day rule is the first payment due. You will have 45 days from election of COBRA to make the first payment. The first payment must include all premiums due since the effective date of your COBRA coverage. After the first payment, you will receive monthly invoice statements showing the monthly COBRA premium amount due. If the monthly COBRA premium amount shown to be due on the invoice statement does not match the monthly COBRA premium amount you received from your group, please call our Customer Service Department at 1 800 292-8868. If your coverage is cancelled because payment has not been received within the appropriate time frame, Blue Cross will not reinstate your COBRA coverage.

2. Each year rates for your group may increase. If this happens, your COBRA rates will also increase. Depending on when Blue Cross is notified and any new benefit issues are settled to establish new rates, you may be retroactively billed the rate increase.

3. If your check is returned to Blue Cross due to insufficient funds and we do not receive payment in full within 30 days of the due date which appears on your bill, your contract will be cancelled and will not be reinstated. If your check is returned to Blue Cross due to insufficient funds after 30 days of the due date, your contract will be cancelled and will not be reinstated.

4. If your former employer's coverage is cancelled with Blue Cross, then your COBRA coverage through Blue Cross is also cancelled. Likewise, if your former employer changes coverage to another carrier then your COBRA coverage by Blue Cross will be cancelled. You will be referred to your group for information on COBRA coverage by your new carrier.

## PAYMENT PROCESSING

Your health is important to us and we want to make sure you continue receiving the best coverage available. Here are four simple steps you can take to ensure continuous coverage while you are enrolled under your COBRA coverage:

1. Pay the exact amount due by the due date. Your payment is considered past due by the delinquent date.

2. If you do not receive a statement by the first of the month, please call our Customer Service Department at 1 800 292-8868 to arrange payment.

3. Always write your contract number(s) on your check.

4. If you have health and dental coverage, return both statements with a separate check for each coverage. Remember to put your contract number(s) on both checks.

## CHANGES TO YOUR COBRA COVERAGE

Any eligibility changes due to your COBRA coverage will be in accordance with the guidelines established by your group and must be reported to Blue Cross promptly.

1. To change your COBRA coverage from family to individual, your spouse must write us a letter that includes his or her signature, requesting to be removed from your COBRA coverage. If your spouse is being removed from your COBRA coverage because of a divorce or legal separation, the spouse may be eligible for an extension of COBRA coverage. Please refer to the COBRA Continuation Coverage Election Notice for more information about how to qualify for an extension of COBRA coverage in this case.

2. Address changes must be reported to us immediately by phone or letter.

3. Notify us if you become covered by any other group coverage or by Medicare.

---

**PLEASE DETACH AND RETAIN THIS PAGE**



**COBRA**                                          | FOR OFFICE USE ONLY |

# COBRA

## Cobra Continuation Coverage Election Form

**INSTRUCTIONS:** To elect COBRA continuation coverage, complete this Election Form and return it to us. Under federal law, you must have 60 days after the date of this notice to decide whether you want to elect COBRA continuation coverage under the Plan.

Send completed Election Form to: _____

_____

_____

This Election Form must be completed and returned by mail or hand delivery on _____

If mailed, it must be post-marked no later than _____

If you do not submit a completed Election Form by the due date shown above, you will lose your right to elect COBRA continuation coverage. If you reject COBRA continuation coverage before the due date, you may change your mind as long as you furnish a completed Election Form before the due date. If you change your mind after first rejecting COBRA continuation coverage, your COBRA continuation coverage will begin on the date that your group health plan coverage terminated.

**READ THE IMPORTANT INFORMATION PROVIDED ABOUT YOUR
COBRA CONTINUATION COVERAGE RIGHTS (included in COBRA Election packet MKT-171)**

I (We) elect **COBRA** continuation coverage in the following group health plans (the plan) as indicated below:

Type of plans (please check):    ☐ Health    ☐ Dental

| LAST NAME | FIRST NAME | MIDDLE INITIAL | SOCIAL SECURITY NUMBER |
|---|---|---|---|
| DATE OF BIRTH<br>MM/DD/YYYY | | RELATIONSHIP TO EMPLOYEE | |
| LAST NAME | FIRST NAME | MIDDLE INITIAL | SOCIAL SECURITY NUMBER |
| DATE OF BIRTH<br>MM/DD/YYYY | | RELATIONSHIP TO EMPLOYEE | |
| LAST NAME | FIRST NAME | MIDDLE INITIAL | SOCIAL SECURITY NUMBER |
| DATE OF BIRTH<br>MM/DD/YYYY | | RELATIONSHIP TO EMPLOYEE | |
| LAST NAME | FIRST NAME | MIDDLE INITIAL | SOCIAL SECURITY NUMBER |
| DATE OF BIRTH<br>MM/DD/YYYY | | RELATIONSHIP TO EMPLOYEE | |

Type of coverage elected (please check one only):

☐  I (We) elect to continue family coverage under the plan
☐  I (We) elect to continue single coverage under the plan
☐  I decline/waive my right to COBRA continuation coverage under the plan

| | | |
|---|---|---|
| SIGNATURE | PRINT NAME | DATE |
| PRINT ADDRESS | | TELEPHONE NUMBER |
| RELATIONSHIP TO EMPLOYEE | | |

MKT-365 (Rev. 7-2005)

# COBRA

## Notice by Qualified Beneficiaries of Second Qualifying Event

**IMPORTANT:** An extension of COBRA coverage for up to 36 months (from the date of the first qualifying event) may be available to spouses and dependent children who elect COBRA if a second qualifying event occurs during the first 18 months of COBRA coverage. The second event can be a second qualifying event only if it would have caused the qualified beneficiary to lose coverage under the Plan if the first qualifying event had not occurred. For this extension to apply, you must deliver this notice to us at:

| | | | | |
|---|---|---|---|---|
| Plan Administrator's Name | Address | City | State | Zip |

within 60 days after the second qualifying event or within 60 days after the date coverage is lost under the Plan because of the event, whichever is later. **If you do not deliver this notice by the due date above, you will lose your right to an extension of COBRA continuation coverage.** Please refer to the summary plan descriptions for your group health plan(s) for more information about COBRA continuation coverage.

**Group Health Plan Information:**
Please check the group health plans (the "Plan") under which you have COBRA coverage: ☐ Health        ☐ Dental

**Covered Employee Information:**
Please complete the information below for the former employee who was covered under the Plan:

| EMPLOYEE'S LAST NAME | FIRST NAME | MIDDLE INITIAL | SOCIAL SECURITY NUMBER | |
|---|---|---|---|---|
| EMPLOYEE'S STREET ADDRESS | CITY | | STATE | ZIP |
| DATE OF TERMINATION/REDUCTION IN HOURS<br>MM/DD/YYYY | | | | |

**Qualified Beneficiary Information:**
Please complete the information below for each person (any spouse or dependent children) who has COBRA coverage:

| LAST NAME | FIRST NAME | MIDDLE INITIAL | SOCIAL SECURITY NUMBER | |
|---|---|---|---|---|
| STREET ADDRESS | | CITY | STATE | ZIP |
| RELATIONSHIP TO EMPLOYEE | | | | |

| LAST NAME | FIRST NAME | MIDDLE INITIAL | SOCIAL SECURITY NUMBER | |
|---|---|---|---|---|
| STREET ADDRESS | | CITY | STATE | ZIP |
| RELATIONSHIP TO EMPLOYEE | | | | |

| LAST NAME | FIRST NAME | MIDDLE INITIAL | SOCIAL SECURITY NUMBER | |
|---|---|---|---|---|
| STREET ADDRESS | | CITY | STATE | ZIP |
| RELATIONSHIP TO EMPLOYEE | | | | |

**Notice of Second Qualifying Event:**
Please check the event that occurred and give the date it occurred:

| ☐ DIVORCE OF THE EMPLOYEE AND SPOUSE*<br>☐ DEPENDENT CHILD'S LOSING ELIGIBILITY FOR COVERAGE AS A DEPENDENT CHILD<br>☐ DEATH OF EMPLOYEE<br><br>*IF THE EVENT IS A DIVORCE, YOU MUST INCLUDE A COPY OF THE DIVORCE DECREE WITH THIS NOTICE. | DATE OF SECOND QUALIFYING EVENT:<br><br>MM/DD/YYYY |
|---|---|

| | | |
|---|---|---|
| SIGNATURE | PRINT NAME | DATE |

MKT-55 (Rev.9-2005)

# C O B R A

## Notice by Qualified Beneficiaries of SSA Disability Determination

**IMPORTANT:** COBRA coverage may be extended for up to 29 months (from the date of the first qualifying event) if any of the qualified beneficiaries are determined by the Social Security Administration (SSA) to be disabled. The disability must start before the 60th day of COBRA coverage and must last until the end of the 18-month COBRA coverage period. You must timely deliver this notice to Blue Cross and Blue Shield of Alabama, Attention: Customer Accounts, 450 Riverchase Parkway East, Birmingham, AL 35298-0001, Fax: 205 220-6884 or 1 888 810-6884 (toll free) before the end of the 18-month period of COBRA coverage and within 60 days after the later of (i) the date of the initial qualifying event, (ii) the date on which coverage is lost under the Plan because of the initial qualifying event, or (iii) the date of the SSA disability determination. If you do not deliver this notice by the due date above, you will lose your right to an extension of COBRA continuation coverage. Please refer to the summary plan descriptions for your Plan for more information about COBRA coverage.

**Group Health Plan Information:** _____

| GROUP NAME | GROUP NUMBER |

Please check the group health plans (the "Plan") under which you had coverage on the day before the qualifying event:

☐ Health    ☐ Dental

**Covered Employee Information:**
Please complete the information below for the former employee who was covered under the Plan:

| EMPLOYEE'S LAST NAME | FIRST NAME | MIDDLE INITIAL | SOCIAL SECURITY NUMBER | | |
|---|---|---|---|---|---|
| EMPLOYEE'S STREET ADDRESS | | CITY | | STATE | ZIP |
| DATE OF TERMINATION/REDUCTION IN HOURS MM/DD/YYYY | | | | | |

**Qualified Beneficiary Information:**
Please complete the information below for each person (the employee, spouse and/or dependent children) who have COBRA coverage under the Plan:

| LAST NAME | FIRST NAME | MIDDLE INITIAL | SOCIAL SECURITY NUMBER | | |
|---|---|---|---|---|---|
| STREET ADDRESS | | CITY | | STATE | ZIP |
| RELATIONSHIP TO EMPLOYEE | | | | | |

| LAST NAME | FIRST NAME | MIDDLE INITIAL | SOCIAL SECURITY NUMBER | | |
|---|---|---|---|---|---|
| STREET ADDRESS | | CITY | | STATE | ZIP |
| RELATIONSHIP TO EMPLOYEE | | | | | |

| LAST NAME | FIRST NAME | MIDDLE INITIAL | SOCIAL SECURITY NUMBER | | |
|---|---|---|---|---|---|
| STREET ADDRESS | | CITY | | STATE | ZIP |
| RELATIONSHIP TO EMPLOYEE | | | | | |

**Notice of SSA Disability Determination:** Please complete all information below:

| NAME OF DISABLED QUALIFIED BENEFICIARY | |
|---|---|
| DATE OF QUALIFIED BENEFICIARY DISABILITY MM/DD/YYYY | DATE OF SSA DISABILITY DETERMINATION MM/DD/YYYY |

You must include a copy of the SSA disability determination letter with this notice.

SIGNATURE                              PRINT NAME                              DATE

MKT-56 (10-2004)

# COBRA

## Important Information
## About Your COBRA Continuation Coverage Rights

### What is COBRA continuation coverage?

A federal law known as COBRA requires that most group health plans (including the plan or plans that are listed in the COBRA Continuation Coverage Election Form and collectively referred to in this notice as "the plan") give employees and their families the opportunity to continue their health care coverage when there is a "qualifying event" that would result in a loss of coverage under the plan. Only persons known as "qualified beneficiaries" may elect to continue their coverage under the plan. Depending on the type of qualifying event, "qualified beneficiaries" can include the employee (or retired employee) covered under the group health plan, the covered employee's spouse, and the dependent children of the covered employee. A child of the covered employee or former employee who is receiving benefits under the plan pursuant to a qualified medical child support order is entitled to the same rights under COBRA as a dependent child of the covered employee. A child born to, adopted by or placed for adoption with a former employee during the period of COBRA coverage may also be a qualified beneficiary if the former employee is a qualified beneficiary who has elected COBRA coverage. Continuation coverage is the same coverage that the plan gives to other participants or beneficiaries under the plan who are not receiving continuation coverage. Each qualified beneficiary who elects continuation coverage will have the same rights under the plan as other participants or beneficiaries covered under the plan, including special enrollment rights and any open enrollment rights.

### How long will COBRA continuation coverage last?

In the case of a loss of coverage due to end of employment or reduction in hours of employment, coverage generally may be continued only for up to a total of 18 months. In the case of losses of coverage due to an employee's death, divorce, the employee's becoming enrolled in Medicare or a dependent child ceasing to be a dependent under the terms of the plan, coverage may be continued for up to a total of 36 months. When the qualifying event is the end of employment or reduction of the employee's hours of employment, and the employee became enrolled in Medicare before the qualifying event, COBRA continuation coverage for qualified beneficiaries other than the employee lasts until 36 months after the date of Medicare enrollment or 18 months after the date of termination of employment or reduction in hours, whichever period ends last. This notice shows the maximum period of continuation coverage available to the qualified beneficiaries.

MKT-54 (1Rev. 9-2005)

### Can COBRA coverage terminate early?

Continuation coverage will be terminated **before** the end of the maximum period if:
- any required premium is not paid in full on time,
- after electing continuation coverage, a qualified beneficiary becomes covered under another group health plan that does not impose any pre-existing condition exclusion for a pre-existing condition of the qualified beneficiary,
- after electing continuation coverage, a qualified beneficiary becomes enrolled in Medicare (under Part A, Part B, or both),
- a qualified beneficiary is covered under the additional 11-month disability extension and there has been a final determination by the Social Security Administration that the disabled qualified individual is no longer disabled, or
- the employer ceases to provide any group health plan for its employees.

Continuation coverage may also be terminated for any reason the plan would terminate coverage of a participant or beneficiary not receiving continuation coverage (such as fraud).

### How can you extend the length of COBRA continuation coverage?

If you elect continuation coverage, an extension of the maximum 18-month period of coverage may be available if a qualified beneficiary is disabled or a second qualifying event occurs. You must timely notify the Plan Administrator or his designee of a disability or a second qualifying event, using the notice procedures specified below, in order to extend the period of continuation coverage. Failure to provide notice of a disability or second qualifying event may affect the right to extend the period of continuation coverage.

### Disability

An 11-month extension of coverage (for a maximum of 29 months of coverage) may be available if any of the qualified beneficiaries is determined by the Social Security Administration (SSA) to be disabled. The disability has to have started at some time before the 60th day of COBRA continuation coverage and must last at least until the end of the 18-month period of continuation coverage. In order for this disability extension to apply, you must timely notify the Plan Administrator or its designee in writing (using the notice procedures specified below) of the SSA disability determination before the end of the 18-month period of continuation coverage **and** within 60 days after the later of (i) the date of the initial

*Grace periods for periodic payments*

Although periodic payments are due on the dates shown above, you will be given a grace period of 30 days after the first day of the coverage period to make each periodic payment. Your continuation coverage will be provided for each coverage period as long as payment for that coverage period is made before the end of the grace period for that payment. However, if you pay a periodic payment later than the first day of the coverage period to which it applies, but before the end of the grace period for the coverage period, any claim you submit for benefits will be suspended as of the first day of the coverage period and then processed by the plan only when the periodic payment is received. If you fail to make a periodic payment before the end of the grace period for that coverage period, you will lose all rights to continuation coverage under the plan.

Your first payment and all periodic payments for continuation coverage should be sent to:

> Blue Cross and Blue Shield of Alabama
> Attention:  COBRA
> P.O. Box 36146
> Birmingham, AL 35236-1346

## What happens when you exhaust COBRA Coverage?

If you exhaust your COBRA coverage, you may buy a conversion health contract from Blue Cross and Blue Shield of Alabama. Ask your Plan Administrator to determine whether a conversion contract is available. Conversion contracts have more limited coverage than COBRA coverage.

You may also qualify for coverage under state law. In Alabama, you can continue coverage through Alabama Health Insurance Plan (AHIP). You can reach AHIP by calling the State Employees' Insurance Board in Montgomery, Alabama. In other states, you should call the state insurance department. If you elect to buy a conversion contract instead of enrolling in AHIP, you will not be able to enroll at a later date in AHIP.

By contrast, if COBRA coverage ends because you stop paying for it, then you will not have any further coverage under the group health plan and you will not be eligible to buy conversion coverage (if available) and you may not qualify for continued coverage under any applicable state law program. For example, in Alabama, you would not qualify for continued coverage under AHIP.

## For more information

This notice does not fully describe continuation coverage or other rights under the plan. More information about continuation coverage and your rights under the plan is available in your summary plan description or from the Plan Administrator.

If you have any questions concerning the information in this notice, your rights to coverage, or if you want a copy of your summary plan description, you should contact the Plan Administrator below.

For more information about your rights under ERISA, including COBRA, the Health Insurance Portability and Accountability Act (HIPAA), and other laws affecting group health plans, contact the U.S. Department of Labor's Employee Benefits Security Administration (EBSA) in your area or visit the EBSA website at www.dol.gov/ebsa. (Addresses and phone numbers of Regional and District EBSA Offices are available through EBSA's website.)

## Keep Your Plan Informed of Address Changes

In order to protect your and your family's rights, you should keep the Plan Administrator informed of any changes in your address and the addresses of family members.  You should also keep a copy, for your records, of any notices you send to the Plan Administrator.

## Plan Administrator Contact Information

Name/Position:

Address:

Phone Number:

in writing to the Plan Administrator during the 60-day notice period, there will be no extension of COBRA coverage as a result of the second qualifying event.

## How can you elect COBRA continuation coverage?

To elect continuation coverage, you must complete the Election Form and furnish it according to the directions on the form. Failure to do so will result in the loss of the right to elect COBRA continuation coverage. Each qualified beneficiary has a separate right to elect continuation coverage. For example, the employee's spouse may elect continuation coverage even if the employee does not. Continuation coverage may be elected for only one, several, or for all dependent children who are qualified beneficiaries. A parent may elect to continue coverage on behalf of any dependent children. The employee or the employee's spouse can elect continuation coverage on behalf of all of the qualified beneficiaries.

In considering whether to elect continuation coverage, you should take into account that a failure to continue your group health coverage will affect your future rights under federal law. First, you can lose the right to avoid having pre-existing condition exclusions applied to you by other group health plans if you have more than a 63-day gap in health coverage, and election of continuation coverage may help you not have such a gap. Second, you will lose the guaranteed right to purchase individual health insurance policies that do not impose such pre-existing condition exclusions if you do not get continuation coverage for the maximum time available to you. Finally, you should take into account that you have special enrollment rights under federal law. You have the right to request special enrollment in another group health plan for which you are otherwise eligible (such as a plan sponsored by your spouse's employer) within 30 days after your group health coverage ends because of a qualifying event. You will also have the same special enrollment right at the end of continuation coverage if you get continuation coverage for the maximum time available to you.

## How much does COBRA continuation coverage cost?

Generally, each qualified beneficiary may be required to pay the entire cost of continuation coverage. The amount a qualified beneficiary may be required to pay may not exceed 102 percent (or, in the case of an extension of continuation coverage due to a disability, 150 percent) of the cost to the plan (including both employer and employee contributions) for coverage of a similarly situated plan participant or beneficiary who is not receiving continuation coverage. The required payment for each continuation coverage period for each option is described in this notice.

In the case of an extension of COBRA coverage due to disability, the amount a qualified beneficiary may be required to pay may not exceed 150 percent of the full cost to the plan after the 18th month, assuming that the disabled qualified beneficiary elects to be covered under the disability extension. If the only qualified beneficiaries who elect the disability extension are non-disabled family members, the cost of coverage will remain at 102 percent of the full cost of coverage.

The Trade Act of 2002 created a new tax credit for certain individuals who become eligible for trade adjustment assistance and for certain retired employees who are receiving pension payments from the Pension Benefit Guaranty Corporation (PBGC) (eligible individuals). Under the new tax provisions, eligible individuals can either take a tax credit or get advance payment of 65% of premiums paid for qualified health insurance, including continuation coverage. If you have questions about these new tax provisions, you may call the Health Coverage Tax Credit Customer Contact Center toll-free at 1 866 628-4282. TTD/TTY callers may call toll-free at 1 866 626-4282. More information about the Trade Act is also available at www.doleta.gov/tradeact/.

## When and how must payment for COBRA continuation coverage be made?

### First payment for continuation coverage
If you elect continuation coverage, you do not have to send any payment with the Election Form. However, you must make your first payment for continuation coverage not later than 45 days after the date of your election. (This is the date the Election Notice is post-marked, if mailed.) If you do not make your first payment for continuation   coverage in full not later than 45 days after the date of your election, you will lose all continuation coverage rights under the plan. Your first payment for continuation coverage must include all premiums owed from the date on which COBRA coverage began. You are responsible for making sure that the amount of your first payment is correct. You may contact the Plan Administrator to confirm the correct amount of your first payment.

### Periodic payments for continuation coverage
After you make your first payment for continuation coverage, you will be required to make periodic payments for each subsequent coverage period. The amount due for each coverage period for each qualified beneficiary is shown in the COBRA Continuation Coverage Election Letter. The periodic payments can be made on a monthly basis. Under the plan, each of these periodic payments for continuation coverage is due on the first day of the month for that coverage period. If you make a periodic payment on or before the first day of the coverage period to which it applies, your coverage under the plan will continue for that coverage period without any break. You will receive periodic notices of payments due for these coverage periods.

qualifying event, (ii) the date on which coverage would be lost because of the initial qualifying event, or (iii) the date of the SSA disability determination.

**SSA Disability Notice Procedures:** The SSA disability notices that you provide must be **in writing**. Oral notice, including notice by telephone, is not acceptable. You must mail, fax or hand deliver your notice to:

Blue Cross and Blue Shield of Alabama
Attention: Customer Accounts
450 Riverchase Parkway East
Birmingham, AL 35298-0001
Fax: (205) 220-6884 or 1 888 810-6884 (toll free)

Your notice must be received by Blue Cross and Blue Shield of Alabama no later than the last day of the required 60-day notice period unless you mail it. If mailed, your notice must be postmarked no later than the last day of the required 60-day notice period. The notice you provide must state:

- the name of the plan or plans under which you lost or are losing coverage,
- the name and address of the employee covered under the plan,
- the name(s) and address(es) of the qualified beneficiary(ies),
- the qualifying event and the date of the qualifying event,
- the name of the disabled qualified beneficiary,
- the date that the qualified beneficiary became disabled, and
- the date that the SSA made its determination of disability.

Your notice must also include a copy of the SSA disability determination. For your convenience, we have provided a form of Notice by Qualified Beneficiaries that you may use to notify Blue Cross and Blue Shield of Alabama of a SSA disability determination. You may also get a copy of this form, at no cost to you, from either the Plan Administrator or Blue Cross and Blue Shield of Alabama. If these procedures are not followed or if the notice is not provided in writing to Blue Cross and Blue Shield of Alabama within the required time period, there will be no disability extension of COBRA continuation coverage.

Each qualified beneficiary who has elected continuation coverage will be entitled to the 11-month disability extension if one of them qualifies. If the qualified beneficiary is determined by SSA to no longer be disabled, you must notify Blue Cross and Blue Shield of Alabama of that fact within 30 days after SSA's determination.

*Second Qualifying Event*
An extension of coverage for up to 18 months will be available to spouses and dependent children who elect continuation coverage if a second qualifying event occurs during the first 18 months of continuation coverage. The maximum amount of continuation coverage available

when a second qualifying event occurs is 36 months (beginning on the date of the first qualifying event). Such second qualifying events may include the death of a covered employee, divorce from the covered employee, the covered employee's becoming enrolled in Medicare (under Part A, Part B, or both), or a dependent child's ceasing to be eligible for coverage as a dependent under the plan. These events can be a second qualifying event only if they would have caused the qualified beneficiary to lose coverage under the plan if the first qualifying event had not occurred.

For example, the former employee becoming enrolled in Medicare will rarely be a second qualifying event that would entitle the spouse or dependent children to extended COBRA coverage. This is because, for plans that are subject to both COBRA and the Medicare Secondary Payer (MSP) laws, this event would not cause the spouse or dependent children to lose coverage under the plan had the first qualifying event not occurred.

In order for this extension to apply, you must timely notify the Plan Administrator in writing (using the procedures specified below) of the second qualifying event within 60 days after the second qualifying event occurs or within 60 days after the date on which coverage would be lost because of the event, whichever is later.

**Qualifying Event Notice Procedures:** The notice of the second qualifying event that you provide must be in writing. Oral notice, including notice by telephone, is not acceptable. You must mail or hand deliver your notice to the Plan Administrator at the address listed at the end of this notice. Your notice must be received by the Plan Administrator no later than the last day of the required 60-day notice period unless you mail it. If mailed, your notice must be postmarked no later than the last day of the required 60-day period. The notice you provide must state:

- the name of the plan or plans under which you lost or are losing coverage,
- the name and address of the employee covered under the plan,
- the name(s) and address(es) of the qualified beneficiary(ies),
- the qualifying event and the date of the qualifying event, and
- the second qualifying event and the date of the second qualifying event.

If the second qualifying event is a divorce, your notice must include a copy of the divorce decree. For your convenience, we have provided a form of Notice by Qualified Beneficiaries that you may use to notify the Plan Administrator of a second qualifying event. You may also get a copy of this form, at no cost to you, from the Plan Administrator. If these procedures are not followed or if the notice is not provided





U.S. POSTAGE
PAID
LUVERNE AL. AL
MAR 17, 06
AMOUNT 06
**$5.12**
00005147-02

36049

0000

36049

5-11

ms
of
Luverne al 36049

RMATION

# COBRA
## Continuation of Coverage

DAVI096   36049.2008 1106 07 03/10/06
FORM 3547

DAVIS/ ROBIN O

nd Blue Shield of Alabama
se Parkway East

Alabama 35298-0001

SERVICE REQUESTED

TURN RECEIPT
REQUESTED

105-0390 0003 1559 7244



**BlueCross BlueShield**
**of Alabama**

# Certificate of Creditable Coverage

Blue Cross and Blue Shield of Alabama is an Independent Licensee of the
Blue Cross and Blue Shield Association

**\*IMPORTANT** - This certificate provides evidence of your prior health coverage. Please refer to
the Statement of HIPAA Portability Rights enclosed in this envelope for a detailed explanation of
the importance of this certificate.

1) Date of this Certificate: __03/20/2006__

2) Name, Address, of Issuer responsible for providing this Certificate:

Blue Cross and Blue Shield of Alabama
450 Riverchase Parkway East, P.O. Box 995
Birmingham, Al. 35298

3) For further information call: Blue Cross Customer Service at 205-988-2200 or 800-292-8868

4) Name of Contract Holder: __Kevin J Atwell__

5) Group Plan(s) covered by this Certificate:
    Plan Number(s):   52397

6) Contract Number under most recent plan: __PPA818224709__

7) Name of Member to whom this Certificate applies:

Name __Kevin J Atwell__                          Date of Birth _____

8) If the individual identified in line 7 has at least 18 months of creditable coverage (disregarding
    periods of coverage before a 63 day break), check here and skip lines 9 and 10 _____

9) Date Waiting Period (if any) began: __08/01/2005__ _____

10) Date Coverage Began: __12/01/2005__

11) Date Coverage Ended: __03/01/2006__
    (or check if coverage is continuing as of the date of this Certificate: _____ )

(Note: Separate certificates will be furnished for the Contract Holder and each Member.)

Kevin J Atwell
1096 Sims Rd
Luverne, AL. 36049-4927

# C O B R A

## CONTINUATION OF COVERAGE APPLICATION



**BlueCross BlueShield**
**of Alabama**

An Independent Licensee of the Blue Cross and Blue Shield Association.



**BlueCross BlueShield of Alabama**

An Independent Licensee of the
Blue Cross and Blue Shield Association.

450 Riverchase Parkway East
P.O. Box 995
Birmingham, Alabama 35298-0001
(205) 988-2200

# COBRA

**CONTINUATION OF COVERAGE APPLICATION**

Under the provisions of the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA) as amended

| FOR OFFICE USE ONLY |
| --- |

## TO BE COMPLETED BY APPLICANT

**Employee Information:**

Name Shown On The Present Coverage
**Robin Davis**
☐ Male
☐ Female

Health Contract Number | Dental Contract Number (If Any)

Group Number/Division | My Date of Birth MM/DD/YYYY

Street Address

City | State | ZIP

Telephone Number: | Home | Work

Date COBRA Coverage Should Start MM/DD/YYYY | Date of Termination/Layoff MM/DD/YYYY

**COBRA Applicant Information:**

Name To Be Shown On Continuation Coverage
☐ Male
☐ Female

Social Security Number | Date of Birth (MM/DD/YYYY)

Billing Address (Street)

City | State | ZIP

Reason I Can Continue Coverage (Check one)
☐ Death ☐ Divorce ☐ Legal Separation ☐ Dependent Married
☐ No Longer An Eligible Dependent ☐ Termination/Reduction in Hours
☐ Employee is entitled to Medicare
Date the above event occurred

List eligible dependents to be shown on the Continuation Coverage:

| LAST NAME | FIRST NAME | INITIAL | SOCIAL SECURITY NUMBER | RELATIONSHIP | DATE OF BIRTH |
| --- | --- | --- | --- | --- | --- |
| | | | | ☐ Husband ☐ Wife | MM DD YYYY |
| | | | | ☐ Son ☐ Daughter | MM DD YYYY |
| | | | | ☐ Son ☐ Daughter | MM DD YYYY |
| | | | | ☐ Son ☐ Daughter | MM DD YYYY |

**COORDINATION OF BENEFITS INFORMATION** — If you, your spouse, or your dependents are covered by any other group health insurance, please give the following information.

NAME OF CONTRACT HOLDER | POLICY, ID, CONTRACT OR CERTIFICATE NUMBER | TYPE COVERAGE ☐ INDIVIDUAL ☐ FAMILY | NAME OF INSURANCE COMPANY

EMPLOYER'S NAME | CITY | GROUP NUMBER | STREET ADDRESS

NAME OF MEMBER ENTITLED TO MEDICARE BENEFITS ☐ Part A ☐ Part B | MEDICARE NUMBER | CITY, STATE, ZIP

**OTHER BLUE CROSS COVERAGE** -- If you or your spouse are currently covered by another Blue Cross and Blue Shield contract, please complete below:

CURRENT BLUE CROSS AND BLUE SHIELD CONTRACT NUMBER

CITY AND STATE OF BLUE CROSS PLAN ENROLLED

I acknowledge that I have received and read a COBRA notice informing me of my COBRA rights.

I understand and acknowledge that it is the Employer's obligation (and not Blue Cross) to provide me with any and all continuation coverage to which I might be entitled under COBRA or under the provisions of the Employer's group health plan implementing COBRA. I further understand and acknowledge that my COBRA benefits are provided to me under and in accordance with the provisions of Part 6 of Title I of the Employee Retirement Income Security Act of 1974. In the event of a dispute between me and Blue Cross regarding my benefits under COBRA or under this application, I understand that any administrative remedies available under the Employer's group plan must be used and exhausted by me before bringing any action against Blue Cross, notwithstanding cancellation of the Employer's coverage.

By signing below, I agree to pay to Blue Cross and Blue Shield of Alabama the monthly premium to continue the group benefits for me and my eligible dependents,

if any, who are listed above. I can continue COBRA coverage for 18 months following my termination of employment or reduction in hours or 36 months if my coverage was terminated for any other event listed above. Under certain circumstances explained in the COBRA notice, if I or a member of my family is or becomes disabled during the first 60 days of COBRA coverage, the 18 month period may be extended to 29 months.

I understand the first payment is due by 45 days after I first elected COBRA. The first payment must include all premiums retroactive to the effective date of my COBRA coverage. All other payments are due within 30 days of the due date. If I fail to pay the amount due on time or if I request that my coverage be cancelled, my coverage will end and not be reinstated under any circumstances.

I understand that coverage will end for me or any of my dependents who become covered by Medicare or any other group health coverage which does not have limitations or exclusions for pre-existing conditions or which has them but

they do not apply. I will notify you in writing if I become covered by another group plan or Medicare. If I or any of my qualified dependents become disabled according to the Social Security Administration (SSA), I will notify you in writing before the end of the 18 month period and within 60 days after the date of my initial qualifying date, the date on which my coverage is lost under my group health plan because of such event, or the date of the SSA disability determination.

While I continue the benefits provided by this group, these benefits are subject to all terms and conditions of the Employer's group health plan and any agreement between the Employer and Blue Cross and Blue Shield of Alabama. My benefits and/or rates will change when this Employer's benefits change, and will end if the Employer's coverage is cancelled at the same time benefits for active employees of the Employer end, regardless of whether I have continued to pay for my coverage.

I wish to continue the following coverage:
☐ HEALTH ONLY ☐ DENTAL ONLY   ☐ HEALTH AND DENTAL   ☐ I enclose with the application a check or money order for the premium payment to cover the period from the effective date of my COBRA coverage through the current coverage period.

SIGNATURE OF APPLICANT _____ Date: _____

## TO BE COMPLETED BY EMPLOYER

I am authorized by the Employer named below to certify that the person named above is eligible under COBRA to continue group health plan coverage to be effective for a maximum of **18** (18 or 36) months. The monthly rate for the continuation coverage will be $ **27.00 / 20.00 Dental** per month until notified by Blue Cross and Blue Shield of Alabama under the conditions noted above.

Employer: **Smart Alabama LLC**   Telephone Numbers: **334-335-5800**

COBRA EFFECTIVE DATE: **3-1-06**

Signature of Authorized Representative: **Melissa McGough**   Date **3-1-06**

Type or Print Name Below Signature: **Melissa McGough**

ENR-270 (Rev. 10-2004)   Original: To Blue Cross and Blue Shield of Alabama, P.O. Box 995, Birmingham, AL 35298-0001   Pink Copy: To Employer   Yellow Copy: To Subscriber

# COBRA

## Notice by Qualified Beneficiaries of SSA Disability Determination

**IMPORTANT:** COBRA coverage may be extended for up to 29 months (from the date of the first qualifying event) if any of the qualified beneficiaries are determined by the Social Security Administration (SSA) to be disabled. The disability must start before the 60th day of COBRA coverage and must last until the end of the 18-month COBRA coverage period. You must timely deliver this notice to Blue Cross and Blue Shield of Alabama, Attention: Customer Accounts, 450 Riverchase Parkway East, Birmingham, AL 35298-0001, Fax: 205 220-6884 or 1 888 810-6884 (toll free) before the end of the 18-month period of COBRA coverage and within 60 days after the later of (i) the date of the initial qualifying event, (ii) the date on which coverage is lost under the Plan because of the initial qualifying event, or (iii) the date of the SSA disability determination. If you do not deliver this notice by the due date above, you will lose your right to an extension of COBRA continuation coverage. Please refer to the summary plan descriptions for your Plan for more information about COBRA coverage.

**Group Health Plan Information:** _____

| GROUP NAME | GROUP NUMBER |

Please check the group health plans (the "Plan") under which you had coverage on the day before the qualifying event:
☐ Health    ☐ Dental

**Covered Employee Information:**
Please complete the information below for the former employee who was covered under the Plan:

| EMPLOYEE'S LAST NAME | FIRST NAME | MIDDLE INITIAL | SOCIAL SECURITY NUMBER | |
|---|---|---|---|---|
| EMPLOYEE'S STREET ADDRESS | | CITY | STATE | ZIP |
| DATE OF TERMINATION/REDUCTION IN HOURS<br>MM/DD/YYYY | | | | |

**Qualified Beneficiary Information:**
Please complete the information below for each person (the employee, spouse and/or dependent children) who have COBRA coverage under the Plan:

| LAST NAME | FIRST NAME | MIDDLE INITIAL | SOCIAL SECURITY NUMBER | |
|---|---|---|---|---|
| STREET ADDRESS | | CITY | STATE | ZIP |
| RELATIONSHIP TO EMPLOYEE | | | | |

| LAST NAME | FIRST NAME | MIDDLE INITIAL | SOCIAL SECURITY NUMBER | |
|---|---|---|---|---|
| STREET ADDRESS | | CITY | STATE | ZIP |
| RELATIONSHIP TO EMPLOYEE | | | | |

| LAST NAME | FIRST NAME | MIDDLE INITIAL | SOCIAL SECURITY NUMBER | |
|---|---|---|---|---|
| STREET ADDRESS | | CITY | STATE | ZIP |
| RELATIONSHIP TO EMPLOYEE | | | | |

**Notice of SSA Disability Determination:** Please complete all information below:

| NAME OF DISABLED QUALIFIED BENEFICIARY | |
|---|---|
| DATE OF QUALIFIED BENEFICIARY DISABILITY<br>MM/DD/YYYY | DATE OF SSA DISABILITY DETERMINATION<br>MM/DD/YYYY |

You must include a copy of the SSA disability determination letter with this notice.

_____        _____        _____
SIGNATURE                              PRINT NAME                              DATE

MKT-56 (10-2004)

# COBRA

## Notice by Qualified Beneficiaries of Second Qualifying Event

**IMPORTANT:** An extension of COBRA coverage for up to 36 months (from the date of the first qualifying event) may be available to spouses and dependent children who elect COBRA if a second qualifying event occurs during the first 18 months of COBRA coverage. The second event can be a second qualifying event only if it would have caused the qualified beneficiary to lose coverage under the Plan if the first qualifying event had not occurred. For this extension to apply, you must deliver this notice to us at:

| Plan Administrator's Name | Address | City | State | Zip |
|---|---|---|---|---|

within 60 days after the second qualifying event or within 60 days after the date coverage is lost under the Plan because of the event, whichever is later. **If you do not deliver this notice by the due date above, you will lose your right to an extension of COBRA continuation coverage.** Please refer to the summary plan descriptions for your group health plan(s) for more information about COBRA continuation coverage.

**Group Health Plan Information:**
Please check the group health plans (the "Plan") under which you have COBRA coverage: ☐ Health    ☐ Dental

**Covered Employee Information:**
Please complete the information below for the former employee who was covered under the Plan:

| EMPLOYEE'S LAST NAME | FIRST NAME | MIDDLE INITIAL | SOCIAL SECURITY NUMBER |
|---|---|---|---|
| EMPLOYEE'S STREET ADDRESS | CITY | STATE | ZIP |
| DATE OF TERMINATION/REDUCTION IN HOURS MM/DD/YYYY | | | |

**Qualified Beneficiary Information:**
Please complete the information below for each person (any spouse or dependent children) who has COBRA coverage:

| LAST NAME | FIRST NAME | MIDDLE INITIAL | SOCIAL SECURITY NUMBER |
|---|---|---|---|
| STREET ADDRESS | CITY | STATE | ZIP |
| RELATIONSHIP TO EMPLOYEE | | | |

| LAST NAME | FIRST NAME | MIDDLE INITIAL | SOCIAL SECURITY NUMBER |
|---|---|---|---|
| STREET ADDRESS | CITY | STATE | ZIP |
| RELATIONSHIP TO EMPLOYEE | | | |

| LAST NAME | FIRST NAME | MIDDLE INITIAL | SOCIAL SECURITY NUMBER |
|---|---|---|---|
| STREET ADDRESS | CITY | STATE | ZIP |
| RELATIONSHIP TO EMPLOYEE | | | |

**Notice of Second Qualifying Event:**
Please check the event that occurred and give the date it occurred:

| ☐ DIVORCE OF THE EMPLOYEE AND SPOUSE*<br>☐ DEPENDENT CHILD'S LOSING ELIGIBILITY FOR COVERAGE AS A DEPENDENT CHILD<br>☐ DEATH OF EMPLOYEE<br><br>*IF THE EVENT IS A DIVORCE, YOU MUST INCLUDE A COPY OF THE DIVORCE DECREE WITH THIS NOTICE. | DATE OF SECOND QUALIFYING EVENT:<br><br>MM/DD/YYYY |
|---|---|

| SIGNATURE | PRINT NAME | DATE |
|---|---|---|

MKT-55 (Rev.9-2005)

# C O B R A

## Cobra Continuation Coverage Election Form

**INSTRUCTIONS:** To elect COBRA continuation coverage, complete this Election Form and return it to us. Under federal law, you must have 60 days after the date of this notice to decide whether you want to elect COBRA continuation coverage under the Plan.

Send completed Election Form to: _____

_____

_____

This Election Form must be completed and returned by mail or hand delivery on _____.

If mailed, it must be post-marked no later than _____.

If you do not submit a completed Election Form by the due date shown above, you will lose your right to elect COBRA continuation coverage. If you reject COBRA continuation coverage before the due date, you may change your mind as long as you furnish a completed Election Form before the due date. If you change your mind after first rejecting COBRA continuation coverage, your COBRA continuation coverage will begin on the date that your group health plan coverage terminated.

**READ THE IMPORTANT INFORMATION PROVIDED ABOUT YOUR
COBRA CONTINUATION COVERAGE RIGHTS (included in COBRA Election packet MKT-171)**

I (We) elect **COBRA** continuation coverage in the following group health plans (the plan) as indicated below:

Type of plans (please check):    ☐ **Health**    ☐ **Dental**

| LAST NAME | FIRST NAME | MIDDLE INITIAL | SOCIAL SECURITY NUMBER |
|---|---|---|---|
| DATE OF BIRTH MM/DD/YYYY | | RELATIONSHIP TO EMPLOYEE | |
| LAST NAME | FIRST NAME | MIDDLE INITIAL | SOCIAL SECURITY NUMBER |
| DATE OF BIRTH MM/DD/YYYY | | RELATIONSHIP TO EMPLOYEE | |
| LAST NAME | FIRST NAME | MIDDLE INITIAL | SOCIAL SECURITY NUMBER |
| DATE OF BIRTH MM/DD/YYYY | | RELATIONSHIP TO EMPLOYEE | |
| LAST NAME | FIRST NAME | MIDDLE INITIAL | SOCIAL SECURITY NUMBER |
| DATE OF BIRTH MM/DD/YYYY | | RELATIONSHIP TO EMPLOYEE | |

**Type of coverage elected (please check one only):**

☐    I (We) elect to continue family coverage under the plan
☐    I (We) elect to continue single coverage under the plan
☐    I decline/waive my right to COBRA continuation coverage under the plan

_____    _____    _____
SIGNATURE                                              PRINT NAME                                          DATE

_____    _____    _____
PRINT ADDRESS                                                                                            TELEPHONE NUMBER

_____
RELATIONSHIP TO EMPLOYEE

MKT-365 (Rev. 7-2005)

# COBRA

## COBRA Continuation Coverage Election Letter

Date of Notice: _____
　　　　　　　　　　　MM/DD/YYYY

To: _____
　　　　　NAME OF EMPLOYEE, SPOUSE, DEPENDENT CHILDREN, AS APPROPRIATE

Address:_____
　　　　　　　　　ADDRESS TO WHICH NOTICE IS BEING SENT

**This notice contains important information about your right to continue your health care coverage with your group health plan(s). Please read the information contained in this notice very carefully.**

To elect COBRA continuation coverage, follow the instructions to complete the Election Form (MKT-365) and submit it to the Plan Administrator at the address below. This Election Form should be included in your COBRA Election Packet (MKT-171).

If you do not elect COBRA continuation coverage, your coverage under the plan will end on _____.
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　MM/DD/YYYY

Please check the reason below:
☐ End of employment　　　　☐ Reduction in hours of employment　　　☐ Death of employee
☐ Divorce　　　　　　　　　☐ Enrollment in Medicare　　　　　　　☐ Loss of dependent child status

Each person ("qualified beneficiary") in the category(ies) checked below is entitled to elect COBRA continuation coverage, which will continue group health care coverage under the plan for up to _____ months.

Please check the appropriate box or boxes below and give the name:

☐ Covered employee or covered former employee _____

☐ Covered spouse or covered former spouse _____

☐ Dependent child(ren) covered under the plan on the day before the event that caused the loss of coverage _____

_____

☐ Child who is losing coverage under the plan because he or she is no longer a dependent under the plan _____

_____

If any of the persons listed above do not reside at the address to which this notice was sent, please notify the Plan Administrator of the new address for these persons so that we may give them a copy of this notice.

If elected, COBRA continuation coverage will begin on _____ and can last until _____.
　　　　　　　　　　　　　　　　　　　　　　　　DATE　　　　　　　　　　　　　　　　　　DATE
You may elect either family coverage or single coverage for COBRA continuation coverage.

COBRA continuation coverage cost — Family: _____.　Single: _____
Your cost for COBRA coverage may change over time, as the cost of benefits under the plan changes. You do not have to send any payment with the Election Form. Important additional information about payment for COBRA continuation coverage is included in "Important Information about your COBRA Conntinuation Coverage Rights" (MKT-54).

If you have any questions about this notice or your rights to COBRA continuation coverage, you should contact:

Plan Administrator:

Name/Position:

Address:　　　　　　　　　　　　　　　　　　　　　Phone Number:

MKT-53 (10-2004)

# COBRA
## Important Information
## About Your COBRA Continuation Coverage Rights

## What is COBRA continuation coverage?

A federal law known as COBRA requires that most group health plans (including the plan or plans that are listed in the COBRA Continuation Coverage Election Form and collectively referred to in this notice as "the plan") give employees and their families the opportunity to continue their health care coverage when there is a "qualifying event" that would result in a loss of coverage under the plan. Only persons known as "qualified beneficiaries" may elect to continue their coverage under the plan. Depending on the type of qualifying event, "qualified beneficiaries" can include the employee (or retired employee) covered under the group health plan, the covered employee's spouse, and the dependent children of the covered employee. A child of the covered employee or former employee who is receiving benefits under the plan pursuant to a qualified medical child support order is entitled to the same rights under COBRA as a dependent child of the covered employee. A child born to, adopted by or placed for adoption with a former employee during the period of COBRA coverage may also be a qualified beneficiary if the former employee is a qualified beneficiary who has elected COBRA coverage. Continuation coverage is the same coverage that the plan gives to other participants or beneficiaries under the plan who are not receiving continuation coverage. Each qualified beneficiary who elects continuation coverage will have the same rights under the plan as other participants or beneficiaries covered under the plan, including special enrollment rights and any open enrollment rights.

## How long will COBRA continuation coverage last?

In the case of a loss of coverage due to end of employment or reduction in hours of employment, coverage generally may be continued only for up to a total of 18 months. In the case of losses of coverage due to an employee's death, divorce, the employee's becoming enrolled in Medicare or a dependent child ceasing to be a dependent under the terms of the plan, coverage may be continued for up to a total of 36 months. When the qualifying event is the end of employment or reduction of the employee's hours of employment, and the employee became enrolled in Medicare before the qualifying event, COBRA continuation coverage for qualified beneficiaries other than the employee lasts until 36 months after the date of Medicare enrollment or 18 months after the date of termination of employment or reduction in hours, whichever period ends last. This notice shows the maximum period of continuation coverage available to the qualified beneficiaries.

MKT-54 (1Rev. 9-2005)

## Can COBRA coverage terminate early?

Continuation coverage will be terminated **before** the end of the maximum period if:
- any required premium is not paid in full on time,
- after electing continuation coverage, a qualified beneficiary becomes covered under another group health plan that does not impose any pre-existing condition exclusion for a pre-existing condition of the qualified beneficiary,
- after electing continuation coverage, a qualified beneficiary becomes enrolled in Medicare (under Part A, Part B, or both),
- a qualified beneficiary is covered under the additional 11-month disability extension and there has been a final determination by the Social Security Administration that the disabled qualified individual is no longer disabled, or
- the employer ceases to provide any group health plan for its employees.

Continuation coverage may also be terminated for any reason the plan would terminate coverage of a participant or beneficiary not receiving continuation coverage (such as fraud).

## How can you extend the length of COBRA continuation coverage?

If you elect continuation coverage, an extension of the maximum 18-month period of coverage may be available if a qualified beneficiary is disabled or a second qualifying event occurs. You must timely notify the Plan Administrator or his designee of a disability or a second qualifying event, using the notice procedures specified below, in order to extend the period of continuation coverage. Failure to provide notice of a disability or second qualifying event may affect the right to extend the period of continuation coverage.

### Disability

An 11-month extension of coverage (for a maximum of 29 months of coverage) may be available if any of the qualified beneficiaries is determined by the Social Security Administration (SSA) to be disabled. The disability has to have started at some time before the 60th day of COBRA continuation coverage and must last at least until the end of the 18-month period of continuation coverage. In order for this disability extension to apply, you must timely notify the Plan Administrator or its designee in writing (using the notice procedures specified below) of the SSA disability determination before the end of the 18-month period of continuation coverage **and** within 60 days after the later of (i) the date of the initial

qualifying event, (ii) the date on which coverage would be lost because of the initial qualifying event, or (iii) the date of the SSA disability determination.

**SSA Disability Notice Procedures:** The SSA disability notices that you provide must be **in writing.** Oral notice, including notice by telephone, is not acceptable. You must mail, fax or hand deliver your notice to:

> Blue Cross and Blue Shield of Alabama
> Attention: Customer Accounts
> 450 Riverchase Parkway East
> Birmingham, AL 35298-0001
> Fax: (205) 220-6884 or 1 888 810-6884 (toll free)

Your notice must be received by Blue Cross and Blue Shield of Alabama no later than the last day of the required 60-day notice period unless you mail it. If mailed, your notice must be postmarked no later than the last day of the required 60-day notice period. The notice you provide must state:

- the name of the plan or plans under which you lost or are losing coverage,
- the name and address of the employee covered under the plan,
- the name(s) and address(es) of the qualified beneficiary(ies),
- the qualifying event and the date of the qualifying event,
- the name of the disabled qualified beneficiary,
- the date that the qualified beneficiary became disabled, and
- the date that the SSA made its determination of disability.

Your notice must also include a copy of the SSA disability determination. For your convenience, we have provided a form of Notice to Qualified Beneficiaries that you may use to notify Blue Cross and Blue Shield of Alabama of a SSA disability determination. You may also get a copy of this form, at no cost to you, from either the Plan Administrator or Blue Cross and Blue Shield of Alabama. If these procedures are not followed or if the notice is not provided in writing to Blue Cross and Blue Shield of Alabama within the required time period, there will be no disability extension of COBRA continuation coverage.

Each qualified beneficiary who has elected continuation coverage will be entitled to the 11-month disability extension if one of them qualifies. If the qualified beneficiary is determined by SSA to no longer be disabled, you must notify Blue Cross and Blue Shield of Alabama of that fact within 30 days after SSA's determination.

*Second Qualifying Event*
An extension of coverage for up to 18 months will be available to spouses and dependent children who elect continuation coverage if a second qualifying event occurs during the first 18 months of continuation coverage. The maximum amount of continuation coverage available

when a second qualifying event occurs is 36 months (beginning on the date of the first qualifying event). Such second qualifying events may include the death of a covered employee, divorce from the covered employee, the covered employee's becoming enrolled in Medicare (under Part A, Part B, or both), or a dependent child's ceasing to be eligible for coverage as a dependent under the plan. These events can be a second qualifying event only if they would have caused the qualified beneficiary to lose coverage under the plan if the first qualifying event had not occurred.

For example, the former employee becoming enrolled in Medicare will rarely be a second qualifying event that would entitle the spouse or dependent children to extended COBRA coverage. This is so because, for plans that are subject to both COBRA and the Medicare Secondary Payer (MSP) laws, this event would not cause the spouse or dependent children to lose coverage under the plan had the first qualifying event not occurred.

In order for this extension to apply, you must timely notify the Plan Administrator in writing (using the procedures specified below) of the second qualifying event within 60 days after the second qualifying event occurs or within 60 days after the date on which coverage would be lost because of the event, whichever is later.

**Qualifying Event Notice Procedures:** The notice of the second qualifying event that you provide must be in writing. Oral notice, including notice by telephone, is not acceptable. You must mail or hand deliver your notice to the Plan Administrator at the address listed at the end of this notice. Your notice must be received by the Plan Administrator no later than the last day of the required 60-day notice period unless you mail it. If mailed, your notice must be postmarked no later than the last day of the required 60-day period. The notice you provide must state:

- the name of the plan or plans under which you lost or are losing coverage,
- the name and address of the employee covered under the plan,
- the name(s) and address(es) of the qualified beneficiary(ies),
- the qualifying event and the date of the qualifying event, and
- the second qualifying event and the date of the second qualifying event.

If the second qualifying event is a divorce, your notice must include a copy of the divorce decree. For your convenience, we have provided a form of Notice by Qualified Beneficiaries that you may use to notify the Plan Administrator of a second qualifying event. You may also get a copy of this form, at no cost to you, from the Plan Administrator. If these procedures are not followed or if the notice is not provided

in writing to the Plan Administrator during the 60-day notice period, there will be no extension of COBRA coverage as a result of the second qualifying event.

## How can you elect COBRA continuation coverage?

To elect continuation coverage, you must complete the Election Form and furnish it according to the directions on the form. Failure to do so will result in the loss of the right to elect COBRA continuation coverage. Each qualified beneficiary has a separate right to elect continuation coverage. For example, the employee's spouse may elect continuation coverage even if the employee does not. Continuation coverage may be elected for only one, several, or all dependent children who are qualified beneficiaries. A parent may elect to continue coverage on behalf of any dependent children. The employee or the employee's spouse can elect continuation coverage on behalf of all of the qualified beneficiaries.

In considering whether to elect continuation coverage, you should take into account that a failure to continue your group health coverage will affect your future rights under federal law. First, you can lose the right to avoid having pre-existing condition exclusions applied to you by other group health plans if you have more than a 63-day gap in health coverage, and election of continuation coverage may help you not have such a gap. Second, you will lose the guaranteed right to purchase individual health insurance policies that do not impose such pre-existing condition exclusions if you do not get continuation coverage for the maximum time available to you. Finally, you should take into account that you have special enrollment rights under federal law. You have the right to request special enrollment in another group health plan for which you are otherwise eligible (such as a plan sponsored by your spouse's employer) within 30 days after your group health coverage ends because of a qualifying event. You will also have the same special enrollment right at the end of continuation coverage if you get continuation coverage for the maximum time available to you.

## How much does COBRA continuation coverage cost?

Generally, each qualified beneficiary may be required to pay the entire cost of continuation coverage. The amount a qualified beneficiary may be required to pay may not exceed 102 percent (or, in the case of an extension of continuation coverage due to a disability, 150 percent) of the cost to the plan (including both employer and employee contributions) for coverage of a similarly situated plan participant or beneficiary who is not receiving continuation coverage. The required payment for each continuation coverage period for each option is described in this notice.

In the case of an extension of COBRA coverage due to disability, the amount a qualified beneficiary may be required to pay may not exceed 150 percent of the full cost to the plan after the 18th month, assuming that the disabled qualified beneficiary elects to be covered under the disability extension. If the only qualified beneficiaries who elect the disability extension are non-disabled family members, the cost of coverage will remain at 102 percent of the full cost of coverage.

The Trade Act of 2002 created a new tax credit for certain individuals who become eligible for trade adjustment assistance and for certain retired employees who are receiving pension payments from the Pension Benefit Guaranty Corporation (PBGC) (eligible individuals). Under the new tax provisions, eligible individuals can either take a tax credit or get advance payment of 65% of premiums paid for qualified health insurance, including continuation coverage. If you have questions about these new tax provisions, you may call the Health Coverage Tax Credit Customer Contact Center toll-free at 1 866 628-4282. TTD/TTY callers may call toll-free at 1 866 626-4282.  More information about the Trade Act is also available at www.doleta.gov/tradeact/.

## When and how must payment for COBRA continuation coverage be made?

### First payment for continuation coverage
If you elect continuation coverage, you do not have to send any payment with the Election Form. However, you must make your first payment for continuation coverage not later than 45 days after the date of your election. (This is the date the Election Notice is post-marked, if mailed.) If you do not make your first payment for continuation   coverage in full not later than 45 days after the date of your election, you will lose all continuation coverage rights under the plan. Your first payment for continuation coverage must include all premiums owed from the date on which COBRA coverage began. You are responsible for making sure that the amount of your first payment is correct. You may contact the Plan Administrator to confirm the correct amount of your first payment.

### Periodic payments for continuation coverage
After you make your first payment for continuation coverage, you will be required to make periodic payments for each subsequent coverage period. The amount due for each coverage period for each qualified beneficiary is shown in the COBRA Continuation Coverage Election Letter. The periodic payments can be made on a monthly basis. Under the plan, each of these periodic payments for continuation coverage is due on the first day of the month for that coverage period. If you make a periodic payment on or before the first day of the coverage period to which it applies, your coverage under the plan will continue for that coverage period without any break. You will receive periodic notices of payments due for these coverage periods.

*Grace periods for periodic payments*

Although periodic payments are due on the dates shown above, you will be given a grace period of 30 days after the first day of the coverage period to make each periodic payment. Your continuation coverage will be provided for each coverage period as long as payment for that coverage period is made before the end of the grace period for that payment. However, if you pay a periodic payment later than the first day of the coverage period to which it applies, but before the end of the grace period for the coverage period, any claim you submit for benefits will be suspended as of the first day of the coverage period and then processed by the plan only when the periodic payment is received. If you fail to make a periodic payment before the end of the grace period for that coverage period, you will lose all rights to continuation coverage under the plan.

Your first payment and all periodic payments for continuation coverage should be sent to:

> Blue Cross and Blue Shield of Alabama
> Attention: COBRA
> P.O. Box 36146
> Birmingham, AL 35236-1346

## What happens when you exhaust COBRA Coverage?

If you exhaust your COBRA coverage, you may buy a conversion health contract from Blue Cross and Blue Shield of Alabama. Ask your Plan Administrator to determine whether a conversion contract is available. Conversion contracts have more limited coverage than COBRA coverage.

You may also qualify for coverage under state law. In Alabama, you can continue coverage through Alabama Health Insurance Plan (AHIP). You can reach AHIP by calling the State Employees' Insurance Board in Montgomery, Alabama. In other states, you should call the state insurance department. If you elect to buy a conversion contract instead of enrolling in AHIP, you will not be able to enroll at a later date in AHIP.

By contrast, if COBRA coverage ends because you stop paying for it, then you will not have any further coverage under the group health plan and you will not be eligible to buy conversion coverage (if available) and you may not qualify for continued coverage under any applicable state law program. For example, in Alabama, you would not qualify for continued coverage under AHIP.

## For more information

This notice does not fully describe continuation coverage or other rights under the plan. More information about continuation coverage and your rights under the plan is available in your summary plan description or from the Plan Administrator.

If you have any questions concerning the information in this notice, your rights to coverage, or if you want a copy of your summary plan description, you should contact the Plan Administrator below.

For more information about your rights under ERISA, including COBRA, the Health Insurance Portability and Accountability Act (HIPAA), and other laws affecting group health plans, contact the U.S. Department of Labor's Employee Benefits Security Administration (EBSA) in your area or visit the EBSA website at **www.dol.gov/ebsa**. (Addresses and phone numbers of Regional and District EBSA Offices are available through EBSA's website.)

## Keep Your Plan Informed of Address Changes

In order to protect your and your family's rights, you should keep the Plan Administrator informed of any changes in your address and the addresses of family members. You should also keep a copy, for your records, of any notices you send to the Plan Administrator.

### Plan Administrator Contact Information

Name/Position:

Address:

Phone Number:

**SMART Alabama, LLC**

Stamped Metal American Research Technology

121 Shinjyoung Drive • Luverne AL 36049

Envelope
for INCOME
TAX forms
Note date they
were mailed

36009+0442-42 B005

Kevin Attwell

C -



02 1P $000.39⁰
0004505228  FEB 21 2007
MAILED FROM ZIP CODE 36049

| SMART ALABAMA,LLC | OSHA CASE #: _____ |
| Incident/Near Miss Report Form | PRIVACY CASE: __ YES __ No |

## INVESTIGATOR INFORMATION

**FACILITY NAME:** SMART ALABAMA L.L.C.
**TELEPHONE #:** 334-335-5800

**FACILITY ADDRESS:** 121 Shin Young Drive Luverne, Al 36049

**REPORT PREPARED BY:** Robin Atwell
**DATE OF REPORT:** 01/30/06

**TITLE OF REPORTER:** Safety Assistant
**REPORTER'S TELEPHONE #:** 334-403-0787

## TYPE OF INJURY

__ INJURY    ✓ ILLNESS    __ NEAR MISS    __ PROPERTY DAMAGE    __ FIRE

## EMPLOYEE INFORMATION

**EMPLOYEE NAME:** Robin Atwell
**SOCIAL ____:**
__ MALE  ✓ FEMALE

**EMPLOYEE'S JOB TITLE:** Safety Assistant
**EMPLOYEE'S HIRE DATE:** 08/25/05
**EMPLOYEE'S YEARS OF SERVICE:**
**EMPLOYEE'S BIRTH DATE:** .3

**EMPLOYEE'S DEPARTMENT:** Safety Department
**EMPLOYEE'S COST CENTER:**

**EMPLOYEE'S CURRENT MAILING ADDRESS:**

## INCIDENT INFORMATION

**DATE OF INCIDENT:** 01/30/06   **TIME OF INCIDENT (MILITARY):**   **TIME EMPLOYEE BEGAN WORK:**

**WHAT OBJECT OR SUBSTANCE CAUSED THE INJURY, ILLNESS, PROPERTY DAMAGE, OR FIRE?**
Stress from Pressure from tense situation w/ Supervisor

**WHAT WAS THE EMPLOYEE DOING RIGHT BEFORE THE INCIDENT?**
Working

**HOW DID THE INCIDENT OR EXPOSURE OCCUR?**

## MEDICAL INFORMATION

**DESCRIBE THE NATURE OF THE INJURY:**

**DESCRIBE THE BODY PART AFFECTED:**

**NAME OF TREATING PHYSICIAN:**   **TREATING NURSE:**   **HAS EMPLOYEE RETURNED TO WORK?** ✓ YES __ NO

**FATALITY:** YES (NO)   **DATE OF FATALITY:** / /

**ADDRESS OF TREATING PHYSICIAN:**

| **OSHA RECORDABLE:** YES   NO | **INCIDENT TYPE:** | **WORKER'S COMPENSATION:** YES   NO |
| **BODY PART:** Nerves | **BASIC CAUSE:** Stress | |
| **STATUS:** (ACTIVE) INACTIVE | **DAYS MISSED:** | **DAYS RESTRICTED:** |
| **TRANSFERRED/TERMINATION:** · YES   NO | **DATE OF FATALITY:** | **NATURE OF INJURY:** |

**IF TREATMENT WAS GIVEN AWAY FROM THE WORKSITE, WHERE WAS IT GIVEN?** Charles Tompkins Crenshaw Comm. Hospital

**WAS EMPLOYEE TREATED IN AN EMERGENCY ROOM?** (YES) NO   **WAS EMPLOYEE HOSPITALIZED OVERNIGHT AS AN IN-PATIENT?** (YES) NO

03/15

## Office Employee's Ext.# & Phone #

12/12/2005

| DEPARTMENT | NAME | Ext. | Cell. | Home |
|---|---|---|---|---|
| HR Control/Coordination | | | | |
| C O O | Hong, Ho Man | 223 | 334-208-2431 | 334-335-3368 |
| C F O | Kim, Kwang Pyoung | 228 | 334-208-2425 | 334-808-2469 |
| C M O | Jung, Doug Hyob | 227 | 334-208-2380 | 334-335-2884 |
| Management Group | | | | |
| Director | Kwon, Li Yong | 224 | 334-208-2433 | 334-335-2282 |
| Human Resource | Gary R. Sport | 244 | 334-208-2421 | 334-336-8055 |
| | Kim, Byoung Joon | 242 | 334-208-2432 | 334-335-2800 |
| | Ruth Ryan | 304 | 334-208-5844 | |
| | Ira Walton | 240 | 334-208-2916 | 334-335-2816 |
| | Barbara Powell | 247 | 334-404-9779 | 334-527-3148 |
| | Fran Hughes | 241 | 334-303-7650 | 334-335-5412 |
| | Amy Kelley | 238 | 334-428-0777 | 334-428-0777 |
| | Yu K. Kalipi | 233 | | 334-348-2653 |
| Safety | Joseph | 304 | 334-208-2375 | |
| | Melissa McSween | | 334-208-2428 | 334-335-5947 |
| | Rance Maddox | 236 | 334-208-3502 | 334-208-3592 |
| | Lisa, Bedford | 236 | 334-428-0120 | 334-335-4821 |
| | Robin Davis | 235 | 334-403-0787 | 334-335-3501 |
| Accounting | Yun, Hyun Sik | 231 | 334-208-2923 | 334-335-2238 |
| | Phela Gulledge | 245 | | 334-807-0467 |
| | Staci Mount | 232 | 334-232-1205 | 334-335-8647 |
| I T | Choi, Sun Gil | 323 | 334-208-5645 | 334-335-9939 |
| | Brad Watts | 229 | 334-707-1048 | 334-707-1048 |
| Purchasing | Kim, Michael | 234 | | |
| | Jennifer Worley | 239 | 334-850-5102 | 334-335-3315 |
| Maintenance | Mark Spada | 230 | 334-208-2428 | |
| | Kim, Young Tae | 259 | 334-208-2435 | 334-335-2037 |
| | Shawn, Strickens | 284 | 334-208-2806 | 334-335-2220 |
| | Kim, Joug Wook | 320 | 334-208-3096 | 334-335-3559 |
| | Tina, Lowery | 295 | 334-428-1156 | 334-302-9904 |
| | Jung, Joo Jin | | 334-208-3687 | 334-335-2080 |
| Develop/Procurement | Oh, Jae Young | 294 | 334-208-2422 | 334-335-3038 |
| | Hwang In Tae | 327 | 334-300-5980 | 334-335-2852 |
| | Han, Jae Gil | 280 | 334-208-3684 | 334-335-2858 |
| | Kim, Heo Joong | 276 | 334-300-5886 | |
| | Brad Andrews | 291 | 334-444-8117 | 334-444-8117 |
| | Park, So Young | 283 | | 334-782-2185 |
| | Jeff, Messer | 330 | | |

Representative Tel: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    Fax:334-335-5816 (Admin) Fax: 384-135-5853 (Production)

| DEPARTMENT | NAME | Ext. | Cell. | Home |
|---|---|---|---|---|
| Director | Son, Bong Kun | 225 | 334-208-2410 | 334-569-9188 |
| Deputy Manager | Heo, Huk | 228 | 334-208-3500 | 334-208-5887 |
| Production Manager | Doe, Sands | 267 | 334-300-3854 | |
| Press/Tool&Die | Kim, Jong Kwan | 269 | 334-208-2378 | |
| | Kim, Soo Guen | 268 | 334-208-2399 | 334-335-2470 |
| | Jim Liebenguth | 280 | 334-300-5630 | 334-372-7694 |
| | Kim, Byoung Jong | 287 | 334-208-3889 | 334-336-2854 |
| | Newborn, Roy | 285 | | 335-3108 |
| Assembly | Kim, Jong Il | 283 | 334-208-3890 | |
| | April Mcdonald | 285 | 334-372-0458 | 334-335-8797 |
| | Jung, Joo Jin | | 334-208-3987 | 334-335-2080 |
| | Jung Jin Ho | | 334-208-3891 | |
| | Cha, Jae Gil | 288 | 334-208-2385 | 334-335-2058 |
| | Llyod, Weather | 271 | 334-300-3943 | |
| | Kim, Sang Gu | 319 | 334-208-5696 | 334-335-2037 |
| | Choo, Jeong Koo | 311 | 718-308-1511 | |
| | Painter, John | 273 | 334-740-8171 | |
| | Choi, Young Gil | 274 | 334-208-3682 | 334-335-2037 |
| | Shonaa Meridith | 287 | 334-281-3619 | |
| Sales | Cha, Jae Gil | 286 | 334-208-2385 | 334-335-2056 |
| | Park, Sang Yu | 285 | 334-208-2367 | 334-335-3368 |
| | Kim, Soo Il(Charles) | 272 | 718-308-1511 | 334-206-3692 |
| | Wright, Derrick | 303 | 334-562-9451 | 334-430-9430 |
| Quality Control 334-300-6060 | David J. McGough | 270 | 334-208-5646 | 616-561-0034 |
| | Choi, Jae Kyu | 282 | 334-208-2405 | 334-808-8157 |
| | Matt Jones | 284 | 334-524-4025 | 334-524-4025 |
| HMMA | Park, Young Hee | 290 | | 334-347-0387 |
| | Seo, Jong Dock | 281 | 334-208-3688 | 334-335-3108 |
| | Ko, Byung Keuk | 281 | 334-208-5411 | 334-335-5108 |
| | Brad Warren | 284 | 334-208-6800 | |
| | Shah, Phillips | 258 | 334-484-4533 | |
| | Cho, Jun Dum | | 334-300-5153 | |
| Production Team (Director Son, Bong Kun) - cont' | | | | |
| Production Tech | Park, Chang Dong | 254 | 334-208-2381 | 334-335-2084 |
| | Seo, Kwang Sik | 255 | 334-208-2418 | 334-335-2852 |
| | Kang, Hyo Sik | 282 | 334-208-3891 | |
| | Park, Jong Hee | 243 | 205-412-2872 | 425-897-2872 |
| | Green, Rodney | 326 | 334-337-4439 | 334-588-5137 |
| | Hwang Soon Hoon | 281 | 334-208-2634 | 334-208-2834 |
| | Seo, Hyun Duck | 278 | 334-208-3684 | |
| | Kim, Hyun | 277 | 334-208-2388 | 334-335-2853 |
| | Jung, Sun Do | 283 | | |
| Production Line Tel# | | | Assem(308) Press(309) Shipping(302 or 249) T&D(308) Maint(301) | |

Important information inside on savings, advice and what your fee includes.



# Income Tax Return
## Client Copy

For more information about tax, financial and mortgage services, contact us year-round.

1-800-HRBLOCK ∎ hrblock.com

# Contact us year-round.

## Call **1-800-HRBLOCK** or
## visit us at **hrblock.com.**

# Tax Services ■ Financial Services ■ Mortgage Services

H&R Block Financial Advisors, Inc., a subsidiary of H&R Block, Inc., offers investment services and securities products. H&R Block Financial Advisors, Inc. is a dually-registered investment advisor and broker-dealer and a member of NYSE/SIPC. Banking services offered through H&R Block Bank, a Federal Savings Bank, Member FDIC. Tax services offered through subsidiaries of H&R Block Services, Inc. Mortgage services offered through H&R Block Mortgage Corporation. H&R Block, Inc., H&R Block Services, Inc., H&R Block Bank and H&R Block Mortgage Corporation are not registered broker-dealers.

Affiliated Business Disclosure: H&R Block Services, Inc. and its tax preparation subsidiaries (collectively, "Block") may refer certain information about you to H&R Block Mortgage Corporation and/or Option One Mortgage Corporation. H&R Block Mortgage and Option One are indirect wholly-owned subsidiaries of H&R Block, Inc. Because of this relationship, this referral may provide Block a financial or other benefit. You are NOT required to obtain a mortgage loan from H&R Block Mortgage and/or Option One. OTHER LENDERS ARE AVAILABLE. YOU SHOULD SHOP FOR THE BEST PRICES, SERVICES AND INTEREST RATES. If you obtain a loan from H&R Block Mortgage and/or Option One, you will be charged interest and fees in accordance with the mortgage loan documents and, depending on your qualification and market conditions, you will be charged between 0% to 6% of the loan amount for discount points, $250 to $595 for processing fees and $225 to $750 for loan administration fees.

Not all programs are available in all areas. H&R Block Mortgage Corporation is licensed or exempt from licensing to conduct business in all states. H&R Block Mortgage Corporation, 3 Ada, Irvine, CA 92618 is an Arizona Mortgage Banker #BK0902757, loans made or arranged pursuant to a Department of Corporations California Finance Lenders License located at 6561 Irvine Center Drive #B, Irvine, CA 92618, a Georgia Residential Mortgage Licensee #14400 at 6561 Irvine Center Drive #B, Irvine, CA 92618, an Illinois Residential Mortgage Licensee at 6561 Irvine Center Drive #B, Irvine, CA 92618, is a Kansas Licensed Mortgage Company, licensee #1998-0597, a Massachusetts Mortgage Lender #ML0039, licensed by the New Hampshire banking department, licensed by New Jersey Department of Banking and Insurance at 613 Hope Road, Eatontown, NJ 07724, 732-380-1200, is a Licensed Mortgage Banker – NYS Banking Department at 3 Ada, Irvine, CA 92618, is licensed by the Pennsylvania Department of Banking, is a Rhode Island Licensed Lender and is licensed by the Virginia State Corporation Commission, license number MLB-609. H&R Block Mortgage Corporation Underwriting Guidelines apply to all loan programs. Loans not made on properties in New Mexico and West Virginia. ©Copyright 2006. H&R Block Mortgage Corporation. All rights reserved. Information accurate on printing date: 10/13/06.

©2006 H&R Block Services, Inc.

222 Rev
10/06

Form **8879**

Department of the Treasury
Internal Revenue Service

## IRS e-file Signature Authorization

▶ Do not send to the IRS. This is not a tax return.
▶ Keep this form for your records. See instructions.

OMB No. 1545-0074

2006

Declaration Control Number (DCN) ▶

| Taxpayer's name | Social security number |
|---|---|
| KEVIN ATWELL | |
| Spouse's name | Spouse's social security number |
| ROBIN DAVIS | |

### Part I    Tax Return Information - Tax Year Ending December 31, 2006 (Whole Dollars Only)

| | | | |
|---|---|---|---|
| 1 | Adjusted gross income (Form 1040, line 38; Form 1040A, line 22; Form 1040EZ, line 4) | **1** | 15,244. |
| 2 | Total tax (Form 1040, line 63; Form 1040A, line 37; Form 1040EZ, line 11) | **2** | 0. |
| 3 | Federal income tax withheld (Form 1040, line 64; Form 1040A, line 38; Form 1040EZ, line 7) | **3** | 798. |
| 4 | Refund (Form 1040, line 74a; Form 1040A, line 45a; Form 1040EZ, line 12a, Form 1040EZ-T, line 1a) | **4** | 838. |
| 5 | Amount you owe (Form 1040, line 76; Form 1040A, line 47; Form 1040EZ, line 13) | **5** | |

### Part II    Taxpayer Declaration and Signature Authorization (Be sure you get and keep a copy of your return)

Under penalties of perjury, I declare that I have examined a copy of my electronic individual income tax return and accompanying schedules and statements for the tax year ending December 31, 2006, and to the best of my knowledge and belief, it is true, correct, and complete. I further declare that the amounts in Part I above are the amounts from my electronic income tax return or request for refund. I consent to allow my intermediate service provider, transmitter, or electronic return originator (ERO) to send my return or request to the IRS and to receive from the IRS (a) an acknowledgement of receipt or reason for rejection of the transmission, (b) an indication of any refund offset, (c) the reason for any delay in processing the return or refund, and (d) the date of any refund. If applicable, I authorize the U.S. Treasury and its designated Financial Agent to initiate an ACH electronic funds withdrawal (direct debit) entry to the financial institution account indicated in the tax preparation software for payment of my Federal taxes owed on this return and/or a payment of estimated tax, and the financial institution to debit the entry to this account. I further understand that this authorization may apply to future Federal tax payments that I direct to be debited through the Electronic Federal Tax Payment System (EFTPS). In order for me to initiate future payments, I request that the IRS send me a personal identification number (PIN) to access EFTPS. This authorization is to remain in full force and effect until I notify the U.S. Treasury Financial Agent to terminate the authorization. To revoke a payment, I must contact the U.S. Treasury Financial Agent at 1-888-353-4537 no later than 2 business days prior to the payment (settlement) date. I also authorize the financial institutions involved in the processing of the electronic payment of taxes to receive confidential information necessary to answer inquires and resolve issues related to the payment. I further acknowledge that the personal identification number (PIN) below is my signature for my electronic income tax return or request for refund and, if applicable, my Electronic Funds Withdrawal Consent.

Taxpayer's PIN: check one box only

[X] I authorize **HR BLOCK** to enter or generate my PIN     `16056`
ERO firm name    do not enter all zeros
as my signature on my tax year 2006 electronically filed income tax return or request for refund.

[ ] I will enter my PIN as my signature on my tax year 2006 electronically filed income tax return or request for refund. Check this box only if you are entering your own PIN and your return or request is filed using the Practitioner PIN method. The ERO must complete Part III below.

Your signature ▶ **COPY ONLY**    Date ▶ `03/29/2007`

Spouse's PIN: check one box only

[X] I authorize **HR BLOCK** to enter or generate my PIN     `10838`
ERO firm name    do not enter all zeros
as my signature on my tax year 2006 electronically filed income tax return or request for refund.

[ ] I will enter my PIN as my signature on my tax year 2006 electronically filed income tax return or request for refund. Check this box only if you are entering your own PIN and your return or request is filed using the Practitioner PIN method. The ERO must complete Part III below.

Spouse's signature ▶ **COPY ONLY**    Date ▶ `03/29/2007`

### Practitioner PIN Method Returns Only - continue below

### Part III    Certification and Authentication - Practitioner PIN Method Only

ERO's EFIN/PIN. Enter your six-digit EFIN followed by your five-digit self-selected PIN.

do not enter all zeros

I certify that the above numeric entry is my PIN, which is my signature for the tax year 2006 electronically filed income tax return or request for refund for the taxpayer(s) indicated above. I confirm that I am submitting this return in accordance with the requirements of the Practitioner PIN method and Publication 1345, Handbook for Authorized IRS e-file Providers of Individual Income Tax Returns.

ERO's signature ▶    Date ▶ `03/29/2007`

### ERO Must Retain This Form - See Instructions
### Do Not Submit This Form to the IRS Unless Requested To Do So

**KBA  For Privacy Act and Paperwork Reduction Act Notice, see page 2 of form.**    Form 8879 (2006)

8879(D) (2006)    FD8879D-1V 1.0
Form Software Copyright 1996 - 2007 H&R Block Tax Services, Inc.

Declaration Control Number (DCN)

| 0 | 0 | - | 6 | 3 | 1 | 2 | 7 | 6 | - | | | | | - | 7 |

**FORM AL8453**

ALABAMA DEPARTMENT OF REVENUE

**Individual Income Tax Declaration for Electronic Filing**

For the year January 1 - December 31, 2006

**2006**

**Label**

Use Alabama label Otherwise, please type or print

Your first name and initial: **KEVIN** Last name: **ATWELL**

Your social security number

If a joint return, spouse's first name and initial: **ROBIN** Last name: **DAVIS**

Spouse's soc. sec. no. if joint return

Home address (number and street). If a P.O. Box, see instructions.

Apt. no.

Telephone number (optional) **334-527-8853**

City, town or post office, state, and ZIP code

FN (For official use only)

### Part I — Tax Return Information

(Whole dollars only.)

| | | | |
|---|---|---|---|
| 1 | Alabama taxable income (Form 40, line 17) | 1 | 2,329 |
| 2 | Total tax liability (Form 40, line 22) | 2 | 0 |
| 3 | Total payments (Form 40, line 26) | 3 | 282 |
| 4 | Refund (Form 40, line 33) | 4 | 282 |
| 5 | Amount you owe (Form 40, line 27) | 5 | 0 |

### Part II — Direct Deposit

1 Routing number:

2 Account number:

3 Type of account: ☐ Checking ☐ Savings

### Part III — Declaration of Taxpayer

(Sign only after Part I is completed.)

Under penalties of perjury, I declare that I have compared the information contained on my return with the information I have provided to my electronic return originator and that the amounts described in Part 1 above agree with the amounts shown on the corresponding lines of my 2006 Alabama individual income tax return. To the best of my knowledge and belief this return, including any accompanying schedules and statements, is true, correct, and complete. Also, I hereby authorize the Alabama Department of Revenue to disclose to my ERO described below any information concerning the disbursement of the refund requested or any problems encountered in the processing of my return.

☒ I authorize a representative of the Department of Revenue to discuss my return and attachments with my preparer.

**Sign Here** ▶

COPY ONLY                COPY ONLY

Your signature     Date     Spouse's signature. If a joint return, BOTH must sign.     Date

### Part IV — Declaration of Electronic Return Originator (ERO) and Paid Preparer

(See instructions.)

I declare that I have reviewed the above taxpayer's Alabama individual income tax return and that the entries on this form are complete and correctly represented based on all information of which I have any knowledge. I also declare that I have followed all other requirements described in IRS PUB. 1345, Revenue Procedures for Electronic Filing of Individual Income Tax Returns (Tax Year 2006), and the Alabama Handbook for Electronic Filers of Individual Income Tax Returns (Tax Year 2006). If I am also the paid preparer, under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete.

ERO's Use Only

ERO's signature ▶

Date **03/29/2007**

Check if also paid preparer ☒

Preparer's SSN or PTIN

E.I. No.

Firm's name (or yours if self-employed) and address: **H AND R BLOCK EASTERN ENTERPRISES IN**
**146 EAST 4TH STREET**
**LUVERNE, AL**

ZIP Code **36049-**

Paid Preparer's Use Only

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete.

Preparer's signature ▶

Date

Check if self-employed ☐

Preparer's SSN or PTIN

Firm's name (or yours if self-employed) and address ▶

E.I. No.

ZIP Code

AL29

**DO NOT MAIL TO ALABAMA DEPT. OF REVENUE**

Form AL8453 2006

Form **1040EZ**

Department of the Treasury - Internal Revenue Service
**Income Tax Return for Single and Joint Filers With No Dependents** (99)

**2006**

OMB No. 1545-0074

| | |
|---|---|
| **Label** (See page 11.) Use the IRS label. Otherwise, please print or type. | KEVIN ATWELL<br>ROBIN DAVIS<br>P O BOX 442<br>BRANTLEY, AL 36009 |

Your social security number

Spouse's social security no.

**You must enter ▲ your SSN(s) above. ▲**

Checking a box below will not change your tax or refund.

**Presidential Election Campaign** (page 11)

Check here if you, or your spouse if a joint return, want $3 to go to this fund? ▶ | ☐ You | ☐ Spouse

**Income**

Attach Form(s) W-2 here.

Enclose, but do not attach, any payment.

| | | | |
|---|---|---|---|
| 1 | Wages, salaries, and tips. This should be shown in box 1 of your Form(s) W-2. Attach your Form(s) W-2. | 1 | 13,723. |
| 2 | Taxable interest. If the total is over $1,500, you cannot use Form 1040EZ. | 2 | |
| 3 | Unemployment compensation and Alaska Permanent Fund dividends (see page 13). | 3 | 1,521. |
| 4 | Add lines 1, 2, and 3. This is your adjusted gross income. | 4 | 15,244. |
| 5 | If someone can claim you (or your spouse if a joint return) as a dependent, check the applicable box(es) below and enter the amount from the separate worksheet. <br> ☐ You   ☒ Spouse <br> If no one can claim you (or your spouse if a joint return), enter $8,450 if single; $16,900 if married filing jointly. See page 2 for explanation. | 5 | 16,900. |
| 6 | Subtract line 5 from line 4. If line 5 is larger than line 4, enter -0-. This is your taxable income. | ▶ 6 | 0. |

**Payments and tax**

| | | | |
|---|---|---|---|
| 7 | Federal income tax withheld from box 2 of your Form(s) W-2. | 7 | 798. |
| 8a | Earned income credit (EIC). | 8a | |
| b | Nontaxable combat pay election. | 8b | |
| 9 | Credit for federal telephone excise tax paid. Attach Form 8913 if required. | 9 | 40. |
| 10 | Add lines 7, 8a, and 9. These are your total payments. | ▶ 10 | 838. |
| 11 | Tax. Use the amount on line 6 above to find your tax in the tax table on pages 24-32 of the booklet. Then, enter the tax from the table on this line. | 11 | |

**Refund**

Have it directly deposited! See page 18 and fill in 12b, 12c, and 12d or Form 8888.

| | | | |
|---|---|---|---|
| 12a | If line 10 is larger than line 11, subtract line 11 from line 10. This is your refund. <br> If Form 8888 is attached, check here ▶ ☐ | ▶ 12a | 838. |
| ▶ b | Routing number | ▶ c | Type: ☒ Checking   ☐ Savings |
| ▶ d | Account number | | |

**Amount you owe**

| | | | |
|---|---|---|---|
| 13 | If line 11 is larger than line 10, subtract line 10 from line 11. This is the amount you owe. For details on how to pay, see page 19. | ▶ 13 | |

**Third party designee**

Do you want to allow another person to discuss this return with the IRS (see page 20)?   ☒ Yes. Complete the following.   ☐ No

Designee's name ▶ HR BLOCK    Phone no. ▶ (334) 335-3323    Personal ID number (PIN) ▶ 01289

**Sign here**

Under penalties of perjury, I declare that I have examined this return, and to the best of my knowledge and belief, it is true, correct, and accurately lists all amounts and sources of income I received during the tax year. Declaration of preparer (other than the taxpayer) is based on all information of which the preparer has any knowledge.

Joint return? See page 11.

Keep a copy for your records.

| Your signature | Date | Your occupation | Daytime phone number |
|---|---|---|---|
| – For Information Only – | | MATERIAL HANDLE | |
| Spouse's signature. If a joint return, both must sign. | Date | Spouse's occupation | |
| ----- Do Not File ----- | | HOMEMAKER | |

**Paid preparer's use only**

| Preparer's signature *Larry A. Sherry* | Date 3/29/2007 | Check if self-employed ☒ | Preparer's SSN or PTIN |
|---|---|---|---|
| Firm's name (or yours if self-employed), address, and ZIP code ▶ | H AND R BLOCK EASTERN ENTERPR<br>LUVERNE, AL 36049 | EIN | |
| | | Phone no. (334) 335-3323 | |

KBA   For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see page 22.

Form **1040EZ** (2006)

FORM **40** Alabama **2006**
Individual Income Tax Return
RESIDENTS & PART- YEAR RESIDENTS

For the year Jan. 1 - Dec. 31, 2006, or other tax yr: Beginning: ●     Ending: ●

| Your social security number | Spouse's SSN if joint return |
|---|---|

| Your first name | Initial | Last name |
|---|---|---|
| ●KEVIN | | ATWELL |

| Spouse's first name | Initial | Last name |
|---|---|---|
| ●ROBIN | | DAVIS |

Present home address (number and street or P.O. Box number)
●

| City, town or post office | State | ZIP code |
|---|---|---|
| | ●AL | 36009 |

**USE BLACK INK TO COMPLETE RETURN**

**Filing Status and Exemptions** Ck only 1 box

1 ● [ ] $1,500 Single
2 ● [X] $3,000 Married filing joint return (even if only one spouse had income)
3 ● [ ] $1,500 Married filing separate return. Complete line 5 with spouse's name and SSN
4 ● [ ] $3,000 Head of family (with qualifying person). (See pg 7 of inst.) Complete line 5

● Name ●
● Soc. Sec. No. ●
● Relationship ●

| | | A - Alabama tax withheld | | B - Income | |
|---|---|---|---|---|---|
| 6 Wages, salaries, tips, etc. (list each employer and address separately): | | | | | |
| a SEE ATTACHMENT | 6a ● | 282 00 | 6a | 13,723 00 | |
| b | 6b ● | 00 | 6b | 00 | |
| c | 6c ● | 00 | 6c | 00 | |
| d | 6d ● | 00 | 6d | 00 | |
| 7 Interest and dividend income (also attach Schedule B if over $1,500) . . . . . . . . . | | | 7 ● | 0 00 | |
| 8 Other income (from page 2, Part I, line 9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | 8 ● | 0 00 | |
| 9 Total income. Add amounts in the income column for line 6a through line 8 . . . . | | | 9 ● | 13,723 00 | |
| 10 Total adjustments to income (from page 2, Part II, line 26) . . . . . . . . . . . . . . | | | 10 ● | 0 00 | |
| 11 Adjusted gross income. Subtract line 10 from line 9 . . . . . . . . . . . . . . . . . . . | | | 11 ● | 13,723 00 | |

**Income and Adjustments**

**Deductions**
You Must Attach pg 2 of Fed Form 1040, Fed Form 1040A, Fed Form 1040NR, or pg 1 of 1040EZ, if claiming a deduction on line 13.

| | | | |
|---|---|---|---|
| 12 Check box a, if you itemize deductions, and enter net from Sch A, line 26. Box a or b MUST be checked | | | |
| Check box b, if you do not itemize deductions, & enter standard deduction. | | | |
| ● a [X] Itemized Deductions or b [ ] Standard Deduction . . . | 12 ● | 8,394 00 | |
| ►13 Federal tax deduction (see instructions) | | | |
| DO NOT ENTER THE FED TAX WITHHELD FROM YOUR FORM W-2(S) | 13 ● | 0 00 | |
| 14 Personal exemption (from line 1, 2, 3, or 4) . . . . . . . . . . . . . . | 14 ● | 3,000 00 | |
| 15 Dependent exemption (from page 2, Part III, line 2) . . . . . . . . . . | 15 ● | 00 | |
| 16 Total deductions. Add lines 12, 13, 14, and 15 . . . . . . . . . . . . . . . . . . . . . | | | 16 ● | 11,394 00 |

**Tax**
Do not Staple Form(s) W-2, W-2G, 1099 and/or 40V to this form.

| | | | |
|---|---|---|---|
| 17 Taxable income. Subtract line 16 from line 11 . . . . . . . . . . . . . . . . . . . . . . | | 17 ● | 2,329 00 |
| 18 Income Tax due. Enter amount from tax table or check if from [ ] Form NOL- 85A . | | 18 ● | 74 00 |
| 19 Less credits from: ● [X] Schedule CR and/or [ ] Schedule OC . . . . . . . . . . | | 19 ● | 74 00 |
| 20a Net tax due Alabama. Subtract line 19 from line 18 . . . . . . . . . . . . . . . . . . | | 20a ● | 0 00 |
| b Consumer Use Tax (use worksheet on page 10) . . . . . . . . . . . . . . . . . . . . | | 20b ● | 0 00 |
| 21 Alabama Election Campaign Fund. You may make a voluntary contribution to the following: | | | |
| a Alabama Democratic Party [ ] $1 [ ] $2 [X] none . . . . . . . . . . . . | 21a ● | 0 00 | |
| b Alabama Republican Party [ ] $1 [ ] $2 [X] none . . . . . . . . . . . . | 21b ● | 0 00 | |
| 22 Total tax liability and voluntary contribution. Add lines 20a, 20b, 21a, and 21b . . | | 22 ● | 0 00 |

**Payments**

| | | | |
|---|---|---|---|
| 23 Alabama income tax withheld (from Forms W- 2, W- 2G, and/or 1099) | 23 ● | 282 00 | |
| 24 Amount paid with extension (attach Form 4868A) . . . . . . . . . . | 24 ● | 00 | |
| 25 2006 estimated tax payments (see instructions on page 11) . . . . | 25 ● | 00 | |
| 26 Total payments. Add lines 23 through 25 . . . . . . . . . . . . . . . . . . . . . . . . . . | | 26 ● | 282 00 |

**AMOUNT YOU OWE**

| | | | |
|---|---|---|---|
| 27 If line 22 is larger than line 26, subtract line 26 from line 22, and enter AMOUNT YOU OWE. Place payment, along with Form 40V, loose in the mailing envelope (FORM 40V MUST ACCOMPANY PAYMENT ) | 27 ● | 00 |
| 28 Estimated tax penalty. Also include on line 27 (see instructions page 11) . . . | 28 ● | 00 |

**OVERPAID**

| | | | |
|---|---|---|---|
| 29 If line 26 is larger than line 22, subtract line 22 from line 26, and enter amount OVERPAID . . . | 29 ● | 282 00 |
| 30 Amount of line 29 to be applied to your 2007 estimated tax . . . . . . | 30 ● | 00 |

**Donation Check- offs**

| | | | |
|---|---|---|---|
| 31 Total Donation Check- offs from Schedule DC, line 2 . . . . . . . . | 31 ● | 0 00 |
| 32 Total. Add line 30 and line 31 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 32 ● | 0 00 |

**REFUND**

| | | | |
|---|---|---|---|
| 33 REFUNDED TO YOU. (CAUTION: You must sign this return on page 2.) Subtract line 32 from line 29. For Direct Deposit, check here ● [ ] and complete Part V, Page 2 | 33 ● | 282 00 |

If an addressed envelope came with your return, please use it and follow the instructions on the envelope. If you do not have one, mail your return to one of the addresses below

**WHERE TO FILE FORM 40**

AL29

If you are not making a payment, mail your return to:
Alabama Department of Revenue
P.O. Box 154
Montgomery, AL 36135- 0001

If you are making a payment, mail your return, Form 40V, and payment to:
Alabama Department of Revenue
P.O. Box 2401
Montgomery, AL 36140- 0001

Mail only your 2006 Form 40 to one of the above addresses. Prior year returns, amended returns, and all other correspondence should be mailed to Alabama Department of Revenue, P.O. Box 327464, Montgomery, AL 36132- 7464.



KEVIN ATWELL & ROBIN DAVIS

Form 40 (2006)                                                                                                                                      Page 2

**PART I**

| | | | |
|---|---|---|---|
| 1 | Alimony received . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 | ● 00 |
| 2 | Business income or (loss) (attach Federal Schedule C or C- EZ) . . . . . . . . . . . . . . . | 2 | ● 00 |
| 3 | Gain or (loss) from sale of Real Estate, Stocks, Bonds, etc. (attach Schedule D) . . . . . . . . . | 3 | ● 00 |
| 4a | Total IRA distributions  4a ● 00  4b Taxable amount (see instructions) | 4b | ● 00 |
| 5a | Total pensions and annuities  5a ● 00  5b Taxable amount (see instructions) | 5b | ● 00 |
| 6 | Rents, royalties, partnerships, estates, trusts, etc. (attach Schedule E). . . . . . . . . . . . . . | 6 | ● 00 |
| 7 | Farm income or (loss) (attach Federal Schedule F) . . . . . . . . . . . . . . . . . . . . . . . . . | 7 | ● 00 |
| 8 | Other income (state nature and source – see instructions) _____ | 8 | ● 00 |
| 9 | Total other income. Add lines 1 through 8. Enter here and also on page 1, line 8 . . . . . . . | 9 | ● 0 00 |

Other Income (see page 12)

**PART II**

| | | | |
|---|---|---|---|
| 1a | Your IRA deduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1a | ● 00 |
| b | Spouse's IRA deduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1b | ● 00 |
| 2 | Payments to a Keogh retirement plan and self-employment SEP deduction . . . . . . . . . | 2 | ● 00 |
| 3 | Penalty on early withdrawal of savings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 | ● 00 |
| 4 | Alimony paid. Recipient's last name _____ SSN ● _____ Address _____ City _____ State ___ ZIP _____ | 4 | ● 00 |
| 5 | Adoption expenses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5 | ● 00 |
| 6 | Moving Expenses (Attach Federal Form 3903) to City _____ State ___ ZIP _____ | 6 | ● 00 |
| 7 | Self-employed health insurance deduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7 | ● 00 |
| 8 | Total adjustments. Add lines 1 through 7. Enter here and also on page 1, line 10 . . . . . . . | 8 | ● 0 00 |

Adjustments to Income (see page 15)

**PART III**

1a Dependents:

| (1) First name   Last name | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) Did you provide more than one-half dependent's support? |
|---|---|---|---|
| | ● | | |
| | ● | | |
| | ● | | |
| | ● | | |

Dependents

Do not include yourself or your spouse

(See page 8)

| | | | |
|---|---|---|---|
| b | Total number of dependents claimed above . . . . . . . . . . . . . . . . . . . . . . . . . . . . ● | | 0 |
| 2 | Amount allowed. (Multiply $300 by the total number of dependents claimed on line 1b.) Enter amount here and on page 1, line 15 | 2 | ● 00 |

**PART IV**

General Information

All Tax-payers Must Complete This Section.

1 Residency    ▶ ● [X] Full Year   If you were a part-year resident of Alabama during 2006, indicate your period of residence:
Check only one box ● ▶ [ ] Part Year   From _____ 2006 through _____ 2006. Total months _____

2 Did you file an Alabama income tax return for the year 2005? [X] Yes [ ] No

3 If no, state reason. _____

4 Give name & address of present employer: Yours **ALANTIC GROUP 5426 ROBIN H NORFOLK    VA**
Your Spouse's **NONE**

5 Enter the Federal Adjusted Gross Income ● $ **15,244** and Federal Taxable Income ● $ _____0_____ as reported on your 2006 Federal Individual Income Tax Return.

6 Do you have income which is reported on your Fed rtn, but not reported on your AL rtn (other than your state tax refund)? [X] Yes [ ] No
If yes, enter source(s) and amount(s) below: (other than state income tax refund)
Source **UNEMPLOYMENT COMPENSATION** Amount ● 1,521 00
Source _____ Amount ● 00

7 Do you have income included in this return from a grantor trust? [ ] Yes [X] No

**PART V**

Direct Deposit

For Direct Deposit of your refund, complete 1, 2, and 3 below. (See Page 16 of instructions to see if you qualify.)

1 Routing Number: _____   2 Type: [ ] Checking [ ] Savings

3 Account Number: _____

● [X] I authorize a representative of the Department of Revenue to discuss my return and attachments with my preparer.

Sign Here In Black Ink

Keep a copy of this return for your records

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge

| | Date | Daytime telephone number | Your occupation |
|---|---|---|---|
| Your signature  **For Information Only** | | 334-527-8853 | **MATERIAL HANDL** |
| Spouse's signature (if joint return, BOTH must sign)  **For Information Only** | Date | Daytime telephone number | Spouse's occupation  **HOMEMAKER** |

Paid Preparer's Use Only

| Preparer's signature  _(signature)_ | Date  **03/29/2007** | Check if self-employed [X] | Preparer's SSN or PTIN  ● |
|---|---|---|---|
| Firm's name (or yours if self-employed) ▶  **H AND R BLOCK EASTE** | Daytime telephone no.  **334-335-3323** | E.I. No. | |
| Address  **146 EAST 4TH STREET LUVERNE AL** | | | ZIP Code  **36049** |

AL29

40 (2006)                                              AL40-2V 1.17

Form Software Copyright 1998 - 2007 H&R Block Tax Services, Inc

SCHEDULE
**A**
(FORM 40)



ALABAMA DEPARTMENT OF REVENUE
**Schedule A - Itemized Deductions**    **2006**

ATTACH TO FORM 40 - SEE INSTRUCTIONS FOR SCHEDULE A

| Name(s) as shown on Form 40 | Your social security number |
|---|---|
| KEVIN ATWELL & ROBIN DAVIS | |

The itemized deductions you may claim for the year 2006 are similar to the itemized deductions claimed on your Federal return, however, the amounts may differ. Please see instructions before completing this schedule. **PART-YEAR RESIDENTS:** A resident of Alabama for only a part of the year should list below only those deductions actually paid while a resident of Alabama.

| | | | | | | |
|---|---|---|---|---|---|---|
| **Medical and Dental Expenses** (See page 19) | | CAUTION: Do not include expenses reimbursed or paid by others. | | | | |
| | 1 | Medical and dental expenses | 1 | 3,143 00 | | |
| | 2 | Enter amount from Form 40, line 11 ... 13,723 00 | 2 | | | |
| | 3 | Multiply the amount on line 2 by 4% (.04). Enter the result | 3 | 549 00 | | |
| | 4 | Subtract line 3 from line 1. Enter the result. If zero or less, enter -0- | | | 4 | 2,594 00 |
| **Taxes You Paid** (See page 20) | 5 | Real estate taxes | 5 | 278 00 | | |
| | 6 | FICA Tax (Soc Sec and Medicare) and Federal Self- Employment Tax | 6 | 1,051 00 | | |
| | 7 | Railroad Retirement (Tier 1 only) | 7 | 00 | | |
| | 8 | Other taxes. (List- include personal property taxes.) ▶ | 8 | 00 | | |
| | 9 | Add the amounts on lines 5 through 8. Enter the total here | | | 9 | 1,329 00 |
| **Interest You Paid** (See page 20) NOTE: Personal interest is not deductible. | 10a | Home mortgage interest and points reported to you on Fed Form 1098 | 10a | 4,271 00 | | |
| | b | Home mortgage interest not reported to you on Federal Form 1098. (If paid to an individual, show that person's name and address.) ▶ | 10b | 00 | | |
| | 11 | Points not reported to you on Form 1098 | 11 | 00 | | |
| | 12 | Investment interest. (Attach Form 4952A) | 12 | 00 | | |
| | 13 | Add the amounts on lines 10a through 12. Enter the total here | | | 13 | 4,271 00 |
| **Gifts to Charity** (See page 20) | | CAUTION: If you made a charitable contribution and received a benefit in return, see page 20. | | | | |
| | 14 | Contributions by cash or check | 14 | 00 | | |
| | 15 | Other than cash or check. (You MUST att Fed Fm 8283 if over $500.) | 15 | 200 00 | | |
| | 16 | Carryover from prior year | 16 | 00 | | |
| | 17 | Add the amounts on lines 14 through 16. Enter the total here | | | 17 | 200 00 |
| **Casualty and Theft Loss** (Attach Fm 4684) | 18a | Enter the amount from Federal Form 4684, line 16 (See page 21) | 18a | 00 | | |
| | b | Enter 10% of your Adjusted Gross Income (Form 40, line 11) | 18b | 00 | | |
| | c | Subtract line 18b from line 18a. If zero or less, enter -0- | | | 18c | 0 00 |
| **Job Expenses and Most Other Miscellaneous Deductions** (See page 21) | 19 | Unreimbursed employee expenses- job travel, union dues, job ed. etc.(You MUST attach Federal Form 2106 if required. See inst.) ▶ | 19 | 00 | | |
| | 20 | Other expenses (investment, tax preparation, safe deposit box, etc.). List type & amount. ▶ | 20 | 00 | | |
| | 21 | Add the amounts on lines 19 and 20. Enter the total | 21 | 00 | | |
| | 22 | Multiply the amt on Form 40, line 11 by 2% (.02). Enter the result here. | 22 | 00 | | |
| | 23 | Subtract line 22 from line 21. Enter the result. If zero or less, enter -0- | | | 23 | 0 00 |
| **Other Miscellaneous Deductions** | 24 | Other (from list on page 22 of instructions). List type and amount. ▶ | | | 24 | 00 |
| **Qualified Long-Term Care Ins. Premiums** | | CAUTION: Do not include medical premiums. | | | | |
| | 25 | Enter amount here | | | 25 | 00 |
| **Total Itemized Deductions** | 26 | Add the amounts on lines 4, 9, 13, 17, 18c, 23, 24, and 25. Enter the total here. Then enter on Form 40, page 1, line 12 | | | 26 | 8,394 00 |

Schedule A (Form 40) 2006

AL29



Schedules B, CR, & DC (Form 40) 2006

**Page 2**

| Name(s) as shown on Form 40 | Your social security number |
|---|---|
| KEVIN ATWELL & ROBIN DAVIS | |

## SCHEDULE B - Interest And Dividend Income

If you received more than $1500 of interest and dividend income, you must complete Schedule B. See instructions on page 22

| | List Payers and Amounts | A Exempt Interest | | B Taxable Interest and Dividends | |
|---|---|---|---|---|---|
| **1** I N T E R E S T | | | 00 | | 00 |
| | | | 00 | | 00 |
| | | | 00 | | 00 |
| | | | 00 | | 00 |
| | | | 00 | 1 | 00 |
| | | | 00 | | 00 |
| | | | 00 | | 00 |
| | | | 00 | | 00 |
| | | | 00 | | 00 |
| **2** D I V I D E N D S | | | | | 00 |
| | | | | | 00 |
| | | | | | 00 |
| | | | | 2 | 00 |
| | | | | | 00 |
| | | | | | 00 |
| | | | | | 00 |
| | | | | | 00 |
| **3** | TOTAL TAXABLE INTEREST AND DIVIDENDS Enter here and on Form 40, page 1, line 7 | | • 3 | | 00 |

## SCHEDULE CR - Credit For Taxes Paid To Other States

See instructions on page 23.
PLEASE NOTE: You may need to fill out the worksheet on page 23 before completing this schedule. This credit will NOT be allowed unless you file a nonresident income tax return with the other state and attach a copy of that 2006 return to your Alabama return.

| | | | | | If more than one "other" |
|---|---|---|---|---|---|
| 1 2006 taxable income as shown on the NC (name of state) state return | 1 | 4,784 | 00 | | state use Schedule CR worksheet. If using the |
| 2 Tax due the other state using Alabama tax rates | 2 | 170 | 00 | | worksheet, line 5 (below) |
| 3 Tax due the other state as shown on that state's return or Form W- 2G | 3 | 80 | 00 | | will equal worksheet Part 5, line 21. |
| 4 Tax due Alabama from Form 40, page 1, line 18 | 4 | 74 | 00 | | |
| 5 CREDIT ALLOWABLE. Enter the amount from line 2, 3, 4, or the amount from the worksheet on page 23 of the booklet, whichever is smallest. If you have no other credits, enter amount from line 5 to Form 40, page 1, line 19. If you have other credits, enter the amount from line 5 to Schedule OC, Part A, line 1, and complete | | • 5 | | 74 | 00 |

## SCHEDULE DC - Donation Check- Offs

1 You may donate all or part of your overpayment. (Enter the amount in the appropriate boxes.)

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| a | Senior Services Trust Fund | • | 00 | i | Mental Health | | | 00 |
| b | AL Arts Development Fund | • | 00 | j | Neighbors Helping Neighbors | | | 00 |
| c | AL Nongame Wildlife Fund | • | 00 | k | AL Breast & Cervical Cancer Program | | | 00 |
| d | Child Abuse Trust Fund | • | 00 | l | AL 4- H Club | | | 00 |
| e | AL Veterans Program | • | 00 | m | AL Organ Ctr. Donor Awareness Fund | | | 00 |
| f | AL Indian Children's Scholarship Fund | • | 00 | n | AL Nat'l Guard Foundation Inc. | | | 00 |
| g | Penny Trust Fund | • | 00 | o | Cancer Research Institute | | | 00 |
| h | Foster Care Trust Fund | • | 00 | | | | | |

2 Total Donations. Add lines 1a, b, c, d, e, f, g, h, i, j, k, l, m, n, and o. Enter here and on Sch. A, line 31. | • | | 00 |

Schedules B, CR & DC (Form 40) 2006

AL29

```
                              Supporting Schedules                           2006
Name: KEVIN ATWELL & ROBIN DAVIS                              SSN:
-----------------------------------------------------------------------------
AL Form 40, Page 1
Income and Adjustments - Wages, salaries, tips, etc.
                                                      AL Tax
Employer and Address                                  Withheld          Income
-----------------------------------------------------------------------------
SILLA ENGINEERING AM BRANTLEY                            82              3,577
MFG ALABAMA OPP                                          3                194
SMART ALABAMA LLC LUVERNE                                84              2,312
THE ATLANTIC GROUP NORFOLK                              0               4,784
SMART ALABAMA LLC LUVERNE                               113              2,856
                                                    -----------      -----------
     Total                                              282             13,723
```

**D- 400 (48)** 9-21-06

# Individual Income Tax Return 2006
## North Carolina Department of Revenue

< Staple W- 2s Here

**NC Public Campaign Fund**
Select "Yes" if you want to designate $3 of taxes to this special Fund for voter education materials and for candidates who accept spending limits. Selecting Yes does not change your tax or refund.

For calendar year 2006, or other tax year starting _____ and ending _____

KEVIN ATWELL & ROBIN DAVIS

REI

| | You | | Yes | X | No |
| Your Spouse | | Yes | X | No |

**NC Political Parties Financing Fund**
Select appropriate box if you want to designate $3 to this Fund. Your tax remains the same whether or not you make a designation

| **Filing Status** | **Year spouse died:** | | | | **Number of Exemptions Claimed:** 02 |
| | | ☐ Select box if you or your spouse were out of the country on April 15 and a U.S. citizen or resident | ☐ Return for deceased taxpayer | | |
| ☐ 1. Single | | | Date of death: | | |
| X 2. Married Filing Jointly | | ☐ Select box if return is filed and signed by Executor or Administrator | ☐ Return for deceased spouse | | |
| ☐ 3. Married Filing Separately | | | Date of death: | | |
| ☐ 4. Head of Household | | Select box if you or your spouse were a nonresident of NC for the entire year | | You [X] Spouse [X] | |
| ☐ 5. Widow(er) with Dependent Child | | Select box if you or your spouse moved into or out of NC during the year | | | |

| You | Your Spouse |
| ☐ Democratic | ☐ Democratic |
| ☐ Republican | ☐ Republican |
| X Unspecified | X Unspecified |

## For Computer Use Only

| FS | 2 | EX | 02 | PP | Y | DT | N | DS | N | OC | N | EA | N |
|----|---|----|----|----|----|----|----|----|----|----|----|----|----|
| ATWE | | | | | | NRT | Y | NRS | Y | PYT | N | PYS | N |
| KEVIN | | | ATWELL | | | | | | | PCT | N | PFT | 3 |
| ROBIN | | | DAVIS | | | | | | | PCS | N | PFS | 3 |

| AGI | 15244 | 20C | 0 | 30 | | 6000 | 42 | | 0 |
|-----|-------|-----|---|----|----|------|----|----|----|
| 06 | -1656 | 20D | 0 | 32 | | 0 | 43 | | 0 |
| 07 | 5900 | 22A | 0 | 33 | | 4300 | 44 | | 0 |
| 09 | 0 | 22C | 0 | 34 | | 1600 | 45 | | 0 |
| 15 | 0 | EU | | 35 | | 0 | 46 | | 0 |
| 17 | 0 | 23 | 0 | 36 | | 0 | 48 | | 4784 |
| 19A | 181 | 25 | 0 | 37 | | 0 | 49 | | 15244 |
| 19B | 0 | 26 | 0 | 39 | | 0 | | | |
| 20A | 0 | 28 | 101 | 40 | | 0 | | | |
| 20B | 0 | 29 | 10300 | 41 | | 0 | | | |
| TN | 3345278853 | PN | 3343353323 | PP | | | | | |

702014800008

| **Sign Return Below** | **X Refund Due** | 101 | **Payment Due** | 0 |

I certify that, to the best of my knowledge, this return is accurate and complete.

Your Signature _____ Date _____

Spouse's Signature (if filing joint return, both must sign ) _____ Date _____

334 527 8853
Home Telephone Number (Include area code)

If prepared by a person other than taxpayer, this certification is based on all information of which the preparer has any knowledge

Paid Preparer's Signature _____ Date 03 29 07

Paid Preparer's FEIN, SSN, or PTIN _____ 334 335 3323
Paid Preparer's Telephone Number

If you ARE NOT due a refund, mail return, any payment, and Form D-400V to: NCDOR, P.O. Box 25000, Raleigh, N.C. 27640- 0640
If REFUND mail to: NCDOR, P.O. Box R, Raleigh, N.C. 27634-0001

D-400 2006 Page 2    (48)

| Last Name (First 10 Characters) | ATWELL | | Your Social Security Number | |
|---|---|---|---|---|

D-400 Line-by-Line Information

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| AGI | Federal Adjusted Gross Income | AGI | 15244 | | **Additions to Federal Taxable Income** | | |
| 6. | Taxable Income from Federal Return | 6. | -1656 | | | | |
| 7. | Additions to Federal Taxable Income | 7. | 5900 | 29. | Itemized deductions or standard deduction | | |
| 8. | Add Lines 6 and 7 | 8. | 4244 | | from your federal return | 29. | 10300 |
| 9. | Deductions from Federal Taxable | | | 30. | N.C. standard deduction | | |
| | Income | 9. | 0 | | Single $3,000; | Head of household $4,400; | |
| 10. | Line 8 minus Line 9 | 10. | 4244 | | Qualifying widow(er) $6,000; | Married filing jointly $6,000 | |
| 11 | Same as Line 10 | 11 | 4244 | | Married filing separately: | | |
| 12. | Part-year residents and | | | | If your spouse does NOT claim itemized deductions $3,000 | | |
| | nonresidents | 12. | 0.3138 | | If your spouse claims itemized deductions $0 | | |
| 13. | N.C. Taxable Income | 13. | 1332 | | NOTE: If 65 or older or blind or if someone can | | |
| 14. | N.C. Income Tax | 14. | 80 | | claim you as a dependent, see worksheet | 30 | 6300 |
| 15. | Tax Credits | 15. | 0 | 31. | Line 29 minus 30 - Amount cannot | | |
| 16. | Line 14 minus Line 15 | 16. | 80 | | be less than zero | 31. | 4300 |
| 17. | Consumer Use Tax | 17. | 0 | 32. | State, local, and foreign income taxes or | | |
| 18. | Add Lines 16 and 17 | 18. | 80 | | general sales taxes | 32. | 0 |
| | | | | 33. | If standard deduction, enter amount from | | |
| | **North Carolina Income Tax Withheld** | | | | Line 31. If itemizing, enter Line 31 or 32, | | |
| | | | | | whichever is less | 33 | 4300 |
| 19a | Your Income Tax Withheld | 19a | 181 | 34 | Personal exemption adjustment | 34 | 1600 |
| 19b. | Spouse's Income Tax Withheld | 19b. | 0 | 35. | Interest income from other states | 35. | 0 |
| | | | | 36. | Adjustment for domestic production | | |
| | **Other Tax Payments** | | | | activities (See instructions) | 36. | 0 |
| | | | | 37. | Other federal taxable income additions | 37. | 0 |
| 20a. | 2006 Estimated Tax | 20a. | 0 | 38. | **Total additions** | 38. | 5900 |
| 20b. | Paid with Extension | 20b. | 0 | | | | |
| 20c. | Partnership | 20c. | 0 | | **Deductions from Federal Taxable Income** | | |
| 20d. | S Corporation | 20d. | 0 | | | | |
| 21. | Add Lines 19a through 20d | 21 | 181 | 39 | State or local income tax refund | 39 | 0 |
| 22a. | If Line 18 is more than Line 21, | | | 40. | Interest income from obligations of | | |
| | subtract and enter the result | 22a. | 0 | | US or US' possessions | 40 | |
| 22b. | Penalties and interest | 22b. | 0 | 41. | Social Security and Railroad | | |
| EU | Exception to underpayment of | | | | Retirement Benefits | 41. | 0 |
| | estimated tax | EU | | 42. | Bailey settlement retirement benefits | 42. | 0 |
| 22c. | Underpayment of estimated | 22c. | 0 | 43. | Other retirement benefits | 43. | 0 |
| | income tax | | | 44. | Severance wages | 44. | 0 |
| | | | | 45. | Adjustment for additional first-year | | |
| 23. | Pay this Amount | 23. | 0 | | depreciation added back in 2002, 2003, | | |
| | | | | | and 2004 (See instructions) | 45. | 0 |
| 24. | If Line 18 is less than Line 21, subtract | | | 46. | Other federal taxable income deductions | 46. | 0 |
| | and enter the result | 24. | 101 | 47. | **Total deductions** | 47. | 0 |
| | **Amount of Refund to Apply to:** | | | | **Nonresidents and Part-Year Residents** | | |
| 25. | Amount of Line 24 to be applied | | | 48. | NC source income while a nonresident and | | |
| | to 2007 Estimated Income Tax | 25. | 0 | | all income while a part-year NC resident | 48. | 4784 |
| 26. | N.C. Nongame and Endangered | | | 49. | Total income from all sources | 49. | 15244 |
| | Wildlife Fund | 26. | 0 | 50. | Divide Line 48 by Line 49 | 50. | 0.3138 |
| 27. | Add Lines 25 and 26 | 27. | 0 | | | | |
| | | | | | N.C. Residency Dates for Part-Year | | |
| 28. | Amount to be Refunded | 28. | 101 | | Residents | | |

| | Beginning | Ending |
|---|---|---|
| Taxpayer: | | |
| Spouse: | | |

This page must be filed with the first page of this form.

**H&R BLOCK**

| Client Name | Client SSN |
|---|---|
| KEVIN ATWELL & ROBIN DAVIS | |

# Peace of Mind® Extended Service Plan

The Peace of Mind® Extended Service Plan (the "Plan") offered by H&R Block ("Block") is available only at participating Block offices at the time your return is completed, but no later than October 31 of the year of the return due date. The Plan is separate from, and in addition to, Block's Standard Guarantee that pays penalty and interest resulting from an error in tax preparation.

The Plan is effective when paid for and signed by you and, cannot be transferred by you to others. Subject to the exceptions noted below, the Plan provides you with the following benefits with respect to the individual federal and any individual state or local returns prepared and paid for on the date of this agreement.

If your return is audited, Block will provide you with a qualified person (but not an attorney) to represent you before the tax authority should such tax authority question the accuracy of your return.

If you owe additional taxes as a result of an error in tax preparation and the error is discovered by you, your representative or a tax authority, during the period of 3 years from the filing deadlines for such returns, not including extensions, Block will pay you for such taxes up to a cumulative total of $5,000 for all such returns. Such 3 year limitation applies to your federal and state returns, including returns for those states in which the "open" period to review returns is greater than 3 years. In some cases, the correction of a specific error will involve changes on multiple returns, including State or Local tax returns, which may result in an overpayment on one return and a balance due on another. In such cases, the overpayment and balance due will be netted in determining the amount Block will pay for additional taxes owed as a result of correction of the error. Block assumes no responsibility for payment of additional taxes to a tax authority. You are responsible for providing payment of additional taxes to the tax authority.

Before such payment, you must:
  (a) notify Block of any government notice regarding such taxes within 60 days from the date of such notice;
  (b) promptly provide Block with copies of such notices and other documents relating to or substantiating such additional taxes;
  (c) provide Block with reasonable notice of and allow Block to attend an audit with you or as your representative with Power of Attorney;
  (d) allow Block at its sole discretion and expense, to challenge the determination that additional taxes and penalties and interest are owed; and
  (e) provide Block with your receipt as proof of your purchase of the Plan.

You may be required to include such payment as income on your return in an amount that will be indicated on any Form 1099 you receive from Block. Block is not responsible for the payment of any taxes you may owe on such income.

The Plan applies only to filed and accepted original individual resident tax returns prepared by Block for the year of the return and for which the balance due has been paid. You represent to us that you have reviewed the items on your return and that items or issues on such returns have not been, or are not currently, under examination by tax authorities as of the date of purchase indicated on your receipt that specifies the total purchase price for the Plan and which is incorporated herein.

The Plan does not apply to:
  (a) amended returns; 1040-NR;
  (b) non-individual returns such as employment (including taxes assessed on Form 4137 for income other than allocated tips), corporate, state and local small business, occupation tax, partnership, trust, estate, and gift tax returns;
  (c) any returns used to file for tax credits or rebates such as property tax, homestead or renters credits that are not filed in conjunction with a federal, state or local return;
  (d) the calculation of estimated tax payment vouchers, additional taxes owed as a result of an erroneous refund of your estimated tax payments by the IRS or a State or Local taxing authority;
  (e) any return for which, as of the date of such purchase, you have knowledge of additional taxes owed;
  (f) any return for which you have received on or before the date of such purchase any notification from any tax authority of examination or audit;
  (g) returns for which errors have been identified by Block prior to an assessment of additional taxes by tax authorities and can be corrected by Block within 30 days from Block's preparation of the return;
  (h) any return relating to previous years;

KEVIN ATWELL & ROBIN DAVIS

## Peace of Mind® Extended Service Plan

(i) additional taxes, penalties and interest that are assessed as the result of (i) incorrect, incomplete, false or misleading information that you have given to Block in connection with its preparation of a return; (ii) the government's inability to obtain from you sufficient records to support deductions, credits and other items on your return; (iii) your failure to timely pay the taxes as shown to be due on your return; and (iv) additional taxes assessed as the result of your desire to take a position on your return that challenges current IRS or judicial tax law guidelines or interpretation. In the event you receive a refund of any assessment that Block has paid you under the Plan, you must reimburse Block for the amount of such refund; and

(j) assessments of additional taxes that occur after 3 years from the filing deadline for the return, not including extensions.

### ARBITRATION IF A DISPUTE ARISES BETWEEN YOU AND H&R BLOCK

If a dispute arises between you and H&R Block, including any dispute that relates to POM, the dispute shall be settled by binding arbitration unless you opt-out of this arbitration provision. The arbitration procedures, including the procedures for you to opt-out of arbitration, are set forth in the Client Service Agreement between you and Block, in the section titled "Arbitration if a Dispute Arises Between You and H&R Block." The "Arbitration if a Dispute Arises Between You and H&R Block" section hereby is incorporated by reference.

Note: This arbitration provision will not apply to any claims relating to the Peace of Mind Extended Service Plan, the subject matter of which is currently being asserted in any certified class action lawsuit pending against H&R Block as of November 2, 2006.

POM-Extended (2006)      FDPOMEX-2V 1.0
Form Software Copyright 1998 - 2007 H&R Block Tax Services, Inc

KEVIN ATWELL & ROBIN DAVIS

## Peace of Mind® Extended Service Plan

**Satisfaction**
If for any reason you are not satisfied with the terms of this Plan and want to rescind this Plan, you may obtain a full refund of the fee you paid for the Plan provided that within seven (7) days from the date of purchase you contact the district manager of the H&R Block office where your tax return was prepared and provide at that office the receipt for such payment.

**Claim Process - Frequently Asked Questions:**

**I received an inquiry from a tax authority. How do I file a claim?**
Take your tax authority notice and any related documents to your local H&R Block office. Your local H&R Block office will file a claim with the Peace of Mind Claims Department. The claim will be reviewed and processed. If the claim is approved, you will receive a check. If the claim is not approved, you will receive a letter explaining the reason for the denial.

**How long will it take to process my claim?**
It usually takes 4 - 6 weeks to reach a claim determination.

**What else do I need to know?**
Federal law states that if your tax liability is paid by someone else, the amount of that payment becomes taxable income to you. Therefore, you will need to include your Peace of Mind payment on your tax return next year. If the payment is $600 or more you will receive form 1099-MISC from H&R Block next year.

**What about penalty and interest payments?**
Payment of any penalty and interest assessed on the additional tax due may be processed separately under the conditions of H&R Block's Standard Guarantee and paid by your local office.

**Who do I contact if I have more questions?**
You should contact the H&R Block office where your claim was originally filed.

You can also speak to a client service representative by calling 1-800-HRBLOCK.

You can find additional information on our web site: www.hrblock.com/goto/peaceofmind.

**What if my claim is denied?**
You may dispute the denial by calling 1-800-HRBlock, or by submitting an email via hrblock.com, and clicking on customer support and requesting a second review. Your claim will usually be reviewed within 2 - 5 days. You will receive the final determination in writing. New Hampshire Residents: In the event you do not receive satisfaction under this Peace of Mind contract, you may contact the New Hampshire Insurance Department, Consumer Division, which provides oversight for consumer guaranty contracts, at 21 South Fruit Street, Suite 14, Concord NH 03301 or 603-271-2261. This number is only for clients who purchased Peace of Mind.

My/our signature(s) below confirms that I/we understand and voluntarily agree to the terms, conditions and disclosures presented in this Agreement, including the requirement that any dispute between me/us and H&R Block be settled through binding arbitration.

Client's Name(s): **KEVIN ATWELL & ROBIN DAVIS** _____

Extended Service Plan Accepted. _____    Extended Service Plan Declined. __X__

Client's Signature: __**Signature on file**_____    Date: _____

Spouse Signature: __**Signature on file**_____    Date: _____

Tax Professional Signature: _____    Date: _____

# INFORMATION, IDENTIFICATION AND INSTRUCTIONS IN CONNECTION WITH APPLICATION FOR A REFUND ANTICIPATION LOAN AND A REFUND DEPOSIT ACCOUNT

System Protected by U.S. Patent Nos. 4,890,228, 5,193,057, and 5,963,921

## 1. INFORMATION

| Name of Applicant or Joint Filer | Name of Joint Applicant or Joint Filer |
|---|---|
| **KEVIN ATWELL** | **ROBIN DAVIS (KYLE)** |
| First         M.I.         Last | First         M I         Last |

| | |
|---|---|
| .                              . | S                                        , |
| Home Address | Home Address |
| :                          __ __ -6009 | .                                      9 |
| Mailing Address | Mailing Address |

Social Security/Taxpayer Identification # _____    Social Security/Taxpayer Identification # 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

Date of Birth 12/26/1973                                              Date of Birth :

Home Phone # (334) 527-8853 (Required)             Home Phone # (334) 527-8853 (Required, if different)

Work Phone # (334) 335-5800 (Required, if employed)   Work Phone # _____ (Required, if employed)

Residence: [X] Own  [ ] Rent  [ ] Other              Residence: [X] Own  [ ] Rent  [ ] Other

Checking Account: [X] Yes  [ ] No                     Checking Account: [X] Yes  [ ] No

Savings Account: [ ] Yes  [X] No                      Savings Account: [ ] Yes  [X] No

## 2. IDENTIFICATION

The following unexpired identification ("ID") has been provided:

**For photo ID of Applicant or Joint Filer:**          **For second ID of Applicant or Joint Filer, if required:**

Type of ID **DRIVERS LICENSE** _____       Type of ID _____

ID Number, if any 5641048 _____             ID Number, if any _____

Place of Issuance **AL**                               Place of Issuance _____

Date of Issuance, if any 10/12/2004   Expiration Date, if any 03/23/2008    Date of Issuance, if any _____   Expiration Date, if any _____

Additional Information _____                 Additional Information _____

**For photo ID of Joint Applicant or Joint Filer:**    **For second ID of Joint Applicant or Joint Filer, if required:**

Type of ID _____                             Type of ID _____

ID Number, if any _____                      ID Number, if any _____

Place of Issuance _____                      Place of Issuance _____

Date of Issuance, if any _____   Expiration Date, if any _____    Date of Issuance, if any _____   Expiration Date, if any _____

Additional Information _____                 Additional Information _____

## 3. PAYMENT INSTRUCTIONS

A. For an Instant RAL, please provide the loan proceeds by check, unless the box below is completed, in which case the loan proceeds should be provided via direct deposit into my [ ] H&R Block Card account. The account number into which I authorize my loan proceeds to be directed is

_____

The routing transit number (RTN) of the financial institution that provides this account, which is required to complete the direct deposit of my loan proceeds, is _____ .

B. For a Classic RAL, please provide my loan proceeds by check, unless the boxes below are completed, in which case the loan proceeds should be provided via direct deposit into my [ ] H&R Block Card account. The account number into which I authorize my loan proceeds to be directed is

_____

The routing transit number (RTN) of the financial institution that provides this account, which is required to complete the direct deposit of my loan proceeds, is _____ .

C. If the tax refund is greater than the amount of the RAL, please provide my proceeds of the excess refund by the same method chosen in subsection B, unless the boxes below are completed, in which case the proceeds should be provided by direct deposit into the following account:
[ ] H&R Block Easy IRA   [ ] H&R Block Financial Advisors account   [ ] H&R Block Easy Savings account.

D. Notwithstanding any request above to receive proceeds by direct deposit, if the application for a RAL is approved (1) in an amount smaller than the amount specified in the Total of Payments section in the Loan Agreement and Disclosure Statement, or (2) with an itemization different than the itemization of Amount Financed set forth in the Loan Agreement and Disclosure Statement, the RAL and any excess refund will be provided by check.

By signing below I confirm that the information set forth herein is true and correct. If I sign below as an Applicant or a Joint Applicant, I am indicating that I fully understand that I am applying for a loan. If I sign below as a Joint Filer I am indicating that I fully understand that I will not be personally responsible for any loan provided to the Applicant but that I agree that the Applicant may rely on our joint tax refund in applying for a loan.

| **Signature on file** | | **Signature on file** | |
|---|---|---|---|
| Applicant Signature | Date | Joint Applicant or Joint Filer Signature (if any) | Date |

**Signature on file**

Witness

Toll- Free Customer Service Number 1- 888- 832- 5625

KEVIN ATWELL & R DAVIS

## LOAN AGREEMENT AND DISCLOSURE STATEMENT

In this Loan Agreement and Disclosure Statement ("Agreement"), "RAL" means a Refund Anticipation Loan, "Refund Account" means a Refund Deposit Account, "I", "me" and "my" means each person who has applied to HSBC for a RAL. "H&R Block" means each of H&R Block Services, Inc., and each of its parents, affiliates and subsidiaries (and franchisees thereof).

The following Truth in Lending Act ("TILA") disclosures are based on a RAL in the amount specified in item 9 of the Itemization of Amount Financed. I will receive a replacement TILA Disclosure Statement, including an Itemization of Amout Financed, if I am approved for a RAL in a different amount, if a prior debt to be paid is not set forth or is different than the amount set forth, or if any of the items are incorrectly stated. I may receive a duplicate copy if the RAL is disbursed to me by check.

### Truth in Lending Act Disclosure Statement

| | | |
|---|---|---|
| 1. Amount Financed (the amount of credit provided to me or on my behalf) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ | 820.69 (e) |
| 2. FINANCE CHARGE (the dollar amount the credit will cost me) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ | 17.31 (e) |
| 3. Total of Payments (the amount I will have paid after I have made all payments as scheduled) . . . . . . . . . . . . . . . . . . | $ | 838.00 (e) |
| 4. ANNUAL PERCENTAGE RATE (the cost of my credit as a yearly rate) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 69.987% (e) |

"e" = estimate                                                             If line is left blank, amount is "0"

**Creditor:** My creditor is (a) HSBC Bank USA, National Association, if the office in which this Agreement was obtained is located in California, Delaware, Washington, D.C., Florida, Massachusetts, New Jersey, New York, Oregon, Pennsylvania, or Washington, or (b) HSBC Trust Company (Delaware), National Association, if the office in which this Agreement was obtained is located in any other location (the applicable entity shall hereinafter be referred to as "HSBC").

**Demand Feature:** My loan will be repayable on demand or when the anticipated tax refund is electronically deposited in my Refund Account, whichever is earlier.

**Payment Schedule:** HSBC estimates that the Total of Payments set forth above will be due in a single payment approximately 12 days from the date of this Agreement.

**Security Interest:** I am providing HSBC with a security interest in my tax refund payment by the IRS, in all funds deposited in the Refund Account, and in that Refund Account.

**Prepayment:** If I pay off early, I will not be entitled to a refund of part or all of the Finance Charge.

**Contract Reference:** Refer to the Application and the accompanying Loan Agreement for additional information about nonpayment, default, any right to accelerate the maturity of the obligation, and any prepayment rebates or penalties.

**Required Deposit:** The Annual Percentage Rate does not take into account my required deposit.

---

Itemization of Amount Financed

| | | |
|---|---|---|
| 1. Amount paid directly to me . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ | 604.74 (e) |
| 2. Amount paid for my Refund Account Fee to HSBC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ | 29.95 (e) |
| 3. Amount paid for tax preparation to H&R Block . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ | 186.00 (e) |
| 4. Amount paid for prior year items owed to H&R Block . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ | 0.00 (e) |
| 5. Amount paid for Express Filer Fee to H&R Block . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ | 0.00 (e) |
| 6. Amount paid for Peace of Mind to H&R Block . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ | 0.00 (e) |
| 7. Amount Financed (Items 1+2+3+4+5+6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ | 820.69 (e) |
| 8. Prepaid FINANCE CHARGE (RAL Fee to HSBC) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ | 17.31 (e) |
| 9. Total RAL (Items 7+8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ | 838.00 (e) |

"e" = estimate                                                            If line is left blank, amount is "0"

### Loan Agreement

**1. Obligation on RAL.**
(a) I am obligated, on the date I sign this Agreement, to accept a RAL if HSBC approves my Application, unless HSBC approves me for a RAL in an amount different than the amount set forth in the Total of Payments section in the TILA Disclosure Statement, if a prior debt to be paid is not set forth or is different than the amount set forth in the Itemization of Amount Financed, or if any of the items in the TILA Disclosure Statement or Itemization of Amount Financed are incorrectly stated. In such a case, I will be provided with a replacement TILA Disclosure Statement and I will be obligated to accept the RAL if I accept the RAL proceeds check. My loan will begin, and HSBC will earn the finance charge, when I am approved for the RAL and the proceeds check or debit card is made available.

(b) I may cancel my RAL transaction, or my obligation to accept a RAL, for up to 48 hours after I become obligated to accept the RAL. To do so, I must return to HSBC or the office where I received my RAL proceeds any check I have received (or cash in the amount of the RAL if I have cashed the check) or, if I received a debit card, cash in the amount of the RAL proceeds deposited on the debit card, and comply with other requirements set by HSBC. I understand that, if I use my right to cancel, my finance charge and Refund Account Fee will be refunded to me and HSBC will provide me with any tax refund only after HSBC receives the refund from the IRS.

**2. Security Interest.** If I receive a RAL, I grant HSBC a security interest in the property described in the TILA Disclosure Statement as collateral for my obligation to repay the RAL and perform my other obligations under the Application and this Agreement.

**3. Deductions.** My Prepaid Finance Charge, Refund Account Fee, fees for the completion and system administration of my income tax return by H&R Block, and prior year debt owed to H&R Block shall be deducted from the proceeds of my RAL.

**4. Other Charges.** (a) I agree to pay a returned check charge of $19 if any check or automatic debit is not honored. (b) I agree to pay a periodic interest charge for each monthly period that the loan remains unpaid beginning on a date that is at least 30 days after payment of my loan is demanded, and on or around the same date of each succeeding month (or if there is no such date, the last date of the month). The charge will be equal to a default periodic interest rate of 1.5% multiplied by the principal balance outstanding on the RAL on each date that the charge is imposed. (c) In the event that I pay my account by telephone, I agree to pay a $10 fee for each such payment. HSBC reserves the right to change such fee from time to time. I may call Customer Service for a current fee schedule. (d) I also agree to pay any attorney's fees and collection agency costs incurred by HSBC or its affiliates to collect any delinquent RAL as permitted by law.

**5. Instant RAL.** If I receive an Instant RAL, and if the electronic filing of my return is rejected by the Internal Revenue Service ("IRS"), I authorize H&R Block to insert my Refund Account number at HSBC, together with HSBC's routing transit number, on my signed paper returns, and mail them to the IRS.

**6. Application of Payments.** Each payment I make on the RAL will be applied in any order determined by HSBC.

**7. Debit Card.** If I receive my RAL proceeds on a debit card, I may request from H&R Block Bank, the debit card issuer, a disbursement of all or a portion of such proceeds via a check mailed to me or ACH transfer to my bank account one time at no cost. This one time request should be made to H&R Block Bank by calling 1-866-353-1266.

BY SIGNING BELOW, I AGREE TO THE TERMS OF THIS LOAN AGREEMENT, AND TO THE APPLICATION, WHICH INCLUDES AN ARBITRATION CLAUSE WHICH MAY SUBSTANTIALLY LIMIT MY RIGHTS IN THE EVENT OF A DISPUTE. I ALSO ACKNOWLEDGE RECEIVING A COMPLETED COPY OF THIS LOAN AGREEMENT AND DISCLOSURE STATEMENT.

---

CAUTION: IT IS IMPORTANT THAT YOU THOROUGHLY READ THIS CONTRACT BEFORE YOU SIGN IT.
NOTICE TO CUSTOMER
(a) DO NOT SIGN THIS IF IT CONTAINS ANY BLANK SPACES.
(b) YOU ARE ENTITLED TO AN EXACT COPY OF ANY AGREEMENT YOU SIGN.
(c) YOU HAVE THE RIGHT AT ANY TIME TO PAY IN ADVANCE THE UNPAID BALANCE DUE UNDER THIS AGREEMENT AND YOU MAY BE ENTITLED TO A PARTIAL REFUND OF THE FINANCE CHARGE.

---

Date: _____      **Signature on file** (seal)      **Signature on file** (seal)
                            Signature of Applicant                      Signature of Joint Applicant

## A few things to remember when you Send-a-Friend our way:

1. The maximum amount of friends that you can refer is 5 (five).

2. You must pay for your tax preparation to receive the
   Send-a-Friend reward.

3. Your friend must pay for their tax preparation in order to receive the
   Send-a-Friend reward.

4. Your friend must be a new client to H&R Block (a new client is a
   person who did not use a H&R Block office to prepare their prior
   year return).

5. Form cannot be redeemed within 2 hours of the referring party.

 **H&R BLOCK**

## Send a friend to H&R Block. We'll thank you both with cash!

**$10 for you. $20 to your friend!***

1. Give this form to a friend and have them complete the information below.
2. We'll send you a check for up to 5 new clients you refer.*

| Last Name | First | MI |
|---|---|---|
| Address | | |
| City | State | Zip Code |

*Valid only for new clients who purchase tax prep for a federal return from a participating U.S. H&R Block office between 1/1/07 and 6/1/07. A new client is a person who did not use a H&R Block office to prepare their prior year return. Referral certificate must be presented prior to completion of initial tax prep interview. Amended returns are ineligible. Limit of five referrals per referring party and one referral per paid federal return. Cannot be redeemed by a referred client who completes tax prep within two hours of the referring party. H&R Block associates are not eligible. May not be combined with any other discount, gift or referral offer. Allow approximately 8 weeks for check delivery. Call 1-877-600-5432 for referral status.

To make an appointment call the office below. For other H&R Block locations call 1-800-HRBLOCK.

$$10 to:
LONNY SHOUP                 K ATWELL & R DAVIS

(334) 335-3323             (334) 527-8853

**H&R BLOCK**   For office use
01014387163290
Client ID

Thanks for choosing H&R Block and referring your friends.

---

## Send a friend to H&R Block. We'll thank you both with cash!

**$10 for you. $20 to your friend!***

1. Give this form to a friend and have them complete the information below.
2. We'll send you a check for up to 5 new clients you refer.*

| Last Name | First | MI |
|---|---|---|
| Address | | |
| City | State | Zip Code |

*Valid only for new clients who purchase tax prep for a federal return from a participating U.S. H&R Block office between 1/1/07 and 6/1/07. A new client is a person who did not use a H&R Block office to prepare their prior year return. Referral certificate must be presented prior to completion of initial tax prep interview. Amended returns are ineligible. Limit of five referrals per referring party and one referral per paid federal return. Cannot be redeemed by a referred client who completes tax prep within two hours of the referring party. H&R Block associates are not eligible. May not be combined with any other discount, gift or referral offer. Allow approximately 8 weeks for check delivery. Call 1-877-600-5432 for referral status.

To make an appointment call the office below. For other H&R Block locations call 1-800-HRBLOCK.

$$10 to:
LONNY SHOUP                 K ATWELL & R DAVIS
146 EAST 4TH STREET
LUVERNE AL 36049
(334) 335-3323             (334) 527-8853

**H&R BLOCK**   For office use
01014387163290
Client ID

Thanks for choosing H&R Block and referring your friends.

---

## Send a friend to H&R Block. We'll thank you both with cash!

**$10 for you. $20 to your friend!***

1. Give this form to a friend and have them complete the information below.
2. We'll send you a check for up to 5 clients you refer.*

| Last Name | First | MI |
|---|---|---|
| Address | | |
| City | State | Zip Code |

*Valid only for new clients who purchase tax prep for a federal return from a participating U.S. H&R Block office between 1/1/07 and 6/1/07. A new client is a person who did not use a H&R Block office to prepare their prior year return. Referral certificate must be presented prior to completion of initial tax prep interview. Amended returns are ineligible. Limit of five referrals per referring party and one referral per paid federal return. Cannot be redeemed by a referred client who completes tax prep within two hours of the referring party. H&R Block associates are not eligible. May not be combined with any other discount, gift or referral offer. Allow approximately 8 weeks for check delivery. Call 1-877-600-5432 for referral status.

To make an appointment call the office below. For other H&R Block locations call 1-800-HRBLOCK.

$$10 to:
LONNY SHOUP                 K ATWELL & R DAVIS
146 EAST 4TH STREET
LUVERNE AL 36049
(334) 335-3323             (334) 527-8853

**H&R BLOCK**   For office use:
01014387163290
Client ID

Thanks for choosing H&R Block and referring your friends.

---

## Send a friend to H&R Block. We'll thank you both with cash!

**$10 for you. $20 to your friend!***

1. Give this form to a friend and have them complete the information below.
2. We'll send you a check for up to 5 new clients you refer.*

| Last Name | First | MI |
|---|---|---|
| Address | | |
| City | State | Zip Code |

*Valid only for new clients who purchase tax prep for a federal return from a participating U.S. H&R Block office between 1/1/07 and 6/1/07. A new client is a person who did not use a H&R Block office to prepare their prior year return. Referral certificate must be presented prior to completion of initial tax prep interview. Amended returns are ineligible. Limit of five referrals per referring party and one referral per paid federal return. Cannot be redeemed by a referred client who completes tax prep within two hours of the referring party. H&R Block associates are not eligible. May not be combined with any other discount, gift or referral offer. Allow approximately 8 weeks for check delivery. Call 1-877-600-5432 for referral status.

To make an appointment call the office below. For other H&R Block locations call 1-800-HRBLOCK.

$$10 to:
LONNY SHOUP                 K ATWELL & R DAVIS
146 EAST 4TH STREET
LUVERNE AL 36049
(334) 335-3323             (334) 527-8853

**H&R BLOCK**   For office use
01014387163290
Client ID

Thanks for choosing H&R Block and referring your friends.

---

## Send a friend to H&R Block. We'll thank you both with cash!

**$10 for you. $20 to your friend!***

1. Give this form to a friend and have them complete the information below.
2. We'll send you a check for up to 5 clients you refer.*

| Last Name | First | MI |
|---|---|---|
| Address | | |
| City | State | Zip Code |

*Valid only for new clients who purchase tax prep for a federal return from a participating U.S. H&R Block office between 1/1/07 and 6/1/07. A new client is a person who did not use a H&R Block office to prepare their prior year return. Referral certificate must be presented prior to completion of initial tax prep interview. Amended returns are ineligible. Limit of five referrals per referring party and one referral per paid federal return. Cannot be redeemed by a referred client who completes tax prep within two hours of the referring party. H&R Block associates are not eligible. May not be combined with any other discount, gift or referral offer. Allow approximately 8 weeks for check delivery. Call 1-877-600-5432 for referral status.

To make an appointment call the office below. For other H&R Block locations call 1-800-HRBLOCK.

$$10 to:
LONNY SHOUP                 K ATWELL & R DAVIS
146 EAST 4TH STREET
LUVERNE AL 36049
(334) 335-3323             (334) 527-8853

**H&R BLOCK**   For office use
01014387163290
Client ID

Thanks for choosing H&R Block and referring your friends.

---

Send Friend (2006)                          PDFRIEND-2V 1.0
Form Software Copyright 1996 - 2007 H&R Block Tax Services, Inc.





| Prepared For: | Prepared By: | For Year-round Service: |
|---|---|---|
| KEVIN ATWELL AND ROBIN DAVIS | LONNY SHOUP | H AND R BLOCK EASTERN ENTERPRISES INC |
| | H AND R BLOCK EASTERN ENTERPRISES INC | 146 EAST 4TH STREET |
| Date Prepared: | 146 EAST 4TH STREET | Luverne, AL 36049-0000 |
| | Luverne, AL 36049-0000 | (334)335-3323 |
| 03/29/2007 | (334)335-3323 | |

Next Year's Appointment - We look forward to seeing you next year on Date:_____ Time: _____

## Today's Savings

* Claiming a refund for the long-distance telephone taxes you have paid since February 2003    $40.00
  saved you:

* In simple terms, the Marginal Tax Rate is the tax rate that you pay on your last dollar of taxable income. It is the highest federal tax bracket that affects your tax calculation. The Effective Tax Rate is the percentage of your total income that you paid in taxes. For 2006, your Marginal Tax Rate is 0% and your Effective Tax Rate is 0%.

Total Savings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $40.00

## Filing, Refund and Balance Due Information

| Tax Return | efile | Refund / (Balance Due) | Payment Information | | Delivery |
|---|---|---|---|---|---|
| Federal | Yes | $838.00 | Refund<br>H&R Block Fees<br>Bank Fees<br>Net Amount | $838.00<br>($186.00)<br>($47.26)<br>$604.74 | The Refund Anticipation Loan (RAL) check will be available in 1 - 2 days for the estimated amount of $604.74.* |
| Alabama | Yes | $282.00 | Refund $282.00 | | Alabama will mail check for the amount of $282.00. |
| North Carolina | No | $101.00 | Refund $101.00 | | North Carolina will mail check for the amount of $101.00<br>Mail tax return to:<br>NORTH CAROLINA DEPARTMENT OF REVENUE<br>P.O. BOX R<br>RALEIGH, NC 27634-0001 |

* If you are approved, your loan will be subject to all the terms, conditions, and authorizations (including offsets of prior amounts) in your RAL Application.





**H&R Block**
# ADVANTAGE®
**Opportunities and Advice**

- **Plan to keep more of your refund next year:**
  A Refund Anticipation Loan (RAL) is fast and easy but it's also expensive because the lending bank charges for this service. And even if you deposit a RAL check at your own bank, you may have to wait a few days for funds to be available due to your bank's policies. Next year, why not file your return electronically and choose IRS direct deposit instead of a RAL? That way, you will avoid RAL fees and get the full amount of your refund deposited into your bank account in approximately 8- 15 days. The payoff: More of your refund stays in your own pocket.

- **Save money on groceries with the Food Stamp Program:**
  On average, eligible households receive about $200 per month in food stamp benefits. The amount will vary based on your state, income and the number of people in your household. You can spend food stamps like cash at authorized grocery stores, and the benefits come on an electronic card. To find out if you're eligible, call the national toll- free hotline at 1- 800- 221- 5689. For Alabama information, call 1- 800- 382- 0499, or visit www.dhr.state.al.us/Index.asp.

- **Need help with health care?**
  See your local Community Health Center (CHC). You may be eligible for dental care, primary and preventive health care, and more through these centers. The CHCs try to reach people who are medically- underserved in both urban and rural areas. Income eligibility is set by each center. To find a CHC near you, call toll- free1- 888- 275- 4772. Or visit www.bphc.hrsa.gov/chc/ or http://ask.hrsa.gov/pc.

- **You may not need to file next year:**
  Because none of your income was taxable this year, the federal government is refunding all of the federal income tax withheld from your paychecks. If you don't expect your income to increase in 2007, we can help you complete a new W- 4, the form to give to your employer to stop federal withholding. You'll then have more money in your paycheck to help make ends meet throughout the year. However, if there is a chance your income will increase, you'll want your employer to keep withholding taxes. Talk to your tax professional about planning your withholding and whether completing a new W- 4 is right for you.

- **Budgeting helps:**
  Starting a budget can help you cover monthly expenses and save for the future. To get started, write down all of your recurring expenses such as food, rent, utilities, loans and more. Then estimate how much you spend on these expenses each month. Keep this list current by adjusting it whenever new expenses come up. When you get your paycheck, allocate enough to cover your expenses. Then you'll know how much is yours to spend or save. For more information about budgeting, visit hrblock.com.

- **Get help weatherizing your home:**
  You could be eligible for the Weatherization Assistance Program (WAP), which provides funds for things like adding home insulation and sealing leaks in doors and windows. These improvements may help with long- term savings on heating and cooling costs, while also making your home more comfortable. Renters and homeowners can apply. Renters must get permission from their landlords before WAP can install any weatherization materials. Most states base eligibility on income only and assets are not included. For more about WAP and how to apply, call the Alabama WAP office at 334- 242- 4909, or visit www.adeca.state.al.us/EWT/.

Affiliated Business Disclosure: H&R Block Services, Inc. and its tax preparation subsidiaries (collectively, "Block") may refer certain information about you to H&R Block Mortgage Corporation and/or Option One Mortgage Corporation. H&R Block Mortgage and Option One are indirect wholly owned subsidiaries of H&R Block, Inc. Because of this relationship, this referral may provide Block a financial or other benefit. You are NOT required to obtain a mortgage loan from H&R Block Mortgage and/or Option One. OTHER LENDERS ARE AVAILABLE. YOU SHOULD SHOP FOR THE BEST PRICES, SERVICES AND INTEREST RATES. If you obtain a loan from H&R Block Mortgage and/or Option One, you will be charged interest and fees in accordance with the mortgage loan documents and, depending on your qualification and market conditions, you will be charged between 0% to 6% of the loan amount for discount points, $260 to $505 for processing fees and $225 to $750 for loan administration fees. Not all programs are available in all areas. Program restrictions apply. H&R Block Mortgage Corporation is licensed or exempt from licensing to conduct business in all states. H&R Block Mortgage Corporation Underwriting Guidelines apply. Loans not made on properties in New Mexico and West Virginia. ©Copyright 2006. All rights reserved. Information accurate as of: 09/12/2006.

This H&R Block Advantage document provides suggestions that may help you improve your tax and financial situation. Its contents should be considered in conjunction with information you receive from other sources that are familiar with your specific circumstances. H&R Block Financial Advisors, Inc., a subsidiary of H&R Block, Inc., offers investment services and securities products. H&R Block Financial Advisors, Inc. is a dually- registered investment advisor and broker- dealer and a member of NYSE/SIPC. Banking services offered through H&R Block Bank, a Federal Savings Bank, Member FDIC. Tax services offered through subsidiaries of H&R Block Services, Inc. Mortgage services offered through H&R Block Mortgage Corporation. H&R Block, Inc., H&R Block Services, Inc., H&R Block Bank and H&R Block Mortgage Corporation are not registered broker- dealers





## 2006 Tax Return Summary

### Federal Year over Year Comparison

| INCOME | Year 2006 | Year 2005 | Change($) |
|---|---|---|---|
| Wages, salaries, tips | $13,723 | $0 | $13,723 |
| Unemployment compensation | $1,521 | $0 | $1,521 |
| Total income | $15,244 | $0 | $15,244 |
| **ADJUSTED GROSS INCOME** | | | |
| Total income less total adjustments | $15,244 | $0 | $15,244 |
| **PAYMENTS** | | | |
| Federal withholding | $798 | $0 | $798 |
| Total payments | $838 | $0 | $838 |
| **REFUND** | | | |
| Overpayment | $838 | $0 | $838 |
| Refund due | $838 | $0 | $838 |
| **OTHER COMPUTATIONS** | | | |
| Alternative minimum taxable income | $15,244 | $0 | $15,244 |
| Filing status | Married Filing Jointly | | |

This H&R Block Advantage document provides suggestions that may help you improve your tax and financial situation. Its contents should be considered in conjunction with information you receive from other sources that are familiar with your specific circumstances. H&R Block Financial Advisors, Inc., a subsidiary of H&R Block, Inc., offers investment services and securities products. H&R Block Financial Advisors, Inc. is a dually-registered investment advisor and broker-dealer and a member of NYSE/SIPC. Banking services offered through H&R Block Bank, a Federal Savings Bank, Member FDIC. Tax services offered through subsidiaries of H&R Block Services, Inc. Mortgage services offered through H&R Block Mortgage Corporation. H&R Block, Inc., H&R Block Services, Inc., H&R Block Bank and H&R Block Mortgage Corporation are not registered broker-dealers.





## Today's Services

| | |
|---|---|
| **Tax Preparation** | |
|     * Total Tax Preparation................................................. | **$186.00** |
| | |
| **H&R Block Service Fees** | |
|     * Total H&R Block Fees.............................................. | **$186.00** |
| | |
| **Bank Fees** | |
|     * Finance Charge.................................................... | $17.31 |
|     * Refund Account Fee .............................................. | $29.95 |
|     * Total Bank Fees.................................................. | $47.26 |
| | |
| **Total Fees Owed** ...................................................... | **$233.26** |
| | |
| **Net Amount** | |
|     * Check (Estimated)................................................. | **$604.74** |

## Additional Notes:

This H&R Block Advantage document provides suggestions that may help you improve your tax and financial situation. Its contents should be considered in conjunction with information you receive from other sources that are familiar with your specific circumstances. H&R Block Financial Advisors, Inc., a subsidiary of H&R Block, Inc., offers investment services and securities products. H&R Block Financial Advisors, Inc. is a dually-registered investment advisor and broker-dealer and a member of NYSE/SIPC. Banking services offered through H&R Block Bank, a Federal Savings Bank, Member FDIC. Tax services offered through subsidiaries of H&R Block Services, Inc. Mortgage services offered through H&R Block Mortgage Corporation. H&R Block, Inc., H&R Block Services, Inc. H&R Block Bank and H&R Block Mortgage Corporation are not registered broker-dealers.





_____

Your Personal Action Plan

## Track Your Money: Budget

Budgeting helps you set and achieve your goals and track where you spend your money. By following a budget, you'll better understand your spending habits to make sure you're spending money carefully. To help you get started, we've provided the following steps, plus a budget worksheet on the next page.

**Step 1**  **Define Your Goals**

Short- Term Example - 1) Pay bills on time each month. 2) Save for a down payment on a car.

Your Short- Term Goals: _____

_____

Long- Term Example - 1) Purchase my own home. 2) Retire by age 62.

Your Long- Term Goals: _____

_____

**Step 2**  **Track Your Expenses**

Use the budget planner on the following page to get started, or set up your own budget sheet.

**Step 3**  **Reduce High- Interest Debt**

For little or no cost, many organizations help people consolidate their debts into one monthly payment, reduce interest and get out of debt faster. For more information, contact the National Foundation for Credit Counseling at 1- 800- 388- 2227 or visit www.nfcc.org.

**Step 4**  **Save a Little Each Month**

Build an emergency savings account to help you pay for unexpected bills or make it through to your next paycheck.

Benefits of Savings Accounts

- **Low cost.** You can open an account at a bank or credit union, usually with a deposit of $50.
- **Easy access.** Money in a savings account is easy to withdraw when you need it. You withdraw your money by using checks, ATMs or a debit card.
- **Safer.** By depositing your emergency savings into an account, you'll safeguard your money against theft or loss.
- **Earn money.** If you earn interest on your account, you'll add more money to your savings.

How to Start Saving

- **Open an account.** Ask your financial institution if you can direct deposit a small portion of your paycheck into a savings account. Or stop in at a local bank in your neighborhood and deposit cash.
- **Use your tax refund.** This could be your chance to get a head start and be ready when those unplanned expenses occur.

This H&R Block Advantage document provides suggestions that may help you improve your tax and financial situation. Its contents should be considered in conjunction with information you receive from other sources that are familiar with your specific circumstances. H&R Block Financial Advisors, Inc., a subsidiary of H&R Block, Inc., offers investment services and securities products. H&R Block Financial Advisors, Inc. is a dually- registered investment advisor and broker- dealer and a member of NYSE/SIPC. Banking services offered through H&R Block Bank, a Federal Savings Bank, Member FDIC. Tax services offered through subsidiaries of H&R Block Services, Inc. Mortgage services offered through H&R Block Mortgage Corporation. H&R Block, Inc., H&R Block Services, Inc., H&R Block Bank and H&R Block Mortgage Corporation are not registered broker- dealers





Your Personal Action Plan

## Monthly Budgeting Worksheet

### Income

| | |
|---|---|
| Monthly Net Wages (after taxes) | _____ |
| Other Income | _____ |
| Total Income | _____ |

Your net wages is how much you've earned after your employer takes out taxes and other payroll deductions

Other income could include interest income or alimony.

### Fixed Expenses

| | |
|---|---|
| Rent | _____ |
| Renter's Insurance | _____ |
| Gas - Natural | _____ |
| Water | _____ |
| Electric | _____ |
| Cable | _____ |
| Phone | _____ |
| Cell Phone | _____ |
| Car Insurance | _____ |
| Car Payment | _____ |
| Gas - Car | _____ |
| Other | _____ |

Fixed expenses cost the same amount, or a similar amount, each month or billing period.

### Flexible Expenses

| | |
|---|---|
| Groceries | _____ |
| Credit Card 1 | _____ |
| Credit Card 2 | _____ |
| Entertainment | _____ |
| Prescriptions | _____ |
| Dining Out | _____ |
| Laundry | _____ |
| Pocket Money | _____ |
| Total Expenses (Fixed & Flexible) | _____ |

Flexible expenses are hard to anticipate sometimes. Estimate, on average, how much you spend on these items a month.

| | |
|---|---|
| Total Income | |
| Total Expenses | - _____ |
| Extra or Shortage | _____ |
| | |
| Savings | _____ |

To find out what you have left over at the end of the month, subtract your total expenses from your total income

If you have money left over, consider saving it for emergencies.

This H&R Block Advantage document provides suggestions that may help you improve your tax and financial situation. Its contents should be considered in conjunction with information you receive from other sources that are familiar with your specific circumstances. H&R Block Financial Advisors, Inc., a subsidiary of H&R Block, Inc., offers investment services and securities products. H&R Block Financial Advisors, Inc. is a dually-registered investment advisor and broker-dealer and a member of NYSE/SIPC. Banking services offered through H&R Block Bank, a Federal Savings Bank, Member FDIC. Tax services offered through subsidiaries of H&R Block Services, Inc. Mortgage services offered through H&R Block Mortgage Corporation. H&R Block, Inc., H&R Block Services, Inc., H&R Block Bank and H&R Block Mortgage Corporation are not registered broker-dealers

**SHERRY D. McSWEAN**
*Revenue Commissioner, Crenshaw County, Alabama*
P.O. Box 208
Luverne, Alabama 36049

```
PRE-SORT
FIRST CLASS
U.S. POSTAGE
PAID
Luverne, AL 36049
PERMIT 45
```

Tax Year 2006

# PROPERTY
# TAX NOTICE

COOK JENNIFER
C/O KEVIN ATWELL

BRANTLEY        AL   36009

ACCOUNT NUMBER

TOTAL TAX DUE    $    278.43

YOUR CHECK NUMBER _____

ACCOUNT NUMBER

TOTAL TAX DUE    $    278.43
DELINQUENT BILL DUE UPON RECEIPT

**DUE BEFORE DECEMBER 31st**

**COURTESY NOTICE**

This is not an Official Receipt
AD VALOREM TAX NOTICE

**TAXES ARE DUE OCTOBER 1st OF THIS YEAR**

Dear Property Owner: This reminder is prepared as a courtesy. Please check all information. If you NO LONGER OWN this property, notify the Revenue Commissioner's office at (334) 335-6568. If your property taxes are paid by a MORTGAGE COMPANY, use this notice as a reminder of the amount that your mortgage company should pay.

Thank you for your cooperation.
**SHERRY D. McSWEAN**

NOTE: Any change in ownership or physical improvements to land must be reported to the Revenue Commissioner's Office at (334) 335-6568. Taxes are delinquent January 1st.

IF YOU PAY YOUR OWN TAXES, PLEASE MAIL THIS STUB WITH PAYMENT OR BRING STUB AND AMOUNT DUE TO THE REVENUE COMMISSIONER'S OFFICE. MAKE PAYABLE TO SHERRY D. McSWEAN, REVENUE COMMISSIONER.

**RETURN TO:**
**SHERRY D. McSWEAN**
*Revenue Commissioner, Crenshaw County, Alabama*
P.O. Box 208
Luverne, Alabama 36049

NOTE: To receive Original Receipt, please send self-addressed stamped envelope, otherwise your cancelled check is your receipt.



## SHERRY D. McSWEAN
Revenue Commissioner, Crenshaw County, Alabama
P.O. BOX 208
LUVERNE, ALABAMA 36049

| | RECEIPT NO. | ACCOUNT NUMBER |
|---|---|---|
| | 7271 | 1309160 |

RECEIPT FOR YEAR 2005

| ASSESSED VALUE | TOTAL STATE COUNTY TAX | EXEMPTION | | NET STATE COUNTY TAX | SCHOOL | MUNICIPAL TAX |
|---|---|---|---|---|---|---|
| | | STATE/COUNTY | TAX | | | |
| 6540 | 42.51 | 0 | 0 | 42.51 | 1  0 | 2  0 |
| | 173.31 | 0 | 0 | 173.31 | 2  19.62 | 3  32.7 |
| | | | | | | 4  0 |
| | | | | | | 5  0 |
| | | | | | | 6  0 |
| | | | | | | 7  0 |

| | MUN. DIST. | CLASS | Timber | TAXES |
|---|---|---|---|---|
| PAY BY CHECK OR MONEY ORDER | | | 0.00 | 268.14 |

PAY BY CHECK OR MONEY ORDER
TAX DUE OCT. 1
DELINQUENT JAN. 1

**NOTE:**

NO PENALTY OR INTEREST WILL BE
CHARGED IF PAID BEFORE DECEMBER 31.

**OWNER NAME AND ADDRESS**

COOK JENNIFER
C/O KEVIN ATWELL
P O BOX 231

BRANTLEY          AL 36009

Assessor Fee                    0.00

|  | ↑ | | |
|---|---|---|---|
| | 1. PERSONAL | C.U.R. | 0.00 |
| | 2. REAL | TOTAL TAX | 268.14 |
| | 3. PENALTY | INTEREST | 5.29 |
| | 4. FEE | CITATION | 0.00 |
| | | DELINQUENT FEE | 5.00 |
| | | ADVERTISING | 0.00 |
| | | DECREE | 0.00 |
| | | POSTAGE | 0.00 |
| | | PROBATE FEE | 0.00 |
| | | GRAND TOTAL | 278.43 |

20-05-16-2-008-002.000-0

Account   :
Receipt   : 7271
Paid By   : ATWELL KEVIN
Date Paid: 03/01/2007
Type  Pmt: CASH          0
Teller    : 77
   Exempt: None

Excess Amt : 0

TAX PAYER SIGN : _____

PROFESSIONAL FORMS & SYSTEMS, INC. 1-800-368-7050

```
Brantley Bank & Trust Company                        DATE:  01/12/2007
P O BOX 25                                 FEDERAL ID NUMBER:  63-1064593
Brantley            AL 36009                        PHONE:  (334)527-3206
```

```
KEVIN JOE ATWELL                                     PAGE:       1
    ---            ----  ---

    ---                       9
```

The following information is being reported to the IRS for taxpayer ID number:   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

_____    IRS INFORMATION FOR TAX YEAR 2006   _____

The information in box 1 is important tax information and is being furnished to
the Internal Revenue Service.  If you are required to file a return, a negligence penalty or
other sanction may be imposed on you if the IRS determines that an underpayment of tax results
because you overstated a deduction for this mortgage interest or for these points or because
you did not report this refund of interest on your return.

```
Form 1098      Mortgage Interest Statement                OMB No. 1545-0901
   Account number:   6000621100 Product: Consumer Real Estate Loans
   Box 1  Mortgage interest received from payer(s)/borrower(s)............... $4,271.08
```

INSTRUCTIONS FOR PAYER/BORROWER
Caution: The amount shown may not be fully deductible by you.  Limits based on the loan amount
and the cost and value of the secured property may apply.  Also, you may only deduct interest
to the extent it was incurred by you, and not reimbursed by another person.

A person (including a financial institution, a governmental unit, and a cooperative housing
corporation) who is engaged in a trade or business and, in the course of such trade or
business, received from you at least $600 of mortgage interest (including certain points) on
any one mortgage in the calendar year must furnish this statement to you.

   If you received this statement as the payer of record on a mortgage on which there are other
borrowers, furnish each of the other borrowers with information about the proper distribution
of amounts reported on this form.  Each borrower is entitled to deduct only the amount he or
she paid and points paid by the seller that represent his or her share of the amount allowable
as a deduction for mortgage interest and points.  Each borrower may have to include in income a
share of any amount reported in box 3.

   If your mortgage payments were subsidized by a government agency, you may not be able to
deduct the amount of the subsidy.  See the instructions for Form 1040, Schedule A, C, or E for
how to report the mortgage interest.  Also, for more information, see Pub. 936, Home Mortgage
Interest Deduction, and Pub. 535, Business Expenses.

Account number.  May show an account or other unique number the lender has assigned to
distinguish your account.

Box 1.  Shows the mortgage interest received by the interest recipient during the year.  This
amount includes interest on any obligation secured by real property, including a home equity,
line of credit, or credit card loan.  This amount does not include points, government subsidy
payments, or seller payments on a 'buy-down' mortgage.  Such amounts are deductible by you only
in certain circumstances.  Caution:  If you prepaid interest in 2006 that accrued in full by
January 15, 2007, this prepaid interest may be included in box 1.  However, you cannot deduct
the prepaid amount in 2006 even though it may be included in box 1.  If you hold a mortgage
credit certificate and can claim the mortgage interest credit, see Form 8396, Mortgage Interest
Credit.  If the interest was paid on a mortgage, home equity, line of credit, or credit card
loan secured by your personal residence, you may be subject to a deduction limitation.

| 1 Wages, tips, other comp. 4784.00 | 2 Federal income tax withheld 381.32 |
|---|---|
| 3 Social security wages 4784.00 | 4 Social security tax withheld 296.61 |
| 5 Medicare wages and tips 4784.00 | 6 Medicare tax withheld 69.37 |

| a Control number 0000008268 V02 | Dept. | Corp. SCF5 | Employer use only 290 |
|---|---|---|---|

c Employer's name, address, and ZIP code

**THE ATLANTIC GROUP INC**
**5426 ROBIN HOOD ROAD**
**NORFOLK, VA  23513**

b EIN ID number

| 7 Social security tips | 8 Allocated tips |
|---|---|
| 9 Advance EIC payment | 10 Dependent care benefits |
| 11 Nonqualified plans | 12a |
| 14 Other | 12b |
| | 12c |
| | 12d |
| | 13 Stat emp. Ret. plan 3rd party sick pay |

e/f Employee's name, address and ZIP code

KEVIN ATWELL

| 15 State NC | State wages, tips, etc. 4784.00 |
|---|---|
| 17 State income tax 181.00 | 18 Local wages, tips, etc. |
| 19 Local income tax | 20 Locality name |

City or Local Filing Copy
**W-2** Wage and Tax Statement **2006**
OMB No. 1545-0008

Copy 2 to be filed with employee's City or Local Income Tax Return.

**NOTE: THESE ARE SUBSTITUTE WAGE AND TAX STAT**

This information is being furnished to the Internal
Revenue Service.

**IMPORTANT NOTE:**
In order to insure efficient processing,
attach this W-2 to your tax return like this
(following agency instructions):



NOTE: THESE ARE SUBSTITUTE WAGE AND
TAX STATEMENTS AND ARE ACCEPTABLE
FOR FILING WITH YOUR FEDERAL, STATE AND
LOCAL/CITY INCOME TAX RETURNS.

Department of the Treasury - Internal Revenue Service

**Copy 2—To Be Filed With Employee's State, City, or Local Income Tax Return.**

| 2006 | OMB No. 1545-0008 |
|---|---|

| a Control number | 1 Wages, tips, other comp. | 2 Federal income tax withheld |
|---|---|---|
| 0004615 | 194.25 | 3.81 |

| b Employer ID number | 3 Social security wages | 4 Social security tax withheld |
|---|---|---|
| | 194.25 | 12.04 |

| | 5 Medicare wages and tips | 6 Medicare tax withheld |
|---|---|---|
| | 194.25 | 2.81 |

c Employer's name, address, and ZIP code
MFG Alabama
Opp Industrial Park III
200 Hattaway Road
Opp, AL 36467

d Employee's social security number

e Employee's name, address, and ZIP code
Kevin J Atwell

| 7 Social security tips | 8 Allocated tips | 9 Advance EIC payment |
|---|---|---|
| 10 Dependent care benefits | 11 Nonqualified plans | 12a Code |
| 13 Statutory employee | 14 Other | 12b Code |
| Retirement plan  X | | 12c Code |
| Third-party sick pay | | 12d Code |

| AL | 439610 | 194.25 | 3.30 |
|---|---|---|---|
| 15 State Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | |
| 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name | |

Form W-2 Wage and Tax Statement       Dept. of the Treasury — IRS       39-1908647

---

**Copy C—For EMPLOYEE'S RECORDS. (See Notice to Employee on back of Copy B.)**

| 2006 | OMB No. 1545-0008 |
|---|---|

| a Control number | 1 Wages, tips, other comp. | 2 Federal income tax withheld |
|---|---|---|
| 0004615 | 194.25 | 3.81 |

| b Employer ID number | 3 Social security wages | 4 Social security tax withheld |
|---|---|---|
| 20-2856181 | 194.25 | 12.04 |

| | 5 Medicare wages and tips | 6 Medicare tax withheld |
|---|---|---|
| | 194.25 | 2.81 |

c Employer's name, address, and ZIP code
MFG Alabama
Opp Industrial Park III
200 Hattaway Road
Opp, AL 36467

d Employee's social security number

e Employee's name, address, and ZIP code
Kevin J Atwell

| 7 Social security tips | 8 Allocated tips | 9 Advance EIC payment |
|---|---|---|
| 10 Dependent care benefits | 11 Nonqualified plans | 12a Code  See inst. for box 12 |
| 13 Statutory employee | 14 Other | 12b Code |
| Retirement plan  X | | 12c Code |
| Third-party sick pay | | 12d Code |

| AL | 194.25 | 3.30 |
|---|---|---|
| 15 State Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax |
| 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |

Form W-2 Wage and Tax Statement       Dept. of the Treasury — IRS       39-1908647
This information is being furnished to the IRS. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

---

**Copy 2—To Be Filed With Employee's State, City, or Local Income Tax Return.**

| 2006 | OMB No. 1545-0008 |
|---|---|

| a Control number | 1 Wages, tips, other comp. | 2 Federal income tax withheld |
|---|---|---|
| 0004615 | 194.25 | 3.81 |

| b Employer ID number | 3 Social security wages | 4 Social security tax withheld |
|---|---|---|
| | 194.25 | 12.04 |

| | 5 Medicare wages and tips | 6 Medicare tax withheld |
|---|---|---|
| | 194.25 | 2.81 |

c Employer's name, address, and ZIP code
MFG Alabama
Opp Industrial Park III
200 Hattaway Road
Opp, AL 36467

d Employee's social security number

e Employee's name, address, and ZIP code
Kevin J Atwell

| 7 Social security tips | 8 Allocated tips | 9 Advance EIC payment |
|---|---|---|
| 10 Dependent care benefits | 11 Nonqualified plans | 12a Code |
| 13 Statutory employee | 14 Other | 12b Code |
| Retirement plan  X | | 12c Code |
| Third-party sick pay | | 12d Code |

| AL | 194.25 | 3.30 |
|---|---|---|
| 15 State Employer's state ID number | 18 State wages, tips, etc. | 17 State income tax |
| 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |

Form W-2 Wage and Tax Statement       Dept. of the Treasury — IRS       39-1908647
BW24UP       NTF 2560506

Copy 2 -- To Be Filed With Employee's State, City, or Local Income Tax Return.

39-1908647
OMB No. 1545-0008

| a Control number | 1 Wages, tips, other comp. 3577.25 | 2 Federal income tax withheld 13.00 |
|---|---|---|
| b Employer ID no. (EIN) | 3 Social security wages 3577.25 | 4 Social security tax withheld 221.80 |
| | 5 Medicare wages and tips 3577.25 | 6 Medicare tax withheld 52.88 |

c Employer's name, address, and ZIP code

SILLA ENGINEERING AMERICA, LLC
P.O. BOX 582
518 N. SASSER ST.
BRANTLEY, AL  36009

d Employee's social security number

e Employee's name, address, and ZIP code

KEVIN ATWELL

| 7 Social security tips | 8 Allocated tips | 9 Advance EIC payment |
|---|---|---|
| 10 Dependent care benefits | 11 Nonqualified plans | 12a Code |
| 13 Statutory employee | 14 Other | 12b Code |
| Retirement plan | | 12c Code |
| Third-party sick pay | | 12d Code |

AL    3577.25    82.00

| 15 State  Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax |
|---|---|---|
| 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |

Form W-2 Wage and Tax Statement    2006    Dept. of the Treasury -- IRS

---

This information is being furnished to IRS. If you are required to file a tax return, a negligence penalty/other sanction may be imposed on you if this income is taxable & you fail to report it.

Copy C -- For EMPLOYEE'S RECORDS
(see Notice to Employee.)

39-1908647
OMB No. 1545-0008

| a Control number | 1 Wages, tips, other comp. 3577.25 | 2 Federal income tax withheld 13.00 |
|---|---|---|
| b Employer ID no. (EIN) | 3 Social security wages 3577.25 | 4 Social security tax withheld 221.80 |
| | 5 Medicare wages and tips 3577.25 | 6 Medicare tax withheld 52.88 |

c Employer's name, address, and ZIP code

SILLA ENGINEERING AMERICA, LLC
P.O. BOX 582
518 N. SASSER ST.
BRANTLEY, AL  36009

d Employee's social security number

e Employee's name, address, and ZIP code

KEVIN ATWELL

| 7 Social security tips | 8 Allocated tips | 9 Advance EIC payment |
|---|---|---|
| 10 Dependent care benefits | 11 Nonqualified plans | 12a Code See inst. for box 12 |
| 13 Statutory employee | 14 Other | 12b Code |
| Retirement plan | | 12c Code |
| Third-party sick pay | | 12d Code |

AL    3577.25    82.00

| 15 State  Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax |
|---|---|---|
| 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |

Form W-2 Wage and Tax Statement    2006    Dept. of the Treasury -- IRS

---

6  AW24UP1    NTF 2593081    Copyright 2006 Greatland/Nelco

Copy 2 -- To Be Filed With Employee's State, City, or Local Income Tax Return.

39-1908647
OMB No. 1545-0008

| a Control number | 1 Wages, tips, other comp. 3577.25 | 2 Federal income tax withheld 13.00 |
|---|---|---|
| b Employer ID no. (EIN) | 3 Social security wages 3577.25 | 4 Social security tax withheld 221.80 |
| | 5 Medicare wages and tips 3577.25 | 6 Medicare tax withheld 52.88 |

c Employer's name, address, and ZIP code

SILLA ENGINEERING AMERICA, LLC
P.O. BOX 582
518 N. SASSER ST.
BRANTLEY, AL  36009

d Employee's social security number

e Employee's name, address, and ZIP code

KEVIN ATWELL

| 7 Social security tips | 8 Allocated tips | 9 Advance EIC payment |
|---|---|---|
| 10 Dependent care benefits | 11 Nonqualified plans | 12a Code |
| 13 Statutory employee | 14 Other | 12b Code |
| Retirement plan | | 12c Code |
| Third-party sick pay | | 12d Code |

AL    3577.25    82.00

| 15 State  Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax |
|---|---|---|
| 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |

Form W-2 Wage and Tax Statement    2006    Dept. of the Treasury -- IRS

## 2006 W-2 and EARNINGS SUMMARY

The wages, tips, and other compensation reflected in box 1 are the sum of those wages shown on your last pay statement, plus any additional compensation or adjustments received after the payroll close.

Your gross pay may not match your box 1 totals due to adjustments made for GTL, 401(k), cafeteria plans, etc...

To change your employee W-4 profile information, file a new W-4 with your payroll department.

KEVIN ATWELL

Social Security Number: 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

Taxable Marital Status: MARRIED

Exemptions/Allowances:
Federal: 2
State: 6
Local: 0

© 2006 AUTOMATIC DATA PROCESSING, INC.

Fold and Detach Here

---

Safe, accurate,
FAST! Use **e-file**   Visit the IRS Web Site at www.irs.gov/efile.

**Employee Reference Copy**

## W-2 Wage and Tax Statement

Copy C for employee's records.

OMB No. 1545-0008

**2006**

| a Control number 000000284 V92 | Dept. | Corp. SCF5 | Employer use only 230 |
|---|---|---|---|

c Employer's name, address, and ZIP code

THE ATLANTIC GROUP INC
5426 ROBIN HOOD ROAD
NORFOLK, VA 23513

d Employee's name, address, and ZIP code

KEVIN ATWELL

| b Employer's FED ID number | 1 Employer's SSA number |
|---|---|
| 1 Wages, tips, other comp. | 2 Federal income tax withheld |
| 4784.00 | 381.32 |
| 3 Social security wages | 4 Social security tax withheld |
| 4784.00 | 296.61 |
| 5 Medicare wages and tips | 6 Medicare tax withheld |
| 4784.00 | 69.37 |
| 7 Social security tips | 8 Allocated tips |
| 9 Advance EIC payment | 10 Dependent care benefits |
| 11 Nonqualified plans | 12a See instructions for box 12 |
| 14 Other | 12b |
| | 12c |
| | 12d |
| | 13 Stat emp/Ret. plan/3rd party sick pay |

| 15 State Employer's state ID no. | 16 State wages, tips, etc. |
|---|---|
| NC | 4784.00 |
| 17 State income tax | 18 Local wages, tips, etc. |
| 181.00 | |
| 19 Local income tax | 20 Locality name |

# Instructions for Employee

**Box 1.** Enter this amount on the wages line of your tax return.

**Box 2.** Enter this amount on the federal income tax withheld line of your tax return.

**Box 8.** This amount is not included in boxes 1, 3, 5, or 7. For information on how to report tips on your tax return, see your Form 1040 instructions.

**Box 9.** Enter this amount on the advance earned income credit payments line of your Form 1040 or Form 1040A.

**Box 10.** This amount is the total dependent care benefits that your employer paid to you or incurred on your behalf (including amounts from a section 125 (cafeteria) plan). Any amount over $5,000 also is included in box 1. You must complete Schedule 2 (Form 1040A) or Form 2441, Child and Dependent Care Expenses, to compute any taxable and nontaxable amounts.

**Box 11.** This amount is: (a) reported in box 1 if it is a distribution made to you from a nonqualified deferred compensation or nongovernmental section 457(b) plan or (b) included in box 3 and/or 5 if it is a prior year deferral under a nonqualified or section 457(b) plan that became taxable for social security and Medicare taxes this year because there is no longer a substantial risk of forfeiture of your right to the deferred amount.

**Box 12.** The following list explains the codes shown in box 12. You may need this information to complete your tax return. Elective deferrals (codes D, E, F, and S) and designated Roth contributions (codes AA and BB) under all plans are generally limited to a total of $15,000 ($10,000 if you only have SIMPLE plans; $18,000 for section 403(b) plans if you qualify for the 15-year rule explained in Pub. 571). Deferrals under code G are limited to $15,000. Deferrals under code H are limited to $7,000.

However, if you were at least age 50 in 2006, your employer may have allowed an additional deferral of up to $5,000 ($2,500 for section 401(k)(11) and 408(p) SIMPLE plans). This additional deferral amount is not subject to the overall limit on elective deferrals. For code G, the limit on elective deferrals may be higher for the last three years before you reach retirement age. Contact your plan administrator for more information. Amounts in excess of the overall elective deferral limit must be included in income. See the "Wages, Salaries,

Tips, etc." line instructions for Form 1040.

Note. If your return follows code D, E, F, G, H, or S, you made a make-up pension contribution for a prior year(s) when you were in military service. To figure whether you made excess deferrals, consider these amounts for the year shown, not the current year. If no year is shown, the contributions are for the current year.

**A**—Uncollected social security or RRTA tax on tips. Include this tax on Form 1040. See "Total Tax" in the Form 1040 instructions.

**B**—Uncollected Medicare tax on tips. Include this tax on Form 1040. See "Total Tax" in the Form 1040 instructions.

**C**—Taxable cost of group-term life insurance over $50,000 (included in boxes 1, 3, and 5 (up to social security wage base), and 5)

**D**—Elective deferrals to a section 401(k) cash or deferred arrangement. Also includes deferrals under a SIMPLE retirement account that is part of a section 401(k) arrangement.

**E**—Elective deferrals under a section 403(b) salary reduction agreement

**F**—Elective deferrals under a section 408(k)(6) salary reduction SEP

**G**—Elective deferrals and employer contributions (including nonelective deferrals) to a section 457(b) deferred compensation plan

**H**—Elective deferrals to a section 501(c)(18)(D) tax-exempt organization plan. See "Adjusted Gross Income" in the Form 1040 instructions for how to deduct.

**J**—Nontaxable sick pay (information only, not included in boxes 1, 3, or 5)

**K**—20% excise tax on excess golden parachute payments. See "Total Tax" in the Form 1040 instructions.

**L**—Substantiated employee business expense reimbursements (nontaxable)

**M**—Uncollected social security or RRTA tax on taxable cost of group-term life insurance over $50,000 (former employees only). See "Total Tax" in the Form 1040 instructions.

**N**—Uncollected Medicare tax on taxable cost of group-term life insurance over $50,000 (former employees only). See "Total Tax" in the Form 1040 instructions.

**P**—Excludable moving expense reimbursements paid directly to employee (not included in boxes 1, 3, or 5)

**Q**—Nontaxable combat pay. See the instructions for Form 1040 or Form 1040A for details on reporting this amount.

**R**—Employer contributions to your Archer MSA. Report on Form 8853, Archer MSAs and Long-Term Care Insurance Contracts.

**S**—Employee salary reduction contributions under a section 408(p) SIMPLE (not included in box 1)

**T**—Adoption benefits (not included in box 1). You must complete Form 8839, Qualified Adoption Expenses, to compute any taxable and nontaxable amounts.

**V**—Income from exercise of nonstatutory stock option(s) (included in boxes 1, 3 (up to social security wage base), and 5)

**W**—Employer contributions to your Heath Savings Account. Report on Form 8889, Health Savings Accounts (HSAs).

**Y**—Deferrals under a section 409A nonqualified deferred compensation plan.

**Z**—Income under section 409A on a nonqualified deferred compensation plan. This amount is also included in box 1. It is subject to an additional 20% tax plus interest. See "Total Tax" in the Form 1040 instructions.

**AA**—Designated Roth contributions to a section 401(k) plan.

**BB**—Designated Roth contributions under a section 403(b) salary reduction agreement.

**Box 13.** If the "Retirement plan" box is checked, special limits may apply to the amount of traditional IRA contributions that you may deduct.

Note. Keep Copy C of Form W-2 for at least 3 years after the due date for filing your income tax return. However, to help protect your social security benefits, keep Copy C until you begin receiving social security benefits, just in case there is a question about your work record and/or earnings in a particular year. Review the information shown on your annual (for workers over 25) Social Security Statement.

This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

Department of The Treasury - Internal Revenue Service

le, accurate...
STI Use
e-file
at www.irs.gov/efile.

**W-2 Wage and Tax Statement 2006**
OMB No. 1545-0008

Employee Reference Copy

| Control number | Dept. | Corp. | Employer use only |
|---|---|---|---|
| 989881 15/B9R | 000005 | T | 21 |

Employer's name, address, and ZIP code
SMART ALABAMA LLC
121 SHIN YOUNG DR
LUVERNE AL 36049

Batch #00897

Employee's name, address, and ZIP code
EVIN ATWELL

| Employer's FED ID number 02-0678162 | d Employee's SSA number 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 |
|---|---|
| Wages, tips, other comp. 2312.04 | 2 Federal income tax withheld 235.72 |
| Social security wages 2312.04 | 4 Social security tax withheld 143.35 |
| Medicare wages and tips 2312.04 | 6 Medicare tax withheld 33.52 |
| Social security tips | 8 Allocated tips |
| Advance EIC payment | 10 Dependent care benefits |
| Nonqualified plans | 12a See instructions for box 12 |
| Other | 12b |
| | 12c |
| | 12d |
| | 13 Stat emp. Ret. plan 3rd party sick pay |
| 5 State Cafe 125 | 16 State wages 2312.04 |
| AL | |
| 7 State Income tax 83.64 | 18 Local wages, tips, etc. |
| 9 Local income tax | 20 Locality name |

This blue Earnings Summary section is included with your W-2 to help describe portions in more detail. The reverse side includes general information that you may also find helpful.

1. The following information reflects your final 2006 pay stub plus any adjustments submitted by your employer.

| | | | |
|---|---|---|---|
| Gross Pay | 2457.72 | Social Security Tax Withheld Box 4 of W-2 | 143.35 | AL State Income Tax Box 17 of W-2 | 83.64 |
| | | | SUI/SDI Box 14 of W-2 | |
| Fed. Income Tax Withheld Box 2 of W-2 | 235.72 | Medicare Tax Withheld Box 6 of W-2 | 33.52 | |

2. Your Gross Pay was adjusted as follows to produce your W-2 Statement.

| | Wages, Tips, other Compensation Box 1 of W-2 | Social Security Wages Box 3 of W-2 | Medicare Wages Box 5 of W-2 | AL State Wages, Tips, Etc. Box 16 of W-2 |
|---|---|---|---|---|
| Gross Pay | 2,457.72 | 2,457.72 | 2,457.72 | 2,457.72 |
| Less Other Cafe 125 | 145.68 | 145.68 | 145.68 | 145.68 |
| Reported W-2 Wages | 2,312.04 | 2,312.04 | 2,312.04 | 2,312.04 |

3. Employee W-4 Profile. To change your Employee W-4 Profile information, file a new W-4 with your payroll dept.

KEVIN ATWELL

Social Security Number: 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
Taxable Marital Status: SINGLE
Exemptions/Allowances:
FEDERAL: 0
STATE:

© 2006 AUTOMATIC DATA PROCESSING, INC

Fold and Detach Here

| Wages, tips, other comp. 2312.04 | 2 Federal income tax withheld 235.72 |
|---|---|
| 3 Social security wages 2312.04 | 4 Social security tax withheld 143.35 |
| 5 Medicare wages and tips 2312.04 | 6 Medicare tax withheld 33.52 |

| a Control number 989881 15/B9R | Dept. 000005 | Corp. | Employer use only |
|---|---|---|---|
| | | T | 21 |

c Employer's name, address, and ZIP code
SMART ALABAMA LLC
121 SHIN YOUNG DR
LUVERNE AL 36049

| b Employer's FED ID number | d Employee's SSA number |
|---|---|
| 7 Social security tips | 8 Allocated tips |
| 9 Advance EIC payment | 10 Dependent care benefits |
| 11 Nonqualified plans | 12a |
| 14 Other | 12b |
| | 12c |
| | 12d |
| | 13 Stat emp. Ret. plan 3rd party sick pay |

e/f Employee's name, address, and ZIP code
KEVIN ATWELL

| 15 State Employer's state ID no. AL | 16 State wages, tips, etc. 2312.04 |
|---|---|
| 17 State income tax 83.64 | 18 Local wages, tips, etc. |
| 19 Local income tax | 20 Locality name |

**W-2 Wage and Tax Statement 2006**
AL State Reference Copy
OMB No. 1545-0008
Copy 2 to be filed with employee's State Income Tax Return.

| 1 Wages, tips, other comp. 2312.04 | 2 Federal income tax withheld 235.72 |
|---|---|
| 3 Social security wages 2312.04 | 4 Social security tax withheld 143.35 |
| 5 Medicare wages and tips 2312.04 | 6 Medicare tax withheld 33.52 |

| a Control number 989881 15/B9R | Dept. 000005 | Corp. | Employer use only |
|---|---|---|---|
| | | T | 21 |

c Employer's name, address, and ZIP code
SMART ALABAMA LLC
121 SHIN YOUNG DR
LUVERNE AL 36049

| b Employer's FED ID number | d Employee's SSA number |
|---|---|
| 7 Social security tips | 8 Allocated tips |
| 9 Advance EIC payment | 10 Dependent care benefits |
| 11 Nonqualified plans | 12a |
| 14 Other | 12b |
| | 12c |
| | 12d |
| | 13 Stat emp. Ret. plan 3rd party sick pay |

c/f Employee's name, address and ZIP code
KEVIN ATWELL

| 15 State Employer's state ID no. AL | 16 State wages, tips, etc. 2312.04 |
|---|---|
| 17 State income tax 83.64 | 18 Local wages, tips, etc. |
| 19 Local income tax | 20 Locality name |

**W-2 Wage and Tax Statement 2006**
AL State Filing Copy
OMB No. 1545-0008
Copy 2 to be filed with employee's State Income Tax Return.

**Instructions for Employee**

**Box 1.** Enter this amount on the wages line of your tax return.

**Box 2.** Enter this amount on the federal income tax withheld line of your tax return.

**Box 8.** This amount is not included in boxes 1, 3, 5, or 7. For information on how to report tips on your tax return, see your Form 1040 instructions.

**Box 9.** Enter this amount on the advance earned income credit payments line of your Form 1040 or Form 1040A.

**Box 10.** This amount is the total dependent care benefits that your employer paid to you or incurred on your behalf (including amounts from a section 125 (cafeteria) plan). Any amount over $5,000 also is included in box 1. You must complete Schedule 2 (Form 1040A) or Form 2441, Child and Dependent Care Expenses, to compute any taxable and nontaxable amounts.

**Box 11.** This amount is: (a) reported in box 1 if it is a distribution made to you from a nonqualified deferred compensation or nongovernmental section 457(b) plan or (b) included in box 3 and/or box 5 if it is a prior year deferral under a nonqualified or section 457(b) plan that became taxable for social security and Medicare taxes this year because there is no longer a substantial risk of forfeiture of your right to the deferred amount.

**Box 12.** The following list explains the codes shown in box 12. You may need this information to complete your tax return. Elective deferrals (codes D, E, F, and S) and designated Roth contributions (codes AA and BB) under all plans are generally limited to a total of $15,000 ($10,000 if you only have SIMPLE plans; $18,000 for section 403(b) plans if you qualify for the 15-year rule explained in Pub. 571). Deferrals under code G are limited to $15,000. Deferrals under code H are limited to $7,000.

However, if you were at least age 50 in 2006, your employer may have allowed an additional deferral of up to $5,000 ($2,500 for section 401(k)(11) and 408(p) SIMPLE plans). This additional deferral amount is not subject to the overall limit on elective deferrals. For code G, the limit on elective deferrals may be higher for the last three years before you reach retirement age. Contact your plan administrator for more information. Amounts in excess of the overall elective deferral limit must be included in income. See the "Wages, Salaries,

Tips, etc." line instructions for Form 1040.

**Note.** If a year follows code D, E, F, G, H, or S, you made a make-up pension contribution for a prior year(s) when you were in military service. To figure whether you made excess deferrals, consider these amounts for the year shown, not the current year. If no year is shown, the contributions are for the current year.

A—Uncollected social security or RRTA tax on tips. Include this tax on Form 1040. See "Total Tax" in the Form 1040 instructions.

B—Uncollected Medicare tax on tips. Include this tax on Form 1040. See "Total Tax" in the Form 1040 instructions.

C—Taxable cost of group-term life insurance over $50,000 (included in boxes 1, 3 (up to social security wage base), and 5)

D—Elective deferrals to a section 401(k) cash or deferred arrangement. Also includes deferrals under a SIMPLE retirement account that is part of a section 401(k) arrangement.

E—Elective deferrals under a section 403(b) salary reduction agreement

F—Elective deferrals under a section 408(k)(6) salary reduction SEP

G—Elective deferrals and employer contributions (including nonelective deferrals) to a section 457(b) deferred compensation plan

H—Elective deferrals to a section 501(c)(18)(D) tax-exempt organization plan. See "Adjusted Gross Income" in the Form 1040 instructions for how to deduct.

J—Nontaxable sick pay (information only, not included in boxes 1, 3, or 5)

K—20% excise tax on excess golden parachute payments. See "Total Tax" in the Form 1040 instructions.

L—Substantiated employee business expense reimbursements (nontaxable)

M—Uncollected social security or RRTA tax on taxable cost of group-term life insurance over $50,000 (former employees only). See "Total Tax" in the Form 1040 instructions.

N—Uncollected Medicare tax on taxable cost of group-term life insurance over $50,000 (former employees only). See "Total Tax" in the Form 1040 instructions.

P—Excludable moving expense reimbursements paid directly to employee (not included in boxes 1, 3, or 5)

Q—Nontaxable combat pay. See the instructions for Form 1040 or Form 1040A for details on reporting this amount.

R—Employer contributions to your Archer MSA. Report on Form 8853, Archer MSAs and Long-Term Care Insurance Contracts.

S—Employee salary reduction contributions under a section 408(p) SIMPLE (not included in box 1)

T—Adoption benefits (not included in box 1). You must complete Form 8839, Qualified Adoption Expenses, to compute any taxable and nontaxable amounts.

V—Income from exercise of nonstatutory stock option(s) (included in boxes 1, 3 (up to social security wage base), and 5)

W—Employer contributions to your Health Savings Account. Report on Form 8889, Health Savings Accounts (HSAs).

Y—Deferrals under a section 409A nonqualified deferred compensation plan.

Z—Income under section 409A on a nonqualified deferred compensation plan. This amount is also included in box 1. It is subject to an additional 20% tax plus interest. See "Total Tax" in the Form 1040 instructions.

AA—Designated Roth contributions to a section 401(k) plan.

BB—Designated Roth contributions under a section 403(b) salary reduction agreement.

**Box 13.** If the "Retirement plan" box is checked, special limits may apply to the amount of traditional IRA contributions that you may deduct.

**Note:** Keep Copy C of Form W-2 for at least 3 years after the due date for filing your income tax return. However, to help protect your social security benefits, keep Copy C until you begin receiving social security benefits, just in case there is a question about your work record and/or earnings in a particular year. Review the information shown on your annual (for workers over 25) Social Security Statement.

This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

Department of The Treasury - Internal Revenue Service

---

NOTE: THESE ARE SUBSTITUTE WAGE AND TAX STATEMENTS AND ARE ACCEPTABLE FOR FILING WITH YOUR

This information is being furnished to the Internal Revenue Service.

**IMPORTANT NOTE:**
In order to insure efficient processing, attach this W-2 to your tax return like this (following agency instructions):



TAX RETURN

| THIS FORM W-2 | OTHER W-2'S |
|---|---|

NOTE: THESE ARE SUBSTITUTE WAGE AND TAX STATEMENTS AND ARE ACCEPTABLE FOR FILING WITH YOUR FEDERAL, STATE AND LOCAL/CITY INCOME TAX RETURNS.

**Notice to Employee**

**Refund.** Even if you do not have to file a tax return, you should file to get a refund if box 2 shows federal income tax withheld or if you can take the earned income credit.

**Earned income credit (EIC).** You must file a tax return if any amount is shown in box 9.

You may be able to take the EIC for 2006 if: (a) you do not have a qualifying child and you earned less than $12,120 ($14,120 if married filing jointly), (b) you have one qualifying child and you earned less than $32,001 ($34,001 if married filing jointly), or (c) you have more than one qualifying child and you earned less than $36,348 ($38,348 if married filing jointly). You and any qualifying children must have valid social security numbers (SSNs). You cannot take the EIC if your investment income is more than $2,800. Any EIC that is more than your tax liability is refunded to you, but only if you file a tax return. If you have at least one qualifying child, you may get as much as $1,648 of the EIC in advance by completing Form W-5, Earned Income Credit Advance Payment Certificate, and giving it to your employer.

**Clergy and religious workers.** If you are not subject to social security and Medicare taxes, see Publication 517, Social Security and Other Information for Members of the Clergy and Religious Workers.

**Corrections.** If your name, SSN, or address is incorrect, correct Copies B, C, and 2 and ask your employer to correct your employment record. Be sure to ask the employer to file Form W-2c, Corrected Wage and Tax Statement, with the Social Security Administration (SSA) to correct any name, SSN, or money amount error reported to the SSA on Form W-2. If your name and SSN are correct but are not the same as shown on your social security card, you should ask for a new card at any SSA office or call 1-800-772-1213.

Department of the Treasury - Internal Revenue Service

---

ate, accurate,
ASTI Use
Visit the IRS Web Site
at www.irs.gov/efile

**W-2** Wage and Tax Statement **2006**

Copy C for Employee's records OMB No. 1545-0008

| a Control number | Dept. | Corp. | Employer use only |
|---|---|---|---|
| 989878 15/B9R | 000010 | T | 246 |

c Employer's name, address, and ZIP code
SMART ALABAMA LLC
121 SHIN YOUNG DR
LUVERNE AL 36049

Batch #00897

e/f Employee's name, address, and ZIP code
ROBIN DAVIS

| 1 Wages, tips, other comp. | 2 Federal income tax withheld |
|---|---|
| 2855.58 | 163.75 |
| 3 Social security wages | 4 Social security tax withheld |
| 2855.58 | 177.05 |
| 5 Medicare wages and tips | 6 Medicare tax withheld |
| 2855.58 | 41.41 |
| 7 Social security tips | 8 Allocated tips |
| 9 Advance EIC payment | 10 Dependent care benefits |
| 11 Nonqualified plans | 12a See instructions for box 12 |
| 14 Other | 12b |
|  | 12c |
|  | 12d |
|  | 13 Stat emp. Ret. plan 3rd party sick pay |
| 15 State  Employer's state ID no. | 16 State wages, tips, etc. |
| AL | 2855.58 |
| 17 State income tax | 18 Local wages, tips, etc. |
| 113.09 |  |
| 19 Local income tax | 20 Locality name |

---

# 2006 W-2 and EARNINGS SUMMARY

This blue Earnings Summary section is included with your W-2 to help describe portions in more detail. The reverse side includes general information that you may also find helpful.

1. The following information reflects your final 2006 pay stub plus any adjustments submitted by your employer.

| Gross Pay | 3001.26 | Social Security Tax Withheld Box 4 of W-2 | 177.05 | AL State Income Tax Box 17 of W-2 | 113.09 |
|---|---|---|---|---|---|
|  |  |  |  | SUI/SDI Box 14 of W-2 |  |
| Fed. Income Tax Withheld Box 2 of W-2 | 163.75 | Medicare Tax Withheld Box 6 of W-2 | 41.41 |  |  |

2. Your Gross Pay was adjusted as follows to produce your W-2 Statement.

| | Wages, Tips, other Compensation Box 1 of W-2 | Social Security Wages Box 3 of W-2 | Medicare Wages Box 5 of W-2 | AL State Wages, Tips, Etc. Box 16 of W-2 |
|---|---|---|---|---|
| Gross Pay | 3,001.26 | 3,001.26 | 3,001.26 | 3,001.26 |
| Less Other Cafe 125 | 145.68 | 145.68 | 145.68 | 145.68 |
| Reported W-2 Wages | 2,855.58 | 2,855.58 | 2,855.58 | 2,855.58 |

3. Employee W-4 Profile. To change your Employee W-4 Profile Information, file a new W-4 with your payroll dept.

ROBIN DAVIS

Social Security Number: 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
Taxable Marital Status: SINGLE
Exemptions/Allowances:
FEDERAL: 2
STATE:

© 2006 AUTOMATIC DATA PROCESSING, INC

---

| 1 Wages, tips, other comp. | 2 Federal income tax withheld |
|---|---|
| 2855.58 | 163.75 |
| 3 Social security wages | 4 Social security tax withheld |
| 2855.58 | 177.05 |
| 5 Medicare wages and tips | 6 Medicare tax withheld |
| 2855.58 | 41.41 |
| a Control number | Dept. | Corp. | Employer use only |
| 989878 15/B9R | 000010 | T | 246 |

c Employer's name, address, and ZIP code
SMART ALABAMA LLC
121 SHIN YOUNG DR
LUVERNE AL 36049

| 7 Social security tips | 8 Allocated tips |
| 9 Advance EIC payment | 10 Dependent care benefits |
| 11 Nonqualified plans | 12a |
| 14 Other | 12b |
|  | 12c |
|  | 12d |
|  | 13 Stat emp. Ret. plan 3rd party sick pay |

e/f Employee's name, address and ZIP code
ROBIN DAVIS

| 15 State  Employer's state ID no. | 16 State wages, tips, etc. |
| AL | 2855.58 |
| 17 State income tax | 18 Local wages, tips, etc. |
| 113.09 |  |
| 19 Local income tax | 20 Locality name |

AL State Reference Copy
**W-2** Wage and Tax Statement **2006**
Copy 2 to be filed with employee's State Tax Return. OMB No. 1545-0008

| 1 Wages, tips, other comp. | 2 Federal income tax withheld |
|---|---|
| 2855.58 | 163.75 |
| 3 Social security wages | 4 Social security tax withheld |
| 2855.58 | 177.05 |
| 5 Medicare wages and tips | 6 Medicare tax withheld |
| 2855.58 | 41.41 |
| a Control number | Dept. | Corp. | Employer use only |
| 989878 15/B9R | 000010 | T | 246 |

c Employer's name, address, and ZIP code
SMART ALABAMA LLC
121 SHIN YOUNG DR
LUVERNE AL 36049

| 7 Social security tips | 8 Allocated tips |
| 9 Advance EIC payment | 10 Dependent care benefits |
| 11 Nonqualified plans | 12a |
| 14 Other | 12b |
|  | 12c |
|  | 12d |
|  | 13 Stat emp. Ret. plan 3rd party sick pay |

e/f Employee's name, address and ZIP code
ROBIN DAVIS

| 15 State  Employer's state ID no. | 16 State wages, tips, etc. |
| AL | 2855.58 |
| 17 State income tax | 18 Local wages, tips, etc. |
| 113.09 |  |
| 19 Local income tax | 20 Locality name |

AL State Filing Copy
**W-2** Wage and Tax Statement **2006**
Copy 2 to be filed with employee's State Income Tax Return.

**Instructions for Employee**

**Box 1.** Enter this amount on the wages line of your tax return.

**Box 2.** Enter this amount on the federal income tax withheld line of your tax return.

**Box 8.** This amount is not included in boxes 1, 3, 5, or 7. For information on how to report tips on your tax return, see your Form 1040 instructions.

**Box 9.** Enter this amount on the advance earned income credit payments line of your Form 1040 or Form 1040A.

**Box 10.** This amount is the total dependent care benefits that your employer paid to you or incurred on your behalf (including amounts from a section 125 (cafeteria) plan). Any amount over $5,000 also is included in box 1. You must complete Schedule 2 (Form 1040A) or Form 2441, Child and Dependent Care Expenses, to compute any taxable and nontaxable amounts.

**Box 11.** This amount is: (a) reported in box 1 if it is a distribution made to you from a nonqualified deferred compensation or nongovernmental section 457(b) plan or (b) included in box 3 and/or 5 if it is a prior year deferral under a nonqualified or section 457(b) plan that became taxable for social security and Medicare taxes this year because there is no longer a substantial risk of forfeiture of your right to the deferred amount.

**Box 12.** The following list explains the codes shown in box 12. You may need this information to complete your tax return. Elective deferrals (codes D, E, F, and S) and designated Roth contributions (codes AA and BB) under all plans are generally limited to a total of $15,000 ($10,000 if you only have SIMPLE plans; $18,000 for section 403(b) plans if you qualify for the 15-year rule explained in Pub. 571). Deferrals under code G are limited to $15,000. Deferrals under code H are limited to $7,000.

However, if you were at least age 50 in 2006, your employer may have allowed an additional deferral of up to $5,000 ($2,500 for section 401(k)(11) and 408(p) SIMPLE plans). This additional deferral amount is not subject to the overall limit on elective deferrals. For code G, the limit on elective deferrals may be higher for the last three years before you reach retirement age. Contact your plan administrator for more information. Amounts in excess of the overall elective deferral limit must be included in income. See the "Wages, Salaries,

Tips, etc." line instructions for Form 1040.

**Note.** If a year follows code D, E, F, G, H, or S, you made a make-up pension contribution for a prior year(s) when you were in military service. To figure whether you made excess deferrals, consider these amounts for the year shown, not the current year. If no year is shown, the contributions are for the current year.

**A**—Uncollected social security or RRTA tax on tips. Include this tax on Form 1040. See "Total Tax" in the Form 1040 instructions.

**B**—Uncollected Medicare tax on tips. Include this tax on Form 1040. See "Total Tax" in the Form 1040 instructions.

**C**—Taxable cost of group-term life insurance over $50,000 (included in boxes 1, 3 (up to social security wage base), and 5)

**D**—Elective deferrals to a section 401(k) cash or deferred arrangement. Also includes deferrals under a SIMPLE retirement account that is part of a section 401(k) arrangement.

**E**—Elective deferrals under a section 403(b) salary reduction agreement

**F**—Elective deferrals under a section 408(k)(6) salary reduction SEP

**G**—Elective deferrals and employer contributions (including nonelective deferrals) to a section 457(b) deferred compensation plan

**H**—Elective deferrals to a section 501(c)(18)(D) tax-exempt organization plan. See "Adjusted Gross Income" in the Form 1040 instructions for how to deduct.

**J**—Nontaxable sick pay (information only, not included in boxes 1, 3, or 5)

**K**—20% excise tax on excess golden parachute payments. See "Total Tax" in the Form 1040 instructions.

**L**—Substantiated employee business expense reimbursements (nontaxable)

**M**—Uncollected social security or RRTA tax on taxable cost of group-term life insurance over $50,000 (former employees only). See "Total Tax" in the Form 1040 instructions.

**N**—Uncollected Medicare tax on taxable cost of group-term life insurance over $50,000 (former employees only). See "Total Tax" in the Form 1040 instructions.

**P**—Excludable moving expense reimbursements paid directly to employee (not included in boxes 1, 3, or 5)

**Q**—Nontaxable combat pay. See the instructions for Form 1040 or Form 1040A for details on reporting this amount.

**R**—Employer contributions to your Archer MSA. Report on Form 8853, Archer MSAs and Long-Term Care Insurance Contracts.

**S**—Employee salary reduction contributions under a section 408(p) SIMPLE (not included in box 1)

**T**—Adoption benefits (not included in box 1). You must complete Form 8839, Qualified Adoption Expenses, to compute any taxable and nontaxable amounts.

**V**—Income from exercise of nonstatutory stock option(s) (included in boxes 1, 3 (up to social security wage base), and 5)

**W**—Employer contributions to your Health Savings Account. Report on Form 8889, Health Savings Accounts (HSAs).

**Y**—Deferrals under a section 409A nonqualified deferred compensation plan.

**Z**—Income under section 409A on a nonqualified deferred compensation plan. This amount is also included in box 1. It is subject to an additional 20% tax plus interest. See "Total Tax" in the Form 1040 instructions.

**AA**—Designated Roth contributions to a section 401(k) plan.

**BB**—Designated Roth contributions under a section 403(b) salary reduction agreement.

**Box 13.** If the "Retirement plan" box is checked, special limits may apply to the amount of traditional IRA contributions that you may deduct.

**Note:** Keep Copy C of Form W-2 for at least 3 years after the due date for filing your income tax return. However, to help protect your social security benefits, keep Copy C until you begin receiving social security benefits, just in case there is a question about your work record and/or earnings in a particular year. Review the information shown on your annual (for workers over 25) Social Security Statement.

This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

Department of The Treasury - Internal Revenue Service

---

NOTE: THESE ARE SUBSTITUTE WAGE AND TAX STATEMENTS AND ARE ACCEPTABLE FOR FILING WITH YOUR FEDE

---

This information is being furnished to the Internal Revenue Service.

**IMPORTANT NOTE:**
In order to insure efficient processing, attach this W-2 to your tax return like this (following agency instructions):



TAX RETURN

THIS FORM W-2 | OTHER W-2S

NOTE: THESE ARE SUBSTITUTE WAGE AND TAX STATEMENTS AND ARE ACCEPTABLE FOR FILING WITH YOUR FEDERAL, STATE AND LOCAL/CITY INCOME TAX RETURNS.

**Notice to Employee**

**Refund.** Even if you do not have to file a tax return, you should file to get a refund if box 2 shows federal income tax withheld or if you can take the earned income credit.

**Earned income credit (EIC).** You must file a tax return if any amount is shown in box 9.

You may be able to take the EIC for 2006 if: (a) you do not have a qualifying child and you earned less than $12,120 ($14,120 if married filing jointly), (b) you have one qualifying child and you earned less than $32,001 ($34,001 if married filing jointly), or (c) you have more than one qualifying child and you earned less than $36,348 ($38,348 if married filing jointly). You and any qualifying children must have valid social security numbers (SSNs). You cannot take the EIC if your investment income is more than $2,800. Any EIC that is more than your tax liability is refunded to you, but only if you file a tax return. If you have at least one qualifying child, you may get as much as $1,648 of the EIC in advance by completing Form W-5, Earned Income Credit Advance Payment Certificate, and giving it to your employer.

**Clergy and religious workers.** If you are not subject to social security and Medicare taxes, see Publication 517, Social Security and Other Information for Members of the Clergy and Religious Workers.

**Corrections.** If your name, SSN, or address is incorrect, correct Copies B, C, and 2 and ask your employer to correct your employment record. Be sure to ask the employer to file Form W-2c, Corrected Wage and Tax Statement, with the Social Security Administration (SSA) to correct any name, SSN, or money amount error reported to the SSA on Form W-2. If your name and SSN are correct but are not the same as shown on your social security card, you should ask for a new card at any SSA office or call 1-800-772-1213.

ATWELL KEVIN

1332840
2008                                                                    Homestead:1

20-05-16-2-008-002 . 000 #0  Book/Page:157    007    01
Sec:16 Twn:07N Rng:18E      Acreage  :    0.00
E1/2 OF LT 48 SANFORD PLAT
85.00X 250.00 LOT
0111 Single Family

************* Total Appraised Value $55520

| | R: | 5560 | S: | 36.14 | 4000 | 26.00 | 10.14 | |
| | P: | 0 | C: | 91.74 | 2000 | 33.00 | 58.74 | |
| | T: | 5560 | W: | 27.80 | 0 | 0.00 | | 27.80 |
| | | | H: | 27.80 | 2000 | 10.00 | 17.80 | |
| | | | 1: | 0.00 | 0 | 0.00 | | 0 |
| | | | 2: | 16.68 | 0 | 0.00 | | 16 |



**H&R BLOCK**

# Privacy Policy

Protecting your privacy is fundamental to our business at H&R Block. We honor all applicable privacy regulations, and we further strive to operate our business in a manner that justifies your choice of H&R Block products and services. We are providing this privacy policy to you as required by law. This privacy policy explains the types of information we may collect from you, and informs you how we may use or disclose that information.

## Who This Policy Covers

This statement applies to information we collect when we provide financial products and services to customers and former customers of this H&R Block office, an independently-owned franchise. Our franchisor operates under a similar but separate privacy policy because it is a separate legal entity and may have different practices or processes. All H&R Block offices (whether independently-owned franchisees or company owned through H&R Block, Services, Inc.) are required to comply with applicable privacy and security laws and regulations.

## Information We Collect

We may collect information so that we may prepare your tax return. This information, referred to in this policy as "tax return information," includes, for example, your name, address and certain other data such as your social security number, income and deductions data, and other information about you and your dependents that we need to prepare your tax return.

We may collect other information in connection with transactions beyond tax return preparation that you complete or propose to complete with us, our affiliates (including, as applicable, our franchisor) or others. This information may include, for example, your name, address and certain other "nonpublic personal information" such as checking, debit and credit account numbers, balances and payment history, income, assets, and social security number. "Tax return information" and "nonpublic personal information" may be collectively referred to as "personal information" in this policy.

We may collect personal information about you from the IRS, our franchisor, and non-affiliated third parties such as credit reporting agencies in connection with transactions you complete or propose to complete with us, our affiliates, our franchisor or non-affiliated third parties (e.g., personal information about your tax return, tax refund, refund anticipation loans or other loans).

We, our affiliates, our franchisor, or non-affiliated third parties with whom we have business relationships may collect information about you when you inquire about services or request information from us, submit rebate forms, or when you enter contests sponsored by us or our franchisor. This information may include, for example, your name, telephone number, mailing address and e-mail address.

## How We May Disclose Your Information

Our disclosure of your personal information is controlled by one or more of the following: Section 7216 of the Internal Revenue Code; the Gramm Leach Bliley Act of 1999; certain other laws, and H&R Block policies. We may disclose any of the categories of personal information that we collect (as described above), subject to the terms of this privacy policy.

Section 7216 of the Internal Revenue Code requires that we have your consent before we disclose your tax return information to affiliates or non-affiliated third parties except the Internal Revenue Service (IRS) and law enforcement officials, and except for certain other lawful purposes. Where this consent is required, we will not disclose your tax return information without your consent.

Information that is identical to specific elements of your tax return information, such as name and address, may not be subject to Section 7216 if we also collect this information for purposes other than preparing your tax return. In these situations, we may disclose such information as described in this policy and as required or permitted by law (but without regard to Section 7216).

We do not share your nonpublic personal information with non-affiliated third parties for marketing purposes except as permitted by the Gramm Leach Bliley Act or other applicable law, nor do we sell or rent your personal information to third party direct marketers.

We may disclose your personal information as described below when you have provided consent under Section 7216 (where required), or as otherwise permitted by applicable laws:

If you have provided consent under Section 7216, we may disclose your tax return information to our franchisor and its affiliates engaged in banking, investment, credit cards or consumer loans, insurance or other financial services activities in order to provide you with service enhancements and product opportunities that we believe may interest you.

We may disclose your personal information to service providers who perform business functions on our behalf. Services such organizations could perform on our behalf may include, for example, check printing, data processing and analysis, contest supervision, and direct mail or e-mail production. We require all service providers to have written contracts that specify appropriate use of your personal information, require them to safeguard your personal information, and prohibit them from making unauthorized or unlawful use of your personal information.

We may disclose your personal information to financial institutions with which we have joint marketing agreements. We require all joint marketers to have written contracts with us that specify appropriate use of your personal information, require them to safeguard your personal information, and prohibit them from making unauthorized or unlawful use of your personal information. If a state law (or other law) requires us to give you the right to opt-out prior to any disclosure of your personal information for joint marketing, we will not disclose personal information for such purposes without providing such opt-out or obtaining your consent.

We may disclose your personal information to affiliates, our franchisor, or non-affiliated third parties for other purposes permitted or required by law. Such purposes may include, for example, processing or fulfilling a service you request, or selling or transferring our business or assets.

If you elect to obtain a refund anticipation loan, other loan products, a revolving line of credit to pay your tax liability, or if you elect to pay your tax preparation or electronic filing fees from your tax refund, you will be presented with a loan application and agreement and/or refund processing agreement. By accepting these agreements and signing the consent form presented to you, you are authorizing H&R Block to disclose your personal information to the lending bank. You should review these agreements and the privacy policies of the lending bank to understand how it may use and disclose your personal information.

We may disclose your personal information to affiliates or non-affiliated third parties (including government entities) when we have a good faith belief that such disclosure is required by law. This may occur in connection with a court order, legal process, or other judicial, administrative or investigative proceeding that produces a request for personal information from us.

## How We Protect Your Information

H&R Block maintains policies and procedures requiring us to restrict access to your personal information in several ways. These include programs and specifications for physical security and records retention and disposal; computer and communication security measures reflected in system design, password protection, and data management practices; and other measures to restrict access to the data we hold in physical and electronic forms.

## How You May Control Use of Your Information

We may use personal information you provide (subject to your consent, where required) to communicate with you about products and services available through H&R Block or non-affiliated third parties. If at any time you wish to limit the offers or promotions you receive from us, you may call 877-723-5458. We will use reasonable efforts to comply with your request, although it may still be necessary for us to send you information from time to time about transactions or accounts you have with us, our franchisor, or our affiliates.

## Thank you for choosing H&R Block, the leading tax services provider. If you have questions about your return or need additional tax help, please contact us anytime during the year.

### Looking for copies of your tax return?

We keep copies of your tax return for at least three years. To get a copy of your return, contact the office where your tax return was prepared. (Fee may apply.) If the office where you had your return prepared is not open year-round, call 1-800-HRBLOCK to find the nearest open office that can assist you.

### Trying to find a tax office?

H&R Block has convenient neighborhood locations across the country. To find a location near you or an office open year-round, call 1-800-HRBLOCK or visit hrblock.com and click on "Find an Office."

## H&R Block can also help with your other tax and financial needs. Look to us for these additional services:

### hrblock.com

Visit America's tax leader online for all of your tax and financial needs. Use our free tax and financial tools, look up the closest H&R Block office, or even drop off your return online. H&R Block also has do-it-yourself tax solutions. From our Web site, you can download our TaxCut® tax software or use our TaxCut® Online programs. TaxCut® software is also available in stores.

### H&R Block Financial Advisors

Plan ahead with tax-smart financial advice. At H&R Block Financial Advisors, we have the products and services to help you make the most of your investments. Call our Investor Center at 1-866-295-7912, or visit hrblock.com and click "Investments."

### H&R Block Bank

If you want simple and affordable banking solutions, H&R Block Bank truly has your best interest in mind. We offer a full-range of deposit services, highly competitive loan products and a financial knowledge base second to none. For more information about our products and services, call us at 1-888-OUR-HRBB, or visit hrblock.com and click "Bank."

### H&R Block Mortgage Corporation

With a wide variety of loan programs, H&R Block Mortgage Corporation may be able to help you refinance for a lower interest rate, take advantage of your home's equity or purchase a new property. Call a loan specialist at 1-866-694-2363, or visit hrblock.com and click "Mortgage."

# AFFIDAVIT OF RUTH RYAN

STATE OF ALABAMA        )

CRENSHAW COUNTY        )

1.    My name is Ruth Ryan.  I am over the age of nineteen and I have personal knowledge of the facts in this affidavit.

2.    I am employed by SMART Alabama, LLC ("SMART") in Luverne, Alabama. I work as Employee Relations Manager and have served in that role since beginning my employment with SMART in September 2005.

3.    Prior to working at SMART, I have had previous experience in Human Resources.  I have served as employment manager at Keystone in Eufaula, Alabama; employment coordinator for three years at Wayne Farms in Union Springs, Alabama; and recruiting coordinator for a temporary employment agency located in Troy, Alabama.

4.    In my role as Employee Relations Manager, I report to Gin Roh, who serves as Human Resources Manager, and Gary Sport, who serves as General Manager for SMART.   My work area is located in the Administration side of SMART's Luverne, Alabama plant.  This work area is open, with cubicles for employees working in such areas. The Administration offices are located on the left side of the building if an employee is walking in the building from the front

doors. The Production offices are located to the right side of the reception area and, like the Administration offices, are open work areas with cubicles. The Safety Office has, since the outset of my employment with SMART, been located just off the Production offices in an office with a door with a window. This office is located by a conference room and also near the hallway frequented by employees when going to the first aid room or the cafeteria.

     5.    My job as Employee Relations Manager includes handling all aspects of employee relations, including working with temporary employment agencies, assisting supervisors in issuing discipline to employees, enforcing SMART's attendance policy, assisting employees with requests for Family and Medical Leave, and investigating employee concerns, including those falling under SMART's policy prohibiting sexual and other unlawful harassment.

     6.    As Employee Relations Manager, I am familiar with SMART's policy prohibiting sexual and other forms of harassment. A true and correct copy of the policy in effect during 2005 and 2006, as maintained by SMART in the ordinary course of business, is attached to this affidavit as Attachment A. The policy prohibits all forms of harassment, including those based on a tangible employment action (also referred to as "quid pro quo") and those based on a hostile work environment.

7.    SMART Alabama ensures that employees are aware of the harassment policy by including it in its handbook, which is distributed to employees upon their hire.  Employees are also instructed about the policy during their orientation.  In addition, management employees receive annual training in the harassment policy.

8.    As set forth in Attachment A, the policy also provides that employees must report harassment they witness or experience to their immediate supervisor or Human Resources.  We do not have a formal complaint form for employees to complete when they are concerned about harassment; however, I generally do encourage employees who report harassment to make a written statement so that they can be sure to include all aspects of their concerns and so that we can investigate all aspects of their concerns.  As Employee Relations Manager, I am the individual responsible for receiving complaints and investigating complaints of harassment.  SMART prohibits retaliation against employees who bring forward complaints of harassment.

9.    As set forth in the policy, all complaints of harassment are investigated so that we can determine whether the policy has been violated and whether disciplinary action needs to be taken.  We do not undertake investigations in an effort to discredit the complaining employee, but instead interview the employee and witnesses to ascertain the nature and circumstances of the alleged conduct, including whether it was based on sex or some other protected factor, so

that we may accurately determine whether the policy has been violated and what, if any, disciplinary action is appropriate.

10.     In my employment as Employee Relations Manager, I knew Robin Davis Atwell. Ms. Atwell originally worked in the production area of the plant, but later moved to the Safety Office under the supervision of Safety Manager Rance Maddox. Like all other employees, she would have received SMART's harassment policy during orientation. Had Ms. Atwell had a complaint of harassment, she could have gone to her immediate supervisor, Rance Maddox, or to Human Resources, which included Gary Sport and myself.

11.     During Ms. Atwell's employment, I was not part of any disciplinary actions issued to Ms. Atwell or performance discussions with Ms. Atwell. Ms. Atwell never came to me and complained about discipline, pay, or evaluations.

12.     Rance Maddox served as the Safety Manager as of the time I came to work at SMART. At no time during Mr. Maddox's employment with SMART did I observe him engaging in any sexually harassing or inappropriate behavior with any female employee.

13.     Although I did not work directly with Ms. Atwell, I had the opportunity to interact with her when she worked in the Safety Office. I would see her at the copy area or other common areas shared by the Production and Administration offices. Through my interactions with her, I observed that Ms.

Atwell often touched people on their shoulders, hands, or backs when she talked to them. I did not consider this a violation of SMART's harassment policy because the conduct did not appear to be unwelcome to other employees and did not appear to be sexual or harassing in nature.

14.    During one conversation we had at the copying machine in the QC area, Ms. Atwell was discussing with me the fact that the Safety Office was working long hours and that she would like to be transferred to another area of the plant. At that time (late 2005 and early 2006), the entire plant was working overtime and often worked seven days per week. Ms. Atwell made no mention whatsoever that Rance Maddox was acting inappropriately towards her or that he had made sexual comments or jokes or touched her in any way during this conversation. After this time, I began looking into a transfer for Ms. Atwell, but did not act immediately because Ms. Atwell did not convey to me that her request was urgent or that she was being subjected to any harassing behavior.

15.    On one occasion I saw Ms. Atwell in the hallway, and I observed that she looked to be upset. This occasion occurred in late January or early February 2006. I met with her in a conference room and asked her what was wrong. She told me that Rance Maddox had touched her inappropriately on the shoulders. She made no mention whatsoever that he touched her on the breast. She gave no details about the circumstances under which he touched her. She did not tell me

anything else about Rance Maddox's conduct. She did not provide me with a written statement at any time. She did tell me that Colinda Porter, another SMART employee working in the Safety office, observed Mr. Maddox touch her. I told Ms. Atwell that I would investigate the matter and also get back with her about a transfer. This was the one and only occasion on which Ms. Atwell complained to me about Rance Maddox.

16.    I investigated the matter by interviewing the only witness identified by Ms. Atwell, Colinda Porter. I did not interview Ms. Porter in an effort to discredit Ms. Atwell or because I did not believe her. Instead, in accordance with company policy, I was trying to determine the nature and circumstances of the incident and whether a policy violation had, in fact, occurred. When I spoke to Ms. Porter, I told her I was investigating an incident in which Rance Maddox allegedly touched Robin Atwell. I asked Ms. Porter what had happened. She explained that all three of them were seated in the Safety Office, and Robin Atwell was typing on her computer. Ms. Atwell stated, "I did it! I finally did it!" Ms. Porter explained that, after Mr. Maddox asked her what she did, Ms. Atwell explained that she had finally entered a case into the OSHA 300 log. According to Ms. Porter, Mr. Maddox walked up to Ms. Atwell's desk and put his hand on Ms. Atwell's shoulders and said, "Good job." According to Ms. Porter, they all laughed. At no time did Ms. Porter tell me that Mr. Maddox had touched Ms.

Atwell's breast. Ms. Porter did not inform me of any comments or touchings that Mr. Maddox had made that she considered inappropriate or unprofessional.

17.    Based on my meeting with Ms. Porter, I could not conclude that any harassment in violation of the policy had occurred. Based on Ms. Atwell's brief account and Ms. Porter's account, I concluded that Mr. Maddox's touching Ms. Atwell's shoulders was not done in a sexually harassing manner and was not inappropriate conduct. I did plan to follow up with Ms. Atwell and address the matter with her further. Had she provided me any more information at that time, I would have continued to investigate. However, I was never given that opportunity because, the next day, when I looked for Ms. Atwell, she was gone and did not return to the plant.

18.    I did not recommend taking any disciplinary action against Rance Maddox after meeting with Ms. Atwell and Ms. Porter. I did not have enough information to conclude that a policy violation had occurred. In any event, shortly after Ms. Atwell failed to return to work in early February 2006, Mr. Maddox resigned his employment with SMART Alabama.

19.    At no time did Fran Hughes come to me and report that Ms. Atwell had a harassment concern to her. Ms. Hughes was not responsible for receiving and/or investigating reports of harassment, but I ensured that she, along with other employees working in and around the Human Resources area, understood that such

reports should immediately come to me. At no time did Chairman Kwon come to me and report that Ms. Atwell had a concern with Rance Maddox. Chairman Kwon would not have been Ms. Atwell's supervisor, and did not serve as part of Human Resources.

20.     At the time Ms. Atwell left her employment in early February 2006, I was aware, through my discussions with Gary Sport, that Ms. Atwell was going to be transferred to a position in the production area. Had Ms. Atwell given SMART the opportunity to transfer her to the production area, she would have been far away from Rance Maddox. Again, I deny Ms. Atwell reporting to me any concerns about Rance Maddox other than the one concern about him touching her shoulders. She never reported to me any other touchings, any comments he made, any phone calls he made, or any other conduct she considered harassing and/or inappropriate.

21.     In late January 2006, I received a note on my desk from an individual named Cathy Caldwell. Ms. Caldwell worked for ADI Security Services, which contracts with SMART to provide plant security. ADI operates the guard booth located in SMART's parking lot, by which each employee and visitor must pass when parking in the plant parking lot. Ms. Caldwell's note stated that Rance Maddox had kissed her in the guard booth. I went immediately to the security office, namely the guard booth, to investigate, but Ms. Caldwell was gone. When I

spoke with the guard in the guard booth, I learned that there had been no witnesses to the alleged kiss. I  later learned from ADI Security Services that she did not return to work.  Had I met with her, I would have been able to more thoroughly investigate her concerns.

22.    I did not recommend discipline of Rance Maddox for this incident because I was been unable to investigate the events. I do not know if Gary Sport counseled Mr. Maddox about these events or not.  Again, Mr. Maddox left the employment of SMART shortly after the beginning of February 2006.  I have no personal knowledge that Mr. Maddox left the employment of SMART Alabama for any reason other than

23.    The foregoing is true and complete, and I declare it under penalty of perjury.

_(signature)_

**RUTH RYAN**

_10/31/07_

**DATE**

**STATE OF ALABAMA**         )

**CRENSHAW COUNTY**         )

Sworn to and subscribed before me on this the _31_ day of October, 2007.

_Staci Mount_

**NOTARY PUBLIC**

1615483 v1                                    10

**My commission expires:**  9-15-2010

# EXHIBIT A



## SEXUAL AND OTHER UNLAWFUL HARASSMENT

It is SMART ALABAMA, LLC's objective to provide a working environment free from discrimination and conduct commonly referred to as sexual harassment. The E.E.O.C. (Equal Employment Opportunity Commission) has provided a broad definition of sexual harassment. It is general in nature and may not always be clear when evaluating everyday situations.

"Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when:

1. submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment,

2. submission to or rejection of such conduct by an individual is used as a basis for employment decisions affecting such individual, or

3. such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment."

Sexual harassment refers to behavior inappropriate in the workplace because it is offensive, unwelcome behavior which would not occur but for the sex of the offended person. Both sexual harassment, and accusations of sexual harassment, are disrupting to the work environment.

If you or a co-worker experiences what you believe to be sexual harassment or accusations of sexual harassment, report it promptly to your immediate supervisor or the Human Recourses Department. SMART ALABAMA, LLC will investigate any employee, regardless of job position when such allegations are made. Based on available information, SMART ALABAMA, LLC will take appropriate action and communicate on a need-to-know basis.

Appropriate disciplinary action, up to and including termination will be taken against any individual for sexual harassment charges determined to be valid.

Ⓢ S M A R T

**Men**

1. Men feel they have to be too cautious as to what they say or how they behave.
2. Men feel cross-gender communication is not as great a problem as women feel it is.
3. Men feel women do not think men are trying.
4. Men feel that women have more advantages in the workplace.
5. Men feel that they are not allowed to make mistakes.
6. Men feel women want both to be provided for and to have equality.
7. Men feel that women dress and act in a way that draws attention to their sexuality.



## 8.   Sexual Harassment

Sexual harassment is a gender issue requiring special attention. This common form of discrimination is one of the most pressing and costly problems facing organizations today. Sexual harassment is unwelcome behavior that happens to you because of your sex that creates an intimidating, hostile, or offensive work environment. Many instances involve a man sexually harassing a woman, however, sexual harassment can also be:

• A woman harassing a man.
• A woman harassing a woman.
• A man harassing a man.

Some types of behavior that can be considered sexual harassment are:

• Unwelcome sexual advances.
• Request for sexual favors, or
• Verbal or physical conduct of a sexual nature.

Two types of sexual harassment are:

• "Quid Pro Quo" Harassment
• Hostile Environment



## "Quid Pro Quo"

"This for that," such as, where an employee's submission to unwelcome sexual conduct is an expressed or implied condition of receiving job benefits or the employee's refusal to submit to sexual conduct would result in tangible job detriment.

## Hostile Environment

Verbal or physical conduct of a sexual nature that has the purpose or effect of unreasonably interfering with an individual's employment creating an intimidating, hostile, or offensive work environment.

## What are the Potential Liabilities?

- Back pay
- Reinstatement
- Damages for emotional harm
- Punitive damages

## Sexual Harassment and the Law

Although many federal and state laws do not specifically define sexual harassment or make it illegal, courts have found that sexual harassment is a form of sex discrimination which violates the laws against sex discrimination in the workplace.

**Title VII or the Civil Rights Act of 1964** is a federal law that protects individuals from discrimination based upon sex. This law makes it illegal for an employer to discriminate against individuals because of their sex in hiring, firing, and other terms and conditions of employment, such as promotions, raises, and other job opportunities.

The laws of most states also make it illegal to discriminate on the basis of sex, and some states specifically make sexual harassment against the law.



## Conduct Considered to be Sexual Harassment

Many different kinds of conduct that are of a sexual nature may be sexual harassment, if the behavior is unwelcome and if it is severe or pervasive. However, courts have resisted adopting what they consider a workplace "code of conduct" or list of behavior that is automatically considered to be sexual harassment. As a result, if the conduct is not unwelcome or not severe or pervasive, courts will not necessarily consider each type of conduct listed below to be sexual harassment.

Some examples of conduct that may be sexual harassment:

- **Verbal or written conduct:**
  Comments about clothing, personal behavior, or your body; sexual or sex-based jokes; requesting sexual favors or repeatedly asking you out; sexual innuendoes; telling rumors about your personal or sexual life; threatening you.

- **Physical conduct:**
  Rape or assault; impeding or blocking your movement; inappropriate touching of your body or clothing; kissing, hugging, patting, stroking

- **Nonverbal conduct:**
  Looking up and down your body; derogatory gestures or facial expression of a sexual nature; following or stalking you.

- **Visual displays:**
  Posters, drawings, pictures, screensavers or e-mails of a sexual nature.

## 9.  Sexual Orientation Issues

Today's workplace is characterized by a mix of values and lifestyles. As gays and lesbians increasingly make their presence known in the workplace, a variety of issues develop. Some people believe that homosexuality is immoral and others just don't understand it. Although someone's sexual orientation has nothing to do with an

0002-S69(M)-AIDT 3/04

# AFFIDAVIT OF GARY SPORT

STATE OF ALABAMA            )

CRENSHAW COUNTY            )

1.      My name is Gary Sport.  I am over the age of nineteen and I have personal knowledge of the facts in this affidavit.

2.      I am employed by SMART Alabama, LLC ("SMART") in Luverne, Alabama as General Manager.  I began working for SMART as Human Resources Manager in 2004 and served in that role until 2006.  When I became General Manager, Mr. Gin Roh became Human Resource Manager and serves in that position to date.  Ms. Ruth Ryan serves as Employee Relations Manager.

3.      Prior to working at SMART Alabama, I had previous human resources experience.  I worked for three years as Human Resource Manager for W.L. Petrey Wholesale Company.  I also worked in manufacturing operations and set-up for Klienert's and Standard Textile Company.  I have a degree in human resource management from Faulkner University.

4.      SMART is a stamping and welding facility for automotive parts, which means that employees form and weld metal parts and body parts for automobiles.  SMART supplies parts to Hyundai Motors Manufacturing Alabama ("HMMA") in Montgomery, Alabama.

5.     SMART's plant is one physical facility that houses both the production area and office areas. At the front of the plant, there is a reception area. To the left of the reception area is an open office area with cubicles. This area houses the Administration offices, and is where my office is located. To the right of the reception area are the Production offices. Like the Administration offices, this is an open area with cubicles. Just off the Production office area is the Safety Office. The Safety Office has a door with a window in the door. In 2005 and 2006, this office door was often left open because air did not circulate well within the office. The Safety Office is adjacent to a hallway utilized by employees going to the first aid room or the cafeteria.

6.     In my role as General Manager, I am responsible for overseeing the Administration portion of SMART's operations.     This includes overseeing Employee Relations, Human Resources, and Safety.     I also have some responsibility for SMART's Information Technology Department.

7.     As General Manager, and as former Human Resources Manager, I am familiar with SMART's policy prohibiting sexual and other forms of harassment. A true and correct copy of the policy in effect during 2005 and 2006, as maintained by SMART in the ordinary course of business, is attached to this affidavit as Attachment A. The policy prohibits all forms of harassment, including those based

on a tangible employment action (also referred to as "quid pro quo") and those based on a hostile work environment.

8.    SMART Alabama ensures that employees are aware of the harassment policy by including it in its handbook, which is distributed to employees upon their hire. Employees are also instructed about the policy during their orientation. The policy is posted on the employee bulletin boards located behind the reception desk near the Production office area. In addition, management employees receive annual training in the harassment policy.

9.    As set forth in Attachment A, the policy also provides that employees must report harassment they witness or experience to their immediate supervisor or Human Resources. We do not have a formal complaint form for employees to complete when they are concerned about harassment. SMART prohibits retaliation against employees who bring forward complaints of harassment.

10.    As set forth in the policy, all complaints of harassment are investigated so that we can determine whether the policy has been violated and whether disciplinary action needs to be taken. We do not undertake investigations in an effort to discredit the complaining employee, but instead interview the employee and witnesses to ascertain the nature and circumstances of the alleged conduct, including whether it was based on sex or some other protected factor, so

that we may accurately determine whether the policy has been violated and what, if any, disciplinary action is appropriate.

11.    In my employment as General Manager and Human Resources Manager, I knew Robin Davis Atwell.  Ms. Atwell originally worked in the production area of the plant, but later moved to the Safety Office under the supervision of Safety Manager Rance Maddox.  Like all other employees, she would have received SMART's harassment policy during orientation.  Had Ms. Atwell had a complaint of harassment, she could have gone to her immediate supervisor, Rance Maddox, or to Human Resources, which, at that time, included Ruth Ryan, or myself.

12.    In my employment as General Manager and Human Resources Manager, I also knew Rance Maddox.  Mr. Maddox was hired by SMART as its Safety Manager through a recruiting service in March 2005.  I, along with Director Kwon, participated in an interview of Mr. Maddox and determined that he had the credentials and experience required for the Safety Manager position.

13.    At no time did the recruiter used by SMART inform me that Mr. Maddox had been accused of or engaged in sexually harassing behavior in the past. At no time prior to Mr. Maddox's hire or during 2005 was I ever informed by any individual that Mr. Maddox had been accused or had engaged in any sexually harassing behavior.  At no time during Mr. Maddox's employment did I observe

him make sexual comments or jokes to an employee, make excessive inquiries into an employee's private life, make sexual advances to an employee, ask an employee on a date, touch an employee inappropriately, or otherwise engage in any conduct prohibited by SMART's harassment policy attached hereto as Exhibit A.

14.    At the outset of his employment with SMART, Mr. Maddox received a copy of SMART's policy prohibiting sexual and other forms of harassment. Attached hereto as Attachment B is a true and correct copy, as maintained by SMART in the ordinary course of business, of Mr. Maddox's Acknowledgement of receipt of the company handbook, which contains the harassment policy. At no time during his employment with SMART Alabama did I observe Mr. Maddox engaging in any conduct violating the harassment policy, including, but not limited to, touching a female employee inappropriately, making unwanted advances, requesting dates from female employees, and making sexual comments.

15.    During the course of her employment with SMART, Ms. Atwell was moved to work in the Safety Office with Rance Maddox. At that time, she was responsible for various functions in the Safety Office, including processing workers' compensation claims, maintaining SMART's OSHA 300 logs, scheduling employees' doctor's visits, and completing accident investigation reports. Other employees, including, but not limited to, Colinda Porter, Wendy Burgans, and Lisa Bodiford worked in the Safety Office at the same time.

16.     During the course of Ms. Atwell's employment with SMART, I was made aware that she was not satisfactorily performing her duties within the Safety Office.     Specifically, Rance Maddox informed me that Ms. Atwell was not performing her job duties.     He expressed concern because failure to complete workers' compensation forms and OSHA 300 logs could result in harm to an employee or the company.     At no time did he state that he was punishing Ms. Atwell because she had refused any advances or because she would not date him.

17.     For this reason, Mr. Maddox and I met with Ms. Atwell on or about January 13, 2006 in a conference room. Attachment C is a true and correct copy of the memorandum that was given to Ms. Atwell by Mr. Maddox during the meeting.     During that meeting, Mr. Maddox reminded Ms. Atwell of her job responsibilities within the Safety Office.     He spoke to her in a professional tone and did not act inappropriately in his words or actions.

18.     In late 2005 and early 2006, the entire plant, including the Safety Office was working a seven-day-a-week schedule.     When the plant worked overtime, so did the individuals working in the Safety Office.     When the plant worked weekends, so did the individuals working in the Safety Office.     This included Ms. Atwell.  I am aware of no special schedule created for Ms. Atwell.

19.     I was aware that Rance Maddox allowed employees working within the Safety Office to wear blue jeans on Fridays.  This is common practice within

the plant, unless we have a visitor or customer coming into the plant. I learned that Mr. Maddox verbally counseled Ms. Atwell about wearing jeans on a day other than Friday, but she received no written discipline. This would not have affected Ms. Atwell's performance evaluation, ability to obtain a raise, or ability to obtain a transfer.

20.    At no time did Rance Maddox tell me that he wanted to terminate Ms. Atwell from within the Safety Office. As Safety Manager, Mr. Maddox would have had to have my approval before doing so. Attachment D is a true and correct copy of an unsigned document produced during discovery, which is dated January 30, 2007 and references Ms. Atwell from being terminated from within the Safety Office. Prior to this litigation, I had never seen the memo. It had never been presented to me by Mr. Maddox or Ms. Atwell. At no time did SMART have any plans to terminate Ms. Atwell's employment. At no time did anyone employed by SMART tell her that her employment was being terminated or that she needed to resign.

21.    SMART's handbook prohibits the taking of company property, including company documents. Attachment E to this affidavit is a true and correct copy, as maintained by SMART in the ordinary course of business, of the policy within the handbook prohibiting unauthorized taking of company documents. During this litigation, documents were produced to SMART by Ms. Atwell. These

documents were missing from SMART and contained sensitive information, including employee injury and medical information. This information should not have been retained by Ms. Atwell while she was employed with SMART or after she left SMART's employment. I know of no reason why Ms. Atwell would have taken this information home with her.

22.    During his employment with SMART, Rance Maddox was counseled about his behavior. Mr. Maddox was under a great deal of pressure from Director Kwon, my superior, to accomplish certain tasks in the Safety Office.    Other employees working in the Safety Office, including Ms. Atwell, complained to me about the harsh tone in which Mr. Maddox spoke to them and his tendency to lose his temper. No one reported that Mr. Maddox was making sexually inappropriate comments and no one reported that Mr. Maddox was touching any employee inappropriately. For this reason, I issued Mr. Maddox the memorandum attached hereto as Attachment F, a true and correct copy as maintained by SMART in the ordinary course of business. In issuing this memorandum, I was not considering any complaints of harassment that had been made concerning Mr. Maddox because no such complaints had been made.

23.    At no time did Ms. Atwell report to me that she was being sexually harassed by Mr. Maddox. At no time did she report that he was asking her to lunch or asking her out for drinks. At no time did she report that he had asked about her

8

breasts or called her "honey," "baby," or "sweetie." At no time did she report that Mr. Maddox said, "Work with me" or "I'll take care of you." At no time did she report that Mr. Maddox said, "I've got a real man for you." At no time did she report that he had touched her breasts, rubbed up against her, or touched her arms or hands. She did mention to me that he had called her at home in the evening, but did not complain that he had done so or state that he had made any sexual or inappropriate remarks or inquiries. I have called Ms. Atwell at home to follow up on unfinished Safety Office business and did not consider this a complaint of harassment because Ms. Atwell was merely making a statement of fact, not complaining about what had occurred or that she had found it intimidating, severe, or harassing.

24.    I did speak with Ms. Atwell about transferring to another area of the plant. I spoke with Ruth Ryan about the transfer. I learned from Ms. Ryan that Ms. Atwell did not enjoy working for Mr. Maddox because the Safety Office worked long hours. I also understood this from general conversation with Ms. Atwell. Neither Ms. Atwell nor Ms. Ryan told me that Ms. Atwell was requesting a transfer because of any sexually harassing behavior by Rance Maddox.

25.    In any event, SMART arranged for Ms. Atwell to be moved to the production area under the supervision of Lloyd Weathers. This area was at least 200 to 300 feet from the Safety Office. Although Rance Maddox would go out

into the plant to inspect safety matters and ensure employees were wearing their personal protective equipment, he did not spend any substantial time out in the plant area and did not engage in one-on-one contact with employees. I learned from David McGough, Quality Manager, that Ms. Atwell had discussed with him a transfer to his area. Mr. McGough did not inform me that Ms. Atwell requested a transfer because of harassing or inappropriate behavior by Mr. Maddox. Mr. McGough and those working in Quality have offices in the Production side of the plant. These cubicles are visible from the door of the Safety Office and are much closer in proximity than Ms. Atwell working in the plant assembly area.

26.    I was never told by Ms. Atwell or anyone else that she needed a transfer because of Mr. Maddox sexually harassing her. I have reviewed the document dated February 2, 2006 produced by Ms. Atwell during discovery, a true and correct copy of which is attached hereto as Attachment G. I had never seen this document prior to discovery in this litigation. I did not receive this document from Ms. Atwell or any other SMART employee.

27.    At no time did Fran Hughes come to me and report that Ms. Atwell had a harassment concern. Ms. Hughes served as assistant to Vice-President Hong during Ms. Atwell's employment and had no Human Resources authority. She was not responsible for investigating complaints of harassment. At no time did Chairman Kwon come to me and report that Ms. Atwell had a concern with Rance

Maddox. Chairman Kwon would not have been her supervisor, and was and not a part of Human Resources. Any complaints of harassment by Ms. Atwell should have come to Ruth Ryan or me. Any complaints of harassment made to Ms. Hughes or Mr. Kwon would have been forwarded immediately to Ms. Ryan or me.

28.     Ms. Atwell was made aware, through discussions with myself and Ms. Ryan, that she would be transferred to the production assembly area. However, she ceased reporting to work as of February 7, 2006, as reflected by her time records, a true and correct copy of which as maintained by SMART in the ordinary course of business is attached hereto as Attachment H.

29.     The one issue of which I was made aware concerning Ms. Atwell was her reporting to Ruth Ryan that Rance Maddox had touched her on the shoulders. At no time was I made aware that Mr. Maddox touched Ms. Atwell on her breast. Ms. Ryan conducted an investigation and reported to me her findings. Specifically, she told me that Ms. Atwell reported Mr. Maddox touching her on the shoulder. Ms. Ryan reported that she interviewed Colinda Porter, another employee working in the Safety Office, who explained that all three of them were seated in the Safety Office, and Robin Atwell was typing on her computer. Ms. Atwell stated, "I did it! I finally did it!" Ms. Porter explained that, after Mr. Maddox asked her what she did, Ms. Atwell explained that she had finally entered a case into the OSHA 300 log. According to Ms. Porter, Mr. Maddox walked up to

Ms. Atwell's desk and put his hand on Ms. Atwell's shoulders and said, "Good job." According to Ms. Porter, they all laughed. At no time did Ms. Porter or Ms. Ryan or Ms. Atwell tell me that Mr. Maddox had touched Ms. Atwell's breast. Ms. Porter or Ms. Atwell or Ms. Ryan did not inform me of any comments or touchings that Mr. Maddox had made that she considered inappropriate or unprofessional.

30.    Disciplinary action was not taken against Mr. Maddox for the alleged touching incident because it was concluded that no policy violation had occurred. From both Ms. Atwell and Ms. Porter's accounts of the event, as reported to me by Ruth Ryan, I concluded that Mr. Maddox's conduct was not harassing in nature. Ms. Ryan intended to follow up with Ms. Atwell as to her investigation's conclusion, but Ms. Atwell left the employment of SMART and did not return.

31.    In late January 2006, I learned of a complaint from an individual named Cathy Caldwell. Ms. Caldwell worked for ADI Security Services, which contracts with SMART to provide plant security. ADI operates the guard booth located in SMART's parking lot, by which each employee and visitor must pass when parking in the plant parking lot. Again, Ms. Ryan investigated this incident. She reported to me that she learned that Ms. Caldwell no longer worked for ADI and did not return. She told me that she was unable to locate any witnesses to the incident.

32.    I did not recommend discipline of Rance Maddox for this incident because we were unable to investigate the events and because Mr. Maddox was on a leave, as referenced below, and had disclosed to me that he was going to leave the employment of SMART.

33.    Mr. Maddox left the employment of SMART within three weeks of Ms. Atwell's leaving her position at SMART in February 2006.   Mr. Maddox had been on a leave of absence during January and February 2006, as reflected by Attachment J, a true and correct copy of a document maintained by SMART in the ordinary course of business. He resigned his position voluntarily.   His resignation had nothing to do with any complaints of harassment against him.

34.    The foregoing is true and complete, and I declare it under penalty of perjury.

_____

**GARY SPORT**

_____

10/31/07

**DATE**

**STATE OF ALABAMA**      )

**CRENSHAW COUNTY**      )

Sworn to and subscribed before me on this the 31 day of October, 2007.

Staci Mount

**NOTARY PUBLIC**

**My commission expires:** 9-15-2010

# EXHIBIT A



## SEXUAL AND OTHER UNLAWFUL HARASSMENT

It is SMART ALABAMA, LLC's objective to provide a working environment free from discrimination and conduct commonly referred to as sexual harassment. The E.E.O.C. (Equal Employment Opportunity Commission) has provided a broad definition of sexual harassment. It is general in nature and may not always be clear when evaluating everyday situations.

"Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when:

1. submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment,

2. submission to or rejection of such conduct by an individual is used as a basis for employment decisions affecting such individual, or

3. such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment."

Sexual harassment refers to behavior inappropriate in the workplace because it is offensive, unwelcome behavior which would not occur but for the sex of the offended person. Both sexual harassment, and accusations of sexual harassment, are disrupting to the work environment.

If you or a co-worker experiences what you believe to be sexual harassment or accusations of sexual harassment, report it promptly to your immediate supervisor or the Human Recourses Department. SMART ALABAMA, LLC will investigate any employee, regardless of job position when such allegations are made. Based on available information, SMART ALABAMA, LLC will take appropriate action and communicate on a need-to-know basis.

Appropriate disciplinary action, up to and including termination will be taken against any individual for sexual harassment charges determined to be valid.

Ⓢ S M A R T

**Men**

1. Men feel they have to be too cautious as to what they say or how they behave.
2. Men feel cross-gender communication is not as great a problem as women feel it is.
3. Men feel women do not think men are trying.
4. Men feel that women have more advantages in the workplace.
5. Men feel that they are not allowed to make mistakes.
6. Men feel women want both to be provided for and to have equality.
7. Men feel that women dress and act in a way that draws attention to their sexuality.



## 8.  Sexual Harassment

Sexual harassment is a gender issue requiring special attention. This common form of discrimination is one of the most pressing and costly problems facing organizations today. Sexual harassment is unwelcome behavior that happens to you because of your sex that creates an intimidating, hostile, or offensive work environment. Many instances involve a man sexually harassing a woman, however, sexual harassment can also be:

- A woman harassing a man.
- A woman harassing a woman.
- A man harassing a man.

Some types of behavior that can be considered sexual harassment are:

- Unwelcome sexual advances.
- Request for sexual favors, or
- Verbal or physical conduct of a sexual nature.

Two types of sexual harassment are:

- "Quid Pro Quo" Harassment
- Hostile Environment

0002-S69(M)-AIDT 3/04



### "Quid Pro Quo"

"This for that," such as, where an employee's submission to unwelcome sexual conduct is an expressed or implied condition of receiving job benefits or the employee's refusal to submit to sexual conduct would result in tangible job detriment.

### Hostile Environment

Verbal or physical conduct of a sexual nature that has the purpose or effect of unreasonably interfering with an individual's employment creating an intimidating, hostile, or offensive work environment.

### What are the Potential Liabilities?

- Back pay
- Reinstatement
- Damages for emotional harm
- Punitive damages

### Sexual Harassment and the Law

Although many federal and state laws do not specifically define sexual harassment or make it illegal, courts have found that sexual harassment is a form of sex discrimination which violates the laws against sex discrimination in the workplace.

**Title VII or the Civil Rights Act of 1964** is a federal law that protects individuals from discrimination based upon sex. This law makes it illegal for an employer to discriminate against individuals because of their sex in hiring, firing, and other terms and conditions of employment, such as promotions, raises, and other job opportunities.

The laws of most states also make it illegal to discriminate on the basis of sex, and some states specifically make sexual harassment against the law.



## Conduct Considered to be Sexual Harassment

Many different kinds of conduct that are of a sexual nature may be sexual harassment, if the behavior is unwelcome and if it is severe or pervasive. However, courts have resisted adopting what they consider a workplace "code of conduct" or list of behavior that is automatically considered to be sexual harassment. As a result, if the conduct is not unwelcome or not severe or pervasive, courts will not necessarily consider each type of conduct listed below to be sexual harassment.

Some examples of conduct that may be sexual harassment:

- **Verbal or written conduct:**
  Comments about clothing, personal behavior, or your body; sexual or sex-based jokes; requesting sexual favors or repeatedly asking you out; sexual innuendoes; telling rumors about your personal or sexual life; threatening you.

- **Physical conduct:**
  Rape or assault; impeding or blocking your movement; inappropriate touching of your body or clothing; kissing, hugging, patting, stroking

- **Nonverbal conduct:**
  Looking up and down your body; derogatory gestures or facial expression of a sexual nature; following or stalking you.

- **Visual displays:**
  Posters, drawings, pictures, screensavers or e-mails of a sexual nature.

## 9.   Sexual Orientation Issues

Today's workplace is characterized by a mix of values and lifestyles. As gays and lesbians increasingly make their presence known in the workplace, a variety of issues develop. Some people believe that homosexuality is immoral and others just don't understand it. Although someone's sexual orientation has nothing to do with an

0002-S69(M)-AIDT 3/04

# EXHIBIT B

SMART ALABAMA, LLC Employee Handbook          12/10/2004

## *Acknowledgement*

I have read the policies outlined in this handbook. I understand that while this is not an employment contract I am bound to abide by the policies set herein.

I further understand that SMART ALABAMA, LLC may modify, revise and update this manual at any time. I am also aware that this updating may include additions or deletions.

I also certify that I have had ample time to discuss this handbook and its contents with SMART ALABAMA, LLC representatives and I fully understand the contents. Disclosure of Employee Handbook to any third party or other employers is prohibited and could be grounds for termination.

With this knowledge I accept the policies outlined herein as a condition of employment.

Employee signature _Rann Maddox_

Date _03 / 07 / 05_

\* SMART ALABAMA, LLC reserves the right to make changes to this handbook for the purpose of modifying, revising and updating company policy and this manual. Notice of changes will be posted on the bulletin boards and become a part of this manual. Violation of any company policy may result in immediate termination.

38

*CONFIDENTIAL*

DFRP'S
00750
ATWELL V. SMART

# EXHIBIT C

## Day Shift Safety Assistant Position Responsibilities

The following is a summary of specific job responsibilities that
a Safety Assistant will be required to perform on a day to day
basis.

* Start time 8:00 a.m. till 5:00 p.m.
  Normal break time is 10 minutes
  Lunch is one hour

* Maintain OSHA 300 Log, medical records, and all
  doctors and workers compensation issue daily.

* Review and track Safety Representatives and
  Supervisors, Safety Inspections and Monthly
  Safety Topics

* Conduct frequent safety walk–throughs of all departments
  to ensure that all employees are wearing all Personal
  Protection Equipment and are following all safety requirements

* Assit the Safety Manager in responding to the employees
  needs and concerns for safety requirements

* Train new Safety Representatives on proper Safety Inspections
  Procedures and Safety Responsibilities

* Conduct Lockout/Tagout Safety Training for employees that
  require a lockout device and perform competency testing for
  lockout trained employees

* * Review and file Safety Inspection, Crane Inspection, Safety
  Committees Inspections, Accident Reports, etc. that may come to
  Safety office

* Assist the Safety Manager in New Hire Safety Orientation



Atwell v. Smart
0078
Pltf's RFP

* Assist the Safety Manager in taking notes and conducting the meeting for the day shift Safety/Ergonomic Committees

* Prepare Safety Orientation Handouts, Sign Off Sheets, and Manuals

* Assist with washing the gloves and inventory of the Personal Protection Equipment and also issuing PPE to team leaders for their department

MONTHLY RESPONSIBILITIES

* Conduct Department Ergonomic Rotation Audits for correct rotation schedule

* Audit new employees ramp in documention to ensure correct ramp in process

* Conduct A.M. inspection and check the Emergency Evacuation System for plant

* As a part of the Egronomic Rotation Audit, conduct employee interviews to ensure that rotation is done

* Audit new employees training documentation to ensure standard operating procedure for equipment safety training is completed and documented

* Update SOP'S for each piece of equipment to ensure accuracy and usefulness

* Revise and update Evacuation Route Maps to make them easier to read and understand

* Other duties as deemed necessary by the Safety Manager

Atwell v. Smart
0079
Pltf's RFP

* All worker's compensation cases will be managed and reported to Day shift safety assistant.
* All light duty team members will be assigned and monitored and
* Managed, a list of all light duty members will be developed and placed on the safety managers desk for review each morning, also a copy will be emailed to department manager, plant manager, and a hard copy will be given to each team leader with restrictions if any.

* Inventory all PPE daily and fill out correct reporting procedure.

I confirm that I am able to perform the function and requirements of this position as described herein and explain to me

_Rob, Dave Atwell_    01/13/06

Safety Assistant

I Confirm that I have explained the major requirement and responsibilities of the position to the individual named above and have witnessed his/her signature

_Kanse Maddr, CSM, CECO, CSPS_
Safety Manager

Atwell v. Smart
0080
Pltf's RFP

# EXHIBIT D

January 30, 2006

Attention:    Robin Davis
Reference:    Job Performance Evaluation (4th Attempt)
From:         Rance Maddox


Earlier this month on January 24, 2006, in our last Safety Office meeting, I discussed with you that I would be performing Job Performance Evaluations on that same day. This memo is to inform you of your Job Performance within the Safety Department.

In my last attempt on January 5, 2006, I informed you once again of your Job Description. As you can remember, it is First Shift Safety Assistant responsibility to enter in and complete the OSHA 300A Log. This is a serious matter that you have taken lightly. The last entry in the OSHA 300A Log was on November 30, 2005, which was entered in by Melissa McGough. As of this date, January 30, 2006, you have yet to enter in or complete any Recordables on the OSHA 300A Log. This highly unacceptable and can no longer be tolerated. From your hire date within the Safety Department, November 14, 2005, you have had ample time to have completed this task or to have asked questions if you did not understand how to perform this task.

Along with completing the OSHA 300A Log, there has to be a First Report of Injury claim from Worker's Compensation filed out and emailed to Bill Hicks. This is also very serious and must be done within 48 hours of initial injury. This is also one of your job performances you have yet to complete. There are several employees who were injured on the job and have had to wait over a month to see a doctor or is still waiting on Workman's Comp approval, because they haven't gotten the First Report of Injury Form.

The following is a list of other Job Descriptions you have yet to perform:

1. Daily Planner for all Three Shifts
2. Reports of Safety Memos

4. Office Organization
5. Safety Committee/First Responders Meeting


Also, it has become a problem with you working weekends. It has been a month since you last worked a weekend. As a Safety Assistant it is your job as well as the other Safety Assistants to work weekends.

Please be aware that when you started a new job in the Safety Office you were on a ninety day probationary period. Because of the deficiencies in your job performance, and with multiple attempts to correct these problems, you have given me no other choice but to terminate you from within the Safety Department. I wish you the best luck in the future.



Rance Maddox, CMA, CECD, CMS

# EXHIBIT E

SMART ALABAMA, LLC Employee Handbook                12/10/2004

## NON-TOBACCO

The use of tobacco products in any form is strictly forbidden in SMART ALABAMA, LLC facilities. Smokeless tobacco use and smoking is allowed only in designated areas outdoors. While using tobacco please be considerate of others. Use only approved receptacles for disposal of properly extinguished tobacco products. Do not discard cigarette butts on company property or spit on flooring in any areas, inside or outside the facility.

### Company Property

### CONFIDENTAL INFORMATION SECURITY

As a matter of course, employees of SMART ALABAMA, LLC will have access to confidential and proprietary information. This information includes, but is not limited to, personnel information, pricing, client lists, contractual agreements, intellectual property, and marketing/sales strategies. It is a condition of employment that you not disclose this information to third parties during or after employment. Disclosure of SMART ALABAMA, LLC confidential information without express written approval is prohibited.

### FACILITIES SECURITY

It is the responsibility of all employees to make sure the facilities and work areas are secure. Any employee entrusted with facility keys shall make certain the facility is secure when that employee is the last to leave. See your immediate supervisor if this will be one of your responsibilities. This includes,

but is not limited to, turning off appropriate lights, and closing and locking all doors and windows.

Report any potential security risks to your immediate supervisor.

### COMPANY EQUIPMENT

Company property, such as laser printers, copiers, computers, and all production tools, are to be used for SMART ALABAMA, LLC business purposes only. Use of unauthorized equipment may result in appropriate disciplinary action, up to, and including termination.

24

SMART ALABAMA, LLC Employee Handbook          12/10/2004

Your designated work area, desks, and cabinets are not to be locked with personal locks. If you need assistance securing company property see your immediate supervisor.

## PHONE SYSTEMS, VOICE MAIL AND PERSONAL CALLS

Telephone systems, equipment, and operators are in place to provide business services of the company. Employees are to limit the personal use of these items. Lengthy calls should be made during breaks.

Long distance calls for personal use are prohibited.

## CONSERVATION AND RECYCLING

Conserving energy and resources is a priority at SMART ALABAMA, LLC. Employees are required to conserve power and water in all reasonable ways. Recycling containers are provided throughout the facility for collection. Containers are marked for various materials. Please be certain to separate all recyclables and put them into the appropriate containers.

## *Computer Related*

## COMPUTERS AND RELATED EQUIPMENT

SMART ALABAMA, LLC provides employees access to computers, printers, and other equipment on an as-needed basis, to perform their job requirements. This equipment is to be used exclusively for the business activities of SMART ALABAMA, LLC. Employees found to be using company

computer equipment for personal use may be subject to appropriate disciplinary action, up to, and including termination.

Employees are required to maintain their computers and related equipment in good working order. If any of your equipment needs service, repair, or maintenance, notify your immediate supervisor.

Employees shall not use company systems to knowingly violate any city, state, or federal laws.

Computer games and personal software may not be installed on company equipment.

Company equipment shall not be used to create or store personal information or projects.

25

# EXHIBIT F



**SMART**
*Stamped Metal American Research Technology, Alabama.LLC*

Human Resource Department
121 Shin Young Drive    Luverne, Alabama 36049    334-335-5800

January 23, 2006

Rance,

This letter is to express my concerns about our Safety Management at SMART  As we have discussed before, there are some things in the Safety arena that need to be completed  Also, I am somewhat concerned about your approach to the job, the people, and the management of the job.

By copy of this letter to you I am documenting that we are discussing these issues on January 23, 2006.

These are the key areas we need to succeed in with dates for completion

Safety Plan

1. Prepare a schedule to cover weekend works and post on Safety office door. Someone should be in the safety area any time *Sun 1t Temp 2⁵⁽ʰshift* the production facility is working several lines *Jo Grm will be gric Schedule* January 27

2. Set up the workers' comp case coordinator. The safety person on each shift will be responsible for following up with and *light duty/Team Leader* documenting the activities of each injured worker on their shift  I will assist you in putting this together February 3

3. Assign Robin the coordinator of the comp cases  She should maintain the OSHA 300 log and assure that each file contains proper documentation and records. I want you to be the person speaking with our work comp carrier on work related injuries and issues from this point forward involving me when you feel or see it necessary. *RANCE will be in-charge W/C Coordicch* January 24

4. A list of modified duty jobs should be identified in the productions areas and given to each Supervisor and Team Leader. Ex: Fender Pads, Sweeping, Dusting of Welding Slag, Separating Nuts and Bolts, etc. January 31

5. Joanne will begin on Feb 1. At this time everyone is to be transitioned from the safety office and placed on modified duty in the plant production area February 1-10

6. Begin training through Joanne immediately on First Aid Responders  We should have 4 per shift from a cross section of the plant. Prepare a job description for these individuals  February

7. Dailey PPE inventories for each shift should be done, compiled, and put on mine and Mr. Kwon's desks each morning. Purchase requisitions with assigned P.O. and a copy of inventory shortage or explanation for need should be attached to all purchase requests. No verbal orders are to be made; no orders are to be made unless you have a signed purchase request. Robin knows where the P.O. list is on the public server, make sure whomever initiates an order logs the P.O. electronically so I can verify as needed. Immediately-Daily

8. Shawn should have the cage for PPE completed within a week  Plans to relocate all PPE to that area should be made. TBD

9. Each shift Safety person will be responsible for having the next shift's PPE washed and prepared Implement a strict one for one exchange policy on PPE. We can have a sign made to place on the door of the cage to indicate this. Daily

For your personal concern, I want you to maintain a positive attitude toward your job and co-workers. Show respect at all times to your peers, your subordinates, and our Security Team. Manage yourself professionally and calmly. Don't threaten or intimidate people  Your actions as a manager are always under review by those around us and they do not hesitate to point out faults. Be aware of these things at all times. As a manager you must maintain a calm posture when things annoy you. It is good to question things but be aware of your presentation. Calmness goes much further in soliciting support for your ideas than anger and shortness with people. Be at work during the assigned hours  Keep me informed of issues and changes around you.

Rance, we can make this work and the responsibility for that falls on you. As I review your job performance over the next few weeks I hope to see a dramatic improvement in these areas  It is not our desire to make a change. Let's work together to further secure your position with this company

Gary

*[signature]*

**CONFIDENTIAL**

DFRP'S
00752
ATWELL V. SMART

# EXHIBIT G

S7-3503

02/02/06

Gary Sport
Human Res
Smart

PLAINTIFF'S
EXHIBIT

RE: Department transfer

~~Gary Per my conversation with you.~~
In Regards to the Sexual
Harrasment situation with Rance
Maddox. I Have requested a
departmental transfer. I have
been ~~asked~~ told to be patient. ~~and~~ By H.R. personel
I do not feel comfortable
being in a ~~closed office area~~
~~with any~~ confined work area
with Rance maddox. After I
talked to you about what events
have taken place, Rance maddox
has made my work environment
be a hostile one and I feel
that he was advised about my
complaint and that he is ~~going taking~~ using
~~advantage~~ his position to intimidate
others of By means of threats
~~of being~~ both direct + indirect.
So therefore at this point until
some permanent changes have been made in

regards to my position at
Smart or Rance maddox's
position at Smart, I am
requesting that one of the
following actions be taken
IN a timely manor.

Robin Davis Atwell leave of Absence
    Paid. (pending investigation)
Robin Davis Atwell leave of Absence
    unpaid  (pending investigation)
Rance maddox leave of Absence
    Paid (pending investigation)
Rance maddox leave of Absence
    unpaid (pending investigation)

Please inform me as soon
as a decision has been made
in Reference to what actions are
going to be taken.

                Sincerely,
                Robin Davis Atwell

# EXHIBIT H



SMART ALABAMA LLC
Punch Detail Report
Previous pay period
All accounts, all pay rules, all Timeclock groups

Page
02/13/2006

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Thu 02/02 | 630a*U | | 530p | | | | 11.00 | 82.65 | |
| Fri 02/03 | 1207p*U | | 325p | | | | 3.37 | 86.02 | |
| Sat 02/04 | Unscheduled | | | | | | | | |
| Sun 02/05 | 917a*U | | 356p | | | | 6.65 | 92.67 | |
| Mon 02/06 | Unscheduled | | | | | | | | |
| Tue 02/07 | 534a*U | | *? | | | | 0.00 | 92.67 | |

Acct:000007,802
REGULAR:   64.92   OVERTIME:   13.33   DOUBLE:   14.42

---

WALDEN,RICHARD          0001990176000007,802
                                MATERIAL CONTROL,CMA-2    8 hour shift    25778    B9R
          ID IN   DEPT   SHIFT   ACTIVITY   OUT   ID IN   DEPT   SHIFT   ACTIVITY   OUT   TOTALS

| | | | | |
|---|---|---|---|---|
| Wed 01/25 | Unscheduled | | | |
| Thu 01/26 | Unscheduled | | | |
| Fri 01/27 | 550a*U | 200p | 8.17 | 8.17 |
| Sat 01/28 | 550a*U | 200p | 8.17 | 16.33 |
| Sun 01/29 | Unscheduled | | | |
| Mon 01/30 | 550a*U | 225p | 8.58 | 24.92 |
| Tue 01/31 | 555a*U | 203p | 8.13 | 33.05 |
| Wed 02/01 | 623a*U | 207p | 7.73 | 40.78 |
| Thu 02/02 | 559a*U | 203p | 8.07 | 48.85 |
| Fri 02/03 | 532a*U | 204p | 8.53 | 57.38 |
| Sat 02/04 | 554a*U | 1213p | 6.32 | 63.70 |
| Sun 02/05 | Unscheduled | | | |
| Mon 02/06 | 555a*U | 203p | 8.13 | 71.83 |
| Tue 02/07 | 552a*U | 203p | 8.18 | 80.02 |
| Add Punch | 666 01/27 | 550a | | |
| Add Punch | 666 01/27 | 200p | | |
| Add Punch | 666 01/28 | 550a | | |
| Add Punch | 666 01/28 | 200p | | |
| Add Punch | 666 01/30 | 550a | | |

Acct:000007,802
REGULAR:   73.05   OVERTIME:   6.97

---

BODIFORD,LISA M.          0001989346000010,1015
                                HUMAN RESOURCES,SAFETY    8 hour shift    589    B9R
          ID IN   DEPT   SHIFT   ACTIVITY   OUT   ID IN   DEPT   SHIFT   ACTIVITY   OUT   TOTALS

| | | | | |
|---|---|---|---|---|
| Wed 01/25 | 946p | 727a*L | 9.45 | 9.45 |
| Thu 01/26 | 945p | 738a*L | 9.63 | 19.08 |
| Fri 01/27 | 941p | 624a*L | 8.40 | 27.48 |
| Sat 01/28 | 948p | 617a | 8.00 | 35.48 |
| Sun 01/29 | ABSENT | | (8.00) | |
| Mon 01/30 | 949p | 626a*L | 8.43 | 43.92 |
| Tue 01/31 | 949p | 718a*L | 9.30 | 53.22 |
| Wed 02/01 | 954p | 709a*L | 9.15 | 62.37 |
| Thu 02/02 | 941p | 809a*L | 10.15 | 72.52 |
| Fri 02/03 | 950p | 626a*L | 8.43 | 80.95 |
| Sat 02/04 | ABSENT | | (8.00) | |
| Sun 02/05 | ABSENT | | (8.00) | |
| Mon 02/06 | 1001p*L | 736a*L | 9.58 | 90.53 |
| Tue 02/07 | 947p | 624a*L | 8.40 | 98.93 |

Acct:000010,1015
REGULAR:   80.00   OVERTIME:   18.93

---

DAVIS,ROBIN          0001989878000010,1015
                                HUMAN RESOURCES,SAFETY · Office    1445    B9R
          ID IN   DEPT   SHIFT   ACTIVITY   OUT   ID IN   DEPT   SHIFT   ACTIVITY   OUT   TOTALS

| | | | | | | |
|---|---|---|---|---|---|---|
| Wed 01/25 | ABSENT | | | | (8.00) | |
| Thu 01/26 | ABSENT | | | | (8.00) | |
| Fri 01/27 | ABSENT | | | | (8.00) | |
| Sat 01/28 | Unscheduled | | | | | |
| Sun 01/29 | Unscheduled | | | | | |
| Mon 01/30 | 747a | 1216p | M 1250p*L | 500p | 8.43 | 8.43 |
| Tue 01/31 | 749a | 543p*L | | | 8.72 | 17.15 |
| Wed 02/01 | 745a | 324p*L | | | 8.40 | 25.55 |
| Thu 02/02 | 721a*E | 1230p | M 137p*L | 526p*L | 8.97 | 34.52 |
| Fri 02/03 | 740a | 1153a | M 1235p*L | 500p | 8.30 | 42.82 |
| Sat 02/04 | 700a*U | 1021a | | | 3.35 | 46.17 |
| Sun 02/05 | Unscheduled | | | | | |

```
SHART ALABAMA LLC                                                            Page
Punch Detail Report                                                    02/13/2006
Previous pay period
All accounts, all pay rules, all Timeclock groups

Mon 02/06  736a                         515p                         8.40   54.57
Tue 02/07  735a                        1108a   M 1158a*L    1230p-E   4.22   58.79
  Add Punch      900 01/30  500p
  Add Punch      900 02/03  300p
  Remove Punch   666 02/05  918a


  Acct:000010,1015
               REGULAR:    57.15  OVERTIME:    1.63



EILAND,JO ANN          0001990205000010,1015
                                 HUMAN RESOURCES,SAFETY   8 hour shift    25768   B9R
           ID IN   DEPT    SHIFT  ACTIVITY   OUT    ID IN   DEPT   SHIFT  ACTIVITY   OUT    TOTALS
Wed 01/25 Unscheduled
Thu 01/26 Unscheduled
Fri 01/27 Unscheduled
Sat 01/28 Unscheduled
Sun 01/29 Unscheduled
Mon 01/30 Unscheduled
Tue 01/31 Unscheduled
Wed 02/01 Unscheduled
Thu 02/02 Unscheduled
Fri 02/03 Unscheduled
Sat 02/04 Unscheduled
Sun 02/05 Unscheduled
Mon 02/06  750a*U                       1205p                        4.25   4.25
Tue 02/07  747a*U                       1137a                        3.83   8.08
  Add Punch      855 02/06  750a


  Acct:000010,1015
               REGULAR:    8.08



MCGOUGH,MARY M          0001290993000010,1015
                                 HUMAN RESOURCES,SAFETY   8 hour shift    385   B9R
           ID IN   DEPT    SHIFT  ACTIVITY   OUT    ID IN   DEPT   SHIFT  ACTIVITY   OUT    TOTALS
Wed 01/25  750a                         509p                         9.00   9.00
Thu 01/26  757a                         512p                         9.00  18.00
Fri 01/27  757a                         505p                         9.00  27.00
Sat 01/28 Unscheduled
Sun 01/29 Unscheduled
Mon 01/30  756a                         1202p   M 111p*L     515p    7.85  34.85
Tue 01/31  755a                          713p*L                     11.22  46.07
Wed 02/01  800a                         1200p   M 100p*L     513p    8.00  54.07
Thu 02/02  759a                          513p                        9.00  63.07
Fri 02/03  757a                         1044a*E                      2.73  65.80
Sat 02/04 Unscheduled
Sun 02/05 Unscheduled
Mon 02/06  759a                         1202p   M 100p*L     503p    8.03  73.83
Tue 02/07  757a                         1103a   M 1250p*L    500p    7.22  81.05
  Remove Punch   666 01/30  333p
  Add Punch      666 01/30  515p
  Add Punch      666 01/31  755a
  Add Punch      666 02/01  100p
  Remove Punch   666 02/02  1208p
  Add Punch      666 02/06  100p


  Acct:000010,1015
               REGULAR:    74.98  OVERTIME:    6.07



TEAGUE,DEREK          0001990135000010,1025
                                 HUMAN RESOURCES,BUILDING SERVICES
                                                         8 hour shift    1949   B9R
           ID IN   DEPT    SHIFT  ACTIVITY   OUT    ID IN   DEPT   SHIFT  ACTIVITY   OUT    TOTALS
Wed 01/25  758a                         500p                         9.00   9.00
Thu 01/26  747a                         1206p   M 1245p*L    503p    8.35  17.35
Fri 01/27  735a                         500p                         9.42  26.77
Sat 01/28 Unscheduled
Sun 01/29 Unscheduled
Mon 01/30  744a                         113Ba   M 1200p     503p    8.63  35.40
Tue 01/31  756a                         512p                         9.00  44.40
Wed 02/01  755a                         522p*L                       9.37  53.77
```

# EXHIBIT I



**SMART**

*Stamped Metal American Research Technology, Alabama.LLC*

121 Shin Young Drive     Human Resource Department
Luverne, Alabama 36049     334-335-5800

January 12, 2006

RE:  Mr. Rance Maddox

To Whom It May Concern:

Mr. Rance Maddox is an employee with SMART Alabama, llc.   Mr. Maddox has been employed with this company for less than one year.  Due to this he does not qualify under the guidelines of the FMLA and is not eligible for those benefits.   Also, at this time, there are no other disability benefits available to Mr. Maddox through this company.  He has been placed on paid administrative leave.

Any questions or inquiries into his status may be made directly to me at the number above, extension 244.

Sincerely,

Gary R. Sport
General Manager
Human Resource Group
SMART AL, llc

**CONFIDENTIAL**

**DFRP'S**
**00753**
**ATWELL V. SMART**



**DEPARTMENT OF VETERANS AFFAIRS**
Medical Center
Tuscaloosa, AL 35404

In reply refer:
Maddox, Rance

Date: January 10, 2006

To Whom It May Concern:

Mr. Rance Maddox was admitted to the Tuscaloosa VA Medical Center on
January 6, 2006 for treatment. He is scheduled for release on January 12, 2006.
He can resume preadmission activities.

Sincerely,

Velda Pugh

*CONFIDENTIAL*

DFRP'S
00754
ATWELL V. SMART

# DEPOSITION OF RUTH RYAN

## September 12, 2007

## Pages 1 through 67

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL 36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**



**Page 1**

1
2    IN THE UNITED STATES DISTRICT COURT
3    FOR THE MIDDLE DISTRICT OF ALABAMA
4              NORTHERN DIVISION
5
6    ROBIN ATWELL,
7        Plaintiff,
8    vs.          CIVIL ACTION NO.
                  2:06CV1089-MEF
9
     SMART ALABAMA, LLC,
10
        Defendants.
11
12      * * * * * * * * * * * * *
13
14      DEPOSITION OF RUTH RYAN, taken
15   pursuant to stipulation and agreement before Tracye
16   Sadler, Certified Court Reporter and Commissioner
17   for the State of Alabama at Large, in the Law
18   Offices of Burr & Forman, 201 Monroe Street, Suite
19   1950, Montgomery, Alabama, on September 12, 2007,
20   commencing at approximately 1:15 p.m.
21
22      * * * * * * * * * * * * *
23

**Page 2**

1            APPEARANCES
2
3    ON BEHALF OF THE PLAINTIFF:
     Mr. Richard F. Horsley
4    GOOZEE, KING & HORSLEY, LLP
5    Suite 200
     Shades Brook Building
6    3300 Cahaba Road
     Birmingham, Alabama 35223
7
8
9    ON BEHALF OF THE DEFENDANT:

     Ms. Kathryn Morris Willis
10   Mr. Scott Williams
     BURR & FORMAN
11   Attorneys at Law
     3100 SouthTrust Tower
12   420 North 20th Street
     Birmingham, Alabama 35203
13
14
15
        * * * * * * * * * * * *
16
17
18
        EXAMINATION INDEX
19
20
     BY MR. HORSLEY . . . . . . . . . 4
21
22
        (No exhibits marked to this deposition )
23

**Page 3**

1              STIPULATIONS
2       It is hereby stipulated and agreed by and
3    between counsel representing the parties that the
4    deposition of RUTH RYAN is taken pursuant to the
5    Federal Rules of Civil Procedure and that said
6    deposition may be taken before Tracye Sadler,
7    Certified Court Reporter and Commissioner for the
8    State of Alabama at Large, without the formality of
9    a commission, that objections to questions other
10   than objections as to the form of the question need
11   not be made at this time but may be reserved for a
12   ruling at such time as the said deposition may be
13   offered in evidence or used for any other purpose
14   by either party provided for by the Statute.
15      It is further stipulated and agreed by and
16   between counsel representing the parties in this
17   case that the filing of said deposition is hereby
18   waived and may be used at the trial of this
19   case or used in any other manner by either party
20   hereto provided for by the Statute regardless of
21   the waiving of the filing of the same.
22      It is further stipulated and agreed by and
23   between the parties hereto and the witness that the

**Page 4**

1    signature of the witness to this deposition is
2    hereby not waived.
3
4       * * * * * * * * * * * *
5
6       THE COURT REPORTER:  Usual
7          stipulations?
8       MS. WILLIS:  Yes.  Read and sign.
9
10         RUTH RYAN
11      The witness, after having first been duly sworn
12   to speak the truth, the whole truth, and nothing
13   but the truth, testified as follows:
14         EXAMINATION
15   BY MR. HORSLEY:
16   Q.  Ms. Ryan, my name is Richard Horsley.  I
17      represent Robin Atwell in a lawsuit that's
18      been filed against SMART Alabama, LLC.
19      And, if you would, tell us your full name.
20   A.  My full name?
21   Q.  Yes, ma'am.
22   A.  Ruth Elizabeth Ryan.
23   Q.  Ruth Elizabeth Ryan?

Page 5

1    A.  Uh-huh (positive response).
2    Q.  Have you given a deposition before today?
3    A.  No.
4    Q.  I'm going to ask you some questions that
5        shouldn't take very long.  If I'm unclear
6        or you don't understand my question, just
7        tell me that and I'll try to ask it a
8        different way or rephrase it.  Once you
9        answer a question, I'm going to assume that
10       it's the answer that you intended to give;
11       okay?
12   A.  Okay.
13   Q.  What's your current residence address?
14   A.  Do you need a physical address?
15   Q.  Yes, ma'am.
16   A.  That would be
17   Q.  Greensboro?
18   A.  Greenville.  That's in Goshen, 36035.
19   Q.  36035.  Goshen, Alabama?
20   A.  Yes.
21   Q.  What county is that in?
22   A.  Pike County.
23          MS. WILLIS:  You can't ask me

Page 6

1          questions.  But I don't know.
2    A.  I think it's Pike County.
3    Q.  And where are you currently employed?
4    A.  With SMART Alabama, LLC.
5    Q.  In what capacity are you employed there?
6    A.  Employee relations manager.
7    Q.  All right.  You've never given a deposition
8        before today?
9    A.  No.
10   Q.  Have you ever been involved in a lawsuit
11       before either as a defendant or a
12       plaintiff?
13   A.  No.
14   Q.  Have you ever given testimony in a
15       courtroom for any reason?
16   A.  No.
17   Q.  All right.  How long have you worked for
18       SMART?
19   A.  The 26th, I believe, is going to be two
20       years.
21   Q.  26th of this month?
22   A.  Of this month.
23   Q.  And where were you -- have you been the

Page 7

1        employee relations manager the entire time
2        you've been with SMART?
3    A.  Yes.  Yes.
4    Q.  Who is your direct supervisor?
5    A.  I have Mr. Gin Roh and Gary Sport.
6    Q.  Jim ...
7    A.  Roh.  G-I-N.
8    Q.  Oh, Gin.  We talked about him earlier.
9    A.  Yeah.
10   Q.  And Gary Sport?
11   A.  Yes.
12   Q.  All right.  Where did you work immediately
13       before SMART?
14   A.  Keystone in Eufaula.
15   Q.  Chicken plant?
16   A.  Yes.  They like to be called poultry
17       industry.
18          (Off-the-record discussion.)
19   Q.  How long did you work for Keystone?
20   A.  I believe three months.
21   Q.  In what capacity were you employed there?
22   A.  I was employment manager.
23   Q.  Employment manager?

Page 8

1    A.  That's the title, yes.
2    Q.  And did you leave there voluntarily to go
3        to work for SMART?
4    A.  Yes.  I put two weeks' notice.
5    Q.  And where were you employed immediately
6        before Keystone?
7    A.  Wayne Farms.
8    Q.  In Pike County?
9    A.  No.  In Union Springs.
10   Q.  Union Springs.  Okay.
11   A.  Yes.
12   Q.  That's also a poultry plant?
13   A.  Yes.
14   Q.  In what capacity were you employed at Wayne
15       Farms?
16   A.  Employment coordinator.
17   Q.  And how long were you there?
18   A.  I believe almost three years.
19   Q.  Three years?
20   A.  About that time.
21          MS. WILLIS:  And I'm not trying to
22       instruct you.  But if you
23       say -- don't say uh-huh and

Deposition of Ruth Ryan                  Atwell vs. SMART Alabama                  September 12, 2007

Page 9

1   uh-uh if you can help it.
2   Just say yes or no because she
3   can't get it down. He
4   understands probably what
5   you're saying, but just try to
6   remember to do that.
7   THE WITNESS: The dates you mean?
8   MS. WILLIS: No. No. I'm just
9   saying when you answer a
10  question like uh-huh -- don't
11  say uh-huh or uh-uh if you can
12  help it.
13  THE WITNESS: Okay.
14  MS. WILLIS: It just makes it
15  easier for her to take it
16  down.
17  Q. She just means say yes or no rather than
18  uh-huh or uh-uh because it's hard for her
19  to type it.
20  MS. WILLIS: I mean, if you mean
21  yes, say yes. If you mean no,
22  say no.
23  THE WITNESS: I didn't even notice

Page 10

1   that I did it. I'm sorry.
2   MR. HORSLEY: No. That's okay.
3   Everybody does it. Everybody
4   does it.
5   MS. WILLIS: Everybody does it.
6   I do it sometimes on the
7   record, and then I have to go
8   back and correct myself.
9   MR. HORSLEY: Yeah. Everybody
10  does. It's no big deal.
11  Q. All right. You worked at Wayne Farms for
12  three years. Did you leave --
13  A. About three years.
14  Q. Did you leave there voluntarily to go to
15  Keystone?
16  A. Yes. I put two weeks' notice too.
17  Q. And then immediately before Wayne Farms
18  where were you employed?
19  A. Before that?
20  Q. Yes, ma'am.
21  A. There was a temp agency. I don't remember
22  right now the name. And I worked there for
23  almost a year.

Page 11

1   Q. Where are they located?
2   A. They were located -- they don't exist
3   anymore. They were located in Troy on
4   Three Notch Street. I can't remember the
5   name right now.
6   Q. That's downtown, isn't it?
7   A. Yes. Three Notch Street.
8   Q. Okay.
9   A. And I was their recruiting coordinator and
10  then the office.
11  Q. How long were you there?
12  A. About a year.
13  Q. You left there voluntarily to go to Wayne
14  Farms?
15  A. Yes.
16  Q. And before the temp agency where were you
17  employed?
18  A. I was self-employed.
19  Q. In what capacity?
20  A. I did flower arrangements and designs and
21  things like that.
22  Q. Okay. Was that business incorporated?
23  A. I was -- in Florida that was a former

Page 12

1   business. Here I was just trying to start
2   it.
3   Q. And what was the name of that business?
4   A. Living Silk.
5   Q. Living Silk?
6   A. Uh-huh (positive response).
7   Q. And you started that in Florida?
8   A. Yeah.
9   Q. And then while you were still doing that
10  business, you moved to Alabama, I take it?
11  A. I closed everything and we moved to Alabama
12  for a business with my husband, yeah.
13  Q. And where did you live in Florida?
14  A. Ft. Lauderdale.
15  Q. Were you employed down there anywhere other
16  than in the flower business?
17  A. Books-a-Million.
18  Q. Books-a-Million. What did you do there?
19  A. I started as a cashier and a floor person.
20  That's what I call it. And ended up being
21  department manager.
22  Q. Okay. How long did you work at
23  Books-a-Million?

Deposition of Ruth Ryan                    Atwell vs. SMART Alabama                    September 12, 2007

Page 13

1    A.  I believe all together about five or six
2         years.
3    Q.  And then where were you employed
4         immediately before that?
5    A.  Before that I -- I baby-sitted a little bit
6         and I was -- yeah, I was doing
7         baby-sitting.
8    Q.  What's your educational background?
9    A.  I have a -- what is comparable here to a
10        bachelor in sales and marketing.
11   Q.  And where is that from?
12   A.  Chile, my country.
13   Q.  Chile?
14   A.  Uh-huh (positive response).  Oh, I'm
15        sorry.  Yes.
16   Q.  That's fine.  So you were --
17   A.  I'm originally from Chile.
18   Q.  How old were you when you moved to the
19        States?
20   A.  28 years old.
21   Q.  Any other jobs you've held in America other
22        than the ones you've told me about?
23   A.  The ones that I remember, yeah.

Page 14

1    Q.  And other than your husband, do you have
2         any other relatives over 19 that live in
3         Alabama?
4    A.  Yes, I do.  My parents.
5    Q.  What are their names?
6    A.  Yolanda Cruz, C-R-U-Z, Jorge Carter, and
7         his family, my husband's family.
8              You mean immediate relatives?  I'm
9         sorry.
10   Q.  Well --
11             MS. WILLIS:  He doesn't want your
12             relatives on a jury which is
13             why he's asking you these
14             questions.
15   Q.  Yeah.  Do you have a lot of relatives in
16        Alabama that are over 19?
17   A.  My husband's family only.
18   Q.  Okay.  Just when you get a chance, get a
19        list --
20   A.  But there are not very many.  But I will
21        give the list to her.
22   Q.  Just give the list to her and she will give
23        it to me.

Page 15

1         Never been arrested for any reason?
2    A.  No.
3    Q.  All right.  According to our records Robin
4         Atwell was first employed with SMART
5         Alabama, LLC, in August of 2005.
6    A.  Uh-huh (positive response).
7    Q.  Did you participate in any way in hiring
8         Robin Atwell?
9    A.  No.
10   Q.  You didn't interview her or conduct any
11        face-to-face meetings with her prior to the
12        time she became an employee?
13   A.  No.
14   Q.  From the time she became employed at SMART,
15        which was in August, until the second week
16        in November she was an assembly
17        technician.  During that period of time, if
18        you recall, from August 2005 through
19        November the 13th, 2005, do you recall
20        having any meetings with Robin Atwell about
21        any problems that she was having at work?
22   A.  No, not that I recall.
23   Q.  Did you know her personally during that

Page 16

1         period of time?  Do you recall?
2    A.  No.
3    Q.  If you passed each other in the plant,
4         would you have known her name at that time?
5    A.  No.
6    Q.  Again, focusing on that time period from
7         August of 2005 through November 13th, 2005,
8         were you aware that she was being
9         disciplined or reprimanded for anything she
10        had done at work?  Did you hear anything
11        about that?
12   A.  This is all 2005; is that correct?
13   Q.  Yes, ma'am.
14   A.  No.
15   Q.  How long have you been at SMART?  I know
16        you told me this, but --
17   A.  Almost two years.
18   Q.  Two years.  Okay.  So when you became an
19        employee -- or when you became the human
20        resources -- or human relations --
21             MS. WILLIS:  No, that's not who
22             she is.
23   Q.  Tell me again what your job title is.

4 (Pages 13 to 16)

Page 17

1    A.  Employee relations manager.
2    Q.  Employee relations manager.  When you
3        became the employee relations manager
4        approximately two years ago, Rance Maddox
5        had already been employed there for a time
6        as the safety manager or director; is that
7        correct?
8    A.  That's correct.
9    Q.  From the time that you became employed
10       there -- well, let me ask you this:  Was
11       Robin Atwell already there when you became
12       an employee?
13   A.  Yes.
14   Q.  From the time you became an employee in
15       2005 up until, again, November the 13th --
16       and I'm using that date because that's the
17       date that Robin was transferred from the
18       technician position to the safety office;
19       okay?
20   A.  Uh-huh (positive response).
21   Q.  And so from the time you became employed
22       until November the 13th, were you ever made
23       aware of any employee leveling any type of

Page 18

1        sexual harassment complaints against Rance
2        Maddox?
3    A.  No.
4    Q.  Do you recall having any employees come to
5        you during that period of time with any
6        complaints about Rance Maddox that you
7        recall?
8    A.  We're talking still 2005?
9    Q.  Yes, ma'am.  From the time you became
10       employed, you know, through the second week
11       in November.
12   A.  No.
13   Q.  Okay.
14   A.  I don't recall any.
15   Q.  So is it fair to say that from your
16       standpoint from the time you became
17       employed there through November 13th of
18       2005 you were not aware of any conflicts or
19       problems between Robin Atwell and Rance
20       Maddox?
21           MS. WILLIS:  Object to the form.
22           You can answer.
23   A.  So you're asking me if I was aware during

Page 19

1        that time that they had any kind of
2        conflict?
3    Q.  Yes, ma'am.
4    A.  Is that the question?
5    Q.  Yes, ma'am.  Were you made aware of any
6        type of conflict or problems between those
7        two individuals from August -- or from the
8        time you became employed there until the
9        second week in November of '05?
10   A.  The second week of November of '05 was the
11       time that she was transferred to -- or just
12       transferred to the safety office.  And, no,
13       I was not aware of any conflict.
14   Q.  Yeah.  We're talking about the period of
15       time before she got transferred.  No
16       problems that you're aware of between those
17       two?
18   A.  That I know of, no.
19   Q.  Now, let's now talk about the period of
20       time after which she was transferred to the
21       safety office, which my understanding was
22       November the 14th of 2005.
23   A.  Okay.

Page 20

1    Q.  From November the 14th through -- from
2        November the 14th, 2005, until December
3        31st, the end of the year, okay, 2005, do
4        you recall having any discussions with
5        Robin Atwell specifically concerning Rance
6        Maddox?
7    A.  In what manner?  What kind of discussions?
8    Q.  Anything you can recall where y'all
9        discussed Rance Maddox.
10           MS. WILLIS:  From November to the
11           end of the year.
12   A.  Until December 31st?
13   Q.  Yes, ma'am.
14   A.  No.
15   Q.  Okay.
16   A.  Not that I can recall.
17   Q.  So as you sit here today you don't recall
18       any discussions in 2005, the year, that you
19       and Robin Atwell had concerning Rance
20       Maddox?
21   A.  Not specifically concerning to him, no, I
22       don't recall any of that.
23   Q.  During that same period of time do you

Deposition of Ruth Ryan                    Atwell vs. SMART Alabama                    September 12, 2007

Page 21

1    recall having any discussions with Robin
2    Atwell about any problems she was having
3    with any other employees other than Rance
4    Maddox?
5    A.  No, not that I can recall.
6    Q.  And just so we're clear on the record, you
7    said earlier when you first got there you
8    wouldn't have known -- or y'all didn't know
9    each other to talk to each other?
10   A.  No.
11   Q.  But today you do know who Robin Atwell is;
12   is that correct?
13   A.  Yes, I do.
14   Q.  If she were here today you would recognize
15   her?
16   A.  Yes, I would.
17   Q.  Okay.  The same with Rance Maddox.  You
18   know Mr. Maddox?
19   A.  Yes, I would.  Yes, I know him.
20   Q.  All right.  During the year 2005, other
21   than -- you've already said you don't
22   recall Robin Atwell complaining about Rance
23   Maddox in 2005.  Do you recall any

Page 22

1    employees complaining to you about Rance
2    Maddox concerning anything?
3           MS. WILLIS:  In 2005?
4    Q.  In 2005.
5    A.  No.
6    Q.  All right.  Let's go now to -- I hate to
7    make you go in compartments --
8    A.  The date is --
9    Q.  -- but that's just kind of the way we have
10   to do it.
11   A.  That's okay.
12          MS. WILLIS:  It's sometimes the
13          easier way.
14   Q.  Let's go now to 2006.
15   A.  Uh-huh (positive response).
16   Q.  And just in case you need a watermark, I
17   think that Robin's last day that she worked
18   at SMART was February the 7th, 2006.
19   A.  Uh-huh (positive response).
20   Q.  So let's start at January 1 and we're going
21   to go until the last day she worked; okay?
22   A.  Uh-huh (positive response).
23   Q.  From January 1, 2006, until February 7,

Page 23

1    2006, do you recall having any discussions
2    with Robin Atwell specifically concerning
3    Rance Maddox?
4    A.  Yes.
5    Q.  Were there numerous conversations or can
6    you give me a number?
7    A.  I recall one very specific conversation
8    with her.
9    Q.  And approximately when would that have
10   taken place?
11   A.  It would have been between those dates.
12   Q.  So it would have been sometime between --
13   A.  Close to the last period that she worked.
14   Q.  It would have been sometime between January
15   1st, 2006, and February the 7th, 2006,
16   closer to February 7th, 2006?
17   A.  Closer, yes.
18   Q.  And tell me, first of all, what
19   precipitated that meeting.  What was the
20   reason for that discussion?
21   A.  She looked upset as I saw her in the
22   hallway, and I asked her -- I believe
23   that's what I did.  I asked her what was

Page 24

1    wrong.
2    Q.  How did she look upset to you?
3    A.  She -- she normally smiled a lot, and she
4    wasn't smiling.
5    Q.  Okay.
6    A.  And I believe that's what triggered that.
7    And she --
8    Q.  Was she crying or just not smiling?
9    A.  She -- she wasn't smiling.  She looked
10   troublesome.  She -- she wasn't happy.
11   Q.  Okay.
12   A.  And she told me she needed to speak with me
13   and --
14   Q.  Let me ask you this just so we're clear.
15   Had y'all had the opportunity before that
16   point to actually meet each other and get
17   to know one another?
18   A.  Several times.  I saw her in the safety
19   office several times if that's the
20   question, yes.
21   Q.  So by the time you saw her in the
22   hallway --
23   A.  I could recognize her, yes.

Page 25

1  Q.  -- you knew her and you knew her well
2       enough to know that she normally looked
3       happy?
4  A.  Yeah.  Yeah.
5  Q.  All right.  Go ahead.  I'm sorry.  You saw
6       her and she looked upset in the hallway.
7       What happened after that?
8  A.  From what I recall we sat down in the
9       Lincoln room.
10  Q.  The Lincoln room?
11  A.  Lincoln room.
12  Q.  What's that?  Just a meeting room?
13  A.  It's one of the meeting rooms.  We call
14       them Lincoln and --
15           MS. WILLIS:  They're all named
16               after presidents.
17  A.  It's very special.  You need to come and
18       see.
19  Q.  I may have to do it.
20  A.  Very special.
21           Anyway, and she told me that she was
22       upset because Rance had touched her
23       inappropriately -- according to her it was

Page 26

1       inappropriate.
2  Q.  So you're saying that he -- she was
3       complaining that he had touched her
4       inappropriately?
5  A.  Exactly.  And I asked where or how.  And
6       she said in the shoulders.  And so -- and
7       she said -- and I -- I believe she said
8       I -- I don't like that.  And I said, okay,
9       did someone witness this?  And she said,
10       yeah, Colinda Porter, which is a coworker
11       in the same office.
12  Q.  Let me ask you something quickly.  When she
13       said he touched her on her shoulders, did
14       she just say he touched me on my shoulders
15       or did she explain it any further than
16       that?
17  A.  She said he touched me on my shoulders.
18  Q.  She didn't indicate that he went down the
19       front of her chest or anything like that?
20  A.  I don't recall that he -- she would say
21       anything on those lines.
22  Q.  Well, why --
23  A.  She was upset because she said that she

Page 27

1       didn't like that, that he put his hands on
2       her shoulders --
3  Q.  Why --
4  A.  -- and she didn't appreciate that.
5           MS. WILLIS:  Answer his question.
6  Q.  Why did you ask her if anyone witnessed it?
7  A.  Because in order to validate or to verify
8       the situation, it's common that I ask if
9       there's any witness to any situation.
10  Q.  Are you aware or were you aware back then
11       of any policy or regulation at SMART that
12       required a witness in order to validate a
13       sexual harassment claim?
14           MS. WILLIS:  Object to the form.
15               You can answer.
16  A.  I don't believe that it is a validation.
17       It's to try to find or to define, to
18       understand exactly what took place.  And
19       that's why I was looking to see if someone
20       else saw it too.
21  Q.  Was that the first question that you asked
22       her?
23  A.  I asked her what happened, and then she

Page 28

1       told me.  And she was upset.  And I said,
2       did anybody see this?  And she said -- I
3       believe she said Colinda.  And I tried to
4       comfort her and explained that I would
5       investigate the situation.
6  Q.  Anything else you recall during that
7       meeting in the Lincoln room?
8  A.  I wanted her to be okay.
9  Q.  Did you say anything else to her other than
10       I'll investigate it?
11  A.  I don't recall anything else.
12  Q.  Do you recall her saying anything else to
13       you other than he touched me on the
14       shoulders and that Colinda saw it?
15  A.  I don't recall anything else honestly.
16  Q.  At any point --
17  A.  I'm sorry.
18  Q.  That's okay.  At any point during that
19       discussion did she begin to cry?
20  A.  She seemed very upset, and I believe she
21       was -- she had tears in her eyes.
22  Q.  And, again, so we're clear, today all you
23       can tell me is that she told you that he

Deposition of Ruth Ryan                    Atwell vs. SMART Alabama                    September 12, 2007

Page 29

1   had touched her on her shoulders, she
2   didn't like that, and that she thought
3   Colinda had seen it?
4   A.  She told me Colinda had seen it, not that
5   she thought.  She told me Colinda had seen
6   it.
7   Q.  And that's it.  That's all y'all
8   discussed?
9   A.  As far as I remember, that's correct.
10  Q.  And as far as you remember she was in tears
11  at some point during that conversation?
12  A.  She was upset.  She was visibly upset.
13  Q.  Well, tell me -- and, again, that occurred
14  sometime between January 1st and
15  February 7th?
16  A.  Uh-huh (positive response).
17  Q.  Tell me what you did subsequent to that
18  meeting in relation to what she had told
19  you.
20  A.  To the best of my recollection I left the
21  room and I went to find Miss Colinda to try
22  to see what really took place.  And for
23  some reason I didn't get to meet with her

Page 30

1   until the following day.  And it was my
2   understanding that Miss Robin left that
3   day.  The following day I met with Colinda
4   and she explained to me what happened.
5   Q.  And your purpose for seeking to find and
6   speak with Colinda was to find out what
7   really happened is what you said; is that
8   correct?
9   A.  What happened in the whole situation.
10  Q.  All right.  And you didn't find her that
11  day, but you met with her the following
12  day?
13  A.  Yeah.
14  Q.  Where did that meeting take place?
15  A.  I don't recall what room I used.
16  Q.  Washington?  Adams?  Jefferson?
17  A.  I honestly don't remember what room I used.
18          MS. WILLIS:  Was it in a
19          conference room?
20  A.  It was in a conference room because it is
21  the only place that is closed.
22  Q.  Okay.  And tell me about that
23  conversation.  What did you ask Colinda?

Page 31

1   A.  I asked Colinda how was she doing.  And
2   then I asked her -- I explained to her --
3   no.  I asked her to tell me what happened
4   with Robin the day before, if anything
5   happened.  And --
6   Q.  Is that specifically what you said?
7   A.  I believe those were my words.  I don't
8   recall exactly my words with her.  But I
9   asked her to explain to me if she had seen
10  Mr. Maddox touching Robin in any way.
11  Q.  Okay.
12  A.  And she said that they were all seated in
13  the office -- this is to the best of my
14  recollection -- and Mr. Maddox was seated
15  in his side of the office.  Colinda sits in
16  the middle and Miss Robin sits in the end
17  of this big wide open office.  And she said
18  that Robin was typing something in the
19  computer.  Robin is facing the wall, the
20  side with her computer, and he's facing
21  both of them with his computer.  And all of
22  a sudden Robin said, I did it.  I finally
23  did it.  And so it moved the attention to

Page 32

1   her.  And Rance asked what did you do?  And
2   she said I finally entered a case in the
3   OSHA 300.
4   Q.  All right.
5   A.  This is Ms. Porter explaining.
6   Q.  Right.
7   A.  And then Mr. Maddox stood up and walked to
8   her desk and looked at her computer and --
9   now, Ms. Porter is observing all this --
10  and saw that she had entered this in the
11  OSHA 300 and put his hand on the shoulders
12  and said great job.  And she turned around
13  and laughed and they all laughed and
14  Colinda laughed with them, thought it was
15  great that she had finally done the task.
16  And Mr. Maddox left the room and that was
17  the end of it.  And then maybe 10 or 20
18  minutes Ms. Davis -- that's how I knew her.
19  I'm sorry.
20  Q.  Well, I mean, Robin --
21  A.  Robin Davis, yeah.
22  Q.  Okay.
23  A.  She stood up and left the room.  And that's

8 (Pages 29 to 32)

Page 33

1   all she knows.
2   Q.  Did she indicate that Robin was upset when
3       she left the room?
4   A.  Not whatsoever.  They were all laughing and
5       they were very happy.  Not whatsoever.
6   Q.  Okay.
7   A.  I asked if there's any other incidents and
8       situations and she said no.
9   Q.  That she had seen?  You asked her if she
10      had seen anything else?
11  A.  If she had seen anything else and no.
12  Q.  At the time you met with her was she
13      working for Rance also?
14  A.  Yeah.
15         MS. WILLIS:  Are you talking about
16         Colinda?
17         MR. HORSLEY:  Colinda.  I'm
18         sorry.
19  A.  Oh, I'm sorry.
20  Q.  Colinda was working for Rance at that
21      time?
22  A.  Yes.
23  Q.  All right.  Anything else that was said

Page 34

1   during that meeting that you can recall?
2   A.  In reference to that, that's -- oh, she
3       mentioned, also, that he was -- it was
4       common for them to touch a hand or the
5       shoulder, on the face, things like that.
6   Q.  Okay.  Colinda told you that it was common
7       for them to --
8   A.  For -- especially for Robin.  Robin was a
9       very friendly person, that she didn't see
10      anything wrong with touching someone in the
11      shoulders or on the arm or in the face and
12      things like that.
13  Q.  All right.  And then that meeting is over,
14      and what did you do next, if anything,
15      related to this?
16  A.  I went to look for Miss Robin to try to
17      share with her my findings on the situation
18      and to comfort or to clarify the situation,
19      and I couldn't find her.  I was told that
20      she had left.
21  Q.  And this was the day after supposedly
22      the --
23  A.  The day after the incident.

Page 35

1   Q.  And were you ever able to speak with her
2       about it?
3   A.  No.  I was -- I looked for her within a few
4       days.  And, no, I did not.  I was not able
5       to speak with -- you're talking about
6       Robin?
7   Q.  Yes, ma'am.
8   A.  Yes.  No.
9   Q.  And did she ever come back to work after
10      that?
11  A.  I don't recall seeing her after that.
12  Q.  Did you ever attempt to call her at home or
13      have any further discussions with her about
14      it?
15  A.  No, I did not.
16  Q.  So the meeting you and Robin had in the
17      Lincoln room was the first and last meeting
18      that y'all had concerning Rance Maddox?
19  A.  About that incident, yes.
20  Q.  Yes, ma'am.  Okay.  Did y'all have any
21      meetings about any other incidents that you
22      recall?
23  A.  Not incidents, no.

Page 36

1   Q.  And I don't know how to put this in a time
2       frame because I don't know when y'all may
3       have met.  But do you independently today
4       recall any meetings that you had by
5       yourself with Robin Atwell about anything?
6   A.  Casual conversations.
7   Q.  Yeah.
8   A.  She would talk about -- as we're making
9       copies and the -- there's two common copy
10      machines.  Just casual conversations, how
11      everything was going and things like that.
12  Q.  Did you do anything else to investigate
13      Ms. Atwell's allegations?
14  A.  After I met with Miss Colinda?
15  Q.  Uh-huh (positive response).
16  A.  No.  I needed to meet -- I was planning to
17      meet with Miss Robin.  No.
18  Q.  That's your testimony today that that's all
19      you did pursuant to her allegations; is
20      that correct?
21  A.  Yeah, that's correct.
22         (Brief interruption.)
23  Q.  Okay.  It looks like we've got Plaintiff's

Deposition of Ruth Ryan                    Atwell vs. SMART Alabama                    September 12, 2007

---

Page 37

1    Exhibit 1, 2, 3, and 5. There was an
2    exhibit that I marked in Gary's
3    deposition. I don't remember what number
4    it was, but it was SMART's position
5    statement pursuant to Robin Atwell's EEOC
6    charge.
7         MS. WILLIS: Plaintiff's
8         Exhibit 4.
9    Q.  It was Exhibit 4 to Mr. Sport's
10   deposition. Have you ever seen that
11   document before?
12   A.  Yes.
13   Q.  Okay. Did you -- I don't want to know what
14   you discussed with attorneys, but did you
15   help in preparing that document?
16   A.  No.
17   Q.  You did not?
18   A.  No.
19   Q.  Did anybody ask you questions -- when have
20   you seen this?
21   A.  When you say help, what do you mean by
22   that? I'm sorry.
23   Q.  Did you contribute information to anyone in

---

Page 38

1    order to prepare this document?
2    A.  I was asked a question by the attorney.
3    Q.  Anybody else?
4    A.  No. The attorney was the one who was doing
5    the questioning.
6    Q.  Any information in Plaintiff's Exhibit 4 --
7    A.  What is Exhibit 4?
8    Q.  It's what we just looked at.
9    A.  Okay. I'm sorry.
10   Q.  Any information in Plaintiff's Exhibit 4
11   that pertains to you would have been
12   information that you contributed to your
13   attorney; correct -- or to SMART's
14   attorney; is that fair?
15   A.  Information that could be in that
16   exhibit --
17   Q.  Is simply what you told the attorneys?
18   A.  What I knew that I told -- yeah.
19   Q.  Okay. Did you review this document in its
20   completed form before it was sent back to
21   the EEOC?
22   A.  No. The first time I reviewed was
23   yesterday.

---

Page 39

1         MR. HORSLEY: Okay. Let's see.
2         We're missing --
3         MS. WILLIS: 1 we've got. 2 we've
4         got. 3 we've got. 4 was the
5         position statement we're
6         missing.
7         MR. HORSLEY: 5 we've got.
8         MS. WILLIS: 5 was the charge and
9         we've got it. 6 was the AIDT
10        manual.
11        MR. HORSLEY: Okay. We don't have
12        that.
13        MS. WILLIS: 7 was the sex
14        harassment policy itself,
15        which is that which is in
16        front of you.
17        MR. HORSLEY: Okay. He took the
18        marked one.
19        MS. WILLIS: He took the marked
20        one. And then 8 was the
21        personnel file information for
22        Rance Maddox.
23        MR. HORSLEY: And apparently he

---

Page 40

1         took that one also.
2         MS. WILLIS: Do you mind if I stop
3         right now and at least let him
4         know that he's done it?
5         MR. HORSLEY: No. That's fine.
6         (Off-the-record discussion.)
7    Q.  Okay. Now, Ms. Ryan, you've already told
8    me everything that you said to Robin or
9    that she said to you in the meeting in the
10   Lincoln room; is that correct?
11   A.  To the best of my recollection.
12   Q.  She didn't ask you for a transfer during
13   that meeting, did she?
14   A.  I don't recall in that specific moment that
15   she would have said that. I don't recall
16   that she would have said that she wanted a
17   transfer.
18   Q.  You never met with Gary Sport and told him
19   that she wanted a transfer, did you?
20   A.  We discussed with -- in the casual
21   conversation with Ms. Davis.
22   Q.  Atwell is Davis just so that's clear?
23   A.  I'm sorry. Yes.

---

Deposition of Ruth Ryan                Atwell vs. SMART Alabama                September 12, 2007

Page 41

1   MS. WILLIS: And she tends to say
2   Davis.
3   MR. HORSLEY: That's fine.
4   A.  I try to remember the other one.
5       And that she wanted to transfer. And I
6   think I had mentioned that at some point to
7   Mr. Gary that she wishes to transfer.
8   There was -- yeah. She mentioned she
9   wanted to transfer but in an informal way,
10  like when we talk at -- making copies or
11  going back and forth and -- to the QC
12  department.
13  Q.  And what reason did she give you that she
14  wanted a transfer?
15  A.  She was working a lot of hours. They were
16  working a lot of hours.
17  Q.  Your testimony is that she told you she
18  wanted a transfer to decrease her hours?
19  A.  They -- they were working in different
20  schedules, and she wanted to have -- you
21  know, I'm saying what I think --
22  Q.  Right.
23  A.  -- a more -- schedule more, I guess --

Page 42

1   Q.  Flexibility?
2   A.  I guess she had more flexibility then
3   because they were calling her in different
4   times from being in the safety department.
5   But I guess the schedule was too -- it was
6   hard on her.
7   Q.  So is it your testimony today that she
8   asked you for a transfer because she didn't
9   like the schedule that she was working?
10  A.  The schedule. And there was a lot of
11  traffic also in the safety office. There's
12  a lot of work.
13  Q.  Other than your discussion in the Lincoln
14  room with Ms. Davis -- Atwell-Davis and
15  your discussion with Colinda, did you have
16  any other discussions with any other
17  employees about Rance Maddox's behavior?
18  A.  Not that I can recall.
19  Q.  Okay. This document was marked as
20  Plaintiff's Exhibit Number 1 to Gary
21  Sport's deposition. And I'm going to ask
22  you --
23      MS. WILLIS: Why don't you read

Page 43

1   through that.
2   Q.  -- if you've ever seen that. And go ahead
3   and read through it and then we'll talk
4   about it.
5       Have you ever seen that document?
6   A.  Yesterday, yes.
7   Q.  You're saying that yesterday was the first
8   time you've seen that?
9   A.  Yes, sir.
10  Q.  Did you ever tell Robin Atwell to write
11  down her complaints about Mr. Maddox and
12  submit them to some other part of the
13  office?
14  A.  I don't recall telling her to write down
15  complaints against Mr. Maddox. I recommend
16  anybody to write down information all the
17  time.
18  Q.  Pursuant to sexual harassment complaints at
19  SMART, do y'all not have forms that are to
20  be completed when an employee alleges
21  sexual harassment against another employee?
22      MS. WILLIS: Object to the form.
23      You can answer.

Page 44

1   A.  We don't have specifically a form. We have
2   a -- well, the open door policy states that
3   they come to -- they go to their
4   supervisor -- immediate supervisor with the
5   complaint and they come to HR. And when
6   they come to HR, then we receive the
7   complaint in a written format or in a
8   verbal format.
9   Q.  Do you recall Robin Atwell ever asking you
10  for a form to complete?
11  A.  I don't recall that.
12  Q.  But it's your testimony that that letter
13  marked as Plaintiff's Exhibit Number 1
14  never made it to you while this was going
15  on?
16  A.  No, sir.
17  Q.  Did you ever refer Robin Atwell to a
18  Dr. Tompkins, a counselor?
19  A.  Dr. Tompkins?
20  Q.  Yes, ma'am.
21  A.  As in medical doctor?
22  Q.  Psychologist.
23  A.  Dr. Tompkins is a general medical doctor

Page 45

1    who is -- was serving then as our worker's
2    comp doctor. As a matter of fact, it's her
3    doctor.
4    Q. Did you ever tell her to go see him after
5    what she reported to you about Rance
6    Maddox?
7    A. No.
8    Q. I think you've already said this. After
9    she -- after you couldn't find her the
10   following day --
11   A. That's right.
12   Q. -- you haven't seen her nor spoken with her
13   since?
14   A. I have not spoken with her, no.
15   Q. And that was the extent of your
16   investigation into these allegations,
17   speaking with her --
18   A. I was informed later -- I'm sorry.
19   Q. -- speaking with her and Colinda?
20   A. Uh-huh (positive response).
21   Q. Is that correct?
22   A. Uh-huh (positive response).
23   Q. Yes?

Page 46

1         MS. WILLIS: Yes or no.
2    A. Yes. I'm sorry.
3    Q. All right. And sometime in late February
4    it's my understanding that Rance Maddox
5    left SMART; is that correct?
6    A. Uh-huh (positive response). Yes.
7    Q. And what were the circumstances for his
8    departure from SMART?
9    A. I was not involved in the exact reason of
10   why he left, but he resigned. My
11   understanding -- I'm sorry. He quit. That
12   was my understanding.
13   Q. And you never met with him about the
14   reasons why he was quitting or talked with
15   him about that?
16   A. I spoke with him when he returned to bring
17   his uniforms. And I asked him how he was
18   doing, and he said he was doing better.
19   And his uniforms were there. He looked
20   pleasant. And we didn't engage in any
21   other conversation of what are you going to
22   do now, et cetera. That was that.
23   Q. And based upon what you've told me in this

Page 47

1    deposition, it's my understanding you've
2    never discussed Robin Atwell's allegations
3    with Mr. Maddox?
4    A. I did not.
5    Q. While Rance was still employed at SMART,
6    were you ever made aware of an incident
7    between him and Cathy Caldwell?
8         Do you know who Cathy Caldwell is?
9    A. He was a -- she was -- I'm sorry -- a
10   security guard.
11        No. It was after she departed, and I
12   guess it -- within the time frame a
13   document was in my desk about a situation
14   in that regard.
15   Q. Okay.
16   A. So it would have been between that frame.
17   So the answer would have been, I guess,
18   yes.
19   Q. Yeah. I think my question was before Rance
20   Maddox left SMART.
21   A. Yeah.
22        MS. WILLIS: Not before Robin --
23   Q. Yeah. Are you aware of an incident that

Page 48

1    took place between he and Cathy Caldwell?
2    A. Yes.
3    Q. All right. Tell me --
4    A. Not the incident. I was aware that there
5    was a situation and -- but it was a note on
6    my desk.
7    Q. And is that the first time you became aware
8    of that incident?
9    A. Yeah, that was the first time.
10   Q. And what do you recall the note saying?
11        Was it a handwritten note?
12   A. I believe it was. Something along the
13   lines that Mr. Maddox had kissed her.
14   Q. It was a handwritten note from her; right?
15   A. I believe so. I believe so.
16   Q. And what did you do as a result of that?
17   A. I went to -- I went immediately to the
18   safety -- sorry -- to the security
19   department to locate her, and she was no
20   longer there. And then I asked the
21   security to please call her at home, and
22   she was not answering. And we -- I was
23   informed that she had quit.

Deposition of Ruth Ryan        Atwell vs. SMART Alabama        September 12, 2007

Page 49

1   Q. And you never spoke directly with her
2      about --
3   A. No. Never. I wish to have had the
4      opportunity.
5   Q. And did you meet with Rance Maddox about
6      this?
7   A. No. That was presented to Mr. Gary.
8   Q. Is it your understanding that Gary met with
9      Rance about this?
10   A. It's my understanding that he was handling
11      it.
12   Q. Did you ever have a discussion with Gary
13      after this to determine what the results of
14      that meeting were?
15   A. No.
16   Q. So you don't know if her allegations were
17      confirmed or not; is that correct?
18   A. I'm sorry. I'm moving my head. No, I
19      don't.
20   Q. You don't know the results of that meeting?
21   A. I don't know.
22   Q. Do you know whether or not Mr. Maddox's
23      departure had anything to do with two

Page 50

1      sexual harassment complaints made against
2      him in the month of February of 2006?
3          MS. WILLIS: Object to the form.
4          You can answer.
5   A. I don't know what two sexual harassment
6      complaints you're referring to, sir.
7   Q. Well, I'll be -- the allegation that you
8      received from Robin Atwell that he had
9      touched her on the shoulders and she
10      didn't like it and then the allegations
11      that were on your desk that he had kissed
12      Cathy Caldwell.
13   A. Okay.
14   Q. Those are two allegations, and I'm
15      asking -- I'm assuming they both occurred
16      in -- well, let's just say 2006, January
17      and February. Are you aware if those two
18      allegations against him had anything to do
19      with his quitting or resignation?
20   A. Ms. Davis' claim was that she was
21      uncomfortable with him having touched her
22      on the shoulders inappropriately to her
23      position. My position was to investigate

Page 51

1      if that was inappropriate in fact. So --
2          MS. WILLIS: Let me stop you
3          there. I think his question
4          is do you know -- and,
5          Richard, you can ask it
6          again -- if Robin's allegation
7          about him touching her
8          shoulders and Cathy
9          Caldwell's -- the note you got
10          about -- or was on your desk
11          about Cathy Caldwell having
12          been kissed have anything to
13          do with Rance leaving the
14          company.
15   A. No, I don't know.
16   Q. You don't know?
17   A. No.
18          MS. WILLIS: Sorry.
19          MR. HORSLEY: No. That's fine.
20   Q. Did the fact that he had been accused twice
21      in less than two months by two separate
22      females prompt you or Gary Sport to do any
23      further investigation of Mr. Maddox?

Page 52

1   A. Mr. Maddox?
2   Q. Yeah. I mean -- yeah, Mr. Maddox. I'm
3      sorry.
4   A. That's okay. Mr. Maddox -- the safety
5      department was -- it is a very difficult
6      department. So there was a lot of things
7      that -- that were, I guess, going on at the
8      same time. But your question is did I --
9      can you repeat that again?
10   Q. Sure.
11   A. I'm lost.
12   Q. Did the fact that --
13   A. There were two accusations you say?
14   Q. I'll ask it again.
15      Did the fact that Mr. Maddox had two
16      separate females make two separate
17      allegations that could constitute sexual
18      harassment against him within less than two
19      months prompt you or Mr. Sport to do any
20      further investigation of Mr. Maddox?
21   A. Again, Mr. Gary Sport was counseling with
22      him. But what we found with Robin Davis --
23      whatever is her last name, I'm sorry -- was

Page 53

1   that her allegation of inappropriate touch
2   was not necessarily inappropriate other
3   than to her position. So it would have
4   been with the other situation, but Mr. Gary
5   is the one that was taking care of that.
6   My findings were the other one.
7   Q. Do you know if there were any witnesses to
8   the Cathy Caldwell incident?
9   A. I asked and they told me none.
10   Q. None?
11   A. Yeah.
12   Q. Have you talked with Rance Maddox at all
13   for any reason since he left SMART?
14   A. No.
15   Q. Have you and Gary Sport talked to each
16   other about Robin Atwell's allegations
17   against Mr. Maddox outside the presence of
18   an attorney at any time?
19   A. I believe I was made aware that she was
20   presenting a complaint.
21       MS. WILLIS: Richard, I don't mean
22       to interrupt. Do you -- I was
23       going to take a quick bathroom

Page 54

1   break, but if you're --
2       MR. HORSLEY: I'll be through in
3       ten minutes.
4       MS. WILLIS: That's fine. I'll
5       wait.
6   Q. In response to some interrogatories,
7   questions that I sent to SMART, I think
8   there was an answer that there haven't been
9   any other sexual harassment allegations at
10   the plant in the last couple of years.
11   Today are you aware of any other females
12   that have made sexual harassment
13   allegations against any other employees at
14   the SMART plant in the last two years?
15   A. That's in a -- the general scope, not
16   individual, not --
17   Q. Has anybody reported to you that a female
18   claims to have been sexually harassed by
19   some other employee?
20   A. Yeah. In different ways, yeah.
21   Q. Okay.
22   A. And not just females.
23   Q. Males complaining about females or --

Page 55

1   A. Koreans, Hispanics.
2   Q. Okay. I guess my understanding from the
3   answers to the interrogatories is that none
4   of those claims have resulted in a lawsuit
5   to your knowledge; is that correct?
6   A. That's right, not that I know of. That's
7   right.
8       MS. WILLIS: Can we go off for a
9       second?
10       MR. HORSLEY: Yeah.
11       (Off-the-record discussion.)
12   Q. Did you ever meet with Lisa Bodiford about
13   Robin Atwell's claims?
14   A. No.
15   Q. Did you ever meet with Wendy Burgans?
16   A. I was requested under the lawyer to get
17   information.
18   Q. Did you speak with Wendy Burgans outside
19   the presence of an attorney?
20   A. No.
21   Q. No?
22   A. No. I asked her to -- let me recall that.
23   In writing a statement -- I really don't

Page 56

1   recall if I -- if I was present or not.
2   But I believe that I was asked to get that
3   information for our lawyer.
4   Q. Did she give a statement to your knowledge?
5   A. Yeah.
6   Q. A written statement?
7   A. No, she did not.
8   Q. All right. Do you know what she said?
9   A. I don't want to make things up. I don't
10   remember.
11   Q. Okay. You don't remember the substance of
12   what she may have said about this?
13   A. No, I don't. At this moment I don't.
14   Q. What about Lakisha Jessie? Have you spoken
15   with her about this?
16   A. No, I did not.
17   Q. Carissa Jones. Have you spoken with her
18   about this?
19   A. No, I did not.
20   Q. Have you spoken with Scott Kelley about
21   this?
22   A. Scott Kelley commented to me about a dream
23   that Ms. Davis shared with him.

Page 57

1  Q.  So Scott Kelley told you that
2     Ms. Atwell-Davis told him that she had a
3     sex dream about him; is that correct?
4  A.  You know it. Yes.
5        MS. WILLIS: Well, he doesn't know
6        it, but --
7  Q.  That was Mr. Kelley, not Mr. Maddox; right?
8  A.  No. I'm sorry. Mr. Kelley, yeah.
9  Q.  All right. Did he tell you anything else
10    other than she told him she had a sex dream
11    about him?
12 A.  That he was embarrassed about it.
13 Q.  That he was embarrassed about it?
14 A.  Yeah. That she was so blunt to tell that
15    to him.
16 Q.  Okay.
17 A.  That he told her that -- oh, that
18    apparently she said something along the
19    lines that her boyfriend at that point was
20    jealous of Mr. Kelley because of her having
21    the dream, I guess, sexual dream.
22 Q.  Okay.
23 A.  And that he replied to her not to be --

Page 58

1     and, oh, that he was upset with Mr. Kelley
2     and that he replied not to worry because he
3     was a happily married man.
4  Q.  Mr. Kelley reported to you that he was
5     upset about this?
6  A.  He was embarrassed.
7  Q.  Or he was embarrassed.
8  A.  He was embarrassed.
9  Q.  Did he tell you when this conversation
10    occurred between he and Ms. Atwell?
11 A.  He didn't date it. There wasn't a date.
12 Q.  Did he ever report any sexual harassment to
13    anyone to your knowledge?
14 A.  No.
15 Q.  Okay. Melissa McGough. Did you talk with
16    her about this?
17 A.  No.
18 Q.  No?
19 A.  No.
20 Q.  Who is Gary Smith?
21 A.  He's a team leader. He used to be just a
22    technician, but he's a team leader now.
23 Q.  Have you spoken with him about this?

Page 59

1  A.  No.
2  Q.  There's another person -- I can't remember
3     her name -- who, I think, said or is going
4     to say that she overheard Robin Atwell tell
5     Rance Maddox that she had had breast
6     implant surgery. Are you familiar with
7     that, with who that is?
8  A.  That she or -- no. Explain to me again.
9  Q.  Yeah. Have you spoken with anyone or are
10    you aware of any employee out there or
11    former employee who claims to have heard
12    Robin Atwell tell Rance Maddox I've had
13    breast implant surgery or my breasts aren't
14    real, anything like that?
15 A.  I don't recall right now. I -- it was
16    common knowledge because apparently she --
17    or someone said that she did and -- but I
18    don't know who to tell you who was it.
19 Q.  Well, could you tell that she had had
20    breast implant surgery just from looking at
21    her?
22 A.  I don't even go there. Sorry.
23 Q.  Well, I'm just saying --

Page 60

1        MS. WILLIS: You're not being
2        impolite.
3  Q.  No. I'm not being rude. I'm asking you --
4     you saw her from time to time. Was that
5     something that was noticeable about her?
6     Could anybody -- anyone could tell that she
7     had had breast implants?
8  A.  She's a beautiful woman if I may say that,
9     yes.
10 Q.  But, I mean, you could tell from before and
11    after that she had probably had --
12 A.  No, no, no. I would never --
13 Q.  -- breast implant surgery?
14 A.  I didn't know before and I knew it after
15    because apparently she shared with many
16    people that.
17 Q.  Okay. That's not uncommon for a woman to
18    share that she's had breast implant
19    surgery, is it?
20       MS. WILLIS: Object to the form.
21       You can answer.
22 Q.  There's nothing wrong with that, is there?
23 A.  I think it depends on how you feel about

Page 61

1    it. If it's a -- I'm very conservative.
2    So there are things that I believe are not
3    needed to be said. So that's my answer.
4    Q. Okay. Last question. Is there anything
5    else that you're aware of that other
6    employees have either told you or that
7    you've heard about Robin Atwell?
8    A. In what way?
9    Q. And, again, it's kind of an open-ended
10    question. But what I want to know, is
11    there anything else out there that you're
12    aware of, like her telling somebody she had
13    a sex dream about them, her telling people
14    she had breast implant surgery, her, you
15    know, saying that putting the hands on the
16    shoulders wasn't any big deal? Is there
17    anything else out there that you know of
18    that you can tell me other people have told
19    you about her or you've heard directly?
20    A. She -- there was an activity that we all
21    were invited to go to play --
22    Q. An activity?
23    A. Activity as in going out, the office

Page 62

1    people, and play bowling.
2    Q. Uh-huh (positive response).
3    A. And one of our managers was there. And she
4    commented to me, same thing, when we're
5    doing copies that she was so excited and so
6    happy and she couldn't contain herself
7    because ...
8        MS. WILLIS: It's okay. Say
9             whatever it is.
10    A. Yeah. Because this manager's pants were so
11    tight that she could see his butt and his
12    butt was so cute.
13    Q. Who is the manager with the cute butt?
14    A. Sorry.
15    Q. That's okay.
16    A. Mr. Lloyd Weathers.
17    Q. Lloyd Weathers.
18    A. Yes. He's no longer in the company.
19    Q. And she said to you during this bowling
20    outing that --
21        MS. WILLIS: During or after the
22             bowling outing?
23    Q. Was it during the bowling --

Page 63

1    A. That she looked at his behind, yes.
2    Q. Okay. So she commented to you that he had
3    a good behind and --
4    A. And then the next day she said -- no. Then
5    the following day when we were doing copies
6    or something she commented to me how cute
7    his butt was and she couldn't contain
8    herself because it was so round. Sorry.
9    Q. Well, I've got to ask a couple of more
10    questions about that.
11    A. For the entertainment?
12    Q. No. What did -- were those her words, I
13    can't contain myself?
14    A. I recall that and laughing. I thought
15    she's just too funny.
16    Q. Okay. It wasn't something you were
17    offended by, was it?
18    A. No. I -- I hear so many things, sir, and
19    that --
20    Q. She didn't say it to him to your knowledge,
21    did she?
22    A. Not that I know of. I don't know. I don't
23    know.

Page 64

1    Q. But this conversation was a jovial
2    conversation --
3    A. Casual.
4    Q. -- between you and her, two females in the
5    copy room?
6        MS. WILLIS: Object to the form.
7             You can answer.
8    Q. Is that correct?
9    A. In the where did you say?
10    Q. It was in a conversation that occurred
11    between two females in the copy room;
12    correct?
13    A. It's not just between two females. That
14    could have been heard by a lot of other
15    people because we were doing copies in a
16    traffic area and she said it to me.
17    Q. She spoke to you, though; right?
18    A. Yeah. She was speaking with me.
19    Q. Did anybody else tell you they overheard
20    her say that to you?
21    A. She might have commented to someone. I
22    don't recall names right now. No, I don't
23    recall that.

Deposition of Ruth Ryan                    Atwell vs. SMART Alabama                    September 12, 2007



Page 65

1   Q.   But no one told you, hey, I overheard Robin
2      talking about how excited she was about
3      Lloyd's behind? Nobody said that to you?
4   A.   No.
5        MR. HORSLEY: That's all.
6        MS. WILLIS: I don't have
7        anything.
8        (Deposition concluded at
9        approximately 2:30 p.m.)
10      * * * * * * * * *
11       FURTHER DEPONENT SAITH NOT
12      * * * * * * * * *
13       REPORTER'S CERTIFICATE
14 STATE OF ALABAMA:
15 MONTGOMERY COUNTY:
16     I, Tracye Sadler, Certified Court
17 Reporter and Commissioner for the State of Alabama
18 at Large, do hereby certify that I reported the
19 deposition of:
20        RUTH RYAN
21 who was duly sworn by me to speak the truth, the
22 whole truth and nothing but the truth, in the
23 matter of:

Page 66

1       ROBIN ATWELL,
2       Plaintiff,
3       vs.
4       SMART ALABAMA, LLC,
5       Defendants.
6       IN THE UNITED STATES DISTRICT COURT
7       FOR THE MIDDLE DISTRICT OF ALABAMA
8       NORTHERN DIVISION
9       Case Number 2:06CV1089-MEF
10 on September 12, 2007.
11     The foregoing 65 computer-printed pages
12 contain a true and correct transcript of the
13 examination of said witness by counsel for the
14 parties set out herein. The reading and signing of
15 same is hereby not waived.
16     I further certify that I am neither of
17 kin nor of counsel to the parties to said cause nor
18 in any manner interested in the results thereof.
19     This 2nd day of October 2007.
20
21     _____
22     Tracye Sadler, Certified
       Court Reporter and
       Commissioner for the State
23      of Alabama at Large

Page 67

1     * * * * * * * * * * * *
2      WITNESS SIGNATURE PAGE
3     * * * * * * * * * * * *
4
5 IN RE: ATWELL vs. SMART ALABAMA, LLC
6
7     I, RUTH RYAN, hereby certify that I have
8 read the foregoing transcript of my deposition
9 given on September 12, 2007, and it is a true and
10 correct transcript of the testimony given by me at
11 the time and place stated with the corrections, if
12 any, and the reasons therefor noted on a separate
13 sheet of paper and attached hereto.
14
15
16     _____
      RUTH RYAN
17    SWORN TO AND SUBSCRIBED before me this ____
18 day of _____, 2007.
19     _____
      NOTARY PUBLIC
20
      MY COMMISSION EXPIRES:
21
      _____
22
23

BURR & FORMAN
3100 SouthTrust Tower
420 North 20th Street
Birmingham, Alabama 35203

IN RE: ATWELL vs. SMART ALABAMA, LLC

Dear Ms. Ryan:

Enclosed is a copy of the transcript of your
deposition taken on September 12, 2007. Please read
the transcript and make any corrections on the
correction sheet provided specifying the page and
line number of each correction.

You will find the original signature page attached to
the front of the transcript. Even if there are no
corrections, please sign the original signature page
and have your signature notarized
Please return the signature page, correction sheet
and transcript within thirty days. The list of
corrections will be attached to the original
deposition and all parties will be notified of any
changes.
Sincerely,

Tracye Sadler Blackwell
Certified Court Reporter
ACCR No. 294

cc: Mr. Richard F. Horsley
    Ms. Kathryn Morris Willis

Deposition of Ruth Ryan                     Atwell vs. SMART Alabama                     September 12, 2007

Page 1

## A

able 35:1,4
about 7:8 8:20 10:13
  11:12 13:1,22 15:20
  16:11 18:6 19:14,19
  21:2,22 22:1 30:22
  33:15 35:2,5,13,19
  35:21 36:5,8 42:17
  43:4,11 45:5 46:13
  46:15 47:13 49:2,5,9
  51:7,10,11 53:16
  54:23 55:12 56:12,14
  56:15,18,20,22 57:3
  57:11,12,13 58:5,16
  58:23 60:5,23 61:7
  61:13,19 63:10 65:2
  65:2
according 15:3 25:23
ACCR 68:19
accusations 52:13
accused 51:20
ACTION 1:8
activity 61:20,22,23
actually 24:16
Adams 30:16
address 5:13,14
after 4:11 19:20 25:7
  25:16 34:21,23 35:9
  35:11 36:14 45:4,8,9
  47:11 49:13 60:11,14
  62:21
again 16:6,23 17:15
  28:22 29:13 51:6
  52:9,14,21 59:8 61:9
against 4:18 18:1 43:15
  43:21 50:1,18 52:18
  53:17 54:13
agency 10:21 11:16
ago 17:4
agreed 3:2,15,22
agreement 1:15
ahead 25:5 43:2
AIDT 39:9
Alabama 1:3,9,17,19
  2:6,12 3:8 4:18 5:19
  6:4 12:10,11 14:3,16
  15:5 65:14,17 66:4,7
  66:23 67:5 68:2,3
allegation 50:7 51:6
  53:1
allegations 36:13,19
  45:16 47:2 49:16
  50:10,14,18 52:17
  53:16 54:9,13
alleges 43:20
almost 8:18 10:23
  16:17
along 48:12 57:18

already 17:5,11 21:21
  40:7 45:8
America 13:21
another 24:17 43:21
  59:2
answer 5:9,10 9:9
  18:22 27:5,15 43:23
  47:17 50:4 54:8
  60:21 61:3 64:7
answering 48:22
answers 55:3
anybody 28:2 37:19
  38:3 43:16 54:17
  60:6 64:19
anymore 11:3
anyone 27:6 37:23
  58:13 59:9 60:6
anything 16:9,10 20:8
  22:2 26:19,21 28:6,9
  28:11,12,15 31:4
  33:10,11,23 34:10,14
  36:5,12 49:23 50:18
  51:12 57:9 59:14
  61:4,11,17 65:7
Anyway 25:21
anywhere 12:15
apparently 39:23 57:18
  59:16 60:15
APPEARANCES 2:1
appreciate 27:4
approximately 1:20
  17:4 23:9 65:9
area 64:16
arm 34:11
around 32:12
arrangements 11:20
arrested 15:1
asked 23:22,23 26:5
  27:21,23 31:1,2,3,9
  32:1 33:7,9 38:2 42:8
  46:17 48:20 53:9
  55:22 56:2
asking 14:13 18:23
  44:9 50:15 60:3
assembly 15:16
assume 5:9
assuming 50:15
attached 67:13 68:8,12
attempt 35:12
attention 31:23
attorney 38:2,4,13,14
  53:18 55:19
attorneys 2:11 37:14
  38:17
Atwell 1:6 4:17 15:4,8
  15:20 17:11 18:19
  20:5,19 21:2,11,22
  23:2 36:5 40:22
  43:10 44:9,17 50:8

58:10 59:4,12 61:7
  66:1 67:5 68:3
Atwell's 36:13 37:5
  47:2 53:16 55:13
Atwell-Davis 42:14
  57:2
August 15:5,15,18 16:7
  19:7
Avenue 5:16
aware 16:8 17:23 18:18
  18:23 19:5,13,16
  27:10,10 47:6,23
  48:4,7 50:17 53:19
  54:11 59:10 61:5,12

## B

baby-sitted 13:5
baby-sitting 13:7
bachelor 13:10
back 10:8 27:10 35:9
  38:20 41:11
background 13:8
based 46:23
bathroom 53:23
beautiful 60:8
became 15:12,14 16:18
  16:19 17:3,9,11,14
  17:21 18:9,16 19:8
  48:7
before 1:15 3:6 5:2 6:8
  6:11 7:13 8:6 10:17
  10:19 11:16 13:4,5
  19:15 24:15 31:4
  37:11 38:20 47:19,22
  60:10,14 67:17
begin 28:19
BEHALF 2:3,8
behavior 42:17
behind 63:1,3 65:3
being 12:20 16:8 42:4
  60:1,3
believe 6:19 7:20 8:18
  13:1 23:22 24:6 26:7
  27:16 28:3,20 31:7
  48:12,15,15 53:19
  56:2 61:2
best 29:20 31:13 40:11
  better 46:18
between 3:3,16,23
  18:19 19:6,16 23:11
  23:12,14 29:14 47:7
  47:16 48:1 58:10
  64:4,11,13
big 10:10 31:17 61:16
Birmingham 2:6,12
  68:2
bit 13:5
Blackwell 68:17
blunt 57:14

Bodiford 55:12
Books-a-Million 12:17
  12:18,23
both 31:21 50:15
bowling 62:1,19,22,23
boyfriend 57:19
break 54:1
breast 56:5,13,20 60:7
  60:13,18 61:14
breasts 59:13
Brief 36:22
bring 46:16
Brook 2:5
Building 2:5
Burgans 55:15,18
Burr 1:18 2:10 68:1
business 11:22 12:1,3
  12:10,12,16
butt 62:11,12,13 63:7

## C

Chaba 2:6
Caldwell 47:7,8 48:1
  50:12 51:11 53:8
Caldwell's 51:9
call 12:20 25:13 35:12
  48:21
called 7:16
calling 42:3
capacity 6:5 7:21 8:14
  11:19
care 53:5
Carissa 56:17
Carter 14:6
case 3:17,19 22:16 32:2
  66:9
cashier 12:19
casual 36:6,10 40:20
  64:3
Cathy 47:7,8 48:1
  50:12 51:8,11 53:8
cause 66:17
cc 68:21
CERTIFICATE 65:13
Certified 1:16 3:7
  65:16 66:21 68:18
certify 65:18 66:16
  67:7
cetera 46:22
chance 14:18
changes 68:13
charge 37:6 39:8
chest 26:19
Chicken 7:15
Chile 13:12,13,17
circumstances 46:7
Civil 1:8 3:5
claim 27:13 50:20
claims 54:18 55:4,13

59:11
clarify 34:18
clear 21:6 24:14 28:22
  40:22
Close 23:13
closed 12:11 30:21
closer 23:16,17
Colinda 26:10 28:3,14
  29:3,4,5,21 30:3,6,23
  31:1,15 32:14 33:16
  33:17,20 34:6 36:14
  42:15 45:19
come 18:4 25:17 35:9
  44:3,5,6
comfort 28:4 34:18
commencing 1:20
commenced 56:22 62:4
  63:2,6 64:21
commission 3:9 67:20
Commissioner 1:16 3:7
  65:17 66:22
common 27:8 34:4,6
  36:9 59:16
comp 45:2
company 51:14 62:18
comparable 13:9
compartments 22:7
complaining 21:22
  22:1 26:3 54:23
complaint 44:5,7 53:20
complaints 18:1,6
  43:11,15,18 50:1,6
complete 44:10
completed 38:20 43:20
computer 31:19,20,21
  32:8
computer-printed
  66:11
concerning 20:5,19,21
  22:2 23:2 35:18
concluded 65:8
conduct 15:10
conference 30:19,20
confirmed 49:17
conflict 19:2,6,13
conflicts 18:18
conservative 61:1
constitute 52:17
contain 62:6 63:7,13
  66:12
contribute 37:23
contributed 38:12
conversation 23:7
  29:11 30:23 40:21
  46:21 58:9 64:1,2,10
conversations 23:5
  36:6,10
coordinator 8:16 11:9
copies 36:9 41:10 62:5

Deposition of Ruth Ryan                Atwell vs. SMART Alabama                September 12, 2007

Page 2

63:5 64:15
**copy** 36:9 64:5,11 68:5
**correct** 10:8 16:12 17:7
  17:8 21:12 29:9 30:8
  36:20,21 38:13 40:10
  45:21 46.5 49:17
  55:5 57:3 64:8,12
  66:12 67:10
**correction** 68:7,7,11
**corrections** 67:11 68:6
  68:9,12
**counsel** 3:3,16 66:13,17
**counseling** 52:21
**counselor** 44:18
**country** 13:12
**county** 5:21,22 6:2 8:8
  65:15
**couple** 54:10 63:9
**Court** 1:2,16 3:7 4:6
  65:16 66:6,22 68:18
**courtroom** 6:15
**coworker** 26:10
**Cruz** 14:6
**cry** 28:19
**crying** 24:8
**current** 5:13
**currently** 6:3
**cute** 62:12,13 63:6
**C-R-U-Z** 14:6

─────────── **D** ───────────

**date** 17:16,17 22:8
  58:11,11
**dates** 9:7 23:11
**Davis** 32:18,21 40:21
  40:22 41:2 42:14
  50:20 52:22 56:23
**day** 22:17,21 30:1,3,3
  30:11,12 31:4 34:21
  34:23 45:10 63:4,5
  66:19 67:18
**days** 35:4 68:11
**deal** 10:10 61:16
**Dear** 68:4
**December** 20:2,12
**decrease** 41:18
**defendant** 2:8 6:11
**Defendants** 1:10 66:5
**define** 27:17
**departed** 47:11
**department** 12:21
  41:12 42:4 48:19
  52:5,6
**departure** 46:8 49:23
**depends** 60:23
**DEPONENT** 65:11
**deposition** 1:14 2:22
  3:4,6,12,17 4:1 5:2
  6:7 37:3,10 42:21

**47**:1 65:8,19 67:8
  68:6,12
**designs** 11:20
**desk** 32:8 47:13 48:6
  50:11 51:10
**determine** 49:13
**different** 5:8 41:19
  42:3 54:20
**difficult** 52:5
**direct** 7:4
**directly** 49:1 61:19
**director** 17:6
**disciplined** 16:9
**discussed** 20:9 29:8
  37:14 40:20 47:2
**discussion** 7:18 23:20
  28:19 40:6 42:13,15
  49:12 55:11
**discussions** 20:4,7,18
  21:1 23:1 35:13
  42:16
**DISTRICT** 1:2,3 66:6
  66:7
**DIVISION** 1:4 66:8
**doctor** 44:21,23 45:2,3
**document** 37:11,15
  38:1,19 42:19 43:5
  47:13
**doing** 12:9 13:6 31:1
  38:4 46:18,18 62:5
  63:5 64:15
**done** 16:10 32:15 40:4
**door** 44:2
**down** 9:3,16 12:15 25:8
  26:18 43:11,14,16
**downtown** 11:6
**Dr** 44:18,19,23
**dream** 56:22 57:3,10
  57:21,21 61:13
**duly** 4:11 65:21
**during** 15:17,23 18:5
  18:23 20:23 21:20
  28:6,18 29:11 34:1
  40:12 62:19,21,23

─────────── **E** ───────────

**each** 16:3 21:9,9 24:16
  53:15 68:7
**earlier** 7:8 21:7
**easier** 9:15 22:13
**educational** 13:8
**EEOC** 37:5 38:21
**either** 3:14,19 6:11
  61:6
**Elizabeth** 4:22,23
**embarrassed** 57:12,13
  58:6,7,8
**employed** 6:3,5 7:21
  8:5,14 10:18 11:17

**12**:15 13:3 15:4,14
  17:5,9,21 18:10,17
  19:8 47:5
**employee** 6:6 7:1 15:12
  16:19 17:1,2,3,12,14
  17:23 43:20,21 54:19
  59:10,11
**employees** 18:4 21:3
  22:1 42:17 54:13
  61:6
**employment** 7:22,23
  8:16
**Enclosed** 68:5
**end** 20:3,11 31:16
  32:17
**ended** 12:20
**engage** 46:20
**enough** 25:2
**entered** 32:2,10
**entertainment** 63:11
**entire** 7:1
**especially** 34:8
**et** 46:22
**Eufaula** 7:14
**even** 9:23 59:22 68:9
**ever** 6:10,14 17:22 35:1
  35:9,12 37:10 43:2,5
  43:10 44:9,17 45:4
  47:6 49:12 55:12,15
  58:12
**Everybody** 10:3,3,5,9
**everything** 12:11 36:11
  40:8
**evidence** 3:13
**exact** 46:9
**exactly** 26:5 27:18 31:8
**examination** 2:18 4:14
  66:13
**excited** 62:5 65:2
**exhibit** 37:1,2,8,9 38:6
  38:7,10,16 42:20
  44:13
**exhibits** 2:22
**exist** 11:2
**EXPIRES** 67:20
**explain** 26:15 31:9 59:8
**explained** 28:4 30:4
  31:2
**explaining** 32:5
**extent** 45:15
**eyes** 28:21

─────────── **F** ───────────

**F** 2:4 68:21
**face** 34:5,11
**face-to-face** 15:11
**facing** 31:19,20
**fact** 45:2 51:1,20 52:12
  52:15

**fair** 18:15 38:14
**familiar** 59:6
**family** 14:7,7,17
**far** 29:9,10
**Farms** 8:7,15 10:11,17
  11:14
**February** 22:18,23
  23:15,16 29:15 46:3
  50:2,17
**Federal** 3:5
**feel** 60:23
**female** 54:17
**females** 51:22 52:16
  54:11,22,23 64:4,11
  64:13
**few** 35:3
**file** 39:21
**filed** 4:18
**filing** 3:17,21
**finally** 31:22 32:2,15
**find** 27:17 29:21 30:5,6
  30:10 34:19 45:9
  68:8
**findings** 34:17 53:6
**fine** 13:16 40:5 41:3
  51:19 54:4
**first** 4:11 15:4 21:7
  23:18 27:21 35:17
  38:22 43:7 48:7,9
**five** 13:1
**flexibility** 42:1,2
**floor** 12:19
**Florida** 11:23 12:7,13
**flower** 11:20 12:16
**focusing** 16:6
**following** 30:1,3,11
  45:10 63:5
**follows** 4:13
**foregoing** 66:11 67:8
**form** 3:10 18:21 27:14
  38:20 43:22 44:1,10
  50:3 60:20 64:6
**formality** 3:8
**Forman** 1:18 2:10 68:1
**format** 44:7,8
**former** 11:23 59:11
**forms** 43:19
**forth** 41:11
**found** 52:22
**frame** 36:2 47:12,16
**friendly** 34:9
**from** 13:11,17 15:14,18
  16:6 17:9,14,17,21
  18:9,15,16 19:7,7
  20:1,1,10 22:23 25:8
  42:4 46:8 48:14 50:8
  55:2 59:20 60:4,10
  **front** 26:19 39:16 68:9
**Ft** 12:14

**full** 4:19,20
**funny** 63:15
**further** 3:15,22 26:15
  35:13 51:23 52:20
  65:11 66:16

─────────── **G** ───────────

**Gary** 7:5,10 40:18 41:7
  42:20 49:7,8,12
  51:22 52:21 53:4,15
  58:20
**Gary's** 37:2
**general** 44:23 54:15
**Gin** 7:5,8
**give** 5:10 14:21,22,22
  23:6 41:13 56:4
**given** 5:2 6:7,14 67:9
  67:10
**go** 8:2 10:7,14 11:13
  22:6,7,14,21 25:5
  43:2 44:3 45:4 55:8
  59:22 61:21
**going** 5:4,9 6:19 22:20
  36:11 41:11 42:21
  44:14 46:21 52:7
  53:23 59:3 61:23
**good** 63:3
**GOOZEE** 2:4
**Goshen** 5:18,19
**great** 32:12,15
**Greensboro** 5:17
**Greenville** 5:16,18
**guard** 47:10
**guess** 41:23 42:2,5
  47:12,17 52:7 55:2
  57:21
**G-I-N** 7:7

─────────── **H** ───────────

**hallway** 23:22 24:22
  25:6
**hand** 32:11 34:4
**handling** 49:10
**hands** 27:1 61:15
**handwritten** 48:11,14
**happened** 25:7 27:23
  30:4,7,9 31:3,5
**happily** 58:3
**happy** 24:10 25:3 33:5
  62:6
**harassed** 54:18
**harassment** 18:17:13
  39:14 43:18,21 50:1
  50:5 52:18 54:9,12
  58:12
**hard** 9:18 42:6
**hate** 22:6
**having** 4:11 15:20,21
  18:4 20:4 21:1,2 23:1

Deposition of Ruth Ryan               Atwell vs. SMART Alabama                    September 12, 2007

Page 3

50:21 51:11 57:20
**head** 49:18
**hear** 16:10 63:18
**heard** 59:11 61:7,19
64:14
**held** 13:21
**help** 9:1,12 37:15,21
**her** 9:15,18 14:21,22
15:10,11,23 16:4
21:15 23:8,21,22,23
24:18,21,23 25:1,1,6
25:22,23 26:3,13,13
26:19 27:2,6,22,23
28:4,8,9,12,21 29:1,1
29:23 30:10,11 31:2
31:2,3,8,9,20 32:1,8
32:8,18 33:9,12
34:17,19 35:1,3,11
35:12,13 36:19 41:18
42:3,6 43:11,14 45:2
45:4,9,12,12,14,17
45:19 48:13,14,19,21
49:1,16 50:9,21,22
51:7 52:23 53:1,3
55:22 56:15,17 57:17
57:19,20,23 58:16
59:3,21 60:4,5 61:12
61:13,14,19 63:12
64:4,20
**hereto** 3:20,23 67:13
**herself** 62:6 63:8
**hey** 65:1
**him** 7:8 20:21 21:19
40:3,18 45:4 46:13
46:15,16,17 47:7
50:2,18,21 51:7
52:18,22 56:23 57:2
57:3,10,11,15 58:23
63:20
**hiring** 15:7
**Hispanics** 55:1
**home** 35:12 48:21
**honestly** 28:15 30:17
**Horsley** 2:4,4,20 4:15
4:16 10:2,9 33:17
39:1,7,11,17,23 40:5
41:3 51:19 54:2
55:10 65:5 68:21
**hours** 41:15,16,18
**HR** 44:5,6
**human** 16:19,20
**husband** 12:12 14:1
**husband's** 14:7,17

**I**

**immediate** 14:8 44:4
**immediately** 7:12 8:5
10:17 13:4 48:17
**implant** 59:6,13,20

60:13,18 61:14
**implants** 60:7
**impolite** 60:2
**inappropriate** 26:1
51:1 53:1,2
**inappropriately** 25:23
26:4 50:22
**incident** 34:23 35:19
47:6,23 48:4,8 53:8
**incidents** 33:7 35:21,23
**incorporated** 11:22
**independently** 36:3
**INDEX** 2:18
**indicate** 26:18 33:2
**individual** 54:16
**individuals** 19:7
**industry** 7:17
**informal** 41:9
**information** 37:23 38:6
38:10,12,15 39:21
43:16 55:17 56:3
**informed** 45:18 48:23
**instruct** 8:22
**intended** 5:10
**interested** 66:18
**interrogatories** 54:6
55:3
**interrupt** 53:22
**interruption** 36:22
**interview** 15:10
**introduced** 3:18
**investigate** 28:5,10
36:12 50:23
**investigation** 45:16
51:23 52:20
**invited** 61:21
**involved** 6:10 46:9

**J**

**January** 22:20,23
23:14 29:14 50:16
**jealous** 57:20
**Jefferson** 30:16
**Jessie** 56:14
**Jim** 7:6
**job** 16:23 32:12
**jobs** 13:21
**Jones** 56:17
**Jorge** 14:6
**jovial** 64:1
**jury** 14:12
**just** 5:6 9:2,5,8,14,17
12:1 14:18,22 19:11
21:6 22:9,16 24:8,14
25:12 26:14 36:10
38:8 40:22 50:16
54:22 58:21 59:20,23
63:15 64:13

**K**

**Kathryn** 2:9 68:22
**Kelley** 56:20,22 57:1,7
57:8,20 58:1,4
**Keystone** 7:14,19 8:6
10:15
**kin** 66:17
**kind** 19:1 20:7 22:9
61:9
**KING** 2:4
**kissed** 48:13 50:11
51:12
**knew** 25:1,1 32:18
38:18 60:14
**know** 6:1 15:23 16:15
18:10 19:18 21:8,11
21:18,19 24:17 25:2
36:1,2 37:13 40:4
42:1 47:8 49:16,20
49:21,22 50:5 51:4
51:15,16 53:7 55:6
56:8 57:4,5 59:18
60:14 61:10,15,17
63:22,22,23
**knowledge** 55:5 56:4
58:13 59:16 63:20
**known** 16:4 21:8
**knows** 33:1
**Koreans** 55:1

**L**

**Lakisha** 56:14
**Large** 1:17 3:8 65:18
66:23
**last** 22:17,21 23:13
35:17 52:23 54:10,14
61:4
**late** 46:3
**later** 45:18
**Lauderdale** 12:14
**laughed** 32:13,13,14
**laughing** 33:4 63:14
**Law** 1:17 2:11
**lawsuit** 4:17 6:10 55:4
**lawyer** 55:16 56:3
**leader** 58:21,22
**least** 40:3
**leave** 8:2 10:12,14
**leaving** 51:13
**left** 11:13 29:20 30:2
32:16,23 33:3 34:20
46:5,10 47:20 53:13
**less** 51:21 52:18
**let** 17:10 24:14 26:12
40:3 51:2 55:22
**letter** 44:12
**let's** 19:19 22:6,14,20
39:1 50:16

**leveling** 17:23
**like** 7:16 9:10 11:21
26:8,19 27:1 29:2
34:5,12 36:11,23
41:10 42:9 50:10
59:14 61:12
**Lincoln** 25:9,10,11,14
28:7 35:17 40:10
42:13
**line** 68:7
**lines** 26:21 48:13 57:19
**Lisa** 55:12
**list** 14:19,21,22 68:11
**little** 13:5
**live** 12:13 14:2
**Living** 12:4,5
**LLC** 1:9 4:18 6:4 15:5
66:4 67:5 68:3
**Lloyd** 62:16,17
**Lloyd's** 65:3
**LLP** 2:4
**locate** 48:19
**located** 11:1,2,3
**long** 5:5 6:17 7:19 8:17
11:11 12:22 16:15
**longer** 48:20 62:18
**look** 24:2 34:16
**looked** 23:21 24:9 25:2
25:6 32:8 35:3 38:8
46:19 63:1
**looking** 27:19 59:20
**looks** 36:23
**lost** 52:11
**lot** 14:15 24:3 41:15,16
42:10,12 52:6 64:14

**M**

**machines** 36:10
**Maddox** 17:4 18:2,6,20
20:6,9,20 21:4,17,18
21:23 22:2 23:3
31:10,14 32:7,16
35:18 39:22 43:11,15
45:6 46:4 47:3,20
48:13 49:5 51:23
52:1,2,4,15,20 53:12
53:17 57:7 59:5,12
**Maddox's** 42:17 49:22
**made** 3:11 17:22 19:5
44:14 47:6 50:1
53:19 54:12
**make** 22:7 52:16 56:9
68:6
**makes** 9:14
**making** 36:8 41:10
**Males** 54:23
**man** 58:3
**manager** 6:6 7:1,22,23
12:21 17:1,2,3,6

62:13
**managers** 62:3
**manager's** 62:10
**manner** 3:19 20:7
66:18
**manual** 39:10
**many** 14:20 60:15
63:18
**marked** 2:22 37:2
39:18,19 42:19 44:13
**marketing** 13:10
**married** 58:3
**matter** 45:2 65:23
**may** 3:6,11,12,18 25:19
36:2 56:12 60:8
**maybe** 32:17
**ma'am** 4:21 5:15 10:20
16:13 18:9 19:3,5
20:13 35:7,20 44:20
**McGough** 58:15
**mean** 9:7,20,20,21 14:8
32:20 37:21 52:2
53:21 60:10
**means** 9:17
**medical** 44:21,23
**meet** 24:16 29:23 36:16
36:17 49:5 55:12,15
**meeting** 23:19 25:12,13
28:7 29:18 30:14
34:1,13 35:16,17
40:9,13 49:14,20
**meetings** 15:11,20
35:21 36:4
**Melissa** 58:15
**mentioned** 34:3 41:6,8
**met** 30:3,11 33:12 36:3
36:14 40:18 46:13
49:8
**middle** 1:3 31:16 66:7
**might** 64:21
**mind** 40:2
**minutes** 32:18 54:3
**Miss** 29:21 30:2 31:16
34:16 36:14,17
**missing** 39:2,6
**moment** 40:14 56:13
**Monroe** 1:18
**Montgomery** 1:19
65:15
**month** 6:21,22 50:2
**months** 7:20 51:21
52:19
**more** 41:23,23 42:2
63:9
**Morris** 2:9 68:22
**moved** 12:10,11 13:18
31:23
**moving** 49:18
**myself** 10:8 63:13

Deposition of Ruth Ryan                    Atwell vs. SMART Alabama                    September 12, 2007

Page 4

**N**

name 4:16,19,20 10:22
  11:5 12:3 16:4 52:23
  59:3
named 25:15
names 14:5 64:22
necessarily 53:2
need 3:10 5:14 22:16
  25:17
needed 24:12 36:16
  61:3
neither 66:16
never 6:7 15:1 40:18
  44:14 46:13 47:2
  49:1,3 60:12
next 34:14 63:4
Nobody 65:3
none 53:9,10 55:3
normally 24:3 25:2
North 2:12 68:2
NORTHERN 1:4 66:8
notarized 68:10
NOTARY 67:19
Notch 11:4,7
note 48:5,10,11,14 51:9
noted 67:12
nothing 4:12 60:22
  65:22
notice 8:4 9:23 10:16
noticeable 60:5
notified 68:12
November 15:16,19
  16:7 17:15,22 18:11
  18:17 19:9,10,22
  20:1,2,10
number 23:6 37:3
  42:20 44:13 66:9
  68:7
numerous 23:5

**O**

Object 18:21 27:14
  43:22 50:3 60:20
  64:6
objections 3:9,10
observing 32:9
occurred 29:13 50:15
  58:10 64:10
October 66:19
off 55:8
offended 63:17
offered 3:13
office 11:10 17:18
  19:12,21 24:19 26:11
  31:13,15,17 42:11
  43:13 61:23
Offices 1:18
Off-the-record 7:18

40:6 55:11
oh 7:8 13:14 33:19 34:2
  57:17 58:1
okay 5:11,12 8:10 9:13
  10:2 11:8,22 12:22
  14:18 16:18 17:19
  18:13 19:23 20:3,15
  21:17 22:11,21 24:5
  24:11 26:8 28:8,18
  30:22 31:11 32:22
  33:6 34:6 35:20
  36:23 37:13 38:9,19
  39:1,11,17 40:7
  42:19 47:15 50:13
  52:4 54:21 55:2
  56:11 57:16,22 58:15
  60:17 61:4 62:8,15
  63:2,16
old 13:18,20
Once 8:8
one 23:7 24:17 25:13
  38:4 39:18,20 40:1
  41:4 53:5,6 62:3 65:1
ones 13:22,23
only 14:17 30:21
open 31:17 44:2
open-ended 61:9
opportunity 24:15 49:4
order 27:7,12 38:1
original 68:8,9,12
originally 13:17
OSHA 32:3,11
other 3:9,13,19 12:15
  13:21,21 14:1,2 16:3
  21:3,3,9,9,20 24:16
  28:9,13 33:7 35:21
  41:4 42:13,16,16
  43:12 46:21 53:2,4,6
  53:16 54:9,11,13,19
  57:10 61:5,18 64:14
out 30:6 59:10 61:11
  61:17,23 66:14
outing 62:20,22
outside 53:17 55:18
over 14:2,16 34:13
overheard 59:4 64:19
  65:1

**P**

page 67:2 68:7,8,9,11
pages 66:11
pants 62:10
paper 67:13
parents 14:4
part 43:12
participate 15:7
parties 3:3,16,23 66:14
  66:17 68:12
party 3:14,19

passed 16:3
people 60:16 61:13,18
  62:1 64:15
period 15:17 16:1,6
  18:5 19:14,19 20:23
  23:13
person 12:19 34:9 59:2
personally 15:23
personnel 39:21
pertains 38:11
physical 5:14
Pike 5:22 6:2 8:8
place 23:10 27:18
  29:22 30:14,21 48:1
  67:11
plaintiff 1:7 2:3 6:12
  66:2
Plaintiff's 36:23 37:7
  38:6,10 42:20 44:13
planning 36:16
plant 7:15 8:12 16:3
  54:10,14
play 61:21 62:1
pleasant 46:20
please 48:21 68:6,9,11
point 24:16 28:16,18
  29:11 41:6 57:19
policy 27:11 39:14 44:2
Porter 26:10 32:5,9
position 17:18 37:4
  39:5 50:23,23 53:3
positive 5:1 12:6 13:14
  15:6 17:20 22:15,19
  22:22 29:16 36:15
  45:20,22 46:6 62:2
poultry 7:16 8:12
precipitated 23:19
prepare 38:1
preparing 37:15
presence 53:17 55:19
present 56:1
presented 49:7
presenting 53:20
presidents 25:16
prior 15:11
probably 9:4 60:11
problems 15:21 18:19
  19:6,16 21:2
Procedure 3:5
prompt 51:22 52:19
provided 3:14,20 68:7
Psychologist 44:22
PUBLIC 67:19
purpose 3:13 30:5
pursuant 1:15 3:4
  36:19 37:5 43:18
put 8:4 10:16 27:1
  32:11 36:1
putting 61:15

p.m 1:20 65:9

**Q**

QC 41:11
question 3:10 5:6,9
  9:10 19:4 24:20 27:5
  27:21 38:2 47:19
  51:3 52:8 61:4,10
questioning 38:5
questions 3:9 5:4 6:1
  14:14 37:19 54:7
  63:10
quick 53:23
quickly 26:12
quit 46:11 48:23
quitting 46:14 50:19

**R**

Rance 17:4 18:1,6,19
  20:5,9,19 21:3,17,22
  22:1 23:3 25:22 32:1
  33:13,20 35:18 39:22
  42:17 45:5 46:4 47:5
  47:19 49:5,9 51:13
  53:12 59:5,12
rather 9:17
RE 67:5 68:3
read 4:8 42:23 43:3
  67:8 68:6
reading 66:14
real 59:14
really 29:22 30:7 55:23
reason 6:15 15:1 23:20
  29:23 41:13 46:9
  53:13
reasons 46:14 67:12
recall 15:18,19,22 16:1
  18:4,7,14 20:4,8,16
  20:17,22 21:1,5,22
  21:23 23:1,7 25:8
  26:20 28:6,11,12,15
  30:15 31:8 34:1
  35:11,22 36:4 40:14
  40:15 42:18 43:14
  44:9,11 48:10 55:22
  56:1 59:15 63:14
  64:22,23
receive 44:6
received 50:8
recognize 21:14 24:23
recollection 29:20
  31:14 40:11
recommend 43:15
record 10:7 21:6
records 15:3
recruiting 11:9
refer 44:17
reference 34:2
referring 50:6

regard 47:14
regardless 3:20
regulation 27:11
related 34:15
relation 29:18
relations 6:6 7:1 16:20
  17:1,2,3
relatives 14:2,8,12,15
remember 9:6 10:21
  11:4 13:23 29:9,10
  30:17 37:3 41:4
  56:10,11 59:2
repeat 52:9
rephrase 5:8
replied 57:23 58:2
report 58:12
reported 45:5 54:17
  58:4 65:18
Reporter 1:16 3:7 4:6
  65:17 66:22 68:18
REPORTER'S 65:13
represent 4:17
representing 3:3,16
reprimanded 16:9
requested 55:16
required 27:12
reserved 3:11
residence 5:13
resignation 50:19
resigned 46:10
resources 16:20
response 5:1 12:6
  13:14 15:6 17:20
  22:15,19,22 29:16
  36:15 45:20,22 46:6
  54:6 62:2
result 48:16
resulted 55:4
results 49:13,20 66:18
return 68:11
returned 46:16
review 38:19
reviewed 38:22
Richard 2:4 4:16 51:5
  53:21 68:21
right 6:7,17 7:12 10:11
  10:22 11:5 15:3
  21:20 22:6 25:5
  30:10 32:4,6 33:23
  34:13 40:3 41:22
  45:11 46:3 48:3,14
  55:6,7 56:8 57:7,9
  59:15 64:17,22
Road 2:6
Robin 1:6 4:17 15:3,8
  15:20 17:11,17 18:19
  20:5,19 21:1,11,22
  23:2 30:2 31:4,10,16
  31:18,22 32:20,21

Deposition of Ruth Ryan                Atwell vs. SMART Alabama                September 12, 2007

Page 5

| | | | | |
|---|---|---|---|---|
| 33:2 34:8,8,16 35:6 | 33:10,11 37:10,20 | **something** 26:12 31:18 | 60:13,19 61:14 | 33:12,21 36:1 38:22 |
| 35:16 36:5,17 37:5 | 43:2,5,8 45:12 | 48:12 57:18 60:5 | **sworn** 4:11 65:21 67:17 | 43:8,17 47:12 48:7,9 |
| 40:8 43:10 44:9,17 | **self-employed** 11:18 | 63:6,16 | | 52:8 53:18 60:4,4 |
| 47:2,22 50:8 52:22 | **sent** 38:20 54:7 | **sometime** 23:12,14 | **T** | 67:11 |
| 53:16 55:13 59:4,12 | **separate** 51:21 52:16 | 29:14 46:3 | **take** 5:5 9:15 12:10 | **times** 24:18,19 42:4 |
| 61:7 65:1 66:1 | 52:16 67:12 | **sometimes** 10:6 22:12 | 30:14 53:23 | **title** 8:1 16:23 |
| **Robin's** 22:17 51:6 | **September** 1:19 66:10 | **sorry** 10:1 13:15 14:9 | **taken** 1:14 3:4,6 23:10 | **today** 5:2 6:8 20:17 |
| **Roh** 7:5,7 | 67:9 68:6 | 25:5 28:17 32:19 | 68:6 | 21:11,14 28:22 36:3 |
| **room** 25:9,10,11,12 | **serving** 45:1 | 33:18,19 37:22 38:9 | **taking** 53:5 | 36:18 42:7 54:11 |
| 28:7 29:21 30:15,17 | **set** 66:14 | 40:23 45:18 46:2,11 | **talk** 19:19 21:9 36:8 | **together** 13:1 |
| 30:19,20 32:16,23 | **several** 24:18,19 | 47:9 48:18 49:18 | 41:10 43:3 58:15 | **told** 13:22 16:16 24:12 |
| 33:3 35:17 40:10 | **sex** 39:13 57:3,10 61:13 | 51:18 52:3,23 57:8 | **talked** 7:8 46:14 53:12 | 25:21 28:1,23 29:4,5 |
| 42:14 64:5,11 | **sexual** 18:1 27:13 | 59:22 62:14 63:8 | 53:15 | 29:18 34:6,19 38:17 |
| **rooms** 25:13 | 43:18,21 50:1,5 | **SouthTrust** 2:11 68:1 | **talking** 18:9 19:14 | 38:18 40:7,18 41:17 |
| **round** 63:8 | 52:17 54:9,12 57:21 | **speak** 4:12 24:12 30:6 | 33:15 35:5 65:2 | 46:23 53:9 57:1,2,10 |
| **rude** 60:3 | 58:12 | 35:1,5 55:18 65:21 | **task** 32:15 | 57:17 61:6,18 65:1 |
| **Rules** 3:5 | **sexually** 54:18 | **speaking** 45:17,19 | **team** 58:21,22 | **Tompkins** 44:18,19,23 |
| **ruling** 3:12 | **Shades** 2:5 | 64:18 | **tears** 28:21 29:10 | **touch** 34:4 53:1 |
| **Ruth** 1:14 3:4 4:10,22 | **share** 34:17 60:18 | **special** 25:17,20 | **technician** 15:17 17:18 | **touched** 25:22 26:3,13 |
| 4:23 65:20 67:7,16 | **shared** 56:23 60:15 | **specific** 23:7 40:14 | 58:22 | 26:14,17 28:13 29:1 |
| **Ryan** 1:14 3:4 4:10,16 | **sheet** 67:13 68:7,11 | **specifically** 20:5,21 | **tell** 4:19 5:7 16:23 | 50:9,21 |
| 4:22,23 40:7 65:20 | **shoulder** 34:5 | 23:2 31:6 44:1 | 23:18 28:23 29:13,17 | **touching** 31:10 34:10 |
| 67:7,16 68:4 | **shoulders** 26:6,13,14 | **specifying** 68:7 | 30:22 31:3 43:10 | 51:7 |
| | 26:17 27:2 28:14 | **spoke** 46:16 49:1 64:17 | 45:4 48:3 57:9,14 | **Tower** 2:11 68:1 |
| **S** | 29:1 32:11 34:11 | **spoken** 45:12,14 56:14 | 58:9 59:4,12,18,19 | **Tracye** 1:15 3:6 65:16 |
| **Sadler** 1:16 3:6 65:16 | 50:9,22 51:8 61:16 | 56:17,20 58:23 59:9 | 60:6,10 61:18 64:19 | 66:21 68:17 |
| 66:21 68:17 | **side** 31:15,20 | **Sport** 7:5,10 40:18 | **telling** 43:14 61:12,13 | **traffic** 42:11 64:16 |
| **safety** 17:6,18 19:12,21 | **sign** 4:8 68:9 | 51:22 52:19,21 53:15 | **temp** 10:21 11:16 | **transcript** 66:12 67:8 |
| 24:18 42:4,11 48:18 | **signature** 4:1 67:2 68:8 | **Sport's** 37:9 42:21 | **ten** 54:3 | 67:10 68:5,6,9,11 |
| 52:4 | 68:9,10,11 | **Springs** 8:9,10 | **tends** 41:1 | **transfer** 40:12,17,19 |
| **SAITH** 65:11 | **signing** 66:14 | **standpoint** 18:16 | **testified** 4:13 | 41:5,7,9,14,18 42:8 |
| **sales** 13:10 | **Silk** 12:4,5 | **start** 12:1 22:20 | **testimony** 6:14 36:18 | **transferred** 17:17 |
| **same** 3:21 20:23 21:17 | **simply** 38:17 | **started** 12:7,19 | 41:17 42:7 44:12 | 19:11,12,15,20 |
| 26:11 52:8 62:4 | **since** 45:13 53:13 | **State** 1:17 3:8 65:14,17 | 67:10 | **trial** 3:18 |
| 66:15 | **Sincerely** 68:14 | 66:22 | **their** 11:9 14:5 44:3 | **tried** 28:3 |
| **sat** 25:8 | **sir** 43:9 44:16 50:6 | **stated** 67:11 | **therefor** 67:12 | **triggered** 24:6 |
| **saw** 23:21 24:18,21 | 63:18 | **statement** 37:5 39:5 | **thereof** 66:18 | **troublesome** 24:10 |
| 25:5 27:20 28:14 | **sit** 20:17 | 55:23 56:4,6 | **thing** 62:4 | **Troy** 11:3 |
| 32:10 60:4 | **sits** 31:15,16 | **states** 1:2 13:19 44:2 | **things** 11:21 34:5,12 | **true** 66:12 67:9 |
| **saying** 9:5,9 26:2 28:12 | **situation** 27:8,9 28:5 | 66:6 | 36:11 52:6 56:9 61:2 | **truth** 4:12,12,13 65:21 |
| 41:21 43:7 48:10 | 30:9 34:17,18 47:13 | **Statute** 3:14,20 | 63:18 | 65:22,22 |
| 59:23 61:15 | 48:5 53:4 | **still** 12:9 18:8 47:5 | **think** 6:2 22:17 41:6,21 | **try** 5:7 9:5 27:17 29:21 |
| **schedule** 41:23 42:5,9 | **situations** 33:8 | **stipulated** 3:2,15,22 | 45:8 47:19 51:3 54:7 | 34:16 41:4 |
| 42:10 | **six** 13:1 | **stipulation** 1:15 | 59:3 60:23 | **trying** 8:21 12:1 |
| **schedules** 41:20 | **SMART** 1:9 4:18 6:4 | **stipulations** 3:1 4:7 | **thirty** 68:11 | **turned** 32:12 |
| **scope** 54:15 | 6:18 7:2,13 8:3 15:4 | **stood** 32:7,23 | **though** 64:17 | **twice** 51:20 |
| **Scott** 2:10 56:20,22 | 15:14 16:15 22:18 | **stop** 40:2 51:2 | **thought** 29:2,5 32:14 | **two** 6:19 8:4 10:16 |
| 57:1 | 27:11 43:19 46:5,8 | **Street** 1:18 2:12 11:4,7 | 63:14 | 16:17,18 17:4 39:7 |
| **seated** 31:12,14 | 47:5,20 53:13 54:7 | 68:2 | **three** 7:20 8:18,19 | 19:17 36:9 49:23 |
| **second** 15:15 18:10 | 54:14 66:4 67:5 68:3 | **submit** 43:12 | 10:12,13 11:4,7 | 50:5,14,17 51:21,21 |
| 19:9,10 55:9 | **SMART's** 37:4 38:13 | **SUBSCRIBED** 67:17 | **through** 15:18 16:7 | 52:13,15,16,18 54:14 |
| **security** 47:10 48:18,21 | **smiled** 24:3 | **subsequent** 29:17 | 18:10,17 20:1 43:1,3 | 64:4,11,13 |
| **see** 25:18 27:19 28:2 | **smiling** 24:4,8,9 | **substance** 56:11 | 54:2 | **type** 9:19 17:23 19:6 |
| 29:22 34:9 39:1 45:4 | **Smith** 58:20 | **sudden** 31:22 | **tight** 62:11 | **typing** 31:18 |
| 62:11 | **some** 5:4 29:11,23 41:6 | **Suite** 1:18 2:5 | **time** 3:11,12 7:1 8:20 | |
| **seeing** 35:11 | 43:12 54:6,19 | **supervisor** 7:4 44:4,4 | 15:12,14,17 16:1,4,6 | **U** |
| **seeking** 30:5 | **somebody** 61:12 | **supposedly** 34:21 | 17:5,9,14,21 18:5,9 | **uh-huh** 5:1 8:23 9:10 |
| **seemed** 28:20 | **someone** 26:9 27:19 | **Sure** 52:10 | 19:20 20:23 24:21 | 9:11,18 12:6 13:14 |
| **seen** 29:3,4,5 31:9 33:9 | 34:10 59:17 64:21 | **surgery** 59:6,13,20 | | 15:6 17:20 22:15,19 |

Deposition of Ruth Ryan                    Atwell vs. SMART Alabama                    September 12, 2007

Page 6

22:22 29:16 36:15
45:20,22 46:6 62:2
**uh-uh** 9:1,11,18
**unclear** 5:5
**uncomfortable** 50:21
**uncommon** 60:17
**under** 55:16
**understand** 5:6 27:18
**understanding** 19:21
30:2 46:4,11,12 47:1
49:8,10 55:2
**understands** 9:4
**uniforms** 46:17,19
**Union** 8:9,10
**UNITED** 1:2 66:6
**until** 15:15 17:15,22
19:8 20:2,12 22:21
22:23 30:1
**upset** 23:21 24:2 25:6
25:22 26:23 28:1,20
29:12,12 33:2 58:1,5
**used** 3:13,19 30:15,17
58:21
**using** 17:16
**Usual** 4:6

**V**

**validate** 27:7,12
**validation** 27:16
**verbal** 44:8
**verify** 27:7
**very** 5:5 14:20 23:7
25:17,20 28:20 33:5
34:9 52:5 61:1
**visibly** 29:12
**voluntarily** 8:2 10:14
11:13
**vs** 1:8 66:3 67:5 68:3

**W**

**wait** 54:5
**waived** 3:18 4:2 66:15
**waiving** 3:21
**walked** 32:7
**wall** 31:19
**want** 14:11 37:13 56:9
61:10
**wanted** 28:8 40:16,19
41:5,9,14,18,20
**Washington** 30:16
**wasn't** 24:4,9,10 58:11
61:16 63:16
**watermark** 22:16
**way** 5:8 15:7 22:9,13
31:10 41:9 61:8
**Wayne** 8:7,14 10:11,17
11:13
**ways** 54:20
**Weathers** 62:16,17

**week** 15:15 18:10 19:9
19:10
**weeks** 8:4 10:16
**well** 14:10 17:10 25:1
26:22 29:13 32:20
44:2 50:7,16 57:5
59:19,23 63:9
**Wendy** 55:15,18
**went** 26:18 29:21 34:16
48:17,17
**were** 6:23 7:21 8:5,14
8:17 10:18 11:2,3,11
11:16 12:9,15 13:3
13:16,18 16:8 17:22
18:18 19:5 21:14
23:5 27:10 31:7,12
33:4,5 35:1 41:15,19
42:3 46:7,19 47:6
49:14,16 50:11 52:7
52:13 53:6,7 61:21
62:10 63:5,12,16
64:15
**we'll** 43:3
**we're** 18:8 19:14 21:6
22:20 24:14 28:22
36:8 39:2,5 62:4
**we've** 36:23 39:3,3,4,7
39:9
**whatsoever** 33:4,5
**while** 12:9 44:14 47:5
**whole** 4:12 30:9 65:22
**wide** 31:17
**Williams** 2:10
**Willis** 2:9 4:8 5:23 8:21
9:8,14,20 10:5 14:11
16:21 18:21 20:10
22:3,12 25:15 27:5
27:14 30:18 33:15
37:7 39:3,8,13,19
40:2 41:1 42:23
43:22 46:1 47:22
50:3 51:2,18 53:21
54:4 55:8 57:5 60:1
60:20 62:8,21 64:6
65:6 68:22
**wish** 49:3
**wishes** 41:7
**witness** 3:23 4:1,11 9:7
9:13,23 26:9 27:9,12
66:13 67:2
**witnessed** 27:6
**witnesses** 53:7
**woman** 60:8,17
**words** 31:7,8 63:12
**work** 7:12,19 8:3 12:22
15:21 16:10 35:9
42:12
**worked** 6:17 10:11,22
22:17,21 23:13

**worker's** 45:1
**working** 33:13,20
41:15,16,19 42:9
**worry** 58:2
**wouldn't** 21:8
**write** 43:10,14,16
**writing** 55:23
**written** 44:7 56:6
**wrong** 24:1 34:10
60:22

**Y**

**yeah** 7:9 10:9 12:8,12
13:6,23 14:15 19:14
25:4,4 26:10 30:13
32:21 33:14 36:7,21
38:18 41:8 47:19,21
47:23 48:9 52:2,2
53:11 54:20,20 55:10
56:5 57:8,14 59:9
62:10 64:18
**year** 10:23 11:12 20:3
20:11,18 21:20
**years** 6:20 8:18,19
10:12,13 13:2,20
16:17,18 17:4 54:10
54:14
**yesterday** 38:23 43:6,7
**Yolanda** 14:6
**y'all** 20:8 21:8 24:15
29:7 35:18,20 36:2
43:19

**0**

**05** 19:9,10

**1**

**1** 22:20,23 37:1 39:3
42:20 44:13
**1st** 23:15 29:14
**1:15** 1:20
**10** 32:17
**12** 1:19 66:10 67:9 68:6
**13th** 15:19 16:7 17:15
17:22 18:17
**14th** 19:22 20:1,2
**19** 14:2,16
**1950** 1:19

**2**

**2** 37:1 39:3
**2nd** 66:19
**2:06CV1089-MEF** 1:8
66:9
**2:30** 65:9
**20** 32:17
**20th** 2:12 68:2
**200** 2:5
**2005** 15:5,18,19 16:7,7

16:12 17:15 18:8,18
19:22 20:2,3,18
21:20,23 22:3,4
**2006** 22:14,18,23 23:1
23:15,15,16 50:2,16
**2007** 1:19 66:10,19
67:9,18 68:6
**201** 1:18
**26th** 6:19,21
**28** 13:20
**294** 68:19

**3**

**3** 37:1 39:4
**300** 32:3,11
**31st** 20:3,12
**3100** 2:11 68:1
**3300** 2:6
**35203** 2:12 68:2
**35223** 2:6
**36035** 5:18,19

**4**

**4** 2:20 37:8,9 38:6,7,10
39:4
**420** 2:12 68:2

**5**

**5** 37:1 39:7,8

**6**

**6** 39:9
**65** 66:11
**68** 5:16

**7**

**7** 22:23 39:13
**7th** 22:18 23:15,16
29:15

**8**

**8** 39:20

# DEPOSITION OF GARY SPORT

## September 12, 2007

## Pages 1 through 102

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL  36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

Case 2:06-cv-01089-MEF-WC     Document 18-10     Filed 11/02/2007     Page 2 of 36

Deposition of Gary Sport     Atwell vs. SMART Alabama     September 12, 2007



Page 1

1
2
3        IN THE UNITED STATES DISTRICT COURT
4        FOR THE MIDDLE DISTRICT OF ALABAMA
5                 NORTHERN DIVISION
6
7     ROBIN ATWELL,
8        Plaintiff,
9     vs.          CIVIL ACTION NO.
                   2:06CV1089-MEF
10
11    SMART ALABAMA, LLC,
12        Defendants.
13          * * * * * * * * * * * * *
14
15        DEPOSITION OF GARY SPORT, taken
16    pursuant to stipulation and agreement before Tracye
17    Sadler, Certified Court Reporter and Commissioner
18    for the State of Alabama at Large, in the Law
19    Offices of Burr & Forman, 201 Monroe Street, Suite
20    1950, Montgomery, Alabama, on September 12, 2007,
21    commencing at approximately 10:10 a.m.
22
23          * * * * * * * * * * * * *

Page 2

1
2
3     APPEARANCES
4     ON BEHALF OF THE PLAINTIFF:
      Mr. Richard F. Horsley
      GOOZEE, KING & HORSLEY, LLP
5     Suite 200
      Shades Brook Building
6     3300 Cahaba Road
      Birmingham, Alabama  35223
7
8
9     ON BEHALF OF THE DEFENDANT:
      Ms. Kathryn Morris Willis
10    Mr. Scott Williams
      BURR & FORMAN
11    Attorneys at Law
      3100 SouthTrust Tower
12    420 North 20th Street
      Birmingham, Alabama  35203
13
14
15
16          * * * * * * * * * * * *
17
18        EXAMINATION INDEX
19
20    BY MR. HORSLEY . . . . . . . . . . 6
21
22        (Index continued on next page)
23

Page 3

1          PLAINTIFF'S EXHIBITS
2
1     2-2-06 Handwritten Letter to Gary Sport    60
      from Robin Atwell; Re:  Department
3     Transfer
4
2     Defendant SMART Alabama, LLC's Rule        76
      26(A) Initial Disclosures
5
6   3   Defendant SMART Alabama, LLC's Responses  76
      to Plaintiff's First Set of
7     Interrogatories and Request for
      Production
8
4     SMART's Position Statement Presented to    77
9     EEOC
10  5   Charge of Discrimination                  78
11  6   Excerpt from Pre-Employment Training      78
      Material on Sexual Harassment
12
7     Excerpt from Employment Manual on Sexual   80
13    Harassment
14  8   Information from Rance Maddox's Personnel  88
      File
15
16          * * * * * * * * * * * *
17
18        STIPULATIONS
19     It is hereby stipulated and agreed by and
20    between counsel representing the parties that the
21    deposition of GARY SPORT is taken pursuant to the
22    Federal Rules of Civil Procedure and that said
23

Page 4

1     deposition may be taken before Tracye Sadler,
2     Certified Court Reporter and Commissioner for the
3     State of Alabama at Large, without the formality of
4     a commission, that objections to questions other
5     than objections as to the form of the question need
6     not be made at this time but may be reserved for a
7     ruling at such time as the said deposition may be
8     offered in evidence or used for any other purpose
9     by either party provided for by the Statute.
10        It is further stipulated and agreed by and
11    between counsel representing the parties in this
12    case that the filing of said deposition is hereby
13    waived and may be introduced at the trial of this
14    case or used in any other manner by either party
15    hereto provided for by the Statute regardless of
16    the waiving of the filing of the same.
17        It is further stipulated and agreed by and
18    between the parties hereto and the witness that the
19    signature of the witness to this deposition is
20    hereby not waived.
21
22          * * * * * * * * * * * * *
23

Page 5

1    THE COURT REPORTER:  Usual
2        stipulations?
3    MS. WILLIS:  Yes.  But we would
4        like to read and sign.
5
6        GARY SPORT
7    The witness, after having first been duly sworn
8  to speak the truth, the whole truth, and nothing
9  but the truth, testified as follows:
10        EXAMINATION
11  BY MR. HORSLEY:
12  Q.  Gary, my name is Richard Horsley.  We've
13      met several times over the last couple of
14      months.  First of all, please tell the
15      court reporter your full name.
16  A.  It's Gary Rex Sport.
17  Q.  And it's Sport, S-P-O-R-T, not with an "S"?
18  A.  Correct.
19  Q.  Tell me what your current residence address
20      is.
21  A.                              Luverne.
22  Q.  Luverne, Alabama.  What's the zip code?
23  A.  36049.

Page 6

1    Q.  And you're currently employed where?
2    A.  SMART Alabama.
3    Q.  How long have you been employed with SMART
4        Alabama?
5    A.  I've been with SMART for three and a half
6        years.
7    Q.  Have you given a deposition before today?
8    A.  Yes.
9    Q.  On approximately how many occasions?
10   A.  I believe three.
11   Q.  Three.  You know the drill.  If you don't
12       understand the question or if it's not
13       clear, tell me to repeat it.  Once you
14       answer a question, I'm going to assume that
15       you understood it and gave the answer that
16       you intended to give; okay?
17   A.  Okay.
18   Q.  And, again, if I'm not clear, tell me that
19       you don't understand what I'm asking and
20       I'll repeat it; okay?
21   A.  Okay.
22   Q.  In what capacity are you employed with
23       SMART Alabama?

Page 7

1    A.  I'm a general manager.
2    Q.  And tell us briefly what is the business of
3        SMART Alabama, LLC.
4    A.  Okay.  SMART is a stamping and welding
5        facility, automotive parts.
6    Q.  Stamping?
7    A.  Stamping.
8    Q.  What does that mean?
9    A.  Forming metal parts, automobile parts, body
10       parts.
11   Q.  And welding?
12   A.  And welding.
13   Q.  And is it fair to characterize SMART as a
14       supplier for Hyundai?
15   A.  Yes.
16   Q.  Do y'all supply to any other companies?
17   A.  No.  Solely to Hyundai.
18   Q.  And tell us briefly, again, what your job
19       duties are at SMART.
20   A.  Okay.  As general manager I'm responsible
21       for the administration side of the
22       business.  At present I have the employee
23       relations group under my control, the

Page 8

1    entire human resource group under my
2    control which encompasses employee
3    relations, general affairs group, and the
4    safety group under my control with indirect
5    responsibility for IT and accounting.
6    Q.  Is the SMART plant located in Luverne?
7    A.  Yes.
8    Q.  Is there more than one or is there just one
9        plant?
10   A.  Just one plant.
11   Q.  And is your office physically located in
12       that plant or is there a separate building
13       where the offices are?
14   A.  My office is in that plant.
15   Q.  And you are in charge of the entire human
16       resources department; is that fair?
17   A.  Yes.
18   Q.  Who is the human resources director, if
19       there is one?
20   A.  At this point a gentleman named Gin Roh.
21   Q.  Jim Roh?
22   A.  Gin, G-I-N.
23   Q.  Gin.  Okay.

Page 9

1    A.  R-O-H.
2    Q.  Where is he from?
3    A.  Gin is from Korea.
4    Q.  Who was the HR director back in December of
5        '05?
6    A.  I was.
7    Q.  You were.  How long have you been working
8        for SMART?
9    A.  Three and a half years.
10   Q.  Three and a half years.  And just kind of
11       generally go through the different jobs
12       you've held since you went to work there.
13   A.  I was hired as human resource manager
14       actually, and I held that position until
15       approximately November, I want to say, of
16       two thousand --
17   Q.  2000?
18   A.  Last -- 2006.
19   Q.  2006.  Okay.
20   A.  At which time I was moved to general
21       manager.
22   Q.  So you've basically had two jobs at SMART,
23       HR director and general manager?

Page 10

1    A.  That's right.
2    Q.  All right.  Where were you employed before
3        SMART?
4    A.  Just prior to SMART I was at W.L. Petrey
5        Wholesale Company.
6    Q.  P-E-T-R-Y?
7    A.  P-E-T-R-E-Y.
8    Q.  Where is that located?
9    A.  That's in Montgomery.
10   Q.  Montgomery?
11   A.  Yes.
12   Q.  What type of company is that?
13   A.  That is a wholesale distributor, primarily
14       services convenience stores.
15   Q.  And how long were you employed there?
16   A.  I was with Petrey for approximately three
17       years.
18   Q.  In what capacity?
19   A.  Human resource manager.
20   Q.  The whole time?
21   A.  Yes.
22   Q.  And did you leave there voluntarily to go
23       to work for SMART?

Page 11

1    A.  Yes.
2    Q.  Where were you immediately prior to Petrey?
3    A.  Before Petrey I worked for Kleinert's,
4        Incorporated.
5    Q.  Say that again.
6    A.  Kleinert's.
7    Q.  How do you spell that?
8    A.  It's K-L-I-E-N-E-R-T-S (sic).
9    Q.  Where are they located?
10   A.  They were in Elba.
11   Q.  Elba?
12   A.  Correct.
13   Q.  Do you know Merrill Shirley?
14   A.  I know Merrill Shirley, yes, I do.
15   Q.  And how long were you with Kleinert's?
16   A.  I was just with Kleinert's for a year and a
17       half.
18   Q.  What did you do for them?
19   A.  With Kleinert's I was assigned to Central
20       America setting up a manufacturing
21       facility.
22   Q.  And I failed to ask, what does Kleinert's
23       do?

Page 12

1    A.  Kleinert's is an apparel manufacturer.
2        They manufacture children's clothing.
3    Q.  So did you actually live in Central America
4        while you were employed for them?
5    A.  It was -- I had a townhouse there, but I
6        traveled back and forth.  I was between the
7        two.
8    Q.  What part of Central America?
9    A.  San Pedro Sula, Honduras.
10   Q.  All right.  Did you leave there voluntarily
11       to go to work for Petrey?
12   A.  Yes.
13   Q.  And where were you immediately before
14       Kleinert's?
15   A.  Immediately before Kleinert's I was with
16       Standard Textile Company.
17   Q.  Standard?
18   A.  Yes.
19   Q.  Where are they located?
20   A.  Standard Textile was -- is home-based out
21       of Cincinnati, Ohio.  I worked out of an
22       office in Enterprise, Alabama.
23   Q.  And what did you do for them?

Page 13

1   A.  I was responsible for their Mexican
2       operations.  I was considered a -- I'm
3       trying to remember the name.  I was a
4       coordinator of outsourced operations in
5       Mexico -- western Mexico.
6   Q.  Did you live in Mexico?
7   A.  I spent a lot of time back and forth, but I
8       didn't have a residence there.
9   Q.  You didn't have a residence there?
10  A.  No.
11  Q.  Did you leave there voluntarily to go to
12      work for Kleinert's?
13  A.  Yes.
14  Q.  Where were you immediately before Standard?
15  A.  Before that Phillips-Van Heusen Company.
16  Q.  Phillips-Van Heusen?
17  A.  Right.  Shirtmaker.
18  Q.  Yeah.  And where was that?
19  A.  That was in Ozark.
20  Q.  Ozark.  Do you know Anne Laura Parker?
21  A.  Yes, sure do.
22          (Brief interruption.)
23  Q.  What did you do for Van Heusen?

Page 14

1   A.  I was an industrial engineer.
2   Q.  And you lived in Ozark during that time?
3   A.  Luverne.
4   Q.  And you left there voluntarily to go to
5       work for Standard?
6   A.  Yes.
7   Q.  And immediately before Phillips where were
8       you?
9   A.  Back to the beginning.  Oxford Industries.
10  Q.  Where are they located?
11  A.  Oxford had a -- I was assigned to the
12      facility there in Luverne.
13  Q.  What do they do?
14  A.  They are a manufacturer of men's pants --
15      men's and women's pants.
16  Q.  And what was your job there?
17  A.  Industrial engineer.
18  Q.  Did you leave there voluntarily to go to
19      work for Van Heusen?
20  A.  Yes.
21  Q.  And before Oxford were you in school?
22  A.  Yes.
23  Q.  Tell me about your education.

Page 15

1   A.  Okay.  Actually I went to school with
2       Oxford on a co-op scholarship.  I completed
3       that and went to work with them, fulfilled
4       that obligation, and then moved on.  And
5       during that time frame became interested in
6       human resources, went back to school,
7       obtained a degree in human resource
8       management and --
9   Q.  Where from?
10  A.  Faulkner.  Faulkner University.
11  Q.  Faulkner?
12  A.  Yeah.  And was afforded an opportunity to
13      move into the HR side of the business.
14      Actually in the Honduran project I was
15      heavily involved in recruiting and the HR
16      type parts of that, getting that factory up
17      and going.  And then came to Petrey
18      actually as an HR manager to help them with
19      some things.
20  Q.  Okay.
21  A.  And here I am.
22  Q.  Where did you obtain your college degree?
23  A.  The HR degree is at Faulkner.  The IE is

Page 16

1       from Southern Technical Institute in
2       Marietta, Georgia.
3   Q.  So you don't have an engineering degree, or
4       do you?
5   A.  I have --
6   Q.  You said IE.  I'm sorry.  You do.
7   A.  I have an associate's actually, yeah.
8   Q.  Where was that again?
9   A.  Southern Technical Institute.  At the time
10      it was a specialized division of Georgia
11      Tech that strictly cut to the chase
12      literally, so ...
13  Q.  Was that in Atlanta?
14  A.  Marietta.
15  Q.  Where did you go to high school?
16  A.  Luverne.
17  Q.  So you were born and raised in Luverne?
18  A.  Yes.
19  Q.  Do you know Warren Giles?
20  A.  I know Warren very well.  It's been a long
21      time since I've seen him, but, yes, I know
22      Warren.  Saw his father this morning in
23      fact.

Deposition of Gary Sport                    Atwell vs. SMART Alabama                    September 12, 2007

Page 17

1   Q.  Have you ever been a plaintiff or a
2       defendant in a lawsuit before?
3   A.  Yes.
4   Q.  How many times -- well, first, have you
5       ever been a plaintiff?
6   A.  No.
7   Q.  You've been a defendant?
8   A.  I've been a defendant, yes.
9   Q.  How many times?
10  A.  I guess only one that I can recall.
11  Q.  And in what capacity were you named as a
12      defendant?
13  A.  As a human resource manager of a company.
14  Q.  Which company?
15  A.  Petrey.
16  Q.  So you were named as an individual
17      defendant in a lawsuit filed against
18      Petrey?
19  A.  Oh, no.  No, I was not named as an
20      individual defendant.
21  Q.  You weren't an individual --
22  A.  No.
23  Q.  Are you telling me that -- well, what are

Page 18

1       you telling me?
2           I don't want to put words in your
3       mouth.  Tell me how you were involved in a
4       lawsuit as an employee of Petrey.
5   A.  Okay.  Petrey had a lawsuit from a
6       gentleman who felt like he had been wronged
7       in some contractual agreements from a
8       buyout from a company.  And I had some
9       knowledge of some of the goings-on in that,
10      so I was involved in that.
11  Q.  You were not named as a defendant --
12  A.  No.  No.
13  Q.  Did you have to give a deposition in that
14      case?
15  A.  Yes, I did.
16  Q.  But you've never actually been named as a
17      defendant in a lawsuit as far as you know?
18  A.  Not up to and including today, yes.
19  Q.  Okay.  Now, that's one deposition.  You
20      said earlier you thought you had given
21      three.  What were the other two
22      depositions?
23  A.  I gave another deposition at Petrey.  They

Page 19

1       were all at Petrey.  And one was involving
2       a wrongful termination.  Actually the other
3       two were.
4   Q.  And, again, you were not named as a
5       defendant, but you had to give a
6       deposition?
7   A.  No.  Exactly.
8   Q.  Do you know if those cases in which you
9       testified were filed in federal court or
10      state court?
11  A.  The one involving the contract dispute was
12      there in Crenshaw County.  I guess that was
13      circuit court.  And the other -- the other
14      was in state court.  We came to Montgomery
15      for the court.  And the third was -- I
16      don't remember where it was filed.  It was
17      settled.
18  Q.  No other participation in lawsuits other
19      than what you've just told me about other
20      than this case today?
21  A.  There are some pending things at SMART,
22      yes.
23  Q.  Are you named as a defendant in any of

Page 20

1       those cases?
2   A.  Yes.
3   Q.  Can you tell me about --
4           MS. WILLIS:  Richard, if we can go
5       off for a second.
6           MR. HORSLEY:  Fine, yeah.
7           (Off-the-record discussion.)
8   Q.  Have you ever been arrested for any reason?
9   A.  No.
10  Q.  I can't remember exactly what counties all
11      are included in the Middle District of
12      Alabama.
13          MS. WILLIS:  I'll help you if I
14      can.
15          MR. HORSLEY:  What are the
16      counties?
17          You have Crenshaw --
18          THE WITNESS:  Butler.
19          MS. WILLIS:  Butler.  You have
20      Lee, Montgomery --
21          THE WITNESS:  Lowndes, I believe.
22          MR. HORSLEY:  Russell.
23          MS. WILLIS:  Isn't Autauga County

Page 21

1      in it too?
2   Q.  In any counties that you know to be a part
3       of the Middle District of Alabama,
4       specifically the ones that we just named,
5       do you have any relatives that are over 19
6       years of age?
7           MS. WILLIS:  Oh, Lord.
8   Q.  Is there a lot of them?
9   A.  Yes.
10  Q.  Can you just give a list to Katie and
11      she'll give them to me?
12  A.  Sure.
13          MS. WILLIS:  And we'll check the
14          Middle District and make sure.
15          I just know you've got quite a
16          few in Luverne alone that I
17          know about.
18          THE WITNESS:  Most of them are out
19          of Luverne, so ...
20  Q.  Are you married?
21  A.  Yes.
22  Q.  What's your wife's name?
23  A.  Kathy.

Page 22

1   Q.  Kathy Sport.  Have you been married before
2       Kathy?
3   A.  No.
4   Q.  Do you have any children that are over 19?
5   A.  No.
6   Q.  Back in August of 2005 were you the human
7       resources director at SMART?
8   A.  Yes.
9   Q.  Is it your understanding that that's the
10      month that Robin Atwell became an employee
11      of SMART Alabama, or do you know?  Does
12      that sound right?
13  A.  That's close, yes.  Yes.
14  Q.  Did you participate in any way in hiring
15      Robin Atwell as an employee at SMART?
16  A.  I participated in the pre-employment
17      training.  Robin was hired through AIDT
18      style training -- group training, so ...
19  Q.  What does that mean?
20  A.  That's -- AIDT is a state industrial
21      development company that helped us
22      recruit.  And we did training classes.  We
23      were doing mass hiring at the time.  So

Page 23

1       Robin was involved in one of those groups
2       that we hired.
3   Q.  Do you specifically remember her
4       independently or do you just know she was a
5       part of one of those groups?
6   A.  I remember her.
7   Q.  You obviously interacted with her somewhat
8       during those training sessions; is that
9       correct?
10  A.  I interacted with everyone, yes.  I spent a
11      good bit of time with the people.
12  Q.  And at some point she interviewed with
13      someone at SMART to become an employee; is
14      that correct?
15  A.  No, not technically.  The way the training
16      worked was the people completed the
17      training process and pre-employment
18      physicals, those type things, and then we
19      selected whom we wanted to hire.  There
20      were really no interviews per se.  The
21      whole process was one big interview, I
22      guess.
23  Q.  Would she have interviewed with anyone

Page 24

1       prior to the AIDT training class?
2   A.  Yes, she would.
3   Q.  Did she interview with you?
4   A.  I don't recall.  We had several people
5       doing the interviews at the time, so ...
6   Q.  Was Rance Maddox one of those individuals
7       that was interviewing prior to the AIDT
8       training class?
9   A.  No.
10  Q.  So if she says that Rance Maddox
11      interviewed her, are you contending that
12      she's incorrect?
13  A.  To be hired at SMART, yes, that's
14      incorrect.
15  Q.  Are you aware of any time when Rance Maddox
16      would have interviewed her prior to her
17      first day of employment at SMART?
18  A.  No.
19  Q.  And am I correct that she started at SMART
20      in August of '05 as an assembly technician?
21  A.  Yes.
22  Q.  And what's the best definition you can give
23      me of that job?

Deposition of Gary Sport          Atwell vs. SMART Alabama          September 12, 2007

Page 25

1   A.  She ran a robot that made parts.
2   Q.  A robot?
3   A.  Yes.
4   Q.  And it's my understanding that she served
5      in that capacity up until approximately
6      November the 13th of '05. Is that your
7      understanding?
8   A.  Yes.
9   Q.  As the human resources director during that
10     period of time do you specifically recall
11     any reprimands, warnings, punishments that
12     Robin Atwell received while she was an
13     assembly technician from August until
14     November?
15        I know there are records that are --
16     I'm just asking your memory.
17   A.  I don't recall any.
18   Q.  Do you recall her being a problem employee
19     to any extent during that period of time?
20        MS. WILLIS: Object to the form.
21          You can answer.
22   A.  No, I don't recall.
23   Q.  Are you aware of Robin Atwell complaining

Page 26

1     during that period of time -- from August
2     25th to 11-13 of '05 are you aware of her
3     complaining about sexual harassment from
4     any other co-employees?
5   A.  No.
6   Q.  And who was her supervisor from the time --
7     or during the time period that she was an
8     assembly technician?
9   A.  I don't recall who her immediate supervisor
10     was at that time.
11   Q.  Scott Kehey?
12   A.  Kelley.
13   Q.  Kelley. I'm sorry. I can't read my own
14     writing.
15        Scott Kelley?
16   A.  Scott was a team leader. It's possible he
17     was.
18   Q.  So if she says that he was her supervisor,
19     you would agree with that?
20   A.  I have no reason to dispute that.
21   Q.  Is he still there at SMART?
22   A.  Yes.
23   Q.  What's his position at SMART?

Page 27

1   A.  Scott is now a -- Scott was a team leader
2     at the time. He is now a supervisor.
3   Q.  In what department?
4   A.  Assembly.
5   Q.  Approximately how many employees would have
6     been in Scott Kelley's team -- how many
7     assembly techs would have been in his team
8     back during August to November of '05?
9   A.  Most of our teams consist of approximately
10     30 persons.
11   Q.  30?
12   A.  25 to 30 persons.
13   Q.  Okay. And Robin Atwell would have been a
14     team member; correct?
15   A.  Correct.
16   Q.  All right. And from November -- excuse
17     me. From August to November of '05 what
18     was Rance Maddox's position?
19   A.  Safety manager.
20   Q.  Of the entire plant or a certain part of
21     the plant?
22   A.  The entire plant.
23   Q.  Safety manager?

Page 28

1   A.  Yes.
2   Q.  Is that the same thing as safety director
3     or risk manager?
4   A.  Yes, I suppose so. Risk manager, safety
5     manager, yes. We typically don't use the
6     term director except for higher positions.
7   Q.  Was he the highest level safety employee at
8     the plant?
9   A.  Yes.
10   Q.  He was in charge of safety issues?
11   A.  He was in charge of the safety issues,
12     absolutely.
13   Q.  And when did he first become an employee of
14     SMART, if you know?
15   A.  Gosh, I want -- it's just a guess. I want
16     to say somewhere around March or February
17     of that year.
18   Q.  Of '05?
19   A.  That's certainly a guess.
20   Q.  Okay.
21        MS. WILLIS: I think you probably
22       have some documents that show
23       that.

Page 29

1  Q.  It looks like he started March 7th of '05.
2      Does that sound right?
3  A.  Okay.  That sounds right.
4  Q.  And was his employment as safety director
5      the entire time he was there as far as you
6      know?
7  A.  Yes.
8  Q.  Can you tell me who hired Rance Maddox?
9  A.  Yes.  Rance was hired by myself and
10     Director Kwon.
11 Q.  Do you recall personally interviewing Rance
12     Maddox before he became an employee?
13 A.  Yes.
14 Q.  Was that conducted with Mr. Kwon?
15 A.  Yes.
16 Q.  Do you recall what Mr. Maddox's credentials
17     were to become the safety director at -- or
18     safety manager at SMART?
19 A.  Not specifically.  But I do recall he came
20     with good credentials, a good background in
21     safety.
22 Q.  Specifically with regard to Rance Maddox --
23     and it may be the same with all employees

Page 30

1      or it may be different.  I'm not sure how
2      it works.  But let's concentrate on him
3      first of all.
4          When you hired Rance Maddox as the
5      safety director at the plant, prior to him
6      becoming employed there is there any type
7      of background check that you or Mr. Kwon or
8      both of you ran on him?
9  A.  Rance was hired through a recruiter, and
10     typically the recruiter screened these
11     people for us based on the criteria that we
12     give them.  So Mr. Kwon and I did not do
13     background checks, but at the same time we
14     depend on the recruiters to provide us
15     quality personnel.
16 Q.  Who was the recruiter?
17 A.  The recruiter for Rance was -- I honestly
18     do not recall.  It was one of two different
19     recruiters we were using at the time, but
20     I'm not certain of which one.
21 Q.  And basically with regard to Mr. Maddox,
22     they would have screened him and then
23     recommended him to SMART and then y'all

Page 31

1      would not have done any independent
2      background check on him; is that fair?
3  A.  That's fair.
4  Q.  Okay.  Did SMART require this company to
5      provide any records related to the
6      screening of Mr. Maddox, or do you know?
7  A.  No, we did not.
8  Q.  You did not require that.  Okay.  From the
9      time he was hired in March of '05 until
10     November of '05 did y'all have any employee
11     that complained about Mr. Maddox sexually
12     harassing them?
13 A.  No.
14 Q.  No sexual harassment complaints against
15     Mr. Maddox as far as you know from March of
16     '05 through November of '05; is that
17     correct?
18 A.  None that I'm aware of.
19 Q.  Are you aware -- or did you personally have
20     to reprimand or punish Mr. Maddox for
21     anything from the time he became employed
22     until November the 13th of '05 as far as
23     you remember?

Page 32

1  A.  Not that I recall, no.
2  Q.  How was his performance as the safety
3      director?
4          MS. WILLIS:  Object to the form.
5          You can answer.
6  A.  Rance's performance was -- Rance's
7      performance was good at times and lacking
8      at times.
9  Q.  Generally what was good about his
10     performance?
11 A.  Rance had good knowledge of OSHA statutes
12     and laws, which is something we desperately
13     needed at the time.  He was really good in
14     that area.  And Rance's follow-up skills
15     were typically good in dealing with OSHA
16     and those type things.  That was important
17     in the startups.
18 Q.  So he was good with regard to governmental
19     regulations and things like that?
20 A.  Yes.
21 Q.  All right.  What was he bad at?
22 A.  Sometimes Rance's organizational skills
23     were not the best.

Page 33

1  Q.  Can you give me an example of that?
2  A.  It was -- he could get overwhelmed fairly
3      quickly, though it was very easy at the
4      time to get overwhelmed with everything we
5      had going on.  So some things would slip
6      through the slats every now and then.
7  Q.  Anything else that he was bad at?
8  A.  Not that I can recall.
9  Q.  Is there a gray area between bad and good
10     where he was marginal in certain areas, or
11     do you have an opinion about that?
12         MS. WILLIS:  Object to the form.
13         You can answer.
14  A.  Rance overall was adequate.
15  Q.  How about employee relations?  How did he
16     do with the people that he -- is it fair to
17     characterize him as a supervisor over all
18     employees as far as safety issues is
19     concerned?
20         MS. WILLIS:  Object to the form.
21         You can answer.
22  A.  I wouldn't characterize him as a supervisor
23     of -- over them as a -- as responsible for

Page 34

1      that.  He was limited in his areas of
2      authority as far as dealing with safety
3      aspects, chain of commands of things.
4  Q.  Do you have any feeling one way or the
5      other about how he was with how he dealt
6      with co-employees?  Did he get along with
7      people or did he not get along with people?
8  A.  In my experience with Rance he got along
9      with people very well.  He's very open and
10     had good rapport with most people.
11  Q.  From March until November 13th Of 2005 what
12     was his physical location in the plant?
13  A.  He was assigned to the safety office.
14  Q.  And the safety office, as I understand it,
15     is an actual physical office with a door;
16     is that correct?
17  A.  Correct.
18  Q.  And if you close that door, that office is
19     cut off from the rest of the plant; is that
20     correct?
21         MS. WILLIS:  Object to the form.
22         You can answer.
23  A.  There is a window in the door, but ...

Page 35

1  Q.  Other than the window in the door, are
2      there any other windows where people can
3      see in or see out of that office?
4  A.  No.
5  Q.  During the months from March through
6      November 13th of '05, was anyone
7      specifically stationed in that office other
8      than Rance Maddox?
9  A.  Could you repeat that, please?
10  Q.  Yeah.  From the time he became an employee
11     until November the 13th --
12  A.  Okay.
13  Q.  I'm using that date because I think
14     that's --
15  A.  Right.
16  Q.  -- approximately the date that Robin
17     became -- or started working in the safety
18     department.
19         During that time period was there
20     anybody else that was physically located in
21     the safety office other than Rance Maddox?
22  A.  Yes.
23  Q.  And who would that have been?

Page 36

1  A.  That would have been -- I'm certain of
2      Melissa McGough.
3  Q.  Melissa McGough?
4  A.  Yes.  And there were other associates in
5      there at that time, though Melissa, as I
6      recall, was the only permanently assigned
7      person.
8  Q.  What was her job?
9  A.  She was a safety assistant.
10  Q.  Is she still with the company?
11  A.  Yes.
12  Q.  What's her job now?
13  A.  Safety assistant.
14  Q.  She's still a safety assistant?
15  A.  Yes.
16  Q.  She's still employed in that office?
17  A.  Yes.
18  Q.  She would have been there from the time
19     that Rance got there until November the
20     13th of '05, right, physically stationed in
21     that office?
22  A.  That's correct.
23  Q.  Are you aware of any complaints that

Page 37

1    Ms. McGough made during that time period of
2    any nature about Rance Maddox?
3  A.  Not that I recall anything.
4  Q.  Okay.  What was Ruth Ryan's job in November
5    of '05?
6  A.  Ruth was the employee relations manager.
7  Q.  Employee relations.  In the initial
8    disclosures that Katie provided to us they
9    have Rance Maddox currently or last known
10   living at 703 21st Street North, Columbus,
11   Mississippi, 39701.  Do you have any
12   information about where he currently lives
13   other than that information?
14 A.  Best of my knowledge that's still accurate.
15 Q.  Did you help in obtaining -- I'm not asking
16   you stuff you discussed with attorneys.
17   But did you have some reason to know where
18   he was living after he left SMART?
19       MS. WILLIS:  And don't tell him
20       anything we talked about.
21       That's not what he's asking.
22   MR. HORSLEY:  Yeah.
23   THE WITNESS:  I understand.

Page 38

1  Q.  Were you aware of where he was living after
2    he left SMART?
3  A.  Yes.
4  Q.  And did he go straight to Columbus,
5    Mississippi, after he left?
6  A.  I'm not real certain exactly where he went
7    after he left.  I found him in Columbus.
8  Q.  How did you find him in Columbus?
9  A.  I called -- I'm trying to remember.  I knew
10   that Rance was from Columbus.  I knew he
11   had some relatives over there.
12      Oh, I do recall now.  We called -- we
13   found out who he was employed with, and we
14   called there.  And they told us the last
15   forwarding address that he had given them,
16   and we ran him down in Columbus.
17 Q.  And, again, I don't want to know something
18   you've talked about with lawyers, but were
19   your efforts to find him in Columbus
20   associated with this lawsuit?
21 A.  No, actually they were not.  They were --
22 Q.  All right.  Tell me why you were --
23 A.  They were associated with one of these

Page 39

1    co-employee suits that involved some OSHA
2    things.  And Rance had mediated some of the
3    things with OSHA, so I needed some
4    information from him.
5  Q.  All right.  And as far as you know he's
6    still there?
7  A.  As far as I know.
8  Q.  Do you know if he works anywhere over there?
9  A.  I don't know.
10 Q.  At the time you spoke with him on the
11   co-employee issues did he tell you he was
12   employed anywhere?
13 A.  I want to say when I first started speaking
14   to him he was employed, I want to say, in
15   Hattiesburg, Mississippi.  And he left the
16   company, and that's when I had to go in
17   search of him.  He didn't indicate whether
18   he was employed or not.
19 Q.  You don't know where he was employed in
20   Hattiesburg?
21 A.  It was a vinyl fence company.  That's
22   all --
23 Q.  Vinyl fence?

Page 40

1  A.  That's what I understand.
2  Q.  When you made contact with Rance Maddox
3    back then related to the co-employee
4    lawsuit, did you discuss with him at all
5    Robin Atwell or any allegations that she is
6    making against him?
7  A.  No, honestly I don't recall having that
8    discussion at all.
9  Q.  Since he left SMART, have you outside the
10   presence of the attorneys for SMART had any
11   discussions with Rance Maddox about Robin
12   Atwell or any of the allegations that she's
13   making in this lawsuit?
14 A.  No.
15 Q.  Have you had any discussions with him
16   outside the presence of an attorney with
17   regard to Cathy Caldwell's allegations that
18   she is making in her lawsuit?
19 A.  Yes.
20 Q.  You have?
21 A.  Yes.
22 Q.  Tell me when you discussed Cathy Caldwell
23   with him.

Page 41

1    A.   Rance called me shortly after Cathy
2    Caldwell's deposition.  He apparently -- he
3    had received something in the mail and he
4    was asking what was going on.  And I told
5    him at that point what I knew about where
6    things were.  And that was the last time I
7    talked with him.
8    Q.   So that would have been a couple of months
9    ago?
10   A.   A couple of months ago, something like
11   that, yes.  It was after the deposition.  I
12   do know that.
13   Q.   Okay.  Did he tell you what he had -- was
14   it something he got from a lawyer or do you
15   know?
16   A.   No.  I didn't ask.
17   Q.   What did he ask you about -- what did he
18   want to know?
19   A.   He said that he had gotten something in the
20   mail and -- about some charges with Cathy
21   Caldwell, apparently something to do with
22   Cathy Caldwell.  And I said, Rance, you
23   know, don't -- don't get upset.  You know,

Page 42

1    we're working through this.  And that was
2    basically the gist of the conversation.
3    But I really -- you know, I really didn't
4    want to discuss a lot of it with him to be
5    honest.
6    Q.   Right.  Y'all didn't get into any specifics
7    about what she testified about?
8    A.   No.  No.  I've been advised not to discuss
9    those things.
10        MS. WILLIS:  Don't talk about what
11        we talked about.
12   Q.   Did he say anything to you about Cathy
13   Caldwell during that conversation?
14   A.   Nothing more than just he was upset that he
15   had received something and wanted to know
16   what was going on.
17   Q.   Do you have any better idea of what it was
18   he received?
19   A.   I really, really do not.  If I did, I would
20   certainly share it with you.
21        MS. WILLIS:  Off the record.
22        (Off-the-record discussion.)
23   Q.   At any point during that conversation did

Page 43

1    he deny the allegations that she was making
2    or discuss her allegations in any way with
3    you?
4    A.   No.
5    Q.   During that conversation did you have any
6    discussions about Robin Atwell?
7    A.   No.
8    Q.   As far as you know was he still at that
9    Columbus, Mississippi, address when you
10   talked to him?
11   A.   Yes.  He indicated he was still in
12   Columbus.
13   Q.   All right.  Again, outside of anything that
14   you've learned from the attorneys for
15   SMART, other than the Robin Atwell
16   allegations, other than the Cathy Caldwell
17   allegations, are you aware of any other
18   employee at SMART who claims to have been
19   harassed in any way by Rance Maddox?
20   A.   I'm not aware of any.
21   Q.   Are you aware of any allegations of
22   harassment by Rance Maddox prior to the
23   time he became an employee of SMART?

Page 44

1    A.   No.
2    Q.   Is he married?  Was he married when he was
3    at SMART?
4    A.   He was married while he was at SMART, yes.
5    Q.   And what's his wife's name?
6    A.   His wife's name is Sonia.
7    Q.   Sonia?
8    A.   He called her Sonia.  I'm assuming it's
9    Sonia.
10   Q.   Okay.  Sonia Maddox.  And you don't know
11   whether or not he's still married to her?
12   A.   Only an assumption is that, yes, he is.
13   Because he's still in Columbus and I know
14   that's where her family is from.
15   Q.   Is Rance an Afro-American?
16   A.   Yes.
17   Q.   And do you know whether Sonia is --
18   A.   She is.
19   Q.   -- Caucasian or African-American?
20   A.   African-American.
21   Q.   Do you know whether or not they have any
22   children together?
23   A.   They have two -- as best I recall two

Page 45

1    children. I can't say whether they're
2    stepchildren or children, but I know there
3    were two boys in that relationship.
4    Q.  They're under 19 as far as you know?
5    A.  No. I think one was -- one is probably
6    over 19. He was in college at the time.
7    And I think there was one maybe under 19 at
8    that time.
9    Q.  Is the one over 19 still living in Alabama
10   as far as you know?
11   A.  I have no idea where he is.
12   Q.  All right. Are you aware of Robin Atwell
13   having made allegations of sexual
14   harassment against any other employee at
15   SMART other than Rance Maddox?
16   A.  I was -- I'm really not aware of Robin
17   making sexual harassment allegations
18   against anyone at SMART.
19   Q.  Other than the allegations she's making in
20   this lawsuit, you're not aware if she's
21   accused anyone else out there of sexual
22   harassment; correct?
23   A.  To my knowledge no one.

Page 46

1    Q.  And you are not aware that she has ever
2    accused anyone of sexual harassment at any
3    of her previous employers, are you?
4    A.  I'm not aware of that.
5    Q.  And what I'm getting at -- and you've
6    probably already answered -- is just make
7    sure that no one has ever told you, hey,
8    Robin Atwell sued her former employer or
9    accused her former boss of sexual
10   harassment, anything like that.
11   A.  No, not that I know of.
12   Q.  All right. Am I correct that she became a
13   safety assistant on or about November the
14   13th of '05?
15   A.  Yes.
16   Q.  And how did that come about?
17   A.  Robin -- the best of my recollection is
18   Robin was injured on the job, an on-the-job
19   injury. And at the time we had such a
20   heavy work load in those -- in all of our
21   office areas. We were utilizing people in
22   the safety office to help keep things up,
23   caught up. And Robin was brought up to do

Page 47

1    some work. She had some skills. And she
2    had some EMT background and things like
3    that, first-aid treatment. So we brought
4    her up front to help do that while she was
5    on modified duty, and that's how she became
6    to be there to start with.
7    Q.  And so when she got that job was she
8    actually physically moved into the safety
9    office with Rance Maddox?
10   A.  Yes.
11   Q.  And was Melissa McGough still in there to
12   your knowledge?
13   A.  For a short period of time.
14   Q.  And did Rance work first shift?
15   A.  Yes.
16   Q.  And was Robin Atwell working in the safety
17   office during the first shift with Rance
18   Maddox?
19   A.  At times -- scheduling in there was so
20   crazy. It's hard to say that she was in
21   there all the time during first. She --
22   but, yes, there were times.
23   Q.  Was she a first-shift employee as far as

Page 48

1    you know?
2    A.  As far as I know that's where she landed,
3    yes.
4    Q.  And what about Melissa McGough? Was she a
5    first-shift employee?
6    A.  Yes, Melissa was.
7    Q.  Was it the company's intention, if you
8    know, to move Robin back to assembly
9    technician once she had recovered from her
10   injury?
11   A.  It was -- yes, it's always our intention to
12   get them back on their original job.
13   Q.  Did she receive a pay raise or a pay
14   reduction when she was moved to the safety
15   office?
16   A.  Not to my knowledge.
17   Q.  Neither?
18   A.  Neither.
19   Q.  All right. And what exactly, if you know,
20   were her job duties in the safety office?
21   A.  Robin -- once we settled Robin into a slot
22   in there, Robin was assigned, as all safety
23   assistants, to administer first aid for

Page 49

1  minor injuries, stabilize situations,
2  coordinate with our work comp doctors,
3  doctors' appointments, those things, and to
4  coordinate and report injuries to our
5  worker's compensation insurance carrier and
6  keep a -- keep up with the recordkeeping,
7  OSHA recordkeeping.
8  Q.  Was she the one who was actually generating
9     the first reports of injury?
10 A.  No.  The first report of injury is done by
11    the immediate team leader.  And so, no, she
12    would not have been -- only if she was
13    there and witnessed the accident.
14 Q.  All right.  With November the 13th as our
15    starting -- or November the 14th as our
16    starting date, her first day in the safety
17    office, from that day until the end of the
18    year, until December the 31st, did you have
19    any complaints or are you aware of any
20    complaints that Robin Atwell made to anyone
21    about Rance Maddox?
22        And that's a broad question because I'm
23    asking you whether it was sexual

Page 50

1  harassment, whether it was just she didn't
2  like him, you know, anything that you heard
3  of or you received from her voicing
4  complaints about Rance Maddox.
5  A.  The problem is the time frames.  I -- I
6     can't recall that I -- I can't sit here and
7     say that I heard them during that
8     particular time frame.
9  Q.  So as you sit here today you can't testify
10    that she ever complained to you or that you
11    heard she had complained to anyone else
12    about Rance Maddox from November the 14th,
13    '05, through December the 31st, '05?
14 A.  Not as to the best of my recollection, no.
15 Q.  During that same period of time -- same
16    question for Rance Maddox -- did he ever
17    complain to you or did you ever hear he had
18    complained to anyone else about Robin
19    Atwell for anything?
20 A.  No.  I don't recall -- I don't recall
21    really anything on either side.
22 Q.  As far as you can recall as you sit here
23    today there didn't seem to be any conflicts

Page 51

1  or problems between those two from November
2  the 14th until the end of December '05; is
3  that correct?
4  A.  Not between those two.
5  Q.  Are you aware of conflicts or problems that
6     Robin Atwell was having during that period
7     of time with anyone else at SMART?
8  A.  No.  No.
9  Q.  Same question with Rance Maddox.  Are you
10    aware of any person in particular he was
11    having problems or conflicts with during
12    that period of time?
13 A.  Other than me or Director Kwon, no.
14 Q.  And would those problems have been related
15    to his organizational problems and being
16    overwhelmed essentially?
17 A.  Yes.
18 Q.  What was his -- say by the end of 2005 was
19    his job in jeopardy as a result of the
20    deficits that you spoke about earlier?
21 A.  I wouldn't say that his job was in
22    jeopardy, but at the same time Rance was --
23    pressure was being put on Rance to get some

Page 52

1  things accomplished and completed, so ...
2  Q.  All right.  During the month of January --
3     well, let me ask it this way, and then you
4     tell me if I'm wrong or if you remember it
5     differently or if it's just not true.
6        During the month of January do you
7     recall having a sit-down discussion with
8     Robin Atwell in the cafeteria specifically
9     concerning Rance Maddox?
10       MS. WILLIS:  Are we talking about
11       January '06?
12       MR. HORSLEY:  I'm sorry.  Did I
13       say '05?
14       MS. WILLIS:  You said just
15       January.
16       MR. HORSLEY:  Yeah, January of
17       '06.
18       MS. WILLIS:  I just wanted to make
19       sure.
20 A.  I don't -- I don't recall that
21    conversation.
22 Q.  So as you sit here today is it your
23    testimony you don't recall having a

Page 53

1     conversation with her in the cafeteria
2     during January of '06 about Rance Maddox?
3   A.  No, I don't have any recollection of that.
4   Q.  And I'm not being smart with this
5     question. Are you saying that it could
6     have happened, you just don't remember, or
7     are you saying it didn't happen?
8   A.  I'm saying I don't remember.
9   Q.  Did you have or do you recall any other
10     conversations outside of the cafeteria that
11     you had with Robin Atwell specifically
12     regarding Rance Maddox during the month of
13     January '06?
14        And if it helps you, it looks like, you
15     know, her last day at work was February
16     7th, I believe, of '06. But I'm asking you
17     specifically about January.
18   A.  I don't recall any specific -- I'm racking
19     my brain here. Robin and I talked on
20     several occasions, but to say that we ever
21     really just focused in on Rance, I don't
22     recall a conversation that was just
23     exclusively Rance. It was probably -- it

Page 54

1     would have been more about the things that
2     were not getting done in the safety office
3     and my concerns there.
4   Q.  So could those conversations have taken
5     place in January of '06?
6   A.  Yes.
7   Q.  And aside from the issues y'all discussed
8     specifically related to job performance or
9     what needed to get done, do you
10     specifically recall her complaining in any
11     way about Rance Maddox during any of those
12     meetings?
13   A.  I recall -- I recall that Robin did -- I
14     can remember Robin complaining that Rance
15     was pushing hard.
16   Q.  Not physically pushing but --
17   A.  Not physically. But the pressure was on
18     him and it was flowing down. So, yeah, I
19     do recall her talking about those things as
20     well as we were talking about the
21     performance issues.
22   Q.  Any other complaints you recall today that
23     she made other than he was pushing too

Page 55

1     hard?
2   A.  No, I don't.
3   Q.  Okay. Do you -- and, again, I'm focusing
4     on January of '06. In any of the meetings
5     or -- and I say meetings. And what I
6     really am asking is conversations that
7     y'all had.
8   A.  Right.
9   Q.  Do you recall any conversations that you
10     had with Robin in January of '06 where she
11     used the word uncomfortable in describing
12     how she felt working with Rance Maddox?
13   A.  No, I don't recall.
14   Q.  Did she ever relay to you during any of
15     those conversations that she felt as though
16     he was being verbally abusive?
17        MS. WILLIS: Object to the form.
18        You can answer.
19   A.  No, I can't -- the only pieces of that that
20     I remember are that Robin -- I was focusing
21     on the issues in the safety office, the
22     lack of performance in that safety office.
23     And I know I was putting a lot of pressure

Page 56

1     on Rance. He was putting pressure on the
2     people who worked for him. And, you know,
3     there were times that they felt like --
4     indicated they felt like he was being hard
5     on them. But as far as abusive, I don't
6     recall no one ever saying that he was
7     abusive. Maybe short.
8   Q.  Okay. Who else in the safety office told
9     you that he was putting too much pressure
10     on them?
11   A.  The only -- well, at that time Colinda
12     Porter was in there, and I had the same
13     type conversations with Colinda.
14   Q.  Is she still there?
15   A.  No. Colinda is no longer with the company.
16   Q.  Do you know where she lives?
17   A.  I have no idea. Colinda was a very
18     laid-back person. She handled things very
19     well. But she saw the duress that Rance
20     was becoming under and we discussed that.
21   Q.  When did she leave the company?
22   A.  Sometime this year. I'm not real certain.
23   Q.  Did she leave voluntarily?

Page 57

1  A.  No.
2  Q.  She got fired?
3  A.  She was dismissed.
4  Q.  Do you recall why?
5  A.  Attendance.
6  Q.  Do you know where she lives?
7  A.  I want to say she's from Troy.  I'm not
8      certain of that, but I believe she's from
9      Troy.
10 Q.  All right.  Back then you said, you know,
11     the performance of the safety office was
12     lacking.  Did you and Mr. Kwon believe that
13     was the fault of Rance Maddox or the entire
14     office, or did y'all assign any fault to
15     that?
16 A.  Well --
17 Q.  I guess the question I'm really trying to
18     ask is, did you assign the lack of
19     performance in the safety office to Robin
20     Atwell to any degree?
21 A.  Yes.
22 Q.  All right.  How so?
23 A.  The -- we became aware, as I recall, in

Page 58

1      January that the OSHA logs were -- had not
2      been updated since Melissa McGough left the
3      office.  And that was a serious, serious
4      issue that could lead to some serious
5      violations.  And that's when we started
6      looking really close at all of the issues
7      in the safety office more and more.  And,
8      of course, we hold Rance as the manager
9      responsible for getting things done.  And
10     so Director Kwon was working more through
11     Rance, but, yes, some of the problems there
12     were directly associated with Robin's lack
13     of performance.
14 Q.  Did you ever have any meetings directly
15     with her about that?
16 A.  No.
17 Q.  All right.  During the month of January --
18     well, I'm sorry.  Let's go back to
19     November.
20        During the month of November of '05 did
21     Robin Atwell ever directly tell you or did
22     you hear it from anyone else that Rance
23     Maddox hugged her on her birthday?  Have

Page 59

1      you ever heard anything about that?
2  A.  No.
3  Q.  And just so we're clear, you never heard of
4      any problems between those two during the
5      month of November or December 2005; right?
6  A.  No.  It all -- it really just seemed to
7      come to a head after Christmas as best I
8      recall.
9  Q.  And is it your testimony that at no time
10     during the month of January 2006 did she
11     complain to you about any inappropriate or
12     sexually harassing behavior by Mr. Maddox
13     toward her?
14 A.  No, she never complained to me about that.
15 Q.  And you've already said she never told you
16     that she felt uncomfortable working in the
17     office with him?
18 A.  That's correct.
19        (Plaintiff's Exhibit 1 was marked
20        for identification.)
21 Q.  All right.  Let me show you what I am going
22     to mark as Plaintiff's Exhibit 1.  Have you
23     seen that document before?

Page 60

1      You can read it if you want to.
2         MS. WILLIS:  Go ahead and read it.
3  A.  I have had an opportunity to review this
4      document, yes.
5  Q.  When was the first time you saw this
6      document?
7  A.  The first time that I recall ever seeing
8      this document was sometime in the last few
9      months when we started our investigations
10     or started discussing this with our
11     attorneys.
12 Q.  So it's your testimony that you did not
13     receive Plaintiff's Exhibit Number 1 -- or
14     that you never saw Plaintiff's Exhibit
15     Number 1 until in the last several months?
16 A.  Right.  I do not recall seeing -- I haven't
17     seen this document before it was presented
18     to me.
19 Q.  And just so I'm clear, it's your testimony
20     that you never saw Plaintiff's Exhibit
21     Number 1 before this lawsuit was filed;
22     correct?
23 A.  That's correct.

Page 61

1  Q.  And you never saw this document before the
2      EEOC charge was filed by Robin Atwell; is
3      that correct?
4  A.  That's correct.
5  Q.  And you'll agree with me that it appears to
6      be addressed to you, Gary Sport, human
7      resources, SMART; is that right?
8  A.  Yes.
9  Q.  Are you aware of Robin Atwell ever giving
10     this document to any employee at SMART?
11 A.  No, I'm not.
12 Q.  And you're saying today she never gave it
13     to you?
14 A.  She never gave it to me, correct.
15 Q.  It's dated February 2nd, 2006.
16 A.  Uh-huh (positive response).
17 Q.  Do you agree with that?
18 A.  Yes.
19 Q.  There's a phone number at the top.  It
20     looks like it's 527-3503.  Is that number
21     familiar to you?
22 A.  No, it's not.
23 Q.  Okay.

Page 62

1  A.  Nothing more than knowing it's a Brantley
2      number.
3  Q.  Brantley.  Okay.  527 is a Brantley --
4  A.  Brantley prefix.
5  Q.  -- prefix?
6  A.  Right.
7  Q.  Could that be Robin Atwell's phone number?
8  A.  I would assume that it would be, yes.
9  Q.  And you see in the first sentence where she
10     says -- it looks like she says, Gary, per
11     my conversation with you, and then that's
12     been scratched through.  And then the
13     second sentence says in regards to the
14     sexual harassment situation with Rance
15     Maddox.  The next sentence says I have
16     requested a departmental transfer.
17         As of February 2nd, 2006, are you aware
18     of Robin Atwell complaining to either you
19     or anyone else at the plant that Rance
20     Maddox had sexually harassed her?
21 A.  No.  Not sexually harassed her, no.
22 Q.  Are you aware as of that date, 2-2-06, that
23     she had requested a departmental transfer?

Page 63

1  A.  Yes, I was aware of that.
2  Q.  All right.  When did you first learn that
3      she was requesting a transfer?
4  A.  I don't recall the exact date, but it would
5      have been sometime in probably late
6      January.
7  Q.  And would she have come to you about that,
8      or did she come to you about that?
9  A.  No, she did not come to me.  She --
10     protocol would have probably been to have
11     gone to the employee relations group.
12 Q.  Ruth Ryan?
13 A.  Right.
14 Q.  So, again, as you testified today, you
15     don't recall Robin Atwell ever coming
16     directly to you to request a departmental
17     transfer; is that right?
18 A.  I do recall Robin asking me about it after
19     I was aware of it.
20 Q.  Okay.
21 A.  Yes.
22 Q.  And approximately when was that if you can
23     remember?

Page 64

1  A.  It would have been, again, toward the end
2      of the month when all of this --
3  Q.  End of January?
4  A.  -- really kind of surfaced.
5  Q.  End of January?
6  A.  Yes.
7  Q.  And just tell me, where were y'all when she
8      talked to you about this?
9  A.  Physically?
10 Q.  Yeah.
11 A.  Honestly I have no idea.  Somewhere there
12     in the plant, I'm sure.
13 Q.  Okay.
14 A.  And I don't even remember having a detailed
15     conversation.  It was more of a "am I going
16     to be transferred" type thing.
17 Q.  At the time she asked you that question did
18     you already know she was requesting it?
19 A.  Yes.
20 Q.  And who made you aware that she was
21     requesting a departmental transfer?
22 A.  Specifically I don't remember, but I'm sure
23     it would have come from the employee

Page 65

1    relations side that she was asking to be
2    moved out of safety.
3  Q.  Did they advise you as best you remember
4    the circumstances why she was requesting a
5    departmental transfer?
6  A.  To the best of my recollection the
7    circumstances -- or the way I interpreted
8    the circumstances was simply she could not
9    handle the pressure of that job anymore and
10   needed to be moved.
11 Q.  And as far as you were informed, today it's
12   your testimony that the transfer she
13   requested had nothing to do with sexual
14   harassment by Rance Maddox; is that
15   correct?
16 A.  That's not the way I understood everything.
17 Q.  Again, did you hear anything about any
18   sexual harassment by Rance Maddox during
19   that time period, end of January, beginning
20   of February?
21 A.  I'm sure during that time period that I did
22   because I know that Robin reported some
23   things to employee relations and they

Page 66

1    discussed things with me, but --
2  Q.  What do you recall her reporting to
3    employee relations?
4  A.  Rance touching her on the shoulders.
5  Q.  Anything else other than him touching her
6    shoulders?
7  A.  That's really the only incident that I
8    recall there ever being.
9  Q.  And we're not -- that would have been --
10   your best judgment is that she reported
11   that at the end of January, beginning of
12   February; is that about right?
13 A.  Sometime along in there I would think.
14 Q.  And then when employee relations reports
15   that to you, that she was complaining he
16   had touched her on the shoulders, what did
17   you do, if anything?
18 A.  I would ask them -- certainly ask them to
19   investigate it and see what's the basis for
20   this allegation or this claim and report --
21   let me know what's going on.
22 Q.  Did you ever have any meetings with Rance
23   Maddox about the allegation that he had

Page 67

1    touched her on her shoulders?
2  A.  No, I didn't.
3  Q.  And do you know if Ruth Ryan ever had any
4    meetings with him about that?
5  A.  I'm not certain that Ruth ever did. I know
6    she investigated it.
7  Q.  Do you know if anybody had a direct meeting
8    with Rance about that allegation?
9  A.  Not that I'm aware of.
10 Q.  As we sit here today the only allegation
11   that you're aware of that Robin Atwell made
12   to any employees at SMART during the time
13   she was employed there is that, number one,
14   he was -- Rance Maddox was putting too much
15   pressure on her or pushing too hard;
16   correct?
17 A.  (Witness nods head.)
18 Q.  Is that right?
19 A.  Yes.
20 Q.  And then, secondly, that he had touched her
21   somehow inappropriately on her shoulders?
22     MS. WILLIS:  Object to the form.
23       You can answer.

Page 68

1  Q.  Or touched her on her shoulders?
2  A.  Yes.
3  Q.  Is that correct?
4  A.  Yes.
5  Q.  Are those the only two complaints that
6    you're aware of today that Robin Atwell
7    ever made while an employee at SMART?
8  A.  The best as I can recall, yes, that's the
9    only two that I remember.
10 Q.  Okay. Did you have any discussions with
11   Ruth Ryan about the situation between Rance
12   Maddox and Robin Atwell during the
13   beginning of February or end of January
14   2006?
15 A.  Oh, yes.
16 Q.  And did it involve anything other than what
17   we just talked about, the too much pressure
18   and touching her on her shoulder?
19 A.  Well, it was certainly about the transfer
20   request and just the apparent friction that
21   was developing and trying to come to a
22   resolution.
23 Q.  Did she relate -- did Ruth Ryan relate to

Page 69

1  you anything else that was causing friction
2  between Robin Atwell and Rance Maddox other
3  than the pressures of the office and her
4  touching her on her shoulder?
5  A.  No.
6  Q.  That's at any time.  She's never told you
7  anything other than that; is that correct?
8  A.  That's all that I can recall that Ruth and
9  I ever discussed was the shoulder and the
10  performance-based issues.
11  Q.  And it's your testimony that you never
12  received Plaintiff's Exhibit 1?
13  A.  No, not that I recall.  I've never seen
14  this.
15  Q.  Okay.  I'm just going to ask you about some
16  people that are on the initial disclosures.
17  Lisa Bodiford.  Is she still employed
18  there?
19  A.  No.
20  Q.  No.  Do you know where she is?
21  A.  No, I do not.
22  Q.  What were the circumstances under which she
23  left?

Page 70

1  A.  Lisa -- I believe Lisa left voluntarily.
2  She was working her way through school and
3  had some conflicts, so ...
4  Q.  Wendy Burgans.  Is she still there?
5  A.  No.
6  Q.  Do you know why she left?
7  A.  Yes.  Wendy was dismissed from the company
8  for attendance violations.
9  Q.  Did I ask you where Lisa Bodiford is now?
10  Do you know?
11  A.  Yes.  And I don't know.
12  Q.  You don't know.  Do you know where Wendy
13  is?
14  A.  I know Wendy's around Luverne.  I see her
15  occasionally.  She's a local.
16  Q.  Lakisha Jessie.  Is she still there?
17  A.  No.
18  Q.  And why did she leave?
19  A.  She was asked to leave for not coming to
20  work.
21  Q.  Is she still in that area, or do you know?
22  A.  I believe Lakisha is from Troy and probably
23  still in the area.

Page 71

1  No.  I'm sorry.  Lakisha is from
2  Andalusia.
3  Q.  Andalusia?
4  A.  One or the other.
5  Q.  All right.  Carissa Jones?
6  A.  Carissa is still there.
7  Q.  She's still there?
8  A.  Yes.
9  Q.  Where would she have worked -- or do you
10  know what knowledge she may have of these
11  claims?
12  A.  No.
13  Q.  The people I just named, Wendy, Lisa,
14  Lakisha, do you know what knowledge they
15  may have about these claims?
16  A.  Lisa was a third-shift safety assistant
17  under Rance.  And Wendy and Lakisha were
18  assigned just as Robin, work-related
19  injuries, to work in the safety office for
20  a short period of time.  So they worked
21  under Rance.
22  Q.  Have you ever had any direct discussions
23  with those ladies about any complaints that

Page 72

1  Robin Atwell has made against Rance Maddox?
2  A.  No.
3  Q.  Are you aware of anything that -- of any of
4  those individuals that dispute or
5  contradict anything that Robin Atwell
6  alleged to have occurred between she and
7  Rance Maddox?
8  A.  In our investigations into this, yes, I'm
9  aware.
10  Q.  Okay.  Tell me which ones may dispute what
11  Robin has said.
12  A.  Colinda Porter was actually supposedly the
13  witness when Rance placed his hands on her
14  shoulders.
15  Q.  Colinda Porter?
16  A.  Yes.
17  Q.  Okay.
18      MS. WILLIS:  She should be on
19      there.
20      MR. HORSLEY:  Yeah, she's on
21      there.
22      MS. WILLIS:  Okay.  And we can
23      supplement with some addresses

Deposition of Gary Sport                 Atwell vs. SMART Alabama                 September 12, 2007

---

Page 73

1    if we need to or last knowns.
2  Q. All right. Colinda Porter was the witness
3    who saw him put his hands on her shoulders?
4  A. Right.
5  Q. And what's your understanding of what she
6    says about that?
7  A. She says that it went back to the lack of
8    OSHA logs being updated and that Robin was
9    working on that and said that, hey, I did
10   one, I got one, I got it right. And Rance
11   walked over and looked and put his hands on
12   her shoulders and said, great, good work,
13   and it was just a small moment of
14   celebration for making some progress. And
15   that's Colinda's ...
16 Q. All right. Melissa McGough. She's on here
17   because obviously she worked in the same
18   office?
19 A. Right.
20 Q. Scott Kelley. He was her supervisor when
21   she was --
22 A. Right.
23 Q. -- or her team leader?

---

Page 74

1  A. Right.
2  Q. Is Colinda still there?
3  A. No.
4  Q. Why did she leave?
5  A. Colinda had a problem coming to work.
6  Q. Do you know where she is now?
7  A. Colinda -- I believe Colinda is in Troy.
8    She's from Troy.
9  Q. I don't remember exactly where I saw it,
10   but there is some employee that says that
11   Robin Atwell told Rance Maddox she had some
12   type of sexual dream that he was involved
13   in. Are you aware of which witness says
14   that?
15 A. I'm sorry.
16 Q. She overhead Robin Atwell telling Rance
17   Maddox that she had some sex dream and he
18   was in it.
19 A. No, I don't know --
20 Q. You don't know which one of those girls
21   said that?
22   I'm hoping it was a girl that said
23   that.

---

Page 75

1  A. I don't know. I hope so.
2  Q. There's another employee who, I believe,
3    claims that she heard Robin Atwell telling
4    Rance Maddox that she had had breast
5    augmentation surgery. Are you aware of
6    which employee that is?
7  A. No, I don't -- I wouldn't know which one.
8  Q. Have you had any direct conversations with
9    any employees about either of these
10   subjects, the sex dream or the breast
11   implants?
12 A. No. Not directly, no.
13 Q. Did you help with these initial
14   disclosures? Have you ever seen these?
15 A. Yes.
16   (Plaintiff's Exhibit 2 was marked
17   for identification.)
18 Q. Okay. I'm going to mark these as
19   Plaintiff's Exhibit 2.
20   (Plaintiff's Exhibit 3 was marked
21   for identification.)
22 Q. I'm going to mark as Plaintiff's Exhibit 3
23   SMART's responses to my interrogatories and

---

Page 76

1    request for production. Have you seen
2    those before?
3  A. Yes, I have.
4  Q. Okay. Were you the person at SMART that
5    was primarily responsible for responding to
6    those?
7  A. That's right.
8  Q. Okay. Did you --
9    MR. HORSLEY: Did he sign those?
10   MS. WILLIS: He sure did.
11 Q. You signed those and had your signature
12   notarized; correct?
13 A. Uh-huh (positive response).
14   MS. WILLIS: Be sure and answer
15   out.
16 A. Oh, yes.
17 Q. And you reviewed all those responses, at
18   least the ones -- the nonobjectioned
19   responses, and those are true and accurate
20   and you've sworn that they're true and
21   accurate; correct?
22 A. Correct.
23   (Plaintiff's Exhibit 4 was marked

---

Page 77

1    for identification.)
2  Q.  I'm going to mark as 4 SMART'S position
3      statement which, I believe, was presented
4      to the Equal Employment Opportunity
5      Commission.  Have you ever seen that
6      document before?
7  A.  Yes, I have.
8  Q.  Did you participate in generating that
9      document?
10 A.  Indirectly.
11 Q.  Okay.  How did you do that?
12 A.  By contacting our attorneys and letting
13     them proceed with the investigation.
14         MS. WILLIS:  And you reviewed it;
15         right?
16 A.  And I reviewed it, yes, for accuracy after
17     it was over.
18 Q.  So you can testify today that the matters
19     and contentions contained in Exhibit 4 are
20     true and accurate; is that correct?
21 A.  Yes.
22         (Plaintiff's Exhibit 5 was marked
23         for identification.)

Page 78

1  Q.  I'm going to show you Plaintiff's
2      Exhibit 5, which is Robin's EEOC charge.
3         MS. WILLIS:  Take a moment and
4         read through it if you
5         haven't.
6         THE WITNESS:  Yeah.  It's been a
7         while since I've seen it.
8  Q.  Okay.  Did you ever see that after she
9      filed it before today?
10 A.  Oh, yes.
11         (Plaintiff's Exhibit 6 was marked
12         for identification.)
13 Q.  Plaintiff's Exhibit 6 is what's been
14     produced by your attorneys as at least one
15     section of the employment manual related to
16     sexual harassment.  I assume this is a
17     sexual harassment policy at SMART.  Will
18     you look over that and tell me if that's
19     correct.
20 A.  No.  Actually this is not part of our
21     employment manual.
22 Q.  All right.  What is that?
23 A.  This is part of the pre-employment

Page 79

1      training that we did.  You can see AIDT.
2  Q.  I got you.  Is that a document that would
3      have been given to Robin Atwell during her
4      pre-employment training?
5  A.  Yes.
6  Q.  Is that also a document that would have
7      been given to Rance Maddox during his
8      pre-employment training?
9  A.  Not this particular document.  Rance did
10     not go through this form of training.  Our
11     managers do not.
12 Q.  So he would not have received that document
13     prior to employment?
14 A.  Not this one.  He would have received one,
15     but not this one.
16         (Plaintiff's Exhibit 7 was marked
17         for identification.)
18 Q.  All right.  Plaintiff's Exhibit 7 is, I
19     believe, a section from the employment
20     manual regarding sexual harassment; is that
21     correct?
22 A.  Yes.  Correct.
23 Q.  Is that the only section of the employment

Page 80

1      manual to your knowledge that addresses
2      sexual harassment?
3  A.  Yes, to my knowledge.
4  Q.  And Robin Atwell would have received that
5      document prior to employment; is that
6      correct?
7  A.  She would have received this on the day she
8      was employed.
9  Q.  And the same for Rance Maddox.  He would
10     have received that on the day he became
11     employed?
12 A.  Correct.
13 Q.  Did either Rance or Robin Atwell have to
14     undergo any type of specific training with
15     regard to workplace sexual harassment
16     either before or after they became employed
17     at SMART?
18 A.  Yes.  After.  We subject all of our
19     managers, office personnel, and salary
20     individuals to workplace harassment and
21     training annually.
22 Q.  You do it annually?
23 A.  Yes.

Page 81

1 Q. So how soon after Rance Maddox became an
2    employee would he have had to go through
3    that training?
4 A. Gosh, I don't recall. We -- it just
5    depends on what time of year we did it that
6    year. I really don't recall.
7 Q. Well, if he became employed in March of '05
8    and Robin became employed in August of '05,
9    do you know whether or not Rance underwent
10   any training -- sexual harassment training
11   prior to August of '05?
12 A. Not without going back and reviewing the
13   records.
14 Q. Do you know -- can you say with any degree
15   of certainty that he would have undergone
16   sexual harassment training prior to
17   November the 14th of '05?
18 A. Other than the orientation, I can't say
19   with certainty that he did.
20 Q. Do you know whether or not Robin Atwell
21   ever underwent actual sexual harassment
22   training while she was an employee at
23   SMART?

Page 82

1 A. Other than this, I can say fairly certain
2    that she did not.
3 Q. And, briefly, what does that training
4    consist of?
5 A. The sexual --
6 Q. Yeah, sexual harassment.
7 A. Well -- I'm sorry. For Robin or for
8    Rance?
9 Q. For Rance.
10 A. That's two different --
11 Q. For Rance.
12 A. Okay. For Rance it is -- it's during our
13   orientation period when we hire people in.
14   And we go through our handbook and we talk
15   about -- we have certain things highlighted
16   that are extremely important. And this is
17   one of the things that we go through with
18   the sexual harassment charges for our
19   people. And it would have been discussed
20   with Rance, gone over with Rance, and he
21   would have acknowledged and, of course,
22   signed off on the handbook that he
23   acknowledges these policies.

Page 83

1 Q. And that's done during his orientation?
2 A. Yes.
3 Q. But, then, as far as the annual training,
4    what does that consist of?
5 A. The annual training is where we bring in
6    our legal counsel and they do a formal
7    training for that, union voidance, the hot
8    topics. And we make everyone attend and
9    sign off that they've attended and record
10   that.
11 Q. And y'all do that every year?
12 A. We do that, yes. We've just completed
13   that.
14 Q. But we can't say here today with any degree
15   of certainty whether Rance ever underwent
16   that training prior to November of '05?
17 A. No. I can't say without reviewing some
18   records.
19 Q. Do you know whether or not he ever
20   underwent that training before he left
21   SMART?
22 A. I feel certain that he did because he was
23   employed with us from February till the end

Page 84

1    of the year. And I feel certain that he
2    received it during that time, but ...
3 Q. And we don't know today or can't say with
4    any degree of certainty whether or not
5    Robin Atwell ever underwent that training;
6    correct?
7 A. I can fairly well say with certainty that
8    Robin did not undergo that formal training.
9 Q. Tell me why -- well, tell me, first of all,
10   your understanding of why Robin Atwell left
11   SMART.
12 A. The way I interpreted the whole scenario
13   for Robin leaving was we came back after
14   Christmas and really put a lot of
15   pressure -- and Director Kwon was really
16   the man applying most of the pressure -- to
17   Rance for issues in the safety office, lack
18   of performance. And as Rance began
19   tightening the screws and putting pressure,
20   Robin became agitated and friction started
21   to build. And Robin asked to be
22   transferred, and we accommodated that, put
23   her back to where she came from. And from

Page 85

1   the day she was told that she could go back
2   we never saw her again.  She never reported
3   back to work, so ...
4   Q.  Okay.  So the transfer back to technician
5       went into effect February -- beginning of
6       February?
7   A.  Sometime early February, yes.
8   Q.  If the last day she was employed was
9       February the 7th, do you know whether or
10      not she had been moved back at that time?
11  A.  I know she had been told that the transfer
12      was completed, that she was going to be
13      placed back out of the office area back
14      into the assembly area, and she never
15      reported to that area.
16  Q.  And how far away is the assembly area from
17      Rance Maddox's office?
18  A.  It would really depend on what area.  It
19      could be -- the shortest distance would
20      certainly be two or 300 feet.  As far as --
21      it's a half-million-square-foot building.
22      It could be all the way to the back of the
23      building.  It could be anywhere in between.

Page 86

1   Q.  As a safety director during that period of
2       time, January of '05 and February of '06,
3       wouldn't Rance Maddox have the opportunity
4       every day to go through the technician
5       areas?
6   A.  Oh, yes.
7   Q.  Okay.  So if Robin Atwell were moved back
8       to or had been transferred back to the
9       technician area, is it fair to say she
10      still would have seen Rance Maddox on a
11      daily basis?
12          MS. WILLIS:  Object to the form.
13          You can answer.
14  A.  I would say that -- just based on the work
15      load and the things that were going on at
16      that time, I wouldn't think it would be
17      fair to say that she would see him on a
18      daily basis.  Rance did not have time to be
19      out in the plant that frequently.
20      Typically when he was in the plant, someone
21      had come and got him.  There was a
22      situation that he needed to address.
23  Q.  And you say that after she requested the

Page 87

1   transfer y'all told her it had been granted
2   and then she never came back.  Is that your
3   understanding?
4   A.  That's my understanding.
5   Q.  Did you have any discussions with her
6       subsequent to that time?
7   A.  No.
8   Q.  Have you had any discussions with her at
9       any time subsequent to February 2nd of '06
10      up until today?
11  A.  No.
12  Q.  Other than saying hello?
13  A.  Right.  Other than the deposition is really
14      the only time I've seen her.
15          (Plaintiff's Exhibit 8 was marked
16          for identification.)
17  Q.  I don't know if you're the one to identify
18      this or not.  But what I've marked as
19      Plaintiff's Exhibit 8 is -- I requested
20      Rance Maddox's personnel file, and this is
21      what I got.
22  A.  Okay.
23  Q.  And it looks like his wife is Sonia.

Page 88

1       Does that appear to be certain portions
2       of his personnel file?
3   A.  Yes, it is.
4   Q.  I couldn't really tell from looking at that
5       the reasons why he left SMART.  Can you
6       tell me when and why he left SMART?
7   A.  I don't know the exact date.  It was
8       sometime in maybe late February.  I would
9       have to look and see.
10  Q.  Of '06?
11  A.  '06.  And at the time Director Kwon was
12      really, really pushing hard to get things
13      done.  And I think the load, the pressure,
14      just became too much for Rance.  And
15      Rance -- I came in one morning, walked down
16      to check on things, and Rance said I've
17      decided to resign.  And I said that's
18      probably not a bad thing, Rance.
19          He left the company.  I think it was --
20      a lot of people left the company during
21      that time.  It was some tough days.
22  Q.  So he told you directly he was resigning?
23  A.  Yes.

Deposition of Gary Sport                    Atwell vs. SMART Alabama                    September 12, 2007

Page 89

1   Q.  And he was not terminated; is that
2       correct?
3   A.  No.
4   Q.  And he told you he was resigning within
5       three to four weeks after Robin Atwell
6       left; is that correct?
7   A.  Yeah, somewhere in that time frame, I'm
8       sure.
9   Q.  And at the time that he left is it your
10      testimony that you and Mr. Maddox have
11      never had a meeting directly related to the
12      complaints that Robin Atwell had made
13      against him?
14  A.  Mr. Maddox and I had had a meeting along
15      with Mr. Kwon earlier about some
16      performance issues.  It was all part of the
17      same thing but not directly related to the
18      allegations that Ms. Atwell has made.
19  Q.  And you had never met with him specifically
20      about the allegations of too much pressure
21      on her and the shoulder -- touching her
22      shoulders?
23  A.  Not about the shoulder.  In our meeting

Page 90

1       with Rance before we had addressed his
2       professionalism and that he really just
3       needed to calm a little.
4   Q.  And are you telling us today that his
5       resigning as far as you know didn't have
6       anything to do with any allegations that
7       Robin Atwell was making?
8   A.  No.
9   Q.  I've seen somewhere where he may have been
10      having some medical problems.  Are you
11      aware of any medical problems that he was
12      having?
13  A.  Rance never confided in me that he had any
14      serious medical problems, but we did know
15      that he spent some time in the VA hospital
16      in Tuscaloosa during this same period of
17      time.  In fact, as I recall -- and this may
18      not be completely accurate -- but sometime
19      during that -- maybe it's when he returned
20      from his medical stay that he said I
21      decided I can't do this anymore, I'm going
22      to leave the company.  And I never did know
23      exactly what his problems were.  And with

Page 91

1       him leaving, I didn't really feel a need to
2       inquire, so ...
3   Q.  All right.  I'm going to go through a
4       laundry list of quick questions and then
5       we'll be through just so I'm clear.
6   A.  Okay.
7   Q.  Is it your testimony that Robin Atwell
8       never reported to you that Rance Maddox
9       touched her on her shoulders?
10  A.  That's correct.  Never directly to me.
11  Q.  Did Robin Atwell ever report to you that
12      Rance Maddox on numerous occasions asked
13      her what she was eating and if she wanted
14      to go eat lunch with him?
15  A.  No.
16  Q.  Did Robin Atwell ever tell you that Rance
17      Maddox would often show up at restaurants
18      where she was eating after she had told him
19      that she could not go eat with him?
20  A.  No.
21  Q.  Did Robin Atwell ever tell you that Rance
22      Maddox gave her a hug that she perceived as
23      inappropriate on November 16th of 2005, her

Page 92

1       birthday?
2   A.  I don't recall her telling me that he
3       hugged her on his birthday.
4   Q.  Has Robin Atwell ever told you that Rance
5       Maddox repeatedly touched her on her arms,
6       hands, and attempted to hold hands with her
7       while he was speaking with her at work?
8   A.  No.
9   Q.  Has Robin Atwell ever told you that
10      Mr. Maddox repeatedly put his arm around
11      Ms. Atwell and rubbed her back while at
12      work?
13  A.  No.
14  Q.  Has Ms. Atwell ever told you that
15      Mr. Maddox often asked her if she wanted to
16      go have drinks with him after work?
17  A.  No.
18  Q.  Has Ms. Atwell ever told you that
19      Mr. Maddox made comments to her such as it
20      was impossible for males to be monogamous
21      in their sexual relationships?
22  A.  No.
23  Q.  Has Ms. Atwell ever informed you that

Page 93

1  Mr. Maddox asked her to go to Montgomery
2  with him and spend the night?
3  A. No.
4  Q. Has she ever told you that he invited her
5  to go to Montgomery and have drinks at a
6  bar called Igor's?
7  A. Not as I recall.
8  Q. Has Ms. Atwell ever informed you that
9  Mr. Maddox on numerous occasions
10  deliberately rubbed his pelvis area against
11  her buttocks?
12  A. No.
13  Q. Has Ms. Atwell ever told you that
14  Mr. Maddox repeatedly tried to call her at
15  her home sometimes late at night?
16  A. She probably -- yes, she did tell me that
17  he would call her home.
18  Q. When did -- as best you recall when did she
19  tell you that?
20  A. Just during the course of her tenure in
21  there. It was not uncommon for myself to
22  call her or anyone if we needed help at the
23  plant or looking for things. So I'm sure

Page 94

1  she did tell me that he had called her at
2  home.
3  Q. Okay. Would Mr. Maddox usually be at the
4  plant at night, sometimes late at night?
5  A. Sometimes.
6  Q. But that wasn't his normal shift, was it?
7  A. Well, our safety office -- I hesitated
8  earlier when you asked me that question
9  because we work -- we're a 24-hour-a-day
10  operation. So our safety managers, even
11  our current safety manager, staggers his
12  times. He'll come in sometimes on days.
13  Sometimes he shows up at nights, you know,
14  just to be available, so ...
15  Q. Did she ever tell you that he would call
16  her late at night and ask her what she was
17  doing?
18  A. No.
19  Q. Did Ms. Atwell ever tell you that
20  Mr. Maddox asked her if her breasts were
21  real and asked her what they felt like?
22  A. No.
23  Q. Did she ever tell you that Mr. Maddox made

Page 95

1  the comment, quote, I've got a real man for
2  you, end quote, to Ms. Atwell?
3  A. No.
4  Q. Did Ms. Atwell ever tell you that
5  Mr. Maddox had grabbed both of her
6  shoulders and squeezed them as if he were
7  giving her a massage?
8  A. No, Ms. Atwell never told me directly.
9  Q. Did she ever tell -- well, did you ever
10  hear that from anybody indirectly, that
11  shoulder incident?
12  A. The shoulder touching, yes.
13  Q. Okay.
14  A. Yes.
15  Q. Did she ever tell you that Mr. Maddox had
16  put his hands on her shoulders and moved
17  them down just above her breasts and rubbed
18  the top of her breasts?
19  A. No.
20  Q. Did you ever hear that indirectly from
21  anyone else?
22  A. No.
23  Q. Did Ms. Atwell ever tell you that

Page 96

1  Mr. Maddox had touched her legs?
2  A. No.
3  Q. Did Ms. Atwell ever tell you that
4  Mr. Maddox repeatedly said, quote, baby,
5  I'll take care of you and we'll be a team,
6  you've got to work with me?
7  A. No, I don't recall her ever telling me that
8  he told her that.
9  Q. Did Ms. Atwell ever tell you that she felt
10  like Mr. Maddox was retaliating against her
11  for complaining about him to you and Ruth
12  Ryan?
13  A. No, I don't remember that.
14       MR. HORSLEY: Let me take a quick
15  break, and I think I'm
16  through.
17       (A brief recess was taken.)
18  Q. (Mr. Horsley continuing:) Subsequent to
19  the time that Rance Maddox left, I'm
20  assuming either you received or became
21  aware that Robin Atwell had filed an EEOC
22  charge that contained allegations against
23  Mr. Maddox; correct?

Page 97

1　A.　Correct.
2　Q.　Did you outside the presence of attorneys
3　　　ever try to contact him about that?
4　A.　No.
5　Q.　Did you ever have any discussions with him
6　　　about that other than when you may have
7　　　been with SMART's attorneys?
8　A.　No, I didn't.
9　Q.　You've never had any -- outside the
10　　　presence of attorneys you've never had any
11　　　discussions about the allegations in the
12　　　EEOC charge or the lawsuit filed by Robin
13　　　Atwell with Rance Maddox; correct?
14　A.　No. I don't talk to Rance.
15　Q.　And other than the conversations you told
16　　　me about a couple of months ago, you
17　　　haven't had any discussions with him about
18　　　the Cathy Caldwell case either; right?
19　A.　No, not at all.
20　Q.　Have you ever met with Cathy Caldwell about
21　　　any allegations that she has made about
22　　　Rance Maddox?
23　A.　No.

Page 98

1　Q.　Do you know who has met with her about
2　　　those allegations, if anybody?
3　A.　As I recall, Ruth Ryan attempted to meet
4　　　with her, but Cathy did not show for the
5　　　meeting that Ruth had scheduled. I don't
6　　　know that anyone ever physically met with
7　　　her. Attempts were made. Perhaps Cathy's
8　　　boss met with her.
9　Q.　Are you aware she alleges that he kissed
10　　　her at work?
11　A.　Yes.
12　Q.　Do you know Mysti Dicks?
13　A.　Yes.
14　Q.　Do you know where Mysti is these days?
15　A.　Mysti had some legal problems the last time
16　　　I had track of her. I'm not sure where she
17　　　is.
18　Q.　What kind of legal problems?
19　A.　Mysti had a drug charge pending. That's
20　　　when we asked that she be removed from our
21　　　company as a security guard.
22　Q.　Is that why she was -- at least y'all got
23　　　her off the premises of SMART because you

Page 99

1　　　learned of a drug charge?
2　A.　Right.
3　Q.　How did y'all become aware of that?
4　A.　They run these things in the local paper.
5　　　Everybody knows everybody. It's a small
6　　　town. And it involved some minors. And we
7　　　just decided at the time that's not the
8　　　kind of person we wanted on our reception
9　　　desk or the possibility that -- we asked
10　　　for a new receptionist to be placed there.
11　Q.　What type of drug charge was it? Do you
12　　　know?
13　A.　Possession, I think.
14　Q.　Marijuana?
15　A.　I don't -- no, I don't -- I want to say it
16　　　was --
17　Q.　Cocaine?
18　A.　-- cocaine or meth.
19　Q.　Okay.
20　A.　But I'm not certain.
21　　　　　MR. HORSLEY:  I believe that's it.
22　　　　　MS. WILLIS:  I don't have
23　　　anything.

Page 100

1　　　　　(Deposition concluded at
2　　　approximately 12:00 noon.)
3　　　* * * * * * * * * *
4　　　FURTHER DEPONENT SAITH NOT
5　　　* * * * * * * * * *
6　　　REPORTER'S CERTIFICATE
7　STATE OF ALABAMA:
8　MONTGOMERY COUNTY:
9　　　I, Tracye Sadler, Certified Court
10　Reporter and Commissioner for the State of Alabama
11　at Large, do hereby certify that I reported the
12　deposition of:
13　　　　　GARY SPORT
14　who was duly sworn by me to speak the truth, the
15　whole truth and nothing but the truth, in the
16　matter of:
17　　　　　ROBIN ATWELL,
18　　　Plaintiff,
19　　　vs.
20　　　SMART ALABAMA, LLC,
21　　　Defendants.
22　　　IN THE UNITED STATES DISTRICT COURT
23　　　FOR THE MIDDLE DISTRICT OF ALABAMA

Deposition of Gary Sport                Atwell vs. SMART Alabama                September 12, 2007

Page 101

1        NORTHERN DIVISION
2        Case Number 2:06CV1089-MEF
3    on September 12, 2007.
4        The foregoing 100 computer-printed pages
5    contain a true and correct transcript of the
6    examination of said witness by counsel for the
7    parties set out herein.  The reading and signing of
8    same is hereby not waived.
9        I further certify that I am neither of
10   kin nor of counsel to the parties to said cause nor
11   in any manner interested in the results thereof.
12       This 2nd day of October 2007.
13
14
15
                 _____
16               Tracye Sadler, Certified
                 Court Reporter and
17               Commissioner for the State
                 of Alabama at Large
                 ACCR No. 294
18
19
20
21
22
23

Page 103

1
2
3    October 2, 2007
4
5    Mr. Gary Sport
     c/o Ms. Kathryn Morris Willis
6    BURR & FORMAN
     3100 SouthTrust Tower
7    420 North 20th Street
     Birmingham, Alabama 35203
8
     IN RE:  ATWELL vs. SMART ALABAMA, LLC
9
     Dear Mr. Sport:
10
     Enclosed is a copy of the transcript of your
11   deposition taken on September 12, 2007.  Please read
     the transcript and make any corrections on the
12   correction sheet provided specifying the page and
     line number of each correction.
13
     You will find the original signature page attached to
14   the front of the transcript.  Even if there are no
     corrections, please sign the original signature page
15   and have your signature notarized.
16   Please return the signature page, correction sheet
     and transcript within thirty days.  The list of
17   corrections will be attached to the original
     deposition and all parties will be notified of any
18   changes.
19   Sincerely,
20
21   Tracye Sadler Blackwell
     Certified Court Reporter
22
     cc: Mr. Richard F. Horsley
23       Ms. Kathryn Morris Willis

Page 102

1        * * * * * * * * * * * * * *
2        WITNESS SIGNATURE PAGE
3        * * * * * * * * * * * * * *
4
5    IN RE:  ATWELL vs. SMART ALABAMA, LLC
6
7
         I, GARY SPORT, hereby certify that I have
8
     read the foregoing transcript of my deposition
9
     given on September 12, 2007, and it is a true and
10
     correct transcript of the testimony given by me at
11
     the time and place stated with the corrections, if
12
     any, and the reasons therefor noted on a separate
13
     sheet of paper and attached hereto.
14
15
         _____
16       GARY SPORT
17       SWORN TO AND SUBSCRIBED before me this _____
18   day of _____, 2007.
19
         _____
20       NOTARY PUBLIC
21       MY COMMISSION EXPIRES:
22
         _____
23

Case 2:06-cv-01089-MEF-WC    Document 18-10    Filed 11/02/2007    Page 28 of 36

Deposition of Gary Sport                Atwell vs. SMART Alabama                September 12, 2007

Page 1

## A

**about** 14:23 19:19 20:3
21:17 26:3 31:11
32:9 33:11,15 34:5
37:2,12,20 38:18
40:11 41:5,17,20
42:7,7,10,11,12 43:6
46:13,16 48:4 49:21
50:4,12,18 51:20
52:10 53:2,17 54:1
54:11,19,20 58:15
59:1,11,14 63:7,8,18
64:8 65:17 66:12,23
67:4,8 68:11,17,19
69:15 71:15,23 73:6
75:9 82:15 89:15,20
89:23 96:11 97:3,6
97:11,16,17,20,21
98:1
**above** 95:17
**absolutely** 28:12
**abusive** 55:16 56:5,7
**accident** 49:13
**accommodated** 84:22
**accomplished** 52:1
**accounting** 8:5
**ACCR** 101:17
**accuracy** 77:16
**accurate** 37:14 76:19
76:21 77:20 90:18
**accused** 45:21 46:2,9
**acknowledged** 82:21
**acknowledges** 82:23
**ACTION** 1:9
**actual** 34:15 81:21
**actually** 9:14 12:3 15:1
15:14,18 16:7 18:16
19:2 38:21 47:8 49:8
72:12 78:20
**address** 5:19 38:15
43:9 86:22
**addressed** 61:6 90:1
**addresses** 72:23 80:1
**adequate** 33:14
**administer** 48:23
**administration** 7:21
**advise** 65:3
**advised** 42:8
**affairs** 8:3
**afforded** 15:12
**African-American**
44:19,20
**Afro-American** 44:15
**after** 5:7 37:18 38:1,5,7
41:1,11 59:7 63:18
77:16 78:8 80:16,18
81:1 84:13 86:23
89:5 91:18 92:16

**again** 6:18 7:18 11:5
16:8 19:4 38:17
43:13 55:3 63:14
64:1 65:17 85:2
**against** 17:17 31:14
40:6 45:14,18 72:1
89:13 93:10 96:10,22
**age** 21:6
**agitated** 84:20
**ago** 41:9,10 97:16
**agree** 26:19 61:5,17
**agreed** 3:20 4:10,17
**agreement** 1:16
**agreements** 18:7
**ahead** 60:2
**aid** 48:23
**AIDT** 22:17,20 24:1,7
79:1
**Alabama** 1:4,10,18,20
2:6,12 3:4,6 4:3 5:22
6:2,4,23 7:3 12:22
20:12 21:3 22:11
45:9 100:7,10,20,23
101:17 102:5 103:7,8
**allegation** 66:20,23
67:8,10
**allegations** 40:5,12,17
43:1,2,16,17,21
45:13,17,19 89:18,20
90:6 96:22 97:11,21
98:2
**alleged** 72:6
**alleges** 98:9
**alone** 21:16
**along** 34:6,7,8 66:13
89:14
**already** 46:6 59:15
64:18
**always** 48:11
**America** 11:20 12:3,8
**Andalusia** 71:2,3
**Anne** 13:20
**annual** 83:3,5
**annually** 80:21,22
**another** 18:23 75:2
**answer** 6:14,15 25:21
32:5 33:13,21 34:22
55:18 67:23 76:14
86:13
**answered** 46:6
**anybody** 35:20 67:7
95:10 98:2
**anymore** 65:9 90:21
**anyone** 23:23 35:6
45:18,21 46:2 49:20
50:11,18 51:7 58:22
62:19 93:22 95:21
98:6
**anything** 31:21 33:7

37:3,20 42:12 43:13
46:10 50:2,19,21
59:1 65:17 66:5,17
68:16 69:1,7 72:3,5
90:6 99:23
**anywhere** 39:8,12
85:23
**apparel** 12:1
**apparent** 68:20
**apparently** 41:2,21
**appear** 88:1
**APPEARANCES** 2:1
**appears** 61:5
**applying** 84:16
**appointments** 49:3
**approximately** 1:21
6:9 9:15 10:16 25:5
27:5,9 35:16 63:22
100:2
**area** 32:14 33:9 70:21
70:23 85:13,14,15,16
85:18 86:9 93:10
**areas** 33:10 34:1 46:21
86:5
**arm** 92:10
**arms** 92:5
**around** 28:16 70:14
92:10
**arrested** 20:8
**aside** 54:7
**asked** 64:17 70:19
84:21 91:12 92:15
93:1 94:8,20,21
98:20 99:9
**asking** 6:19 25:16
37:15,21 41:4 49:23
53:16 55:6 63:18
65:1
**aspects** 34:3
**assembly** 24:20 25:13
26:8 27:4,7 48:8
85:14,16
**assign** 57:14,18
**assigned** 11:19 14:11
34:13 36:6 48:22
71:18
**assistant** 36:9,13,14
46:13 71:16
**assistants** 48:23
**associated** 38:20,23
58:12
**associates** 36:4
**associate's** 16:7
**assume** 6:14 62:8 78:16
**assuming** 44:8 96:20
**assumption** 44:12
**Atlanta** 16:13
**attached** 102:13 103:13
103:17

**attempted** 92:6 98:3
**Attempts** 98:7
**attend** 83:8
**attendance** 57:5 70:8
**attended** 83:9
**attorney** 40:16
**attorneys** 2:11 37:16
40:10 43:14 60:11
77:12 78:14 97:2,7
97:10
**Atwell** 1:7 3:3 22:10,15
25:12,23 27:13 40:5
40:12 43:6,15 45:12
46:8 47:16 49:20
50:19 51:6 52:8
53:11 57:20 58:21
61:2,9 62:18 63:15
67:11 68:6,12 69:2
72:1,5 74:11,16 75:3
79:3 80:4,13 81:20
84:5,10 86:7 89:5,12
89:18 90:7 91:7,11
91:16,21 92:4,9,11
92:14,18,23 93:8,13
94:19 95:2,4,8,23
96:3,9,21 97:13
100:17 102:5 103:8
**Atwell's** 62:7
**augmentation** 75:5
**August** 22:6 24:20
25:13 26:1 27:8,17
81:8,11
**Autauga** 20:23
**authority** 34:2
**automobile** 7:9
**automotive** 7:5
**available** 94:14
**aware** 24:15 25:23 26:2
31:18,19 36:23 38:1
43:17,20,21 45:12,16
45:20 46:1,4 49:19
51:5,10 57:23 61:9
62:17,22 63:1,9
64:20 67:9,11 68:6
72:3,9 74:13 75:5
90:11 96:21 98:9
99:3
**away** 85:16
**a.m** 1:21

## B

**baby** 96:4
**back** 9:4 12:6 13:7 14:9
15:6 22:6 27:8 40:3
48:8,12 57:10 58:18
73:7 81:12 84:13,23
85:1,3,4,10,13,13,22
86:7,8 87:2 92:11
**background** 29:20 30:7

30:13 31:2 47:2
**bad** 32:21 33:7,9 88:18
**bar** 93:6
**based** 30:11 86:14
**basically** 9:22 30:21
42:2
**basis** 66:19 86:11,18
**became** 15:5 22:10
29:12 31:21 35:10,17
43:23 46:12 47:5
57:23 80:10,16 81:1
81:7,8 84:20 88:14
96:20
**become** 23:13 28:13
29:17 99:3
**becoming** 30:6 56:20
**before** 1:16 4:1 6:7
10:2 11:3 12:13,15
13:14,15 14:7,21
17:2 22:1 29:12
59:23 60:17,21 61:1
76:2 77:6 78:9 80:16
83:20 90:1 102:17
**began** 84:18
**beginning** 14:9 65:19
66:11 68:13 85:5
**BEHALF** 2:3,8
**behavior** 59:12
**being** 25:18 51:15,23
53:4 55:16 56:4 66:8
73:8
**believe** 6:10 20:21
53:16 57:8,12 70:1
70:22 74:7 75:2 77:3
79:19 99:21
**best** 24:22 32:22 37:14
44:23 46:17 50:14
59:7 65:3,6 66:10
68:8 93:18
**better** 42:17
**between** 3:21 4:11,18
12:6 33:9 51:1,4 59:4
68:11 69:2 72:6
85:23
**big** 23:21
**Birmingham** 2:6,12
103:7
**birthday** 58:23 92:1,3
**bit** 23:11
**Blackwell** 103:21
**Bodiford** 69:17 70:9
**body** 7:9
**born** 16:17
**boss** 46:9 98:8
**both** 30:8 95:5
**boys** 45:3
**brain** 53:19
**Brantley** 62:1,3,3,4
**break** 96:15

Deposition of Gary Sport       Atwell vs. SMART Alabama       September 12, 2007

Page 2

breast 75:4,10
breasts 94:20 95:17,18
brief 13:22 96:17
briefly 7:2,18 82:3
bring 83:5
broad 49:22
Brook 2:5
brought 46:23 47:3
build 84:21
building 2:5 8:12 85:21 85:23
Burgans 70:4
Burr 1:19 2:10 103:6
business 7:2,22 15:13
Butler 20:18,19
buttocks 93:11
buyout 18:8

**C**

cafeteria 52:8 53:1,10
Cahaba 2:6
Caldwell 40:22 41:21 41:22 42:13 43:16 97:18,20
Caldwell's 40:17 41:2
call 93:14,17,22 94:15
called 38:9,12,14 41:1 44:8 93:6 94:1
calm 90:3
came 15:17 19:14 29:19 84:13,23 87:2 88:15
capacity 6:22 10:18 17:11 25:5
care 96:5
Carissa 71:5,6
carrier 49:5
case 4:12,14 18:14 19:20 97:18 101:2
cases 19:8 20:1
Cathy 40:17,22 41:1,20 41:22 42:12 43:16 97:18,20 98:4
Cathy's 98:7
Caucasian 44:19
caught 46:23
cause 101:10
causing 69:1
cc 103:22
celebration 73:14
Central 11:19 12:3,8
certain 27:20 30:20 33:10 36:1 38:6 56:22 57:8 67:5 82:1 82:15 83:22 84:1 88:1 99:20
certainly 28:19 42:20 66:18 68:19 85:20
certainty 81:15,19

83:15 84:4,7
CERTIFICATE 100:6
Certified 1:17 4:2 100:9 101:15 103:21
certify 100:11 101:9 102:7
chain 34:3
changes 103:18
characterize 7:13 33:17,22
charge 3:10 8:15 28:10 28:11 61:2 78:2 96:22 97:12 98:19 99:1,11
charges 41:20 82:18
chase 16:11
check 21:13 30:7 31:2 88:16
checks 30:13
children 22:4 44:22 45:1,2
children's 12:2
Christmas 59:7 84:14
Cincinnati 12:21
circuit 19:13
circumstances 65:4,7,8 69:22
Civil 1:9 3:23
claim 60:20
claims 43:18 71:11,15 75:3
class 24:1,8
classes 22:22
clear 6:13,18 59:3 60:19 91:5
close 22:13 34:18 58:6
clothing 12:2
cocaine 99:17,18
code 5:22
Colinda 56:11,13,15,17 72:12,15 73:2 74:2,5 74:7,7
Colinda's 73:15
college 15:22 45:6
Columbus 37:10 38:4,7 38:8,10,16,19 43:9 43:12 44:13
come 46:16 59:7 63:7,8 63:9 64:23 68:21 86:21 94:12
coming 63:15 70:19 74:5
commands 34:3
commencing 1:21
comment 95:1
comments 92:19
commission 4:4 77:5 102:20
Commissioner 1:17 4:2

100:10 101:16
comp 49:2
companies 7:16
company 10:5,12 12:16 13:15 17:13,14 18:8 22:21 31:4 36:10 39:16,21 56:15,21 70:7 88:19,20 90:22 98:21
company's 48:7
compensation 49:5
complain 50:17 59:11
complained 31:11 50:10,11,18 59:14
complaining 25:23 26:3 54:10,14 62:18 66:15 96:11
complaints 31:14 36:23 49:19,20 50:4 54:22 68:5 71:23 89:12
completed 15:2 23:16 52:1 83:12 85:12
completely 90:18
computer-printed 101:4
concentrate 30:2
concerned 33:19
concerning 52:9
concerns 54:3
concluded 100:1
conducted 29:14
confided 90:13
conflicts 50:23 51:5,11 70:3
considered 13:2
consist 27:9 82:4 83:4
contact 40:2 97:3
contacting 77:12
contain 101:5
contained 77:19 96:22
contending 24:11
contentions 77:19
continued 2:22
continuing 96:18
contract 19:11
contractual 18:7
contradict 72:5
control 7:23 8:2,4
convenience 10:14
conversation 42:2,13 42:23 43:5 52:21 53:1,22 62:11 64:15
conversations 53:10 54:4 55:6,9,15 56:13 75:8 97:15
coordinate 49:2,4
coordinator 13:4
copy 103:10
correct 5:18 11:12 23:9

23:14 24:19 27:14,15 31:17 34:16,17,20 36:22 45:22 46:12 51:3 59:18 60:22,23 61:3,4,14 65:15 67:16 68:3 69:7 76:12,21,22 77:20 78:19 79:21,22 80:6 80:12 84:6 89:2,6 91:10 96:23 97:1,13 101:5 102:10
correction 103:12,12 103:16
corrections 102:11 103:11,14,17
counsel 3:21 4:11 83:6 101:6,10
counties 20:10,16 21:2
County 19:12 20:23 100:8
couple 5:13 41:8,10 97:16
course 58:8 82:21 93:20
court 1:3,17 4:2 5:1,15 19:9,10,13,14,15 100:9,22 101:16 103:21
co-employee 39:1,11 40:3
co-employees 26:4 34:6
co-op 15:2
crazy 47:20
credentials 29:16,20
Crenshaw 19:12 20:17
criteria 30:11
current 5:19 94:11
currently 6:1 37:9,12
cut 16:11 34:19
c/o 103:5

**D**

daily 86:11,18
date 35:13,16 49:16 62:22 63:4 88:7
dated 61:15
day 24:17 49:16,17 53:15 80:7,10 85:1,8 86:4 101:12 102:18
days 88:21 94:12 98:14 103:16
dealing 32:15 34:2
dealt 34:5
Dear 103:9
December 9:4 49:18 50:13 51:2 59:5
decided 88:17 90:21 99:7
defendant 2:8 3:4,6

17:2,7,8,12,17,20 18:11,17 19:5,23
Defendants 1:11 100:21
deficits 51:20
definition 24:22
degree 15:7,22,23 16:3 57:20 81:14 83:14 84:4
deliberately 93:10
deny 43:1
department 3:3 8:16 27:3 35:18
departmental 62:16,23 63:16 64:21 65:5
depend 30:14 85:18
depends 81:5
DEPONENT 100:4
deposition 1:15 3:22 4:1,7,12,19 6:7 18:13 18:19,23 19:6 41:2 41:11 87:13 100:1,12 102:8 103:11,17
depositions 18:22
describing 55:11
desk 99:9
desperately 32:12
detailed 64:14
developing 68:21
development 22:21
Dicks 98:12
different 9:11 30:1,18 82:10
differently 52:5
direct 67:7 71:22 75:8
directly 58:12,14,21 63:16 75:12 88:22 89:11,17 91:10 95:8
director 8:18 9:4,23 22:7 25:9 28:2,6 29:4 29:10,17 30:5 32:3 51:13 58:10 84:15 86:1 88:11
disclosures 3:5 37:8 69:16 75:14
Discrimination 3:10
discuss 40:4 42:4,8 43:2
discussed 37:16 40:22 54:7 56:20 66:1 69:9 82:19
discussing 60:10
discussion 20:7 40:8 42:22 52:7
discussions 40:11,15 43:6 68:10 71:22 87:5,8 97:5,11,17
dismissed 57:3 70:7
dispute 19:11 26:20

Case 2:06-cv-01089-MEF-WC    Document 18-10    Filed 11/02/2007    Page 30 of 36

Deposition of Gary Sport          Atwell vs. SMART Alabama                September 12, 2007

Page 3

72:4,10
distance 85:19
distributor 10:13
District 1:3,4 20:11
  21:3,14 100:22,23
division 1:5 16:10
  101:1
doctors 49:2,3
document 59:23 60:4,6
  60:8,17 61:1,10 77:6
  77:9 79:2,6,9,12 80:5
documents 28:22
doing 22:23 24:5 94:17
done 31:1 49:10 54:2,9
  58:9 83:1 88:13
door 34:15,18,23 35:1
down 38:16 54:18
  88:15 95:17
dream 74:12,17 75:10
drill 6:11
drinks 92:16 93:5
drug 98:19 99:1,11
duly 5:7 100:14
duress 56:19
during 14:2 15:5 23:8
  25:9,19 26:1,7 27:8
  35:5,19 37:1 42:13
  42:23 43:5 47:17,21
  50:7,15 51:6,11 52:2
  52:6 53:2,12 54:11
  55:14 58:17,20 59:4
  59:10 65:18,21 67:12
  68:12 79:3,7 82:12
  83:1 84:2 86:1 88:20
  90:16,19 93:20
duties 7:19 48:20
duty 47:5

**E**
each 103:12
earlier 18:20 51:20
  89:15 94:8
early 85:7
easy 33:3
eat 91:14,19
eating 91:13,18
education 14:23
EEOC 3:9 61:2 78:2
  96:21 97:12
effect 85:5
efforts 38:19
either 4:9,14 50:21
  62:18 75:9 80:13,16
  96:20 97:18
Elba 11:10,11
employed 6:1,3,22 10:2
  10:15 12:4 30:6
  31:21 36:16 38:13
  39:12,14,18,19 67:13

69:17 80:8,11,16
  81:7,8 83:23 85:8
employee 7:22 8:2 18:4
  22:10,15 23:13 25:18
  28:7,13 29:12 31:10
  33:15 35:10 37:6,7
  43:18,23 45:14 47:23
  48:5 61:10 63:11
  64:23 65:23 66:3,14
  68:7 74:10 75:2,6
  81:2,22
employees 27:5 29:23
  33:18 67:12 75:9
employer 46:8
employers 46:3
employment 3:12
  24:17 29:4 77:4
  78:15,21 79:13,19,23
  80:5
EMT 47:2
Enclosed 103:10
encompasses 8:2
end 49:17 51:2,18 64:1
  64:3,5 65:19 66:11
  68:13 83:23 95:2
engineer 14:1,17
engineering 16:3
Enterprise 12:22
entire 8:1,15 27:20,22
  29:5 57:13
Equal 77:4
essentially 51:16
even 64:14 94:10
  103:14
ever 17:1,5 20:8 46:1,7
  50:10,16,17 53:20
  55:14 56:6 58:14,21
  59:1 60:7 61:9 63:15
  66:8,22 67:3,5 68:7
  69:9 71:22 75:14
  77:5 78:8 81:21
  83:15,19 84:5 91:11
  91:16,21 92:4,9,14
  92:18,23 93:4,8,13
  94:15,19,23 95:4,9,9
  95:15,20,23 96:3,7,9
  97:3,5,20 98:6
every 33:6 83:11 86:4
everybody 99:5,5
everyone 23:10 83:8
everything 33:4 65:16
evidence 4:8
exact 63:4 88:7
exactly 19:7 20:10 38:6
  48:19 74:9 90:23
examination 2:18 5:10
  101:6
example 33:1
except 28:6

Excerpt 3:11,12
exclusively 53:23
excuse 27:16
Exhibit 59:19,22 60:13
  60:14,20 69:12 75:16
  75:19,20,22 76:23
  77:19,22 78:2,11,13
  79:16,18 87:15,19
EXHIBITS 3:1
experience 34:8
EXPIRES 102:20
extent 25:19
extremely 82:16

**F**
F 2:4 103:22
facility 7:5 11:21 14:12
fact 16:23 90:17
factory 15:16
failed 11:22
fair 7:13 8:16 31:2,3
  33:16 86:9,17
fairly 33:2 82:1 84:7
familiar 61:21
family 44:14
far 18:17 29:5 31:15,22
  33:18 34:2 39:5,7
  43:8 45:4,10 47:23
  48:2 50:22 56:5
  65:11 83:3 85:16,20
  90:5
father 16:22
Faulkner 15:10,10,11
  15:23
fault 57:13,14
February 28:16 53:15
  61:15 62:17 65:20
  66:12 68:13 83:23
  85:5,6,7,9 86:2 87:9
  88:8
federal 3:23 19:9
feel 83:22 84:1 91:1
feeling 34:4
feet 85:20
felt 18:6 55:12,15 56:3
  56:4 59:16 94:21
  96:9
fence 39:21,23
few 21:16 60:8
file 3:14 87:20 88:2
filed 17:17 19:9,16
  60:21 61:2 78:9
  96:21 97:12
filing 4:12,16
find 38:8,19 103:13
Fine 20:6
fired 57:2
first 3:6 5:7,14 17:4
  24:17 28:13 30:3

39:13 47:14,17,21
  48:23 49:9,10,16
  60:5,7 62:9 63:2 84:9
first-aid 47:3
first-shift 47:23 48:5
flowing 54:18
focused 53:21
focusing 55:3,20
follows 5:9
follow-up 32:14
foregoing 101:4 102:8
form 4:5 25:20 32:4
  33:12,20 34:21 55:17
  67:22 79:10 86:12
formal 83:6 84:8
formality 4:3
Forman 1:19 2:10
  103:6
former 46:8,9
Forming 7:9
forth 12:6 13:7
forwarding 38:15
found 38:7,13
four 89:5
frame 15:5 50:8 89:7
frames 50:5
frequently 86:19
friction 68:20 69:1
  84:20
from 3:3,11,12,14 9:2,3
  15:9 16:1 18:5,7,8
  25:13 26:1,3,6 27:16
  27:17 31:8,15,21
  34:1,1,19 35:5,10
  36:18 38:10 39:4
  41:14 43:14 44:14
  48:9 49:17 50:3,12
  51:1 54:7 57:7,8
  58:22 64:23 70:7,22
  71:1 74:8 79:19
  83:23 84:23,23 85:16
  88:4 90:20 95:10,20
  98:20
front 47:4 103:14
fulfilled 15:3
full 5:15
further 4:10,17 100:4
  101:9

**G**
Gary 1:15 3:2,22 5:6
  5:12,16 61:6 62:10
  100:13 102:7,16
  103:5
gave 6:15 18:23 61:12
  61:14 91:22
general 7:1,20 8:3 9:20
  9:23
generally 9:11 32:9

generating 49:8 77:8
gentleman 8:20 18:6
Georgia 16:2,10
getting 15:16 46:5 54:2
  58:9
Giles 16:19
Gin 8:20,22,23 9:3
girl 74:22
girls 74:20
gist 42:2
give 6:16 18:13 19:5
  21:10,11 24:22 30:12
  33:1
given 6:7 18:20 38:15
  79:3,7 102:9,10
giving 61:9 95:7
Glenwood 5:21
go 9:11 10:22 12:11
  13:11 14:4,18 16:15
  20:4 38:4 39:16
  58:18 60:2 79:10
  81:2 82:14,17 85:1
  86:4 91:3,14,19
  92:16 93:1,5
going 6:14 15:17 33:5
  41:4 42:16 59:21
  64:15 66:21 69:15
  75:18,22 77:2 78:1
  81:12 85:12 86:15
  90:21 91:3
goings-on 18:9
gone 63:11 82:20
good 23:11 29:20,20
  32:7,9,11,13,15,18
  33:9 34:10 73:12
GOOZEE 2:4
Gosh 28:15 81:4
gotten 41:19
governmental 32:18
grabbed 95:5
granted 87:1
gray 33:9
great 73:12
group 7:23 8:1,3,4
  22:18 63:11
groups 23:1,5
guard 98:21
guess 17:10 19:12
  23:22 28:15,19 57:17
G-I-N 8:22

**H**
half 6:5 9:9,10 11:17
half-million-square-f...
  85:21
handbook 82:14,22
handle 65:9
handled 56:18
hands 72:13 73:3,11

Deposition of Gary Sport    Atwell vs. SMART Alabama    September 12, 2007

Page 4

92:6,6 95:16
**Handwritten** 3:2
**happen** 53:7
**happened** 53:6
**harassed** 43:19 62:20
  62:21
**harassing** 31:12 59:12
**harassment** 3:11,13
  26:3 31:14 43:22
  45:14,17,22 46:2,10
  50:1 62:14 65:14,18
  78:16,17 79:20 80:2
  80:15,20 81:10,16,21
  82:6,18
**hard** 47:20 54:15 55:1
  56:4 67:15 88:12
**Hattiesburg** 39:15,20
**having** 5:7 40:7 45:13
  51:6,11 52:7,23
  64:14 90:10,12
**head** 59:7 67:17
**hear** 50:17 58:22 65:17
  95:10,20
**heard** 50:2,7,11 59:1,3
  75:3
**heavily** 15:15
**heavy** 46:20
**held** 9:12,14
**hello** 87:12
**help** 15:18 20:13 37:15
  46:22 47:4 75:13
  93:22
**helped** 22:21
**helps** 53:14
**her** 23:3,6,7 24:11,16
  24:16 25:18 26:2,6,9
  26:18 36:8,12 40:18
  43:2 44:8,11,14 46:3
  46:8,9 47:4 48:9,20
  49:16 50:3 53:1,15
  54:10,19 58:15,23,23
  59:13 62:20,21 66:2
  66:4,5,16 67:1,1,15
  67:20,21 68:1,1,18
  68:18 69:3,4,4 70:2
  70:14 72:13 73:3,12
  73:20,23 79:3 84:23
  85:2 87:1,5,8,14
  89:21,21 91:9,9,13
  91:22,23 92:2,3,5,5,6
  92:7,11,15,19 93:1,4
  93:11,14,15,17,20,22
  94:1,16,16,20,20,21
  95:5,7,16,17,18 96:1
  96:7,8,10 98:1,4,7,8
  98:10,16,23
**hereto** 4:15,18 102:13
**hesitated** 94:7
**Heusen** 13:15,16,23

14:19
**hey** 46:7 73:9
**He'll** 94:12
**high** 16:15
**higher** 28:6
**highest** 28:7
**highlighted** 82:15
**him** 16:21 30:2,5,8,22
  30:23 31:2 33:17,22
  37:19 38:7,8,16,19
  39:4,10,14,17 40:4,6
  40:15,23 41:5,7 42:4
  43:10 50:2 54:18
  56:2 59:17 66:5 67:4
  73:3 86:17,21 89:13
  89:19 91:1,14,18,19
  92:16 93:2 96:11
  97:3,5,17
**hire** 23:19 82:13
**hired** 9:13 22:17 23:2
  24:13 29:8,9 30:4,9
  31:9
**hiring** 22:14,23
**hold** 58:8 92:6
**home** 93:15,17 94:2
**home-based** 12:20
**Honduran** 15:14
**Honduras** 12:9
**honest** 42:5
**honestly** 30:17 40:7
  64:11
**hope** 75:1
**hoping** 74:22
**Horsley** 2:4,4,20 5:11
  5:12 20:6,15,22
  37:22 52:12,16 72:20
  76:9 96:14,18 99:21
  103:22
**hospital** 90:15
**hot** 83:7
**HR** 9:4,23 15:13,15,18
  15:23
**hug** 91:22
**hugged** 58:23 92:3
**human** 8:1,15,18 9:13
  10:19 15:6,7 17:13
  22:6 25:9 61:6
**Hyundai** 7:14,17

---

**I**

**idea** 42:17 45:11 56:17
  64:11
**identification** 59:20
  75:17,21 77:1,23
  78:12 79:17 87:16
**identify** 87:17
**Igor's** 93:6
**immediate** 26:9 49:11
**immediately** 11:2

12:13,15 13:14 14:7
**implants** 75:11
**important** 32:16 82:16
**impossible** 92:20
**inappropriate** 59:11
  91:23
**inappropriately** 67:21
**incident** 66:7 95:11
**included** 20:11
**including** 18:18
**Incorporated** 11:4
**incorrect** 24:12,14
**independent** 31:1
**independently** 23:4
**Index** 2:18,22
**indicate** 39:17
**indicated** 43:11 56:4
**indirect** 8:4
**indirectly** 77:10 95:10
  95:20
**individual** 17:16,20,21
**individuals** 24:6 72:4
  80:20
**industrial** 14:1,17
  22:20
**Industries** 14:9
**information** 3:14 37:12
  37:13 39:4
**informed** 65:11 92:23
  93:8
**initial** 3:5 37:7 69:16
  75:13
**injured** 46:18
**injuries** 49:1,4 71:19
**injury** 46:19 48:10
  49:9,10
**inquire** 91:2
**Institute** 16:1,9
**insurance** 49:5
**intended** 6:16
**intention** 48:7,11
**interacted** 23:7,10
**interested** 15:5 101:11
**interpreted** 65:7 84:12
**interrogatories** 3:7
  75:23
**interruption** 13:22
**interview** 23:21 24:3
  24:11,16
**interviewed** 23:12,23
  24:11,16
**interviewing** 24:7
  29:11
**interviews** 23:20 24:5
**introduced** 4:13
**investigate** 66:19
**investigated** 67:6
**investigation** 77:13
**investigations** 60:9
  72:8

**invited** 93:4
**involve** 68:16
**involved** 15:15 18:3,10
  23:1 39:1 74:12 99:6
**involving** 19:1,11
**issue** 58:4
**issues** 28:10,11 33:18
  39:11 54:7,21 55:21
  58:6 69:10 84:17
  89:16

---

**J**

**January** 52:2,6,11,15
  52:16 53:2,13,17
  54:5 55:4,10 58:1,17
  59:10 63:6 64:3,5
  65:19 66:11 68:13
  86:2
**jeopardy** 51:19,22
**Jessie** 70:16
**Jim** 8:21
**job** 7:18 14:16 24:23
  36:8,12 37:4 46:18
  47:7 48:12,20 51:19
  51:21 54:8 65:9
**jobs** 9:11,22
**Jones** 71:5
**judgment** 66:10
**just** 8:8,10 9:10 10:4
  11:16 19:19 21:4,10
  21:15 23:4 25:16
  28:15 42:14 46:6
  50:1 52:5,14,18 53:6
  53:21,22 59:3,6
  60:19 64:7 68:17,20
  69:15 71:13,18 73:13
  81:4 83:12 86:14
  88:14 90:2 91:5
  93:20 94:14 95:17
  99:7

---

**K**

**Kathryn** 2:9 103:5,23
**Kathy** 21:23 22:1,2
**Katie** 21:10 37:8
**keep** 46:22 49:6,6
**Kehey** 26:11
**Kelley** 26:12,13,15
  73:20
**Kelley's** 27:6
**kin** 10:10
**kind** 9:10 64:4 98:18
  99:8
**KING** 2:4
**kissed** 98:9
**Kleinert's** 11:3,6,15,16
  11:19,22 12:1,14,15
  13:12
**knew** 38:9,10 41:5

**know** 6:11 11:13,14
  13:20 16:19,20,21
  18:17 19:8 21:2,15
  21:17 22:11 23:4
  25:15 28:14 29:6
  31:6,15 37:17 38:17
  39:5,7,8,9,19 41:12
  41:15,18,23,23 42:3
  42:15 43:4 44:10,13
  44:17,21 45:2,4,10
  46:11 48:1,2,8,19
  50:2 53:15 55:23
  56:2,16 57:6,10
  64:18 65:22 66:21
  67:3,5,7 69:20 70:6
  70:10,11,12,12,14,21
  71:10,14 74:6,19,20
  75:1,7 81:9,14,20
  83:19 84:3 85:9,11
  87:17 88:7 90:5,14
  90:22 94:13 98:1,6
  98:12,14 99:12
**knowing** 62:1
**knowledge** 18:9 32:11
  37:14 45:23 47:12
  48:16 71:10,14 80:1
  80:3
**known** 37:9
**knowns** 73:1
**knows** 99:5
**Korea** 9:3
**Kwon** 29:10,14 30:7,12
  51:13 57:12 58:10
  84:15 88:11 89:15
**K-L-I-E-N-E-R-T-S**
  11:8

---

**L**

**lack** 55:22 57:18 58:12
  73:7 84:17
**lacking** 32:7 57:12
**ladies** 71:23
**laid-back** 56:18
**Lakisha** 70:16,22 71:1
  71:14,17
**landed** 48:2
**Large** 1:18 4:3 100:11
  101:17
**last** 5:13 9:18 37:9
  38:14 41:6 53:15
  60:8,15 73:1 85:8
  98:15
**late** 63:5 88:8 93:15
  94:4,16
**laundry** 91:4
**Laura** 13:20
**Law** 1:18 2:11
**laws** 32:12
**lawsuit** 17:2,17 18:4,5

Case 2:06-cv-01089-MEF-WC    Document 18-10    Filed 11/02/2007    Page 32 of 36

Deposition of Gary Sport                Atwell vs. SMART Alabama                September 12, 2007

Page 5

18:17 38:20 40:4,13
40:18 45:20 60:21
97:12
lawsuits 19:18
lawyer 41:14
lawyers 38:18
lead 58:4
leader 26:16 27:1
49:11 73:23
learn 63:2
learned 43:14 99:1
least 76:18 78:14 98:22
leave 10:22 12:10
13:11 14:18 56:21,23
70:18,19 74:4 90:22
leaving 84:13 91:1
Lee 20:4
left 14:4 37:18 38:2,5,7
39:15 40:9 58:2
69:23 70:1,6 83:20
84:10 88:5,6,19,20
89:6,9 96:19
legal 83:6 98:15,18
legs 96:1
let 52:3 59:21 66:21
96:14
Letter 3:2
letting 77:12
let's 30:2 58:18
level 28:7
like 5:4 18:6 29:1 32:19
41:10 46:10 47:2
50:2 53:14 56:3,4
61:20 62:10 87:23
94:21 96:10
limited 34:1
line 103:12
Lisa 69:17 70:1,1,9
71:13,16
list 21:10 91:4 103:16
literally 16:12
little 90:3
live 12:3 13:6
lived 14:2
lives 37:12 56:16 57:6
living 70:10,18 38:1
45:9
LLC 1:10 7:3 100:20
102:5 103:8
LLC's 3:4,6
LLP 2:4
load 46:20 86:15 88:13
local 70:15 99:4
located 8:6,11 10:8
11:9 12:19 14:10
35:20
location 34:12
logs 58:1 73:8
long 6:3 9:7 10:15

11:15 16:20
longer 56:15
look 78:18 88:9
looked 73:11
looking 58:6 88:4
93:23
looks 29:1 53:14 61:20
62:10 87:23
Lord 21:7
lot 13:7 21:8 42:4
55:23 84:14 88:20
Lowndes 20:21
lunch 91:14
Luverne 5:21,22 8:6
14:3,12 16:16,17
21:16,19 70:14

M

Maddox 24:6,10,15
29:8,12,22 30:4,21
31:6,11,15,20 35:8
35:21 37:2,9 40:2,11
43:19,22 44:10 45:15
47:9,18 49:21 50:4
50:12,16 51:9 52:9
53:2,12 54:11 55:12
57:13 58:23 59:12
62:15,20 65:14,18
66:23 67:14 68:12
69:2 72:1,7 74:11,17
75:4 79:7 80:9 81:1
86:3,10 89:10,14
91:8,12,17,22 92:5
92:10,15,19 93:1,9
93:14 94:3,20,23
95:5,15 96:1,4,10,19
96:23 97:13,22
Maddox's 3:14 27:18
29:16 85:17 87:20
made 4:6 25:1 37:1
40:2 45:13 49:20
54:23 64:20 67:11
68:7 72:1 89:12,18
92:19 94:23 97:21
98:7
mail 41:3,20
make 21:14 46:6 52:18
83:8 103:11
making 40:6,13,18
43:1 45:17,19 73:14
90:7
males 92:20
man 84:16 95:1
management 15:8
manager 7:1,20 9:13
9:21,23 10:19 15:18
17:13 27:19,23 28:3
28:4,5 29:18 37:6
58:8 94:11

managers 79:11 80:19
94:10
manner 4:14 101:11
manual 3:12 78:15,21
79:20 80:1
manufacture 12:2
manufacturer 12:1
14:14
manufacturing 11:20
many 6:9 17:4,9 27:5,6
March 28:16 29:1 31:9
31:15 34:11 35:5
81:7
marginal 33:10
Marietta 16:2,14
Marijuana 99:14
mark 59:22 75:18,22
77:2
marked 59:19 75:16,20
76:23 77:22 78:11
79:16 87:15,18
married 21:20 22:1
44:2,2,4,11
mass 22:23
massage 95:7
Material 3:11
matter 100:16
matters 77:18
may 4:1,6,7,13 29:23
30:1 71:10,15 72:10
90:9,17 97:6
maybe 45:7 56:7 88:8
90:19
McGough 36:2,3 37:1
47:11 48:4 58:2
73:16
mean 7:8 22:19
mediated 39:2
medical 90:10,11,14,20
meet 98:3
meeting 67:7 89:11,14
89:23 98:5
meetings 54:12 55:4,5
58:14 66:22 67:4
Melissa 36:2,3,5 47:11
48:4,6 58:2 73:16
member 27:14
memory 25:16
men's 14:14,15
Merrill 11:13,14
met 5:13 89:19 97:20
98:1,6,8
metal 7:9
meth 99:18
Mexican 13:1
Mexico 13:5,5,6
Middle 1:4 20:11 21:3
21:14 100:23
minor 49:1

minors 99:6
Mississippi 37:11 38:5
39:15 43:9
modified 47:5
moment 73:13 78:3
monogamous 92:20
Monroe 1:19
Montgomery 1:20 10:9
10:10 19:14 20:20
93:1,5 100:8
month 22:10 52:2,6
53:12 58:17,20 59:5
59:10 64:2
months 5:14 35:5 41:8
41:10 60:9,15 97:16
more 8:8 42:14 54:1
58:7,7,10 62:1 64:15
58:7,7,10 62:1 64:15
morning 16:22 88:15
Morris 2:9 103:5,23
most 21:18 27:9 34:10
84:16
mouth 18:3
move 15:13 48:8
moved 9:20 15:4 47:8
48:14 65:2,10 85:10
86:7 95:16
much 56:9 67:14 68:17
88:14 89:20
myself 29:9 93:21
Mysti 98:12,14,15,19

N

name 5:12,15 13:3
21:22 44:5,6
named 8:20 17:11,16
17:19 18:11,16 19:4
19:23 21:4 71:13
nature 37:2
need 4:5 73:1 91:1
needed 32:13 39:3 54:9
65:10 86:22 90:3
93:22
neither 48:17,18 101:9
never 18:16 59:3,14,15
60:14,20 61:1,12,14
69:6,11,13 85:2,2,14
87:2 89:11,19 90:13
90:22 91:8,10 95:8
97:9,10
new 99:10
next 2:22 62:15
night 93:2,15 94:4,4,16
nights 94:13
nods 67:17
None 31:18
nonobjectioned 76:18
noon 100:2
normal 94:6
North 2:12 37:10 103:7

NORTHERN 1:5
101:1
notarized 76:12 103:15
NOTARY 102:19
noted 102:12
nothing 5:8 42:14 62:1
65:13 100:15
notified 103:17
November 9:15 25:6
25:14 27:8,16,17
31:10,16,22 34:11
35:6,11 36:19 37:4
46:13 49:14,15 50:12
51:1 58:19,20 59:5
81:17 83:16 91:23
number 60:13,15,21
61:19,20 62:2,7
67:13 101:2 103:12
numerous 91:12 93:9

O

Object 25:20 32:4
33:12,20 34:21 55:17
67:22 86:12
objections 4:4,5
obligation 15:4
obtain 15:22
obtained 15:7
obtaining 37:15
obviously 23:7 73:17
occasionally 70:15
occasions 6:9 53:20
91:12 93:9
occurred 72:6
October 101:12 103:3
off 20:5 24:19 42:21
82:22 83:9 98:23
offered 4:8
office 8:11,14 12:22
34:13,14,15,18 35:3
35:7,21 36:16,21
46:21,22 47:9,17
48:15,20 49:17 54:2
55:21,22 56:8 57:11
57:14,19 58:3,7
59:17 69:3 71:19
73:18 80:19 84:17
85:13,17 94:7
offices 1:19 8:13
Off-the-record 20:7
42:22
often 91:17 92:15
Oh 17:19 21:7 38:12
68:15 76:16 78:10
86:6
Ohio 12:21
okay 6:16,17,20,21 7:4
7:20 8:23 9:19 15:1
15:20 18:5,19 27:13

Case 2:06-cv-01089-MEF-WC    Document 18-10    Filed 11/02/2007    Page 33 of 36

Deposition of Gary Sport                Atwell vs. SMART Alabama                September 12, 2007

Page 6

28:20 29:3 31:4,8
35:12 37:4 41:13
44:10 55:3 56:8
61:23 62:3 63:20
64:13 68:10 69:15
72:10,17,22 75:18
76:4,8 77:11 78:8
82:12 85:4 86:7
87:22 91:6 94:3
95:13 99:19
once 6:13 48:9,21
one 8:8,8,10,19 17:10
18:19 19:1,11 23:1,5
23:21 24:6 30:18,20
34:4 38:23 45:5,5,7,9
45:23 46:7 49:8 56:6
67:13 71:4 73:10,10
74:20 75:7 78:14
79:14,14,15 82:17
87:17 88:15
ones 21:4 72:10 76:18
only 17:10 36:6 44:12
49:12 55:19 56:11
66:7 67:10 68:5,9
79:23 87:14
on-the-job 46:18
open 34:9
operation 94:10
operations 13:2,4
opinion 33:11
opportunity 15:12 60:3
77:4 86:3
organizational 32:22
51:15
orientation 81:18
82:13 83:1
original 48:12 103:13
103:14,17
OSHA 32:11,15 39:1,3
49:7 58:1 73:8
other 4:4,8,14 7:16
18:21 19:2,13,13,18
19:18,19 26:4 34:5
35:1,2,7,21 36:4
37:13 43:15,16,17
45:14,15,19 51:13
53:9 54:22,23 66:5
68:16 69:2,7 71:4
81:18 82:1 87:12,13
97:6,15
out 12:20,21 21:18
35:3 38:13 45:21
65:2 76:15 85:13
86:19 101:7
outside 40:9,16 43:13
53:10 97:2,9
outsourced 13:4
over 5:13 21:5 22:4
33:17,23 38:11 39:8

45:6,9 73:11 77:17
78:18 82:20
overall 33:14
overhead 74:16
overwhelmed 33:2,4
51:16
own 26:13
Oxford 14:9,11,21 15:2
Ozark 13:19,20 14:2

_____ P _____

page 2:22 102:2 103:12
103:13,14,16
pages 101:4
pants 14:14,15
paper 99:4 102:13
Parker 13:20
part 12:8 21:2 23:5
27:20 78:20,23 89:16
participate 22:14 77:8
participated 22:16
participation 19:18
particular 50:8 51:10
79:9
parties 3:21 4:11,18
101:7,10 103:17
parts 7:5,9,9,10 15:16
25:1
party 4:9,14
pay 48:13,13
Pedro 12:9
pelvis 93:10
pending 19:21 98:19
people 23:11,16 24:4
30:11 33:16 34:7,7,9
34:10 35:2 46:21
56:2 69:16 71:13
82:13,19 88:20
per 23:20 62:10
perceived 91:22
performance 32:2,6,7
32:10 54:8,21 55:22
57:11,19 58:13 84:18
89:16
performance-based
69:10
Perhaps 98:7
period 25:10,19 26:1,7
35:19 37:1 47:13
50:15 51:6,12 65:19
65:21 71:20 82:13
86:1 90:16
permanently 36:6
person 36:7 51:10
56:18 76:4 99:8
personally 29:11 31:19
personnel 3:14 30:15
80:19 87:20 88:2
persons 27:10,12

Petrey 10:4,16 11:2,3
12:11 15:17 17:15,18
18:4,5,23 19:1
Phillips 14:7
Phillips-Van 13:15,16
phone 61:19 62:7
physical 34:12,15
physically 8:11 35:20
36:20 47:8 54:16,17
64:9 98:6
physicals 23:18
pieces 55:19
place 54:5 102:11
placed 72:13 85:13
99:10
plaintiff 1:8 2:3 17:1,5
100:18
Plaintiff's 3:1,6 59:19
59:22 60:13,14,20
69:12 75:16,19,20,22
76:23 77:22 78:1,11
78:13 79:16,18 87:15
87:19
plant 8:6,9,10,12,14
27:20,21,22 28:8
30:5 34:12,19 62:19
64:12 86:19,20 93:23
94:4
please 5:14 35:9 103:11
103:14,16
point 8:20 23:12 41:5
42:23
policies 82:23
policy 78:17
Porter 56:12 72:12,15
73:2
portions 88:1
position 3:8 9:14 26:23
27:18 77:2
positions 28:6
positive 61:16 76:13
Possession 99:13
possibility 99:9
possible 26:16
prefix 62:4,5
premises 98:23
presence 40:10,16 97:2
97:10
present 7:22
presented 3:8 60:17
77:3
pressure 51:23 54:17
55:23 56:1,9 65:9
67:15 68:17 84:15,16
84:19 88:13 89:20
pressures 69:3
previous 46:3
pre-employment 3:11
22:16 23:17 78:23

79:4,8
primarily 10:13 76:5
prior 10:4 11:2 24:1,7
24:16 30:5 43:22
79:13 80:5 81:11,16
83:16
probably 28:21 45:5
46:6 53:23 63:5,10
70:22 88:18 93:16
problem 25:18 50:5
74:5
problems 51:1,5,11,14
51:15 58:11 59:4
90:10,11,14,23 98:15
98:18
Procedure 3:23
proceed 77:13
process 23:17,21
produced 78:14
production 3:7 76:1
professionalism 90:2
progress 17:14
project 15:14
protocol 63:10
provide 30:14 31:5
provided 4:9,15 37:8
103:12
PUBLIC 102:19
punish 31:20
punishments 25:11
purpose 4:8
pursuant 1:16 3:22
pushing 54:15,16,23
67:15 88:12
put 18:2 51:23 73:3,11
84:14,22 92:10 95:16
putting 55:23 56:1,9
67:14 84:19
P-E-T-R-E-Y 10:7
P-E-T-R-Y 10:6

_____ Q _____

quality 30:15
question 4:5 6:12,14
49:22 50:16 51:9
53:5 57:17 64:17
94:8
questions 4:4 91:4
quick 91:4 96:14
quickly 33:3
quite 21:15
quote 95:1,2 96:4

_____ R _____

racking 53:18
raise 48:13
raised 16:17
ran 26:1 30:8 38:16
Rance 3:14 24:6,10,15

27:18 29:8,9,11,22
30:4,9,17 32:11
33:14 34:8 35:8,21
36:19 37:2,9 38:10
39:2 40:2,11 41:1,22
43:19,22 44:15 45:15
47:9,14,17 49:21
50:4,12,16 51:9,22
51:23 52:9 53:2,12
53:21,23 54:11,14
55:12 56:1,19 57:13
58:8,11,22 62:14,19
65:14,18 66:4,22
67:8,14 68:11 69:2
71:17,21 72:1,7,13
73:10 74:11,16 75:4
79:7,9 80:9,13 81:1,9
82:8,9,11,12,20,20
83:15 84:17,18 85:17
86:3,10,18 87:20
88:14,15,16,18 90:1
90:13 91:8,12,16,21
92:4 96:19 97:13,14
97:22
Rance's 32:6,6,14,22
rapport 34:10
Re 3:3 102:5 103:8
read 5:4 26:13 60:1,2
78:4 102:8 103:11
reading 101:7
real 38:6 56:22 94:21
95:1
really 23:20 32:13 42:3
42:3,19,19 45:16
50:21 53:21 55:6
57:17 58:6 59:6 64:4
66:7 81:6 84:14,15
85:18 87:13 88:4,12
88:12 90:2 91:1
reason 20:8 26:20
37:17
reasons 88:5 102:12
recall 17:10 24:4 25:10
25:17,18,22 26:9
29:11,16,19 30:18
32:1 33:8 36:6 37:3
38:12 40:7 44:23
50:6,20,20,22 52:7
52:20,23 53:9,18,22
54:10,13,13,19,22
55:9,13 56:6 57:4,23
59:8 60:7,16 63:4,15
63:18 66:2,8 68:8
69:8,13 81:4,6 90:17
92:2 93:7,18 96:7
98:3
receive 48:13 60:13
received 25:12 41:3
42:15,18 50:3 69:12

Case 2:06-cv-01089-MEF-WC    Document 18-10    Filed 11/02/2007    Page 34 of 36

Deposition of Gary Sport                    Atwell vs. SMART Alabama                    September 12, 2007

Page 7

79:12,14 80:4,7,10
84:2 96:20
**reception** 99:8
**receptionist** 99:10
**recess** 96:17
**recollection** 46:17
50:14 53:3 65:6
**recommended** 30:23
**record** 42:21 83:9
**recordkeeping** 49:6,7
**records** 25:15 31:5
81:13 83:18
**recovered** 48:9
**recruit** 22:22
**recruiter** 30:9,10,16,17
**recruiters** 30:14,19
**recruiting** 15:15
**reduction** 48:14
**regard** 29:22 30:21
32:18 40:17 80:15
**regarding** 51:12 79:20
**regardless** 4:15
**regards** 62:13
**regulations** 32:19
**relate** 68:23,23
**related** 31:5 40:3 51:14
54:8 78:15 89:11,17
**relations** 7:23 8:3
33:15 37:6,7 63:11
65:1,23 66:3,14
**relationship** 45:3
**relationships** 92:21
**relatives** 21:5 38:11
**relay** 55:14
**remember** 13:3 19:16
20:10 23:3,6 31:23
38:9 52:4 53:6,8
54:14 55:20 63:23
64:14,22 65:3 68:9
74:9 96:13
**removed** 98:20
**repeat** 6:13,20 35:9
**repeatedly** 92:5,10
93:14 96:4
**report** 49:4,10 66:20
91:11
**reported** 65:22 66:10
85:2,15 91:8 100:11
**reporter** 1:17 4:2 5:1
5:15 100:10 101:16
103:21
**REPORTER'S** 100:6
**reporting** 66:2
**reports** 49:9 66:14
**representing** 3:21 4:11
**reprimand** 31:20
**reprimands** 25:11
**request** 3:7 63:16
68:20 76:1

**requested** 62:16,23
65:13 86:23 87:19
**requesting** 63:3 64:18
64:21 65:4
**require** 31:4,8
**reserved** 4:6
**residence** 5:19 13:8,9
**resign** 88:17
**resigning** 88:22 89:4
90:5
**resolution** 68:22
**resource** 8:1 9:13
10:19 15:7 17:13
**resources** 8:16,18 15:6
22:7 25:9 61:7
**responding** 76:5
**response** 61:16 76:13
**responses** 3:6 75:23
76:17,19
**responsibility** 8:5
**responsible** 7:20 13:1
33:23 58:9 76:5
**rest** 34:19
**restaurants** 91:17
**result** 51:19
**results** 101:11
**retaliating** 96:10
**return** 103:16
**returned** 90:19
**review** 60:3
**reviewed** 76:17 77:14
77:16
**reviewing** 81:12 83:17
**Rex** 5:16
**Richard** 2:4 5:12 20:4
103:22
**right** 10:1,2 12:10
13:17 22:12 27:16
29:2,3 32:21 35:15
36:20 38:22 39:5
42:6 43:13 45:12
46:12 48:19 49:14
52:2 55:8 57:10,22
58:17 59:5,21 60:16
61:7 62:6 63:2,13,17
66:12 67:18 71:5
73:2,4,10,16,19,22
74:1 76:7 77:15
78:22 79:18 87:13
91:3 97:18 99:2
**risk** 28:3,4
**Road** 2:6 5:21
**Robin** 1:7 3:3 22:10,15
22:17 23:1 25:12,23
27:13 35:16 40:5,11
43:6,15 45:12,16
46:8,17,18,23 47:16
48:8,21,21,22 49:20
50:18 51:6 52:8

53:11,19 54:13,14
55:10,20 57:19 58:21
61:2,9 62:7,18 63:15
63:18 65:22 67:11
68:6,12 69:2 71:18
72:1,5,11 73:8 74:11
74:16 75:3 79:3 80:4
80:13 81:8,20 82:7
84:5,8,10,13,20,21
86:7 89:5,12 90:7
91:7,11,16,21 92:4,9
96:21 97:12 100:17
**Robin's** 58:12 78:2
**robot** 25:1,2
**Roh** 8:20,21
**rubbed** 92:11 93:10
95:17
**Rule** 3:4
**Rules** 3:23
**ruling** 4:7
**run** 99:4
**Russell** 20:22
**Ruth** 37:4,6 63:12 67:3
67:5 68:11,23 69:8
96:11 98:3,5
**Ryan** 63:12 67:3 68:11
68:23 96:12 98:3
**Ryan's** 37:4
**R-O-H** 9:1

**S**

**S** 5:17
**Sadler** 1:17 4:1 100:9
101:15 103:21
**safety** 8:4 27:19,23
28:2,4,7,10,11 29:4
29:17,18,21 30:5
32:2 33:18 34:2,13
34:14 35:17,21 36:9
36:13,14 46:13,22
47:8,16 48:14,20,22
49:16 54:2 55:21,22
56:8 57:11,19 58:7
65:2 71:16,19 84:17
86:1 94:7,10,11
**SAITH** 100:4
**salary** 80:19
**same** 4:16 28:2 29:23
30:13 50:15,15 51:9
51:22 56:12 73:17
80:9 89:17 90:16
101:8
**San** 12:9
**saw** 16:22 56:19 60:5
60:14,20 61:1 73:3
74:9 85:2
**saying** 53:5,7,8 56:6
61:12 87:12
**says** 24:10 26:18 62:10

62:10,13,15 73:6,7
74:10,13
**scenario** 84:12
**scheduled** 98:5
**scheduling** 47:19
**scholarship** 15:2
**school** 14:21 15:1,6
16:15 70:2
**Scott** 2:10 26:11,15,16
27:1,1,6 73:20
**scratched** 62:12
**screened** 30:10,22
**screening** 31:6
**screws** 84:19
**se** 23:20
**search** 39:17
**second** 20:5 62:13
**secondly** 67:20
**section** 78:15 79:19,23
**security** 98:21
**see** 35:3,3 62:9 66:19
70:14 78:8 79:1
86:17 88:9
**seeing** 60:7,16
**seem** 50:23
**seemed** 59:6
**seen** 16:21 59:23 60:17
69:13 75:14 76:1
77:5 78:7 86:10
87:14 90:9
**selected** 23:19
**sentence** 62:9,13,15
**separate** 8:12 102:12
**September** 1:20 101:3
102:9 103:11
**serious** 58:3,3,4 90:14
**served** 25:4
**services** 10:14
**sessions** 23:8
**set** 3:6 101:7
**setting** 11:20
**settled** 19:17 48:21
**several** 5:13 24:4 53:20
60:15
**sex** 74:17 75:10
**sexual** 3:11,12 26:3
31:14 45:13,17,21
46:2,9 49:23 62:14
65:13,18 74:12 78:16
78:17 79:20 80:2,15
81:10,16,21 82:5,6
82:18 92:21
**sexually** 31:11 59:12
62:20,21
**Shades** 2:5
**share** 42:20
**sheet** 102:13 103:12,16
**she'll** 21:11
**shift** 47:14,17 94:6

**Shirley** 11:13,14
**Shirtmaker** 13:17
**short** 47:13 56:7 71:20
**shortest** 85:19
**shortly** 41:1
**shoulder** 68:18 69:4,9
89:21,23 95:11,12
**shoulders** 66:4,6,16
67:1,21 68:1 72:14
73:3,12 89:22 91:9
95:6,16
**show** 28:22 59:21 78:1
91:17 98:4
**shows** 94:13
**sic** 11:8
**side** 7:21 15:13 50:21
65:1
**sign** 5:4 76:9 83:9
103:14
**signature** 4:19 76:11
102:2 103:13,14,15
103:16
**signed** 76:11 82:22
**signing** 101:7
**simply** 65:8
**since** 9:12 16:21 40:9
58:2 78:7
**Sincerely** 103:19
**sit** 50:6,9,22 52:22
67:10
**situation** 62:14 68:11
86:22
**situations** 49:1
**sit-down** 52:7
**skills** 32:14,22 47:1
**slats** 33:6
**slip** 33:5
**slot** 48:21
**small** 73:13 99:5
**smart** 1:10 3:4,6 6:2,3
6:5,23 7:3,4,13,19
8:6 9:8,22 10:3,4,23
19:21 22:7,11,15
23:13 24:13,17,19
26:21,23 28:14 29:18
30:23 31:4 37:18
38:2 40:9,10 43:15
43:18,23 44:3,4
45:15,18 51:7 53:4
61:7,10 67:12 68:7
76:4 78:17 80:17
81:23 83:21 84:11
88:5,6 98:23 100:20
102:5 103:8
**SMART's** 3:8 75:23
77:2 97:7
**Solely** 7:17
**some** 15:19 18:7,8,9
19:21 23:12 28:22

Deposition of Gary Sport                    Atwell vs. SMART Alabama                    September 12, 2007

Page 8

33:5 37:17 38:11
39:1,2,3 41:20 47:1,1
47:2 51:23 58:4,11
65:22 69:15 70:3
72:23 73:14 74:10,11
74:17 83:17 88:21
89:15 90:10,15 98:15
99:6
**somehow** 67:21
**someone** 23:13 86:20
**something** 32:12 38:17
41:3,10,14,19,21
42:15
**sometime** 56:22 60:8
63:5 66:13 85:7 88:8
90:18
**sometimes** 32:22 93:15
94:4,5,12,13
**somewhat** 23:7
**somewhere** 28:16
64:11 89:7 90:9
**Sonia** 44:6,7,8,9,10,17
87:23
**soon** 81:1
**sorry** 16:6 26:13 52:12
58:18 71:1 74:15
82:7
**sound** 22:12 29:2
**sounds** 29:3
**Southern** 16:1,9
**SouthTrust** 2:11 103:6
**speak** 5:8 100:14
**speaking** 39:13 92:7
**specialized** 16:10
**specific** 53:18 80:14
**specifically** 21:4 23:3
25:10 29:19,22 35:7
52:8 53:11,17 54:8
54:10 64:22 89:19
**specifics** 42:6
**specifying** 103:12
**spell** 11:7
**spend** 93:2
**spent** 13:7 23:10 90:15
**spoke** 39:10 51:20
**Sport** 1:15 3:2,22 5:6
5:16,17 22:1 61:6
100:13 102:7,16
103:5,9
**squeezed** 95:6
**stabilize** 49:1
**staggers** 94:11
**stamping** 7:4,6,7
**Standard** 12:16,17,20
13:14 14:5
**start** 47:6
**started** 24:19 29:1
35:17 39:13 58:5
60:9,10 84:20

**starting** 49:15,16
**startups** 32:17
**state** 1:18 4:3 19:10,14
22:20 100:7,10
101:16
**stated** 102:11
**statement** 3:8 77:3
**STATES** 1:3 100:22
**stationed** 35:7 36:20
**Statute** 4:9,15
**statutes** 32:11
**stay** 90:20
**stepchildren** 45:2
**still** 26:21 36:10,14,16
37:14 39:6 43:8,11
44:11,13 45:9 47:11
56:14 69:17 70:4,16
70:21,23 71:6,7 74:2
86:10
**stipulated** 3:20 4:10,17
**stipulation** 1:16
**stipulations** 3:19 5:2
**stores** 10:14
**straight** 38:4
**Street** 1:19 2:12 37:10
103:7
**strictly** 16:11
**stuff** 37:16
**style** 22:18
**subject** 80:18
**subjects** 75:10
**SUBSCRIBED** 102:17
**subsequent** 87:6,9
96:18
**sued** 46:8
**Suite** 1:19 2:5
**suits** 39:1
**Sula** 12:9
**supervisor** 26:6,9,18
27:2 33:17,22 73:20
**supplement** 72:23
**supplier** 7:14
**supply** 7:16
**suppose** 28:4
**supposedly** 72:12
**sure** 13:21 21:12,14
30:1 46:7 52:19
64:12,22 65:21 76:10
76:14 89:8 93:23
98:16
**surfaced** 64:4
**surgery** 75:5
**sworn** 5:7 76:20 100:14
102:17
**S-P-O-R-T** 5:17

**T**

**take** 78:3 96:5,14
**taken** 1:15 3:22 4:1

54:4 96:17 103:11
**talk** 42:10 82:14 97:14
**talked** 37:20 38:18
41:7 42:11 43:10
53:19 64:8 68:17
**talking** 52:10 54:19,20
**team** 26:16 27:1,6,7,14
49:11 73:23 96:5
**teams** 27:9
**Tech** 16:11
**Technical** 16:1,9
**technically** 23:15
**technician** 24:20 25:13
26:8 48:9 85:4 86:4,9
**techs** 27:7
**tell** 5:14,19 6:13,18 7:2
7:18 14:23 18:3 20:3
29:8 37:19 38:22
39:11 40:22 41:13
52:4 58:21 64:7
72:10 78:18 84:9,9
88:4,6 91:16,21
93:16,19 94:1,15,19
94:23 95:4,9,15,23
96:3,9
**telling** 17:23 18:1
74:16 75:3 90:4 92:2
96:7
**tenure** 93:20
**term** 28:6
**terminated** 89:1
**termination** 19:2
**testified** 5:9 19:9 42:7
63:14
**testify** 50:9 77:18
**testimony** 52:23 59:9
60:12,19 65:12 69:11
89:10 91:7 102:10
**Textile** 12:16,20
**their** 13:1 48:12 92:21
**therefor** 102:12
**thereof** 101:11
**thing** 28:2 64:16 88:18
89:17
**things** 15:19 19:21
23:18 32:16,19 33:5
34:3 39:2,3 41:6 42:9
46:22 47:2 49:3 52:1
54:1,19 56:18 58:9
65:23 66:1 82:15,17
86:15 88:12,16 93:23
99:4
**think** 28:21 35:13 45:5
45:7 66:13 86:16
88:13,19 96:15 99:13
**third** 19:15
**third-shift** 71:16
**thirty** 103:16
**though** 33:3 36:5 55:15

**thought** 18:20
**thousand** 9:16
**three** 6:5,10,11 9:9,10
10:16 18:21 89:5
**through** 9:11 22:17
30:9 31:16 33:6 35:5
42:1 50:13 58:10
62:12 70:2 78:4
79:10 81:2 82:14,17
86:4 91:3,5 96:16
**tightening** 84:19
**till** 83:23
**time** 4:6,7 9:20 10:20
13:7 14:2 15:5 16:9
16:21 22:23 23:11
24:5,15 25:10,19
26:1,6,7,10 27:2 29:5
30:13,19 31:9,21
32:13 33:4 35:10,19
36:5,18 37:1 39:10
41:6 43:23 45:6,8
46:19 47:13,21 50:5
50:8,15 51:7,12,22
56:11 59:9 60:5,7
64:17 65:19,21 67:12
69:6 71:20 81:5 84:2
85:10 86:2,16,18
87:6,9,14 88:11,21
89:7,9 90:15,17
96:19 98:15 99:7
102:11
**times** 5:13 17:4,9 32:7
32:8 47:19,22 56:3
94:12
**today** 6:7 18:18 19:20
50:9,23 52:22 54:22
61:12 63:14 65:11
67:10 68:6 77:18
78:9 83:14 84:3
87:10 90:4
**together** 44:22
**told** 19:19 38:14 41:4
46:7 56:8 59:15 69:6
74:11 85:1,11 87:1
88:22 89:4 91:18
92:4,9,14,18 93:4,13
95:8 96:8 97:15
**top** 61:19 95:18
**topics** 83:8
**touched** 66:16 67:1,20
68:1 91:9 92:5 96:1
**touching** 66:4,5 68:18
69:4 89:21 95:12
**tough** 88:21
**toward** 59:13 64:1
**Tower** 2:11 103:6
**town** 99:6
**townhouse** 12:5
**track** 98:16

**Tracye** 1:16 4:1 100:9
101:15 103:21
**training** 3:11 22:17,18
22:18,22 23:8,15,17
24:1,8 79:1,4,8,10
80:14,21 81:3,10,10
81:16,22 82:3 83:3,5
83:7,16,20 84:5,8
**transcript** 101:5 102:8
102:10 103:10,11,14
103:16
**transfer** 3:3 62:16,23
63:3,17 64:21 65:5
65:12 68:19 85:4,11
87:1
**transferred** 64:16
84:22 86:8
**traveled** 12:6
**treatment** 47:3
**trial** 4:13
**tried** 93:14
**Troy** 57:7,9 70:22 74:7
74:8
**true** 52:5 76:19,20
77:20 101:5 102:9
**truth** 5:8,8,9 100:14,15
100:15
**try** 97:3
**trying** 13:3 38:9 57:17
68:21
**Tuscaloosa** 90:16
**two** 9:16,22 12:7 18:21
19:3 30:18 44:23,23
45:3 51:1,4 59:4 68:5
68:9 82:10 85:20
**type** 10:12 15:16 23:18
30:6 32:16 56:13
64:16 74:12 80:14
99:11
**typically** 28:5 30:10
32:15 86:20

**U**

**Uh-huh** 61:16 76:13
**uncomfortable** 55:11
59:16
**uncommon** 93:21
**under** 7:23 8:1,4 45:4,7
56:20 69:22 71:17,21
**undergo** 80:14 84:8
**undergone** 81:15
**understand** 6:12,19
34:14 37:23 40:1
**understanding** 22:9
25:4,7 73:5 84:10
87:3,4
**understood** 6:15 65:16
**underwent** 81:9,21
83:15,20 84:5

Case 2:06-cv-01089-MEF-WC   Document 18-10   Filed 11/02/2007   Page 36 of 36

Deposition of Gary Sport                Atwell vs. SMART Alabama                September 12, 2007

Page 9

union 83:7
UNITED 1:3 100:22
University 15:10
until 9:14 25:5,13 31:9
  31:22 34:11 35:11
  36:19 49:17,18 51:2
  60:15 87:10
updated 58:2 73:8
upset 41:23 42:14
use 28:5
used 4:8,14 55:11
using 30:19 35:13
Usual 5:1
usually 94:3
utilizing 46:21

**V**

VA 90:15
Van 13:23 14:19
verbally 55:16
very 16:20 33:3 34:9,9
  56:17,18
vinyl 39:21,23
violations 58:5 70:8
voicing 50:3
voidance 83:7
voluntarily 10:22
  12:10 13:11 14:4,18
  56:23 70:1
vs 1:9 100:19 102:5
  103:8

**W**

waived 4:13,20 101:8
waiving 4:16
walked 73:11 88:15
want 9:15 18:2 28:15
  28:15 38:17 39:13,14
  41:18 42:4 57:7 60:1
  99:15
wanted 23:19 42:15
  52:18 91:13 92:15
  99:8
warnings 25:11
Warren 16:19,20,22
wasn't 94:6
way 22:14 23:15 34:4
  43:2,19 52:3 54:11
  65:7,16 70:2 84:12
  85:22
weeks 89:5
welding 7:4,11,12
well 16:20 17:4,23 34:9
  52:3 54:20 56:11,19
  57:16 58:18 68:19
  81:7 82:7 84:7,9 94:7
  95:9
Wendy 70:4,7,12 71:13
  71:17

Wendy's 70:14
went 9:12 15:1,3,6 38:6
  73:7 85:5
were 9:7 10:2,15 11:2
  11:10,15 12:4,13
  13:14 14:7,21 16:17
  17:11,16 18:3,11,21
  19:1,3,4,9 22:6,23
  23:20 29:17 30:19
  32:15,23 36:4 38:1
  38:18,21,21,22,23
  41:6 45:3 46:21
  47:22 48:20 54:2,20
  56:3 58:1,12 64:7
  65:11 69:22 71:17
  76:4 86:7,15 90:23
  94:20 95:6 98:7
weren't 17:21
western 13:5
we'll 21:13 91:5 96:5
we're 42:1 59:3 66:9
  94:9
We've 5:12 83:12
while 12:4 25:12 44:4
  47:4 68:7 78:7 81:22
  92:7,11
whole 5:8 10:20 23:21
  84:12 100:15
wholesale 10:5,13
wife 87:23
wife's 21:22 44:5,6
Williams 2:10
Willis 2:9 5:3 20:4,13
  20:19,23 21:7,13
  25:20 28:21 32:4
  33:12,20 34:21 37:19
  42:10,21 52:10,14,18
  55:17 60:2 67:22
  72:18,22 76:10,14
  77:14 78:3 86:12
  99:22 103:5,23
window 34:23 35:1
windows 35:2
witness 4:18,19 5:7
  20:18,21 21:18 37:23
  67:17 72:13 73:2
  74:13 78:6 101:6
  102:2
witnessed 49:13
women's 14:15
word 55:11
words 18:2
work 9:12 10:23 12:11
  13:12 14:5,19 15:3
  46:20 47:1,14 49:2
  53:15 70:20 71:19
  73:12 74:5 85:3
  86:14 92:7,12,16
  94:9 96:6 98:10

worked 11:3 12:21
  23:16 56:2 71:9,20
  73:17
worker's 49:5
working 9:7 35:17 42:1
  47:16 55:12 58:10
  59:16 70:2 73:9
workplace 80:15,20
works 30:2 39:8
work-related 71:18
wouldn't 33:22 51:21
  75:7 86:3,16
writing 26:14
wrong 52:4
wronged 18:6
wrongful 19:2
W.L 10:4

**Y**

yeah 13:18 15:12 16:7
  20:6 35:10 37:22
  52:16 54:18 64:10
  72:20 78:6 82:6 89:7
year 11:16 28:17 49:18
  56:22 81:5,6 83:11
  84:1
years 6:6 9:9,10 10:17
  21:6
y'all 7:16 30:23 31:10
  42:6 54:7 55:7 57:14
  64:7 83:11 87:1
  98:22 99:3

**Z**

zip 5:22

**0**

05 9:5 24:20 25:6 26:2
  27:8,17 28:18 29:1
  31:9,10,16,16,22
  35:6 36:20 37:5
  46:14 50:13,13 51:2
  52:13 58:20 81:7,8
  81:11,17 83:16 86:2
06 52:11,17 53:2,13,16
  54:5 55:4,10 86:2
  87:9 88:10,11

**1**

1 3:2 59:19,22 60:13,15
  60:21 69:12
10:10 1:21
100 101:4
11-13 26:2
12 1:20 101:3 102:9
  103:11
12:00 100:2
1221 5:21
13th 25:6 31:22 34:11

35:6,11 36:20 46:14
  49:14
14th 49:15 50:12 51:2
  81:17
16th 91:23
19 21:5 22:4 45:4,6,7,9
1950 1:20

**2**

2 3:4 75:16,19 103:3
2nd 61:15 62:17 87:9
  101:12
2-2-06 3:2 62:22
2:06CV1089-MEF 1:9
  101:2
20th 2:12 103:7
200 2:5
2000 9:17
2005 22:6 34:11 51:18
  59:5 91:23
2006 9:18,19 59:10
  61:15 62:17 68:14
2007 1:20 101:3,12
  102:9,18 103:3,11
201 1:19
21st 37:10
24-hour-a-day 94:9
25 27:12
25th 26:2
26(A) 3:5
294 101:17

**3**

3 3:6 75:20,22
30 27:10,11,12
300 85:20
31st 49:18 50:13
3100 2:11 103:6
3300 2:6
35203 2:12 103:7
3522 2:6
36049 5:23
39701 37:11

**4**

4 3:8 76:23 77:2,19
420 2:12 103:7

**5**

5 3:10 77:22 78:2
527 62:3
527-3503 61:20

**6**

6 2:20 3:11 78:11,13
60 3:2

**7**

7 3:12 79:16,18

7th 29:1 53:16 85:9
703 37:10
76 3:4,6
77 3:8
78 3:10,11

**8**

8 3:14 87:15,19
80 3:12
88 3:14

Gary Sport
Human Res
Smart



S37- 3503
02/02/06


PLAINTIFF'S
EXHIBIT

RE: Department transfer

~~Gary Per my conversation with you.~~
In Regards to the Sexual
Harrasment Situation with Rance
maddox. I Have requested a
departmental transfer. I have
been ~~told~~ ~~asked~~ to be patient. ~~and~~ By H.R. personel
I do not feel Comfortable
being in a ~~closed office area~~
~~with any~~ Confined work area
with Rance maddox. After I
talked to you about what events
have taken place, Rance maddox
has made my work Environment
be a hostile one and I feel
that he was advised about my using
Complaint and ~~that~~ he is ~~going taking~~
~~because~~ his position to intimidate
Others ~~OF~~ By means of threats
~~OF being~~ both direct & indirect.
So therefore at this point until
some permanent Changes have been made in

regards to my position at Smart or Rance maddox's position at smart, I am requesting that one of the following actions be taken IN a timely manor.

Robin Davis Atwell leave of Absence Paid. (pending investigation)

Robin Davis Atwell leave of Absence Unpaid (pending investigation)

Rance Maddox leave of Absence Paid (pending investigation)

Rance Maddox leave of Absence Unpaid (pending investigation)

Please inform me as soon as a decision has been made in Reference to what actions are going to be taken.

Sincerely,

Robin Davis Atwell

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION



PLAINTIFF'S
EXHIBIT
2

ROBIN ATWELL, an individual,       )
                                   )
        Plaintiff;                 )
                                   )
v.                                 )      CIVIL ACTION NO. 2:06 CV 1089-
                                   )      MEF
SMART ALABAMA, LLC, a legal entity, , )
                                   )
        Defendant.                 )

## DEFENDANT SMART ALABAMA, LLC'S RULE 26(A) INITIAL DISCLOSURES

Pursuant to Federal Rule of Civil Procedure 26(a)(1), defendant SMART Alabama, LLC

("SMART" or "defendant") submits the following as its initial disclosures:

### Preliminary Statement

The defendant has made diligent efforts to identify all information and documents in its

possession, custody, and control that are within the categories of information and documents set

forth in Rule 26(a)(1). This initial disclosure represents the defendant's good faith effort,

without the benefit of discovery, to comply with Rule 26(a)(1), and is not intended, and should

not be construed, as the defendant's opinion or belief as to whether any witnesses identified

actually have discoverable information that the defendant may use to support its claims or

defenses in the case. If additional documents or witnesses are revealed through discovery, the

defendant will identify them pursuant to the applicable provisions of the Federal Rules of Civil

Procedure and any order of this Court.

### Disclosures

1538947 v1

1.    With respect to Rule 26(a)(1)(A), the defendant believes that the persons listed below may have discoverable information that the defendant may use to support its claims or defenses.  The listing of an individual's name below does not in any way imply consent by defendant to ex parte contact of any witness by opposing counsel whom opposing counsel would not be entitled to contact under Professional Rule of Conduct 4.2.  See RentClub, Inc. v. Transamerica Rental Finance Corp., 811 F.Supp. 651 (M.D. Fla. 1992), aff'd, 43 F.3d 1439 (1995).

Robin Atwell
c/o Goozee, King & Horsley
Shades Brook Building, Suite 200
3300 Cahaba Road
Birmingham, Alabama 35223
Knowledge of plaintiff's working conditions, employment at SMART, and plaintiff's claims.

Lisa Bodiford
Knowledge of plaintiff's working conditions, employment at SMART, and plaintiff's conduct and demeanor.

Wendy Burgans
Knowledge of plaintiff's working conditions, employment at SMART, and plaintiff's conduct and demeanor.

Lakisha Jessie
Knowledge of plaintiff's working conditions, employment at SMART, conduct and plaintiff's conduct and demeanor.

Carissa Jones
Knowledge of plaintiff's working conditions, employment at SMART, and plaintiff's conduct and demeanor.

Scott Kelley
Knowledge of plaintiff's working conditions, employment at SMART, and plaintiff's conduct and demeanor.

Rance Maddox*
Former Safety Manager
SMART Alabama, LLC
703 21st Street North

Columbus, Mississippi 39701
Knowledge of plaintiff's working conditions, employment at SMART, and plaintiff's conduct and demeanor.

Melissa McGough
Knowledge of plaintiff's working conditions, employment at SMART, and plaintiff's conduct and demeanor.

Colinda Porter
Knowledge of plaintiff's working conditions, employment at SMART, and plaintiff's conduct and demeanor.

Ruth Ryan*
Employee Relations Manager
SMART Alabama, LLC
121 Shinyoung Drive
Luverne, Alabama 36049
Knowledge of plaintiff's working conditions, employment at SMART, and plaintiff's conduct and demeanor.

Gary Smith
Knowledge of plaintiff's working conditions, employment at SMART, and plaintiff's conduct and demeanor.

Gary Sport*
General Affairs Manager
SMART Alabama, LLC
121 Shinyoung Drive
Luverne, Alabama 36049
Knowledge of plaintiff's working conditions, employment at SMART, and plaintiff's conduct and demeanor.

2.     The defendant hereby tenders for inspection and copying the documents in its possession, custody or control that are responsive to Rule 26(a)(1)(B), and that are not the subject of the attorney/client privilege or the work product doctrine, at the offices of Burr & Forman LLP upon reasonable notice by plaintiff's counsel following plaintiff's counsel's execution of a Stipulation of Confidentiality.

3.     With respect to Rule 26(a)(1)(C), the defendant is not claiming any category of damages against the plaintiff at this time.

1538947 v1                                3

4.      The defendant does not have any documents that are responsive to Rule
26(a)(1)(D).


_Kathryn M. Willis_
Marcel L. Debruge (DEB006)
Ronald W. Flowers ASB-3635-A59F
Kathryn Morris Willis ASB-8533-N76M

Attorneys for Defendant
SMART ALABAMA

OF COUNSEL:
BURR & FORMAN LLP
420 North 20th Street, Suite 3100
Birmingham, Alabama 35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served on the following by directing
same to their office addresses through first-class, United States mail, postage prepaid, on this the
29th day of January 2006:

Richard F. Horsley, Esq.
Goozee, King & Horsley
Shades Brook Bldg., Suite 200
3300 Cahaba Road
Birmingham, Alabama 35223


_Kathryn M. Willis_
OF COUNSEL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

ROBIN ATWELL, an individual,          )
                                      )
          Plaintiff,                  )
                                      )
v.                                    )   CIVIL ACTION NO. CV-06-1089-
                                      )   MEF
SMART ALABAMA, LLC, a legal entity,   )
                                      )
          Defendant.

PLAINTIFF'S
EXHIBIT
3

### DEFENDANT SMART ALABAMA, LLC'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES AND REQUEST FOR PRODUCTION

COMES NOW the defendant, SMART Alabama, LLC (hereinafter referred to as "SMART Alabama"), and responds to Plaintiff's First Set of Interrogatories and Requests for Production as follows:

### GENERAL OBJECTIONS

1.    SMART objects to each discovery request to the extent any request seeks information protected by the attorney-client privilege and/or work product doctrine.

2.    SMART objects to each discovery request to the extent it seeks information that is irrelevant to the claims or defenses of the parties.  SMART further objects to each discovery requests to the extent it seeks information that is not reasonably calculated to lead to the discovery of admissible evidence.  SMART

further objects to each discovery request to the extent it seeks information that exceeds the limitations of Federal Rule of Civil Procedure 26(b)(2)(i), (ii) and (iii).

3.    SMART objects to each discovery request to the extent that it is vague, overly broad, unduly burdensome, not limited in time or scope, or harassing.

4.    SMART objects to producing personnel information of its current or former employees (other than plaintiff) prior to the execution of a Stipulation of Confidentiality on the grounds that SMART considers personnel information to be confidential, and production of personnel information would unnecessarily invade and intrude upon employees' expectations of privacy as to said information.

5.    SMART objects to producing information or documents regarding confidential business information prior to the execution of a Stipulation of Confidentiality.

6.    SMART objects to any and all discovery requests to the extent that they require SMART to prepare the plaintiff's case, and to determine what plaintiff should deem relevant to or supportive of certain claims and allegations; as such, the requests are not a proper method of discovery.

7.    SMART objects to the instructions and definitions of plaintiff's discovery requests to the extent that plaintiff seeks to impose upon SMART greater

1568829 v1

2

duties and obligations than those required of SMART by the Federal Rules of Civil Procedure.

8.    SMART objects to the definitions accompanying the discovery requests to the extent that they seek to artificially broaden the scope of the discovery requests beyond the ordinary meaning of the words used in them.

9.    All objections are hereby expressly preserved, as is the right to move for a protective order or make additional objections.   SMART reserves all objections as to the admissibility at trial of any of the information hereinafter provided.

10.    These "General Objections" are applicable to and incorporated into each of SMART 's responses, *infra*, as if specifically stated herein.  The stating of specific objections to a particular request shall not be construed as a waiver of SMART's "General Objections."  Unless otherwise specifically stated, SMART's objections to each discovery request apply to the entire request, including each and every subsection and/or subpart of the request.

## INTERROGATORIES

**INTERROGATORY NO. 1:** Please state the name, address and job title of the person responsible for answering these Interrogatories.

**RESPONSE NO. 1:**    In addition to its general objections, SMART objects to this interrogatory on the grounds that it seeks information protected by the attorney-client privilege and/or the work-product doctrine. Subject to and without waiving its objections to this interrogatory, SMART Alabama states that Gary Sport, General Affairs Manager at SMART Alabama, assisted in providing responses to these interrogatories.

**INTERROGATORY NO. 2:** State the names, last known addresses and telephone numbers of any and all witnesses from whom these Defendants have obtained statements which in any way concern the events made the subject of this lawsuit. (Including written, recorded, videotaped, e-mailed or in any other fashion).

**RESPONSE NO. 2:**    In addition to its general objections, SMART objects to this interrogatory to the extent that it seeks information protected by the attorney-client privilege and/or the work-product doctrine. Subject to and without waiving its objections to this interrogatory, SMART refers Plaintiff to its Initial Disclosures and its Rule 26(a) documents produced to Plaintiff.

1568829 v1

4

**INTERROGATORY NO. 3:** State the names, last known addresses and telephone numbers of any and all individuals, of whom these Defendants are aware, who claim to have or are believed to have knowledge of the events made the subject of this lawsuit.

**RESPONSE NO. 3:**    In addition to its general objections, SMART objects to this interrogatory to the extent that it seeks information protected by the attorney-client privilege and/or the work-product doctrine. SMART also objects to this interrogatory to the extent that it seeks to impose additional obligations beyond those set forth in the Court's Scheduling Order. Subject to and without waiving its objections to this interrogatory, SMART refers Plaintiff to its Initial Disclosures and its Rule 26(a) documents.

**INTERROGATORY NO. 4:** For each person named in the preceding Interrogatory, please state in detail the knowledge that person either claims to or is believed to have concerning the events made the subject of this lawsuit.

**RESPONSE NO. 4:**    In addition to its general objections, SMART objects to this interrogatory to the extent that it seeks information protected by the attorney-client privilege and/or the work-product doctrine. SMART also objects to this interrogatory to the extent that it seeks to impose additional obligations beyond those set forth in the Court's Scheduling Order. Subject to and without waiving its

1568829 v1

objections to this interrogatory, SMART refers Plaintiff to its Initial Disclosures and its Rule 26(a) documents.

**INTERROGATORY NO. 5:** State the current employment status of Rance Maddox. If he has been demoted, transferred or terminated, please state in detail all reasons for his demotion, transfer or termination.

**RESPONSE NO. 5:** In addition to its general objections, SMART objects to this interrogatory on the grounds that it is unreasonably vague and ambiguous. Subject to and without waiving its objections to this interrogatory, SMART states that Rance Maddox resigned his employment from SMART voluntarily.

**INTERROGATORY NO. 6:** State whether or not Rance Maddox was ever interviewed, questioned, interrogated or briefed about the allegation made by the Plaintiff against him, prior to the time that this lawsuit was filed. If so, please provide the dates that any of those discussions took place and the detailed substance of any and all of those discussions, including who spoke with Mr. Maddox and what they told him and Mr. Maddox's responses to what he was told.

**RESPONSE NO. 6:** In addition to its general objections, SMART objects to this interrogatory to the extent it seeks information protected by the attorney-client privilege and/or the work-product doctrine. In addition, SMART objects to this interrogatory on the grounds that it is unreasonably vague and ambiguous. Subject to and without waiving its objections to this interrogatory, SMART states that Gary

Sport, General Affairs Manager, spoke with Rance Maddox about plaintiff's generalized concern that Mr. Maddox questioned her frequently about tasks to be performed in the safety office.

**INTERROGATORY NO. 7:** If these Defendants claim that the conduct allegations of the Plaintiff toward Mr. Maddox did not in fact occur, please provide the names, last known address and telephone numbers of any and all witnesses who will support the contention. Or, if there are documents that will support that contention, please reference all of those documents.

**RESPONSE NO. 7:**    In addition to its general objections, SMART objects to this interrogatory to the extent that it seeks information protected by the attorney-client privilege and/or the work-product doctrine.  SMART also objects to this interrogatory to the extent that it seeks to impose additional obligations beyond those set forth in the Court's Scheduling Order.  Subject to and without waiving its objections to this interrogatory, SMART refers Plaintiff to its Initial Disclosures and its Rule 26(a) documents.

**INTERROGATORY NO. 8:**  If these Defendant's are claiming that the conduct alleged to have occurred was consensual, initiated or promoted by the Plaintiff, please state the names, last known addresses and telephone numbers of any and all witnesses whom this Defendant believes will support that contention.  Of, if there

1568829 v1

7

are documents that this Defendant believes to support that contention, please reference those documents.

**RESPONSE NO. 8:**    In addition to its general objections, SMART objects to this interrogatory to the extent that it seeks information protected by the attorney-client privilege and/or the work-product doctrine. SMART also objects to this interrogatory to the extent that it seeks to impose additional obligations beyond those set forth in the Court's Scheduling Order. Subject to and without waiving its objections to this interrogatory, SMART refers Plaintiff to its Initial Disclosures and its Rule 26(a) documents.

**INTERROGATORY NO. 9:**  Please state in detail the date, time and substance of any and all conversations had by these Defendants, or agents/employees thereof, with the Plaintiff concerning any of the events made the subject of this lawsuit, including what was said to her and what she said.

**RESPONSE NO. 9:**    In addition to its general objections, SMART objects to this interrogatory to the extent that it seeks information protected by the attorney-client privilege and/or the work-product doctrine. SMART further objects to this interrogatory on the grounds that it is overly broad, unduly burdensome, not properly limited in time and scope, irrelevant to the claims and defenses of the parties and not reasonably calculated to lead to the discovery of admissible evidence.

**INTERROGATORY NO. 10:** Please state whether or not this Plaintiff has ever provided a written, recorded, video tape or e-mailed statement to these Defendants regarding any of the events made the subject of this lawsuit.

**RESPONSE NO. 10:**    In addition to its general objections, SMART objects to this interrogatory on the grounds that it is unreasonably vague and ambiguous. Subject to and without waiving its objections to this interrogatory, SMART states that the only allegations reported by plaintiff were that Rance Maddox asked her questions about safety office tasks and touched her shoulder one time.

**INTERROGATORY NO. 11:** If the Plaintiff was ever reprimanded, punished, suspended, written up or terminated for any reason during her employment with this Defendant, please provide the dates and exact reasons for those reprimands, punishments, suspension or terminations.

**RESPONSE NO. 11:**    In addition to its general objections, SMART objects to this interrogatory on the grounds that it is unreasonably vague and ambiguous. Subject to and without waiving its objections to this interrogatory, SMART states that plaintiff was not punished, demoted, suspended or terminated, and, pursuant to Fed.R.Civ.P. 33(d), will provide copies of any counselings or memorandums provided to plaintiff about her performance.

**INTERROGATORY NO. 12:** If these Defendants are aware of any complaints made about Rance Maddox by female employees during the previous five years,

1568829 v1

9

which involve inappropriate or offensive behavior, please state the names and last known addresses and telephone numbers of these employees or former employees.

**RESPONSE NO. 12:**    In addition to its general objections, SMART objects to this interrogatory on the grounds that it is unreasonably vague and ambiguous. SMART does not know what Plaintiff means by "inappropriate or offensive behavior." SMART also objects to this interrogatory on the grounds that it is overly broad, unduly burdensome, and not properly limited in time and scope. Subject to and without waiving its objections to this interrogatory, SMART states that it is unaware of any harassment complaints made about Rance Maddox by any female employees of SMART during the previous 5 years.

**INTERROGATORY NO. 13:** If you provided names in response to the preceding Interrogatory, please state the exact substance of the complaints made by those individuals including the dates the complaints were made.

**RESPONSE NO. 13:**    In addition to its general objections, SMART objects to this interrogatory on the grounds that it is unreasonably vague and ambiguous. SMART does not know what Plaintiff means by "inappropriate or offensive behavior." SMART also objects to this interrogatory on the grounds that it is overly broad, unduly burdensome, and not properly limited in time and scope. Subject to and without waiving its objections to this interrogatory, SMART states

that it is unaware of any harassment complaints made about Rance Maddox by any

female employees of SMART during the previous 5 years.

**INTERROGATORY NO. 14:** State in detail whether or not the Plaintiff made

complaints of any nature about Rance Maddox to these Defendants or any

representatives thereof.  Please describe the times, dates and exact substance of any

complaints made by the Plaintiff concerning Rance Maddox.

**RESPONSE NO. 14:**    In addition to its general objections, SMART objects to

this interrogatory on the grounds that it is overly broad, unduly burdensome, and

not properly limited in time and scope.    SMART further objects to this

interrogatory on the grounds that it is unreasonably vague and ambiguous.  Subject

to and without waiving its objections to this interrogatory, SMART states that the

only "complaints" made to SMART by plaintiff about Rance Maddox were that he

questioned her about safety office tasks and touched her shoulders on one

occasion.

**INTERROGATORY NO. 15:** State in detail any, including the date and

substance, of any action taken by these Defendants in response to any complaints

made by the Plaintiff concerning in any way Rance Maddox.

**RESPONSE NO. 15:**    In addition to its general objections, SMART objects to

this interrogatory on the grounds that it is overly broad, unduly burdensome, and

not properly limited in time and scope.    SMART further objects to this

interrogatory on the grounds that it is unreasonably vague and ambiguous. Subject to and without waiving its objections to this interrogatory, SMART states that it thoroughly investigated plaintiff's concerns, interviewed the witness identified by plaintiff as to shoulder touching, counseled Rance Maddox about the manner in which he asked questions of plaintiff, and told plaintiff that she could be transferred to another area of the plant.

**INTERROGATORY NO. 16:** Provide the style and case number of any and all lawsuits filed against these Defendants in the preceding five years which contain any allegations associated with sexual harassment.

**RESPONSE NO. 16:**    In addition to its general objections, SMART objects to the interrogatory on the grounds that it is overly broad, unduly burdensome, not properly limited in time and scope. Irrelevant to the claims and defenses of the parties, and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving its objections to this interrogatory, SMART states as follows:     None.

**INTERROGATORY NO. 17:** Provide the names, addresses and telephone numbers of any and all witnesses this Defendant intends to call a the trial of this case.

**RESPONSE NO. 17:**    In addition to its general objections, SMART objects to this interrogatory to the extent that it seeks information protected by the attorney-

1568829 v1                                    12

client privilege and/or the work-product doctrine. SMART further objects to this interrogatory on the grounds that it seeks to impost additional violations beyond those set forth in the Court's Scheduling Order. Subject to and without waiving its objections to this interrogatory, SMART refers its Plaintiff to its Initial Disclosures and its Rule 26(a) documents produced to Plaintiff.

**INTERROGATORY NO. 18:** Provide the names, addresses, telephone numbers and detailed opinions of any and all experts this Defendant has retained or intends to retain pursuant to the claims made in this case.

**RESPONSE NO. 18:**    In addition to its general objections, SMART objects to this interrogatory on the grounds that it seeks to impose additional obligations beyond those set forth in the Court's Scheduling Order or the Federal Rules of Civil Procedure.    Subject to and without waiving its objections to this interrogatory, SMART states that it will disclose expert information in accordance with the deadlines set forth in the Court's Scheduling Order.

**INTERROGATORY NO. 19:** If Rance Maddox is no longer employed by this Defendant, please provide his last known address, telephone number and employer.

**RESPONSE NO. 19:**    Subject to and without waiving its general objections to this interrogatory, SMART refers plaintiff to its Rule 26(a) Initial Disclosures.

## REQUEST FOR PRODUCTION

**REQUEST NO. 1:**    Provide copies of any and all documents, of any nature whatsoever, in the possession of these Defendants, which relate in any to the events made the subject of this lawsuit.

**RESPONSE NO. 1:**    In addition to its general objections, SMART objects to this request to the extent that it seeks information protected by the attorney-client privilege and/or the work-product doctrine.  SMART also objects to this request on the grounds that it is overly broad, unduly burdensome, not properly limited in time and scope, irrelevant to the claims and defenses of the parties, and not reasonably calculated to lead to the discovery of admissible evidence.  Subject to and without waiving its objections to this request, SMART states that it will produce non-privileged documents relevant to plaintiff's allegations in this lawsuit.

**REQUEST NO. 2:**    Provide any and all statements, in the possession of these Defendants, which relate in any way to the events of this lawsuit.

**RESPONSE NO. 2:**    In addition to its general objections, SMART objects to this request on the grounds that it seeks information protected by the attorney-client privilege and the work-product doctrine.

**REQUEST NO. 3:**    Provide any and all photographs, videotapes or audiotapes, in the possession of these Defendants, which this Defendant claims to depict the Plaintiff in any manner.

1568829 v1

14

**RESPONSE NO. 3:**    In addition to its general objections SMART objects to this request on the grounds that it is overly broad, unduly burdensome, not properly limited in time and scope, irrelevant to the claims and defenses of the parties, not reasonably calculated to lead to the discovery of admissible evidence. SMART further objects to this request on the grounds that it is unreasonably vague. Subject to and without waiving its objections to this request, SMART states that it will produce non-privileged responsive documents concerning plaintiff's employment with SMART and plaintiff's allegations in this action.

**REQUEST NO. 4:**    Provide copies of any and all documents, in the possession of these Defendants which this Defendant claims to bear the signature of the Plaintiff.

**RESPONSE NO. 4:**    In addition to its general objections, SMART objects to this request on the grounds that it is overly broad, unduly burdensome, not properly limited in time and scope, irrelevant to the claims and defenses of the parties, not reasonably calculated to lead to the discovery of admissible evidence. SMART further objects to this request on the grounds that it is unreasonably vague and ambiguous. Subject to and without waiving its objections to this request, SMART states that it will produce non-privileged responsive documents concerning plaintiff's employment with SMART and plaintiff's allegations in this action.

1568829 v1

15

**REQUEST NO. 5:**    Produce the entire and complete personnel file of the Plaintiff.

**RESPONSE NO. 5:**    Subject to and without waiving its general objections, SMART will produce the personnel file of plaintiff in its possession, custody, and control.

**REQUEST NO. 6:**    Produce the entire and complete personnel file of Rance Maddox.

**RESPONSE NO. 6:**    In addition to its general objections, SMART objects to this request on the grounds that it is overly broad, unduly burdensome, not properly limited in time and scope, irrelevant to the claims and defenses of the parties, and not reasonably calculated to lead to the discovery of admissible evidence.  Subject to and without waiving its objections to this request, SMART states that it will produce relevant portions of Rance Maddox's personnel file.

**REQUEST NO. 7:**    Produce the entire and complete personnel file of Scott Kelly.

**RESPONSE NO. 7:**    In addition to its general objections, SMART objects to this request on the grounds that it is overly broad, unduly burdensome, not properly limited in time and scope, irrelevant to the claims and defenses of the parties, and not reasonably calculated to lead to the discovery of admissible evidence.

1568829 v1

16

**REQUEST NO. 8:**    Produce the entire and complete personnel file of Jerry Sports.

**RESPONSE NO. 8:**    In addition to its general objections, SMART objects to this request on the grounds that it is overly broad, unduly burdensome, not properly limited in time and scope, irrelevant to the claims and defenses of the parties, and not reasonably calculated to lead to the discovery of admissible evidence. SMART further objects to this request on the grounds that it knows of no SMART employee named Jerry Sports.

**REQUEST NO. 9:**    Produce the entire and complete personnel file of Ruth Ryan.

**RESPONSE NO. 9:**    In addition to its general objections, SMART objects to this request on the grounds that it is overly broad, unduly burdensome, not properly limited in time and scope, irrelevant to the claims and defenses of the parties, and not reasonably calculated to lead to the discovery of admissible evidence.

**REQUEST NO. 10:**    Provide copies of any and all documents, in possession of these Defendants, which these Defendants claim to bear the signature of Rance Maddox.

**RESPONSE NO. 10:**    In addition to its general objections, SMART objects to this request on the grounds that it is overly broad, unduly burdensome, not properly limited in time and scope, irrelevant to the claims and defenses of the parties, and

not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving its objection to this request, SMART will produce documents signed by Rance Maddox, if any, which concern plaintiff's employment or plaintiff's allegations.

**REQUEST NO. 11:**   Provide complete copies of any and all complaints and or allegations, written, e-mailed, videotaped, audio taped or verbalized in any way, made by the Plaintiff to these Defendants concerning in any way Rance Maddox.

**RESPONSE NO. 11:**   In addition to its general objections, SMART objects to this request on the grounds that it is overly broad, unduly burdensome, not properly limited in time and scope, irrelevant to the claims and defenses of the parties, and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving its objections to this request, SMART states that plaintiff provided no written, emailed, videotaped, or audiotaped complaints about Rance Maddox to SMART.

**REQUEST NO. 12:**   Provide complete copies of any and all complaints and or allegations, written, e-mailed, videotaped, audio taped or verbalized in any way, made by any employee to these Defendants concerning in any way by Rance Maddox in the preceding five years.

**RESPONSE NO. 12:**   In addition to its general objections, SMART objects to this request on the grounds that it is overly broad, unduly burdensome, not properly

1568829 v1

18

limited in time and scope, irrelevant to the claims and defenses of the parties, and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving its objections to this request, SMART states that there have been no complaints of harassment made about Rance Maddox to SMART.

**REQUEST NO. 13:**    If Rance Maddox has been transferred, demoted or terminated, please produce copies of any and all documents, of any nature whatsoever, associated with that change of position.

**RESPONSE NO. 13:**    In addition to its general objections, SMART objects to this request on the grounds that it is overly broad, unduly burdensome, irrelevant to the claims and defenses of the parties, and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving its objections to this request, SMART refers plaintiff to its response to Interrogatory 5.

**REQUEST NO. 14:**    Produce copies of any and all write ups, reprimands, punishments, suspensions, terminations, or any other written admonishment, in possession of these Defendants, which relate in any way to the Plaintiff.

**RESPONSE NO. 14:**    In addition to its general objections, SMART objects to this request on the grounds that it is unreasonably vague and ambiguous. Subject to and without waiving its objections to this request, SMART states that it will produce available, relevant documents from plaintiff's personnel file.

1568829 v1

19

**REQUEST NO. 15:**    Produce copies of any and all write ups, reprimands, punishments, suspensions, terminations, or any other written admonishment, in possession of these Defendants, which relate in any way to Rance Maddox.

**RESPONSE NO. 15:**    In addition to its general objections, SMART objects to this request on the grounds that it is overly broad, unduly burdensome, irrelevant to the claims and defenses of the parties, and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving its objections to this request, SMART states that it will produce relevant discipline of Rance Maddox, if any.

**REQUEST NO. 16:**    Provide complete copies of any and all policies, procedures, manuals, handbooks, employee handbooks or any other document disseminated to the Plaintiff while she was an employee of this company.

**RESPONSE NO. 16:**    Subject to and without waiving its general objections to this request, SMART states that it will provide a copy of the Team Member Handbook provided to plaintiff during her employment with SMART.

**REQUEST NO. 17:**    Provide complete copies of any and all policies, procedures, manuals, handbooks, employee handbooks or any other document disseminated to Rance Maddox while he was an employee of this company.

**RESPONSE NO. 17:**    Subject to and without waiving its general objections to this request, SMART states that it will provide a copy of the Team Member Handbook provided to Rance Maddox during his employment with SMART.

**REQUEST NO. 18:**    Provide complete copies of any and all notices, postings, memos, letters, e-mails, or any other tangible document, in the possession of these Defendants, generated by these Defendants or any representatives thereof, during the entire time that the Plaintiff was an employee of this Defendant, which relate in any way to sexual, verbal or physical harassment.

**RESPONSE NO. 18:**    In addition to its general objections, SMART objects to the request on the grounds that is it unreasonably vague and ambiguous.  Subject to and without waiving its objections to this request, SMART states that it will produce documents referencing sexual harassment made available to SMART employees.

**REQUEST NO. 19:**    If either the Plaintiff or Rance Maddox had employment contracts, please provide complete copies of those contracts.

**RESPONSE NO. 19:**    In addition to its general objections, SMART objects to this request that it is overly broad, unduly burdensome, irrelevant to the claims and defenses of the parties, and not reasonably calculated to lead to the discovery of admissible evidence.  SMART further objects to this request on the grounds that it

is unreasonably vague and ambiguous.  Subject to and without waiving its objections to this request, SMART states as follows:  None.

**REQUEST NO. 20:**    Provide copies of any and all documents these Defendants have provided to any expert retained to testify in this case.

**RESPONSE NO. 20:**    In addition to its general objections, SMART objects to this request to the extent that it seeks information protected by the attorney-client privilege and/or the work-product doctrine.  SMART further objects to this request on the grounds that it seeks to impose additional obligations beyond those set forth in the Court's Scheduling Order.  Subject to and without waiving its objections to this request, SMART states that it will provide responsive information in accordance with the deadlines set forth in the Court's Scheduling Order.

**REQUEST NO. 21:**    Provide copies of any all exhibits this Defendant intends to use at the trial of this case.

**RESPONSE NO. 21:**    In addition to its general objections, SMART objects to this request to the extent that it seeks information protected by the attorney-client privilege and/or the work-product doctrine.  SMART further objects to this request on the grounds that it seeks to impose additional obligations beyond those set forth in the Court's Scheduling Order.  Subject to and without waiving its objections to this request, SMART states that it will provide responsive information in accordance with the deadlines set forth in the Court's Scheduling Order.

1568829 v1

22

AS TO RESPONSES TO INTERROGATORIES:

SMART ALABAMA, LLC

By: _____

Its: _GENERAL MANAGER ADMINISTRATION_

**VERIFICATION**

STATE OF ALABAMA            )

COUNTY OF _Crenshaw_        )

     Before me this day personally appeared _Gary Sport_ and after being first duly sworn on oath, deposes and says that he is the _GENERAL MANAGER ADMIN._ for SMART ALABAMA, LLC, that he has read the foregoing responses to interrogatories on behalf of SMART ALABAMA, LLC; that he subscribes to the same on behalf of SMART ALABAMA, LLC and is duly authorized to do so; that the foregoing answers are based upon information supplied by persons who he believes to be knowledgeable regarding said information and from the books and records of the organization; and that he believes the foregoing answers to be true and correct to the best of his information, knowledge and belief.

    Given under my hand and seal, this _14_ day of June, 2007.



_Staci Mount_
NOTARY PUBLIC
[SEAL]

My Commission
Expires: _9-15-2010_

1565829 v1

23

*Kathryn M. Willis*
_____
Marcel L. Debruge (DEB006)
Kathryn Morris Willis (MOR130)

Attorneys for Defendant
SMART ALABAMA, LLC

OF COUNSEL:

**BURR & FORMAN LLP**
3400 SouthTrust Tower
420 North 20th Street
Birmingham, Alabama 35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served on the following by directing same to his office address through first-class, United States mail, postage prepaid, on this the 19th day of June, 2007:

Richard F. Horsley, Esq.
Lindsey O. Hill, Esq.
Goozee, King & Horsley
1 Metroplex, Suite 280
Birmingham, Alabama 35209

Thomas F. Kelly, Jr., P.C.
17 Court Square
P.O. Box 605
Clayton, Alabama 36016

*Kathryn M. Willis*
_____
OF COUNSEL

1568829 v1

24



## POSITION STATEMENT

Charging Party: Robin Atwell
Charge Number: 420-2006-02661
Respondent: SMART Alabama, LLC

### I.    General Information

SMART Alabama, LLC ("SMART Alabama"), located in Luverne, Alabama, produces stamped metal products which are used in the manufacture of motor vehicles by Hyundai Motor Manufacturing Company in Montgomery, Alabama.    SMART Alabama, LLC is an equal opportunity employer and has in place a strict policy against any form of unlawful employment discrimination, harassment, or retaliation.    A copy of SMART Alabama's Anti-Harassment Policy is Attachment 1 to this Position Statement.

Robin Atwell ("Charging Party") was hired by SMART Alabama LLC as a Technician in August 2005.    After sustaining an occupational injury, Charging Party was moved to a light duty position in the safety office.    Charging Party remained employed as an assistant in the safety office until she abandoned her position on or about February 7, 2006. SMART Alabama denies that Charging Party was discriminated against on the basis of her gender, denies that Charging Party was subjected to any form of actionable sexual harassment or retaliation, and further denies that the company engaged in any form of unlawful conduct.

### II.    Charging Party Cannot Provide Any Reliable Evidence of Actionable Harassment.

Charging Party contends that she was subjected to unwelcome harassment by Rance Maddox, SMART Alabama's safety director, from November 16, 2005 until February 7, 2006. Specifically, Charging Party contends that Maddox touched her legs and shoulders, rubbed up against her buttocks, invited her to go out for drinks, and made comments that she perceived as sexual advances to her  Charging Party's harassment allegations are not substantiated by any

1482658

witnesses and are highly unreliable in light of the safety office's location, Charging Party's own behavior, and her failure to report many of the allegations contained within her EEOC charge to SMART Alabama management.

Charging Party's contentions regarding Maddox touching her they worked in the safety office are highly improbable based upon the office's location and proximity to other employees. The safety office in which Charging Party and Maddox worked is located in the production office area of SMART Alabama's plant. SMART Alabama employees frequently walk by the safety office on their way to the production floor, the breakroom, and the employee parking lot. The safety office was regularly visited by employees seeking protective equipment and first aid. The safety office's door has a glass window, and employees sitting in the outside production offices, as well as those passing by, can see into the safety office. Up until June 2006, the safety office's door was often left open because the air conditioning in the office did not operate properly. Moreover, during the approximately three months that Charging Party worked with Maddox in the safety office, several other employees on light duty temporarily worked as assistants in the safety office. Their shifts overlapped with Charging Party's working hours of 8:00 A.M. until 5:00 P.M. No safety assistant reported any improper conduct by Maddox, and the only other assistant named as a witness to Maddox's actions, Colinda Porter, denied that any sexual advances were made by Maddox to Charging Party or any other assistant working in the safety office.

Charging Party's own conduct makes the allegations of harassment in her EEOC charge unreliable. Her contention that Maddox asked her if her breasts were real and what they felt like is highly questionable in light of other employees reporting that Charging Party volunteered that she had had breast surgery in the presence of Maddox and other employees. Her allegation that

1482638                                    2

DFRP'S
00039
ATWELL V. SMART

Maddox's touching her shoulder was a sexual advance that caused her distress is contradicted by other employees observing Charging Party reaching out to touch Maddox's hand or shoulder when speaking with him. Furthermore, her assertion that Maddox's alleged sexual comments and advances were unwelcome conflicts with an incident reported by a shift manager. While working in the safety office Charging Party informed him, in the presence of other employees, that she had had a sexual dream about him that and further stated that it was "hot and passionate."

Most importantly, Charging Party now makes allegations that were never reported to SMART Alabama management during her employment. Charging Party never complained to Gary Sport that Maddox harassed her in a sexual manner. Instead, Charging Party shared with Gary Sport with only a generalized concern regarding Maddox's constantly questioning her about tasks to be performed for the safety office. She never reported Maddox asking her to have drinks after work, asking her to travel to Montgomery, calling her late at night, or saying, "I've got a real man for you." Charging Party never informed SMART Alabama that Maddox tried to hold her hand, inappropriately hugged her and rubbed her back, and rubbed his pelvis area against her buttocks. The only incident reported by Charging Party was promptly investigated and remedied by SMART Alabama.

III.  **SMART Alabama Acted Promptly to Investigate and Resolve the Concerns Reported by Charging Party.**

Though many of the incidents now claimed by Charging Party as sexual harassment are questionable, SMART Alabama responded quickly and effectively to the two complaints she did make during her employment. Charging Party reported to Gary Sport that Maddox persistently questioned her about work tasks in the safety office in a manner she found to be harassing. Though Maddox, in an interview with Sport, denied talking to Charging Party in anything other

DFRP'S
00040
ATWELL V. SMART

than a professional manner, Sport issued Maddox a written counseling about the manner in which he spoke to other employees in the safety office and informed Charging Party that SMART Alabama would honor her request to transfer her to another area of the plant. Charging Party's assertion that a position on the line, to which she was being transferred, would put her in daily contact with Maddox is incorrect. Had Charging Party not abandoned her position and transferred, her contact to Maddox would be limited only to situations in which she required first aid assistance.

The only other conduct reported by Charging Party was Maddox's allegedly placing his hands on her shoulders while she was working at her computer in the safety office. Upon learning of Charging Party's allegation, Ruth Ryan, Employee Relations Manager for SMART Alabama, promptly investigated the matter. During her investigation, she interviewed Colinda Porter, who also worked in the safety office and was named by Charging Party as a witness to the incident. Ms. Porter reported that, after Charging Party exclaimed, "I did it! I finally did it!" after successfully entering a case into the OSHA 300 log, Maddox walked over, looked at Charging Party's computer monitor, and said, "Great job" as he placed his hands on her shoulders. Porter reported that both Maddox and Charging Party laughed, and Charging Party did not appear to be upset about the incident. Nevertheless, Ryan attempted to follow up with Charging Party as to the investigation, but, before she could do so, Charging Party walked off the job and did not return to her employment at SMART.

IV.    **Charging Party Was Not Subject to Retaliation.**

Charging Party's vague allegation that she was subjected to retaliation after complaining about Maddox's alleged conduct is meritless. At no time did Rance Maddox or anyone else at SMART Alabama take any adverse action against Charging Party based on any reports she made

1487604                                     4

to management. Charging Party's contention that Maddox began placing additional job duties on her is so vague and ambiguous that it is difficult for SMART Alabama to respond. Maddox did counsel Charging Party about her failure to properly document workers' compensation cases and maintain the OSHA 300 log, but this counseling was in no way related to any complaints of harassment by Charging Party. Rather, because the temporary assistants in the safety office had complained that Charging Party was forcing her work responsibilities onto them, Maddox issued Charging Party a memo reminding her of her job responsibilities as safety assistant.

Nor did Maddox "fabricate" any other complaints about Charging Party's performance. Though Charging Party contends that Maddox wrote her up for working overtime, at no time did Gary Sport authorize such overtime. Her allegation that she was "written up" for wearing blue jeans is simply untrue. Maddox allowed employees working in the safety office to wear blue jeans only on Fridays. When Charging Party wore blue jeans on a day other than Friday, Maddox simply verbally reminded her of the rule regarding the wearing of blue jeans.

Her contention that Maddox's placing her on the weekend schedule was a form of retaliation is simply erroneous. Because of SMART Alabama's production schedule, employees in the safety office, including Charging Party and other individuals working in safety on light duty, were placed on the weekend work schedule. Charging Party was not singled out by Maddox for weekend work.

SMART Alabama denies that it subjected Charging Party to any adverse action based on any "complaints" of harassment. Rather, SMART Alabama attempted to resolve Charging Party's concerns. At no time did any complaints by Charging Party about Rance Maddox play any role in any employment action taken by SMART Alabama.

1492638                                   5

DFRP'S
00042
ATWELL V. SMART

IV.    Conclusion

The foregoing makes clear that the Charging Party has not been subjected to unlawful harassment, discrimination, or retaliation.  SMART Alabama LLC respectfully requests that the Commission terminate its investigation into this matter and issue a no-cause determination and immediate dismissal in response to this meritless Charge of Discrimination.

6

DFRP'S
00043
ATWELL V. SMART

# CHARGE OF DISCRIMINATION

| | AGENCY | CHARGE NUMBER |
|---|---|---|
| This form is affected by the Privacy Act of 1974; See Privacy Act State. before completing this form. | ☐ FEPA ☒ EEOC | 410-2006-02661 |

_____ and EEOC

*State or local Agency, if any*

| NAME (Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Mrs. Robin Atwell | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| | Brantley, Alabama 36009 | |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| Smart Alabama LLC | | (334) 335-5800 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 121 Shin Young Drive | Luverne Alabama 36049 | Crenshaw |

| NAME | | TELEPHONE NUMBER (Include Area Code) |
|---|---|---|
| | | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

| CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es)) | DATE DISCRIMINATION TOOK PLACE |
|---|---|
| ☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN<br>☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER (Specify) | EARLIEST  LATEST<br>11 /16 /2005  2/17 /2006<br>☐ CONTINUING ACTION |

THE PARTICULARS ARE (If additional space is needed, attach extra sheet(s)):

See Attachment

PLAINTIFF'S EXHIBIT 5

RECEIVED
EEOC

MAY 1 6 2006

BIRMINGHAM DISTRICT OFFICE

| ☐ I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State and Local Requirements) |
|---|---|
| | Michel Johnson  Comm. Exp. 6-21-08<br>I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct.<br><br>Robin Atwell | SIGNATURE OF COMPLAINANT<br>Robin Atwell<br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(Day, month, and year) |
| Date        Charging Party (Signature) | |

EEOC FORM 5 (Rev. 06/92)

Robin Atwell began her employment with Smart Alabama LLC on approximately August 25, 2005. She was trained during the first week and served as an assembly tech for the remainder of August until November 14, 2005.

On or about November 14, 2005, Robin Atwell became a safety assistant which required her to transfer to a different part of the plant. Her new office was actually located in the office of the safety director, Rance Maddox. From approximately November 16, 2005 through February 7, 2006, Robin Atwell was the subject of sexual harassment by Rance Maddox. The particulars are as follows:

*    During her first week in Mr. Maddox's office, and continuing through January 2006, Mr. Maddox asked Mrs. Atwell on numerous occasions where she was eating and if she wanted to eat with him. When she would tell him she had other plans, on numerous occasions, he would show up wherever she was eating and ask if he could eat with her.

*    On November 16, 2005, Mrs. Atwell's birthday, Rance Maddox hugged her. Although it was a birthday hug, the hug was inappropriately tight and long.

*    From November 16, 2005 through the end of January 2006, Mr. Maddox repeatedly touched the Plaintiff on her arms and hands and attempted to hold hands with her while talking to her. This occurred on a daily basis.

*    From November 16, 2005 through the end of January 2006, Mr. Maddox repeatedly put his arm around Mrs. Atwell and inappropriately rubbed her back.

*    In December 2005, and continuing through January 2006, Mr. Maddox began asking Mrs. Atwell if she wanted to have drinks with him after work. At each request, she informed him that she would check with Kevin, her fiancé, and husband beginning on January 5, 2006. Regardless of her response, Mr. Maddox continued to ask her out for drinks knowing that she had a fiancé and a husband as of January 5, 2006.

*    At some time between November 16, 2005 and December 1, 2005, Mr. Maddox made the comment to Mrs. Atwell that it was impossible for men to be monogamous in their sexual relations.

*    On several occasions from the end of November 2005 through January 2006, Mr. Maddox asked Mrs. Atwell to travel to Montgomery, Alabama to meet him for drinks at Egor's, a local bar.

*    On numerous occasions between November 16, 2005 and the end of January 2006, Mr. Maddox deliberately rubbed his pelvis area against Mrs. Atwell's buttocks.

*    From November 16, 2005 through the end of January 2006, on numerous occasions, Mr. Maddox called the Plaintiff at her home, sometimes late at night. On each occasion, he would ask her what she was doing.

\*       On several occasions between December 2005 and January 2006, Mr. Maddox asked Mrs. Atwell if her breast were real and asked her what they felt like. She felt as though he was inviting her to ask him to touch her breast.

\*       On several occasions between December 1, 2005 and the end of January 2006, Mr. Maddox made the comment "I've got a real man for you" to Mrs. Atwell.

\*       On January 18, 2006, while Mrs. Atwell was in the corner of the office working on a computer, Mr. Maddox grabbed both of her shoulders and squeezed them as if he were giving her a massage. He moved his hands over her shoulders where they were situated just above her breast and rubbed her.

\*       On numerous occasions between November 16, 2005 and the end of January 2006, Mr. Maddox touched the Plaintiff on her legs.

\*       Beginning in December 2005 and continuing through December 2006, Mr. Maddox hugged Mrs. Atwell inappropriately and stated "baby, I'll take care of you"...."we'll be a team"..."you've got to work with me". Mrs. Atwell perceived the clear meaning of these statements that Mr. Maddox would help her with working conditions and raises if she would engage in sexual activities with him. On one occasion during that same period of time, Mr. Maddox asked Mrs. Atwell to spend the night in Montgomery for a training session.

On or about January 18, 2006, Mrs. Atwell reported Mr. Maddox's conduct to Gary Sport, a managerial employee. Previously, during casual conversations, she had informed Mr. Sport that she was uncomfortable working around Mr. Maddox. Despite these discussions, Mr. Maddox had not been reprimanded or counseled in any way.

As a result of her reporting Mr. Maddox, Mr. Maddox began placing more job duties on Mrs. Atwell. Furthermore, as a result of her reporting her, Mr. Maddox began to make Mrs. Atwell's working environment intolerable and hostile. At some point toward the end of January 2006, Mrs. Atwell reported Mr. Maddox to Ruth Ryan in the human resources department. Ms. Ryan told Mrs. Atwell to simply be short with Rance and just do her job. She assured Mrs. Atwell that they were investigating her complaints as of February 1, 2006. As a result of this meeting, Mr. Maddox created a weekend work schedule and put Mrs. Atwell on the schedules during hours that he knew she could not work. Still, during this time, Mr. Maddox continued to touch Mrs. Atwell inappropriately.

Mr. Maddox began to fabricate complaints about Mrs. Atwell and on a couple of occasions wrote her up for excessive overtime, which had been previously approved by Gary Sport. She was also written up for wearing blue jeans.

On February 7, 2006, Mrs. Atwell again met with Ruth Ryan. She reported to Ms. Ryan that reporting Rance had simply increased the hostility of her work environment. Ms. Ryan informed Mrs. Atwell that they would place her on another line; however, she would still have to

see Mr. Maddox everyday. Mrs. Atwell has been unable to return to work since that time due to severe emotional distress, depression and fear associated with the harassment and retaliation by Rance Maddox.

Smart Alabama LLC was made aware by Mrs. Atwell on numerous occasions about Mr. Maddox's sexual harassment toward her; however, they either did nothing or took measures that did not help or cure the problem. Smart Alabama LLC either was or should have been aware of previous and subsequent similar conduct by Mr. Maddox; however, he remained an employee.

 **S M A R T**

**Men**

1. Men feel they have to be too cautious as to what they say or how they behave.
2. Men feel cross-gender communication is not as great a problem as women feel it is.
3. Men feel women do not think men are trying.
4. Men feel that women have more advantages in the workplace.
5. Men feel that they are not allowed to make mistakes.
6. Men feel women want both to be provided for and to have equality.
7. Men feel that women dress and act in a way that draws attention to their sexuality.



## 8. Sexual Harassment

Sexual harassment is a gender issue requiring special attention. This common form of discrimination is one of the most pressing and costly problems facing organizations today. Sexual harassment is unwelcome behavior that happens to you because of your sex that creates an intimidating, hostile, or offensive work environment. Many instances involve a man sexually harassing a woman, however, sexual harassment can also be:

- A woman harassing a man.
- A woman harassing a woman.
- A man harassing a man.

Some types of behavior that can be considered sexual harassment are:

- Unwelcome sexual advances.
- Request for sexual favors, or
- Verbal or physical conduct of a sexual nature.

Two types of sexual harassment are:

- "Quid Pro Quo" Harassment
- Hostile Environment

 S M A R T

## "Quid Pro Quo"

"This for that," such as, where an employee's submission to unwelcome sexual conduct is an expressed or implied condition of receiving job benefits or the employee's refusal to submit to sexual conduct would result in tangible job detriment.

## Hostile Environment

Verbal or physical conduct of a sexual nature that has the purpose or effect of unreasonably interfering with an individual's employment creating an intimidating, hostile, or offensive work environment.

## What are the Potential Liabilities?

- Back pay
- Reinstatement
- Damages for emotional harm
- Punitive damages

## Sexual Harassment and the Law

Although many federal and state laws do not specifically define sexual harassment or make it illegal, courts have found that sexual harassment is a form of sex discrimination which violates the laws against sex discrimination in the workplace.

**Title VII or the Civil Rights Act of 1964** is a federal law that protects individuals from discrimination based upon sex. This law makes it illegal for an employer to discriminate against individuals because of their sex in hiring, firing, and other terms and conditions of employment, such as promotions, raises, and other job opportunities.

The laws of most states also make it illegal to discriminate on the basis of sex, and some states specifically make sexual harassment against the law.



## Conduct Considered to be Sexual Harassment

Many different kinds of conduct that are of a sexual nature may be sexual harassment, if the behavior is unwelcome and if it is severe or pervasive. However, courts have resisted adopting what they consider a workplace "code of conduct" or list of behavior that is automatically considered to be sexual harassment. As a result, if the conduct is not unwelcome or not severe or pervasive, courts will not necessarily consider each type of conduct listed below to be sexual harassment.

Some examples of conduct that may be sexual harassment:

- **Verbal or written conduct:**
  Comments about clothing, personal behavior, or your body; sexual or sex-based jokes; requesting sexual favors or repeatedly asking you out; sexual innuendoes; telling rumors about your personal or sexual life; threatening you.

- **Physical conduct:**
  Rape or assault; impeding or blocking your movement; inappropriate touching of your body or clothing; kissing, hugging, patting, stroking

- **Nonverbal conduct:**
  Looking up and down your body; derogatory gestures or facial expression of a sexual nature; following or stalking you.

- **Visual displays:**
  Posters, drawings, pictures, screensavers or e-mails of a sexual nature.

## 9.    Sexual Orientation Issues

Today's workplace is characterized by a mix of values and lifestyles. As gays and lesbians increasingly make their presence known in the workplace, a variety of issues develop. Some people believe that homosexuality is immoral and others just don't understand it. Although someone's sexual orientation has nothing to do with an



PLAINTIFF'S
EXHIBIT

## SEXUAL AND OTHER UNLAWFUL HARASSMENT

It is SMART ALABAMA, LLC's objective to provide a working environment free from discrimination and conduct commonly referred to as sexual harassment. The E.E.O.C. (Equal Employment Opportunity Commission) has provided a broad definition of sexual harassment. It is general in nature and may not always be clear when evaluating everyday situations.

"Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when:

1. submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment,

2. submission to or rejection of such conduct by an individual is used as a basis for employment decisions affecting such individual, or

3. such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment."

Sexual harassment refers to behavior inappropriate in the workplace because it is offensive, unwelcome behavior which would not occur but for the sex of the offended person. Both sexual harassment, and accusations of sexual harassment, are disrupting to the work environment.

If you or a co-worker experiences what you believe to be sexual harassment or accusations of sexual harassment, report it promptly to your immediate supervisor or the Human Recourses Department. SMART ALABAMA, LLC will investigate any employee, regardless of job position when such allegations are made. Based on available information, SMART ALABAMA, LLC will take appropriate action and communicate on a need-to-know basis.

Appropriate disciplinary action, up to and including termination will be taken against any individual for sexual harassment charges determined to be valid.





PLAINTIFF'S
EXHIBIT
8

**S M A R T**
*Stamped Metal American Research Technology, Alabama LLC*

## EMPLOYEE INFORMATION

LAST NAME _MADDOX_    FIRST _RANCE_    MI _____

ADDRESS _9 LAKewood Dr._

CITY _Hattiesburg_    STATE _MS_    ZIP CODE _39402_

TELEPHONE # (_601_) _268-9569_    BIRTHDATE _1-26-62_

SOCIAL SECURITY # _____

FOR OFFICE USE                                    EMPLOYEE # _____

| START DATE 3/7/05 | TERM DATE |
|---|---|
| FEDERAL FILING STATUS M-4 | STATE FILING STATUS M-4 |
| FEDERAL W2 ALLOWANCE | STATE W2 ALLOWANCE |
| MARRIED X | SINGLE |

JOB TITLE _____

| WORK STATUS | SALARY OR HOURLY |
|---|---|
| FULL TIME PERM (FP) | |
| FULL TIME TEMP (FT) FT | SALARY (004) |
| PART TIME PERM (PP) | HOURLY (001) |
| PART TIME TEMP (PT) | |

HOURLY RATE $ _____    BI- WEEKLY SALARY $ ~~2618.48~~ 2115.38    1081.69

ES on 1 year 55K/yr

| OTHER DEDUCTIONS | WEEKLY AMOUNT |
|---|---|
| | |
| | |
| | |

*CONFIDENTIAL*

DFRP'S
00741
ATWELL V. SMART

# Form W-4 (2005)

**Purpose.** Complete Form W-4 so that your employer can withhold the correct federal income tax from your pay. Because your tax situation may change, you may want to refigure your withholding each year.

**Exemption from withholding.** If you are exempt, complete only lines 1, 2, 3, 4, and 7 and sign the form to validate it. Your exemption for 2005 expires February 16, 2006. See Pub. 505, Tax Withholding and Estimated Tax.

**Note.** You cannot claim exemption from withholding if (a) your income exceeds $800 and includes more than $250 of unearned income (for example, interest and dividends) and (b) another person can claim you as a dependent on their tax return.

**Basic instructions.** If you are not exempt, complete the **Personal Allowances Worksheet** below. The worksheets on page 2 adjust your withholding allowances based on itemized deductions, certain credits, adjustments to income, or two-

earner/two-job situations. Complete all worksheets that apply. However, you may claim fewer (or zero) allowances.

**Head of household.** Generally, you may claim head of household filing status on your tax return only if you are unmarried and pay more than 50% of the costs of keeping up a home for yourself and your dependent(s) or other qualifying individuals. See line E below.

**Tax credits.** You can take projected tax credits into account in figuring your allowable number of withholding allowances. Credits for child or dependent care expenses and the child tax credit may be claimed using the **Personal Allowances Worksheet** below. See Pub. 919, How Do I Adjust My Tax Withholding? for information on converting your other credits into withholding allowances.

**Nonwage income.** If you have a large amount of nonwage income, such as interest or dividends, consider making estimated tax payments using Form 1040-ES, Estimated Tax for Individuals. Otherwise, you may owe additional tax.

**Two earners/two jobs.** If you have a working spouse or more than one job, figure the total number of allowances you are entitled to claim on all jobs using worksheets from only one Form W-4. Your withholding usually will be most accurate when all allowances are claimed on the Form W-4 for the highest paying job and zero allowances are claimed on the others.

**Nonresident alien.** If you are a nonresident alien, see the Instructions for Form 8233 before completing this Form W-4.

**Check your withholding.** After your Form W-4 takes effect, use Pub. 919 to see how the dollar amount you are having withheld compares to your projected total tax for 2005. See Pub. 919, especially if your earnings exceed $125,000 (Single) or $175,000 (Married).

**Recent name change?** If your name on line 1 differs from that shown on your social security card, call 1-800-772-1213 to initiate a name change and obtain a social security card showing your correct name.

---

## Personal Allowances Worksheet (Keep for your records.)

**A** Enter "1" for **yourself** if no one else can claim you as a dependent . . . . . . . . . . . . . . . . . . . . **A** _____

**B** Enter "1" if:
- You are single and have only one job; or
- You are married, have only one job, and your spouse does not work; or
- Your wages from a second job or your spouse's wages (or the total of both) are $1,000 or less.

} **B** _____

**C** Enter "1" for your **spouse.** But, you may choose to enter "-0-" if you are married and have either a working spouse or more than one job. (Entering "-0-" may help you avoid having too little tax withheld.) . . . . . . **C** _____

**D** Enter number of **dependents** (other than your spouse or yourself) you will claim on your tax return . . . . **D** _____

**E** Enter "1" if you will file as **head of household** on your tax return (see conditions under Head of household above) . . **E** _____

**F** Enter "1" if you have at least $1,500 of **child or dependent care expenses** for which you plan to claim a credit . . **F** _____
(**Note.** Do not include child support payments. See Pub. 503, Child and Dependent Care Expenses, for details.)

**G** **Child Tax Credit** (including additional child tax credit):
- If your total income will be less than $54,000 ($79,000 if married), enter "2" for each eligible child.
- If your total income will be between $54,000 and $84,000 ($79,000 and $119,000 if married), enter "1" for each eligible child plus "1" additional if you have four or more eligible children.

} **G** _____

**H** Add lines A through G and enter total here. (Note. This may be different from the number of exemptions you claim on your tax return.) ▶ **H** _____

For accuracy, complete all worksheets that apply.
- If you plan to itemize or claim adjustments to income and want to reduce your withholding, see the **Deductions and Adjustments Worksheet** on page 2.
- If you have more than one job or are married and you and your spouse both work and the combined earnings from all jobs exceed $35,000 ($25,000 if married) see the **Two-Earner/Two-Job Worksheet** on page 2 to avoid having too little tax withheld.
- If neither of the above situations applies, stop here and enter the number from line H on line 5 of Form W-4 below.

---

Cut here and give Form W-4 to your employer. Keep the top part for your records.

Form **W-4**

**Employee's Withholding Allowance Certificate**

OMB No. 1545-0010

Department of the Treasury Internal Revenue Service

▶ Whether you are entitled to claim a certain number of allowances or exemption from withholding is subject to review by the IRS. Your employer may be required to send a copy of this form to the IRS.

**2005**

| 1 Type or print your first name and middle initial | Last name | 2 Your social security number |
|---|---|---|
| RANCE | MADDOX | |

Home address (number and street or rural route)
9 Lakewood De.

3 ☐ Single ☑ Married ☐ Married, but withhold at higher Single rate.
Note. If married, but legally separated, or spouse is a nonresident alien, check the "Single" box.

City or town, state, and ZIP code
Hattiesburg, Ms. 35492

4 If your last name differs from that shown on your social security card, check here. You must call 1-800-772-1213 for a new card. ▶ ☐

| 5 | Total number of allowances you are claiming (from line H above or from the applicable worksheet on page 2) | 5 | 4 |
| 6 | Additional amount, if any, you want withheld from each paycheck | 6 | $ |

7 I claim exemption from withholding for 2005, and I certify that I meet **both** of the following conditions for exemption.
- Last year I had a right to a refund of **all** federal income tax withheld because I had **no** tax liability **and**
- This year I expect a refund of **all** federal income tax withheld because I expect to have **no** tax liability.

If you meet both conditions, write "Exempt" here . . . . . ▶ | 7 |

Under penalties of perjury, I declare that I have examined this certificate and to the best of my knowledge and belief, it is true, correct, and complete.

Employee's signature
(Form is not valid unless you sign it.) ▶ *Rance Maddox*

Date ▶ 3-7-05

| 8 Employer's name and address (Employer: Complete lines 8 and 10 only if sending to the IRS.) | 9 Office code (optional) | 10 Employer identification number (EIN) |

For Privacy Act and Paperwork Reduction Act Notice, see page 2.    Cat. No. 10220Q    Form **W-4** (2005)

**CONFIDENTIAL**

DFRP'S
00742
ATWELL V. SMART

FORM
A-4 (REV. 1-80)

## ALABAMA DEPARTMENT OF REVENUE
## Employee's Withholding Exemption Certificate

NAME: _VANCE MADDOX_    SOCIAL SECURITY NO. _____

ADDRESS: _9 Lakewood Dr._    CITY _Hattiesburg_    STATE _MS_    ZIP CODE _39402_

**EMPLOYEE:** File this form with your employer. Otherwise, Alabama Income tax must be withheld from your wages without exemption.

**EMPLOYER:** Keep this certificate with your records. If the employee is believed to have claimed too many exemptions, the Alabama Department of Revenue should be so advised.

If you had no Alabama income tax liability last year and you anticipate no Alabama income tax liability this year, you may claim "exempt" from Alabama withholding tax. To claim exempt status, check this block, sign and date this form and file it with your employer. Employees claiming exempt status are not required to complete Lines 1 through 5. ☐

### HOW TO CLAIM YOUR WITHHOLDING EXEMPTIONS

1. IF YOU ARE SINGLE, $1,500 personal exemption is allowed.
   (a) If you claim full personal exemption ($1,500) write a letter "S"
   (b) If you claim no personal exemption write the figure "0" (Note: If you claim no personal exemption or claim 1 or 2, you cannot claim dependents on Line 3.)

2. IF YOU ARE MARRIED or SINGLE CLAIMING HEAD OF FAMILY, $3,000 personal exemption is allowed.
   (a) If you claim exemption for both spouses ($3,000), write the letter "M"
   (b) If you are single claiming head of family ($3,000), write the letter "H" (see "Head of family" instructions on back of this form)
   (c) If you claim exemption for yourself only ($1,500) write the letter "0"
   (d) If you claim no personal exemption write the figure "0"

3. If claiming the year you will provide more than one-half of the support of persons closely related to you (other than your spouse), write the number of such dependents. (See instructions on other side.) ........................ _M-4_

4. Additional amount, if any, you want deducted each pay period .......................................... $ _____

5. TOTAL EXEMPTIONS (Example: Employee claims "0" on Line 2 and "4" on Line 3. Employee should enter column headed "5" in Withholding Tables.) .................................... _M-4_

THIS LINE TO BE COMPLETED BY EMPLOYEE:
I certify that the withholding exemptions claimed on this certificate do not exceed the amount to which I am entitled.

DATE _3/7/05_    SIGNED _Vance Maddox_

CONFIDENTIAL

DFRP'S
00743
ATWELL V. SMART

# LEAVE PERMIT

☐ BUSINESS   ☒ PERSONAL

| DEPARTMENT | Safety | TITLE | Safety Manager | NAME | Rance Maddox |
|---|---|---|---|---|---|
| PERIOD | 12-19-05 | ~ | 12-19-05 | | |
| DESTINATION | | | | | |

REASON

☐ Business : _____
☒ Personal : ☐ Hospital   ☐ child Care   ☐ Family
☐ Others : _____

| DATE | 12-14-05 | APPLICANT | Rance Maddox | SIGNATURE | |
|---|---|---|---|---|---|

| ✍ Audited Department | | | | ✍ HR Department | | | |
|---|---|---|---|---|---|---|---|
| Signature | Associate | Asst.Mgr | Mgr | D. Mgr | Signature | Associate | Asst.Mgr | Mgr |

Ⓢ SMART ALABAMA,

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

# LEAVE PERMIT

☐ BUSINESS   ☒ PERSONAL

| DEPARTMENT | Safety | TITLE | Safety Manager | NAME | Rance Maddox |
|---|---|---|---|---|---|
| PERIOD | 12-19-05 | ~ | 12-19-05 | | |
| DESTINATION | | | | | |

REASON

☐ Business : _____
☒ Personal : ☐ Hospital   ☐ child Care   ☐ Family
☐ Others : _____

| DATE | 12-14-05 | APPLICANT | Rance Maddox | SIGNATURE | Rance Maddox |
|---|---|---|---|---|---|

| ✍ Audited Department | | | | ✍ HR Department | | | |
|---|---|---|---|---|---|---|---|
| Signature | Associate | Asst.Mgr | Mgr | D. Mgr | Signature | Associate | Asst.Mgr | Mgr |

SHA - 002 Rev. 00        Ⓢ SMART ALABAMA,        (8.5X11)

*CONFIDENTIAL*

DFRP'S
00744
ATWELL V. SMART



DCH REGIONAL MEDICAL CENTER
PHYSICIAN'S ORDER

DT0013

PATIENT: MADDOX,DOLLIE M

ACCT #:

| UNIT#: | SX: F | AGE: 77 | LOC: MICU 107-01 |
| HT/FT: 5 IN: 3 | WT/KG: | ADMIT DATE: 01/15/06 | PHYSICIAN: |

2/6/03   To Whom It May Concern,

Rance Maddox was here to visit on todays date, 02/06/06,

DO NOT write or modify orders above the scanned line.

PATIENT: MADDOX,DOLLIE M                ACCT #:



*CONFIDENTIAL*

DFRP'S
00745
ATWELL V. SMART



**Stamped Metal American Research Technology, Alabama LLC**

**121 Shin Young Drive Luverne, AL 36049**
**Phone: 334-335-5800    Fax:  334-335-5816/5853**

### TRAINING TUITION REIMBUSMENT AGREEMENT
### Effective November 11, 2004

SMART Alabama, LLC. is dedicated to providing proper training to its staff and employees. The purpose of this training is to allow company personnel to possess the knowledge and skills required to satisfactorily perform their job duties. Some of the training will be general and other will be very job specific and relating to this industry. While the company will provide such training at no cost to the employee it is important that the company protect its assets and investments into its Human Resources.

It is an adopted policy of this company that any employee receiving job specific or advanced technological training to exceed the amount of $3000 per individual per event must consent to an intent to remain with the company for a given period of time as defined below or reimburse SMART Alabama, LLC. in full for the training cost incurred.

By my signature I agree to remain an employee in good-standing with SMART Alabama, LLC. for 18 months from the date of any job specific training with cost incurred by the company that exceed $3000.00 U.S.D. I understand that SMART Alabama, LLC. is purchasing this training to allow me to further my career and benefit this company. Should I choose to leave this company prior to 18 months after training I agree to reimburse the company in full for the cost of any training I have received. I further understand that I may request to see invoices for the cost of all training I received while an employee of SMART Alabama, LLC. that are in excess of $3000.00 U.S.D. Should SMART Alabama, LLC. terminate my employment as an associate of this company, SMART reserves the right to enforce this policy depending on events surrounding the termination.

_____        3/7/05
Associate Signature                        Date

*CONFIDENTIAL*

DFRP'S
00746
ATWELL V. SMART

Emergency Contact Numbers:

Name: _Rance Maddox_

Please list at least 2 people we can contact in case of an emergency.
These numbers should be numbers of someone we can reach
**immediately**. You can list more if you would like to. If any phone
numbers change, please let the HR Department know of these
changes.

Name: _Sonia Maddox_
Phone Number: _601-268-9569_

Name: _Sonia Maddox_
Phone Number: _601-818-0256_

Name: _____
Phone Number: _____

*CONFIDENTIAL*

DFRP'S
00747
ATWELL V. SMART

Deborah Rodgers
387 Meadowview Rd
Greenville, Al 36037

MR. Maddox -SMART
121 Shin Young Dr.
Luverne, Al 36049


Dear Mr. Maddox:

I would like to thank you for taking the time to interview me. Having the opportunity to talk with you was very exciting. I'm looking forward to joining SMART'S work force.

I'm currently taking FIT (Focused Industry Training Program) to better my working skills. This class teaches many different skills. These skills include word processing, excel, manufacturing, and job acquisition skills.


I enjoyed the amazing training class on safety procedures on April 27, 2005 and May 2, 2005. I loved the tour of the plant it was exciting seeing how car parts were made. It was a great experience for me. I would personally like to thank you for taking the time out of your busy day.


Thank you,


Deborah Rodgers


*CONFIDENTIAL*

DFRP'S
00748
ATWELL V. SMART

137 S Martin Ave.
Luverne, AL 36049
May 3, 2005

Rance Maddox
121 Shin Young Drive
Luverne, AL 36049

Dr. Mr. Maddox:

I would like to thank you for the amazing class concerning safety procedures for SMART on April 27, 2005 and on May 2, 2005.

The pleasant atomphere and work environment has instill in me to be a SMART employment. I feel with the information you have given me will help me to be safe conscience and aware of my surrounding.

**IT TAKES A WINNING ATTITUDE TO SUCCEED!!!!!!**

I look forward to working with you.

Sincerely,

Audrey Rogers

Audrey Rogers
FIT Student

*CONFIDENTIAL*

DFRP'S
00749
ATWELL V. SMART

SMART ALABAMA, LLC Employee Handbook                12/10/2004

## *Acknowledgement*

I have read the policies outlined in this handbook. I understand that while this is not an employment contract I am bound to abide by the policies set herein.

I further understand that SMART ALABAMA, LLC may modify, revise and update this manual at any time. I am also aware that this updating may include additions or deletions.

I also certify that I have had ample time to discuss this handbook and its contents with SMART ALABAMA, LLC representatives and I fully understand the contents. Disclosure of Employee Handbook to any third party or other employers is prohibited and could be grounds for termination.

With this knowledge I accept the policies outlined herein as a condition of employment.

Employee signature _Lame Maddox_____

Date _03/07/05_____

\* SMART ALABAMA, LLC reserves the right to make changes to this handbook for the purpose of modifying, revising and updating company policy and this manual. Notice of changes will be posted on the bulletin boards and become a part of this manual. Violation of any company policy may result in immediate termination.

38

*CONFIDENTIAL*

DFRP'S
00750
ATWELL V. SMART



Policy:  Full or Partial Paid Company Issued Items
Effective:  January 1, 2005

SMART Alabama, LLC. provides certain items to each employee to assist in the safe and
functional performance of their duties.  Many of these items are fully company paid and
others are partially subsidized.  In order to assure fairness to both the company and all
associates, SMART Alabama, LLC. has adopted the following position:

> Should an associate leave the company (through resignation or termination)
> within the first six (6) months of employment, SMART Alabama, LLC. will
> withhold from the final paycheck the company incurred cost for any items
> issued to the employee that are not returned, i.e., tools, manuals, safety
> apparel, welding tools and equipment, radios, etc.
> For Safety Shoes or Prescription Safety Glasses that the company has paid a
> partial payment on, the company will withhold the company paid portion.

By my signature, I acknowledge that I have read, fully understand, and agree with the
above policy.

_Rance Maddox_
name (please print)

_Rance Maddox_                    Date: _3/7/05_
Signature

EMPLOYEE START DATE: _3/7/05_

SIX MONTH SENIORITY DATE:_____

*CONFIDENTIA*

DFRP'S
00751
ATWELL V. SMART



Stamped Metal American Research Technology, Alabama LLC

121 Shin Young Drive          Human Resource Department          334-335-5800
                              Luverne, Alabama 36049

January 23, 2006

Rance,

This letter is to express my concerns about our Safety Management at SMART   As we have discussed before, there are some things in the Safety arena that need to be completed   Also, I am somewhat concerned about your approach to the job, the people, and the management of the job.

By copy of this letter to you I am documenting that we are discussing these issues on January 23, 2006

These are the key areas we need to succeed in with dates for completion

Safety Plan

1.   Prepare a schedule to cover weekend works and post on Safety office door.  Someone should be in the safety area any time the production facility is working several lines *In Gray will be give schedule* January 27   *Sun It 1st Temp 2nd shift*

2.   Set up the workers' comp case coordinator.  The safety person on each shift will be responsible for following up with and documenting the activities of each injured worker on their shift   I will assist you in putting this together   *light duty/Team Leader* February 3

3    Assign Robin the coordinator of the comp cases.  She should maintain the OSHA 300 log and assure that each file contains proper documentation and records.  I want you to be the person speaking with our work comp carrier on work related injuries and issues from this point forward involving me when you feel or see it necessary   *Rance will be in-charge W/C Coordinator* January 24

4    A list of modified duty jobs should be identified in the productions areas and given to each Supervisor and Team Leader.  Ex: Fender Pads, Sweeping, Dusting of Welding Slag, Senarating Nuts and Bolts, etc.
                                                                                          January 31

5.   Joanne will begin on Feb 1.  At this time everyone is to be transitioned from the safety office and placed on modified duty in the plant production area                                         February 1-10

6.   Begin training through Joanne immediately on First Aid Responders   We should have 4 per shift from a cross section of the plant   Prepare a job description for these individuals   February

7.   Daily PPE inventories for each shift should be done, compiled, and put on mine and Mr. Kwon's desks each morning. Purchase requisitions with assigned P.O. and a copy of inventory shortage or explanation for need should be attached to all purchase requests.  No verbal orders are to be made; no orders are to be made unless you have a signed purchase request   Robin knows where the P.O. list is on the public server, make sure whomever initiates an order logs the P.O. electronically so I can verify as needed                                                              immediately-Daily

8.   Shawn should have the cage for PPE completed within a week.  Plans to relocate all PPE to that area should be made
                                                                                          TBD

9.   Each shift Safety person will be responsible for having the next shift's PPE washed and prepared   Implement a strict one for one exchange policy on PPE.  We can have a sign made to place on the door of the cage to indicate this.                                                                           Daily

For your personal concern, I want you to maintain a positive attitude toward your job and co-workers.  Show respect at all times to your peers, your subordinates, and our Security Team.  Manage yourself professionally and calmly~ Don't threaten or intimidate people.  Your actions as a manager are always under review by those around us and they do not hesitate to point out faults.  Be aware of these things at all times.  As a manager you must maintain a calm posture when things annoy you.  It is good to question things but be aware of your presentation.  Calmness goes much further in soliciting support for your ideas than anger and shortness with people   Be at work during the assigned hours.  Keep me informed of issues and changes around you.

Rance, we can make this work and the responsibility for that falls on you   As I review your job performance over the next few weeks I hope to see a dramatic improvement in these areas   It is not our desire to make a change.  Let's work together to further secure your position with this company

Gary

**CONFIDENTIAL**

DFRP'S
00752
ATWELL V. SMART



**SMART**
*Stamped Metal American Research Technology, Alabama.LLC*

Human Resource Department
121 Shin Young Drive     Luverne, Alabama 36049     334-335-5800

January 12, 2006

RE: Mr. Rance Maddox

To Whom It May Concern:

Mr. Rance Maddox is an employee with SMART Alabama, llc. Mr. Maddox has been employed with this company for less than one year. Due to this he does not qualify under the guidelines of the FMLA and is not eligible for those benefits. Also, at this time, there are no other disability benefits available to Mr. Maddox through this company. He has been placed on paid administrative leave.
Any questions or inquiries into his status may be made directly to me at the number above, extension 244.

Sincerely,

Gary R. Sport
General Manager
Human Resource Group
SMART AL, llc

*CONFIDENTIAL*

DFRP'S
00753
ATWELL V. SMART



**DEPARTMENT OF VETERANS AFFAIRS**
Medical Center
Tuscaloosa, AL 35404

In reply refer:
Maddox, Rance

Date:  January 10, 2006

To Whom It May Concern:

Mr. Rance Maddox was admitted to the Tuscaloosa VA Medical Center on
January 6, 2006 for treatment.  He is scheduled for release on January 12, 2006.
He can resume preadmission activities.

Sincerely,

Velda Pratt

*CONFIDENTIAL*

DFRP'S
00754
ATWELL V. SMART

## DECLARATION OF LISA BODIFORD

1.     My name is Lisa Bodiford. I am over the age of nineteen years and give this statement freely and voluntarily.

2.     I have been employed by SMART Alabama, LLC since April 2005. I have always been employed as a safety assistant. As a safety assistant, I do inventory on gloves and sleeves, do first aid, and filing. I have also done safety training in the past in my position as safety assistant.

3.     I worked 2PM-10PM in the safety office. Rance Maddox worked in the safety office from approximately 8AM until 10PM. Robin Davis Atwell worked from 8 to 5. Robin and I worked a few hours together each day. The safety office has a door with a window in it so you can see in the office from the outside. Sometimes we would leave the door open.

4.     During the time I worked in the safety office and both Rance and Robin were present, I never saw Rance touch Robin in any way. I never heard him say to Robin that they should go get a drink after work or ask Robin to go spend the night in Montgomery. I came in every day after lunch so I do not know if Robin and Rance went to lunch together. I never heard him say to Robin, "I've got a real man for you." I never heard Rance comment to Robin that it was impossible for men to be monogamous in sexual relationships. I never heard Robin complain about Rance's conduct in my presence.

5.     I never heard Rance ask Robin about having breast implants, but Robin told me in the presence of some other employees that she had had breast surgery. Robin also told me and a group of employees about body piercings when we were standing in the first aid room. She told us that she had piercings in her vagina area (although I don't recall her specific words, I understood that she was referring to that region of her body). Robert Bowman, a press supervisor, told me that Robin showed him naked pictures of herself from an email on her computer in the safety office. I was not present.

6.     When I worked with Rance, he never touched me. He never called me "honey," "baby," or "sweetheart." He never made any jokes or comments about sex. I thought Rance was okay to work with. There were some days that he became agitated more easily than others.

7.     From working in the safety office, I got the impression that Robin did not know how to perform her job functions. She would ask me to pay bills for safety equipment and ask me to enter cases into the OSHA 300 log. I saw emails from Bill Hicks, our workers' compensation company contact, to Robin listing those employees for which she was not sending the First Report of Injury.

8.     On one occasion, Robin left us a note saying that Gary Sport said, if we did not complete an OSHA 300 log by the end of the night, we would have to answer to him. This did not make sense to me because keeping the OSHA 300 log was her job to do, and I could not access the OSHA 300 log from my computer. We (myself, Wendy Burgans) told Rance Maddox in a meeting that we were doing Robin's job and that she was pushing off her work on us. He told us to keep a list of what we were doing each day. He never asked me to see my list.

9.      Most of the time, we all had to work on the weekends. I am aware of no special weekend schedule created by Rance for Robin.  There were a lot of weekends that we were scheduled to work that Robin would not show up.

10.     I do not know for certain the reason Robin quit working at SMART.   I do not know exactly why Rance left, but he told me he had had enough and was leaving. I do not know exactly what he meant by that.

11.     The foregoing is true and complete to the best of my knowledge, and I declare it under penalty of perjury.

Lisa Bodiford

Date

## DECLARATION OF WENDY BURGANS

1.     My name is Wendy Burgans. I am over the age of 19 years and give this statement voluntarily and under penalty of perjury.

2.     I have been employed by SMART Alabama, LLC for a year.  I was hired as an assembly technician. I worked in the safety office from December 2005 until March 2006. This was because I was on light duty for an injury. The safety office has a door with a window, and you can see from outside into the office. Sometimes we had to leave the door open because it got hot in the office.

3.     While I worked in the safety office, I worked 2PM-10PM.  I worked with Rance Maddox and Robin Davis Atwell. Lisa Bodiford also worked with us. When I worked in the safety office, I helped take care of people who were hurt, filled out injury reports, and did filing.

4.     Sometimes Rance and Robin were both present while I was working in the safety office. I never heard Rance say to Robin anything about going to get drinks or going to spend the night in Montgomery or "I'm a lot of man for you." Robin told us in the safety office that she had breast surgery, and Rance walked into the office as she was telling us. I do not recall him saying anything about the surgery. I saw him touch Robin's shoulder with one hand and say "good job." Rance's hand did not drift down towards her breasts. In fact, his hand was more on her back than on her shoulder.  Robin did not appear to me to be upset or offended.  This did not offend me because I thought he was just giving a compliment for a job well done.  As best I could tell, Robin and Rance got along because they were always talking and joking.

5.     I do know Robin had problems keeping up with the workers' compensation list because I would have to do the majority of the list for her. Lisa Bodiford, Colinda Porter and I met with Rance on one occasion. Rance asked why we were griping about having to do all of Robin's work.  We told him that Robin was demanding that we do all her work, including inventory, paying bills, and typing notices to team leaders and management.  Rance said he was going to talk to Robin about this but I do not know whether they talked or not.  I do know the next night I typed out a performance evaluation memo at Rance's instruction, and this memo addressed Robin's performance.

6.     When I worked with Rance, he did not touch me in any way other than to compliment me by patting my back while looking over my shoulder onto my computer screen. I took no offense to this because I did not consider this to be sexual in nature.  Rance never joked or commented about sex or made any comments to me that I considered inappropriate.

7.     I do not have any personal knowledge of Robin complaining about Rance. I do not know why Robin left SMART Alabama's employment. I do not know why Rance left the employment of SMART.

8.     The foregoing is true and complete, and I declare it under penalty of perjury.

Wendy Burgans
_____

10-29-06
_____
Date

## DECLARATION OF LAKISHA JESSIE

1.    My name is Lakisha Jessie. I am over the age of nineteen years and give this statement freely and under penalty of perjury.

2.    I have been employed by SMART Alabama LLC since August 2005. I am employed as an assembly technician. I worked in the safety office from September 2005 until about January 2006. I was on light duty from an injury. While in the safety office, I filed paperwork, kept up with personal protective equipment, took gloves and sleeves to the Wash Hut, and assisted in taking injured employees to the hospital.

3.    When I worked in safety, I worked from 2PM-10PM. During that time, Rance Maddox, Robin Davis Atwell, Wendy Burgans, Calinda Porter, and Lisa Botiford worked in the safety office. We did not all work at the same time. Robin worked 8AM-5PM, so Lisa, Wendy, and I worked about three hours while she was there. Rance worked until everything was done, and the majority of the time, he would stay until 9:00 or 10:00 at night.

4.    When I worked and both Rance and Robin were present, I never heard Rance ask Robin to get a drink after work or to go spend the night in Montgomery. I never heard him tell Robin that he had a lot of man for her. I never heard him talk about Robin's breasts or her having breast surgery. I never heard him tell Robin he would take care of her. I never heard Rance talk about sex with Robin or make any sexual jokes or comments to her. I never saw him touch Robin in any way, not even to shake her hand. I am aware of no complaints made by Robin about Rance to me or to anyone else at SMART.

5.    Rance never talked about sex or joked about sexual topics to me. Rance never touched me. He may have patted me on the shoulder but never in a way that I perceived to be in a sexual manner. To me, Rance was an excellent person to work with. He had times when he got stressed out or angry. When I would let him know that I had not done anything wrong, he would apologize and move on.

6.    During my work in the safety office, I noticed that Robin had a difficult time with basic computer tasks. Robin asked me to work overtime to help straighten out some documents, and Rance approved my working the extra time. I do not know if Robin ever got written up for her job performance. I do recall a meeting which Robin did not attend in which Rance went over the duties each person in the safety office was to cover. While working in the safety office, I worked some weekends. Otherwise, I know that Robin had to alternate working weekends with Lisa and Amanda Dempsey. I do not know of any special schedule made out for Robin for the weekends.

7.    I do not know why Robin left SMART Alabama's employment. The last day I know of her being here, she had already left by the time I arrived at 2PM. I do not know why Rance left SMART Alabama.

8.    The foregoing is true and correct to the best of my knowledge, and I declare it under penalty of perjury.

_____
Lakisha Jessie

_____
Date      June 29th, 2006

## DECLARATION OF CARISSA JONES

1.    My name is Carissa Jones. I am over the age of 19 years and give this statement voluntarily and under penalty of perjury.

2.    I have been employed by SMART Alabama since February 2005. I have been employed as a quality inspector the entire time I have worked at SMART.

3.    I first knew Robin Davis Atwell from her working on the line when she would come in for third shift while I was getting off my shift. I also knew Robin Davis Atwell from going into the safety office. Sometimes, when the breakroom was too crowded, I would eat lunch near the security guard's desk in the lobby. On my way back into the plant towards the end of my lunch break, I would stop by the safety office and talk to Rance Maddox until my break was done.

4.    The safety office had a door with a glass window so that you can see inside from the other production offices. Anyone can walk by at break time or when they go to their cars. The door to the office would often remain open because the safety office did not have air conditioning. The hallway by the safety office is very busy because it is the main entrance into the plant area or the breakroom. During the time that Robin and Rance worked in the safety office, there was never a shade on the door or a paper or posting blocking the view from the outside into the safety office. Rance's desk was against the far wall of the room, and Robin's was on the opposite side of the room, closest to the door. People would go into and out of the safety office all the time when Rance was safety manager to get gloves or earplugs or fill out forms or tell Rance other things that they needed.

5.    When I would go into the safety office, I would stand in the doorway or near Rance's desk. Rance and I would discuss the plant, how tired I was, and how our families were. We never discussed anything of a sexual nature.

6.    Robin would call me "honey" and "baby." I told her that I did not like that and asked her to call me by my name. When she talked to you, she would touch you or put her hands on your back. On one occasion, I was in the safety office, and Robin told me Rance was not there because he was in the hospital. I said, "You have tattoos," and she said, "Yeah, girl I have piercings, too. I can't show you where they are." When she told me this, she placed her hand on my shoulder.

7.    On the times that I stopped by the safety office and both Rance and Robin were present, I never heard him ask her to go get drinks or go eat lunch with him or go to Montgomery with him or call her honey or baby. I never heard them having any conversation unrelated to work, even to talk about weekend plans or television shows. The conversation I had was limited to her asking him questions about opening files or numbers for accident reports. I never saw Rance touch Robin in any way. Rance never touched me in all the time I knew him, and I would have thought if he was a touchy person, he would have touched me or hugged me because we were friends, but he never did. Rance was very dignified, intelligent, and professional.

8.    From my contact with Robin, both in the safety office and from when she worked out on the line, I got the impression that Robin did not like Rance because she did not like having

a black person in a position of authority over her. I got this impression because, when Robin was working third shift on the line, I would have to inspect her parts on second shift, and she would ignore me if I tried to tell her about the problems we had on our shift that she should watch out for her on shift. She would not make eye contact with me then.

9.      I don't know the exact reason Robin left SMART. I had heard it was because she was going to be back on the line, but I do not know this for sure.

10.     The foregoing is true and complete to the best of my knowledge, and I declare it under penalty of perjury.

Carissa Jones

6/29/06
Date

## DECLARATION OF SCOTT KELLEY

1.     My name is Scott Kelley. I am over the age of 19 years and give this statement voluntarily and under penalty of perjury.

2.     I am employed by SMART Alabama, LLC ("SMART") as a shift supervisor. I have been employed here since January 18, 2005. I was initially employed as a Team Leader but became a shift supervisor in September 2005.

3.     I worked with Robin Davis Atwell at SMART. I was her shift supervisor beginning in September 2005. During the first week Robin was assigned to my shift, I received a complaint from Dexter Daniels, team leader, about her. Dexter told me that Robin asked him to give Kevin Atwell, her boyfriend and a line technician here at SMART, the telephone number of Deborah Chance, a quality inspector. Dexter told me that Robin promised him that, if he gave the number to Kevin and was successful in breaking them up, then she would perform oral sex on him, engage in anal sex with him, and do anything else he wanted her to do. I encouraged Dexter to stay away from Robin and instructed him that, if he needed to talk with her, he needed to have another person present. A couple of days later, Dexter told me that Robin was still asking him to give the phone number to Kevin. Shortly thereafter, Dexter and I were walking by Robin, when she asked Dexter, "Have you gotten that done yet?" Dexter said to me, "You see what I mean?" and I understood this to mean Robin was asking if he had given the phone number to Kevin yet.

4.     Another time, Botzwana Culver, who was an assistant team leader, came to me and told me that Robin said to him that she did not have a gag reflex and asked, "Would you like to see?" He told me that she then demonstrated using a lollipop. Botzwana told me he just walked away from her. I told him that he needed to be mindful of what he said to Robin and to keep their conversations short and to the point.

5.     A third shift press supervisor, Robert Bowman, told me that she was showing naked pictures of herself on the Internet to him while they were in the safety office. He said you were just asking for trouble if you were a man and were in the room with her by yourself.

6.     Robin was on my shift only a few months before she got injured and was moved to the safety office. One day, after she was moved to the safety office, Gary Smith (team leader) and I walked into the safety office, and Edith Corley and Lisa Bodiford were sitting in the office. Robin asked me, "Is Kevin acting weird around you tonight?" I understood her to be referring to her boyfriend Kevin and asked her why. Robin told me that she had a dream about me the prior night. I replied, "really?" and she began saying, "Oh yeah, you were fucking the hell out of me." I was shocked and offended and did not say anything back to her. Instead, I told Lisa that Gary had filled out a safety report incorrectly and we needed to correct it. Robin interrupted, saying, "It was hot and passionate." She went on to tell me that she had told Kevin about it and that he was upset. I told her to tell Kevin he should not worry about it because I am happily married. Although I felt that, as a shift supervisor, I could handle the situation myself by not engaging in behavior like Robin's, I told Ruth Ryan in HR about the incident after it happened.

7.      Once Robin moved to the safety office, I had occasion to go into the safety office for work-related reasons (papers to be filled out, etc.) approximately one to two times per week. I was present when both she and Rance Maddox were both in the safety office. I never saw Rance Maddox touch Robin Atwell.  I never heard him ask Robin to go out for drinks or eat lunch with him or to meet him in Montgomery.  I only heard Rance giving instructions to Robin about safety matters, particularly things she had done wrong.  In my conversations with Rance outside Robin's presence, I never heard Rance make a joke or comment that was sexual in nature or that concerned a female.

8.      The foregoing is true and correct, and I declare it under penalty of perjury.


_Scott Kelley_ _____
Scott Kelley
_6/29/06_ _____
Date

## DECLARATION OF MELISSA MCGOUGH

1.      My names is Melissa McGough.  I give this statement freely and voluntarily and under penalty of perjury.

2.      I began working for SMART Alabama, LLC as the receptionist in August 2004.  I am currently employed as a safety assistant.  I handle workers' compensation files and claims.  I worked in the safety department for about six months before I moved to become benefits coordinator.  I then moved back to safety in March 2006.

3.      The safety office has a glass window in the door. To my knowledge, the window has not ever been covered. The door rarely stayed open because there was no air conditioning.  People walked by the safety office all the time.

4.      When I worked in safety, I worked with Rance Maddox.  My relationship with him was fair.  I thought Rance was unorganized and that he pushed a lot of the work off on me, even though he was the manager.  He could become irritated or agitated when something did not go right in the office.  I thought he was sharp as to safety on the production floor but that he could not organize the office.  He never came on to me in what I believed to be a sexual manner.  He would tell me things like, "Sweetheart, we need to do this," but I did not take it seriously because I had heard a lot of older men say something like it. We rode in the car together to go to Hyundai in Montgomery, and go to the Wash Hut to wash gloves and sleeves, and he never made any sexual advances to me then.  If I did something well, he would put his arm around me or on my back. I did not interpret this as being sexual in nature.  He never touched me on my legs or below my waist or near my breasts.  He only called me at home to ask if I could work Saturday or where I had put a file. I never reported him to HR because I did not feel threatened by him.

5.      However, I asked Gary Sport, our HR manager, if I could move to another part of the plant because Rance and I had had a disagreement that day about the paperwork and the lack of organization of the office.  I was moved into benefits. SMART requested that I move back to safety after Rance left because I was the only one qualified enough to do the safety assistant job.

6.      In my role in safety, I had to complete expense reports and workers' compensation cases.  I trained Robin Davis Atwell in how to complete these reports and how to document OSHA cases.  I stayed in the safety office for two weeks to train Robin. Robin told me she had breast implants and that her husband, Kevin, told her not to be advertising anything that was not for sale.

7.      During the time that I trained Robin in the safety department, I never heard Rance Maddox ask her to go to get drinks or to spend the night in Montgomery. Although I do not know it for certain, I believe they ate lunch together, but this did not strike me as unusual because I would eat lunch with Rance when I worked with him.  I did hear Rance call her "honey" or "baby" but I did not think much of it because it was

his personality. Robin did not appear to me to be offended and I never heard her tell him to stop. I do not specifically recall seeing Rance touch Robin on any part of her body. I am not aware of any complaints made by Robin about Rance to HR. She never said anything to me leading me to believe that Rance had harassed her in any way or that she was offended by his conduct.

8.    I am not aware of the reason Robin left. I recall her leaving at lunch one day and never coming back. I am not aware of the specific reason that Rance left. I know that he seemed very stressed out working with Mr. Kwon and he had indicated to me that he was going to resign. When I came in the next day, I learned Rance had resigned.

9.    When I took back over the safety assistant position in March 2006, I found that there were approximately 100 OSHA cases that had not been reported to the company claims examiner. Medical records were stacked in drawers and were not filed according to HIPAA guidelines. The entire office was disorganized. It would have been Robin's job to keep these records and reports organized, but I had to redo it once I came back to safety.

10.    The foregoing is true and correct to the best of my knowledge, and I declare it under penalty of perjury.

Melissa McGough
Melissa McGough

6-29-06
Date

## DECLARATION OF COLINDA PORTER

1.    My name is Colinda Porter . I am over the age of nineteen years and give this statement voluntarily and under penalty of perjury.

2.    I am employed by SMART Alabama, LLC as an assembly technician. I have been employed here since August 2005. I got injured at work towards the end of September 2005 and was placed on modified duty. During my modified duty period, I worked in the safety office. I worked with Rance and Melissa McGough doing filing, memos, and first aid. I was on modified duty until early November 2005. I went back on the floor for a few days but was placed back in the safety office because I was pregnant. I worked in the safety office until March 20, 2006.

3.    The safety office is located in the production offices area. There is a door to the office but there is a window to the door where you can see in from the outside. On many days, we would have the door propped open because the air did not flow well in that office.

4.    I first saw Robin Davis Atwell when I first started at SMART. We were in orientation classes together with approximately 25 other people. We worked different shifts out on the line. My main contact with Robin came after she came to work in the safety office.

5.    When I worked in the safety office with both Rance and Robin, there were three desks. I sat at the desk on the wall opposite the door. Robin sat at a desk to my left and Rance sat at a desk to my right. I never had a problem with either Robin and Rance. While working with Robin and Rance, I never heard him ask her to go get a drink or go spend the night in Montgomery. I know, on one occasion, that Robin and Rance were supposed to go on a work-related lunch with some other people but I do not know if they left together. I never heard him say, "I've got a real man for you." I did hear Rance say something like, "I'm looking out for you" to Robin, but this was work-related, specifically to the OSHA 300 log. Rance said the same thing to me when I was on light duty and pregnant, but it was a work-related comment based on all I had going on, and I took no offense to it.

6.    I recall that Robin had difficulty entering cases into the OSHA 300 log. One day, when she successfully entered a case on the log, she was very excited. Rance, who was already walking over from his desk, placed both hands on her shoulders and said "Good job." They laughed because Robin had finally entered a case, and I laughed, too. Robin did not appear to be offended, shocked, or upset. Rance walked out of the office, and then Robin did. Although I noticed a lot of tension between them after that day, I do not know of anything else happening between them. I never saw Rance touch Robin near her pelvis, breasts, or buttocks. I never saw Rance rub up against Robin. On one occasion, Ruth Ryan from HR interviewed me, told me Robin had complained about Rance, and asked me about him touching her on the shoulders. I told Ruth the same account as I give in this paragraph.

7.    When Robin would talk to Rance, she would reach out and touch him on the hand or the back. I did not think anything of it because Robin was a person who liked to talk with her hands.

8. Robin told me one time about going bowling with Lloyd Weathers (assembly manager), Gary Sport, and someone else I cannot recall. I understood that Rance was supposed to go but did not because Robin said something to him like, "You should have come." Robin demonstrated for us how Lloyd would bowl and move his behind and commented that he had a cute butt. On a separate occasion, Robin and Rance were talking about doing a safety class to be held in the Washington Room. I do not know if Lloyd Weathers was in the Washington Room because I stayed in the office. Robin left the office to set up for the safety class and then came back in and said she could barely contain herself because Lloyd had such a cute butt. She laughed, Rance laughed, and that was the end of it.

9. From working in the safety office, I know that Rance warned Robin about her job performance several times. First, there was a verbal warning. Although they stepped outside the office to do this, Robin came back in and said that Rance talked to her about the OSHA 300 log and that she was upset because some of the things should have been done by Melissa McGough when she worked in the office. Next, I typed up a memo about her job description, what she was supposed to do daily, and what she was not doing properly (she was not doing workers' compensation claims properly because we were receiving medical bills that had not been paid and she was not completing expense reports). I was not present when he gave her this memo. After that time, I noticed that, when Rance would ask Robin about something work-related, she would respond by saying, "Guess you're going to write me up for that, too" in a smart manner.

10. The last day she was in the safety office, Robin was wearing jeans. We were only allowed to wear jeans on Fridays. She was sitting at her desk, and Rance sat at his desk. Rance said something to her about only wearing jeans on Friday, and she said, "Guess you're going to write me for up that, too." Later in the day, Rance was not in the office, and Robin was on the phone. I do not know who she was speaking with and only heard her end of the conversation. I heard Robin say, "He's looking for any reason to get me fired." She then laughed, but, all of a sudden, she burst into tears and said that she needed to get off the phone. She did not say anything to me, grabbed her purse, and walked out. I do not know where she went.

11. I do not know for certain the reason Robin left SMART's employment. I had heard that, after she spoke with Ruth Ryan, there had been discussion of placing her outside the safety office under the supervision of Lloyd Weathers. I do not know what position she would have been placed in or if this actually happened.

12. I do not know the reason Rance left SMART's employment. I do know that, before he left SMART, Rance appeared to be under a lot of stress working with Mr. Kwon. Rance never called me baby or sweetheart, never made a sexual joke in my presence, and never said anything inappropriate in my presence. Rance never touched me while I worked in the safety office.

13. The foregoing is true and correct, and I declare it under penalty of perjury.

_Colinda Porter_
Colinda Porter

_June 29, 2006_
Date

## DECLARATION OF GARY SMITH

1.     My name is Gary Smith. I am over the age of nineteen years and give this statement freely and voluntarily and under penalty of perjury.

2.     I am employed by SMART Alabama, LLC as a team leader. I have been employed by SMART Alabama since November 15, 2004. I started out as a forklift driver but became a team leader about six months after I starting working at SMART.

3.     I knew Robin Davis Atwell from around the plant and from the fact that she was a safety assistant or supervisor for awhile. One day, I walked into the safety office with Scott Kelley. One of my team members had cut himself, and Scott and I needed to redo a safety report. Robin was present in the office. Robin told Scott, "Last night I had a dream I was fucking the shit out of you." Scott walked out and did not say anything to her. Scott later told me that Robin was crazy.

4.     Robin flirted a lot during her employment at SMART. On smoke breaks, when we were outside, I heard a maintenance man and Robin flirting back and forth with each other. They were discussing having sex with each other and how they could hook up. To my knowledge, they never acted on their flirting. Robin also came on to Scott in the safety office besides the incident about Robin's dream. It got to the point that Scott would not go to the safety office by himself.

5.     I would go into the safety office on a daily basis to talk with Rance Maddox. Rance and I were friendly. Rance worked very hard and was very professional. He gave me advice on how to handle safety equipment or how to write up an employee who would not wear safety equipment. At least some of the time when I went into the safety office, Robin was there as well. Robin would not flirt with me or anyone else in the safety office when Rance was around. Rance never said anything to Robin about going to get drinks after work or going to Montgomery with him or make any jokes or comments about sex. I never saw Rance touch Robin in any way.

6.     Rance called me one time and asked if I was coming in. I told him no, I had to go to the doctor. I came in the next day and was told he quit. The day before he quit, he told me that Robin had complained about him putting his hands on her shoulders. Rance said he did not touch her. That is all he said about it. Prior to this time, many employees out on the floor were talking about Robin losing her job. I heard this talk but do not know the reason why it was said she was going to lose her job.

7.     The foregoing is true and correct to the best of my knowledge, and I declare it under penalty of perjury.

_Gary Smith_
Gary Smith

_6-29-06_
Date

## AFFIDAVIT OF FRAN HUGHES

**STATE OF ALABAMA**          )

**CRENSHAW COUNTY**          )

1.    My name is Fran Hughes.  I am over the age of nineteen and I have personal knowledge of the facts in this affidavit.

2.    I am employed by SMART Alabama, LLC in Luverne, Alabama.  I was hired on July 9, 2003 and handled bookkeeping and paperwork necessary for start-up of the plant.  I eventually transitioned into a Human Resources Specialist position in 2005.

3.    However, during late 2005 and early 2006, I worked more as an assistant to Vice President Hong.  At that time, my working area was in a cubicle on the Production side of the plant.  I did not work in the Administration side of the plant where Human Resources is located.  Although I handled some Human Resources accounts, such as SMART's accounts for uniforms, I was not responsible for carrying out Human Resources functions such as assisting supervisors in disciplining employees, making or approving termination decisions, or conducting investigations.  I had no complaint forms at my desk for employees to file complaints or raise concerns.

4.    During late 2005, I would not have handled employee orientation. I have attended such meetings since that time. Although I have told SMART employees that we have an open door policy (which we do), this does not mean that reports of harassment are to come to me. Instead, such reports are handled by Ruth Ryan and other managers in Human Resources, including Gary Sport and Gin Roh.

5.    In my current role as Human Resources specialist, I am responsible for assisting in the hiring of employees and in organizing pre-employment training classes. I also handle community relations and event planning for SMART. I handle some employee separation protocols, which means I handle ensuring that their badges and uniforms are returned. I do not make decisions as to employee termination or discipline. I am not the individual responsible for receiving or conducting investigations of employee complaints, although I do sit in on such investigation meetings as a witness. Ruth Ryan, Employee Relations Manager, is responsible for conducting investigations.

6.    At all times during my employment with SMART Alabama I have understood that SMART has a policy prohibiting any form of harassment, including sexual harassment. A true and correct copy of the harassment policy in effect in late 2005 and early 2006 is attached to my affidavit as Attachment A. I received this policy upon my hire and receive updated copies when SMART

revises its handbook. Also, I have attended annual training meetings for salaried personnel, in which we are trained on SMART's policy prohibiting harassment. I understand that any reports of harassment made to me must be immediately reported to Ruth Ryan in Employee Relations so that the matter can be investigated as set out in the policy. At no time during my employment with SMART has an employee approached me with a complaint or concern of sexual harassment or any other form of harassment.

7.     As a result of my employment at SMART, I knew Robin Davis Atwell. I was aware that Ms. Atwell transferred from the assembly area to the Safety Office. I worked near the Safety Office when working with Vice President Hong in the Production side of the plant. At no time did Ms. Atwell come to me and ask for a complaint form. At no time did she leave me a handwritten letter about Rance Maddox or any other matter. Had I received such a letter or form from Ms. Atwell, which I deny, I would have immediately taken it to Human Resources and, more specifically, Ruth Ryan, so that the matter could be appropriately investigated.

8.     At no time did Ms. Atwell tell me that she was being harassed by Rance Maddox, touched inappropriately by Rance Maddox, called at home by Rance Maddox, asked to lunch or drinks by Rance Maddox, subject to comments about her breasts, monogamy, or other sexual topics by Rance Maddox, or

otherwise harassed by Rance Maddox in any way.  In fact, Ms. Atwell did not complain to me at all about Rance Maddox while she worked at SMART.

9.    I do not know how or why Ms. Atwell left the employment of SMART.  I have no knowledge that she was terminated, was going to be terminated, or was asked to resign.

10.    As a consequence of my employment with SMART Alabama, I also knew Rance Maddox, who served as Safety Manager.  At no time has any employee, including Ms. Atwell, come to me and complained about Mr. Maddox in any manner.  Mr. Maddox was consistently friendly and professional in his interactions with me.

11.    The foregoing is true and complete, and I declare it under penalty of perjury.

_Fran Hughes_
**FRAN HUGHES**

_10/31/07_
**DATE**

**STATE OF ALABAMA**        )

**CRENSHAW COUNTY**        )

Sworn to and subscribed before me on this the _31_ day of _October_ 2007.

_Staci Mount_
**NOTARY PUBLIC**

**My commission expires:** _9-15-2010_

# EXHIBIT A



## SEXUAL AND OTHER UNLAWFUL HARASSMENT

It is SMART ALABAMA, LLC's objective to provide a working environment free from discrimination and conduct commonly referred to as sexual harassment. The E.E.O.C. (Equal Employment Opportunity Commission) has provided a broad definition of sexual harassment. It is general in nature and may not always be clear when evaluating everyday situations.

"Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when:

1. submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment,

2. submission to or rejection of such conduct by an individual is used as a basis for employment decisions affecting such individual, or

3. such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment."

Sexual harassment refers to behavior inappropriate in the workplace because it is offensive, unwelcome behavior which would not occur but for the sex of the offended person. Both sexual harassment, and accusations of sexual harassment, are disrupting to the work environment.

If you or a co-worker experiences what you believe to be sexual harassment or accusations of sexual harassment, report it promptly to your immediate supervisor or the Human Recourses Department. SMART ALABAMA, LLC will investigate any employee, regardless of job position when such allegations are made. Based on available information, SMART ALABAMA, LLC will take appropriate action and communicate on a need-to-know basis.

Appropriate disciplinary action, up to and including termination will be taken against any individual for sexual harassment charges determined to be valid.

DFRP'S
00044
ATWELL V. SMART

## Ⓢ S M A R T

**Men**

1. Men feel they have to be too cautious as to what they say or how they behave.
2. Men feel cross-gender communication is not as great a problem as women feel it is.
3. Men feel women do not think men are trying.
4. Men feel that women have more advantages in the workplace.
5. Men feel that they are not allowed to make mistakes.
6. Men feel women want both to be provided for and to have equality.
7. Men feel that women dress and act in a way that draws attention to their sexuality.



8. ### Sexual Harassment

Sexual harassment is a gender issue requiring special attention. This common form of discrimination is one of the most pressing and costly problems facing organizations today. Sexual harassment is unwelcome behavior that happens to you because of your sex that creates an intimidating, hostile, or offensive work environment. Many instances involve a man sexually harassing a woman, however, sexual harassment can also be:

- A woman harassing a man.
- A woman harassing a woman.
- A man harassing a man.

Some types of behavior that can be considered sexual harassment are:

- Unwelcome sexual advances.
- Request for sexual favors, or
- Verbal or physical conduct of a sexual nature.

Two types of sexual harassment are:

- "Quid Pro Quo" Harassment
- Hostile Environment

0002-S69(M)-AIDT 3/04



## "Quid Pro Quo"

"This for that," such as, where an employee's submission to unwelcome sexual conduct is an expressed or implied condition of receiving job benefits or the employee's refusal to submit to sexual conduct would result in tangible job detriment.

## Hostile Environment

Verbal or physical conduct of a sexual nature that has the purpose or effect of unreasonably interfering with an individual's employment creating an intimidating, hostile, or offensive work environment.

## What are the Potential Liabilities?

- Back pay
- Reinstatement
- Damages for emotional harm
- Punitive damages

## Sexual Harassment and the Law

Although many federal and state laws do not specifically define sexual harassment or make it illegal, courts have found that sexual harassment is a form of sex discrimination which violates the laws against sex discrimination in the workplace.

**Title VII or the Civil Rights Act of 1964** is a federal law that protects individuals from discrimination based upon sex. This law makes it illegal for an employer to discriminate against individuals because of their sex in hiring, firing, and other terms and conditions of employment, such as promotions, raises, and other job opportunities.

The laws of most states also make it illegal to discriminate on the basis of sex, and some states specifically make sexual harassment against the law.

 S M A R T

## Conduct Considered to be Sexual Harassment

Many different kinds of conduct that are of a sexual nature may be sexual harassment, if the behavior is unwelcome and if it is severe or pervasive. However, courts have resisted adopting what they consider a workplace "code of conduct" or list of behavior that is automatically considered to be sexual harassment. As a result, if the conduct is not unwelcome or not severe or pervasive, courts will not necessarily consider each type of conduct listed below to be sexual harassment.

Some examples of conduct that may be sexual harassment:

- **Verbal or written conduct:**
  Comments about clothing, personal behavior, or your body; sexual or sex-based jokes; requesting sexual favors or repeatedly asking you out; sexual innuendoes; telling rumors about your personal or sexual life; threatening you.

- **Physical conduct:**
  Rape or assault; impeding or blocking your movement; inappropriate touching of your body or clothing; kissing, hugging, patting, stroking

- **Nonverbal conduct:**
  Looking up and down your body; derogatory gestures or facial expression of a sexual nature; following or stalking you.

- **Visual displays:**
  Posters, drawings, pictures, screensavers or e-mails of a sexual nature.

## 9.  Sexual Orientation Issues

Today's workplace is characterized by a mix of values and lifestyles. As gays and lesbians increasingly make their presence known in the workplace, a variety of issues develop. Some people believe that homosexuality is immoral and others just don't understand it. Although someone's sexual orientation has nothing to do with an

0002-S69(M)-AIDT 3/04

## AFFIDAVIT OF DAVID MCGOUGH

**STATE OF ALABAMA**    )

**CRENSHAW COUNTY**    )

1.    My name is David McGough. I am over the age of nineteen and I have personal knowledge of the facts in this affidavit.

2.    I am employed by SMART Alabama, LLC in Luverne, Alabama. I work as Quality Manager. My office is located in the Production office side of the plant, to the right of the reception area if an employee is walking through the front doors of the plant. The Production offices consist of an open area with cubicles. The Production offices are within 30 feet of the Safety Office, which is located on a hallway. At all times during my employment, the Safety Office has had a door on it, and the door has a window in it.

3.    At all times during my employment with SMART Alabama I have understood that SMART has a policy prohibiting any form of harassment, including sexual harassment. A true and correct copy of the harassment policy in effect in late 2005 and early 2006 is attached to my affidavit as Attachment A. I received this policy upon my hire and receive updated copies when SMART revises its handbook. Also, I have attended annual training meetings for salaried personnel, in which we are trained on SMART's policy prohibiting harassment. I

understand that any reports of harassment made to me must be immediately reported to Ruth Ryan in Employee Relations or Gary Sport so that the matter can be investigated as set out in the policy. At no time during my employment with SMART has an employee approached me with a complaint or concern of sexual harassment or any other form of harassment.

4.    As the result of my employment with SMART, I knew Robin Davis Atwell. Ms. Atwell worked in the Safety Office. In January 2006, she approached me about transferring to my area, Quality. At that time she did not complain that Rance Maddox had touched her inappropriately, made any inappropriate comments, or sexually harassed her in any manner. Had she made any statement to that effect, I would have reported it immediately to Ruth Ryan or Gary Sport. She simply told me that she did not enjoy working in the Safety Office with Rance Maddox. She ultimately did not transfer to my area because she was being transferred to a position in assembly. Had she been transferred to my area, she would have worked in the same office area in which I do, approximately 30 feet from the Safety Office.

5.    At no time did Ms. Atwell complain to me that she was being sexually harassed by Rance Maddox.

6.    The foregoing is true and complete, and I declare it under penalty of perjury.

_(signature)_
_____
**DAVID MCGOUGH**

_(date)_
**DATE**


**STATE OF ALABAMA**          )

**CRENSHAW COUNTY**          )


     Sworn to and subscribed before me on this the _31_ day of _October_ 2007.


_Staci Mount_
_____
**NOTARY PUBLIC**


**My commission expires:** _9-15-2010_

# EXHIBIT A



### SEXUAL AND OTHER UNLAWFUL HARASSMENT

It is SMART ALABAMA, LLC's objective to provide a working environment free from discrimination and conduct commonly referred to as sexual harassment. The E.E.O.C. (Equal Employment Opportunity Commission) has provided a broad definition of sexual harassment. It is general in nature and may not always be clear when evaluating everyday situations.

"Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when:

1. submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment,

2. submission to or rejection of such conduct by an individual is used as a basis for employment decisions affecting such individual, or

3. such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment."

Sexual harassment refers to behavior inappropriate in the workplace because it is offensive, unwelcome behavior which would not occur but for the sex of the offended person. Both sexual harassment, and accusations of sexual harassment, are disrupting to the work environment.

If you or a co-worker experiences what you believe to be sexual harassment or accusations of sexual harassment, report it promptly to your immediate supervisor or the Human Recourses Department. SMART ALABAMA, LLC will investigate any employee, regardless of job position when such allegations are made. Based on available information, SMART ALABAMA, LLC will take appropriate action and communicate on a need-to-know basis.

Appropriate disciplinary action, up to and including termination will be taken against any individual for sexual harassment charges determined to be valid.

DFRP'S
00044
ATWELL V. SMART

**SMART**

**Men**

1. Men feel they have to be too cautious as to what they say or how they behave.
2. Men feel cross-gender communication is not as great a problem as women feel it is.
3. Men feel women do not think men are trying.
4. Men feel that women have more advantages in the workplace.
5. Men feel that they are not allowed to make mistakes.
6. Men feel women want both to be provided for and to have equality.
7. Men feel that women dress and act in a way that draws attention to their sexuality.



## 8. Sexual Harassment

Sexual harassment is a gender issue requiring special attention. This common form of discrimination is one of the most pressing and costly problems facing organizations today. Sexual harassment is unwelcome behavior that happens to you because of your sex that creates an intimidating, hostile, or offensive work environment. Many instances involve a man sexually harassing a woman, however, sexual harassment can also be:

- A woman harassing a man.
- A woman harassing a woman.
- A man harassing a man.

Some types of behavior that can be considered sexual harassment are:

- Unwelcome sexual advances.
- Request for sexual favors, or
- Verbal or physical conduct of a sexual nature.

Two types of sexual harassment are:

- "Quid Pro Quo" Harassment
- Hostile Environment

0002-S69(M)-AIDT 3/04

Ⓢ S M A R T

## "Quid Pro Quo"

"This for that," such as, where an employee's submission to unwelcome sexual conduct is an expressed or implied condition of receiving job benefits or the employee's refusal to submit to sexual conduct would result in tangible job detriment.

## Hostile Environment

Verbal or physical conduct of a sexual nature that has the purpose or effect of unreasonably interfering with an individual's employment creating an intimidating, hostile, or offensive work environment.

## What are the Potential Liabilities?

- Back pay
- Reinstatement
- Damages for emotional harm
- Punitive damages

## Sexual Harassment and the Law

Although many federal and state laws do not specifically define sexual harassment or make it illegal, courts have found that sexual harassment is a form of sex discrimination which violates the laws against sex discrimination in the workplace.

**Title VII or the Civil Rights Act of 1964** is a federal law that protects individuals from discrimination based upon sex. This law makes it illegal for an employer to discriminate against individuals because of their sex in hiring, firing, and other terms and conditions of employment, such as promotions, raises, and other job opportunities.

The laws of most states also make it illegal to discriminate on the basis of sex, and some states specifically make sexual harassment against the law.



## Conduct Considered to be Sexual Harassment

Many different kinds of conduct that are of a sexual nature may be sexual harassment, **if** the behavior is unwelcome and if it is severe or pervasive. However, courts have resisted adopting what they consider a workplace "code of conduct" or list of behavior that is automatically considered to be sexual harassment. As a result, if the conduct is not unwelcome or not severe or pervasive, courts will not necessarily consider each type of conduct listed below to be sexual harassment.

Some examples of conduct that may be sexual harassment:

- **Verbal or written conduct:**
  Comments about clothing, personal behavior, or your body; sexual or sex-based jokes; requesting sexual favors or repeatedly asking you out; sexual innuendoes; telling rumors about your personal or sexual life; threatening you.

- **Physical conduct:**
  Rape or assault; impeding or blocking your movement; inappropriate touching of your body or clothing; kissing, hugging, patting, stroking

- **Nonverbal conduct:**
  Looking up and down your body; derogatory gestures or facial expression of a sexual nature; following or stalking you.

- **Visual displays:**
  Posters, drawings, pictures, screensavers or e-mails of a sexual nature.

## 9.    Sexual Orientation Issues

Today's workplace is characterized by a mix of values and lifestyles. As gays and lesbians increasingly make their presence known in the workplace, a variety of issues develop. Some people believe that homosexuality is immoral and others just don't understand it. Although someone's sexual orientation has nothing to do with an

0002-S69(M)-AIDT 3/04

# AFFIDAVIT OF RANCE MADDOX

**STATE OF MISSISSIPPI** )

**LOWNDES COUNTY** )

1.    My name is Rance Maddox.  I am over the age of nineteen and I give this statement freely and under penalty of perjury.

2.    I was employed by SMART Alabama as its Safety Manager from March 2005 through January 2006.  As Safety Manager, I was responsible for plant safety audits, ergonomics, lockout/tagout procedures, workers' compensation, and OSHA compliance.  I resigned my employment because of differences with a higher-level manager, Director Kwon, which had nothing to do with harassment or being accused of harassment.

3.    When I was hired by SMART Alabama, I received a copy of SMART's anti-harassment policy.  I understood that SMART prohibited any form of harassment, sexual or otherwise.  I knew that engaging in any form of harassment would result in discipline, including termination.  I served as an EEO Officer in the Navy and have a thorough understanding of what constitutes harassment.

4.    When I worked in the Safety Office at SMART as Safety Manager, the Safety Office was located on the production side of the plant.  The Safety

Office's door had a window within the door. We often kept the door open because the air conditioning did not work properly. Many employees passed by the Safety Offfice on the way to the breakroom.

5.    I knew Robin Atwell from working in the safety office. She began working in the Safety Office after sustaining an on-the-job injury. She was a safety assistant. As a safety assistant, she was responsible for inputting workers' compensation cases, completing accident reports, and verifying details in such reports. She was also responsible for maintaining and updating SMART's OSHA 300 logs. There were other safety assistants, including Colinda Porter, Lakeshia Jessie, Melissa McGough, and Carissa Jones.

6.    Initially, Ms. Atwell performed her duties well. However, after about 30 days in the safety office, Ms. Atwell began to miss work frequently or be late, have problems with inputting workers' compensation, and problems entering OSHA logs. When I began counseling her verbally, I observed that Ms. Atwell did not appreciate it, and her attitude towards me changed.

7.    I provided each safety assistant with a job description, including Ms. Atwell. I verbally counseled Ms. Atwell as to her performance, and Colinda Porter was present. I never wrote her up for wearing blue jeans. Gary Sport, my manager, encouraged us to dress professionally, and I verbally told safety assistants, including Ms. Atwell and Lisa Bodiford, to dress professionally.

8. I did not impose extra job duties on Ms. Atwell. Each safety assistant worked weekends. We would post a schedule for the weekends, as SMART operated on a six-day a week schedule. There were occasions on which I would call Ms. Atwell at home. These were to discuss only work matters, including the locations of work files and where she was if she had not reported to work. I did not ask her out for drinks or lunch. I never told her "I've got a real man for you." I never discussed that it was difficult to be monogamous. I never asked if her breasts were real.

9. The only time I touched Ms. Atwell would have been if I was leaning over her computer to see a report. I did not ever try to hold her hands. I did not hug her on her birthday or at any other time. I never asked her about her breasts or asked to touch them. I never rubbed my pelvis area against her.

10. I did tell Ms. Atwell "we'll be a team" because SMART encourages a team environment and was not referring to any matters outside of work. I likely told her "You've got to work with me" but only in the context of accomplishing tasks in the safety office. I told Ms. Atwell that I would take care of reports she had not completed. I never made any such statements in a sexual context.

11. Gary Sport did meet with me about the manner I spoke to Ms. Atwell and other employees in the Safety Office. He encouraged me to be professional and to have a witness present when speaking with them. He never informed me

that Ms. Atwell had complained that I sexually harassed her. At no time did I sexually harass her. At no time did I see Ms. Atwell outside of work, other than one occasion when she appeared when I was bowling with Gary Sport, David McGoff, and Lloyd Weathers. I did not invite her, and did not talk to her while she was there.

12.    Robin did comment in my presence that Lloyd Weathers was "fine" and a "studmuffin." Robin did ask if I'd like to go get drinks at Double Branch in Troy. I refused.

13.    Robin did socialize with members of the security team serving SMART at the front desk. I'd find her at the front desk, talking to the receptionist, employed by the security company.

14.    At no time did I terminate Ms. Atwell's employment from the Safety Office or from SMART. I did prepare a memorandum terminating her employment from the Safety Office, but not from SMART. I would have had to have the approval of Gary Sport to issue this memo, but I never did. I never told Ms. Atwell that she was terminated or that she should resign. I never took any form of action against her because she refused any advances I allegedly made. I deny making any advances of any kind.

15.    The foregoing is true and correct to the best of my knowledge, and I declare it under penalty of perjury.

_____

**RANCE MADDOX**

_11/01/07_____

**DATE**


**STATE OF MISSISSIPPI**       )

**LOWNDES COUNTY**         )

    Sworn to and subscribed before me on this the __1__ day of _November_ ,
2007.

_____

**NOTARY PUBLIC**

**My commission expires:** _7/21/2010_____

THERE IS NO EXHIBIT Q– MISTAKENLY
ATTACHED