**IN THE UNTIED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **ROBIN ATWELL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 2:06 CV 1089-MEF** |
| | ) | |
| **SMART ALABAMA, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S EVIDENTIARY SUBMISSIONS IN RESPONSE TO THE**
**DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT**

      **COMES NOW** the Plaintiff, through counsel, and submits the following items of

evidence in response to the Defendant's Motion for Summary Judgment:

1.      Deposition of the Plaintiff, Robin Atwell;

2.      Robin Atwell EEOC Charge;

3.      Atwell Letter dated 2/2/2006;

4.      Robin Atwell Calendar;

5.      Deposition of Ruth Ryan;

6.      Rance Maddox's Letter dated 1/30/2006.

                      /s/ Richard F. Horsley
                      **Richard F. Horsley   HOR023**
                      **Attorney for Plaintiff**

**OF COUNSEL:**
**Richard F. Horsley**
**Lindsey O. Hill**
**KING, HORSLEY & LYONS, LLC**
**1 Metroplex, Suite 280**
**Birmingham, Alabama 35209**
**Telephone: (205) 871-1310**
**Facsimile:  (205) 871-1370**
**Email:  rfhala@cs.com**

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the above and foregoing Notice on all counsel of records listed below by placing a copy of same in the United States Mail, first class, postage pre-paid on this the 20th day of November, 2007.

**Kathryn M Willis**
**BURR & FORMAN LLP**
**420 North 20th Street, Suite 3100**
**Birmingham, Alabama 35203**
**Telephone: (205) 251-3000**
**Facsimile: (205) 485-5100**

**Thomas F. Kelly, Jr., P.C.**
**17 Court Square**
**P. O. Box 605**
**Clayton, Alabama 36016**

/s/ Richard F. Horsley
**OF COUNSEL**

# FREEDOM COURT REPORTING

Page 1

1    IN THE UNITED STATES DISTRICT COURT
2         MIDDLE DISTRICT OF ALABAMA
3              NORTHERN DIVISION
4
5    CASE NUMBER: CV 06-1089-MEF
6    ROBIN ATWELL, an individual,
7         Plaintiff,
8    v.
9    SMART ALABAMA, LLC, legal entity,
10        Defendant.
11
12        DEPOSITION TESTIMONY OF:
13            ROBIN O. ATWELL
14            June 21, 2007
15            10:30 a.m.
16
17        STIPULATION
18        IT IS STIPULATED AND AGREED by and
19   between the parties through their respective
20   counsel that the deposition of ROBIN O. ATWELL
21   may be taken before SHERI G. CONNELLY,
22   Commissioner, at the law offices of Burr &
23   Forman, Suite 1950, RSA Tower, 201 Monroe

Page 2

1    Street, Montgomery, Alabama 36104, on the 21st
2    day of June, 2007.
3        IT IS FURTHER STIPULATED AND AGREED
4    that the signature to and the reading of the
5    deposition by the witness is waived, the
6    deposition to have the same force and effect
7    as if full compliance had been had with all
8    laws and rules of Court relating to the taking
9    of depositions.
10       IT IS FURTHER STIPULATED AND AGREED
11   that it shall not be necessary for any
12   objections to be made by counsel to any
13   questions, except as to form or leading
14   questions, and that counsel for the parties
15   may make objections and assign grounds at the
16   time of the trial, or at the time said
17   deposition is offered in evidence, or prior
18   thereto.
19       IT IS FURTHER STIPULATED AND AGREED
20   that the notice of filing of the deposition by
21   the Commissioner is waived.
22
23

Page 3

1              INDEX
2
3    EXAMINATION BY:            PAGE NUMBER:
4    MS. WILLIS                 6
5
6    EXHIBITS:              PAGE NUMBER:
7    Plaintiff's Exhibits:
8        There were no Plaintiff's Exhibits
9    submitted to the deposition.
10
11   Defendant's Exhibits:
12       Defendant's Exhibit 1      20
13       Defendant's Exhibit 2      30
14       Defendant's Exhibit 3      56
15       Defendant's Exhibit 4      59
16       Defendant's Exhibit 5      62
17       Defendant's Exhibit 6      96
18       Defendant's Exhibit 7      106
19       Defendant's Exhibit 8      108
20       Defendant's Exhibit 9      113
21       Defendant's Exhibit 10     126
22       Defendant's Exhibit 11     128
23       Defendant's Exhibit 12     132

Page 4

1        Defendant's Exhibit 13     136
2        Defendant's Exhibit 14     137
3        Defendant's Exhibit 15     151
4        Defendant's Exhibit 16     165
5        Defendant's Exhibit 17     186
6        Defendant's Exhibit 18     258
7        Defendant's Exhibit 19     281
8        Defendant's Exhibit 20     286
9        Defendant's Exhibit 21     294
10       Defendant's Exhibit 22     295
11       Defendant's Exhibit 23     310
12
13
14
15
16
17
18
19
20
21
22
23

# FREEDOM COURT REPORTING

Page 5

```
1          APPEARANCES
2
3    FOR THE PLAINTIFF:
4       Richard L. Horsley
5       King, Horsley & Lyons, LLP
6       Shades Brook Building, Suite 200
7       3300 Cahaba Road
8       Birmingham, Alabama 35223
9       205.871.1310
10
11   FOR THE DEFENDANT:
12      Kathryn M. Willis
13      Burr & Forman, LLP
14      Suite 3400
15      420 North 20th Street
16      Birmingham, Alabama 35203
17      205.251.3000
18
19   ALSO PRESENT:
20      Gary Sport
21
22
23
```

Page 6

```
1          I, SHERI G. CONNELLY, a Court
2    Reporter of Birmingham, Alabama, acting as
3    Commissioner, certify that on this date, as
4    provided by the Federal Rules of Civil
5    Procedure and the foregoing stipulation of
6    counsel, there came before me at the law
7    offices of Burr & Forman, Suite 1950, RSA
8    Tower, 201 Monroe Street, Montgomery, Alabama
9    36104, beginning at 10:30 a.m., ROBIN O.
10   ATWELL, witness in the above cause, for oral
11   examination, whereupon the following
12   proceedings were had:
13
14          ROBIN O. ATWELL,
15      being first duly sworn, was
16      examined and testified as follows:
17
18      COURT REPORTER: Usual stipulations?
19      MS. WILLIS: That's fine.
20      MR. HORSLEY: Sure.
21
22   EXAMINATION BY MS. WILLIS:
23      Q. Ms. Atwell, we met earlier. I'm
```

Page 7

```
1    Katy Willis. I'm an attorney representing
2    Smart Alabama in the lawsuit that you filed
3    against them. I'm here today to ask you some
4    questions regarding the lawsuit you filed.
5    We're going to go over a few rules and it's
6    not to pick on you. It's just we do this with
7    everybody but let me ask you this question
8    first: Have you ever had your deposition taken
9    before?
10      A. Yes, I have.
11      Q. In what case?
12      A. It was a divorce case between my
13   ex-husband and myself.
14      Q. Okay. And was this Mr. Davis?
15      A. Right.
16      Q. Okay. Is that the only deposition
17   you've given?
18      A. To my knowledge, that's the only
19   time.
20      Q. Okay. Let me go over -- so you're
21   probably a little bit of an old pro at this
22   but I'll go over this anyway. You know our
23   court reporter is here taking down everything
```

Page 8

```
1    we say, so please be sure and answer verbally
2    so that I can hear you and the court reporter
3    can accurately record what you're saying. Can
4    you try to remember to do that?
5       A. Yes.
6       Q. And please don't be offended if I or
7    your attorney jump in and say, speak out
8    because it's hard if you shrug your shoulders
9    or do uh-huh or huh-uh for her to get it down.
10      A. Okay.
11      Q. Just so you know, you can take a
12   break when you need it. If you need a
13   bathroom, you know where those are, need some
14   water or soft drink, you know where those are.
15   If you'll just let me know ahead of time when
16   you need a break, I'll be happy to get to a
17   stopping point so long as there's not a
18   question out on the table. Will you let me
19   know when you need a break?
20      A. Yes, I will.
21      Q. Okay. And if you don't understand a
22   question I ask, can I count on you to let me
23   know and I'll try to rephrase it in a way that
```

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 9

1  you understand?
2      A.  Yes.
3      Q.  And I know there may be some
4  questions to which your attorney may object.
5  That's to get his objection on the record.
6  Let me ask you this question: Have you taken
7  any medication today?
8      A.  No, ma'am.
9      Q.  Are there any medical conditions or
10  treatment that you're currently under that I
11  may need to be aware of that may affect your
12  ability to testify?
13      A.  No, ma'am.
14      Q.  Anything else that would prevent you
15  from answering my questions truthfully today?
16      A.  No, ma'am.
17      Q.  Okay.  And I know you've had a
18  deposition taken before.  In getting ready for
19  this deposition, did you review any documents?
20      A.  I have reviewed the documents that I
21  had at my home.
22      Q.  Okay.  And some of those documents
23  as I understand Mr. Horsley has told me have

Page 10

1  been provided to me and we'll go over those
2  later.
3      A.  Okay.
4      MR. HORSLEY:  And she's asking you
5  about today with me too.
6      Q.  Today, yeah.
7      MR. HORSLEY:  What you reviewed with
8  me.
9      MS. WILLIS:  Thank you.
10      A.  Yeah, we had went over the --
11      Q.  And I don't know -- I don't want to
12  know what y'all talked about, okay.
13      A.  Right.  I reviewed the EEOC charges
14  as well as the -- I can't remember what the
15  other name of the other documents were, I'm
16  sorry.  It was the EEOC and I guess the
17  questions that you had as well as my
18  answers --
19      Q.  Okay.
20      A.  -- that I had.
21      Q.  So your interrogatory responses?
22      A.  Exactly, that's what it was.
23      Q.  That's fair enough.  That's fair

Page 11

1  enough.  Thank you.
2      Have you discussed this deposition
3  or the testimony you're giving today for
4  anybody other than your attorney, and keep in
5  mind I don't want you to tell me what you
6  talked about with your attorney.
7      A.  No.
8      Q.  Okay.  And you've mentioned your
9  divorce with Mr. Davis.  Besides the divorce
10  with Mr. Davis, have there been any other
11  lawsuits to which you have been a plaintiff or
12  a defendant?
13      A.  No, ma'am.
14      Q.  Not any kind of personal injury or
15  car wreck or anything like that?
16      A.  I was recently in an automobile
17  accident and no charges or anything has been
18  filed at this time or no lawsuits if that's
19  what you're trying to ask.
20      Q.  Okay.  And I guess the divorce with
21  Mr. Davis, what county was that in?
22      A.  Coffee.
23      Q.  And what year was that?

Page 12

1      A.  '97, 1997.
2      Q.  And I guess you and he were the only
3  parties to the case?
4      A.  Correct.
5      Q.  And did it go to court?
6      A.  Multiple times.
7      Q.  Multiple times.  What was the
8  ultimate outcome?
9      A.  We got a divorce.
10      Q.  Okay.  Okay.  Let me ask you this
11  question: Have you ever filed an EEOC charge
12  besides the one you filed against Smart
13  Alabama?
14      A.  No, ma'am.
15      Q.  Have you ever filed for workers'
16  compensation benefits?
17      A.  I believe once in my lifetime.
18      Q.  And when was that?
19      A.  Should have been in March of 1990 I
20  believe.
21      Q.  And what kind of injury did you have
22  then that prompted you to file for benefits?
23      A.  The employer I was working at

3 (Pages 9 to 12)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 13

1  flooded. Elba is notorious for flooding and
2  it flooded then and so I was no longer able to
3  work there.
4      Q.  And was that workers' comp benefits
5  or was that unemployment?
6      A.  No, no, that was unemployment, I'm
7  sorry.
8      Q.  And that's fine. So you filed for
9  unemployment compensation with which employer
10  in Elba?
11      A.  It was Nasco Equipment Company.
12  It's a forklift company.
13      Q.  And I guess they are no longer. Do
14  they exist any longer?
15      A.  I'm not certain to be honest with
16  you.
17      Q.  Okay. And let me move on to my
18  original question.
19      A.  Okay.
20      Q.  Have you ever filed for workers'
21  compensation benefits, meaning you were
22  seeking benefits because you were injured on a
23  job?

Page 14

1      A.  Not to my knowledge, no, other than
2  the Smart.
3      Q.  And was that for your left shoulder?
4  Was that a shoulder injury?
5      A.  It was -- I didn't seek benefits. I
6  just -- they filed my medical bills through
7  the workmen's comp.
8      Q.  Okay.
9      A.  For the shoulder injury and the
10  other workmen's comp issue was to deal with me
11  being hospitalized by Dr. Tompkins for stress-
12  related problems.
13      Q.  And was that your hospitalization in
14  January 2006 that you're referencing?
15      A.  Correct, as well as some doctors'
16  visits.
17      Q.  But you didn't seek benefits for
18  those, did you?
19      A.  No, ma'am, they were denied.
20      Q.  Have you ever filed for bankruptcy?
21      A.  No, ma'am.
22      Q.  I guess I should have asked this the
23  first time but can you state your full name

Page 15

1  for the record?
2      A.  Robin O'Ree Atwell.
3      Q.  And have you ever gone by any other
4  name?
5      A.  Yes, ma'am.
6      Q.  Okay.
7      A.  Robin O'Ree Davis and Robin O'Ree
8  Kyle, K-Y-L-E, that's my maiden name.
9      Q.  Kyle is your maiden name?
10      A.  Uh-huh. And Robin O'Ree Webster, my
11  stepfather adopted me so Kyle then became my
12  maiden name when I was three.
13      Q.  So Webster was the name you were
14  born with?
15      A.  Born with.
16      Q.  Okay. Besides Robin Atwell, Robin
17  Davis, Robin Kyle, and Robin Webster, have
18  there been any other names that you've gone
19  by?
20      A.  When my ex-boyfriend and I were
21  dating, I went by his last name. We filed
22  taxes together. It would have been Robin -- I
23  think it was Robin O. Farmer.

Page 16

1      Q.  How long were you known by that
2  name?
3      A.  Four years approximately.
4      Q.  Okay. And what's your current
5  address?
6      A.  Physical as well as mailing?
7      Q.  Yeah.
8      A.  Okay. The physical is 9133 West
9  Emmett Avenue.
10      Q.  And where is that address?
11      A.  Brantley, Alabama.
12      Q.  Okay. And how long have you been
13  residing at that address, Ms. Atwell?
14      A.  It would be 14 months.
15      Q.  Okay. And who all resides at the
16  9133 West Emmett Avenue address with you?
17      A.  My husband and myself.
18      Q.  And your husband is?
19      A.  Kevin Atwell.
20      Q.  And is Mr. Atwell employed?
21      A.  Yes, he is.
22      Q.  Who is he employed with?
23      A.  He works nuclear power plant

4 (Pages 13 to 16)

# FREEDOM COURT REPORTING

Page 17

1  shutdowns so he works for various contractors
2  all over the United States.
3       Q.  Does he work through a particular
4  company?
5       A.  Several.
6       Q.  And how long have you all been
7  married, you and Mr. Kevin Atwell?
8       A.  January of this year was a year.
9       Q.  So since January 2006?
10      A.  Right.
11      Q.  Okay.  Prior to the 9133 West Emmett
12  Avenue address that you moved to 14 months
13  ago, what was your address?
14      A.  It was 1125 North Morrow Avenue.
15      Q.  And was that also in Brantley?
16      A.  That was in Elba.
17      Q.  And how long did you live at that
18  address?
19      A.  I moved there after the '90 flood --
20  '98 flood, sorry.  Oh, gosh, I'm not really
21  certain.  Can I reference some notes?
22      Q.  Well, I'm going to get out your
23  interrogatory responses --

Page 18

1       MR. HORSLEY:  Just tell us what you
2  remember.
3       Q.  -- and we can look at them then.
4       A.  I'm saying maybe four or five years
5  max.
6       Q.  Who resided at that address with you
7  in Elba, the North Morrow Avenue?
8       A.  Myself and my four children.
9       Q.  And let me ask you this and one
10  reason I'm asking is because I think you've
11  asked for a jury trial in this case and I want
12  to make sure that -- I don't know that any of
13  your children are of jury age but can you tell
14  me your children's names and ages?
15      A.  It's Ashton Davis is 14.
16      Q.  Okay.
17      A.  Mason Davis is 12.  Logan Davis,
18  he's eight, and Jakan Kyle, he's six.
19      Q.  And where do your four sons reside?
20      A.  My two oldest sons now live with
21  their father, Mark Davis, and my two younger
22  children live with my mother.
23      Q.  Where does your mother reside?

Page 19

1       A.  In Elba.
2       Q.  And you don't have custody of the
3  children?
4       A.  I have joint custody of Ashton and
5  Mason.
6       Q.  But not of Logan and Jakan?
7       A.  Correct.
8       Q.  So you were married to Mark Davis.
9  Where does Mark Davis live?
10      A.  He lives in Elba, Alabama.
11      Q.  Okay.  Do you know who he's employed
12  by?
13      A.  He's through civil service through
14  Fort Rucker.
15      Q.  And when were you all married?
16      A.  In '92, November of '92.
17      Q.  How long were you all married?
18      A.  Almost five years.
19      Q.  And then when were you married to
20  Mr. -- were you married another time I guess?
21      A.  I was married another time but it
22  was annulled.
23      Q.  Okay.  And who was that?

Page 20

1       A.  Shane Teal, T-E-A-L.
2       Q.  And when were you all married?
3       A.  In 1998 I believe.
4       Q.  Okay.  And obviously it was briefly?
5       A.  It was for a month.
6       Q.  Because it was annulled, okay.  Did
7  you ever go by the name of Robin Teal?
8       A.  Just very briefly, I took my name
9  back as soon as everything was settled.
10      Q.  And no children from that union?
11      A.  No.
12      Q.  Okay.  And so you've been married to
13  Mr. Davis, Mr. Teal, and Mr. Atwell?
14      A.  Correct.
15
16       (Whereupon, Defendant's Exhibit 1
17  was marked for identification and a
18  copy of same is attached hereto.)
19
20       Q.  Okay.  And I'm going to show you,
21  Ms. Atwell, and this may help you out.  I
22  wasn't trying to trick you, I was just trying
23  to get through that part, what I'm going to

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 21

1  mark as Defendant's Exhibit 1 which are your
2  interrogatory responses.
3      A.  Okay.
4      Q.  And I wanted to just go over the
5  list of your relatives.  I appreciate your
6  providing those but I want to make sure we've
7  covered all of those since you have asked for
8  a jury trial.
9      A.  Okay.
10     Q.  Let's just go over these briefly.
11 Your mother-in-law is Janice Eddison; is that
12 correct?
13     A.  That's correct.
14     Q.  And she's over the age of 18?
15     A.  Yes, she is.
16     Q.  Kevin Atwell, your husband, we've
17 spoken about?
18     A.  Right.
19     Q.  Okay.  Janice Stephens, that's your
20 sister-in-law?
21     A.  Yes.
22     Q.  It's your husband's --
23     A.  Sister.

Page 22

1      Q.  -- sister?  She's over the age of
2  18?
3      A.  Yes.
4      Q.  And Keith Stephens must be her
5  husband?
6      A.  Correct.
7      Q.  Earl Kyle is your stepfather who
8  adopted you; is that right?
9      A.  Right.
10     Q.  And he currently lives in Elba?
11     A.  Right.
12     Q.  Is he employed?
13     A.  He's retired.
14     Q.  And Avis Kyle, your mother, is she
15 employed?
16     A.  She is.
17     Q.  Okay.  Where is she employed?
18     A.  She's employed at the Coffee County
19 Courthouse.
20     Q.  Okay.  Is she a clerk there?
21     A.  She works for the revenue
22 commissioner.
23     Q.  And you listed is it --

Page 23

1      A.  Clydie.
2      Q.  I'm sorry, Flowers?
3      A.  Right.
4      Q.  And how is Clydie Flowers related to
5  you?
6      A.  That's my husband's grandmother.
7      Q.  Okay.  And she works at Crenshaw
8  County Courthouse?
9      A.  Yes, she does.
10     Q.  What does she do there?
11     A.  She is a receptionist.
12     Q.  For one of the judges or just in the
13 courthouse?
14     A.  In the main lobby.
15     Q.  And Kyle Flowers, who is that?
16     A.  That is Kevin, my husband's,
17 cousin -- uncle, I'm sorry.
18     Q.  And he's over the age of 18?
19     A.  Yes, he is.
20     Q.  And Kelly Flowers, is Kelly Flowers
21 over the age of 18?
22     A.  Yes, she is.
23     Q.  And where does she work?

Page 24

1      A.  Last I knew she was teaching.  We
2  don't have a whole lot of communication with
3  her so I'm not certain.
4      Q.  Okay.  Vickey White, how is Vickey
5  White related to you?
6      A.  That's my husband's aunt.
7      Q.  And is she over the age of 18?
8      A.  Yes, she is.
9      Q.  And where is she director of
10 nursing?
11     A.  Over an assisting living facility, I
12 believe it's in Covington County.
13     Q.  Marilyn Kennedy, how is Marilyn
14 related to you?
15     A.  My husband's aunt.
16     Q.  He's got a lot of family around.
17     A.  Yes, he does.
18     Q.  You did a good job of remembering.
19 And is she employed?
20     A.  She works at CCA, it's Crenshaw
21 Christian Academy, in the day-care facility.
22     Q.  Okay.  Clarence Kennedy, how is
23 Clarence related to you?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 25

1    A.  That's Marilyn's husband.
2    Q.  Okay.  And is Clarence employed?
3    A.  He is.  He works something to do
4  with the logging industry but I'm not sure
5  exactly what he does.
6    Q.  Okay.  Misty Frazier, how is Misty
7  related to you?
8    A.  That's my husband's cousin.
9    Q.  And all you know about her is she's
10  a student?
11    A.  She's a nursing student.
12    Q.  Is she over 18?
13    A.  Yes, she is.
14    Q.  Where does Misty live?
15    A.  She was living with her mother but
16  she's currently moved to Mobile because she is
17  now going to ultrasound school.
18    Q.  To do ultrasounds?
19    A.  Right.
20    Q.  Okay.  Dewants Owen?
21    A.  Yeah, it's actually supposed to be
22  Dewanis.  I didn't read that there's -- oh,
23  it's spelling not determined.  That's my

Page 26

1  husband's uncle.
2    Q.  And where does he live?
3    A.  He lives in Brantley.
4    Q.  And is he employed?
5    A.  No, ma'am, he's disabled.
6    Q.  Okay.  Over 18?
7    A.  Yes, he is.
8    Q.  Kenneth Owens, how are you related
9  to Kenneth Owens?
10    A.  My husband's cousin.
11    Q.  And is he employed?
12    A.  I've never met Kenneth.
13    Q.  Okay.  Vicki Billings, how are you
14  related to Vicki?
15    A.  That's my husband's sister -- half
16  sister.
17    Q.  Okay.  And she lives in Luverne?
18    A.  I think she may have a Luverne
19  address.
20    Q.  Where does she work?
21    A.  At Crenshaw Community Hospital.
22    Q.  Okay.  Any other -- and I know
23  you've listed here that you've got the Webster

Page 27

1  last name.  Any other relatives that you can
2  think of that reside in like Coffee County,
3  Crenshaw County, those areas, other than the
4  ones we've already talked about?
5    A.  No, ma'am, all of my relatives are
6  on my father's side and they live in the Lee
7  County area and all of my other relatives live
8  out of state in other states.
9    Q.  And what's your father's family
10  name?
11    A.  Webster.
12    Q.  Okay, all right.  And let me go back
13  up a little bit.  Mr. Teal, do you know where
14  he lives now?
15    A.  No, ma'am.
16    Q.  You can flip over with me if you
17  want to follow along, Ms. Atwell.  I think --
18  let's see, I'm looking on page eight if you're
19  looking at the top of the fax pages.
20    A.  Okay.
21    Q.  It's item number 12 about your
22  criminal record.
23    A.  Right.

Page 28

1    Q.  And you referenced a harassment
2  charge around 1997 and a husband.  Which
3  husband was that with?
4    A.  Mark Davis.
5    Q.  Okay.  And that was in what county?
6    A.  Coffee.
7    Q.  So when you were living in Elba and
8  I'm going to make sure I've got the right ones
9  covered.  I'm going to show you this and make
10  sure it matches up with what we've got.  I'm
11  going to mark as Exhibit -- it's just I guess
12  a printout but I want to make sure we're
13  talking about the right things.  Here you go.
14  You can take your time and flip through that
15  if you want to.  We can talk through all of
16  these.
17    A.  Okay.
18    Q.  I'm going to ask you about the
19  status of them.  Now I know in your
20  interrogatory responses that you told me that
21  you were charged with some form of harassment
22  but let's just kind of go through this.
23    A.  Okay.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 29

1    Q.   With your ex-husband in Coffee
2 county, Mr. Davis.
3    A.   Right.
4    Q.   What was the outcome as you recall
5 of that?
6    A.   At that point I was really, really
7 afraid of him because he did have such close
8 connections with the chief himself, they would
9 fish bass tournaments together, and so I
10 dropped my charges against him and in turn he
11 dropped his charges against me because he had
12 pressed charges against me for cursing at him.
13    Q.   Okay.  And this was in 1997?
14    A.   Approximately.
15    Q.   Just about and I mean, we're going
16 to go through this very briefly?
17    A.   Right.
18    Q.   And then you had listed in your
19 interrogatory responses criminal conspiracy
20 misdemeanor in Crenshaw County and criminal
21 mischief.  What was that all about?
22    A.   My now husband had a pickup truck, I
23 think it was a 2005 model, I'm not certain.

Page 30

1 It was stolen and taken into another county
2 and caught on fire.  The police officer that
3 did the initial report claimed that I was on
4 the vehicle with another person who's known to
5 be in all type of bad things, been locked up
6 for all sorts of things.  The police officer
7 that set -- made these statements owes my
8 husband and his mother several thousand
9 dollars as well as money for damage to some
10 property that he had rented and never paid
11 for.
12    Q.   And who was the police officer?
13    A.   It's Robin Daniels.
14
15    (Whereupon, Defendant's Exhibit 2
16    was marked for identification and a
17    copy of same is attached hereto.)
18
19    Q.   Okay.  And so those are the ones
20 you've listed.  Let's go through the ones in
21 exhibit -- Defendant's Exhibit 2, that right
22 there, and I'll just reference it.  It looks
23 like the first on -- and I'm just reading off

Page 31

1 the first page, tell me if you don't see where
2 I am, but this looks like criminal conspiracy
3 in Crenshaw County.  Is that the truck
4 incident --
5    A.   The truck incident.
6    Q.   -- that you were referring to?
7    A.   Yes.
8    Q.   And it looks like -- it looks like
9 on the second page I'm looking at the
10 disposition paragraph.  Is that a guilty plea;
11 is that right?
12    A.   Yes, ma'am.
13    Q.   Okay.  So you pled guilty to that?
14    A.   Yes, ma'am.
15    Q.   Did you receive any form of I guess
16 probation?
17    A.   No, ma'am, paid no fines, paid no
18 court costs.
19    Q.   Okay.  Let's see, if you'll flip
20 over to the third page behind that, which is
21 that big long chart, and I'm looking down at
22 the bottom around 1/11/06.  It said probation
23 of one year.  Was probation along with that

Page 32

1 charge?
2    A.   If it was, I was not aware of it.
3    Q.   Okay.  And if you'll flip with me to
4 the next one, we can just move on from there.
5 It looks like -- the second one looks like
6 it's in Coffee County and that it says assault
7 third degree.  Is this referencing -- and this
8 is in 2004.  Was this regarding your ex-
9 husband or was this something else?
10    A.   No, ma'am, a gentleman that I was
11 dating at the time that I lived with at 1216
12 Caroline Street, his stepmother was trying to
13 evict us from the property.  They didn't get
14 along very well.  She came up to where we were
15 living and the property was in his father's
16 name, who she was married to.  And she was
17 showing out in front of the kids and
18 threatened to run her vehicle into the house
19 and I tried to stop her and she pressed
20 charges against me and I pressed charges
21 against her because I was trying to physically
22 restrain her and she hit me.
23    Q.   Okay.

8  (Pages 29 to 32)

# FREEDOM COURT REPORTING

Page 33

1  A.  So charges were pressed both ways
2  but they were all dropped.
3  Q.  And I think that second page, that
4  chart, it looks like it was -- I think what we
5  call legally it says non pros but it was
6  essentially dropped?
7  A.  Right.
8  Q.  Okay.  And then flipping to the next
9  one, this looks like this was in Elba in
10  Coffee County.  It's just -- I want to make
11  sure this is you driving with a suspended
12  license or something?
13  A.  Yes, ma'am.
14  Q.  And it looks like -- I'm looking at
15  the second page -- that you did a guilty plea
16  and paid a fine?
17  A.  Right.
18  Q.  Okay.  And then the next one in
19  Exhibit 2 looking -- driving with suspended
20  license, I want to make sure that's not a
21  duplication.  It looks like a different
22  number.  Was this a different driving with
23  suspended license?

Page 34

1  A.  Right, I think I was stopped in two
2  different areas.
3  Q.  Okay.  And you paid a fine for this
4  one too and I'm looking at the chart back
5  behind it?
6  A.  Yes, ma'am.
7  Q.  Oh, let me -- let me ask you because
8  I didn't ask you, what is your Social Security
9  number?
10  A.  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.
11  Q.  And do you have a current Alabama
12  driver's license?
13  A.  No, ma'am.
14  Q.  You don't.  Is it suspended?
15  A.  Yes, ma'am.
16  Q.  Okay, all right.  And then I'm
17  looking at the next one, Ms. Atwell, and I
18  believe we've already talked about this.  It
19  says criminal mischief in 2005 in Crenshaw
20  County.  Is that related to the truck?
21  A.  It is.
22  Q.  Okay, and we know what happened with
23  that so if you'll just move on to the next

Page 35

1  one.  It looks like there is an expired
2  license somewhere in Elba?
3  A.  I think that was in conjunction with
4  the same or one of the tickets --
5  Q.  Okay.
6  A.  -- that was previously.
7  Q.  Okay.  And then it looks like one of
8  our last ones here was just a speeding ticket.
9  I don't even know why that pulled up on this
10  because we all have those, don't we?
11  A.  That's right.
12  Q.  And then the very last one I'm
13  looking at, Ms. Atwell, was harassment around
14  1996.  Was this related to -- in Coffee
15  County, was this related to Mr. Davis?
16  A.  That very well could be it, I'm --
17  Q.  The reason I'm thinking it might be
18  is I'm looking at the last page and it says
19  something about Mark William Davis.  If you
20  see where I'm referring to, it's the very last
21  page.
22  A.  I believe that was --
23  Q.  Was that the incident that you

Page 36

1  described in your interrogatory responses?
2  A.  I believe it is.
3  Q.  Okay, all right.  Just very briefly,
4  you graduated from high school; is that right?
5  A.  No, ma'am.
6  Q.  You didn't.  Where did you go to
7  high school?
8  A.  I went to high school in Elba,
9  Alabama.
10  Q.  Okay.  And it looks like you got
11  your GED though --
12  A.  Right.
13  Q.  -- from Enterprise State.  Did you
14  have any college or technical or vocational
15  training?
16  A.  The only vocational training that I
17  had was I decided to go into the emergency
18  medical field and I took some courses through
19  LBW, Enterprise State Junior College.  Auburn
20  University offered some courses and CEU's and
21  things of that nature.
22  Q.  Okay.  Have you ever had any
23  military service?

9  (Pages 33 to 36)

# FREEDOM COURT REPORTING

Page 37

1   A.  No, ma'am.
2   Q.  I usually just ask that question.
3   Most people haven't. I'm going to talk a
4   little bit about your employment history and I
5   know you've done us the favor of listing some
6   of those so hopefully this will make this a
7   lot quicker. When you got out of high school,
8   who were you employed with?
9   A.  High school, my first employer would
10  have been a place called -- I think it was
11  Homefood Restaurants or Homestyle Restaurants.
12  Q.  Were you a server?
13  A.  I was.
14  Q.  And was that in Elba?
15  A.  It was.
16  Q.  And how long did you work there, do
17  you remember?
18  A.  A few months. It wasn't very long
19  because that's when I had gotten ill and no
20  longer could go to school or work.
21  Q.  Okay. And what illness was it that
22  caused you to be unable to work or attend
23  school?

Page 38

1   A.  I was pregnant and had spotting and
2   bleeding and they put me on bedrest.
3   Q.  We talked a little bit about that
4   earlier.
5   A.  Yeah.
6   Q.  And do you remember how much you
7   were paid at Homestyle or that place?
8   A.  No, ma'am.
9   Q.  While you were working there, did
10  you receive any verbal or written discipline?
11  A.  No, ma'am.
12  Q.  When you worked there, did they have
13  a handbook?
14  A.  No, ma'am.
15  Q.  Did you have a way you could report
16  concerns you had?
17  A.  Just directly to my supervisor.
18  Q.  Did you ever complain about
19  discrimination while you worked there?
20  A.  No, ma'am.
21  Q.  And besides the problems with your
22  pregnancy while you were working at Homestyle,
23  were you ever injured or ill enough to seek

Page 39

1   treatment from a doctor or a health care
2   provider?
3   A.  While I was employed there?
4   Q.  Uh-huh, besides the pregnancy.
5   A.  The pregnancy related, no, ma'am.
6   Q.  And after you worked at Homestyle,
7   did you stay home and have your -- have your
8   child?
9   A.  I did.
10  Q.  And where was the next place you
11  worked?
12  A.  My husband and I started a catering
13  business together.
14  Q.  And that was Southern Elegance?
15  A.  It was.
16  Q.  And this was Mark Davis that you
17  started this business with?
18  A.  Correct.
19  Q.  And that operated out of Elba?
20  A.  Elba, Alabama.
21  Q.  And were you your own boss?
22  A.  Actually we were in like partners I
23  guess you would say.

Page 40

1   Q.  Okay. But you -- I mean, basically
2   y'all just reported to each other --
3   A.  Right.
4   Q.  -- about what was going on, you
5   didn't have a supervisor?
6   A.  No.
7   Q.  How much did you earn or how much
8   were you paid as a result of the catering
9   business?
10  A.  It varied due to the number of
11  parties and events that we handled. To be
12  honest with you, I'm not sure exactly what the
13  total income would be over those years.
14  Q.  Okay. And y'all divorced and the
15  business closed down?
16  A.  Right.
17  Q.  Does Mr. Davis still operate that
18  business?
19  A.  No.
20  Q.  And while you were working for
21  Southern Elegance as a caterer, were you ever
22  injured or ill enough to seek the treatment of
23  a doctor or a health care provider?

