IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

ROBIN ATWELL,                          )
                                       )
      Plaintiff,                       )
                                       )
v.                                     )          CASE NO. 06-cv-1089-MEF
                                       )          (WO – Recommended for
                                       )          publication)
SMART ALABAMA, LLC,                    )
                                       )
      Defendant.                       )

## MEMORANDUM OPINION AND ORDER

### I. INTRODUCTION

This cause is before the Court on Defendant Smart Alabama, LLC's Motion for Summary Judgment (Doc. # 16). Plaintiff seeks to redress allegedly unlawful employment practices in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"). For the reasons stated herein, Defendant's Motion is GRANTED IN PART and DENIED IN PART.

### II. JURISDICTION AND VENUE

The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because Plaintiff's claims are brought under Title VII, 42 U.S.C. § 2000e-2(a)(1). The parties do not contest personal jurisdiction and venue, and the Court finds a sufficient basis for each.

### III. STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on

file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "An issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party. An issue is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-23.    Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). On the other hand, a court ruling

on a motion for summary judgment must believe the evidence of the nonmovant and must

draw all justifiable inferences from the evidence in the nonmoving party's favor.

*Anderson*, 477 U.S. at 255. After the nonmoving party has responded to the motion for

summary judgment, the Court must grant summary judgment if there is no genuine issue

of material fact and the moving party is entitled to judgment as a matter of law. FED. R.

CIV. P. 56(c).

## IV. FACTS AND PROCEDURAL BACKGROUND

The Court has carefully considered all deposition excerpts and documents

submitted in support of and in opposition to the motion. The submissions of the parties,

viewed in the light most favorable to the nonmoving party, establish the following

relevant facts:

**A. Background**

Defendant operates a stamping and welding plant in Luverne, Alabama for

automotive parts provided to Hyundai Motor Manufacturing Alabama. Aff. of Gary

Sport (Doc. # 18-8, at ¶ 4). Defendant's plant is one building that consists of a

production area (also called the production floor), a reception area, and two main office

areas. (*Id.* ¶ 5). The administrative office area, which includes the Human Resources

Department, is to the left of the reception area. The production office area is to the right

of the reception area. Both of these office areas are open and have cubicles. The safety

department office is just off the production office area. (*Id.*)

On August 25, 2005, Plaintiff began working for Defendant as an assembly technician, and she worked in the production area. Plaintiff's Dep. (Doc. # 18-2, at 67). On November 14, 2005, Plaintiff transferred to the safety department and took the position of safety assistant. Once she began working in the safety department, she reported to Rance Maddox ("Maddox"), the Safety Manager. The alleged harassment by Maddox began on November 16, 2005 and continued until sometime shortly before February 7, 2006, which was the last day that Plaintiff worked for Defendant.

**B. Incidents of alleged harassment**

Maddox let it be known by people in the safety department that he was a "womanizer" and a "ladies man." (*Id.* at 125). He was "a very touchy, feely person." (*Id.* at 174). The touching "got to where it was something all the time every day." (*Id.* at 174). In her deposition, Plaintiff testified about the following harassing acts and statements:

- On one occasion, Maddox walked up behind Plaintiff while she was sitting. He began rubbing her shoulders. As she tried to stand up, he reached down and touched her on the upper part of one of her breasts, and he laughed after doing so. Plaintiff responded by "cussing" at Maddox. (*Id.* at 172-74).

- On an unknown number of occasions, Maddox rubbed his shoulder against Plaintiff's breasts. (*Id.* at 174-75).

4

- On several occasions, Maddox asked Plaintiff if her breasts were real and what they felt like. The questions were asked when Plaintiff faced Maddox in a way that he was able to see down her blouse. Plaintiff did not respond. (*Id.* at 214-17).

- On November 16, 2005, which was Plaintiff's birthday, Maddox hugged Plaintiff for eight to ten seconds and in a manner that was "inappropriately tight and long." (*Id.* at 177-78).

- On numerous occasions, Maddox would try to hold hands with Plaintiff while talking with her, pull her close to him while he sat on the edge of his desk, and touch and rub her when they were near each other looking at work related items. (*Id.* at 179).

- On twenty to thirty occasions, Maddox would try to hold Plaintiff's hand. (*Id.* at 180).

- On at least twenty occasions, Maddox would wrap his arm around Plaintiff's arm or approach her from behind and rub her arms. The first arm touching occurred after Plaintiff had been in the safety office for two days. (*Id.* at 182-83).

- On at least ten occasions, Maddox would rub his pelvis area against Plaintiff's buttocks, shoulder, and other body parts. When this first happened, he approached her from behind as she was filing, and he acted like he was squeezing through a tight space, even though there was sufficient room to pass by without rubbing against Plaintiff. The sliding rub lasted about three seconds. Plaintiff was startled

5

by this rubbing, and Maddox laughed about it. (*Id.* at 194-95, 251-52).

• On an unknown number of occasions, when Maddox and Plaintiff met with Antoine Kwan, the director of the plant, Maddox would rub his legs against Plaintiff's legs under the table. (*Id.* 223-24).

• Maddox called Plaintiff "baby," "honey," and "sweetie" every day. (*Id.* at 222).

• Maddox asked Plaintiff to eat lunch with him on a daily basis. Although she declined to eat with him, he would overhear her conversations with others about lunch plans and show up wherever she was eating. On one occasion, he showed up at Chicken Shack and sat next to her. Although there were not many places to eat near the plant, the fact that he showed up wherever she was every day was not a coincidence. (*Id.* at 167-70).