10 (Pages 37 to 40)

# FREEDOM COURT REPORTING

Page 41

1     A.  No, ma'am.
2     Q.  I'm looking back at your
3  interrogatories.  It was just trying -- I know
4  it's hard to remember this.  I want to make it
5  as quick as possible.  Coffee County EMS, did
6  you ever work for them?
7     A.  Yes, ma'am.
8     Q.  And it looks like maybe from '92 to
9  '96?
10    A.  I believe that's correct.
11    Q.  Would that have been before y'all
12 opened the catering business, you and
13 Mr. Davis?
14    A.  That would have been the Elba
15 Rescue.
16    Q.  Elba Rescue was before you opened
17 the catering business; is that right?
18    A.  It was actually during the same
19 time.  My husband was the captain of the
20 rescue squad.
21    Q.  So you worked on the rescue squad
22 too.
23    A.  As well.

Page 42

1     Q.  What did you do?
2     A.  I did some of the bookkeeping for
3  them.  I was the secretary.  I did the minutes
4  for the meetings.  I was an ambulance driver.
5  I was an emergency first responder, had
6  various tasks that were -- that everyone had
7  to do as far as stocking trucks and checking
8  trucks and that sort of thing.
9     Q.  Who did you report to?
10    A.  My husband.
11    Q.  Your husband.  And did you ever
12 complain about discrimination while you worked
13 for Elba Rescue or Coffee County EMS?
14    A.  No, ma'am.
15    Q.  And while you were working for Elba
16 Rescue or Coffee County EMS, were you ever
17 injured or ill enough to seek treatment from a
18 health care provider?
19    A.  While I was working for Elba Rescue,
20 I fell going to a run in the hallway and
21 injured my -- I think it was my left knee and
22 had to be taken by ambulance to the emergency
23 room.

Page 43

1     Q.  Let me ask you this: How much did
2  you make while you were working at Elba?
3     A.  Actually Elba Rescue at that point
4  was a volunteer service.
5     Q.  Okay.  So you were just putting in
6  time voluntarily because of your husband --
7     A.  Right.
8     Q.  -- and you do that.  Young World of
9  Learning?
10    A.  Yes, that's a day-care facility in
11 Elba.
12    Q.  In Elba, okay?  And you reported to
13 if Peggy Carpenter?
14    A.  I did.
15    Q.  And what were you paid there?
16    A.  Minimum wage, whatever minimum wage
17 was during that time.
18    Q.  Did you receive any raises or
19 bonuses while you worked there?
20    A.  Not to my knowledge, no.
21    Q.  Did you ever receive any discipline
22 while you worked there?
23    A.  No, ma'am.

Page 44

1     Q.  Did Young World of Learning have any
2  kind of handbook or procedure for you to
3  report concerns you had about your job?
4     A.  No, ma'am.
5     Q.  What was your reason for leaving
6  there?
7     A.  My youngest two children -- or my
8  oldest two children started school and my
9  youngest two, I moved into a church-based
10 facility, at Baptist church, they offered a
11 preschool and day-care program and I -- that
12 the only reason I left because by working
13 there I received a discount on my childcare
14 fees while working at Young World because all
15 four of my children attended that school.
16    Q.  Okay.  And while you were working at
17 Young World, did you complain about
18 discrimination?
19    A.  No, ma'am.
20    Q.  It looks like you also worked at
21 Kelly's Barbecue?
22    A.  Yes, ma'am.
23    Q.  Were you a server?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 45

1    A.  Yes, ma'am.
2    Q.  And you reported to Fay Tindale?
3    A.  Yes, ma'am.
4    Q.  And this was in Elba?
5    A.  Yes.
6    Q.  And why did you leave that job?
7    A.  At that time I had separated and was
8  trying to get everything in my life straight
9  and I had to work during the day and then I
10  had the younger kids and I couldn't afford the
11  day care so I stayed home and actually saved
12  more money by doing my child support than I
13  was by driving back and forth to work and
14  paying day care.
15    Q.  And did you receive any discipline
16  while you worked there at Kelly's Barbecue
17  as a server?
18    A.  No, ma'am.
19    Q.  Okay.  Did you have a way you could
20  report concerns or questions you had about
21  your job while you were working there?
22    A.  Straight to Ms. Fay.
23    Q.  And did you ever complain about

Page 46

1  discrimination while you worked there?
2    A.  No, I never had trouble with
3  discrimination.
4    Q.  And did you -- were you ever injured
5  or ill enough while you were working there at
6  Kelly's Barbecue to get treatment from a
7  health care provider besides childbirth?
8    A.  No, ma'am.
9    Q.  And it looks like you also worked at
10  Double Branch?
11    A.  Yes.
12    Q.  And you worked there from 2003 to
13  2004?
14    A.  I believe that's correct.
15    Q.  You were a bartender?
16    A.  Right, bartender and server.
17    Q.  And a server.  And who did you
18  report to?
19    A.  Jimbo Ross, he was the -- he's not
20  the owner but he was the manager.
21    Q.  Okay.  And did you receive any kind
22  of discipline, verbal or written --
23    A.  No.

Page 47

1    Q.  -- while you were there?  And why
2  did you leave?
3    A.  I just didn't like the bar scene
4  anymore.  I had met Kevin and we were trying
5  to establish a relationship and that's an okay
6  place for a person that's single maybe but if
7  you're trying to start a relationship, there's
8  too many people that come in and out that can
9  cause problems in a relationship.  That's not
10  the best place to work.
11    Q.  Where did you work after you worked
12  at Double Branch?
13    A.  I worked for Allwood Construction
14  out of Troy.
15    Q.  And what did you do there at Allwood
16  Construction?
17    A.  Paperwork and general cleanup and
18  errand running, bookkeeping, just anything and
19  everything.  He had very few employees and the
20  ones he did were on the construction site.
21    Q.  Okay.  So you were more on the
22  clerical side?
23    A.  Right.

Page 48

1    Q.  So you were kind of responsible for
2  and understood the importance of keeping
3  accurate documents?
4    A.  Right.
5    Q.  And your supervisor was Allen Wood;
6  is that right?
7    A.  That's correct.
8    Q.  While you worked there, did you get
9  any kind of discipline, whether verbal or
10  written?
11    A.  No, ma'am.
12    Q.  Did you have a way you could express
13  concerns or problems or questions you had
14  about your employment while you were working
15  at Allwood Construction?
16    A.  Yes, ma'am.
17    Q.  How did you do that there?
18    A.  He's a very good friend of ours and
19  so I mean, he was over at our house quite
20  often, so anytime -- if I had any kind of
21  questions or concerns, I could always go to
22  him.
23    Q.  And while you were working there at

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 49

1　Allwood Construction, were you ever injured or
2　ill enough to seek the care of a health care
3　provider or a doctor?
4　　A.　No.
5　　Q.　And why did you leave Allwood
6　Construction?
7　　A.　He had just started out, it was a
8　new business, and the business wasn't working
9　out very well and it was just not a very good
10　situation. It had got to the point to where
11　it was affecting our friendship but he had a
12　lifestyle that was completely different than
13　what me and my boyfriend and children were
14　accustomed to and we had to break ties as far
15　as the work relationship.
16　　Q.　Were you making $12 an hour there --
17　　A.　Correct.
18　　Q.　-- full-time? And when you said
19　business wasn't going well, what was going on?
20　　A.　He didn't have very many contracts.
21　He would have to go out and give people bids
22　for different jobs and he was a social
23　butterfly and he would spend more time talking

Page 50

1　and going here and he was playing in a band in
2　the bars and it was just not very well
3　organized on his behalf.
4　　Q.　Okay. And what was the next place
5　you worked after you worked at Allwood?
6　　A.　At Smart.
7　　Q.　At Smart. And I promise we're going
8　to go through Smart in detail but we're going
9　to get to that.
10　　Let me ask you this question: Are
11　you currently working?
12　　A.　No, ma'am.
13　　Q.　Why aren't you working at this point
14　in time?
15　　A.　I don't feel comfortable working at
16　this point because of everything that has gone
17　on while I was working at Smart.
18　　Q.　Have you applied for any jobs?
19　　A.　No, ma'am.
20　　Q.　No job since you left Smart?
21　　A.　No, ma'am.
22　　Q.　Have you interviewed anywhere?
23　　A.　No, ma'am.

Page 51

1　　Q.　Gone to any job fairs?
2　　A.　No, ma'am.
3　　Q.　I think you had said you may have
4　been doing some baby-sitting and some other
5　things through a relative?
6　　A.　Right, for my sister-in-law and my
7　mother-in-law.
8　　Q.　How often do you work for them?
9　　A.　I clean their house as needed. It
10　may be once a month. It may be twice a month.
11　It may be every three or four months. It just
12　usually depends on if they have some type of
13　event coming up that's going to be at their
14　home.
15　　Q.　Okay.
16　　A.　And I baby-sit for my sister-in-law
17　Janna also, and that's just an as-needed
18　basis. I don't baby-sit every day for her to
19　work or anything.
20　　Q.　How often do you baby-sit for Janna
21　on average?
22　　A.　I haven't kept Walker in over three
23　months so it's not very often, it's just once

Page 52

1　in a while.
2　　Q.　Do you get paid when you baby-sit
3　Walker?
4　　A.　I have.
5　　Q.　And how much does Janna pay you?
6　　A.　$15, $20, it just really depends on
7　how long she's going to be gone and it's not
8　that I charge her, she just tries to give me
9　some extra spending money.
10　　Q.　Okay. But your husband is employed?
11　　A.　Yes, he is.
12　　Q.　Okay. And how much does he earn?
13　　A.　About 2,000 a week.
14　　Q.　So you're just staying at home right
15　now?
16　　A.　Right.
17　　Q.　Do you have any plans to obtain a
18　job in the future?
19　　A.　Not at this time, no, ma'am.
20　　Q.　What I guess would need to change
21　for you to feel compelled to seek out a job?
22　　A.　When I feel comfortable enough to be
23　able to go out and be around other people.

13 (Pages 49 to 52)

# FREEDOM COURT REPORTING

Page 53

1    Q.  Have you sought any counseling or
2  assistance with that since you left Smart?
3    A.  I tried to get counseling but the
4  workmen's comp refused to pay for me to see
5  the counselor and I couldn't afford to pay out
6  of my own pocket.
7    Q.  Does your husband have health
8  insurance now?
9    A.  No, ma'am.
10   Q.  Do you understand if you become
11  employed at some time while this lawsuit is
12  going on that you'll let Mr. Horsley know so
13  he can let me know?
14   A.  Yes, ma'am.
15   Q.  Okay.  Now, let's talk a little bit
16  about your employment with Smart because I
17  know that's why we're here today.  You worked
18  with Smart in Luverne?
19   A.  Correct.
20   Q.  And just so I understand, I want to
21  make sure we're talking about the same place,
22  Smart's plant is in Luverne on 331?
23   A.  Correct.

Page 54

1    Q.  And you go in the parking lot in the
2  security shack that's run by ADI Security?
3    A.  Correct.
4    Q.  And the security guards work out
5  there and let you in and out if you're an
6  employee?
7    A.  Correct.
8    Q.  And when were you hired by Smart?
9    A.  My hire date was August the 25th of
10  2005.
11   Q.  Okay.  Did you fill out an
12  application?
13   A.  Yes, ma'am, previous to that.
14   Q.  Okay.  And you went through I guess
15  training with AIDT?
16   A.  Correct.
17   Q.  And what kind of things did you
18  cover in your AIDT training?
19   A.  Basically very little.  Our class
20  consisted of I think three and a half months.
21  The plant was really short-handed and they had
22  to condense their training classes in order to
23  be able to fill the need for the employees.

Page 55

1    Q.  Who hired you?
2    A.  We were called in in a group
3  setting.  There was probably 50 or 60 people
4  in a conference room, so exactly who hired
5  who, I'm not certain other than that we were
6  the ones that were chosen out of the group
7  that had applied.
8    Q.  Did you have an interview of any
9  sort?
10   A.  I did on one of the nights during
11  our training class, our AIDT training class, I
12  was called in to Rance Maddox's office for an
13  interview for third shift, safety position.
14   Q.  Right.  But you didn't start in that
15  position, did you?
16   A.  No, ma'am.
17   Q.  You went to -- I guess out in the
18  production area?
19   A.  Correct.
20   Q.  As an assembly technician?
21   A.  Correct.
22   Q.  So you didn't report to Rance Maddox
23  at that time at all?

Page 56

1    A.  No, ma'am.
2    Q.  When you were hired at Smart, you
3  understood there was a policy that prohibited
4  harassment; right?
5    A.  Not initially but later on after
6  reading some more in the manual, it was
7  obvious there were a lot of different areas
8  that people where their rights and all were
9  protected.
10
11   (Whereupon, Defendant's Exhibit 3
12   was marked for identification and a
13   copy of same is attached hereto.)
14
15   Q.  And I'm going to show you what I'm
16  going to mark as Defendant's Exhibit 3 and is
17  this one of the manuals you're talking about?
18   A.  This is a copy of a larger version.
19   Q.  Okay.
20   A.  It's one of the little condensed
21  manuals that they hand out to their employees.
22   Q.  When do they hand them out to the
23  employees?

14  (Pages 53 to 56)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 57

1    A. I believe I was issued mine the very
2  first night of AIDT training.
3    Q. So you got a handbook. If you'll
4  turn with me, I'm looking on the page number,
5  guys, that's the bottom of the page, little
6  seven.
7    A. Okay.
8    Q. Are you with me there?
9    A. I am.
10    Q. And you see there's a nonharassment
11  policy?
12    A. Right.
13    Q. And so you received this I guess on
14  the first night you were trained by AIDT?
15    A. I believe. It was one of the nights
16  that we were trained by AIDT. There was only
17  three or four nights.
18    Q. Did you read it at that time?
19    A. No.
20    Q. Okay. I mean, a lot of times people
21  don't. Did you eventually go back and read
22  it?
23    A. Yes.

Page 58

1    Q. When did you go back and read it?
2    A. I'm not really certain exactly when
3  I read it but it was sometime after I started
4  working, I would say within the first few
5  weeks or whatever.
6    Q. You took it home and took the time
7  and read through it?
8    A. Right, because there was a lot of
9  information that you were issued when you were
10  first hired.
11    Q. When you were first hired, yeah.
12  But you understood I guess going in even
13  before you read the manual that it was wrong
14  to harass somebody, whether it was on the
15  basis of their gender or race or anything
16  else?
17    A. Right.
18    Q. And you understand you could report
19  it if you were being harassed?
20    A. Right.
21    Q. You understood that at the outset of
22  when you — you at least had some
23  understanding of that at the outset of your

Page 59

1  employment at Smart?
2    A. Right.
3    Q. And it looks like you also had maybe
4  some diversity training during AIDT. Do you
5  remember that?
6    A. Is that for the drug testing?
7
8    (Whereupon, Defendant's Exhibit 4
9    was marked for identification and a
10    copy of same is attached hereto.)
11
12    Q. No, but I'll -- you've provided me
13  with these documents so I'll let you explain
14  them to me and it's just part of the AIDT
15  manual. It was so thick I didn't copy the
16  whole thing to show you guys because we would
17  be pawing through it forever. And I'm marking
18  as Defendant's Exhibit 4, it looks like your
19  AIDT completion certificate, and I'm looking
20  at what it is — it looks like page 422 of the
21  manual. I've got 422 down on the left-hand
22  corner. Are you with me?
23    A. Yes, ma'am.

Page 60

1    Q. And it talks about sexual harassment
2  and that sexual harassment can be lots of
3  different things and that sex harassment is
4  against the law; right?
5    A. Right.
6    Q. So do you remember receiving this
7  during your training as well?
8    A. The booklet that this was in yes,
9  ma'am, and this was also included.
10    Q. Okay. And let me ask you another
11  question about your handbook. I know you said
12  you went back and I'm referring to Defendant's
13  Exhibit 3 now, you said you had gone back
14  through several weeks after you started
15  working at Smart and kind of thumbed through
16  it, pawed through it once you had time to go
17  through it. You understood that certain
18  behaviors, you know, or certain behaviors like
19  attendance violations or certain things could
20  result in discipline for you; right?
21    A. Correct.
22    Q. And I guess there's a list of things
23  and I'm looking on page 34 of Defendant's

15 (Pages 57 to 60)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 61

1 Exhibit 3. Just tell me when you're there.
2     A.  Okay, I'm there.
3     Q.  And I guess on pages 33 and 34,
4 there is a list of different things that could
5 result in disciplinary action for an employee;
6 right?
7     A.  Right.
8     Q.  They -- they may include reporting
9 to work late, fighting, horseplay,
10 insubordination, some of those things; right?
11     A.  Correct.
12     Q.  Turning with me to page 34, you
13 understood when you were employed with Smart
14 that theft or misuse or taking of company
15 property violated company policy too; right?
16     A.  Correct.
17     Q.  Okay.  And let me -- you worked at
18 Smart from I guess August of 2005 until
19 February of 2007; is that right?
20     A.  That's correct.
21     Q.  And I think maybe your last day that
22 you worked there, and I think we're going to
23 look and be sure, was February 7th.  Does that

Page 62

1 sound about right?
2     A.  I believe that's right.
3
4     (Whereupon, Defendant's Exhibit 5
5 was marked for identification and a
6 copy of same is attached hereto.)
7
8     Q.  And we're going to look at your
9 calendar a little bit later and I know that's
10 going to help.  But I'm going to mark as
11 Defendant's Exhibit 5, it looks like your time
12 punch records, and you're at the bottom of the
13 page, and it looks like you -- I'm looking at
14 the bottom of Defendant's Exhibit 5.  You
15 weren't scheduled on Sunday the 5th.  You came
16 in and worked Monday the 6th and you worked
17 some on Tuesday the 7th but didn't come back
18 after that?
19     A.  Correct.
20     MR. HORSLEY:  Objection.
21     Q.  Is that about right?
22     A.  Yes.
23     Q.  Okay, that's accurate, all right.

Page 63

1 And when you -- when you left your employment,
2 you weren't terminated, were you?
3     A.  I have never received a letter of
4 termination.
5     Q.  Huh?
6     A.  I did not receive a letter of
7 termination.
8     Q.  Did anybody ever tell you you were
9 being fired?
10     A.  No, ma'am.
11     Q.  Did anybody ever say anything
12 leading you to that conclusion?
13     A.  On the day that I left, no, ma'am.
14 Prior to that, yes.
15     Q.  Who had said what on what day?
16     A.  I received a letter of termination
17 from Rance Maddox.
18     Q.  How did you obtain that letter?
19     A.  It was on my desk in my office.
20     Q.  It was on your desk.  Where was it
21 on your desk?
22     A.  On the right-hand end.  I had a
23 horseshoe-shaped desk and it was there amongst

Page 64

1 some papers on the top and they called it a
2 community pile.  It has all sorts of things
3 that have to be filed by a person that works
4 usually on third shift.
5     Q.  Do you know if Rance Maddox had the
6 authority independently to terminate your
7 employment with Smart?
8     A.  He made it very clear very often
9 that he had such power.
10     Q.  Would you have any reason to dispute
11 that he would have to have the -- no matter
12 what he said that he would have to have the
13 approval of human resources to do that?
14     A.  It was not my understanding
15 according to him.  He made the decisions on
16 who worked in his office and who did not work
17 in his office.
18     Q.  Okay.  But you don't have any facts
19 disputing that -- you don't have any facts to
20 dispute that it would have required the
21 approval of human resources other than what
22 Rance Maddox told you?
23     A.  Well, actually we have minutes from

16 (Pages 61 to 64)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 65

1  meetings that were taken by Colinda Porter
2  where he made such statements letting you know
3  that he was in control of his office.
4      Q. Okay. But again, I guess I don't
5  want to reask the question but other than
6  those things, do you know of any facts that
7  would lead you to disagree with me that he
8  would ultimately have to have the approval of
9  Gary Sport or Ruth Ryan or somebody in human
10  resources before he went through with any kind
11  of termination?
12      A. I was unaware that he would have to
13  go through anyone else.
14      Q. Did anybody ever tell you you needed
15  to resign?
16      A. Resign, no, ma'am.
17      Q. Okay. Why did you leave that day?
18      A. I had moved my office -- my
19  necessary things out of my office into a
20  conference room across the hallway and Rance
21  came in with a girl named Wendy Burgin who I
22  believe works second shift. I think she was
23  light duty, she was not a regular safety

Page 66

1  employee, and demanded that I move back into
2  our office. She -- they walked in together
3  side by side, she stood there and I had told
4  him that I was not going back in the office.
5  And later on that day, I had went and talked
6  to Ruth again and let her know, you know, what
7  was going on and she said they would handle
8  it, there was an investigation pending, for me
9  to just keep quiet, do my job, stay away from
10  him, only answer questions if it was work
11  related and you know, that -- she promised me
12  and assured me that she would handle it. And
13  I believe that was the day that I was written
14  up for wearing blue jeans on a Friday.
15      Q. But you never received a written
16  write-up for that, did you?
17      A. He showed me one but as far as me
18  receiving it in my hand, no, but he did
19  Colinda Porter to type up some type of paper
20  that -- for me wearing blue jeans.
21      Q. The blue jeans were only supposed to
22  be worn on Fridays; right?
23      A. It wasn't in the handbook but in

Page 67

1  general the office people did wear jeans on
2  Friday unless there was a certain group of
3  people maybe coming in or visitors or somebody
4  special coming in.
5      Q. Okay. And we're going to come back
6  to all of that. Let me ask you a little bit
7  about your job at Smart or your jobs at Smart.
8  When you first worked there, you worked in the
9  production area?
10      A. That's correct.
11      Q. Were you actually out there
12  stamping?
13      A. The machines were.
14      Q. The machines were and you were
15  operating?
16      A. Right.
17      Q. -- as an assemble technician?
18      A. Right.
19      Q. And who did you report to there?
20      A. My supervisor was a lady named Tammy
21  Green and over her was a gentleman named Scott
22  Kelly.
23      Q. So Tammy Green, was she like your

Page 68

1  team leader or group leader?
2      A. She was. She was.
3      Q. Okay. And Scott was over her?
4      A. Correct.
5      Q. And what shift did you work when you
6  worked with Tammy Green and Scott Kelly out in
7  the production area?
8      A. Third shift.
9      Q. Okay. So you were nighttime?
10      A. Right.
11      Q. And you worked there and then you
12  became injured; is that correct?
13      A. While I was working, yes, ma'am.
14      Q. At Smart, out in production, how did
15  you that happen?
16      A. I was working in the -- I want to
17  say it was the dash area, I'm not certain on
18  that. There was boards on the floors and they
19  were not all the time level where they would
20  meet up together and if you would walk -- step
21  on one, the other side would be higher than
22  that one and you could trip easily and I had
23  tripped one night while I had one of the big

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 69

1   dash things in my hand taking it from one
2   machine to another and fell and had hurt my
3   back and then went to the emergency room that
4   night but there was nothing wrong other than a
5   pulled muscle with that injury.
6       Q.  Did you injure yourself again?
7       A.  I did.
8       Q.  When was that?
9       A.  I was moved to a different area
10  working with some smaller pieces and actually
11  the way I was described to it is I had some
12  muscle damage and they thought that it was
13  like a partially torn rotator cuff in my left
14  shoulder.
15      Q.  Okay.  And so after you got the
16  partially torn -- the whatever was wrong with
17  the muscles in your shoulder?
18      A.  Right.
19      Q.  Is that when you moved to the safety
20  office?
21      A.  No, ma'am.
22      Q.  Okay.  Well, when did you move to
23  the safety office?

Page 71

1       Q.  Okay.
2       A.  I just did that because they asked
3   that of me and because a third shift safety
4   position had been somewhat kind of promised to
5   me.  They were trying to work on convincing
6   some of the people in the office that they did
7   they need somebody on third shift.
8       Q.  And who had kind of sort of promised
9   you a third shift safety position?
10      A.  Gary Sport.
11      Q.  And when was this that you talked to
12  him about it?
13      A.  I had actually talked to Rance when
14  he did the interview and Rance I'm assuming
15  had talked to Gary because Gary came to me
16  while I was working one night and told me to
17  hang in there, we're working on it but things
18  around there work kind of slow when it comes
19  to making decisions like that so they kind
20  of --
21      Q.  Do you -- I'm sorry, I didn't mean
22  to cut you off.  Please finish your answer.
23      A.  They have to take it one step at a

Page 70

1       A.  I went to the first aid room, that's
2   where injured employees go.  I had actually
3   been working in the safety office while
4   working in the plant.
5       Q.  How did you do that?
6       A.  It's a little confusing.  They did
7   not have a third shift safety person per se.
8   They had a young lady named Amanda Dempsey who
9   was third shift who was pregnant and put on
10  light duty.  To my knowledge, she had -- she
11  didn't have any medical training.  If she did,
12  it was limited, but from the conversations
13  that she and I had, I don't think she had
14  much.  But Scott Kelly is my husband's cousin
15  and he knew that I had some medical training,
16  so whenever anything would come up, they would
17  come and pull me from my job to let me treat
18  people and then even take people to the
19  hospital and that sort of thing.
20      Q.  But you didn't regularly work in
21  there, that wasn't actually your job duties at
22  that time?
23      A.  That was not my job duties, right.

Page 72

1   time.  The Koreans want to save money, the
2   Americans want it done right and sometimes it
3   just doesn't pan out the way everybody wants
4   it to.
5       Q.  Let me back up a little bit.  You
6   said Rance interviewed you one of the nights
7   during AIDT training?
8       A.  He did.
9       Q.  What did you all discuss in that
10  interview?
11      A.  He wanted -- he told me what he was
12  looking for, wanted to know what my abilities
13  were, what my training was, what they lacked
14  in that department, what he wanted to see
15  become of that department, just things of that
16  nature.
17      Q.  Anything personal discussed?
18      A.  No, ma'am.
19      Q.  No problems during the interview?
20      A.  No, ma'am.
21      Q.  He was as professional and courteous
22  I guess --
23      A.  Right, he was not interviewed.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 73

1  There was a young lady in the office at the
2  time typing on the computer.
3      Q.  Who was in the office, do you
4  remember?
5      A.  I believe it was Lisa -- I'm trying
6  to remember what her -- Bodiford.
7      Q.  Okay.  So I'm going to kind of
8  fast-forward that to when you had talked to
9  Rance or talked to Gary about the safety
10 assistant position.  You eventually moved into
11 that position in November of 2005; is that
12 right?
13     A.  Yes, ma'am.
14     Q.  How did that come about?
15     A.  To the best of my knowledge, I was
16 just moved to that position because of the
17 girl that was actually in that office went to
18 another department to work for Gary Sport.
19 Her name was Melissa McGough.
20     Q.  Okay.  And when you started out
21 working -- was this some form of light duty
22 for you as far as your shoulder?
23     A.  I was actually still on light duty

Page 74

1  while I was working there in the office.  I
2  actually did my physical therapy with the
3  on-site physical therapist.
4      Q.  And when you worked in the safety
5  office, you reported to Rance Maddox?
6      A.  I did.
7      Q.  And he was the safety manager?
8      A.  He was.
9      Q.  Do you know all of his job duties?
10     A.  I know many of his job duties.
11     Q.  What did you understand those to
12 include?
13     A.  That he was to oversee people
14 working in his department, not only safety,
15 that included the security department.  He had
16 to meet with the team leaders.  He had to meet
17 with human resources.  He had to, you know,
18 just pretty much make sure that everything was
19 done properly in the plan and in the office
20 and scheduling was done correctly and
21 paperwork was filled out correctly and he -- I
22 mean, he had numerous things that he had to --
23 to have done but not all of those were done

Page 75

1  personally, he just made sure they were done.
2      Q.  He oversaw all of it I guess?
3      A.  He oversaw it.
4      Q.  And I guess one of the things you
5  mentioned like making sure things were safe in
6  the plant, walking through the plant; right?
7      A.  Right.
8      Q.  Making sure people had protective
9  equipment or earplugs or whatever it was
10 necessary?
11     A.  Right.
12     Q.  Making sure paperwork was filled
13 out.  That was very important; right?
14     A.  Right.
15     Q.  Because if you didn't fill that out,
16 workers' comp claims didn't get filed?
17     A.  That's right.
18     Q.  Or things didn't get recorded in the
19 OSHA log?
20     A.  Right.
21     Q.  Which could have gotten the company
22 and Rance probably in a whole lot of trouble?
23     A.  Correct.

Page 76

1      Q.  If they hadn't been filled out
2  correctly?
3      A.  That's correct.
4      Q.  And OSHA had come to look at them or
5  requested them.  Have you ever seen a job
6  description for Rance Maddox?
7      A.  Not to my knowledge.
8      Q.  Do you know to whom he reported?
9      A.  It was my understanding that he
10 reported to Gary Sport.
11     Q.  You told me you reported to Rance
12 Maddox.  Which other Smart employees was Rance
13 Maddox responsible for supervising or
14 overseeing?
15     A.  All of the employees that he was
16 responsible for, I'm not sure about all the
17 people that worked in the safety department --
18 I mean the security department.
19     Q.  Just tell me the names of the people
20 in the safety department.
21     A.  It was Amanda Dempsey, Colinda
22 Porter, Lisa Bodiford, Wendy Burgins, myself,
23 and then all the people that worked in the

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 77

1 security department.
2 Q. Rance oversaw them?
3 A. He did.
4 Q. But that was -- that was ADI; right?
5 A. Actually I'm not sure exactly how it
6 went but their payroll come through our office
7 and he met with them and they had to follow
8 his rules. It was under -- listed under the
9 safety department.
10 Q. Do you know whether there's a
11 contract or anything for services between
12 Smart and ADI?
13 A. I'm pretty sure there is.
14 Q. Have you seen one?
15 A. Not to my knowledge, I have not seen
16 one.
17 Q. Do you know whether employees of ADI
18 or employees of Smart are under any kind of
19 agreement between the two of them?
20 A. I'm not certain but I'm sure -- you
21 know, that's what ADI does. They contract
22 with large companies to provide security
23 services.

Page 78

1 Q. And they provide their employees to
2 provide security --
3 A. Right.
4 Q. -- for other companies, okay. Let
5 me ask you about I guess some of the folks you
6 work with in the safety office because I know
7 you listed several and we'll go through those.
8 Some of these ladies were in there I guess on
9 light duty; right?
10 A. Some.
11 Q. You had named Amanda Dempsey --
12 A. Right.
13 Q. -- who was in because she was
14 pregnant I think you said?
15 A. Correct.
16 Q. What shift did she work?
17 A. Third.
18 Q. You had mentioned Wendy Burgins a
19 little bit earlier.
20 A. Right.
21 Q. Was Wendy on any form of light duty?
22 A. Yes, ma'am, she had a knee injury
23 and required surgery and so she was on light

Page 79

1 duty also. I believe it required surgery. I
2 may have her confused. I think I'm having her
3 confused, I'm sorry, with another employee.
4 Q. That's fine. That's fine. What
5 shift did Wendy work?
6 A. Second shift.
7 Q. Did you get along with Wendy?
8 A. At times it was very hard for me to
9 count on her to get certain things done that I
10 left for her to have done because everything
11 that I had heard from the other team leaders
12 is that every time Lisa went in the plant to
13 do a plant inspection, Wendy went with her.
14 If Lisa went to the bathroom, Wendy went with
15 her. I couldn't convince her or motivate her
16 enough to realize that she could do something
17 on her own without having to have somebody
18 with her all the time.
19 Q. Is Wendy a truthful person?
20 A. To be honest with you, I don't know.
21 I worked first shift, she worked second.
22 Q. All right. You named a couple of
23 others. We'll go through those. Colinda

Page 80

1 Porter?
2 A. Yes, ma'am.
3 Q. What shift did Colinda work?
4 A. She came in on the first shift.
5 Q. So she worked -- you worked on first
6 shift; right?
7 A. Right.
8 Q. And so she worked with you?
9 A. On occasion.
10 Q. On occasion. How did that work that
11 it was only on occasion?
12 A. People had to be taken to the
13 doctors, physical therapy, follow-up visits.
14 Sometimes I was on the road, sometimes she was
15 on the road. Inventory had to be taken.
16 Plant inspections had to be made so it was
17 kind of hit and miss as to who all was in the
18 office at one particular time.
19 Q. Okay. So sometimes she was there
20 and sometimes she wasn't?
21 A. Correct.
22 Q. And sometimes you were there and
23 sometimes you weren't?

20 (Pages 77 to 80)

Page 81

1    A. Correct.
2    Q. And was Colinda there because of
3 light duty or do you know why?
4    A. Yes.
5    Q. Okay?
6    A. Pregnancy related.
7    Q. Okay. And is Colinda a truthful
8 person?
9    A. Other than working with her for the
10 short period of time that I worked there,
11 that's all I personally know about her.
12    Q. Any reason to think she would lie
13 about you?
14    A. No, ma'am.
15    Q. Okay. Lisa Bodiford, is that who
16 that is?
17    A. Yes.
18    Q. Lisa that you named?
19    A. Right.
20    Q. What shift did Lisa work?
21    A. She was on second shift also.
22    Q. So she worked second shift with
23 Wendy?

Page 82

1    A. Correct.
2    Q. That's who you were talking about
3 earlier?
4    A. Correct.
5    Q. Now, Lisa -- do you know Lisa was
6 working in the safety office?
7    A. I believe that she was just a
8 general safety employee. I don't -- to my
9 knowledge I don't know if she was there
10 because of an injury. She was never treated
11 for an injury while I was working.
12    Q. Okay.
13    A. She was there prior to me coming to
14 the safety department.
15    Q. So yeah, she was there to start
16 with?
17    A. Right.
18    Q. Before you came in, okay. And is
19 Lisa a truthful person?
20    A. Other than our work experience
21 together, I really don't personally know her.
22    Q. Any reason to think she would lie
23 about you?

Page 83

1    A. No, ma'am.
2    Q. Did you say Carissa Jones?
3    A. I don't --
4    Q. Was there an employee there named
5 that -- I had that written down but?
6    A. There was a Lakeisha Jessie.
7    Q. Okay. We'll talk about Lakeisha.
8 Does Lakeisha work in the safety office?
9    A. If you want to call it that. That
10 was -- I don't know what that was exactly
11 Lakeisha was there on light duty and we
12 couldn't get Lakeisha off of light duty.
13    Q. What shift was Lakeisha supposed to
14 work in the safety office while she was on
15 light duty?
16    A. I think she was on second if not
17 third. She would come and overlap her
18 schedules so much that I would have to look
19 back through my notes to be able to tell you
20 if she was second or third because she was
21 there sometimes during both shifts.
22    Q. And you couldn't get her off light
23 duty, what did you mean by that?

Page 84

1    A. You have some people that want to --
2 come in the safety office and want to stay in
3 the safety office and the doctors say they're
4 okay and everybody says they're okay and they
5 don't want to go back to work and you kind of
6 have to be the bad guy and tell them, you've
7 got to go to work.
8    Q. Because working in the safety office
9 was a little bit more cushy than working out
10 there --
11    A. Right.
12    Q. -- with machines; right?
13    A. Air condition, restroom right across
14 the hall, right, you know, and they had
15 access, you know, to go back down the hall and
16 go out for a smoke break. There's a safety
17 office and there's a first aid room. They are
18 two totally different areas.
19    Q. Okay.
20    A. The light duty people generally work
21 out of the first aid room if they weren't put
22 in other areas of the plant. If there were
23 other jobs assigned that we still in the plant

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 85

1  but it was within their ability to do those
2  jobs with their injuries.
3      Q.  Well, the safety office was in the
4  production office side of the plant; is that
5  right?
6      A.  Correct.
7      Q.  You told me it was just down the
8  hall from the bathroom?
9      A.  The first aid room.
10     Q.  The first aid room?
11     A.  Was right across the hall from that
12 bathroom.
13     Q.  Right across the room to the
14 bathroom, but the safety office is right down
15 near by the break rooms, is it not, kind of on
16 the way to the --
17     A.  It's in a corridor by itself.
18     Q.  Right.  And it faces off to the
19 production offices though.
20     A.  Well, the production offices are
21 here.  The safety office is in a doorway in
22 the hallway.  There's no other doors in the
23 hallway.