• On one occasion, Maddox asked Plaintiff to go out with him for drinks, and he said that he would buy the drinks and that she would not have to worry about driving if she was "tore up" because they could get a room. (*Id.* at 189).

• On one occasion, Maddox told Plaintiff that it was impossible for men to be monogamous in their sexual relations. (*Id.* at 191).

• On five or six occasions, Maddox told Plaintiff, "I've got a real man for you," in conjunction with, "Just work with me baby." (*Id.* at 218-20).

• On ten to fifteen occasions, and sometimes when Plaintiff asked about getting a raise, Maddox would say, while rubbing Plaintiff, that if she worked with him, he

would get her what she wanted and he would take care of her.  Plaintiff responded by walking out.  (*Id.* at 229-31).

• On fifteen to twenty occasions, Maddox called Plaintiff while she was home. Sometimes, he asked her about work-related matters, and each time, he also tried to talk about nonwork-related matters.  He wanted to know what she was doing, where she was, and what she was doing later.  However, he did not make specific comments that were inappropriate.  (*Id.* at 207-13).

• Maddox made references to Plaintiff about Maddox's sex life with his wife, and he told Plaintiff that his wife was a "fucking bitch."  (*Id.* at 237-40).

## C. Defendant's sexual harassment policy

At all times relevant to this case, Defendant's policy regarding "sexual and other unlawful harassment" was as follows:

It is SMART ALABAMA, LLC's objective to provide a working environment free from discrimination and conduct commonly referred to as sexual harassment . . . .

Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when:

a.    submission to such conduct is made either explicitly or implicitly a term or condition of an individuals' employment,

b.    submission to or rejection of such conduct by an individual is used as a basis for employment decisions affecting such individual, or

c.    such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment."

Sexual harassment refers to behavior inappropriate in the workplace because it is offensive, unwelcome behavior which would not occur but for the sex of the

offended person. Both sexual harassment, and accusations of sexual harassment, are disrupting to the work environment.

If you or a co-worker experiences what you believe to be sexual harassment or accusations of sexual harassment, report it to your immediate supervisor or the Human Resources Department.  SMART ALABAMA, LLC will investigate any employee, regardless of job position when such allegations are made.  Based on available information, SMART ALABAMA, LLC will take appropriate action and communicate on a need-to-know basis.

SMART Employee Handbook (Doc. # 18-3, Ex. 3, at 65).  This policy is in the Defendant's employee handbook, and it is posted on employee bulletin boards behind the reception desk near the production office area.  (Doc. # 18-8, ¶ 8).

Plaintiff received the employee handbook during general training, which was soon after she started working for Defendant.  (Doc. # 18-2, at 57).  She read the policy in the first few weeks of her employment, but she understood from the outset of her employment that sexual harassment was against company policy and that she could report sexual harassment if it occurred.  (*Id.* at 58-59).  Plaintiff did not receive training specifically for sexual harassment during general training or when she was employed by Defendant.  (Doc. # 18-10, at 84).  Managers receive annual training in Defendant's sexual harassment policy.[1]  (Doc. # 18-8, ¶ 8).

An employee could report harassment verbally or in writing.[2]  Dep. of Ruth Ryan

---

[1] It is not clear whether Maddox received the annual training prior to the period of alleged sexual harassment.  (Doc. # 18-10, at 83-84).

[2] This aspect of the policy was not in the employee handbook.

(Doc. # 18-9, at 44). Gary Sport ("Sport") was the Human Resources Manager at all relevant times. (Doc. # 18-8, ¶ 2). Ruth Ryan ("Ryan") is Employee Relations Manager at all relevant times. (Doc. # 18-9, at 16-17). The Human Resources group encompasses the Employee Relations group. Dep. of Gary Sport (Doc. # 18-10, at 7-8). Fran Hughes ("Hughes") did some work for the Human Resources Department, although her desk was in the production office area.[3]

### D. Termination letter from Maddox to Plaintiff

On January 30, 2006, Plaintiff found a letter addressed to her and written by Maddox. The letter, which was dated January 30, summarized what Maddox stated were deficiencies in Plaintiff's job performance and stated that her employment "from within the safety department" was terminated. Letter from Rance Maddox to Plaintiff (Doc. # 18-4, Ex. 15, at 11). The letter was on Plaintiff's desk in a "community pile" that contained work-related papers. (Doc. # 18-2, at 63-64). Maddox did not sign the letter or personally hand it to Plaintiff, and neither Maddox nor any other employee of Defendant verbally notified Plaintiff that she was terminated or that she needed to resign. (*Id.* at 62-65). Although the letter only referenced termination of her employment "from within the

---

[3] Hughes did some work for the Human Resources Department, and she told employees that she had an open door policy with respect to any problems or concerns. Therefore, the Court finds that there is sufficient evidence from which a reasonable jury could conclude that Hughes was a person who was designated by Defendant to receive complaints about sexual harassment. (Doc. # 18-2, at 188). Hughes testified that if she received a complaint of sexual harassment, she immediately would have informed the Human Resources Department of the complaint. (Doc. # 18-20, ¶ 7). Thus, it is reasonable that Plaintiff would have thought that Hughes was a person designated by Defendant to receive complaints about sexual harassment.

safety department," and not her employment with Defendant in general, Plaintiff felt like she would be terminated from her employment with Defendant. (*Id.* at 227-28). Plaintiff believed that Maddox had the authority to terminate her employment from Defendant, without the approval of someone in the Human Resources Department. (*Id.* at 64-65). Despite believing that the letter terminated her employment with Defendant, Plaintiff continued to come to work until February 7, 2006.