Page 86

1      Q.  And wasn't there a window in the
2  door of the safety office?
3      A.  Yes, ma'am.
4      Q.  And from what I remember just --
5  that maybe there are some problems with air
6  conditioning in there when it got hot that you
7  had to leave the door open.
8      A.  Sometimes there was an odd smell and
9  sometimes the door was left open and sometimes
10 the door was left shut.  If we were having a
11 meeting or if I was trying to get some work
12 done, we would put a note on the door, if you
13 need attention, please see assistant in first
14 aid room, things of that -- there was a lot of
15 notes posted all over the door in the hallway
16 because we didn't have a central bulletin
17 board outside of our office to paste things so
18 a lot of things were just taped up on the
19 windows and doors.
20     Q.  Okay.  But employees came in and out
21 of that room if they needed earplugs or --
22     A.  No; no, ma'am.
23     Q.  -- come report something?

Page 87

1      A.  No, ma'am.
2      Q.  They never came in the safety
3  office?
4      A.  Occasionally but those things were
5  kept in the first aid room.
6      Q.  Did you work some in the first aid
7  room?
8      A.  I have.  I came in.  I've done
9  inventory of the first aid room and organized
10 the first aid room and made lists for the
11 people that are working the first aid room to
12 be able to issue out the team leaders all
13 their necessary equipment for their shift and
14 that sort of thing.
15     Q.  When an employee had an injury I
16 guess they would go where?
17     A.  To the first aid room.
18     Q.  How would you know to take them to
19 the doctor?
20     A.  Someone would come to the office and
21 let us know, hey, we've got somebody in
22 here -- if it's serious.  If it was just a
23 minor abrasion or something, a lot of times

Page 88

1  the people that were in the first aid room
2  that were on light duty would treat the injury
3  themselves.
4      Q.  Or would you ever help treat because
5  of your training and background with EMS?
6      A.  I would.  If it was something minor
7  and they wanted to handle it, I would let them
8  handle it.  There are some people that were
9  not comfortable with blood or handling that
10 kind of thing, so at that point, you know, I
11 would do that for him or whoever else was
12 working the safety office would do that for
13 them.
14     Q.  You told me about Lakeisha Jessie.
15 I think you named Melissa McGough earlier or
16 she had been working in there.  Did she work
17 in the safety office or first aid room while
18 you were doing that?
19     A.  Safety office, not while I was
20 there, she was working in the safety office
21 while I was in the plant.  They transferred
22 her on -- my understanding, don't hold me to
23 it -- but it was under Gary -- it was in the

22 (Pages 85 to 88)

Page 89

1 human resources department and then her
2 position became open and I was placed in her
3 position.
4     Q. Okay. She train you in your
5 position or show you to what to do?
6     A. The first few days that I was there,
7 she came in and worked off and on during the
8 day showing me different things and where
9 things went and how things were supposed to be
10 and phone numbers and --
11     Q. What kind of things did she show
12 you, like how to do --
13     A. She showed me where all the stuff
14 was in the first aid room, all the stuff was
15 in the office, how to use the extension, how
16 to use my voice mail. How do I log onto the
17 computer, which programs we had in the
18 computer. I'm trying to remember now. It was
19 just a basic overview of everything that was
20 to be done because it was kind of a really
21 quick transition that took place.
22     Q. Uh-huh.
23     A. And so you know, everybody is like,

Page 90

1 well, we'll help you do this and we'll help
2 you do that and don't worry about this and
3 don't worry about that, because you know, it
4 was taking up time from where she was supposed
5 to be to come and try to train me so she had
6 handwritten out a bunch of notes and that kind
7 of thing and said if I had any questions, to
8 come to her.
9     Q. Okay.
10     A. And then Rance assured me that --
11 you know, that he knew how to do it all too so
12 that if there was anything that I didn't catch
13 the first go-around, that he would show me.
14     Q. Is Melissa McGough a truthful
15 person?
16     A. As far as -- I only worked with her
17 for a brief, you know, three days there in the
18 same office together. Other than that, she
19 worked on the entire different end of the
20 plant from where I had worked at.
21     Q. Any reason to think she would tell a
22 lie about you?
23     A. Not to my knowledge.

Page 91

1     Q. Anybody else that you can think of
2 that worked under Rance in the safety
3 department at Smart?
4     A. Those are the only people that I can
5 think of other than they were -- that worked
6 for him in the safety department, that's all.
7     Q. Okay.
8     A. But light duty employees, there were
9 several that came in and out while I was there
10 but they're not considered safety employees.
11     Q. Let me back up just a minute. You
12 have -- you reported to Tammy Harper when you
13 were out on the -- not Tammy Harper, Tammy
14 Green -- I'm thinking of an entire other case,
15 I'm sorry, I just slipped -- Tammy Green, when
16 you were out and she was your team leader;
17 right?
18     A. Correct.
19     Q. Any problems with her?
20     A. No, ma'am.
21     Q. Any reason to think that she would
22 tell a lie about you?
23     A. No, ma'am.

Page 92

1     Q. What about Scott Kelly, how much
2 interaction did you have with him when you
3 worked out in the plant area?
4     A. Just passing by and here and there
5 and actually made a record amount of parts on
6 my machine and they had a big party and Scott
7 come over and congratulated everybody and
8 Tammy bought her employees, the ones that made
9 records, that she bought them gifts themselves
10 because the team leaders receive watches when
11 their employees do good but employees receive
12 nothing, so she went and bought us some stuff.
13     Q. Okay. Is Scott Kelly a truthful
14 person?
15     A. To my knowledge.
16     Q. Okay. Did you have any further
17 interaction with him when he was in the safety
18 office -- when you were in the safety office,
19 I'm sorry.
20     A. Other than coming in and bringing
21 his employees in and out to get treated and
22 following up on different things and sometimes
23 they would have employees that would tell

# FREEDOM COURT REPORTING

Page 93

1  their team leader they were on light duty and
2  Scott would come or other team leaders would
3  come to find that they were really on light
4  duty and sometimes they weren't.
5     Q.  Uh-oh.
6     A.  They would be telling a fib about
7  where they were supposed to be.  So yeah, we
8  interacted some but it was usually always on
9  a -- whatever business as far as the safety
10  office is.
11     Q.  How many desks were there in the
12  safety office?
13     A.  There was two desks and one folding
14  table.
15     Q.  Okay.  Was that set up so that three
16  people could work in there at one time?
17     A.  It was.
18     Q.  How many computers were in there?
19     A.  Three.
20     Q.  Okay.  Did they all have the same
21  software on them?
22     A.  I'm not certain.
23     Q.  Okay.  Tell me just kind of

Page 94

1  generally -- you've told me a little bit about
2  what you did, that Melissa sort of walked you
3  through where some things were.  Tell me
4  generally what your duties were as being in
5  the safety -- working in the safety office at
6  Smart.
7     A.  Okay.  When I would first came in in
8  the mornings, I would go through the first aid
9  room and I would see if all my people were
10  there that were supposed to be there and if
11  they weren't, I would track them down and we
12  would go ahead and start a morning inventory
13  because we had to have an inventory done for
14  Jim and Antoine Kwan and he's a real stickler
15  on his inventories and charts and graphs and
16  all of that and Wendy did all of his charts
17  and graphs, so we just got all the figures up
18  and she would type them in and then get ready
19  for the following day.
20     I would go in and answer multiple
21  phone calls during the day, make multiple
22  phone calls during the day, workmen's comp,
23  doctor's visits, making people follow up,

Page 95

1  checking on their physical therapy to see if
2  things are going all right and they've got
3  their prescription like they need because they
4  have to have a prescription or a doctor's
5  order to be able to attend physical therapy
6  and some people would have them or misplace
7  them, so we fill out incident reports, file
8  incident reports, if they are recordables or
9  not recordables, if taking the information
10  from there if they were treated by a doctor in
11  the emergency room or in the office and
12  deciding whether or not they were a reported
13  injury as far as if it was a severe injury or
14  just a minor abrasion or something of that
15  nature.  You have to kind of read over each
16  incident report and look at -- attach the
17  medical information if there's any and decide
18  where to go from there.  You had to file -- I
19  had to fax things.  I had to copy things, a
20  lot of -- a lot of time is spent on the
21  telephone and copier and fax.
22     Q.  A lot of clerical things too?
23     A.  Right.

Page 96

1     Q.  Well, it was important that all that
2  paperwork got processed; right?
3     A.  Correct.
4
5     (Whereupon, Defendant's Exhibit 6
6     was marked for identification and a
7     copy of same is attached hereto.)
8
9     Q.  And I'm going to show you -- I think
10  you've provided this to me -- but what I have
11  marked as Defendant's Exhibit 6.  It looks
12  like a day shift, a safety assistant, position
13  responsibilities, and is this consistent with
14  what you've told me as far as what your duties
15  were?
16     A.  It is.  This was not exactly what
17  was explained in the beginning.  When I first
18  took over the position, this was something
19  that was -- not everything but there are some
20  things on here that were added later and then
21  some things are just -- you know you've got to
22  do it but they just type it out all nice and
23  neat where it looked really important but it's

24  (Pages 93 to 96)

# FREEDOM COURT REPORTING

Page 97

1 just like really anything.
2    Q.  What's an example, a teeny thing on
3 Defendant's Exhibit 6?
4    A.  Let me see, like "conduct lockout
5 tagout safety training for employees that
6 require a lockout device and perform
7 competency testing for lockout trained
8 employees." I can't teach lockout tagout
9 safety training, I'm not certified, but I was
10 required by Rance to teach these classes.
11 Other employees were required to teach these
12 classes. So there's a lot of things on here
13 that look nice but they just don't work out.
14    Q.  Okay. But you were one of the ones
15 responsible for maintaining the OSHA 300
16 medical records and workers' comp. You had
17 already told me that?
18    A.  Right.
19    Q.  Okay. And you worked on safety
20 inspections or safety topics?
21    A.  Right.
22    Q.  You did walk through because I think
23 you described you and other people in the

Page 98

1 office would go out in the plant and do
2 inspections; right?
3    A.  Right, safety glasses, ear plugs,
4 steel-toed shoes, sleeves, gloves.
5    Q.  Make sure people are wearing --
6    A.  Hard hats, correct.
7    Q.  Okay, absolutely. Assist the safety
8 manager in responding to the employees' needs
9 and concerns for safety requirements. Just
10 kind of -- did you kind of -- tell me what you
11 understood that to mean I guess.
12    A.  Which one are you on?
13    Q.  I'm on the front page, Ms. Atwell.
14 It's about the one, two, three, four, fifth
15 star down, the fifth asterisk down.
16    A.  Okay.
17    Q.  Do you see that?
18    A.  Okay.
19    Q.  And what did you understand that to
20 mean?
21    A.  "Assist the safety manager in
22 responding to the employees' needs and
23 concerns for safety requirements." What I

Page 99

1 would gather by reading that is that I'm going
2 to help the safety manager by providing the
3 employees with the information they need on
4 safety issues as well as the materials they
5 need for safety related issues.
6    Q.  And just whatever else was needed --
7    A.  Right.
8    Q.  -- as far as when people walked in?
9    A.  Right, questions, comments,
10 concerns, right, safety training.
11    Q.  Let's see, looking at the second
12 page of this Defendant's Exhibit 6, anything
13 there that you didn't understand you were
14 supposed to perform?
15    A.  I never did an a.m. inspection and
16 check for the emergency evacuation system for
17 the plant. I was hired to be in the office
18 doing the OSHA 300 log, the workmen's comp,
19 the organization of the first aid room, the
20 ordering of supplies. I had to do all the
21 invoices and send all the stuff over to
22 accounting to make sure all the bills were
23 paid. A lot of these things were put in here

Page 100

1 but they were actually the responsibility of
2 someone else.
3    Q.  Okay. Who were they the
4 responsibility of?
5    A.  A lot of the things that were on
6 here were the responsibility of Rance Maddox.
7    Q.  Okay. Looking at the third page,
8 I'm looking at the top of that, Ms. Atwell,
9 "All workers' comp cases will be managed and
10 report to day shift safety assistant." Was
11 that you?
12    A.  Correct.
13    Q.  And so you were responsible for
14 entering those and getting them over to --
15 getting reports done on those; right?
16    A.  Well, I was the managing report.
17 Now if it happened on the second or third
18 shift, they were supposed to enter that
19 information, pass it on to me, that way I
20 would know what had happened. That way when a
21 doctor's office calls and says, listen, I've
22 got so-and-so and so-and-so here, are they
23 here on a legitimate workmen's comp claim, so

25 (Pages 97 to 100)

# FREEDOM COURT REPORTING

Page 101

1  we need to know how to process this because if
2  you didn't have that communication, I would
3  say, well, no, I haven't -- I'm not aware of
4  them having an injury and then we would have
5  to come back later and find out yes, they did.
6  So we had to try to -- everybody try to work
7  together.
8      Q.  Okay.  And you signed off on this
9  description I guess which was written out in
10  January of 2006; is that right?
11     A.  Correct.
12     Q.  In your role as the day shift safety
13  assistant, you had access to company
14  documents; right?
15     A.  In my office.
16     Q.  Yeah.
17     A.  Yeah.
18     Q.  Like I'm talking about OSHA 300
19  logs, workers' comp first report of injury
20  forms.  Those are company documents; right?
21     A.  Correct.
22     Q.  And you understood that taking
23  company property or company documents was

Page 102

1  really an offense that could lead up to
2  discipline and termination; right?
3      A.  I actually took documents on a
4  regular basis and did a lot of work at home.
5      Q.  Well, I'm just -- the reason I'm
6  asking is I'm just real curious.  I can show
7  you -- I haven't been marked them as an
8  exhibit.  I'm happy to do it if it would help
9  us be more clear that we've got a lot of
10 documents you -- your lawyer produced to us as
11 far as first reports of injuries --
12     A.  Right.
13     Q.  -- and OSHA 300 logs, and I'm just
14 not sure how you I guess continued to have
15 those after you no longer worked at Smart.
16     A.  The only thing I can think of is
17 that I had those documents in my possession at
18 the time that everything went down on the 7th.
19     Q.  And so you took them with you?
20     A.  I already had material at home.  I
21 worked -- I brought material home on a regular
22 basis.
23     Q.  Why did you take it home?

Page 103

1      A.  To be able to go proofread things
2  and make sure there weren't any corrections
3  that need to be made and that sort of thing.
4      Q.  Were you paid for that time?
5      A.  No.
6      Q.  Did you ever report that time?
7      A.  No, I would rather do my work at
8  home than to have to be there and work with
9  Rance.
10     Q.  Okay.  But you understood taking
11 documents from the company was an offense for
12 which you could have been disciplined; right?
13     A.  No, ma'am, I was encouraged to do my
14 work at home.
15     Q.  Well, I understand that.  I don't --
16     A.  Right.
17     Q.  I'm encouraged to do work at home
18 too whenever I can.
19     A.  Exactly.
20     Q.  But my question is more of this: You
21 understood that if you took a document you
22 were not authorized to take or asked to take
23 that that would violate company policy; right?

Page 104

1      A.  I was never aware that I took any
2  documents that were against company policy.
3      Q.  And I'm not saying that we did --
4      A.  Right.
5      Q.  I'm just saying if you had taken
6  something that you had not been expressly
7  authorized to take to work on or to work at
8  home, that that would violate company policy?
9      A.  Right.
10     Q.  Now, when you worked at Smart, you
11 were paid I think you told me nine dollars an
12 hour initially.  Is that about right?
13     A.  Right, when I started in the
14 assembly.
15     Q.  Okay.  And did that ever go up?
16     A.  When I was moved to the safety
17 department it went to I believe nine
18 dollars -- stayed at nine dollars but I was
19 supposed to have been going to 9.50.
20     Q.  Did you ever go to 9.50 or can you
21 just not remember?
22     A.  I've got some copies of some of my
23 pay stubs but I believe 9.50 is correct.  I'm

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 105

1  pretty sure that's correct.
2     Q.  That you ended up at 9.50 at the
3  time you left?
4     A.  I think -- I think that's correct.
5  I'll have to double-check with my pay stubs to
6  be sure.
7     Q.  Do you have those pay stubs with
8  you?
9     A.  There's a copy of one there.
10     Q.  Does that show -- are you looking at
11  Exhibit --
12       MR. HORSLEY:  5.
13     Q.  -- 5?
14     A.  I don't think it has the pay rate on
15  this particular one.
16     Q.  I think this has your time and not
17  your pay.
18     A.  Right.  There's a secondary page to
19  this that has your pay rate on it.
20       MS. WILLIS:  Off the record.
21
22     (Whereupon, a discussion was held
23     off the record.)

Page 106

1
2     (Whereupon, a brief recess was taken
3     from 12:03 p.m. to 12:14 p.m.)
4
5     (Whereupon, Defendant's Exhibit 7
6     was marked for identification and a
7     copy of same is attached hereto.)
8
9     Q.  (By Ms. Willis) Ms. Atwell, before
10  the break you had indicated you might have
11  some pay stubs and I have just marked the one
12  that you have given to us as Defendant's
13  Exhibit 7.  Is this a pay stub you received
14  while working at Smart Alabama?
15     A.  Yes, ma'am.
16     Q.  And is this for oh, goodness, it
17  looks like November 2005?
18     A.  It is.
19     Q.  And you were making nine dollars per
20  hour?
21     A.  That's right.
22     Q.  And overtime of time and half when
23  you worked overtime?

Page 107

1     A.  Right.
2     Q.  It looks like you had a lot of hours
3  of overtime --
4     A.  I did.
5     Q.  -- that month.  Was that pretty
6  common?
7     A.  That was usually pretty common.
8     Q.  You guys were working pretty hard;
9  right?
10     A.  Yes, ma'am.
11     Q.  And the plant was working weekends?
12     A.  Right, three shifts, seven days a
13  week.
14     Q.  Okay.  Wow, that is a lot.  So the
15  safety office had to be working then too;
16  right?
17     A.  Correct.
18     Q.  To accommodate who was out in the
19  plant working in production; right?
20     A.  Correct.
21     Q.  And everybody had to work --
22  everybody in the safety office was supposed to
23  work weekends; isn't that right?

Page 108

1     A.  Right.
2
3     (Whereupon, Defendant's Exhibit 8
4     was marked for identification and a
5     copy of same is attached hereto.)
6
7     Q.  Okay.  And I'm going to show you
8  what I'm going to mark as Exhibit 8 something
9  I think you provided to us and it was a
10  weekend work schedule --
11     A.  Correct.
12     Q.  -- for the safety office.  Let me
13  show you that.  Was this a typical -- and when
14  I say this, I mean Defendant's Exhibit 8, was
15  this a typical weekend work schedule?
16     A.  No, ma'am.
17     Q.  Why wasn't it typical?
18     A.  Due to the fact that I worked Monday
19  through Friday, when I was put on a schedule
20  to work on a Sunday on second shift or maybe
21  even on a third shift, which sometimes would
22  happen, that would mean that I would work a
23  third shift and then have to come back in and

27 (Pages 105 to 108)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

| Page 109 | Page 111 |
|---|---|

**Page 109**

1 work a first shift back to back, two doubles.
2    Q.  Well, let's look here on -- it looks
3 like when you're scheduled for third shift
4 that you're scheduled for third shift on a
5 Saturday; right?
6    A.  Sometimes.
7    Q.  Okay.
8    A.  Some of these were revised because
9 there was a conflict in the schedule. I
10 discussed it with Rance. He was not in
11 agreement. I took it to Gary, explained to
12 Gary that I cannot work a third shift on
13 Sunday and be back at work at eight o'clock on
14 Monday morning.
15    Q.  And was that adjusted when you
16 reported that to Gary?
17    A.  It was being handled was -- was my
18 understanding.
19    Q.  Okay. But you didn't have to work
20 the back to back after you went to Gary about
21 it?
22    A.  I did not return back to work.
23    Q.  After that?

**Page 111**

1 that aren't on the schedule that were actually
2 worked by myself or other safety department
3 employees because of them being shorthanded.
4    Q.  But everybody was supposed to work
5 regardless of what had been going on during
6 the week because y'all were all working seven
7 days a week three shifts; right?
8    A.  Well, this was put in after I
9 started to work in the safety department.
10    Q.  Okay. I understand that --
11    A.  Right, when I first --
12    Q.  -- because that February date --
13    A.  When I first got hired, I worked
14 Monday through Friday, 8:00 until 5:00.
15    Q.  When you first got hired at Smart?
16    A.  When I first went to the safety
17 department.
18    Q.  Okay. And then when did that
19 change?
20    A.  Shortly thereafter, I'm not sure
21 exactly when to be honest with you.
22    Q.  Bear with me just a second.
23    A.  For example -- can I show you

| Page 110 | Page 112 |
|---|---|

**Page 110**

1    A.  Right.
2    Q.  But it looks like, you know, it
3 looks like, for example -- I think you're
4 scheduled to work four days on this weekend
5 schedule and it looks like that Wendy's
6 working maybe three days and Lisa is working
7 several days as well. Lisa is working three
8 or four days; is that right?
9    A.  Yes, ma'am.
10    Q.  So everybody was expected to work on
11 the weekends?
12    A.  Right.
13    Q.  Regardless of whether --
14    A.  We have actually tried to do a
15 rotation schedule --
16    Q.  Uh-huh.
17    A.  -- where everyone would have a
18 weekend off and we had people that didn't show
19 up and people that you couldn't depend on and
20 the majority of those people were the people
21 that were on light duty that we would let work
22 the first aid room. So then we would get
23 called in, so there were a lot of weekends

**Page 112**

1 something here?
2    Q.  Yes, ma'am, I'm listening.
3    A.  Here on Sunday, February 5, 2006, it
4 has Tabitha working first shift, which is 6:00
5 a.m. to 4:00 p.m. It has me working second
6 shift, which is 4:00 p.m. to 12:00 a.m., so I
7 get off at 12 midnight and be back at work at
8 eight o'clock in the morning on Monday
9 morning.
10    Q.  And that's what you went to Gary
11 about?
12    A.  Correct.
13    Q.  How many times did that happen
14 before you went to Gary about it?
15    A.  I believe -- the first time it
16 happened I went to Gary about it and then
17 Rance had it typed up that way -- actually
18 Colinda typed these but she typed these
19 according to the schedule that Rance gave her.
20    Q.  Colinda typed them up?
21    A.  The next time I told Gary, I said,
22 I'm not going -- I'm not working it, I'm not,
23 and I did not.

28 (Pages 109 to 112)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 113

1   Q.  Okay.  I'm going to show you -- I
2   don't have a copy of this if I need to make a
3   copy but if y'all can just look at it and we
4   can give it back to her.  It's some time
5   records you guys produced.
6
7       (Whereupon, a discussion was held
8       off the record.)
9
10      (Whereupon, Defendant's Exhibit 9
11      was marked for identification and a
12      copy of same is attached hereto.)
13
14      Q.  I'm going to mark as 9 some
15  documents you -- and if you don't mind, I'm
16  going to walk over there and look at them with
17  you because that's the easiest way,
18  Ms. Atwell.
19      A.  Okay.
20      Q.  I'm marking as Exhibit 9 to your
21  deposition some of your time records -- some
22  more of your time records that you produced to
23  us.  Does this look like your time?

Page 114

1       A.  It very well could be.  Without me
2   being able to reference mine at home --
3   anything on here can be changed --
4       Q.  Okay.
5       A.  -- on the computer system because
6   that's how they would add and correct people's
7   hours.
8       Q.  Okay.  And I'm representing to you
9   and I understand you wanting to check that.
10  This is -- I think my office put that stamp on
11  it.
12      A.  Okay.
13      Q.  But I think this is what you gave
14  us --
15      A.  Okay.
16      Q.  -- as best I understand.  With that
17  caveat, I guess, let's move forward.
18      A.  Okay.
19      Q.  And it looks like that -- like let's
20  look, for example, in January you didn't work
21  Saturday or Sunday, January 7th or 8th; right?
22  That's what it reflects.
23      A.  No.

Page 115

1       Q.  Okay.  Then let's flip over.  It
2   looks like in -- I'm going back to December
3   and you were working in the safety office in
4   December; right?
5       A.  Correct.
6       Q.  And you -- you didn't work Saturday
7   the 17th or Sunday the 18th; is that right?
8   That's what these documents reflect at least.
9       A.  Now, some of these may or may not be
10  correct because sometimes when you would come
11  in in a hurry or somebody was hurt or
12  whatever, you didn't go by the time clock and
13  swipe your badge and make sure it beeped and
14  you were in the system.  You went on in and
15  did your job.  There's going to be some times
16  that aren't on here where I was actually
17  present and there's going to be some times on
18  here where I was not present.
19      Q.  Okay.
20      A.  Does that make any sense?
21      Q.  Yeah.  I guess I have the question
22  of when would there be some times that time is
23  on here and you weren't actually present if

Page 116

1   you had to swipe your card I guess?
2       A.  Because not everyone swiped their
3   card in the offices when you were coming in
4   if -- if there was an emergency.  Like for
5   example, one evening I was called in, there
6   was a gentleman around the press area that had
7   a seizure.  They called me from home.  I live
8   four miles from the plant.  There was a safety
9   person there at the plant.  They called me.  I
10  came in, assisted them, took him to the
11  emergency room.  I never clocked in.  I never
12  clocked out.
13      Q.  Okay.  Okay, fair enough.  And I
14  guess here's another weekend work schedule
15  where it looks like you worked a Sunday,
16  November 6th, but you didn't work Saturday the
17  5th, at least according to the time records?
18      A.  Correct.
19      Q.  Did you write these notes on what's
20  marked P26(A) 0032 of Defendant's Exhibit 9?
21      A.  No, ma'am.
22      Q.  Do you know who wrote that?
23      A.  The lady that's in payroll.  Her

29 (Pages 113 to 116)

# FREEDOM COURT REPORTING

Page 117

1 name is not coming to me right this second.
2 Q. Okay. And these time records were
3 kept in a system; is that right?
4 A. Correct.
5 Q. And I guess it registered it by
6 you — like you told me before, it swipes your
7 badge?
8 A. Right, you swiped out. Well,
9 sometimes when you would swipe it, it would
10 work and sometimes it wouldn't, you might have
11 to swipe it again and then sometimes —
12 Q. It would have to beep?
13 A. Right.
14 Q. Okay; okay.
15 A. So.
16 Q. And did you have access to your own
17 time cards through that system or did somebody
18 have to approve and review your time?
19 A. The time went through payroll and
20 they were the only people that had access to
21 my knowledge of these time sheets.
22 Q. Okay. Can I ask — let me ask you
23 the question because — and if it's — you

Page 118

1 know, if it's an error on my part, I'm sorry,
2 but these have been marked as something you
3 provided to us and I'm going to show you
4 another page. How did you come in to
5 possession of these time records?
6 A. You can go to them and request them
7 because that's the only way you can check your
8 time.
9 Q. Like your check versus your time —
10 your paycheck versus your time?
11 A. Right; exactly.
12 Q. Okay. And looking on 33, are these
13 your handwritten notes on P26(A)0033 of
14 Defendant's Exhibit 9?
15 A. They are.
16 Q. And triple shift, two employees were
17 out, is that what you were referencing earlier
18 that somebody didn't come to work?
19 A. Correct.
20 Q. And so you worked — you attempted
21 to clock out and back in, I'm sorry; is that
22 right?
23 A. Right, because if you don't clock

Page 119

1 out it won't — they'll cut your time off at
2 whatever hours your general hours are supposed
3 to stop.
4 Q. Okay.
5 A. So in order to get credit for it,
6 you had to clock out, wait a few minutes, then
7 clock back in and then let payroll know, hey,
8 I worked overtime or I worked an extra shift
9 or whatever the situation was.
10 Q. And P26(A)0036, are these your notes
11 as well? Here I'm going to pull the staple
12 out —
13 A. Okay.
14 Q. — and we'll staple it back for you,
15 I promise. Are these your notes?
16 A. Yes.
17 Q. And the notes, if I'm correct, 12:43
18 Colinda left for lunch. Is that in reference
19 to Colinda Porter who also worked in the
20 safety office?
21 A. It is.
22 Q. And 1:12 returned, I assume that's
23 when she returned?

Page 120

1 A. Correct.
2 Q. Why were you keeping up with that?
3 A. Actually these notes were taken the
4 very last day I worked at Smart.
5 Q. Okay, that's fine. That makes
6 sense. Why did you document when Colinda left
7 for lunch and when she came back?
8 A. Earlier Rance and I had a
9 conversation where he was very rude to me
10 about me taking lunch later on in the day that
11 I was supposed to take it at a specific time.
12 A lot of times you could not take your lunch
13 at a specific time because of the fact that
14 things come up — somebody gets hurt, I'm not
15 going to go eat lunch and make them sit there
16 for an hour.
17 Q. Okay, fair enough. Now, what is
18 this one o'clock, asked about what?
19 A. Light duty status in assigned areas.
20 Q. And what was that conversation
21 about?
22 A. That's what the — what Rance had
23 asked me about and I gave him — that was

30 (Pages 117 to 120)

# FREEDOM COURT REPORTING

Page 121

1 already posted in the office or the bulletin
2 thing inside our door where we put things. It
3 has the employee, their type of injury, their
4 light duty status, and if they're attending
5 physical therapy or not, and I showed him
6 where it was but he already knew where it was.
7 He has a copy put on his desk every day. Gary
8 had a copy on his desk. I believe Lloyd
9 Weathers had a copy on his desk. Every day
10 when somebody new was added, a new list was
11 issued to people in various departments.
12    Q. Okay. And was that 108, was that a
13 similar inquiry about the light duty release
14 dates?
15    A. Yes; uh-huh.
16    Q. You told me a little bit earlier,
17 Ms. Atwell, that different people had
18 different kind of shifts within the safety
19 office/first aid room; right?
20    A. Correct.
21    Q. How many safety assistants or
22 personnel were on each shift generally?
23    A. There were two safety assistants,

Page 122

1 myself and Lisa Bodiford.
2    Q. Okay.
3    A. Everyone else was light duty.
4    Q. But they worked with safety and/or
5 first aid?
6    A. Correct.
7    Q. So you're right in correcting me not
8 necessarily safety assistants. How many
9 people, regardless of whether they were a
10 safety assistant, were considered a light duty
11 team member worked per shift as far as safety
12 and first aid went?
13    A. It varied daily because some people
14 were released, some people were added. Some
15 days there may be no one added. Some days
16 there may be three added.
17    Q. Okay. So it just varied?
18    A. It varied.
19    Q. Okay. And now while you worked in
20 the safety office, and we've touched on this a
21 little bit, your performance was discussed
22 with you several times by -- with you by Rance
23 Maddox several times; right?

Page 123

1    A. My performance?
2    Q. Performance issues or job
3 performance.
4    A. The performance of the entire office
5 was discussed several times.
6    Q. Okay.
7    A. My performance issues, me in general
8 were discussed between Gary and Rance and
9 myself one day in the conference room.
10    Q. When was that meeting in the
11 conference room?
12    A. January the 13th.
13    Q. What happened during that
14 discussion, Ms. Atwell?
15    A. Rance presented the paper that we
16 had looked at earlier, Exhibit 6, and I'm not
17 certain who read or reviewed -- if it was read
18 or reviewed out loud or if it was just -- if I
19 read it myself because I really don't recall,
20 but Rance let me know prior to that he had
21 certain expectations and that if I couldn't
22 meet those expectations, that that was his office,
23 somebody else, that that was his office,

Page 124

1 people in his office were going to do what he
2 wanted to do. If they didn't want to -- I'm
3 trying to think what his words were -- work
4 with him, then he would find someone that
5 would.
6    Q. Okay. What were his expectations he
7 told you about?
8    A. The reason I made nine dollars and
9 not 9.50 was because I filled out my request
10 for my 30-day raise and Rance had to do his
11 portion of it in order for me to get my 30-day
12 raise. I never got that turned in because I
13 would not work with him.
14    Q. You say you work with him, what do you
15 mean by that?
16    A. He referred to himself, you know,
17 I'm the man and I'm this and I'm that and you
18 just have to know him.
19    Q. Well, unfortunately I don't --
20    A. I know. I know.
21    Q. -- so I'm going to have to rely on
22 your description today.
23    A. Rance let it be known that he

31 (Pages 121 to 124)

# FREEDOM COURT REPORTING

Page 125

1  thought he was this big, bad womanizer person,
2  ladies man, and he thought he could do
3  whatever he wanted to do and say whatever he
4  wanted to say and he didn't worry about -- he
5  said, I don't care what Gary says, I don't
6  care what anybody in human resources says,
7  this is my office and this is the way it's
8  going to work. He didn't care if he made you
9  cry. He didn't care if he made you upset. He
10  didn't care if you threatened to go tell
11  somebody what was going on, he didn't care,
12  because he -- he actED like -- he showed no
13  fear at all.
14      Q.  Okay. Fair enough. Let me ask you
15  this question: What expectation specifically
16  did he communicate to you during this January
17  13th meeting with he and Gary Sport in the
18  conference room?
19      A.  Oh, he was a perfect gentleman in
20  front of Gary.
21          MR. HORSLEY:  Answer the question
22  she's asking you.
23          THE WITNESS:  Okay.