**E. Plaintiff's reporting of harassment**

**1. Meeting with Hughes and follow-up letter to Hughes and Sport**

In the middle of January, 2006,[4] Plaintiff met with Hughes and reported the following conduct by Maddox:

> He may come up from behind and wrap his arms around your arm or come up from behind and rub your arms this way or come up from the front and grab you on each side and just – he would invade your space by the way he held your arms to talk to you, not like in a gruff way but just like in a – you know, this is my space , this is your space, he would invade your space while he held you and pulled you towards him.

(Doc. # 18-2, at 182). The testimony provides little detail about what else Plaintiff told Hughes in this conversation. Plaintiff asked "for a form to fill out for harassment." Hughes stated that the company did not have such a form, and that Plaintiff could write

---

[4] It is not clear on what date this conversation occurred. The deposition testimony only says that this meeting occurred sometime before January 18, 2006. However, Plaintiff's response brief says that "Plaintiff first reported Rance Maddox's conduct to supervisory personnel in the middle of January 200[6]." (Doc. # 23, at 12). This first report refers to the meeting with Hughes. (Doc. # 18-2, at 183-84).

her complaints and submit the writing.  (*Id.* at 139, 184).

At least two weeks later, on February 2, 2006, Plaintiff wrote the complaints by hand in a letter to Hughes.  On or soon after February 2, Plaintiff typed the letter and gave two copies to Hughes, one of which was to be forwarded to Sport.[5]  (*Id.* at 186-87).  The typed version of the letter is not in the record, but the hand written draft is before the Court.  (Doc. # 18-4, Ex. 17).  In her deposition, Plaintiff stated that the letter contained "everything that [she] felt that was going on."[6]  (*Id.* at 184).  The letter references the "sexual harassment situation with Rance Maddox," but does not provide details about Maddox's conduct.  (Doc. # 18-4, Ex. 17, at 19).  Plaintiff wrote, "After I talked to you about what events have taken place, Rance Maddox has made my work environment to be a hostile one . . . ."  (*Id.*).  The letter mentions that Plaintiff requested a departmental transfer.  At the end of the letter, Plaintiff asked that she or Maddox be given a leave of absence.  (*Id.*).

### 2. Meeting with Sport and follow-up letter to Maddox and Sport

On January 18, 2006, Plaintiff met with Sport to discuss "some concerns that [she]

---

[5] Plaintiff does not know whether Sport ever received his copy of the typed letter.  (Doc. # 18-2, at 187).  Sport testified that he received a copy of the hand written draft, but not until after this litigation commenced.  (Doc. # 18-10, at 60).  Sport testified that on February 2, 2006, he was aware that Plaintiff wanted a departmental transfer, but not that she complained of sexual harassment.  (*Id.* at 62-63).

[6] Hughes denies that Plaintiff (1) complained to her about Maddox at any time, (2) asked her for a complaint form, and (3) gave her a letter of complaint.  Aff. of Fran Hughes (Doc. # 18-20, ¶¶ 7-8).  Because of the procedural posture of the case, the Court must for the purposes of this motion accept Plaintiff's testimony regarding her contact with Hughes about this matter.

had with [Maddox] and some problems that [she] was having within the office."[7]  (Doc. #

18-2, at 129).  Plaintiff told Sport that Maddox asked her whether her breasts were real

and what they felt like.[8]  (*Id.* at 217-18).  Plaintiff does not remember specifically what

else she told Sport, but she "went over everything that was making [her] feel

uncomfortable and that he [Maddox] didn't get his way, he turned into a grouch and that

he was making it miserable for [Plaintiff] because [she] wouldn't play along with him."

(*Id.* at 181).  Plaintiff requested to transfer out of the safety department.  Plaintiff's

Calendar (Doc. # 18-4, Ex. 14, at 5).

Sport asked her to write a letter to Maddox that addressed all of her complaints.

(Doc. # 18-2, at 129).  Sport said that he would talk to Maddox about Plaintiff's

complaints after Maddox received the letter.  (*Id.* at 131).  On January 18, Plaintiff typed

a letter to Maddox on a computer in the safety office.  (*Id.* at 132).  Only the first four

sentences of the letter are in the record, and they state only that Plaintiff has had "a couple

of hit and miss days of training," and that Plaintiff has "learned a lot" and is "still learning

every day."  (Doc. # 18-3, Ex. 11, at 110).  The rest of the letter appears to no longer

---

[7] In her response brief, Plaintiff claims that in "casual conversations" prior to January 18, 2006, she informed Sport that she was uncomfortable working around Maddox.  (Doc. # 23, ¶ 14).  However, Plaintiff's citations to her deposition do not support this assertion, and the Court finds no evidence to support it.

[8] Sport denies that Plaintiff reported any sexual harassment from Maddox, and he only recalls that Plaintiff told him that Maddox called her at home.  (Doc. # 18-8, ¶ 23).  Sport did not consider this to be a complaint about sexual harassment, and thus he did not conduct an investigation.

exist, and Plaintiff is not certain what happened to it.  (Doc. # 18-2, at 130).  Plaintiff

recounted the missing portions of the letter in her deposition:

> Q:    What else was contained in the letter? . . .
> A:    Well, that was just the start of it.  I was trying to be able to get my raise.  I
>       was trying to show, you know, in the letter, you know, I'm not going to
>       work for him, you know, I'm not that type of person.  He went on and on
>       and on various complaints, you know that -- you know this was my way to
>       voice what I felt, you know, how I felt.
> Q:    What other complaints do you recall being in the original [letter]?
> A:    The jokes that he made about women and this and that and the other and the
>       little comments and the way that he would invade your space and then, you
>       know, try to be all nice to you in an inappropriate way and then turn around
>       when you wouldn't go along with him and snap at you.  It's like Jekyll and
>       Hyde, either you play along or I'm not going to play nice.