Page 126

1          MR. HORSLEY:  She asked you what
2  expectations did he describe for you in that
3  meeting.
4          THE WITNESS:  In front of Gary?
5          MR. HORSLEY:  Yeah.
6      A.  Everything listed here.
7      Q.  In the sheets?
8      A.  In the sheets.
9
10  (Whereupon, Defendant's Exhibit 10
11  was marked for identification and a
12  copy of same is attached hereto.)
13
14      Q.  Okay. And I'm going to show you
15  what I'm marking as 10 and I believe you had a
16  copy of this but I don't know so I'm just
17  going to show it to you.
18      A.  Okay.
19      Q.  I mean, I know you've got it but I
20  think you may have provided the copy, how
21  about that.
22      A.  Oh.
23      Q.  Do you recognize Defendant's Exhibit

Page 127

1  10?
2      A.  I vaguely recall this. I actually
3  didn't receive it on the 5th. That's the day
4  that I got married.
5      Q.  Okay.
6      A.  I wasn't at work that day.
7      Q.  But have you seen Defendant's
8  Exhibit 10 before now?
9      A.  I'm not certain -- I can't say with
10  certainty that I've seen it before but I was
11  just looking at the date and it --
12      Q.  The date clicked?
13      A.  Yeah.
14      Q.  Now, had you in fact had some
15  discussions about the OSHA 300 log with Rance?
16      A.  We discussed it daily. I gave him a
17  printout every day.
18      Q.  About cases entered in the OSHA 300
19  log?
20      A.  I guess he had to meet with certain
21  people and he would say, I need a current
22  copy, and I would give him a current copy and
23  I don't know what he did with them exactly

Page 128

1  but.
2      Q.  Okay. Had you ever discussed
3  letting him know what's going on with workers'
4  comp and billing and injuries that occurred?
5      A.  From time to time it would be in
6  conversation but very little conversations
7  that he and I actually had had to do with
8  work-related issues unless he was inquiring
9  about, you know, where's so-and-so supposed to
10  be or where is this or just little small
11  things.
12      Q.  We're going to get to your
13  conversations, I promise.
14      A.  Okay.
15
16  (Whereupon, Defendant's Exhibit 11
17  was marked for identification and a
18  copy of same is attached hereto.)
19
20      Q.  I'm going to show you what I have
21  marked as -- I'm going to mark it as 11 and
22  you produce -- I think your lawyer produced
23  this to us.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 129

```
1      A.  Okay.
2      Q.  And I'm going to have to get your
3  help. I don't know what 11 is all about.
4      A.  Okay. This is a letter that I had
5  typed and saved in my computer.
6      Q.  Uh-huh.
7      A.  This is all that remains of the
8  letter. When I tried to print it off of the
9  computer, that was all that was left of it.
10 Someone apparently had deleted the remainder
11 of it. I had went to Gary and expressed to
12 him some concerns that I had with Rance and
13 some problems that I was having within the
14 office and Gary asked me to write Rance a
15 letter and I did.
16     Q.  Okay. And when did you print this
17 letter off?
18     A.  I'm not sure the exact date that it
19 was printed off.
20     Q.  Obviously before you left on
21 February 7th; right?
22     A.  Right.
23     Q.  Did you ever give a letter or a
```

Page 130

```
1  completed version of Defendant's Exhibit 11 to
2  Rance?
3      A.  Yes, I did.
4      Q.  You did?
5      A.  I did.
6      Q.  Did you give a copy to Gary?
7      A.  I believe I did.
8      Q.  Okay. And it says -- and I'm just
9  looking at the letter -- "It's intended to
10 express some of the concerns that I have. I
11 have worked in the safety department since
12 November 14. I had a couple of hit and miss
13 days of training on daily operation. I have
14 learned a lot and am still learning every
15 day." What else was contained in the letter?
16 Obviously you were concerned about training
17 and performing your job duties; right?
18     A.  Well, that was just the start of it.
19 I was trying to be able to get my raise. I
20 was trying to show, you know, in the letter,
21 you know, I'm not going to work for him, you
22 know, I'm not that type of person. He went on
23 and on and on various complaints, you know,
```

Page 131

```
1  that -- you know, this was my way to voice
2  what I felt, you know, how I felt.
3      Q.  What other complaints do you recall
4  being in the original document of Defendant's
5  Exhibit 11?
6      A.  The jokes that he made about women
7  and this and that and the other and the little
8  comments and the way that he would invade your
9  space and then, you know, try to be all nice
10 to you in an inappropriate way and then turn
11 around when you wouldn't go along with him and
12 snap on you. It's like Jekyll and Hyde,
13 either you play along or I'm not going to play
14 nice.
15     Q.  Okay. What was I guess the
16 conclusion or the outcome or the resolution
17 you were putting in Defendant's Exhibit 11?
18     A.  Gary wanted me to voice everything
19 that was going on, all my concerns, all my
20 questions, all my problems, that way once
21 Rance was notified by me by letter, Gary could
22 address him at that point.
23     Q.  Okay. Gary did eventually address
```

Page 132

```
1  Rance; right?
2      A.  I'm assuming so.
3      Q.  Okay. And we'll talk about that in
4  a bit too.
5      A.  Okay.
6      Q.  Do you know who -- what happened to
7  Defendant's Exhibit 11 or what happened to the
8  rest of it?
9      A.  Everybody that worked in that office
10 had access to that computer.
11     Q.  So you really have no idea what
12 happened to it?
13     A.  No idea.
14
15     (Whereupon, Defendant's Exhibit 12
16     was marked for identification and a
17     copy of same is attached hereto.)
18
19     Q.  Okay. I've got several I guess
20 memos I wanted to show you. Now, y'all
21 eventually did have a meeting I guess about --
22 let me show you this and ask you what this is
23 about before that because I think this came
```

33 (Pages 129 to 132)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 133

1   before the meeting and I'm marking as 12 a
2   note that you signed dated and I think you
3   produced to us dated January 12 of '06 about a
4   meeting with a Diane Balkcom.
5       A.   Correct.
6       Q.   Did you type this?
7       A.   I did.
8       Q.   Is that your signature at the
9   bottom?
10      A.   It is.
11      Q.   And I guess you were Robin Davis
12  because your name hadn't changed over from
13  being married a week before?
14      A.   Right.
15      Q.   And what was this all about,
16  Ms. Atwell?
17      A.   We had an employee that was struck
18  by a forklift before I became a member of the
19  safety department. She went through various
20  therapists, specialists, neurologists, just
21  about every doctor you can imagine, physical
22  therapy and everything. She was released to
23  modified duty. She came for all of about five

Page 134

1   minutes and sat in a padded rolling chair with
2   armrests and said she could not sit there any
3   longer and got up and walked out.
4       Q.   Okay.
5       A.   We had a lot of trouble trying to
6   work with her and a lot of it had to do with
7   her husband, he had a really sour attitude,
8   and so Gary had to have a meeting with her to
9   let her know that the doctors had released
10  her, she was expected to come back and work
11  out her modified duty program and that if she
12  didn't, that it could result in her
13  termination.
14      Q.   Okay. And that's what this is
15  about?
16      A.   This is a letter to Gary.
17      Q.   From you?
18      A.   From me.
19      Q.   Summarizing?
20      A.   I had to summarize the meeting,
21  correct.
22      Q.   And did you just hold on to this
23  when you left Smart —

Page 135

1       A.   Correct.
2       Q.   -- on February 7?
3       A.   Correct.
4       Q.   Why did you hang on to this thing
5   because it really didn't have anything to do
6   with you and your employment; right?
7       A.   Well, she had threatened and had
8   obtained at least two lawyers that I know of
9   while I was there and I knew if it ever went
10  to court I would need some way to refresh
11  myself on anything that might come of that
12  particular case.
13      Q.   Okay. So you held on to it for that
14  reason --
15      A.   I did.
16      Q.   -- and took it with you?
17      A.   I did.
18      Q.   Okay. Now, eventually you guys in
19  the safety office had a meeting, right, kind
20  of about who's on first and who's supposed to
21  be doing what; right?
22      A.   Right.
23      Q.   And there's a little bit of

Page 136

1   confusion about whose responsibility was whose
2   maybe?
3       A.   Oh, yeah.
4       Q.   Yes, there was?
5       A.   No doubt.
6       Q.   Tell me a little bit about the
7   confusion.
8       A.   Certain people were assigned to do
9   certain things and they wouldn't do their
10  things and then I was required to do all of my
11  things plus some of their things and you'd
12  come in and paper would be stacked up and
13  piled up and nothing would be filed and it was
14  like trying to push a chain, I mean, trying to
15  get some people to do what was expected of
16  them.
17      Q.   How did this meeting come about, do
18  you have any idea?
19      A.   What was the date on that meeting,
20  do you have it?
21
22      (Whereupon, Defendant's Exhibit 13
23      was marked for identification and a

34 (Pages 133 to 136)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 137

1  copy of same is attached hereto.)
2
3  **Q. I'm going to show it to you. It's**
4  **January 24th and I'll go ahead and mark 13.**
5  A. Okay.
6  MR. HORSLEY: Off the record.
7
8  (Whereupon, a discussion was held
9  off the record.)
10
11  A. I had went to Gary and to Ruth about
12  Rance and this meeting was held after that.
13  That's where the comments that "It was made
14  clear that if anyone has a problem or feel the
15  need to run to anyone in human resource
16  concerning how he operates the safety
17  department, can feel free to do so. The fact
18  is, Mr. Maddox was hired to do this job and is
19  still in charge of the safety department."
20  **Q. Who typed Defendant's Exhibit 13?**
21  A. Colinda Porter.
22
23  (Whereupon, Defendant's Exhibit 14

Page 139

1  and Joseph. I've actually spoken with Ruth in
2  private before and I've also actually spoken
3  with oh, gosh, she's in human resources.
4  MR. HORSLEY: Just tell her as best
5  you remember.
6  A. I can't remember her name and asked
7  for a complaint form to be able to fill out
8  against Rance if there was any type of
9  complaint form. I was told there was no such
10  form itself, just to fill out something in
11  writing and submit that.
12  **Q. Well, let me ask you a little bit**
13  **about these calendars while we're on them and**
14  **we'll kind of have to flip-flop. It looks**
15  **like — and I'm flipping through the exhibit,**
16  **Ms. Atwell, that — it looks like you've got**
17  **two Januaries and Februaries. You've got —**
18  **there's the January and February at the**
19  **beginning with the Southeast Sportsman**
20  **calendar and then we get back to pages five**
21  **and six and it's January and February again.**
22  **Are these separate calendars?**
23  A. This was my calendar that was on my

Page 138

1  was marked for identification and a
2  copy of same is attached hereto.)
3
4  **Q. Okay. I'm going to go ahead and**
5  **show you 14 because I'm just a little bit**
6  **confused —**
7  A. Okay.
8  **Q. — kind of on the timing of some**
9  **things.**
10  A. Okay.
11  **Q. If you'll look with me, it's**
12  **P26(A)0002, it's the second page of the**
13  **exhibit. I think you've got on January 18th**
14  **you met with Gary. Do you see that? Are you**
15  **with me? I'm on January now.**
16  MR. HORSLEY: Right.
17  **Q. January 18th, do you see that**
18  **meeting with Gary?**
19  A. Correct.
20  **Q. And I don't see anything about Ruth**
21  **until the next page, February P26(A)0003, and**
22  **I think February 1st spoke with Ruth.**
23  A. That was the day I spoke with Ruth

Page 140

1  desk at work.
2  **Q. Uh-huh.**
3  A. Like a little small pocket calendar.
4  MR. HORSLEY: Pointing to the second
5  one?
6  THE WITNESS: The second one.
7  **Q. You mean P26(A) 5 and 6, that was**
8  **the one on your desk?**
9  A. Correct.
10  **Q. Is that right?**
11  A. As well as this one, I believe.
12  **Q. Okay.**
13  A. Yes, these were different — two
14  separate calendars.
15  **Q. And the front two ones, P26(A) 2 and**
16  **3, where did you maintain these calendars?**
17  A. These were maintained in my
18  briefcase.
19  **Q. In your briefcase. Did you take**
20  **that to and from work with you every day?**
21  A. On occasion, not every day.
22  **Q. So you left it at home at times?**
23  A. Sometimes.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 141

1    Q.  When would you fill in this
2  calendar?
3    A.  Usually at night, my husband worked
4  third shift at the same plant and I would fill
5  in my daily events.
6    Q.  Okay.  Do you have these for other
7  months of the year that year?
8    A.  Oh, yeah.
9    Q.  Okay.  Do you have them for other
10  months?
11   A.  Oh, yeah.
12   Q.  I think we're going to need the rest
13  of that.
14   A.  Okay.
15   Q.  I mean, I know you weren't employed
16  but I mean, if it's got anything --
17   A.  It's got church and baseball.
18     MR. HORSLEY:  Just give it to me and
19  then we'll --
20     THE WITNESS:  Okay.
21   Q.  (By Ms. Willis) And I guess why did
22  you decide to -- had you always been a
23  calendar keeper I guess is my question.

Page 142

1    A.  I have actually.  I always have.
2    Q.  And do you just write down things
3  that are important to you or events that are
4  important to you?
5    A.  Right.  I've never been really good
6  at keeping up with dates and times, so if I
7  don't write something down, then I may, you
8  know, get my days mixed up.
9    Q.  But you tried to record things that
10  were obviously important to you like the day,
11  I got married --
12   A.  Correct.
13   Q.  -- on January 5th on this calendar?
14   A.  Correct.
15   Q.  Or things that affected you like --
16  it looks like on the 24th when you go to
17  Crenshaw County Hospital I believe that's CCH.
18  I'm in January, I'm sorry.
19   A.  Okay.
20   Q.  Do you see where I'm looking, the
21  24th?
22   A.  Yes.
23   Q.  Because that was important to you;

Page 143

1  right?
2    A.  Correct.
3    Q.  So you wrote down the things that
4  were important to you.  Did you fill it in
5  every day or would you sometimes miss a day
6  and go back in and fill in things that had
7  happened?
8    A.  I probably had went back and filled
9  in things from the day before, I'm not going
10  to say that I haven't, because you know,
11  sometimes you get in a big hurry and don't
12  have time to write down -- I'm a journal
13  keeper also.
14   Q.  Okay.  Do you have a journal for the
15  time period during your employment with Smart
16  Alabama?
17   A.  No, actually I started a journal
18  afterwards --
19   Q.  Okay.
20   A.  -- as part of my self-therapy.
21   Q.  Your self-therapy, was that
22  prescribed by a physician or health care
23  provider?

Page 144

1    A.  No, I did some research on the
2  internet and that was one of the things that
3  they suggested, since I couldn't see a
4  therapist, I went through some of the steps to
5  try to see what could be done and that was one
6  of the things was to keep a journal of your
7  thoughts and your feelings and your concerns.
8    Q.  And did that journal contain
9  information about the events that had
10  transpired during your employment at Smart?
11   A.  The journal started after I left.
12   Q.  Right, and I'm saying did it
13  reference things that had happened to you or
14  occurred while you were working at Smart?
15   A.  Yes, it referenced feelings that I
16  was having because of things that happened.
17   Q.  Did it reference Rance Maddox?
18   A.  Oh, yeah.
19     MS. WILLIS:  We're going to have to
20  get that journal because it's -- it's clearly
21  responsive.  I think we've asked for any
22  journals or you know --
23     THE WITNESS:  I never -- I didn't

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 145

1    think to say anything.
2         MS. WILLIS: Oh, no, that's fine,
3    but we're going to need to get that and we may
4    need to -- I hope we won't have to do this
5    again based on that journal but we do need
6    to --
7         Q.  (By Ms. Willis) You don't happen to
8    have that with you today, do you?
9         A.  No; no.
10        Q.  If you'll just get that to your
11   lawyer.
12        A.  Okay.
13        Q.  And I don't want to know anything
14   that -- I don't want to know when you started
15   to talk to him and what y'all talked about.
16        A.  Right.
17        Q.  But if it relates to -- I think
18   you've alleged mental anguish in this action
19   so it's relevant -- I think it's relevant
20   to --
21        MR. HORSLEY: Can we take a break
22   for a minute and let me ask her some things
23   about that and then maybe we can put something

Page 146

1    on the record about the journal.
2         MS. WILLIS: Yeah, that's fine.
3
4         (Whereupon, a brief recess was taken
5         from 12:50 p.m. to 12:57 p.m.)
6
7         MR. HORSLEY: Well, what I'm
8    agreeing to do today as far as a journal about
9    which Ms. Atwell just testified is to have her
10   provide it to me. I'm going to look at it and
11   decide from my standpoint whether or not I
12   think it is discoverable, and if it is, I will
13   obviously produce it. If I don't think it's
14   discoverable, then I'm not going to produce it
15   and -- with the understanding that the
16   defendant can file a motion to compel to force
17   me to produce it. My understanding on the
18   record of what the journal contains does not
19   specifically reference the defendant or Rance
20   Maddox and contains other very personal things
21   that are completely unrelated to this lawsuit,
22   so I'm going to have to look at it before I
23   can agree to produce it.

Page 147

1         MS. WILLIS: Okay. And I understood
2    that and I'll just say for the record, I take
3    the position at this point, and of course we
4    can agree to disagree later on down the road.
5         MR. HORSLEY: Right.
6         MS. WILLIS: That if it relates to
7    events or you know, she's claiming mental
8    anguish I believe as part of her damages in
9    this action, if it relates to that as a result
10   of any of the actions of Smart or Rance Maddox
11   then it is relevant. We may be able to
12   discuss the redaction of other unrelated
13   things as a possibility, you know, I'm within
14   a time limit but I'm going to probably reserve
15   the right to leave the depo or reopen the depo
16   if the journal -- if the journal is produced
17   or if the Court makes you produce the journal
18   if that's an issue.
19        MR. HORSLEY: Okay.
20        MS. WILLIS: If the journal so calls
21   for that.
22        MR. HORSLEY: That's fine.
23        MS. WILLIS: Okay.

Page 148

1         MR. HORSLEY: That's fine.
2         MS. WILLIS: Let's move forward.
3    Thank you for addressing that. I appreciate
4    that.
5         Q.  (By Ms. Willis) Ms. Atwell, will you
6    look back with me at Defendant's Exhibit 13,
7    which is this memo about the meeting?
8         A.  Okay.
9         Q.  And this meeting was addressed for
10   everybody, right, who was there?
11        A.  For Rance, myself, Lisa and Colinda
12   were the ones present. I'm not sure exactly
13   why Wendy wasn't there. She may have had a
14   doctor's visit or something.
15        Q.  Basically it sounds like the point
16   of the meeting was to reiterate
17   responsibilities and hey guys, let's stop any
18   kind of blame game that's going on here and
19   get some stuff done. Is that the way you
20   understood it?
21        A.  No.
22        Q.  Okay. Well, tell me how you
23   understood it because you were there.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 149

1    A.   Rance made it clear that -- like I
2  said, that he was the big boss.
3    Q.   Okay.
4    A.   That he did the hiring, he did the
5  firing, he controlled everything of everyone
6  in his office and he didn't answer to anyone,
7  and these notes actually aren't word for word,
8  they're just a brief summary of everything
9  that was said in that meeting and if you would
10  notice also --
11   Q.   Yes, ma'am.
12   A.   -- in this meeting the -- the only
13  person who had any changes made to their job
14  duties, which were just changed on the 14th I
15  believe of that month, was it the 13th or
16  14th, was myself.
17   Q.   I understand that but you know, you
18  had told me before I guess earlier on in your
19  testimony that when --
20   A.   Right.
21   Q.   -- you started in the office, you
22  were responsible for OSHA 300 and workers'
23  comp paperwork?

Page 150

1    A.   Right.
2    Q.   So that part hadn't changed; right?
3    A.   Right.
4    Q.   So this wasn't really a substantial
5  change to your duties, it was just a -- I
6  guess a -- I don't want to say a repeat or a
7  reiteration of what had already taken place --
8  what you had already been doing as well as
9  what had already taken place in the January
10  job description meeting?
11   A.   Correct.
12   Q.   Okay.  And we talked a little bit
13  about the blue jeans early on in the
14  deposition?
15   A.   Correct.
16   Q.   And it was your understanding blue
17  jeans were okay on Fridays if somebody wasn't
18  coming in or what not?
19   A.   Correct, if we weren't having plant
20  visitors or some type of special function or
21  something of that nature.
22   Q.   Did you ever receive any write-ups
23  from Rance Maddox about wearing blue jeans?

Page 151

1    A.   I had -- he told me he was writing
2  me up and he gave me a verbal warning.
3    Q.   Okay.  Are you aware as to whether
4  he counseled any other employees, whether they
5  be safety assistants or light duty people,
6  about wearing jeans on certain days?
7    A.   To my knowledge he hasn't -- jeans,
8  no.
9    Q.   But you don't know one way or the
10  other if he did or not?
11   A.   I don't know.
12
13       (Whereupon, Defendant's Exhibit 15
14       was marked for identification and a
15       copy of same is attached hereto.)
16
17   Q.   Okay.  I am going to show you what
18  I'm marking as now 15 and I believe you guys
19  made this available to us.  Are these your
20  notes on Defendant's Exhibit 15?
21   A.   They are.
22   Q.   And is this the termination letter
23  you saw?

Page 152

1    A.   Yes.
2    Q.   How did you come to have a copy of
3  this?
4    A.   It was in the community file where
5  Colinda keeps her things that everyone gives
6  her that's kind of centrally located where
7  everything gets filed.
8    Q.   Okay.  And so you took a -- you took
9  a copy from there?
10   A.   I made a copy from there.
11   Q.   Okay.  Why did you make a copy of
12  it?
13   A.   Because it was intended -- there was
14  one here on the desk and the way I know that
15  she's the one that had typed it is because it
16  was in her central folder.
17   Q.   But it was never handed to you and
18  said, Robin, you're terminated?
19   A.   When you walk in your office and
20  your name plaque is missing off of your desk
21  and this is the only thing sitting on your
22  desk, it's kind of obvious.
23   Q.   Yes, ma'am, but that wasn't my

38 (Pages 149 to 152)

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Page 153

1  question. Nobody ever handed this to you and
2  said you were terminated, did they?
3      A. They didn't have to.
4      MR. HORSLEY: Just answer that
5  question.
6      A. No; no.
7      Q. Okay. And it wasn't sitting out on
8  your desk, it was sitting in the community
9  file on your desk; right?
10     A. This was sitting on the desk in the
11 community file.
12     Q. Okay.
13     A. There was another copy -- there was
14 papers everywhere in this office. There was
15 another copy on the desk. When you walk in --
16 because I didn't have a calendar on my desk
17 right here, desk pad, everything was up.
18     Q. Okay. Well, let's look at 15. Do
19 you know if Gary Sport had authorized this
20 letter?
21     A. I have no idea.
22     Q. Do you know if Ruth Ryan or anybody
23 else in human resources authorized this

Page 155

1  entry in the OSHA 300A log was on November 30,
2  2005, which was entered in by Melissa
3  McGough." "You have yet to enter in or
4  complete any recordables on the OSHA 300A
5  log." I mean, we've talked about you
6  understood OSHA logs going in the safety
7  office?
8      A. Correct.
9      Q. You didn't make any notes out beside
10 this part of the letter; right?
11     A. Correct.
12     Q. And so there hadn't been any
13 recordables put into the log as of January
14 30th?
15     A. There have been. There's actually
16 two different OSHA 300 logs.
17     Q. There's a 300 and a 300A?
18     A. Right.
19     Q. I understand that. But as far as
20 the 300A log, do you know if anything had
21 been -- any recordables were showing up in
22 that log as of this time, January 30th?
23     A. There had to have been because there

Page 154

1  letter?
2      A. I have no idea to be honest with
3  you.
4      Q. Do you know who typed it?
5      A. Looking at the words and the
6  spelling and the way things are aligned here,
7  I feel very strongly that Colinda Porter typed
8  that to be honest with you.
9      Q. But you don't know for sure?
10     A. I don't know for sure.
11     Q. It's just your thought?
12     A. I've seen a lot of things that she's
13 typed and I feel comfortable with saying that
14 I think she typed it.
15     Q. Fair enough. Fair enough. And
16 let's look at the contents of Defendant's
17 Exhibit 15. I'm looking at the second
18 paragraph of the first page of Defendant's
19 Exhibit 15.
20     A. Okay.
21     Q. "As you can remember, it is first
22 shift safety assistant responsibility to enter
23 in and complete the OSHA 300A log." "The last

Page 156

1  was things recorded. We had to go back from
2  when the plant opened and go re-enter multiple
3  things in the OSHA 300 log that was -- way
4  before I was ever even hired, we had to go
5  through the entire file cabinet and play
6  catch-up.
7      Q. Okay. Now I'm looking at the third
8  paragraph. "Along with completing the OSHA
9  300A log, there has to be a first report of
10 injury claim from workers' compensation filled
11 out and emailed to Bill Hicks. This is also
12 very serious and must be done within 48 hours
13 of initial injury." You told me earlier you
14 understood about filling out workers'
15 compensation forms; right?
16     A. Correct.
17     Q. And that you had some problems with
18 other people in the office --
19     A. Correct.
20     Q. -- giving you information about what
21 had happened on their shifts?
22     A. Actually it was their responsibility
23 to fill out their report on the people that

39 (Pages 153 to 156)

# FREEDOM COURT REPORTING

Page 157

1    were injured on their shift.
2        Q.   Uh-huh, okay.  What's the note
3    here — is this your handwriting by paragraph
4    three on the first page of Exhibit 15?
5        A.   It is.
6        Q.   And it says, "Whatever I have copies
7    of all my stuff now and some of the old
8    stuff."  Was that some of the stuff you took
9    with you when you left Smart as far as the
10   first reports of injury?
11       A.   Some of the stuff that I had
12   accumulated over the period of time of working
13   there.
14       Q.   And taken home with you?
15       A.   Correct.
16       Q.   When did you handwrite these notes
17   on Defendant's Exhibit 15 by the way?
18       A.   Probably the day I got it.
19       Q.   The day you found it?
20       A.   Correct.
21       Q.   And were you at work then or were
22   you --
23       A.   Oh, I was at work.

Page 158

1        Q.   Okay, that you wrote this in?
2        A.   Because I went to Mr. Kwan
3    immediately.
4        Q.   You went to Mr. Kwan?
5        A.   I did.
6        Q.   With this letter?
7        A.   With this letter.
8        Q.   And what did you and Mr. Kwan
9    discuss?
10       A.   I made Mr. Kwan a copy of it.  I put
11   the copy that was left on the desk in my
12   pocket, discussed it with him.  He said he
13   would find out what was going on, he was very
14   upset about it.  I explained to him what all
15   had been going on and that he would find out
16   and get to the bottom of it.  That was not his
17   exact words but that was the gist of our
18   conversation.
19       Q.   He didn't tell you you were
20   terminated, did he?
21       A.   No, he did not.
22       Q.   Okay.  Did he ever get back to you
23   about it?

Page 159

1        A.   No, he did not.
2        Q.   But you left shortly thereafter, I
3    guess within a week of this?
4        A.   Correct.
5        Q.   Okay.  And then you've got notes
6    about what is this, never been instructed,
7    what is this, never been instructed, for daily
8    planner and reports of safety memos; is that
9    right?
10       A.   The daily planner for all three
11   shifts, I have no idea what exactly that was
12   other than the daily planner that we did was
13   for the light duty employees and it was what
14   their restrictions were and where they were
15   supposed to be.  That was done daily, so I
16   have no clue what he was trying to say that I
17   didn't do because it was -- the closest thing
18   that I knew that he was talking about was the
19   light duty planner that lets all the team
20   leaders know where everybody is supposed to
21   be.
22       Q.   But you didn't talk to Rance Maddox
23   directly about this Defendant's Exhibit 15,

Page 160

1    did you?
2        A.   No, he wasn't there.
3        Q.   Okay.  Was he out on medical leave
4    at that time?
5        A.   I'm not certain to be honest with
6    you.
7        Q.   Okay.  Then looking at the second
8    page, "Office organization, I know where my
9    stuff is and can't control what is done on
10   second or third shift.  This office is shared
11   by six people."
12       A.   Right.
13       Q.   Is that referring to the safety
14   assistants and the light duty people who work
15   in the safety office with you?
16       A.   Correct.
17       Q.   Okay.  "Safety committee/first
18   responders meeting, made list, posted list,
19   gave list to Lloyd," is that Lloyd Weathers?
20       A.   It is.
21       Q.   "And asked him to give me a date and
22   time when I could meet with the safety
23   committee people.  No response."  Had you

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 161

1  followed up on that since not getting a
2  response from Lloyd?
3      A.  It was followed up on and later on a
4  meeting was scheduled.
5      Q.  Okay.  Let me ask you this: With
6  regard to I guess Defendant's Exhibit 15 and
7  14 and the January 6 or January 5th memo,
8  which was 10, that note -- none of these
9  memos, whether you received them or not, ever
10  resulted in you being demoted, did they?
11     A.  No, but I was never given my raise
12  that I was supposed to have.
13     Q.  I'm looking back at Defendant's
14  Exhibit 1, which is the interrogatory
15  responses, and I'm looking at page six and I
16  thought you had told me earlier in the
17  deposition but I may be wrong but it says here
18  I began working with Smart Alabama for nine
19  dollars an hour and ended at 9.50 so you
20  eventually did go to 9.50; right?
21     A.  I believe I may have.  I don't have
22  a current statement but the 9.50 was what I
23  was making on third shift.  When I transferred

Page 162

1  to first shift, they wanted to decrease my pay
2  to nine dollars because that's what a first
3  shift employee gets paid.  Third shift gets
4  paid more.
5      Q.  But you were truthful when you
6  signed your interrogatory responses just as
7  you're being truthful here right now; right?
8      A.  To the best of my knowledge, yes.
9      Q.  So you began working making nine
10  dollars an hour and ended at 9.50?
11     A.  Right.
12     Q.  But you moved from third shift to
13  first shift?
14     A.  Right.
15     Q.  So you understood there may have
16  been some kind of shift premium paid for
17  working that third shift?
18     A.  Right, but if I -- the whole reason
19  for taking that position was for more money.
20     Q.  Okay.  Did anybody ever promise you
21  you were going to make more money?
22     A.  I was told that I would stay the
23  same.

Page 163

1      Q.  Okay.  That -- who told you you
2  would stay the same?
3      A.  Gary and he had -- he eventually got
4  that straight.
5      Q.  Okay.  So you did get a raise?
6      A.  No, I stayed at my regular pay rate
7  that I was on third shift but I never got my
8  30-day raise.
9      Q.  What was the --
10     A.  Or 30- or 90-day, I'm not certain.
11  Anyway, there was a raise period that came in
12  there where I had to have an evaluation.
13  Rance told me to write it out and I wrote it
14  out.  He said, I'll sign it.  I took it to him
15  to sign it.  I felt like he wanted certain
16  favors in order to sign that.  I tore it up
17  and threw it in the garbage.  I never asked
18  for my raise.
19     Q.  So you didn't ask for it?
20     A.  I asked Rance to do my paperwork.
21     Q.  But you never went to Gary about
22  your raise?
23     A.  No.

Page 164

1      Q.  Never went to Ruth about your raise?
2      A.  No.
3      Q.  Never went to anybody else in HR
4  about your raise?
5      A.  No, because it has to go through
6  your supervisor.  They have to give you a good
7  report in order for you to get your raise.
8      Q.  Now, you started in the safety
9  office in the beginning of November; right?
10     A.  Correct.
11     Q.  So you would have worked November,
12  December, January before you would have ever
13  even been eligible for the 90-day raise;
14  right?
15     A.  Correct.
16     Q.  But that was -- that would have been
17  at the beginning of February that you would
18  have been eligible -- even eligible for a
19  90-day raise; right?
20     A.  Right, that's why I said it was 30
21  to 90 or 60, I don't -- I'll have to look in
22  the handbook.
23     Q.  But you -- you only worked until the

41 (Pages 161 to 164)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 165

1  7th of January — I mean February, I'm sorry,
2  and then left; right?
3      A.  Correct.
4      Q.  Okay, all right.  Now, obviously you
5  filed an EEOC charge after you left the
6  employment of Smart; right?
7      A.  Correct.
8      Q.  And you signed that under penalty of
9  perjury; right?
10     A.  Correct.
11
12     (Whereupon, Defendant's Exhibit 16
13     was marked for identification and a
14     copy of same is attached hereto.)
15
16     Q.  And I'm going to mark as Exhibit 16
17  your charge and you were as truthful and
18  accurate and complete with the EEOC as you
19  could have been; right?
20     A.  Correct.
21     Q.  I'm going to show you what I'm
22  marking as 16, which is your EEOC charge.
23  Tell me when you're done reviewing it.

Page 166

1      A.  I've reviewed it.
2      MR. HORSLEY:  We've looked at it.
3      Q.  Okay.  I just wanted to make sure.
4  And did you sign this charge on I guess the
5  third page — oh, at the bottom of the third
6  page, is that your signature down in the left-
7  hand corner?
8      A.  Yes, it is.
9      Q.  And you understood you were signing
10 under the penalty of perjury?
11     A.  Yes.
12     Q.  And I don't want to know any
13 discussions about what you may have had with
14 your lawyer about what to put in there; okay?
15     A.  Okay.
16     Q.  Let's just go through the
17 contentions of your EEOC charge and I'm going
18 to ask you some specific questions about
19 those; okay?
20     A.  Okay.
21     Q.  Now, I'm looking at the first
22 asterisk.  "During her first week in
23 Mr. Maddox's office, and continuing through

Page 167

1  January 2006, Mr. Maddox asked Ms. Atwell on
2  numerous occasions where she was eating and if
3  she wanted to eat with him.  When she would
4  tell him she had other plans, on numerous
5  occasions, he would show up wherever she was
6  eating."  On what date did this occur?
7      A.  There were several dates actually.
8  I don't have the exact dates.
9      Q.  You didn't write them down on a
10 calendar?
11     A.  I don't — I don't write every
12 single little thing down.  I write some very
13 important things down.  Would you like to give
14 me an example of how something like that would
15 occur?
16     MR. HORSLEY:  Just answer her
17 questions.
18     MS. WILLIS:  That's fine.
19     MR. HORSLEY:  She just wants to know
20 if you wrote it down or not and the answer is
21 no.
22     Q.  (By Ms. Willis) And that's fine.
23 Did he ask you to go eat at a specific place?

Page 168

1      A.  Yes, Ranch House, Chicken Shack.
2      Q.  Anywhere else that you can think of?
3      A.  He asked me to a place where you
4  don't eat.
5      Q.  What's that?
6      A.  It's a bar.
7      Q.  What's that?
8      A.  In Montgomery, Igor's or Iyor's or
9  something.
10     Q.  And I think that's later on down in
11 the charge and we'll get to that; okay?
12     A.  Okay.
13     Q.  Right now I'm just asking you about
14 lunch.  How many times did he ask you to have
15 lunch with him?
16     A.  It was almost on a daily basis.
17 Where are you eating lunch?  Where are you
18 going?  What are y'all going to have today?
19 Where are you going today?  Do you want to go
20 grab something?  No.
21     Q.  Okay.  Did that offend you?
22     A.  When it got to where it was — the
23 other things going on, the other things that

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

Page 169

1    had been done, other things that had been
2    said, I was very uncomfortable.
3        Q.   But initially it didn't bother you?
4        A.   Well, initially it started out as
5    what I thought was just innocent conversation,
6    you know.  Would you like to go eat here or
7    where are you going and then when it got to
8    where me and the girls would go show up
9    somewhere to eat because he would overhear us
10   on the phone where we were going to go eat for
11   lunch and then you never know, you might see
12   him pull through the parking lot or he might
13   show up.  So I started getting my husband to
14   come eat lunch with me every day and he worked
15   third shift, so he would have to get up out of
16   bed to come eat lunch.
17       Q.   Now, there's not very many places to
18   eat in Luverne around the plant, are there?
19       A.   Right around the plant, no.
20       Q.   So it's not necessarily that Rance
21   was following you to lunch, it may be -- it
22   could have been at least limited possibilities
23   about where to eat?