(Doc. # 18-2, at 130-31).  The portion of the letter in the record does not mention

anything related to sexual harassment.  Plaintiff gave copies of the complete letter to

Maddox and Sport.  (Doc. # 18-2, at 130).

### 3. Meeting with Kwon

On January 30, 2006, the same day she found the termination letter, Plaintiff met

with Antoine Kwon, the director of the plant, for about thirty minutes.  (*Id.* at 196).

Plaintiff brought a copy of the termination letter for Kwon.  (*Id.* at 158).  In Plaintiff's

deposition, she recounted what she told Kwon at this meeting:

Q:    What specifically did you tell him during [the January 30, 2006] meeting?
A.    We went over the [termination] letter and I explained to him everything that had
      gone on over the period of time that I had worked there, everything.
Q:    Well, can you tell me more specifics than everything?
A:    About him calling all hours of the day and night, about him showing up where I
      eat, about him asking me out, about him touching me inappropriately, about him

13

telling me to just work with him and you know, everything about how I'd cry, about how I'd throw up, and how it's causing me problems at home.

(*Id.* at 196-97). Plaintiff stated that she went to Kwon because reporting to human resources (i.e., Hughes and Sport) "didn't do any good." (*Id.* at 197). According to Plaintiff, Kwon was "very upset" and told Plaintiff that he would find out what was going on. (*Id.* at 158).

### 4. Meetings with Ryan

On February 1 and 2, 2006, Plaintiff met with Ruth Ryan, Employee Relations Manager. (*Id.* at 138-39, 202-06). At the February 1 meeting, Plaintiff was vague about her complaints because Ryan's assistant was present. Plaintiff requested a transfer from the safety department at this meeting. (Doc. # 18-4, Ex. 14, at 6). At the February 2 meeting, Plaintiff made more specific complaints, which she recounted in her deposition:

> Q:    Tell me everything you told Ruth during [the February 2 meeting].
> A.    I told Ruth everything that was going on with Rance as far as doing things that made me feel uncomfortable and the comments that he had made and the way he had touched me inappropriately.
> Q:    What touches did you tell her about?
> A:    I don't know if I told her – I don't know which ones I told her other than just in general, you know, him touching me inappropriately . . . .
> Q:    What specific comments did you report to Ruth on the 2nd in the Washington room?
> A:    That the things he had said, the touching inappropriately, you know, the fact that it was causing me problems at home. If my husband found out, I was afraid of what he would do. He also worked at the plant. It was not a good situation. It was a ticking time bomb. You know, that's what was said. I'm not exactly sure which order or what extent but she knew what was going on.

(Doc. # 18-2, at 204-05). Plaintiff testified that she did not know whether Ryan investigated the alleged conduct. Ryan testified that she investigated only the shoulder touching incident, which, according to Ryan, was the only conduct that Plaintiff reported at the February 2 meeting or any other time.[9] Aff. of Ruth Ryan (Doc. # 18-7, ¶ 15).

On February 7, 2006, Plaintiff and her husband met with Ryan. (Doc. # 18-2, at 199). Ryan informed Plaintiff that she would be transferred to the production area of the plant, which is a part of the facility that Plaintiff wanted to avoid because she would see Maddox "every day." (*Id.*).[10] Plaintiff said that she would not accept the transfer. (*Id.* at 279).

After the conversation with Ryan, Plaintiff walked into the safety office, and Maddox told her that he was going to write her up for taking unauthorized overtime. (*Id.*). Plaintiff left the safety office, and she was upset. Ryan saw Plaintiff, and suggested

---

[9] According to Ryan, Plaintiff did not provide any details about the circumstances of the shoulder touching incident, but she identified one witness, Colinda Porter. Ryan investigated the incident and interviewed Porter. Porter stated that Maddox, Porter, and Plaintiff were working in the safety office, and Plaintiff was typing on her computer. Plaintiff said, "I did it! I finally did it!" Plaintiff explained that she had successfully entered a case in a log. Maddox walked up to Plaintiff's desk and put his hand on her shoulders and said, "Good job." They all laughed. (*Id.* ¶ 16). Ryan concluded that this incident did not involve sexual harassment. Ryan planned on discussing the matter further with Plaintiff, but she did not have the opportunity to do so because Plaintiff left the company on February 7, 2006. (*Id.* ¶ 17). Ryan reported her findings to Sport, who testified that this was the only incident of alleged sexual harassment of which he was aware. (Doc. # 18-8, ¶ 29).

[10] Ryan testified that Plaintiff would have worked "far away" from Maddox. (Doc. # 18-7, ¶ 20). Sport testified that Maddox did not spend a substantial amount of time in the production area and he would not have had one-on-one contact with employees. (Doc. # 18-8, ¶ 25).

that Plaintiff go to a doctor.  Plaintiff went to a doctor, and she did not return to work at a later date.  (*Id.*).

## F. Plaintiff's efforts to get a raise

Plaintiff made $9.00 an hour when she started in the production area, and she had the same pay rate in the safety department.[11]  (Doc. # 18-2, at 104-06, 162).  Plaintiff was eligible for a raise to $9.50 an hour after 30 days in the safety department.[12]  (*Id.* at 104).  To obtain the raise, she needed to make a request to her immediate supervisor, who was Maddox, and the supervisor would have "to give [her] a good report."  (*Id.* at 164).  In reference to the raise request, Maddox told Plaintiff to write it out, and then he would sign it.[13]  (*Id.* at 163).  Plaintiff wrote out the request and took it to Maddox, but she then "tore it up and threw it in the garbage" because she felt like Maddox wanted "certain

---

[11] Plaintiff's deposition testimony is not clear about how much she made when she worked in the safety department, and if her pay increased, when it did so.  On page 106, it states that she made $9.00 an hour.  On pages 161 and 162, she seems to say that her pay rate was $9.50 when her employment was terminated.