Page 170

1        A.   Well, there's enough places that --
2    the random possibility of him showing up at
3    the same place very often was -- you know, I
4    just don't see it happening as a coincidence.
5        Q.   Did he ever show up where you were
6    eating and ask could he eat with you?
7        A.   Oh, he has come and sat down with
8    me, yes, ma'am.  He didn't ask.  He just sat.
9        Q.   You've been with others?
10       A.   No.
11       Q.   By yourself?
12       A.   It was by myself one day.
13       Q.   Where was that at?
14       A.   At the Chicken Shack in Luverne.
15       Q.   And that happened one time?
16       A.   Yes.
17       Q.   About when did that happen in your
18   employment at Smart?
19       A.   I'm saying it was maybe somewhere
20   before January -- between December and
21   January.  The reason I'm thinking is that's
22   when I started making reference to my husband
23   and then started making him come eat lunch

Page 171

1    with me.
2        Q.   Okay.  Did anybody else witness him
3    inviting you to lunch?
4        A.   Colinda may have, I'm not certain on
5    that.
6        Q.   Anybody else?
7        A.   No one that I can think of at this
8    time.
9        Q.   Did you ever report Rance asking you
10   to take you to lunch or go to lunch with you?
11       A.   That was the part of the whole gist
12   of the things when I went to human resources,
13   that was part of what was brought up.
14       Q.   Who did you report that to?
15       A.   It was brought up to Gary in the
16   cafeteria at Smart.
17       Q.   So you ran into him one day in the
18   cafeteria?
19       A.   No, I went to go talk directly with
20   Gary and we were actually speaking in the
21   cafeteria.  It was between lunch shifts.
22       Q.   Okay.  And what did you tell him
23   specifically about going to lunch?

Page 172

1        A.   I think -- it wasn't just about
2    lunch itself.  It was about numerous things.
3        Q.   Okay.  But just for now I'm
4    asking --
5        A.   Okay.
6        Q.   -- what specifically did you tell
7    Gary about Rance wanting you to go to lunch?
8        A.   I don't remember my exact words but
9    probably that, you know, that he had been
10   coming on to me and that I was uncomfortable
11   with it and he calls all the time and asks me
12   to go out to eat all the time and shows up,
13   you know, and just the same things that are
14   listed.
15       Q.   Did you ever tell Rance that you
16   felt uncomfortable with him doing that?
17       A.   Oh, yeah, I've cussed at him.
18       Q.   When did you cuss at him?
19       A.   The day that he reached over my
20   shoulders and grabbed my breast when I was at
21   my computer station at my desk.
22       Q.   That's not exactly what you told the
23   EEOC, was it, and I'm looking -- the third

# FREEDOM COURT REPORTING

Page 173

1  asterisk, "On January 18, 2006, while
2  Ms. Atwell was in the corner of the office
3  working on a computer, Mr. Maddox grabbed both
4  of her shoulders and squeezed them as if he
5  were giving her a massage. He moved his hands
6  over her shoulders where they were situated
7  just above her breast and rubbed her." He
8  didn't touch your breast, did he?
9      A. Your breast is not just a small
10  area. It's -- it goes in other areas and yes,
11  the actual breast area was touched.
12      Q. Why didn't you tell the EEOC that
13  instead of just above your breast?
14      A. Because it wasn't under it, it was
15  above. It was in this area.
16      Q. Okay. And I'll go ahead and ask you
17  about that incident. That happened when you
18  successfully entered something into the
19  computer; right?
20      A. No.
21      Q. Well, tell me how this came about
22  then.
23      A. He was all the time rubbing and

Page 174

1  bumping up against you and hugging and holding
2  hands.
3      Q. Yes, ma'am, that's not what I asked
4  though. I'm asking about this particular
5  incident which you're referring to. Tell me
6  how that came about.
7      A. I was working on my computer. I
8  don't even know what I was doing or working on
9  at that particular time. My desk was in a
10  corner. My computer was in the very center.
11  My chair rolled up to the middle. He walked
12  up behind me. I could not roll backwards. He
13  reached over and was rubbing my shoulders. As
14  I tried to get up, he reached down. He
15  laughed and thought it was funny.
16      Q. Okay. But that happened that one
17  time?
18      A. At the computer desk, yes.
19      Q. At computer desk. Did he touch your
20  shoulder/breast at any other time?
21      A. He was a very touchy, feely person.
22      Q. Did he touch them at any other time?
23      MR. HORSLEY: She's asking you if he

Page 175

1  touched your breasts at any other time.
2      A. He's rubbed his shoulders up against
3  my breasts.
4      Q. When did that happen?
5      A. I'm not sure exactly a date unless I
6  listed a date here.
7      Q. Did you ever record it on your
8  calendar?
9      A. Not unless it was on my calendar.
10      Q. So that just wasn't important enough
11  to you to keep track of it I guess?
12      MR. HORSLEY: Object to the form,
13  argumentative.
14      MS. WILLIS: You can answer.
15      A. It got to where it was something all
16  the time every day.
17      Q. Okay.
18      A. And so yes, he has.
19      Q. Did anybody witness him when he came
20  and rubbed your shoulders/up above your breast
21  when you were sitting at the computer?
22      A. To my knowledge, no.
23      Q. When that happened I know -- and

Page 176

1  we're going to get into who you've talked to
2  at Smart a little bit later on.
3      A. Okay.
4      Q. Did you tell anybody in your family
5  or anybody else outside the workplace about
6  it?
7      A. I told my sister-in-law.
8      Q. Your sister-in-law, Janna?
9      A. Uh-huh.
10      Q. Let's look back at the second page.
11  "On November 16, 2005, Ms. Atwell's birthday,
12  Rance Maddox hugged her. Although it was a
13  birthday hug, the hug was inappropriately
14  tight and long." Where were you at Smart when
15  Rance hugged you?
16      A. In our office.
17      Q. In the safety office?
18      A. Uh-huh.
19      Q. Was anyone else present?
20      A. Not to my knowledge.
21      Q. Was the door open or closed?
22      A. Closed.
23      Q. Was any conversation had prior to

44 (Pages 173 to 176)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 177

1 him hugging you?
2     A.  He came in and I had had flowers and
3 balloons -- two actually arrangements of
4 flowers and balloons sent to me, so that's how
5 he knew it was my birthday, and I was standing
6 up in passing walking by it was like, you
7 know, happy birthday but other than -- I
8 didn't actually come outright and tell him
9 it's my birthday.
10     Q.  And when you say inappropriately
11 tight and long, how long did the hug last?
12     A.  I'd say maybe eight to ten seconds.
13     Q.  Okay.  And you consider that too
14 long?
15     A.  Oh, yeah.
16     Q.  Did you report that to anybody when
17 it happened?
18     A.  No.
19     Q.  What did you do after he hugged you?
20     A.  I was on my way out the door and I
21 went on out and did -- wherever I was heading
22 to.
23     Q.  Kept on working or whatever you were

Page 178

1 doing prior to the hug?
2     A.  Yeah, I thought it was kind of
3 weird.
4     Q.  Okay.
5     A.  But --
6     Q.  Did you record it, and I'm looking
7 if y'all want to look on Defendant's Exhibit
8 14, did you record it anywhere on any
9 calendar?
10     A.  I'm not certain if it's on there or
11 not.
12     Q.  I don't see anything about it but --
13     A.  It's my birthday, I wouldn't forget.
14     Q.  I don't -- I don't see one of these
15 kinds of calendars for November.  I do see
16 your desk calendar, so if you have one of
17 those, you might want to give that to your
18 lawyer too for November 2005.
19     A.  Okay.  I have that.
20     Q.  Let's talk about this other
21 allegation from November 16 through the end of
22 January.  "Mr. Maddox repeatedly touched the
23 plaintiff on her arms and hands and attempted

Page 179

1 to hold hands with her while talking to her."
2 Where would you be when he would do this?
3     A.  It could be a variety of places.  He
4 could be at his desk and call me to his desk
5 and either I could stand on the side of his
6 desk and he'll say, come around here so I can
7 see.  And as I would stand beside him and try
8 to show him things or get him to show me
9 things, that's when all the touching and
10 rubbing would be while I was closer by or if I
11 was doing things filing or looking for
12 something, you know, he would come by or brush
13 by.  And when he would try to talk to you, he
14 would try to hold your hand or rub your hand.
15 And if he sat on the front side of his desk,
16 he would try to hold your hand and pull you in
17 towards where his legs were.
18     Q.  Did you ever see him doing that with
19 any other female employee?
20     A.  I did one other female employee.
21     Q.  Who?
22     A.  Melissa McGough.
23     Q.  When did that occur?

Page 180

1     A.  It was actually while I was in
2 training and he was that way with her.
3     Q.  What do you mean that way with her,
4 what exactly did you see?
5     A.  He was holding her hand while he was
6 standing there talking to her and he hugged
7 her but she was leaving the office to go to
8 another area and so I really didn't know what
9 to make of it.  It really didn't strike me as
10 odd at that particular time.
11     Q.  How many times did he try to hold
12 your hand?
13     A.  I'd say at least 20 or 30.
14     Q.  Did you ever record it on your
15 calendar?
16     A.  I'm not certain unless it's -- if
17 it's not on there, then I may not have written
18 that down.
19     Q.  Did anybody ever witness him trying
20 to hold your hand while he was talking to you?
21     A.  I'm not certain.
22     Q.  Did you ever report it that he was
23 trying to hold your hand when he was talking

45 (Pages 177 to 180)

**Page 181**

1 to you?
2     A. Yes.
3     Q. To whom?
4     A. To Gary and to Ruth.
5     Q. To Gary when you talked to him
6 first?
7     A. Uh-huh.
8     Q. And then to Ruth later on?
9     A. Right, and the second -- the first
10 and second meeting that I had with Ruth, it
11 was discussed in both of those meetings.
12     Q. Okay. What specifically did you
13 tell Gary?
14     A. That he was out of the way, I don't
15 remember exactly what my words were. I just
16 went over everything that was making me
17 uncomfortable and that when he didn't get his
18 way, he turned into a grouch and that he was
19 making it miserable for me because I wouldn't
20 play along with him.
21     Q. Did you specifically reference him
22 holding your hand?
23     A. I'm -- I'm not positive but I'm very

**Page 182**

1 sure that I did because --
2     Q. But you're not absolutely certain?
3     A. I know that I did with Ruth.
4     Q. Okay. The other allegation I guess
5 in this part is that he touched you -- touched
6 you on your arms. Where would he touch you on
7 your arms? What part of your arms? Let me
8 make that question a little clearer.
9     A. He may come up from behind and wrap
10 his arm around your arm or come up from behind
11 and rub your arms this way or come up from the
12 front and grab you on each side and just -- he
13 would invade your space by the way he held
14 your arms to talk to you, not like in a gruff
15 way but just like in a -- you know, this is my
16 space, this is your space, he would invade
17 your space while he held you and pulled you
18 towards him.
19     Q. How many times did he do that?
20     A. Probably 20 or more, I mean, it's
21 hard to keep up with it because it went on so
22 much.
23     Q. I understand that and you know, I'm

**Page 183**

1 sorry, I have to kind of ask you because I do
2 need to get the specifics. When was the first
3 time he touched your arms like you just
4 described for us?
5     A. I'm not sure exactly which day would
6 be the first time.
7     Q. How long had you been working in the
8 safety office with Rance when he touched you
9 on the arms for the first time?
10     A. Two days.
11     Q. Two days. Did you report it to
12 anybody then?
13     A. The birthday hug, no.
14     Q. Well, did you -- okay. Did you
15 report the touching on the arms to anyone at
16 Smart at the time it happened, the first time
17 it happened?
18     A. No.
19     Q. You waited to report it until
20 sometime mid-January when you met with Gary;
21 right?
22     A. No, it had been reported before
23 then. I had went to Fran Hughes and asked for

**Page 184**

1 a letter from her, a form to fill out,
2 something that I could fill out about Rance.
3 I had already written the letter -- no, that's
4 when I had written the letter to Rance but I
5 had went to Fran Hughes prior to asking for a
6 form to fill out for harassment.
7     Q. Did you tell her specifically --
8     A. Yes.
9     Q. -- what you were putting in the
10 form? Do you consider Fran Hughes a truthful
11 person?
12     A. As far as I know.
13     Q. Okay. Did you ever turn in the
14 letter or the form about --
15     A. The company doesn't have such a
16 form. That's what she --
17     Q. Did you ever write out anything?
18     A. I did.
19     Q. What?
20     A. Everything that I felt that was
21 going on.
22     Q. Well, was that in that January --
23     A. You know, how uncomfortable --

46 (Pages 181 to 184)

Page 185

1    MR. HORSLEY: Make sure that she's
2 finished before you start talking.
3    MS. WILLIS: And I'm sorry, I will
4 extend you the same courtesy.
5    Q. (By Ms. Willis) Did you write that
6 out in that January letter that was unfinished
7 or are you talking about some other document
8 when you say you wrote all that out?
9    A. There's two separate documents.
10 This is the one to Rance himself and there was
11 another letter that was given to Fran through
12 human resources.
13    Q. Where is that letter?
14    A. Human resources I'm assuming.
15    Q. What was the date of that letter?
16    A. Just one second and I'll --
17    MR. HORSLEY: Hold on. Is this the
18 handwritten letter?
19    THE WITNESS: It may be. Do you
20 have it?
21    MR. HORSLEY: Do you not have this?
22    MS. WILLIS: I have one but it's not
23 to -- I don't have anything with Fran Hughes'

Page 186

1 name on it.
2    THE WITNESS: Does it say human
3 resources or --
4    MR. HORSLEY: Hold on.
5    THE WITNESS: This is the rough
6 draft.
7    MR. HORSLEY: Is that what you're
8 talking about? You've got this, don't you?
9    MS. WILLIS: Uh-huh.
10
11    (Whereupon, Defendant's Exhibit 17
12    was marked for identification and a
13    copy of same is attached hereto.)
14
15    Q. (By Ms. Willis) I'll go ahead and
16 mark this. I'm showing you Defendant's
17 Exhibit 17. Is this addressed to Fran Hughes?
18    A. No.
19    Q. And this was a rough draft?
20    A. It is.
21    Q. So it wasn't ever given over?
22    A. Yeah, it was typed.
23    Q. Did you ever give it to anybody?

Page 187

1    A. Yes, it was given to Fran Hughes.
2    Q. When did you give it to Fran Hughes?
3    A. I'm assuming somewhere around the
4 2nd because that's the date on it.
5    Q. Did you not keep a typed copy of it?
6    A. I gave them everything that I had.
7    Q. Although you kept copies of OSHA
8 forms, you didn't keep a typed copy of your
9 complaint?
10    A. I don't have copies of my pay stubs
11 either but -- no, I don't keep copies of
12 everything.
13    Q. Do you know what if anything Fran
14 did with it?
15    A. No idea.
16    Q. Okay. Do you know if Gary Sport,
17 who this was addressed to, ever got it?
18    A. I'm uncertain. There was a copy for
19 Fran and there was a copy for Gary.
20    Q. Okay. But Fran's name is not
21 anywhere on this?
22    A. Right, she's on -- all you have to
23 do is change the name. She's human resources,

Page 188

1 Smart.
2    Q. She dealt more with insurance and
3 community relations; right?
4    A. Actually when she came to our AIDT
5 training meeting, she came in and introduced
6 herself and said that she had an open door
7 policy and that if anybody had any questions
8 or concerns, feel free to come to her. She
9 did have other job responsibilities but she
10 was also there in case someone needed to speak
11 with her about problems or concerns.
12    Q. Okay. Going back to your EEOC
13 charge, you reference going to Igor's in
14 Montgomery, going for drinks after work. How
15 many times did Mr. Maddox ask you if he wanted
16 to go have -- if you wanted to go have drinks
17 after work?
18    A. Between the November and -- sometime
19 in November and around -- somewhere around the
20 New Year when I guess all the Christmas
21 parties and getting ready for New Year's and
22 all, it was around in that particular time.
23 I'm saying maybe three or four times.

47 (Pages 185 to 188)

# FREEDOM COURT REPORTING

Page 189

1  Q. Did you ever go?
2  A. No.
3  Q. Did you ever — let's look at
4  Defendant's Exhibit 14. Did you ever record
5  it on a calendar anywhere?
6  A. No, ma'am.
7  Q. Okay. Did he — what would he say
8  when he asked you to have drinks with you —
9  with him, so sorry.
10  A. That he was going to Igor's and
11  would I like to go with him and they're going
12  to have a good time and come on, you know,
13  we'll have a ball and I'll buy your drinks and
14  don't worry about driving, we'll just — you
15  know, if we get too tore up, we'll get a room,
16  and that kind of stuff.
17  Q. And he said we're going to have a
18  good time. Who else was going with him?
19  A. He never referenced anyone else
20  going with him.
21  Q. Do you know whether anybody else was
22  going to go or not?
23  A. He never said if there was.

Page 190

1  Q. Did anybody ever witness him asking
2  you to have drinks with him after work?
3  A. Not to my knowledge.
4  Q. Okay. Even though they worked there
5  in the safety office with you?
6  A. Like I said, people were in and out.
7  Q. Okay. Did you ever report
8  specifically that he was asking — that he,
9  Mr. Maddox, was asking to have drinks with
10  you?
11  A. I'm sure it was brought up at one of
12  the conversations that I had with somebody.
13  Q. Do you — but you don't know who?
14  A. No.
15  Q. Or when, okay. There's something
16  here in your EEOC charge about a comment
17  between November 16 and December 1st as to it
18  was impossible for men to be monogamous.
19  MR. HORSLEY: Where are you?
20  MS. WILLIS: First page — first
21  page of allegations I guess.
22  THE WITNESS: Right there.
23  MR. HORSLEY: Yeah.

Page 191

1  A. Yes.
2  Q. Where were you when Rance made a
3  comment like this?
4  A. In our office.
5  Q. Who else was present?
6  A. I think somebody had come in and —
7  or we were talking about somebody was upset
8  about something. There was a guy that worked
9  there named Dusty and he had come in and
10  talked to Rance because he was having trouble
11  with his girlfriend, and when Dusty left,
12  that's when Rance started up the conversation
13  about people being — you know, he didn't
14  believe that men could be monogamous and
15  they're not designed that way — we're not
16  built that way, we're not wired that way, you
17  know. He just let it be known that that's how
18  he felt.
19  Q. Was anybody else in the office at
20  that time?
21  A. No.
22  Q. What did you say?
23  A. I don't believe I made a comment.

Page 192

1  Q. Okay. Did you record it on your
2  calendar anywhere?
3  A. No, that's why the dates are as they
4  from —
5  MR. HORSLEY: Just answer what she's
6  asking you.
7  A. No.
8  Q. Did you tell anybody in your family
9  about it?
10  A. I told my sister-in-law, Janna.
11  Q. Did you report it to anybody at that
12  time at Smart?
13  A. No.
14  Q. Why not?
15  A. I just didn't.
16  Q. Didn't think it was important enough
17  to tell anybody?
18  A. That was just a comment.
19  Q. Okay. So you weren't offended by
20  it?
21  A. At that time, I mean, he was just
22  letting me know how he thought but you know, I
23  didn't want — you know, I didn't go to human

48 (Pages 189 to 192)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

Page 193

1    resources with it.
2        Q.  Okay.
3        A.  I've been in their office every day.
4        Q.  Did you go to human resources ever
5    specifically about the comment about men being
6    monogamous in their relationships?
7        A.  No, but I'm sure it was mentioned in
8    some of the meetings that I had.
9        Q.  You don't know one way or another
10   though?
11       A.  No.
12       Q.  Okay.  It says on numerous occasions
13   between November 16 and the end of January he
14   deliberately rubbed his pelvis area against
15   your buttocks.
16       A.  Yes.
17       Q.  Tell me the first time that
18   occurred.
19       A.  I'm not sure exactly the first time
20   that it occurred to be honest with you.  I
21   don't know the exact date.
22       Q.  How long had you been working in the
23   safety office?

Page 194

1        A.  Probably less than a week.
2        Q.  You would agree with me rubbing your
3    pelvis up against somebody's behind, that's
4    pretty serious if it happens; right?
5        A.  Oh, yeah.
6        Q.  Why didn't it get recorded on your
7    calendar?
8        A.  Like I said, some things I write
9    down and some things I didn't.  That's why
10   there's no specific date on there.
11       Q.  How many times did he rub his pelvis
12   against you?
13       A.  Against any part of my body?
14       Q.  Yeah.
15       A.  Probably off and on several times a
16   week at least.
17       Q.  What part of your body did he rub
18   his pelvis up against and how on the first
19   occasion?
20       A.  He's rubbed it up against my
21   buttocks.  He's rubbed it up against my
22   shoulder.  I guess that would be the two main
23   areas.

Page 195

1        Q.  Okay.  And yes, ma'am, and I'm
2    asking the first time that it happened, what
3    part of your body did he rub his pelvis up
4    against?
5        A.  He had come behind me as I was
6    filing.  He made it seem like he was just
7    trying to squeeze by but there was nothing
8    behind him to prevent him from getting by.
9        Q.  How long of contact did he have with
10   you at that point in time when you were
11   filing?
12       A.  It was not a brush, it was a slide
13   if that makes any sense.
14       Q.  About how long did the slide last?
15       A.  Maybe three seconds.
16       Q.  Did you say anything to him about
17   it?
18       A.  No, I stood up, leaned up from where
19   I was — the position I was in.
20       Q.  Do you know if he meant to do it or
21   not?
22       A.  Well, I act startled and he laughed,
23   so he didn't apologize so I'm assuming it was

Page 196

1    intentional.
2        Q.  Did you report it to anybody outside
3    of Smart?
4        A.  No.
5        Q.  Did you report it to anybody at
6    Smart?
7        A.  I did.
8        Q.  Who?
9        A.  It was brought up in the
10   conversations.
11       Q.  Which conversation?
12       A.  The conversations that I had with
13   different people that work in human resources
14   as well as Mr. Kwan.
15       Q.  When did you tell Mr. Kwan about
16   this?
17       A.  The day that I found the termination
18   letter.
19       Q.  How long did you spend with Mr. Kwan
20   that day?
21       A.  About 30 minutes.
22       Q.  Okay.  What specifically did you
23   tell him during that meeting?

49 (Pages 193 to 196)

# FREEDOM COURT REPORTING

Page 197

1    A. We went over the letter and I
2 explained to him everything that had gone on
3 over the period of time that I had worked
4 there, everything.
5    Q. Well, can you tell me more specifics
6 than everything?
7    A. About him calling all hours of the
8 day and night, about him showing up where I
9 eat, about him asking me out, about him
10 touching me inappropriately, about him telling
11 me to just work with him and you know,
12 everything, about how I'd cry, about how I'd
13 throw up, about how it's causing me problems
14 at home.
15    Q. Right. But you understood from the
16 sex harassment policy that you're supposed to
17 report your concerns to human resources, that
18 that was where it was supposed to go?
19    A. And it did and it didn't do any
20 good, so I went to the person that's over
21 their head and that's Antoine Kwan.
22    Q. What did Mr. Kwan say in response to
23 you during the meeting?

Page 198

1    A. I remember him saying what, what
2 several times, and I explained to him and I
3 slowed down because I was really upset and you
4 know, didn't know, you know, if it was
5 factual, if I was really terminated, if I
6 wasn't terminated, you know, what was going
7 on. We had just bought a house. All this
8 mess was going on, you know. All I could
9 think is I really need this job, I don't need
10 it this bad if I'm going to have to put up
11 with this kind of mess and I explained
12 everything to him, all my concerns, all my
13 feelings, everything that was done, everything
14 that was said.
15    Q. And you said you had done that
16 because meeting with human resources had done
17 no good?
18    A. Right, I had asked —
19    Q. What led you to conclude that?
20    A. I had asked to be transferred. I
21 had asked for him to be transferred. I had to
22 transfer myself.
23    Q. But weren't you in fact told that

Page 199

1 you were going to be transferred out to work
2 with Lloyd Weathers?
3    A. On the very last day I was at work,
4 my husband and I met with Ruth and Ruth said
5 that they would move me out into the plant.
6 If I worked out in the plant, I would see
7 Rance every day. He has access to the plant.
8 He has to go through the plant. You have to
9 get your safety equipment through him.
10    Q. Right, but you wouldn't need to have
11 one-on-one interaction with him unless you
12 needed to go to the safety office?
13    A. No, he could come through the plant
14 at any given time.
15    Q. He could come through the plant but
16 there were obviously other people working out
17 there; right?
18    A. There were other people working in
19 the offices too.
20    Q. But none of them really witnessed
21 any of this according to you. Let me -- let
22 me show you looking back at your calendar on
23 the 7th, it says requested transfer. Is that

Page 200

1 when you met with Ruth? I'm looking at your
2 calendar if you want to look along.
3    A. Okay.
4       MR. HORSLEY: Ask the question
5 again.
6       MS. WILLIS: Can you read it back?
7
8    (Whereupon, the desired portion of
9    the proceedings was read back.)
10
11    A. That's one of the occasions that I
12 met with Ruth about getting transferred.
13    Q. But it didn't satisfy you to move to
14 the plant and out away from the safety office?
15    A. I would still have to deal with him
16 every day.
17    Q. Well, where in the plant did you
18 want to be moved if -- so you wouldn't have to
19 deal with him every day?
20    A. To another department that had
21 nothing to do with safety. The people in the
22 front offices didn't have to deal with Rance.
23 They didn't have to have safety equipment.

50 (Pages 197 to 200)

Page 201

1    Q.  Do you know if you were qualified to
2  perform any of the positions in the front
3  office?
4    A.  Actually I was -- there was a
5  gentleman that worked there, I'm trying to
6  remember his name, who was -- he knew what was
7  going on and he said that he would try to get
8  me put into his department.
9    Q.  Who was that?
10    A.  I'm trying to find his name, David
11  McGough.
12    Q.  What department was David McGough
13  in?
14    A.  I'm not certain.  I'll have to do
15  some research on that and let you know.  I'm
16  really not sure.
17    Q.  He worked out in the plant though,
18  didn't he?
19    A.  No, he had an office.
20    Q.  Do you know if anybody who worked
21  with him worked out in the plant or not?
22    A.  I'm not certain.
23    Q.  Okay.  What did you tell David

Page 202

1  McGough if anything?
2    A.  I told him what was going on with
3  Rance.  I'm not sure exactly what details I
4  went into.  He knew that I was unhappy.  He
5  had seen me crying.  He knew that I was upset
6  and he said that he would try to get me a job
7  in his area.
8    Q.  Okay.  But David McGough doesn't
9  work in human resources, does he?
10    A.  No, he doesn't.
11    Q.  When you met with Ruth Ryan the
12  first time, the first time I reflect you met
13  with Ruth Ryan, February 1st, do you see that?
14    A.  With Ruth and Joseph, yes.
15    Q.  Who's Joseph?
16    A.  He -- I'm not exactly sure what his
17  title was.  I know he did some translation and
18  he helped Ruth with some of the new hires I'm
19  thinking but I'm not sure exactly what his
20  title was.  He was like her assistant.
21    Q.  In the meeting on February 1st, tell
22  me everything you told Ruth and Joseph.
23    A.  That Rance had been out of the way,

Page 203

1  I wasn't totally -- I didn't lay everything
2  out on the table that day with Ruth because
3  Joseph was in there and Joseph ate lunch with
4  a girl that worked in our safety office on
5  almost a daily basis and I was afraid of
6  retaliation from Rance even further so I was
7  very vague with Ruth on that day because
8  Joseph was present at that meeting.
9    Q.  But Joseph was part of human
10  resources in some way, wasn't he?
11    A.  Like I said, I'm not -- he was her
12  assistant.  I knew he helped do translations
13  for people that, you know, we couldn't
14  understand what they were saying and -- or he
15  would help do doctors' visits and that kind of
16  stuff but I'm really not sure exactly --
17    Q.  So you didn't give Ruth all of the
18  specifics of what you listed in your EEOC
19  charge when you met with her on February 1st?
20    A.  No.
21    Q.  Did you ever follow up with her and
22  give her all the specifics?
23    A.  Oh, yes.

Page 204

1    Q.  When was that?
2    A.  The next day, the very next day, we
3  met in the Washington room.
4    Q.  And how long did you spend with Ruth
5  on that day?
6    A.  It was well over an hour.  It was
7  late in the evening, everybody was gone from
8  the office, and she and I sat in there alone
9  and spoke.
10    Q.  Tell me everything you told Ruth
11  during that meeting in the Washington Room.
12    A.  I told Ruth everything that was
13  going on with Rance as far as doing things
14  that made me feel uncomfortable and the
15  comments that he had made and the way he had
16  touched me inappropriately.
17    Q.  What touchings did you tell her
18  about?
19    A.  I don't know if I told her -- I
20  don't know which ones I told her other than
21  just in general, you know, him touching me
22  inappropriately and Ruth and I got into a deep
23  conversation about what she thought I should

51 (Pages 201 to 204)

# FREEDOM COURT REPORTING

Page 205

1 do.
2    Q.  What did Ruth say she thought you
3 should do?
4    A.  Apparently once before in her
5 history she had to seek an attorney and try to
6 get something done about one of her employers
7 that was causing her problems and that was her
8 advice to me.  We both were in the washing
9 room.  I explained to her what happened.  She
10 said the same thing had happened to her.  She
11 cried.  I cried and that was what our
12 conversation was about.
13    Q.  What specific comments did you
14 report to Ruth on the 2nd in the Washington
15 room.
16    A.  That the things he had said, the
17 touching inappropriately, you know, the fact
18 that it was causing me problems at home.  If
19 my husband found out, I was afraid of what he
20 would do.  He also worked at the plant.  It
21 was not a very good situation.  It was a
22 ticking time bomb.  You know, that's what was
23 said.  I'm not exactly sure which order or

Page 206

1 what extent but she knew what was going on.
2    Q.  Do you know if she ever interviewed
3 anybody about any of your allegations?
4    A.  I have no idea if she did or if she
5 didn't.  I left a few days after that.
6    Q.  Right.  And she had told you you
7 were going to be transferred but you didn't
8 give her the opportunity to do that; right?
9    A.  I would still have to put up with
10 him every day.  It's their job to protect me
11 from him and other people from him and nobody
12 did.
13    Q.  Yes, but you were going to be
14 working out in the plant, not in the safety
15 office; right?
16    A.  He still works there.  That's
17 correct but he still works there.  He has
18 access to the entire plant.  You have to deal
19 with him.
20    Q.  But you would not be left in a one-
21 on-one situation with him?
22    A.  It doesn't matter.  I don't trust
23 him.

Page 207

1    Q.  But you wouldn't have been left in a
2 one-on-one situation with him though; right?
3    A.  They can't guarantee that.  You have
4 to go to the bathroom.  You have to go to the
5 break room.  I mean, that's -- I couldn't live
6 with that possibility.
7    Q.  Fair enough.  You said he called you
8 at home.  When did he call you at home?
9    A.  He called at home numerous times.  I
10 don't really know exactly which days.  I guess
11 we could pull the cell phone records and the
12 house phone records.
13    Q.  How many times did he call you at
14 home?
15    A.  On my cell phone or my home phone?
16    Q.  Your home phone.
17    MR. HORSLEY:  And don't guess.  Give
18 her a good estimate but don't guess at
19 anything.
20    THE WITNESS:  Okay.
21    A.  It was multiple times but I would
22 hate to say how many but it was -- it was
23 several on both but I don't know --

Page 208

1    Q.  Several, more than once?
2    A.  Oh, yes.
3    Q.  Several, more than three times?
4    A.  Yes.
5    Q.  Can you give me a ballpark, please,
6 and I'm realizing that's just an estimate.
7    A.  Probably on the home phone probably
8 15 or 20.
9    Q.  Okay.  What did you discuss in your
10 conversations with Rance Maddox when he called
11 you on the home phone?
12    A.  He would, you know, hey, what are
13 you doing, this, that, and the other, and you
14 know, he would try to make conversation about,
15 you know, what I was doing or this, that, or
16 the other or sometimes he would call and ask
17 little small things and then after he got that
18 answer, he would try to continue to make
19 conversation.
20    Q.  Okay.  So he would ask small work-
21 related issues?
22    A.  Sometimes or sometimes he would just
23 ask, what are you doing.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 209

1  Q. Okay. How did you end these
2  conversations?
3  A. I've got to go or the kids are
4  running wild or you know, it's late, I've got
5  to go to bed. It just varied dependent on
6  what – where I was at, what I was doing and
7  what all, you know, was being said and
8  probably the mood I was in.
9  Q. Did he ever say anything that you
10  considered to be inappropriate during these
11  conversations on your home phone?
12  A. I consider it inappropriate to call
13  somebody late at night and ask them what they
14  are doing when you're married and you know
15  they're married and you just saw them at work
16  three hours ago.
17  Q. That's fine. But did he make any
18  specific comments during the telephone
19  conversations with you at your home that you
20  considered inappropriate?
21  A. No.
22  Q. And in fact, Gary Sport had called
23  you at home before from the plant too; right?

Page 210

1  A. He has.
2  Q. To discuss work-related business?
3  A. Always.
4  Q. Did that offend you?
5  A. No.
6  Q. And on your cell phone, how many
7  times did he call you on your cell phone?
8  A. I'm not sure exactly but it was
9  several.
10  Q. Several. Can you please give me an
11  estimate of what you mean by several with
12  regard to your cell phone?
13  A. It was a lot. I can't give you an
14  exact number.
15  Q. Did you ever record any of those
16  calls, like tape-record them?
17  A. No.
18  Q. Did you ever record them on your
19  calendar?
20  A. I'm not certain unless there's
21  things written on there. Like we said, the
22  other months aren't on here.
23  Q. What would you discuss with

Page 211

1  Mr. Maddox on the cell phone?
2  A. Sometimes he would ask piddly
3  work-related things and other times he would
4  just want to know what I was doing and where I
5  was at and what I was doing later on.
6  Sometimes when he called he seemed like he may
7  have been intoxicated. His speech wasn't very
8  clear.
9  Q. Okay. Did he ever make any specific
10  comments during the conversations on your cell
11  phone that you considered to be inappropriate?
12  A. I considered it inappropriate for
13  him to be calling the times that he called on
14  a cell phone the company didn't pay for.
15  Q. Yes, ma'am, I understand that, but
16  during those conversations, did he make any
17  specific comments that you considered
18  offensive or inappropriate?
19  A. Yeah, I think it's inappropriate to
20  call a married woman at night and ask her what
21  is she doing.
22  Q. I understand that you do and I
23  understand that.

Page 212

1  A. Yes, I found it very offensive.
2  Q. You found the calls themselves
3  offensive. I'm asking about the specific
4  content of the calls. Was there ever anything
5  specifically said by Mr. Maddox in those calls
6  that was offensive or inappropriate to you?
7  A. Yes.
8  Q. What?
9  A. I thought it was inappropriate to
10  call a married woman at home late at night.
11  MR. HORSLEY: She understands that.
12  What she's trying to get is a specific
13  comment, a sexual comment.
14  THE WITNESS: Okay.
15  MR. HORSLEY: Something else that he
16  said to you that you thought was offensive.
17  THE WITNESS: Right. I think the
18  answer is whatever it --
19  MR. HORSLEY: Tell her what the
20  answer is.
21  A. Yes, I found it offensive.
22  MR. HORSLEY: No, that's not --
23  she's asking -- we know that. We know that.