[12] In her deposition, Plaintiff was not clear when she was eligible for a raise.  (Doc. # 18-2, at 124, 163-64).  On page 124, she stated that she was eligible after 30 days.  On pages 163 and 164, she states that she was not clear whether it was 30, 60, or 90 days, and that she would have to look in the handbook.  The handbook does not discuss when employees are eligible for raises.  (Doc. # 18-3, Ex. 3).  Defendant did not provide any evidence on when she was eligible, other than to point to Plaintiff's confusion in deposition.  (Doc. # 25, ¶ 24).  Because the Court must resolve factual disputes in the light most favorable to Plaintiff, the Court will presume that she was eligible for a raise 30 days after transferring to the safety department.  Plaintiff began working in the safety department on November 14, 2005.  Therefore, she would have been eligible for a raise on December 14, 2005.

[13] It is not clear from Plaintiff's deposition and the briefs when Maddox said he would approve the written request or when Plaintiff brought the request to Maddox for his approval.

16

favors" in exchange for signing the raise request.  (*Id.*).

**G. Plaintiff's work schedule**

When Plaintiff started working in the safety department, her hours were Monday to Friday from 8:00 a.m. to 5:00 p.m.  (*Id.* at 111).  Soon after she started, she was informed that safety department employees would have to work on weekends because the plant was operating three shifts a day, seven days a week.  (*Id.* at 107-08).  Plaintiff understood that every safety department employee was expected to work on weekends.  (*Id.*).

**H. Procedural Background**

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission.  (Doc. # 18-4, Ex. 16, at 13).  On May 24, 2 006, Defendant received the charge.  (*Id.*).  On October 16, 2006, the EEOC issued a Dismissal and Notice of Rights, which gave Plaintiff the right to sue Defendant.[14]  (Doc. # 18-6, Ex. 21, at 1).  On December 8, 2006, Plaintiff commenced this suit and alleged that Defendant violated Title VII.

## V. DISCUSSION

Under Title VII of the Civil Rights Act of 1964, it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or

---

[14] The EEOC was "unable to conclude that the information obtained establishes violations of the statutes."  (Doc. # 18-6, Ex. 21, at 1).

national origin." 42 U.S.C. § 2000e-2(a)(1). The phrase "terms, conditions, or privileges of employment" includes within its scope a discriminatorily hostile or abusive environment, including sexual harassment. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1244 (11th Cir.1999) (en banc).

A plaintiff making a claim of sexual harassment under Title VII must prove four elements: "(1) that she belongs to a protected group; (2) that she has been subjected to unwelcome sexual harassment; (3) that the harassment was based on her sex; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that a basis for holding the employer liable exists." *Hulsey v. Pride Restaurants, LLC*, 367 F.3d 1238, 1244 (11th Cir. 2004) (citing *Mendoza*, 195 F.3d at 1245); *Johnson v. Booker T. Washington Broad. Serv.*, 234 F.3d 501, 508 n.7 (11th Cir. 2000)).

In *Hulsey*, the Eleventh Circuit outlined two theories under which an employer can be found vicariously liable: (1) "the employee's refusal to submit to a supervisor's sexual demands results in a tangible employment action being taken against her," or (2) "it is sufficiently severe and pervasive to effectively result in a change (sometimes referred to as a constructive change) in the terms and conditions of employment, even though the employee is not discharged, demoted, or reassigned." *Id.* at 1245-46. Courts refer to these two theories of liability as the tangible employment action theory and the hostile work environment theory. Plaintiff makes her Title VII claim under both theories.

18

**A. Tangible employment action**

"An employer is liable under Title VII if it (even unknowingly) permits a supervisor to take a tangible employment action against an employee because she refused to give in to his sexual overtures." *Id.* at 1245 (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)). The Supreme Court defined a tangible employment action as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761. However, a "demotion without change in pay, benefits, duties, or prestige" or a "reassignment to [a] more inconvenient job" are not tangible employment actions. *Id.* (citing *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 887 (6th Cir. 1996); *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir. 1994)). Under this theory, it is irrelevant whether the employee took advantage of the employer's system for reporting harassment. *Hulsey*, 367 F.3d at 1245.

There must be a causal link between the tangible employment action and the sexual harassment. *Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1300 (11th Cir. 2007). In *Frederick v. Sprint/United Management Co.*, the Plaintiff claimed that she was denied a promotion by the alleged harasser because she refused to give in to his requests for sexual favors. 246 F.3d 1305, 1312 (11th Cir. 2001). The plaintiff presented evidence that she was qualified for the position to which she sought promotion. *Id.* The defendant presented unrebutted evidence that the plaintiff was denied the promotion

because she had a history of attendance problems. *Id.* The Court affirmed a grant of summary judgment for the defendant with respect to the tangible employment action theory because there was no evidence of a causal link between the denial of the promotion and the sexual harassment. *Id.*

In this case, Plaintiff argues that Maddox "leveled tangible employment action against her by (1) failing to sign her request for a 30 day raise; (2) terminating her employment with his January 30 letter, and; (3) creating an untenable work schedule for her." (Doc. # 23, at 10).