53 (Pages 209 to 212)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

Page 213

1 She knows that. What she's asking about are
2 specific comments that he made that you found
3 offensive.
4 THE WITNESS: Right.
5 MR. HORSLEY: We know that it was
6 offensive for him to call you.
7 THE WITNESS: Right.
8 MR. HORSLEY: She's asking about
9 specific comments. No, she wants to know if
10 there were any specific comments he made that
11 were offensive.
12 A. Just what are you doing, that's --
13 Q. And that was offensive to you, what
14 are you doing?
15 A. Yeah.
16 Q. It made no reference to sex?
17 A. When you call me late at night and
18 you're obviously drunk, then that's offensive.
19 Q. Okay. But he made no reference to
20 sex during those telephone calls?
21 A. No.
22 Q. Okay. Did you ever report the cell
23 phone calls to anybody at Smart?

Page 214

1 A. Yes, that was brought up in the
2 conversations and brought up in the letter
3 that I had written to Rance.
4 Q. Let me ask you this question: You
5 wanted to be as truthful and accurate with the
6 EEOC as you could be; right?
7 A. Right.
8 Q. Why didn't you include in your
9 charge the fact that you had gone to Mr. Kwan?
10 A. I had discussed it and I guess I
11 thought this was just a gist of certain
12 things, I didn't realize it had to be every
13 single little detail.
14 Q. Okay. It says, "On several
15 occasions between December 2005 and January
16 2006, Mr. Maddox asked Ms. Atwell if her
17 breasts were real and what they felt like."
18 When did this first occur?
19 A. I'm assuming sometime between
20 December and January because I'm not really --
21 that's the only dates I know.
22 Q. And it's not recorded on your
23 January calendar anywhere, is it?

Page 215

1 A. No, ma'am.
2 Q. Okay. When was the first time
3 this -- you said the first time this happened
4 was between December 2005 and January 2006.
5 Where were you when he asked if your breasts
6 were real?
7 A. Our office.
8 Q. Okay. And who else was in the
9 office?
10 A. No one.
11 Q. Where were you sitting in the
12 office?
13 A. At my desk I believe.
14 Q. And how did the conversation come
15 about?
16 A. I had turned my chair around and I
17 was filing in the center file cabinet, which
18 actually there's two that face this direction,
19 and I guess by me facing in his direction he
20 could see in my blouse and that is what I feel
21 prompted the conversation.
22 Q. What did he say specifically?
23 A. Just wanted to know if they were

Page 216

1 real.
2 Q. And in fact, you had talked to other
3 employees before about having breast implants,
4 hadn't you?
5 A. Right, some of the girls at work
6 because some of the girls were interested in
7 actually having the surgery themselves.
8 Q. So you had talked about breast
9 implants at work?
10 A. With females.
11 Q. Which females did you discuss that
12 with?
13 A. Amanda Dempsey I know for sure and
14 there was a lady that worked on second or
15 third shift, I'm not certain what her name
16 was, but she had asked and I had told her I
17 guess she had had to have some type of surgery
18 done and was having to have reconstructive
19 stuff and was just curious about the
20 procedure.
21 Q. Okay. What did you say when
22 Mr. Maddox asked if your breasts were real?
23 A. I don't remember saying anything.

54 (Pages 213 to 216)

# FREEDOM COURT REPORTING

Page 217

1  Q. Okay. Did you report it to anybody
2  immediately?
3  A. No, I believe I got up and walked
4  out.
5  Q. What did you do after that? Did you
6  continue performing your job duties?
7  A. At that particular moment?
8  Q. Uh-huh.
9  A. I went outside and got -- I went and
10 got me a drink and went outside and went and
11 smoked and then got myself together and then
12 tried to go back in and do my job.
13 Q. Okay. Was that the only occasion on
14 which he asked if your breasts were real?
15 A. I don't -- no, ma'am -- well, I
16 remember he asked -- no, that was the same day
17 he wanted to know what they felt like, you
18 know, do they feel real, you know, all of this
19 and on and on and you know, it's like he was
20 so adamant about it, that's why I got up and
21 walked out because you know, he wouldn't stop
22 the conversation.
23 Q. But you didn't report it?

Page 218

1  A. So I had to get out and -- you know,
2  leave to stop the conversation.
3  Q. So you didn't report it to anybody
4  at Smart that day?
5  A. That particular day, no.
6  Q. Did you ever specifically report it
7  to anybody?
8  A. I believe that was part of the
9  conversation that Gary and I had in the
10 cafeteria.
11 Q. But you don't know for certain?
12 A. I'm pretty certain that that was
13 part of our conversation that we had in the
14 cafeteria.
15 Q. What specifically did you tell Gary
16 in the cafeteria?
17 A. I don't remember specifically what I
18 said to Gary in the cafeteria other than what
19 had been going on with Rance, I don't know in
20 what details.
21 Q. Okay. The comment, I've got a real
22 man for you, when did he make this comment to
23 you?

Page 219

1  A. He went around all the time saying
2  that particular comment.
3  Q. To other people too?
4  A. Oh, yeah, the girls in his office.
5  Q. In what context would he say it?
6  A. Like he was a stud.
7  Q. Okay. I understand.
8  A. I mean --
9  Q. I guess I need to rephrase that
10 question.
11 A. Yeah.
12 Q. How did it come about?
13 A. Well, he was always real funny about
14 keeping his shoes real shiny and his shirt and
15 I mean, that's just -- that's just the way,
16 you know -- I don't remember, he had this
17 funny ringtone on his phone, I don't remember
18 exactly what it was. It's just he thought he
19 was the man and he would let you know that,
20 you know. I've got a real man for you, you
21 know.
22 Q. How many times did he say, I've got
23 a real man for you, to you?

Page 220

1  A. That in conjunction with if you'll
2  just work with me baby happened probably about
3  five or six times.
4  Q. Five or six times. At the time it
5  happened, did you ever go report it to human
6  resources?
7  A. No.
8  Q. Why not?
9  A. Because I'm not sure exactly why I
10 didn't go at that particular point, I may have
11 been in the middle of doing something. I
12 mean, I'm not really sure exactly when all
13 that transpired. Like I said, we had just
14 bought a house, I was concerned for my job.
15 He made it very clear that if you didn't work
16 with him in the way that he talked about that
17 you wouldn't be in his office anymore, so it
18 was very important for me to try to keep my
19 job and keep my cool and let everybody else
20 handle their end of it.
21 Q. Okay. Did you ever report to
22 anybody when he said, you've got to work with
23 me?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 221

1    A.  That was told to Ruth and I believe
2  it was told to Gary in a conversation that he
3  and I had.
4    Q.  Okay.
5    A.  I know for a fact it was told to
6  Ruth.
7    Q.  Now, you guys did -- and I mean you
8  guys, not just you and Mr. Maddox but other
9  people in the safety office did talk about
10  personal things sometimes; right?
11    A.  On occasion.
12    Q.  Yeah.  And do you recall the
13  occasion on which you told another employee
14  you had had a sex dream about him?
15    A.  I've never told another employee
16  about a sex dream about him.
17    Q.  So if they said that, they would be
18  lying?
19    A.  Yeah.
20    Q.  What about any comments about any
21  other employees being good looking or having a
22  cute butt, do you recall ever making those
23  comments?

Page 222

1    A.  Not to my knowledge.
2    Q.  So if other people witnessed you
3  doing that, they would be lying too?
4    A.  Probably, yes, ma'am.
5    Q.  Besides I've got a real man for you
6  or you've got to work with me, are there any
7  other comments that Mr. Maddox made to you
8  that you considered offensive while you worked
9  at Smart?
10    A.  It was always baby and honey and
11  sweetie when he wasn't ticked off if you
12  wouldn't let him rub up to you or rub your
13  leg.  If I pulled away or snatched away,
14  before then it would always be baby and honey
15  and sweetie.
16    Q.  How many times did he call you baby?
17    A.  Every day.
18    Q.  How many times did he call you
19  honey?
20    A.  Every day.
21    Q.  What about sweetie?
22    A.  Every day.
23    Q.  Did you ever go and report it to

Page 223

1  human resources as it was happening?
2    A.  No.
3    Q.  Why not?
4    A.  It was -- I mean, those were -- that
5  was comments that my daddy calls people.
6  That's comments that my daddy calls me.  That
7  can be taken several different ways but when
8  you put it together with everything else, then
9  you know exactly what he means.
10    Q.  Besides touching up on your
11  shoulders or rubbing up against you, were
12  there any other times Mr. Maddox touched you?
13    A.  Yes.
14    Q.  When?
15    A.  Every time he would have to go meet
16  with Mr. Kwan, he insisted that I go with him
17  to read him the charts and graphs and show him
18  everything because he had never seen them
19  before.  So he would sit in one chair and I
20  would sit in the other and while I'm sitting
21  here trying to explain to Mr. Kwan everything,
22  Rance is rubbing on my right leg the entire
23  time.  He's not rubbing with his hand.  He's

Page 224

1  got his leg moving his foot up and down to
2  make his leg rub against mine.
3    Q.  Kind of like playing footsie?
4    A.  Just like with his upper leg.
5    Q.  Okay.  How many times did this
6  occur?
7    A.  I don't recall.  I don't remember
8  exactly how many times it happened but it
9  was -- he tried to rub hisself on you and
10  touch you and have a lot of physical contact.
11    Q.  Well, I understand that, but did you
12  ever record anywhere that he had rubbed on
13  your leg in Mr. Kwan's office?
14    A.  Probably not specifically in
15  Mr. Kwan's office but that he had rubbed on
16  me, yes.
17    Q.  I don't -- well, I don't see it on
18  this one so --
19    A.  I don't remember the exact days.
20  Somewhere there was a schedule -- a calendar
21  at work that had the -- all the different
22  dates and times we had to meet with Mr. Kwan
23  because he would call and specify a time.

56 (Pages 221 to 224)

| Page 225 | Page 227 |
|---|---|

**Page 225**

1  Q. After meeting with Mr. Kwan when
2  Mr. Maddox would rub your leg, would you ever
3  go tell anybody?
4  A. The only people that I told was my
5  sister-in-law and Ruth and I'm not certain if
6  I told Gary about that or not. I may have, I
7  may not have. I tried to.
8  Q. Did you tell her when it happened --
9  her Ruth when it happened or later on?
10  A. Right, later on after it had
11  happened over a few times.
12  Q. I mean, I'm just going to ask this
13  kind of as a general question just because I'm
14  just kind of curious. If these things were
15  going on and they were occurring as frequently
16  as you're saying they were, why didn't you go
17  ahead and go to somebody instead of, you know,
18  until waiting towards the end of January and
19  the beginning of February to do so?
20  A. Because I was afraid he was going to
21  fire me.
22  Q. But you understood you could report
23  it, didn't you, ma'am?

**Page 226**

1  A. I had just bought a house. I had
2  just got married. I needed that job.
3  Q. Okay.
4  THE WITNESS: Can we take a break,
5  please?
6  MR. HORSLEY: Yeah. Is that all
7  right?
8  MS. WILLIS: Yeah.
9
10  (Whereupon, a brief recess was taken
11  from 2:12 p.m. to 2:26 p.m.)
12
13  Q. (By Ms. Willis) Ms. Atwell, before
14  we took a break, I was asking you and I'm not
15  going to try to summarize your testimony why
16  you hadn't reported some of these things and
17  you had said because you were worried about
18  your job?
19  A. Right.
20  Q. I'm going to direct your attention
21  again to Defendant's Exhibit 15.
22  MR. HORSLEY: Which one is it?
23  MS. WILLIS: This one.

**Page 227**

1  Q. (By Ms. Willis) And if you'll look
2  with me at the last paragraph of that memo on
3  the second page.
4  A. Okay.
5  Q. And it says, "Please be aware that
6  when you started a new job in the safety
7  office, you were on a ninety-day probationary
8  period. Because of the deficiencies in your
9  job performance, and with multiple attempts to
10  correct these problems, you have given me no
11  other choice but to terminate you from within
12  the safety department." And that paragraph
13  doesn't say anything -- does not say anything
14  about terminating your employment with Smart
15  Alabama, does it?
16  MR. HORSLEY: I'm going to object to
17  the form. You can answer.
18  MS. WILLIS: You can answer.
19  A. That's the way that I took that
20  statement.
21  Q. I understand how you would have
22  perceived it but this memo itself does not say
23  anything about you being terminated from Smart

**Page 228**

1  Alabama?
2  MR. HORSLEY: Same objection. You
3  can answer.
4  MS. WILLIS: You can answer.
5  A. I felt as if I was going to be
6  terminated from Smart.
7  Q. Yes, ma'am, and I understand and
8  appreciate the way you thought but my question
9  is this: Does anything in this paragraph and
10  your attorney is going to make the same
11  objection and it's fine.
12  A. Yeah.
13  Q. Does anything in this paragraph say,
14  you will be terminated from your employment
15  with Smart Alabama?
16  MR. HORSLEY: Same objection and
17  just answer the question she's asking
18  regardless of what you think about it.
19  A. Right.
20  Q. You've put on the record what you
21  think about it and that's fine.
22  A. No, it doesn't say Smart.
23  Q. Let's kind of go back to your

Page 229

1 allegations regarding Mr. Maddox. Besides
2 saying, I've got a real man for you, besides
3 saying I'll take care of you or you've got to
4 work with me, were there any other comments
5 that he made -- and baby and honey and
6 sweetie, sorry, I don't mean to leave those
7 out, were there any other comments he made
8 while you worked in the safety office that you
9 considered to be inappropriate?
10     A.  As far as you've got to work with
11 me, when I was talking to him about getting my
12 raise, that's when he started, you've got to
13 work with me again and it -- I took it very
14 inappropriately because as he was rubbing on
15 me, he was telling me, you've got to work with
16 me and I'll get you what you want, I'll get
17 you what you need, and I took that as
18 inappropriate.
19     Q.  Okay.  I understand that.  Did he
20 make any references to sex while he said,
21 you've got to work with me?
22     A.  Physically he did.
23     Q.  Did he make any references to

Page 230

1 work-related things when he said, you've got
2 to work with me?
3     A.  As far as getting a raise, that's --
4 yeah.
5     Q.  I understand that part but did he
6 make any effort -- any reference to any,
7 you've got to work with me, I'm getting the
8 office together, you've got to work with me?
9     A.  No.
10     Q.  How many times did he tell you
11 you've got to work with me?
12     A.  Whenever he would try to rub or
13 touch or grab or hold my hands or whatever,
14 that's usually when that would come about and
15 then I would get ticked off and leave or he
16 would laugh if I got mad and walked out.
17     Q.  Okay.  How many times do you think
18 it happened though I guess if you could
19 estimate for us, please?
20     A.  The baby you've got to work with me
21 or you've got to work with me?
22     Q.  Yes, ma'am.
23     A.  Probably at least ten, 15 times that

Page 231

1 I can remember.
2     Q.  What would you do after he said,
3 baby, you've got to work with me, is that when
4 you would walk out and continue doing your
5 job?
6     A.  I would walk out.  Sometimes I would
7 go to the bathroom.  Sometimes I would go
8 outside, walk around the parking lot.  There
9 were a couple of employees that were in the
10 first aid room that saw that I was upset and
11 come to the bathroom to see what was wrong
12 with me.
13     Q.  Who were those employees, ma'am?
14     A.  I'm trying to remember what their
15 names was.  Gloria Thompson was one.  The
16 other names I -- they're not coming to me
17 right now.
18     Q.  And I'm going to ask you about
19 people you've listed as witnesses a little bit
20 later and maybe that will help jog your memory
21 on that.  That's fine.  What did you tell
22 Gloria Thompson and any other employees when
23 they checked on you, anything?

Page 232

1     A.  What had went on, whatever it was
2 that particular occasion, I don't remember
3 exactly what it was the day that she had come
4 in the bathroom, but whatever it was that he
5 had done or said that day, I had told her
6 about it.
7     Q.  Okay.  Besides -- let me ask you
8 this question:  When if anytime did Rance
9 Maddox say, I'll take care of you?
10     A.  It was -- it was said usually in
11 conjunction of if you'll work with me, I'll
12 take care of you as he rubbed on you or
13 invaded your space.
14     Q.  Did he ever say, I'll take care of
15 you outside of that context?
16     A.  That was usually the way he would
17 say it is usually in conjunction with the
18 other.
19     Q.  Did you ever report it to anybody
20 that he said, I'll take care of you?
21     A.  After everything come out, yes.
22     Q.  But not as it was happening?
23     A.  No.

58 (Pages 229 to 232)

# FREEDOM COURT REPORTING

Page 233

1  Q. Okay. Did you record it on your
2  calendar anywhere, I'll take care of you?
3  Because you said this happened like almost
4  daily, right, or several times?
5  A. It was often. The only thing I see
6  on the January calendar is when I was in the
7  hospital, Rance called me on my cell phone and
8  told me to take it easy.
9  Q. Take it easy because you were in the
10 hospital?
11 A. Uh-huh.
12 Q. Anything else said in that
13 conversation that you recall?
14 A. Not between he and I that I can
15 recall.
16 Q. Okay. But you didn't record, I'll
17 take care of you, anywhere on this calendar at
18 least?
19 A. Not on these two calendars, no,
20 ma'am.
21 Q. Okay. Did anybody witness him
22 saying to you, you know, if you'll work with
23 me, I'll take care of you?

Page 234

1  A. I'm not certain.
2  Q. You don't know one way or the other?
3  A. (Witness shakes head.)
4  Q. Yes or no?
5  A. No, I'm sorry.
6  Q. It's okay. We get tired and that's
7  when we start -- that's when we start doing
8  that. You'll see me start doing it too.
9  A. Okay.
10 Q. Besides I've got a real man for you,
11 I'll take care of you, you've got to work with
12 me, the comment about it's impossible for men
13 to be monogamous in their relationships, and
14 asking you to go to lunch or asking you to go
15 to drinks, were there any other -- and calling
16 you at home or on your cell phone, were there
17 any other verbal comments that Rance Maddox
18 made to you that you considered to be
19 offensive and inappropriate or harassing in
20 nature?
21     MR. HORSLEY: I think you forgot are
22 your breasts real too.
23     MS. WILLIS: Let me -- I'll restate

Page 235

1  it. Thank you because I'm trying to wrap that
2  up there and we'd have to come back. Let me
3  restate the question, okay.
4  Q. (By Ms. Willis) Besides him
5  asking -- besides Rance Maddox asking to eat
6  lunch with you, asking you about going to
7  drinks with him, making a comment about it was
8  impossible for men to be monogamous in their
9  sexual relationships, asking if your breasts
10 were real, saying I've got a real man for you,
11 or saying you've got to work -- if you'll work
12 with me, I'll take care of you or you've got
13 to work with me, I'll take care of you, were
14 there any other verbal comments that Rance
15 Maddox made that you consider to be
16 inappropriate, offensive, or harassing in
17 nature while you were at Smart?
18 A. I heard him make comments to another
19 girl while I was at work.
20 Q. Okay. And who was that girl?
21 A. It was a girl on second shift that
22 he apparently was having some type of affair
23 with and his wife found out about it and she

Page 236

1  come into the office one day and she and he
2  got into a confrontation about their
3  relationship and where his wife stood on it
4  and he asked me to leave the office.
5  Q. What was that employee's name?
6  A. I have it at home. I don't have it
7  with me at this time.
8  Q. Where is it at home? Is it in your
9  journal?
10 A. No.
11 Q. Is it written on some additional
12 notes?
13 A. I had talked with somebody the other
14 day and they had told me what her name was
15 because I had forgotten her name.
16 Q. Okay. Will you let your lawyer know
17 that --
18 A. I will.
19 Q. -- because we need to follow up on
20 that?
21 A. Okay.
22 Q. What comments did he make to her
23 specifically that you considered to be

59 (Pages 233 to 236)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 237

1  inappropriate other than the fact that you've
2  told me that you thought they were having an
3  affair?
4      A.  He made comments about his wife,
5  about how he wasn't happy with her, their sex
6  life wasn't good anymore.  They didn't get
7  along.  All they did was fuss.  Their son or
8  her son or his son, I'm not sure exactly what
9  it was, caused him a lot of problems.  He let
10  me know that he was very unhappy in his
11  marriage.
12      Q.  He let you know or let her know?
13      A.  He let me know.  I don't think it
14  was a secret.  I think pretty much everybody
15  in the plant knew it.
16      Q.  I understand that but I'm a little
17  confused because I thought the conversation
18  was between -- I thought you were telling me
19  about the conversation between this other
20  employee on second shift and Mr. Maddox --
21      A.  Right.
22      Q.  -- about any kind of relationship
23  they had and I'm a little confused about why

Page 238

1  he said anything to you about that.
2      A.  Oh, he didn't say --
3      Q.  Or if he did.
4      A.  He didn't say anything to me about
5  her.
6      Q.  Uh-huh.
7      A.  She came in the office all the time.
8  They ate in the office together.  He would ask
9  me to go outside, go take a break, go do
10  whatever, he would stay in the office with
11  her.  It was kind of unusual because we were
12  first shift employees and she was a second
13  shift employee and she would come in and kind
14  of hang out with him and they would meet up in
15  the hallways and she would call.  I would
16  answer the phone several times during the day.
17  After a while, you began to recognize her
18  voice and then the day they had the
19  confrontation and all in the office.
20      Q.  What kind of confrontation did they
21  have I guess is what I'm asking.
22      A.  The gist of it -- the way I was
23  gathering it is she wanted him to leave his

Page 239

1  wife and he wasn't ready.  Even though he
2  wasn't happy, he wasn't ready.
3      Q.  He said that?
4      A.  Yeah, don't start this shit here.  I
5  don't want to hear it, not now, this isn't the
6  time.
7      Q.  Okay.  You were in the office at
8  this time?
9      A.  I was in the office.
10      Q.  He didn't ask you to leave for that
11  conversation?
12      A.  That's the conversation he asked me
13  to leave for.
14      Q.  Okay.
15      A.  Because she bust in -- she didn't
16  knock, she just busted in the office.
17      Q.  When if at any time did he talk
18  about being unhappy in his marriage then?  I'm
19  still a little fuzzy on that.
20      A.  His wife would call and she would
21  ask to speak to him.  I would transfer the
22  phone over to his desk.  He would pick up the
23  phone.  He would -- they would fuss and ya ya

Page 240

1  back and forth.  I was never really sure
2  exactly what everything was about because I
3  could only hear his end.  He would hang up,
4  she would call back.  This went on quite
5  often.
6      Q.  But did he ever expressly tell you,
7  I'm unhappy in my marriage?
8      A.  Oh, yeah.  He said that she was a --
9      THE WITNESS:  Can I say what he
10  said?
11      MR. HORSLEY:  Yeah, if she wants you
12  to.
13      Q.  (By Ms. Willis) Go ahead.  I mean --
14      A.  That she was a "fucking" bitch and
15  all she did was bitch and raise hell and he
16  was sick of it and he was sick of -- he named
17  the kid but I can't even think of what the
18  kid's name was, it was a teenage boy was what
19  I gathered from our conversations and that he
20  was really, really, really giving them a lot
21  of trouble.
22      Q.  He said this to you?
23      A.  He did.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 241

1    Q.  Was anybody else present when he
2  said this to you?
3    A.  Not that I can recall but I'm not
4  saying that there wasn't, I just can't recall.
5    Q.  When did he say this to you?
6    A.  This was some -- excuse me, this was
7  sometime around Christmas or New Year's.
8    Q.  Okay.  What if anything did you say
9  in response?
10    A.  I really don't recall what I said in
11  response.
12    Q.  Did you report it to anybody?
13    A.  Gary and I had had conversations
14  about problems with his wife because she had
15  also called Gary about Rance.
16    Q.  When did you have a conversation
17  with Gary about Rance's problems with his
18  wife?
19    A.  When his wife called my home one
20  night and spoke to me and my husband and
21  wanted to know why my number was in her
22  husband's cell phone and why he had been
23  calling it so much.

Page 242

1    Q.  When did his wife call your home and
2  ask why your number was in her husband's cell
3  phone?
4    A.  It was around -- I think it was in
5  December.  It was before Christmas I believe,
6  I'm not certain.  It was a Troy number, a 566
7  number.  That's the only reason I remember.
8    Q.  And so after that you talked to Gary
9  about --
10    A.  About his wife calling my home.
11    Q.  What did you -- what specifically
12  did you tell Gary in that conversation?
13    A.  It was pretty much common knowledge
14  by some of the office employees that they were
15  having trouble in their marriage.
16    Q.  That's what you told Gary.
17    A.  No, that's what the gist of our
18  conversation was.  I told him that his wife
19  had called and spoke to me, spoke to my
20  husband, wanted to know who I was and what
21  relation and how did I know her husband and he
22  explained that I worked for him and I guess
23  she was concerned with the number of calls and

Page 243

1  she was asking about some other people that
2  were also stored in his cell phone and who
3  they were and some of the people Kevin didn't
4  know and some of the people he did and he
5  explained to her who they were.
6    Q.  Okay.  Did Gary say anything back to
7  you when you talked about this with him?
8    A.  That she had called him also I guess
9  trying to inquire about some things.  I'm
10  really -- I don't remember exactly what the
11  conversation was about but that he was aware
12  that they were having trouble and that she had
13  contacted him also.
14    Q.  Okay.  Any other occasions that
15  Rance Maddox talked to you about his marriage.
16    A.  Other than when they would fuss and
17  she would call and he would hang up or she'd
18  call his cell phone and he would hang up and
19  he would make comments not directly to me but
20  in front of me about her, you know, that bitch
21  and slam the drawer and go out the door and
22  that kind of thing.  It wasn't directly at me
23  but it was said in front of me.

Page 244

1    Q.  Okay.  Were you offended by any of
2  that?
3    A.  Well, I mean, I tried to leave my
4  personal life at home no matter what was going
5  on and I think that if you were in a position
6  like that, then you should leave your personal
7  life at home.
8    Q.  I understand that but did it offend
9  you?
10    A.  The language that he used, yes.
11    Q.  Have you never used the word bitch?
12    A.  Oh, I have.
13    Q.  Have you ever used it at work?
14    A.  I may have.  It may have been
15  repeating or saying something.
16    Q.  Have you ever used the word "fuck"
17  at work or "fucking"?
18    A.  I probably have.
19    Q.  Okay.  Going back through, and I
20  hate to beat a dead horse on this, besides
21  Rance talking with this second shift employee
22  about their relationship, talking about his
23  relationship with his wife, saying if you work

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 245

1  with me, I'll take care of you, having
2  conversations with you on your home phone or
3  cell phone, saying I've got a real man for
4  you, asking if your breasts were real, making
5  the comment about it being impossible for men
6  to be monogamous, asking to eat with you or
7  asking you to go for drinks, are there any
8  other verbal comments that Rance Maddox made
9  to you during your employment at Smart that
10 you consider to be offensive, inappropriate,
11 or harassing in nature?
12    A.  Does it have to be sexually --
13 sexually harassing or just harassing or
14 either?
15    THE WITNESS:  Does that make any
16 sense?
17    MR. HORSLEY:  Well, this is a sexual
18 harassment case so I think.
19    Q.  (By Ms. Willis) Yeah, I think I'm
20 most interested in the sexual stuff.  If you
21 have something else you consider to be
22 offensive, you can tell me about that but was
23 there anything else of a sexual -- let me

Page 246

1  distinguish it anyway of that way besides and
2  if I need to repeat it I will -- all of the
3  things I just named in my last question, the
4  big long list, were there any other comments
5  or verbal comments that Mr. Maddox made during
6  your employment with Smart that you consider
7  to be sexually offensive or inappropriate?
8    A.  To my knowledge, that's all.
9    Q.  That's all.  Is there any other
10 document or -- document you could look at or
11 person you could talk to that would refresh
12 your memory or recollection about that?
13    A.  Some of the other employees more
14 than likely, yes.
15    Q.  You mean they may have witnessed
16 some of this?
17    A.  Right.
18    Q.  Okay.  But we've gone through and
19 talked about who witnessed what; right?
20    A.  That I could recall.
21    Q.  Okay.  And I'll just ask you this:
22 Besides what we've already talked about, were
23 there any other comments that you considered

Page 247

1  offensive or inappropriate for any other
2  reason other than sex or, you know, sexual
3  harassment from Rance Maddox?
4    A.  No, other than when I had moved to
5  the conference room and he came in there with
6  Wendy and demanded that I come move back into
7  his office.
8    Q.  Okay.
9    A.  I mean, I realize that wasn't sexual
10 but I felt like he was trying to put me back
11 in a place that I had left for a reason.
12    Q.  Your computer was in the office;
13 right?
14    A.  Right.
15    Q.  You had to use your computer to do
16 the OSHA 300 and 300A logs; right?
17    A.  Right, at the time I was going
18 through files one by one.
19    Q.  So you weren't able to enter those
20 being there in the conference room, were you?
21    A.  No, I was reviewing and making sure
22 the files had all their necessary information
23 in them.

Page 248

1    Q.  But you weren't able to enter them
2  in the computer as they came in?
3    A.  Right, and that's why I work --
4    Q.  How long did you -- I'm sorry.  Go
5  ahead, please.
6    A.  That's why I worked so much overtime
7  is because a lot of times when he would leave,
8  I would come back -- I would leave work --
9  bear in mind, I live four miles from the
10 plant.  I would come back and then finish up
11 entering what I needed to enter and then go
12 home.
13    Q.  Okay.  Let's talk about the
14 conference room.  When did you move yourself
15 to the conference room?
16    A.  I'm not sure exactly which day that
17 I had moved but somewhere between January the
18 18th and February the 7th.
19    Q.  Okay.  How many days did you work in
20 there -- the conference room?
21    A.  I don't recall.
22    Q.  Any document or person that would
23 refresh your recollection on that?

62  (Pages 245 to 248)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

**Page 249**

1    A.  I could -- my husband would probably
2  be the only one because I remember telling him
3  the day that I moved in there.
4    Q.  Okay.
5    A.  Because that's the day that I
6  actually told him everything that was going on
7  and begged him not to do anything.
8    Q.  Okay.  And then was it after -- what
9  did you do after Rance told you to come back
10  to the office?
11    A.  I refused.
12    Q.  And what did you do after that?
13    A.  I stayed in there and finished
14  working on the folders that I was working on.
15    Q.  Did you keep working that day?
16    A.  The day that he came in and asked me
17  to?
18    Q.  Uh-huh.
19    A.  I think I stayed in there and
20  worked.  I'm pretty sure I did because I
21  remember taking some of the file folders with
22  me that afternoon because we were having to
23  pull out every single file in the plant from

**Page 250**

1  the time that it opened until current.
2    Q.  How long was it between the time
3  that he asked you to come back to the office
4  and the time you left on February 7 and didn't
5  come back to the plant?
6    A.  I'm not sure exactly which day.
7  It's some day between January the 18th and
8  February the 7th.
9    Q.  But you didn't write it down on the
10  calendar?
11    A.  No.
12    Q.  Besides giving you a birthday hug,
13  attempting to hold hands with you or touch
14  your arms, rubbing your shoulders, rubbing his
15  pelvis area against your buttocks -- actually
16  let me stop there.  I don't know that I
17  followed up with you.  You said -- I think you
18  mentioned something about he rubbed his pelvis
19  one time when he was passing and you were
20  doing filing; is that right?
21    A.  Right.
22    Q.  I don't want to misstate your prior
23  testimony.  Was there any other time that he

**Page 251**

1  rubbed his pelvis against you?
2    A.  If I were in a sitting position and
3  I was reviewing documents, he would come to
4  the side for me to show him something or ask
5  him about something or whatever, he would
6  stand really close to where he would be
7  touching you with his pelvis or hip or thigh,
8  whatever.  It varied.
9    Q.  When was -- when was the first time
10  that happened besides the filing cabinet thing
11  that you've already told me about?
12    A.  I'm not sure exactly when the first
13  occasion was.
14    Q.  Did you write it down on your
15  calendar?
16    A.  No.
17    Q.  How many times did he rub his pelvis
18  against you other than the cabinet -- the
19  filing cabinet time?
20    A.  I'm not sure exactly how many times
21  but it -- just depending on if I had to show
22  him something or ask him something or get him
23  to sign something and usually that's when he

**Page 252**

1  would -- would do that.  I'm not sure exactly
2  a time.
3    Q.  Can you give me a ballpark?
4    A.  Probably ten or more.
5    Q.  What would you do after he would rub
6  up against you?
7    A.  I would usually try to lean in to be
8  able to finish whatever I was doing unless it
9  was like really, really obvious what he was
10  doing and not just he was trying to review the
11  paperwork and wasn't paying attention to where
12  he was standing, so I would lean and sometimes
13  he would lean further and at that point I
14  would just get up.
15    Q.  Did you continue doing your work?
16    A.  No, I would go outside.
17    Q.  And then you would come back and do
18  your work?
19    A.  Yes.
20    Q.  Go outside and smoke a cigarette --
21    A.  Yeah.
22    Q.  -- or take a break?
23    A.  Yeah, and usually he would be ticked

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 253

1  off and he wouldn't be in there when I came
2  back so.
3      Q.  Okay.  Any other specific occasions
4  you can recall him rubbing his pelvis against
5  you?
6      A.  Not at this time, no.
7      Q.  Any -- any document or witness that
8  would help you recall?
9      A.  Not at this time, not without
10 getting up with some people.
11     Q.  Okay.  And we'll talk about those
12 people in just a little bit.
13     A.  Okay.
14     Q.  Let me go through -- did you ever go
15 after he rubbed his pelvis against you and
16 report it to anybody at Smart, like as it was
17 happening or right after it happened?
18     A.  No.
19     Q.  Why not?
20     A.  Because I feared what he would do
21 and I figured I would lose my job.
22     Q.  Okay.  Besides giving you a birthday
23 hug, trying to hold your hand, rubbing your

Page 254

1  arms, rubbing on your shoulder/upper chest
2  area, rubbing his pelvis against you, or
3  touching your shoulders, were there any
4  other -- did Rance Maddox at any time ever
5  touch you in a way that you believe to be
6  sexually inappropriate or offensive or
7  harassing?
8          MR. HORSLEY:  Did you include
9  rubbing the legs when meeting with Mr. Kwan?
10         MS. WILLIS:  No, let me go back
11 again.  Thank you.
12     Q.  (By Ms. Willis) Okay.  Let me start
13 that again.  Besides -- besides giving you a
14 birthday hug, trying to hold hands with you or
15 rubbing your arms, rubbing your leg when you
16 met with Mr. Kwan, putting his arm around you
17 or rubbing his pelvis against you or rubbing
18 your shoulders, are there any other instances
19 when you claim Mr. Maddox touched you in a way
20 that was sexually inappropriate or offensive?
21     A.  To the best of my knowledge, that's
22 all.
23     Q.  Okay.  Any document or witness that

Page 255

1  would help you recall?
2      A.  Not at this time.
3      Q.  Okay.  Let me ask you -- I'm going
4  to ask you a couple of more specific questions
5  about your calendar, just some entries on
6  there.
7      A.  Okay.
8      Q.  If you want to get that out in front
9  of you.  I'm referring to Defendant's Exhibit
10 14 and I'm looking at January 18, 2006.
11     A.  Okay.
12     Q.  Meeting with Gary about Rance,
13 requested transfer.
14     A.  Right.
15     Q.  Tell me everything you told Gary
16 Sport in that meeting.
17     A.  I don't recall every single thing
18 that was said in that meeting.
19     Q.  Well, can you tell me what you do
20 recall, please?
21     A.  I gave him a gist of everything that
22 was going on with Rance up until or as far as
23 what had happened up until that point.