### 1. Denial of a raise

The denial of a raise can be a tangible employment action. *Ellerth*, 524 U.S. at 761. The evidence, when viewed in the light most favorable to the Plaintiff, is sufficient to support her claim that Maddox denied her a raise based on her refusal to provide him with sexual favors. Plaintiff was eligible for a raise after 30 days in the safety department. Maddox let Plaintiff know that he would sign her written request for a raise. However, when Plaintiff went to Maddox to obtain his signature, she felt like she had to provide him sexual favors in exchange for the approval of her raise. Plaintiff did not give the written request to Maddox because she did not want to provide him with sexual favors. Defendant has argued, without evidence, that Plaintiff was not eligible for a raise until 90 days after she started working in the safety department, and Defendant has not presented any evidence to rebut Plaintiff's testimony that Maddox conditioned his

20

approval of her raise request on sexual favors.[15]  Therefore, Plaintiff's tangible

employment action claim based on the denial of a raise is due to survive summary

judgment.

### 2. Termination letter

In the termination letter that Plaintiff found on January 30, 2006, Maddox stated

that she would be terminated "from within the safety department" due to her job

performance.  Plaintiff argues that the letter constituted a tangible employment action

because she believed that it terminated her employment with Defendant.  It is undisputed

that Plaintiff continued to work in the safety department after finding the letter.

Even if the letter terminated Plaintiff from her employment with Defendant, and

not just her employment in the safety department, the Plaintiff has presented no evidence

to rebut the Defendant's evidence that Plaintiff was terminated for her poor job

performance.  The termination letter outlines several deficiencies in Plaintiff's job

performance.  It is undisputed that she failed to perform several job duties, and she did

not work on a weekend in the four weeks prior to January 30, 2006.  (Doc. # 18-4, Ex. 15,

at 11-12).  Sport testified that he was aware that Plaintiff was "not satisfactorily

performing her duties."  (Doc. # 18-8, ¶ 16).  On January 13, 2006, Maddox and Sport

met with Plaintiff to discuss her performance problems.  (Doc. # 18-2, at 123).  There is

---

[15] Defendant presented evidence that Plaintiff's job performance was unsatisfactory.
However, this evidence was used only to support the argument that there was no causal link
between Maddox's termination letter and the sexual harassment of Plaintiff.

sufficient undisputed evidence that Maddox wrote the termination letter because Plaintiff did not satisfactorily perform her job duties, and there is insufficient evidence of a causal link between the letter and the sexual harassment.  Therefore, the letter did not constitute a tangible employment action.

### 3. Untenable work schedule

Plaintiff argues that Maddox took a tangible employment action by making an untenable work schedule for her.  However, Plaintiff does not offer any evidence to rebut Defendant's evidence that her schedule was not significantly different than that of the other employees in the safety department.  (Doc. # 25, at 6) (citing (Doc. # 18-2, at 107-08, 110).  Plaintiff understood that every safety department employee was expected to work on weekends because the plant was operating three shifts a day, seven days a week.  (Doc. # 18-2, at 107-08).  There is no evidence that Maddox singled Plaintiff out for a more difficult work schedule for any reason, let alone because she refused to submit to his sexual advances.  Therefore, Plaintiff's work schedule cannot serve as a basis for a tangible employment action because she has not established a causal link between the sexual harassment and her untenable work schedule.

## B. Hostile work environment

### 1. Severity and pervasiveness of the conduct

Under the hostile work environment theory, an employer is liable if the sexual harassment was "sufficiently severe and pervasive to effectively result in a change

(sometimes referred to as a constructive change) in the terms and conditions of employment, even though the employee is not discharged, demoted, or reassigned." *Hulsey v. Pride Restaurants, LLC*, 367 F.3d 1238, 1245 (11th Cir. 2004). The work environment must be both "objectively and subjectively offensive, one that a reasonable person would find hostile and abusive, and one that the victim in fact did perceive to be so." *Id.* at 1247 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998); *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir.1999) (en banc)). Plaintiff's deposition testimony makes it clear that she subjectively perceived Maddox's conduct to be severe and pervasive.

To determine whether the harassment was objectively severe and pervasive, the Court must consider four factors: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct was physically threatening and humiliating or just a mere utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance." *Id.* at 1247-48 (citing *Faragher*, 524 U.S. at 787-88; *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 509 (11th Cir. 2000); *Mendoza*, 195 F.3d at 1246). A consideration of these factors should employ "a totality of the circumstances approach, instead of requiring proof of each factor individually." *Id.* at 1248 (citing *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir.2002)).

In *Johnson*, the Plaintiff and the harasser were co-hosts of a morning radio talk show. 234 F.3d at 505. The Eleventh Circuit found that fifteen instances of sexually

harassing conduct over four months satisfied the frequency element. *Id.* at 509. The Court found the following conduct to be severe and humiliating: "giving Johnson unwanted massages, standing so close to Johnson that his body parts touched her from behind, and pulling his pants tight to reveal the imprint of his private parts." *Id.* Finally, the Court found that the conduct interfered with the Plaintiff's work performance because she could not get along with the harasser when they were on the air together. *Id.*

In this case, when viewing the facts in the light most favorable to Plaintiff, the harassment was objectively severe and pervasive. Maddox touched and rubbed against Plaintiff frequently. He touched her on the breasts, arms, and hands. He rubbed her on the breasts, arms, and buttocks. This physical contact began on November 16, 2005, and it continued in December, 2005 and January, 2006. Maddox also made sexually harassing comments. He told Plaintiff, "I've got a real man for you." He said, while rubbing Plaintiff, that if she worked with him, he would get her a raise. He asked Plaintiff to go out for drinks, and that she did not have to worry about driving if they got "tore up" because they could get a room.