Page 256

1      Q.  Specifically what did you tell him?
2      A.  I'm not certain specifically what I
3  told him other than I'm sure I told him about
4  how he had been acting and what he had been
5  doing and what he had been saying and how he
6  had been treating me and that sort of thing.
7      Q.  Let's look -- and did you ever
8  follow up with Gary after this meeting,
9  January 18th?
10     A.  I'm sure we did.
11     Q.  Well, do you know of an occasion you
12 did?
13     A.  I know I spoke with him on the day
14 that the weekend schedule was released and I
15 know I spoke to him the day about the
16 situation with his wife calling but I don't
17 know exactly which.
18     Q.  What did you tell him about the day
19 the weekend schedule got released, is that
20 what you had testified to earlier about not
21 working on Sunday night and then getting up
22 and working again Monday morning?
23     A.  Right.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 257

1    Q. Was that all you told him during
2  that conversation was about the weekend shift
3  schedule?
4    A. I didn't understand why he was doing
5  me that way and that -- I probably said this
6  is BS and I can't work that and he said, I'll
7  handle it, I'll handle it, I don't know what
8  the hell he's thinking. He's not thinking.
9    Q. Okay. Have you now told me
10  everything you told Gary on the 18th that you
11  can remember?
12    A. As far as I can remember.
13    Q. Any document or witness that would
14  help you recall?
15    A. Not that I can remember.
16    Q. I'm looking now at January 23. It
17  says, "Rance got letter from Gary." What were
18  you referring to there?
19    A. Apparently Rance had gotten a letter
20  from Gary about how unhappy he was about how
21  he was handling things going on in his office
22  and the employees in his office and something
23  of that nature.

Page 258

1    Q. How did you know about the letter?
2    A. I don't remember if it was that day
3  or the next -- I believe it was the next day
4  Rance had talked to me about things going on
5  in the office. That was the day that we had
6  that meeting the very next morning about
7  everybody's job performances and running to
8  human resources and all that sort of thing and
9  so I believe that's when it was mentioned was
10  when he called the meeting that that's what
11  referenced the letter that he had gotten.
12    Q. Did you ever see the letter while
13  you were working at Smart?
14    A. I did.
15    Q. How did you come to see it?
16    A. I saw it, Rance showed it to me.
17    Q. When did he show it to you?
18    A. I believe it was on the 24th.
19
20  (Whereupon, Defendant's Exhibit 18
21  was marked for identification and a
22  copy of same is attached hereto.)
23

Page 259

1    Q. Okay. I'm showing you Defendant's
2  Exhibit 18. Is this the letter that you're
3  referring to in your calendar?
4    A. I believe this is it. That's right.
5    Q. And if you'll see the second to last
6  paragraph, "Show respect at all times to your
7  peers, your subordinates, and our Security
8  Team. Manage yourself professionally and
9  calmly. Don't threaten or intimidate people."
10  Do you see that?
11    A. Where is that -- okay, yes.
12    Q. That's what Defendant's Exhibit 18
13  says.
14    A. Right.
15    Q. Do you know if Gary was referring to
16  what you had talked to him about on the 18th?
17      MR. HORSLEY: Object to the form.
18  You can answer.
19    A. I wasn't certain if that's what that
20  was referring to or not but I assume so
21  because of the stern lecture that we got about
22  anything going on in our office about people
23  running to human resources.

Page 260

1    Q. But you knew you could go to human
2  resources because you had?
3    A. Right.
4    Q. Looking back at your calendar,
5  Ms. Atwell, I'm looking at January 24th, and I
6  know you noted the safety meeting and that you
7  went to the hospital and we're going to
8  address that a little bit later.
9    A. Right.
10    Q. At the bottom I say -- I see being
11  replaced. Do you see that on January 24,
12  2006?
13    A. Right.
14    Q. What did that mean?
15    A. During the safety meeting, that's
16  when Rance had made reference that, you know,
17  people would be replaced if they didn't work
18  with him like if they started running to human
19  resources, that he was tired of everybody
20  running behind his back, if they had a problem
21  with him, they needed to come to him.
22    Q. Did he ever -- I'm so sorry, please
23  go ahead.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

Page 261

1   A. That was the gist that I can recall.
2   Q. Did he ever specifically tell you
3   you were being replaced during that meeting on
4   January 24th?
5   A. He told me prior to that meeting
6   when he discussed the letter that he got from
7   Gary with me.
8   Q. What specifically did he say to you
9   during that meeting or when he showed you the
10  letter?
11  A. Yeah, he had -- was upset and I
12  guess he was saying that he didn't want
13  anybody to go behind his back, if they had a
14  problem, they needed to come to him. What I
15  couldn't get him to understand was that he was
16  the problem and he let it be known that if
17  anybody butted heads against him that it was
18  not going to be pretty, that's not exact words
19  but.
20  Q. What were his exact words as best
21  you can recall?
22  A. I mean, I really can't remember his
23  exact words. I mean, he had -- that's why I

Page 262

1   left to go to the doctor right after the
2   meeting was held. He had a meeting with me
3   and then he had a meeting with everybody and
4   then I left and went to the doctor.
5   Q. Was anybody else present when he met
6   with you?
7   A. No.
8   Q. Was the door to the safety office
9   open or closed?
10  A. Closed.
11  Q. Okay. Oh, let me ask you this
12  question: Where is David McGough's office?
13  A. It is on the front left -- no, it
14  would be the front right of the main entrance
15  to the building.
16  Q. So on the production side -- the
17  production office side?
18  A. I'm assuming that's production, I'm
19  not for certain.
20  Q. When you walked in the building and
21  you walked to the right?
22  A. Into the offices, right.
23  Q. And the safety office when you

Page 263

1   walked into the building and walked to the
2   right was down that corridor?
3   A. Farther down, correct.
4   Q. But really working with David
5   McGough would have meant you were closer to
6   working with Runce than having worked out in
7   the plant, right, if you worked with David
8   McGough?
9   A. It would depend on which proximity
10  of the plant that I would be put in but I
11  would be over there and David told me he
12  wouldn't let anybody mess with me.
13  Q. Okay.
14  A. And I felt like I would be protected
15  if I worked by him.
16  Q. Okay. Did you ever specifically
17  request to anybody in human resources that you
18  work with David McGough?
19  A. I think Ruth and I had talked about
20  that and she said they were working on it and
21  then I guess that never panned out.
22  Q. Okay. The 28th of January you've
23  got, Kathy quit, question mark. Who's Kathy?

Page 264

1   A. That's Kathy Caldwell.
2   Q. Oh, Kathy Caldwell that worked with
3   security with ADI?
4   A. Right.
5   Q. And why -- why do you have that on
6   your calendar?
7   A. I have that out there and I have a
8   question mark beside it because I put various
9   things on our calendars. Kevin picked me up.
10  MR. HORSLEY: Just answer that
11  question.
12  A. Okay. I just wrote it on there
13  because I was curious.
14  Q. How do you know she quit her job
15  with ADI?
16  A. That's what I had been told.
17  Q. Who told you that?
18  A. I'm not even certain. I'm sure it
19  was somebody that worked there but I'm not --
20  I can't say specifically who told what.
21  Q. Did Kathy tell you that directly?
22  A. No, ma'am.
23  Q. Why was that significant to put down

# FREEDOM COURT REPORTING

Page 265

1  on your calendar, Ms. Atwell?
2      A.  Because she was a member of the
3  security department and we have to take their
4  badges from them when they no longer work for
5  the company.
6      Q.  Did she give you your -- did she
7  give you her ADI security badge?
8      A.  Not me, no.
9      Q.  Who did she give it to?
10     A.  I have no clue.
11     Q.  Do you know why she quit?
12     A.  I've heard rumors since then.
13     Q.  Do you have personal knowledge of
14  why she quit?
15         MR. HORSLEY:  Don't talk about
16  anything you and I have discussed.
17     Q.  No, that you heard with your own
18  ears or saw with your own eyes know of any
19  fact as to why Kathy Caldwell quit her
20  employment with ADI.
21     A.  From her directly?
22     Q.  Uh-huh.
23         MR. HORSLEY:  Yeah, you can answer

Page 266

1  that, yeah.
2      Q.  Just don't talk about what you've
3  talked about with him.
4      A.  Oh, okay.  That's the same thing.
5         MR. HORSLEY:  You can tell her
6  anything that either Kathy Caldwell or anybody
7  else has told you about why she quit or
8  anything else as long as you're not discussing
9  something that you -- that I told you or you
10  told me.
11     A.  Okay.  Kathy told me that she quit
12  because Rance kissed her on the mouth.
13     Q.  When did Kathy tell you that?
14     A.  I'm not sure a date.  I know it was
15  after February the 8th, 9th, somewhere around
16  in there.
17     Q.  How did you come to talk to her
18  around February 8th or the 9th?
19     A.  I had heard rumors that that's what
20  had happened through a friend of ours that
21  worked at the Smart plant, a neighbor of mine.
22     Q.  Who was that?
23     A.  Chris -- I've got to think of his

Page 267

1  last name.  I can't think of Chris' name.  His
2  girlfriend's name is Vonda.
3      Q.  And what did Chris tell you,
4  Ms. Atwell?
5      A.  That he had heard that Kathy quit --
6  well, he -- I had talked to his girlfriend
7  Vonda about what had happened with me and she
8  said, well, you need to talk to Chris and find
9  out about what's going on because Kathy quit
10  too.  And I said, well, what are you talking
11  about, and so I called Cliff, the -- their
12  supervisor, the security department
13  supervisor, and he called Kathy and gave her
14  my number and Kathy called me and she and I
15  had a conversation and that's when she told me
16  that's what had happened to her.
17     Q.  Had you met her before then?
18     A.  No.
19     Q.  Does Vonda work at Smart?
20     A.  She did.
21     Q.  She no longer works there?
22     A.  No.
23     Q.  What about Chris?

Page 268

1      A.  No.
2      Q.  Where do they live?
3      A.  On Sasser Street in Brantley,
4  Alabama.
5      Q.  Okay.  Turning your attention to
6  February in your calendar, ma'am.
7      A.  Okay.
8      Q.  I'm looking at February 8.
9      A.  Okay.
10     Q.  Spoke with John Kelly.  Who's John
11  Kelly and if it's a lawyer, I don't want to
12  know about your conversations but I do need to
13  know who he is.
14         MR. HORSLEY:  Tom Kelly.
15     A.  His card says John.
16         MR. HORSLEY:  That is a lawyer.
17     Q.  You contacted a lawyer?
18     A.  I did.
19     Q.  And I don't want to know what you
20  said to him or what he said to you but you
21  called him on the 8th?
22     A.  I did.
23     Q.  Okay.

67 (Pages 265 to 268)

# FREEDOM COURT REPORTING

Page 269

1   A. Well, actually my husband spoke with
2   him.
3       Q. Your husband, Kevin Atwell?
4   A. He did.
5       Q. But at some point you linked up with
6   Mr. Horsley so okay, and I don't want to know,
7   you know, that. Let's see, I'm showing you
8   looking at Defendant's Exhibit 17 again. I
9   know that you said this was a draft of
10  something that you had done but you don't know
11  if it ever got to Gary Sport one way or
12  another, do you?
13      MR. HORSLEY: She asked you if you
14  know if that ever got to him.
15      A. I know it was left on his desk in a
16  sealed envelope.
17      Q. Who put it there?
18      A. I did.
19      Q. I thought you told me earlier you
20  gave it to Fran Hughes.
21      A. I made one for each. Gary had one
22  and Fran had one. The names were changed at
23  the top of the letters. The letters were

Page 270

1   identical.
2       Q. Okay. But you don't have those
3   letters?
4       A. No, ma'am, I just have the rough
5   draft.
6       Q. And what's the phone number at the
7   top of Exhibit 17? Do you see that about the
8   date?
9       A. 3503 -- I believe that's
10  Dr. Tompkins' number in Luverne.
11      Q. Okay.
12      A. It was just used for scratch
13  purposes after that.
14      Q. Okay. When you spoke with Gary, did
15  he tell you that he would transfer you?
16      A. No, he was going to handle it.
17      Q. Okay. And he did in fact give Rance
18  a memo about the way he talked to employees,
19  didn't he?
20      A. He did.
21      Q. Okay. When was the -- and I want to
22  get this straight. I know we've talked about
23  it all along. When was the first time you

Page 271

1   talked to Ruth Ryan?
2       A. I don't remember. My brain is not
3   working -- February the -- no, January 2006.
4       Q. Is that from your infinite
5   recollection or just what your attorney wrote
6   in your EEOC charge?
7       A. It's not written down the exact date
8   so it's estimation and --
9       Q. What did you -- go ahead, I'm sorry.
10      A. I'm sure he put that because that's
11  probably what I told him.
12      Q. The first time you met with Ruth,
13  what did you tell her specifically?
14      A. I asked her if I could speak to her
15  confidentially. I remember she said, yeah, it
16  won't go any further than here. I told her
17  that I had spoke with Gary about Rance and
18  that I felt betrayed because when I got back
19  to work, Rance was even worse than what he had
20  ever been before.
21      It went from being sexual harassment
22  to hostile work environment. He was throwing
23  stuff. He was kicking doors shut. He would

Page 272

1   slam the phones down. He would ask you for
2   something and he would snatch it out of your
3   hand and I felt that it wasn't fair that I did
4   what I was supposed to do and I trusted him to
5   handle it and instead it back-fired on me. It
6   made it worse on me.
7       Q. What did Ruth say?
8       A. She asked me, you know, to talk to
9   her and so we went in the room and shut the
10  door and I was telling everything that was
11  going on and that's when, you know, she
12  assured me that they would handle it but I
13  needed to do my job and I needed to keep quiet
14  and only speak when spoken to and only answer
15  his questions directly and try not to stay
16  around him and to avoid contact with him and
17  that she promised me they were working on it,
18  that they would do something.
19      Q. And she followed up on that promise
20  when she told you she would transfer you to
21  Lloyd Weathers' area; right?
22      MR. HORSLEY: Object to form. You
23  can answer.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 273

1    MS. WILLIS: You can answer.
2    A.    She never mentioned moving me to
3  Lloyd Weathers' area.
4    Q.    No, ma'am, that's not what you told
5  me. You told me on the last day you went to
6  see her that -- she told you she was -- you
7  told me earlier in this deposition that she
8  said something about going to Lloyd Weathers
9  and you were concerned about that because you
10  thought that you were still going to see
11  Rance. Do you remember that testimony?
12    A.    Yeah, it wasn't Lloyd Weathers. It
13  was David McGough. She was trying to get me a
14  job in his area.
15    Q.    Yes, ma'am, but you've told me
16  earlier in this deposition that she was going
17  to have you out somewhere in the production
18  area that you and Kevin I believe -- and I'm
19  not going to summarize your testimony but that
20  you went to her on that -- one of those last
21  days and she told you that they were working
22  on getting you out there with Lloyd Weathers
23  and you were upset because you thought you

Page 274

1  would still have to be around Rance. Do you
2  remember that testimony?
3    A.    If I said Lloyd Weathers, it was
4  mistaken.
5    Q.    Are you telling me the truth now or
6  were you telling me the truth then because
7  that's not what you testified to earlier?
8    A.    If I said Lloyd Weathers, it was
9  accidentally. I have no idea who she wanted
10  me to work under in the plant.
11    Q.    But she did tell you that she was
12  getting you a transfer?
13    A.    Right, but it would be in the plant.
14    Q.    Okay.
15    A.    Which means I would have to see him
16  every day.
17    Q.    But you wouldn't be in the safety
18  office any longer; correct? You wouldn't be
19  working in the safety office any longer;
20  correct?
21    A.    I don't want to work around him.
22    Q.    Yes, ma'am, that's not my question.
23    A.    Right.

Page 275

1    Q.    My question was: Working in the
2  plant would have meant you were not working in
3  the safety office any longer, wouldn't it?
4    A.    Right.
5    Q.    So you had this conversation with
6  Ruth in January. She told you -- late January
7  or something, she told you to go do your job
8  and that she would work on it. When is the
9  next time you talked to her?
10    A.    I'm not sure if this was the very
11  next time but I do remember an occasion on the
12  30th where I spoke with her.
13    Q.    January 30th?
14    A.    Yes.
15    Q.    Why didn't you report it on your
16  calendar?
17    A.    There's a whole lot on the 30th.
18  Where it says Rance requested medical
19  records --
20    Q.    Uh-huh.
21    A.    -- I went to her because I was upset
22  because he had requested my medical records
23  and he already knew too much and the position

Page 276

1  he was in the office, he had access to
2  those records because Dr. Tompkins wrote it up
3  as workmen's comp and I didn't think he needed
4  to have those records, that if anybody else in
5  the plant wanted those records in the office,
6  you know, human resources, they could have
7  them but it really upset me that -- he was
8  adamant enough that the nurse from
9  Dr. Tompkins' office called me to let me know
10  that he was very ugly to her as he tried to
11  obtain my medical records.
12    Q.    Who was that nurse?
13    A.    B.G.
14    Q.    But as your supervisor, Rance Maddox
15  probably needed a medical excuse to know why
16  you were absent the week prior; correct?
17    A.    He didn't ask for an excuse. He
18  asked for medical records. He said, I want to
19  know what she told y'all.
20    Q.    Did he ever say that directly to
21  you?
22    A.    No, he told that to B.G.
23    Q.    And how did you learn that he told

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 277

1 that to B.G.
2    A.  B.G. called me and told me.
3    Q.  Where did B.G. call you?
4    A.  On my cell phone.
5    Q.  When did she call you?
6    A.  On the 26th or 27th I believe of
7 January.
8    Q.  Okay.  So that's what you spoke to
9 Ruth Ryan about on the 30th was the records?
10    A.  When I came back to work.
11    Q.  After that you spoke with her and
12 Joseph?
13    A.  On another occasion.
14    Q.  And what did you talk to she and
15 Joseph about?  You told me earlier you didn't
16 tell her everything.
17    A.  It was very limiting, right.
18    Q.  Did you speak with her again after
19 that?
20    A.  I know I did.  I know I spoke with
21 her and Joseph on February 1st and I spoke
22 with her on February 2nd and I spoke with her
23 February 3rd.

Page 278

1    Q.  When was the last time you spoke to
2 Ruth?
3    A.  February the 7th.
4    Q.  And during that conversation was
5 when you discussed the transfer?
6    A.  My husband was present for that
7 conversation.
8    Q.  But you were there as well?
9    A.  Yes.
10    Q.  Anything else said during that
11 conversation?
12    A.  My husband was there and he was
13 trying to ask what was going on and what they
14 were going to do about the situation and she
15 told him that that was none of his concern,
16 that that was between she and I.
17    Q.  But she did mention a transfer at
18 some point?
19    A.  Not in front of him, no.
20    Q.  But to you?
21    A.  Yes.
22    Q.  Okay.  And what did she say in that
23 conversation?

Page 279

1    A.  That they were going to transfer me
2 to -- in the plant and you know, I told her
3 that, you know, that wasn't working.  Shortly
4 after that conversation I went down the
5 hallway and that's when Rance -- I went into
6 the office to grab something off the desk.
7 Kevin stood there and held the door open for
8 me, my husband, and that's when he went in to
9 saying to the effect of taking too much
10 overtime and it wasn't authorized and he was
11 going to write me up and something about some
12 other things, I don't remember exactly what it
13 was, but I told him, you know, write it up.
14 Write it up.  I want to see it, write it up.
15 I mean, I had had it.  I was at the point
16 where I had had it.
17    Q.  And so you left after that?
18    A.  I did.  And Ruth come outside and
19 she said, calm down, calm down, and she
20 said -- I told her, I said, my nerves are bad.
21 I said, I need to just sit down.  And she
22 said, why don't you go on to the doctor and so
23 I went to Dr. Tompkins' office.

Page 280

1    Q.  On the 7th?
2    A.  I did.
3    Q.  We're going to get to that too.  You
4 didn't go back to work after that?
5    A.  No.
6    Q.  Did you ever call anybody there —
7    A.  No.
8    Q.  -- and say I'm not coming back?
9    A.  No.
10    Q.  You just didn't go back?
11    A.  Right.
12    Q.  And you haven't worked there since?
13    A.  No.
14       MR. HORSLEY:  Do you need to go eat
15 something?
16
17    (Whereupon, a brief recess was taken
18    from 3:19 p.m. to 3:31 p.m.)
19
20    (Whereupon, the desired portion of
21    the proceedings was read back.)
22
23    Q.  (By Ms. Willis) And so you went to

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 281

1  Dr. Tompkins' office?
2      A.  I did.
3      Q.  And you had been treated by
4  Dr. Tompkins before for your shoulder --
5      A.  I have.
6      Q.  -- as workers' compensation?
7      A.  I had.
8
9      (Whereupon, Defendant's Exhibit 19
10     was marked for identification and a
11     copy of same is attached hereto.)
12
13     Q.  Okay.  And so you went there on the
14  7th.  I show you Exhibit 19 which are the
15  records that we got from his office and I'm
16  calling your attention to -- let's go to
17  page -- it's Bates stamped on the side,
18  Richard.  It's Family Practice Associates
19  00025.
20     A.  Okay.
21     MS. WILLIS:  Are you with me?
22     MR. HORSLEY:  Yeah.
23     Q.  (By Ms. Willis) And Ms. Atwell, you

Page 282

1  went to her -- the office on February 7, 2006;
2  is that correct?
3      A.  I did.
4      Q.  And you wanted to be as truthful and
5  accurate as possible to give your information
6  to the doctor?
7      A.  Right.
8      Q.  Do you know who made the notes on
9  the upper part of page 00025 of Defendant's
10  Exhibit 19?
11     A.  That would be the nurse --
12     Q.  Who is the nurse?
13     A.  -- or the doctor, I'm not sure
14  exactly who.
15     Q.  You don't know which one?
16     A.  No.
17     Q.  And you had been on Wellbutrin
18  before because of your hospitalization and for
19  smoking?
20     A.  It was for -- right, to try to get
21  me to quit smoking.
22     Q.  And they -- all the doctor's office
23  had to rely on was what you were telling them;

Page 283

1  right?
2      A.  Right, and I guess what he had in
3  his records already.
4      Q.  Okay.  He is constantly fussing and
5  nitpicking her.  And are you referring to
6  asking you about your job duties and slamming
7  things around like you've described earlier in
8  this deposition?
9      A.  Right, that was -- actually it
10  starts up further than that.
11     Q.  Yeah, I know it does, that she's
12  filed sexual harassment charges.  I'm not
13  denying that that's there.
14     A.  Okay.
15     Q.  I'm just asking you about that
16  particular part.
17     A.  Right.
18     Q.  That's what you're referring to?
19     A.  Because that's what he had done
20  immediately before I had left the plant was
21  fussing about the overtime and saying he was
22  going to write me up and all of that.
23     Q.  And do you see this note down here

Page 284

1  on the left-hand side where it says, seems
2  fairly calm --
3      A.  Right.
4      Q.  -- husband in office?
5      A.  Right; uh-huh.
6      Q.  And I think he said your anxiety was
7  situational.  Do you see that over to the
8  right?
9      A.  Right.
10     Q.  You were going to start Lexapro and
11  appointment with a counselor; right?
12     A.  Right.
13     Q.  Okay.  How long did you take the
14  Lexapro?
15     A.  For two months and then when I went
16  back to refill it, the workmen's comp wouldn't
17  refill it any longer.  They said that the case
18  had been closed.
19     Q.  Okay.  And you didn't make an
20  appointment -- you didn't have an appointment
21  with a counselor?
22     A.  I called the counselor.  They
23  actually -- I think they had scheduled me an

71 (Pages 281 to 284)

## Page 285

1 appointment, I'm pretty sure they did, and
2 when I called him and explained to him that it
3 was workmen's comp, they called workmen's comp
4 to verify and workmen's comp denied that it
5 would be covered because there was not an
6 actual physical injury.
7    Q. Okay. Did you -- but this wasn't
8 the first time that you had gone to
9 Dr. Tompkins complaining about nausea, you see
10 I'm looking on 25 about nausea, do you see
11 that, up at the top of the page, Ms. Atwell?
12    A. Right.
13    Q. Because if you'll flip with me to
14 00035, do you see that?
15    A. Okay.
16    Q. Okay. That you had gone on October
17 20, 2005, and that was before you started
18 working in the safety office; right?
19    A. Correct.
20    Q. And you felt -- you had had heart
21 racing and felt nauseated and light-headed, so
22 it wasn't the first time you had gone to
23 Dr. Tompkins and reported this; right?

## Page 286

1    A. Actually this was an allergic
2 reaction to some medication.
3    Q. Okay. But it certainly wasn't the
4 first time that you had reported nausea to
5 Dr. Thompson, was it?
6    A. Tompkins, no, ma'am.
7    Q. Tompkins, I'm so sorry. I'm going
8 to show you -- because I know you had talked
9 about your hospitalization. Did you have any
10 other follow-up appointments -- let me ask you
11 this -- with Dr. Tompkins about any anxiety
12 after February 7?
13    A. I don't believe I went back after
14 that other than for my refills.
15    Q. And you may have gone back I know
16 you've had a car wreck that's separate --
17    A. Right.
18    Q. -- and apart from this treatment for
19 your car wreck but that's not related to this
20 case. Am I right about that?
21    A. Correct.
22
23    (Whereupon, Defendant's Exhibit 20

## Page 287

1 was marked for identification and a
2 copy of same is attached hereto.)
3
4    Q. Okay. I'm showing you what I am
5 marking as 20. I will show you that these are
6 the records that we got from Crenshaw
7 Hospital. Is that where you were hospitalized
8 during the last week of January 2006?
9    A. No, this is the car wreck.
10    MR. HORSLEY: '07.
11    A. In March.
12    Q. I understand that but was Crenshaw
13 Hospital where you were hospitalized when you
14 were hospitalized during the last week of
15 January 2006?
16    A. Yes.
17    Q. Okay. And if you'll turn with me to
18 page -- it's another Bates number, 00057, and
19 57 through 60 appear to be notes from when you
20 went to the hospital on or about January 26;
21 is that right?
22    MR. HORSLEY: Say that again, I'm
23 sorry.

## Page 288

1    Q. It appears that 57 through 60 appear
2 to be notes from -- admission notes from when
3 you went into the hospital on or around
4 January 26, 2006. Take your time and flip
5 through there. Twenty-six is I think on page
6 59.
7    MR. HORSLEY: It's just not dated.
8    MS. WILLIS: Fifty-nine is.
9    MR. HORSLEY: Okay.
10    Q. (By Ms. Willis) Are you with me,
11 okay. And you've gone into the hospital,
12 right, with -- and I'm looking at 57 with some
13 chest pain?
14    A. Right.
15    Q. Is that right and some shortness of
16 breath I guess?
17    A. Right.
18    Q. And some nausea, which you had had
19 before?
20    A. Uh-huh.
21    Q. Is there anything in these notes
22 about your -- that you see in these notes
23 about when you were admitted at the hospital

# FREEDOM COURT REPORTING

Page 289

1  about being harassed at work?
2      A.  Yes, ma'am.
3      Q.  Where?
4      A.  "She relates a lot of stress at work
5  and certainly we have had a long discussion
6  with her about all the implications of that."
7      Q.  What specific discussions did you
8  have with Dr. Tompkins and/or his staff about
9  stress at work?
10      A.  At this point all Dr. Tompkins knew
11  is I told him there was a lot of stuff going
12  on at work and that I was having a lot of
13  problems dealing with everything.  I don't
14  know exactly what my words were on it but just
15  letting him know that I was having a lot of
16  stress issues that were related to work.
17      Q.  Okay.  But there's no mention of
18  specific harassment?
19      A.  Correct.
20      Q.  And you had had a history of I guess
21  mitral valve prolapse in the past?
22      A.  I have.
23      Q.  Okay.  Did they ever really diagnose

Page 290

1  you and figure out what was wrong?
2      A.  Here?
3      Q.  Yes, ma'am.
4      A.  They diagnosed me with having a
5  panic attack or a panic disorder or something
6  I believe of that nature.
7      Q.  But you were released?
8      A.  Right.
9      Q.  You were released from the hospital
10  and were able to go back to work; is that
11  right?
12      A.  Correct.
13      Q.  Have you had any anxiety attacks
14  since you left the employment of Smart in
15  February --
16      A.  Yes, ma'am.
17      Q.  -- of 2006?
18      A.  Yes, ma'am.
19      Q.  When?
20      A.  It was not long ago -- actually I've
21  had them several different times.  A friend of
22  mine came up to me from behind and grabbed me
23  and it startled me and I kind of got upset

Page 291

1  then.  When my husband and I fuss about the
2  bills because I'm not working and when he
3  first found out everything that happened with
4  Rance and I sat down in detail and told him
5  everything that happened, then.  Situations
6  similar to that.
7      Q.  They make you anxious?
8      A.  Right.
9      Q.  Okay.  But you -- you don't have any
10  treatment for that right now other than
11  journaling or doing for yourself?
12      A.  Other -- I never had this problem
13  until I was raped and then after I was raped I
14  had this problem but it had gotten so much
15  better.  I could socialize in public.  I could
16  function.  I didn't take five showers a day.
17  I didn't carry a weapon with me everywhere I
18  went.  I didn't check the door locks five
19  times.  I mean, I had gotten myself out of a
20  pattern that created a comfort zone for me and
21  I was able to go on and have a normal life.
22      Q.  I don't want to delve into too
23  painful of a subject --

Page 292

1      A.  Okay.
2      Q.  -- but how long before you worked at
3  Smart were you raped?
4      A.  That was in 1997.
5      Q.  And did you press charges on that?
6      A.  No, ma'am.
7      Q.  I'm sorry.  I'm not getting far into
8  that.  Were you able to seek counseling for
9  that, ma'am?
10      A.  No, ma'am.
11      Q.  You didn't at the time?  No?
12      A.  No.
13      Q.  I'm sorry, I'm not going to speak
14  out for you, I'm sorry.  Did you take any
15  medication at that time?
16      A.  I didn't tell anybody.
17      Q.  I'm so sorry.  I mean, I can't tell
18  you how sorry I am.  Have you sought treatment
19  since?
20      A.  No.  I just talked to, you know, my
21  pastor.  They know and my family knows.  I
22  actually have a child, Logan, the eight-
23  year-old.  He was the baby that I got pregnant

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 293

1  with right after I got raped.
2      Q.  Was Mr. Davis the father?
3      A.  No.
4      Q.  Have you ever been on
5  antidepressants besides the Wellbutrin and the
6  Lexapro that we've talked about here?
7      A.  After my divorce I got put on
8  something, I don't even recall what it was.
9  It's so common now for everybody to be on it.
10  It's kind of like eating, chewing gum, or
11  something.  It's been so long ago, I'm not
12  really certain.
13      Q.  Do you feel like the rape made what
14  was going on at Smart harder for you?
15      A.  Yeah.
16      Q.  Okay.  Now, I know in your
17  interrogatory responses you had said about
18  being treated by a counselor as a child
19  because of some issues with maybe your father
20  or stepfather?
21      A.  Yeah, my real father got killed when
22  I was three.
23      Q.  I'm sorry to hear that.  I'm sorry.

Page 294

1  Did you go to counseling?
2      A.  I did.
3      Q.  As a child?
4      A.  I did.
5      Q.  Do you know how long you did that?
6      A.  My mom drove me to Dothan like -- I
7  think it started out like twice a month and
8  then it got down to where it was once a month
9  and then it got fewer and fewer.
10      Q.  Okay.
11      A.  That was so many years ago but I
12  remember it wasn't like all the time.
13      Q.  Right; right.  You filed your
14  claim -- you filed your EEOC charge; right?
15      A.  Uh-huh.
16      Q.  And we've talked about your EEOC
17  charge, haven't we?
18      A.  Yes, ma'am.
19      Q.  And the EEOC investigated; right?
20      A.  Uh-huh.
21
22      (Whereupon, Defendant's Exhibit 21
23  was marked for identification and a

Page 295

1  copy of same is attached hereto.)
2
3      Q.  They did an investigation and I'm
4  showing you Exhibit 21 where they concluded
5  their investigation and were unable to
6  determine that any discrimination occurred.
7      A.  Right.
8
9      (Whereupon, Defendant's Exhibit 22
10  was marked for identification and a
11  copy of same is attached hereto.)
12
13      Q.  Okay.  And then after that is when
14  you filed your lawsuit or your complaint
15  actually.  I'm going to show you that --
16  knowing that lawyers draft complaints and
17  unfortunately I don't get to question
18  Mr. Horsley about what he was thinking or what
19  was going through his mind at that time -- is
20  this the complaint you filed in this action
21  against Smart Alabama?
22      A.  Yes, ma'am.
23      Q.  And if you'll look with me on I

Page 296

1  guess the second and third page, ma'am, when
2  you talk about in paragraph six, "She was
3  sexually harassed by her supervisor, Rance
4  Maddox.  During this time, the plaintiff made
5  complaints to management of unwelcomed sexual
6  harassment."  Have you told me every way or
7  manner that you were sexually harassed by
8  Rance Maddox while you worked at Smart Alabama
9  during this deposition?
10      A.  To the best of my knowledge, I have.
11      Q.  Is there any document or witness
12  that would help you recall any more
13  specifically?
14      A.  Not at this time.
15      Q.  Okay.  Have you told me every way --
16  every time that you complained or raised a
17  concern to anybody at Smart Alabama about
18  Rance Maddox's actions during this deposition?
19      A.  To the best of my knowledge.
20      Q.  Is there any document or witness
21  that would help you I guess refresh your
22  recollection on that?
23      A.  To the best of my knowledge, I've

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 297

1  given you everything I know of.
2      Q.  Okay.  And I know we asked for --
3  we -- your attorney asked for damages during
4  this.  I'm looking on page five specifically
5  if you want to reference that that you've been
6  deprived of economic benefits.  Are you
7  talking about your wages there?
8      A.  Yes, ma'am.
9      Q.  And you've done emotional distress
10  and mental anguish.  Can you tell me -- other
11  than what you've already told me I guess, are
12  there any other facts that you contend support
13  your allegation that Smart's actions caused
14  you mental anguish or distress?
15      A.  Can you be a little more specific?
16      Q.  Yeah, I'll rephrase that.  That was
17  a little bit confusing.  Besides what you've
18  already told me, the facts you've told me in
19  this deposition, are there any other facts
20  that you have or that you know of supporting
21  your allegation that Smart is responsible for
22  you having mental distress or mental anguish?
23      A.  Medical records, talking to family

Page 298

1  and friends, the fact that we had to sell our
2  house.
3      MR. HORSLEY:  She's just asking if
4  there's anything that y'all haven't talked
5  about today.
6      THE WITNESS:  I don't think so.
7      Q.  (By Ms. Willis)  Okay.  Let me ask
8  you:  You had said in your interrogatory
9  responses you provided us with names of some
10  witnesses that may know things and I'm going
11  to go through these real quickly and we've got
12  to take a short break and then we'll be done,
13  but I want to get from you what they know.
14      MS. WILLIS:  It's Number 14,
15  Richard.
16      MR. HORSLEY:  All right.
17      Q.  (By Ms. Willis)  Ruth Ryan in human
18  resources at Smart Alabama, have you told me
19  everything during this deposition that you
20  think Ruth Ryan knows about your allegations
21  in this case?
22      A.  To the best of my knowledge, I've
23  told you everything.