Maddox's conduct was more frequent than and at least as severe as the conduct of the harasser in *Johnson*. The instances of touching Plaintiff's breasts and buttocks were particularly severe. The Court finds sufficient evidence from which a reasonable jury could conclude that the conduct unreasonably interfered with Plaintiff's work performance because much of it occurred in the safety office, where Maddox and Plaintiff

24

primarily worked.  Therefore, the totality of the circumstances shows that the sexual

harassment of Plaintiff by Maddox was objectively severe and pervasive.

### 2. Availability of the *Faragher-Ellerth* defense

When faced with a claim of sexual harassment under the hostile work environment

theory, an employer can avoid liability with the *Faragher-Ellerth* defense, which requires

the employer to show two elements:  (1) "it exercised reasonable care to prevent and

correct promptly any sexually harassing behavior; and (2) the employee unreasonably

failed to take advantage of any preventive or corrective opportunities it provided."

*Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1303 (11th Cir. 2007) (citing

*Faragher v. City of Boca Raton*, 524 U.S. 775, 807-08 (1998); *Burlington Indus., Inc. v.

Ellerth*, 524 U.S. 742, 765 (1998)) (internal quotation marks omitted)).

### a)     Reasonable care to prevent and correct promptly any sexually harassing behavior

The first element consists of two prongs: (1) reasonable care to prevent sexual

harassment and (2) reasonable care to correct promptly sexual harassment.  *Frederick v.

Sprint/United Management Co.*, 246 F.3d 1305, 1313-14 (11th Cir. 2001).  With respect

to the first prong, an employer must "show that its sexual harassment policy was

effectively published, that it contained reasonable complaint procedures, and that it

contained no other fatal defect."  *Id.*  at 1314.  At a minimum, the policy must allow a

harassed employee to report harassment by a supervisor without having to report the

harassment first to the harassing supervisor.  *Madray v. Publix Supermarkets, Inc.*, 208

F.3d 1290, 1298 (11th Cir. 2000) (quoting *Faragher*, 524 U.S. at 806).

The Court finds sufficient evidence from which a reasonable jury could conclude that Defendant's sexual harassment policy was effective and was disseminated. The policy was in the employee handbook, which was distributed to all employees during training. Managers were also given annual training in the policy. The policy was posted on employee bulletin boards. Plaintiff was aware of the policy at all relevant times. The policy allowed an employee to make a complaint to either his or her direct supervisor or the Human Resources Department. Therefore, the policy satisfies the first prong of the first element of the defense.

With respect to the second prong, "an employer need not act instantaneously, but must act in a reasonably prompt manner to respond to the employee's complaint." *Frederick*, 246 F.3d at 1314. Plaintiff discussed Maddox's conduct with Fran Hughes sometime prior to January 18, 2006. The testimony indicates that in their conversation, Plaintiff told Hughes about Maddox's touching of her arms and invading of her space and asked for a form to complaint about "harassment." The company did not have a form, but Hughes informed Plaintiff that she simply could write her complaints and submit the writing, which was consistent with Ryan's testimony that the company accepted complaints verbally or in writing. At least fifteen days later, on or after February 2, 2006, Plaintiff submitted a written complaint that referenced "the sexual harassment situation with Rance Maddox." There is no evidence that Hughes investigated Plaintiff's

complaint between the meeting with Plaintiff and the time she received Plaintiff's letter. Under these circumstances, the Court finds that no reasonable jury could conclude that it was unreasonable for Hughes not to investigate Plaintiff's complaint until after February 2, 2006 because Plaintiff is the one who decided to submit the details of her complaint in writing and not verbally.

Plaintiff discussed Maddox's conduct with Sport on January 18, 2006. Sport was the Human Resources Manager, and thus was designated to receive complaints about sexual harassment. When viewing the facts in the light most favorable to Plaintiff, this conversation put Sport on notice about Maddox's sexual harassment of Plaintiff. Specifically, Plaintiff told Sport that Maddox asked her whether her breasts were real and what they felt like. Generally, Plaintiff told Sport "everything that was making [her] feel uncomfortable." Presumably, "everything" included the instances of touching and rubbing her breasts and other parts of her body. However, rather than investigate the complaint, as required by the anti-harassment policy, Sport asked Plaintiff to write a letter to Maddox that outlined her complaints. Sport said that he would talk to Maddox after Plaintiff wrote the letter.

Under these circumstances, Sport did not act with reasonable care to promptly investigate Plaintiff's allegations. Rather, Sport asked Plaintiff to write a letter to Maddox outlining her complaints, and said that he would talk to Maddox only after Plaintiff wrote this letter. Had Sport investigated Plaintiff's complaints by immediately

27

discussing them with Maddox and others in the safety department, he may have prevented

further harassment of Plaintiff by Maddox.  Therefore, Defendant has failed to satisfy the

second prong of the first element of the defense.  Because the defense is not available, the

Court will not discuss whether Plaintiff unreasonably failed to take advantage of

Defendant's policy.

## VI. CONCLUSION

Accordingly, it is hereby

ORDERED that Defendant's Motion for Summary Judgment is GRANTED IN

PART and DENIED IN PART.  To the extent that Plaintiff bases her Title VII claim on

the arguments that the termination letter and her work schedule were tangible

employment actions, her Title VII claim is DISMISSED WITH PREJUDICE.  To the

extent that Plaintiff bases her Title VII claim on the arguments that she was a victim of a

hostile work environment and the denial of a raise was a tangible employment action, her

Title VII claim shall proceed to trial.

Done on this the 25th day of February, 2008.