Page 299

1      Q.  Okay.  When's the last time you
2  talked to Ruth Ryan?
3      A.  The 7th of February.
4      Q.  Okay.  Fran Hughes in human
5  resources, have you told me during this
6  deposition everything that you contend
7  Ms. Hughes knows about the facts of this case?
8      A.  Yes, ma'am.
9      Q.  Okay.  When's the last time you've
10  talked to her?
11      A.  Sometime in December of last year.
12      Q.  Okay.  What did y'all talk about at
13  that time?
14      A.  She just had spoken to me.  She was
15  at my cousin's wedding in Brantley.
16      Q.  Okay.  And have you told me
17  everything in this deposition that you contend
18  Gary Sport knows about your allegations in
19  this case?
20      A.  To the best of my knowledge, yes,
21  ma'am.
22      Q.  Misty Dicks, who is Misty Dicks?
23      A.  She's a security guard that also

Page 300

1  works for the contractor through Smart.
2      Q.  Okay.  And what does she -- I
3  haven't heard her name come up.  What does she
4  know about the facts of this case?
5      A.  Apparently he had asked her out
6  repeatedly and had caused her some issues and
7  she shared those with me.
8      Q.  When did you speak with Ms. Dicks
9  about those issues?
10      A.  I'm thinking somewhere between
11  February the 8th and maybe the 15th.
12      Q.  How did you get in touch with
13  Ms. Dicks?
14      A.  I called her father's restaurant in
15  Luverne.
16      Q.  What restaurant is that?
17      A.  It's -- gosh, it's the Ranch House.
18      Q.  Besides telling you that Rance asked
19  her out, is there any other knowledge that you
20  know of that Misty Dicks has about the facts
21  of this case?
22      A.  She said that he had asked her out
23  repeatedly and that she had went to human

75 (Pages 297 to 300)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 301

1  resources and that nothing was done and that
2  her dad had said that if they don't do
3  something that he would.
4      Q.  Okay.  And when's the last time you
5  talked to Misty?
6      A.  I talked to her dad a couple of
7  months ago.  I'm not sure exactly what the
8  date was.  It was just in general, we had went
9  in to eat.
10     Q.  Okay.
11     A.  But I haven't spoken with her in
12 quite a while.
13     Q.  Kathy Caldwell, have you told me
14 everything in this deposition that she knows
15 about the facts of your case?
16     A.  Yes, ma'am, other than I didn't
17 mention that Kathy told me that when he kissed
18 her or attempted to kiss her, I can't
19 remember -- I'm pretty sure that he did kiss
20 her that she slapped him and there was a
21 witness involved in that.
22     Q.  And who was the witness?
23     A.  She may have called a name or may

Page 302

1  not have, I don't remember.
2      Q.  Okay.
3      A.  I gave her my attorney's phone
4  number and asked her to contact them and give
5  them their information and in turn I called my
6  attorney and gave him her information.
7      Q.  And I don't want to talk about what
8  you and your attorney talked about but that's
9  fine.  When was the last time you talked to
10 Ms. Caldwell other than if you had a meeting
11 with him and her and I don't know if you have.
12     A.  It's been quite some time.  I'm not
13 sure exactly the date but it's been a while
14 back.
15     Q.  Six months, longer than that maybe?
16     A.  I'm really not certain to be honest
17 with you.  It hasn't been this year.
18     Q.  Okay.  Gloria Thompson, other than
19 seeing you in the bathroom, are there any
20 other facts that Ms. Thompson has about this
21 case?
22     A.  I'm not -- I haven't talked to her
23 directly but -- since all this has went on but

Page 303

1  she did speak to me before all this went on
2  and she may have some information, I'm not
3  sure.
4      Q.  Bill Bailey, what does Bill Bailey
5  know about the facts of this case?
6      A.  As far as he wanted -- I had talked
7  to him and he said that he wanted to come and
8  testify as far as me working and doing what I
9  was supposed to do and tell about, you know,
10 just like a character reference or something
11 and that he had made -- I believe it was him,
12 let me think who the other guy was, is his
13 name on the list, is it continued -- yeah,
14 okay, no, I'm thinking of somebody else, but
15 yeah, that's all Bill wanted to do.
16     Q.  When was the last time you talked to
17 Bill?
18     A.  Probably February or March.
19     Q.  Of this year?
20     A.  I'm thinking.
21     Q.  Okay.  Janna Stephens is —
22     A.  Saw him in town.  Oh, I'm sorry.
23     Q.  Janna Stephens, your sister-in-law,

Page 304

1  have you told me everything that you know of
2  that Janna knows?
3      A.  I have.
4      Q.  Amanda Dempsey, who was light duty,
5  have you told me everything in this deposition
6  that she may know about the facts of this
7  case?
8      A.  To the best of my knowledge.
9      Q.  When was the last time you talked to
10 Amanda Dempsey?
11     A.  Right after her baby was born and
12 that's been last year I know.
13     Q.  Colinda Porter, have you told me
14 everything that you believe Ms. Porter knows
15 about the facts of this case?
16     A.  To the best of my knowledge, I'm not
17 sure exactly what all she's seen and heard but
18 I don't know.
19     Q.  Okay.  When is the last time you
20 talked to Ms. Porter?
21     A.  When I left Smart.
22     Q.  Lakeisha Jessie, have you told me
23 everything in this deposition that Ms. Jessie

76 (Pages 301 to 304)

Page 305

1  may know?
2      A.  To the best of my knowledge.
3      Q.  When was the last time you talked to
4  Ms. Jessie?
5      A.  When I left Smart.
6      Q.  Teresa Brothers, was Teresa Brothers
7  employed at Smart?
8      A.  She was.  She's been terminated.
9      Q.  What does Ms. Brothers know about
10  the facts of this case?
11      A.  She also wanted to testify about I
12  guess like a character reference or whatever
13  and I guess she had some issues with Rance.
14  I'm not certain what the extent was.  She
15  didn't go into it.
16      Q.  When was the last time you talked to
17  Ms. Brothers?
18      A.  About two months ago when I saw her
19  in town.
20      Q.  Did you discuss this case then?
21      A.  Huh?
22      Q.  Did you discuss this case then?
23      A.  I gave her my attorney's phone

Page 306

1  number and told her that she might want to
2  give him a call.
3      Q.  Okay.  Wendy, is that Wendy Burgins
4  that we were talking about?
5      A.  It is.
6      Q.  Have you told me everything in this
7  deposition that you know of that she knows
8  about your case?
9      A.  I haven't spoken with her since
10  the -- since I left but my husband, one of his
11  friends, I cannot tell you who it was, came to
12  him and told him that Wendy said that she was
13  right, that she would get your job, and so I
14  took it as if Wendy was trying to get my
15  position in the safety office.
16      Q.  But Wendy never said that to you
17  directly?
18      A.  No.
19      Q.  When is the last time you talked to
20  Wendy?
21      A.  The day I left.
22      Q.  Lisa Bodiford, anything else other
23  than what you have already told me that Lisa

Page 307

1  would know in this deposition?
2      A.  To the best of my knowledge.
3      Q.  What -- when's the last time you
4  talked to Lisa?
5      A.  When I left.
6      Q.  Mark Sissy?
7      A.  It's actually Mark and Sissy, it's
8  physical therapy contractors for Smart.
9      Q.  Okay.  And what do they know about
10  the facts of this case?
11      A.  When I was in -- when I was in the
12  physical therapy group for my shoulder, they
13  actually had a lot of problems with Rance
14  coming in while I was doing my physical
15  therapy and kind of sitting around and hanging
16  out, and due to it being a shoulder injury,
17  you had to put on a paper gown and they had to
18  do electro -- it's like an ultrasound kind of
19  heat therapy thing and he would just come in
20  there and he would inquire about people's
21  cases and you know, try to strike up a
22  conversation, and it was in a closed room and
23  it was supposed to be a private setting and he

Page 308

1  made himself seen quite often during my
2  physical therapy treatments to the point where
3  the therapist said, what's up with this guy,
4  and he had told me that he had talked to Mark
5  and Sissy about how he would just come in and
6  sit down in my physical therapy sessions.
7      Q.  When is the last time you talked to
8  Mark or Sissy?
9      A.  It was after I left Smart.
10      Q.  How long after you left Smart?
11      A.  I think it was within a couple of
12  days.
13      Q.  Tammy Green, who was your supervisor
14  out on the floor; is that right?
15      A.  Right.
16      Q.  Anything other than what you've
17  already told me that Tammy knows about this
18  action?
19      A.  To the best of my knowledge, I've
20  shared everything.
21      Q.  What about Tommy Hancock, who is
22  Tommy Hancock?
23      A.  He was an employee at Smart and I

# FREEDOM COURT REPORTING

Page 309

1  talked to him -- I saw him in town one day and
2  he and Kevin know each other from way back and
3  he was showing Kevin his new motorcycle and
4  they got off on the subject, I heard you
5  wasn't at Smart no more and all this kind of
6  stuff, and he said that he wanted to testify
7  that he had knowledge of him making sexual
8  gestures and comments toward other women. He
9  never listed names.
10    Q.  Tabitha, who's Tabitha?
11    A.  I can't recall Tabitha's last name
12  right now. She's a girl that was in the first
13  aid room and she had a broken foot I believe
14  and she had seen me on several occasions
15  crying and tried to console me and she asked
16  what was wrong and I just told her, you know,
17  that it was Rance and she said, you know, he's
18  a jerk and he's this and he's that because you
19  know, I didn't want to get all into it and
20  that's the extent of what she knows and that
21  was the last time that I talked to her was
22  around the last few days of my employment.
23    Q.  Okay.

Page 310

1    MS. WILLIS:  Let us take about a
2  three-minute break, I'm going to look through
3  these, and we'll be done.
4
5    (Whereupon, a brief recess was taken
6    from 3:59 p.m. to 4:06 p.m.)
7
8    (Whereupon, Defendant's Exhibit 23
9    was marked for identification and a
10    copy of same is attached hereto.)
11
12    Q.  (By Ms. Willis) I'm going to mark as
13  Composite Exhibit 23 and it's some documents
14  that you all made available to me this morning
15  and it's the only copy that I have. These
16  medical bills, what are they -- are they for
17  treatment with Dr. Tompkins?
18    A.  They are.
19    Q.  And this is for I guess bills that
20  occurred between January 24 and February 23 of
21  2006?
22    A.  Right.
23    Q.  Is that right?

Page 311

1    A.  Right.
2    Q.  Okay. And then you provided some
3  medical certifications. Is this your training
4  as a responder?
5    A.  That's all that I had with me.
6    Q.  Okay. And then you had referenced
7  some -- it looks like another criminal matter
8  that you had been involved in --
9    A.  Right.
10    Q.  -- but not that you perpetrated
11  yourself or anything?
12    A.  Right.
13    Q.  And this was some domestic violence
14  with regard to an individual named Scotty
15  Farmer?
16    A.  Right.
17    Q.  And this was when? When did this
18  take place, in 2005?
19    A.  I believe that's right, uh-huh.
20    Q.  And he was abusive to you?
21    A.  Right.
22    Q.  And when -- when's the last time --
23    A.  Well, actually we were broken up at

Page 312

1  this point.
2    Q.  Okay.
3    A.  He was just harassing me.
4    Q.  He was still bugging you?
5    A.  Right.
6    Q.  And he had unfortunately been
7  verbally and physically abusive to you prior
8  to that time --
9    A.  Right.
10    Q.  -- prior to when you filled this
11  out? And he was harassing you how when you
12  filled this out?
13    A.  He was riding by the driveway and
14  cutting doughnuts in front of the house.
15    Q.  And when did you all part ways prior
16  to that time?
17    A.  Oh God, it was months before that.
18  This was all over the six-year-old who he is
19  not the father of.
20    Q.  Okay.
21    A.  But the six-year-old calls him dad
22  because we started dating when we was two. He
23  saw me in town one day and he wanted to take

78 (Pages 309 to 312)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 313

1  him with him and I said, no, we had plans, and
2  he showed out and this is what escalated.
3      Q. Escalated as a result and I know
4  that his treatment of you caused you some
5  distress as well?
6      A. Oh, yeah.
7      Q. And that's why you filed this. What
8  was the outcome of this?
9      A. We all -- he went to church and got
10 baptized.
11     Q. Okay. Well, I guess that's a good
12 outcome.
13     A. Yeah, and three of the kids got
14 baptized and we all actually get along now and
15 he comes to my house and me and my husband can
16 go to his house and it's a pretty unique
17 relationship.
18     Q. Who is Mike Mitchell?
19     A. He was a coworker that I worked with
20 at Elba Rescue -- Coffee County EMS.
21     Q. That dates way back?
22     A. Oh, yeah, it must have just been
23 stuck in there because of the medical

Page 314

1  certification.
2      Q. That's fine. And then you provided
3  us your Cobra paperwork for you and your
4  husband Kevin from Smart Alabama?
5      A. Correct.
6      Q. Okay, thank you. And it looks like
7  you had filled out an incident report for
8  stress from pressure from tense situation with
9  supervisor?
10     A. Right.
11     Q. Did you ever turn this in?
12     A. Yeah, there's a copy of it, should
13 be in the incident report binder.
14     Q. Okay. And this just was office
15 employees' phone numbers --
16     A. Right.
17     Q. -- that you had with Smart?
18     A. Right.
19     Q. And then we -- it looks like we had
20 your income tax return for 2006 --
21     A. Correct.
22     Q. -- that you filed this year. Did
23 you marry file jointly?

Page 315

1      A. I believe it was married.
2      Q. Okay.
3      A. I'm trying to remember how he filed.
4  I'm not certain, I just sign.
5      Q. And there's a reference on this page
6  about unemployment compensation. Did you file
7  for unemployment compensation or Mr. Atwell?
8      A. No, Mr. Atwell.
9      Q. Okay.
10     A. In between jobs because of the type
11 of work he does, he draws unemployment because
12 he can draw -- if you work out of more than so
13 many states, you can draw from so many places
14 or something. I'm not -- I let him handle all
15 of that.
16     Q. Okay. But this -- this return as
17 best you know accurately reflects the
18 income --
19     A. Right.
20     Q. -- that you had for 2006?
21     A. Right.
22     Q. Including what income you earned --
23     A. Right.

Page 316

1      Q. -- from Smart? I thought there was
2  something on Smart on the back of this but it
3  may be -- there's Kevin Atwell Smart and then
4  I think there's Robin Atwell or Robin Davis
5  Smart, okay, and that was just -- I was just
6  wanting to go through those and I will give
7  you that. If we can just finish up here.
8  Have you told me every fact supporting your
9  claim you were sexually harassed while you
10 were at Smart?
11     A. To the best of my knowledge, yes, I
12 have.
13     Q. Have you told me every fact
14 supporting your contention that you felt like
15 you had to leave Smart?
16     A. Yes, I have.
17     Q. Okay. Have you answered all my
18 questions truthfully today?
19     A. Yes, I have.
20     Q. You understand you've given all your
21 answers under oath and under penalty of
22 perjury?
23     A. Yes, I do.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 317

1    Q.   And you agree if you think of
2    something else that's responsive to my
3    questions, whether it's a witness' name or a
4    document, that you will let your attorney know
5    so that he can let me know?
6        A.   I will.
7        MS. WILLIS:  That's all I have other
8    than pending, you know, maybe reserving for us
9    to discuss leaving it open as far as the
10   journal and perhaps if there are other pages
11   of the calendar.
12       MR. HORSLEY:  Okay.
13       MS. WILLIS:  Okay.  Thank you.
14       MR. HORSLEY:  Very good.
15
16   (Whereupon, the deposition was
17   concluded at 4:11 p.m.)
18
19       FURTHER DEPONENT SAITH NOT
20
21
22
23

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| | AGENCY | CHARGE NUMBER |
|---|---|---|
| ☐ FEPA | | 420-2006-02661 |
| ☒ EEOC | | |

_____ and EEOC
State or local Agency, if any

**NAME** *(Indicate Mr., Ms., Mrs.)*
Mrs. Robin Atwell

**HOME TELEPHONE** *(Include Area Code)*
(334) 527-3503

**STREET ADDRESS**     **CITY, STATE AND ZIP CODE**
9133 Emmett Ave.    Brantley, Alabama   36009

**DATE OF BIRTH**
11/16/1973

**NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME** *(If more than one list below.)*

**NAME**
Smart Alabama LLC

**NUMBER OF EMPLOYEES, MEMBERS**

**TELEPHONE** *(Include Area Code)*
(334) 335-5800

**STREET ADDRESS**     **CITY, STATE AND ZIP CODE**
121 Shin Young Drive    Luverne   Alabama 36049

**COUNTY**
Crenshaw

**NAME**

**TELEPHONE NUMBER** *(Include Area Code)*

**STREET ADDRESS**     **CITY, STATE AND ZIP CODE**

**COUNTY**

**CAUSE OF DISCRIMINATION BASED ON** *(Check appropriate box(es))*

☐ RACE ☐ COLOR ☒ SEX ☐ RELIGION ☐ NATIONAL ORIGIN
☒ RETALIATION ☐ AGE ☐ DISABILITY ☐ OTHER *(Specify)*

**DATE DISCRIMINATION TOOK PLACE**
EARLIEST    LATEST
11/16/2005   2/17/2006
☐ CONTINUING ACTION

**THE PARTICULARS ARE** *(If additional space is needed, attach extra sheet(s)):*

See Attachment

RECEIVED
EEOC

MAY 16 2006

BIRMINGHAM DISTRICT OFFICE

☐ I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the foregoing is true and correct.

*[signature]* Rob. Atwell

Date      Charging Party *(Signature)*

NOTARY - *(When necessary for State and Local Requirements)*
*[signature]* Comm. Exp. 6-21-08

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT
*[signature]* Robin Atwell

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(Day, month, and year)

EEOC FORM 5 (Rev. 06/92)



Robin Atwell began her employment with Smart Alabama LLC on approximately August 25, 2005. She was trained during the first week and served as an assembly tech for the remainder of August until November 14, 2005.

On or about November 14, 2005, Robin Atwell became a safety assistant which required her to transfer to a different part of the plant. Her new office was actually located in the office of the safety director, Rance Maddox. From approximately November 16, 2005 through February 7, 2006, Robin Atwell was the subject of sexual harassment by Rance Maddox. The particulars are as follows:

* During her first week in Mr. Maddox's office, and continuing through January 2006, Mr. Maddox asked Mrs. Atwell on numerous occasions where she was eating and if she wanted to eat with him. When she would tell him she had other plans, on numerous occasions, he would show up wherever she was eating and ask if he could eat with her.

* On November 16, 2005, Mrs. Atwell's birthday, Rance Maddox hugged her. Although it was a birthday hug, the hug was inappropriately tight and long.

* From November 16, 2005 through the end of January 2006, Mr. Maddox repeatedly touched the Plaintiff on her arms and hands and attempted to hold hands with her while talking to her. This occurred on a daily basis.

* From November 16, 2005 through the end of January 2006, Mr. Maddox repeatedly put his arm around Mrs. Atwell and inappropriately rubbed her back.

* In December 2005, and continuing through January 2006, Mr. Maddox began asking Mrs. Atwell if she wanted to have drinks with him after work. At each request, she informed him that she would check with Kevin, her fiancé, and husband beginning on January 5, 2006. Regardless of her response, Mr. Maddox continued to ask her out for drinks knowing that she had a fiancé and a husband as of January 5, 2006.

* At some time between November 16, 2005 and December 1, 2005, Mr. Maddox made the comment to Mrs. Atwell that it was impossible for men to be monogamous in their sexual relations.

* On several occasions from the end of November 2005 through January 2006, Mr. Maddox asked Mrs. Atwell to travel to Montgomery, Alabama to meet him for drinks at Egor's, a local bar.

* On numerous occasions between November 16, 2005 and the end of January 2006, Mr. Maddox deliberately rubbed his pelvis area against Mrs. Atwell's buttocks.

* From November 16, 2005 through the end of January 2006, on numerous occasions, Mr. Maddox called the Plaintiff at her home, sometimes late at night. On each occasion, he would ask her what she was doing.

EXHIBIT

A



On several occasions between December 2005 and January 2006, Mr. Maddox asked Mrs. Atwell if her breast were real and asked her what they felt like. She felt as though he was inviting her to ask him to touch her breast.

On several occasions between December 1, 2005 and the end of January 2006, Mr. Maddox made the comment "I've got a real man for you" to Mrs. Atwell.

On January 18, 2006, while Mrs. Atwell was in the corner of the office working on a computer, Mr. Maddox grabbed both of her shoulders and squeezed them as if he were giving her a massage. He moved his hands over her shoulders where they were situated just above her breast and rubbed her.

On numerous occasions between November 16, 2005 and the end of January 2006, Mr. Maddox touched the Plaintiff on her legs.

Beginning in December 2005 and continuing through December 2006, Mr. Maddox hugged Mrs. Atwell inappropriately and stated "baby, I'll take care of you"...."we'll be a team"..."you've got to work with me". Mrs. Atwell perceived the clear meaning of these statements that Mr. Maddox would help her with working conditions and raises if she would engage in sexual activities with him. On one occasion during that same period of time, Mr. Maddox asked Mrs. Atwell to spend the night in Montgomery for a training session.

On or about January 18, 2006, Mrs. Atwell reported Mr. Maddox's conduct to Gary Sport, a managerial employee. Previously, during casual conversations, she had informed Mr. Sport that she was uncomfortable working around Mr. Maddox. Despite these discussions, Mr. Maddox had not been reprimanded or counseled in any way.

As a result of her reporting Mr. Maddox, Mr. Maddox began placing more job duties on Mrs. Atwell. Furthermore, as a result of her reporting her, Mr. Maddox began to make Mrs. Atwell's working environment intolerable and hostile. At some point toward the end of January 2006, Mrs. Atwell reported Mr. Maddox to Ruth Ryan in the human resources department. Ms. Ryan told Mrs. Atwell to simply be short with Rance and just do her job. She assured Mrs. Atwell that they were investigating her complaints as of February 1, 2006. As a result of this meeting, Mr. Maddox created a weekend work schedule and put Mrs. Atwell on the schedules during hours that he knew she could not work. Still, during this time, Mr. Maddox continued to touch Mrs. Atwell inappropriately.

Mr. Maddox began to fabricate complaints about Mrs. Atwell and on a couple of occasions wrote her up for excessive overtime, which had been previously approved by Gary Sport. She was also written up for wearing blue jeans.

On February 7, 2006, Mrs. Atwell again met with Ruth Ryan. She reported to Ms. Ryan that reporting Rance had simply increased the hostility of her work environment. Ms. Ryan informed Mrs. Atwell that they would place her on another line; however, she would still have to

Case 2:06-cv-01089-MEF-WC    Document 24-3    Filed 11/20/2007    Page 4 of 4

see Mr. Maddox everyday. Mrs. Atwell has been unable to return to work since that time due to severe emotional distress, depression and fear associated with the harassment and retaliation by Rance Maddox.

Smart Alabama LLC was made aware by Mrs. Atwell on numerous occasions about Mr. Maddox's sexual harassment toward her; however, they either did nothing or took measures that did not help or cure the problem. Smart Alabama LLC either was or should have been aware of previous and subsequent similar conduct by Mr. Maddox; however, he remained an employee.

527-3503

02/02/06

Gary Sport
Human Res
Smart

RE: Department transfer

~~Gary Per my conversation with you.~~
In Regards to the Sexual
Harrasment Situation with Rance
maddox. I Have requested a
departmental transfer. I have
been ~~asked~~ told to be patient. By H.R personel ~~and~~
I do not feel Comfortable
being in a ~~closed office area~~
~~with any~~ Confined work area
with Rance maddox. After I
talked to you about what events
have taken place, Rance maddox
has made my work Environment
be a hostile one and I feel
that he was advised about my using
Complaint and ~~that~~ he is ~~going taking~~
~~access~~ his position to intimidate
others ~~of~~ By means of threats
~~of being~~ both direct + indirect.
So therefore at this point until
Some permanent Changes have been made in

Atwell v. Smart
0058
Pltf's RFP

EXHIBIT
17
R. Atwell 6-21-07



regards to my position at Smart or Rance Maddox's position at Smart, I am requesting that one of the following actions be taken IN a timely manor.

Robin Davis Atwell leave of Absence Paid. (Pending investigation)

Robin Davis Atwell leave of Absence Unpaid (Pending investigation)

Rance Maddox leave of Absence Paid (Pending investigation)

Rance Maddox leave of Absence Unpaid (Pending investigation)

Please inform me as soon as a decision has been made in Reference to what actions are going to be taken.

Sincerely,

Robin Davis Atwell

Atwell v. Smart
0059
Pltf's RFP

# PLAINTIFF'S CALENDARS



EXHIBIT

14

R. Atwell 6-21-07

ATWELL V. SMART
P 26(A) 0001

RING-NECKED PHEASANT X SOP Changes

The ring-necked pheasant is one of the most popular game birds and has been the subject of countless stamps and wildlife portraits. The male of the species is particularly easy to identify because of its signature coloring and white neck ring. The ring-necked pheasant is a ground-dwelling species that can be found in tall prairie grasses or marshland. Pheasants bear precocial young, meaning that hatchlings are able to walk immediately after hatching. Young pheasants depend greatly on insects to supply high levels of protein for growth.

# JANUARY 2006
## SOUTHEAST SPORTSMAN

All of the requests were for immediate action

GUIDE TO BEST FISHING DAYS

BEST ● GOOD ◗ FAIR ◖ POOR ◦

Dates shown on this calendar are approximations based on traditional season openings, events in nature, etc. Please consult your local hunting or fishing regulations for exact season dates.

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| 1 New Year's Day | 2 | 3 | 4 Drug testing/collection training | 5 Got married | 6 | 7 Off |
| 8 Off New Year's Day Observed | 9 New Year's Day Observed | 10 KY CHOW | 11 | 12 | 13 1st Shift safety Resp Epiphany | 14 Off |
| 15 Off | 16 Martin Luther King, Jr. Birthday Observed (USA) | 17 | 18 meeting w/ G-Ray about Ranco requested transfer | 19 | 20 | 21 Off |
| 22 Off | 23 Can't get a letter from Gary. | 24 Safety meeting to D.T. H ECG labs cc meeting being replaced | 25 EKG CAT X-Rays Echo labs Lab EKG CCH Ranco called sold to Save it Gary | 27 Off X X | 28 Kathy? Quit X |
| 29 Off | 30 | 31 cc meeting being replaced X | | | | |

### DECEMBER
| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 | | | | | | |

### FEBRUARY
| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | | | | |

First Quarter 6
Full Moon 14
Last Quarter 22
New Moon 29

# FEBRUARY 2006

## SOUTHEAST SPORTSMAN

### BIG HORN SHEEP

Big horn sheep are best known for their bone-crunching dominance rituals and curly horns. These elusive creatures can survive in a variety of habitats including tundra, coniferous forest and desert. When living in the desert, the color of the sheep's fur coat will change to blend with its surroundings. The signature horns are composed of a fingernail-type material that becomes hardened and is nourished by a blood-supplied bony core. Some ram horns have been known to exceed 40 inches in length.

GUIDE TO BEST FISHING DAYS

BEST · GOOD · FAIR

Fishing days are predicted based on traditional seasonal openings, events and moon phases. Hunting or fishing regulations for your particular area should always be observed.

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | | | | |

Lincoln's Birthday (USA) — 12

REPORT RC VIOLATIONS 1-800-922-5431 — 13

FL REDBUDS START BLOOMING FIRST SIGN OF SPRING IN US — 14

KY FISH AND WILDLIFE INFO www.kdfwr.state.ky.us — 8

Valentine's Day — 14

AZ FISH & WILDLIFE www.azgfd.com — 21

Washington's Birthday (USA) — 22

Washington's Birthday Observed (USA) Presidents Day (USA) — 20

AL PARK INFO 1-800-ALA-PARK — 28

BALD EAGLE LAYING EGGS — 24

First Quarter 5
Full Moon 13
Last Quarter 21
New Moon 28

JANUARY
1 2 3 4 5 6 7
8 9 10 11 12 13 14
15 16 17 18 19 20 21
22 23 24 25 26 27 28
29 30 31

MARCH
1 2 3 4
5 6 7 8 9 10 11
12 13 14 15 16 17 18
19 20 21 22 23 24 25
26 27 28 29 30 31

# DEPOSITION OF RUTH RYAN

## September 12, 2007

## Pages 1 through 67

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL  36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

Page 45

1     who is -- was serving then as our worker's
2     comp doctor.  As a matter of fact, it's her
3     doctor.
4  Q.  Did you ever tell her to go see him after
5     what she reported to you about Rance
6     Maddox?
7  A.  No.
8  Q.  I think you've already said this.  After
9     she -- after you couldn't find her the
10    following day --
11  A.  That's right.
12  Q.  -- you haven't seen her nor spoken with her
13    since?
14  A.  I have not spoken with her, no.
15  Q.  And that was the extent of your
16    investigation into these allegations,
17    speaking with her --
18  A.  I was informed later -- I'm sorry.
19  Q.  -- speaking with her and Colinda?
20  A.  Uh-huh (positive response).
21  Q.  Is that correct?
22  A.  Uh-huh (positive response).
23  Q.  Yes?

Page 46

1         MS. WILLIS:  Yes or no.
2  A.  Yes.  I'm sorry.
3  Q.  All right.  And sometime in late February
4    it's my understanding that Rance Maddox
5    left SMART; is that correct?
6  A.  Uh-huh (positive response).  Yes.
7  Q.  And what were the circumstances for his
8    departure from SMART?
9  A.  I was not involved in the exact reason of
10    why he left, but he resigned.  My
11    understanding -- I'm sorry.  He quit.  That
12    was my understanding.
13  Q.  And you never met with him about the
14    reasons why he was quitting or talked with
15    him about that?
16  A.  I spoke with him when he returned to bring
17    his uniforms.  And I asked him how he was
18    doing, and he said he was doing better.
19    And his uniforms were there.  He looked
20    pleasant.  And we didn't engage in any
21    other conversation of what are you going to
22    do now, et cetera.  That was that.
23  Q.  And based upon what you've told me in this

Page 47

1    deposition, it's my understanding you've
2    never discussed Robin Atwell's allegations
3    with Mr. Maddox?
4  A.  I did not.
5  Q.  While Rance was still employed at SMART,
6    were you ever made aware of an incident
7    between him and Cathy Caldwell?
8        Do you know who Cathy Caldwell is?
9  A.  He was a -- she was -- I'm sorry -- a
10    security guard.
11        No.  It was after she departed, and I
12    guess it -- within the time frame a
13    document was in my desk about a situation
14    in that regard.
15  Q.  Okay.
16  A.  So it would have been between that frame.
17    So the answer would have been, I guess,
18    yes.
19  Q.  Yeah.  I think my question was before Rance
20    Maddox left SMART.
21  A.  Yeah.
22        MS. WILLIS:  Not before Robin --
23  Q.  Yeah.  Are you aware of an incident that

Page 48

1    took place between he and Cathy Caldwell?
2  A.  Yes.
3  Q.  All right.  Tell me --
4  A.  Not the incident.  I was aware that there
5    was a situation and -- but it was a note on
6    my desk.
7  Q.  And is that the first time you became aware
8    of that incident?
9  A.  Yeah, that was the first time.
10  Q.  And what do you recall the note saying?
11        Was it a handwritten note?
12  A.  I believe it was.  Something along the
13    lines that Mr. Maddox had kissed her.
14  Q.  It was a handwritten note from her; right?
15  A.  I believe so.  I believe so.
16  Q.  And what did you do as a result of that?
17  A.  I went to -- I went immediately to the
18    safety -- sorry -- to the security
19    department to locate her, and she was no
20    longer there.  And then I asked the
21    security to please call her at home, and
22    she was not answering.  And we -- I was
23    informed that she had quit.



January 30, 2006

Attention:    Robin Davis
Reference:    Job Performance Evaluation (4th Attempt)
From:         Rance Maddox

Earlier this month on January 24, 2006, in our last Safety Office
meeting, I discussed with you that I would be performing Job
Performance Evaluations on that same day. This memo is to inform
you of your Job Performance within the Safety Department.

In my last attempt on January 5, 2006, I informed you once again of
your Job Description. As you can remember, it is First Shift Safety
Assistant responsibility to enter in and complete the OSHA 300A Log.
This is a serious matter that you have taken lightly.  The last entry in
the OSHA 300A Log was on November 30, 2005, which was entered in
by Melissa McGough. As of this date, January 30, 2006, you have yet to
enter in or complete any Recordables on the OSHA 300A Log.  This
highly unacceptable and can no longer be tolerated.  From your hire
date within the Safety Department, November 14, 2005, you have had
ample time to have completed this task or to have asked questions if you
did not understand how to perform this task.

Along with completing the OSHA 300A Log, there has to be a First
Report of Injury claim from Worker's Compensation filed out and
emailed to Bill Hicks. This is also very serious and must be done within
48 hours of initial injury. This is also one of your job performances you
have yet to complete. There are several employees who were injured on
the job and have had to wait over a month to see a doctor or is still
waiting on Workman's Comp approval, because they haven't gotten the
First Report of Injury Form. *what ever I have copies of all my stuff now & some of the old stuff*

The following is a list of other Job Descriptions you have yet to
perform:

1. Daily Planner for all Three Shifts *what is this? (never been instructed.)*
2. Reports of Safety Memos *what is this? (never been instructed.)*

Atwell v. Smart
0090
Pltf's RFP

4. Office Organization *I know where my stuff is and can't control what is done on second or third shift. This office is shared by 6 people*

5. Safety Committee/First Responders Meeting *made list posted list gave list to Cloyd and asked him to give me a date & time when I could meet with the Safety Comm. people. NO Response.*

Also, it has become a problem with you working weekends. It has been a month since you last worked a weekend. As a Safety Assistant it is your job as well as the other Safety Assistants to work weekends.

Please be aware that when you started a new job in the Safety Office you were on a ninety day probationary period. Because of the deficiencies in your job performance, and with multiple attempts to correct these problems, you have given me no other choice but to terminate you from within the Safety Department. I wish you the best luck in the future.

Rance Maddox, CMA, CECD, CMS

Atwell v. Smart
0091
Pltf's RFP