_____
                /s/ Mark E. Fuller
CHIEF UNITED STATES DISTRICT JUDGE

28

A copy of this checklist is available at the website for the USCA, 11th Circuit at www.ca11.uscourts.gov
Effective on April 9, 2006, the new fee to file an appeal will increase from $255.00 to $455.00.

## CIVIL APPEALS JURISDICTION CHECKLIST

1.    **Appealable Orders:** Courts of Appeals have jurisdiction conferred and strictly limited by statute:

   (a)    **Appeals from final orders pursuant to 28 U.S.C. § 1291:** Only final orders and judgments of district courts, or final orders of bankruptcy courts which have been appealed to and fully resolved by a district court under 28 U.S.C.§ 158, generally are appealable. A final decision is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." Pitney Bowes, Inc. v. Mestre, 701 F.2d 1 365, 1 368 ( 11th Ci r. 1 983). A magistrate judge's report and recommendation is not final and appealable until judgment thereon is entered by a district court judge. 28 U.S.C. § 636(c).

   (b)    **In cases involving multiple parties or multiple claims,** a judgment as to fewer than all parties or all claims is not a final, appealable decision unless the district court has certified the judgment for immediate review under Fed.R.Civ.P. 54(b). Williams v. Bishop, 732 F.2d 885, 885- 86 (11th Cir. 1984). A judg ment which resolves all issues except matters, such as attorneys' fees and costs, that are collateral to the merits, is immediately appealable. Budinich v. Becton Dickinson & Co., 486 U.S.196, 201, 108 S.Ct. 1717, 1721-22, 100 L .Ed.2d 178 (1988); LaChance v. Duffy's Draft House, Inc., 146 F.3d 832, 837 (11th Cir. 1998).

   (c)    **Appeals pursuant to 28 U.S.C. § 1292(a):** Appeals are permitted from orders "granting, continuing, modifying, refusing or dissolving injunctions or refusing to dissolve or modify injunctions . . ." and from "[i]nterlocutory decrees . . . determining the rights and liabilities of parties to admiralty cases in which appeals from final decrees are allowed." Interlocutory appeals from orders denying temporary restraining orders are not permitted.

   (d)    **Appeals pursuant to 28 U.S.C. § 1292(b) and Fed.R.App.P. 5**: The certification specified in 28 U.S.C. § 1292(b) must be obtained before a petition for permission to appeal is filed in the Court of Appeals. The district court's denial of a motion for certification is not itself appealable.

   (e)    **Appeals pursuant to judicially created exceptions to the finality rule:** Limited exceptions are discussed in cases including, but not limited to: Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546, 69S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949); Atlantic Fed. Sav. & Loan Ass'n v. Blythe Eastman Paine Webber, Inc., 890 F.2d 371, 376 (11th Cir. 1989); Gillespie v. United States Steel Corp., 379 U.S. 148, 157, 85 S.Ct. 308, 312, 13 L.Ed.2d 199 (1964).

                                                                    *Rev.: 4/04*

2.    **Time for Filing**: The timely filing of a notice of appeal is mandatory and jurisdictional. <u>Rinaldo v. Corbett</u>, 256 F.3d 1276, 1278 (11th Cir. 2001). In civil cases, Fed.R.App.P. 4(a) and (c) set the following time limits:

(a)    **Fed.R.App.P. 4(a)(1):** A notice of appeal in compliance with the requirements set forth in Fed.R.App.P. 3 must be filed in the district court within 30 days after the entry of the order or judgment appealed from. However, if the United States or an officer or agency thereof is a party, the notice of appeal must be filed in the district court within 60 days after such entry. **THE NOTICE MUST BE RECEIVED AND FILED IN THE DISTRICT COURT NO LATER THAN THE LAST DAY OF THE APPEAL PERIOD – no additional days are provided for mailing.** Special filing provisions for inmates are discussed below.

(b)    **Fed.R.App.P. 4(a)(3):** "If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later."

(c)    **Fed.R.App.P. 4(a)(4):** If any party makes a timely motion in the district court under the Federal Rules of Civil Procedure of a type specified in this rule, the time for appeal for all parties runs from the date of entry of the order disposing of the last such timely filed motion.

(d)    **Fed.R.App.P. 4(a)(5) and 4(a)(6):** Under certain limited circumstances, the district court may extend the time to file a notice of appeal. Under Rule 4(a)(5), the time may be extended if a motion for an extension is filed within 30 days after expiration of the time otherwise provided to file a notice of appeal, upon a showing of excusable neglect or good cause. Under Rule 4(a)(6), the time may be extended if the district court finds upon motion that a party did not timely receive notice of the entry of the judgment or order, and that no party would be prejudiced by an extension.

(e)    **Fed.R.App.P. 4(c):** If an inmate confined to an institution files a notice of appeal in either a civil case or a criminal case, the notice of appeal is timely if it is deposited in the institution's internal mail system on or before the last day for filing. Timely filing may be shown by a declaration in compliance with 28 U.S.C. § 1746 or a notarized statement, either of which must set forth the date of deposit and state that first-class postage has been prepaid.

3.    **Format of the notice of appeal:** Form 1, Appendix of Forms to the Federal Rules of Appellate Procedure, is a suitable format. <u>See</u> also Fed.R.App.P. 3(c). A <u>pro se</u> notice of appeal must be signed by the appellant.

4.    **Effect of a notice of appeal:** A district court loses jurisdiction (authority) to act after the filing of a timely notice of appeal, except for actions in aid of appellate jurisdiction or to rule on a timely motion of the type specified in Fed.R.App.P. 4(a)(4).